IN THE UNITED STATES DISTRICT COURT FOR

**FILED**

THE WESTERN DISTRICT OF TEXAS

JUL 0 6 1999

WACO DIVISION

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | W99-73M BY_____ |
| | ) | DEPUTY CLERK |
| Plaintiff | ) | Preliminary and |
| | ) | Detention |
| vs. | ) | |
| | ) | |
| CHRISTOPHER ANDRE VIALVA and | ) | June 24, 1999 |
| BRANDON BERNARD | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| _____ | ) | |

A p p e a r a n c e s:

    For the Plaintiff:   Bill Johnston
                              Assistant U.S. Attorney
                              700 East San Antonio, #200
                              Waco, Texas

    For the Defendant,  Stanley Schwieger
      Chris Vilva:        Attorney at Law
                              P. O. Box 975
                              Waco, Texas  76703

    For the Defendant,  Russell Hunt, Sr.
      Brandon Bernard:   Attorney at Law
                              Waco, Texas

    Transcriber:          Ernest C. Swanson
                                Federal Transcribers of El Paso
                                10125 Palmetto Drive
                                El Paso, Texas  79925

      The above-styled and numbered cause came on for a

detention hearing on June 24, 1999, before the Honorable

Dennis G. Green, Magistrate Presiding, in the United States

Court House, Waco, Texas.

1

2

3                          <u>I  N  D  E  X</u>

4

5    <u>DANIEL W. CHADWICK:</u>

6      Direct Examination by Mr. Johnston.......... 3
       Cross Examination by Mr. Hunt................ 20

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     THE COURT:  Be seated, please.

2    THE CLERK:   W99-73M, the United States of America

3 vs Christopher Andre Vialva, Defendant Number One, and

4 Brandon Bernard, Defendant Number Two.

5     MR. JOHNSTON:  Bill Johnston for the United States.

6     MR. SCHWIEGER:  Stan Schwieger for Defendant Number

7 One, Your Honor.

8     MR. HUNT:  Russell Hunt for Defendant Number Two,

9 Your Honor.

10    THE COURT:  Both sides ready to proceed?

11    MR. JOHNSTON:  We are, Your Honor.

12    MR. SCHWIEGER:   Yes, Your Honor.

13    MR. HUNT:  Yes, sir.

14    THE COURT:   Go ahead and call your first witness.

15    MR. JOHNSTON:  Yes, Your Honor.  We'll call Special

16 Agent Chadwick.  As we do, we'd ask the Court to take

17 judicial notice of the cover sheet of the complaint and the

18 attached affidavit that are on file, for the limited purpose

19 of this hearing.

20    THE COURT:  Any objection, Mr. Hunt?

21    MR. HUNT:  None, Your Honor.

22    THE COURT:  All right.

23

24

25

1                    DANIEL W. CHADWICK, PLAINTIFF'S WITNESS, SWORN,

2                    DIRECT EXAMINATION,

3    By Mr. Johnston:

4    Q.  Please state your name and how you're employed.

5    A.  Daniel W. Chadwick.  I'm a Special Agent with the Federal

6    Bureau of Investigation.

7    Q.  How many years have you been with the FBI?

8    A.  Over ten years.

9    Q.  And how many years have you been in law enforcement

10   altogether?

11   A.  Over 13.

12   Q.  As a part of your function with the FBI, among others,

13   can you state whether or not you have primary responsibility

14   for the Waco FBI office in dealing with criminal activity at

15   Fort Hood, Texas?

16   A.  Yes, sir; I do.

17   Q.  Do you have enough experience to know, experience with

18   Fort Hood to know whether or not it is a base that is mostly

19   exclusive federal jurisdiction?

20   A.  Yes, sir; I do.

21   Q.  And is it?

22   A.  Yes, sir.

23   Q.  Can you state the relative size of Fort Hood, just for

24   the record, in terms of -- compared to other bases and so

25   forth?

1    A.  It's the second largest post in the United States.

2    Q.  Okay.  And in connection with that, are there certain

3    boundaries and markers and maps that aid you in knowing what

4    is and what is not Fort Hood territory?

5    A.  Yes, sir.

6    Q.  And is there an area which is a part of Fort Hood known

7    as Blora, which is the Belton Lake recreation area?

8    A.  Yes, sir.

9    Q.  I would ask you then if you received some sort of call or

10   notification that something rather serious had occurred on

11   Fort Hood on June 21st, 1999?

12   A.  Yes, sir, I received a call at approximately 11:30 or so

13   that night.

14   Q.  What was the essence of the call and what did you do?

15   A.  That they had discovered a car that had been burned, and

16   that there were bodies in the trunk.  And at that time, I

17   went ahead and got ready and headed out to Fort Hood.

18   Q.  Where did you arrive and go to when you got to Fort Hood?

19   A.  I went to the Criminal Investigative Divisions office

20   located there on Fort Hood.

21   Q.  What was the summary of what you were told as you

22   arrived, in terms of what they had found?

