NO. W-99-CR-70(1)

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

FILED
JUN 14 2004
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff/Respondent, | |
| v. | CRIMINAL NO. W-99-CR-70(1) |
| | WO4 CA 163 |
| CHRISTOPHER ANDRE VIALVA, Defendant/Movant. | |

The Honorable Walter Smith
Chief United States District Judge

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TITLE 28, UNITED STATES CODE, SECTION 2255 AND BRIEF IN SUPPORT [REDACTED]

Susan M. Otto
Federal Public Defender
Lisa S. McCalmont
Assistant Federal Public Defender
215 Dean A. McGee Avenue, Suite 109
Oklahoma City, Oklahoma  73102
Telephone: (405) 609-5930
Facsimile: (405) 609-5932

ATTORNEYS FOR
DEFENDANT/MOVANT
CHRISTOPHER ANDRE VIALVA

JUNE 14, 2004

372

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. W-99-CR-70(1)** |
| | § | *DEATH PENALTY CASE* |
| | § | |
| **CHRISTOPHER ANDRE VIALVA.** | § | |

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TITLE 28, UNITED STATES CODE, SECTION 2255 AND BRIEF IN SUPPORT

This Motion is submitted by counsel previously appointed to represent the movant, Christopher Andre Vialva. Appointment of counsel was authorized by Title 18, United States Code, Section 3006A (a)(2)(B), and Title 21, United States Code, Section 848 (q)(4)(B). This Motion contains all of the information required by the *Model Form for Motions Under 28 U.S.C. §2255,* appended to Title 28. For clarity and ease of reference for the Court, the supporting arguments and authorities are incorporated into this Motion.

References to documents filed in the district court record of this case will be "Doc." followed by the number of the document reflected on the court's docket sheet, transcripts of the proceedings shall be referenced as follows:

| | |
|---|---|
| Trial Transcript | I through XVI Tr.  1-3328 |
| Preliminary/ Detention Hearing | PH Tr. 6/24/99 2-33 |
| Pretrial Hearings | Tr. month/day/year  page |
| Guilty Pleas | GP Tr. month/day/year  page |
| Sentencings | SH Tr. month/day/year page |
| Attachments | Ex. I through XI - A through Z |

1.    *Name and location of court which entered the judgment of conviction under attack:* United States District Court for the Western District of Texas, Waco Division, Waco, Texas.

924

2.    ***Date of judgment of conviction***: June 13, 2000.

3.    ***Length of sentence****:* Counts One, Three and Four, death by lethal injection; Count Two, life imprisonment without possibility of parole.

4.    ***Nature of offense involved (all counts)****:*
*Second Superseding Indictment, March 28, 2000*
Count One: 18 U.S.C. §§ 2119 and 2 (carjacking resulting in death);
Count Two: 18 U.S.C. §§ 1117 and 1111(a) (conspiracy to kill with premeditation and malice aforethought by shooting with a firearm and arson);
Count Three: 18 U.S.C. §1111 (a) and (b), (first degree murder of Todd Bagley within the special maritime and territorial jurisdiction of the United States);
Count Four: 18 U.S.C. §1111 (a) and (b), (first degree murder of Stacie Bagley within the special maritime and territorial jurisdiction of the United States).

5.    ***What was your plea? (Check one)***

    (a)    Not guilty    ☒
    (b)    Guilty    ☐
    (c)    Nolo contendere    ☐

*If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:* Not applicable.

6.    ***Kind of trial: (Check one)***

    (a)    Jury    ☒
    (b)    Judge only    ☐

7.    ***Did you testify at trial?***    Yes ☐    No ☒

8.    ***Did you appeal from the judgment of conviction?*** Yes ☒    No ☐

9.    ***If you did appeal, answer the following:***

    (a)    Name of court: United States Court of Appeals for the Fifth Circuit;
    (b)    Result: Convictions and sentences affirmed, *United States v. Vialva*, 299 F.3d 467 (5th Cir. 2002);

(c)     Date of result: July 19, 2002; <u>petition for writ of certiorari</u> <u>denied</u> *Vialva v. United States*, 123 S. Ct. 2572 (June 16, 2003).

**10.     *Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?***
Yes ☐     No ☒

11.     ***If your answer to 10 was "yes", give the following information:***

(a)     (1)     Name of court _____
(2)     Nature of proceeding _____
(3)     Grounds raised _____
(4)     Did you receive an evidentiary hearing on your petition, application or motion? Yes ☐   No ☐
(5)     Result _____
(6)     Date of result _____

(b)     As to any second petition, application or motion, give the same information:
(1)     Name of court _____
(2)     Nature of proceeding _____
(3)     Grounds raised _____
(4)     Did you receive an evidentiary hearing on your petition, application or motion? Yes ☐   No ☐
(5)     Result _____
(6)     Date of result _____

(c)     As to any third petition, application or motion, give the same information:
(1)     Name of court _____
(2)     Nature of proceeding _____
(3)     Grounds raised _____
(4)     Did you receive an evidentiary hearing on your petition, application or motion? Yes ☐   No ☐
(5)     Result _____
(6)     Date of result _____

(d)     Did you appeal, to an appellate court having jurisdiction, the result of action taken on any petition, application or motion?

(1)     First petition, etc.     Yes ☐     No ☐

3

(2)   Second petition, etc.  Yes ☐   No ☐
(3)   Third petition, etc.   Yes ☐   No ☐

(e)   If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not: _____

**12.   State _concisely_ every ground on which you claim that you are being held unlawfully. Summarize _briefly_ the fact supporting each ground. If necessary, you may attach pages state additional grounds and _facts_ supporting same.**

CAUTION:   If you fail to set forth all grounds in this motion, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate grounds for possible relief.  You may raise any grounds which you have other than those listed. However, *you should raise in this motion all available grounds* (relating to this conviction) on which you based your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds.  If you select one or more of these grounds for relief, you must allege facts.  The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.

(a)   Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

(b)   Conviction obtained by use of coerced confession.

(c)   Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d)   Conviction obtained by use of evidence obtained pursuant an unlawful arrest.

(e)   Conviction obtained by a violation of the privilege against self-incrimination.

(f)   Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g)   Conviction obtained by a violation of the protection against double jeopardy.

(h)   Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(I)   Denial of effective assistance of counsel.

(j)   Denial of right of appeal.

4

**A.     Ground I:**

**THE DISTRICT COURT FAILED TO COMPLY WITH THE STATUTORY PROCEDURE FOR THE APPOINTMENT OF COUNSEL IN DEATH-ELIGIBLE PROSECUTIONS, DENYING MOVANT CHRISTOPHER ANDRE VIALVA ACCESS TO COUNSEL QUALIFIED TO DEFEND HIM IN A FEDERAL CAPITAL PROSECUTION.**

Supporting FACTS (tell your story *briefly* without citing cases or law): *Memorandum Appended.*

**B.     Ground Two:**

**MR. VIALVA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS ABRIDGED WHEN HIS TRIAL COUNSEL APPLIED FOR EMPLOYMENT WITH THE UNITED STATES ATTORNEY'S OFFICE DURING THE PENDENCY OF HIS TRIAL WITHOUT SECURING CONSENT BEFORE THE CONFLICT AROSE OR AN EFFECTIVE WAIVER AFTER THE CONFLICT HAD OCCURRED. THE CONFLICT CAUSED AN ADVERSE EFFECT ON AND/OR PREJUDICE TO THE OUTCOME OF MR. VIALVA'S TRIAL WHICH NECESSITATES REVERSAL AND A NEW TRIAL.**

Supporting FACTS (tell your story *briefly* without citing cases or law): *Memorandum Appended.*

5



**C.     Ground III:**

**THE GOVERNMENT'S FAILURE TO DISCLOSE MATERIAL EVIDENCE AS REQUIRED BY *BRADY v. MARYLAND* AND ITS PROGENY DEPRIVED CHRISTOPHER VIALVA OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL, SECURED BY THE FIFTH AMENDMENT.  THE SUPPRESSED EVIDENCE WOULD HAVE CAST DOUBT ON THE TESTIMONY OF THE COOPERATING DEFENDANTS, THE ONLY EVIDENCE IDENTIFYING MR. VIALVA AS THE PERSON WHO SHOT THE BAGLEYS.  THE SUPPRESSION OF THE EVIDENCE IS PROSECUTORIAL MISCONDUCT THAT UNDERMINES CONFIDENCE IN THE OUTCOME OF THE TRIAL. THE  CONVICTIONS AND SENTENCES MUST BE VACATED AND A NEW TRIAL GRANTED.**

Supporting FACTS (tell your story *briefly* without citing cases or law): ***Memorandum Appended.***

**D.     Ground IV:**

**CHRISTOPHER VIALVA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY THE SIXTH AND EIGHTH AMENDMENTS DURING THE GUILT PHASE OF HIS TRIAL.  TRIAL COUNSEL FAILED TO OBTAIN FUNDING FOR NECESSARY EXPERT ASSISTANCE, RESULTING IN AN INADEQUATE INVESTIGATION OF FIRST STAGE ISSUES.  COUNSEL FAILED TO SUBJECT THE GOVERNMENT'S CASE TO ADVERSARIAL TESTING THROUGH PROPER CROSS EXAMINATION, OBJECTIONS, AND CHALLENGES. BECAUSE OF INADEQUATE PREPARATION, COUNSEL FAILED TO PRESENT A COHERENT DEFENSE.  TRIAL COUNSEL'S FAILURES, INDIVIDUALLY AND CUMULATIVELY, UNDERMINE CONFIDENCE IN THE OUTCOME OF THE PROCEEDINGS.  A NEW TRIAL IS THE SOLE REMEDY FOR THESE FAILURES.**

Supporting FACTS (tell your story *briefly* without citing cases or law): ***Memorandum Appended.***

929

E.    **Ground V:**

**A CAPITAL DEFENDANT'S PROPENSITY TO COMMIT VIOLENCE IN THE FUTURE CANNOT BE PREDICTED ACCURATELY. THE JURY'S CONSIDERATION OF " FUTURE DANGEROUSNESS" AS A FACTOR IN AGGRAVATION OF PUNISHMENT RESULTED IN THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY, IN VIOLATION OF THE RIGHT TO DUE PROCESS OF LAW SECURED BY THE FIFTH AMENDMENT. ASSESSMENTS OF FUTURE DANGEROUSNESS RELY ON GENERALIZATIONS ABOUT CONDUCT, RATHER THAN FACTS SPECIFIC TO THE DEFENDANT. THIS PROCESS DENIES THE DEFENDANT THE INDIVIDUALIZED SENTENCING REQUIRED BY THE EIGHTH AMENDMENT. THE GOVERNMENT'S INVOCATION AND THE JURY'S USE OF THE "FUTURE DANGEROUSNESS" NON-STATUTORY AGGRAVATING FACTOR DEPRIVED CHRISTOPHER VIALVA OF A CONSTITUTIONALLY ADEQUATE SENTENCING PROCESS.**

Supporting FACTS (tell your story. *briefly* without citing cases or law): *Memorandum Appended.*

F.    **Ground VI:**

**MR. VIALVA'S TRIAL COUNSEL WERE INEFFECTIVE IN MOVING FOR SEVERANCE OF THE PENALTY PHASE OF THE TRIAL. MR. VIALVA WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL AND HIS EIGHTH AMENDMENT RIGHT TO AN INDIVIDUALIZED SENTENCING.**

Supporting FACTS (tell your story *briefly* without citing cases or law): *Memorandum Appended.*

930

G.    **Ground VII:**

**CHRISTOPHER VIALVA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY THE SIXTH AND EIGHTH AMENDMENTS DURING THE PENALTY PHASE OF HIS TRIAL. TRIAL COUNSEL'S FAILURE TO OBTAIN ADEQUATE FUNDING RESULTED IN A COMPLETE FAILURE TO DEVELOP AND PRESENT READILY AVAILABLE MITIGATION EVIDENCE.    COUNSEL FAILED TO DEVELOP INFORMATION ABOUT CHRISTOPHER VIALVA'S MENTAL STATE, HIS UPBRINGING, HIS CHARACTER, AND HIS POTENTIAL. COUNSEL FAILED TO ADDRESS THE GOVERNMENT'S ALLEGATIONS ABOUT MR. VIALVA'S "FUTURE DANGEROUSNESS" AND FAILED TO PRESERVE ERROR ARISING FROM THE GOVERNMENT'S PRESENTATION OF THIS AND NON-STATUTORY AGGRAVATING FACTORS. AS A RESULT OF THESE FAILURES, COUNSEL PRESENTED NO EFFECTIVE DEFENSE TO THE DEATH PENALTY.    TRIAL COUNSEL'S FAILURES, INDIVIDUALLY AND CUMULATIVELY, UNDERMINE CONFIDENCE IN THE OUTCOME OF THE SENTENCING PROCEEDINGS.  A NEW TRIAL IS THE SOLE REMEDY FOR THESE FAILURES.**

Supporting FACTS (tell your story *briefly* without citing cases or law): *Memorandum Appended.*

H.    **Ground VIII:**

**THE GRAND JURY DID NOT DETERMINE ALL OF THE ELEMENTS ESSENTIAL TO ESTABLISH CAPITAL MURDER.   MR. VIALVA'S SUBSEQUENT CONVICTIONS AND SENTENCES OF DEATH WERE IMPOSED IN DEROGATION OF THE INDICTMENT CLAUSE OF THE FIFTH AMENDMENT. THE CONVICTIONS AND SENTENCES MUST BE VACATED.**

Supporting FACTS (tell your story *briefly* without citing cases or law): *Memorandum Appended.*

8

I.    **Ground IX:**

**THE DEATH SENTENCE IMPOSED ON MR. VIALVA WAS SUBSTANTIALLY INFLUENCED BY THE CUMULATIVE ERRORS IN THE GUILT AND PENALTY PHASES. A SENTENCE IMPOSED UNDER SUCH CIRCUMSTANCES VIOLATES MR. VIALVA'S CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW. THE SENTENCES OF DEATH MUST BE VACATED.**

Supporting FACTS (tell your story *briefly* without citing cases or law): *Memorandum Appended.*

J.    **Ground X:**

**THE FEDERAL DEATH PENALTY IS UNCONSTITUTIONAL AS APPLIED IN VIOLATION OF THE EIGHTH AND FIFTH AMENDMENTS AND EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION SINCE IT HAS BEEN PURSUED AND IMPOSED DISPROPORTIONATELY AGAINST PEOPLE OF COLOR.**

Supporting FACTS (tell your story *briefly* without citing cases or law): *Memorandum Appended.*

K.    **Ground XI:**

**THE LETHAL INJECTION OF MR. VIALVA UNDER THE PROTOCOLS CURRENTLY IN FORCE BY THE BUREAU OF PRISONS AND ANY SIMILAR PROTOCOLS VIOLATES THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT.**

Supporting FACTS (tell your story *briefly* without citing cases or law): *Memorandum Appended.*

13.    *If any of the grounds listed in 12A through 12 K were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them:*    The procedural posture of each Ground is discussed in the appended Memorandum.

14.    *Do you have any petition or appeal now pending in any court as to the judgment under attack?*    Yes ☐    No    ☒

15.   *Give the name and address, if known, of each attorney who represented you in the following stages of the judgment under attack:*

(a)   At preliminary hearing:          Stanley L. Schwieger
                                       600 Austin
                                       Waco, Texas 76701

(b)   At arraignment and plea:  Stanley Schwieger, Waco, Texas (appearance waived and not guilty plea entered July 13, 1999).

(c)   At trial:          Stanley L. Schwieger
                         600 Austin
                         Waco, Texas 76701

                         B. Dwight Goains
                         Assistant United States Attorney
                         805 Fighting Buck Avenue
                         Alpine, Texas 79830

      Mr. Goains was appointed as "learned counsel" on the application of Mr. Schwieger. The appointment was effective July 21, 1999. At the time of the appointment, Mr. Goains was in private practice in Cameron, Texas.

(d)   At sentencing:          Stanley L. Schwieger
                              600 Austin
                              Waco, Texas 76701

                              B. Dwight Goains
                              Assistant United States Attorney
                              805 Fighting Buck Avenue
                              Alpine, Texas 79830

(e)   On appeal:          Stanley L. Schwieger
                          600 Austin
                          Waco, Texas 76701

                          Steven C. Losch
                          906 Delia Drive
                          Longview, Texas 75601

10

G-33

Mr. Losch died in May, 2003, prior to the oral argument before the Fifth Circuit.

(f)    In any post conviction proceeding:

> Susan M. Otto
> Federal Public Defender
> Lisa S. McCalmont
> Assistant Federal Public Defender
> Western District of Oklahoma
> 215 Dean A. McGee   Suite 109
> Oklahoma City, Oklahoma 73102

Miss Otto was appointed on application of Mr. Vialva in the instant proceeding, Mr. Vialva's first post conviction application. Ms. McCalmont entered her appearance as second counsel pursuant Title 18, United States Code, Section 3005 and Title 21, United States Code, Section 848.

(g)    On appeal from any adverse ruling in a post-conviction proceeding: None. This is Mr. Vialva's first post conviction application for relief, following his direct appeal.

16.    *Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?*
Yes  ☒    No  ☐

17.    *Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?*    Yes  ☐    No  ☒

(a)    If so, give name and location of court which imposed sentence to be served in the future: *None - all counts of conviction emanate from one prosecution and all counts are subject to the challenges presented in this Motion.*

(b)    And give date and length of sentence to be served in the future. *Not Applicable*

(c)    Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future:
Yes  ☐    No  ☒  *Not Applicable*

Wherefore, Movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____
Susan M. Otto
Oklahoma Bar #6818
Federal Public Defender
Western District of Oklahoma


_____
Lisa S. McCalmont
Texas Bar #24007629  Oklahoma Bar#17096
Assistant Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee Suite 109
Oklahoma City, Oklahoma 73102
Telephone:  (405) 609-5930
Telefacsimile: (405) 609-5932



I declare under penalty of perjury that the foregoing is true and correct. Executed on this ___8th___ day of June, 2004, at Terre Haute, Indiana.



_____
CHRISTOPHER ANDRE VIALVA
Register # 91909-080



Witnessed by: _____

12

935

Wherefore, Movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____
Susan M. Otto
Oklahoma Bar #6818
Federal Public Defender
Western District of Oklahoma

_____
Lisa S. McCalmont
Texas Bar #24007629   Oklahoma Bar #17096
Assistant Federal Public Defender
Western District of Oklahoma
215 Dean A. McGee Suite 109
Oklahoma City, Oklahoma 73102
Telephone: (405) 609-5930
Telefacsimile: (405) 609-5932

I declare under penalty of perjury that the foregoing is true and correct. Executed on this _____ day of June, 2004, at Terre Haute, Indiana.

_____
CHRISTOPHER ANDRE VIALVA
Register # 91909-080

Witnessed by: _____
Counselor

12

## CERTIFICATE OF SERVICE

I certify on the 14th day of June, 2004, a true and correct copy of the foregoing Redacted Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Pursuant Title 28, United States Code, Section 2255 and Brief in Support was hand delivered to:

Mr. Mark Frazier
Assistant United States Attorney
Chief, Waco Division
800 Franklin Avenue Suite 280
Waco, Texas 76701

Counsel for Respondent United States of America.

I certify on the 14th day of June, 2004, a true and correct copy of the foregoing and a copy of the proposed Order was sent via first class mail, postage prepaid to:

Mr. Rob Owen
Law Offices of Owen & Rountree, L.L.P.
P.O. Box 40428
Austin, Texas 78704
Counsel for Brandon Bernard.

_____
Susan M. Otto

937

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

INDEX TO EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xx

INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

GROUND I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

THE DISTRICT COURT FAILED TO COMPLY WITH THE STATUTORY PROCEDURE FOR THE APPOINTMENT OF COUNSEL IN DEATH-ELIGIBLE PROSECUTIONS, DENYING MOVANT CHRISTOPHER ANDRE VIALVA ACCESS TO COUNSEL QUALIFIED TO DEFEND HIM IN A FEDERAL CAPITAL PROSECUTION

A.    Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.    Facts Relevant to Determination of the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

C.    Legal Authority Supporting Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

GROUND II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

MR. VIALVA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS ABRIDGED WHEN HIS TRIAL COUNSEL APPLIED FOR EMPLOYMENT WITH THE UNITED STATES ATTORNEY'S OFFICE DURING THE PENDENCY OF HIS TRIAL WITHOUT SECURING CONSENT BEFORE THE CONFLICT AROSE OR AN EFFECTIVE WAIVER AFTER THE CONFLICT HAD OCCURRED. THE CONFLICT CAUSED AN ADVERSE EFFECT ON AND/OR PREJUDICE TO THE OUTCOME OF MR. VIALVA'S TRIAL WHICH NECESSITATES REVERSAL AND A NEW TRIAL

A.    Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

B.    How the Conflict Unfolded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

C.    The Law of Conflicts and the Constitutional Right to Effective Assistance of
      Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

D.    Mr. Goains's Application for Employment With the Government Created
      a Conflict of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

E.    This Conflict Was Unwaivable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

i

938

F.  This Conflict Was Not Waived . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    1.  Waivers Must Occur Before The Conflict Arises . . . . . . . . . . . . . . . . . . . . . . . . 23

    2.  Waivers Are Knowing and Voluntary Relinquishments of Rights . . . . . . . . . . . 24

G.  The Trial Court Failed to Make an Adequate Inquiry into the Conflict or Inform
    Mr. Vialva of His Rights to Unconflicted Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

H.  Under Any Standard of Review, Reversal Is Required to Cure the Harm Arising
    From This Conflict of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    1.  This Was a Personal Interest Conflict That Was Profound and Current . . . . . . . 30

    2.  Under Any Standard of Review, this Conflict Requires Reversal and
        a New Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

GROUND III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

THE GOVERNMENT'S FAILURE TO DISCLOSE MATERIAL EVIDENCE AS REQUIRED BY *BRADY v. MARYLAND* AND ITS PROGENY DEPRIVED CHRISTOPHER VIALVA OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL, SECURED BY THE FIFTH AMENDMENT. THE SUPPRESSED EVIDENCE WOULD HAVE CAST DOUBT ON THE TESTIMONY OF THE COOPERATING DEFENDANTS, THE ONLY EVIDENCE IDENTIFYING MR. VIALVA AS THE PERSON WHO SHOT THE BAGLEYS. THE SUPPRESSION OF THE EVIDENCE IS PROSECUTORIAL MISCONDUCT THAT UNDERMINES CONFIDENCE IN THE OUTCOME OF THE TRIAL. THE CONVICTIONS AND SENTENCES MUST BE VACATED AND A NEW TRIAL GRANTED

A.  Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

B.  Predicate Legal Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

C.  Facts Establishing Grounds for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    Evolution of the Prosecution's Theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

    Information Disclosed to the Defense Prior to Trial . . . . . . . . . . . . . . . . . . . . . . . . . 46

    Material Information Suppressed by the United States . . . . . . . . . . . . . . . . . . . . . . . 49

    Christopher Lewis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Tony Sparks  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Brandon Bernard  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

D.    Significance of the Omitted Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

GROUND IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

CHRISTOPHER VIALVA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY THE SIXTH AND EIGHTH AMENDMENTS DURING THE GUILT PHASE OF HIS TRIAL. TRIAL COUNSEL FAILED TO OBTAIN FUNDING FOR NECESSARY EXPERT ASSISTANCE, RESULTING IN AN INADEQUATE INVESTIGATION OF FIRST STAGE ISSUES. COUNSEL FAILED TO SUBJECT THE GOVERNMENT'S CASE TO ADVERSARIAL TESTING THROUGH PROPER CROSS EXAMINATION, OBJECTIONS, AND CHALLENGES. BECAUSE OF INADEQUATE PREPARATION, COUNSEL FAILED TO PRESENT A COHERENT DEFENSE. TRIAL COUNSEL'S FAILURES, INDIVIDUALLY AND CUMULATIVELY, UNDERMINE CONFIDENCE IN THE OUTCOME OF THE PROCEEDINGS. A NEW TRIAL IS THE SOLE REMEDY FOR THESE FAILURES

A.    Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

B.    Predicate Legal Authority - The Sixth Amendment and Supreme Court Precedent  . . . . 60

C.    Specific Instances of Ineffective Assistance of Counsel  . . . . . . . . . . . . . . . . . . . . . 62

    1.    Trial Counsel Failed to Obtain Funding for Necessary Experts, Resulting in Inadequate Investigation and Deficient Preparation  . . . . . . . . . . . . 62

    2.    Counsel Failed to Conduct an Adequate Investigation  . . . . . . . . . . . . . . . . . . . 67

    3.    Counsel Failed to Subject the Government's Case to Requisite Adversarial Testing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

        Forensic Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

        Terry Brown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

        Christopher Lewis  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

        Gang Affiliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

        Mental Age of Christopher Vialva  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

940

4.    Counsel Failed to Present a Coherent Defense ........................... 85

5.    Counsel Failed to Establish a Working Relationship with Mr. Vialva ........ 88

D.    Prejudice Resulted From Counsel's Deficient Performance ..................... 89

GROUND V ................................................................... 92

A CAPITAL DEFENDANT'S PROPENSITY TO COMMIT VIOLENCE IN THE FUTURE CANNOT BE PREDICTED ACCURATELY. THE JURY'S CONSIDERATION OF " FUTURE DANGEROUSNESS" AS A FACTOR IN AGGRAVATION OF PUNISHMENT RESULTED IN THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY, IN VIOLATION OF THE RIGHT TO DUE PROCESS OF LAW SECURED BY THE FIFTH AMENDMENT. ASSESSMENTS OF FUTURE DANGEROUSNESS RELY ON GENERALIZATIONS ABOUT CONDUCT, RATHER THAN FACTS SPECIFIC TO THE DEFENDANT. THIS PROCESS DENIES THE DEFENDANT THE INDIVIDUALIZED SENTENCING REQUIRED BY THE EIGHTH AMENDMENT. THE GOVERNMENT'S INVOCATION AND THE JURY'S USE OF THE "FUTURE DANGEROUSNESS" NON-STATUTORY AGGRAVATING FACTOR DEPRIVED CHRISTOPHER VIALVA OF A CONSTITUTIONALLY ADEQUATE SENTENCING PROCESS

A.    Procedural Posture of this Claim ........................................ 92

B.    Constitutional Requirements for Capital Sentencing ......................... 93

C.    Experts and Juries Are Nearly Always Wrong about the Risk of Violence
Posed by Capital Defendants. Courts Should Not Permit Juries to
Consider Future Dangerousness as an Aggravating Factor ..................... 94

1.    Facts - The Texas Defender Service Study ........................... 94

2.    An Error Rate of 95% is Constitutionally Impermissible ................ 95

3.    Judicial Precedent Concluding Evidence of Future Dangerousness
is Constitutionally Permissible Is No Longer Binding .................... 96

D.    Regardless of Their Historical Inaccuracy, the Methods by Which Psychological
Violence Risk Assessments Are Conducted Do Not Meet the Constitutional Mandate
That Evidence upon Which a Sentence of Death Is Based Be Both Reliable
and Individualized ................................................... 99

1.    Because Clinical Assessments are Widely Recognized as Being



Scientifically Unreliable, Their Use During a Capital Sentencing
Proceeding Infects the Proceeding with an Unconstitutional
Level of Unreliability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

2.    Because Actuarial Assessments are Not Based on an Assessment
of the Defendant, They are Not Sufficiently Individualized
to Satisfy the Constitution's Requirement that the Individual's Actions
and Character be Considered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

3.    Any Assessment Derived Without an Examination of the Defendant
Should be Constitutionally Barred . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

E.    Mr. Vialva's Case Demonstrates All of the Constitutional Defects Inherent
in Injecting Future Dangerousness into the Penalty Analysis . . . . . . . . . . . . . . . . . . 104

GROUND VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

MR. VIALVA'S TRIAL COUNSEL WERE INEFFECTIVE IN MOVING FOR
SEVERANCE OF THE PENALTY PHASE OF THE TRIAL. MR. VIALVA WAS
DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL AND
HIS EIGHTH AMENDMENT RIGHT TO AN INDIVIDUALIZED SENTENCING

A.    Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

B.    Argument and Authority - The Eighth Amendment Requires An Individualized
Sentencing Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

C.    Mr. Vialva's Counsel Were Ineffective By Failing to Support the Motion for
Severance of the Penalty Phase with Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

GROUND VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

CHRISTOPHER VIALVA WAS DENIED THE EFFECTIVE ASSISTANCE OF
COUNSEL GUARANTEED TO HIM BY THE SIXTH AND EIGHTH
AMENDMENTS DURING THE PENALTY PHASE OF HIS TRIAL. TRIAL
COUNSEL'S FAILURE TO OBTAIN ADEQUATE FUNDING RESULTED IN A
COMPLETE FAILURE TO DEVELOP AND PRESENT READILY AVAILABLE
MITIGATION EVIDENCE. COUNSEL FAILED TO DEVELOP INFORMATION
ABOUT CHRISTOPHER VIALVA'S MENTAL STATE, HIS UPBRINGING, HIS
CHARACTER, AND HIS POTENTIAL. COUNSEL FAILED TO ADDRESS THE
GOVERNMENT'S ALLEGATIONS ABOUT MR. VIALVA'S "FUTURE
DANGEROUSNESS" AND FAILED TO PRESERVE ERROR ARISING FROM
THE GOVERNMENT'S PRESENTATION OF THIS AND NON-STATUTORY
AGGRAVATING FACTORS. AS A RESULT OF THESE FAILURES, COUNSEL
PRESENTED NO EFFECTIVE DEFENSE TO THE DEATH PENALTY. TRIAL



COUNSEL'S FAILURES, INDIVIDUALLY AND CUMULATIVELY, UNDERMINE CONFIDENCE IN THE OUTCOME OF THE SENTENCING PROCEEDINGS. A NEW TRIAL IS THE SOLE REMEDY FOR THESE FAILURES

A.    Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

B.    Legal Standard Applicable to this Ground . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

C.    Specific Instances of Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . 115

    1.    Counsel Failed to Secure Adequate Funding for Necessary Resources and to Devote Adequate Time and to Investigate, Prepare, and Present a Mitigation Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

    2.    Counsel Failed to Investigate, Prepare, and Present A Mitigation Case . . . . . . 118

        Social History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

        Medical History, Mental and Emotional Health Issues . . . . . . . . . . . . . . . . . . . 122

        Education and Peer Influences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

D.    Failure to Adequately Prepare, Present, and Preserve Error in the Case Against Future Dangerousness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

    1.    Dr. Cunningham Should Never Have Been Presented to the Jury, or If Presented, His Testimony Should Have Been Limited to a Scientific Valid Use of His Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

        a.    Dr. Cunningham Was Hired One Month Before Trial Began . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

        b.    The Defense Inappropriately Curtailed Dr. Cunningham's Analysis By Withholding a Personal Interview with Mr. Vialva . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

        c.    Defense Counsel Had a Duty to Know, Before Sponsoring Dr. Cunningham's Testimony, That He Had Concluded, Erroneously, Mr. Vialva Was Dangerous . . . . . . . . . . . . . . . . . . . . . . . 132

        d.    Defense Counsel Had a Duty to Know, Before Sponsoring His Testimony, That Dr. Cunningham's Methodology for Predicting Future Dangerousness Is Scientifically Invalid . . . . . . . . . . 134

e.    Defense Counsel Should Have Know That Introducing Dr. Cunningham Would Open the Door to Damaging Government Experts ............................................. 138

2.    Richard Coons ............................................. 138

3.    Anthony Davis ............................................. 141

4.    Failure to Object to Jury Special Verdict Form and the Prosecutor's Opening Statement ............................................. 141

5.    Failure to Preserve on Appeal Objections to the Inclusion of Non-Statutory Aggravators As Unconstitutional ............................................. 143

GROUND VIII ............................................. 144

THE GRAND JURY DID NOT DETERMINE ALL OF THE ELEMENTS ESSENTIAL TO ESTABLISH CAPITAL MURDER.  MR. VIALVA'S SUBSEQUENT CONVICTIONS AND SENTENCES OF DEATH WERE IMPOSED IN DEROGATION OF THE INDICTMENT CLAUSE OF THE FIFTH AMENDMENT. THE CONVICTIONS AND SENTENCES MUST BE VACATED

A.    Procedural Posture of this Claim ............................................. 144

B.    Facts Relevant to the Determination of this Claim ............................................. 144

C.    Argument and Authorities ............................................. 146

GROUND IX ............................................. 155

THE DEATH SENTENCE IMPOSED ON MR. VIALVA WAS SUBSTANTIALLY INFLUENCED BY THE CUMULATIVE ERRORS IN THE GUILT AND PENALTY PHASES.  A SENTENCE IMPOSED UNDER SUCH CIRCUMSTANCES VIOLATES MR. VIALVA'S CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW.  THE SENTENCES OF DEATH MUST BE VACATED ............................................. 155

A.    Procedural Posture of this Claim ............................................. 155

B.    Argument and Authorities Supporting Claim for Relief ............................................. 156

1.    *De Novo* Review is Applicable ............................................. 156

2.    Multiple, Compound Violations of Mr. Vialva's Constitutional Rights Undermine Confidence in the Outcome of the Proceedings ......... 158

9AA



GROUND X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

 THE FEDERAL DEATH PENALTY IS UNCONSTITUTIONAL AS APPLIED IN VIOLATION OF THE EIGHTH AND FIFTH AMENDMENTS AND EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION SINCE IT HAS BEEN PURSUED AND IMPOSED DISPROPORTIONATELY AGAINST PEOPLE OF COLOR

A. Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

B. Facts Supporting Claim of Disparate Impact . . . . . . . . . . . . . . . . . . . . . . . . 159

C. Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

GROUND XI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

 THE LETHAL INJECTION OF MR. VIALVA UNDER THE PROTOCOLS CURRENTLY IN FORCE BY THE BUREAU OF PRISONS AND ANY SIMILAR PROTOCOLS VIOLATES THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT . . . . . . . . . . . . . . . . . . . . . . . . 161

A. Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

B. The Government's Lethal Injection Procedure Violates the Eighth Amendment Prohibition Against Cruel and Unusual Punishment . . . . . . . . . . . . . . . . 162

  1. The Eighth Amendment Prohibition Against Cruel and Unusual Punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

  2. The Bureau of Prisons's Lethal Injection Protocol Risks Unnecessary Pain, Torture and Lingering Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

   a. The Bureau of Prisons's Lethal Injection Process . . . . . . . . . . . . . . . . . 164

   b. Intravenous Drug Administration Always Carries a Risk of Failure . . . 165

   c. The Risks Associated with the Bureau of Prisons's Lethal Injection Protocol . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

    i. Use of Persons Untrained in Preparing Drugs and Performing IV Procedures Creates an Unnecessary Risk of Flawed Executions That Cause Conscious Suffering . . . . . . 167

    ii. The Chemical Cocktail Creates an Unnecessary Risk of Flawed Executions That Cause Conscious Suffering . . . . . . 170

d.    Executions Have "Gone Wrong" ............................... 172

e.    Executions Need Not Risk Conscious Suffering ................. 173

REQUESTS FOR RELIEF ............................................ 174

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Johnson*,
  338 F.3d 382 (5th Cir. 2003) ......................................... 91

*Apprendi v. New Jersey*,
  530 U.S. 466 (2000) ......................................... 148, 149, 153

*Araim v. Painewebber, Inc.*,
  691 F. Supp. 1415 (N.D. Ga. 1988) ...................................... 97

*Atkins v. Virginia*,
  536 U.S. 304 (2002) ......................................... 98, 103, 107

*Atley v. Ault*,
  191 F.3d 865 (8th Cir. 1999) ...................................... 25, 28

*Barefoot v. Estelle*,
  463 U.S. 880 (1983) ......................................... 96, 97, 98, 129

*Beets v. Scott*,
  65 F.3d 1258 (5th Cir. 1995) ................................. 19, 30, 34, 35

*Boyle v. Johnson*,
  93 F.3d 180 (5th Cir. 1996) ......................................... 128

*Brady v. Maryland*,
  373 U.S. 83 (1963) ......................... 42, 43, 44, 59, 76, 78, 157

*Brown v. Board of Education of Topeka*,
  347 U.S. 483 (1954) ......................................... 98

*Bryan v. Mullin*,
  335 F.3d 1207 (10th Cir. 2003) ...................................... 113

*Bryant v. Scott*,

28 F.3d 1411 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*Burger v. Kemp,*
   483 U.S. 776, 783 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cargle v. Mullin,*
   317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155, 156

*Combs v. Coyle,*
   205 F.3d 269 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

*Cooper v. Rimmer,*
   358 F.3d 655 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*Cuyler v. Sullivan,*
   446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 34, 35

*Derden v. McNeel,*
   978 F.2d 1453 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

*Distribuidora Dimsa S.A. v. Linea Aerea del Cobre S.A.,*
   768 F. Supp. 74 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Dunagan v. Dretke,*
   No. 3-03CV-0374-K, 2003 WL. 22519443 (N.D. Tex. Nov. 4, 2003) . . . . . . 36, 37, 140

*Eddings v. Oklahoma,*
   455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112, 123

*Estelle v. Gamble,*
   429 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

*Farmer v. Brennan,*
   511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

*Flores v. Johnson,*
   210 F.3d 456 (Garza, J., specially concurring) . . . . . . . . . . . . . . . . . . . . . 104, 105, 138

*Furman v. Georgia,*
   408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 100, 158

*Garcia v. Bunnel,*
   33 F.3d 1193 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Giglio v. United States,*

405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 44, 59

*Glasser v. United States,*
    315 U.S. 60 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 24, 25, 27, 32, 33, 34, 37

*Gregg v. Georgia,*
    428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 107

*Hamblin v. Mitchell,*
    354 F.3d 482 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 19, 34, 35, 61, 62, 113, 154

*Harris v. United States,*
    536 U.S. 545 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

*Harris v. Wood,*
    64 F.3d 1432 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156, 158

*Holloway v. Arkansas,*
    435 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 26, 31, 32, 34

*Hope v. Pelzer,*
    536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

*Hurtado v. California,*
    110 U.S. 516 (1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*Johnson v. Cockrell,*
    306 F.3d 249 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Johnson v. Zerbst,*
    304 U.S. 458 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27

*Jones v. United States,*
    526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146, 147, 148

*Jurek v. Texas,*
    428 U.S. 262 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 97, 98

*In re Kemmler,*
    136 U.S. 436 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

*Kimmelman v. Morrison,*
    477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*King v. Illinois Central RR,*

337 F.3d 550 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Kyles v. Whitley,*
    514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44, 58, 59

*La Grand v. Stewart,*
    173 F.3d 1144 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161, 162

*Lewis v. Cockrell,*
    No. 3-93-329-G, 2002 WL. 1398554 (June 26, 2002 N.D. Tex.) . . . . . . . . . . . . . . . . 131

*Lewis v. Dretke,*
    355 F.3d 364 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Lockett v. Ohio,*
    438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93, 95, 107, 112

*Lockhart v. Johnson,*
    104 F.3d 54 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Massaro v. United States,*
    538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 112

*McCleskey v. Kemp,*
    481 U.S. 279 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*McMann v. Richardson,*
    397 U.S. 759 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Mickens v. Taylor,*
    535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 26, 27, 30, 33, 152

*Moore v. Johnson,*
    194 F.3d 586 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123, 154, 155

*Napue v. Illinois,*
    360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 44, 59

*Neder v. United States,*
    527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152, 153

*Nelson v. Campbell,*
    __ S. Ct. ___, 2004 WL 1144374 (May 24, 2004) . . . . . . . . . . . . . . . . . . . . . . . 160

*Penry v. Lynaugh,*
      492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107, 123

*Perillo v. Johnson,*
      205 F.3d 775 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 30, 32, 34, 35

*Preiser v. Rodriguez,*
      411 U.S. 475 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

*Ring v. Arizona,*
      536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143, 149, 150, 152

*Skaggs v. Parker,*
      235 F.3d 261 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126, 127, 136

*Soffar v. Dretke,*
      ____ F.3d _____, 2004 WL 848416 (5th Cir. Apr. 21, 2004) . . . . . . . . . . . . . . . 72, 91

*States v. Grimes,*
      142 F.3d 1342 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Stewart v. Martinez-Villareal,*
      523 U.S. 637 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

*Stouffer v. Reynolds,*
      168 F.3d 1155 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Stouffer v. Reynolds,*
      214 F.3d 1231 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Strickland v. Washington,*
      466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 61, 62, 72, 109, 113, 114

*Strickler v. Greene,*
      527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 58, 59

*United States v. Agurs,*
      427 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Allen,*
      357 F.3d 745 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150, 153

*United States v. Bagley,*
      473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Bernard,*
    299 F.3d 467 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106, 149, 151, 154

*United States v. Boone,*
    245 F.3d 352 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Canales,*
    744 F.2d 413 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

*United States v. Carpenter,*
    769 F.2d 258 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Casseus,*
    282 F.3d 253 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Causey,*
    185 F.3d 407 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*United States v. Cronic,*
    466 U.S. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*United States v. Davidson,*
    No. 92-CR-35,1992 WL 165825 (N.D.N.Y., July 10, 1992) . . . . . . . . . . . . . . . . . . . 11

*United States v. Davis,*
    No. CR.A. 01-282, 2003 WL 1837701 (E.D. La. Apr. 9, 2003) . . . . . . . . . . . . . . . . . 150

*United States v. Dufur,*
    648 F.2d 512 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Fell,*
    217 F. Supp. 2d 469 (D. Vt. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

*United States v. Garcia,*
    517 F.2d 272 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28

*United States v. Gordon,*
    346 F.3d 135 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 112

*United States v. Hernandez,*
    829 F.2d 988 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

*United States v. Higgs,*
    353 F.3d 281 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

951

*United States v. Horton,*
845 F.2d 1414 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Lee,*
89 F. Supp. 2d 1017 (E.D. Ark. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136, 137

*United States v. Lentz,*
225 F. Supp. 2d 666 (E.D. Va. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

*United States v. Miranda,*
148 F. Supp. 2d 292 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*United States v. Regan,*
228 F. Supp. 2d 742 (E.D. Va. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

*United States v. Robinson,*
367 F.3d 278 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151, 152, 153

*United States v. Rocha,*
109 F.3d 225 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

*United States v. Schwartz,*
283 F.3d 76 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Shepherd,*
576 F.2d 719 (7th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Steel,*
759 F.2d 706 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Sterling-Surez,*
233 F. Supp. 2d 269 (D.P.R. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Tipton,*
90 F.3d 861 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*United States v. Vaquero,*
997 F.2d 78 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Watson,*
496 F.2d 1125 (4th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*United States v. Webb,*
No. 03-50978, 2004 WL 1114455 (5th Cir. May 13, 2004) . . . . . . . . . . . . . . . . 60, 112

952

*United States v. Weddell,*
      567 F.2d 767 (8th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*United States v. Williams,*
      544 F.2d 1215 (4th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Walton v. Arizona,*
      497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  146, 148

*Wheat v. United States,*
      486 U.S. 153 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18, 25, 27

*Willingham v. Johnson,*
      *No. Civ. A. 3:98-CV-0409-L*, 2001 WL 1677023 (N.D. Tex. Dec. 31, 2001) . . . . . . . .  30

*Wiggins v. Smith,*
      539 U.S. 510, 123 S. Ct. 2527 (2003) . . . . . . . . . . . . . . . . . . . . . . . .  62, 67, 113, 117, 123

*Williams v. Reed,*
      29 F. Cas. 1386 (C.C.D. Me. 1824) (No. 17,733) . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Williams v. Taylor,*
      529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62, 112, 123

*Williams v. Washington,*
      59 F.3d 673 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  109

*Wood v. Georgia,*
      450 U.S. 261 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

*Woodson v. North Carolina,*
      428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  93

*Zafiro v. United States,*
      506 U.S. 534 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  108

*Zant v. Stephens,*
      462 U.S. 862 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  93, 95

## STATE CASES

*People v. Spreitzer,*
      525 N.E.2d 30 (Ill. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34



*State v. Dhaliwal,*
    53 P.3d 65 (Wash. Ct. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*State v. Webb,*
    750 A.2d 448 (Conn. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

## FEDERAL CONSTITUTION AND STATUTES

U.S. CONST. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

5 U.S.C. § 552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

18 U.S.C. § 1111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

18 U.S.C. § 2119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 9, 10, 13, 14, 58, 63, 65,
                                                                              144, 146, 155

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 15

18 U.S.C. § 3161 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 69, 70, 71

18 U.S.C. § 3591 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

18 U.S.C. § 3596 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

21 U.S.C. § 848 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Act of Apr. 30, 1790, ch. 9, § 29, 1 Stat. 118 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## STATE STATUTES

GA. CODE ANN. § 17-8-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

OHIO REV. CODE ANN. § 2945.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

TEX. CODE CRIM. PROC. art. 43.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

TEX. CRIM. PROC. CODE ART. 37.071 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

TEX. GOV'T CODE, tit. 2 Subt. G, App. A, Art. 10, § 9, Rule 1.06 (Vernon Supp. 1999) . . . . . 21

## ADMINSTRATIVE RULES AND GUIDELINES

*Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation*, Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States (May 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 67

Guide to Judiciary Policies and Procedures (1999) . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 12, 63, 64, 65

U.S. Sentencing Guidelines Manual § 4A1.2(d) (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

## MODEL RULES AND CODES

ABA Comm. on Ethics and Prof. Resp., Formal Op. 96-400 (1996) . . . . . . . . . . . . . . . 21, 22, 24

ABA Standards for Criminal Justice, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) . . . . . 66, 88, 115, 116, 117, 127

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev. ed. 2003) . . . . . . . . . . . . . . . . . . . 67, 88, 113-117

Model Rules of Professional Conduct Rule 1.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Restatement (Third) of the Law Governing Lawyers . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22, 24

## AMICUS BRIEFS

Brief of Amicus Curiae American Psychiatric Association, *Barefoot v. Estelle*, No. 82-6080 (S. Ct. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

*Motion of Legal Ethicists and the Stein Center for Law and Ethics for Leave to File Brief as Amici Curiae and Brief in Support of Petitioner*, in *Mickens v. Taylor*, No. 99-9285, 2001 WL 881242, at *5 (filed in the S. Ct. July 19, 2001) . . . . . . . . . . . . 34

## LAW REVIEW AND OTHER ARTICLES

*Assessing the Risk for Violence*, AM. PSYCH. ASS'N, APA DOC. REF. NO. 200109 . . . . . . . . . 139

Edward J. Bronson, *Severance of Co-Defendants in Capital Cases: Some Empirical Evidence*, Discussion Paper Series, No. 94-1 21-22, 14 (College of Behavioral and Social Sciences, Cal. St. Univ., Chico, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 109, 110

*Drug Enforcement Administration, Intelligence Bulletin:* Marijuana and Embalming Fluid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Mark D. Cunningham & Thomas J. Reidy, *Integrating Base Rate Data in Violence Risk Assessments at Capital Sentencing*, 16 BEHAV. SCI. L. 71 (1998) . . . . . . . . . . . . . . 131

Mark D. Cunningham & Thomas J. Reidy, *Don't Confuse Me With the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing*, 26 CRIM. JUSTICE & BEHAV. 20 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

Mark D. Cunningham & Thomas J. Reidy, *Violence Risk Assessment at Federal Capital Sentencing: Individualization, Generalization, Relevance, and Scientific Standards*, 29 CRIM. JUSTICE & BEHAVIOR 512 (Oct. 2002) . . . . . . . . . . . . 100

Lawrence J. Fox, *Making the Last Chance Meaningful: Predecessor Counsel's Ethical Duty to the Capital Defendant*, 31 HOFSTRA L. REV. 1181 (2003) . . . . . . . . . . . . . . . . 40

KEITH INMAN & NORAH RUDIN, AN INTRODUCTION TO FORENSIC DNA ANALYSIS (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

James W. Marquart, et al., *Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases*, 23 LAW & SOC'Y REV. 449 (1989) . . . . . . . . . . . . 139

Kevin McNally, *Death Is Different: Your Approach to a Capital Case Must be Different, Too*, THE CHAMPION (Mar. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

Thomas J. Reidy & Mark D. Cunningham, *From Death to Life: Prison Behavior of Former Death Row Inmates In Indiana*, 28 CRIM. JUSTICE & BEHAVIOR 62 (Feb.2001) . . . . . . 99

Jonathan R. Sorensen & Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. CRIM. LAW & CRIMINOLOGY 1251 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

David M. Siegel, *My Reputation or Your Liberty (Or Your Life): the Ethical Obligations of Criminal Defense Counsel in Postconviction Proceedings*, 23 J. LEGAL PROF. 85 (1998-99) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

Katja Taxis & Nick Barber, *Ethnographic study of incidence and severity of intravenous drug errors*, 326 BRITISH MED. J. (Mar. 29, 2004) . . . . . 166, 168, 169, 170

*Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness*, TEXAS DEFENDER SERV. (2004) . . . . . . . . . . . . . . . . . . . . . . . 138

Jonathan P. Tomes, *Damned if You Do, Damned if You Don't: The Use of Mitigation Experts in Death Penalty Litigation*, 24 AM. J. CRIM. L. 359 (1997) . . . . . . . . . . . . 115

Table 1 Defense Failure to Cross Examine Witnesses ................................ II-I

Declaration of Terry Terrell Brown ........................................ II-J

## GROUND III

Declaration of Kaye Losch ............................................. III-A

Sentencing Hearing Tr. 3/22/01 (Lewis) ...................................... III-B

Sentencing Hearing Tr. 3/22/01 (Brown) ..................................... III-C

*Sworn Statement of Terry Brown* ......................................... III-D

*CID Agent Activity Summaries* SA Meraz .................................... III-E

*CID Agent Activity Summaries* SA Nelson .................................... III-F

*Juvenile Voluntary Statement of Terry Brown* ................................ III-G

*Final CID Report, pt.6* ............................................... III-H

Insert, *FBI Special Agent Evan Rae* (including Sworn Statement of Christopher Lewis) .... III-I

Final CID Report ¶ 5.5 and sworn statement of Robert Volk ........................ III-J

*Telephone message,* Date: 11/2, Time 3:23, From Charles Myers ATF ................. III-K

*Notes of Robert Swanton,* "Debriefing on 11-5-99 w/ Aycock, FBI ˙ ATF" .............. III-L

Guilty Plea Tr. 12/16/99 .............................................. III-M

*Telephone Message,* Dated 3/15, Time: 2:39 p.m., From: Mrs. Brown ................ III-N

*Telephone Messages,* Dated 5/5, Time 10:00 a.m., From Byron
San Marco ATF; Dated 5/9, Time 8:28 a.m., From Byron San Marco;
Dated 5/23, Time 9:46 a.m., From John Aycock ................................ III-O

**Redacted per Extant
Sealing Order**

957

Declaration of Terry Brown (duplicate of Exhibit II-J) .................................. III-S

Grand Jury Tr. (7/13/99) ........................................................ III-T

Declaration of Ranada Gentry ................................................... III-U

Table of What Defense and Prosecution Knew ...................................... III-V

**GROUND IV**

*United States v. Webb,*
No. 03-50978, 2004 WL 1114455, at *1 (5th Cir. May 13, 2004) .................... IV-A

*Guide to Judiciary Policies and Procedures,* Vol. VII, ch. VI § 6.02 (F) ............... IV-B

*Guide to Judiciary Policies and Procedures,* Vol. VII, App. F, p. F-10 through F-15 ..... IV-C

**Redacted per Extant
Sealing Order**

Graphic Representation and Charts Showing Time to Trial ........................... IV-E

Declaration of Leon Cheney .................................................... IV-F

Declaration of Kent Christianson ............................................... IV-G

Declaration of Tena Francis (with draft social history attached) ...................... IV-H

Table 1 Defense Failure to Cross Examine Witnesses ............................... IV-I

Texas Ranger Report of Investigation, Agent Aycock ............................... IV-J

Declaration of Robert White ................................................... IV-K

Declaration of Stanley Schwieger (June 7, 2004) .................................. IV-L

Affidavit of Dwight Stewart .................................................... IV-M

**GROUND V**

No Exhibits for Ground V ...................................................... None

958

## INDEX TO EXHIBITS VOLUME II (GROUNDS VI-XI)

**GROUND VI**

Edward J. Bronson, *Severance of Co-Defendants in Capital Cases: Some Empirical Evidence*, Discussion Paper Series, No. 94-1 21-22, 14 (College of Behavioral and Social Sciences, Cal. St. Univ., Chico, 1994) .............. VI-A

Declaration of Kevin McNally (June 6, 2004) (severance) .......................... VI-B

**GROUND VII**

Affidavit of Tina Dickson Erdmann ......................................... VII-A

Declaration of Jane McHan ................................................ VII-B

Declaration of Daneen Milam ............................................. VII-C

Psychosocial History of Christopher Vialva ................................. VII-D

Declaration of Debbie ("Dee") Bynum ...................................... VII-E

Declaration of Rowallan Vialva ........................................... VII-F

Declaration of Jacorby Smith ............................................. VII-G

Declaration of James Davidson ............................................ VII-H

Declaration of Jessica Haskins ............................................ VII-I

Declaration of Jenell Hamilton ........................................... VII-J

Declaration of Charlene Burke ........................................... VII-K

Declaration of Patrick Brockett .......................................... VII-L

Declaration of Mark Cunningham ......................................... VII-M

Inmate Triennial Report, with update of Counselor Bruce Ryherd, United States Penitentiary, Terre Haute, Indiana ................................... VII-N

Declaration of Stanley Schwieger (April 12, 2004) ........................... VII-O

Supp. Rec. on Appeal .................................................. VII-P

Declaration of Benjamin Sims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . VII-Q

**GROUND VIII**

Amended Notice Seeking Death Penalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . VIII-A

Letter of Steven Losch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . VIII-B

Letter of Christopher Vialva to Stan Schwieger, "Received Jan 15 2003"  . . . . . . . . . . . . VIII-C

Letter of Christopher Vialva to Clerk "Received Jan 16 2003" . . . . . . . . . . . . . . . . . . . . . . VIII-D

**GROUND IX**

No Exhibits for Ground IX  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . None

**GROUND X**

Declaration of Kevin McNally (June 5, 2004) (racial disparity) . . . . . . . . . . . . . . . . . . . . . . X-A

**GROUND XI**

BOP Chemical Substances Preparation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . XI-A

Drug Sequence Protocol . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . XI-B

Affidavit Mark J. S. Heath, M.D. (Mar. 3, 2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . XI-C

Katja Taxis & Nick Barber, *Ethnographic study of incidence and severity of intravenous drug errors*, 326 BRITISH MED. J. (Mar. 29, 2004) . . . . . . . . . . . . . . . . . . . XI-D

Statement of Dr. Mark Heath (Dec. 20, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . XI-E

BOP Execution Protocol  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . XI-F

Medical Examiner Report on Robert Knighton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . XI-G

Affidavit of Carol Weihrer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . XI-H

2000 Report of the AVMA Panel on Euthanasia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . XI-I

Declaration of Pat Ehlers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . XI-J

*Post-Furman Botched Executions*, Death Penalty Information Center at http://www.deathpenaltyinfor.org/article.php?scid=8&did=478 (Feb. 4, 2004) . . . . XI-K

## INTRODUCTION AND SUMMARY OF ARGUMENT

Christopher Vialva was convicted of shooting and killing Todd and Stacie Bagley on Fort Hood military installation in Killeen, Texas. The United States alleged the homicides occurred as part of a carjacking, an allegation that provided a separate basis for exercising federal jurisdiction. Mr. Vialva was barely twenty years old when the jury sentenced him to death.

The jury's verdict was the inevitable result of the virtually unrebutted evidence and argument presented by the government. As this Motion and Supporting Brief will prove, there can be no confidence in the outcome of Mr. Vialva's trial because of several grievous, compounding Constitutional errors that infected and impugned the entire process.

Mr. Vialva was represented by two lawyers selected without regard to the statutory and procedural safeguards that ensure defendants charged with capital crimes are represented by qualified attorneys who are familiar with the processes unique to federal court. The result of this departure from procedure was the appointment of Dwight Goains as an attorney "learned in the law" of death penalty. Mr. Goains was not qualified and was laboring under an actual conflict that cabined his advocacy.

The record developed during this post conviction process establishes a litany of critical failures by the defense and misconduct by the prosecution. Counsel failed to raise, or raised inadequately, legal issues that would have influenced how the case proceeded. Counsel failed to obtain the funding necessary to prepare a defense to guilt in the first stage or a case for life in the second stage. As a result, the defense failed to present a coherent defense and failed to put the government's case to the adversarial testing required for Due Process. The prosecution withheld material information that undermined the only evidence identifying Mr. Vialva as the person who shot the Bagleys. By any standard, the suppressed information would have changed the jury's

961

assessment of the critical witnesses' credibility. Counsel failed in their most important duty: to present a case for Mr. Vialva's life. Counsel's eleventh hour efforts were wholly ineffective. Defense counsel called an expert who could have assisted them in certain aspects of their presentation, but, was misused to the extent he ended up helping the prosecution prove its most influential aggravating circumstance.

The jury deliberated the fate of twenty year-old Christopher Vialva without knowing a single important fact about his life: his history of head trauma; his bipolar disorder and the genetic aspect of the disorder; the chaos that deprived him of the basic structure of childhood; and his resulting struggle with depression. The jury never knew Mr. Vialva's mental age, as a result of his youth compounded with his bipolar disorder, made him several years younger than his chronological age, a fact that bore directly on his capacity to resolve complex problems. Above all, the jury never heard from the many people who cared about him and who loved him: his aunt Dee Bynum who wanted to raise him as her son; his friend's mother who still regrets not taking him into her home and who would welcome him today; his male friends who remember him walking away rather than fighting; his former girlfriend who still recalls his kindness and still considers him a friend; his girlfriend at the time of the offense who felt he "cherished" her. All of these people feel Christopher Vialva was incapable of such an act of violence. The Christopher Vialva who emerges from this information is unrecognizable as the same person portrayed to the jury. The only explanation for this radical variance is that the trial attorneys presented their case in nearly complete ignorance of the person they were appointed to defend.

The verdicts and sentences of death were imposed in violation of the Constitution and laws of United States. A new trial is the only redress for these violations.

2

## GROUND I

**THE DISTRICT COURT FAILED TO COMPLY WITH THE STATUTORY PROCEDURE FOR THE APPOINTMENT OF COUNSEL IN DEATH-ELIGIBLE PROSECUTIONS, DENYING MOVANT CHRISTOPHER ANDRE VIALVA ACCESS TO COUNSEL QUALIFIED TO DEFEND HIM IN A FEDERAL CAPITAL PROSECUTION.**

### A.    Procedural Posture of this Claim

This issue was not raised on direct appeal. Stanley Schwieger, the first lawyer appointed by the trial court, continued representing Mr. Vialva on appeal. This post conviction proceeding is Mr. Vialva's first opportunity to present this claim with the assistance of independent counsel.

### B.    Facts Relevant to Determination of the Merits

In a criminal complaint filed June 23, 1999, Mr. Vialva and Brandon Bernard were charged with carjacking, a violation of Title 18, United States Code, Section 2119. The complaint alleged Mr. Vialva took the motor vehicle "by force and violence or by intimidation" "with intent to cause death or serious bodily harm." Doc. 1. The affidavit of Federal Bureau of Investigation Special Agent Daniel Chadwick detailed the information on which he relied as the complainant. The United States Magistrate Judge before whom Mr. Vialva was presented on June 23 entered a temporary order of detention and set the matter for a preliminary hearing the next day, June 24, 1999. Doc. 2. Attorney Stanley Schwieger was appointed to represent Mr. Vialva, incident to the initial presentment. Doc. 4. At the conclusion of the June 24 preliminary and detention hearing, the Magistrate Judge ordered the detention of Mr. Vialva and Mr. Bernard, in part, "Because you are both facing a potential death penalty . . . ." Doc. 11; PH Tr. 6/24/99, p. 32.

Neither the United States Magistrate Judge nor the United States District Judge consulted with the Federal Public Defender for the Western District of Texas prior to appointing Mr. Schwieger or after determining Mr. Vialva was potentially subject to the death penalty. *See*

3

Declaration of Lucien Campbell, attached hereto as Exhibit I-A, ¶ 2. At all times relevant to these

proceedings, Mr. Lucien Campbell was serving as the Federal Public Defender for the Western

District of Texas. Mr. Campbell provides indigent defense services through his headquarters office

in San Antonio and staffed branch offices throughout the Western District, excluding Waco, Texas.

*See id.* ¶ 1.

Mr. Vialva was named in a four count indictment returned July 13, 1999. Three of the four

counts carried a maximum punishment of death. Doc. 14. On July 16, 1999, Mr. Schwieger filed

a "Motion for Appointment of Co-Counsel in Death Penalty Case." Mr. Schwieger advised the court

he had "limited death penalty experience" based on his participation in three "capital murder Writs

of Habeas Corpus" and his preparation of a motion to suppress in another death penalty case. Doc.

19, p. 2, § IV. Mr. Schwieger stated he was advised by Mr. William Johnston of the United States

Attorney's Office of the government's intention to seek the death penalty in Mr. Vialva's case.

Doc. 19, p. 2, § V. In support of the Motion, Mr. Schwieger advised the Court:

> Current counsel has spoken to Mr. B. Dwight Goains, of Goains & Goains, whose
> offices are located in Cameron, Texas. Mr. Goains has been lead counsel [in] several
> state capital murder trials, including State v. Kenneth Allen McDuff, in the 54th
> District Court of McLennan County, Texas. Mr. Goains is a Texas board certified
> criminal law practitioner. Current counsel for the defense believes that Mr. Goains
> is "learned in the law applicable to capital cases." *See* 18 U.S.C. § 3005 (1998).

Doc. 19, p. 4, § VII. Mr. Schwieger did not confer with Mr. Campbell before submitting Mr.

Goains's name to the Court. *See* Declaration of Stanley Schwieger ¶ 3, attached hereto as Exhibit

IV-L. The United States responded, "The Government leaves this matter to the discretion of the

Court." Doc. 31. The Court appointed Mr. Goains without consulting with Mr. Campbell. Exhibit

I-A, ¶ 3. Mr. Richard Burr, who serves as Capital Resource Counsel on retainer with the

Administrative Office of the United States Courts, was not consulted by the Court or by Mr.

4

Schwieger prior to Mr. Goains's appointment as "learned counsel." *See* Declaration of Richard Burr, attached hereto as Exhibit I-B, ¶¶ 2, 8. The Court made no express findings concerning Mr. Goains's qualifications. Doc. 29.

## C.    Legal Authority Supporting Relief

The right of the accused "to make his full defence by counsel learned in the law" and the obligation of the court to assign counsel, "not exceeding two", to assist a defendant indicted "for treason or another capital crime" was enacted by Congress in 1790. Act of Apr. 30, 1790, ch. 9, § 29, 1 Stat. 118. This fundamental right to representation has remained secured by statute since its initial enactment. The current statute, codified in Title 18, United States Code, Section 3005, in 1948, was amended by the Federal Death Penalty Act of 1994. June 25, 1948, ch. 645, §1, 62 Stat. 814; Sept. 13, 1994, Pub. L. 103-322, Title VI, § 60026, 108 Stat. 1982. The present version of Section 3005, which controlled the appointment of counsel in Mr. Vialva's case, directs the court:

> . . . shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours. In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or if no such organization exists in the district, the Administrative Office of the United States Courts.

The purpose of requiring a recommendation from the Federal Public Defender organization is rooted in the federal courts' commitment to providing effective assistance of counsel, consonant with the Sixth Amendment.

In response to the expansion of the federal death penalty statutes and the correlative increase in the number of prosecutions, the Judicial Conference of the United States, through its Defender Services Committee, conducted a plenary review of the federal courts' provision of resources for capital defense. In May, 1997, the Chair of the Defender Services Committee appointed a three

judge subcommittee, chaired by Judge James R. Spencer of the Eastern District of Virginia "to study the judiciary's current approach to the appointment and compensation of counsel in these cases, its success in recruiting qualified attorneys, and the quality and cost of services provided." *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* (hereinafter, *Spencer Committee Report*), Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States (May 1998), available at http://www.uscourts.gov./dpenalty/4REPORT.htm.   Addressing the importance of learned counsel, the Spencer Subcommittee noted:

> Federal death penalty cases require knowledge of the extensive and complex body of law governing capital punishment *and* the intricacies of federal criminal practice and procedure.  Neither one alone is sufficient to assure high quality representation. Lawyers and judges recounted cases in which seasoned federal criminal lawyers who lacked death penalty experience missed important issues. . . . On the other hand, differences between state and federal practice place a lawyer who may have prior capital experience but no prior federal criminal trial experience at a disadvantage. The federal sentencing guidelines, speedy trial act, rules of evidence and procedure, and the specifics of the federal death penalty law play an important role in representation.

*Spencer Committee Report*, § I (C) (1) (emphasis in original).  The Spencer Subcommittee proposed eleven recommendations "to enhance the judicial administration of federal death penalty cases." *Id.* Introduction.

The Judicial Conference adopted the Spencer Subcommittee's recommendations September 15, 1998.  The recommendations, accompanied by the Subcommittee's commentary, were promulgated by the Administrative Office of the United States Court in Volume VII, Appendix I, of the *Guide to Judiciary Policies and Procedures* (1999) (hereinafter, *Guide*).   The recommendations address the qualifications for appointed counsel, beginning with a direction to the courts about quality:

> Courts should ensure that all attorneys appointed in federal death penalty cases are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding type of litigation. High quality legal representation is essential to assure fair and final verdicts, as well as cost-effective case management.

*Guide*, Vol. VII, App. I (1)(a).  The *Guide* notes the statute requires the appointment "at the outset of every capital case" of two counsel, "at least one of whom is experienced and knowledgeable about the defense of death penalty cases."  *Guide*, Vol. VII, App. I (1)(b).

> Ordinarily, "learned counsel" should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation.

*Id.*  Consonant with Section 3005, the *Guide* directs the appointing court to consider the recommendation of the Federal Public Defender, unless the organization has a conflict. *Guide*, Vol. VII, App. I (2)(b).  The commentary notes the requirement for consultation:

> . . . reflects the [Spencer] Subcommittee's view that recommendations concerning appointment of counsel are best obtained on an individualized, case-by-case basis. . . . Currently, within approximately 24 hours of receipt of a request, the Administrative Office or federal defender provides the court with the names of attorneys who are not only qualified to serve as counsel but who also have been contacted and indicated their willingness to serve in the particular case.  These individualized recommendations help to ensure that counsel are well-suited to the demands of a particular case and compatible with one another and the defendant.  Case-specific consultation is also required by existing Judicial Conference policy (see paragraph 6.01B of the Guidelines for the Criminal Justice Act (CJA Guidelines), Volume VII, *Guide to Judiciary Policies and Procedures*, explaining the 18 U.S.C. § 3005 consultation requirement and suggesting that in developing a recommendation, consideration be given to "the facts and circumstances of the case.").

*Guide*, Vol. VII, App. I (2), Commentary p. I-6 I-7 (footnotes omitted).  Based on the information available to the Spencer Subcommittee in 1997, the members commented:

> Since 1994, courts have been required to consider the recommendation of their federal public defender organization or the Administrative Office regarding the appointment of counsel in each federal death penalty case.  The Administrative Office has notified the courts of this relatively recent innovation, and it has been largely followed and

7

yielded results satisfying to judges, defense counsel and prosecutors. In a small number of cases, however, the Subcommittee found that courts had ignored or been unaware of the consultation requirement.

*Id.* at I-6 (footnotes omitted). Mr. Schwieger cited the Spencer Subcommittee Report in his Motion, solely as support for his argument that learned counsel should be appointed to assist in preparing for the Department of Justice's death penalty authorization meeting. Doc. 19, pp. 2-4, § VI. Mr. Schwieger did not provide the Court with a copy of the report, or with a reference for its retrieval from the United States Courts' website. Mr. Schwieger cited Section 3005, but did not quote it in its entirety or otherwise explain the appointing court's duty to consult the Federal Public Defender. Thus, the Court's failure to consult Mr. Campbell is attributable, in part, to counsel's failure to apprise the Court of the applicable law.

The actions of the Judicial Conference in response to the Spencer Subcommittee's findings and recommendations are a direct measure of the importance the United States Courts place on providing the "high quality representation" necessary in capital cases. The implementing procedures devised to assist the courts are not optional. While a court may decline to follow the recommendation of the Federal Public Defender, the statute does not vest the court with the option to ignore the statutory requirement of consultation. The record establishes the appointments of Mr. Schwieger and Mr. Goains were made in derogation of Section 3005 and the implementing procedures established by the Judicial Conference in the *Guide. See also,* Exhibit I-B, ¶ 6.

Counsel were unable to identify any cases in which the appointing court's failure to comply with the consultation requirement was raised as an error on appeal or on post-conviction review in the Fifth Circuit. However, Section 3005 has been construed, in varying factual contexts, by a number of courts outside the Fifth Circuit. These decisions highlight the structural nature of errors arising from the courts' misapplication of Section 3005.

8

In *United States v. Watson*, 496 F.2d 1125 (4th Cir. 1973), the defendant was charged with first degree murder, a violation of Title 18, United States Code, Section 1111. Section 1111 provided death as a possible punishment. Mr. Watson's court appointed counsel requested the appointment of co-counsel, based on his need for assistance in preparing to defend the complex case. The district court denied the request. *Id.* at 1126. Mr. Watson was convicted and appealed, contending, *inter alia*, that his rights were violated by the district court's denial of second counsel pursuant Section 3005. The government asserted no error occurred because the Supreme Court's ruling in *Furman v. Georgia*, 408 U.S. 238 (1972) effectively abrogated the death penalty as a possible punishment for the federal first degree murder statute.

The Fourth Circuit agreed *Furman* prohibited the imposition of the death penalty in Mr. Watson's case, but disagreed that the right to second counsel secured by Section 3005 was also rendered void.

> Not every capital crime is a complex one and not every capital crime arises from a complex set of facts which would require extensive investigation and trial preparation by defense counsel. Yet it seems to us that it is more likely than not that an alleged offense of the type for which Congress has purportedly continued the death penalty will be a complex and difficult case to prepare and try. The kinds of crimes made punishable by death are usually such as to generate revulsion in the trier of fact and, as a result, a high degree of prejudice if the trial is not conducted strictly in accord with recognized procedures, including the rules of evidence and the burden of proof. It is not unlikely that Congress may have also sought to buttress the defense with two attorneys to provide greater assurance that a defendant's rights would be fully observed.

*Watson*, 496 F.2d at 1128 (footnotes omitted). The government urged that even if error occurred, no prejudice could be shown from the district court's denial of counsel. The Fourth Circuit noted the evidence against Mr. Watson was "substantial, if not overwhelming," but:

> . . . we recognize the almost insuperable difficulty which would be placed upon any defendant, if the burden is placed on him, to show post hoc that he was prejudiced by denial of his right to have two attorneys.

*Id.* at 1129. Finding the statute "unequivocal," the Fourth Circuit concluded it had no right to construe the language as vesting the district court with discretion in its application. The Fourth Circuit concluded "the statute would be eviscerated by application of the harmless error doctrine" and so reversed the conviction and ordered a new trial. *Id.* at 1130; *see also United States v. Williams*, 544 F.2d 1215, 1218 (4th Cir. 1976) (Holding failure to appoint second counsel in a capital case "gives rise to an irrebuttable presumption of prejudice.").

The Fourth Circuit revisited Section 3005 following the 1994 amendment. In *United States v. Boone*, 245 F.3d 352 (4th Cir. 2001), the defendant was charged with destroying a vehicle by the use of an explosive, in violation of Title 18, United States Code, Section 844(I). Since the driver of the vehicle was killed in the explosion, the death penalty was available as a punishment. Mr. Boone sent a *pro se* letter to the district judge referring to the death penalty and asking at what point additional counsel would be available. The district court did not respond to the letter, but noted on the record that the issue was preserved for further review. *Id.* at 358. The government argued the 1994 amendment to Section 3005 restricted the appointment of second counsel to only those cases in which the death penalty was actually sought. The Fourth Circuit agreed with Mr. Boone that the amendment did not require reversal of *Watson.* The Fourth Circuit reaffirmed its decision that the unambiguous language of Section 3005, as amended, mandates the court provide two counsel to assist a defendant if the death penalty is the "maximum sentence" that could be imposed. *Id.* at 359. Mr. Boone's conviction was vacated and the case was remanded for a new trial. *Id.* at 364.

The dissent in *Boone* noted other Circuits restricted the right to second counsel to those cases in which the death penalty was actually sought by the United States. This assertion is relevant when the cases on which the dissent relied are examined. With two exceptions, all of the cases cited by the dissent were decided prior to the reinstatement of the federal death penalty and its expansion in the

10

Federal Death Penalty Act of 1994. None of the cases required the appellate courts to consider the impact of the Department of Justice's death penalty authorization process on the accused's right to learned counsel.[1] In the two remaining cases, the United States stipulated it would not seek the death penalty. Neither case noted when this stipulation occurred.[2] *See also United States v. Casseus*, 282 F.3d 253, 256 (3d Cir. 2002) (Appellants indicted for a capital offense March 25, 1999; requests for second counsel not addressed; United States announced decision not to seek death May 12, 1999; harmless error analysis applied: "Because the right to additional counsel is created by statute, and not coterminous with the right to counsel contained in the Sixth Amendment, the essential question is whether there is a 'high probability' that the error did not prejudice the appellants."). The critical fact distinguishing these cases from Mr. Vialva's is that none of the defendants were subject to imposition of the death penalty under the present statutory and procedural scheme. Prior constructions of the statute provide no basis for the conclusion a reviewing court would apply a harmless error analysis to a case in which the accused's statutory rights were not observed and a death sentence was obtained.

A second line of cases, concerning whether counsel qualifies as "learned in the law applicable to capital cases," was addressed in *United States v. Miranda*, 148 F. Supp. 2d 292, 293 (S.D.N.Y. 2001). The district court examined the standards expressed by the Spencer Subcommittee, by Federal Death Penalty Resource Counsel David Bruck, and by the American Bar Association. The court found it "should consider the recommendation of the federal public defender." *Id.* at 297(citing

---

[1] *United States v. Steel*, 759 F.2d 706 (9th Cir. 1985); *United States v. Dufur*, 648 F.2d 512 (9th Cir. 1980); *United States v. Shepherd*, 576 F.2d 719 (7th Cir. 1978); and *United States v. Weddell*, 567 F.2d 767 (8th Cir. 1977).

[2] *United States v. Grimes*, 142 F.3d 1342, 1347 (11th Cir. 1998); *United States v. Davidson*, No. 92-CR-35, 1992 WL 165825, *1 (N.D.N.Y. July 10, 1992).

11

971

Section 6.01 of the *Guide to Judiciary Policies and Procedures*). The court noted the *Guide* recommends consultation about the facts and circumstances of the case to determine the qualifications required to provide effective representation. The court also noted the availability of the Federal Death Penalty Resource Counsel "in order to identify qualified counsel." *Id.* at 297. Finding the application for appointment of counsel failed to establish proposed counsel's qualifications, the court directed a hearing on the application. *Id.* at 297.

A separate problem was presented in *United States v. Sterling-Suárez*, 233 F. Supp. 2d 269 (D.P.R. 2002), in which the district court found an attorney "learned in the law" over the attorney's objections. The counsel selected by the district court was the Federal Public Defender for Puerto Rico. The opinion is silent on whether the court sought the advice of the Administrative Office or Death Penalty Resource Counsel before making its determination. The court recited the 1989 American Bar Association standards, as well as counsel's prior experience in death penalty cases that did not proceed to trial. The court made no findings concerning the Federal Public Defender's availability or willingness to serve as learned counsel. While the district court did not address all of the concerns expressed in the Spencer Subcommittee Report, it did engage in a qualitative analysis of counsel's credentials, as they appeared from the public record. The Court failed to perform a similar inquiry in this case.

The threshold question of whether the United States would seek the death penalty was never in doubt in this case. The Assistant United States Attorney responded to counsel's request for second counsel by stating the government left the matter "to the court's discretion." Doc. 31. In the absence of a government stipulation to the contrary, the Magistrate Judge's conclusion the accused were "facing the potential death penalty" was correct and Section 3005 was apposite. The Court's initial appointment of Mr. Schwieger did not comply with Section 3005. Mr. Schwieger's subsequent

application for appointment of Mr. Goains was similarly improper. If the Court would have consulted Mr. Campbell and the Death Penalty Resource Counsel, neither Mr. Schwieger nor Mr. Goains would have been recommended for appointment. Exhibit I-A, ¶ 5, ¶ 6; Exhibit I-B, ¶ 9, ¶ 10.

Even if this Court determines Mr. Vialva must demonstrate prejudice from these sequential violations of Section 3005, such prejudice is manifest from the face of the record and from extra-record facts developed during this post-conviction litigation. These errors began with Mr. Schwieger's request for appointment of Mr. Goains and continued through the course of the litigation. These errors, detailed in Grounds II through IX, prove Mr. Vialva was denied the rights secured to him by Title 18, United States Code, Section 3005. The trial court's departure from the statutory and judicial procedures established to ensure the appointment of qualified counsel denied Mr. Vialva Due Process and his Sixth Amendment Constitutional right to the effective assistance of counsel.

## GROUND II

**MR. VIALVA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS ABRIDGED WHEN HIS TRIAL COUNSEL APPLIED FOR EMPLOYMENT WITH THE UNITED STATES ATTORNEY'S OFFICE DURING THE PENDENCY OF HIS TRIAL WITHOUT SECURING CONSENT BEFORE THE CONFLICT AROSE OR AN EFFECTIVE WAIVER AFTER THE CONFLICT HAD OCCURRED. THE CONFLICT CAUSED AN ADVERSE EFFECT ON AND/OR PREJUDICE TO THE OUTCOME OF MR. VIALVA'S TRIAL WHICH NECESSITATES REVERSAL AND A NEW TRIAL.**

Mr. Goains's application for employment with the United States Attorney's Office during the pendency of Mr. Vialva's trial created a conflict of interest. In the opinion of noted legal ethicist Lawrence J. Fox, former chair of the American Bar Association's Standing Committee on Ethics and Professional Responsibility, it was an unwaivable conflict that "represents one of the most profound and sad conflicts of interest I have ever observed." Declaration of Lawrence J. Fox, at 18, attached

13

hereto as Exhibit II-A. As Mr. Fox explains, the conflict resulted in "violations so serious that they clearly implicate Mr. Viavla's constitutional right to effective assistance of counsel." *Id.* at 1. The only remedy for this "egregious violation of our rules of professional conduct is to provide Mr. Vialva with a new trial at which he is represented by the effective lawyer which the Constitution guarantees him – one true champion whose loyalty to the accused is unconditional and uncompromised." *Id.* at 19.

## A.    Procedural Posture of this Claim

Through the ineffectiveness of trial and appellate counsel, this Ground was not previously presented to any court. This is Mr. Vialva's first opportunity to present this claim with the assistance of independent counsel and to support his claim with extra record facts.

## B.    How the Conflict Unfolded

On June 23, 1999, United States Magistrate Judge Green appointed Mr. Stan Schwieger to represent Mr. Vialva. Doc. 4. On July 16, 1999, Mr. Schwieger moved for the appointment of additional counsel to represent Mr. Vialva, citing 18 U.S.C. § 3005.[3] Doc. 19. In the motion, Mr. Schwieger stated he had "limited death penalty experience" and requested the appointment of Mr. Dwight Goains, whom Mr. Schwieger believed to be "learned in the law applicable to capital cases." *Id.* at 2, 4. On July 21, 1999, this Court appointed Mr. Dwight Goains to serve as co-counsel with Mr. Schwieger in the trial of Mr. Vialva's capital case. Doc. 29. Mr. Goains undertook the representation of Mr. Vialva without reservation.

Unbeknown to Mr. Vialva, Mr. Goains had "for about the last eight or ten years . . . been

---

[3]Whoever is indicted for . . . [a] capital crime shall be allowed to make his full defense by counsel; and the court . . . shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases . . . ." 18 U.S.C. § 3005.

trying to apply to be an Assistant United States Attorney." *See* Tr. Hearing (5/12/00) at 3, attached hereto as Exhibit II-B. In early February 2000, while his representation of Mr. Vialva was underway and without prior notification to Mr. Vialva, Mr. Goains acted on that interest and interviewed for an opening in the Waco field office of the United States Attorney's Office of the Western District of Texas, the very agency, the very district, and the very field office that was prosecuting Mr. Vialva. *See* Letter from Dwight Goains to Susan Otto (Feb. 27, 2004) ¶¶ 1-2, attached hereto as Exhibit II-C [hereinafter "Goains Letter"]; *see also* Letter from Susan Otto to Dwight Goains (Feb. 24, 2004) ¶¶ 1-2, attached hereto as Exhibit II-D [hereinafter "Otto Letter"]; Declaration of Lisa S. McCalmont ¶ 6, attached hereto as Exhibit II-E [hereinafter "Declaration McCalmont"].

Although Mr. Goains was not hired for the opening in the Waco field office, he expressed continuing interest in a position with the United States Attorney's Office in a letter sent in March, 2000. *See* Goains Letter ¶ 4 (Exhibit II-C); and Otto Letter ¶ 4 (Exhibit II-D); Declaration McCalmont ¶ 8 (Exhibit II-E).

On May 3, 2000, Mr. Goains visited Mr. Vialva in jail to discuss his conflict and exacted a waiver from Mr. Vialva. *See* Electronic Mail from Stan Schwieger to Lisa Brown (5/4/00), attached hereto as Exhibit II-F. Mr. Schwieger apparently did not accompany Mr. Goains to the meeting with Mr. Vialva. *Cf. id.* Mr. Goains has no specific recollection of what he told Mr. Vialva in that visit. *See* Declaration McCalmont ¶ 9 (Exhibit II-E).

On Friday May 12, 2000, three days before the commencement of trial on Monday May 15, 2000, and three months after his job interview, Mr. Goains requested a hearing before this Court to make a record about his application to the United States Attorney's Office. *See* Tr. Hearing (5/12/00) at 3 (Exhibit II-B). Mr. Goains has said the substance of the hearing accurately reflects his discussions with Mr. Vialva on May 3, 2000. *See* Declaration McCalmont ¶ 12 (Exhibit II-E).

15

975

At the hearing, Mr. Goains reminded the Court that, "as this Court is well aware, Your Honor, for about the last eight or ten years I've been trying to apply to be an Assistant United States Attorney." *See* Tr. Hearing (5/12/00) at 3 (Exhibit II-B). Mr. Goains asserted his application to join the United States Attorney's Office had nothing to do with Mr. Vialva's case, but "there's more than an excellent chance I may receive an offer" and that "if that offer does come in, I'm going to accept it." *Id.* at 4. Mr. Goains asserted he had discussed the matter with Mr. Vialva and had offered to withdraw or permit the substitution of another counsel, but that Mr. Vialva wished him to continue in the case. *Id.* at 3, 4. Mr. Goains presented Mr. Vialva to the Court for its examination. *Id.* at 4-5. The Court asked Mr. Frazier, the Assistant United States Attorney in charge of prosecuting Mr. Vialva's case, for comment. Mr. Frazier requested a waiver from Mr. Vialva that "to the extent there is any conflict, if there is any, that Mr. Vialva waives it and understands that that's permanent waiver of any type of potential issue." *Id.* at 5. The Court exacted the waiver from Mr. Vialva by explaining to him that he would not be able to say later "Well, I didn't get a fair trial, because Mr. Goains had applied for a job with the U.S. Attorney's Office." *Id.* at 6.

After the trial of Mr. Viavla's case was concluded, Mr. Goains moved to withdraw as counsel because he "d[id] not wish to represent Mr. Vialva in his appeals process." Doc. 292. The Court granted Mr. Goains's motion to withdraw. Doc. 294. Sometime after trial, Mr. Goains disposed of his files regarding his representation of Mr. Vialva and was not able to produce those files to post-conviction counsel. *See* Declaration of George Rawlings ¶ 5, attached hereto as Exhibit II-G. During the pendency of Mr. Vialva's appeal, Mr. Goains accepted employment with the United States Attorney's Office for the Western District of Texas. Mr. Goains is presently employed as an Assistant United States Attorney in the Alpine, Texas Office. *See* Goains Letter ¶¶ 6-8 (Exhibit

16

976

II-C); Otto Letter ¶¶ 6-8 (Exhibit II-D).[4]

### C.    The Law of Conflicts and the Constitutional Right to Effective Assistance of Counsel

Every defendant has a Constitutional right guaranteed under the Sixth Amendment to "the assistance of an attorney unhindered by a conflict of interests." *Holloway v. Arkansas*, 435 U.S. 475, 483 n.5 (1978). A criminal lawyer "owes [his] client a duty of loyalty, [and] a duty to avoid conflicts of interest." *Strickland v. Washington*, 466 U.S 668, 688 (1984). It is well settled that "[w]hen a client employs an attorney, he has a right to presume, if the latter be silent on the point, that he has no engagements, which interfere, in any degree, with his exclusive devotion to the cause confided to him; that he has no interest, which may betray his judgment, or endanger his fidelity." *Williams v. Reed*, 29 F. Cas. 1386, 1390 (C.C.D. Me. 1824) (No. 17,733).

Breach of the fundamental duty of loyalty owed by a lawyer to his client so risks unhinging the fundamental fairness of the criminal trial process that the Supreme Court has examined issues of conflicts frequently and created a framework for conflicts analysis.

The first step in the analysis is to ascertain whether there was a conflict. The Court looks to the rules of professional conduct to ascertain whether there is a present conflict or a situation that can develop into a conflict. For example, in criminal representations, one question is whether there is a joint or concurrent representation which causes the lawyer to simultaneously serve two masters, or whether there is a situation which implicates duties of loyalty to clients in successive representations. *Compare Holloway*, 435 U.S. at 478 (concurrent); *Glasser v. United States*, 315 U.S. 60, 68-69 (1942) (concurrent); *with Mickens v. Taylor*, 535 U.S. 162, 164-65 (2002) (successive

---

[4]Mr. Vialva's notice of appeal was filed on June 16, 2000 (Doc. 291) and Mr. Vialva's appellant's brief was filed in the Fifth Circuit on May 30, 2001.

representation).

Second, the Court must determine whether the conflict was waivable. If the conflict is waivable, then it must be determined whether there was a waiver, when the waiver occurred, and whether any waiver was effective. At this point, the Court considers whether the defendant, through counsel, recognizes and objects to the conflict or has knowingly and intelligently waived the conflict. *Compare Wheat v. United States*, 486 U.S. 153, 157 (1988) (client waiver); *with Glasser*, 315 U.S. at 70 (no affirmative waiver); *and Holloway*, 435 U.S. at 478 (objection to concurrent conflict).

Third, the Court must determine to what extent the trial court provided the needed prophylaxis through inquiry into the conflict to assure that the conflict would not adversely impact the defendant or the fairness of the proceedings. In this inquiry, the Court considers whether a trial judge knew of or should have known of the conflict, or made any inquiry into the conflict. *Compare Glasser*, 315 U.S. at 71 (no meaningful inquiry); *Holloway*, 435 U.S. at 478 (failure to meaningfully inquire); *Mickens*, 535 U.S. at 174 (no inquiry); *with Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980) (no duty to inquire).

Finally, the Court must ascertain whether the conflict rises to the level of a Constitutional violation by looking at the nature and extent of the conflict. In an effort to characterize the nature and extent of the conflict, courts somewhat confusingly pose the question as whether there is an "actual conflict," "possible," or "potential" conflict. *See, e.g., Mickens*, 535 U.S. at 167-73 (collecting cases); *Sullivan*, 446 U.S. at 350 (considering whether actual as opposed to potential conflict exists); *Burger v. Kemp*, 483 U.S. 776, 783 (1987) (possible conflict). But regardless of the terminology used, the point of this inquiry is to determine what standard of review applies to the conflict, whether harm can be presumed, or whether harm is less certain to have occurred and therefore some level of proof of adverse impact or prejudice to the defendant is required.

18

Based on this analysis, the Court applies any one of a range of standards of review. In limited circumstances, the Court concludes, based on the nature and extent of the conflict, that no proof of harm is necessary and reversal for a new trial is automatic. *See, e.g., Holloway*, 435 U.S. at 491; *Glasser*, 315 U.S. at 76. More routinely, the Court requires a showing that the conflict has had an adverse effect on representation. *Sullivan*, 446 U.S. at 350. Finally, although the Supreme Court has never addressed the question directly, some lower courts have applied the *Strickland* standard that requires proof of objective unreasonableness of counsel's conduct coupled with a likely prejudicial impact on the outcome of the case. *See, e.g., Lockhart v. Johnson*, 104 F.3d 54, 58 (5th Cir. 1997) (holding that *Strickland* standard is "ordinarily" used in cases of attorney conflict and that the *Cuyler/Sullivan* standard is "primarily" reserved for cases of multiple representation); *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc) (applying *Strickland* outside of the multiple or serial client context).

Mr. Goains labored under a conflict. The conflict was unwaivable. Even if the conflict had been waivable, it was not knowingly and intelligently waived. The Court failed to fulfill its independent duty to inquire and protect Mr. Vialva's rights and the fairness of the proceedings. Under any of the possible standards of review, this conflict caused prejudice to Mr. Vialva and warrants reversal and a new trial.

### D. Mr. Goains's Application for Employment With the Government Created a Conflict of Interest

The Fifth Circuit has held that "'[a] conflict exists when defense counsel places himself in a position conducive to divided loyalties.'" *United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir. 1993) (quoting *United States v. Carpenter*, 769 F.2d 258, 263 (5th Cir. 1985)). To determine if any particular situation creates such a conflict, we look to the national and local rules of professional

conduct. *Perillo v. Johnson*, 205 F.3d 775, 801 (5th Cir. 2000) (the ABA Model Rules of Professional Conduct are the "relevant ethical standards"); *Vaquero*, 997 F.2d at 90-91 (Court of Appeals determines significance of conflict by reference to national standards of legal ethics).

The relevant national and local rules of professional conduct all recognize that conflicts can arise when a lawyer's personal interests affect the representation of a client. The black letter rule of law is that "[u]nless the affected client consents . . . , a lawyer may not represent a client if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's financial or other personal interests." RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 125 (2003).

A lawyer who has discussions regarding employment with an entity adverse to his client breaches the fundamental duty of loyalty to his client and places himself in a position of divided loyalties. *See* MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7, cmt. 10, Personal Interest Conflicts (5th ed. 2003) ("[W]hen a lawyer has discussions concerning possible employment with an opponent of the lawyer's client, . . . such discussions could materially limit the lawyer's representation of the client."); *see also* TEX. GOV'T CODE, tit. 2 Subt. G, App. A, Art. 10, § 9, Rule 1.06 (Vernon Supp. 1999); RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 125 cmt. d (2003).

A lawyer is thus prohibited from undertaking substantive employment discussions, and specifically prohibited from accepting employment, unless he has consulted and has received prior consent from his client. *Job Negotiations with Adverse Firm or Party*, ABA Comm. on Ethics and Prof. Resp., Formal Op. 96-400, at *1 (1996) (Employment discussions or negotiations by a lawyer with an adverse firm or party "clearly raise ethical issues under Rule 1.7(b), which prohibits a lawyer, without consultation and consent, from representing a client when his personal interests may

20

materially limit the representation."). "[F]or the protection of clients, Rule 1.7(b) requires a lawyer who is actively representing a client in a matter, and who is considering an association with a firm or party to whom he is opposed in the matter, to consult with his client and obtain the client's consent to his continuing to work on the matter while the lawyer explores such association." *Id.* at *5. Consent to the conflict must occur *before* the conflict materializes.

> We, therefore, conclude that a lawyer who has an active and material role in representing a client in litigation must consult with and obtain the consent of that client, ordinarily *before* he participates in a substantive discussion of his experience, clients or business potential or the terms of an association with an opposing firm. The consultation that the Committee here concludes that a job-seeking lawyer should have with a client whom he is currently representing, *before he participates in substantive employment discussions*, should include all facts that the client should consider in making an informed decision. These include the posture of the case, the nature of the work that the lawyer could or should be doing, and the availability of others in the firm to assume the work that the lawyer is doing.

*Id.* at *3 (emphasis added) (internal footnotes omitted). "If discussion of employment has become concrete and the interest in such employment is mutual, the lawyer must promptly inform the client. Without effective client consent, the lawyer must terminate all further discussions concerning the employment, or withdraw from representing the client." RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 125 cmt. d (2003) (internal citations omitted).

> The rationale for requiring prior consent to such conflicts is that:
>
> Personal interests of a lawyer that are inconsistent with those of a client might significantly limit the lawyer's ability to pursue the client's interest. Even if a lawyer could subordinate significant personal interests to the interests of clients, it is difficult to determine after the fact whether a lawyer had succeeded in keeping a client's interests foremost.

*Id.* § 125 cmt. b.

The importance of consultation and consent before the conflict arises cannot be overemphasized. Prior consultation serves the purpose of putting the power over the conflict in the

21

hands of the client. *See id.* § 122 cmt. b ("In effect, the consent requirement means that each affected client or former client has the power to preclude representation by withholding consent.").

A world of options are open to an ordinary client if he is consulted before the conflict arises. The client, if he wishes, can prohibit the conduct outright or he can seek independent advice before consenting.[5]

Mr. Goains was appointed to represent Mr. Vialva in July of 1999. He engaged in substantive employment discussions with the United States Attorney's Office in February 2000, some six months after his representation of Mr. Vialva began. *See* Goains Letter ¶ 2 (Exhibit II-C); Otto Letter ¶ 2 (Exhibit II-D); Declaration McCalmont ¶ 7 (Exhibit II-E). Mr. Goains's best recollection and records show he did not speak with Mr. Vialva about the conflict until May 3, some three months after substantive employment discussions had occurred. *See* Declaration McCalmont ¶ 9 (Exhibit II-E); Tr. Hearing (5/12/00), at 3 (Exhibit II-B). Having failed to secure Mr. Vialva's consent to the employment discussions before those discussions took place, Mr. Goains was in violation of the rules of professional ethics by which he was bound and in breach of the duty of loyalty to his client. Mr. Goains's substantive employment discussions with the United States Attorney's Office created a conflict which "is particularly egregious." *See* Declaration Lawrence Fox, at 5 (Exhibit II-A). At that point, the conflict became current and substantial. *Id.* at 5-6.

### E.    This Conflict Was Unwaivable

Some conflicts are simply unwaivable. *See United States v. Schwartz*, 283 F.3d 76, 95-96 (2d

---

[5]Of course, Mr. Vialva's situation was not that of an ordinary client. Mr. Vialva was indigent. The Court created the attorney client relationship when it appointed Mr. Goains. Only the Court had the power to terminate the relationship. Thus, the options available to any ordinary client, specifically the power to preclude the conflict if apprised of the conflict before it occurred, were not available to Mr. Vialva without the Court's assistance. Mr. Vialva's dependence on the Court makes the notice to the Court and the Court's inquiry, discussed *infra*, all the more important.

Cir. 2002). Particularly insidious are those conflicts which, as here, implicate the self-interest, the pecuniary interests, of the lawyer. Such conflicts are the kind that "'[n]o rational defendant would knowingly and intelligently be represented by a lawyer whose conduct was guided largely by a desire for self-preservation.'" *Id.* at 96 (quoting *United States v. Fulton*, 5 F.3d 605, 613 (2d Cir. 1993)). In general, a client has the right to waive an attorney conflict. But this was not a conflict any reasonably advised client would actually waive. In this case, there is a significant risk that Mr. Goains, expectantly waiting for a forthcoming job offer, would consciously or subconsciously "pull his punches." As Mr. Fox explains, "[t]he fact is there is no reasonable lawyer who would have advised Mr. Vialva to accept Mr. Goains as his lawyer with all these limitations on Mr. Goains' freedom of action." Declaration Lawrence J. Fox, at 10 (Exhibit II-A). Indeed, there is no lawyer, "consistent with our profession's ethical obligation to act competently – who could recommend accepting any limitation, let alone these profound limitations, on the zealous representation Mr. Vialva could receive." *Id.* This was an unwaivable conflict.

**F.      This Conflict Was Not Waived**

**1.      Waivers Must Occur Before The Conflict Arises**

Even if this conflict could have been waived, there was no waiver in this case. For a waiver to be effective, no matter how comprehensive or what form it takes, it must occur *before* the conflict arises. ABA Comm. on Ethics and Prof. Resp., Formal Op. 96-400 (1996), at *3, 5. No such prior waiver occurred. A waiver obtained after the conflict arises is ineffective; like shutting the barn door after the horse is already gone, it cannot cure the problem.

23

## 2.    Waivers Are Knowing and Voluntary Relinquishments of Rights

Even if an after-acquired waiver were theoretically possible, Mr. Goains's belated attempt to secure a waiver from Mr. Vialva was ineffective. Mr. Vialva's purported waiver was neither knowing nor voluntary.

A waiver of the right to unconflicted counsel "must be 'an intentional relinquishment or abandonment of a known right.'" *United States v. Garcia*, 517 F.2d 272, 276 (5th Cir. 1975) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Waivers must be "voluntary but also 'knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" *Id.* (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). "The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances that surround the case, including the background, experience, and conduct of the accused." *Id.* at 277 n.5. Moreover, "[t]o preserve the protection of the Bill of Rights for hard-pressed defendants, we indulge every reasonable presumption against the waiver of fundamental rights." *Glasser*, 315 U.S. at 70.

Consent must be informed and "made with adequate information about the material risks." RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 122 (2003). "A client's consent will not be effective if it is based on an inadequate understanding of the nature and severity of the lawyer's conflict." *Id.* cmt. b. Importantly, "[t]he[] imponderables [of conflict analysis] are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics." *Wheat*, 486 U.S. at 163. Thus, care must be taken to insure that the client understands all of the ramifications of the potential for adverse impact on his case.

Mr. Goains apparently told Mr. Vialva nothing before engaging in substantive discussions

24

984

with the United States Attorney's Office. Three months after those discussions began, Mr. Goains approached Mr. Vialva on May 3 and told him of his interview, that there was a more than excellent chance he would be offered a job with the United States Attorney's Office, that he would take the job if offered, and that he knew his employment discussions would not interfere with Mr. Goains's representation of Mr. Vialva. *See* Declaration McCalmont ¶¶ 9, 10 (Exhibit II-E).

Mr. Goains told Mr. Vialva nothing of his right to consult with independent counsel and nothing of the risk, recognized by courts, that lawyers interviewing or having pending employment with prosecution offices may have difficulty challenging the prosecution's case or cross examining government witnesses who will be future colleagues. *See, e.g., Atley v. Ault*, 191 F.3d 865, 867 (8th Cir. 1999). Most specifically, there is no indication Mr. Vialva was told Mr. Goains interviewed for a vacancy in the same United States Attorney's branch office that was prosecuting him. There is no indication Mr. Vialva was told the interview was conducted by William Blagg, the United States Attorney, who took a personal interest in the prosecution of this high profile case, the first death penalty case in the Western District of Texas, and who held the power to hire Mr. Goains.

Mr. Goains repeated his attempt at a waiver, compounding his failure to get a knowing waiver, when he appeared before the Court on May 12, 2000. There, he volunteered to the Court what he had previously told Mr. Vialva and then presented Mr. Vialva to the Court for examination. In court, the waiver exacted from Mr. Vialva was highly coercive, occurring on the Friday before trial began on Monday. Conflicted counsel was the lawyer "learned in the law of capital cases" and responsible for the first stage of the case. Mr. Vialva was in no position to ask him to leave the case, especially since the trial court did not explain to Mr. Vialva his rights: consultation with an independent lawyer; time to consider the impact of the conflict on his case; and, if Mr. Vialva chose to have Mr. Goains replaced, time for his new lawyer to prepare for the case. Mr. Vialva's consent

25

985

to Mr. Goains continuing in the case was not freely, knowingly, or intelligently given. There was no

waiver. *See* Declaration Lawrence J. Fox, at 13-16 (Exhibit II-A).

> G.   **The Trial Court Failed to Make an Adequate Inquiry into the Conflict or Inform Mr. Vialva of His Rights to Unconflicted Counsel**

To safeguard a criminal defendant's right to the effective assistance of counsel, a trial court

has an affirmative obligation to explore the possibility of conflict when such conflict is brought to

the attention of the trial judge in a timely manner. *See Holloway*, 435 U.S. at 484-86. When a trial

judge "knows or should know that a conflict does exist, the duty to make a ***thorough inquiry*** is

manifest and unqualified." *Mickens*, 535 U.S. at 185 (Stevens, J., dissenting) (emphasis added)

(commenting on the undisputed duty of the trial court to inquire into conflicts). The duty to make

inquiry is especially profound when the Court has appointed counsel for an indigent defendant. In

such a case, the client does not exercise control over the representation as a private client would. He

has not chosen the lawyer, and he may not discharge appointed counsel without the assistance of the

Court. In this situation, the Court must be especially vigilant.

Indeed, it has long been recognized that "Federal courts have an independent interest in

ensuring that criminal trials are conducted within the ethical standards of the profession and that legal

proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160. The judge has an

"affirmative obligation to investigate a disclosed possibility that defense counsel will be unable to

act with uncompromised loyalty to his client." *Mickens*, 535 U.S. at 194 (Souter, J., dissenting). The

Supreme Court explained:

> Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude
> for the essential rights of the accused. Speaking of the obligation of the trial court to
> preserve the right to jury trial for an accused Mr. Justice Sutherland said that such
> duty 'is not to be discharged as a mere matter of rote, but with sound and advised
> discretion, with an eye to avoid unreasonable or undue departures from that mode of

26

trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity.' Patton v. United States, 281 U.S. 276, 312, 313, 50 S.Ct. 253, 263, 74 L.Ed. 854, 70 A.L.R. 263. The trial court should protect the right of an accused to have the assistance of counsel. 'This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record.' Johnson v. Zerbst, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461.

*Glasser*, 315 U.S. at 71.

So serious is the requirement that the Court monitor the process of the relinquishment of the right to unconflicted counsel, the Fifth Circuit has promulgated a procedure for trial court inquiry into conflicts:

As in Rule 11 procedures, the district court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the district court as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections.

*United States v. Garcia*, 517 F.2d 272, 278 (5th Cir. 1975).[6]

The potential for conflict arising from pending employment with an adversary is specifically a circumstance which triggers a duty of inquiry by the trial court to assess the gravity of the conflict by "ask[ing] questions of counsel or of the defendant to ascertain the nature and extent of the conflict of interest." *Atley*, 191 F.3d at 871 (holding the risk that lawyer may fail to zealously cross-examine future co-workers or associates presents a serious conflict); *Garcia v. Bunnel*, 33 F.3d 1193, 1195-97

---

[6]*Abrogated by Flanagan v. United States*, 465 U.S. 259 (1984) (regarding immediate appealability of pre-trial disqualifications).

27

(9th Cir. 1994) (trial judge conducts extensive inquiry into possible conflict associated with future employment in District Attorney's office including granting a continuance to permit the defendant to consult with independent counsel and his family).

In this case, this Court granted Mr. Goains's request for a hearing on the issue of conflict. But rather than make any inquiry of Mr. Vialva or of Mr. Goains, the Court simply allowed Mr. Goains to make a record of his client's consent to Mr. Goains's continued representation and exacted a waiver from Mr. Vialva at the behest of the United States Attorney's Office. *See* Tr. Hearing (5/12/00), at 3-6 (Exhibit II-B).

The Court did not inquire of Mr. Goains, nor did Mr. Goains volunteer, whether Mr. Goains had consulted his client regarding the conflict before or after the conflict arose. The Court did not inquire of Mr. Goains, nor did Mr. Goains volunteer, with whom in the United States Attorney's Office he had interviewed. The Court did not inquire, nor did Mr. Goains volunteer, where within the Western District of Texas, the position for which he had originally interviewed was located. The Court did not inquire, nor did Mr. Goains volunteer, if he was interviewing with the civil or criminal branch of the United States Attorney's Office. The Court did not inquire, nor did Mr. Goains volunteer, if any of the lawyers involved in Mr. Vialva's case would be his future colleagues at the United States Attorney's Office. The Court did not inquire, nor did Mr. Goains volunteer, whether any of the Government witnesses at trial represented agencies with which Mr. Goains would work closely as an Assistant United States Attorney. The Court did not inquire, nor did Mr. Goains volunteer, who within the United States Attorney's Office would be ultimately responsible for making the final decisions regarding Mr. Goains's application and whether that person had an interest in the outcome of Mr. Vialva's case, which, as the first death penalty case in the Western District of Texas, was a notably high publicity trial.

28

The Court never informed Mr. Vialva of his rights. The Court did not tell Mr. Vialva he could receive outside legal advice before waiving any conflict. The Court never informed Mr. Vialva he could ask questions. The Court never informed Mr. Vialva he had an absolute right to a conflict-free attorney. Rather, the Court implied, without explanation, that Mr. Vialva's right to conflict-free representation was contingent on the Court's consideration: "if you did want me to appoint you a different lawyer from Mr. Goains, then, I would certainly consider that." Tr. Hearing (5/12/00), at 6 (Exhibit II-B). The Court did not tell Mr. Vialva that, if another lawyer were appointed, the Court would give the new lawyer time to prepare for trial. The Court did not engage in a colloquy with Mr. Vialva, rather the Court requested Mr. Vialva give one word answers - "yes' or "no." *See* Declaration Lawrence J. Fox, at 10-12 (Exhibit II-A).

The Court had no information on which to independently judge the impact of the conflict on Mr. Vialva or whether Mr. Vialva had the appropriate information necessary for a waiver. In such a situation, the Court failed to discharge its unequivocal duty to inquire and to determine that "the risk of inadequate representation is too remote for further concern, or find[] that the defendant has intelligently assumed the risk and waived any potential Sixth or Fourteenth Amendment claim of inadequate counsel." *Mickens*, 535 U.S. 162, 189 (Souter, J., dissenting); *see State v. Dhaliwal*, 53 P.3d 65 (Wash. Ct. App. 2002) (court knew of possible conflict and failed to adequately inquire), *aff'd*, 79 P.3d 432 (Wash. 2003). Mr. Vialva lost any opportunity to have the harm of this conflict remedied before trial because the Court failed to fulfill its duty of inquiry into the conflict.

**H.     Under Any Standard of Review, Reversal Is Required to Cure the Harm Arising From This Conflict of Interest**

Finding that a violation of the rules of professional conduct has occurred and that the conflict has not been waived is the starting place, not the ending place of an analysis of conflicts for purposes

29

of Constitutional law. *See Mickens*, 535 U.S. at 175-76. The final step in the analysis must be to characterize the nature and impact of the conflict. When undertaking that task, the "guiding principal" is to ask "whether counsel's allegiance to the accused was compromised by competing obligations." *Perillo*, 205 F.3d at 798. Important factors are the "temporal relationship" between the conflicts. *Id.* Another important factor is whether the conflict is "transient or insubstantial." *Id.*

### 1.    This Was a Personal Interest Conflict That Was Profound and Current

This conflict stems from the competing interests which arose when Mr. Goains sought employment with an adversary of his client. Thus, this conflict emanates from Mr. Goains's personal interests. Some courts have implied that "personal interests" conflicts can be of relatively minor import. *See, e.g., Beets*, 65 F.3d at 1271 (noting some personal interest conflicts can be "wholly benign").[7] But personal conflicts can be among the most profound. They do not involve the typical situation in which a lawyer merely has to choose between the interests of two clients. Rather, they require dealing with the competing interests between a client's interest and the lawyer's own self-interest; it is almost impossible for a lawyer to be detached and impartial when his own interests are concerned.

Mr. Goains's conflict demonstrates the evil of the personal interest conflict. Indeed, his conflict had all the insidious dangers of the classic, and highly egregious, concurrent representation conflicts. The conflict was concrete and profound, interfered with his representation of Mr. Vialva,

---

[7]Indeed, the scenarios often described as "personal interest" conflicts "are matters involving payment of fees; doing business with a client; a lawyer's status as a witness; and a lawyer's actions when exposed to malpractice claims." *Willingham v. Johnson*, No. Civ. A. 3:98-CV-0409-L, 2001 WL 1677023, *9 (N.D. Tex. Dec. 31, 2001). These are typically not conflicts which require a court to bring into sharp focus the murky problem of how a lawyer's conflict may have affected his adversarial skills.

and has persisted to this day.[8]  The conflict implicated not only the future pecuniary gain for Mr. Goains in the form of his potential retirement benefits as well as his future remuneration for his day to day work, but it also directly cabined his advocacy skills at trial.  It is deeply troubling that Mr. Goains was still interviewing for his job at the United States Attorney's Office, with the United States Attorney himself,[9] during Mr. Vialva's trial.  Each time he challenged evidence at the trial or the conduct of the government, he should have been challenging the work and opinions of those he desired to be his future colleagues and doing so before the very man who would determine whether he would be hired.  As the Court in *Holloway* explained, the evil of having *two present interests* is "what the advocate finds himself compelled to *refrain* from doing." *Holloway*, 435 U.S. at 490-91 (emphasis in original).  That evil was a specter throughout this case.

The conflict did, and continues to, exist.  The conflict is persistent and ongoing and substantial in nature.

### 2.    Under Any Standard of Review, this Conflict Requires Reversal and a New Trial

Given the very factually dependant nature of the conflict inquiry, it is not always easy to tell which of the various standards of review of attorney conflicts should apply in any given case.  "Even a brief review of the precedent reveals that any categorical treatment of when an actual conflict exists is difficult. . . .  Instead, the determination of actual conflict and adverse effect is tightly bound to the facts of the case at hand." *Perillo*, 205 F.3d at 782.  Because the task of conflicts review is so

---

[8]Mr. Goains's employ at the U.S. Attorney's Office creates a continuing conflict between Mr. Goains, his office, and his former client. *See* Declaration Lawrence J. Fox, at 17-19. (Exhibit II-A)

[9]As the Court may recall, Mr. Blagg was in attendance at the trial of this matter.  The Court introduced Bill Blagg, then U.S. Attorney for the Western District of Texas, to the jury. (VIII Tr. 1643-44).

difficult, the Fifth Circuit has cautioned us that ascertaining which standard of review applies:

> depends, not so much upon the label used to define the attorney's conflict, as upon these and any other factors that illuminate whether the character and extensiveness of the prior representation were such that counsel is prevented by his interest in another's welfare from vigorously promoting the welfare of his current client.

*Id.* at 799 (internal quotations and citations omitted). "[G]eneralizations" about the nature of the conflict, "may not, however, hold universally true." *Id.* at 798. The "guiding principal" therefore must be to ask "whether counsel's allegiance to the accused was compromised by competing obligations." *Id.* at 798. Important factors are the "temporal relationship" between the conflicts. *Id.* at 798. Another important factor is whether the conflict is "transient or insubstantial." *Id.* at 799.

Mr. Vialva believes that this case falls squarely within the rationale offered by the Supreme Court for automatic reversal. In each case of automatic reversal, e.g. *Holloway* and *Glasser*, the Court has focused on the existence of a conflict and the inherent difficulty of ascertaining the effect of the conflict if the Court is called upon to speculate what the conflict may have caused counsel *not to do.* Thus, the Court concludes automatic reversal is required when you have a case where you know the conflict exists but "to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible." *Holloway*, 435 U.S. at 491. This is especially true when the trial court has failed to make an adequate inquiry into the nature of the conflict and the defendant's understanding of his rights. *See, e.g., Wood v. Georgia*, 450 U.S. 261, 272 n.18 (1981) ("*Sullivan mandates* reversal when the trial court has failed to make an inquiry even though it knows or reasonably should know that a particular conflict exists.") (internal quotations omitted, emphasis in original).[10]

---

[10]Mr. Vialva appreciates that the Supreme Court in *Mickens v. Taylor*, 535 U.S. 162 (2002) limited the statement in note 18 of the *Wood v. Georgia* opinion to a mere rebuttal argument directed at the dissent in that case and not a pronouncement of a rule of law. *Mickens*, 535 U.S. at 170 n.3. The

No man can serve two masters. *Glasser*, 315 U.S. at 71. When a lawyer attempts that impossible task, the Supreme Court has declined to engage in parsing the adverse impact the conflict may have had on the trial, saying that assessing prejudice where one must attempt to ascertain what chilling effect the conflict may have had on counsel "is at once difficult and unnecessary." *Id.* at 75-76.

> These concerns are especially heightened in death penalty cases:
>
> While unrevealed conflicts always cast these shadows on the representation, the problem is particularly acute in criminal representations, especially capital cases. There is no way to recreate what might have, could have, or should have happened if the accused were represented by a lawyer with undivided loyalty. The defense of capital cases is an art, not a science. Each case is literally unique. The decision-tree from retainer to final appeal includes hundreds of branches -- dead ends, false starts and choices, ranging from the minor -- do I ask one more question on cross-examination? -- to the major -- should the client defend on self-defense or insanity? As a result, when confronted with a case involving a conflict of interest violation this Court must be particularly sensitive to the harm the client suffered and to the damage to the system of justice any failure to remediate the ethical lapse will cause.

*Motion of Legal Ethicists and the Stein Center for Law and Ethics for Leave to File Brief as Amici Curiae and Brief in Support of Petitioner*, in *Mickens v. Taylor*, No. 99-9285, 2001 WL 881242, at *5 (filed in the S. Ct. July 19, 2001).

For all of the reasons justifying automatic reversal in *Holloway* and *Glasser*, Mr. Vialva should be granted automatic reversal and a new trial. *Cf. People v. Spreitzer*, 525 N.E.2d 30, 35 (Ill. 1988) (a *per se* conflict arises when a defense counsel has ties to a person or entity that would benefit

---

Court in *Mickens* does not construe a trial judge's failure to inquire as requiring automatic reversal. Although Mr. Vialva understands that this Court is bound by *Mickens,* he respectfully objects to *Mickens'* revisionist interpretation of a clear statement of law in *Wood v. Georgia* as dicta, and preserves this issue for further review. Additionally, Mr. Vialva believes the circumstances that warranted remand in *Wood v. Georgia* (which even the Court in *Mickens* acknowledges required remand) apply here when the facts of Mr. Vialva's case are taken in their entirety.

from an unfavorable verdict for the defendant); *cf. Perillo*, 205 F.3d at 804 ("actual conflict may exist when an attorney represents two clients whose interests in the outcome of a matter are different").

Alternatively, if the Court declines to apply a standard of automatic reversal based on the totality of the circumstances in the case and the existence of a conflict into which the Court failed to inquire, Mr. Vialva believes that the *Cuyler/Sullivan* standard (actual conflict which adversely affected representation, but no requirement for showing prejudice to outcome) is the standard that should govern the determination of the issues in this case. It is a standard which Mr. Vialva can meet. *See Perillo*, 205 F.3d at 781, 797; *id.* at 804 n.12 (explaining *Sullivan/Cuyler* standard, and noting that the court was "not persuaded that *Beets* requires the conclusion that an attorney's personal relationship with a client is always immaterial when determining whether counsel labored under an actual conflict between the interests of two clients" and declining to resolve the precise scope of *Beets*). The principal reasons the Fifth Circuit recognizes as requiring the *Cuyler/Sullivan* standard are at play in this case: first, "a cold record may not reveal the erosion of zeal that may ensue from divided loyalty" and second, there was no inquiry by the court or prosecutors for the protection of Mr. Vialva's interests. *Id.* at 806 n.13 (internal quotations and citations omitted).

Even if the Court applies the most rigorous standard enunciated in *Strickland* to this conflict, the facts support reversal in this case. *See Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995).[11] (applying *Strickland* in conflict cases where multiple representation is not at issue).

An actual conflict arises when "defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or

---

[11] Mr. Vialva recognizes the Court may feel bound to construe *Beets* narrowly and apply *Strickland* to the analysis of the conflicts in this case. For all the reasons elucidated in the foregoing argument, Mr. Vialva disagrees that *Beets* is the appropriate standard as both a matter of law and on the facts of this case, and herein preserves his objection on this point for further review.

34

994

competing interests of a former or current client." *Perillo*, 205 F.3d at 781. Mr. Vialva believes that this conflict was an "actual conflict" which had an adverse effect, indeed caused prejudice to Mr. Vialva, meeting both the *Cuyler/Sullivan* or *Strickland* standards for relief. The evils of this conflict are evident in the record of this case.

The trial of Mr. Vialva was the first federal death penalty case tried in the Western District of Texas. The United States Attorney was present for trial of the case and thus Mr. Goains was, in effect, continuing his interview throughout the trial. Indeed, the appearance of the United States Attorney himself at the trial was so notable that Court took a moment to introduce the U.S. Attorney to the jury: "Members of the Jury, those of you who were not here Monday-before-last would not have been introduced to our U.S. Attorney for this District, Bill Blagg, who is here with us today, Mr. Blagg." VIII Tr. 1643-44. This was, therefore, unlike many other attorney conflict cases, a "high publicity" case. *United States v. Horton*, 845 F.2d 1414, 1420 (7th Cir. 1988) (finding no adverse effect in part because case was not a "high-publicity criminal prosecution in which there was a public interest, or anything else that would attract the attention of those involved in the selection and confirmation process").

Mr. Goains's extended interview had a noticeable effect on his advocacy in this case. As courts universally acknowledge:

> Cross-examination is the greatest legal engine ever invented for the discovery of truth. The importance of cross-examination in the American judicial system cannot be overstated. It sheds light on a witness' perception, memory and narration and can expose inconsistencies, incompleteness, and inaccuracies in his testimony. There are few subjects, perhaps, upon which the Supreme Court and other courts have been more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.

*Dunagan v. Dretke*, No. 3-03CV-0374-K, 2003 WL 22519443, at *6 (N.D. Tex. Nov. 4, 2003)

35

995

(internal citations and quotations omitted). Yet, Mr. Goains, in charge of the first stage of the case, failed to cross examine a government witnesses on key evidence. For example, Mr. Goains asked no questions about the acquisition of gunshot trace evidence. IX Tr. 1779 ("Mr. Goains: We have no cross-examination, Your Honor."). Mr. Schwieger, under the direction of Mr. Goains in the first stage, failed to cross examine government witness on chemical testing for gunshot residue. XI Tr. 2282 ("Mr. Schwieger: I don't believe we have anything, Your Honor."). There was no reason not to cross examine these witnesses. As an expert on gunshot residue attests, the government in this case tested for gunshot residue, a highly fugitive substance, hours after it knew a gun had been used in the commission of the crime without any knowledge of whether any defendants had washed their hands. *See* Declaration of Robert White ¶ 21, attached hereto as Exhibit II-H. The government collected samples for gunshot residue testing using outdated and outmoded tests that were incapable of identifying with certainty the presence of gunshot residue at all. *See id.* ¶¶ 20, 16-17 (concluding that the SEM method of testing should have been used and contrasting atomic absorption and scanning electron microscopy methods of gunshot residue analysis). The government then declined to test the samples it collected, claiming that it was worried the defendants had been contaminated by "ambient" gunshot residue as a result of riding in a police car.

Gunshot residue is either present or it is not. If it is present, then the case must be made for why it is present. *See id.* ¶ 22. There is no role for predetermining that no gunshot residue will be found, or that false positives will be found, in advance of testing, unless, of course, the results of the testing are not wanted at all. *Id.* One conclusion that could have been drawn from the gunshot residue collection and testing in this case is that the government was not seeking the truth of who fired the gun that killed the Bagleys. *Id.* ¶ 23. Mr. Goains never advanced this theory to the jury.

In a case in which the government has no forensic evidence linking the defendant to the

crime, the unwillingness to adversarily test the decisions that led to the absence of forensic evidence is utterly inexplicable, unless Mr. Goains was disinclined to embarrass the prosecution by pointing out their flawed collection and preservation of evidence and evident disinterest in establishing the facts of the case. As the Supreme Court has noted "declin[ing] cross-examination" "luminates the cross-purposes under which [counsel] was laboring." *Glasser*, 315 U.S. at 73.

These were not the only instances of the failure of the defense to cross examine witnesses in the guilt stage of the case. *See* Table 1, which is attached hereto as Exhibit II-I, shows the defense failed to cross examine 26 of 60 government witnesses. Mr. Goains, who was responsible for the first stage, personally passed 12 of the 26 witnesses. Five others were simply passed by the government and released by the Court. Of course, not all of these 26 witnesses were as critical as the gunshot residue witnesses, but many were. For example, Mr. Goains forfeited the opportunity to cross examine John Bowman, Curtis McGee, and Ricky Lynch, on the nature of the gang to which Mr. Vialva belonged. As is discussed *infra* in Ground VII, there is ample evidence that the "gang" was not nationally affiliated as it was portrayed by the government and that Mr. Vialva had no "leadership" role in that gang. These facts could have been elicited, in whole or in part, from Bowman, McGee, and Lynch, directly challenging a major prosecution theory regarding the significance of "gang" affiliation. *See id.*

The defense could have used cross examination to reinforce the absence of forensic evidence linking Mr. Vialva to the crime. At least two witnesses, Aycock and Garza, testified about blood evidence. The defense declined to cross them on any subject, including the absence of blood evidence linking Mr. Vialva to the crime. *See id.* The absence of trace evidence of the victims' blood was significant in light of Terry Brown's testimony.

Cross examination could have reinforced for the jury that, as a direct result of the absence of

37

forensic evidence, this case rested on the testimony of two co-defendants, Christopher Lewis and Terry Terrell Brown. The prosecution focused on obtaining confessions from those participants because they were minors, not subject to the death penalty under Federal law. They were the lynchpins of the prosecution case. But, yet again inexplicably, Mr. Goains failed to cross examine Mr. Terry Terrell Brown on, or call Mr. Brown's attorney to discuss, an issue central to the credibility of Mr. Brown's testimony, his potential exposure to the death penalty in state court. IX Tr. 1936-1948; 1961-1963 (Mr. Goains). Mr. Brown had a deal which eliminated his exposure to the state death penalty. That issue was key to exposing Mr. Browns's motives for cooperation with the government and his motive to lie in this case. As Mr. Brown's recent statement makes clear, he had every reason to lie in order to avoid the state death penalty. The government told him that everything short of murder would be taken care of as a result of his plea bargain. Murder was the only thing to which he could not admit. *See* Declaration of Terry Terrell Brown, attached hereto as Exhibit II-J. When a lawyer fails "to adequately cross examine" the single eyewitness who makes the case against him, his client is "deprived of his Sixth Amendment right to effective assistance of counsel." *Dunagan*, 2003 WL 22519443, at *9. The ineffectiveness in this case stems directly from Mr. Goains's conflict. But there was more.

At the end of the government's case, the prosecution told the jury: "The physical evidence and the non-criminal witnesses who the Government brought you, who you heard a number of, all explain and support the facts." XIII Tr. 2681. That statement was patently false. There was no physical or forensic evidence linking Mr. Vialva to the crime, no blood or gunshot residue or other trace evidence. There were no neutral "non-criminal" witnesses who placed a gun in Mr. Vialva's hands. Yet Mr. Goains failed to challenge this, the last statement the jury heard before retiring to deliberate on guilt and innocence. It is absolutely inexplicable that lead counsel for the

38

998

guilt/innocence stage of the case would fail to object, or direct Mr. Schwieger to object, to the overt misstatement of the facts made by the prosecution.

These, and all of the additional issues raised, *infra* in Ground IV, illustrate Mr. Goains had an actual conflict which manifested itself throughout the trial in inadequate advocacy. In a case which rested on absolutely no forensic evidence linking the defendant to the crime and on the testimony of a witness who had a powerful motive to lie, it is unbelievable that Mr. Goains would not have vigorously attacked the government's case. Mr. Goains's failure to do more, when more was so easily available, had an obvious prejudicial impact on the case. If the jury had recognized and understood there was no forensic evidence linking Mr. Vialva to the crime and the government's principal witness who put a gun in Mr. Vialva's hand had a life and death motive to lie, the outcome of this trial would likely have been different.

Mr. Goains's post-trial conduct is evidence of the adverse effect and prejudice to Mr. Vialva. After the trial Mr. Goains disposed of his files and was unable to produce them for post-conviction counsel. *See* Declaration George Rawlings ¶ 5 (Exhibit II-G). Mr. Goains was under an affirmative obligation to "maintain the records of the case in a manner that will inform successor counsel of all significant developments relevant to the litigation." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.13(B) (2003) [hereinafter "2003 Guidelines"]. This obligation is not new as of 2003 when the ABA Guidelines were published. It is well known that capital cases in which a death sentence is handed down will be appealed and then subject to post-conviction relief. The obligation to keep and maintain records should have been quite clear to Mr. Goains. *See* David M. Siegel, *My Reputation or Your Liberty (Or Your Life): the Ethical Obligations of Criminal Defense Counsel in Postconviction Proceedings*, 23 J. LEGAL PROF. 85, at *10 (1998-99) [hereinafter "*My Reputation*"]; *see also* Lawrence J. Fox, *Making the Last*

39

*Chance Meaningful: Predecessor Counsel's Ethical Duty to the Capital Defendant*, 31 HOFSTRA L. REV. 1181, 1189 (2003). There are any number of inferences that can be drawn from Mr. Goains's destruction of his records and one certainly is, like spoliation of evidence, that he wished to eliminate any facts adverse to his representation of Mr. Vialva.[12] At a minimum, Mr. Goains did not have his client's interests at the forefront of his considerations. As Mr. Fox explains, in a capital case, "there can be no benign explanation – short of fire or theft – to explain Mr. Goains failure to treat Mr. Vialva's files as if they were the crown jewels." Declaration Lawrence J. Fox, at 17 (Exhibit II-A).

Further, Mr. Goains has been unwilling to assist post-conviction counsel in establishing the facts regarding the trial. Mr. Goains is under an absolute duty to assist the work of successor counsel, even when that work includes "investigating or asserting a claim that prior counsel was ineffective." 2003 Guidelines, 10.13, commentary. At a minimum, that duty must include a duty to come forward with a truthful and accurate account of the lawyer's interactions with the client. "'Where trial counsel refuses to cooperate with the investigation of a claim of ineffective assistance of counsel. counsel is violating the ethical duty she owes her client.'" *My Reputation*, at *7; Declaration Lawrence J. Fox, at 17-18 (Exhibit II-A).

Mr. Goains has failed to assist Mr. Vialva's present counsel in establishing a complete picture of the events surrounding Mr. Goains's conflict. Present counsel has spoken with Mr. Goains by telephone several times, but ultimately Mr. Goains has refused to either prepare a declaration or edit any declaration prepared by Mr. Vialva's present counsel that would describe in full the events surrounding his conflict. Declaration McCalmont ¶ 3 (Exhibit II-E). Just as he did at trial, Mr.

---

[12]"An adverse inference based on the destruction of potential evidence is predicated on the 'bad conduct' of the defendant." *King v. Illinois Central RR*, 337 F.3d 550, 556 (5th Cir. 2003). Bad conduct would appear to include destruction of records that are required to be kept and which are known to be relevant to litigation. *Cf. id.*

40

Goains is still putting himself first.

Mr. Goains had a conflict and still does. Mr. Vialva never waived the conflict. The Court failed to adequately inquire into the conflict or protect Mr. Vialva's right to unconflicted counsel or the fairness of the proceedings. The conflict had an adverse, indeed prejudicial, impact on the case that in all probability affected the outcome. For these, and all of the foregoing reasons, and on this ground alone, Mr. Vialva's conviction should be reversed and a new trial granted.

## GROUND III

**THE GOVERNMENT'S FAILURE TO DISCLOSE MATERIAL EVIDENCE AS REQUIRED BY *BRADY v. MARYLAND* AND ITS PROGENY DEPRIVED CHRISTOPHER VIALVA OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL, SECURED BY THE FIFTH AMENDMENT. THE SUPPRESSED EVIDENCE WOULD HAVE CAST DOUBT ON THE TESTIMONY OF THE COOPERATING DEFENDANTS, THE ONLY EVIDENCE IDENTIFYING MR. VIALVA AS THE PERSON WHO SHOT THE BAGLEYS. THE SUPPRESSION OF THE EVIDENCE IS PROSECUTORIAL MISCONDUCT THAT UNDERMINES CONFIDENCE IN THE OUTCOME OF THE TRIAL. THE CONVICTIONS AND SENTENCES MUST BE VACATED AND A NEW TRIAL GRANTED.**

### A.    Procedural Posture of this Claim

The undersigned counsel became aware of the facts supporting this claim while conducting the "aggressive investigation of all aspects of the case" required of post conviction counsel. 2003 ABA Guidelines 10.15.1. As part of the undersigned counsel's reinvestigation of the facts underlying the conviction, contact was established with two of Mr. Vialva's codefendants, Terry Terrell Brown and Tony Sparks. The principal facts supporting this claim for relief were discovered as a result of Mr. Brown's release of his trial attorney's file to the undersigned counsel. Section 2255 is the appropriate mechanism for considering Constitutional claims supported by extra record facts.

Trial counsel requested disclosure of "impeaching evidence" concerning witnesses called by the United States, citing *Brady v. Maryland*, 373 U.S. 83 (1963). The motion recited nine categories

41

of information that could be used to impeach a witness, including "juvenile adjudication's [sic] attributed to each witness." Doc. 45. In a separate motion, counsel requested disclosure of and access to sixteen categories of evidence, including exculpatory evidence and the substance of any agreement between the United States and a witness. The motion invoked Rule 16, Fed. R. Crim. P., and cited *Brady*. Doc. 38. A third motion reiterated the request for disclosure of any agreements between the United States and witnesses. Doc. 41. A contemporaneously filed memorandum of law cited *Giglio v. United States*, 405 U.S. 150 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959). Doc. 42. All of these pleadings were filed August 2, 1999. The government responded it would disclose information consistent with *Brady* "as it becomes known to the Government" and would disclose any agreements with witnesses prior to trial. Docs. 50, 58, and 48.

The direct appeal did not include an issue based on the government's violation of Mr. Vialva's Due Process rights secured by the Fifth Amendment, enforced through *Brady* and its progeny. Since the facts on which this claim is based became known during the course of post conviction investigation, the claim could not have been presented in its present form on direct appeal. Further, Mr. Vialva was represented on direct appeal by Mr. Stanley Schwieger, one of his trial counsel, and Mr. Steven Losch. Mr. Losch was incapacitated for the majority of the direct appeal. *See* Declaration of Kaye Losch, attached hereto as Exhibit III-A.

The present post conviction proceeding is Mr. Vialva's first opportunity to develop facts on this issue with the assistance of independent counsel. *See Kyles v. Whitley* 514 U.S. 419, 431 (1995) (State capital prosecution; "Following direct appeal, it was revealed in the course of state collateral review that the State had failed to disclose evidence favorable to the defense."); *id.* at 431 (petitioner exhausted state remedies and presented the issue under the ambit of federal habeas review); *Strickler v. Greene*, 527 U.S. 263, 283 (1999) (failure to raise *Brady* claim at trial excused by suppression of

1002

documents by Commonwealth, counsel's reliance on the prosecutor's "open file policy," and the factual basis for the claim was unknown to counsel.); *id.* at 287 (failure to exhaust issue in State post conviction proceedings did not bar presentation of claim in federal habeas proceedings since Commonwealth maintained it had "voluntarily given full disclosure.").

B.      **Predicate Legal Authority**

The  prosecution's affirmative duty to disclose evidence favorable to the defense is linked directly to the accused's Constitutional right to Due Process:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violated due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution.

*Brady v. Maryland*, 373 U.S. at 87.  The Supreme Court first expanded the parameters of *Brady* by removing the restriction that conditioned  the prosecution's duty to disclose favorable evidence on a request by the defendant.  *See United States v. Agurs*, 427 U.S. 97,103-108 (1976).  The Court expanded the  rule of *Brady* to its present form when it held favorable evidence is material, and its suppression results in Constitutional error, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Thus, disclosure of "evidence favorable to an accused" is required, *Brady*, 373 U.S. at 87, without distinction between exculpatory and impeachment evidence, *Giglio v, United States*, 405 U.S. 150, 154 (1972).  The Court expressly recognized:

> The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

1003

*Napue v. Illinois*, 360 U.S. at 269. Accordingly, to establish the materiality of the omitted evidence:

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Kyles v. Whitley*, 514 U.S. at 434-435.

### C.    Facts Establishing Grounds for Relief

The undersigned counsel have attempted to ascertain what information was disclosed to trial counsel by the United States. The United States Attorney's office advised the government engaged in "open file" discovery with trial counsel, voluntarily making copies without requiring a specific request. Mr. Schwieger provided all of his files to undersigned counsel. Mr. Goains advised his files were no longer available. The United State Attorney's office declined to allow the undersigned counsel access to its file, for purposes of permitting a comparison between the contents of the "open file" and trial counsel's files. Mr. Brown authorized disclosure of his trial counsel's file to counsel for Mr. Vialva. Mr. Brown's prior counsel, Mr. Robert Swanton, provided a complete copy of his file in PDF format.[13] The factual basis for this claim is derived from the undersigned counsel's review of the available records. These facts are averred to the best of the undersigned counsel's information and belief.

<u>Evolution of the Prosecution's Theory</u>

The government acknowledged that, without the cooperation of Terry Terrell Brown and

---

[13]The portions of the file reproduced as exhibits were extracted from the scanned images. Certain documents were filed under seal, or are maintained under seal as Court documents. References and arguments relating to materials contained in the sealed documents will be submitted for filing under seal contemporaneously with this Motion.

Christopher Lewis, "the appropriate penalty for the main perpetrators in this crime could not have been gotten." SH Tr. 3/22/01 (Lewis) at 5, attached hereto as Exhibit III-B; *cf.* SH Tr. 3/22/01 (Brown), attached hereto as Exhibit III-C (Mr. Brown's sentencing immediately followed Mr. Lewis's; prosecutor's comments applied to both defendants.). In fact, no forensic evidence proved directly or inferred circumstantially that Christopher Vialva shot the Bagleys. The only evidence on this critical point came from Terry Brown and Christopher Lewis, who testified as eyewitnesses because they participated in the events. Establishing and maintaining the credibility of these coconspirators was crucial for the government.

Christopher Vialva, Brandon Bernard, Christopher Lewis, and Terry Brown were detained by a Game Warden and a Nolanville Police Officer literally yards from where the Bagleys' automobile was burning. They remained in the custody of the government from that point forward. In opening statement, the prosecutor referred to DNA evidence, an arson investigation, and other efforts by investigators to "corroborate" the accounts of Brown and Lewis. VIII Tr. 1485-1487. In final closing argument, the prosecution touted the quality of the forensic investigation:

> You know, Ladies and Gentlemen, one thing about this case that you can walk away from when you leave this courtroom, whenever that is, is that you know that the investigators who worked this case did a very, very, very thorough job. And you can be proud of that. They left no stone unturned in their search for evidence, even evidence which had nothing to do with the offense. The cigarette butt found out by the car. The package of Black & Milds cigars. The rocks that had red on them that turned out to be nothing. The soil samples by the car that had gasoline, which was obviously gasoline from the vehicle after it burned. Those type of things were presented to you so you would know how thorough the investigation is, not because they had any evidentiary value. [14]

XIII Tr. at 2675. In truth, delays in the collection of the suspects' clothes, the choice of an outdated

---

[14]Trial counsel's failure to object to the evidence, or the prosecutor's improper argument, will be discussed in Ground IV.

test for the collection of trace evidence indicative of gunshot residue, and the ultimate failure of any forensic testing to substantiate the accounts of Brown and Lewis rendered the investigation wholly unsuccessful for the government. Still, the government used these ultimately useless facts as the testimony of Brown and Lewis, the only evidence left to the government, evolved.

Information Disclosed to the Defense Prior to Trial[15]

Terry Brown gave his first statement while detained at the Criminal Investigation Division (CID) offices in Fort Hood. The first statement, taken by CID Agent Rogelio Meraz, was reduced to writing in the form of a narrative followed by a transcript of questions and answers. Mr. Brown initialed the pages and signed an affidavit adopting the statement as true and correct under oath. These documents are dated "22 Jun 1999" at "Time: 0542." *See Sworn Statement of Terry Brown,* attached hereto as Exhibit III-D. This statement was completely false in all material respects. Agent Meraz's activity log reflects that prior to taking this statement, he contacted Mr. Brown's mother at 12:30 a.m., let her meet with her son at 1:30 a.m., conducted an interview with Mr. Brown at 1:50 a.m., and confiscated Mr. Brown's clothes at 4:00 a.m. *See CID Agent Activity Summaries* SA Meraz, attached hereto as Exhibit III-E. The only record of what transpired at the 1:50 a.m. interview is an Advice of Rights form, signed at 1:56 a.m.

Mr. Brown's next contact with law enforcement came at 11:45 a.m. on June 22 when he met with CID Agent Nelson and the Federal Bureau of Investigation Agent in charge of the case, Daniel Chadwick. Agent Nelson's activity log reflects the interrogation lasted until 4:00 p.m. *See CID Agent Activity Summaries* SA Nelson attached hereto as Exhibit III-F. At 4:30 p.m., Terry Brown signed a second statement. In this version, Mr. Brown claimed he twice attempted to persuade Mr.

---

[15]Attached hereto as Exhibit III-V, is a table entitled "What Defense and Prosecution Knew" which also displays the information contained in the following subsections.

Vialva to leave the Bagleys' automobile in a park and "they" will call the police. Mr. Brown claimed Mr. Vialva said the victims "knew too much." Mr. Brown gave an account of driving to Old Nolanville road with Brandon Bernard, approaching the Bagleys' vehicle, but turning around "because I couldn't take it anymore," and returning to where Bernard was standing with his automobile. In this version, Mr. Brown did not see who shot the Bagleys or who set the fire. *See Juvenile Voluntary Statement of Terry Brown,* attached hereto as Exhibit III-G.

At 7:10 p.m., according to Agent Nelson's activity log, Mr. Brown told the agent "he had not been totally truthful." Agent Nelson's log reflects:

> Between 1930-2200, 22 Jun 99, SA NELSON re-interviewed BROWN on and off approximately 12 times. BROWN would provide additional information about the incident each time SA NELSON went back into the room. After BROWN provided SA NELSON with additional information he would ask SA NELSON if he could think about a particular incident and SA NELSON would leave the room. Upon SA NELSON's return, BROWN would provide info consistent with BERNARD's statement.

*See* Exhibit III-F. The final CID report summarized the interviews of all the subjects. *See Final CID Report,* pt.6, attached hereto as Exhibit III-H (excerpted to include part 6 in its entirety). Following a summary of the contacts with Mr. Brown by Agents Meraz and Nelson on June 22 at "2200" the report notes:

> Agent's Comment: A sworn statement was not taken by SA NELSON as the US Attorney and SA CHADWICK stated no further written statements would be taken.

Exhibit III-H ¶ 6.3, p. 11.

With regard to Brandon Bernard, the report noted Mr. Bernard was interviewed at an unspecified time on June 22 by Special Agent Chadwick: "Mr BERNARD stated Mr VIALVA shot Mr T. BAGLEY and Mrs S. BAGLEY in the head, then started the vehicle on fire." Exhibit III-H ¶ 6.2. The report did not indicate Mr. Bernard gave a sworn statement. Documents released to

47

\1007



counsel as part of discovery  included two photocopies of the same single page of handwritten notes.[16]  *Insert, FBI Special Agent Evan Rae,* June 29, 1999,  attached hereto as Exhibit III-I.  The time, date, place, and participants in the interview are not reflected in the notes, nor is the authorship of the notes apparent.  According to the notes, Mr. Bernard admitted buying the lighter fluid with Terry Brown and witnessing "both Chris were pooring [sic] lighter fluid inside the car."  The notes reflect Mr. Bernard, "said he would tell us how it all went down."  In direct conflict with the interview summary contained in the Final CID Report, the notes do not reflect Mr. Bernard identified Mr. Vialva as the person who shot the Bagleys.  The discovery materials maintained in counsel's files did not include a Federal Bureau of Investigation Form FD-302 by Special Agent Chadwick documenting his apparent contact with Mr. Bernard.  There is no explanation for the discrepancy in the accounts of the interview and no sworn statement signed by Mr. Bernard.

At 7:07 a.m.[17] on June 22, Game Warden Volk provided a statement to CID recounting his involvement with the suspects and the investigation.  In the statement, Warden Volk recounted observing:

> . . . what appeared to be a large blood spatter on the roadway in front of the area
> where one of the black males was located.  The black male was moving his foot in
> a sweeping motion as if to cover the blood spatter.

The Final CID report reflects CID Agent Nelson interviewed Warden Volk at "0905" on June 22.  *See Final CID Report* ¶ 5.5, attached hereto as Exhibit III-J (excerpted to include 5.5 only).

---

[16]The FBI Insert reflects Agent Rae's collection of documents from the United States Army Criminal Investigation Division.  The Insert indicates the documents relate to Christopher Lewis, but the handwritten notes indicate they were created incident to a contact with Brandon Bernard.  The entire Insert is attached as it appeared in trial counsel's discovery materials.

[17]The typed time is stricken through and a handwritten notation "09˙5" is substituted.  The amendment may reflect the time of CID Agent Nelson's contact with Warden Volk.

Warden Volk was interviewed by Agent Meraz at 4:45 p.m., June 23. At that time, Warden Volk provided the additional detail noted by Agent Meraz, "he saw blood on VIALVA's shoe." *Id.*

According to the Final CID report, CID Agent Bair, FBI Special Agent Chadwick, ATF Agent, and Ranger Aycock participated in a debriefing of Mr. Brown in the presence of his court appointed attorney. This contact took place July 26, 1999. Exhibit III-H, ¶ 6.3, p. 11. The CID report summarized the interview, which was conducted "under a proffer agreement with the US Attorney." *Id.* The report indicates Mr. Brown said he and Mr. Bernard purchased the lighter fluid with a $10.00 bill given to them by Vialva. *Id.* Mr. Brown denied spraying lighter fluid in the automobile, but maintained he poured it on his undershirt. *Id.* Mr. Brown said Mr. Vialva shot Mr. Bagley "in the head," but Mr. Brown "claimed he turned away" before Mr. Vialva fired the second shot. The account ends with the notation:

> Agent's Comment: No written statement was taken from Master BROWN at the time because the investigators believed Master BROWN was not completely truthful in all of his testimony.

Exhibit III-H, ¶ 6.3, p. 12.

### Material Information Suppressed by the United States

The United States Attorney's direction to the investigating agents suppressed prior inconsistent statements of Terry Brown. Mr. Brown was clearly providing a version of events that the government felt was not truthful. If Mr. Brown's trial testimony is presumed to be consistent with the government's presentation of the true events, then all of Mr. Brown's prior contrary statements were proper subjects of impeachment. The government may not avoid its obligation to disclose prior inconsistent statements, or exculpatory evidence, or impeachment evidence by failing to make a record of the information.

Mr. Brown testified on cross examination that he gave "probably somewhere between two

1009

or three" prior statements to law enforcement. Trial counsel may be faulted for failing to seize on this gross underestimate based on the CID report alone. But, the government bears responsibility for suppressing the substance of a debriefing conducted by Agent Chadwick and ATF Agent Myers on November 5, 1999, in the presence of Mr. Brown's counsel. *See Telephone message*, Date: 11/2, Time 3:23, From Charles Myers ATF, attached hereto as Exhibit III-K. During that debriefing, Mr. Brown gave the following account:

> Terry put lighter fluid in the trunk right after the shooting, then Brandon threw the match through the front window of the passengers seat.

*See Notes of Robert Swanton*, "Debriefing on 11-5-99 w/ Aycock, FBI · ATF," attached hereto as Exhibit III-L. This is a material variance from the government's factual basis for Mr. Brown's guilty plea, read by the Assistant United States Attorney in open court December 16, 1999:

> Before the trunk was shut, and at the direction of Vialva, Brown poured some lighter fluid into the trunk area. At the direction of Christopher Vialva, Bernard then lit a match and threw it inside the vehicle. . . .

GP Tr. 12/16/99, 35, attached hereto as Exhibit III-M. In this version, Mr. Vialva became the director of Brown's and Bernard's actions, apparently to support the government's theory Mr. Vialva commanded a leadership role in the group. The absence of this fact from the November 5 debriefing of Mr. Brown could have been used to cross examine Mr. Brown, or other government witnesses.

The second point of significance is the omission of any reference to where Mr. Bernard threw the match. Mr. Brown's November 5 statement could not be included as the government's version because it would have been contradicted by the Fire Marshal, Thomas Sing, who testified the windows in the automobile were up at the time of the fire. X Tr. 2094-2096.

The matches were an area of weakness in Mr. Brown's testimony and the government's case.

In recounting the purchase of the lighter fluid, Mr. Brown testified he went back into the Mickey's convenience store after Mr. Bernard told him he did not have a lighter. IX Tr. 1911. In recounting the sequence of events on the Old Nolanville Road, Mr. Brown testified that after the automobile was set on fire, he ran down the hill, gave his shirt to Christopher Lewis, and walked over to Mr. Bernard's automobile, "and the matches and everything that I had – that we had got from the store was on the front – on the front passenger's side." IX Tr. 1931. The matches were not part of the government's voluminous inventory of evidence, so no physical evidence could corroborate or refute Mr. Brown's final version of the events.

In addition to the November 5, 1999, debriefing, government agents apparently interviewed Mr. Brown at the local jail March 15, 2000. *See Telephone Message,* Dated 3/15, Time: 2:39 p.m., From: Mrs. Brown, attached hereto as Exhibit III-N. At least one interview preceded Mr. Brown's appearances at trial on May 25 and June 8, 2000. *See Telephone Messages,* Dated 5/5, Time 10:00 a.m., From Byron San Marco ATF; Dated 5/9, Time 8:28 a.m., From Byron San Marco; Dated 5/23, Time 9:46 a.m., From John Aycock, attached hereto as Exhibit III-O. No information about these interviews was disclosed to the defense. Based on the information presently available to counsel, it appear the government suppressed any information that was inconsistent with or contradictory to the final version of events presented to the jury.

]

**Redacted per Extant
Sealing Order**

\1011

# REDACTED PER EXTANT
# SEALING ORDER

During the November 5, 1999 debriefing, Mr. Brown admitted a selling a stolen firearm to Brandon

Bernard, engaging in burglaries in the Heather Glen, Willow Springs, and Fort Hood area housing

developments, beating a man with a sledgehammer during a fight at a carnival, and shooting at a

"guy named Killer" in a drive-by shooting. Exhibit III-L. At trial, Mr. Brown admitted his

continuing affiliation with the Bloods. IX Tr. 1861-1862. Mr. Brown also admitted being in

possession of a firearm, pointing the firearm at the backseat of the Bagleys' automobile, and offering

to kill the Bagleys. IX Tr. 1897-1898.

**Redacted per Extant**
**Sealing Order**

The government did not disclose the full extent of its communications with Mr. Brown

during the plea negotiation process. Although the publicly filed plea agreement contained no express promise regarding a motion for downward departure, the subject was discussed by the parties to the agreement. Mr. Brown's counsel publicly filed an objection to the portion of the presentence report in which the writer indicated there were no bases for downward departure. Counsel for Mr. Brown urged the Court to consider a downward departure, "based on the anticipation the Government will be filing a USSG § 5K1.1 Motion in this matter." The basis for counsel's "anticipation" was not disclosed to the defense.

Further, the government did not disclose its understanding or agreement with the State of Texas authorities regarding the prosecution of Mr. Brown.

## REDACTED PER EXTANT
## SEALING ORDER

In fact, the prosecution was aware of the concurrent jurisdiction status of the land on which the homicides occurred. IX Tr. 1808.

The failure to disclose the basis for the government's assertion was exacerbated by the prosecution's consistent efforts to reinforce for the jury that Mr. Brown was not testifying under the pall of a possible death sentence. IX Tr. 1959-1960.

The plea agreement was a contract between Mr. Brown and the United States. The United States was aware that another witness, Gregory Lynch, said Mr. Brown was smoking a "blunt," a "cigar with marijuana," when Mr. Sparks retrieved the Glock from Mr. Lynch. XI Tr. 2187. Mr.

53

Brown admits he was smoking a "wet," a marijuana cigarette dipped in embalming fluid. This was apparently Mr. Brown's drug of choice at the time. He smoked two of the dipped marijuana cigarettes during the day and described himself as "high" during the course of events. *See* Declaration of Terry Brown ¶ 4, attached hereto as Exhibit III-S.

**Redacted per Extant
Sealing Order**

                                                                        The government was obligated to disclose this information bearing directly on this critical witness's credibility.

<u>Christopher Lewis</u>

The Final CID report contains a summary of contacts with Christopher Lewis, beginning with a statement taken at 7:40 a.m. on June 22. This statement was apparently taken after the officers received the consent of Mr. Lewis's mother. Exhibit III-H ¶ 6.4. In the statement, Mr. Lewis portrayed himself as an innocent bystander who was duped by Mr. Vialva. Exhibit III-I, *Sworn Statement of Christopher Lewis.* The six page statement contained numerous false statements and omissions, as Mr. Lewis acknowledged at trial. XI Tr. 2304-2305; 2398-2399; 2412-2416; 2418-2422; 2427. Mr. Lewis was debriefed July 2, 1999 by CID Agent Bair, FBI Special Agent Chadwick, and ATF Agent Meyer, in the presence of his attorney. The Final CID report notes, "Master LEWIS omitted several facts concerning the events of 21 Jun 99, and failed to fully confess his involvement." Exhibit III-H, ¶ 6.4, p. 13. The interview was resumed July 6, with the same agents participating. The report indicates Mr. Lewis admitted being part of the carjacking and, for the first time, implicated Tony Sparks in the offense. The report of the interview ends with the notation, "A sworn statement was not taken per the request of SA CHADWICK." Exhibit III-H, ¶

54



6.4, p. 12. When Agent Chadwick testified at the grand jury, he responded affirmatively to a question crediting the source of his testimony as the "physical evidence" and "based at its core on a Christopher Lewis statement." GJ Tr. (7/13/99) 13-14, attached as Exhibit III-T. At trial, the government confirmed "only one" statement had been disclosed to the defense. XI Tr. 2395.

The government's suppression of Mr. Lewis's prior inconsistent statements is evident. At the grand jury proceedings on July 13, 1999, Agent Chadwick, testified Mr. Vialva lit the fire in the Bagleys' automobile. Exhibit III-T, 35. Mr. Lewis's account of the events at trial excluded him from being in a position to see who lit the fire. In a similar shift, Mr. Lewis agreed with the government's statement in the factual basis at his guilty plea that Christopher Vialva threw the .22 caliber firearm into the bushes when they were confronted by the police during the early morning of June 22. Exhibit III-M, 30. At trial, Mr. Lewis testified he threw the weapon into the bushes. XI Tr. 2316. While this may seem a minor factual point, in the larger context of Mr. Lewis's credibility, his willingness to be led or to agree to different versions of the events is intrinsic to the jury's evaluation of his testimony. This is especially apt when the transcript reveals the prosecution asking a virtually unbroken stream of leading questions.

Like Mr. Brown, Mr. Lewis was subject to a transfer of his juvenile proceedings as part of his plea agreement. Mr. Lewis was also subject to an evaluation that was not disclosed to the defense. Based on counsel's information and belief, the report contains information bearing on Mr. Lewis's credibility as a witness, including his cognitive capacity, his history of drug usage, and his prior criminal conduct. Trial counsel's files do not reflect the government's disclosure of Mr. Lewis's criminal history. At Mr. Lewis's sentencing, which occurred after Mr. Vialva's trial, record reflects Mr. Lewis's guideline sentencing range was based on a Criminal History Category II. Exhibit III-B, 3. At trial, Mr. Lewis testified he was serving a sentence of probation for "Assault

with Bodily Injury," as a result of a "fight." XI Tr. 2303-04. It is unclear from the record of Mr. Lewis's sentencing whether he was treated as an adult or a juvenile for that offense. A sentence of probation imposed following either an adult or a juvenile adjudication would result in a Criminal History Category II. *See* U.S. SENTENCING GUIDELINES MANUAL § 4A1.2(d) (2000). But, if the State treated Mr. Lewis as an adult, that decision would be indicative either of the severity of the conduct, or his prior criminal history, or both. Without full disclosure of Mr. Lewis's prior criminal history before trial, the defense was unable to assess and evaluate the severity of the offense. The "fight" may have been a far more serious episode than Mr. Lewis divulged and his participation may have been indicative of his propensity for violence, a highly relevant subject bearing on his credibility. The government's failure to disclose Mr. Lewis's prior criminal history deprived the defense of relevant material information.

Tony Sparks

The final CID report indicates Mr. Sparks was contacted one by Ranger Aycock and ATF Agent Meyer, on June 28, 1999. Mr. Sparks denied any knowledge of the events. Exhibit III-H, ¶ 6.5. Mr. Sparks has admitted he was carrying the .22 in his shoe and threw it into the bushes when they were confronted by the Killeen police officers. *See* Declaration of Ranada Gentry, attached hereto as Exhibit III-U, (4). Mr. Sparks has also stated there was no plan to kill the Bagleys when he dropped off at his house, shortly before his curfew. *Id.* at (5). Based on the files available to counsel at this time, it is likely Mr. Sparks was contacted more than once by the authorities prior to his guilty plea. There is no information about prior contacts in trial counsel's files.

Brandon Bernard

Mr. Bernard's initial statement was followed by a proffer. Counsel for Mr. Bernard believed the government was going to negotiate a plea with Mr. Bernard. Doc. 136, *Defendant's Motion for*

*Continuance* §§ III-V.  The substance of the proffer, the details of the plea negotiation, and the reason for the government's ultimate refusal to resolve Mr. Bernard's case  were not disclosed to Mr. Vialva's trial counsel.  This information was improperly suppressed by the government.

### D.    Significance of the Omitted Evidence

Since the government was proceeding without the benefit of forensic evidence, or the testimony of a disinterested eyewitness, preserving the credibility of the two coconspirators  was absolutely essential to secure convictions in the first stage and death sentences in the second stage.  Based on the information known to counsel at this juncture, it is evident the government failed to disclose the progression of prior inconsistent statements from both Mr. Brown and Mr. Lewis.  The government's decision to avoid taking written statements from the witnesses during the successive interviews is of particular interest when the testimony of Mr. Brown on redirect is recalled:

A    When I made those statements, the first one, as he read it, it was completely where no one had a part of anything.  And the second statement that I made, they'd – someone had already – I guess they'd already made statements in the CIA [sic] office and they had --

Q    The CID office?

A.    Yeah, the CID office.  They had information, and, basically he told me – and I told him what – I just confirmed, basically, whatever he said.

IX Tr. 1961.  Based on the record, the "what he said" would have included that Brandon Bernard said Mr. Vialva shot the Bagleys and Mr. Vialva had blood on his shoe, two significant pieces of misinformation.  The agents' notes of their successive interrogations of Mr. Brown in the absence of counsel, and his debriefings in the presence of counsel, were improperly withheld exculpatory evidence.  The government's records of its contacts with Mr. Lewis, Mr. Sparks, and Mr. Bernard are of similar consequence.

Like *Kyles v. Whitley*, the prosecution's case improved with each successive telling.  Even

57

if the more rigorous standard enunciated in *Strickler v. Greene* is applied, the facts as they stand at this point merit, at a minimum, further discovery. The undersigned counsel have exercised due diligence in attempting to determine what information was disclosed to trial counsel. Counsel for the government declined undersigned counsel's request to review the prosecution's "open file" record. Counsel for the government indicated the files would be produced only if ordered by the Court pursuant Rule 6, *Rules Governing Section 2255 Proceedings for the United States District Courts.*

In a separate effort, the undersigned counsel submitted a Freedom of Information Act request to the Federal Bureau of Investigation September 15, 2003. On October 21, 2003, the Bureau advised the requested material was exempt from disclosure and invoked Title 5, United States Code, Section 552 (b)(7)(A).[18] Following an appeal, undersigned counsel were notified of the Bureau's conclusion that the exemption from disclosure was "no longer applicable to withhold the records in their entireties" and advised "releasable portions" of the records would be forwarded. Counsel received the notice of the Bureau's decision March 22, 2004, but have yet to receive the records.

Mr. Vialva has demonstrated the withheld information is of the same consequence as the evidence in *Kyles* and, unlike *Strickler*, it is not merely cumulative to an otherwise overwhelming body of incriminating evidence. The government's case against Mr. Vialva rested on the credibility of Terry Brown, the only witness who claimed to have seen Mr. Vialva shoot the Bagleys. If the jury did not believe Terry Brown, no other evidence established Mr. Vialva shot the Bagleys. The omitted evidence removed from the jury's consideration four facts directly damaging Mr. Brown's

---

[18](b)(7) " [R]ecords or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with law enforcement proceedings." 5 U.S.C. § 552 (b)(7). The notice did not identify the "law enforcement proceedings" that would be compromised by disclosure.

credibility:

1)    Mr. Brown was heavily intoxicated on embalming fluid throughout the entire day, impairing both his perception of events and his own behavior;

2)    Mr. Brown had engaged in prior acts of violence with firearms in the past, including a drive-by shooting;

3)    Mr. Brown had established a pattern *in this case* of tailoring his story to the government for his own benefit; and,

4)    Mr. Brown was, in fact, at risk of being prosecuted by the State of Texas for capital murder and his understanding with the government was that anything "short of murder" would be taken care of in exchange for his testimony.

It is impossible to conclude the jury's decision would have been unaffected by this information. The omission of this evidence undermines confidence in the outcome of this capital trial. There are only two possible reasons trial counsel did not impeach Mr. Brown with this information. Either the government did not disclose this information, in violation of *Brady*, *Giglio*, and *Napue*, or the information was disclosed to trial counsel, who failed to use it, in derogation of Mr. Vialva's right to effective assistance of counsel. In either case, a new trial is required to cure the Constitutional violation.

1019



**GROUND IV**

**CHRISTOPHER VIALVA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY THE SIXTH AND EIGHTH AMENDMENTS DURING THE GUILT PHASE OF HIS TRIAL. TRIAL COUNSEL FAILED TO OBTAIN FUNDING FOR NECESSARY EXPERT ASSISTANCE, RESULTING IN AN INADEQUATE INVESTIGATION OF FIRST STAGE ISSUES. COUNSEL FAILED TO SUBJECT THE GOVERNMENT'S CASE TO ADVERSARIAL TESTING THROUGH PROPER CROSS EXAMINATION, OBJECTIONS, AND CHALLENGES. BECAUSE OF INADEQUATE PREPARATION, COUNSEL FAILED TO PRESENT A COHERENT DEFENSE. TRIAL COUNSEL'S FAILURES, INDIVIDUALLY AND CUMULATIVELY, UNDERMINE CONFIDENCE IN THE OUTCOME OF THE PROCEEDINGS. A NEW TRIAL IS THE SOLE REMEDY FOR THESE FAILURES.**

**A.    Procedural Posture of this Claim**

This Ground was not presented in Mr. Vialva's direct appeal. The trial record was inadequate for purposes of presenting this issue for review since the facts underlying this Ground were not developed during the course of trial. This Section 2255 Motion is the appropriate mechanism for raising claims of ineffective assistance of trial counsel. *Massaro v. United States*, 538 U.S. 500, 504-505 (2003); *accord United States v. Gordon*, 346 F.3d 135, 136-137 (5th Cir. 2003); *United States v. Webb*, No. 03-50978, 2004 WL 1114455, at *1 (5th Cir. May 13, 2004).[19]

**B.    Predicate Legal Authority - The Sixth Amendment and Supreme Court Precedent**

This Ground involves a number of distinct, but related, instances of trial counsel's failure to provide Constitutionally adequate representation to Mr. Vialva. The legal standard against which counsel's performance is measured is the same for each instance of ineffectiveness. For purposes of clarity and to avoid undue repetition, the legal standard for this claim will be discussed first,

---

[19]In accordance with Fifth Circuit Loc. R. 47.5.4, this unpublished decision is cited as persuasive authority and attached hereto as Exhibit IV-A.

followed by a specification of the facts and any relevant law applicable to the individual errors.

The Sixth Amendment explicitly guarantees: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel encompasses the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970). "If no actual 'Assistance' 'for' the accused's 'defence' is provided, then the constitutional guarantee has been violated." *United States v. Cronic*, 466 U.S. 648, 654 (1984) (footnote omitted). The Court recognized the purpose of the Sixth Amendment was to ensure a fair trial:

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

*Strickland v. Washington*, 466 U.S. 668, 686 (1984). The Court formulated a two part test for determining whether counsel's performance fulfilled the Sixth Amendment guarantee. First, the defendant must show counsel's performance was deficient in that it "fell below an objective standard of reasonableness." *Id.* at 687-688. Second, the defendant must demonstrate counsel's deficient performance prejudiced the defense through errors "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Declining to adopted any absolute measures, the Court noted the American Bar Association's Standards for Criminal Justice were "guides to determining what is reasonable, but they are only guides." *Id.* at 688.

The broad contours described in *Strickland* have been refined in a series of decisions in which the Court has addressed the duties specific to counsel representing defendants charged with capital crimes. The American Bar Association's Standards for Criminal Justice, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) [hereinafter 1989 ABA Guidelines], and Guidelines for the Appointment and Performance of Defense Counsel in Death

61



Penalty Cases (Rev. ed. 2003) [hereinafter 2003 ABA Guidelines], are the recognized measures against which the reasonableness of counsel's performance will be judged. *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing ABA Standards for Criminal Justice); *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2536-2537 (2003) (citing ABA Guidelines). The test for prejudice remains whether counsel's deficient performance "renders the result of the trial unreliable or the proceeding fundamentally unfair." *See Williams v. Taylor*, 529 U.S. at 393, fn. 17, citing *Strickland,* 466 U.S. at 687; *and Kimmelman v. Morrison*, 477 U.S. 365, 393 (1986) (Powell, J., concurring) (reaffirming that *Lockhart v. Fretwell*, 506 U.S. 364 (1993) did not supplant *Strickland*). Thus, counsel's individual errors will be evaluated against recognized standards of practice and the errors, individually and cumulatively, will be measured against *Strickland*'s due process standard.

C.    **Specific Instances of Ineffective Assistance of Counsel**

1.    **Trial Counsel Failed to Obtain Funding for Necessary Experts, Resulting in Inadequate Investigation and Deficient Preparation.**

Two distinct provisions of federal law describe the source and procedure for funding the defense function in federal capital cases. In furtherance of those statutes, the Administrative Office of the United States Courts provides detailed guidance to practitioners and the Courts. When Mr. Vialva's case was filed in 1999, well defined procedures were in place to obviate the conflicts caused when a court is placed in the position of "managing partner" of the defense team in a pending capital case. There was a complete failure of the processes and procedures in this case. As a result, counsel proceeded to trial less than a year after the crimes occurred, insufficiently funded and inadequately prepared.

**Redacted per Extant
Sealing Order**

**REDACTED PER EXTANT
SEALING ORDER**

Also on August 2, 1999, counsel filed a separate motion requesting the appointment of Leon

Cheney as an investigator for the defense.  The unsealed motion did not refer to the Criminal Justice

Act, or any portion of the *Guide to Judiciary Policies and Procedures* promulgated by the United

States Courts under the authority of the Judicial Conference of the United States.  Instead, the

---

**Redacted per Extant
Sealing Order**

63

motion requested the costs be "defrayed by the United States Government." The unsealed motion provided no estimate of the costs associated with Mr. Cheney's services. Doc. 40. The United States opposed the motion on the grounds it would provide "open file discovery, consistent with Rule 16 of the Federal Rules of Criminal Procedure which should enable a proper defense to be prepared without an investigation." Doc. 57.

The Court granted the motion for appointment of Leon Cheney. Doc. 52.

**REDACTED PER EXTANT**
**SEALING ORDER**

64

1024

**REDACTED PER EXTANT
SEALING ORDER**

**Redacted per Extant**
**Sealing Order**

Counsel did not request additional time to complete the experts' work, even though counsel detailed several critical areas of inquiry that remained uncompleted on the day jury selection began. Counsel's failure to request additional time to prepare for the defense of the death penalty is indicative of their failure to comprehend the impact of fully developed mitigation evidence to the presentation of first stage issues. Counsel simply did not recognize that evidence of Mr. Vialva's cognitive disorders might be useful in efforts to rebut the government's presentation regarding premeditation and substantial planning.

Counsel's failure to present a complete, appropriately documented application for funding, supported by citation to the relevant statutory and procedural authorities, resulted in the lapse in funding and the concomitant failure to complete necessary investigation efforts. Counsel had an affirmative duty to pursue a thorough investigation of all matters relating to the guilt and penalty phase of the case. *See* 1989 ABA Guidelines 11.4.1, 11.7.1, and 11.8.3. The responsibility to obtain and utilize necessary resources is coextensive with this duty. *See Wiggins*, 123 S.Ct. at 2536-2537 ("Despite the fact that the Public Defender's office made funds available for the retention of a forensic social worker, counsel chose not to commission such a report. Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association

---

**Redacted per Extant**
**Sealing Order**

(ABA) – standards to which we have long referred as 'guides to determining what is reasonable.'") (internal citations omitted). This initial failure compromised the entire defense of Mr. Vialva.

## 2.    Counsel Failed to Conduct an Adequate Investigation.

Adequate time is a second resource critical to adequate representation in capital cases. In a survey of capital and non-capital homicide cases from fiscal year 1992 through fiscal year 1997, the average total attorney hours per representation in federal capital trials was 1,889 hours with 1,480 of those hours spent out of court. *Spencer Committee Report* (cited in 2003 ABA Guidelines 6.1, Commentary, n. 116.). It is axiomatic that, for counsel to expend an average of 1,480 hours out of court preparing for trial, counsel must first secure sufficient time to prepare from the court. Although counsel filed four requests for additional time to prepare for trial, jury selection began May 15, 2000, less than one year after the homicides. The following timetable reveals the abbreviated schedule on which counsel were operating:

| Event (Docket No.) | Date | Elapsed Time from Trial Settings |
|---|---|---|
| Indictment (Doc. 14) | July 13, 1999 | |
| **Jury Trial - First Setting (Doc. 17)** | September 13, 1999 | *62 days* |
| First Motion to Continue (Docs. 69, 70) | August 31, 1999 | |
| **Jury Trial - Second Setting (Doc. 74)** | December 13, 1999 | *91 days* |
| Second Motion to Continue (Doc. 88, 89) | November 12, 1999 | *28 days* |
| **Jury Trial - Third Setting (Doc. 93)** | January 10, 2000 | |



| Event (Docket No.) | Date | Elapsed Time from Trial Settings |
|---|---|---|
| Superseding Indictment (Doc. 98) | December 14, 1999 | |
| Third Motion to Continue (Docs. 100, 101) | January 3, 2000 | |
| Tony Sparks Arraigned | January 4, 2000 | *63 days* |
| **Jury Trial - Fourth Setting (Doc. 108)** | March 13, 2000 | |
| Motion to Continue/Strike Trial Setting (Docs. 140-141) | February 28, 2000 | |
| Notice of Intent to Seek Death Penalty (Doc. 145) | February 29, 2000 | *63 days* |
| Order Vacating Trial Setting (Doc. 158) | March 13, 2000 | |
| Second Superseding Indictment (Doc. 170) | March 28, 2000 | |
| **Order Setting Jury Trial (Doc. 172)** | **May 15, 2000** | |
| Government Motion to Amend Notice of Intent to Seek Death Penalty (Doc. 174) | March 30, 2000 | |
| Order Granting Government Leave to Amend Notice (Doc. 213) | May 1, 2000 | |
| **Final Trial Date** | May 15, 2000 | |

Through four motions for continuance, counsel eked out 307 days to prepare a defense in the first capital prosecution in the Western District of Texas. Of the continuances granted, two were attributable directly to the superseding indictments. Mr. Vialva was entitled to a minimum of thirty days to prepare following his appearance or waiver of appearance on each of the superseding indictments. 18 U.S.C. § 3161(c)(2). Viewed in the context of the Speedy Trial Act, Mr. Vialva was afforded only 217 days beyond the minimum time for preparation mandated by law.

The most revealing aspect of the timetable is the 63 days between the March 13 trial setting and the May 15 trial date. During that 63 days, Mr. Vialva's counsel were served with the initial

1028

and the amended Notice of Intent to Seek the Death Penalty, a Second Superseding Indictment, and notification of the lapse in defense funding, necessitating an emergency application for writ of mandamus to the Fifth Circuit. Further, the docket sheet reflects counsel filed eleven substantive motions, two responses, and two motions challenging prospective jurors for cause based on counsel's review of hundreds of juror questionnaires during this period. Docs. 163-168, 183, 187, 195-196, 221 (motions); 182, 189 (responses); 215, 219 (challenges for cause). While each of these tasks were related to the trial of the case, the impact of completing them on the compressed schedule virtually insured counsel had little time for any other case related tasks.

The four requests for continuance failed to provide the Court with relevant information regarding the average length of pretrial preparation afforded federal capital defendants. This information was available to counsel through the Capital Resource Counsel. The information, in raw data and graphic representation, is attached hereto as Exhibit IV-E, pages 1-17, inclusive. This data illustrates Mr. Vialva was in the minority of federal capital defendants, allotted less time than half of the defendants confined on death row, and less time than approximately two-thirds of the capitally charged defendants who received a non-death verdict. *Id.* at 1-3.

**Redacted per Extant
Sealing Order**

[2] Counsel proceeded to trial on May 15, 2000 without requesting a further continuance, despite a number of critical tasks that remained unfinished

**Redacted per Extant
Sealing Order**

as they began selecting the jury. Counsel could have resisted this rush to trial by presenting properly documented motions and by announcing they were not ready to proceed on May 15.

Short on money and time, counsel allocated their scant resources to an investigator and a forensic crime scene expert, and limited their efforts to an attack on the quality of the government's case. Leon Cheney, the first expert retained by counsel, conferred with Mr. Goains on July 21, 1999, thirty days after the homicides, and twenty-eight days after the appointment of Mr. Schwieger. Mr. Cheney's first examination of the crime scene occurred on August 12, 1999, a lapse of an additional twenty-two days. *See* Declaration of Leon Cheney ¶4, attached hereto as Exhibit IV-F. Mr. Cheney revisited the crime scene in late August with Kent Christianson, an expert in forensic evidence who ultimately testified at trial. *Id.* at ¶ 8; *and see* Declaration of Kent Christianson ¶ 4, attached hereto as Exhibit IV-G. Counsel knew the crime scene was located yards from a road accessible to the public. There is no indication from counsel's time records, files, or the court record indicating counsel sought and were denied access to the crime scene. There is nothing in the record indicating why counsel would have forfeited the opportunity to examine the crime scene as soon as possible.

After a lapse of nearly two months, Mr. Christianson was asked to review the government's case and give an expert opinion about the evidence collected by the government. Exhibit IV-G ¶ 4. His efforts included testing the ejection pattern for the .40 caliber Glock pistol. Mr. Christianson was not asked to develop any evidence that related to other suspects, or alternate theories of how the crime may have occurred. He was not ask to investigate information about street gangs in Killeen, Texas. *Id.* at ¶ 5. Counsel did not ask their forensic expert about the significance of the unmelted brass shell casings recovered from trunk of the Bagleys' vehicle. If asked, Mr. Christianson would have told counsel the discoloration was the likely result of water coming in

70

contact with the super-heated casings. Mr. Christianson would have explained the casings were intact, in part because of the heat distribution inside the trunk of the burning automobile. *Id.* at ¶ 6. Mr. Christianson acknowledged he was unfamiliar with any gunshot residue testing methods other than atomic absorption. *Id.* at ¶ 7.

Similarly, Mr. Cheney was not asked to "physically observe, look at or into the vehicle" driven by Mr. Hall. Mr. Cheney contacted both Mr. Hall and Mr. Shinn, but, in his opinion, "they were not considered as strong suspects in this case." Exhibit IV-F at ¶ 6. Although Mr. Cheney believed Mr. Lewis and Mr. Brown were "lying about their actions," his research of the codefendants was limited to a computer database for "criminal history background checks." *Id.* at 6. Since Mr. Brown and Mr. Lewis were juveniles, it is unclear how much information would have been accessible through a database. Mr. Cheney made an attempt to inquire about Killeen street gangs, but was unsuccessful because he was "an outsider." *Id.* This absence of information for use in the guilt stage was not cured through the mitigation specialist's development of social history since funding for that expert ceased before she completed any substantial work. *See* Declaration of Tena Francis ¶ 13, attached hereto as Exhibit IV-H. Since counsel argued to the jury a theory of defense based on the idea someone other than Mr. Vialva, at some location other than Fort Hood, shot and killed the Bagleys, it is inconceivable why they did not attempt to develop supporting evidence. *See* VIII Tr. 1488-1489 (opening statement); XIII Tr. 2633-2634 (closing argument, reference to Cleveland Shinn and Omer Hall), 2632 (closing argument, gang evidence). Conversely, if counsel would have consulted with their forensic expert, they would have avoided delving into fruitless areas of cross examination. *See* X Tr. 2112-2113 (melting point of brass).

Counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on

71

investigation." *Strickland v. Washington*, 466 U.S. at 690-691. Thus, the scope of defense counsel's pretrial investigation "necessarily follows from the decision as to what the theory of defense will be." *Soffar v. Dretke*, __ F.3d __, No. 98-20385, 2004 WL 848416, at *27 (5th Cir. Apr. 21, 2004). Counsel failed to conduct an investigation adequate to formulate a coherent defense theory, or to assail the government's case, or to avoid errors in cross examination, and the resulting prejudice to Mr. Vialva is evident when the course of the trial is reviewed.

### 3.    Counsel Failed to Subject the Government's Case to Requisite Adversarial Testing.

The prosecution's opening statement was a comprehensive account of its anticipated evidence. VIII Tr. 1471-1487. The prosecution offered a detailed chronology of the events, naming the participants who engaged in specific actions, and advising the jury "the plan had already been hatched" when Sparks and Lewis approached Todd Bagley at the pay telephone. VIII Tr. 1473; 1477. The prosecutor made specific reference to Mr. Vialva's "gang." VIII Tr. 1476. The prosecution told the jury about the law enforcement efforts exerted to collect and process evidence at the crime scene. VIII Tr. 1484-1485. The prosecution concluded by telling the jury it would hear the testimony of "criminal co-defendants, persons who participated in this crime along with the defendants charged before the Court." VIII Tr. 1486. True to the "road map," the prosecution pinioned its first stage case on three themes: law enforcement efforts were diligent and thorough; Christopher Vialva, the leader of a violent street gang targeting innocent victims, orchestrated the plan to kill the Bagleys; and the eyewitness testimony of participating codefendants was conclusive proof of guilt. The defense failed to subject any of the three points to genuine adversarial testing.

1032

*Forensic Evidence*

In its opening statement, the prosecution referred to the .40 caliber Glock handgun as the "murder weapon." VIII Tr. 1484. This initial injection of the legal question presented for the jury decision passed without objection by the defense. A series of employees of various law enforcement agencies were called to attest to their efforts in preserving and collecting evidence at the scene. The defense allowed a series of discrepancies to pass without cross examination or comment. *See* Table 1, attached hereto as Exhibit IV-I. Counsel's failure to challenge these discrepancies must be considered in the context of their failure to cross examine 26 of the government's 60 witnesses, many of whom testified to matters that were not in dispute. *See id.* The prosecution's portrayal of a well contained crime scene was inaccurate. In truth, the area was far from secure and no responsible person consistently maintained control of the scene and the suspects.

Defense counsel admitted he did not "understand DNA very well," but proceeded to conduct a haphazard cross examination of the government's serologist that included questioning about recovery of DNA from "mummies out of the Egyptian pyramids." X Tr. 1991, 1992.[23] The government's serologist had two vital areas of information helpful to the defense: none of the evidence recovered from the burned vehicle or the victims was forensically linked to Mr. Vialva; none of the evidence recovered from Brandon Bernard's Buick was forensically linked to the victims. X Tr. 1983-1985 (items recovered from burned vehicle linked to victims); 1986 (blood on Christopher Lewis's undershirt was Christopher Lewis's). The only item of evidence connected to

---

[23]This line of inquiry was particular inapposite since the serologist was testifying about extracting material from epithelial cells for nuclear DNA testing (X Tr. 1991), not mitochondrial DNA from non-nuclear material such as "mummy" bones or similarly degraded samples. *See* KEITH INMAN & NORAH RUDIN, AN INTRODUCTION TO FORENSIC DNA ANALYSIS 37-55 (1997) (explaining extraction and typing methods, sources of DNA material, and limits of typing methods).

Mr. Vialva was a ski mask retrieved from Bernard's Buick. The government's serologist testified she could not exclude Mr. Vialva as a contributor to a mixed sample of DNA retrieved from the mask. X Tr. 1987-1988. Without cross examining the serologist on the extraction methods, limits on the particular replication method, or analytical issues specific to mixed sample extractions, counsel simply reinforced the mathematical projections on which the serologist's testimony was based. X Tr. 1992-1993. The serologist admitted it was not possible to determine when the DNA was deposited on the ski mask. X Tr. 1993.

On redirect, the prosecution asked the serologist, if from the absence of blood on clothing, she could "conclude whether someone shot someone or not, " predictably eliciting a negative response. X Tr. 1995. Defense counsel asked no further questions, apparently unprepared to pursue a central issue in the defense. At least two areas of interest were present. Terry Brown, who testified the day before the serologist, said he saw blood coming from Mr. Bagley's head shooting "straight up" like "a water faucet" for several seconds. IX Tr. 1924-1925. Ranger Aycock's report detailed a search of the Bagleys' automobile at the impound lot. The investigators were trying to determine how the tooth recovered from the trunk could have been dislodged from Mrs. Bagley. Based on the location of the tooth and the likely blood pattern, Ranger Aycock discounted the theory Mrs. Bagley was lying on her side, inside the trunk, when she was shot. Ranger Aycock noted:

> However, if the female victim was raised up when shot in the face, losing the tooth and causing it to go into the area in which it was found in, blood back spatter from a gunshot wound might indeed go into a different mode and direction in a cone shape from that particular wound. This might cause the blood spatter from the gunshot wound to be more easily recognized and discovered, possibly on the clothes of the shooter. In any event, investigators became enthralled in the trunk to the extent that several hours were spent on it, examining it for additional evidence.

*See* Texas Ranger Report of Investigation, Agent Aycock, p. 40, ¶ 1.125, attached as Exhibit VII-J.

Counsel failed to pursue this obvious area of inquiry with any of the government's witnesses, or

74

1034

with their own experts. It does not appear counsel attempted an independent examination of the suspects' clothing to either rule out trace blood evidence or to develop an alternate theory of who shot the Bagleys.

Defense counsel wholly failed to challenge the government's excuse for the absence of gunshot residue evidence. This deficiency was addressed in Ground II, in the context of counsel's conflict of interest. Counsel's failure to subject the government's excuse to adversarial testing is a second basis for granting relief. It is beyond peradventure that the critical issue in this capital prosecution was who inflicted the fatal wounds to the Bagleys. The government's failure to secure relevant evidence bearing on this issue was an open invitation to the defense to present evidence casting doubt on the theory of prosecution.

Mr. Cheney recalls discussing the atomic absorption method during one of the team meetings and advising counsel the method was outdated by a decade at that time. Exhibit IV-F at ¶ 7. Despite this information, counsel failed to ask the government's witness a single question. Counsel were unprepared to refute the validity of a government protocol that arbitrarily abandoned testing or to present countervailing evidence about the use of gunshot trace evidence. An expert could have demonstrated the flaws in the evidence collection and testing process, casting doubt on the government's assurances "no stone was left unturned." Further, an expert could have testified the use of an outdated testing method was not consistent with best practices in 1999. *See* Declaration of Robert White ¶ 21-23, attached hereto as Exhibit IV-K. An expert could have testified the government waited "an excessively long time to collect the gunshot residue" and appeared to be unfamiliar with what happened with the suspects while they were in custody. *Id.*, at ¶ 21. Further, Mr. Amen's testimony about the reason why no tests were conducted could have been attacked as unreasonable. *Id.*, at ¶ 22. This expert testimony would have reinforced two points for the defense:

1035

there was no forensic evidence to establish who fired the weapon that killed the Bagleys; and, the absence of forensic evidence was entirely attributable to the outmoded procedures chosen by the government. *Id.*, at 24. Without the support of an expert, defense counsel's closing argument was constrained to commenting on the absence of evidence indicating the suspects showered or washed their hands and telling the jury members they could use their "own reason and common sense." XIII Tr. 2625.

In the end, the government was unable to present any forensic evidence establishing Mr. Vialva was the person who fired the Glock. No fingerprints, blood, or other trace evidence placed Mr. Vialva in proximity to the victims at the time the shots were fired. After more than a dozen law enforcement witnesses testified, the government's theory that Christopher Vialva fired the fatal shots rested entirely on the testimony of Terry Brown and Christopher Lewis.

*Terry Brown*

The United States had an affirmative duty to disclose all information bearing on Terry Brown's credibility as witness, including prior inconsistent statements regardless of the manner in which they were memorialized. The government's breach of the obligations imposed by *Brady v. Maryland* have been addressed in Ground III. But, the government's obligation is independent of counsel's duty to diligently investigate and adversarily test the government's case.

Terry Brown's testimony was crucial to the government's guilt stage presentation. On December 16, 1999, Mr. Brown and Mr. Lewis entered pleas of guilty to three counts of a Superseding Information. Counsel for Mr. Vialva was present during the guilty plea proceedings.[24]

_____

[24]The Court conducted rearraignments of five defendants contemporaneously on December 16, 1999. Mr. Schwieger was representing James Edward Deaver in Case Number W-99-CR-43. The transcript indicates all counsel were present with their clients for the entire proceedings. A copy of the transcript is appended as Exhibit III-M.

Despite the fact counsel were aware Mr. Brown had waived his Fifth Amendment rights and admitted guilt, they made no attempt to question him prior to trial either directly or through interrogatories to his counsel. Counsel did not request the Court unseal the juvenile proceedings, nor did they request disclosure of any court ordered mental health evaluations of Mr. Brown. Counsel did not request production of agents' field notes or other information documenting interviews or debriefings.

Counsel were in possession of the final report of the CID in which investigators documented contacts with the suspects. On page eleven, the reporter notes an interview between Mr. Brown and Special Agent Nelson at 2200 hours on June 22, 1999. The entry concludes:

> Agent's Comment: A sworn statement was not taken by SA NELSON as the US Attorney and (FBI) SA CHADWICK stated no further written statements would be taken.

Exhibit III-H, at 11. An entry from July 26, 1999 documented a debriefing of Mr. Brown attended by CID Agent Bair, FBI Agent Chadwick, ATF Agent Meyer, and Texas Ranger Aycock. *Id.* Mr. Brown's lawyer was present for the meeting since it was proceeding under a proffer agreement with the United States Attorney's office. The notation ends, on page twelve:

> Agent's Comment: No written statement was taken from Master BROWN at the time because the investigators believed Master BROWN was not completely truthful in all of this testimony.

Exhibit III-H, at 12. These two entries would have alerted reasonably diligent counsel to the existence of at least two interviews of Mr. Brown that did not result in a statement being taken from him. The reasons for the government's skepticism are as material as the fact the interviews were conducted. Certainly the notes of the latter interview, proceeding under a proffer agreement, would have disclosed Mr. Brown's role in the evolution of the government's theory.

Counsel's attempts to impeach Mr. Brown with his prior inconsistent statements were

restricted to the memorials of two interviews. Mr. Brown could not recall how many statements he had given, but estimated "Probably somewhere between two or three." IX Tr. 1938. Mr. Brown attested to the first statement during the course of his interview "at the CIA [sic] office." IX Tr. 1939. Mr. Brown explained the first statement was given "before the deal was offered" and, as Mr. Brown understood, "we were in the process of being released." IX Tr. 1941. Counsel then directed his cross examination to Mr. Brown's testimony on direct examination that he spoke with Mrs. Bagley while the car was parked at Billy Rorie's house. Counsel asserted, "And that's not in any of your statements, true?" Mr. Brown responded:

A:    Yes, it is in some of my statements.

Q:    That you talked to her at Billy Rorie's house?

A:    Yes. Whether or not they put them in, I don't know, but yes, *I mentioned it in every one of my statements. The statements were not handwritten by me or typed by me.*

IX Tr. 1947 (emphasis added). If no sooner, then certainly at this point, counsel was on notice Mr. Brown gave far more than "between two and three" statements and that the defense had not been apprised of these interviews by the government. This revelation drew no reaction from counsel, despite its obvious significance as, at least, a discovery violation and, at most, a violation of *Brady*.

In fact, Mr. Brown was debriefed November 5, 1999, in the presence of his attorney. The substance of this interview was discussed in Ground III. The salient feature of that debriefing in this context is that Mr. Brown openly admitted recent prior acts of violent, assaultive behavior including the use of a sledgehammer during a fight, the use of firearm in a drive-by shooting, and the chambering of a shotgun round during an altercation.

Another contact with investigators apparently occurred March 15, 1999, in the absence of Mr. Brown's lawyer. No record of that interview appears to have been disclosed. **Redacted per Extant Sealing Order**

1038

**Redacted per Extant
Sealing Order**

Even if the Court finds the government did not breach its duty to disclose this impeachment evidence, other evidence should have alerted counsel.

Greg Lynch testified Mr. Brown was smoking a "blunt" when he came to the door of Lynch's house to collect the Glock. XI Tr. 2187. In fact, Mr. Brown was smoking a "wet", a marijuana cigarette dipped in embalming fluid.[25] Mr. Brown had been drinking and using a variety of drugs, including "acid", continuously since June 19. *See* Declaration of Terry Brown, Exhibit III-S ¶ 4. Mr. Brown averred that, if he would have been asked questions about his drug use, he would have answered truthfully. *Id.* at ¶ 12. Counsel argued against the admission of a job application Mr. Brown filled out on June 21 on the grounds it was hearsay. IX Tr. 1889. Counsel apparently failed to note Mr. Brown's remarkably disjointed handwriting and his incoherent reason for leaving prior jobs: "Point Out." Gov. Ex. 39. Mr. Brown's intoxication explains both points. Mr. Lynch testified after Mr. Brown in the government's sequence of witnesses. Counsel's failure to ask Mr. Brown about his drug use at Mr. Lynch's is a strong indication counsel never interviewed Mr. Lynch prior to trial. Counsel made no effort to ameliorate the deficiencies in his cross examination of Mr. Brown by recalling him as a witness for the defense.

On redirect examination, the prosecution shored up Mr. Brown's testimony through a series of leading questions about the potential punishment he was facing. The prosecutor asked Mr.

---

[25]The Drug Enforcement Adminsitration lists some of the common short term effects of smoking "wets" are: anger and frustration, paranoia, physical violence, hallucinations, and delusions. *See Intelligence Bulletin:* Marijuana and Embalming Fluid, *available at* http://www.usdoj.gov/dea/pubs/state/newsrel/newark_intel_bulletin_embalming.pdf.

Brown, "And did you also learn from your attorney that juveniles, under federal law, cannot be executed?" IX Tr. 1959. The prosecutor reiterated the question, in a slightly different form, a few questions later. IX Tr. 1960. The prosecution made no mention of the fact Mr. Brown was potentially subject to the death penalty under Texas law.

**Redacted per Extant
Sealing Order**

While the latter fact may have been withheld from the defense, counsel, as an experienced State practitioner, should have recognized Mr. Brown's exposure to a possible State capital prosecution.

Counsel devoted considerable effort to the issue of jurisdiction, apparently for the purpose of defeating federal jurisdiction over the first degree murder charge. *See* Declaration of Stanley Schwieger ¶ 9 (June 7, 2004), attached hereto as Exhibit IV-L. Brenda Henderson, the Real Property Officer for Fort Hood, testified Old Nolanville/Quarry Road and the adjacent property was an area of concurrent jurisdiction in which "the State and the Government hold jurisdiction over the area." IX Tr. 1807-1808. Ms. Henderson was one of the twenty-six government witness who were not cross examined by counsel. Ms. Henderson's testimony would have provided a basis to inquire of Mr. Brown or his counsel concerning Mr. Brown's exposure to State prosecution. If counsel would have researched the law, or pursued this issue through investigation, Mr. Brown's motive to insulate himself from a State capital prosecution would have been exposed for the jury's consideration.

*Christopher Lewis*

Christopher Lewis entered a plea of guilty in the same proceeding with Terry Brown, on December 16, 1999. Counsel did not attempt to interview Mr. Lewis prior to trial and apparently conducted no investigation about his activities independent from the information provided by the

government during discovery. Mr. Lewis, the youngest of the participants, was also subject to federal juvenile delinquency proceedings that would have included a mental health evaluation. Counsel sought none of the documents relating to Mr. Lewis's appearances in state and federal juvenile proceedings.

The final CID report records three contacts between Mr. Lewis and CID agents on June 22, 1999. According to the report, Mr. Lewis gave two statements and drew a sketch of the scene. On July 2, Mr. Lewis was presented for a debriefing under a proffer agreement. Agents from CID, the FBI, and ATF attended. Mr. Lewis was accompanied by counsel. The debriefing ended when the agents concluded Mr. Lewis "omitted several facts" and "failed to confess his involvement." A second debriefing, apparently more satisfactory to the government, was conducted July 9. Nevertheless, the report notes:

> Agent's Comment: A sworn statement was not taken per the request of (FBI) SA CHADWICK.

On July 13, 1999, Agent Chadwick testified before the grand jury. In the course of posing a question, the prosecutor characterized their presentation as "based at its core on a Christopher Lewis statement." GJ Tr. (7/13/99) 14 (Exhibit III-T). The grand jury transcript was disclosed to the defense in discovery.

Counsel did not request production of Agent Chadwick's field notes or any other agent's memorialization of Mr. Lewis's July 9 account. Counsel for both defendants cross examined Mr. Lewis at trial, eliciting repeated admissions that his initial statement of June 22 contained several material lies, including his account of the sequence of events, of seeing how the Bagleys were shot, and of Mr. Vialva setting the fire. XI Tr. 2421-2422; 2416. The reason for Mr. Lewis's retreat from his initial statement remained unexplored at the conclusion of the cross examination.

81

*Gang Affiliation*

The government's first notice of its intention to present allegations about Mr. Vialva's membership in a gang occurred during the June 24, 1999 preliminary and detention hearing. The Federal Bureau of Investigation case agent, Daniel Chadwick, testified Mr. Vialva was in a "gang database that's maintained by the Killeen Police Department." Addressing other "gang-related" acts, Agent Chadwick testified, "It appears that Chris Vialva for sure, or at least, and possibly some of the others, were involved in another type of violent act that's related with gang-type activity." PH Tr. (6/24/99) 19. Chief Assistant United States Attorney William Johnston focused the grand jury's attention on this issue:

> Q:    And to cut to the chase on some of their – on why they run together and why some of these relationships exist, can you state whether or not you have strong evidence that they are members of a criminal organization or gang?
>
> A:    (By Agent Chadwick) Yes, sir, we do.

GJ Tr. (7/13/99) 12 (Exhibit III-T). Later in the same presentation, Agent Chadwick characterized the suspects' transportation of the Bagleys as a "trophy ride" through the neighborhoods where "their gang" lived. GJ Tr. (7/13/99) 27-28 (Exhibit III-T). On April 26, 2000, counsel filed a motion to exclude evidence about the gang on the grounds the evidence was not relevant and, even if it were, the probative value was substantially outweighed by its prejudicial effect. Doc. 206. The government responded the evidence was "highly relevant to show the that the crime was a joint venture." Doc. 210. The Court heard brief argument on the issue just before opening statements began. VIII Tr. 1470-1471. The Court overruled the motion and counsel's subsequent objection to the government's reference to gangs in its opening statement. VIII Tr. 1471, 1476.

The importance of this evidence was manifest to counsel well before trial. It was clear the government intended to use this evidence to argue premeditation, significant prior planning, and a

82

leadership role attributable to Mr. Vialva, as well as to lay the foundation for the claim of future dangerousness in the penalty phase of the trial. Mr. Cheney recalls making some inquiry, the nature of which he is no longer able to recall. Mr. Cheney attributed his lack of results to the fact he was an outsider. This should have formed the basis for a request for additional resources. These resources were available and there is every reason to believe their efforts would have yielded positive results. If the evidence would have ben developed, the true nature of the "gang" would have been revealed.

Contrary to the government's theory, this was not a local chapter of a larger crime organization. The group did not exhibit the characteristics typical of genuine local affiliates of West Coast gangs. There was no evident monetary or criminal enterprise connection between the group and the Los Angeles organization. See Affidavit of Dwight Stewart ¶ 5, attached hereto as Exhibit IV-M. There was no evidence the deaths of the Bagleys were ordered or sanctioned by the people who started the group, or that the deaths furthered any purpose of the group. *Id.* at ¶ 7. Most importantly, the reasons behind Mr. Vialva's membership in the group would have been explained. Mr. Vialva's prior associations indicate he liked to be part of the group, but rarely exercised any control. Within the 212 PIRU, Mr. Vialva was "at most, a 'soldier' as opposed to a leader." *Id.* at ¶ 8. The government's portrayal of Mr. Vialva as a leader in a criminal organization would have been rebutted by this evidence.

### *Mental Age of Christopher Vialva*

At nineteen, Mr. Vialva was chronologically the oldest of the five suspects. The government consistently and successfully portrayed Mr. Vialva as the ringleader of the group and the architect of a well-planned crime. Both the carjacking and the first degree murder charges required the government to prove Mr. Vialva acted deliberately and wilfully. Counsel failed to adduce readily

1043

available evidence that would have established Mr. Vialva's cognitive capacities were not those of a normal adult. This evidence would have been relevant to the jury's determination of Mr. Vialva's ability to form the requisite criminal intent.

Before the mitigation specialist's efforts were halted by the funding lapse, she had collected and summarized records documenting Mr. Vialva's history of treatment for behavioral disorders and his diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) in a draft social history. Mr. Vialva's public school records were also available for counsel's review. Exhibit IV-H ¶¶ 9, 10 (see Draft Social History, attached to Exhibit IV-H as Exhibit B). These two sources of information would have alerted experienced death penalty litigators to the issue of Mr. Vialva's cognitive capacity. If a complete social history would have been completed, counsel would have learned of Mr. Vialva's family history of bipolar disorder and his history of brain injury. *See* Declaration of Tina Erdmann ¶¶ 3, 4, 8, 9, attached hereto as Exhibit VII-A.

An expert could have explained to the jury that many children diagnosed with ADHD are actually suffering from bipolar disorder. Many of the medications prescribed for ADHD are contraindicated for children with bipolar disorder. An expert could have explained Mr. Vialva's records were indicative of misdiagnosis by his treatment providers. *See* Declaration Dr. Daneen Milam ¶¶ 21, 23, attached hereto as Exhibit VII-C. An expert could have explained that nineteen year olds, even without disorders, do not possess the same cognitive capacities as twenty-five year olds, solely as a result of the organic processes that continue in brain development through young adulthood. An expert could have explained the last portion of the human brain to reach full development is the frontal lobe, the area in which complex problem solving and emotional control are centered. *Id.* at ¶ 25. An expert could have explained, "Christopher, with all of his neuropsychological deficits, would have a high probability of being two to three years younger in

84

1044



brain development than his age peers." *Id.* Further, an expert could have explained the impact of bipolar disorder on normal cognitive functioning, placing this information before the jury in the context of Mr. Vialva's life. *Id.*

Even Dr. Cunningham, the expert retained less than a month before trial began, recognized that although Mr. Vialva was nineteen years old at the time of the offense, he was "still an adolescent in terms of his brain development." *See* Declaration of Mark Cunningham ¶ 17, attached hereto as Exhibit VII-M. Dr. Cunningham knew that brain development, especially in the frontal lobe, continues until the mid-twenties and there was "reason to believe that Mr. Vialva was developmentally younger than his chronological age." *Id.* Dr. Cunningham expressly recognized Mr. Vialva's developmental age was "an important factor the jury should have had available to them in evaluating Mr. Vialva's moral culpability" in the context of punishment. *Id.* This information was not placed before the jury during the second stage and, because counsel did not realize the significance of this information, the evidence was not presented in the first stage. Part of the reason for this failure is that Dr. Cunningham was conducting his work while the first stage was being tried.

### 4.    Counsel Failed to Present a Coherent Defense

Each of the preceding errors cumulatively "underscores a fundamental lack of formulation and direction in presenting a coherent defense." *Stouffer v. Reynolds,* 168 F.3d 1155, 1164 (10th Cir. 1999). Counsel's failure to formulate and present a coherent defense is reviewed to determine whether the omitted evidence creates a reasonable doubt that did not otherwise exist. *Stouffer v. Reynolds,* 214 F.3d 1231, 1234 (10th Cir. 2000).

Mr. Goains's brief opening statement reminded the jury of the government's burden to prove the case beyond a reasonable doubt. VIII Tr. 1487-1488. Mr. Goains noted, "the Government's case, their entire case, strictly lies on the testimony of co-defendants." *Id.* at 1488. Mr. Goains then

told the jury, "I think the evidence, Ladies and Gentlemen, will show that these statements, they have changed their statements several times. They have lied." *Id.* Mr. Goains concluded by asking the jury to pay special attention to cross examination, reminding them, "people lie, or certainly can lie. Physical evidence never lies." VIII Tr. 1489. From this preview, a juror could reasonably expect physical evidence that "never lies" exonerating Mr. Vialva and rebutting, in some fashion, the false testimony of government witnesses. The jury waited in vain for such a presentation by Mr. Vialva's counsel.

Mr. Goains pursued the "lying witness" theme during his cross examination of Omer Hall and Cleveland Shinn, two young men who drove up Nolanville Road while the Bagleys' vehicle was on fire and Mr. Bernard's vehicle was stuck in the ditch. VIII Tr. 1529-1532; 1561-1563. During the cross examination of Mr. Hall and Mr. Shinn, Mr. Goains referred to the location as a "murder scene" twice. VIII Tr. 1529, 1563. Mr. Goains asked Mr. Hall if he returned to the area because "(your) conscious [sic] was bothering you?" VIII Tr. 1532. Mr. Goains's next question was, "(H)ave you ever heard of people that start fires, that they usually always return to the crime scene?" VIII Tr. 1532. Mr. Hall explained he went home, left his truck, and returned to the scene in his car because he was scared and wanted to avoid problems. Mr. Hall explained he had been driving his standard transmission truck for five days at that point. VIII Tr. 1531. The Court reacted to this testimony by asking the jurors if anyone else felt old hearing someone say they had to learn how to drive a stick shift. The transcript reflects laughter in the courtroom. VIII Tr. 1540. Mr. Goains's cross examination did nothing more than reinforce Mr. Shinn's direct testimony, concluding with a question about Mr. Shinn and Mr. Hall getting "caught at this crime scene of a murder scene." VIII Tr. 1563.

The closing argument is an accurate reflection of the disarrayed, disjointed theory presented

86



by Mr. Vialva's counsel.  Mr. Goains reminded the jury about Mr. Hall and Mr. Shinn:

> I'm telling you, that is very suspicious.  They were caught at the scene.  They were allowed to leave, and then they came back because their conscience was bothering them.

XIII Tr. 2634.  Recounting the witnesses' testimony about seeing some of the young men changing clothes and throwing clothes into the bushes, Mr. Goains told the jury, "that's an absolute lie." XIII Tr. 2634.  In response, the prosecution referred to Mr. Hall and Mr. Shinn as "innocent bystanders" and reminded the jury the defense accused Mr. Hall of setting the car on fire.  The prosecution asked the jury, "How desperate can one be?"  XIII Tr. 2679.

Mr. Schwieger fared no better when he attacked various witnesses' accounts of the time certain events occurred.  XIII Tr. 2616-2627; 2619.  The difference between the accounts was a matter of minutes, not hours, and none of the variances were relevant to determining whether Mr. Vialva shot the Bagleys.  Mr. Schwieger argued about the physical evidence, highlighting the unmelted shell casing and the presence of DNA on the ski mask were equivocal evidence against Mr. Vialva.  XIII Tr. 2617-2618.  What is missing from both Mr. Schwieger's and Mr. Goains's arguments is any affirmative direction  of the jury's attention towards reasonable doubt.  This omission is the direct result of counsel's failure to present a theory of defense predicated on any direct or circumstantial evidence.  Instead, counsel  relied solely on an effort to convince the jury everyone associated with the government's case was lying.

The defense called a forensic evidence expert and a medical examiner to address, respectively, trajectory of the shell casings and the position of the Bagleys when they were shot.  The first witness was called to cast doubt on Mr. Brown's account of the position of Mr. Vialva at the rear of the car when the shots were fired.  The expert's testimony was based on a test firing of the weapon the day before he appeared to testify.  XII Tr.  2498.  The expert could not rule out the

.87

1047

possibility the shell casings fell into the trunk as the weapon was being fired. XII Tr. 2530-2531. Similarly, because of the mobility of the human body, the forensic expert could not rule out the possibility the Bagleys were shot "just like the witnesses said." XII Tr. 2534. The medical examiner conceded, based on the trajectory of the firearm, Mr. Bagley could have been shot as he lay in the trunk. XII Tr. 2571. The medical examiner maintained the only way to account for Mrs. Bagley's wound was that "she had to have been moved." XII Tr. 2565. In closing, Mr. Goains argued the medical examiner's testimony supported the conclusion the fatal shot was fired from the right rear panel rather than the left. "Well, who was standing on the right side? Terry Brown." XIII Tr. 2636. Mr. Goains's effort to resurrect a viable theory from the expert's problematic testimony is clear evidence no coherent theory of defense existed.

### 5.    Counsel Failed to Establish a Working Relationship with Mr. Vialva

Counsel had an affirmative responsibility to confer with Mr. Vialva, to keep him advised of the progress of his case in a meaningful way, and to incorporate him into the defense of his case. *See* 1989 ABA Guidelines 11.4.1(D)(2) (counsel required to conduct independent investigation; timely interview of client required); 11.4.2 ("Trial counsel should maintain close contact with the client throughout the preparation of the case, discussing (inter alia) the investigation, potential legal issues that exist or develop, and the development of the defense theory."); *and* 2003 ABA Guidelines 10.5 (A) ("Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client.").

**Redacted per Extant
Sealing Order**

**Redacted per Extant
Sealing Order**

Counsel's lack of contact was not offset by any other member of the defense team. Tena Francis conferred with Mr. Vialva once, in a public visiting area of the county jail. Ms. Francis told Mr. Vialva she would return to conduct a first interview with him. Ms. Francis "never accomplished this basic, critical task because of a failure in funding." Declaration of Tena Francis, Exhibit IV-H at ¶20.

There is no set formula describing how much time a lawyer must devote to building a working relationship with a client. The variables include the complexity of the case, the sophistication of the client, and the skill of the attorney in communicating effectively. Counsel's brief contacts with Mr. Vialva are indicative of the disarray in which this case proceeded to trial. The lack of a coherent defense is directly attributable to counsel's failure to confer with their client. As will be explained in detail in Ground VII, the most salient aspects of Mr. Vialva's life were entirely unknown by counsel. Mr. Vialva was, in every essential respect, a stranger to his lawyers. The lawyers bear full responsibility for this.

**D.    Prejudice Resulted From Counsel's Deficient Performance**

Counsel's misdirected efforts to impugn the government's case fell wide of the mark for legitimate trial strategy. Counsel engaged in no meaningful investigation in an effort to negate the

---

[26]It is unclear from the records exactly how much of the time claimed by counsel and the investigator was spent speaking with Mr. Vialva and how much was spent traveling to the jail and gaining access to the client.

testimony of two admitted participants who claimed to be eyewitnesses to the shooting. Counsel never attempted to interview Terry Brown or Christopher Lewis after their pleas of guilty. Counsel failed to pursue evidence that would have established a series of unrecorded interviews between federal law enforcement officers and Mr. Brown. This information could have supported the otherwise bald allegation of witness "coaching" by the government. No effort was made to develop independently evidence that would bear on their credibility. Mr. Brown was the only testifying witness who claimed to be in proximity to the Bagleys when the shots were fired. Counsel's suggestion in closing argument that Mr. Brown was in the only possible position to shoot Mrs. Bagley would have gained substantial legitimacy if Mr. Brown's continuing exposure to a State capital prosecution would have been explained to the jury.

Apparently content with the absence of forensic evidence incriminating Mr. Vialva, counsel made no effort to demonstrate the potentially exculpatory evidence the government failed to develop by relying on arbitrary protocols and outdated evidence collection methods. Such a presentation would have lent support to the argument the government focused on the two suspects against whom they could seek the death penalty, assiduously avoiding any evidence that might disprove their theory. Counsel failed to use the scant resources at their disposal to ensure the defense experts did contradict not each other. Counsel ignored their client as a potential resource and as an integral part of the defense.

Trial counsel failed to exercise the skill and diligence a reasonably competent lawyer would have invested. Counsel's failures are inexcusable as strategic choices since they plainly lacked the information necessary to make an informed decision. Counsel's omissions and errors prejudiced Mr. Vialva by depriving him of precisely the sort of information the jury needed to weigh the prosecution's case. *See Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994) (no physical evidence

90

connected the accused to crime scene; failure to interview eyewitness whose testimony was "the cornerstone of the state's case in chief" denied defendant effective assistance of counsel; vigorous cross examination is not a substitute for pretrial investigation); *Anderson v. Johnson*, 338 F.3d 382, 393-94 (5th Cir. 2003) (no physical evidence linked the accused to the crime; "reasonable probability" that but for counsel's failure to interview and present crucial eyewitness the result of the trial would have been different); *Soffar*, 2004 WL 848416 at *32-33 (failure to consult ballistics expert "to make a strategic decision as to whether such information would have helped Soffar's defense," failure to contact eyewitness based on unconfirmed statement he was "a vegetable," and failure to investigate extant discrepancies in accounts of incident amounted to deficient performance; prejudice established in light of absence of physical evidence linking accused to crime and patently helpful evidence omitted from jury's consideration).

The evidence omitted from the jury's consideration created a reasonable doubt that did not otherwise exist on the crucial issues of Mr. Vialva's capacity to form the requisite intent, the identity of the person who shot the Bagleys, and the degree of Mr. Vialva's culpability in the events. As a result of counsel's deficient performance, Mr. Vialva was denied his Sixth Amendment right to effective assistance of counsel and, concomitantly, was denied Due Process. There can be no confidence in the outcome of the guilt phase of this trial. A new trial of the guilt phase is required.

## GROUND V

**A CAPITAL DEFENDANT'S PROPENSITY TO COMMIT VIOLENCE IN THE FUTURE CANNOT BE PREDICTED ACCURATELY. THE JURY'S CONSIDERATION OF " FUTURE DANGEROUSNESS" AS A FACTOR IN AGGRAVATION OF PUNISHMENT RESULTED IN THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY, IN VIOLATION OF THE RIGHT TO DUE PROCESS OF LAW SECURED BY THE FIFTH AMENDMENT. ASSESSMENTS OF FUTURE DANGEROUSNESS RELY ON GENERALIZATIONS ABOUT CONDUCT, RATHER THAN FACTS SPECIFIC TO THE DEFENDANT. THIS PROCESS DENIES THE DEFENDANT THE INDIVIDUALIZED SENTENCING REQUIRED BY THE EIGHTH AMENDMENT. THE GOVERNMENT'S INVOCATION AND THE JURY'S USE OF THE "FUTURE DANGEROUSNESS" NON-STATUTORY AGGRAVATING FACTOR DEPRIVED CHRISTOPHER VIALVA OF A CONSTITUTIONALLY ADEQUATE SENTENCING PROCESS.**

**A.       Procedural Posture of this Claim**

Trial counsel moved to strike the statutory and non-statutory aggravating factors from the government's Notice of Intent to Seek the Death Penalty. The motion addressed the "future dangerousness" non-statutory aggravating factor, but conceded prior Supreme Court authority permitted its use. Counsel's argument for striking the aggravator was that since Congress did not choose to include "future dangerousness" as a statutory aggravating factor, its use as a non-statutory aggravating factor contravened the intent of Congress. Doc. 164, pp. 35-36. Counsel renewed their challenge through a motion to reconsider and objections to the penalty phase instructions. Docs. 205, 275. This issue was omitted from the direct appeal.

This Ground challenges of the "future dangerousness" aggravating factor in light of recent developments that have exposed the unconstitutionality of its use as an aggravating factor. As such, this Ground is distinct from the challenge presented by trial counsel and is presented appropriately through this Motion.

1052

## B.    Constitutional Requirements for Capital Sentencing

The Eighth and Fifth Amendments to the Constitution require that sentencing procedures should not create "a substantial risk [that the death penalty will] be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). To be Constitutional, sentencing procedures must be both reliable and individualized.

"[C]onsideration of the character and record of the *individual* offender and the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (emphasis added); *id.* (condemning any death penalty regime that "treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death"). When considering aggravating circumstances, the Constitution "requires an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983) (emphasis in original).  Just as the death penalty cannot be mandated for the commission of a given crime, neither can it be mandated for belonging to a particular group or population.

Because of the severity and finality of the death penalty, reliability in the procedures governing its imposition must be ensured so that the penalty is imposed only when it is warranted. *Lockett v. Ohio*, 438 U.S. 586, 602 (1978) (explaining that, under the Eighth Amendment, the determination that death is the appropriate sentence must be reliable).  "Because there is a qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for *reliability* in the determination that death is the appropriate punishment in a specific case.'" *Id.* at 885-85 (emphasis added) (quoting *Woodson*, 428 U.S. at 305).  A procedure is Constitutionally unsound if it does not distinguish reliably between the cases

1053



in which the death penalty is warranted, and those in which it is not.

> **C.   Experts and Juries Are Nearly Always Wrong about the Risk of Violence Posed by Capital Defendants. Courts Should Not Permit Juries to Consider Future Dangerousness as an Aggravating Factor**

> **1.    Facts - The Texas Defender Service Study**

The Texas Defender Service published a study this year reporting on 155 inmates sentenced to death in Texas against whom the state presented expert testimony of future dangerousness. *Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness*, TEXAS DEFENDER SERV. (2004) [hereinafter "TDS Study"].[27]  A jury had determined each member of the study would likely "commit criminal acts of violence that would constitute a continuing threat to society." TEX. CRIM. PROC. CODE art. 37.071, § 2(b)(1).

The results of the study establish the poor predictive capabilities of juries.  Of the 155 inmates studied, only eight (5%) engaged in assaultive behavior that results in treatment beyond first aid, and 31 (20%) have no disciplinary records at all.[28]  TDS Study, p. 23.  Only two inmates (1%) have been prosecuted for a crime while in prison.  None of the 155 inmates studied has killed again. *Id.*  This study might be discounted if all the 155 inmates studied remained on death row, secured in their cells 23 hours per day,[29] but the study encompassed a significantly broader population.  Of the 155 inmates, 48 had their sentences reduced to life in prison or less, with 4 of 48 ultimately

---

[27]The full study from the Texas Defender Service is available at: http://www.texasdefender.org/DEADLYSP.PDF.

[28] The other 75% of inmates were involved in rules violations not involving injury to another requiring more than first aid.  TDS Study, p. 23.

[29] To so criticize the study, one would also have to ignore the significant opportunity for violence that exists even in the death row setting.

released from prison. Of the 48 inmates released from death row, only 4% committed serious assaultive behavior, 10% had no disciplinary records at all, and only one was prosecuted for a crime while in prison. TDS Study, p. 24. Thus, even among the population with an increased opportunity to commit violent behavior, 96% have committed no serious assaultive act.

The results are clear: 95% of the time an expert tells a jury a defendant poses a future danger to society, the expert is wrong; 95% of the time a jury agrees with that expert, the jury is wrong. The Texas study confirms the American Psychiatric Association's longstanding Statement on Prediction of Dangerousness, "Psychiatrists have no special knowledge or ability with which to predict dangerous behavior. Studies have shown that even with patients in which there is a history of violent acts, predictions of future violence will be wrong for two out of every three patients." American Psychiatric Association, Fact Sheet at 1.[30] Experts have argued for years that predictions of future dangerousness are impossible. But, until now, there has been no empirical proof those predictions are uniformly wrong.

### 2.    An Error Rate of 95% is Constitutionally Impermissible

The Constitution requires reliability in sentencing procedures. *Zant*, 462 U.S. at 884-85. The requirement of reliability is based on the fundamental principle capital sentencing procedures must be designed to separate those cases in which the death penalty is warranted from those in which it is not. *Lockett*, 438 U.S. at 601. No federal court would permit a jury to determine a death sentence based on the flip of a coin, "Heads, life sentence; tails, death sentence." Under such a process, the jury would abrogate its responsibility to determine the facts and apply the law in favor of a system based on mathematical probabilities. But, if the jury flipped a coin on the issue of future

---

[30]The full text of this document is available at www.psych.org/public_info/violence.pdf.



dangerousness, "Heads, the defendant will commit acts of violence in the future; tails, he will not," the mathematical probability is that the jury would be incorrect 50% of the time, a substantial improvement over the 95% error rate empirically established by the Texas Defender Study. The Constitution does not tolerate a jury decision, especially a decision so consequential as the death penalty, based on a coin toss. The Constitutional requirement of a reliable sentencing process is breached by the use of an aggravating factor that cannot be determined reliably by a jury or the experts on whose opinion the jury must base its decision. An error rate of 95% places the "future dangerousness" aggravating squarely outside the limits of reliability.

### 3. Judicial Precedent Concluding Evidence of Future Dangerousness is Constitutionally Permissible Is No Longer Binding

Courts upholding the Constitutionality of future dangerousness predictions in the death penalty context have followed *Jurek v. Texas*, 428 U.S. 262, 276 (1976), and *Barefoot v. Estelle*, 463 U.S. 880, 896 (1983). *See, e.g., Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002). In *Jurek*, the Supreme Court upheld the Constitutionality of the Texas death penalty statute, and explained "[i]t is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made." 428 U.S. at 274-75. Referring to *Jurek*, the Court in *Barefoot* explained that "if it is not impossible for even a lay person sensibly to arrive at that conclusion [whether a defendant will be a future danger], it makes little sense, if any, to submit that psychiatrists, out of the entire universe of persons who might have an opinion on the issue, would know so little about the subject that they should not be permitted to testify." 463 U.S. at 896-97.

The *Barefoot* Court qualified its conclusions with two statements. First, the Court held, "[w]e are not *persuaded* that such testimony is almost entirely unreliable and that the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its

96

shortcomings." *Id.* at 899 (emphasis added). The Court reiterated that "[w]e are *unconvinced, at least of now*, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon has the opportunity to present his own side of the case." *Id.* at 901 (emphasis added). *Jurek* and *Barefoot* are not based on the legal conclusion that expert testimony of future dangerousness is *per se* admissible, or that juries are *per se* qualified to make a "future dangerousness" determination. Instead, those cases are based upon the assumption accurate future dangerousness predictions are possible for jurors, *Jurek*, 428 U.S. at 274-76, and for experts, *Barefoot*, 463 U.S. at 897.

At the time *Jurek* and *Barefoot* were decided there were opinions, but no facts to demonstrate that neither juries nor experts can predict future dangerousness. The factual predicates for *Jurek* and *Barefoot* are now known to be inaccurate. The Court simply did not have before it the facts that are now before this court. In light of a 95% error rate, the *Jurek* Court's assessment that future dangerousness predictions are difficult, but not impossible, is now demonstrably incorrect. As a result, the *Barefoot* Court's extension of *Jurek* to include psychologists as possible predictors of future dangerousness is also based on a flawed premise.

The *Barefoot* Court would not have upheld the Constitutionality of expert testimony purporting to predict future dangerousness if it had been persuaded that expert testimony of future dangerousness was almost entirely unreliable, or that the factfinder and the adversary system are not competent to uncover, recognize, and take due account of its shortcomings, or that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness. *Barefoot*, 463 U.S. at 899-901. Similarly, the *Jurek* Court had been presented with evidence that jurors are wrong about future dangerousness 95% of the time, it would not have concluded that jurors are competent to make such determinations.

97

\105⁊

This Court is not bound by *Jurek* , *Barefoot,* or their progeny. A district court is not bound slavishly to follow the precedents of higher courts where subsequent events make it nearly certain that the court would repudiate its ruling if given a chance to do so. *See Distribuidora Dimsa S.A. v. Linea Aerea del Cobre S.A.*, 768 F. Supp. 74, 77 (S.D.N.Y. 1991); *Araim v. Painewebber, Inc.*, 691 F. Supp. 1415, 1417-18 (N.D. Ga. 1988). The Court signaled its willingness to reconsider its decision in *Barefoot*: "[w]e are *unconvinced, at least of now*, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness . . . ." *Barefoot*, 463 U.S. at 901 (emphasis added). The Court made clear the factual predicate for a contrary conclusion had not yet been developed. Presented with evidence that future dangerousness predictions are impossible, this Court can depart from *Barefoot* and *Jurek.*

The Supreme Court has departed from prior precedent when it is demonstrated that the basis for that prior precedent no longer holds true. Perhaps the best known example is *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954). The Court departed from the "separate but equal" fallacy when confronted with sociological evidence demonstrating the detrimental impact of that doctrine on the children affected by it. The Court explained "[w]hatever may have been the extent of psychological knowledge at the time of *Plessy v. Ferguson*, this finding [that segregation was having a detrimental impact on African American children] is amply supported by modern authority. Any language in *Plessy v. Ferguson* contrary to this finding is rejected." *Brown*, 347 U.S. at 494-95 (internal footnote omitted).

The Court's willingness to change its position in the face of changing facts and circumstances is especially apparent in the context of the Eighth Amendment, which "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *See Atkins v. Virginia*, 536 U.S. 304, 311-12 (2002) (internal quotation omitted). In *Atkins*, the

98

Court recognized that a change external to its own jurisprudence required a reversal of its prior position and concluded that execution of the mentally retarded is Constitutionally impermissible. *Id.* at 321. The logical extension of *Atkins* is that the Eighth Amendment will not permit the use of a sentencing factor that injects a 95% error rate into capital sentencing.

> **D.    Regardless of Their Historical Inaccuracy, the Methods by Which Psychological Violence Risk Assessments Are Conducted Do Not Meet the Constitutional Mandate That Evidence upon Which a Sentence of Death Is Based Be Both Reliable and Individualized**

Methods for assessing a person's risk for future violence fall into two categories, clinical and actuarial methods. Clinical methods make use of interviews and psychological tests to determine whether the person is likely to commit violent acts in the future. Actuarial methods use data obtained from a group of individuals to predict that other individuals properly categorized as belonging to that group will act in conformity with the historical performance of the group. *See* Brett C. Trowbridge & Charles H. Williams, *Arguing Future Dangerousness: New Techniques for Assessing the Risk of Violence*, 14 WASHINGTON CRIMINAL DEFENSE (2000) [hereinafter "Trowbridge"].[31] Existing methods of "violence risk assessment" thus range from the purely subjective to the purely objective. Neither of these methods of violence risk assessment is Constitutionally sufficient.

> **1.    Because Clinical Assessments are Widely Recognized as Being Scientifically Unreliable, Their Use During a Capital Sentencing Proceeding Infects the Proceeding with an Unconstitutional Level of Unreliability**

Clinically based violence risk assessments have been flatly rejected in the psychology community. "Standard clinical methods such as interviewing and psychological testing have proven

---

[31]The full text of this article is available at www.trowbridgefoundation.org/docs/arguing_future_dangerous.htm.

99

to be unreliable in estimating long-term violence likelihood." Thomas J. Reidy & Mark D. Cunningham, *From Death to Life: Prison Behavior of Former Death Row Inmates In Indiana*, 28 CRIM. JUSTICE & BEHAVIOR 62, 63 (Feb. 2001). Among other reasons, many of the "structured assessments,"[32] which use checklists of factors believed to be indicative of future violence, have been criticized as employing subjective factors that fail to present probabilistic estimates of recidivism. Trowbridge, at *4. Moreover, there are no peer-reviewed studies demonstrating that interview data, or clinical analysis of records are predictive of violence in prison. Mark D. Cunningham & Thomas J. Reidy, *Violence Risk Assessment at Federal Capital Sentencing: Individualization, Generalization, Relevance, and Scientific Standards*, 29 CRIM. JUSTICE & BEHAVIOR 512, 524 (Oct. 2002). "[I]nterviewing and clinical analysis are not generally accepted in the community of violence risk assessment scientists as reliable methods of predicting prison violence." *Id.* at 525.

Future violence is often over estimated, even among forensic specialists. Trowbridge, at *3. In fact, persons with medical training over estimate future violence more often than forensic specialists without medical training. *Id.* Perhaps this tendency to assume an artificially inflated rates of recidivism explains why clinical assessments relying on records reviews and checklists routinely fail to account for the surprisingly low base rate of repeat violence. For example, of 188 defendants convicted of capital murder and paroled after *Furman v. Georgia*,[33] after an average of 5.3 years at liberty, only one killed again, and only six committed violent offenses. This equates to

---

[32] Some of the better known structured assessments are the HCR-20 for assessing general violence recidivism, the SARA for assessing risk of spousal abuse, and the SVR-20 for assessing sexual violence. *See* Trowbridge, at 4.

[33] 408 U.S. 238 (1972).

a 0.6% per year rate of recidivism among capital murderers. Jonathan R. Sorensen & Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. CRIM. LAW & CRIMINOLOGY 1251, 1255 (2000). These statistics demonstrate the actual rate of recidivism is relatively low, and that this relative rate of recidivism is not accounted for in "clinical" violence risk assessments, one of the main criticisms of such assessments. Reidy, 28 CRIM. JUSTICE & BEHAVIOR, at 63. Most inmates suffer from most of the conditions identified as predictors of violence in clinical assessments, yet only a small proportion of inmates turn out to be violent. Thus, these assessments do not reliably distinguish among those who are actual future threats and those who are not. *Id.* at 64.

The Constitution requires that capital sentencing procedures reliably distinguish among those for whom the sentence of death is warranted, and those for whom it is not. The scientific community has rejected clinical studies as unreliable. Clinical studies are highly subjective, and are incapable of identifying those who pose an actual threat of future violence. Clinical studies permit the prejudices of the clinician, who is actually more likely to over-estimate the likelihood of future violence, to enter into the analysis. As a result, clinical violence risk assessments are Constitutionally impermissible as evidence of future dangerousness in a capital sentencing hearing.

2.    **Because Actuarial Assessments are Not Based on an Assessment of the Defendant, They are Not Sufficiently Individualized to Satisfy the Constitution's Requirement that the Individual's Actions and Character be Considered**

Actuarial assessments are also used to predict the risks of future violence. An actuarial risk assessment looks at the historical actions taken by a group of people, and infers that persons having characteristics similar to the group will, in the future, act in conformity with the historical actions of the group. *Cf.* Cunningham, 29 CRIM. JUSTICE & BEHAVIOR, at 513. By enumerating characteristics of a particular individual such assessment attempt to characterize that individual as

a member of the studied group.  The final prediction is based on the notion that persons who can be

categorized as being part of the group will necessarily act as the worst members of the group have

acted.  *Id.* (explaining that knowledge of the base rate of violence among the sample is the most

important single piece of information in making accurate violence risk assessments).  Introduction

of such studies into a capital sentencing hearing is Constitutionally impermissible, since the studies

divert the jury from considering the acts and character of individual defendant, in favor of

considering the historical acts of the group.

Actuarial analyses are widely recognized to have predictive capability, but only within their

appropriate scope.  Actuarial analyses assign a numerical value to the probability that members of

particular group will take some act in the future.  Insurance companies use actuarial analyses as a

matter of course to charge teenage boys more for car insurance than adults.  The insurance company

uses the probability that a teenage boy will have an accident to make the business decision that an

insurance policy for a particular boy should be issued, only if it charges that boy, and all other boys

like him, more for the insurance policy.  The insurance company does not know which of the boys

it insures are going to have car accidents.  The insurance company does not identify one particular

boy and decide he should be charged the full cost of the expected accident.  Instead, the insurance

company spreads the cost of all expected accidents over all boys insured to cover the cost of the

accidents that it expects will occur.  Note that to the extent the accidents do not occur, the insurance

company makes a greater profit.

Actuarial analyses of future dangerousness may have utility for certain purposes.  For

example, if a prison authority were deciding how to allocate its prison guards, it would be wise to

allocate more guards to monitor inmates for whom it had a statistically higher expectation of future

violence.  It would be entirely ill-advised to direct one or more guards to follow around a single

102

inmate based solely on actuarial information, however, since actuarial analysis is incapable of determining which inmate poses a security problem.

The limits of actuarial analysis in the context of future dangerousness is examined in detail in Ground VII. Dr. Patrick Brockett, whose opinion is discussed , *infra* Ground VII, states that once an actuarial analysis steps beyond predicting how a group will perform, it loses scientific reliability. Actuarial analysis determine whether an individual will act in conformity with the group studied, and certainly cannot determine whether the person will in fact commit an act of violence. Actuarial analyses do not take account of the fact that each person is an individual who can make the choice to commit future violent acts. Certainly, in the context of the death penalty, the requirement that the character and acts of the individual defendant be considered is not satisfied by predictions based on the past acts of anonymous persons completely unconnected to the defendant. Such predictions are disguised as "individualized" since they depend upon the defendant's behaving exactly as a group would do. This is not the sort of individualization the Constitution requires. Placing the defendant into a group and then predicting his future acts based on the past acts of the group is to indict the defendant for the past acts of the group. Reason and common sense dictate that this cannot become part of the fabric of our system of criminal justice.

The Eighth Amendment "draws its meaning from the evolving standards of decency that mark the progress of a maturing society." *Atkins*, 536 U.S. at 311-12 (citing *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958)). Improperly using an mathematical formula to determine a defendant's fast does not advance evolving standards of decency. Actuarial analyses should not be used to make life or death decision.



### 3. Any Assessment Derived Without an Examination of the Defendant Should be Constitutionally Barred

As in Christopher Vialva's case, psychologists and psychiatrists make predictions about a defendant's risk for future violence, using any number of analytical frameworks, without meeting the defendant. The Constitution cannot tolerate a sentencing procedure that permits the use of an assessment of the accused's risk of future violence, made without the assessor's interviewing the accused. Even if a 95% error rate could be tolerated, and even if the Constitution is interpreted to allow jurors to hear evidence that is neither individualized nor reliable, the evidence admitted should be based, at a minimum on an analysis made after an evaluation of the defendant. Judge Garza, in his special concurrence in *Flores v. Johnson*, summarized this argument:

> [W]hat separates the executioner from the murderer is the legal process by which the state ascertains and condemns those guilty of heinous crimes. If that process is flawed because it allows evidence without any scientific validity to push the jury toward condemning the accused, the legitimacy of our legal process is threatened. The Supreme Court has made clear that the constitutionality of a state's capital sentencing scheme is dependent on the individualized basis in which defendants are considered. I question whether that concern for individuality exists under a system which not only *admits expert testimony without examining the subject* but also, as in this case, accepts the possibility that jurors will allow that evidence, rather than factors more personal to a defendant's crime and character, to effectively condemn that individual to death.

210 F.3d 456, 469-70 (5th Cir. 2000) (emphasis added).

### E. Mr. Vialva's Case Demonstrates All of the Constitutional Defects Inherent in Injecting Future Dangerousness into the Penalty Analysis

Once the government gave notice of its intention to prove "future dangerousness" as a non-statutory aggravating factor, trial counsel had no choice but to try to prove Mr. Vialva's lack of dangerousness. Mr. Vialva's counsel did this by using an expert witness who employed an actuarial analysis. The expert witness neither met nor interviewed Mr. Vialva. In rebuttal, the government

introduced an expert of its own who performed only a clinical analysis of written records, and, again, failed to meet Mr. Vialva personally. The jury agreed with the government and concluded that Mr. Vialva would pose a future danger to others.

Like the Texas state court juries, Mr. Vialva's jury failed to predict his behavior correctly. Mr. Vialva has posed no threat of violence since his incarceration five years ago. The Bureau of Prisons has granted Mr. Vialva level two privileges, allowing him access to all the limited advantages available to death row inmates. Mr. Vialva works as an orderly on death row. *See* Inmate Triennial Report, with update of Counselor Bruce Ryherd, United States Penitentiary, Terre Haute, Indiana, attached hereto as Exhibit VII-N. For this job, he is allowed access to cleaning tools and supplies. While performing orderly duties, Mr. Vialva is unshackled. He has recreational privileges, which places him in unrestrained contact with other death row inmates. Mr. Vialva makes coffee for the inmates. The guards have access to the same coffee pot. Mr. Vialva has not abused his privileges to the detriment of any inmate, guard, or staff person on death row.

Mr. Vialva's jury relied on a clinical expert whose opinions were not based on any accepted scientific methodology and an actuarial assessment that was not based on Christopher Vialva's character or acts. With such faulty information, it is not surprising Mr. Vialva failed to reach a correct conclusion. Standards of decency should not allow a person to be put to death based on a jury finding proven to be the result of incorrect information and a flawed process.

## GROUND VI

**MR. VIALVA'S TRIAL COUNSEL WERE INEFFECTIVE IN MOVING FOR SEVERANCE OF THE PENALTY PHASE OF THE TRIAL. MR. VIALVA WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL AND HIS EIGHTH AMENDMENT RIGHT TO AN INDIVIDUALIZED SENTENCING.**

### A.      Procedural Posture of this Claim

The severance issue was raised inadequately at trial and argued ineffectively on direct appeal to the Fifth Circuit. Because of the ineffectiveness of trial and appellate counsel, this ground may be considered in this Motion.

Mr. Vialva filed a pretrial motion requesting a separate guilt stage trial from his codefendant Brandon Bernard. Doc. 187, p. 1. Mr. Vialva also requested a severance of the penalty stage to protect his right to an individualized sentencing. *Id.* at 11-29. Counsel made no specific offer of proof regarding the harm to Mr. Vialva as a result of Mr. Bernard's mitigation evidence. Rather, counsel relied on the danger inherent in the joint trial in which the jury, asked to consider each defendant's penalty simultaneously, would necessarily, but impermissibly, compare the moral culpability of one defendant to the other. The Court denied Mr. Vialva's motion for a separate trial. Tr. (4/28/00) 22.

Mr. Vialva renewed his motion for a separate trial at the end of jury selection. VII Tr. 1452. The Court again denied the motion. VII Tr. 1452. Mr. Vialva renewed his motion for severance at the beginning of the penalty phase of the trial. XIV Tr. 2708-9. The Court again denied the motion saying "that's just not going to be granted." XIV Tr. 2709.

The issue of severance was raised on direct appeal, where Mr. Vialva was represented by one of his trial counsel. The appellate argument focused on the likely adverse impact to Mr. Vialva of Mr. Bernard's mitigation evidence regarding his Christian upbringing and conversion to the

106

Christian faith. *See United States v. Bernard*, 299 F.3d 467, 475 (5th Cir. 2002).

The Fifth Circuit reviewed the issue for plain error, believing Mr. Vialva "did not [specifically] object to Bernard's evidence [as it was presented at trial] and failed to renew an unsuccessful pretrial motion for severance." *Id.* Applying a plain error standard of review, the Circuit found the mitigation evidence on behalf of Mr. Bernard was not mutually antagonistic with the evidence offered by Mr. Vialva and thus severance was not compelled. *Id.*

The Fifth Circuit's opinion is not directly relevant to the determination of this challenge to counsel's effectiveness in presenting the issue of severance to this Court. This Court is not bound by the Fifth Circuit's determination for at least two reasons. First, the Fifth Circuit rested its analysis of severance on the assumption Mr. Vialva did not renew his pretrial objection to a joint penalty phase trial at the outset of the penalty phase of his trial. *Bernard*, 299 F.3d at 475. The Fifth Circuit's assumption was incorrect, causing the court to apply an incorrect standard of review to the appellate issue. Mr. Vialva specifically preserved his objection to joint penalty trial at the outset of the penalty phase proceedings. XIV Tr. 2708-9. Second, the Fifth Circuit viewed the issue of severance as turning on the nature of the mitigation case presented by Mr. Vialva's codefendant. As the following discussion will show, the Constitution requires severance in any federal capital case, regardless of the evidence presented, when individualized determination of moral culpability is required.

107

**B.      Argument and Authority - The Eighth Amendment Requires An Individualized Sentencing Proceeding**

In a capital case, "punishment should be directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989).[34] Toward that end, a "sentencer [must] make an individualized assessment of the appropriateness of the death penalty." *Id.* "Only then can we be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." *Id.* (quoting *Woodson*, 428 U.S. at 304); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (individualized consideration of capital defendant must take place prior to Constitutional imposition of death penalty). One jury conducting capital sentencing determinations for multiple defendants flies in the face of longstanding jurisprudence regarding the nature and scope of capital sentencing hearings. If two or more defendants conduct their sentencing hearings "simultaneously," then the procedures certainly cannot lead to the individualized sentencing determinations required in all capital sentencing procedures. *See Gregg v. Georgia*, 428 U.S. 153 (1976).

Neither the Supreme Court nor the Fifth Circuit have expressly considered the issue of severance of capital codefendants in the penalty phase of the trial. But, the Supreme Court has held severance is required anytime "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants." *Zafiro v. United States*, 506 U.S. 534 (1993) (non-capital case considering only severance at guilt stage of case); *see also United States v. Causey*, 185 F.3d 407, 423 (5th Cir. 1999) (death sentences vacated on other grounds mooting issue of error of joint penalty

---

[34]The *Penry* Court concluded the Constitution did not prohibit the execution of the mentally retarded. That portion of the decision was abrogated by *Atkins v. Virginia*, 536 U.S. 304 (2002). The Court's analysis of the Constitutional requirements for an individualized assessment of the appropriateness of the death penalty remains effective in all other respects.

phase). The issue of penalty phase severance is thus an issue of first impression in this Circuit. The question presented is whether the right to a fair and individualized sentencing proceeding is a "specific trial right" compromised by joint trial in violation of the Eighth Amendment and the rule of law set out in *Zafiro*.

The one Circuit that has reached the issue of severance provides no guidance to this Court. In *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), the court "agree[d] . . . that trial court discretion as to severance in the capital-penalty phase must be considered so constitutionally constrained [by the Eighth Amendment's requirement for individualized sentencing] at its outer limits and, as a corollary, that our standard of review is for abuse of discretion so constrained." *Id.* at 892. The Fourth Circuit further agreed '[t]he concerns raised by appellants [regarding severance of the penalty phase] are legitimate ones." *Id.* But, the Circuit understood the defendants were arguing severance was not required under the Eighth Amendment *per se*. Ultimately, the Circuit determined efficiency and fairness to the prosecution, as well as the presence of curative instructions, made the decision to jointly try the penalty phase of the case a reasonable one. Neither the reasoning nor the result in *Tipton* is persuasive.

The Constitutional mandate of an individual sentencing proceeding is clear. Sentencing must be individual and less than individual sentencing is a *per se* violation of the Eighth Amendment. Even if there were no *per se* prohibition against joint penalty trials, there is ample evidence to show the factual premise underlying the Fourth Circuit's opinion is incorrect. Trying defendants together, regardless of the mitigation evidence presented and of curative instructions offered, increases the risk that a sentence of death will be imposed. It is specious to suggest any consideration of prosecutorial efficiency tips the scales in favor of joint trials.

**C.      Mr. Vialva's Counsel Were Ineffective By Failing to Support the Motion for Severance of the Penalty Phase with Evidence**

A defendant may base a claim for ineffectiveness of counsel on the failure to effectively move for severance. *See generally Williams v. Washington*, 59 F.3d 673 (7th Cir. 1995) (finding ineffectiveness for, in part, failing to move for severance). To succeed on a such a claim, a defendant must show both that counsel's failure to move for a severance constituted professional performance below an objective standard of reasonableness and that if such a motion had been made, the outcome of the proceeding would likely have been different. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

Mr. Vialva meets that standard. Counsel's motion for severance of the penalty phase of the trial presented legal argument, but no facts, in support of the claim for severance. Presented with a bare legal argument on an issue of first impression, this Court had very little option other than to deny severance. The motion for severance could have been supported by specific, compelling facts readily available to trial counsel.

A study conducted in 1994 by Edward J. Bronson, a noted academic and expert witness, reveals unique problems inure in multi-defendant capital cases that never occur in typical criminal trials. *See* Edward J. Bronson, *Severance of Co-Defendants in Capital Cases: Some Empirical Evidence*, Discussion Paper Series, No. 94-1 21-22, 14 (College of Behavioral and Social Sciences, Cal. St. Univ., Chico, 1994), attached hereto as Exhibit VI-A. Dr. Bronson reports a risk of dilution of the effectiveness of mitigation evidence when mitigation evidence is presented for more than one defendant at a time. *Id.* at § II (B), p. 2. There is a risk of group affiliation by race or by membership status in a "gang." *Id.* at §II (C), p. 3. There is a risk that juror memory as to the conduct of each defendant will fail. *Id.* at 3. These risks of harm are more than just speculative;

110

they are likely to occur. A social science study of the effect of joint penalty phase trials indicates when defendants are tried jointly in the penalty phase there is a greater likelihood that a sentence of death will be returned, regardless of the facts of the case and the individual mitigation evidence presented and regardless of curative jury instructions admonishing individualized treatment. *Id.* at §V (D)(1), p.10. The study reports:

> [R]espondents voted for death 65.1% of the time when defendants were tried jointly, but just 47.2% of the time when the defendant was tried alone. This provides evidence that joinder, at least in some cases, makes it more likely that a defendant will receive the death penalty. This result was highly statistically significant.

*Id.*

Professor Bronson's study indicates the risk of harm utterly unrelated to the offense in joint penalty trials is unacceptably high and does not comport with the standards required under the Eighth Amendment for individualized and particularized capital sentencing. Indeed, the risk associated with joint penalty trials is so high that some jurisdictions expressly prohibit joint capital trials upon the request of the defendant. *See* GA. CODE ANN. § 17-8-4 ("When two or more defendants are jointly indicted for a capital offense, any defendant so electing shall be separately tried unless the state shall waive the death penalty."); and OHIO REV. CODE ANN. § 2945.20 ("When two or more persons are jointly indicted for a capital offense, each of such persons shall be tried separately."). These statutes confirm the risk of harm. They also represent an "evolving standard of decency" indicative of a growing rejection of the notion that the Constitutional mandate for individualized sentencing can be fulfilled in joint trials.

Moreover, information readily available to trial counsel shows the majority of federal death penalty cases involving multiple defendants facing multiple capital counts are being tried separately. *See Declaration of Kevin McNally* (June 6, 2004) (severance), Federal Death Penalty Resource

111

1071

Counsel, attached hereto as Exhibit VI-B. "Of the multi-capital defendant prosecutions (43), some form of severance has been granted in thirty instances or 70% [of the cases] . . ." *Id.* at ¶ 5 (footnote omitted).

It is below the standards of professional competence to present a motion that fails to adduce supporting facts. *Cf. United States v. Hernandez*, 829 F.2d 988, 991 (10th Cir. 1987) (ambiguous affidavit in support of severance will not permit the trial court to determine prejudice to defendant of failure to sever trial). There is ample evidence trial counsel could have used to demonstrate severance was required. There can be no doubt counsel's failure to present this compelling evidence likely had an adverse impact on the determination of the motion and, concomitantly, the outcome of this case. Counsel's failure to advocate persuasively for severance resulted in the joint penalty phase trial of their client, markedly increasing the chance the jury would imposed a death sentence.

A new trial is required to cure this Sixth and Eighth Amendment Constitutional error.

112

## GROUND VII

**CHRISTOPHER VIALVA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY THE SIXTH AND EIGHTH AMENDMENTS DURING THE PENALTY PHASE OF HIS TRIAL. TRIAL COUNSEL'S FAILURE TO OBTAIN ADEQUATE FUNDING RESULTED IN A COMPLETE FAILURE TO DEVELOP AND PRESENT READILY AVAILABLE MITIGATION EVIDENCE.   COUNSEL FAILED TO DEVELOP INFORMATION ABOUT CHRISTOPHER VIALVA'S MENTAL STATE, HIS UPBRINGING, HIS CHARACTER, AND HIS POTENTIAL. COUNSEL FAILED TO ADDRESS THE GOVERNMENT'S ALLEGATIONS ABOUT MR. VIALVA'S "FUTURE DANGEROUSNESS" AND FAILED TO PRESERVE ERROR ARISING FROM THE GOVERNMENT'S PRESENTATION OF THIS AND NON-STATUTORY AGGRAVATING FACTORS. AS A RESULT OF THESE FAILURES, COUNSEL PRESENTED NO EFFECTIVE DEFENSE TO THE DEATH PENALTY.    TRIAL COUNSEL'S FAILURES, INDIVIDUALLY AND CUMULATIVELY, UNDERMINE CONFIDENCE IN THE OUTCOME OF THE SENTENCING PROCEEDINGS.  A NEW TRIAL IS THE SOLE REMEDY FOR THESE FAILURES.**

### A.    Procedural Posture of this Claim

None of the errors claimed in this Ground were presented in Mr. Vialva's direct appeal.[35] As discussed in Ground IV, the trial record was inadequate for purposes of presenting this issue for review since the underlying facts were not developed during the course of trial.  This Section 2255 Motion is the appropriate mechanism for raising claims of ineffective assistance of trial counsel. *Massaro v. United States*, 538 U.S. 500, 504-505 (2003); *accord United States v. Gordon*, 346 F.3d 135, 136-137 (5th Cir. 2003); *United States v. Webb*, No. 03-50978, 2004 WL 1114455, at *1 (5th Cir. May 13, 2004).[36]

---

[35] On direct appeal, Mr. Vialva raised this Court's failure to admit evidence of racial harassment as mitigating evidence.  That issue is not being raised in this Ground.  This Ground relates solely to trial counsel's failure to investigate, prepare, and present mitigating evidence.

[36] In accordance with Fifth Circuit Loc. R. 47.5.4, this unpublished decision is cited as persuasive authority and attached hereto as Exhibit IV-A.

113

## B.    Legal Standard Applicable to this Ground

Counsel has an obligation to investigate and present evidence in the sentencing phase of a capital trial so that the defendant's sentencing can take place in the full context of the defendant's life. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (affirming longstanding recognition of the importance of a wide range of evidence as relevant for purposes of mitigation); *Eddings v. Oklahoma*, 455 U.S. 104, 115-117 (1982) (family history of capital defendant is vital mitigating evidence); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978) (individualized consideration of capital defendant must take place prior to Constitutional imposition of death penalty).

The Supreme Court recognized the standards established by the American Bar Association Guidelines for Appointment and Performance of Counsel in Death Penalty Cases constitute an appropriate guide to what is reasonable in the performance of capital defense counsel. *Wiggins v. Smith*, 123 S. Ct. 2527, 2537 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). "[T]he *Wiggins* case now stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases. This principle adds clarity, detail and content to the more generalized and indefinite 20-year-old language of *Strickland . . . .*" *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003) (finding trial counsel deficient in penalty phase for failing to investigate and present mitigation evidence and such failure caused prejudice, requiring a new penalty phase trial); *see also Bryan v. Mullin*, 335 F.3d 1207, 1238 n.6 (10th Cir. 2003) (Henry, J., concurring in part, dissenting in part) (recognizing the ABA Guidelines as the standard for reasonable performance). The ABA Guidelines "are not aspirational." Rather, "they embody the current consensus about what is required to provide effective defense representation in capital cases." 2003 ABA Guide 1.1, History of Guideline at 2.

114



To prevail on a claim of ineffective assistance of counsel, a petitioner must show his counsel's performance was deficient, and the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 689-94. "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 123 S. Ct. 2527, 2535 (2003) (quoting *Strickland*, 466 U.S. at 688). "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 2542 (quoting *Strickland*, 466 U.S. at 692). The representation of Mr. Vialva during the penalty phase was patently deficient. The consequent prejudice to Mr. Vialva is equally evident.

**C.    Specific Instances of Ineffective Assistance of Counsel**

    **1.    Counsel Failed to Secure Adequate Funding for Necessary Resources and to Devote Adequate Time and to Investigate, Prepare, and Present a Mitigation Case**

# REDACTED PER EXTANT
# SEALING ORDER

**Redacted per Extant**
**Sealing Order**

The American Bar Association expressly recognizes adequate funding for non-attorney defense team members is essential to the defense of a capital prosecution. 2003 ABA Guideline 9.1(C). The mitigation specialist "is also an indispensable member of the defense team throughout all capital proceedings." *Id.* at 4.1, Commentary, *The Core Defense Team* (B). These standards express well-settled principles of practice. In 1997, legal scholars commented on the necessity of using mitigation experts in capital cases. *See* Jonathan P. Tomes, *Damned if You Do, Damned if You Don't: The Use of Mitigation Experts in Death Penalty Litigation,* 24 AM. J. CRIM. L. 359 (1997); *see also* 1989 ABA Guidelines 8.1 *Supporting Services,* commentary, (e.g. social scientists, trial assistants, and requirement to "conduct a thorough investigation of the defendant's life history and background"); 11.8.6 *Defense Case at the Sentencing Phase.* The mitigation specialist, qualified by experience and training, is essential since he or she "insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict." 2003 ABA Guidelines 4.1, Commentary, *The Core Defense Team* (B). Counsel wholly failed to obtain the funding necessary for Ms. Francis's critical work.

As discussed in Ground IV, counsel pursued the funding issue through a petition for writ of mandamus to the Fifth Circuit. Once the matter was returned from the Circuit, counsel appeared before the Court to resolve the pending funding request. Mr. Schwieger engaged in the following exchange with the Court regarding Ms. Francis's remaining work:

She stated that she needed to spend more time with the client. She stated there were several immediate family members who needed to be interviewed, including four former stepfathers, two maternal aunts who raised Christopher. She included school teachers, three coaches, neighbors, and mental health professionals who treated him. She also stated that she would like to investigate and alleged bad behavior from the McLennan County Jail as a precursor for any future dangerousness argument --

THE COURT: Well, now, we just talked about future dangerousness.

MR. SCHWIEGER: Yes. I understood. But this would also include any type of investigation that would need to be conducted out there. But the person that's doing future dangerousness, Your Honor, includes, I believe, a look at the federal penitentiary and not – forecasting forward, not basically focusing in on any behavior at this point. But, basically, I think there might be some overlap there, I would agree.

I Tr. 5-6. The Court asked counsel how much additional funding was being requested. Counsel asked for $15,000.00, in addition to the $5,760.00 Mr. Francis was paid before funding was stopped by the Court. The Court responded, "Well, I'm sure she would love to have $30,000.00, too. Talk to her and see what she can do for $3,000.00." I Tr. 6-7. At the conclusion of this hearing, counsel began jury selection without requesting a continuance to allow Ms. Francis sufficient time to complete her investigation. Ms. Francis "was able to accomplish little within the time constraints, and did not produce much information with which to supplement the preliminary investigation that had been completed. There was simply not enough time to complete the investigation at that point." Declaration of Tena Francis, Exhibit IV-H ¶17.

Counsel's failure to secure adequate, uninterrupted funding resulted in a "woefully inadequate" social history investigation. Id. at ¶20. Without the predicate investigation, the defense was completely unprepared to present an integrated, coherent case for mitigation. At an early stage in the case preparation, Ms. Francis recognized the serious consequences to Mr. Vialva resulting from counsel's failure to comprehend the importance of mitigation in a capital case. Ms. Francis's account of her limited investigation, the difficulties she encountered with counsel, and her ultimate

117

inability to complete critical tasks is detailed in her Declaration, Exhibit IV-H ¶¶ 11, 12, 13, 15, and 16.

Ms. Francis's impressions are confirmed by the observations of Richard Burr who conferred with the Vialva defense team. Mr. Burr met with Ms. Francis and the attorneys August 25, 1999. Mr. Burr noted Mr. Goains's resistance to idea of developing mitigation evidence, and the need to develop a complete social history before embarking on a course with mental health experts. *See* Declaration of Richard Burr, Exhibit I-B ¶¶ 13-14. As the attorney with primary responsibility in first stage and by virtue of his position as the defense team member "learned in the law" of death penalty, Mr. Goains had a duty to ensure the case was properly staffed and adequately funded. The second critical resource necessary to an adequate defense, time to prepare, was plainly absent. Neither Mr. Goains nor Mr. Schwieger requested sufficient time to allow full development of the second stage evidence. As a default position to adequate resources, counsel instead relied on Mr. Vialva's mother as a primary resource for the second stage presentation. This decision had disastrous results.

### 2.    Counsel Failed to Investigate, Prepare, and Present A Mitigation Case

Counsel have an affirmative duty to all reasonably available mitigation evidence in rebuttal to aggravating evidence offered by the prosecution. *Wiggins*, 123 S. Ct. at 2537 (*citing* 1989 ABA Guidelines). Counsel must conduct an "investigation regarding penalty . . . regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented." 2003 ABA Guidelines 10.7 (A)(2) at 77; 1989 ABA Guide 11.4.1. Counsel should consider, among other things, medical history, educational history, social and family history, religious and cultural influences, educational history and employment. 2003 ABA Guidelines 10.7 at 78-81, Commentary.

Mitigation evidence is especially important because, "death is different" and "avoiding execution is, in many capital cases, the best and only realistic result possible."  Kevin McNally, *Death Is Different: Your Approach to a Capital Case Must be Different, Too*, THE CHAMPION, at 8 (Mar. 1984).  As detailed in Ground IV, Mr. Vialva's contacts with his counsel were sporadic and, in view of the magnitude of the case, remarkably brief.  The result of counsel's failure to develop a working relationship with Mr. Vialva is their essential unfamiliarity with the essential aspects of their client.  In truth, there was a wealth of positive evidence about Mr. Vialva.

### Social History

Mitigation specialist Jane McHan was retained to assist present counsel.  Ms. McHan completed the social history investigation Ms. Francis was forced to abandon.  *See* Declaration of Jane McHan ¶¶ 1, 2, attached hereto as Exhibit VII-B.  The results of Ms. McHan's investigation are contained in a comprehensive report detailing the forces and influences in Mr. Vialva's life.  *See* Psychosocial History of Christopher Vialva, attached hereto as Exhibit VII-D.  The report reflects Mr. Vialva was raised in profoundly chaotic circumstances.  The chaos was the direct result of his mother's illness.

Lisa Dickson Brown, like her sisters, suffers from mental and emotional disorders that cause her to engage in self-destructive behavior.  *See* Affidavit of Tina Dickson Erdmann ¶ 3, attached hereto as Exhibit VII-A (sister's diagnosis of bipolar disorder); Declaration of Debbie Bynum ¶ 3, attached hereto as Exhibit VII-E (sister's diagnosis of bipolar disorder, sister's account of mother's possible bipolar disorder); *see* Declaration of Daneen Milam ¶ 22 (Dr. Milam's diagnosis of Lisa Brown's bipolar and borderline personality disorder), attached hereto as Exhibit VII-C.  Christopher and his half-sister, Audrey Mabrey, suffered the impact of their mother's illness. Lisa's sisters were so concerned about her children they offered to adopt Christopher and Audrey.  Exhibit VII-A ¶ 10.

1079

Debbie Bynum and her husband, an African-American, offered Christopher a home that would have appeared unremarkable to society. Exhibit VII-E ¶ 6. Lisa refused, despite the fact she viewed her children as the primary obstacles to her happiness. *Id.*; Exhibit VII-A ¶ 10 ("I feel Lisa blamed Christopher and Audrey for her disappointments in life and her failure to achieve her personal dreams."); As a result, Christopher and Audrey were left to shift for themselves at a very young age. *See* Exhibit VII-D ¶¶ 164-65 (Audrey); 166, 228-232 (Christopher). Lisa became involved in a series of abusive relationships with men that left lasting negative effects on both children. Exhibit VII-D ¶¶ 155, 157-59 (violence of Robert Mabrey, physical abuse of Christopher by Mabrey; Lisa's denial); 490 (gang involvement as "place to belong" in response to chaotic home); 491 (Christopher's depression); Exhibit VII-E ¶ 5. Lisa's response to Christopher's "bi-racial" heritage was symptomatic of her mental and emotional problems, traced back to her relationship with her own father. Exhibit VII-E at ¶ 6; Exhibit VII-A ¶ 5.

Mr. Vialva's biological father, Rowallan Vialva, a native of Trinidad, was excluded from Christopher's life because of ongoing conflicts with Lisa. *See* Declaration of Rowallan Vialva ¶ 13, attached hereto as Exhibit VII-F. Rowallan was consistently portrayed by Lisa as an abusive man, who practiced voodoo and abandoned his son. Exhibit VII-F ¶¶ 8, 9. While Rowallan was not without fault, he would have provided Christopher with a place to stay when Lisa threw him out of the house in June, 1999. *Id.* at ¶ 13. Rowallan was willing to assist his son because he, too, had been subjected to such serious emotional deprivation as a child that he ran away from his mother to live on his own from the age of thirteen. Exhibit VII-D ¶¶ 60-63. Alerted to Christopher's arrest, Rowallan called Mr. Schwieger to inquire about his representation of Christopher. Exhibit VII-F ¶ 10. Unaccountably, Mr. Schwieger failed to maintain contact with his client's father or to refer the information to Ms. Francis. *See* Declaration of Stanley Schwieger (June 7, 2004), Exhibit IV-L

120

¶ 5.

Because of Lisa's untreated disorders, she was particularly ill-equipped to understand and respond appropriately when Christopher began to manifest symptoms of disorder. The course of treatment for Christopher was counterproductive with some of the measures exacerbating his symptoms. *See* Exhibit VII-C ¶¶ 20, 23 (misdiagnosis and counterproductive treatment). As a result, Christopher continued to have problems in school and problems at home. The combination of these factors contributed directly to Christopher's seeking acceptance and approval from peer groups. While the family was living in Heather Glen, Christopher's peer group was composed of supportive friends who looked out for each other. Lisa, in an effort to keep Christopher from associating with "gangs," moved to Long Branch, an area recognized by Christopher's peers as a substantially worse neighborhood for youth gang activity. *See* Declaration of Jacorby Smith ¶ 4, attached hereto as Exhibit VII-G.

Despite all of this, Christopher was well-liked by his positive peer group. Christopher was able to form friendships and attachments. *Id.* at ¶ 3; Declaration of James Davidson ¶ 3, attached hereto as Exhibit VII-H. He was a kind, supportive young man who treated his girlfriends with respect and concern. *See* Declaration of Jessica Haskins ¶ 5, attached hereto as Exhibit VII-I; Declaration of Jenell Hamilton ¶ 5, attached hereto as Exhibit VII-J. These young people remember Christopher as a nonviolent person, struggling with conflicts in his home, depression and worries about his mother, and looking for a place to belong. Exhibit VII-G ¶¶ 6, 7; Exhibit VII-H ¶¶ 4, 6; Exhibit VII-I ¶¶ 5-7; Exhibit VII-J ¶ 3-5; *and see* Declaration of Benjamin Sims ¶ 7, attached hereto as Exhibit VII-Q. Charlene Burke, the mother of Christopher's friend Benjamin Sims, was impressed with Christopher's respectful behavior. Ms. Burke felt Lisa Brown "was not very involved in Chris's life." Ms. Burke spoke with Lisa Brown several times. "Instead of being

121

\1081

concerned about her [Lisa Brown's] children, she [Lisa] seemed more concerned about finding a man for herself." *See* Declaration of Charlene Burke, attached hereto as Exhibit VII-K ¶¶ 4, 5. Because of Ms. Burke's family circumstances, she could not give Christopher a home when he asked to stay with her while he and Ben finished high school. Ms. Burke recalls this decision with regret, "I feel guilt that I did not allow Chris to come and live with us, because I feel he would not be in the situation he is in now if I had done so." *Id.* at ¶ 8. Ms. Burke would give Christopher a home today if he were released from prison because she, like Christopher's friends, find it hard to believe he would have committed such an act of violence. *Id.* at 9.

The jury heard none of this evidence, not because the witnesses were unwilling to help Christopher, but because either they did not understand what mitigating evidence was, or they were never contacted by the defense. The importance of this information about Mr. Vialva's early childhood and adolescence is addressed by Ms. McHan and Dr. Daneen Milam. This information would have powerfully rebutted the government's portrayal of Mr. Vialva as a marauding thug who showed no concern for others.

### Medical History, Mental and Emotional Health Issues

Ms. McHan's report documents Mr. Vialva's history of serious illness as an infant, head injuries indicative of brain trauma, and his evolving mental health issues. Dr. Milam explains the significance of these factors in assessing Mr. Vialva's cognitive capacity and mental age.

Mr. Vialva's childhood records and the accounts of lay witnesses substantiate a history of physical trauma, beginning with his birth by forceps delivery and a streptococcus infection so severe that, at eleven days old, he was hospitalized for seventeen days. Exhibit VII-C ¶7; Exhibit VII-D ¶ 101. Mr. Vialva sustained a number of injuries to his head as a child and teenager. Exhibit VII-A ¶¶ 8, 9; Exhibit VII-C ¶ 14. Mr. Vialva began demonstrating behavioral disturbances at an

122

early age, continuing and worsening in his adolescence . *Id.* at ¶¶ 9 -14. All of these records, coupled with clinical testing, lead Dr. Milam to conclude Mr. Vialva "has displayed symptoms strongly suggestive of organic brain damage and Bi-Polar Disorder from a very early age. . ." *Id.* at ¶ 16. The diagnosis of bipolar disorder is not surprising in light of the very strong genetic component to the disorder and the prevalence of the disorder in Christopher's maternal family line.

Dr. Milam explains that bipolar disorder is amenable to medical treatment. Exhibit VII-C ¶ 27. But Mr. Vialva was not diagnosed with and treated for bipolar disorder as a child. Instead, he was misdiagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD) and medicated with an antidepressant. *Id* at ¶ 14. The appropriate medication for a bipolar child is a mood regulator. The stimulants prescribed for hyperactive children "make a mood disorder worse." *Id.* at ¶ 23. The accounts of Mr. Vialva's childhood friends and his public school records reflect the failure of his medical treatment in his frequent depression, mood swings, inability to concentrate, irritability, and impulsiveness. Mr. Vialva would have struggled with bipolar disorder under the best family circumstances. The chaotic home in which Mr. Vialva lived served only to exacerbate his illness. Mr. Vialva's mother, struggling with her own undiagnosed and untreated disorder, was genuinely incapable of acting appropriately to assist her son. *See* Exhibit VII-C ¶ 22, and *Exhibit 2*, appended to Declaration of Daneen Milam.

Two salient points emerge from this mitigating evidence. First, none of the deficits under which Mr. Vialva labored were subject to his control. Second, bipolar disorder is highly treatable and Mr. Vialva's intellectual assets make him amenable to treatment. This evidence flatly contradicts the government's contentions the offense was the result of coldly calculated substantial planning and premeditation and Mr. Vialva lacked potential for rehabilitation.

*Education and Peer Influences*

123

\1083

The government presented evidence that Mr. Vialva was a discipline problem in school and was involved in organized gang activity. Trial counsel's failure to respond to the government's allegations of gang affiliation, presented during the guilt phase, was addressed in Ground IV. The same evidence explaining Mr. Vialva's association with the "212 PIRU" could have been used during the penalty phase. Mr. Dwight Stewart, Ms. McHan, and Dr. Milam address the influences that cause young people to associate with groups that intentionally portray themselves in counter-cultural expression. Mr. Vialva's impulse to associate was prompted by motives others than a natural desire for crime. Instead, Mr. Vialva, as many young people do, was experiencing the effects of alienation, exacerbated in his case by his bipolar disorder and his chaotic home life. As Mr. Stewart explains, even when incarcerated, young people can move away from the group and complete life goals. This occurred with many of Mr. Vialva's friends, including Jacorby Smith, who holds a B.A. degree in criminal justice and is enrolled in the Police Academy in Killeen, Texas. Exhibit VII-D ¶ 294. Contrary to the government's presentation, Mr. Vialva was not doomed by his association with the group to a life of organized crime.

Each of these aspects of Mr. Vialva's life contained precisely the sort of information recognized as essential to effective representation during the second stage of a capital trial. Counsel's failure to develop and present this evidence clearly fell below acceptable standards of practice. Mr. Vialva's case was prejudiced when the jury was prevented from considering evidence addressing directly and rebutting specifically the most damaging aspects of the government's case in aggravation of punishment. *See Williams*, 529 U.S. at 398 (mitigating evidence that may not wholly rebut future dangerousness yet "may well have influenced the jury's appraisal of his moral culpability."); *Wiggins,* 123 S. Ct. at 2542 ("Petitioner thus has the kind of troubled history we have declared relevant in assessing a defendant's moral culpability.") (citing *Penry v. Lynaugh*, 492 U.S.

124

302 (1989) and *Eddings v. Oklahoma*, and *Lockett v. Ohio*); *Moore v. Johnson*, 194 F.3d 586, 620-621 (5th Cir. 1999) (trial counsel's failure to investigate mitigating evidence of defendant's history of deprivation and neglect, coupled with failure to use mitigation evidence that was patent without further inquiry, constituted deficient performance and prejudiced defendant in the penalty phase.).

At the time of trial, Christopher Vialva was a young man who was well-liked by many of his peers and loved by the people who knew him best. James Davidson, Jacorby Smith, and Benjamin Sims were three of Mr. Vialva's closest childhood friends. All of these young men expressed feeling shocked when they heard about Mr. Vialva's arrest. The violence of the crime was inconsistent with their experience of Mr. Vialva's behavior. Exhibit VII-H ¶¶ 5, 7; Exhibit VII-G ¶ 8; Exhibit VII-Q ¶ 9. When Mr. Smith heard Mr. Vialva was accused of being the "triggerman," "I couldn't believe he could do that." Exhibit VII-G ¶ 8. Two of Mr. Vialva's girlfriends and the mother of one of his friends would have testified Mr. Vialva treated them with consideration, respect, and concern. Exhibit VII-I ¶ 6; Exhibit VII-J ¶ 5; Exhibit VII-K ¶ 4. All of them felt the conduct with which Mr. Vialva was charged was completely out of character for him. Exhibit VII-I ¶ 8; Exhibit VII-J ¶ 6; Exhibit VII-K ¶ 9. It is unconscionable that Mr. Vialva's jury was placed in the position of deciding whether he should live or die without having heard from people who knew him well and loved him.

### D.    Failure to Adequately Prepare, Present, and Preserve Error in the Case Against Future Dangerousness

In addition to counsel's general failure to investigate, prepare, and present and mitigation case for Mr. Vialva, counsel also failed to rebut the future dangerousness aggravator.

First, counsel presented Dr. Mark Cunningham to discuss the future dangerousness aggravator. Counsel had an absolute obligation be familiar with the substance of Dr. Cunningham's

125

opinion and know that his testimony would be affirmatively harmful, since he concluded Mr. Vialva was dangerous. Since Dr. Cunningham had concluded erroneously that Mr. Vialva was likely to be dangerous, he should not have testified. Moreover, Dr. Cunningham reached his erroneous conclusion by relying on an "actuarial" analysis of future dangerousness that was completely without scientific validity. Counsel had an obligation to understand Dr. Cunningham's method of analysis and to affirm its validity. A basic review of Dr. Cunningham's published papers would have allowed counsel to predict the substance of his testimony and would have revealed the fundamental flaws in Dr. Cunningham's methodology.

Second, the presentation of Dr. Cunningham opened the door to the government witnesses Dr. Richard Coons and Anthony Davis who were highly damaging on the issue of future dangerousness. Neither Dr. Coons's nor Mr. Davis's testimony would have been relevant if the defense had not opened an inquiry into expert prediction of dangerousness. Moreover, Dr. Coons's testimony should have been challenged on the grounds of his qualifications, as well as the reliability and relevance of his conclusions. Dr. Coons relied on a method of psychological analysis which requires a personal interview, yet he never personally examined Mr. Vialva. Mr. Davis's testimony should have been challenged on the grounds of relevance because he knew nothing about the facts of the case and certainly knew nothing about Mr. Vialva. Yet, without objection from the defense, Mr. Davis opined on the likelihood that Mr. Vialva would join a gang in prison. Neither Dr. Coons nor Mr. Davis had relevant or reliable information on which to base their opinions.

Third, counsel failed to object to those elements of the future dangerousness aggravator in the jury instructions which, in violation of the Constitution, effectively mandated a finding of dangerousness for any defendant who had a prior criminal history.

Finally, counsel failed to preserve on appeal objections to the inclusion of future

126

dangerousness as an unconstitutional non-statutory aggravator.

Counsel's ineffectiveness contributed directly to the jury's conclusion Mr. Vialva was dangerous and the death sentence was warranted. Without question, the outcome of the sentencing proceedings would likely have been different without counsel's deficient performance.

1.    **Dr. Cunningham Should Never Have Been Presented to the Jury, or If Presented, His Testimony Should Have Been Limited to a Scientific Valid Use of His Data**

A lawyer has a fundamental obligation to know the general substance of his witnesses' testimony and to present witnesses who are helpful to his client's case. When expert witnesses are at issue, there is a further obligation to insure that the experts are in fact experts, actually competent to testify on the subject matter about which they opine. *Skaggs v. Parker*, 235 F.3d 261, 273 (6th Cir. 2000) ("[C]ounsel's failure to present an even marginally competent expert on crucial evidence prejudiced [the defendant] at the penalty phase of the trial."). Mr. Vialva's counsel failed to allow sufficient time or information for Dr. Cunningham to make a complete and thorough analysis. Counsel failed to understand the method of Dr. Cunningham's analysis. Consequently, they failed to ascertain what Dr. Cunningham would say about future dangerousness. Counsel failed to understand Dr. Cunningham would conclude, erroneously, Mr. Vialva was at high risk for engaging in violent conduct in the future. Counsel failed to understand the methodology Dr. Cunningham employed lacked "scientific legitimacy." *See* Declaration of Patrick Brockett ¶ 13, attached hereto as Exhibit VII-L. Counsel called Dr. Cunningham to testify without appreciating Dr. Cunningham would not testify favorably to Mr. Vialva. There is no excuse for such a readily avoidable error.

127

1087

### a.    Dr. Cunningham Was Hired One Month Before Trial Began

Counsel had virtually no time to become familiar with Dr. Cunningham's proposed testimony. Dr. Cunningham was contacted in April 2000. He performed services for the defense team between May 17 and June 16, 2000. *See* Declaration of Mark Cunningham, Ph.D. ¶¶ 3-4, attached hereto as Exhibit VII-M. Voir dire began May 15, 2000; Dr. Cunningham testified June 9, 2000. XV Tr. 2960. Thus, Dr. Cunningham began his work after the trial was underway. Dr. Cunningham had only 24 days in which to perform his entire analysis, leaving virtually no time to interface with counsel regarding his findings and the substance of his expert opinion.

The responsibility for failing to provide the expert sufficient time to complete his work and to confer with counsel rests squarely with counsel. It is incumbent on counsel to prepare adequately for the mitigation phase in a capital case. Through a chain of events, counsel were attempting to assemble their second stage case while the jury was hearing first stage evidence. *Skaggs*, 235 F.3d at 270 (Noting reversible error when counsel "waited until the eleventh hour to prepare for the penalty phase."). There is simply no legitimate strategic reason for such lack of preparation. "Preparation for the sentencing phase . . . should begin immediately upon counsel's entry into the case." 1989 ABA Guideline 11.8.3.

Mr. Schwieger knew as early as July of 1999 this would be a capital case, when he presented his request for the appointment of counsel learned in the law of capital punishment. Doc. 19.

**Redacted per Extant
Sealing Order**

128



part IX. Mr. Schwieger waited nine months, from August 1999 to April 2000, fully a month and a half after he received notice of the charged aggravators to contact Dr. Cunningham. Doc. 145 (Notice of Intent to Seek Death Penalty, 2/29/00); Exhibit VII-M ¶ 3 (initial contact in April 2000).

**Redacted per Extant
Sealing Order**

Once funding for the expert was granted, counsel did nothing to secure sufficient time for adequate preparation by the expert and adequate consultation with counsel. I Tr. 3-7 (failing to lodge objection to time frame once funding was authorized). As with the mitigation expert, counsel failed to obtain sufficient time to prepare and present a critical aspect of the mitigation case.

> **b.    The Defense Inappropriately Curtailed Dr. Cunningham's Analysis By Withholding a Personal Interview with Mr. Vialva**

In the crush of trying to decide how to use the expert as trial was underway, Mr. Schwieger made an affirmative choice to bar Dr. Cunningham from evaluating Mr. Vialva. In his declaration, Mr. Schwieger explains:

> Prior to retaining Dr. Cunningham, I had retained Dr. William Reid, psychiatrist, to assist me in Mr. Vialva's case. Dr. Reid told me that, if fully evaluated by a psychologist, Mr. Vialva would likely be diagnosed as having Antisocial Personality Disorder. After receiving that information, I made a strategic decision to withhold

---

[37]This Court initially denied counsel's April 24 request for further funding requiring counsel to file a Writ of Mandamus on funding to the Fifth Circuit. It was not until the Fifth Circuit ruled on May 15th, 2000, that the issue of the April 24 funding request was finally resolved. Of course, there would have been no delay had counsel made their original request for funding timely and inclusive, and then requested the Court to seek permission from the Fifth Circuit for the budget to exceed the statutory cap.

a personal interview/evaluation of Mr. Vialva by Dr. Cunningham. At trial, Dr. Cunningham said his conclusions regarding Mr. Vialva were necessarily tentative because he had not personally met, interviewed, or evaluated Mr. Vialva.

Declaration of Stanley Schwieger ¶ 4 (April 12, 2004), attached hereto as Exhibit VII-O.

Ordinarily, a lawyer's strategic decision is given great deference. *See, e.g., Boyle v. Johnson*, 93 F.3d 180, 187 (5th Cir. 1996) (informed strategic decisions are given a heavy measure of deference). But to warrant deference, a decision must be truly strategic, the product of careful planning and consideration. *Id.* In this case, Mr. Schwieger's decision was uninformed and unreasonable. Mr. Schwieger's concern a diagnosis of an "antisocial personality disorder" would compel Dr. Cunningham to conclude Mr. Vialva was likely to be dangerous in the future was unfounded. Dr. Cunningham explains that "a diagnosis of antisocial personality disorder is not relevant to any prediction of institutional violence and is not, in and of itself, an indication of a particularly dangerous or incorrigible inmate." Exhibit VII-M ¶ 12. Thus, Dr. Cunningham concludes, "Mr. Schwieger's concern about antisocial personality disorder was unwarranted for purposes of an assessment of Mr. Vialva's risk of future institutional violence." *Id.*

Dr. Cunningham's opinion on this point is confirmed by the American Psychiatric Association, which says that a diagnosis of antisocial personality disorder is not probative of future dangerousness. *See* Brief of Amicus Curiae American Psychiatric Association, *Barefoot v. Estelle*, No. 82-6080, at *4 (S. Ct. 1982) [hereinafter "APA Br."].[38] Although Mr. Schwieger felt he was making a "strategic" choice regarding the interview, he was not. As the Fifth Circuit has noted, a decision "cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose." *Lewis v. Dretke*,

---

[38]The brief is available at: http://www.psych.org/edu/other_res/lib_archives/archives/amicus/82-6080.pdf.

355 F.3d 364, 368 (5th Cir. 2003).

Mr. Schwieger reacted to a possibility he perceived to be bad, but which was actually value neutral. By withholding that information from his expert, he caused the expert to lose credibility with the jury when the expert he was forced to admit he was "reluctant to definitively describe [Christopher] who I have not personally evaluated, and so I back off of making, you know, kind of the firmest of conclusions." XV Tr. 3018. Dr. Cunningham reinforced repeatedly the tentative nature of his conclusions: "Because I have not directly interviewed and evaluated 'Chris,' that risk assessment is necessarily somewhat more tentative and cautious, because I –." XV Tr. 2969. My findings are "somewhat more tentative." *Id.* "[T]here is some specific information about [Chris] that I don't have." *Id.* "Well, again, [my findings] these are – somewhat more cautious and tentative, because they're not based on an interview, but, instead, based on review of the records and files." XV Tr. 3016.

Moreover, the absence of a personal interview exposed Dr. Cunningham to devastating cross examination that allowed the prosecution to imply Mr. Vialva was more dangerous than the defense would like the jury to know:

Q. (Frazier)        All right.  Why didn't you talk to "Chris" Vialva.

A. (Cunningham)     In this case, I was not requested to by the defense.

                    * * *

Q. (Frazier)        But there is a degree of caution and tentativeness in the absence of an interview, that's correct.

Q. (Frazier)        Because if you had the interview and had the opportunity to do that, you might find out more about "Chris"

131

> Vialva that would change your opinion about "Chris" Vialva and his future dangerousness, isn't that true?

A. (Cunningham)    There's certainly always the potential. It's unlikely that clinical data is going to fundamentally change it.

XV Tr. 3080.

The decision to withhold a personal evaluation of Mr. Vialva was ill-informed and unreasonable, and directly damaged the defense case on future dangerousness. If there is any doubt about the value of Dr. Cunningham's opinion made without a personal interview, the United States District Court for the Northern District of Texas has provided an opinion. The district court suggests very little weight should be given to the testimony of Dr. Cunningham on future dangerousness when it is based on statistical evidence alone, without a personal interview of the defendant. *Lewis v. Cockrell*, No. 3-93-329-G, 2002 WL 1398554, at * 11 (June 26, 2002 N.D. Tex.) (denying habeas relief), *rev'd, Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003) (reversing on grounds failure to adduce evidence of petitioner's abusive childhood at penalty phase was deficient).

**c.    Defense Counsel Had a Duty to Know, Before Sponsoring Dr. Cunningham's Testimony, That He Had Concluded, Erroneously, Mr. Vialva Was Dangerous**

Dr. Cunningham is widely published on the subject of future dangerousness. His opinion on future dangerousness is well known and easily discoverable. The factors he attributes to increased risk of violence in a prison setting are the historical "base rate" or number of occurrences of violence in prison, adjusted upward for the youthful age of the offender, the previous history of violence, and membership in a gang. *See* Mark D. Cunningham & Thomas J. Reidy, *Integrating Base Rate Data in Violence Risk Assessments at Capital Sentencing*, 16 BEHAV. SCI. L. 71, 82, 87

132

1092

(1998) (youthful age, past aggression/violence); *see also* Mark D. Cunningham & Thomas J. Reidy, *Don't Confuse Me With the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing*, 26 CRIM. JUSTICE & BEHAV. 20, 38 (1999) (gang participation).

If Mr. Vialva's counsel had read Dr. Cunningham's published papers, they would have understood Dr. Cunningham would conclude, based on Mr. Vialva's age, the nature of offense, and his gang membership, Mr. Vialva posed a higher than average risk for violence in prison. As an alternative to independent research, counsel could have simply asked Dr. Cunningham his opinion of the risk that Mr. Vialva would be dangerous in prison. Dr. Cunningham would have told the lawyers what he told the jury: "Mr. Vialva has many of the risk factors that have been identified by the research as risk factors, and he has very few of the protective factors operating." XV Tr. 3068. The obvious conclusion was that Dr. Cunningham would testify Mr. Vialva was at risk for dangerous conduct in the future.

Any lingering doubt about Dr. Cunningham's position on the point was dispelled by the prosecution during cross examination. The prosecution elicited Dr. Cunningham's opinion that if he were incarcerated, he would not wish to share a cell with Mr. Vialva:

> Q. (Frazier)  —would you describe "Chris" Vialva as the type of person you would want to be in a jail cell with?
>
> A. (Cunningham)  ***My heart says no.*** My head, because I'm a scientist and I base things on probability, says that I might take him, as opposed to a property offender, or someone else who worked themselves up to a USP by their violence record.

XV Tr. 3081-82 (emphasis added).

The damage of this testimony is obvious. Counsel could have easily known Dr. Cunningham

would not support Mr. Vialva's defense. As the Sixth Circuit has cogently recognized, a decision to have an expert testify that is made without full investigation of the tenor of the expert's testimony can be "objectively unreasonable" and may be due no deference from the court when the expert's testimony actually controverts an element of the defense case and causes prejudice. *Combs v. Coyle*, 205 F.3d 269, 288-89 (6th Cir. 2000) (defense counsel ineffective for allowing expert to testify on voluntary intoxication without first ascertaining that the expert's opinion was intoxication in the case was not so great as to deprive the defendant of the ability to form intent). Under this standard, counsel's decision to call Dr. Cunningham was unreasonable. Dr. Cunningham was called to demonstrate Mr. Vialva posed only a slight risk of dangerousness in the future. Instead, Dr. Cunningham testified Christopher would be dangerous. It is ineffective assistance of counsel to undermine the defendant's case by presenting an expert who proves an element of the prosecution's case, as Dr. Cunningham did.

> **d.    Defense Counsel Had a Duty to Know, Before Sponsoring His Testimony, That Dr. Cunningham's Methodology for Predicting Future Dangerousness Is Scientifically Invalid**

There are two principal methodologies for evaluating the future dangerousness of a defendant. The one employed by Dr. Cunningham is the statistical "actuarial" method. The other methodology is a clinical, psychological evaluation, like that employed by Dr. Richard Coons, the prosecution's rebuttal witness.[39] Dr. Cunningham's methodologies are scientifically invalid and resulted in an erroneous conclusion about the likelihood of Mr. Vialva's risk of violence in prison.

---

[39]As discussed in Part IV of this brief, and incorporated herein by reference, there is no methodology that has resulted in accurate predictions of future dangerousness. Juries and experts are almost always wrong.

134

1094

Dr. Cunningham testified his "violence risk assessment" methodology was based on an "actuarial" or "statistical" study of historical occurrences of violence in prisons. Using this "base rate" of the occurrence of violence, he claims he can predict the likelihood that a particular individual will engage in violent conduct in prison. He says, knowing the base rate is "the single most important piece of information necessary to make an *accurate prediction*." XV Tr. 2981 (emphasis added). He explained to the jury that his methodology is a lot like the one used by the insurance industry which has:

> been commercially involved in the business of risk assessment for hundreds of years. For example, your automobile insurance. When my son turned sixteen, my insurance rates went up a thousand a year, and that's based on the insurance company's experience with sixteen-year-old male, unmarried drivers, and they used that group basis to then estimate the likelihood of my son having an accident in the community. Similar sorts of applications of group statistics occur in medicine. In fact, any scientifically-informed practice of medicine or psychology is directly connected with group statistics. For example, if I go to the doctor and he diagnoses a cancer, one of the first questions that I have is, "What's my prognosis?" Well, the prognosis is the five-year survival rate of people with a similar cancer, and we consider that group estimates, their group outcome to say a lot about what my chances are. Or even if I go to the doctor and have an infection, he prescribes an antibiotic for me, that's also based on group statistics, that a large number of patients that have this particular infection were given this antibiotic in the drug trials, and this percentage of them responded favorably with this small percentage of side effects, and that's how he knows to give that medication to me. So, group statistical information is extensively used in a number of different applications in our culture.

XV Tr. 2966-67.

First, despite Dr. Cunningham's reliance on actuarial science in his analysis of future dangerousness, he is not an actuarial scientist. He has no specialized training, skill, or experience in statistics or mathematics, and he did not work with an actuary in the development of his work on future dangerousness. *See* Exhibit VII-M ¶ 24, and Exhibit A to that Declaration.

More importantly, Dr. Cunningham is simply wrong. As Dr. Patrick Brockett, an expert in

actuarial science[40] explains, Dr. Cunningham "immediately misinforms the jury when he compares violence risk prediction to insurance industry risk assessment." *See* Exhibit VII-L ¶ 10. "A principal difference between insurance industry predictions of risk of loss and violence risk prediction is that the insurance industry predicts the risk of loss of the group to assess *its* (the insurance company's) risk, not the risk of an individual, whereas violence risk prediction purports to predict the risk that an individual will engage in violent conduct." *Id.* Thus, there is "a fundamental difference between the two applications and the legitimacy which the methodology has as applied to the insurance industry cannot be imputed to Dr. Cunningham's violence risk prediction." *Id.*

Most importantly, "when Dr. Cunningham begins to speak in specifics about which personal attributes might add to a risk of violence and how one might predict the risk of violence for a specific individual, his statements lose scientific legitimacy." *Id.* ¶ 13. Dr. Brockett explains "Dr. Cunningham is simply wrong when he says that understanding the base rate of historical violence can help predict how an individual will behave." *Id.* ¶ 17. Group statistical data is fundamentally used to predict how a group will behave and cannot be used to predict how an individual will behave. Such a prediction is scientifically unjustified and "is strongly overstepping the constraints

---

[40]Dr. Brockett's exceptional qualifications as an actuarial scientist are detailed as Exhibit 1 to his Declaration. Among other things, Dr. Brocket holds a Ph.D. in Mathematics from the University of California at Irvine, California. He is the Director of the Risk Management and Insurance Program at the University of Texas at Austin where he holds the Gus S. Wortham Chair in Risk Management and Insurance and the Director of the Center for Risk Management and Insurance. He is a professor in the Departments of Management Science and Information Systems, Finance, and Mathematics at the University of Texas at Austin. Further, Dr. Brockett is a fellow of the American Association for the Advancement of Science, the Institute of Mathematical Statistics, the American Statistical Association, and the Royal Statistical Society, a Special Member of the ASTIN Section of the International Actuarial Association, and an Academic Corresponding Member of the Casualty Actuarial Society.



of the statistical methodology and confusing group averages for individual propensities." *Id.*

Dr. Cunningham is misguided in his use of group statistical data. The flaws in his methodology are clear to any expert in the field of actuarial science, like Dr. Brockett, but also should have been clear to counsel in this case. As Dr. Brockett notes, "[w]orkers in the field of violence risk prediction have noted for decades the limitations of using actuarial methods as applied to violence predictions." *Id.* ¶ 18. And importantly,

> This is information that was available to Mr. Vialva's counsel in the . . . published studies and any reasonable investigation should have revealed the inapplicability of Dr. Cunningham's methodology in the assessment of future dangerousness to Mr. Vialva's counsel.

*Id.* ¶ 20.

Dr. Cunningham's testimony was "junk science" the prosecution turned effectively to support its claim of future dangerousness. As a result of counsel's ineffectiveness on this point "the jury impos[ed] a death sentence based on inaccurate 'psychobabble.'" *Skaggs*, 235 F.3d at 275. "[C]ounsel's deficient performance rendered the result of the trial unreliable and the proceeding fundamentally unfair." *Id.* (internal quotations omitted). As time has passed, the error of Dr. Cunningham's predictions have been proven. Mr. Vialva has done well in prison, earning privileges and the right to do a job which gives him access to cleaning chemical and instruments. He makes coffee that the guards drink. Despite the challenges presented by Mr. Vialva's bipolar disorder, he is doing very well in the structured environment of prison. *See* Inmate Triennial Report, with update of Counselor Bruce Ryherd, United States Penitentiary, Terre Haute, Indiana, attached hereto as Exhibit VII-N. Dr. Milam noted Mr. Vialva's positive adjustment, concluding "Chris's intellectual potential is well within normal limits and would serve as a protective factor that would enable him to learn, adjust, and improve in a prison setting, as indeed he has." Exhibit VII-C ¶ 27.

e.   **Defense Counsel Should Have Know That Introducing Dr. Cunningham Would Open the Door to Damaging Government Experts**

Finally, the defense should have known that the testimony of Dr. Cunningham was ill-advised because it opened the door to adverse government rebuttal witnesses. The pitfalls inherent in Dr. Cunningham's area of testimony were well known and easily discoverable if counsel performed a reasonable investigation. Before counsel engaged Dr. Cunningham, a published case highlighted this specific danger. *See United States v. Lee*, 89 F. Supp. 2d 1017 (E.D. Ark. 2000), *rev'd*, 274 F.3d 485 (8th Cir. 2002) (reversing order of new trial on penalty phase). In that case, Dr. Cunningham's direct testimony led to cross examination eliciting the defendant showed impulsivity, lack of remorse, poor behavioral control, predatory violence, and was at increased risk for violent recidivism. *Id.* at 1026. The government proceeded to destroy Dr. Cunningham's credibility, based on his scientific opinions, and make out an unrebutted case for future dangerousness. Based on this published decision, reasonably prepared counsel would have avoided this obvious risk.

2.   **Richard Coons**

Dr. Richard Coons was presented as a rebuttal witness on future dangerousness. XV Tr. 3154. The defense made no objection to Dr. Coons's testimony. The defense also made no attempt to voir dire Dr. Coons to determine his qualifications to testify, or the reliability or relevance of his testimony.

Dr. Coons told the jury that, as a psychiatrist, he evaluates future dangerousness by looking generally at the individual's: (1) past history of violence; (2) attitude toward violence; (3) offense (spontaneous or planned); (4) personality and behavior; and (5) conscience. XV Tr. 3157-59. Based on this analysis Dr. Coons concluded that Christopher "would" be dangerous in the future, in part

138

1098

because Dr. Coons perceived that Christopher exhibited a "lack of remorse." XV Tr. 3159.

Dr. Coons never examined Mr. Vialva, and, thus, having no basis for his evaluation or conclusions. To remedy this gross deficiency, the government, without objection, asked a "hypothetical" which was based on the facts of the case. Without knowing anything about the "gang" with which Mr. Vialva was affiliated, or why he was affiliated, Dr. Coons concluded, "If they're member of a gang on the outside, they'll be a member of the gang inside [prison]." XV Tr. 3162.

In the face of this devastating testimony that Mr. Vialva "would" be dangerous, the only questions defense counsel asked were whether Dr. Coons had statistical data to back up his conclusions, and whether he was being paid to be at the trial. XV Tr. 3164. Such a performance was woefully inadequate to reveal the highly significant errors in his analysis and the inadequate basis of his testimony.

The defense failed to object to Dr. Coons's use of "remorse" as a factor in his dangerousness analysis. The defense had moved to exclude "remorse" as a component of the future dangerousness aggravator. The Court later agreed "remorse" was an improper characteristic of future dangerousness. Thus, the defense failed to point out to the jury and to the Court that Dr. Coons was relying on information the Court would determine to be impermissible.[41]

The prosecution and Dr. Coons were not challenged on the use of a hypothetical which mirrored exactly the facts of this case. Such testimony is highly objectionable as "simply subjective testimony without any scientific validity." *Flores v. Johnson*, 210 F.3d 456, 459 (Garza, J.,

---

[41]Mr. Vialva's counsel objected to the inclusion of "lack of remorse" when this aggravator was converted into jury instructions. (XVI Tr. 3196); *see also* Objections to Jury Instructions (Doc. 275 at 29). The Court agreed that the "lack of remorse" component would be taken out of the instructions. (XVI Tr. 3196).

specially concurring); *see also Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness*, TEXAS DEFENDER SERV., at 14 (2004) (describing the typical prosecution technique of using a hypothetical to obscure the absence of a personal interview with a defendant).[42]    Moreover, the American Psychiatric Association objects to the use of the hypothetical format where "the limited facts given in the hypothetical fail to disprove other [interpretations] that plainly do not indicate a general propensity to commit criminal acts." APA Br. at *4.

Finally, Dr. Coons was not questioned regarding his qualifications to render an opinion in this case. Dr. Coons did not interview Mr. Vialva, yet he employed a quasi-clinical method of analysis of future dangerousness. This method has been discredited widely. Unlike Dr. Cunningham's methodology, Dr. Coons's method depends exclusively on personal evaluation. Dr. Coons is a psychiatrist, yet the American Psychiatric Association has concluded that psychiatrists *cannot* predict dangerousness. *See* APA Br. at * 4 ("The unreliability of psychiatric predictions of long-term future dangerousness is by not an established fact within the [psychiatric] profession."); *Assessing the Risk for Violence*, AM. PSYCH. ASS'N, APA DOC. REF. NO. 200109 ("psychiatrists cannot predict dangerousness with definitive accuracy"). Based on this authority, Dr. Coons was not qualified to render his opinion in this case; his testimony was irrelevant. Counsel's failure to challenge the government's rebuttal evidence on the primary aggravator was a deficient performance of counsel's duties at a critical, pivotal point. There can be no question counsel's failure deeply damaged the case. A prediction of 100% certainty of dangerousness, as Dr. Coons presented, is prejudicial to defendant. James W. Marquart, et al., *Gazing into the Crystal Ball: Can*

---

[42]The full study from the Texas Defender Service is available at: http://www.texasdefender.org/ DEADLYSP.PDF.

*Jurors Accurately Predict Dangerousness in Capital Cases*, 23 LAW & SOC'Y REV. 449, 458 (1989). Dr. Coons's testimony was 100% prejudicial to Christopher.

### 3. Anthony Davis

After Dr. Cunningham made membership in a gang relevant to the prediction of future dangerousness, the prosecution offered the rebuttal testimony of Anthony Davis, a Federal Bureau of Prisons intelligence officer with a specialty in gangs and gang member activity in federal prisons. XV Tr. 3164-65. Mr. Davis offered opinions on the Bloods and Crips gangs as they operate in federal prisons. XV Tr. 3166-67. Mr. Davis was permitted to testify, unchallenged by an objection from the defense. The jury was not informed Mr. Davis knew nothing about the facts of Mr. Viavla's case. He had not evaluated the "gang" to which Mr. Vialva allegedly belonged. He did not know anything about Mr. Vialva's life or his role in the "gang." He had no idea whether Mr. Vialva was actually a member or affiliate of the nationally organized "Bloods" gang that operates in federal prisons. His testimony was irrelevant since he knew nothing about the case. Yet the defense made none of this evident to the jury. In the absence of a legitimate strategic reason, failure to cross examine a witness on a key aspect of the defense is ineffective. *Dunagan v. Dretke*, No. 3-03CV-0374-K, 2003 WL 22519443, at *9 (N.D. Tex. Nov. 4, 2003). Moreover, since "gang" membership was so important to the finding of dangerousness, there can be no doubt that the failure was prejudicial. *Cf. id.*

### 4. Failure to Object to Jury Special Verdict Form and the Prosecutor's Opening Statement

Mr. Vialva's counsel also failed to control the scope of the issue presented to the jury in the special verdict form and the prosecutor's opening statement. The jury was charged by the Court as follows:

1101



The non-statutory aggravating factors that the government has alleged in this case as to counts one, three and four, which you should consider as to each defendant, are:

> (1) That the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others *in that the defendant has engaged in a continuing pattern of violent conduct, has threatened other [sic] with violence, or has demonstrated low rehabilitative potential*;
> (2) * * *

Supp. Rec. on Appeal at 17 (Tr. Court's Charge on Punishment, June 12, 2000) (emphasis added), attached hereto as Exhibit VII-P. During the final objections to the jury charge, Mr. Vialva's lawyers failed to object to this charge.[43] Yet this charge *requires* a finding of future dangerousness when the enumerating conditions are met. Any person who has a prior conviction for violent conduct will be found to have met these conditions. An aggravator cannot be said to be truly individualized for the defendant's conduct and predictive of his future conduct, assuming, *arguendo*, such a prediction could be made, unless the aggravator requires more than simply meeting a checklist of prior bad acts. As defined by the Court, this aggravator does not afford the individualized sentencing required by the Eighth Amendment. Counsel were ineffective for failing to lodge an objection to the aggravator framed by the Court.

Counsel were ineffective when they failed to object to the prosecution's reliance on "lack of remorse" in its opening statement. XIV Tr. 2712. The defense had a pending objection to the use of lack of remorse as a component of the future dangerousness aggravator. The Court sustained the objection at a later point. Despite the pending objection, the defense allowed the prosecutor to tell the jury that lack of remorse could be considered. The defense then allowed the prosecution rebuttal witness, Dr. Coons, to use lack of remorse in his evaluation of future dangerousness. Counsel had

---

[43]Mr. Vialva's lawyers had objected to the "rehabilitative potential" phrase in pretrial written objections, but did not renew that objection at trial.

a duty to maintain their objection to lack of remorse; they failed in that duty. The prejudice to Mr. Vialva cannot be overstated. This Court agreed that lack of remorse was an improper component of the future dangerousness aggravator, yet without objection, remorse became an element of the prosecution's case.

5.     **Failure to Preserve on Appeal Objections to the Inclusion of Non-Statutory Aggravators As Unconstitutional**

Counsel moved pretrial to strike the non-statutory aggravating factors as unconstitutional. Doc. 164. Counsel argued Congress did not contemplate a non-statutory future dangerousness aggravator in addition to the statutory dangerousness aggravators. *Id.* at 36. Additionally, counsel claimed various subparts of the Government's definition of future dangerousness were unconstitutionally vague and permitted unreliable jury findings. *Id.* at 37, 40, 46.[44]

Mr. Vialva's appellate counsel failed to preserve these objections by raising the issue on appeal. If the issue had been presented to the Fifth Circuit, it would have likely resulted in a new trial. Counsel could have demonstrated that non-statutory aggravating factors should not be included in federal death penalty cases, that the future dangerousness aggravator is facially unconstitutional, and since only the future dangerousness aggravator serves to undercut mitigation evidence, its absence from the penalty phase of the trial would have likely changed the outcome. Under these circumstances, there can be no confidence in the outcome of the penalty phase of this

---

[44]The Court denied Mr. Vialva's motion on 4/14/00. (Doc. 194). In a motion for reconsideration, Mr. Vialva claimed the non-statutory aggravators were vague and overbroad and violated due process (Doc. 205 at 3, 6). The Government responded by saying only that "The Supreme Court has long held that the future dangerousness of the Defendant is a proper factor for a jury to consider in a capital case. See Jurek v. Texas, 428 U.S. 262, 275 (1976) and California v. Ramos, 463 U.S. 992, 1003, n.17 (1983)." (Doc. 211 at 8). Mr. Vialva's counsel also objected to this proposed aggravator in Written Objections/Requests to the Penalty Phase Charge with Authorities. (Doc. 275).

1103

case. A new trial is required.

"Future dangerousness" is the only aggravator that encourages the jury to conclude the defendant is incorrigible and no mitigating factor offsets the risk of keeping him alive. A decisive rebuttal by the defense was imperative for the jury to conclude sparing the defendant's life is warranted. Counsel not only failed to rebut this aggravator, but materially assisted the government in its proof. Such performance, which is the essence of ineffectiveness and unquestionably results in prejudice, demands a new trial.

## GROUND VIII

**THE GRAND JURY DID NOT DETERMINE ALL OF THE ELEMENTS ESSENTIAL TO ESTABLISH CAPITAL MURDER. MR. VIALVA'S SUBSEQUENT CONVICTIONS AND SENTENCES OF DEATH WERE IMPOSED IN DEROGATION OF THE INDICTMENT CLAUSE OF THE FIFTH AMENDMENT. THE CONVICTIONS AND SENTENCES MUST BE VACATED.**

### A.      Procedural Posture of this Claim

Trial counsel did not challenge the indictment based on a violation of the Indictment Clause of the Fifth Amendment. The Constitutional sufficiency of the indictment was not raised on direct appeal. Appellate counsel for Mr. Vialva failed to present supplemental argument after the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002). As discussed in detail, *infra*, this issue is properly before the Court for consideration.

### B.      Facts Relevant to the Determination of this Claim

Mr. Vialva was charged, with Brandon Bernard, in a four count indictment returned July 13, 1999. Doc. 14. A superseding indictment was returned December 14, 1999, charging Tony Sparks as a codefendant with Mr. Vialva and Mr. Bernard. Doc. 98. The United States filed a Notice of Intent to Seek the Death Penalty against Mr. Vialva February 29, 2000. Doc. 145.

144

A final, Second Superseding Indictment was returned March 28, 2000. Mr. Sparks, Mr. Bernard, and Mr. Vialva were named as codefendants in Count One, which charged them both as principals and as aiders and abettors in the offense of carjacking resulting in death, a violation of Title 18, United States Code, sections 2119 and 2. Count Two charged Mr. Vialva and Mr. Bernard with conspiring to kill Todd and Stacie Bagley with premeditation and malice aforethought through the use of a firearm and by setting fire to a motor vehicle, in violation of Title 18, United States Code, sections 1117 and 1111. Count Three charged Mr. Vialva and Mr. Bernard jointly, "aided and abetted by each other and others known to the Grand Jury," killed Todd Bagley by shooting him with a firearm within the special maritime and territorial jurisdiction of the United States. Similarly, Count Four charged Mr. Vialva and Mr. Bernard with killing Stacie Bagley within the special maritime and territorial jurisdiction of the United States by shooting her with a firearm and setting fire to the vehicle in which she lay after being shot. Doc. 170. By statute, Counts One, Three, and Four carried maximum potential punishments of death. 18 U.S.C. § 2119 (3); 18 U.S.C. § 1111(b).

On March 30, 1999, the United States filed a Motion to Amend Notice of Intent to Seek the Death Penalty. Doc. 174. The Court granted the United States leave to file the amended notice in an order docketed May 1, 2000. Doc. 213.[45]

With regard to Counts One, Three, and Four, the Amended Notice recited the four predicate statutory factors enumerated in Title 18, United States Code, section 3591(a)(2). Exhibit VIII-A, 2-3 (Count One); 5-6 (Count Three); 8-9 (Count Four). The Amended Notice cited five of the sixteen statutory factors enumerated in Title 18, United States Code, section 3592 (c) and four non-

---

[45]The Court Clerk's docket does not reflect the United States Attorney filed the Amended Notice after the Court granted leave to do so. For purposes of clarity, the Amended Notice is attached hereto as Exhibit VIII-A.

statutory aggravating factors, consonant with Title 18, United States Code, section 3593 (a)(2). The statutory and non-statutory aggravating factors were identical for the three Counts. Exhibit VIII-A, 4-5 (Count One); 7-8 (Count Three); 10-11 (Count Four).

At the conclusion of the penalty phase, the jurors were presented a Special Findings Form that required them to find unanimously one of the four predicate factors of Section 3591 beyond a reasonable doubt, prior to considering the aggravating factors for each of the three counts. Doc. 286, pp. 1-2; 14-15; 27-28.[46] If the jurors found one of the three predicate factors beyond a reasonable doubt, the form directed them to proceed with deliberations on the statutory aggravating factors. Four of the five factors listed in the Amended Notice were submitted for consideration. The first listed factor, Mr. Vialva's previous conviction of a violent felony, was omitted from the jury's consideration. Doc. 286, pp. 3-4; 16-17; 29-30. The form directed the jurors to proceed with deliberations on the non-statutory aggravating factors if they reached a unanimous affirmative decision on at least one of the statutory aggravating factors. The non-statutory aggravating factor, "vileness of the crime" was not submitted for the jury's consideration. Doc. 286, p. 5; 18; 31. The jury returned affirmative findings on all of the statutory and non-statutory aggravating factors alleged against Mr. Vialva. Doc. 286, p. 3-6; 16-18; 29-31.

### C.    Argument and Authorities

Trial counsel failed to recognize the application of the Fifth Amendment Indictment Clause in this capital prosecution. Extant Supreme Court authority construing the Constitutionality of the federal carjacking statute provided a clear roadmap to this issue. Counsel's failure to recognize the Indictment Clause issue is inexplicable since counsel presented general challenges to the

---

[46] The *Special Findings Form* encompassed the verdicts on each count, for each defendant. The form was filed as a single document, without internal pagination.

Constitutionality of the carjacking statute and the sufficiency of death penalty notice process.[47] Counsel's failure to recognize this issue of federal law is another instance of ineffective assistance of counsel stemming from inexperience in federal capital litigation.

Four months prior to the return of the first indictment against Mr. Vialva, the Supreme Court decided *Jones v. United States*, 526 U.S. 227 (1999). The issue in *Jones* was whether the federal carjacking statute, Title 18, United States Code, section 2119, enumerated three distinct offenses with distinct degrees of punishment, or one offense for which three sentencing enhancements were possible. The Court began its analysis, noting:

> Much turns on the determination that a fact is an element of the offense rather than a sentencing consideration, given that *elements must be charged by indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt.*

*Id.* at 232 (emphasis added). The Court examined its prior decisions addressing the due process and trial by jury rights secured by the Fourteenth and Sixth Amendments, as well as the historical underpinnings of the American jury system. The Court's canvass concluded with its recognition that prevailing Sixth Amendment construction does not require submission to the jury of every fact bearing on sentencing. Yet, the Court reaffirmed the Sixth Amendment is implicated if the jury is removed from the process of deciding facts that determine a statutory sentencing range. *Id.* at 244-248. The Court noted a series of three cases involving state capital sentencing schemes did not resolve the Constitutional question presented by the carjacking statute. One of those cases was *Walton v. Arizona*, 497 U.S. 639 (1990). *Jones*, 526 U.S. at 250-252. To avoid a construction that

---

[47]Three motions were filed March 21, 2000 that, respectively, challenged the Constitutionality of the carjacking statute on Commerce Clause grounds, attacked the factual and legal sufficiency of the individual aggravating factors identified in the first notice, and sought dismissal of the notice as unconstitutional. Docs. 163, 164, and 168. The last, styled Motion to Dismiss Notice of Intent to Seek the Death Penalty, cited the Fifth Amendment, but did not specifically cite or advance any argument based on the Indictment Clause.

would leave the Constitutionality of Section 2119 in doubt, the Court found the statute established three separate offenses, with "distinct elements, each of which must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict." *Id.* at 252.

The decision in *Jones* should have alerted trial counsel to the two key elements of an Indictment Clause challenge: the statute enumerates one or more distinct offenses, each of which must be proven beyond a reasonable doubt; distinct punishments, varying in severity, are attributed to the distinct offenses. *Jones* settled the question of whether the carjacking statute encompassed separate offenses. The analysis of *Jones*, applied to the federal death penalty scheme, would result in the conclusion first, that "distinct elements" must be found beyond a reasonable doubt by a jury as a condition precedent to considering whether to impose the death penalty. 18 U.S.C. § 3591 (a). Further, the jury may not impose a sentence of death without first determining the existence of at least one statutory or non-statutory aggravating factor beyond a reasonable doubt, and determining the aggravating factor sufficiently outweighs all the mitigating factors. 18 U.S.C. § 3593 (e). The statute requires a unanimous verdict before a death sentence can be imposed. *Id.* Distinct elements requiring proof beyond a reasonable doubt are patent from the plain language of the death penalty statutes.

*Jones* was an unmistakable signal for an argument the Indictment Clause prohibited imposition of the death penalty on any notice less than the return of an indictment, enumerating all of the requisite elements. Mr. Vialva's jury was required to determine beyond a reasonable doubt the predicate statutory factors, and the statutory and non-statutory aggravating factors submitted from the government's Amended Notice, placing this case squarely within the reasoning of *Jones*. There is no reason apparent from the record explaining counsel's failure to present a Fifth Amendment challenge to the trial court.

148

Mr. Vialva's appellate counsel missed a second opportunity to challenge the Constitutionality of the death penalty process on direct appeal, despite another significant decision from the Supreme Court. Part of this error is attributable to the circumstances surrounding Mr. Vialva's representation. Attorney Steven Losch was appointed as counsel on appeal with trial counsel Stan Schwieger. The direct appeals of Mr. Vialva and Mr. Bernard were consolidated by the Fifth Circuit. Mr. Vialva's Appellant's Brief, filed May 31, 2001, did not raise a Constitutional challenge to the sufficiency of the notice procedure. In a letter dated October 22, 2001, Mr. Losch advised the Fifth Circuit that he would be entering the hospital in two days for emergency surgery on his spine. *See* Letter of Steven Losch, attached hereto as Exhibit VIII-B. Mr. Losch did not recover his health after his surgery. His health continued to decline until his death at the beginning of May, 2003. *See* Declaration of Kay Losch, Exhibit III-A. Mr. Losch's incapacity resulted in Mr. Schwieger's bearing full responsibility for several critical stages of the appeal.[48]

Appellate counsel failed to recognize the significance of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), decided June 26, 2000, two days before Mr. Vialva's direct appeal was docketed. Any attempted excuse for counsel's failure to understand the implications of *Jones* will not survive a first reading of *Apprendi*. Justice O'Connor's dissent explicitly and thoroughly explains the inevitable consequence of *Jones*, as extended by the majority in *Apprendi*, in the context of capital sentencing. Justice O'Connor addressed the impact of the majority's decision on *Walton v. Arizona*, identifying *Walton* as an important refutation to the Court's "'increase in the maximum penalty' rule." *Apprendi*, 530 U.S. at 536 (O'Connor, J., dissenting). The dissent revisited the result in *Walton* in light of the majority's result:

---

[48] Mr. Schwieger requested the appointment of additional counsel to present the oral argument for Mr. Vialva. The motion was denied by the Fifth Circuit.

> Thus, using the terminology that the Court itself employs to describe the constitutional fault in the New Jersey sentencing scheme presented here, under Arizona law, the judge's finding that a statutory aggravating factor exists "exposes the criminal defendant to a penalty *exceeding* the maximum he would received if punished according to the facts reflected in the jury verdict alone." *Ante,* at 2359 [483].

*Id.* at 537 (emphasis in original). From this point, the shortest possible logical step would have prompted appellate counsel to challenge the Constitutionality of a federal statute that vests the prosecutor, not the judge, with the authority to place a defendant at risk of receiving "a penalty *exceeding* the maximum he would have received if punished according to the facts" on which the indictment was returned.

Two additional decisions of profound significance in death penalty jurisprudence were announced during the pendency of Mr. Vialva's appeal. *Ring v. Arizona*, 536 U.S. 584 (2002) and *Harris v. United States*, 536 U.S. 545 (2002), were decided June 24, after the Fifth Circuit heard oral argument, but before it rendered its decision in the consolidated appeals. Counsel for Mr. Bernard filed a Notice of Supplemental Authorities and, following the July 19, 2002 decision of the Fifth Circuit, a Petition for Rehearing and Rehearing En Banc in which he presented argument based on *Ring* and *Apprendi*. On September 18, 2002, Mr. Schwieger requested leave to file Mr. Vialva's petition for rehearing out of time, citing the continued incapacity of Mr. Losch and his inability to file the pleading. The petition for rehearing and application for rehearing *en banc* did not assert *Ring* warranted rehearing. Counsel did not adopt Mr. Bernard's arguments by reference or otherwise attempt to include an issue based on *Ring*.

The Fifth Circuit noted Mr. Bernard's argument in the opinion on direct appeal, but rejected the argument finding, "*Ring* did not hold that indictments in capital cases must allege aggravating and mental state factors." *United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002).

Alternatively, the Fifth Circuit concluded that even if *Apprendi* were apposite, "the alleged error in the indictment does not amount to plain error." *Id.* (citing *United States v. Cotton*, 535 U.S. 625 (2002).). Because of Mr. Losch's continuing disability, Mr. Schwieger wrote the Petition for Writ of Certiorari. He did not raise an issue based on *Ring*. Mr. Vialva protested the omission of the issue in a letter to his counsel and in a letter directed to the Fifth Circuit. *See* Letter of Christopher Vialva to Stan Schwieger, "Received Jan 15 2003," attached hereto as Exhibit VIII-C; Letter of Christopher Vialva to Clerk, "Received Jan 16 2003," attached hereto as Exhibit VIII-D.

Counsel recognize issues raised and decided on direct appeal will not be revisited ordinarily under the ambit of Section 2255. The exceptions to this general rule include claims based on intervening changes in the law, or the development of new facts. *See United States v. Rocha*, 109 F.3d 225, 229 (5th Cir. 1997) (On appeal from denial of § 2255 motion; "Rocha, of course, could hardly be expected to have raised a *Bailey* claim before *Bailey* was decided, but his proper course of action is to file a successive § 2255 motion, not to raise the issue for the first time here."). The ineffectiveness of Mr. Vialva's prior counsel, as well as subsequent factual and legal developments in this evolving area of capital litigation militate in favor of this Court's consideration of the issue on collateral review.

The impact of *Ring* on federal capital prosecutions was immediate and extensive. The United States sought superseding indictments in its pending death penalty prosecutions. The new indictments included the requisite statutory intent and aggravating factors as charged elements of the capital offense, clearly indicating the government's recognition of *Ring* as controlling authority. *E.g., United States v. Regan*, 228 F. Supp. 2d 742, 746 (E.D. Va. 2002); *United States v. Lentz*, 225 F. Supp.2d 666, 669 (E.D. Va. 2002); *United States v. Fell*, 217 F. Supp. 2d 469, 483-484 (D. Vt. 2002) *judgment vacated by* 360 F.3d 135 (2d Cir. 2004); *United States v. Davis*, No. CR.A. 01-282,

151

2003 WL 1837701, at *5 (E.D. La. Apr. 9, 2003) (Denying motion to declare federal death penalty unconstitutional; "Here, the government filed a second superseding indictment alleging a requisite mental state and two statutory aggravating factors that would make the defendant eligible for the death penalty."). In cases that had proceeded to verdicts of death, the government tacitly or explicitly acknowledged the error, but argued it was harmless. *See United States v. Allen*, 357 F.3d 745, 749 (8th Cir. 2004) ("First, the government argues that Allen's indictment sufficiently alleged the requisite elements for imposition of the death penalty. Second, if error is found, the government argues the error is harmless.") *rehearing en banc granted, judgment vacated* (May 11, 2004) ; *United States v. Robinson*, 367 F.3d 278, 283-84 (5th Cir. 2004) ("As we have noted, the government concedes the indictment is constitutionally deficient because it fails to allege the statutory aggravating factors that make Robinson eligible for the death penalty. The government argues, however, that the error is harmless.").

In this case, the appeal was not stayed for further briefing or additional oral argument by the parties, nor was the matter considered by the Court sitting *en banc*. The panel's decision did not reconcile the facts of this case with the authorities on which it relied to reach its legal conclusion. Any attempt at such a reconciliation calls into question the soundness of the panel's reasoning.

First, the panel focused on the absence of a challenge to the Constitutionality of the indictment in *Ring*. *Bernard*, 299 F.3d at 488-489. The panel's statement is true as far as it goes: Mr. Ring did not contend that his Arizona state indictment violated the Fifth Amendment's Indictment Clause. Such an argument would have been ill-founded since the Indictment Clause of the Fifth Amendment is not enforced against the States through the Fourteenth Amendment. *See Hurtado v. California*, 110 U.S. 516 (1884). It does not follow, however, that the Supreme Court held the Indictment Clause is unenforceable in the case of a capitally charged federal defendant.

152

In similar reasoning, the panel cited *Cotton* as support for its factual conclusion any arguable defect would survive a plain error analysis, "[e]ven if *Apprendi* were applicable to this case." *Bernard*, 299 F.3d at 489. *Cotton* involved defendants charged with the non-capital offense of conspiracy to distribute cocaine and cocaine base. The Supreme Court noted the history and evolution of subject matter jurisdiction in criminal cases. The Court noted defects in subject matter jurisdiction are never forfeited or waived and may be raised at any time. "In contrast, the grand jury right can be waived." *Cotton*, 535 U.S. at 630, citing, *inter alia*, Rule 7(b), Fed.R.Crim.P. Based on these predicate findings, the Court proceeded to engage in a plain error inquiry. Since the issue was not presented, the Supreme Court had no occasion to consider the charging defect presented in a federal capital case in which the right to indictment is expressly excluded as a right subject to waiver pursuant Rule 7. The Fifth Circuit ignored this patent distinction in its summary disposition of Mr. Bernard's argument.

In *Robinson*, 367 F.3d at 286, the United States conceded the capital indictment returned in the Northern District of Texas constituted error after *Ring*. The issue presented to the Fifth Circuit was whether the error was reversible *per se*, or was subject to harmless error review. *Id.* Resorting once again to *Cotton* and a similar, non-capital case, *Neder v. United States*, 527 U.S. 1 (1999), the Circuit concluded the failure to obtain a indictment charging the elements of the offense was "difficult to distinguish" from a case in which the petit jury was not instructed on an essential element. *Robinson*, 367 F.3d at 286. The Circuit conducted a harmless error analysis based on the evidence presented against the defendant at trial, concluding "any rational grand jury would find probable cause to charge Robinson with at least one of the statutory aggravating factors omitted from this indictment." *Id.* at 288. The Circuit was able to reach this conclusion only by first deciding the failure to submit the elements of the capital charge to the grand jury for its independent

153

consideration, and the omission of those elements from the final charge issued by the grand jury, was not a structural error. *Id.* at 286.

The flaw in this reasoning was examined by the Eighth Circuit when its considered a procedurally identical case involving a defective federal capital indictment. The matter was presented for the Eighth Circuit's review when certiorari was granted, the decision vacated, and the matter remanded in light of *Ring*. Like the Fifth Circuit, the Eighth Circuit rejected a reading of *Neder* that would leave a *per se* rule of reversal intact. Instead, the Eighth Circuit adopted a harmless error standard of review. Noting the Supreme Court's analysis in *Cotton*, the Eighth Circuit held:

> Nothing in the petit jury's findings compels the conclusion that a completely different group of people - the grand jury - would have found the same fact, even if the evidentiary burdens are lower. This is particularly true where, as here, at issue are relatively qualitative determination which do not lend themselves to precise fact-finding in that same way that drug quantity determinations might.

*Allen*, 357 F.3d at 757. Unable to conclude "beyond a reasonable doubt that the indictment error did not affect Allen's substantial rights," the Eighth Circuit concluded the government failed in its burden of proving the error was harmless, vacated the sentence of death, and remanded the case for resentencing to life. *Id.* at 758.

*Robinson* and *Allen* stand in direct opposition, creating a split among the Circuits.[5] The Fifth

---

[5]The Fourth Circuit has addressed this subject in the context of a capital prosecution. *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003). The case involved charges of kidnaping resulting in death and murder within the special territorial jurisdiction of the United States, charged as "felony murder" counts. The Fourth Circuit found dispositive the fact that one of the statutory aggravating factors, prior conviction of a felony, did not have to be charged pursuant *Apprendi*. The Fourth Circuit did not address the issue of post indictment amendment by the government's adding additional aggravators once the indictment is obtained. This problem was addressed directly by the Eight Circuit in *Allen*, 357 F.3d at 755-756.

Circuit's summary disposition of the error presented in this case does not constitute a full determination on the merits. The United States was never required to address the error in this case. Having assumed no burden, the government advanced no argument or authorities regarding harmless error. This Court should consider the undeniable error in this case and, based on the government's response, conduct its own analysis of the Constitutional consequences of that error.

## GROUND IX

**THE DEATH SENTENCE IMPOSED ON MR. VIALVA WAS SUBSTANTIALLY INFLUENCED BY THE CUMULATIVE ERRORS IN THE GUILT AND PENALTY PHASES. A SENTENCE IMPOSED UNDER SUCH CIRCUMSTANCES VIOLATES MR. VIALVA'S CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW. THE SENTENCES OF DEATH MUST BE VACATED.**

### A.    Procedural Posture of this Claim

Issue 14 in Mr. Vialva's direct appeal stated the following assignment of error:

> The cumulative impact of all of the errors at the punishment stage denied appellant a fair trial when the invalid pecuniary gain statutory aggravating factor is taken off the scale.

The argument on this point was not briefed separately, but was combined with a larger issue relating to the use of the pecuniary gain aggravating factor. The Fifth Circuit found the pecuniary gain aggravating was invalid, but determined the error was harmless. *United States v. Bernard*, 299 F.3d 467, 482-485 (5th Cir. 2002). Accordingly, the Circuit rejected the "cumulative impact" argument advanced in Issue 14. *Id.* at 488.

This Ground addresses the cumulative effect of distinct deprivations of Mr. Vialva's Constitutional rights. The underlying errors, presented in this Motion as Grounds I through VIII, are matters appropriate to post conviction review. The combined effect of these errors on Mr. Vialva's Constitutional rights is properly raised at this juncture.

155



### B.    Argument and Authorities Supporting Claim for Relief

Applying *Strickland*, the Fifth Circuit recognized errors occurring during the guilt phase of a capital trial may prejudice a defendant in the penalty phase when, as here, the same jury determines guilt and punishment. In such cases, "the question is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable." *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) (granting habeas relief from state death sentence, finding counsel's deficient guilt phase performance "prejudiced the outcome of the punishment phase"). In the context of noncapital federal prosecutions, the Fifth Circuit has acknowledged:

> We recognize that the cumulative effect of several incidents of improper argument
> or misconduct may require reversal, even though no single one of the incidents,
> considered alone, would warrant such a result.

*United States v. Canales*, 744 F.2d 413, 430 (5th Cir. 1984). It does not appear the Fifth Circuit has addressed the standard for cumulative error analysis in the context of post conviction review of federal capital convictions. Guidance for the determination of this issue of first impression may be found in the courts' analysis in analogous cases.

### 1.    *De Novo* Review is Applicable

Citing *Moore v. Johnson* as an "especially clear affirmation" of the principle that guilt phase errors may affect the sentencing process, the Tenth Circuit applied *de novo* review to an issue cumulative error raised by a state death sentenced petitioner in Title 28, United States Code, Section 2254 proceeding. *Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003). The application of *de novo* review in such a proceeding is structurally analogous to the review this Court will apply to Mr. Vialva's claims. Accordingly, the Tenth Circuit's analysis of cumulative error is persuasive. The Tenth Circuit noted prior decisions in which trial counsel's first stage ineffective assistance, prosecutorial misconduct, and evidentiary errors were recognized as impacting the sentencing

156

determination by the jury. The Tenth Circuit held:

> Accordingly, our consideration of petitioner's claim of error at the penalty phase may be cumulated with guilt-phase error, so long as the prejudicial effects of the latter influenced the jury's determination of sentence.

*Id.* at 1208.

Applying this analysis, errors that do not implicate Constitutional protections, and thus do not result in prejudice to the accused's rights, will not gain magnitude simply through being accumulated. *See Derden v. McNeel*, 978 F.2d 1453, 1461 (5th Cir. 1992) (federal habeas review of state burglary conviction).[6] The converse principle is also true: demonstrated violations of an accused's Constitutional rights should be considered in the aggregate in determining whether the errors, as a whole, undermine confidence in the outcome of the proceedings. *See Cargle*, 317 F.3d at 1220-1221 (relief from conviction granted, cumulative error applied to guilt phase ineffective assistance of counsel and Brady/prosecutorial misconduct claims); *id.* at 1224-1225 (Sentencing relief was affirmed based on cumulative error from first and second stages, improper victim impact "highlighted by the conspicuous absence of counterbalancing mitigation evidence from the defense," improper prosecutorial argument, and "the apparent strength of the State's case with respect to those crimes was greatly inflated by petitioner's counsel's failure to challenge the State's vulnerable witnesses, and the prosecution's impermissible vouching for them, during the guilt phase."); *Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (noting cumulative prejudice from counsel's

---

[6]Counsel recognize one interpretation of the Fifth Circuit's construction of cumulative error would require a showing that each error individually rises to Constitutional proportions, and that the prejudice associated with each error must be individually sufficient to cause prejudice to the outcome. Mr. Vialva disagrees with such an interpretation and preserves this error for further review. Relief based on cumulative error should require only that the errors, when viewed cumulatively, are of Constitutional proportion and, when viewed cumulatively, are likely to have caused prejudice to the outcome of the proceedings.

157



ineffectiveness which included, among other things, failure to investigate and prepare adequately for trial, and failure to consult adequately with client).

### 2.     Multiple, Compound Violations of Mr. Vialva's Constitutional Rights Undermine Confidence in the Outcome of the Proceedings

As set forth in the preceding Grounds I through VIII, with the arguments and evidence incorporated in the present Ground, Mr. Vialva was deprived of his Constitutional rights through several and successive errors that occurred from the inception of his case.  Each of these errors was of Constitutional proportion and each caused prejudice.  The initial violation of Mr. Vialva's right to Due Process occurred when the Court failed to comply with the statutory and procedural safeguards intended to ensure that only qualified counsel are appointed to represent defendants charged with federal capital crimes.  The consequence of the Court's action was the appointment of unqualified counsel, one of whom was operating under an actual conflict of interest.  The deficient performance of these counsel deprived Mr. Vialva of his right to effective assistance of counsel, guaranteed by the Sixth Amendment.

Counsel failed to investigate and prepare a coherent guilt phase representation, which resulted in a failure to subject the government's case to adversarial testing.  Counsel failed to present legitimate, factually and legally supported motions requesting severance of Mr. Vialva's sentencing stage trial.  The government's violation of *Brady*, especially when viewed in the context of counsel's failure to prepare a first stage defense, deprived Mr. Vialva of Due Process guaranteed by the Constitution.  The sentence of death was imposed in derogation of Mr. Vialva's Fifth Amendment Indictment Clause rights, and his right to an individualized determination by the jury.  Most critically, Mr. Vialva was denied his right to the effective assistance of counsel during the penalty phase through his counsel's failure to investigate, prepare, and present a case in mitigation.  This

1118

failure encompassed counsel's complete failure to effectively address the government's primary aggravating factor against Mr. Vialva.

Each of these errors implicates Constitutional rights intrinsic to a fair trial and a reliable result. Each of these errors, standing alone, is sufficient to undermine confidence in the outcome of the proceedings. Taken in cumulation, reversal of the convictions and relief from the sentences of death are compelled.

## GROUND X

**THE FEDERAL DEATH PENALTY IS UNCONSTITUTIONAL AS APPLIED IN VIOLATION OF THE EIGHTH AND FIFTH AMENDMENTS AND EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION SINCE IT HAS BEEN PURSUED AND IMPOSED DISPROPORTIONATELY AGAINST PEOPLE OF COLOR.**

### A.    Procedural Posture of this Claim

Trial counsel did not challenge the death penalty authorization process, or racial disparity in prosecution resulting from the process. Similarly, counsel did not challenge the Constitutionality of the Federal Death Penalty Act as applied. No issue regarding this aspect of the death penalty was raised on appeal.

### B.    Facts Supporting Claim of Disparate Impact

The two capitally charged defendants, Mr. Vialva and Mr. Bernard, are African Americans. The victims were Caucasian. The crime was an interracial homicide.

According to Federal Death Penalty Resource counsel, out of a pool of 1,845 *potential* capital defendants, a total of 318 (or 17%) have actually been authorized for capital prosecution. Declaration of Kevin McNally ¶ 6 (June 5, 2004) (racial disparity), attached hereto as Exhibit X-A. Within the group of 318 defendants, the death penalty has been sought disproportionately against African-Americans at a rate of 52%. *Id.* ¶ 7.

159

11\19

**C.      Argument and Authorities**

It is a violation of the Eighth Amendment, the Fifth Amendment, and the Equal Protection Clause of the United States Constitution to sentence a defendant to death by a scheme which is directly impacted by race or disparately impacts selected racial groups. *See, e.g., Furman v. Georgia*, 408 U.S. 238, 242 (1972) (Douglas, J., concurring) (discrimination by race in sentencing violates Eighth Amendment prohibition against unusual punishment). There are selected instances in which statistical evidence alone, like the evidence presented in Exhibit X-A, has been considered proof of a Constitutional violation. *See McCleskey v. Kemp*, 481 U.S. 279, 292 n.12 (1986). Generally, however, one must prove both disproportionate impact and the decision makers in a specific case acted with discriminatory purpose. *Id.* at 292.

Mr. Vialva believes the evidence presented in Exhibit X-A proves a facial Constitutional violation in the disproportionate impact of the death penalty on a suspect class of defendants. The selection criteria used by the Department of Justice as part of its selection process is not publicly available. Further discovery is needed to reveal the bases for the Department's decision making to establish prejudice to Mr. Vialva . At minimum, the statistical evidence shows Mr. Vialva has a good faith basis to bring this claim and to include it in this 2255 motion to avoid waiver. The statistical evidence is sufficient to justify discovery in support of the claim. Therefore, following the filing of this motion Mr. Vialva will, under separate cover, request further discovery on this point and later seek to amend this issue.

## GROUND XI

## THE LETHAL INJECTION OF MR. VIALVA UNDER THE PROTOCOLS CURRENTLY IN FORCE BY THE BUREAU OF PRISONS AND ANY SIMILAR PROTOCOLS VIOLATES THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT

The Government proposes to execute Mr. Vialva by lethal injection.[7] Lethal injection by the protocols currently in force, or any similar protocols, violates the Eighth Amendment.

### A.    Procedural Posture of this Claim

Through the ineffectiveness of trial and appellate counsel this ground was not previously presented to any court.

Although Mr. Vialva raises his objection to lethal injection in this section 2255 motion, Mr. Vialva believes an action under Title 42, section 1983 of the United States Code, is the appropriate remedy to challenge the method of execution. *Cf. Preiser v. Rodriguez*, 411 U.S. 475, 498-99 (1973) (challenge to length of confinement should be raised as a habeas proceeding; challenge to conditions of confinement should be raised under section 1983). Mr. Vialva is presenting this claim to assure the issue will not be waived if any court decides a challenge to the method of execution must be characterized as a habeas corpus action. *See Nelson v. Campbell*, __ S. Ct. ___, No. 03-6821, 2004 WL 1144374 (May 24, 2004) (holding method of execution claims which do not result in invalidation of execution methodology may be raised in 1983 actions, but not deciding whether claims that result in permanent injunctions or bars of execution would require presentation as habeas claims).

---

[7] 18 U.S.C. § 3596 (a) requires that a federal sentence of death is to be carried out in the manner prescribed by the state in which the sentence of death in imposed. Mr. Vialva was sentenced in Texas and the State of Texas carries out its sentences of death by lethal injection. *See* TEX. CODE CRIM. PROC. art. 43.14.



Mr. Vialva recognizes it is unlikely this Court will reach the merits of this claim in the present proceeding. This claim as presented in this pleading is similar to challenges to the accused's competency to be executed. The Supreme Court has held those claims may be preserved by raising them in an initial habeas corpus proceeding, although resolution of the issue is deferred appropriately to a subsequent proceeding. *Stewart v. Martinez-Villareal*, 523 U.S. 637, 643-44 (1998). Mr. Vialva believes he is entitled to relief on the other claims in his Motion and this issue will be rendered moot as this Court rules on those other claims.

**B.     The Government's Lethal Injection Procedure Violates the Eighth Amendment Prohibition Against Cruel and Unusual Punishment**

Mr. Vialva's most basic concern is the Bureau of Prisons's lethal injection protocols creates a substantial risk he will consciously suffocate and/or suffer excruciating pain as he is put to death. The principal reason for this concern is that there is no assurance the protocol used by the Bureau of Prisons will render and maintain Mr. Vialva unconscious while suffocating and painful drugs are injected to cause his death. Such eventualities appear to have occurred during lethal injection procedures across the nation and, under the current procedures used by the Bureau of Prisons, there is a reasonable likelihood that they will occur again during Mr. Vialva's execution.

**1.     The Eighth Amendment Prohibition Against Cruel and Unusual Punishment**

The Eighth Amendment proscribes the infliction of unnecessary pain in the implementation of a sentence of death. *In re Kemmler*, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death . . . ."); *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (Eighth Amendment prohibits "physically barbarous punishments"); *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (Eighth Amendment prohibits "unnecessary pain" and conduct that "create[s] a risk of particular discomfort and humiliation"). A punishment violates the Constitution if it involves the

foreseeable infliction of suffering. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (Eighth Amendment is violated by prison officials when they know of a risk of serious harm and proceed without taking reasonable measures to abate the risk).

The Ninth Circuit has held execution by lethal gas involved prolonged and conscious suffering in violation of the Eighth Amendment. *La Grand v. Stewart*, 173 F.3d 1144, 1149 (9th Cir. 1999) (experiencing "air hunger," painful contraction of muscles for a period of several minutes sufficient to warrant finding that execution by lethal gas is unconstitutional). The Ninth Circuit explained:

> "Inmates who are put to death in the gas chamber . . . do not become immediately unconscious upon the first breath of lethal gas. An inmate probably remains conscious anywhere from 15 seconds to one minute, and there is a substantial likelihood that consciousness, or a waxing and waning of consciousness, persists for several additional minutes. During this time, inmates suffer intense, visceral pain, primarily as a result of lack of oxygen to the cells. The experience of 'air hunger' is akin to the experience of a major heart attack, or to being held under water. Other possible effects of the cyanide gas include tetany, an exquisitely painful contraction of the muscles, and painful build-up of lactic acid and adrenaline. Cyanide-induced cellular suffocation causes anxiety, panic, terror, and pain."

*Id*. at 1148-49 (quoting *Fierro v. Gomez*, 865 F. Supp. 1387, 1404 (N.D. Cal. 1994)).

The principal difference between execution by lethal gas and execution by lethal injection is that with lethal gas, conscious pain and suffering will always and necessarily occur. With execution by lethal injection, an execution has to be "botched" for pain and suffering to ensue. *See, State v. Webb*, 750 A.2d 448, 453 (Conn. 2000); *see also, Cooper v. Rimmer*, 358 F.3d 655, 659 (9th Cir. 2004) (petitioner falls short of proving lethal protocols create "unnecessary risk of unconstitutional pain or suffering"). However, as the following discussion will show, the protocols and procedures adopted by the Bureau of Prisons evince such a fundamental misunderstanding of the adverse consequences attendant to poor drug mixing and the intricacies of intravenous processes

163

that the risk of conscious pain and suffering is indeed unnecessarily high. "Botching" of executions by lethal injection under the Bureau of Prisons's protocol will not result from misapplying the protocols. It will not be an unforeseeable accident. Rather, the "botching" will be the inevitable consequence of using procedures and protocols that contravene standard medical practices. Thus, the same concerns that caused the Ninth Circuit to declare execution by lethal gas unconstitutional apply with equal force to the protocols by which the Bureau of Prisons implements death by lethal injection.

2.    **The Bureau of Prisons's Lethal Injection Protocol Risks Unnecessary Pain, Torture and Lingering Death**

a.    **The Bureau of Prisons's Lethal Injection Process**

The Bureau of Prisons (BOP) describes its lethal injection process as involving the administration of a lethal combination of three chemical substances: sodium pentothal, to cause unconsciousness; pancuronium bromide, to paralyze and stop respiration; and potassium chloride, to stop the heart. One, or possibly two, intravenous lines are introduced into the defendant. The lethal drugs are injected by executioners from hand-held syringes.

Drug mixing is described as follows:

Chemical Substances Preparation

1.    SODIUM PENTOTHAL: 2.5% kit, 25 MG. 5/Grams/50 CC's sterile water used. Draw up in syringe using 16 ga. Needle (purple). Mark syringe. This is the first drug administered. Only one syringe is needed.

2.    PANCURONIUM BROMIDE (PAVILON [sic]): Comes in vials. Glass tops must be broken off each vial. 12 vials are used for a total of 60 cc's. One syringe is administered for execution. Second drug given.

3.    POTASSIUM CHLORIDE (KCL): (2) 60 CC SYRINGES ARE USED. This stops the heart. Use (6) vials (40 meg 20 ml) Mark each

syringe.

4.    HEP LOCK FLUSH WITH FOOD COLOR: (1) 60 CC SYRINGE.
Use sterile water. Two vials 10 ml.
After each step above use approximately 10 cc in line after each drug
given, this flushes the IV line.

5.    If IV set in both arms then the above amounts would be doubled.

BOP Chemical Substances Preparation, attached hereto as Exhibit XI-A.

The order in which the drugs are introduced to the inmate under the Federal Protocol is as

follows:

1.    Yellow:      Sodium Pentothol [sic] (10cc)
2.    Black:       Saline (60 cc)
3.    Blue:        Pancuronium (60 cc)
4.    Blue:        Pancuronium (60 cc)
5.    Black:       Saline (60 cc)
6.    Red:         Potassium Chloride (60 cc)
7.    Red:         Potassium Chloride (60 cc)

BOP Drug Sequence Protocol, attached hereto as Exhibit XI-B.

**b.    Intravenous Drug Administration Always Carries a Risk of Failure**

The administration of lethal injection to a condemned inmate is similar to performing an

operation in which anesthesia is administered to a patient. Many of the same concerns and issues

that govern surgical procedures apply with equal force to the lethal injection process. As in a

surgical procedure, for a lethal injection to be humane and to proceed as planned, drugs must be

correctly prepared from powders or liquid concentrates into liquid form. The correct dosages of the

drugs must be drawn into syringes. The intravenous ("IV") set-up must be prepared, which includes

an IV bag, lines, and catheters for accessing the patient's veins. Once inserted, the catheters must

be connected via tubing to IV fluid bags. When the set-up is complete, the drugs must be injected

from syringes into the IV lines in a "downstream" direction toward the patient. The drugs must be

165

delivered into the IV line in the correct sequence.  Finally, the IV catheter must be monitored throughout the process to ensure it stays in place and the drugs flow into the inmate as intended. Each of these steps requires specialized training.  If the procedures are performed by unqualified personnel, there are risks of harm to the inmate.  *See* Affidavit of Mark J. S. Heath, M.D. (Mar. 3, 2004) ¶ 7, attached hereto as Exhibit XI-C [hereinafter "Heath I"].

The process of IV drug therapy is so complicated that, even when performed by skilled medical personnel in an operating theater, there are risks.  Dr. Heath describes some of the problems that can occur in any IV therapy.  *See generally id.* ¶ 8 (a)-(n).  For example, if drugs are mixed incorrectly, the drugs will not be able to perform their intended functions.  *Id.* ¶ 8 (a), (b).  If administered incorrectly, IV drugs can infiltrate the tissue surrounding the catheter rather than enter the vein as intended.  *Id.* ¶ 8 (g), (I).  The result of infiltration is that the drugs intended to be delivered through the IV lines fail to reach the patient.  IV tubing can leak or become disconnected. If leaks or disconnections occur, the drugs intended to travel through the IV lines will fail to reach the patient.  *Id.* ¶ 8 (f), (k).  The syringes that introduce drugs to the IV line system can be injected in the "upstream" direction, away from the patient, instead of "downstream" toward the patient.  The result of a "retrograde injection" is that the drugs intended to travel through the IV lines will fail to reach the patient in the desired concentrations or will fail to reach the patient entirely.  *Id.* ¶ 8 (e).

Even with trained and proficient personnel, a number of difficulties occur routinely during the administration of drugs through intravenous lines, creating a risk the lethal injection process will not proceed as planned.  *See generally id.* ¶ 8 (a)-(n).  When mistakes occur in an operating theater, trained and experienced personnel are present with access to equipment and facilities necessary to correct problems as they occur.  The critical distinction in lethal injection procedures is that the Bureau of Prisons does not provide such safeguards. The Bureau of Prisons fails to provide for any

166



contingencies related to the difficulties of administering drugs intravenously. *Id.* ¶¶ 10-19.

### c. The Risks Associated with the Bureau of Prisons's Lethal Injection Protocol

There are two principal risks with Bureau of Prisons's lethal injection protocol that exacerbate the inherent risks of administration of drugs through intravenous lines. First, there is no evidence qualified and trained personnel capable of handling the risks of intravenous drug administration are present for the execution. Second, the Bureau of Prisons, apparently without the benefit of qualified guidance, has selected a drug protocol that risks conscious paralysis due to the amounts and choices of drugs and other substances utilized.

### i. Use of Persons Untrained in Preparing Drugs and Performing IV Procedures Creates an Unnecessary Risk of Flawed Executions That Cause Conscious Suffering

Nothing in the lethal injection process will proceed correctly if the drug dosages are inadequate to perform their intended functions. Heath I ¶ 8 (a), (b). Drug mixing errors are common in IV drug therapy. A recent study indicates that errors occurred in 49% of IV administrations, and that most errors were related to drug mixing. *See* Katja Taxis & Nick Barber, *Ethnographic study of incidence and severity of intravenous drug errors*, 326 BRITISH MED. J. (Mar. 29, 2004), attached hereto as Exhibit XI-D.

This commonly observed form of error, which even occurs with trained personnel in a hospital setting, is likely to occur in executions because of the Bureau of Prisons's protocol. The protocol states 5,000 mg (5 grams) of sodium pentothal is mixed with 50 cc's of sterile water to create the dosage of the drug to produce unconsciousness. There is no controversy that, if 5,000 mg/50cc were delivered to a condemned inmate, he would be rendered unconscious and probably killed by this drug alone. But, the protocol states that after the 5,000 mg of sodium pentothal is

mixed with 50 cc's of water, only 10 cc's of the mixture are administered to the inmate. *Compare* BOP Chemical Substances Preparation (Exhibit XI-A) *with* BOP Drug Sequence Protocol (Exhibit XI-B). If only 10 cc's are administered, the effective dose to the inmate is 1,000 mg of pentothal. This dosage puts the inmate squarely at risk of receiving insufficient levels of pentothal to render and maintain him in an unconscious state while the drugs paralyzing and killing him are administered. *See* Statement of Dr. Mark Heath (Dec. 20, 2003), ¶ 10, attached hereto as Exhibit XI-E [hereinafter Heath II]. To the best of counsel's knowledge and belief, the 10 cc mixture appears to be the lowest dose of sodium pentothal used in the United States in the course of executions by lethal injections.

The Bureau prescribes the IV lines are to be flushed between doses of drugs with a saline fluid altered with food coloring. *See* BOP Chemical Substances Preparation (step 5), attached hereto as Exhibit XI-A. A saline flush is an advisable, necessary process, intended to prevent adverse drug interactions when drugs like sodium pentothal and pancuronium come in direct contact with each other in intravenous lines. It is usually accomplished by simply flushing the lines with saline fluid. For unexplained reasons, the Bureau laces its saline flush with food coloring. Food coloring, contaminated with a variety of additives, is not approved for medical intravenous processes. *See* Heath II ¶ 10. It is simply impossible to predict how the contaminated saline will affect the flushing process or interact with the drugs already introduced through the IV lines.

The lethal injection process will not work as a humane execution unless the IV line is set up correctly, the IV catheter accesses the inmate's vein properly, and the IV maintains proper access throughout the execution process. There is no information publicly available about how the Bureau intends to insert IV catheters into the condemned inmate. A heavily redacted version of the Bureau of Prisons Execution Protocol was filed in litigation in the Northern District of Georgia. The

publicly disclosed portion of the Protocol says only that the Warden at the Terre Haute penitentiary has the obligation to assure that qualified personnel are present. *See* BOP Execution Protocol at 7, attached hereto as Exhibit XI-F. The Protocol is silent on the critical matter of what training and experience will constitute qualification for these duties. There is reason to be concerned regarding the placement of the catheters in the case of Federal executions. The Execution Protocol apparently risks movement and displacement of the catheters when the inmate is moved into the execution chamber and strapped down on the table. *See* BOP Execution Protocol at 19-20 (there is no identification of when in the execution process the IV catheters are introduced relative to the movement of the inmate into the execution chamber). Unless specially qualified staff are present and monitoring the IV catheter to ensure it remains in place and functioning, the risks of incomplete drug delivery increase unacceptably.

The government appears to introduce the lethal drugs through hand held syringes. *See* BOP Chemical Substances Preparation, attached hereto as Exhibit XI-A. Hand plunged syringes risk human error. If a syringe is pumped too quickly, the resulting burst of pressure could cause an infiltration of IV fluid into the tissue surrounding the vein or a "blow-out" of the intravenous line from the vein. *See* Heath I ¶ 8 (I), (j). This risk is heightened if the executioners cannot observe the IV site to see if the pressure at which the drugs are pumped is causing a disruption. The risk is heightened further if the executioners are not medical personnel trained in delivering drugs through intravenous lines. *Id.* ¶¶ 9, 15.

The Bureau of Prisons presents no information about what procedure it will employ if it is unable to access a peripheral vein. In Oklahoma, access to an inmate through a central line was used in at least one execution by lethal injection. *See* Oklahoma Medical Examiner Report on Robert Knighton, attached hereto as Exhibit XI-G. Such eventualities have been known to occur in other

169

States.  The Bureau of Prisons may also propose a "cut down" procedure to reach a vein if necessary.  A "cut down" is an invasive medical procedure used when ordinary methods of reaching a vein are not possible.  *See* Heath I ¶ 16.  Central line and cut down methods of accessing veins are surgical procedures requiring medical training and experience.  There is no evidence the Bureau of Prisons provides for such contingencies with facilities or personnel trained and capable of performing such surgical tasks.

Training and experience is essential to the "success" of the execution as a humane process.  There is nothing in publicly available information about the Bureau of Prisons's process that demonstrates that the critically necessary properly trained personnel are part of the process.  Indeed, just the contrary is true.  The Bureau's use of food coloring indicates it employs  personnel who need a visual aid to know when a line is flushed, something no trained person would ever need or use.

### ii.    The Chemical Cocktail Creates an Unnecessary Risk of Flawed Executions That Cause Conscious Suffering

The choice of drugs used by the Bureau is a separate area for concern.  Sodium pentothal, also known as sodium thiopental, is the first drug administered to the condemned inmate.  Sodium pentothal is an ultra-short acting barbiturate, used in medical applications to render a surgical patient unconscious for mere minutes in the induction phase of anesthesia.  *See* Heath I ¶¶ 4, 5, 18.  This short acting drug is used so the patient can be re-awakened and breathe spontaneously if complications arise in inserting a breathing tube prior to surgery.  Because of the drug's brief effective duration, especially in the low doses apparently administered by the Bureau, sodium thiopental may not provide a sedative effect throughout the entire execution process.  Due to the chemical combination used in the Bureau's execution process, there is also a risk the sedative effect

170

1130

of the sodium thiopental can be neutralized by other chemicals if there is no successful flushing by saline fluids. *Id.* ¶ 8 (l).

Additionally, sodium thiopental is dispensed as a powder that must be mixed to create a fluid form of the drug for administration. *Id.* ¶ 8 (b). It is essential the drug be prepared by a qualified individual so that preparation risks are minimized. If anything occurs during the mixing or delivery of the sodium thiopental that causes the drug to fail to reach the condemned inmate in the correct dosage at the correct time, the execution will not be humane. Unless the process achieves a surgical plane of anesthesia, an inmate will suffer excruciating pain as he dies. *Id.* ¶ 5.

The second chemical involved in the Bureau's lethal injection process is pancuronium bromide. Pancuronium bromide, like the vecuronium bromide used in Oklahoma, paralyzes all skeletal or voluntary muscles, but has no effect whatsoever on awareness, cognition, or sensation. *Id.* ¶¶ 4, 17. The neuromuscular blocker has the effect of rendering an individual unable to breathe, yet unable to signal his or her distress. *Id.* ¶¶ 5, 17. A neuromuscular blocker paralyzes skeletal muscles, including the diaphragm, affecting the inmate's ability to breathe. It has no effect on consciousness or the perception of pain or suffering. *Id.* ¶¶ 5, 17. If the sodium thiopental does not reach the inmate in an effective dose, he will not be rendered unconscious. Maintaining the inmate in that state, the neuromuscular blocker, will cause him to suffocate while conscious and, when the third chemical, potassium chloride is administered, cause him to suffer excruciating pain. *Id.* ¶ 5. Further, the neuromuscular blocking drug will serve to mask the suffering of the inmate as he suffocates to death and suffers excruciating pain. As many patients undergoing anesthesia have attested, conscious suffering while under the influence of pancuronium bromide is a varified fact. *See* Affidavit of Carol Weihrer, attached hereto as Exhibit XI-H. This unnecessary suffering constitutes cruel and unusual punishment prohibited by the Constitution.

Perhaps the most serious concern regarding the neuromuscular blocking agents is that there is simply no need to assume the risk that any inmate will consciously suffer pain as a result of its administration. A neuromuscular blocking agent is not needed to carry out an execution. *See* Heath I ¶ 17. Moreover, neuromuscular blocking agents are disapproved for use in euthanasia of animals by the American Veterinary Medical Association because of the same risk of conscious suffering. *See* 2000 Report of the AVMA Panel on Euthanasia at 680 ("A combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent."), attached hereto as Exhibit XI-I; *id.* at 681. It is deeply troubling that Bureau is using a suite of drugs to kill human beings which the AVMA prohibits for use in euthanizing animals.

### d.    Executions Have "Gone Wrong"

The principal concerns highlighted above almost certainly played a role in prior executions which have "gone wrong." Dr. Mark Heath has reviewed witness reports from three Oklahoma executions and has concluded these executions are inconsistent with the successful administration of a large does of pentothal. *See* Heath I ¶ 12; *see also* Declaration of Pat Ehlers, attached hereto as Exhibit XI-J.

After reviewing the descriptions of the LaFevers execution, Dr. Mark Heath concluded the scenario described was consistent with IV infiltration. *See* Heath I ¶ 12. If an infiltration occurred, it is likely Mr. LaFevers was not rendered unconscious by administration of the sedative and he suffered tremendously when the paralytic agents were introduced to his body. With reports of up to eighteen convulsions by Mr. LaFevers during the process, it seems likely that he did suffer.

Mr. LaFevers's execution is not an isolated incident peculiar to Oklahoma. The Death Penalty Information Center describes a variety of lethal injections as producing spasms and shaking in the defendants. *See Post-Furman Botched Executions*, Death Penalty Information Center at

1132

http://www.death penaltyinfor.org/ article.php?scid=8&did=478 (Feb. 4, 2004), attached hereto as Exhibit XI-K. As Dr. Heath has explained, a correctly administered suite of drugs which begins with drugs intended to produce unconsciousness would not result in spasms and gasping. *See* Heath I ¶12.

### e.    Executions Need Not Risk Conscious Suffering

The Bureau is not using the current procedure because it is the only reasonable way to conduct executions. It is not necessary to use untrained personnel to access veins, or to use untrained personnel who cannot see the IV site to administer the lethal drugs. It is not necessary to use paralytic drugs or potassium chloride to induce death. As the American Veterinary Medical Association's protocol's for euthanization of animals shows, a single overdose of a long-acting barbiturate like pentobarbital is all that is required to induce a humane death, with none of the adverse consequences associated with the neuromuscular blocking agents or potassium chloride. The Bureau of Prisons risks harm to inmates that is utterly preventable.

As courts have observed, the question with lethal injection is whether the process unnecessarily risks pain and conscious suffering. The "unnecessariness" of the risk must surely be judged by the ease with which the risk can be eliminated. The risks in the Bureau's process are utterly avoidable. It would be a simple thing to have qualified persons available to perform the process. It would be a simple thing to use a single overdose of a long acting barbiturate like pentobarbital and eliminate entirely the risks of using pancuronium bromide and potassium chloride.

For these, and all of the foregoing reasons, Mr. Vialva objects to the protocols and procedures used by the Bureau to induce death by lethal injection as unconstitutional in violation of the Eighth Amendment prohibition against cruel and unusual punishment.

173

## REQUESTS FOR RELIEF

Mr. Vialva requests:

1.    Discovery into all issues for which the record is not yet developed;

2.    After, discovery a full and fair evidentiary hearing as to the Motion as a whole and particularly as to any issues which involve facts not apparent from the existing record and to any issues which involve facts disputed by the government;

3.    Sixty (60) days after the date upon which the evidentiary hearing transcript is prepared in which to file a memorandum of law in support of this Motion addressing facts developed at that hearing and previously known facts;

4.    A temporary and/or permanent injunction barring Mr. Vialva's execution by the unconstitutional methods of lethal injection described in this Motion;

5.    A Writ of Habeas Corpus to have petitioner brought before the Court so he may be discharged from his unconstitutional confinement and restraint, and so that he may be relieved of his unconstitutional conviction and sentence; and

6.    Any and all other relief as my be appropriate and to dispose of the matter as law and justice requires.

**WHEREFORE**, Mr. Vialva prays that the Court grant him this and all relief to which he may be entitled in this proceeding.

1134

Dated this14th day of June, 2004.

Respectfully submitted,

SUSAN M. OTTO
Oklahoma Bar No. 6818
Federal Public Defender
Western District of Oklahoma

LISA S. McCALMONT
Texas Bar No. 24007629; Oklahoma Bar No. 17096
Assistant Federal Public Defender
Death Penalty Federal Habeas Corpus Division
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
Telephone: 405 609-5930
Telefacsimile: 405 609-5932

**COUNSEL FOR DEFENDANT/MOVANT
CHRISTOPHER ANDRE VIALVA**

1135

1136