23   A.  Okay.  They had the burned-out vehicle that was located

24   on Fort Hood that contained two bodies in the trunk, and that

25   there was a vehicle that had become stuck in the mud a short

Chadwick - Direct by Mr. Johnston.                              5

1    distance from this burned-out vehicle, and that there were

2    four subjects that were associated with that vehicle.

3    Q.  That were found there?

4    A.  Yes, sir; that were found there.

5    Q.  In connection with the questions that I'll ask you over

6    the next few minutes about the case, I would ask you this

7    predicate question:  Is the investigation continuing?

8    A.  Yes, sir; it is.

9    Q.  Can you state whether or not there is much more work to

10   be done?

11   A.  Yes, sir.

12   Q.  Is it possible that some of the answers you give will be

13   either modified or expanded upon in the days and weeks to

14   come?

15   A.  Yes, sir; it would be expected.

16   Q.  Are there even folks down in the Killeen area now working

17   vigorously on this?

18   A.  Yes, sir.

19   Q.  Rather than asking you sort of from the unknown first

20   moments on, I'll ask you, based on what you know now --  And

21   what you know now, is it correct that that's based on a

22   number of interviews you and others have done?

23   A.  Yes, sir.

24   Q.  Can you state whether or not you or someone advised all

25   four of those subjects that were found near that car stuck in

Chadwick - Direct by Mr. Johnston.                                    6

1   the mud of their rights?

2   A.   Yes, sir.

3   Q.   Did you or others try to speak to all four?

4   A.   Yes, sir.

5   Q.   And did three of the four speak with you in varying

6   details?

7   A.   Yes, sir.

8   Q.   And is it correct --  Who is the one that didn't speak

9   with you in any detail?

10  A.   To me or to any other investigator was Chris Vialva.

11  Q.   Otherwise, did you get, first of all, from the other

12  three, and then from citizens and other witnesses, a

13  presentation more or less of what had happened?  Obviously

14  there's more to go.  Is that correct, sir?

15  A.   Yes, sir.

16  Q.   Now, to get specific.  Did you speak with Terry Brown and

17  Brandon Bernard to know what they did in connection with the

18  two Chris's on the day in question?

19  A.   Yes, sir; I did.

20          MR. JOHNSTON:  Your Honor, may I just stop here.  I

21  want to make sure I'm covering something.  Your Honor,

22  throughout the testimony, both of mine and possible cross

23  examination, we'll be mentioning the names of four

24  individuals.  And so the record is complete, we'll be using

25  their names.

Chadwick - Direct by Mr. Johnston.                                    7

1          But I would ask the Court to admonish, if the Court

2    would, the gallery, that the names, which I'll state now of

3    Chris Lewis and Terry Brown are the names of juveniles,

4    which, stating for clarity of the record, but otherwise

5    should not be divulged publicly.

6          THE COURT:    Federal law prohibits the divulging

7    of the names of a juvenile or the photographing of a

8    juvenile.  So if there are any members of the press in here,

9    you're not to do that.  If the names are inadvertently

10   mentioned or mentioned directly, as Mr. Johnston has done,

11   you're not to mention those in your news articles.  You can

12   refer to them as juveniles 1 and 2, or however you want to

13   identify them, but you're not to identify them by name.

14         Go ahead, Mr. Johnston.

15   Q.  Thank you, Your Honor.  Henceforth, even for the record,

16   since I've mentioned the names once, I'll use initials TB and

17   you'll know who I'm speaking of, and the initials CL, and

18   you'll know who I'm speaking of, is that correct?

19   A.  Yes, sir.

20   Q.  All right.  From TB and CL, who are male juveniles, did

21   you learn, during the day or late afternoon of June 21st,

22   1999, what they were all doing?

23   A.  Yes, sir.

24   Q.  At some point, was there some decision to do something on

25   the part of all four individuals?

Chadwick - Direct by Mr. Johnston.

1    A.  Yes, sir.

2    Q.  And can you describe what each one did in the late

3    afternoon, I guess, of June 21st, '99?

4    A.  Starting with the ride?

5    Q.  Yes, getting a ride to somewhere.

6    A.  Okay.  At some time, approximately early afternoon, Mr.

7    Bernard and TB gave Chris Vialva and CL a ride to the IGA,

8    which I believe is a store, a regular store-type building

9    with the purpose of Chris Vialva and CL robbing somebody.

10   Q.  Okay.  Was the intention that, according to what you're

11   saying, CL and Chris Vialva, was their purpose in robbing

12   someone made known to TB and to Mr. Bernard?

13   A.  Yes, sir.

14   Q.  So what did Mr. Bernard and TB then do?  Did they carry

15   them somewhere?

16   A.  They carried them to that location and dropped them off.

17   Q.  All right.  Now, you know from CL and others what

18   transpired thereafter.  I would ask you to pick up the story

19   right then.  They were dropped off in the area of a little

20   shopping center in Killeen by TB and by Mr. Bernard.  What

21   happened then?

22   A.  Okay.  CL advised that they had noticed a couple out by a

23   pay phone at a Mickey's Convenience Store, and advised that

24   Chris Vialva walked up to them and asked them for a ride.

25   Once Chris Vialva and CL got into the victim's car, Chris

1    Vialva then pulled a gun on them and directed them to some

2    type of remote, slightly remote wooded area, which at that

3    point he put the two victims inside the trunk of the car.

4    Q.   When you say "he", who is he?

5    A.   Chris Vialva.

6    Q.   Do you know whether or not at that point there were

7    firearms involved in brandishing or otherwise?

8    A.   Yes, sir.

9    Q.   By whom and what were they?

10   A.   Chris Vialva is the one that had drawn a gun and that's

11   what he used to demonstrate that he wanted to take them to

12   this remote area.

13   Q.   So the gun was displayed even before they were put in the

14   trunk?

15   A.   Yes, sir.

16   Q.   And then were they, at gun point, ordered into the trunk

17   of their own vehicle?

18   A.   Yes, sir.

19   Q.   Would you please state what happened then?

20   A.   Okay.  It's a little sketchy.  It appears that they were

21   then driven around some of the areas in Killeen, and then

22   even over to the Coppers Cove area where it was either a

23   money card or an ATM-type card, trying to get cash, using

24   that, over in the Coppers Cove area.

25   Q.   All right.  And whose credit or debit card were CL and

1    Chris Vialva trying to use?

2    A.   The victims' debit card.

3    Q.   All right.  Through your investigation with some help

4    from the Secret Service in terms of pulling records, did you

5    learn that there was a convenience store where that card was

6    attempted to be used?  Was there some record of it?

7    A.   Yes, sir.

8    Q.   What sort of time period are you speaking of that the

9    victims were actually in the trunk while this car was being

10   driven to Killeen, Coppers Cove and elsewhere?

11   A.   To my knowledge as of right now, it appears that it was

12   at least a period of three or four or more hours that this

13   was going on.

14   Q.   During that time, from CL or others, do you know whether

15   or not the victims were crying out, were asking for help or

16   trying to negotiate their way out of the trunk?

17   A.   Yes, sir, they were constantly pleading to be let out,

18   just to let them go.  That was pretty much constant where it

19   even appears other people may have heard that.

20   Q.   You had mentioned at the outset of this that TB and the

21   adult, Mr. Bernard here, dropped the other two off and they

22   said they were going to rob someone.  At some point, did they

23   get back together with this stolen vehicle with the victims

24   in the trunk and TB and Mr. Bernard?

25   A.   Yes, sir, they did link back up.

Chadwick - Direct by Mr. Johnston.                    11

1    Q.   About when and where, if you know?

2    A.   As far as a direct time, it's going to be later on in the

3    evening.   TB was staying at an individual's house by the name

4    of Billy.   It's going to be in the general vicinity of

5    Billy's house is where they linked back up.

6    Q.   In Killeen, you believe or another town?

7    A.   Killeen, Texas.

8    Q.   At this point, were the four together or separate?

9    A.   The four were pretty much together at this point.

10   Q.   Did one of the four cause the four to get back together?

11   In other words, how did this come about that you had two,

12   according to your testimony, in the stolen car and you had

13   two that dropped them off?   How did they get back together

14   and for what purpose, if they said?

15   A.   From what I understand, Chris Vialva had made a call to

16   TB and made the statement that "we need some help.  We've got

17   a situation where we need some help."  They then went through

18   the process of linking back up together, CL, Chris Vialva and

19   the victims' car linked back up with Bernard and TB in

20   Bernard's car for the purpose of providing whatever help that

21   they were needing, which became apparent a little bit later

22   on.

23   Q.   All right.   In addition to the help in performing some

24   act, was it a get away car so to speak?

25   A.   Yes, sir.

1    Q.  Now, in connection with this time frame after they got

2    together, can you state whether or not a discussion then

3    ensued about a plan that went together with the robbery

4    itself, a plan to do something else?

5    A.  Yes, sir.

6    Q.  Tell us about that discussion.

7    A.  Okay.  A discussion came about on what to do with the

8    vehicle.  And then there was some discussion about the

9    victims.  The main concern was with the vehicle.  Chris

10   Vialva was very concerned because he felt like his prints

11   were all over the vehicle.  Within this discussion, it came

12   up about the need to go ahead and burn the car rather than

13   just leave it somewhere.

14   Q.  Was there some direction given or statement made about

15   some act to burn the car, some help to turn the car?

16   A.  Yes.

17   Q.  What was said and done?

18   A.  As far as --

19   Q.  Getting something to help burn the car.

20   A.  All right, yeah.  Chris Vialva had directed Bernard and

21   TB to obtain some type of, either gas -- I think specifically

22   he asked them to obtain gas to do this.  Once TB and Bernard

23   arrived at the store, they determined that the best thing

24   that they could afford to get was going to be lighter fluid.

25   Q.  Can you state whether or not it was made known to these

Chadwick - Direct by Mr. Johnston.

1 two, to TB and to Bernard, that the accelerant that they

2 might buy, if they did, was to burn this car.  Was it made

3 known?

4 A.  Yes.  That's the discussion that was going around, and

5 they knew that they were going to buy this to burn the car.

6 Q.  Bernard, do you see him in Court?

7 A.  Yes, I do.

8 Q.  Would you point him out, please.

9 A.  He's sitting on the right-hand side of the two

10 defendants.

11 Q.  Right.  Did you advise him of his constitutional and

12 statutory rights concerning self-incrimination, you or

13 someone?

14 A.  Yes, sir.

15 Q.  After being so advised, and now talking about this issue

16 of the accelerant, did he make a statement to you about his

17 role in that?

18 A.  Yes, sir.  He advised me that he was the one that had

19 purchased the lighter fluid from the Mickey Store.

20 Q.  Do you know where he got the money, according to him?

21 A.  He didn't really say where he got the money.  I learned

22 from somebody else that --

23 Q.  One of the other defendants?

24 A.  One of the other defendants, that Chris Vialva had given

25 TB the money, and that TB then turned the money over to Mr.

Chadwick - Direct by Mr. Johnston.

14

1   Bernard.

2   Q.  All right.  Is there some evidence of the purchase of a

3   couple of cans of lighter fluid in Killeen or Coppers Cove or

4   some place?

5   A.  Yes, sir.  Some investigators have a copy of a cash

6   register receipt showing the purchase of two cans of lighter

7   fluid.

8   Q.  On the date and in the time frame that we're talking

9   about --

10  A.  On the date and the time frame that we're looking at.

11  Q.  What happened after the lighter fluid was purchased by

12  the two?

13  A.  They then -- it's unsure if they drove around a little

14  bit more, but they basically started heading out towards

15  where this remote area is in Fort Hood with both cars, the

16  get-away car and then the victims' car, and went to the

17  remote area, where at that point, Chris Vialva drove the car

18  up --

19  Q.  When you say "the car", do you mean the victims' car?

20  A.  The victims' car.  He was driving the victims' car.  He

21  drove the victims' car up this -- you really wouldn't call it

22  a road.  It's kind of like a side passage off of another

23  gravel-type road.  And that's where they then stopped the

24  vehicle.  Then at that time they proceeded to go ahead and

25  start pouring this lighter fluid over different portions

Chadwick - Direct by Mr. Johnston.

1    inside the car and over different portions of the car.

2    Q.  Where were the victims?

3    A.  The victims were still in the trunk.

4    Q.  At this point in that remote area, according to CL and

5    possibly others, did the victims begin some very specific

6    requests and discussion from inside the trunk?

7    A.  Yes.  The victims were asking, "Can you see the bible in

8    the car?  Would you please get the bible in the car..."

9           MR. JOHNSTON:  May I approach the witness?

10          THE COURT:  Yes, sir.

11   Q.  If you need to refer to a statement, CL, I'd ask you to

12   do so, but I'd ask you to continue your answer.

13   A.  Okay.  The female victim asked if they saw the bible on

14   the back seat of the car.  CL said yes.  She asked CL if he

15   was a Christian.  And he said no, that he used to go to

16   church.  And she specifically asked him to read a certain

17   paragraph out of Isaiah which he started reading to her.

18   Then she was telling him that that paragraph is telling him

19   what God wants him to do about this situation.  Something to

20   the effect, "thou shall not kill."

21   Q.  Were the victims trying very hard to keep the attention

22   of these fellows?

23   A.  Yes.

24   Q.  Talking and beating on the trunk?

25   A.  Yes.  Yes, sir.

Chadwick - Direct by Mr. Johnston.                              16

1  Q.  And did Mr. Vialva make a response, sir?

2  A.  While he was pouring some of the lighter fluid on the

3  car, they're still beating on the trunk and he said, "Bitch,

4  quit knocking on the trunk.  I'm going to let you out."

5  Q.  Mr. Vialva said this?

6  A.  Mr. Vialva said this.

7  Q.  What did Mr Vialva then do?

8  A.  Shortly after this point, the trunk was opened up and Mr.

9  Vialva shot both victims.

10 Q.  You've talked to CL?

11 A.  Yes, sir.

12 Q.  You've talked to TB?

13 A.  Yes, sir.

14 Q.  You've talked to Mr. Bernard here?

15 A.  Yes, sir.

16 Q.  What have all three told you about who fired the deadly

17 shots?

18 A.  Chris Vialva.

19 Q.  After the victims were shot, was the trunk apparently

20 shut back, sir, or do you know?

21 A.  To my knowledge, the trunk was shut back.

22 Q.  And what happened then?

23 A.  Then they lit the lighter fluid, which started the car

24 burning.  And then they departed.

25 Q.  Was Stacy Bagley the female victim?

Chadwick - Direct by Mr. Johnston.                                                17

A.  Yes, sir.

Q.  And her husband, Todd?

A.  Yes, sir.

Q.  Did the medical examiner find that she had, in Dallas, some sort of bullet wound to the face?

A.  Yes, sir.

Q.  Not the brain but the face?

A.  From what I understand, between the nose and the mouth is where it entered.

Q.  What else did the medical examiner find in looking at her closely in the upper body?

A.  From what I understand, they found soot in the throat area.

Q.  And what conclusion did he say --

A.  That she was still alive when the car was burning.

Q.  The medical examiner or the preliminary information about Mr. Todd Bagley, where was his injury, sir?

A.  To my knowledge, I believe it was the side of the head.

Q.  What did the four defendants try to do then after the shooting and the fire started?

A.  Then they tried to get into Bernard's car and then leave the area.  In the process of attempting to leave the area, the car became stuck in the mud.

Q.  Can you state whether or not, through happenstance or otherwise, maybe a citizen or some other person, came by

Chadwick - Direct by Mr. Johnston.

1  about that time?

2  A.  Yes, sir.

3  Q.  A couple of individuals had stopped to see if they needed

4  help in getting the car unstuck.  In the process of pulling

5  up and asking them for help, they noticed that the four

6  subjects were like taking their clothes off, or exchanging

7  maybe shirts and were acting in a pretty agitated manner, and

8  that people were taking things out of the car and throwing

9  them off into the woods.

10  Q.  What are the things found in the woods that apparently

11  had been thrown there by somebody?

12  A.  Yes, sir, there was.

13  Q.  For instance, what was found in the woods near the car?

14  A.  A 40 caliber pistol, which we believe to be the murder

15  weapon, a 22 caliber pistol, some lighter fluid cans, I

16  believe some article of clothing, the victims' ID's were

17  found in the general area.  And from what I understand, even

18  one of the subject's ID's was found in the wooded area.

19  Q.  The citizen that saw this activity you described after he

20  stopped and tried to help them, did he have some familiarity

21  with some of the defendants?

22  A.  Yes, sir.  One of them --

23  Q.  One of the citizens or --

24  A.  One of the citizens had familiarity with at least three

25  of the individuals that were with this car.

Chadwick - Direct by Mr. Johnston.                    19

1  Q.  Had seen them before?

2  A.  Had seen them before and knew of them.

3  Q.  Of the ones he knew and was somewhat familiar with the

4  way they looked and so forth, can you state whether these two

5  are two of them?  These two defendants.

6  A.  Yes, sir.

7  Q.  Do you have evidence that these two defendants before the

8  Court today are members of any sort of organized criminal

9  activity or gang?

10  A.  Yes.  There's indications that they're associated with a

11  gang that's located in the Killeen area.

12  Q.  What sort of information do you have about their

13  involvement and the activity of the gang, if any?

14  A.  I'm aware that they're in a gang database that's

15  maintained by the Killeen Police Department.

16  Q.  Do you know whether there's any evidence of other

17  criminal activity involving these defendants that may be

18  gang-related?

19  A.  Yes, sir.  There's some stuff that being made known.  It

20  appears that Chris Vialva, for sure, or at least, and

21  possibly some of the others, were involved in another type of

22  violent act that's related with gang-type activity.

23  Q.  Recently, sir?

24  A.  Yes, sir.  Recently.

25  Q.  Did you or others have an opportunity --  Stacy Bagley,

1    who's her daddy?  Who's her father?

2    A.  Charles Woodard.

3    Q.  Is law enforcement familiar with him?

4    A.  Yes, sir.

5    Q.  Why?

6    A.  It's my understanding that he's a retired Killeen Police

7    Department Officer, and he is also now working for Internal

8    Affairs for the Texas Department of Corrections at the Hughes

9    unit in Gatesville.

10   Q.  Did you or someone speak with him and the family to learn

11   about where Stacy Bagley and Todd Bagley had come from in

12   that vehicle?

13   A.  Yes, sir.  They came from Iowa.

14   Q.  All right.  And although it seems very technical, had

15   that vehicle --  Was it even registered in Iowa?

16   A.  Yes, sir.  It had Iowa license plates.

17   Q.  To the extent you can today, can you say it crossed state

18   lines before it came to Texas and had recently done so?

19   A.  Yes, sir.

20          MR. JOHNSTON:  I pass the witness at this time.

21          MR. SCHWIEGER:  I have no questions, Your Honor.

22          THE COURT:  Mr. Hunt.

23                  CROSS EXAMINATION,

24   By Mr. Hunt:

25   Q.  Agent, I'm Russ Hunt, and I represent Mr. Bernard.  I

Chadwick - Cross by Mr. Hunt.

1  have a few questions that I want to ask you because there are

2  some things that I didn't understand, and I want to make sure

3  that you can help me with them.  You said that the

4  investigation was continuing, that there was more work to be

5  done.  Can you give me a summary of what kind of work needs

6  to be done?  You said more work needed to be done.

7  A.  A summary of --

8  Q.  Yeah, can you tell me in general terms what that means?

9  A.  A lot of interviews.  We've got a lot of lab work that

10  we're waiting to get back.  I mean, there's quite extensive

11  amounts of evidence that has been recovered from both the

12  crime scene and from other areas that we have to process and

13  determine whether it's relevant or not.

14  Q.  Okay.  I'm going to try not to be confusing, but I'll try

15  to do this chronologically to follow your testimony.  You

16  said that this episode started out in the early afternoon of

17  the 21st, is that correct?

18  A.  That's to the best of my knowledge.  Some time during the

19  early afternoon is when this would have started, yes, sir.

20  Q.  Okay.  And you said that CV and CL went to the IGA Market

21  in order to rob somebody.

22  A.  No, sir.

23  Q.  That's not correct?

24  A.  I thought you said TB.

25  Q.  I'm calling Vialva CV.

Chadwick - Cross by Mr. Hunt.                                    22

1    A.  All right.

2    Q.  Again, I don't mean to be confusing.

3    A.  I haven't referred to him with initials.  He's an adult.

4    Q.  Exactly.  They went to IGA in order to rob someone, is

5    that correct?

6    A.  Yes, sir.

7    Q.  Can you tell me the source of your information for saying

8    that?

9    A.  Yes, sir.  Bernard.

10   Q.  Okay.  Then some time after that --  Okay.  So that then

11   Bernard and TB carried them to the IGA.  Was it Bernard that

12   was driving in the car?

13   A.  Yes, sir.

14   Q.  During your testimony, you've made reference to two guns,

15   one a 40 and the other one a 22.  Who had the 22?

16   A.  To my knowledge, as far as when the 22 was being ditched,

17   it was in the possession of Chris Vialva when it was pitched

18   into the woods.  We're working on other information that

19   might come about that CL might have been carrying that 22,

20   but it has not been firmed out yet.

21   Q.  Is there anything that would indicate to you so far that

22   Mr. Bernard at any point had either of those two guns?

23   A.  No, sir.

24   Q.  You said that during the time that the victims were being

25   driven around, that there was apparently an attempt to use

Chadwick - Cross by Mr. Hunt.                                    23

1   their credit cards, is that correct?

2   A.  Some type of money, ATM cash, check card, or whatever.

3   Yes, sir.

4   Q.  Do you know if there are any photographs from any of

5   those ATM machines to show who was using it or who was

6   attempting to use it?

7   A.  No, sir, not to my knowledge as of yet.  I mean, a lot of

8   this stuff is still being processed and being gone through.

9   Q.  Certainly.  So something like that might develop, but as

10  of right now, you're not aware of it?

11  A.  Well, I mean, with as many cameras as we have, as far as

12  the different areas that we're looking at, I cannot

13  specifically recall if it was the fact that that particular

14  ATM might not have had a camera or they're still trying to

15  review the tape.  I just couldn't say for sure.

16  Q.  Okay.  When the victims were then taken out into the

17  woods, this is after the credit cards had been used, can you

18  tell me who was in which car?

19  A.  When they were being taken to the woods?

20  Q.  Yes, sir.

21  A.  Chris Vialva and CL were in the victims' car.  Bernard

22  and TB were in Bernard's car.

23  Q.  I assume that Bernard was driving his own car?

24            MR. JOHNSTON:  Excuse me.  I'm going to object,

25  only for clarification both for you and Mr. Hunt and ask

1   whether or not we mean into the woods the final time or just

2   to have them placed in the trunk.

3   Q.  Okay, let's split that up because --  Let's go first to

4   having them placed in the trunk.  Did that involve just the

5   victims' car --

6   A.  I'm sorry.  To my knowledge, that was only the victims'

7   car.  Chris Vialva and CL were the ones that were being given

8   a ride by the victims.  They're the ones that directed them

9   to this area.  I have no information that Bernard's car was

10  at that location.

11  Q.  Okay.  Then the second time the two cars are together is

12  when there's two cars going out into the woods to the place

13  where the car was ultimately found, is that correct?

14  A.  Yes, sir.

15  Q.  Can you tell me --  You've already told me that Vialva

16  was driving one and Bernard is driving the second one.  Do

17  you know which one was in the lead?  Was Vialva's car in the

18  lead and Bernard following him?  Or do you know?

19  A.  Going on what I'm recalling, the way I remember it was

20  that Chris Vialva was in the lead car as they were heading

21  out there, and that Bernard was following in his car.

22  Q.  Okay.  Do you have any information that would indicate

23  that Bernard knew that Vialva's plan was to kidnap anyone or

24  to take them out and kill them prior to the cars being out in

25  the woods on Fort Hood where the one car was burned?

Chadwick - Cross by Mr. Hunt.

1   A.  My indication is that Bernard knew that they were going

2   to rob somebody.

3   Q.  But not that he knew that they were going to kidnap

4   anyone?

5   A.  I have no information that states that.

6   Q.  And not that he knew they were going to kill anyone?

7   A.  Whether or not he could surmise it or whether he had

8   direct knowledge that that's what was going to end up

9   happening?

10  Q.  Yes.

11  A.  I mean, I don't think anybody had stated "we're going to

12  go kill them."

13  Q.  Okay.  Apparently then the pleading that was being done

14  by the victims was by the victims to the occupants of their

15  car which would have been Vialva and the other juvenile, is

16  that correct?

17  A.  To them.  And I mean, other people could hear them.  I

18  mean, at one time we had Bernard's car and the victims' car

19  in close proximity, and they're able to hear the victims

20  pleading at that time.

21  Q.  Did you get that from Bernard, the juvenile or both in

22  Bernard's car?

23  A.  No, I got that from TB.  I would have to research some

24  more to see, I mean, if that was also something Bernard was

25  telling me, although I know Bernard had heard these people

Chadwick - Cross by Mr. Hunt.

1  because that was the indication that was given to me as the

2  reason he knew there was people in the trunk.

3  Q.  You said that prior to the cars going out to Fort Hood

4  that Bernard or the juvenile that he was with were called by

5  Vialva in order to seek help.  Do you have any indication

6  that they knew what "help" meant?  Do you have anything that

7  would indicate to you that at that point they knew Vialva

8  meant, "I'm going to take somebody out into the woods"?

9  A.  When the phone call was made to TB?

10  Q.  Yes, sir.

11  A.  I have no indication that they knew at the time the phone

12  call was made exactly what kind of help was being asked of

13  them, no, sir.

14  Q.  The discussions relative to burning the car, prior to the

15  car being burnt, were those discussions centered around

16  destroying fingerprints as opposed to "get rid of these

17  victims"?

18  A.  Yes, sir.

19  Q.  Okay.  I'm going to move to a different subject.  Can you

20  tell me who warned Mr. Bernard of his rights, the rights to

21  an attorney, the rights to not have to talk to anybody?

22  A.  At the time I took the statement from him?

23  Q.  The first time.

24  A.  I couldn't give you a name.  I could find out the name.

25  I don't know the name off the top of my head, no, sir.

Chadwick - Cross by Mr. Hunt.

1    Q.  Do you know whether it was an FBI agent or some police

2    officer?

3    A.  I believe it was a CID agent.

4    Q.  Do you know where that took place?

5    A.  I'm under the impression that it took place at the CID

6    office.

7    Q.  Okay.  Was he warned again some time after that by

8    someone?

9    A.  Yes, sir; he was.

10    Q.  And who would that be by?

11    A.  That would have been by Judge Cook.

12    Q.  Okay.  Do you know when that took place?

13    A.  Again, I could get an exact time, but the approximate

14    time would be around, probably sometime between 2:00 and

15    3:00.  Or maybe a little bit earlier.

16    Q.  There was some discussion about the two cans of lighter

17    fluid, and whether or not the two cans of lighter fluid were

18    going to be because they couldn't afford to buy gasoline?  Is

19    that because they didn't have anything to carry the gasoline

20    in?

21    A.  That was part of the cost.  They were considering having

22    to buy a container to put the gas in.

23    Q.  Do you know who it was, or was it everyone that spread

24    the lighter fluid around the car in order to torch the car?

25    A.  As far as actually, directly putting the lighter fluid

Chadwick - Cross by Mr. Hunt.

1   onto the car, Chris Vialva and CL were doing that.  It

2   appears that TB may have put some of this lighter fluid on an

3   article of clothing to also be used to help start the fire.

4   Q.  What was Mr. Bernard's part in this?

5   A.  I have no indication that Mr. Bernard was putting any

6   lighter fluid on the car.

7   Q.  Okay.  Who actually lit it?

8   A.  It's not exactly --  Either Chris Vialva or CL is going

9   to have been the ones that lit the car.

10  Q.  When was the first indication that any of the people, any

11  of the four people arrested, intended to kill the two

12  victims?  When is the first indication by anybody?  Was it

13  when Vialva fired on them or did anyone know before he did

14  that that that's what was going to happen?

15  A.  Early on, once the two cars had gotten together, from

16  what was being discussed, it appeared that that was an option

17  that Chris Vialva was considering.  That was an option early

18  on into the ordeal, that that was how the problem was going

19  to be solved.

20  Q.  Okay.  Was the first time then that that was the option

21  that he took, was it obvious to everyone when he actually did

22  it, or did he reach a conclusion, "I'm just going to have to

23  kill then", and then minutes later opened the trunk and

24  killed them?

25  A.  Okay, restate your question.

Chadwick - Cross by Mr. Hunt.

1   Q.  Yeah.  I'm looking for when it was obvious to everyone

2   that that was the option that Vialva chose, that he was just

3   going to kill them.

4   A.  Well, obviously when --  I mean, to my knowledge, I guess

5   when he opened up the trunk and killed them, that's when the

6   final determination, that was the way it was going to be

7   handled, I guess.

8   Q.  Sure, but he didn't announce beforehand, ten minutes

9   beforehand, "Well, I'm just going to have to kill them.

10  We'll open up the trunk and I'll kill them"?

11  A.  No.  To my knowledge, and again I would have to review to

12  see exactly what went with who, but it was apparently to a

13  couple of the others involved, I'm not for sure which ones,

14  that this was going to be a likely result.  We even have -- I

15  have TB advise that that's why he went along was because he

16  was hoping that maybe they could change that result.

17  Q.  Okay.  Change it.  In other words, talk Vialva out of it?

18  A.  And keep it from happening.

19  Q.  Okay.  All right.  Did Bernard say anything about that

20  relative to whether he thought that that was a possibility?

21  A.  Directly or implied, I mean I cannot recall.  I mean, I

22  have the impression that he knew that that was a possibility

23  of what was going to happen.

24  Q.  Okay.  You said that a citizen knew at least three of

25  them and he knew of them.  Which of the four did the citizen

1  not know?

2  A.  CL.

3  Q.  He said that the citizen knew of them.  What does that

4  mean?

5  A.  I believe he went to the same school that they had been

6  attending.  Had seen them around in common places where

7  people would associate with each other.

8  Q.  Okay.  You indicated that they were in some way

9  associated in a criminal organization gang.

10  A.  Yes, sir.

11  Q.  Is there a name for that gang?

12  A.  I've heard the name.  I do not recall exactly what the

13  name is.  I've been told it's some loose association or type

14  of association with the Bloods, but again, I do not recall

15  exactly what the name of the gang was, or how they have it

16  listed in the database, anyway.

17  Q.  And is that all four of them or is that less than four of

18  them?  I'm specifically, obviously interested in Mr. Bernard.

19  A.  That's Mr. Bernard and two others.

20  Q.  Okay.  Bernard, Vialva and one of the other juveniles?

21  A.  TB.  Yes.

22  Q.  You also indicated that they had been involved in some

23  other violent activity.  Can you tell me what that is?

24  A.  That's something we're working on right now, trying to

25  figure exactly what it was.  To my knowledge, it's some type

1    of shooting assault, I believe involving a car, and it

2    happened in Killeen, Texas.

3    Q.  Was anyone killed?

4    A.  I can't remember if they were killed or just wounded.  I

5    don't have that knowledge in hand before me right now.

6            MR. HUNT:  Thank you, Agent.  We'll pass the

7    witness.

8            MR. JOHNSTON:  No further questions of this

9    witness.

10            THE COURT:  Okay, you can step down, sir.

11            MR. JOHNSTON:  Your Honor, I was going to call Mr.

12    Reyna, but I believe what I'll do is, ask the Court to take

13    judicial notice of the pretrial services report that Mr.

14    Reyna prepared on both defendants.  We would so move.

15            THE COURT:  Any objection to the pretrial?

16            MR. HUNT:  None, Your Honor.

17            THE COURT:  It's admitted.

18            MR. JOHNSON:  The United States rests.

19            THE COURT:  Any information from the Defendants?

20            MR. SCHWIEGER:  We rest, Your Honor.

21            MR. HUNT:  Similarly, we have nothing to present,

22    Your Honor.

23            THE COURT:   Concerning the preliminary examination

24    portion, I find there is probable cause to bind the

25    Defendants over to the grand jury.

1      Concerning the Government's request for detention,

2  is there any argument from either side?

3      MR. JOHNSTON:  We rely on the record, Your Honor.

4      MR. SCHWIEGER:  We have no argument, Your Honor.

5      MR HUNT:  No, Your Honor.

6      THE COURT:  Mr. Vialva and Mr. Bernard, I find

7  that based on the evidence presented that you both present a

8  serious threat to the community.  Because you are both facing

9  a potential death penalty, because of the severity of the

10  sentence, obviously you present a risk of flight, and because

11  of the other indications in the pretrial report.

12      Mr. Vialva, it indicates that you're on probation

13  in Bell County, both felony and misdemeanor, and you're on

14  bond at the same time.  Because of the fact that you failed

15  to comply with the conditions of bond and bail, I find that

16  there are no conditions or combination of conditions that

17  could be used to insure your appearance in court and the

18  safety of the community.

19      Mr. Bernard, because of the information, the

20  totality of the information presented during the testimony of

21  the Special Agent, I find that there are also no conditions

22  that would insure your appearance or the safety of the

23  community.

24      I'm going to remand both of you to the custody of

25  the United States Marshals.  They'll take you back to the

## TRANSCRIBER'S CERTIFICATE

I, Ernest C. Swanson, Official Transcriber for the Western District of Texas, Waco Division, do hereby certify that I listened to the cassette recording that was made in magistrate court in the above styled cause, that I transcribed what I heard from said tape, and that the above and foregoing transcript is true, correct and complete to the best of my ability.

Signed by me this the 30th day of June, 1999.

_____

Ernest C. Swanson