*EXHIBIT III-R*

*REDACTED*

*BASED ON EXTANT SEALING ORDER*

1355

1356

# DECLARATION

I, Terry Terrell Brown, being of lawful age, declare under penalty of perjury, that the following is true and correct:

1)    My name is Terry Terrell Brown and I am 22 years old.

2)    I am making this declaration voluntarily.  I have not been threatened, coerced or promised anything by anyone.  I understand this declaration may be used in legal proceedings concerning Christopher Vialva.

3)    In June, 1999, I was staying at 2002 Hill Street, Killeen, Texas with Billy Rorie.  My mother was living on base at Fort Hood at 155-1 Safi Road.

4)    During the Juneteenth Celebration, on June 19, 1999, I was drinking and took a hit of acid.  I continued using drugs and drinking until my arrest on June 21.  The morning of the 21st, I smoked a stick of "wet" - a marijuana cigarette dipped in embalming fluid.  I had two of these and smoked both that day.  I stayed high all day.

5)    I stayed up all night almost every night.  I got up at 7:00 a.m. on June 20 and did not go to sleep again until 6:00 a.m. on June 21.  On June 21, Brandon Bernard picked me up after summer school just shortly before noon.  I didn't go to sleep again until after I was arrested and nodded off in the patrol car.  During this time when I was using drugs I didn't eat much, and mostly just snack cakes.  At the time I got arrested I had at most five hours sleep, little to eat, and I was high.

6)    While I was at the CID Office somebody questioned me.  I don't remember what time it was or how long I had been there, but it was before I talked to my mom.  At the time my mother was living not five minutes away from the CID Office.  At the time I gave the statement at CID the officers were telling me they knew Vialva did it all and that I was down the hill from the car.  They told me about the two shots.

7)    I went in front of a Justice of the Peace later in the day on June 22.  I can't remember the time and I can't remember anything about what happened.  I don't remember if we were still at CID or if we went to the Juvenile Annex.

8)    They took me to McLennan County but because I was 17 I stayed in the holding tank.  I don't remember eating anything.  All I did was sleep.  I don't remember how long I was there.  Finally, they took me to the juvenile facility on Rancier in Killeen.

Exhibit III-S

*Declaration of Terry Terrell Brown*

9)    About a week and half later, Dan Chadwick and Ranger Aycock came to the juvenile facility with an ATF agent, someone from CID, my lawyer, and my mom. At that point, they started telling me details from start to finish. They told me Vialva had blood on his shoe.

10)   I was contacted several more times during the next two months. Ranger Aycock and Agent Chadwick kept bringing me details, asking me to confirm what had happened. They already knew about me pointing the gun. At some point, the jail put me on medication for bipolar disorder. I got word from Brandon Bernard that everybody was pleading guilty. Based on that, I decided to lay out what I had done and plead guilty. My lawyer told me I needed to tell everything I'd ever done so no more charges could be brought up on me. Ranger Aycock brought up the Kick Door Boys so I knew someone had told about that.

11)   Right before Vialva and Bernard's trial, they brought me down to the federal building in Waco. The DA, who was a young guy, ran through my testimony with me. My lawyer was present for that meeting. I was basically confirming what they were telling me.

12)   At no time did any of the lawyers representing Vialva or Bernard try to contact me. My lawyer never even mentioned anything about them wanting to talk to me. I would have talked to them. When I was on the witness stand, Vialva's lawyers never asked me about using drugs on the day of the event. I would have told them the truth if they would have asked me.

13)   When I was on the witness stand and lawyers were asking me about times, conversations, and what was happening, I told them I wasn't listening even though I had a watch and I was present during conversations. The truth is I was high and really wasn't paying attention. To this day I still can't remember specific times and details.

14)   I feel they coerced my statement from me by bringing everything to me as reality. They didn't ask my version of what happened, they basically told me everything. There were things they brought to my attention that I wasn't present for like the pawn shop, the ring being found in Sparks' house, the food shop they stopped at, and conversations they had with other people throughout the day. The way they presented it to me, it would be in my best interest to go along with them and anything short of murder would be taken care of for me.

Page 2 of 3

1358

*Declaration of Terry Terrell Brown*

I declare under penalty of perjury that the foregoing declaration, consisting of 14 paragraphs on six handwritten pages, is true and correct. I have compared the handwritten version of this declaration with the typewritten version and noted the addition of "When I was on the witness stand" at the beginning of the fourth sentence of paragraph 12, I affirm under penalty of perjury that this typewritten declaration in true and correct. Executed this 29 day of April, 2004, in Pollock, Louisiana. *and the omission of "me" in the same sentence. A typographical error in paragraph 5, "each" instead of "eat", has been corrected.*

_TERRY BROWN_
Terry Terrell Brown

Witnessed by:

_Ranada Gentry_    4/29/04
Ranada Gentry

1359

1366

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

UNITED STATES OF AMERICA.        )
                                 )
VS.                              )
                                 )
CHRISTOPHER ANDRE VIALVA         )
and BRANDON BERNARD              )

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

GRAND JURY TESTIMONY OF DANIEL CHADWICK

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

BE IT REMEMBERED that on the 13th day of July, 1999, at 10:28 AM, in the United States Courthouse, Waco, Texas, the United States Grand Jury No. 99-7-6 convened, there being twenty-two (22) Grand Jurors present. at which time the following proceedings were had and adduced as hereinafter set forth:

---

APPEARANCES

FOR THE GOVERNMENT:

MR. WILLIAM W. JOHNSTON
CHIEF ASSISTANT UNITED STATES ATTORNEY
700 South University Parks Drive
Suite 770
P. O. Box 828
Waco, TX 76706

INDEX

Appearances . . . . . . . . . . . . . . . . . . . .    2

DANIEL CHADWICK
        Examination by Mr. Johnston . . . . . . . .    7

Reporter's Certificate . . . . . . . . . . . . . .   58

---

MR. JOHNSTON: If you will, remain standing and raise your right hand.

(The witness was sworn.)

GRAND JURY FOREMAN: Have a seat.

MR. JOHNSTON: Members of the Grand Jury, the federal law concerning what's known as carjacking is found at Title 18, United States Code, Section 2119, and it provides, "Whoever with intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation or attempts to do so shall be fined or imprisoned," in accordance with the title. If serious bodily injury occurred, that section applies.

If death results, another penalty applies. Title 18, United States Code, Section 1111 provides that, "Murder is the unlawfully killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, or premeditated killing or committed in the perpetration or attempt to perpetrate any arson, escape, murder, kidnapping, treason, espionage, sabotage, any aggravated sexual abuse or sexual abuse, burglary or robbery, or perpetrated from a

---

premeditated design unlawfully and maliciously to effect the death of any human being is murder in the first degree."

Section 1117 is a conspiracy statute, and, in other words, you have the substantive crimes, but some crimes it's a crime to conspire to do that crime, like you had a drug case here earlier, and conspiracy to do a drug crime is just the same as if you'd done the drug crime. Similarly, here now Section 1117 provides if two or more persons conspire to violate Section 1111, which we just mentioned, and one or more such persons do any overt act to effect the object of the conspiracy, he shall be punished by imprisonment, as described.

The proposed indictment for you is against two individuals. The proposed indictment is United States of America versus Christopher Andre Vialva -- V I A L V A    and Brandon Bernard.

It's proposed for your consideration in Count One that, "On or about June 21, 1999, in the Western District of Texas, Defendants" -- Vialva and Bernard -- "aided and abetted by each other, with intent to cause death or serious bodily injury (sic), did take a motor vehicle that had been transported, shipped, or received in interstate commerce, namely, a 1989 Buick LeSabre automobile, Iowa License Plate

Exhibit III-T

13(01)

Number 353-EXL, VIN #1G4HR54C5KH455369 from the person or presence of Todd A. Bagley by force and violence, or by intimidation, and did shoot Todd A. Bagley with a firearm, which resulted in the death of Todd A. Bagley, in violation of" -- "2119 and 2."

Count Two is a conspiracy to murder count. Count Two alleges that, "From on or about June 20, 1999 and continuing thereafter until June 21, 1999, at Ft. Hood, Bell County, Texas, in the Western District of Texas, a place within the special maritime and territorial jurisdiction of the United States, Defendants" -- Vialva and Bernard -- "did knowingly, willfully and unlawfully conspire and agree together and with other persons, to kill, with premeditation and malice aforethought, Todd A. Bagley and Stacie L. Bagley, by shooting them with a firearm, contrary to Title 18" -- "Section 1111."

In these type of conspiracies, we have to allege one or more overt acts. We've alleged two. "In furtherance of such agreement and conspiracy and to effect the objects thereof, the defendants and co-conspirators committed the following overt acts, among others:

1. On June 21, 1999, CHRISTOPHER ANDREW VIALVA and others took a 1989 Buick LeSabre from Todd A. and Stacie L. Bagley at gunpoint, and forced the Bagleys into the trunk of their Buick LeSabre.

2. On June 21, 1999, BRANDON BERNARD, driving a getaway car, traveled with CHRISTOPHER ANDREW VIALVA, who was driving the stolen 1989 Buick LeSabre with the Bagleys still in the trunk of the vehicle, to a remote area of Ft. Hood, Texas, where VIALVA opened the trunk and shot Todd A. and Stacie L. Bagley with a firearm. All in violation of Title 18, US Code" -- "1117."

The last count is a murder count against Vialva -- I'm sorry -- the last two counts, Counts Three and Four, one for each victim. "On or about June 21, 1999, on Fort Hood, Bell County, Texas, in the Western District of Texas, a place within the special maritime and territorial jurisdiction of the United States" -- Vialva -- "with premeditation and malice aforethought, did knowingly, willfully" -- "kill Todd A. Bagley, by shooting him with a firearm."

Count Four, same date, June 21st, same allegations, that Vialva with premeditation and malice aforethought killed Stacie Bagley by shooting her with a firearm. It's a four-count proposed indictment.

DANIEL CHADWICK,

EXAMINATION

BY MR. JOHNSTON:

Q. State your name and how you're employed.

A. I'm Daniel W. Chadwick. I'm a Special Agent with the Federal Bureau of Investigation.

Q. And how many years have you been with the FBI?

A. Over ten years.

Q. Okay. Now you're actually situated in the Waco, Texas, office? Is that correct?

A. Yes, it is.

Q. But do you have an area that you work, spend a lot of time working?

A. Yes, sir, the Fort Hood area in Bell County.

Q. All right, and Fort Hood, most folks here are familiar with Fort Hood, but, for the record, Fort Hood is a very large military base? Is that correct?

A. Yes, sir, it is.

Q. And most of that base is -- am I correct that most of it is within the Special Maritime -- all of it is within the Special Maritime jurisdiction or territorial jurisdiction of the US, but most of it is exclusively US? Is that correct?

A. Yes, sir.

Q. By that we mean that any crimes that occur there must be prosecuted in federal court?

A. Yes, sir.

Q. Okay. Did you receive a call sometime on June 21st, '99, from authorities at Fort Hood, Texas, that something had happened?

A. Yes, sir. Approximately at 11:30 on June 21st, I received a call from the duty agent with the Criminal Investigation Division at Fort Hood, CID, and they informed me that they had located a burned vehicle out on the -- on the base and that it had bodies in the trunk.

Q. Okay, and did they indicate to you that there had been some subjects that had -- were found in that area?

A. Yes, sir. They had -- potentially, at that time, they were looking at four subjects and two potential witnesses that were in the area of the burned vehicle that other local law enforcement officers had come across when they were responding to the smoke that the car was making.

MR. JOHNSTON: Okay. Members of the Grand Jury, what I think I'll do, I'll ask a few questions from the agent's perspective as to what he learned, and, obviously, it was somewhat -- you know, through a glass darkened, they weren't quite sure what they had, but then I'm going to, in just a couple of minutes, jump

13362

into what they know from what the witnesses have told them, so I hope that won't confuse that.

Q. (BY MR. JOHNSTON) So early on in the investigation, there were -- is it correct that, in responding to the smoke of the fire, there was law enforcement and then fire control officers there?

A. Yes, sir.

Q. And there were -- was it apparent that there was another vehicle that these four had tried to leave in, but it got stuck or something?

A. Yes, sir. The car that was being driven by Brandon Bernard --

Q. Okay.

A. -- had gotten stuck, and there was four individuals associated with that car.

Q. Okay, and now are they the four individuals that were -- as we jump ahead now, were involved in various degrees in the abduction, killing, and destroying of evidence in connection with the offense?

A. Yes, sir, they were.

Q. All right. Now were these four suspects taken to the military police or the criminal investigation building there at Fort Hood?

A. Yes, sir, they were.

Q. And at some point before statements were

elicited, were they advised of their rights concerning self-incrimination?

A. Yes, sir, they were.

Q. And did three of the four -- have three of the four spoken with you in various degrees?

A. Yes, sir, they have.

Q. All right. Now somewhat omnisciently and to give a basis for this, you have since this occurred spoken at length with Christopher Lewis? Is that correct?

A. Yes, sir.

MR. JOHNSTON: And I'm going to make a note on the record -- it's not so much for the Grand Jurors but for the record -- that during the questioning over the next few minutes here, I'm going to be referencing some juveniles by name, and that -- this record is protected under, of course, the Grand Jury rules, and at this point, these juveniles -- their names would not become public. In the event they are transferred to adult status and presented to you, they'd be adults for all purposes, but at this point the record will reflect their names, and we need to talk about this, but their names are confidential, otherwise. You would be the only folks that would be allowed to know about that.

Is there chalk back there? I just don't want to confuse you with all of these names. That's okay.

There are four names that I want you all to try to separate in your mind, the roles of these four people, and I'll just sort of help you imagine it. At the top, you can give the name Christopher Vialva -- V--I--A--L--V--A.

Q. (BY MR. JOHNSTON) Christopher Vialva, is it correct, Agent, is nineteen years old?

A. Yes, sir.

Q. And you're going to present evidence he was the -- the killer, the gunman?

A. Yes, sir.

Q. All right. Now underneath Christopher Vialva, there's Brandon Bernard, and Brandon Bernard, Agent, he is eighteen, correct?

A. Yes, sir.

MR. JOHNSTON: And, Members of the Grand Jury, those are probably the only two adults that you will hear on this case, unless it's more tangentially related.

Q. (BY MR. JOHNSTON) Is that correct?

A. Yes, sir.

Q. The other -- that's two of four. The other two

is, first of all, Terry Brown?

A. Yes, sir.

Q. Is that correct, and Terry Brown is seventeen years of age?

A. Yes, sir.

Q. And, lastly, Christopher Lewis, and Christopher Lewis is fifteen years of age?

A. Yes, sir.

Q. All right, so you have Vialva and Bernard, Brown and Lewis. You have two Chris's, Chris V. and Chris L. All right, and each of these all had street names or nicknames, as well? Is that correct?

A. Yes, sir, that's correct.

Q. And to cut to the chase on some of their -- on why they run together and why some of these relationships exist, can you state whether or not you have strong evidence that they are members of a criminal organization or a gang?

A. Yes, sir, we do.

Q. And do they claim it, even?

A. Yes, sir, they do.

Q. In search warrants, have you found paraphernalia concerning gang membership?

A. Yes, sir.

Q. What do they call themselves, among other



things?

A. Two, one, two (2-1-2) Piru Bloods, basically an offshoot, I guess, of the -- the West Coast Bloods.

Q. Okay, and do they do things -- do they commit -- do you have evidence that they commit crimes together?

A. Yes, sir.

MR. JOHNSTON: All right, and, Members of the Grand Jury, we're not asking you, you know, to consider someone bad just because they're in a gang. That's up to you to decide that, but it may bear on their -- their willingness to associate together, their willingness to cover for each other and to commit crimes together that they are in a -- in a gang. That's a minor point of this whole thing, but I wanted to admonish you. You know, we shouldn't just immediately say, "Oh, they're a bunch of criminals." That's just not the case when someone is in a gang, but if --

Q. (BY MR. JOHNSTON) For relationships, it's important to this case? Is that correct?

A. Yes, sir.

Q. All right. Now let's -- let's now tell the story. What -- what really happened, as far as we know at this point, based on the evidence you've gathered from -- that is, physical evidence, the discussions

---

you've had with other police officers, with CID, but based at its core on a Christopher Lewis statement? All right, and we'll go off from there, and we'll tell you why we -- why we believe it in different respects, but, if you would, what -- what was it that the folks were doing on the 20th and 21st that eventually led to this encounter with the Bagleys?

A. Okay. We'll -- we'll start with on the 20th. Some of the times are going to be just approximations or estimations that we have not been able to pin down as well as we would like to yet. Most of it started on the 20th when there was, at least, three of the guys that we're talking about -- Chris Vialva was stating that he needed money and was wanting to do a robbery to get money. Himself, Christopher Lewis, and Tony Sparks actually even went out that night, which I believe would be a Sunday night, the night before on the 20th, to -- to do -- to do that with a robbery. They had had a .22 caliber pistol that they had taken with them. Unfortunately, Killeen police officers had stopped them for curfew violations, since two of them were juveniles. Tony Sparks is a juvenile, and they got stopped for the curfew violations. They, basically, told Chris Vialva that he could go home, and then they called the parents of Tony Sparks and released Christopher Lewis and

---

Tony Sparks into their parents' custody.

Q. And you've mentioned a new name, which is pretty closely related to this case, which is Tony Sparks, correct?

A. Yes, sir.

Q. And we'll talk about his role later and what you may be doing apart from the Grand Jury concerning him, but was there a firearm -- on the night of the 20th, did they have a firearm available to them?

A. They had a .22 caliber.

Q. What did they do with it?

A. When the -- the police officer had approached them, they -- they dumped the firearm into the bushes, some bushes there, just to get rid of it.

Q. Did something happen in the meantime with weather conditions and the firearm?

A. I guess there was some rain. It rained that night or --

Q. Or something?

A. -- or heavy dew. Anyway, the firearm had gotten wet when they went back to retrieve it the next day, the next morning, I believe, which would have been Monday morning, and Christopher Vialva was a little upset, because it appeared that it wasn't working very well. At this time, we had a fairly large group. I'd

---

have to -- to look to see all the names, but they were at -- I'm trying to remember what --

Q. To the extent you recall --

A. -- whose house --

Q. That's all right. One of them -- one of the --

A. They were at one of their -- they were at one of the homes.

Q. This is now the daytime on the 21st?

A. This is the daytime on the 21st.

Q. Go ahead.

A. We have Christopher Lewis, we have Christopher Vialva, we've got Tony Sparks, and later on that morning or early afternoon Bernard -- Brandon Bernard and Terry Brown come over to this same house, and between that time Chris Vialva had went out and retrieved the .22 and, again, as I stated earlier, was unhappy with the condition of the .22, because it had gotten wet, and so he was in the process of making arrangements to go ahead and get another weapon that belonged or appeared to belong to Brandon Bernard which was a .40 caliber Glock, and they went over to another individual's house.

Q. Let's go ahead and stop there and talk about the .40 caliber just a moment.

A. Okay.

13644

Q. If you would, tell the Grand Jurors, based on the investigation you've done, along with the Federal Bureau of Alcohol, Tobacco and Firearms in tracing that gun from its original manufacture and first sale through -- or particularly through the report of stolen gun, where do you think that .40 came from?

A. Okay. The .40 caliber was stolen from a soldier that was stationed at Fort Hood at -- the best guess is at a house in Killeen --

Q. Keep going. Excuse me.

A. -- from a -- from this soldier's vehicle, and we don't know what happened to it from where it got -- exactly who may have stolen it and -- and how it got to -- ended up getting to -- another guy that's associated with this guy ended up having this weapon, and I think we have one of the -- one of the Presley brothers, which is another -- a new name but is also part and associated in the hierarchy -- the upper echelon of the hierarchy of the gang.

Q. It went to Dernard's hands? Is that right?

A. Right. He purchased it, basically, for Brandon Bernard, and it -- it got to Brandon Bernard, and then the -- a day or two before the 21st, which was the day of our incident, they had loaned it to another individual, because he was getting threats from another

gang in Copperas Cove.

Q. And this was Mr. Greg Lynch?

A. This is Mr. Greg Lynch.

Q. Okay, another juvenile associated with the gang?

A. Yes, sir.

Q. Okay, and then the .40 caliber then on the 21st, on or about the 21st, ended up in the hands of Chris Vialva?

A. Yes, sir, it did.

Q. Okay, and is that the firearm that most likely caused the death of the Bagleys?

A. Yes, sir.

Q. Okay. Now during the day of the 21st, now going toward afternoon, can you state whether or not there was any more discussion among the group about their intention to rob --

A. Yes, sir. They -- I mean they specifically left the house with the intent, and the four -- we've got five individuals --

Q. Okay.

A. -- that left the house with the specific intent on robbing somebody.

Q. And would you state who those five were, and now this is the afternoon of the 21st.

A. Christopher Vialva, Brandon Bernard, Tony Sparks, Terry Brown, and Christopher Lewis.

Q. Okay. Has Bernard admitted being present like that and knowing about the intended robbery --

A. Yes, sir, he has.

Q. -- after being advised of his rights?

A. Yes, sir.

Q. Okay, and has Christopher Lewis acknowledged that and put both Bernard and Vialva and these others doing this?

A. Yes, sir.

Q. Okay. Go ahead, please. After they -- we're where they talked about it. What did they physically do toward -- toward their goal?

A. From -- from that -- from that point, they first went to a Winn-Dixie that's located in Killeen, fairly close to -- actually fairly close to Fort Hood and one of the -- the gates entering into Fort Hood and decided at that point that that was a little bit too close to -- to where there might be police, or -- or whatever was going through their heads, they became uncomfortable in the Winn-Dixie area.

At that time, they left and went to an IGA shopping center, which was a little bit more on the outskirts of town and -- I say "on the outskirts," but

it's away from the center of everything, so they went to this shopping center. They sat out at the IGA shopping center for a while looking for targets, did not find anything, I guess, that -- that they felt comfortable with, and at this point they went across and down the street a little bit to a Mickey's convenience store, and at that point, as they drove into the convenience store and they pulled off to the side of the convenience store away from the front of it, there's also a laundromat/washateria located next to the store. It appears that they saw Todd talking on the telephone and figured that that might be a good subject.

Q. And to get there, did Brandon Bernard and maybe others drop Vialva and Sparks and Lewis off?

A. Yes, sir.

Q. And did Bernard know he was dropping them off to rob someone?

A. Yes, sir, and, in fact, himself, Brandon Bernard, and Terry Brown, when they parked there, they went ahead and went into the laundromat and was playing some video games while the two Chris's and Tony Sparks were going to end up taking somebody.

Q. All right. Now let's talk about Todd and Stacie Bagley here just a minute here. Todd Bagley, is it correct, had been in the United States Army stationed

at Fort Hood, Texas?

A. Yes, sir.

Q. And Stacie is the daughter of a -- not that this is relevant for your consideration but just to put it -- is the daughter of a former Killeen police officer?

A. Yes, sir.

Q. So she was raised in Killeen?

A. Yes, sir.

Q. Is it correct she met -- maybe in the Killeen area or at some point met Todd Bagley?

A. Yes, sir.

Q. They were involved in activities there in Killeen, you know, home and church life and so forth, but then moved to Iowa? Is that correct?

A. Yes, sir, it is.

Q. About when did they move to Iowa? Do you know?

A. To the best of my knowledge, it's -- they'd been there for -- I don't know -- within the past year --

Q. Okay.

A. -- or so. I'm not -- I'm not for sure.

Q. And did they have a couple of reasons to come back down and visit the Killeen area during this time in June?

---

A. Yes, because, well, her father lives in the Killeen area.

Q. And was there also a camp meeting or revival meeting at their previous church?

A. Yes, sir. They had come down to see their dad -- or her dad and had went to their church and, basically, had discovered that their church was holding this revival for the next week, so instead of leaving that Saturday before the Monday, they had decided to stay an additional time because of being with their friends and worshipping with their friends during the -- the revival meeting that the church was having that week.

Q. Okay, and the --

MR. JOHNSTON: Technically, Members of the Grand Jury, we do have to prove the vehicle had some effect on interstate commerce, and it may be that at a later time we prove it was -- exactly where it was manufactured, the Buick, but for purposes of -- of your finding that you may find, if it traveled from state to state, it's sufficient.

Q. (BY MR. JOHNSTON) And can you state whether or not their vehicle was registered in Iowa?

A. Yes, sir.

Q. And had they driven it down from Iowa to Texas

---

before, obviously, this incident occurred?

A. Yes, sir, they did.

Q. And is it -- does it still bear the Iowa registration and so forth?

A. Yes, sir, it does.

Q. Okay. Now -- so would you please pick up the story again when Todd Bagley and Stacie Bagley were in an area near a Mickey's convenience store, in the same area near a washateria, and the subjects, as you've described, had the intention to rob, please?

A. Okay. At this point, from what it appears, Tony Sparks approached Todd Bagley after he got off the phone and asked him for a ride, and it looks like Todd went back to his car where his wife was sitting in the car and said something to her, I guess, and then looked back at them and -- and waved or somehow said, "Yeah, we'll give you a ride."

Q. Who was -- then who -- who were the ones that wanted a ride then?

A. Tony Sparks, Christopher Lewis, and Christopher Vialva --

Q. Okay.

A. -- and they were the ones that got into the car --

Q. Okay.

---

A. -- with the Bagleys.

Q. And based on what Christopher Lewis has described to you in lengthy discussions, did they really want a ride?

A. Oh, no, sir.

Q. Okay. Go ahead. What happened next?

A. Okay. They gave -- they asked Todd where he was going, and he had pointed off in a direction down Rancier, and they said, "Well, that's where we're going, too," to some type of -- I think it was like an uncle's house that they claimed that they were needing to be driven to.

Q. What happened then?

A. Okay. From that point, they gave the Bagleys some directions as far as driving through some of the residential streets, and then at one point, Christopher Vialva announced that there was a change of plans and drew out the .40 caliber and put it to Todd's head and -- and claimed again that there was a change of plans, and the exact words -- they conveyed the fact that, "This is a robbery" --

Q. Okay.

A. -- and, at that point, Tony Sparks also withdrew the .22 revolver, which was the revolver that had been wet and had been recovered --

Q. Was that a Jennings .22?

A. That's what we recovered, yes, sir, a Jennings.

Q. Okay. Is that an automatic or a revolver, the Jennings?

A. I -- I'm sorry, an automatic.

Q. Okay. Go ahead. Then after they had drawn the weapons, what happened next, sir?

A. Okay. From that point, they then directed them to a remote area that was not real far off, which was basically a dirt road, and got them out to that area. Christopher Vialva and Tony Sparks then withdrew Todd and Stacie from the vehicle and placed them into the trunk of the vehicle at that time.

Q. Was it at this point or later where they took some of their personal possessions, rings, watches, and so forth?

A. Yes, sir. While they were putting them in the trunk, they took their rings and took his watch. Of course, they had the -- the purses and the wallets, I think, from -- before they got into the trunk which were still in the car, and, again, the time frame that we -- that we've -- the best guess that we've got for this is anywhere from the 3:30 to approximately right before the four o'clock time frame when they actually took them.

Q. Okay, and what then happened with them and the

car, and not -- obviously, I'm not going to ask you every detail, but if you can sort of take us through as the time went on that evening.

A. Okay. The -- the first thing it -- that it appears they did is they did go to an ATM machine and then start -- had gotten -- of course, had the ATM card, had gotten a code --

Q. This was Todd and Stacie Bagley's ATM card?

A. -- ATM card, yes, sir --

Q. Go ahead.

A. -- and -- and were trying to make some withdrawals. It doesn't appear that they were successful at that time making withdrawals. There was numerous conversations going on, mainly a lot between Christopher Vialva and the victims that were in the trunk, and anytime that he was displeased with them, he would do -- he would shake the car around, you know, twist -- twist the wheel and make it go back and forth, so they'd roll around in the trunk, or if he was very upset, he would slam on the brake which, again, would make them roll around in the trunk area of the car.

Q. Okay, and can you state whether or not -- as bizarre as it may sound, but over the period of several hours, there were conversations between the Bagleys and the occupants of the vehicle?

A. Specifically, it appears that whenever Chris Vialva got out of the car to either go into the residence -- they stopped at his residence several times and -- and other places -- that Christopher Lewis, to the -- to the most extent, Christopher Lewis would talk to the victims in the car, and the victims in the car, again, were basically, you know, begging for their life as far as trying to convince them that this was a bad thing and that they needed to let them go, would ask them if they believed in God, did they go to church and things along those lines and -- but to no avail in the end.

Q. Okay, and give us an idea -- instead of sort of hijacking these people and taking them to the woods, for lack of a better term, were they sort of paraded around town while in the trunk? Where did the individuals go, and who did they run into? Did they run into different people?

A. My description is I -- I call it a "trophy ride" --

Q. All right. Go ahead.

A. -- because it appears, again -- I mean they were trying to get cash out of the cash machine. They even, it appears, went to a pawn shop to try to pawn her wedding ring, but in-between some of those driving -- I

mean going to those specific places, they were driving around their neighborhoods where the -- the gang -- their -- their gang, I guess, has the predominant number of its members or people that associate with it are -- are in this particular neighborhood, and they -- they were kind of driving around and even sometimes would come back around if they saw a couple of people that they knew.

Q. And would they stop the car and talk and have discussions with people while the Bagleys were in the trunk?

A. Yes, sir, they -- they did. Specifically, they stopped at one house where -- to the point where the individuals at that house became aware that, yes, they were in a stolen car and that there were actually people in the trunk of the car.

Q. Did this go on for -- for several hours?

A. Again, from the best -- our best ability of trying to pin the times down, we -- we've got between 3:30 and 4:00 when the people were taken and placed into the trunk to the last part of their ride which would have been starting about -- right at shortly after 8:00, so we have, you know, four, four-and-a-half hours where they were pretty much just being driven around in the back of this trunk.

Q. Now can you state whether or not -- and I don't know how to ask you at what point -- whether or not at a point and continuing thereafter Chris Vialva and others began having a discussion about, "Now what do we do," or "What do we do with them now," that eventually led to a plan? Can you describe that briefly, please.

A. Yes, sir. I mean it's -- it's -- we're still trying to determine exactly at what point this happened. We eventually have Chris Vialva with Tony Sparks and Chris Lewis, who were in the -- the victim's car, finally linking back up with Terry Brown and Brandon Bernard in -- in Bernard's car and --

Q. And was Bernard summoned; in other words, "Hey, we need you again; we need your help"?

A. Right. There were some phone calls that were made, and -- and the fact -- or the -- the expression being, you know, "All right, it's" -- "it's come to a point where we need some help on figuring out what we're going to do" --

Q. Go ahead, please.

A. -- and at that point -- I mean there was a lot of discussions, but most of the discussions were, "We need to burn the car," because Christopher Vialva was very worried about fingerprints being on the car, and -- and he just -- he just wanted to burn the car.

---

Q. Were there statements made like, "Now they know too much," or "They've seen us," or "They know" --

A. Christopher Vialva was, also, worried about the fact that he had seen -- that they had seen him, and he did not believe them when they said that they wouldn't tell anybody, and -- and so even in some discussions with some of the other guys that were involved in this, he said, "Well, you know, I've got to kill them, because" -- "because they had seen me."

Q. Okay, and so what plan was come up with, and who played what role in the plan to burn --

A. Okay. They -- they decided that they were going to burn the car. While they were riding around, they had -- had stopped on a residential street and -- and where Christopher Vialva gave Terry Brown the money to purchase gas or lighter fluid, some -- some type of flammable fluid, to -- to burn the car, and Terry Brown at this point went off with Brandon Bernard, and they went to a Mickey's convenience store. Terry Brown gave the money to Brandon to actually make the purchase. Brandon felt like he didn't have enough money to purchase a gas container and gas, so he ended up getting the charcoal lighter fluid.

Q. It was like a can or a bottle of some sort of lighter fluid?

---

A. Yes, sir. He got two cans of the -- the barbecue-type that -- that you use to start barbecue briquettes.

Q. And was their mission -- did it separate them from Vialva and the others momentarily?

A. Yes, sir, it did.

Q. All right, and have -- well, I'll -- I'll -- in a minute, I'm going to mention some corroborating facts. I'll ask you to -- go ahead, and then what happened next?

A. And from that point, then they linked back up with Christopher Vialva and Christopher Lewis. Before they got to this point where they actually bought the lighter fluid, we know for sure that -- again, I had mentioned Tony Sparks. Well, Tony Sparks had been let out of the car before this point where they bought the lighter fluid, because he was on juvenile probation and had to be home at eight o'clock, so they had let him out and then -- and to go back home, so at the -- at the point where the lighter fluid was -- was being purchased to -- to burn the car, we have Christopher Lewis and Christopher Vialva, who are in the victim's car, and we have Brandon Bernard and Terry Brown who are in Brandon's car. Okay, after they met back up with Christopher Vialva with the lighter fluid, they then

---

started driving off at -- basically, they went outside of town and ended up on Fort Hood territory, which was a pretty -- it's a pretty desolate type with no houses around or anything, and the deal is is like when you take the -- this -- it's called Quarry Road. There's fences on both sides of it until you get across into the Fort Hood ground or, you know, reservation. Then the Fort Hood side is -- is opened up, and you cross a cattle guard to get into there.

Q. And even by their own acknowledgment, were Bernard and Brown serving as getaway car and getaway car driver, so to speak?

A. Yes, sir. That's -- that's what their purpose was going out there was to provide them a -- for a means of getting back --

Q. And had -- and --

A. -- to Killeen.

Q. All right, sir, and did they provide -- bring with them in their vehicle the lighter fluid?

A. Yes, sir. They had the lighter fluid.

Q. Please go ahead as to what happened once they got out on Fort Hood.

A. Okay. Christopher Vialva had saw -- about -- basically, as soon as you cross this cattle guard, there's a rough clearing, almost -- it kind of looks

13608

like there might have been a road at one time that went up a hill off of the main gravel road that they were on, and so he took the victim's car, drove all the way up to the top of that and parked or -- or -- to a point and wasn't total -- at the total top but stopped the car at a little clearing area at that point. Of course, he thought that was a pretty fun ride and was wanting to do it again, because it was pretty bumpy and big rocks and everything, and it was a pretty bumpy ride up.

Q. What happened then?

A. At that point, Christopher Lewis and Christopher Vialva got out of the car. Terry Brown and Brandon Bernard who -- Brandon Bernard had parked his car down on the bottom with the -- the gravel road, and they were walking up towards where Christopher Vialva had parked the victim's car. They were carrying -- Brandon Bernard, I believe, was the one carrying the lighter fluid. They got up to the victim's car, and then it appears Christopher Vialva and Brandon Bernard started pouring the lighter fluid inside the car and the -- and in the engine compartment and different parts of the car, and Terry Brown helped them pour a little bit of the lighter fluid on, also.

Q. And at this point, obviously, the victims knew that they had stopped and it had been bumpy. Can you

state whether or not there was any more discussion or outcry from the victims?

A. The victims -- I think Stacie was saying, you know, something to the effect of, "Are you going to let us out or, you know, let us go," or whatever and --

Q. Did this -- I'm sorry. I'm sorry. Was there some discussion about directing one of the Defendants for a Bible in the car? Do you -- do you recall that or --

A. The -- at -- at one time, it appeared that somebody had been directed to read to them from out of the Bible but --

Q. Okay. We're not sure exactly when --

A. Well, we don't know if that actually happened now.

Q. Okay.

A. It -- there was -- there was some -- numerous statements that were being said at first to try to make each -- certain people look better, and it appears that might have been one of those statements.

Q. Okay. Would you state then to the certainty that you have at this time what statements were made by the victims once the car stopped.

A. Well, that -- that they were -- you know, again, they were really interested in -- in being let go

or just being left there and, you know -- but -- but not being killed, and Christopher Vialva got pretty upset at this point and supposedly had slammed the trunk a couple of times and -- and said, "Bitch, shut up; I'm fixing to let you out," and it was at this point or shortly right after that point, after some discussion on trying to get several of them to open up the trunk, Christopher Vialva finally -- he had the keys -- opened up the trunk, and it was at that point, when he opened up the trunk, that he shot Todd. It appears he shot Todd first, and then he shot Stacie.

Q. Where did the bullet hit Todd?

A. Todd was shot in the side of the head, and Stacie was shot in the front of the face; I believe under the nose, between the nose and the mouth.

Q. Okay, and what happened then?

A. At that point, Christopher Vialva shut the trunk back again, and then it appears Christopher Vialva was the one that went ahead and -- and lit the -- or put the car on fire. It's not known exactly -- we don't know if it was by lighter or some type of material that he might have had lighter fluid on.

Q. All right. I'm not going to make a pathologist out of you --

A. Okay.

Q. -- but I'll ask you a couple of questions. The injury to Todd Bagley, what -- did it appear to hit -- that may have affected his brain, was hit in the side of the head?

A. Yes, sir.

Q. Whereas -- can you state whether or not the injury to Stacie was not immediately fatal?

A. It doesn't appear so.

Q. Is there some evidence --

A. Yeah, specifically, they -- when they did the autopsy, they found some soot in the throat which gives you the indication that she was still breathing when the car was on fire, because, otherwise, she wouldn't have had the soot in her throat.

Q. All right, and then in their attempt to get away, what happened?

A. As they went back down to the car, Brandon Bernard's car, which, again, was down at the bottom of the hill, the fastest way, I mean it appears that they figured, was to turn around and go back the same way, but it had been raining off and on all day or -- well, at least, in the afternoon in Killeen that day, and so when they swerved a little bit to try to make a turnaround, because it's a pretty narrow dirt road, at that point they ended up getting stuck on the

side of the road.

Q. All right, and did it so happen, sir, that within just minutes some innocent passersby happened to be on that road?

A. They -- they were -- the initial vehicle was a truck that had stopped with two individuals in that truck --

Q. All right.

A. -- and one of them knew or -- that knew the three subjects.

Q. Okay. Now you're talking about Mr. Cleveland Shinn?

A. Yes, sir.

Q. Okay. Now Mr. Cleveland Shinn and -- and a childhood friend of his were in a truck in that area, correct?

A. Yes, sir.

Q. And from all you know, Mr. Cleveland Shinn is a -- a good fellow? Isn't that right?

A. Yes, sir.

Q. And Cleveland Shinn from just being, is it correct, from -- from school at Killeen -- is it Ellison they went --

A. I believe it was at -- it was at school where he knew the --

Q. Yeah.

A. -- the guys from.

Q. Had seen some of them there and about town and so forth?

A. Yes, sir.

Q. And so of all people in the world to catch or see these people out where this car was on fire, Cleveland Shinn was there? Isn't that right?

A. Yes, sir.

Q. And three of the four he knew of? He didn't know Chris Lewis, the younger one? Is that correct?

A. Yes, sir.

MR. JOHNSTON: All right, all right. Members of the Grand Jury, I'm just going to ask a few more questions about this, and I'm going to miss a lot of detail, but my intent is to give you some examples of why the agent believes this is what happened independent of what anybody said.

Q. (BY MR. JOHNSTON) For instance, you had indicated that Terry Sparks -- 1 mean -- Tony Sparks -- was present for the robbery but later went home, correct?

A. Yes, sir.

Q. And did Chris Lewis tell you that some

arrangement was made at some point concerning the victim's jewelry with Tony Sparks?

A. Yes, sir. It appears that he had -- you know, Tony Sparks said, "I'll have the jewelry," because, again, Chris Vialva had kept ahold of the .22, so Chris Vialva had his .22, and he had stated that he would hold onto the jewelry, and then if he didn't give it back to them that night, that he would try to pawn the stuff --

Q. Okay.

A. -- and get what he could.

Q. And sort of like a picture puzzle with a lot of pieces missing at first, you just didn't know who all was involved? Isn't that correct?

A. Yes, sir.

Q. And it's still being made more clear even today? Isn't that right?

A. Yes, sir, it is.

Q. But a few days into this, was it apparent that Tony Sparks played some role, that at some point it was --

A. Yes, sir. We had had some other potential witnesses that -- we were getting indications there was more than the four people in these two vehicles --

Q. Okay.

A. -- and, at one point, we had even heard the name Tony Sparks mentioned --

Q. Okay.

A. -- as being one of the individuals in the car.

Q. But at a point days into this investigation, is it correct that a search was done of his home pursuant to a consent?

A. Yes, sir.

Q. And, sir, if you would, tell the Members of the Grand Jury what was found in a coat pocket in a closet at Tony Spark's home.

A. There was a lady's watch that was located in his coat pocket in his closet that was subsequently identified by the victim's, Stacie Bagley's, father as being her watch.

Q. Did he have a specific recollection? You've seen his statement, have you, or have you seen his statement?

A. From?

Q. From Woody.

A. Oh.

Q. And he was rather specific about saying he'd seen her with it, knew when he'd last seen her with it and so forth?

A. Yes, sir.

1370

Q. Okay, and is it correct -- and I think your testimony pointed out -- that at a point during this carjacking or hijacking they had tried -- someone had tried to go to a pawn shop with a ring or something?

A. Christopher Vialva, once he had found out from Todd Bagley what his wife's wedding ring was worth -- approximately twenty-seven hundred dollars ($2,700.00) is what we were -- what we're finding out -- had attempted to take it to a pawn shop, and there was one in Killeen that he had actually went to and had went inside and attempted to pawn this.

Q. Can you state whether or not anyone working at the pawn shop has identified Vialva?

A. Yes, sir. The pawn shop owner -- I believe it's the owner of the pawn shop -- was working at that particular time and had picked Christopher Vialva out of a lineup as being the individual that had come in and attempted to pawn a woman's wedding ring, and he had stated that, you know, he thought something was fishy with the ring and knew it was worth well over two thousand dollars ($2,000.00) and only offered him a couple of hundred knowing that the guy probably wouldn't take that, which Christopher Vialva didn't, and he left the store.

Q. All right. Another example, you said that the subjects attempted to use an ATM or one of these debit or credit card machines to get currency?

A. Yes, sir.

Q. And have you located ATM records which show, in fact, that card -- or several attempted uses and only one successful use or something like that of the card during the evening?

A. Yes, sir. We still -- we've got -- we've got, at least, two different ATM's, the Air Field Plaza ATM, which was the first place that they attempted to use the card, and then I believe there's a Race Track ATM in Copperas Cove, which is where they drove and also attempted to use the card.

Q. Okay. You indicated that Chris Lewis and others had told you a .40 caliber was used in this offense and described -- and you've told the Grand Jurors how the .40 caliber got in the hands of the Defendants. Were there .40 caliber casings found, sir?

A. Yes, sir. There were two of them in the trunk.

Q. And do you know whether toolmark experts who can -- can look at a firearm and -- and how -- when a round leaves a firearm, it leaves scrapings or toolmarks -- whether or not any examination has been done comparing the .40 caliber firearm which was found versus the shell casings?

A. Yes, sir. There was an examination done, and -- and these experts believe that those two shell casings were cycled through the .40 caliber that we did find at the -- at the crime scene.

Q. All right, and do you have a number of individuals, some friends and gang members, some citizens, who saw these individuals we've been talking about that evening in their -- in that car, that Iowa car, at different places?

A. Yes, sir. We have three females that saw -- of course, their stories vary exactly -- you know, I mean remembering who they saw in the car --

Q. Sure.

A. -- but that was at one point, because one of the females was Brandon Bernard's girlfriend, who he had stopped by and, in fact, it appears, had spoken to his girlfriend's mom, with Chris Vialva behind him in the victim's car, and then, of course, with the victims in the trunk at this time.

Q. So a number of witnesses that saw the various things, and are you still working on that part of the case?

A. Yes, sir, we -- we are.

Q. And, for that matter, is there just quite bit more work to do on the case?

A. Yes, sir, there is.

MR. JOHNSTON: And, Members of the Grand Jury, all you're allowed to do at this point is charge adults in this. Now --

Q. (BY MR. JOHNSTON) But are you taking other proceedings against juveniles?

A. Yes, sir.

Q. Two, so far?

A. Two, so far, and --

Q. Maybe two more in a day or two?

A. We fully expect two more in a day or two.

Q. Okay. In fact, most -- you've already charged as juveniles Tony (sic) Brown and -- and Chris Lewis, correct?

A. Yes, sir.

Q. And then you're, hopefully, charging soon Lynch and Sparks?

A. Yes, sir.

MR. JOHNSTON: And, at any rate, Members of the Grand Jury, in the event the District Judge, Judge Smith, rules that these juveniles should be handled as adults, we would anticipate coming back to you with an indictment which would include them as adults. At this point, all we're allowed to do under the law is present to you the two adults, which would be

Vialva and Bernard.

Q. (BY MR. JOHNSTON) And without going into great detail, has Bernard essentially admitted his involvement in varying degrees, obtaining the lighter fluid, dropping the men off to rob, and so forth?

A. Yes, sir.

Q. And other details have been provided by other witnesses, including Lewis?

A. Yes, sir.

Q. And Mr. Vialva, as is his right, has not spoken with you about the offense?

A. No, sir.

MR. JOHNSTON: And that should not be considered in any -- any way against him. All right, Members of the Grand Jury, that's -- we have another witness or two on this, one of the Texas Rangers who's assisting the agent, and then there may be some witnesses who may have observed something, but do you have any questions of the overall case from the FBI agent?

GRAND JURY FOREMAN: How old is -- I'm sorry. How old is Tony Sparks? What is his age? I didn't get it.

THE WITNESS: I'd have to -- I believe it's sixteen. I'm not for sure. It's either fifteen or sixteen, but I believe it's sixteen.

MR. JOHNSTON: Ma'am, and then sir.

GRAND JUROR: On the -- the Piru Bloods, is that what you called it?

THE WITNESS: Piru, yes, ma'am.

GRAND JUROR: Piru, do you all know how many is in the gang?

THE WITNESS: They have some -- some rough estimates. We've -- again, unfortunately, with that particular gang, you have a lot of, quote, "Blood elements" that -- that are associated with the Blood gang from the West Coast, but they might call themselves a little bit something different, and -- and it's just kind of hard to track, but we -- we do have a -- you know, I've seen an approximation. I think it could be as many as fifteen to sixteen people --

Q. (BY MR. JOHNSTON) Of the sort of running group, core group?

A. Right.

GRAND JUROR: Do you think it's a higher level of ranking in with those gangs to commit a -- you know, a murder or just a robbery?

MR. JOHNSTON: Is there a hierarchy within the gang?

GRAND JUROR: Is there a higher ranking? I mean because there are different ranks in different gangs.

THE WITNESS: This is -- several times, it appears things were -- were described -- I'm having a tough time, and I used to work these things, but -- on the Safe Streets end, but if you just pop out of the culture for a year or two, the -- the language changes so much, but it appears that they were very -- Christopher Vialva was very proud of himself for "hitting a good lick," as they call it, with -- with the theft and -- the theft of the vehicle, the theft -- you know, the robbing of these people and the fact that these people were in the trunk and that several other gang members had, basically, told him the same thing, Billy Rorie being one of them, which was another house he had stopped at during his travellings and -- and who also became aware of the fact that there were people in the trunk of this car, and so I -- I mean as far as him thinking that this was elevating himself, did this make him bigger and higher within the gang hierarchy?

GRAND JUROR: Like an initiation-type thing?

THE WITNESS: Yes. I mean he was already in the gang, but one of the other individuals that appears, that's going to be in one of the vehicles at one time or another during this ordeal for the -- the Bagleys, was a guy by the name of Joey Presley, who it appears to be not -- not the top level but right under the top level of -- in the leadership. In other words, middle management, I guess you'd call it.

Q. (BY MR. JOHNSTON) And you're still working on understanding the gang?

A. Yes, sir.

MR. JOHNSTON: Okay. Sir, you had a question, as well?

GRAND JUROR: I have about four questions. One of them was related to the lighter fluid.

THE WITNESS: Yes.

GRAND JUROR: Was there a witness that could identify an individual --

MR. JOHNSTON: Oh, I'm sorry. I forgot that.

Q. (BY MR. JOHNSTON) Identified one of the two men in the store, is that correct, the clerk where the lighter fluid was purchased?

A. Okay, we -- we --

Q. Sorry.

A. -- got a tape that we believe -- due to the -- the cost of the lighter fluid and the fact that that was all that was purchased, they gave us a --

1372

**Page 49**

Q. A register tape, you mean?

A. -- a register tape from the cash register that gave us the time of 8:03. I think it was -- I believe it was right around the 8:03 time frame when the stuff was purchased. The individual that purchased it was not picked up -- picked out of a lineup, but Terry Brown was picked up out of a lineup as being in the store at that time off -- from the counter.

GRAND JUROR: The other one was the ATM card. Was there any type of videos taken of the individuals trying to use the card?

MR. JOHNSTON: Let me help answer that. That's a -- all of those things were worked on pretty quickly, and you won't believe the number of places where there was no film in the camera, over and over and over.

Q. (BY MR. JOHNSTON) Isn't that correct? I mean --

A. Yes, sir.

Q. -- at -- at the convenience stores, at ATM's and so forth?

GRAND JUROR: Were they successful at using the cards any place?

THE WITNESS: At one place, which was a Race Track in Copperas Cove, which doesn't have the deal

**Page 50**

in the camera, so --

Q. (BY MR. JOHNSTON) There's a gentlemen today -- I don't know who he is -- who may have video that helps --

A. We do have -- we have a chance that we -- we -- in fact, he's got the video tapes from the Air Field Plaza, and from a couple of the Mickey's stores that we have identified, we've gotten the Mickey's stores' tapes for the tape that -- for the lighter fluid purchase. Somebody didn't rewind the tape all the way that morning. The tape cut off at five o'clock in the afternoon, and we've got the purchase at being at eight o'clock, but, again, this guy has the ATM tape for the machine that's at Mickey's, so those are something that we're just now getting ahold of from the ATM machines, and -- and so, hopefully, we're going to get something from there. We do have the Mickey's tape where the abduction took place, although they never went -- actually went into the Mickey's. Once we did a -- we walked through pretty good with Christopher Lewis on exactly what happened and where people were at. Now we're going to be able to go back to the Mickey's tape and see if we might not be able to pick some of the people out actually in front of the store. It's not -- it's not a real good angle, but -- but now that we know

**Page 51**

where they -- they were when they were waiting for Todd to get off the phone, we've got some hopes that we might be able to pick that out.

MR. JOHNSTON: Okay. I want to take up the subpoena issue with you when you've completed your questions. You had something else?

GRAND JUROR: Yeah, a couple more real quick. On Fort Hood, most places, you know, where you go into a reservation like that, there's a guard on duty. Evidently, they didn't go through a guarded area? Is that correct?

THE WITNESS: There's no guard on duty any -- on any of the gates.

MR. JOHNSTON: Fort Hood is a really open base.

THE WITNESS: The -- the only place where you'll even see a MP car is at a visitor's center that's at the main gate that goes into Fort Hood.

THE WITNESS: And the last one I had was the individuals who were in the trunk there, were they tied and gagged, or were they just in there loose?

THE WITNESS: They were just loose in the trunk. To -- to the best of our knowledge, they were loose in the trunk.

THE WITNESS: That's all I had.

**Page 52**

MR. JOHNSTON: Thank you. Yes, sir.

GRAND JURY FOREMAN: As best -- as near as you can tell, about what time were they shot and the car burned?

THE WITNESS: Okay. Well, we're looking at right around the 8:30 time frame, might have been -- well, 8:30 is -- is when we -- it appears we start having people show up, so maybe a few minutes before that.

MR. JOHNSTON: Okay. Ma'am, what's --

GRAND JUROR: You had said that there were witnesses. Were there witnesses to the burning of the car and the shooting or just --

MR. JOHNSTON: Just the four, ma'am.

THE WITNESS: Just -- just the four.

MR. JOHNSTON: In other words, of the four --

THE WITNESS: Okay, other witnesses is what I thought.

MR. JOHNSTON: Of the four, three have given statements in varying degrees?

GRAND JUROR: Okay. I've got it.

MR. JOHNSTON: Any other questions? Yes, ma'am.

GRAND JUROR: Were drugs involved in this?

1373

Were they using drugs while this was going on?

THE WITNESS: It doesn't appear -- I mean we -- you know, in two of the search warrants, we found -- we found evidence of marijuana, one in one of the subject's room and one in a -- in a sibling's room, but as far as this incident, as far as being drug-crazed or anything, no, ma'am.

MR. JOHNSTON: Ma'am.

GRAND JUROR: Why was -- do you know why Cleveland Shinn was in the area if this was a -- more of a desolate area.

THE WITNESS: They -- from what I understand, the -- the individual that was driving the truck, it was a new truck for him, and, basically, they were going to take advantage of the mud.

Q. (BY MR. JOHNSTON) And that was a good question that a lot of them had early on, "Who is this guy, and why is he here," but is it correct that you all have tried to pretty thoroughly check out Cleveland through his -- his --

A. Both those --

Q. -- the family he lives with and just the parents --

A. Both those individuals -- we held onto the two until well into the -- when we finally -- we were

---

starting to get some of the -- of the subjects themselves that started telling us, and we're -- we're, basically, confirming their story of the reason why -- of what time they got out there. Now we didn't take it for granted that they had just -- had shown up later.

GRAND JUROR: They just confirmed they saw these four in the area?

THE WITNESS: Well, also, Mr. --

MR. JOHNSTON: More than that. I didn't get into that.

THE WITNESS: Right. Mr. Shinn had saw them changing clothes when they first drove up, had also witnessed several of them throwing things off into the wooded area.

Q. (BY MR. JOHNSTON) And you found evidence had been discarded where Shinn said?

A. And we did. We found the -- we found the two handguns. We found the lighter fluid -- the -- the cans of lighter fluid.

Q. In fact, was Shinn there at some distance away? He-- he was not where the burning car was? Is that correct, but where the car was stuck?

A. He was where the car was stuck.

Q. And he and this other fellow were in the truck, and at some point, after they'd already seen these guys

---

changing clothes and throwing stuff, did a Nolanville police officer drive up?

A. Right.

Q. And did Shinn observe these guys go nuts trying to get rid of stuff and change?

A. Yes, sir. When --

Q. Okay.

A. I mean these people were, basically -- I mean were just -- just had -- the one time when you wouldn't want every good Samaritan in the area to come by, I mean literally they had -- there was people -- again, it's -- it's -- when I say it's a desolate area, there's not a whole lot of stuff around it, but, on the other hand, it's a backwards way to get to places like BLORA, which is a recreation center for the army that they have on Lake Belton. It's a back way to kind of get in there, and -- and then there was -- I mean we had two MP lieutenants, female lieutenants, that were driving by and actually drove by all these people. They -- they even had noticed some burning, you know, up off on the hillway, because they were going to go meet with one of their husbands who was out in the field that day, and then we had the -- the Nolanville police officer, and then we had one of the game wardens that also showed up shortly after the Nolanville police officer.

---

MR. JOHNSTON: These guys weren't getting out? There was people that showed up, and then you've got law enforcement involved and they saw the fire, and these guys were just stuck which -- thank the Lord. Did you have a question, too, ma'am? I'm sorry.

GRAND JUROR: My question was about the handgun. Were you able to retrieve fingerprints from the gun?

THE WITNESS: No, ma'am, not to my -- I -- I know it's been -- it's still in the lab and -- and probably still being processed, but to my knowledge no fingerprints have been taken off the handgun.

MR. JOHNSTON: Okay. Before we let you go, I need to cover a sort of technical matter.

Q. (BY MR. JOHNSTON) You have -- with the power of this Grand Jury, you have had a number of subpoenas issued --

A. Yes, sir.

Q. -- for financial records from ATM's and for video tapes and so forth, correct?

A. Yes, sir.

Q. And to the extent those have been served, have they been complied with so far? People have given you --

A. Yes.

Q.  -- have been very helpful, in fact?

A.  Yes, sir.

Q.  And do you have a need to maintain that evidence for your investigation?

A.  Yes, sir, I do.

MR. JOHNSTON:  Members of the Grand Jury, if there's no objection -- and noting none -- then you'll be allowed to maintain that evidence pursuant to the Grand Jury's power of subpoena.

THE WITNESS:  Okay.

MR. JOHNSTON:  All right.  We'll let you go.  We have more on this case, but -- thank you, sir.

GRAND JURY FOREMAN:  Thank you.

(The testimony of DANIEL CHADWICK was concluded at 11:28 AM.)

---

CERTIFICATE

I certify that these are the original notes and records recorded by me of the testimony taken and the proceedings held in the case of United States v. Christopher Andre Vialva and Brandon Bernard, before the Grand Jury held in United States District Court, Western District of Texas on July 13, 1999.

Date:  1-06-00

Official Reporter:  _____

THERESA J. POPEJOY
Texas CSR 756
Expiration Date:  12/31/01
Esquire Deposition Services
510 N. Valley Mills Drive
Suite 406
Waco, TX  76710
(254) 772-8729

1376

COUNTY OF OKLAHOMA )
                   )            ss
STATE OF OKLAHOMA    )

## AFFIDAVIT

I, Ranada Gentry, being first duly sworn, do hereby aver and state:

1)      My name is Ranada Gentry. I am of legal age and I reside in the State of Oklahoma. I read and write the English language fluently;

2)      I am employed as an investigator by the Federal Public Defender for the Western District of Oklahoma. I assist the attorneys by locating and interviewing witnesses, collecting documentary and other evidence, researching background information, and providing reports of the results of my investigation to the attorneys. I have been employed by the Federal Public Defender since January 22, 2002. Prior to my current employment, I served as a United States Probation Officer for the Western District of Oklahoma from approximately four years and as a Case Manager at the Federal Correctional Institution, El Reno, Oklahoma for approximately seven years;

3)      On April 22, 2004, I participated in an interview of Tony Sparks at the Federal Correctional Institution, Beaumont, Texas. Susan Otto, the Federal Public Defender, was also present. We advised Mr. Sparks at the beginning of the interview who we were, that we were from the Federal Public Defender Office in Oklahoma City, and that we were representing Christopher Vialva. Mr. Sparks spoke with us for nearly two hours;

4)      During the interview, Mr. Sparks told us about being stopped on the street by the police in the early morning hours of June 21, 1999 with Christopher Vialva and Christopher Lewis. Mr. Sparks said he went out with them the night before because Vialva had been thrown out of his house by his mother and Lewis's family had left for the weekend without him. Sparks said he "snuck out" of his house because he was bored and wanted to run around. Mr. Sparks said he had the .22 caliber pistol in his shoe and he threw it into the bushes when they saw the police on the street. Mr. Sparks denied there was a definite plan to do anything specific that night;

Page 1 of 2

Exhibit III-U

1377

5)  Mr. Sparks admitted he and Christopher Lewis approached Mr. Bagley outside Mickey's convenience store. The plan was to talk people into giving them a ride, then rob them by taking their money and their ATM cards. Mr. Sparks admitted at the time he did not know about the limit on taking money out of ATMs. There was no plan to kill anyone at the time Mr. Sparks got into the car with the Bagleys, Mr. Vialva, and Mr. Lewis. Mr. Sparks was in the Bagleys' car with Vialva and Lewis from the time they encountered the Bagleys at Mickey's until Sparks was dropped off at his house. Mr. Sparks said when he left the car, no definite decision had been made about what to do with the Bagleys. There had been discussion about how to get rid of the car, but no decision had been made to kill the Bagleys at the time he got out of the car and went into his house. Mr. Sparks took the Bagleys' jewelry with him when he left the car;

6)  Mr. Sparks was in the Bagleys' car when Terry Brown pointed the gun at the back seat and offered to kill the Bagleys. Mr. Sparks confirmed Christopher Vialva told Brown not to shoot;

7)  At the end of the interview, Mr. Sparks told us there was a lawyer representing him. He said he thought the lawyer's name was "Charles Banker or Charles Baker", but could not remember the city where he practiced or his telephone number. Miss Otto asked Mr. Sparks what the lawyer was representing him in and Mr. Sparks said he wasn't sure, but the lawyer was "trying to get me out up from under this." Mr. Sparks declined our request for a subsequent interview.

Ranada Gentry

Subscribed and sworn to before me this _18_ day of May, 2004.

Notary Public

My Commission Number is _990/2577_

My Commission Expires: _9/13/07_

Page 2 of 2

1379



| WHAT THE DEFENSE KNEW | | | WHAT THE PROSECUTION FAILED TO DISCLOSE | | |
|---|---|---|---|---|---|
| **Date** | **Substance of Information** | **Source** | **Date** | **Substance of Information** | **Source** |
| 6/22/99 1:50 a.m. | SA Meraz Interviewed Terry Brown, defense given copy of advice of rights form.  Agent activity log reflects that a statement was taken at this time. | Ex. III-E | 6/22/99 1:50 a.m. | No statement dated on 6/22/99 at 1:50 a.m. was disclosed to the defense. | Ex. III-E |
| 6/22/99, 5:55 a.m. | Confiscated Terry Brown's clothes | Ex. III-E | | | |
| 6/22/99, 5:42 a.m. | Sworn statement of Terry Brown which was false in all material respects.  Defense has this statement. | Ex. III-D | | | |
| 6/22/99 | Sworn statement of Christopher Lewis.  Defense has the statement and final CID report indicates that Lewis is not being truthful and directs that no further statements be taken. | Ex. III-H | 6/22/99 | Inference is that on 6/22/99 the government knew Lewis was not being truthful.  Defense not given any information about how the government comes to that conclusion.  Lewis' trial testimony is materially different from the sworn statement and there is no information about further government contact with Mr. Lewis or how that change in testimony evolved. | |
| 6/22/99 11:45 a.m. to 4:00 p.m. | Interrogation of Terry Brown by SA Chadwick and Agent Nelson | Ex. III-F | | | |
| 6/22/99 4:30 p.m. | Terry Brown signs another statement and defense has a copy of this statement. | Ex. III-G | | | |
| 6/22/99 7:10 p.m. | SA Nelson re:interviews Terry Brown, notes he has not been totally honest. | Ex. III-F | | | |

1

Exhibit III-V

1380

| WHAT THE DEFENSE KNEW | | | WHAT THE PROSECUTION FAILED TO DISCLOSE | | |
|---|---|---|---|---|---|
| Date | Substance of Information | Source | Date | Substance of Information | Source |
| 6/22/99 10:00 p.m. | Direction that no further written statements be taken from Mr. Brown | Ex. III-H | | | |
| 6/22/99 un-specified time | SA Chadwick interviews Brandon Bernard. No evidence that sworn statement was taken, but one-page handwritten notes from an interview with Brandon Bernard. | Ex. III-H | 6/22/99 un-specified time | No FBI Form FD-302 by SA Chadwick documenting this contact with Brandon Bernard. | Ex. III-H |
| 6/22/99 7:07 a.m. (9:05) | Game Warden Volk states blood spatter on roadway. | Ex. III-J | | | |
| 6/22/99 4:45 p.m. | Game Warden Volk interviewed by Agent Meraz and says he sees blood on Vialva's shoes. | Ex. III-J | | | |
| 6/28/99 | Mr. Sparks interviewed by Ranger Aycock and ATF Agent Meyer. Mr. Sparks does not sign a statement, but it is reported that he denied knowledge of events. | Ex. III-J | | Statements of Mr. Sparks taken at his guilty plea and later in 2004 indicate that, he does know about the events, and his understanding of events contradicts that of Lewis and/or Brown. | |
| | | | 7/9/99 | Government Brief in Support of Mot. to Transfer Delinquency Proceedings of Mr. Brown to Criminal Prosecution. Government makes admissions regarding jurisdiction. Filed under seal and not given to defense. | |
| 7/26/99 | Debriefing Mr. Brown by Agents Bair, Chadwick and Meyer and Aycock with Attorney Swanton present. Summary of interview is presented but no written statement taken. | Ex. III-H | | | |

2

1381

| WHAT THE DEFENSE KNEW | | | WHAT THE PROSECUTION FAILED TO DISCLOSE | | |
|---|---|---|---|---|---|
| Date | Substance of Information | Source | Date | Substance of Information | Source |
| | | | 7/30/99 | Comprehensive Evaluation of Terry Brown in which Mr. Brown admits a variety of acts of misconduct. | Ex. III-P |
| | | | 11/5/99 | Debriefing of Brown by Agents Chadwick and Meyer in presence of Attorney Swanton. Mr. Swanton's notes reflect materially different statements made about sequence of events of the crime. Admits serious acts of prior violence. Contradicts trial testimony of Brown and Sing. | Ex. III-L |
| 12/6/99 | Guilty plea of Brown. Factual basis for guilty plea differs from substance of 11/5/99 interview. | | | | |
| 2/25/00 | Brandon Bernard's Motion for Continuance documenting proffer discussions between Bernard and the government. | | | | |
| | | | 3/15/00 | Agents interview Mr. Brown in jail. | Ex. III-N |
| 4/17/00 | Guilty pleas of Sparks. Statements contradict statements of other defendants. | | | In light of subsequent interviews, the guilty plea statements elicited by Mr. Sparks's attorney are materially misleading regarding the events of the crime. | |
| | | | 5/9/00 | Agent San Marco interviews Mr. Brown in jail. | Ex. III-O |
| 5/25/00 | Mr. Brown testifies at the guilt innocence phase of the trial. | | | | |
| 6/8/00 | Mr. Brown testifies at penalty phase of the trial. | | | | |

| WHAT THE DEFENSE KNEW | | | WHAT THE PROSECUTION FAILED TO DISCLOSE | | |
|---|---|---|---|---|---|
| Date | Substance of Information | Source | Date | Substance of Information | Source |
| | | | 11/20/00 | Presentence investigation report on Mr. Brown which details arrest record and drug use. | Ex. III-Q |
| | | | 3/21/01 | Sentencing Proceeding Christopher Lewis, reflects a sentencing guideline based on a Criminal History Category II, a much higher category than the criminal history to which he admits at trial would indicate. The implication is that the government must have had information regarding a prior, more serious, criminal history than was communicated to the defense before trial. | |
| | | | 4/29/04 | *Declaration of Terry Brown. Statements regarding drug usage* | |

4

1383

1384

Westlaw.

Page 1

Slip Copy
(Cite as: 2004 WL 1114455 (5th Cir.(Tex.)))

Only the Westlaw citation is currently available.

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Fifth Circuit Rule 47.5.4. (FIND CTA5 Rule 47.)

United States Court of Appeals, Fifth Circuit.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,
v.
Leyumba WEBB, Defendant-Appellant.

No. 03-50978.

May 13, 2004.

Appeal from the United States District Court for the Western District of Texas. USDC No. A-02-CR-301-ALL.

Before JOLLY, WIENER, and PICKERING, Circuit Judges.

Summary Calendar

PER CURIAM. [FN*]

FN* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

*1 Leyumba Webb ("Webb") appeals his jury trial conviction for possession with intent to distribute crack cocaine. Webb argues that the evidence was insufficient to support his conviction and that his trial counsel was ineffective for failing to present evidence of standing at the hearing on his motion to suppress.

As Webb moved for a judgment of acquittal at the close of the Government's case and at the close of the evidence, the standard of review in assessing his sufficiency challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence presented at trial was sufficient for the jury to reasonably infer that Webb exercised control or dominion over the trailer in which the crack cocaine was found. *See United States v. De Leon*, 170 F.3d 494, 497 (5th Cir.1999). The evidence, taken as a whole, was also sufficient to raise a reasonable inference that Webb knew of and had access to the crack cocaine. *See United States v. Onick*, 889 F.2d 1425, 1430 (5th Cir.1990); *United States v. Smith*, 930 F.2d 1081, 1086 (5th Cir.1991); *see also De Leon*, 170 F.3d at 497 ("the sum of the evidence may be greater than the individual factors"). Accordingly, the evidence was sufficient to support Webb's conviction. *See United States v. Mergerson*, 4 F.3d 337, 349 (5th Cir.1993).

We generally do not resolve claims of ineffective assistance of counsel on direct appeal because the record is rarely sufficiently developed. *United States v. Haese*, 162 F.3d 359, 363 (5th Cir.1998). As Webb's counsel was not questioned under oath about his allegedly ineffective assistance and the district court did not make factual findings regarding the alleged ineffective assistance of counsel, the record is insufficient for us to consider Webb's claim on direct appeal. *See United States v. Kizzee*, 150 F.3d 497, 502-03 (5th Cir.1998). Accordingly, the judgment of conviction is AFFIRMED without prejudice to Webb's right to raise his ineffective assistance of counsel claim in a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. We express no view on the merits of such a motion.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Exhibit IV-A

Slip Copy
(Cite as: 2004 WL 1114455 (5th Cir.(Tex.)))

2004 WL 1114455 (5th Cir.(Tex.))

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1386

1382

## Chapter VI. REPRESENTATION IN FEDERAL DEATH PENALTY CASES AND IN FEDERAL CAPITAL HABEAS CORPUS PROCEEDINGS

## CONTENTS

**PAGE**

6.01   Appointment of Counsel in Capital Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6.02   Compensation of Appointed Counsel in Capital Cases . . . . . . . . . . . . . . . . . . 5

6.03   Authorization and Payment for Investigative, Expert and Other Services
   in Capital Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Exhibit IV-B

1388

CHAPTER VI.    REPRESENTATION IN FEDERAL DEATH PENALTY CASES AND IN FEDERAL CAPITAL HABEAS CORPUS PROCEEDINGS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, amended 21 U.S.C. § 848(q), in a manner that creates a two-tiered structure for the compensation of counsel and the approval and payment of persons providing investigative, expert, and other services in capital cases. The pertinent provisions of the AEDPA are applicable to capital cases commenced, and appellate proceedings in which an appeal is perfected, on or after the date of enactment of the AEDPA (April 24, 1996). Thus, this chapter retains guidelines applicable to cases that pre-date the AEDPA, and adds, where appropriate, new guidelines for cases subject to the AEDPA. Unless otherwise specified, provisions in this chapter apply to all capital cases.

NOTE REGARDING FEDERAL DEATH PENALTY CASES: Detailed recommendations concerning the appointment and compensation of counsel in federal death penalty cases were adopted by the Judicial Conference on September 15, 1998. Those recommendations, and accompanying commentary by the Defender Services Committee's Subcommittee on Federal Death Penalty Cases, are set forth in Appendix I to this volume. The complete report, entitled *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation*, is available on the judiciary's web site (www.uscourts.gov) or from the Defender Services Division of the AOUSC, 202-502-3030.

6.01    Appointment of Counsel in Capital Cases.

    A.    Number of Counsel.

        (1)    Federal Death Penalty Cases. As required by 18 U.S.C. § 3005, at the outset of every capital case, courts should appoint two counsel, at least one of whom is experienced in and knowledgeable about the defense of death penalty cases. Pursuant to 21 U.S.C. § 848(q)(4), if necessary for adequate representation, more than two attorneys may be appointed to represent a defendant in such a case. While courts should not appoint more than two lawyers unless exceptional circumstances and good cause are shown, appointed counsel may, with prior court authorization, use the services of attorneys who work in association with them, provided that the employment of such additional counsel (at a reduced hourly rate) diminishes the total cost of representation or is required to meet time limits.

        (2)    Habeas Corpus Proceedings. Pursuant to 21 U.S.C. § 848(q)(4), a financially eligible person seeking to vacate or set aside a death sentence in proceedings under 28 U.S.C. § 2254 or 2255 is entitled

1389

to appointment of one or more qualified attorneys. Due to the complex, demanding and protracted nature of death penalty proceedings, judicial officers should consider appointing at least two counsel.

The judicial officer may appoint an attorney, if qualified under paragraph 6.01 C, who is furnished by a state or local public defender organization or by a legal aid agency or other private, non-profit organization to represent a person charged with a capital crime or seeking federal death penalty habeas corpus relief. Such appointments may be in place of, or in addition to, the appointment of a federal defender organization or a CJA panel attorney or an attorney appointed *pro hac vice* in accordance with paragraph 2.01 D of the *CJA Guidelines*. Such appointments should be made when the court determines that they will provide the most effective representation. In making this determination, the court should take into consideration whether the attorney represented the person during prior state court proceedings.

B.    **Procedures for Appointment in Federal Death Penalty Cases**.

(1)    In appointing counsel in federal death penalty cases, the court shall consider the recommendation of the federal public defender, or, if no such organization exists in the district, of the Administrative Office of the United States Courts. In fulfilling this responsibility, the federal public defender organization or Administrative Office should consult with counsel (if counsel has already been appointed or retained) and the court regarding the facts and circumstances of the case to determine the qualifications which may be required to provide effective representation. In evaluating the qualifications of counsel considered for appointment, the federal public defender organization or Administrative Office should consider:

(a)    the minimum experience standards set forth in 21 U.S.C. § 848(q), 18 U.S.C. § 3005, and other applicable laws or rules;

(b)    the qualification standards endorsed by bar associations and other legal organizations regarding the quality of legal representation in capital cases;

2

1390

(c)   the recommendations of other federal public and community defender organizations, and local and national criminal defense organizations;

(d)   the proposed counsel's commitment to the defense of capital cases; and

(e)   the availability and willingness of proposed counsel to accept the appointment and to represent effectively the interests of the client.

Courts should ensure that all attorneys appointed in federal death penalty cases are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation. Ordinarily, "learned counsel" (see 18 U.S.C. § 3005) should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals or post-conviction review that, in combination with co-counsel, will assure high-quality representation.

(2)    <u>Federal Death Penalty Cases: Special Considerations in the Appointment of Counsel on Appeal</u>. Ordinarily, the attorneys appointed to represent a death-sentenced federal appellant should include at least one attorney who did not represent the appellant at trial. In appointing counsel the court should, among other relevant factors, consider:

(a)  the attorney's experience in federal criminal appeals and capital appeals;

(b)  the general qualifications identified in paragraph 6.01 B(1); and

(c)  the attorney's willingness, unless relieved, to serve as counsel in any post-conviction proceedings that may follow the appeal.

(3)    <u>Federal Death Penalty Cases: Special Considerations in the Appointment of Counsel in Post-Conviction Proceedings</u>. In appointing post-conviction counsel in a case where the defendant is sentenced to death, courts should consider the attorney's experience in federal post-conviction proceedings and in capital post-conviction

3

1391

proceedings, as well as the general qualifications identified in paragraphs 6.01 B(1) and 6.01 C(2).

C.    Statutory Attorney Qualification Requirements.

(1)    Appointment of Counsel Prior to Judgment. Pursuant to 21 U.S.C. § 848(q)(5), at least one of the attorneys appointed must have been admitted to practice in the court in which the case will be prosecuted for not less than five years, and must have had not less than three years experience in the actual trial of felony prosecutions in that court. Pursuant to 18 U.S.C. § 3005, at least one of the attorneys appointed must be knowledgeable in the law applicable to capital cases.

(2)    Appointment of Counsel After Judgment. Pursuant to 21 U.S.C. § 848(q)(6), at least one of the attorneys appointed must have been admitted to practice in the court of appeals for not less than five years, and must have had not less than three years experience in the handling of appeals in felony cases in the court.

(3)    Attorney Qualification Waiver. Pursuant to 21 U.S.C. § 848(q)(7), the presiding judicial officer, for good cause, may appoint an attorney who may not qualify under 21 U.S.C. § 848(q)(5) or (q)(6), but who has the background, knowledge, and experience necessary to represent the defendant properly in a capital case, giving due consideration to the seriousness of the possible penalty and the unique and complex nature of the litigation.

D.    Continuity of Representation.

(1)    In the interest of justice and judicial and fiscal economy, unless precluded by a conflict of interest, presiding judicial officers are urged to continue the appointment of state post-conviction counsel, if qualified under paragraph 6.01 C, when the case enters the federal system.

(2)    Section 848(q)(8) of title 21, U.S.C., provides that, unless replaced by an attorney similarly qualified under paragraph 6.01 C pursuant to counsel's own motion or upon motion of the defendant, counsel shall represent the defendant in every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motion for a new trial, appeal, application for a writ of certiorari to the Supreme Court of the United States, all post-conviction

4

proceedings, applications for stays of execution, competency proceedings, proceedings for executive or other clemency, and other appropriate motions and proceedings.

6.02    Compensation of Appointed Counsel in Capital Cases.

A.    Inapplicability of CJA Hourly Rates and Compensation Maximums.

(1)    Hourly Rates. Pursuant to 21 U.S.C. § 848(q)(10)(A), **with respect to federal death penalty cases and federal capital habeas corpus proceedings commenced, and appellate proceedings in which an appeal is perfected, on or after April 24, 1996,** the presiding judicial officer shall set the hourly compensation rate for appointed counsel in an amount not to exceed $125 per hour for in-court and out-of-court time (unless raised by the Judicial Conference in accordance with section 848(q)(10)(A)).

**For capital cases commenced, and appellate proceedings in which an appeal was perfected, before April 24, 1996,** in accordance with 21 U.S.C. § 848(q)(10) prior to that provision's amendment by the Antiterrorism Act, an attorney appointed to represent a defendant charged with a federal capital crime or seeking to vacate or set aside a death sentence in a proceeding under section 2254 or 2255 of title 28, U.S.C., shall be compensated at a rate and in an amount determined exclusively by the presiding judicial officer to be reasonably necessary to obtain qualified counsel to represent the defendant, without regard to CJA hourly rates or compensation maximums.

(2)    Inapplicability of Compensation Maximums. There is neither a statutory case compensation maximum for appointed counsel nor provision for review and approval by the chief judge of the circuit of the case compensation amount in capital cases.

B.    Attorney Compensation Recommendation.

(1)    In the interest of justice and judicial and fiscal economy, and in furtherance of relevant statutory provisions regarding qualifications of counsel in capital cases (see paragraph 6.01 C), presiding judicial officers are urged to compensate counsel at a rate and in an amount sufficient to cover appointed counsel's general office overhead and to ensure adequate compensation for representation provided.

1393

In consideration of the potential for wide disparity in compensation paid to attorneys in federal death penalty cases and in federal capital habeas corpus proceedings, and for overburdening the Defender Services appropriation, it is recommended that presiding judicial officers limit the hourly rate for attorney compensation to between $75 and $125 per hour for in-court and out-of-court time. **With respect to federal death penalty cases and federal capital habeas corpus proceedings commenced, and appellate proceedings in which an appeal is perfected, on or after April 24, 1996,** the rate of compensation shall not exceed $125 per hour for in-court and out-of-court time (unless revised by the Judicial Conference in accordance with 21 U.S.C. § 848(q)(10)(A)).

(2)     If, following the appointment of counsel in a case in which a defendant was charged with an offense that may be punishable by death, it is determined that the death penalty will not be sought, the court may consider the question of the number of counsel needed and the rate of compensation needed for the duration of the proceeding. After considering whether the number of counsel initially appointed is necessary to ensure effective representation or to avoid disruption of the proceeding, the court may continue such appointments or make an appropriate reduction. After considering the need to compensate appointed counsel fairly, taking into account the commitment of time and resources appointed counsel has made and will continue to make, the court may continue to pay the rate previously approved or prospectively reduce such rate.

C.     <u>Interim Payments to Counsel</u>. It is urged that the court permit interim payment of compensation in capital cases. (See generally paragraph 2.30 B concerning interim payments to counsel in death penalty cases.)

D.     <u>Forms</u>. Claims for compensation and reimbursement of expenses for attorneys furnishing services in death penalty proceedings should be submitted on CJA Form 30, "Death Penalty Proceedings: Appointment of and Authority to Pay Court Appointed Counsel."

E.     <u>Review of Vouchers</u>. Absent extraordinary circumstances, judges should act upon panel attorney compensation claims within 30 days of submission.

F.     <u>Case Budgeting in Federal Capital Habeas Corpus Proceedings and Federal Death Penalty Cases</u>. Courts are encouraged to require appointed counsel to submit a proposed initial litigation budget for court approval that will be subject to modification in light of facts and developments that emerge as the

1394

case proceeds.  Case budgets should be submitted *ex parte* and filed and maintained under seal.

(1)  The budget should serve purposes comparable to those of private retainer agreements by confirming both the court's and the attorney's expectations regarding fees and expenses.

(2)  Consideration should be given to employing an *ex parte* pretrial conference in order to facilitate reaching agreement on a litigation budget at the earliest opportunity.

(3)  The budget should be incorporated into a sealed initial pretrial order that reflects the understandings of the court and counsel regarding all matters affecting counsel compensation and reimbursement and payments for investigative, expert and other services, including but not limited to the following matters:

(a) The hourly rate at which counsel will be compensated (see paragraphs 6.02 A and B);

(b) In capital habeas corpus cases:  the best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) for the entire case (in its discretion, the court may determine that defense counsel should prepare budgets for shorter intervals of time);

(c) In federal death penalty cases:

    i.  Prior to prosecution decision to seek death penalty authorization: the best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the time that the Department of Justice determines whether to authorize the death penalty;

    ii.  After prosecution decision to seek death penalty authorization: the best preliminary estimate that can be made of the cost of all services (counsel, expert, investigative, and other) likely to be needed through the guilt and penalty phases of the trial  (in its discretion, the court may determine that defense counsel should prepare budgets for shorter intervals of time);

7

1395

iii.    <u>Death penalty not sought</u>:  as soon as practicable after a decision not to seek the death penalty, the number of appointed counsel and hourly rate of compensation should be reviewed in accordance with subparagraph 6.02 B(2);

(d)  Agreement that counsel will advise the court of significant changes (counsel, expert, investigative, and other) to the estimates contained in the order;

(e)  Agreement on a date on which a subsequent *ex parte* case budget pretrial conference will be held;

(f)  Procedure and schedules for submission, review, and payment of interim compensation vouchers (see paragraphs 6.02 C and E);

(g)  The form in which claims for compensation and reimbursement should be submitted (see paragraph 6.02 D) and the matters that those submissions should address; and

(h)  The authorization and payment for investigative, expert, and other services (see paragraph 6.03).

(4)    An approved budget should guide counsel's use of time and resources by indicating the services for which compensation is authorized. Case budgets should be re-evaluated when justified by changed or unexpected circumstances, and should be modified by the court where good cause is shown.

G.    <u>Case Management in Federal Capital Habeas Corpus Proceedings</u>. Judges are encouraged to employ the case-management techniques used in complex civil litigation to control costs in federal capital habeas corpus cases.

6.03    <u>Authorization and Payment for Investigative, Expert and Other Services in Capital Cases</u>.

A.    <u>In General</u>.  **With respect to federal death penalty cases and federal capital habeas corpus proceedings commenced, and appellate proceedings in which an appeal is perfected, on or after April 24, 1996,** upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, the court should authorize the defendant's attorneys to obtain such services. No *ex parte* request for

8

1396

investigative, expert, or other services in such cases may be considered unless, a proper showing is made by counsel concerning the need for confidentiality.

**For capital cases commenced, and appellate proceedings in which an appeal was perfected, before April 24, 1996,** in accordance with 21 U.S.C. § 848(q)(9) prior to that provision's amendment by the AEDPA, upon a finding in *ex parte* proceedings that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or sentence, the presiding judicial officer shall authorize the defendant's counsel to obtain such services on behalf of the defendant.

For all capital cases, upon a finding that timely procurement of necessary investigative, expert or other services could not await prior authorization, the presiding judicial officer may authorize such services *nunc pro tunc* consistent with paragraph 3.02 B.

Except as otherwise specified in paragraph 6.03, the provisions set forth in Chapter III are applicable to the authorization and payment for investigative, expert, and other services in capital cases.

B.     <u>AEDPA Limitation: Inapplicability to Pre-AEDPA Cases</u>.  For all capital cases, the compensation maximum set forth in paragraph 3.02 A of these guidelines is inapplicable.

**With respect to federal death penalty cases and federal capital habeas corpus proceedings commenced, and appellate proceedings in which an appeal is perfected, on or after April 24, 1996,** pursuant to 21 U.S.C. § 848(q)(10)(B), the fees <u>and</u> expenses for investigative, expert, and other services are limited to $7,500 in any case unless payment in excess of that amount is certified by the court, or magistrate judge if the services were rendered in connection with a case disposed of entirely before such magistrate judge, as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess payment is approved by the chief judge of the circuit (or an active circuit judge to whom the chief judge has delegated this authority). The $7,500 limit applies to the total payments for investigative, expert, and other services in a case, not to each service individually.

Once payments for investigative, expert, and other services total $7,500, then additional payments must be approved by the chief judge of the circuit (or an active circuit judge to whom the chief judge has delegated this authority). Accordingly, the court shall monitor all payments for investigative, expert, and other services.

9

If it can be anticipated that the payments for investigative, expert, and other services will exceed the statutory maximum, advance approval should be obtained from the court and the chief judge of the circuit (or an active circuit judge to whom the chief judge has delegated this authority). See sample form, Appendix C. Rather than submitting multiple requests, where possible, courts should submit the expert, investigative and other services portion of the approved case budget (see paragraph 6.02 F) to the chief judge of the circuit (or his or her designee) for advance approval.

**For capital cases commenced, and appellate proceedings in which an appeal was perfected, before April 24, 1996,** in accordance with 21 U.S.C. § 848(q)(10) prior to that provision's amendment by the AEDPA, the presiding judicial officer shall set compensation for investigative, expert, and other services in an amount reasonably necessary to obtain such services, without regard to CJA or AEDPA maximum limitations.

C.    <u>Consulting Services in Federal Capital Habeas Corpus Cases and in Federal Death Penalty Cases</u>. Where necessary for adequate representation, subsection (e) of the CJA and 21 U.S.C. § 848(q)(9) authorize the reasonable employment and compensation of expert attorney consultants to provide "light consultation" services to appointed and *pro bono* lawyers in federal capital habeas corpus cases and in federal death penalty cases in such areas as records completion, determination of need to exhaust state remedies, identification of issues, review of draft pleadings and briefs, authorization process to seek the death penalty, etc. "Light consultation" services are those that a lawyer in private practice would typically seek from another lawyer who specializes in a particular field of law, as opposed to "heavy consultation" services, which include, but are not limited to, reviewing records, researching case-specific legal issues, drafting pleadings, investigating claims, and providing detailed case-specific advice to counsel, if such tasks take a substantial amount of time.

An expert attorney consultant shall not be paid an hourly rate exceeding that which an appointed counsel could be authorized to be paid.

Courts may wish to require that an appointed counsel who seeks to have the court authorize the services of an expert attorney consultant confer with the federal defender, or the Administrative Office's Defender Services Division if there is no federal defender in the district or if the federal defender has a conflict of interest, regarding who could serve as an expert attorney consultant.

D.    <u>Interim Payments to Persons Providing Investigative, Expert and Other Services</u>. It is urged that the court or magistrate judge permit interim payment of compensation in capital cases.

10

With respect to federal death penalty cases and federal capital habeas corpus proceedings commenced, and appellate proceedings in which an appeal is perfected, on or after April 24, 1996, 21 U.S.C. § 848(q)(10)(B), as amended, provides a $7,500 payment maximum for the total cost of fees and expenses for investigative, expert, and other services. A special set of procedures for effecting interim payments, including a special memorandum order, must be used in these cases. These procedures and a sample memorandum order are set forth in Appendix F, beginning on page F-11. (See also the case budgeting techniques recommended in paragraph 6.02 F.) Other interim payment arrangements which effectuate a balance between the interest in relieving service providers of financial hardships and the practical application of the statutorily imposed responsibility of the chief judge of the circuit to provide a meaningful review of claims for excess payment may be devised in consultation with the Defender Services Division of the Administrative Office of the United States Courts.

For capital cases commenced, and appellate proceedings in which an appeal was perfected, before April 24, 1996, there are no expert services maximums. A separate set of procedures for effecting interim payments, including a separate memorandum order, must be used in those cases. These procedures and sample memorandum order are set forth in Appendix F, beginning on page F-7.

E.    Forms. Claims for compensation and reimbursement of expenses for investigative, expert or other services in death penalty proceedings should be submitted on CJA Form 31, "Death Penalty Proceedings: *Ex Parte* Request for Authorization and Voucher for Expert and Other Services."

F.    Review of Vouchers. Absent extraordinary circumstances, judges should act upon claims for compensation for investigative, expert, or other services within 30 days of submission.

1399

1400

trans 12   vol VII
append F   6/14/00

PROCEDURES FOR EFFECTING INTERIM PAYMENTS
TO PERSONS PROVIDING SERVICES PURSUANT TO
SUBSECTION (e) OF THE CRIMINAL
JUSTICE ACT (CJA), 18 U.S.C. § 3006A, and 21 U.S.C. § 848(q)(9) and (q)(10)(B)
**IN CAPITAL PROCEEDINGS FOR CASES COMMENCED, AND
APPELLATE PROCEEDINGS IN WHICH AN APPEAL IS PERFECTED,
<u>ON OR AFTER APRIL 24, 1996</u>**

1.   The district court issues a Memorandum Order to persons providing investigative, expert, and other services pursuant to 18 U.S.C. § 3006A(e) and 21 U.S.C. § 848(q)(9) and (q)(10)(B), outlining payment procedures and specifically addressing payment for actual expenses, travel, and compensation. (A Sample Memorandum Order appears on page F-13.)

2.   If excess payment (*i.e.*, more than $7,500 for all such services in a case) is anticipated, written approval of the procedure must be obtained from the chief judge of the circuit or his or her delegate prior to issuance of the Memorandum Order. See sample form, Appendix C. If excess payment was not anticipated, but becomes apparent during the provision of services, approval must be obtained at that point.

3.   Once it is issued, a copy of the Memorandum Order should be furnished to the court's CJA Claims coordinator.

4.   The CJA Form 31 should be submitted for each service provider with full documentation of all expenses claimed on the voucher.

5.   Assign a number to each voucher processed for payment.

6.   Item 17 of the CJA Form 31 must be completed to indicate the time period covered by the voucher and whether it is for the final payment or for an interim payment.

7.   If the court has selected OPTION A of the Sample Memorandum Order, the final voucher should:

     a)  set forth in detail the time and expenses claimed for the entire case;
     b)  reflect all compensation and reimbursement previously received;
     c)  show the net amount remaining to be paid; and
     d)  be approved by the chief judge of the circuit or his or her delegate if the total claim for the case is in excess of the statutory limit.

Exhibit IV-C

1401

8.   If the court has selected OPTION B of the Sample Memorandum Order and established intervals for the submission of cumulative vouchers for the balance of amounts withheld from the interim vouchers, each cumulative voucher should:

a) be labeled "CUMULATIVE VOUCHER";
b) set forth in detail the time and expenses claimed for the pre-established time interval;
c) reflect all compensation and reimbursement previously received during the pre-established time interval;
d) show the net amount remaining to be paid; and
e) be approved by the chief judge of the circuit or his or her delegate.

F-11

1402

SAMPLE

**(To be used in capital proceedings for cases commenced, and appellate proceedings in which an appeal is perfected, <u>on or after</u> April 24, 1996)**

Memorandum to All Persons Providing Services Pursuant to Subsection (e) of the Criminal Justice Act (CJA), 18 U.S.C. §3006A, and 21 U.S.C. § 848(q)(9) and (q)(10)(B), in the Case of

_____

Name

_____

Number

RE:    Interim Payments for Services Other Than Counsel

Because of the expected length of the proceedings in this [federal capital prosecution] [federal capital habeas corpus case], and the anticipated hardship on persons providing services pursuant to 18 U.S.C. § 3006A(e) and 21 U.S.C. § 848(q)(9) and (q)(10)(B) for such a period without payment, in accordance with paragraph 6.03 D of the *Guidelines for the Administration of the Criminal Justice Act and Related Statutes (CJA Guidelines)*, Volume VII, *Guide to Judiciary Policies and Procedures*, the following procedures for interim payments shall apply during the period of time in which you provide services in connection with this case.

1. <u>Submission of Vouchers</u>

Persons providing services under 18 U.S.C. § 3006A(e) and 21 U.S.C. § 848(q)(9) and (q)(10)(B) shall submit to the court clerk, twice each month, an interim CJA Form 31, "Authorization and Voucher for Expert and Other Services."    Compensation earned and reimbursable expenses incurred from the first to the fifteenth days of each month shall be claimed on an interim voucher submitted no later than the twentieth day of each month, or the first business day thereafter. Compensation earned and reimbursable expenses incurred from the sixteenth to the last day of each month shall be claimed on an interim voucher submitted no later than the fifth day of the following month, or the first business day thereafter. The first interim voucher submitted shall reflect all compensation claimed and reimbursable expenses incurred from the date on which your services were first retained to _____, and shall be submitted no later than _____; thereafter, the vouchers shall be submitted twice each month according to the schedule outlined above. Claimants shall complete Item 17 of each interim voucher submitted. Each interim voucher shall be assigned a number when processed for payment. Interim vouchers shall be submitted in accordance with this schedule even though little or no compensation or expenses are claimed for the respective period. All interim vouchers shall be supported by detailed and itemized time and expense statements. Chapter VI and the applicable provisions of Chapter III of the *CJA Guidelines* outline the procedures and rules for claims by persons providing services pursuant to

1403

trans 12   vol VII
append F   6/14/00

18 U.S.C. § 3006A(e) and 21 U.S.C. § 848(q)(9) and (q)(10)(B), and should be followed regarding each voucher.

I will review the interim vouchers when submitted, particularly with regard to the amount of time claimed, and will authorize compensation to be paid for two-thirds of the approved number of hours. This compensation will be determined by multiplying two-thirds of the approved number of hours by the applicable rate. I will also authorize for payment all reimbursable expenses reasonably incurred.

[Select OPTION A or B]

## OPTION A

At the conclusion of the period during which you provide services in this case, you shall submit a final voucher seeking payment of the one-third balance withheld from the earlier interim vouchers, as well as payment for services rendered during the final interim period. The final voucher shall set forth in detail the time and expenses claimed for the entire case, including all appropriate documentation. A statement should be attached to the voucher which reflects all compensation and reimbursement previously received, as well as the net amount remaining to be paid at the conclusion of the case. After reviewing the final voucher, the court, or magistrate judge if the services were rendered in connection with a case disposed of entirely before the magistrate judge, will submit it to the chief judge of the circuit, or his or her delegate, for review and approval. The court or magistrate judge will certify that the total payment amount is necessary to provide fair compensation for services of an unusual character or duration. If the total payment for a service provider does not exceed $7,500, and if it is anticipated that the combined payments for all providers of investigative, expert, and other services will not exceed $7,500, then I will approve the final voucher.

## OPTION B

Every _____ months, counting from the submission date for the first interim voucher, until the conclusion of the services, claimants shall submit a cumulative interim voucher seeking payment of the outstanding one-third balance withheld from all earlier interim compensation paid out during the preceding _____-month interval, as well as payment for services rendered during the last interim period of the interval. The cumulative interim voucher shall be labeled as such and shall set forth in detail the time and expenses claimed for the entire interval, including all appropriate documentation. A statement shall be attached to the cumulative interim voucher, which reflects all compensation and reimbursement previously received, as well as the net amount remaining to be paid at the end of the interval. At the conclusion of the period during which you provide services in this case, you shall submit a final cumulative voucher seeking payment of the one-third balance withheld from the interim vouchers processed during the final interval, as well as payment for services rendered during the last interim period of the interval. After reviewing the cumulative interim voucher, the court, or magistrate judge if the services were rendered in connection with a

F-13

trans 12  vol VII
append F  6/14/00

case disposed of entirely before the magistrate judge, will submit it to the chief judge of the circuit, or his or her delegate, for review and approval. The court or magistrate judge will certify that the total payment amount is necessary to provide fair compensation for services of an unusual character or duration. If the total payment for a service provider does not exceed $7,500, and if it is anticipated that the combined payments for all providers of investigative, expert, and other services will not exceed $7,500, then I will approve the final cumulative voucher seeking payment of the one-third balance withheld from the interim vouchers processed during the final interval, as well as payment for services rendered during the last interim period of the interval.

### 2. Reimbursable Expenses

Persons providing services pursuant to 18 U.S.C. § 3006A(e) and 21 U.S.C. § 848(q)(9) and (q)(10)(B), may be reimbursed for out-of-pocket expenses reasonably incurred incident to the rendering of services.

The following guidelines may be helpful:

a. Case related travel by privately owned automobile should be claimed at the rate of ____ cents per mile, plus parking fees, ferry fares, and bridge, road and tunnel tolls. Transportation other than by privately owned automobile should be claimed on an actual expense basis. Air travel in "first class" is prohibited. For service providers requiring air travel, counsel are encouraged to contact the clerk for authorization to travel at government rates.

b. Actual expenses incurred for meals and lodging while traveling outside of the city/county of _____ in the course of this representation must conform to the prevailing limitations placed upon travel and subsistence expenses for federal judiciary employees in accordance with existing government travel regulations. For specific details concerning high cost areas, counsel should consult the clerk.

c. Telephone toll calls, telegrams, photocopying, and photographs can all be reimbursable expenses if reasonably incurred. However, general office overhead, such as rent, secretarial help, and telephone service, is not a reimbursable expense, nor are items of a personal nature. In addition, expenses for service of subpoenas on fact witnesses are not reimbursable, but rather are governed by Rule 17, F.R.Cr.P. and 28 U.S.C. §1825.

### 3. Further questions or guidance

Answers to questions concerning services provided pursuant to 18 U.S.C. § 3006A and 21 U.S.C. § 848(q), as amended, can generally be found in (1) these statutes; (2) the Plan of the United States District Court for the _____ District of _____, available through the clerk; and (3) the *CJA Guidelines*, published by the Administrative Office of the U.S.

F-14

trans 12  vol VII
append F  6/14/00

Courts, also available through the clerk.  Should these references fail to provide the desired clarification or direction, counsel should address their inquiry directly to me or my staff.

_____
United States District Judge

_____
Date

Approved:

_____        _____
Date                  Chief Judge of the United
                      States Court of Appeals for the
                      _____ Circuit

F-15

1406

1407

*EXHIBIT IV-D*

*REDACTED*

*BASED ON EXTANT SEALING ORDER*

1409



Exhibit IV-E
Page 1

**Days to Trial**

Days

0 — 200 — 400 — 600 — 800 — 1000 — 1200

Trial Result: Death row (repeated for each bar)

> Mr. Vialva was allotted less time than half of those defendants convicted and on death row.



Exhibit IV-E
Page 2



Exhibit IV-E
Page 3

**Number of Days to Trial**

**Days**

**Trial Result**

Mr. Vialva

Mr. Vialva was allotted vastly less time to prepare for trial than those Federal capital defendants who received acquittals.



Exhibit IV-E
Page 4

# PREPARATION TIME PERMITTED DEFENSE COUNSEL IN AUTHORIZED CAPITAL PROSECUTIONS

| Def Name | D Ct Docket # | Status of Case | Date Init | Date of DP | Trial Date |
|---|---|---|---|---|---|
| Cooper, Alex | N.D. IL CR No. 89-CR- | Non-death verdict | 10/25/89 | 5/10/90 | 2/1/91 |
| Davis, Darnell Anth | N.D. IL CR No. 89-CR- | Non-death verdict | 10/25/89 | 5/10/90 | 9/4/91 |
| Chandler, David Ro | N.D. AL CR No. 90-C | Clemency | 12/13/90 | 1/29/91 | 3/12/91 |
| Pitera, Thomas | E.D. NY CR No. 90-04 | Non-death verdict | 6/1/90 | 2/8/91 | 5/7/92 |
| Pretlow, Bilal | D. NJ CR No. 90-CR-2 | Killed or died after author | 7/27/90 | 6/17/91 | 11/12/91 |
| Mathis, Ronald Eug | M.D. FL CR No. 91-30 | Authorization withdrawn | 10/1/91 | 4/22/92 | 2/2/94 |
| Villarreal, Reynaldo | E.D. TX CR No. 9:91- | Non-death verdict | 4/18/91 | 4/23/91 | 6/24/91 |
| Villarreal, Baldemar | E.D. TX CR No. 9:91- | Non-death verdict | 4/18/91 | 4/23/91 | 6/24/91 |
| Zambrano, Jesus | E.D. TX CR No. 9:91- | Guilty plea | 4/18/91 | 4/23/91 | 6/24/91 |
| Brown, Oliver | E.D. LA CR No. 92-46 | Authorization withdrawn | | | |
| Brown, Reginald | E.D. MI CR No. 92-81 | Acquittal/Innocent | 12/8/92 | 8/11/93 | 3/2/95 |
| Brown, Terrance | E.D. MI CR No. 92-81 | Killed or died after author | 6/22/93 | | |
| Carrington, Arleigh | M.D. GA CR No. 92-8 | Authorization withdrawn | 10/28/92 | 1/20/93 | |
| Chatfield, Tony | M.D. GA CR No. 92-8 | Authorization withdrawn | 10/28/92 | 1/20/93 | |
| Culbert, Stacy | E.D. MI CR No. 92-81 | Guilty plea | 12/8/92 | 7/22/94 | 9/5/95 |
| Goldston, Anthony | D. DC CR No. 92-CR-2 | Authorization withdrawn | 7/28/92 | | 4/13/94 |

Exhibit IV-E

page 5

5/14/2004

| Green, William | E.D. LA CR No. 92-46 | Authorization withdrawn | | | |
|---|---|---|---|---|---|
| Harris, Mario | D. DC CR No. 92-CR-2 | Authorization withdrawn | 7/28/92 | | 4/13/94 |
| Hoyle, Mark | D. DC CR No. 92-CR-2 | Authorization withdrawn | 7/28/92 | | 4/13/94 |
| Hutching, James No | E.D. OK CR No. 1:92-0 | Non-death verdict | 8/12/92 | 9/11/92 | 1/26/93 |
| Johnson, Corey | E.D. VA CR No. 3-92- | Death row | 4/28/92 | 5/1/92 | 1/11/93 |
| Johnson, Darryl | W.D. NY CR No. 92-1 | Guilty plea | 7/8/92 | 7/29/93 | 1/3/95 |
| McCollough, John | D. DC CR No. 92-CR-2 | Authorization withdrawn | 7/28/92 | | 4/13/94 |
| McCullah, John Javi | E.D. OK CR No. 1:92-0 | Death sentence vac. - aut | 8/12/92 | 9/11/92 | 1/26/93 |
| Molina, Ramon Med | E.D. OK CR No. 1:92-0 | Non-death verdict | 8/12/92 | 9/11/92 | 1/26/93 |
| Murray, Michael | M.D. PA CR No. 92-2 | Authorization withdrawn | 8/11/92 | 8/27/93 | 7/30/95 |
| O'Bryant, Lonnie | E.D. MI CR No. 92-81 | Guilty plea | 12/8/92 | 8/11/93 | 3/1/95 |
| Perry, Wayne Anth | D. DC CR No. 92-474 | Guilty plea | 12/15/92 | 6/8/93 | 4/5/94 |
| Roane, James | E.D. VA CR No. 3-92- | Death row | 4/28/92 | 5/1/92 | 1/11/93 |
| Thomas, Vernon | E.D. VA CR No. 3-92- | Authorization withdrawn | 4/28/92 | 10/28/92 | 3/1/93 |
| Tipton, Richard | E.D. VA CR No. 3-92- | Death row | 4/28/92 | 5/1/92 | 1/11/93 |
| Williams, George Tr | M.D. GA CR No. 1:92- | Dismissal after notice by | 5/16/92 | 5/27/92 | 2/1/94 |
| Williams, Michael | E.D. MI CR No. 92-81 | Guilty plea | 12/8/92 | 8/11/93 | 6/1/95 |
| Wilkes, Charles | E.D. MI CR No. 92-81 | Guilty plea | 12/8/92 | 5/19/94 | 6/1/95 |
| Crummie, Chedrick | S.D. FL CR No. 93-252 | Acquittal/Innocent | 6/2/93 | 1/5/94 | 9/18/95 |
| | S.D. TX CR No. | | | | |

Exhibit IV-E

page 6

5/14/2004

| | | | | | |
|---|---|---|---|---|---|
| Garza, Juan Raul | 93-00 | Executed | 1/5/93 | 1/7/93 | 7/6/93 |
| Henry, Arnold Mark | E.D. VA CR No. 93-C | Non-death verdict | 9/24/93 | 11/22/93 | 1/18/94 |
| Mack, Edward Alexa | S.D. FL CR No. 93-252 | Acquittal/Innocent | 6/2/93 | 1/5/94 | 9/18/95 |
| Moore, Todd | E.D. VA CR No. 2:93C | Non-death verdict | 12/8/93 | 3/9/94 | 6/14/94 |
| Oscar, Frantz | E.D. VA CR No. 93-C | Non-death verdict | 9/24/93 | 11/22/93 | 1/18/94 |
| Oscar, Jean Claude | E.D. VA CR No. 93-C | Non-death verdict | 9/24/93 | 11/22/93 | 1/18/94 |
| Rozier, Kevin Denar | S.D. FL CR No. 93-252 | Acquittal/Innocent | 6/2/93 | 1/5/94 | 9/18/95 |
| Chanthadara, Bount | D. KS CR No. 94-1012 | Death sentence vac. - aut | 1/5/95 | 6/2/95 | 9/10/96 |
| Davis, Len | E.D. LA CR No. 94-38 | Awaiting retrial | 1/17/95 | 10/6/95 | 4/8/96 |
| Diaz, Walter | N.D. NY CR No. 94-C | Non-death verdict | 9/19/94 | 5/31/95 | 10/16/95 |
| Hall, Orlando C. | N.D. TX CR No. 4:94- | Death row | 11/22/94 | 2/23/95 | 10/2/95 |
| Hardy, Paul | E.D. LA CR No. 94-38 | Awaiting retrial | 12/13/94 | 10/6/95 | 4/8/96 |
| McCauley, Donzell | D. DC CR No. 94-121 | Guilty plea | 3/29/94 | 3/24/95 | 9/11/95 |
| Moore, Dennis B., S | W.D. MO CR No. 94-0 | Non-death verdict | 5/25/95 | 8/22/95 | 9/24/96 |
| Nguyen, Phouc H. | D. KS CR No. 94-1012 | Non-death verdict | 1/5/95 | 6/2/95 | 10/22/96 |
| Tidwell, Tyrone | E.D. PA CR No. 94-35 | Authorization withdrawn | 9/1/94 | 2/5/96 | 11/18/96 |
| Vest, James | W.D. MO CR No. 94-0 | Guilty plea | 4/12/94 | 10/28/94 | 1/8/96 |
| Vest, Mark | W.D. MO CR No. 94-0 | Guilty plea | 4/12/94 | 10/28/94 | 1/8/96 |
| Vest, Steven | W.D. MO CR No. 94-0 | Guilty plea | 4/12/94 | 10/28/94 | 1/8/96 |
| Walker, Tyrone | N.D. NY CR No. 94-C | Non-death verdict | 9/19/94 | 5/31/95 | 10/16/95 |

| | | | | | |
|---|---|---|---|---|---|
| Webster, Bruce | N.D. TX CR No. 4:94- | Death row | 11/22/94 | 2/23/95 | 6/4/96 |
| Wyrick, Kevin | W.D. MO CR No. 94-0 | Authorization withdrawn | 5/25/95 | 8/22/95 | 9/24/96 |
| Acosta, John Lefty | D. NM CR No. 95-538- | Authorization withdrawn | 10/18/95 | 6/21/96 | 4/14/97 |
| Battle, Anthony | N.D. GA CR No. 1:95 | Death row | 11/21/95 | 7/26/96 | 2/21/97 |
| Bonds, Andre | E.D. MO CR No. 4:95 | Guilty plea | 10/19/95 | 2/9/96 | 10/7/96 |
| Chen, Fu Xin | E.D. NY CR No. 95 08 | Guilty plea | 9/28/95 | 7/9/96 | 2/21/97 |
| Chen, Jia Wu | E.D. NY CR No. 95 08 | Guilty plea | 9/28/95 | 7/9/96 | 2/21/97 |
| Damon, Marvin | E.D. VA CR No. 3:95C | Guilty plea | 6/21/95 | 8/9/95 | 1/18/96 |
| DeLaTorree, Jason | D. NM CR No. 95-538- | Guilty plea | 10/18/95 | 6/21/96 | 7/6/99 |
| DesAnges, Omar | W.D. VA CR No. 95-0 | Authorization withdrawn | 4/25/95 | 10/2/95 | 4/15/96 |
| Fleming, Lamont | E.D. NC CR No. 4:95- | Guilty plea | 7/18/95 | 6/21/96 | 9/16/96 |
| Gist, Cory | E.D. NC CR No. 4:95- | Guilty plea | 7/18/95 | 6/21/96 | 9/16/96 |
| Haworth, Richard | D. NM CR No. 95-491 | Guilty plea | 9/7/95 | 2/14/96 | 3/17/97 |
| Jones, Louis | N.D. TX CR No. 6-95- | Death row | 3/7/95 | 9/13/95 | 10/16/95 |
| Martin, Roy Ray | N.D. TX CR No. 5-95- | Authorization withdrawn | 3/7/95 | 10/6/95 | 11/6/95 |
| Mazzini, Marcos | D. NM CR No. 95-538- | Guilty plea | 10/18/95 | 6/21/96 | |
| McVeigh, Timothy J | D. CO CR No. 96-CR-6 | Executed | 8/10/95 | 10/20/95 | 3/31/97 |
| Mungia, Eli Trevino | N.D. TX CR No. 5-95- | Authorization withdrawn | 3/7/95 | 10/6/95 | 11/6/95 |
| Mungia, Ricky River | N.D. TX CR No. 5-95- | Authorization withdrawn | 3/7/95 | 10/6/95 | 11/6/95 |

http://www.capdefnet.org/fdprc/contents/shared_files/docs/time.htm

Exhibit IV-E
page 8

5/14/2004



| | | | | | |
|---|---|---|---|---|---|
| Najar, Vincent | D. NM CR No. 95-538- | Guilty plea | 10/18/95 | 6/21/96 | |
| Nichols, Terry Lynn | D. CO CR No. 96-CR-6 | Non-death verdict | 8/10/95 | 10/20/95 | 9/29/97 |
| Peng, You Zhong | E.D. NY CR No. 95 08 | Authorization withdrawn | 9/28/95 | 7/19/96 | 3/17/97 |
| Spivey, Everett | D. NM CR No. 95-491 | Guilty plea | 9/7/95 | 2/14/96 | 3/17/97 |
| Williams, Robert Ru | E.D. VA CR No. 3:95C | Guilty plea | 6/21/95 | 8/9/95 | 1/18/96 |
| Beckford, Dean Ant | E.D. VA CR No. 3:95C | Non-death verdict | 6/7/96 | 10/1/96 | 6/9/97 |
| Beckford, Devon Da | E.D. VA CR No. 3:95C | Guilty plea | 6/7/96 | 9/19/97 | |
| Bennett, Daniel Ray | C.D. CA CR No. 96-11 | Guilty plea | 12/1/96 | 3/27/97 | 10/7/97 |
| Cable, Donald Thom | M.D. TN CR No. 3:96- | Guilty plea | 4/24/96 | 2/27/98 | 10/6/98 |
| Cazaco, Leonel | E.D. VA CR No. 3:95C | Non-death verdict | 6/7/96 | 10/1/96 | 6/9/97 |
| Clary, Moses | D. NJ CR No. 96-576 ( | Guilty plea | 9/25/96 | 10/29/97 | 9/12/98 |
| Cuff, John | S.D. NY CR No. 96 CR | Guilty plea | 7/15/96 | 12/11/97 | 3/23/99 |
| Dennis, Claude | E.D. VA CR No. 3:95C | Non-death verdict | 6/7/96 | 10/1/96 | 6/9/97 |
| Ferebee, Donald | D. MD CR No. 96-96-2 | Pending trial | 10/15/97 | 4/2/98 | 11/1/02 |
| Hammer, David Paul | M.D. PA CR No. 4-96- | Death row | 9/18/96 | 4/9/97 | 5/5/98 |
| Ingle, Trinity Edwar | W.D. AR CR No. 6:96 | Non-death verdict | 9/24/96 | 1/23/97 | 5/27/97 |
| Johnson, Darryl Ala | N.D. IL CR No. 96 CR | Death row | 6/19/96 | 10/1/96 | 10/23/97 |
| Jones, Anthony | D. MD CR No. WMN- | Non-death verdict | 12/11/96 | 3/20/97 | 4/6/98 |
| Kaczynski, Theodor | E.D. CA CR No. S-96- | Guilty plea | 10/1/96 | 5/15/97 | 11/12/97 |

| | | | | | |
|---|---|---|---|---|---|
| Montanez, Ian Rosa | D. PR CR No. 96-001 ( | Guilty plea | 1/3/96 | 1/21/97 | 1/1/98 |
| Ortiz-Velez, Felix | M.D. PA CR No. 3:CR | Guilty plea | 1/2/96 | 6/25/97 | 2/2/98 |
| Otero, Julio | M.D. PA CR No. 3:CR | Guilty plea | 1/2/96 | 6/25/97 | 2/2/98 |
| Paul, Jeffrey William | W.D. AR CR No. 6:96 | Death row | 9/24/96 | 1/23/97 | 6/17/97 |
| Ray, Quan | N.D. IL CR No. 96 CR | Non-death verdict | 6/19/96 | 10/1/96 | 9/12/97 |
| Stanley, Edward | C.D. CA CR No. 96-11 | Guilty plea | 12/1/96 | 3/27/97 | 10/7/97 |
| Storey, Gregory | D. KS CR No. 96-4001 | Guilty plea | 3/14/96 | 10/18/96 | 4/1/97 |
| Thomas, Richard | E.D. VA CR No. 3:95C | Non-death verdict | 6/7/96 | 10/1/96 | 6/9/97 |
| Walter, Abram | D. AK CR No. F96-02 | Guilty plea | 10/17/96 | 2/20/97 | |
| Allen, Billie Jerome | E.D. MO CR No. 4:97 | Death row | 4/17/97 | 8/1/97 | 2/9/98 |
| Barnette, Aquila Ma | W.D. NC CR No. 3:97 | Awaiting retrial | 2/4/97 | 7/15/97 | 1/12/98 |
| Bobbitt, LaFawn | E.D. VA CR No. 97 CR | Non-death verdict | 5/28/97 | 9/22/97 | 2/24/98 |
| Frank, Deric | S.D. NY CR No. 97 CR | Guilty plea | 4/3/97 | 11/18/97 | 6/9/98 |
| Garcia, Efraim | E.D. MI CR No. 97-80 | Dismissal after notice by j | 7/16/97 | 9/24/98 | 10/5/99 |
| Heatley, Clarence | S.D. NY CR No. 96 CR | Guilty plea | 7/15/96 | 12/11/97 | 2/24/99 |
| Holder, Norris G. | E.D. MO CR No. 4:97 | Death row | 4/17/97 | 8/1/97 | 2/9/98 |
| Holland, Charles | N.D. AL CR No. 96-B- | Guilty plea | 7/10/96 | 11/14/97 | 6/1/98 |
| Holley, Marvin Lee | N.D. AL CR No. 96-B- | Non-death verdict | 7/10/96 | 11/14/97 | 6/1/98 |
| Jones, Rashi | E.D. VA CR No. 97 CR | Non-death verdict | 7/23/97 | 9/22/97 | 2/24/98 |



| Name | Court/No. | Disposition | | | |
|---|---|---|---|---|---|
| Lam, Tanh Huu | E.D. CA CR No. S 97- | Guilty plea | 1/30/97 | 12/18/98 | |
| Reader, Arthur Charl | E.D. TX CR No. 5:97 C | Guilty plea | 9/10/97 | | 4/6/98 |
| Smith, Howard L. | E.D. VA CR No. 97-34 | Lesser included convictio | 8/1/97 | 10/3/97 | 2/16/98 |
| Wooldridge, Steven | W.D. AR CR No. 4:97 | Guilty plea | 9/24/97 | 1/5/98 | 8/3/98 |
| Black, Douglas | D. CO CR No. 98-CR-1 | Guilty plea | 5/7/98 | | 1/25/99 |
| Holloway, Tim | M.D. TN CR No. 3:96- | Guilty plea | 4/24/96 | 2/27/98 | 10/6/98 |
| Kauffman, Christop | S.D. IA CR No. 97 Wo | Guilty plea | 7/23/97 | | 2/2/98 |
| Llamas, Tamara | E.D. NC CR No. 7:97- | Guilty plea | 8/19/97 | 3/2/98 | 6/1/98 |
| McMahan, Jamie | S.D. IA CR No. 97 Wo | Guilty plea | 7/23/97 | | 2/2/98 |
| Pena, Richard | E.D. LA CR No. 97-CR | Guilty plea | 7/1/98 | 8/20/98 | 3/1/99 |
| Rausini, Walder Pier | N.D. CA CR No. 95-03 | Guilty plea | 3/6/97 | 3/1/99 | 3/20/00 |
| Riddle, Steven | D. CO CR No. 98-CR-1 | Guilty plea | 5/7/98 | | 1/25/99 |
| Wakefield, Jimmy Ra | E.D. NC CR No. 7:97- | Guilty plea | 8/19/97 | 3/2/98 | 6/1/98 |
| Gabrion, Marvin | W.D. MI CR No. 1:99- | Death row | 6/3/99 | 2/26/01 | 2/25/02 |
| Williams, Jerry | D. MD CR No. WMN | Authorization withdrawn | 2/21/97 | 3/21/97 | 11/16/98 |
| Colon-Miranda, An | D. PR CR No. 95-029 J | Dismissal after notice by | 6/4/97 | 11/7/97 | 11/20/97 |
| Martinez-Velez, Davi | D. PR CR No. 95-029 J | Dismissal after notice by | 6/4/97 | 11/7/97 | 11/20/97 |
| Rosario-Rodriguez, | D. PR CR No. 95-029 J | Dismissal after notice by | 6/4/97 | 11/7/97 | 11/20/97 |
| Johnson, Shaheem | E.D. VA CR No. 97-00 | Non-death verdict | 8/7/97 | 2/12/98 | 11/2/98 |
| Johnson, Raheem | E.D. VA CR No. 97-00 | Non-death verdict | 8/7/97 | 2/12/98 | 11/2/98 |

1420

| | | | | | |
|---|---|---|---|---|---|
| Kehoe, Chevy | E.D. AR CR No. LR-C | Non-death verdict | 12/12/97 | 3/20/98 | 3/2/99 |
| Lee, Daniel Louis | E.D. AR CR No. LR-C | Awaiting retrial | 12/12/97 | 3/20/98 | 3/2/99 |
| Abeln, Rick | S.D. IL CR No. 98-300 | Guilty plea | 5/26/98 | 7/24/98 | 7/20/99 |
| Westmoreland, Guy | S.D. IL CR No. 98-300 | Authorization withdrawn | 2/4/98 | 12/14/99 | 9/5/00 |
| Lewis, Deandre | S.D. IL CR No. 98 300 | Authorization withdrawn | 5/19/99 | 12/14/99 | 9/5/00 |
| Rollack, Peter | S.D. NY CR No. S4 97 | Guilty plea | 12/1/97 | 1/28/99 | 1/5/00 |
| Dean, Chris | D. VT CR No. 2:98M0 | Guilty plea | 6/18/98 | 1/15/99 | 3/1/00 |
| Santiago, Jose | S.D. NY CR No. 98-CR | Guilty plea | 4/1/98 | 2/4/00 | |
| Green, Roy | C.D. CA CR No. 98-33 | Pending trial | 4/2/98 | 12/10/98 | 6/20/00 |
| Chong, Richard Lee | D. HI CR No. 98-00416 | Guilty plea | 7/1/98 | 2/12/99 | 1/19/00 |
| Lane, Robert | D. MD CR No. L-98-73 | Guilty plea | 2/19/98 | 3/30/99 | 11/8/99 |
| O'Driscoll, Michael | M.D. PA CR No. 4:CR | Pending trial | 8/29/01 | 10/9/01 | 10/1/02 |
| McKelton, Antonio | E.D. MI CR No. 98-80 | Acquittal/Innocent | 4/9/98 | 8/31/98 | 3/15/99 |
| Stitt, Richard | E.D. VA CR No. 2:98C | Death row | 3/11/98 | 6/23/98 | 9/8/98 |
| Bullock, Joseph | E.D. VA CR No. 3:98C | Guilty plea | 5/7/98 | 7/6/98 | 3/2/99 |
| Valle-Lassalle, Victo | D. PR CR No. 97-284 ( | Guilty plea | 12/17/97 | 12/17/98 | 11/12/00 |
| Marrero, Jose Rodri | D. PR CR No. 97-284 ( | Authorization withdrawn | 12/17/97 | 12/4/98 | |
| Dhinsa, Gurmeet Sin | E.D. NY CR No. 97-67 | Non-death verdict | 7/21/97 | 9/25/98 | 1/4/99 |
| Glover, Cody | D. KS CR No. 98-1005 | Guilty plea | 6/23/98 | 11/2/98 | 5/5/99 |



| | | | | | |
|---|---|---|---|---|---|
| Locust, Jeremiah | W.D. NC CR No. 2:98 | Authorization withdrawn | 7/7/98 | 1/14/99 | 1/19/99 |
| Kee, Charles Michae | S.D. NY CR No. 98-CR | Guilty plea | 7/22/98 | 2/7/00 | 9/18/00 |
| Aiken, Ian Orville | S.D. FL CR No. 97-233 | Guilty plea | 7/1/98 | 4/1/99 | 9/5/00 |
| Peoples, Cornelius | W.D. MO CR No. 98- | Pending trial | 7/23/98 | 1/8/99 | 11/18/99 |
| Lightfoot, Xavier La | W.D. MO CR No. 98- | Pending trial | 7/23/98 | 1/8/99 | 11/18/99 |
| Burgett, James Harol | W.D. TN CR No. 98-2 | Guilty plea | 7/24/98 | 9/7/99 | 11/1/99 |
| Lawrence, Jonathan | N.D. FL CR No. 3:98C | Guilty plea | 7/23/98 | 12/8/98 | 4/5/99 |
| Rodgers, Jeremiah | N.D. FL CR No. 3:98C | Guilty plea | 7/23/98 | 12/8/98 | 4/5/99 |
| Gomez, Edsel Torres | D. PR CR No. 98-72 | Guilty plea | 4/21/98 | 10/26/98 | 5/7/00 |
| Al-'Owhali, Mohame | S.D. NY CR No. S6 98 | Non-death verdict | 10/7/98 | 6/26/00 | 1/5/01 |
| Brown, Ricky Lee | N.D. WV CR No. 1:98 | Dismissal after notice by j | 9/17/98 | 2/22/99 | 10/12/99 |
| Brown, Barbara M. | N.D. WV CR No. 1:98 | Dismissal after notice by j | 9/17/98 | 2/22/99 | 10/12/99 |
| Ables, Janette A. | N.D. WV CR No. 1:98 | Dismissal after notice by j | 9/17/98 | 2/22/99 | 10/12/99 |
| Finley, James A. | W.D. NC CR No. 4:98 | Non-death verdict | 9/16/98 | 12/4/98 | 4/7/99 |
| Gilbert, Kristin | D. MA CR No. 98-300 | Non-death verdict | 11/12/98 | 5/14/99 | 10/16/00 |
| Tello, Plutarco | W.D. MO CR No. 98- | Non-death verdict | 12/16/98 | 5/19/99 | 4/10/00 |
| Ortiz, Arboleda | W.D. MO CR No. 98- | Death row | 12/16/98 | 5/19/99 | 4/10/00 |
| Sinisterra, German | W.D. MO CR No. 98- | Death row | 12/16/98 | 4/28/99 | 4/10/00 |
| Pena-Gonzalez, Nich | D. PR CR No. 97-284 ( | Authorization withdrawn | 12/17/97 | 12/17/98 | |

| Name | Case No. | Status | | | |
|---|---|---|---|---|---|
| Bass, John | E.D. MI CR No. 97-80 | Pending trial | 8/19/97 | 2/17/01 | |
| Nieves-Alonso, Heri | D. PR CR No. 97-284 ( | Guilty plea | 12/17/97 | 12/17/98 | |
| Perez, Luis Gines | D. PR CR No. 98-164 ( | Authorization withdrawn | 8/5/98 | 4/1/99 | 1/22/01 |
| Perez, Ricardo Mele | D. PR CR No. 98-164 ( | Authorization withdrawn | 8/5/98 | 4/1/99 | 1/22/01 |
| Edelin, Tommy | D. DC CR No. 98-264 | Non-death verdict | 7/30/98 | 6/30/00 | 3/26/01 |
| Higgs, Dustin | D. MD CR No. PJM-9 | Death row | 12/21/98 | 10/22/99 | 9/26/00 |
| Haynes, Willis | D. MD CR No. PJM-9 | Non-death verdict | 12/21/98 | 10/22/99 | 4/18/00 |
| Clemente, Louis | M.D. FL CR No. 98-43 | Guilty plea | 2/16/99 | 8/11/99 | 3/6/00 |
| Woody, Charles | C.D. CA CR No. 99-84 | Guilty plea | 1/28/99 | 8/23/99 | 1/11/00 |
| Martinez, Mariano | C.D. CA CR No. 99-83 | Non-death verdict | 1/28/99 | 7/19/99 | 5/1/01 |
| Alejandro, Joel Rive | D. PR CR No. 99-044 ( | Pending trial | 2/23/99 | 1/24/00 | |
| Martinez, Hector Ac | D. PR CR No. 99-044 ( | Pending trial | 2/23/99 | 1/24/00 | |
| Lyon, Billy Joe | W.D. KY CR No. 4:99- | Non-death verdict | 4/21/99 | 8/23/99 | 5/19/01 |
| Stewart, Charles Lou | W.D. KY CR No. 4:99- | Dismissal after notice by | 6/7/00 | 7/6/01 | 9/4/01 |
| Cooper, Carl Derrick | D. DC CR No. 99-0266 | Guilty plea | 8/4/99 | 2/14/00 | 5/2/00 |
| Friend, Travis | E.D. VA CR No. 3:99C | Guilty plea | 7/20/99 | 10/1/99 | 7/10/00 |
| Friend, Eugene | E.D. VA CR No. 3:99C | Guilty plea | 7/20/99 | 10/1/99 | 4/25/00 |
| Stephens, Charles L | E.D. TX CR No. 2:99 C | Killed or died after author | 5/26/99 | 10/22/99 | 1/18/00 |
| Tatum, Kenneth A. | E.D. TX CR No. 2:99 C | Non-death verdict | 5/26/99 | 10/22/99 | 8/21/00 |

Exhibit IV-E
page 14

5/14/2004

1A23

| | | | | | |
|---|---|---|---|---|---|
| Smith, Daymon | E.D. TX CR No. 2:99 C | Non-death verdict | 5/26/99 | 10/22/99 | 5/1/00 |
| McIntosh, Richard | S.D. IL CR No. 99-400 | Pending trial | 11/3/00 | 10/30/01 | 2/1/03 |
| Knorr, Carl | S.D. IL CR No. 99-400 | Pending trial | 11/3/00 | 10/30/01 | 2/1/03 |
| Vialva, Christopher | W.D. TX CR No. W99 | Death row | 7/13/99 | 2/29/00 | 5/15/00 |
| Bernard, Brandon | W.D. TX CR No. W99 | Death row | 7/13/99 | 2/29/00 | 5/15/00 |
| Carpenter, Robert L. | W.D. TN CR No. 99-2 | Guilty plea | 6/22/99 | 1/5/00 | 4/1/00 |
| Carpenter, Antonio | W.D. TN CR No. 99-2 | Guilty plea | 6/22/99 | 1/5/00 | 4/1/00 |
| Kendall, Michael Ro | N.D. MS CR No. 3:99 | Guilty plea | 9/23/99 | 6/8/00 | 9/1/00 |
| Llera-Plaza, Carlos I | E.D. PA CR No. 98-36 | Pending trial | 5/6/99 | 7/23/01 | 4/1/02 |
| Rodriguez, Victor | E.D. PA CR No. 98-36 | Pending trial | 7/28/99 | 5/30/00 | 4/1/02 |
| Acosta, Wilfredo M | E.D. PA CR No. 98-36 | Pending trial | 7/28/99 | 5/30/00 | 4/1/02 |
| Stayner, Cary | E.D. CA CR No. CR-F- | Guilty plea | 8/5/99 | 2/10/00 | 3/22/01 |
| Furrow, Buford | C.D. CA CR No. 99-83 | Guilty plea | 8/19/99 | 2/18/00 | 11/14/00 |
| Garrett, Lemond | S.D. GA CR No. 4-99- | Non-death verdict | 7/15/99 | 1/14/00 | 8/16/00 |
| Mohamed, Khalfan | S.D. NY CR No. S6 98 | Non-death verdict | 12/16/98 | 6/26/00 | 1/5/01 |
| Castillo, Mario | C.D. CA CR No. 99-83 | Acquittal/Innocent | 1/28/99 | 3/9/01 | 5/1/01 |
| Jacobo, Gerardo | C.D. CA CR No. 99-83 | Acquittal/Innocent | 1/28/99 | 3/9/01 | 5/1/01 |
| Nelson, Keith D. | W.D. MO CR No. 99- | Death row | 10/21/99 | 3/20/00 | 11/13/01 |
| Wills, Christopher A | E.D. VA CR No. 99-00 | Non-death verdict | 11/3/99 | 12/28/99 | 9/4/01 |



| | | | | | |
|---|---|---|---|---|---|
| Sanders, Marcus | S.D. AL CR No. 98-00 | Non-death verdict | 4/30/98 | 3/27/00 | 7/10/00 |
| Thomas, Christophe | E.D. VA CR No. 99-47 | Lesser included convictio | 12/1/99 | 2/6/00 | 9/5/00 |
| Gray, Kevin | D. DC CR No. 1:00CR | Pending trial | 5/5/00 | 7/27/01 | 3/1/02 |
| Minerd, Joseph | W.D. PA CR No. 99-2 | Pending trial | 12/15/99 | 9/13/00 | 4/15/02 |
| Satcher, Steve | D. MD CR No. AW00 | Guilty plea | 3/8/00 | 11/27/00 | 1/4/02 |
| Moore, Rodney | D. DC CR No. 1:00CR | Pending trial | 5/5/00 | 7/27/01 | 3/1/02 |
| Johnson, Coleman | W.D. VA CR No. 3:00 | Non-death verdict | 5/16/00 | 10/23/00 | 5/8/01 |
| Garcia, Rico | N.D. CA CR No. 00-C | Pending trial | 1/12/00 | | 1/1/03 |
| Quinones, Alan | S.D. NY CR No. 00 CR | Pending trial | 7/20/00 | 10/26/01 | 9/3/02 |
| Rodriguez, Diego | S.D. NY CR No. 00 CR | Pending trial | 7/20/00 | 10/26/01 | 9/3/02 |
| Pham, Trung Thanh | E.D. CA CR No. 00-C | Pending trial | 8/24/00 | 4/11/01 | |
| Johnson, Angela | N.D. IA CR No. 00 CR | Pending trial | | | 11/4/02 |
| Jackson, Richard | W.D. NC CR No. 00-C | Death row | 10/2/00 | 12/4/00 | 4/30/01 |
| Fell, Donald | D. VT 00-M-66-ALL | Pending trial | 2/1/01 | 1/30/02 | |
| Sablan, William | D. CO CR No. 00-CR-5 | Pending trial | 12/12/00 | 5/1/01 | |
| Sablan, Rudy | D. CO CR No. 00-CR-5 | Pending trial | 12/12/00 | 5/1/01 | |
| Church, Walter Lefi | W.D. VA CR No. 00-C | Pending trial | 12/13/00 | 5/11/01 | 9/4/02 |
| Ealy, Samuel Stephe | W.D. VA CR No. 00-C | Pending trial | 12/13/00 | 5/11/01 | 5/14/02 |
| Waldon, Carl | M.D. FL CR No. 3:00- | Pending trial | 12/12/00 | 7/30/01 | 10/1/02 |

http://www.capdefnet.org/fdprc/contents/shared_files/docs/time.htm

Exhibit IV-E
page 16

5/14/2004



| Name | Court | Status | | | |
|---|---|---|---|---|---|
| Haskell, Carl | W.D. MO CR No. 00- | Pending trial | 10/18/00 | | |
| Lallamand, Sienky | N.D. IL CR No. 00 CR | Guilty plea | 9/28/00 | | |
| Best, Jason | N.D. IN CR No. 2:00C | Pending trial | 10/17/00 | 10/10/01 | 7/15/02 |
| Sahakian, David Mic | S.D. IL CR No. 99-400 | Pending trial | 11/3/00 | 10/30/01 | 2/1/03 |
| Wilson, Bryant Lake | W.D. TN CR No. 01-2 | Pending trial | 3/1/01 | 11/15/01 | |
| Shorter, Ramon Lori | W.D. TN CR No. 01-2 | Pending trial | 3/1/01 | 11/15/01 | |
| Pennington, Tiffany | W.D. KY CR No. 01-C | Pending trial | 3/6/01 | 7/18/01 | |
| Britt, L.J. | N.D. TX CR No. 00-C | Pending trial | 11/2/00 | 10/19/01 | 10/21/02 |
| Robinson, Julias Om | N.D. TX CR No. 00-C | Death row | 11/2/00 | 10/19/01 | 2/4/02 |
| Lentz, Jay | E.D. VA CR No. 01-C | Pending trial | 4/24/01 | 8/29/01 | 9/4/02 |
| Frye, James Edward | S.D. MS CR No. 01-C | Pending trial | 2/23/01 | 1/18/02 | 7/22/02 |
| Cooper, Billy D. | S.D. MS CR No. 01-C | Non-death verdict | 2/23/01 | 1/18/02 | 4/15/02 |
| McClure, Cornell Wi | D. MD CR No. 01-CR- | Pending trial | 7/9/01 | 3/4/02 | 2/1/03 |
| Millegan, Rufus Jerr | D. MD CR No. 01-CR- | Pending trial | 7/9/01 | 3/4/02 | 2/1/03 |
| Moussaoui, Zacaria | E.D. VA CR No. 01-C | Pending trial | 12/11/01 | 3/28/02 | 10/14/02 |
| Regan, Brian Patrick | E.D. VA CR No. 01-C | Pending trial | 10/23/01 | 4/19/02 | 1/1/03 |
| Dixon, Emile | E.D. NY CR No. 01-CR | Pending trial | 4/12/01 | 4/8/02 | |

Exhibit IV-E
page 17

5/14/2004



1427

# DECLARATION

I, Leon Cheney, do hereby declare the following to be true and correct, under penalty of perjury. These statements are based on my recollection of events as I now remember them as well as personal time records I maintained as a part of this case.

1. My name is Leon Cheney, I am over 21 years of age and competent in all respects to make this declaration. I am a 20 year law enforcement veteran with both State and Federal experience. Twelve of those years were with the U. S. Marshal Service and the remainder were with police departments in Huntington Beach, California and Burnsville, Minnesota. I am licensed by the Texas Board of private Investigators and have been doing defense investigation work for more than 20 years.

2. On August 6, 1999, I entered this case, set up my case records file and met with defense attorneys Stan Schweiger and Dwight Goains to discuss the case and any investigative tasks needed.

3. On August 11, 1999, I accompanied defense attorneys Stan Schwieger and Dwight Goains to the Bell County Jail and met with our client, Mr. Christopher Vialva, to discuss this case.

4. On August 12, 1999, I traveled to the crime scene located at the extreme south east corner of Ft. Hood Military Reservation for the purpose of photographing the crime scene and generating diagrams of the area because I felt the photos and diagrams supplied to us by the Government were inadequate. After locating the crime scene I backed away from the actual scene location, traveling some distance back down the same road I had just traveled. I then drove back toward the scene and photographed the roadway as I approached the entrance to the scene. I was able to determine where the victims' vehicle had been located due to burn marks on the ground, crime scene tape remnants and other trash associated with the original investigation. I photographed the scene from several location points. I took a steel measuring tape and a 35MM camera to accomplish this. I was surprised that the law enforcement agencies involved in the original scene investigation had not done a better job. I felt this was evidenced by the quality of the photographs and scene diagrams supplied to the defense team by the Government.

Page 1 of 3

Exhibit IV-F

5.    I set up a "war room" at my residence to organize all our evidence including photographs, diagrams and other case related materials. Mr. Schwieger, Mr. Goains, Mr. Christianson, our forensic consultant and I all worked as a team with equal authority on this case. Investigative assignments were handed out by both attorneys but everything concerning those assignments was discussed fully as a team before I started working on the task. All individuals on the defense team knew what was going on with the case at all times.

6.    As part of my work on this case I talked with both Cleveland Shinn and Omar Hall concerning what they may have observed when they encountered the defendants at the crime scene on the evening of June 21, 1999. I did not physically observe, look at or into the vehicle driven by these persons and they were not considered as strong suspects in this case. I did attempt to gather information related to gang activity and gang members in the Killeen, Texas area but my success was limited, I felt, because of me being an outsider. I did perform criminal history background checks on the co-defendants involved in this case through a computer database I subscribed to. I believed then and still do that Chris Lewis and Terry Brown were lying about their actions and what they reportedly had observed at the scene because of their statements and testimony concerning where they supposedly had been standing at the scene. I do not believe they could have observed what they say they did.

7.    As part of this case I discussed gunshot residue testing procedures utilized by the CID personnel with Mr. Schwieger and Mr. Goains. I personally knew the atomic absorption method of testing had been outdated at the time of this case by about ten years.

8.    On August 27, 1999, I accompanied defense attorneys Stan Schwieger, Dwight Goains and our forensic consultant, Kent Christianson, to the crime scene for the purpose of obtaining additional photos and to reconstruct crime scene diagrams.

9.    On December 10, 1999, I met with defense attorneys Stan Schwieger, Dwight Goains and forensic consultant, Kent Christianson and discussed matters directly related to this case. We all then traveled back to the crime scene for additional investigation.

10.    On January 4, 2000, I traveled to Killeen, Texas, for purposes of investigation related to this case. I also went back to the crime scene for additional investigation.

11.    I specifically recall accompanying Dwight Goains to meet with Mr. Vialva to discuss the issue of Mr. Goains' application for employment with the U.S. Attorney's Office. Mr. Goains told Mr. Vialva that, if he wanted substitute counsel to represent him along with Mr. Schwieger, he would help find a lawyer that would represent him. I remember Mr. Vialva

saying that he did not want Mr. Goains to withdraw from the case. I believe Mr. Goains explained his ongoing efforts to obtain employment with the U. S. Attorney's office to Mr. Vialva fully and completely and at a level that Mr. Vialva could completely understand even though he was only 19 years old at the time.

12.    Although I have no specific recollection of the date on which this meeting with Mr. Vialva occurred, my case activity log (sheet no. 7) reflects that on May 3, 2000, I went with Mr. Goains to the jail to meet with our client, Mr. Christopher Vialva, to discuss our progress related to this case. To the best of my knowledge it was at this May 3, 2000, visit with Mr. Vialva that the foregoing discussion regarding Mr. Goains' application for employment with the U.S. Attorney's Office took place.

I, Leon Cheney, declare under penalty of perjury that the foregoing is true and correct. These statements are based on my recollection of events as I now remember them as well as personal time records I maintained as a part of this case. Executed on this ____ day of June 2004, in Waco, Texas.

_____
                    Leon Cheney

Page 3 of 3

1430

1431

## DECLARATION OF KENT CHRISTIANSON

I, Kent Christianson, declare under penalty of perjury that the following statement is true and correct, to the best of my information and belief:

1) My name is Kent Christianson. I am of legal age and I reside in the State of Texas. I read and write the English language fluently;

2) I was retained as a defense expert in the case of *United State of America v. Christopher Vialva*, Western District of Texas. I testified during the guilt stage of the case on behalf of the defense;

3) I was contacted about the case in August, 1999. I do not recall if Dwight Goains or Stanley Schwieger called me. I had worked with both of them on other cases before Mr. Vialva's. I was paid through the United States Courts and was required to submit statements specifying the dates and the time I worked on the case. The records I submitted to the court accurately reflected my work on the case;

4) I was retained as an expert in forensics. My experience and training qualified me to evaluate both the procedures used by the law enforcement agencies and the results of those procedures. I was directed by the lawyers to review the forensic evidence that was collected and processed from the crime scene on Fort Hood. I was asked to evaluate the procedures used by the various agencies that were involved in the case. I went to the crime scene for the first time August 31, 1999;

5) I understood the lawyers were focused on where the two victims were killed and whether they could have been shot at some other location, then brought onto Fort Hood. I was asked to conduct tests of the ejection pattern for the .40 caliber Glock and to evaluate the trajectory of the bullets with respect to the position of the victims in the trunk of the car. I was not asked to develop any evidence that related to other suspects or to other theories of how the crime might have happened. I was not asked to investigate any information about street gangs in Killeen, Texas and I was not asked to investigate anything relating to the two participants who testified for the government;

Exhibit IV-G

6)    The lawyers did not ask my opinion about the significance of the unmelted brass casings recovered from the trunk. I believe the discoloration of the casings was attributable to water being poured on the hot metal while the fire was being extinguished. The fact that the metal was still intact and had not melted would have been the result, in part, of the distribution of the heat inside the trunk;

7)    Although I was asked to comment about the methods used to secure the crime scene and to collect evidence, I did not give my opinion on the multiple hours of delay between the detention of the suspects at the scene and the collection of clothing and gunshot residue swabs at the Fort Hood CID office. I was not asked to comment about the gunshot residue collection procedures used by the Army CID. I was unaware of methods other than atomic absorption.

I certify under penalty of perjury that the foregoing Declaration, consisting of eight paragraphs, is true and correct. Executed this 26th day of May, 2004, in Zionsville, Indiana.

Kent Christianson

Witnessed by:

1433

1434

## DECLARATION OF TENA S. FRANCIS

I, Tena. S. Francis, a person of lawful age, do hereby declare the following to be true and correct, under penalty of perjury:

1) My name is Tena S. Francis. I have provided capital case defense services to attorneys since 1987. During the last nine years, I have owned and operated a business located in the Dallas, Texas area. I am retained or appointed to assist attorneys in capital cases as a mitigation specialist, to develop mitigation evidence for presentation in the guilt and sentencing phases of trial.

2) I graduated from Eastern Kentucky University in 1986 with a Bachelor of Science degree in Police Administration. I earned a Master of Science degree in Criminal Justice from the same university in 1990. Since that time I have continued my education by regular attendance of state and national training programs with topics pertaining to capital case litigation and forensic social work.

3) My *curriculum vitae* is attached to this Declaration as Exhibit A and is incorporated by reference.

4) In 1999, I owned and operated T.S. Francis and Associates, a consulting firm that provided support services to attorneys representing persons facing the death penalty. By the summer of 1999, I had provided investigative services for more than 90 capital murder cases in both the pre-trial and post-conviction stages of prosecution. These cases had been litigated in both federal and state courts in seven states. With regard to several of these cases, I was the defense team's guilt phase investigator. On the majority of these cases, however, my efforts focused on the punishment phase investigation. Additionally, I had provided training to attorneys, law students, investigators, and mitigation specialists during the last several years regarding topics related to punishment phase preparation and social history investigation.

5) Around July 21, 1999, I was contacted by attorney Stan Schwieger. Mr. Schwieger advised me Mr. Richard Burr, one of the Federal Capital Resource Counsel on retainer with the Administrative Office of the United States Courts, had referred me to him as a mitigation specialist. Mr. Schwieger advised he had been appointed to represent Christopher Andre Vialva, one of two defendants eligible for the death penalty in the first federal capital case in the Western District of Texas. Mr. Schwieger advised me a second attorney, Mr. Dwight Goains, was appointed as learned counsel. I had not worked with either Mr. Schwieger or Mr. Goains prior to this case.

6) On July 21, I sent Mr. Schwieger a resume, fee schedule, and an affidavit describing

Page 1 of 7

Exhibit IV-H    1435



the work of a mitigation specialist. This affidavit, and ones similar to it, has been used by myself and other mitigation specialists to educate defense counsel, as well as judges of whom we are requesting funding for a social history investigation as to the relevance, importance and magnitude of a mitigation investigation. This affidavit also included an estimate of the time I anticipated would be required to complete the investigation in Mr. Vialva's case. My estimate was based on recommendations of social workers and mitigation specialists across the country, as well as my twelve years experience in death penalty cases. I noted in the affidavit that information obtained during such an investigation has the potential to impact defense theories and strategies at every stage of the proceeding, and so the investigation should be completed far in advance of a trial. I also noted the importance of providing the mitigation specialist the time and resources required to conduct a comprehensive investigation. I provided Mr. Schwieger my professional opinion that the adequate investigation of a capital case from beginning to end requires approximately 200 - 400 hours of work. This figure did not include travel time. I also noted the amount of time required for the investigation would depend on the amount of preparation done by the attorney and the extent of direction for the mitigation specialist through memoranda prepared by the attorney.

7) An *ex parte* motion requesting authorization for my services was filed under seal August 2, 1999. In the application, counsel requested an appointment of a "mitigation/social study expert/investigator" to assist in preparing a social history report. Counsel stated this report and other arguments "would be submitted to the DOJ in an effort to mitigate the potential punishment of a sentence of death in this case." This statement was made in the context of preparing the defense presentation to the Department of Justice's death penalty authorization committee. The application did not discuss the need to develop mitigation for the second stage of the trial. The motion included an attached proposed litigation budget itemizing the services needed, estimated time, hourly rate, and estimated cost. My services were listed as "mitigation expert", with a 400 hour time estimate. My rate of $60.00 per hour was computed for an estimated total cost of "$18,000.00". I was notified by Stan Schwieger the week of August 21, 1999 that I had been appointed to assist Mr. Vialva's defense. The appointment order, signed and filed by Judge Smith August 9, 1999, did not incorporate counsel's application by reference, nor did it specify approval of a maximum amount for my services. It was my understanding from conversation with Mr. Schwieger that we would approach the judge for more funding after the initial court-ordered amount had been reached. At that time we would attempt to demonstrate to the judge the necessity of more resources for the mitigation investigation. Most all of my contact with the Vialva defense team was through Mr. Schwieger. I seldom spoke to Dwight Goains.

8) Part of my job as a mitigation specialist is to assist the defense team in formulating a comprehensive presentation for the jury. Mitigation evidence includes a wide array

1436

of information about the accused's personal history, early childhood development, and educational progress, as well as mental and emotional health. In my experience, it is very important to collect and review all available records of the client's educational, medical, employment, and mental health history, conduct interviews with the client and others as indicated by the records, and then to confer with the attorneys prior to retaining experts. In many instances, the preliminary investigation will indicate useful areas to pursue and prevent wasting time and resources on experts whose speciality will not aid the second stage defense presentation. For these reasons, I asked the attorneys not to retain any mental health experts until I completed a life history of Mr. Vialva.

9)   Based on my conversation with Mr. Schwieger, I had no reason to suspect funding would be so extremely limited or that the trial of this case would be on a fast track. I began the investigation with one of the most important and time-consuming tasks: records collection. Because it sometimes takes weeks or even months to obtain life history records from various agencies, it is necessary to begin the collection process in the early stage of the investigation. Between August 25, 1999 and early February, 2000, I devoted about 106.5 hours to the case. Most of this time (70.25 hours) were spent performing such tasks as identifying, locating, and collecting life history records; reviewing these records; and constructing reports based on these records. Another 22.5 hours were spent traveling to and from meetings with the attorneys and a key witness. The remaining 13.25 hours were spent in a meeting with defense counsel and interviews of the client and his mother.

10)  On October 17, 1999, I sent the attorneys a summary of the information collected as of that time. This information was needed in order for the attorneys to prepare a "mitigation response". I noted later the attorneys used most all of this information, as matter of fact they cut and pasted my summary memo into the documented they submitted to the DOJ.

11)  It was around this same time that the attorneys began insisting on hiring an expert witness. As mentioned above, I had asked the attorneys to not retain any mental health experts on the case until the investigation was completed. I recall having more than one phone conversation with Stan Schwieger regarding this issue. My intent was to educate Mr. Schwieger as to why our defense team would benefit from the expertise of a neuropsychologist. I explained to Mr. Schwieger, during phone conversations the reasons we should consider retaining an expert in this field. Even though the social history investigation never surpassed a very preliminary stage, I knew based on the limited information I had collected there was the potential for Mr. Vialva to have suffered neurological impairment. Mr. Vialva had sustained several head injuries, beginning at the time of his birth during a forceps delivery. He also had sustained open head injuries at ages four, seven, and seventeen; as well as a closed head injury at age nine.

Page 3 of 7

1437

12) I had a conversation with Mr. Schwieger on October 6, 1999, concerning their intent to hire a psychiatrist, Dr. William Reid. I asked Mr. Schwieger questions about Dr. Reid's credentials, because I had never worked with him before. My recollection is that Mr. Schwieger could offer me no reassurances that this psychiatrist had any past experienced with capital case work. I again expressed my opinion that a neuropsychologist was the expert we needed to consider hiring. Mr. Schwieger had advised me on more than one occasion that he and Mr. Goains felt they would be labeled "ineffective" for not hiring a mental health expert within a certain amount of time. My recollection is that one of Mr. Vialva's defense attorneys knew Dr. Reid from a past case or had heard of him from someone else, and they intended to hire him.

13) During the next few months, the work I spent on this case continued to be an effort to get our records documentation in order. I devoted another 25.25 hours to this endeavor. At some point in early 2000, I was advised by Mr. Schwieger that the court had cut off funding for the case. I understood that the funding had been limited to $7,500.00 total, for all of the experts, and that the maximum had been exhausted paying myself and other defense experts. I had completed an initial draft of a life history of Mr. Vialva, based solely on the records I had available to me and some information from local family members. This life history never advanced past the initial draft. I provided the draft to counsel, for whatever use it might be to them in their efforts. Although I was committed to trying to help Mr. Vialva, I was unable to continue working on the case without funding. I had already spent more time and resources on the case than had been authorized for payment. My business was in financial straits at that point and I had no funds at my disposal to continue the work on a *pro bono* basis.

14) Despite all of our conversations about the need to carefully consider what sort of expert we needed, the attorneys retained a psychiatrist before I was able to complete any substantive evaluation of the case. In February, I was asked to send the life history records to Dr. Reid. I did so. During a March conversation with Mr. Schwieger, he expressed dismay over the opinion provided to him by Dr. Reid after Dr. Reid's testing had been completed. This opinion had caused the attorneys to not want to call Dr. Reid as a witness. Mr. Schwieger could not even identify for me what testing had been completed. I expressed my concern about the attorney's actions and again broached the subject of having a neuropsychological evaluation completed. My recollection is that Mr. Schwieger told me there was no more funding to be had with which to retain another expert witness. Mr. Schwieger and I discussed how inadequate the defense at trial would be with no qualified expert to help the jury understand why Mr. Vialva might have come to be involved in the murders. My comments provoked a conflict with the attorneys. I attempted to repair the situation through a letter on March 29, 2000, a copy of which is appended as

Exhibit B.

15)    A few days after writing this letter, at the request of counsel I drafted an affidavit for Mr. Schwieger, which I understood would be presented to the Court in a request for more funding and time for the investigation. In this affidavit I again noted the reason the investigation must be completed. I presented a description of the investigation thus far, noting the reason most of my time had been spent collecting life history records for Mr. Vialva. I also referred to the mitigation issues that had been developed during this preliminary, seventy-four hour investigation. (The additional 22.5 hours referenced in the affidavit were hours spent traveling.) Potential themes of mitigation referenced in this affidavit were: "...a serious medical condition Mr. Vialva suffered as an infant, which may have had an affect on his development and behavior; exposure to a significant amount of trauma, with regards to both Christopher's physical and psychological well-being, and related to the persons who were his care givers; a lack of stability within the family; exposure to violence (as a victim, as a witness to domestic violence, and his exposure to violence within the community); emotional problems; his attempt to affiliate with gangs as a way to establish a sense of 'family', as well as "safety" within his schools and community; drug use; good character information; and information to refute the government's evidence of future dangerousness." I went on to provide a one-paragraph summary of details from the client's life history that were relevant and compelling enough to warrant further investigation. In the letter accompanying this affidavit, I explained to Mr. Schwieger the investigation would require at least another 200 hours of work. This letter and affidavit are appended as Exhibit C. My recollection is that Mr. Schwieger did not believe the Court would authorize more funding for the mitigation investigation.

16)    Around this same time, I received a phone call from Stan Schwieger, during which he expressed excitement over having recently read an article published in The Champion. The article was written by John Blume and David Voisin, attorneys for whom Mr. Schwieger expressed a great deal of respect. Mr. Schwieger advised he had learned from his review of this article that what I had been telling him during the last several months – pertaining to the need to be cautious and considerate when selecting a capital case expert – was true. He now seemed to understand the reason he and Mr. Goains should not have hired any expert until after the social history investigation is completed, the reason a neuropsychologist should have been considered as a better choice for our defense team. I had Mr. Schwieger fax me a copy of the article, which I have actually used since April, 1999 in my efforts to educate attorneys -- such as those who represented Mr. Vialva – who have a difficult time incorporating mitigation into their work on a capital case.

17)    According to my notes and recollection, I did not receive any word from the attorneys concerning the continuation of the investigation until around May 18, 2000. The jury

1439

selection for the trial had already begun by this time. The judge had authorized an additional $3000 to be spent on the investigation. I was able to accomplish little within the time constraints, and did not produce much information with which to supplement the preliminary investigation that had been completed. There was simply not enough time to complete the investigation at that point.

18) I recall speaking by phone to Mr. Schwieger during the trial. He told me a neuropsychological evaluation had recently been completed and the results indicated Mr. Vialva suffered no brain damage of any kind. I do not recall having any contact with Mr. Schwieger after that phone conversation.

19) Throughout my involvement in this case, my communication with the lawyers was sporadic and poor. For example, there were no meetings at which we discussed a plan for integrating second stage information into the first stage defense presentation. I felt the attorneys did not understand the importance of developing the mitigation case as part of the overall defense strategy. On August 25, 1999, I attended a meeting with the lawyers and Mr. Burr, at which Mr. Burr attempted to explain that mitigation should be a priority. Mr. Burr's comments were not well received by Mr. Goains. This was the first and only meeting I attended with the defense team. If there were subsequent team meetings, I was not invited to attend.

20) As I have attempted to illustrate in this affidavit, the social history investigation for this case was woefully inadequate. I performed a lot of records collection and review during my time on the case. I only met with my client one time, for a short conversation in the local jail. Through some error, I was not approved for a contact visit with Mr. Vialva, so I spoke with him briefly in the public visiting area. Since the conversation was not in a confidential setting, I asked Mr. Vialva a few basic questions and told him I would return at a later date for a complete interview. I never accomplished this basic, critical task because of a failure in the funding of the case.

21) When the second stage of Mr. Vialva's trial began, I had not completed interviews of the client, his family, or his friends. I had not developed a complete history of Mr. Vialva's life, so the defense was unable to present a complete picture to the jury. Most importantly, I had not developed information that would have provided the jury with insight into Mr. Vialva's cognitive and emotional processes. There was no context for the jury to consider when deciding Mr. Vialva's punishment. In my experience, this information is absolutely essential in a capital case. Based on the limited investigation I completed, I believe there was a considerable volume of additional information that could have been developed. In spite of the difficulties I experienced with the attorneys in this case, I would have been willing to complete the necessary work and to participate in the second stage presentation, if the time and resources would have been available.

I declare under penalty of perjury that the foregoing Declaration, consisting of twenty-one paragraphs, is true and correct. Executed this 30th day of April, 2004, in Plano, Texas.

Tena S. Francis

K441



*Tena S. Francis*
*Capital Defense / Mitigation Investigations*
*P.O. Box 191*
*Little Elm, Texas  75068*
*(972) 292-2661*

## CAPITAL LITIGATION EXPERIENCE:

I am currently appointed and retained as a **Mitigation Specialist** in the field of capital defense investigations. During my sixteen-year career as a defense investigator, I have provided investigative services for more than two hundred capital cases in various state and federal courts, in both the pre-trial and the post-conviction stages. I have conducted investigations into both the guilt/innocence and the punishment phases of capital cases. During my career I have been employed by state and federally-funded agencies who provide indigent defense services. I have developed training materials and have provided training to attorneys and to investigators with regard to topics related to capital case defense.

**EDUCATION:**    **Master of Science, Criminal Justice,** Eastern Kentucky University, 1992
**Bachelor of Science, Police Administration,** Eastern Kentucky Univ., 1985

## PROFESSIONAL EXPERIENCE:

**2001 - present**    **Mitigation specialist**, Little Elm, Texas.
Work exclusively with attorneys representing capitally charged persons in state and federal courts, at both the pretrial and post-conviction stages. Services provided include:

- conduct extensive psycho-social history investigations through records collection, witness interviews and literature research;
- conduct fact investigations for guilt innocence phase of proceeding
- assess the need for, identify, and work closely with expert witnesses;
- prepare evidence for presentation to court authority; and
- prepare and present training for attorneys, investigators, and social workers.

Exhibit A

144

*Page 2*

*Tena Francis*

| | |
|---|---|
| **2000 - 2001** | **Director, Capital Punishment Investigation & Educational Services,** Dallas, Texas |
| **1995 - 2000** | **Owner, T.S. Francis & Associates,** Wylie, Texas; TX P.I. Lic. A08158 Work exclusively with attorneys representing capital case defendants in various state and federal courts at both pre-trial and post conviction. Supervise and train staff of six investigators and social workers. Services provided include all of those listed above. |
| **1994 - 1995** | **Investigator, Texas Appellate Practice and Educational Resource Center (TRC),** Houston, Texas Planned and performed investigative assignments for attorneys representing death row inmates during state and federal habeas litigation; supervise and train less experienced staff attorneys, investigators, paralegals, and mitigation specialists; and develop training materials. Investigation tasks performed include: |

- review trial record and prepare investigation plan
- locate and interview witnesses
- conduct extensive social history investigations
- prepare reports for expert witnesses
- prepare witness affidavits for inclusion in legal briefs
- prepare training materials for in-house training
- conduct training programs for in-house training

| | |
|---|---|
| **1991 - 1994** | **Owner, Francis Investigations,** Lexington, Kentucky Provided investigative and other legal support services to criminal defense attorneys. Services provided include all those listed above. |
| **1992 - 1994** | **Adjunct Faculty, Eastern Kentucky University,** Fort Knox, Kentucky Taught Police Admin. / Security courses to students of Criminal Justice. |
| **1987 - 1991** | **Investigator Senior, Department of Public Advocacy,** Frankfort, Kentucky (State public defender agency) Planned and performed investigative services as outlined above for trial level criminal cases ranging from misdemeanors to capital murder. |

**TOPICS OF ADVANCED TRAINING:**

- Texas Capital Defense Conference II – four day seminar (2002)
- Texas Capital Defense Conference – five day seminar; various topics (2001)
- Death Penalthy Mitigation Seminar – three day seminar; various topics related to capital litigation (2001)
- Life in the Balance -- four-day seminar; various topics related to capital

1443

*Tena Francis*

litigation (2001)
- Life in the Balance -- four-day seminar; various; capital litigation (1999)
- Life in the Balance -- four-day seminar; various; capital litigation (1997)
- Homicide Investigations (1996)
- Investigating the Client's Life (1996, 1995)
- Identifying and Investigating Childhood Trauma Issues (1996, 1995)
- Working With A Chemically Dependant Client (1996, 1989)
- Interviewing Jurors (1995)
- Investigating and Litigating State Misconduct Claims (1994)
- Race Claims (1994)
- Juror Misconduct Investigation and Litigation (1994)
- Crime Scene Investigation (1994)
- Ford Claims (1994)
- Mental Health Issues (1994)
- Litigating False Confessions (1994)
- Capital Litigation Issues (1994)
- Developing Mental Health Claims (1994)
- Mitigation Investigation (1993)
- Capital Litigation Issues (1993)
- Death Penalty Post-Conviction (1993)
- Battered Woman Defense (1993)
- Understanding and Working With Mentally Ill Clients (1993)
- Defense of Child Abuse Cases (1993)
- Neuropsychology (1993)
- DNA Fingerprinting (1992)
- Questioned Document Analysis (1992)
- Serology Analysis (1992)
- Child Sexual Abuse Defenses (1992)
- Kinesic Interviewing and Interrogation Techniques (1991)
- Crime Scene Photography (1987)

## PROFESSIONAL MEMBERSHIPS

National Legal Aid Defender Association
National Defender Investigator Association
Alpha Phi Sigma (Criminal Justice Honorary)
College of Law Enforcement Alumni Association

## REFERENCES

Supplied upon request

1444

# CHRISTOPHER ANDRE VIALVA
## Social History Narrative

*Last Update: 01/12/00*

This report is a compilation of information obtained from records collected, witnesses interviewed, and conversations with the client. It is by no means complete and will be revised as more information is available.

This report is divided into the following sections:

List of Family Members
Information About Family Members
Information About Chris' Home Life and Childhood
Information About Chris

Exhibit B



*Vialva Social History, Page 2*

## LIST OF FAMILY MEMBERS

### Immediate

| | |
|---|---|
| Mother: | Lisa Brown |
| Father: | Rowlland "Tony" Vialva |
| Half-sister: | Audrey Mabrey |
| Step-father 5: | Richard Brown |

| | |
|---|---|
| Step-father 1: | Robert Mabrey |
| Step-father 2: | James Gillhouse |
| Step-father 3: | Joe Massey |
| Step-father 4: | Cecil Prime |

### Maternal

### Paternal

***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***

*Vialva Social History, Page 3*

## INFORMATION ABOUT FAMILY MEMBERS

### Mother: Lisa Gay Brown

Chris' mother, Lisa, is forty one years old. Lisa was born to Phyllis and James Dickson. She was the third of five children in the family. James was in the third year of his ten years with the Air Force at the time of Lisa's birth.

Lisa's father told her (when she was ten years old) that he'd never loved her like the other children, as he suspected she was not his child.

Lisa was raised in a strict Seventh Day Adventist background and was not allowed to date significantly during high school. Lisa was a relatively high achiever in high school yet received little encouragement or praise at home for her efforts.

After graduating from high school at age eighteen, Lisa enlisted in the Army. According to available records, Lisa performed admirably, and received exceedingly high evaluations. She left the Army after two years, during the latter part of her pregnancy with Chris. Throughout Chris' life, Lisa has maintained steady employment. She has worked for the Department of the Army as a civilian employee since 1983.

#### Mental health

Lisa appears to have always been an "emotional" person. We have yet to receive all records of her various therapies and counseling sessions.

#### Marriages and relationships

Lisa has been married four times, with three divorces. Lisa had had several "serious" and intense relationships that lasted less than a year each. Each time she separated from a husband, Lisa would remain married to the man, usually getting a divorce only after meeting someone new. On more than one occasion, Lisa has been involved with / married to violent men.

Since most of the time Lisa spent with Chris' father actually took place prior to Chris' birth, that marriage is described in this section. The later marriages and relationships will be described elsewhere in this report.

#### Marriage to Tony Vialva, Chris' father

Lisa's first marriage was to Rowlland "Tony" Vialva (Chris' father), when she was nineteen years old. Vialva, who was born in Trinidad, was a soldier when Lisa met him and both were stationed at Fort Benning, Georgia. Within a month after they were married, Vialva became obsessive and physically

*\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\**

*Vialva Social History, Page 4*

assaultive to Lisa. (Prior to their wedding, the only assaultive behavior he showed toward Lisa was "biting".)

Although married three years, Lisa and Vialva lived together less than twelve months total. During this time, he controlled every aspect of her life, from her dress to her movements. Vialva required Lisa to be covered from head to foot when she left the house (when she was not on duty). He told her he wanted no other man to see "what he had". This attitude extended to their possessions at home, as well; Vialva insisted the curtains be tightly closed at all times because he was worried someone would look in. Vialva would not allow Lisa to use the phone or visit anyone. He would not allow her to drive to her job and she often had to wait several hours for him to pick her up after work. Vialva was extremely violent to Lisa. Vialva would disappear for days at a time during their marriage. During the years since their divorce, Lisa has learned Vialva had several other women who bore children for him during the time she and he were married. His absences were probably related to these extra-marital affairs. It is also possible his absences were related to Vialva's criminal activities, as he may have been involved in the drug trade. On one occasion, Lisa learned Vialva had been to England during a week-long absence. On another occasion, she found that he and a woman-friend had been staying at a motel near the base. Vialva often had "wads of money", which he claimed to have won at the horse races. Army officials believed Vialva was dealing drugs, however.

Lisa learned that Vialva practiced witchcraft when she went into a closet in their home and discovered various religious artifacts he had placed there. (She had been warned to not go into this closet and was beaten by Vialva when he found that she had opened the door.)

Vialva would beat Lisa several times a week. Neighbors on the military base often called the Military Police to break up the altercations. Vialva was usually not detained or arrested, however, because Lisa was afraid to file charges. Vialva became aware that his behavior would land him in jail, so he made a point of taking Lisa to the center-most room of their apartment during the beatings.

After one altercation the Military Police arrested Vialva even though Lisa refused to file charges. He was taken to jail. Lisa awoke early the next morning with Vialva sitting on her chest, his knife to her throat.

Lisa made tentative plans to leave Vialva. She began moving personal effects out of their apartment, a few at a time so as to not arouse his suspicion. She befriended a neighbor who allowed Lisa to store these belongings at her apartment. During the last beating Vialva gave to Lisa, this neighbor contacted the Military Police. Because of Vialva's reputation for violence, ten officers came to the scene. When the MP's arrived, Vialva was choking Lisa and had her leaning backwards over a stair railing. When he refused to identify himself to the female duty officer who had arrived with the MP's, the officer started going through mail laying on a table in the apartment. Vialva, angered at this, attacked the officer. He was arrested for this assault, and was sentenced to thirty days hard labor.

Even though a court martial had been initiated, Vialva was released from jail prior to the end of his

***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***

1448

thirty day sentence. He showed up at their apartment and continued to live with Lisa until the court martial was final. She became pregnant with Chris during this time. After being released for the final time, Vialva moved to Houston. He doubted Lisa's pregnancy was his child, due to the timing of it.

Vialva asked Lisa to move to Houston, where he then had a civilian job. Lisa left the Army on a pregnancy discharge and moved in with Vialva, thinking her baby needed a father and hoping Vialva had changed. A few weeks after she moved in, Vialva began beating Lisa again. Lisa fled Houston, relocating to a sister's house in Wisconsin, where she sought counseling and filed for divorce.

Lisa returned to Vialva one more time prior to Chris' birth. Vialva continued to assault her. Two weeks before Chris was born, Vialva drove Lisa to San Antonio (because she would receive free health care at the Army hospital there). He left Lisa in San Antonio and did not reappear until after Chris was born.

### Pregnancies and children

Lisa has two children, the result of four pregnancies. At age eighteen, Lisa became pregnant after being raped. She miscarried the baby several weeks later. A few months prior to her pregnancy with Chris, Lisa had her second miscarriage. At that time the doctor told Lisa she was a spontaneous aborter.

During her pregnancy with Chris, Lisa did not acknowledge her condition until she was almost seven months into the pregnancy, because she feared she would be heartbroken if she lost another baby. Chris was a full term baby. Although records have not yet been received, it appears to have been a complicated delivery according to the mother's reporting. The delivery was a dry birth that had to be induced. Lisa's pregnancy and the delivery were complicated by Toxemia and Hypertension. She had spotted blood a few times during the pregnancy.

Like Chris, Audrey was a dry birth with several complications. Audrey was not breathing and her heart not beating during the last several minutes of the delivery and during the several minutes following it.

### Father: Rowlland "Tony" Vialva

Not enough is known about Tony Vialva at this time. An address for him has been located in Amarillo, although the rumor is that he has left the country. Vialva has yet to be interviewed.

Vialva is described by Chris' mother as a native of Trinidad. He supposedly has been married several times, sometimes to more than woman at once. He may have had been staying with more than one wife and family during his marriage to Lisa, having "spouses" across the globe.

***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***

Vialva is reported to have more than a dozen children. He is allegedly having an affair with one of his daughters.

Vialva was court-martialed while married to Lisa and discharged from the military dishonorably. The charges included spousal abuse, and he may have been accused of drug trafficking as well.

## Sister: Audrey Mabrey

Audrey is two years younger than Chris. She currently lives with her mother and step-father. Audrey has sporadic contact with her biological father, Robert Mabrey. Apparently after Mabrey was court-ordered to pay a very large sum of back child support, he became interested in being a part of Audrey's life.

According to Chris' mother, Audrey goes through phases of liking and disliking her father, and seems to play one parent against the other to get what she wants.

Audrey became sexually active at age twelve, and has had behavioral problems in school.

## Maternal Family

### Lisa's parents

Lisa's mother died in 1992 from a recurrence of cancer. Lisa's father is remarried and resides in Wisconsin. Due to his dislike for Lisa's choice to keep a bi-racial child, she and her father do not get along.

At this time, little is known about Lisa's siblings.

## Paternal Family

As with regard to Tony Vialva, little is known about his family at this time. They may reside in Trinidad. According to Lisa, Vialva's mother was a VooDoo woman.

## INFORMATION ABOUT CHRIS' HOME LIFE AND CHILDHOOD

### Life with Tony Vialva.

***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***

At the time of his birth, Chris' mother remained committed to Tony Vialva, even though the domestic violence between them had already gotten so bad as to have been a charge against Vialva during an Army court martial. When Chris was just a few days old, Vialva left bite marks all over Chris' torso.

After Chris was born, Lisa returned to Houston to live with Vialva. His abuse of her continued. Vialva practically ignored the baby. Due to Chris having blonde hair, Vialva continued to deny paternity, referring to Chris as a "honky". During the next year, Lisa would alternately stay with Vialva, until a particularly bad beating, then she would flee to Wisconsin to stay with her sister. Sometimes Vialva would come for her; other times Lisa simply returned to Houston to be with him. After Chris was born, Vialva refused to have sex with Lisa.

Lisa left Vialva for the last time, due to him attempting to assault Chris. When Lisa intervened, Vialva kicked her in the head. She lost vision in both eyes from the blow. Lisa contacted her sister in Wisconsin, who sent her husband to pick up Lisa and Chris and accompany them on a flight to Wisconsin. Lisa, who had been blinded for three days, later saw a doctor in Wisconsin. She then filed for divorce, sought counseling, and never returned to Vialva.

Vialva did not seek custody or visitation rights during his divorce from Lisa. And, as noted in a later section, Vialva did not have any contact with Chris until Chris was seven years old. At some point he began paying child support, though.

By the time she moved to Wisconsin this last time, Lisa had practically starved herself to death by anorexia. She tried to re-enlist in the Army, but could not due to medical problems (the spontaneous aborter issue). Within months of her last separation from Vialva, Lisa had gotten involved with the man who would become her second failed marriage.

### Life with Robert Mabrey

Robert Mabrey is Lisa's second failed marriage. She was with Mabrey more than four years, from the time Chris was a year old until he was just past his fifth birthday.

Lisa had been engaged to Robert Mabrey during boot camp, before she met Tony Vialva. After her final separation from Vialva, Mabrey contacted her in Wisconsin and suggested they resume their relationship. Lisa and Chris moved to Florida, where Mabrey lived with his sister. Soon after this, Mabrey re-enlisted in the Army and the three moved to Louisiana. The actual reason for their marriage was the fact that Chris was ill and needed medical attention. Lisa did not have insurance, and wanted to take advantage of Mabrey's military benefits. Chris was taken to the hospital directly from the wedding ceremony.

Like Vialva, Robert Mabrey was physically assaultive to Lisa. During this marriage, though, Lisa fought back, as Mabrey did not have the specialized martial arts training Vialva had had. During the early months of their marriage, Mabrey was deployed often and so not around Lisa or Chris. When

***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***

1451

he was with them, he made Lisa lie concerning Chris' ethnicity. Because Mabrey was ashamed to be associated with a bi-racial step-child, he wanted Lisa to say Chris was her adopted son, and to say he was a Mexican child.

Soon after their move to Louisiana, Mabrey was notified that he would be sent to Germany. Lisa discovered that Mabrey had been writing to a former girlfriend who lived in Germany, and that he planned to resume his affair with this woman once he moved to Germany. Lisa confronted Mabrey, and they decided to separate. When Lisa visited her doctor to get a prescription for birth control, she learned she was pregnant. After learning Lisa was pregnant, Mabrey became assaultive to her. She suspects Mabrey's intention was to cause her to have a miscarriage. He continued to be violent to Lisa for the duration of their on again / off again relationship.

By the time Audrey was born, Mabrey was already in Germany and Lisa had made the decision to take her children there to live with him; even though they had planned on divorcing. When Lisa arrived in Germany, she decided to not seek employment until the end of summer, so she would have time to acquaint herself with the area and culture. Almost immediately, Mabrey was deployed on a thirty day mission, leaving Lisa alone with no job and two small children in a strange land.

Lisa's relationship with Mabrey was no better than it had been before they reunited in Germany. He continued to be assaultive, jealous, and possessive. Additionally, Mabrey was obsessed with the house being spotless. He did not make any effort to help with the children. And, he began to withhold sex from Lisa. Lisa obtained civil service employment with the Department of Defense. She also began singing with a jazz club band. Between her full time job, practice sessions with the band, and the band's performances, Lisa was gone from their home often. She did not depend on Mabrey to watch the children, and so left them with a sitter.

After this, Mabrey's behavior towards Lisa worsened. There was no predictable pattern to his abuse. He would sometimes keep her up all night, as a sort of "sleep deprivation" torture. Lisa would come home from band practice late some nights and find Mabrey had locked her out of their bedroom. He would leave her pillow and blanket on the couch, so she would bed down in the living room. Lisa would be awakened by Mabrey during the night, demanding she come sleep in the bed with him. A few hours later, Mabrey would kick her out of bed again and send her back to the couch. Sometimes Lisa would be packing the children out the door, on her way to drop them at the sitter before going on to work and find that her car was gone. Even though Mabrey's office was only two blocks from their apartment, he would take their only car without telling Lisa. Then, instead of parking it near his office, Mabrey would hide the car somewhere on the base. Lisa would have to search for it, children in tow, then worry about being late for work.

Mabrey constantly accused Lisa of having an affair with the manager of her band. The man was black, and Mabrey used the fact that Chris was bi-racial to justify his suspicions that Lisa was having sex with her manager. The manager, tiring of the constant inferences from Mabrey, dropped Lisa and she was forced to audition for another band.

***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***

Mabrey continued to be assaultive towards Lisa, and she continued to fight back. Lisa would send Chris and Audrey to a bedroom and close the door when the fights began. If the altercations were "quiet" she could count on Chris keeping Audrey in the bedroom. If the fighting was loud enough for Chris to hear, he would come out of the bedroom and attempt to defend his mother from Mabrey's attack. Sometimes Chris would attempt to stop Mabrey by jumping on his back and hitting him. This would cause Mabrey to lash out at Chris.

The Military Police were contacted several times by neighbors. Sometimes, Lisa reported his assaultive behavior to Mabrey's supervisors. Mabrey would be forced to move into the barracks for awhile, then would come home and the violence would resume. This happened several times. One time Mabrey called the MP's to arrest Lisa. During an altercation he had attempted to use Audrey as a shield, and Lisa had accidentally hit the child. The police arrived, took Lisa's statement, then arrested Mabrey instead.

After four years together, Lisa and Robert Mabrey were totally estranged. She did not want to leave Germany, however, because she was becoming successful and popular as a singer. Believing her future as a singer looked promising, Lisa decided to stay and see what happened. She continued to live with Mabrey, work full time for the government, and had money to pay for child care and their expenses. Although Lisa and Mabrey agreed to live together in Germany and separate when it was time for his next rotation / transfer, she learned Mabrey had reneged on this agreement in that he had completed paperwork necessary to send her and Chris home. Mabrey planned to keep Audrey with him, so he could continue to receive housing benefits. Lisa fought this process, not wanting to leave without Audrey.

Out of spite for Mabrey reneging on their deal, Lisa reported to his superiors that Mabrey was having an extra-martial affair with another officer. (To hurt her, Mabrey would often talk on the phone to his lover in front of Lisa.) She was surprised to learn later that Mabrey's lover was a man. When Lisa continued to fight to keep Audrey with her, Mabrey gave up and agreed she could go home with Lisa and Chris. He dropped them off at the airport only because his commanding officer ordered him to give them a ride. Mabrey did not help them into the terminal and did not say goodbye. His parting words to Lisa was to advise her to learn to do things on her own.

### Lisa as a single parent

When she returned to the States, Lisa found herself to be a first-time single parent. She settled in Killeen, where her sister lived, and began working three jobs, which meant Chris and Audrey continued to stay with babysitters. After about a year, she reduced her employment to just two jobs; one was as a dancer in a nightclub. During her third year as a single parent, Lisa became seriously involved with Jim Gillhouse.

### Life with James Gillhouse

***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***

When Chris was eight years old, his mother entered another lengthy relationship, this time with a man who Chris admired and respected. Lisa began a two to three year relationship with a pilot, Jim Gillhouse. This was the first of Lisa's romantic relationships that Chris approved of. Chris may have bonded with Gillhouse because Gillhouse was very dark complected (white, with a tan) and enjoyed sports. Gillhouse would participate with Lisa and her children in family activities, whereas her prior boyfriends would take Lisa out on dates and leave the children at home. Gillhouse, who had a son with Downs Syndrome, was very patient with Chris and understanding of his outbursts.

Gillhouse was the first man Chris had responded to. Chris told Lisa he wanted Gillhouse to be his Dad. Lisa and Gillhouse became engaged almost immediately. Eight months after they began dating, Gillhouse was sent overseas to eventually fight in the Gulf War. He kept in close contact with Lisa, sending her audiotape letters on which he'd also recorded messages for Chris and Audrey. During the entire time of their separation due to his military service, Lisa and the children made plans to spend their lives with Gillhouse.

As a result of his war-time service, Gillhouse underwent a personality change. When he returned from overseas Gillhouse seemed to hate everyone, drank all the time, and became very promiscuous. He no longer had patience with Chris and even told Chris that it was his fault that Gillhouse and Lisa would not be getting married. This broke Chris' heart. During the years since this break up, Lisa has sometimes told Chris that she blames him for Gillhouse leaving her.

### Life with Joe Massey and then with Cecil Prime

Within a year of her separation from Gillhouse, Chris' mother began a relationship that resulted in a third marriage and divorce. Chris was twelve at the time the relationship began. Joe Massey was young, had never been around children, and was totally unprepared to care for Chris and his behavioral problems. Massey's way of "handling" Chris was to physically restrain him, which caused problems between Massey and Lisa. They separated six months after the wedding and then Massey was sent off to Germany. Although separated att he time of his deployment to Germany, Lisa and Massey had not planned to divorce. Lisa and her children could not accompany Massey because of Chris' medical problems. (There was not a hospital facility close enough to adequately care for Chris.)

Soon after he went to Germany, Massey informed Lisa he had been unfaithful to her. This enraged Lisa, prompting her to go out that very night, get drunk, and pick up a stray man for sex. She ended up having a relationship with the man, Cecil "Cowboy" Prime, for about a year.

This man, Cecil "Cowboy" Prime, seemed to get along well with the children. Even though Lisa did not believe in "co-habitation prior to marriage, Prime moved his belongings into her home a little at time. Prime was often deployed and gone for weeks at a time. During Lisa's ten month relationship with Prime, Chris' behavior worsened. He did not think Prime was "good enough" for his mother. Like the other men she had dated, Prime was not up to the task of "handling" Chris, and so he too

*\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\**

1454

*Vialva Social History, Page 11*

left her.

### Life with Richard Brown

Lisa married Richard Brown a few years ago.  He is in the Army and appears to be very supportive of Lisa and her children.  Few details are known about his relationship with Chris, though, at least from Chris' point of view.   According to Lisa, Chris and Brown get along well.

### Physical abuse

As noted in preceding sections, Chris has been subjected to physical abuse as both a witness and as a victim.

The abuse began with his biological father, who left bite marks all over Chris' body when he was an infant.  It was an attempted assault of Chris by his father that prompted his mother to leave Vialva for the last time.  During the months prior to their departure, Chris (then a baby) witnessed countless assaults by his father on his mother.

Chris almost immediately began living with Robert Mabrey, who was also extremely assaultive to Chris' mother.  It is unclear how many times Mabrey assaulted Chris, but there was some violence exhibited towards the children.

### Sexual abuse

There is no indication Chris has been sexually abused and he reports never having been molested.

### Relocations

As an infant and toddler, Chris was relocated several times by his mother as she fled Vialva's abuse and then when she moved around with Mabrey.  Beginning at age five, however, Chris has resided in Killeen.  Although his mother and her various significant others have moved the family to several different neighborhoods in Killeen, for the most part Chris has lived in the same area since beginning school.


## INFORMATION ABOUT CHRIS

### Pre-natal care

During her pregnancy with Chris, Lisa was beaten on more than once occasion, had been forced to flee the house for periods of time, and had become anorexic.  Additionally, tension between she and her parents had been the result of her becoming pregnant with a bi-racial child.  This was Lisa's third

***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***

1455

pregnancy; Chris was her first child to be carried to term.

### Birth

Chris was born in an Army hospital in San Antonio, TX. Although records have not yet been received, it appears to have been a complicated delivery according to the mother's reporting. The delivery was a dry birth that had to be induced. Lisa's pregnancy and the delivery were complicated by Toxemia and Hypertension. She had spotted blood a few times during the pregnancy. At the time of his birth, Chris had extremely severe milk allergies and finally was wet-nursed by his aunt.

### Health

At age eleven days, Chris was diagnosed with Sepsis - Etiology Group B Streptococcus and Conjunctivitis. When admitted to the hospital, Chris had a fever of 101 degrees. He was given Ampicillin, Gentamicin, and Penicillin. Chris was released seventeen days later.

When he was a year and a half old, Chris became ill and his temperature reached 103. He was seen at an emergency room. The records have not yet been received and Chris' mother cannot recall the diagnosis.

At age three Chris was bitten all over his body by fire ants. He was horribly swollen (he looked afflicted with elephantiasis).

At age four and while living in Germany, Chris fell into a radiator at the family's apartment. He vomited but did not lose consciousness. Chris did not receive medical treatment for this head laceration.

At age six, Chris was assaulted by other children. Although he had several cuts on his head from being pelted with rocks, Chris did not receive medical treatment. Chris was being picked on because he was bi-racial.

At age eight, Chris sustained a broken arm during a game of tag with neighborhood children.

Between the ages of eleven and thirteen, Chris' mother took him to a local clinic a half a dozen times, for ailments ranging from sore throat to a bruised knee. Chris thinks his mother was over-cautious with regard to his health.

At age thirteen, Chris was operated on for a hernia.

At age fourteen, Chris broke his wrist while playing football.

At age fifteen, Chris experienced problems with his heart that were a result of his taking the

***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***

*Vialva Social History, Page 13*

medication prescribed to control his behavior.

### Racial identity

Defining who he is has always been a problem for Chris, especially with regard to his race. By the time he was three, Chris had become aware that he was "different", at least in terms of his skin color, from other members of his family. He asked his mother about the "funny brown stuff" on his skin. And, then step-father Mabrey constantly encouraged Lisa to tell people Chris was adopted or that he was half-Mexican, so people would not know his wife had been with a black man. Also as a toddler, Chris was left with a baby-sitter who made bigoted comments about him.

By the time he was in the first grade, Chris began to experience problems with other students, who would pick on him because he was bi-racial. Even after meeting his father at age seven and seeing he was a black man, Chris referred to himself as "white".

When he reached junior high, Chris began referring to himself as being of "mixed" race. Chris got into a fight at school with a student who had called him a "Zebra" when in the seventh grade.

By the time he was in high school, Chris totally identified with the black students at school and considered himself to be black.

Interestingly enough, most of the co-defendants with regard to this case are also of mixed race.

### Childhood development

Chris began walking at age eight months. By age two, Chris and he knew his letters, numbers, colors, and shapes. At age four, Chris was tested and found to be functioning at approximately the second grade level.

### Education, behavior problems, mental health

Although he made good grades, Chris's behavior problems in class were noted as early as his first year of school. Chris was mostly in trouble for talking / disrupting class and being disrespectful to the teachers and other students.

While in the second grade Chris was administered the TAG test. He scored high, however, he was not admitted to the program because of his behavior.

By age nine, Chris was showing signs of aggression towards his mother.

By the time he was ten, Chris' grades had fallen and his behavior deteriorated. He was referred for a psychological evaluation due to his behavior in school.

*\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\**

At age eleven, Chris' grades continued to fall and his behavior continued to deteriorate. He began to dislike school. Chris would punch holes in walls, angered with little provocation. Chris would later act like nothing had happened. When he got into trouble for a theft, he threatened suicide rather than go to jail.

Right after his twelfth birthday, Chris was prescribed Imapramine in an attempt to control his behavior.

When Chris was fourteen (at which time his favorite "step-father had just abandoned the family), he began to exhibit some of the worse behavior of his life. He became increasingly disruptive in school, using more aggressive language with his teachers, and failed all of his classes. Citations were issued to Chris concerning his misbehavior on a near weekly basis.

At age fifteen, Chris had just about exhausted all remedies outside of Alternative School that the education system had to offer. He began seeing a psychotherapist at this age.

At age sixteen, Chris began experimenting with drugs; taking alcohol and marijuana on a weekly basis. He also became sexually active at this age. He continued to be issued citations for bad behavior at school on a near weekly basis, mostly for verbal misbehavior and failing to follow instructions. His request to be qualified as a handicapped student was refused after a "comprehensive individual assessment" was conducted and his IQ found to be 100.

At age seventeen, Chris was labeled a gang member at school. A psychologist conducting another assessment for his possible inclusion in the special education program noted Chris had poor temper control, that he was easily frustrated and had trouble concentrating, that he was resistant to authority figures, and that Chris expressed homicidal ideations that should be monitored.

As a senior, Chris continued to have problems at school, partly because of the pressure from his gang friends vs. adhering to the conditions of his probation for assault. At school, Chris continued to be cited on a near weekly basis. He graduated from high school while technically suspended from classes.

### Suicide attempts

The only confirmed threat of suicide is the incident that occurred when Chris was a fifth grader. When his mother informed Chris he was scheduled to see a juvenile probation officer with regard to the Theft charge, his response was to say he would rather die than go to jail. Chris ran into the kitchen and placed a butcher knife to his throat. He did not see a counselor for this until several months later.

### Alcohol / drug abuse

***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***

1458

As noted above, at age sixteen, Chris began experimenting with drugs; taking alcohol and marijuana on a weekly basis. Chris was taken to the Emergency Room for alcohol poisoning after his high school graduation party. Little else is known at this time about substance abuse.

### Girlfriends

At age fourteen, Chris became involved in his first serious romantic relationship. The girl, Ebony Jackson, was two years younger than Chris. Ebony had been sexually abused and a victim of incest as a child, and so their relationship may not have been one of physical intimacy. Chris bought her a dozen roses out of his first paycheck of his job. The relationship lasted about a year.

Chris became sexually active at age fifteen, with numerous partners. His mother supplied Chris with condoms.

Chris is currently "engaged" to a high school senior he had began dating just prior to his arrest for the current charges.

### Employment

Chris has held a couple of jobs as a young adult, for the Army and for a telemarketing company.

### Relationship with father

Since age one year, Chris has had only two visits with his biological father: when Tony Vialva dropped in for a visit on Chris' seventh birthday and again the following year on his birthday. (During the eighth birthday visit, Vialva had already left before Chris thought to ask his mother who the man was, then was surprised to learn Vialva was his father.)

After being arrested for this offense, Chris contacted his father by mail and then by phone. At first, Vialva indicated he was eager to establish a relationship with his "long lost" son, and even began introducing Chris on the phone to his other children. Some of these half siblings had begun to write to Chris. For some unknown reason, Vialva has terminated the relationship and will no longer speak to Chris on the phone.

### Exposure to violence

Chris was exposed to a lot of violence as a child. Besides being witness to his mother being beaten, Chris was also the victim of domestic violence from some of her men friends.

### Criminal behavior

Chris has a very short list of convictions, mostly in juvenile court, although he has had several run-ins

*\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\*DRAFT\*\*\**

*Vialva Social History, Page 16*

with the law. He has never been to prison. Chris' prior arrests are described, in general, in this section.

Soon after his eighteenth birthday, Chris was caught shoplifting. A few months later he was arrested for Aggravated Assault with regard to a gang-related drive-by shooting. Chris was not alleged to be the shooter, but was a participant in the offense. While in jail, Chris threatened suicide.

Upon being released, Chris plead guilty and received a probated sentence. His probation was not closely monitored by the court system, however, Chris mother and step-father attempted to help him stay clean. His gang friends would come by the house and tease Chris for staying home with his parents.

***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***DRAFT***

# CHRISTOPHER ANDRE VIALVA
## Life History Chronology

*Updated January 5, 2000*

| **DATE** | **EVENT (Source of Information)** |
|---|---|
| **1959** | |
| Jan. 13 | Chris' mother, Lisa was born to Phyllis and James Dickson. She was the third of five children in the family. James was in the third year of his ten years with the Air Force at the time of Lisa's birth. (Interview of Lisa Brown) |
| **1969** | |
| Unknown | Lisa's father told her (when she was ten years old) that he'd never loved her like the other children, as he suspected she was not his child. (Interview of Lisa Brown) |
| **1974-1977** | |
| High School years | Lisa was raised in a strict Seventh Day Adventist background and was not allowed to date significantly during high school. Lisa was a relatively high achiever in high school yet received little encouragement or praise at home for her efforts. (Pauquette Center for Mental Health and Guidance records) |
| **1977** | |
| Unknown | Lisa graduated from Wisconsin Dells High School. (Military records) |
| Nov. 16 | Lisa enlisted in the Army. (Interview of Lisa Brown) Lisa performed admirably, and received exceedingly high evaluations. (Pauquette Center for Mental Health and Guidance records) |
| **1978** | |
| Unknown | Lisa was engaged to Robert Mabrey. Although they broke up, he would later became her second husband. (Interview of Lisa Brown) |

*\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\**

*Vialva Chronology, Page 2*

| | |
|---|---|
| Unknown | While still in Basic Training, Lisa was raped. The rape resulted in a pregnancy. Lisa miscarried after six weeks. (Interview of Lisa Brown) |
| Oct. 06 | Lisa married Chris' father, Rowlland "Tony" Vialva. Vialva, who was born in Trinidad, was a soldier when Lisa met him. Both were stationed at Fort Benning, Georgia. Within a month after they were married, Vialva became obsessive and physically assaultive to Lisa. (Prior to their wedding, the only assaultive behavior he showed toward Lisa was "biting".) (Interview of Lisa Brown) |

Although married three years, Lisa and Vialva lived together less than twelve months total. During this time, he controlled every aspect of her life, from her dress to her movements. Vialva required Lisa to be covered from head to foot when she left the house (when she was not on duty). He told her he wanted no other man to see "what he had". This attitude extended to their possessions at home, as well; Vialva insisted the curtains be tightly closed at all times because he was worried someone would look in. Vialva would not allow Lisa to use the phone or visit anyone. He would not allow her to drive to her job and she often had to wait several hours for him to pick her up after work. Vialva was extremely violent to Lisa. Vialva would disappear for days at a time during their marriage. During the years since their divorce, Lisa has learned Vialva had several other women who bore children for him during the time she and he were married. His absences were probably related to these extra-marital affairs. It is also possible his absences were related to Vialva's criminal activities. (He was involved in the drug trade.) On one occasion, Lisa learned Vialva had been to England during a week-long absence. On another occasion, she found that he and a woman-friend had been staying at a motel near the base. (Interview of Lisa Brown)

Vialva often had "wads of money", which he claimed to have won at the horse races. Army officials believed Vialva was dealing drugs, however. (Interview of Lisa Brown)

Lisa learned that Vialva practiced witchcraft when she went into a closet in their home and discovered various religious artifacts he had placed there. (She had been warned to not go into this closet and was beaten by Vialva when he found that she had opened the door.) (Interview of Lisa Brown)

*\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\**

146

*Vialva Chronology, Page 3*

Vialva would beat Lisa several times a week. Neighbors (on base housing) often called the Military Police to break up the altercations. Vialva was usually not detained or arrested, however, because Lisa was afraid to file charges. Vialva became aware that his behavior would land him in jail, so he made a point of taking Lisa to the center-most room of their apartment during the beatings. (Interview of Lisa Brown)

After one altercation the Military Police arrested Vialva even though Lisa refused to file charges. He was taken to jail. Lisa awoke early the next morning with Vialva sitting on her chest, his knife to her throat. (Interview of Lisa Brown)

**1979**

A few months prior to her pregnancy with Chris, Lisa had her second miscarriage. The baby was fathered by Vialva. Doctors referred to her as a "spontaneous aborter". The doctors kept Lisa in the hospital for a few extra days for psychiatric observation, or just so she could have a chance to rest before going home, because of her fear of Vialva. (Interview of Lisa Brown)

**May 24**

Lisa was promoted to the Grade of Rank Specialist Four. (Military records)

**July 06**

Lisa successfully completed the Primary Leadership Course conducted by the Noncommissioned Officer School of Infantry. (Military records)

**July**

Lisa made tentative plans to leave Vialva. She began moving personal effects out of their apartment, a few at a time so as to not arouse his suspicion. She befriended a neighbor who allowed Lisa to store these belongings at her apartment. (Interview of Lisa Brown)

During the last beating Vialva gave to Lisa, this neighbor contacted the Military Police. Because of Vialva's reputation for violence, ten officers came to the scene. When the MP's arrived, Vialva was choking Lisa and had her leaning backwards over a stair railing. When he refused to identify himself to the female duty officer who had arrived with the MP's, the officer started going through mail laying on a table in the apartment. Vialva, angered at this, attacked the officer.

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

He was arrested for this assault, and was sentenced to thirty days hard labor. (Interview of Lisa Brown)

Even though a court martial had been initiated, Vialva was released from jail prior to the end of his thirty day sentence. He showed up at their apartment and continued to live with Lisa until the court martial was final. She became pregnant with Chris during this time. After being released for the final time, Vialva moved to Houston. He doubted Lisa's pregnancy was his child, due to the timing of it. (Interview of Lisa Brown)

**Nov. 16**

Vialva asked Lisa to move to Houston, where he then had a civilian job. Lisa left the Army on a pregnancy discharge and moved in with Vialva, thinking her baby needed a father and hoping Vialva had changed. A few weeks after she moved in, Vialva began beating Lisa again. Lisa fled Houston, relocating to a sister's house in Wisconsin. She was anorexic and stressed due to the abuse, and sought counseling during this last trimester. (Interview of Lisa Brown)

Her father expressed his distaste for her having married a black man and begged Lisa to abort the baby or to give the baby up for adoption. (Interview of Lisa Brown)

## 1980

**Jan. 09**

Lisa was awarded the Army Commendation Medal for her service in the military from July 27, 1978 - November 16, 1979. (Military records)

**Feb. 29- Aug. 14**

Lisa was seen six times by Dr. Hummel, in Wisconsin, to assess her emotional stability and parental abilities. At the time, Lisa was in the process of divorcing her husband. Lisa had returned to Wisconsin after leaving Vialva due to severe marital difficulties. Vialva had been discharged from the Army for disorderly conduct stemming from a report of civil disturbance and wife abuse. Issues that promoted abuse were arguments regarding money, the excessive debts her husband built up without informing her, and his reported gross lack of concern for her or personal property. (Pauquette Center for Mental Health and Guidance records)

Lisa's psychological evaluation included the Rorschach, the Minnesota

*\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\**

Multi-phasic Personality Inventory, and Clinical Interview. The results of these tests did not indicate any psychosis or thought disorder present. Lisa possessed the qualities to be at least an average parent. She demonstrated a high level of caring and concern for her son. (Pauquette Center for Mental Health and Guidance records)

Lisa returned to Vialva one more time prior to Chris' birth. Vialva continued to assault her. Two weeks before Chris was born, Vialva drove Lisa to San Antonio (because she would receive free health care at the Army hospital there). He left Lisa in San Antonio and did not reappear until after Chris was born. (Interview of Lisa Brown)

**May 10**                **Birth**

Chris was born to Lisa Dickson Vialva and Rowlland Vialva in an Army hospital in San Antonio. He was a full term baby. The delivery was a dry birth that had to be induced. Lisa's pregnancy and the delivery were complicated by Toxemia and Hypertension. She had spotted blood a few times during the pregnancy. (Interview of Lisa Brown) Chris had extremely severe milk allergies and finally was wet-nursed by his aunt. (Dr. Constance Fournier records)

**May**

Lisa returned to Houston to live with Vialva. His abuse of her continued. Vialva practically ignored the baby. Due to Chris having blonde hair, Vialva continued to deny paternity, referring to Chris as a "honky". (Interview of Lisa Brown)

Lisa knows of only one instance where Vialva was physically abusive to Chris. Lisa had left Chris alone in the living room with Vialva. She heard Chris squealing and came to retrieve him. Upon inspection she found he had bite marks on his torso. This occurred when Chris was just a few days old. (Interview of Lisa Brown)

Lisa would leave Vialva on a few occasions, taking Chris with her to Wisconsin where she stayed with her sister. Sometimes Vialva would come for her; other times Lisa simply returned to Houston to be with him. After Chris was born, Vialva refused to have sex with Lisa. (Interview of Lisa Brown)

**May 21**

At age eleven days, Chris was admitted to the Texas Children's Hospital in Houston. He was diagnosed with Sepsis - Etiology Group

*** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ***

*Vialva Chronology, Page 6*

B Streptococcus and Conjunctivitis. When admitted to the hospital, Chris had a fever of 101 degrees. He was given Ampicillin, Gentamicin, and Penicillin. Chris was released seventeen days later. (Texas Children's Hospital records)

June 12

Lisa left Vialva for the last time, due to him attempting to assault Chris. Vialva was upset over something. Lisa was afraid Vialva would hurt Chris. When Lisa intervened, Vialva kicked her in the head. She lost vision in both eyes from the blow. Lisa contacted her sister in Wisconsin, who sent her husband to pick up Lisa and Chris and accompany them on a flight to Wisconsin. Lisa, who had been blinded for three days, later saw a doctor in Wisconsin. She then filed for divorce, sought counseling, and never returned to Vialva. (Interview of Lisa Brown)

By the time she moved to Wisconsin this last time, Lisa had practically starved herself to death by anorexia. She learned during this visit that even the birth of her son could not soften her father's feelings about her relationship with a black man. Lisa and her father have never reconciled their differences. (Interview of Lisa Brown)

Nov.

Lisa tried to re-enlist in the Army, but could not due to medical problems (the spontaneous aborter issue). (Interview of Lisa Brown)

# 1981

Jan.

At age eight months, Chris began to walk. (Dr. Constance Fournier records)

March

Lisa moved herself and Chris from her sister's home in Wisconsin to Jacksonville, Florida. She had received a call from Robert Mabrey, a man she had been engaged to prior to her marriage to Vialva. When Mabrey learned Lisa was divorcing Vialva, he suggested they resume their relationship. At the time, he was living in Jacksonville with his sister and considering re-enlisting in the Army. (Interview of Lisa Brown)

March 25

Eric J. Hummel, Ph.D., sent a letter to the Assistant Family Court Commissioner in Portage, WI concerning the divorce of Chris' parents, Lisa and Rowlland. Dr. Hummel had met with Lisa on seven occasions between February 29, 1980 and August 14, 1980 regarding

***** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

*Vialva Chronology, Page 7*

her marital situation. Dr. Hummel did not have an opportunity to meet with Vialva, however he could attest to the high level of dysfunction in the marriage. According to Dr. Hummel, Lisa was not interested in reconciliation, and he agreed with her. (Divorce records)

Dr. Hummel was extremely reluctant to recommend visitation for Vialva without some assurances of his emotional stability and ability to properly care for a child. (Divorce records)

**May 10**                    **1st Birthday**

**June 02**                   Dr. Hummel sent a letter to the Assistant Family Court Commissioner in Portage, WI. Vialva had "purportedly" called Dr. Hummel from Saudi Arabia, in the hopes that Dr. Hummel could be persuaded into approving unlimited visitation or possibly sole custody of his son. (Divorce records)

Dr. Hummel recommended that the court consider psychological evaluations for the individuals involved before final determination of visitation or custody be made should the father continue to express an interest in Chris. (Divorce records)

**Aug.**                      After re-enlisting in the Army, Mabrey was sent to Ft. Polk in Louisiana. Lisa and Chris went with him. They resided off base. Chris had slept with his mother for all of his life until she and Mabrey got together. Mabrey wanted this situation to cease, and insisted on getting Chris (and Lisa) accustomed to separate beds. Mabrey prevented Chris from leaving his bedroom by installing a gate. To prevent Lisa from going to Chris' as he stood at the gate crying, Mabrey would hold her down on the bed. Sometimes Chris seemed to scream all night. (Interview of Lisa Brown)

**Sept. 02**                  Lisa was granted a divorce from Vialva. He failed to appear in court. Lisa was granted sole custody of Chris and no order was made granting visitation to Rowlland. (Divorce records)

Mabrey was ashamed to be associated with a bi-racial step-child. He wanted Lisa to say Chris was her adopted son, and to say he was a Mexican child. (Interview of Lisa Brown)

When Chris was approximately a year and a half old, Mabrey

**** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* ****

*Vialva Chronology, Page 8*

attempted to assault him. Chris urinated on Mabrey while Mabrey was changing his diaper. When she saw that Mabrey was angry, she asked him to hand her the baby. Instead, he took Chris into the bathroom and locked the door, Lisa threatened to call the police. Mabrey then ran out of the bathroom, took the phone from Lisa, and began choking her. (Interview of Lisa Brown)

Sept. 14      Chris became ill and his temperature reached 103. Lisa could not afford to take him to a doctor. It was Chris being sick that prompted her and Mabrey to marry on this date, so Chris would be entitled to Mabrey's medical benefits. Right after the ceremony, Chris was taken to the Emergency Room at the hospital at Ft. Polk. Lisa cannot recall the diagnosis. (Interview of Lisa Brown)

## 1982

Unknown      Lisa was raped again. Details are not known at this time and it is unclear whether this happened before or after her separation from Robert Mabrey. (Interview of Lisa Brown)

**May 10**      **2nd Birthday**

Unknown      Lisa had worked intensively with Chris and he knew his letters, numbers, colors, and shapes. Lisa believed in enrichment programming and provided him with multiple opportunities to learn. (Dr. Constance Fournier records) It was during their stay in Louisiana that Lisa had this time to spend with Christopher, as she was not working. The fact that Mabrey was deployed often also gave Lisa a lot of time with Chris. (Interview of Lisa Brown)

Soon after his transfer to Ft. Polk, Mabrey was notified that he would be sent to Germany. Lisa discovered that Mabrey had been writing to a former girlfriend who lived in Germany, and that he planned to resume his affair with this woman once he moved to Germany. Lisa confronted Mabrey, and they decided to separate. When Lisa visited her doctor to get a prescription for birth control, she learned she was pregnant. (Interview of Lisa Brown)

After learning Lisa was pregnant, Mabrey became assaultive to her. She suspects Mabrey's intention was to cause her to have a miscarriage. He continued to be violent to Lisa for the duration of

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

their on again / off again relationship. Unlike her relationship with Vialva (who had had martial arts training), Lisa fought back during the altercations with Mabrey. (Interview of Lisa Brown)

Nov.

When Lisa was nearing the end of her second trimester of pregnancy (with Audrey) she began spotting. This happened while she and Mabrey were visiting his family in Georgia (??). Also during this visit, Chris (age two) wandered out of the house in the middle of the night. He was found two miles down the road by a neighbor, who returned Chris to Mabrey's home. No one had yet noticed Chris was gone. (Interview of Lisa Brown)

## 1983

Jan.

Within weeks of Audrey's birth, Mabrey took Lisa to stay with her sister in Killeen in order to be near a good Army hospital. By this time the two had decided to get divorced. Mabrey left Lisa's sister's house for cigarettes one day and simply never returned. He later called Lisa and told her he planned to spend time with his mother before he left for Germany. (Interview of Lisa Brown)

Jan. 21

Lisa's second child, Audrey, was born to Lisa and Robert Mabrey. Like Chris, Audrey was a dry birth with several complications. Audrey was not breathing and her heart not beating during the last several minutes of the delivery and during the several minutes following it. (Interview of Lisa Brown)

Lisa sent photos of their new baby to Mabrey. He wrote back, saying she was the "ugliest" baby he had ever seen. (Interview of Lisa Brown)

**May 10**

**3rd Birthday**

Unknown

When Chris was three years old, he asked his mother "why do I have this funny brown stuff on me?", referring to his brown skin. (Interview of Lisa Brown)

June 03

Lisa moved with Chris and Audrey to Germany in order to be with Robert Mabrey. She had decided not to divorce him; and to give Mabrey an opportunity to be a father to Audrey. (Interview of Lisa Brown)

**** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* ****

*Vialva Chronology, Page 10*

The night before leaving for Germany, Chris was bitten all over his body by fire ants. He was horribly swollen (he looked afflicted with elephantiasis) during their journey overseas.   (Interview of Lisa Brown)

When Lisa arrived in Germany, she decided to not seek employment until the end of summer, so she would have time to acquaint herself with the area and culture. Almost immediately, Mabrey was deployed on a thirty day mission, leaving Lisa alone with two small children in a strange land. (Interview of Lisa Brown)

Lisa's relationship with Mabrey was no better than it had been before they reunited in Germany. He continued to be assaultive, jealous, and possessive. Additionally, Mabrey was obsessed with the house being spotless. He did not make any effort to help with the children. And, he began to withhold sex from Lisa. (Interview of Lisa Brown)

Sept.

Lisa obtained civil service employment with the Department of Defense. She also began singing with a jazz club band. Between her full time job, practice sessions with the band, and the band's performances, Lisa was gone from their home often. She did not depend on Mabrey to watch the children, and so left them with a sitter. (Interview of Lisa Brown)

Mabrey's behavior towards Lisa worsened. There was no predictable pattern to his abuse. He would sometimes keep her up all night, as a sort of "sleep deprivation" torture. Lisa would come home from band practice late some nights and find Mabrey had locked her out of their bedroom. He would leave her pillow and blanket on the couch, so she would bed down in the living room. Lisa would be awakened by Mabrey during the night, demanding she come sleep in the bed with him. A few hours later, Mabrey would kick her out of bed again and send her back to the couch. Sometimes Lisa would be packing the children out the door, on her way to drop them at the sitter before going on to work and find that her car was gone. Even though Mabrey's office was only two blocks from their apartment, he would take their only car without telling Lisa. Then, instead of parking it near his office, Mabrey would hide the car somewhere on the base. Lisa would have to search for it, children in tow, then worry about being late for work. She thinks Mabrey did this as often as he did because he enjoyed inconveniencing her. (Interview of Lisa Brown)

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

1470

*Vialva Chronology, Page 11*

Mabrey constantly accused Lisa of having an affair with the manager of her band. The man was black, and Mabrey used the fact that Chris was bi-racial to justify his suspicions that Lisa was having sex with her manager. The manager, tiring of the constant inferences from Mabrey, dropped Lisa and she was forced to audition for another band. (Interview of Lisa Brown)

Mabrey continued to be assaultive towards Lisa, and she continued to fight back. Lisa would send Chris and Audrey to a bedroom and close the door when the fights began. If the altercations were "quiet" she could count on Chris keeping Audrey in the bedroom. If the fighting was loud enough for Chris to hear, he would come out of the bedroom and attempt to defend his mother from Mabrey's attack. Sometimes Chris would attempt to stop Mabrey by jumping on his back and hitting him. This would cause Mabrey to lash out at Chris. (Interview of Lisa Brown)

The Military Police were contacted several times by neighbors. Sometimes, Lisa reported his assaultive behavior to Mabrey's supervisors. Mabrey would be forced to move into the barracks for awhile, then would come home and the violence would resume. This happened several times. (Interview of Lisa Brown)

One time Mabrey called the MP's to arrest Lisa. During an altercation he had attempted to use Audrey as a shield, and Lisa had accidentally hit the child. The police arrived, took Lisa's statement, then arrested Mabrey instead. (Interview of Lisa Brown)

## 1984

**May 10**                  **4th Birthday**

Unknown                    While living in Germany, Chris fell into a radiator at the family's apartment. He vomited but did not lose consciousness. Chris did not receive medical treatment for this head laceration. (Interview of Lisa Brown)

Unknown                    Chris was tested and found to be functioning at approximately the second grade level. (Dr. Constance Fournier records)

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

1471

*Vialva Chronology, Page 12*

## 1985

**May 10**                    **5th Birthday**

By this time Lisa and Robert Mabrey were totally estranged. She did not want to leave Germany, however, because she was becoming successful and popular as a singer. Believing her future as a singer looked promising, Lisa decided to stay and see what happened. She continued to live with Mabrey, work full time for the government, and had money to pay for child care and their expenses. (Interview of Lisa Brown)

**Oct.**

Lisa was admitted to the Army hospital in order to have her tubes tied. While there, a lesion was discovered on Lisa's face that required testing and treatment. Lisa ended up being hospitalized for two weeks, during which time her two children were left with Mabrey. Mabrey did not cash his payroll check and did not purchase groceries. Lisa came home to find the children had eaten "nothing but toast" during her hospitalization. (Interview of Lisa Brown)

Although Lisa and Mabrey agreed to live together in Germany and separate when it was time for his next rotation / transfer, she learned Mabrey had reneged on this agreement in that he had completed paperwork necessary to send her and Chris home. Mabrey planned to keep Audrey with him, so he could continue to receive housing benefits. Lisa fought this process, not wanting to leave without Audrey. (Interview of Lisa Brown)

Out of spite for Mabrey reneging on their deal, Lisa reported to his superiors that Mabrey was having an extra-martial affair with another officer. (To hurt her, Mabrey would often talk on the phone to his lover in front of Lisa.) She was surprised to learn later that Mabrey's lover was a man. (Interview of Lisa Brown)

**Nov.**

When Lisa continued to fight to keep Audrey with her, Mabrey gave up and agreed she could go home with Lisa and Chris. He dropped them off at the airport only because his commanding officer ordered him to give them a ride. Mabrey did not help them into the terminal and did not say goodbye. His parting words to Lisa was to advise her to learn to do things on her own. (Interview of Lisa Brown)

*\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\**

1472

*Vialva Chronology, Page 13*

Upon returning to the U.S., Lisa and her two children stayed with a sister in Wisconsin one month, then relocated to Killeen to find work. She left the children in Wisconsin for two months while she got settled. The move to Texas was her last relocation. (Interview of Lisa Brown)

**1986**

Unknown              During her first year as a single parent, Lisa worked three jobs, six days week. Chris and Audrey spent a lot of time with a babysitter. Lisa thinks she had reliable and caring babysitters. One sitter was fired though, when overheard making bigoted statements while Chris was in her home. (Interview of Lisa Brown)

March                Chris enrolled in Kindergarten at Peebles Elementary for the last two, six week periods. He received satisfactory grades in all subjects. His teacher noted on the report card that Chris needed to listen and control his talking. (Killeen ISD records)

**May 10**              **6th Birthday**

May 16               Lisa's divorce from Robert Mabrey was finalized after four years, eight months of marriage. (Interview of Lisa Brown)

Aug.                 Chris enrolled in the first grade at Hay Branch Elementary. During this school year, he received an A in Science and B's in Math, Social Studies, and Language Arts. He received a Satisfactory grade in Health, Fine Arts, Art, and PE. Chris had trouble in the following areas: he did not like to work independently, would not control his talking, would not follow instructions, and he was not courteous and had poor manners. He was absent a total of 6 days during the year. (Killeen ISD records)

Unknown              Sometime during this school year Chris was assaulted by other children. Although he had several cuts on his head from being pelted with rocks, Chris did not receive medical treatment. Chris was being picked on because he was bi-racial. (Interview of Lisa Brown)

**1987**

Unknown              Lisa cut back from three to two jobs; one was as a dancer in a nightclub. (Interview of Lisa Brown)

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

*Vialva Chronology, Page 14*

| | |
|---|---|
| April | Chris took the Primary 1 Level of the Metropolitan Achievement Tests. He scored average in all areas except Math, for which he scored below average. (Killeen ISD records) |

**May 10**

**7th Birthday**

Vialva showed up at Lisa's house, uninvited, to meet Chris on his birthday. He took Chris shopping for clothes, but then refused to buy them when Lisa refused to help Chris try them on, instead she suggested Vialva accompany Chris into the fitting room. Vialva bought Chris an expensive toy, instead. (Interview of Lisa Brown)

Aug.

Chris enrolled in the second grade at Hay Branch Elementary. During this school year, he received B's in all classes. He received an E in Handwriting and S's in Health, Fine Arts, Art, and PE. It was noted on the report card that Chris had a poor attitude towards the PE teacher. It was also noted on the report card by his teacher that Chris showed disrespect for herself and other students. He was absent one day during the year. (Killeen ISD records) During this year his vision was tested at 20-70 and Chris began wearing glasses. Prior to this year, Lisa was informed by the school several times that Chris seemed to have trouble seeing; she had thought he was faking it and so did not seek treatment for him until after the school exam. (Interview of Lisa Brown)

Unknown

While in the second grade Chris was administered the TAG test. He scored high, however, he was not admitted to the program because of his behavior. (Dr. Constance Fournier records)

# 1988

**May 10**

**8th Birthday**

Vialva again visited Chris and Lisa, uninvited, on Chris' birthday. This time, he chatted with a man who was staying with Lisa while Chris watched television and Lisa retreated to the kitchen. After Vialva left, Chris asked who he was, not realizing the man was his father. (Chris did not consider himself black.) This would be the last time Chris saw Vialva. Lisa had flashbacks during and after Vialva's fifteen minute visit. She hid in a closet and it took her boyfriend several hours to talk her out. (Interview of Lisa Brown)

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

(474

*Vialva Chronology, Page 15*

| | |
|---|---|
| Aug. | Chris enrolled in the third grade at Bellaire Elementary. During this school year, Chris received an A in Math, B's in Science and Language Arts, and a C in Social Studies. He received S's in Handwriting, Health, Fine Arts, Art, and PE. He continued to have trouble controlling his talking. He was absent a total of three days. (Killeen ISD records) |
| | Chris played soccer during his third grade year, at a local rec center. (Interview of Chris Vialva) |
| Sept. 27 | Chris was seen at the Metroplex Hospital for a broken arm he received during a game of tag with neighbor children. (Interview of Lisa Brown) |

**1989**

| | |
|---|---|
| Unknown | Lisa began a two to three year relationship with a pilot, Jim Gillhouse. This was the first of Lisa's romantic relationships that Chris approved of. Lisa thinks Chris bonded with Gillhouse because Gillhouse was very dark complected (white, with a tan) and enjoyed sports. Gillhouse would participate with Lisa and her children in family activities, whereas her prior boyfriends would take Lisa out on dates and leave the children at home. Gillhouse, who had a son with Downs Syndrome, was very patient with Chris and understanding of his outbursts. Gillhouse was the first man Chris had responded to. Chris told Lisa he wanted Gillhouse to be his Dad. Lisa and Gillhouse became engaged almost immediately. Eight months after they began dating, Gillhouse was sent overseas to eventually fight in the Gulf War. He kept in close contact with Lisa, sending her audiotape letters on which he'd also recorded messages for Chris and Audrey. (Interview of Lisa Brown) |
| Feb. | Chris took the Texas Educational Assessment of Minimum Skills Test. He mastered all subjects tested: Math, Reading, and Writing. (Killeen ISD records) |
| **May 10** | **9th Birthday** |
| Unknown | When Chris was nine years old, Lisa began having his father's pay garnished for child support. She's has collected from Vialva in this manner every since. (Interview of Lisa Brown) |

**** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* ****

147

*Vialva Chronology, Page 16*

| | |
|---|---|
| May 13 | Chris took the Elementary Level of The Metropolitan Achievement Tests. He scored average in all subjects except Reading Comprehension, Math, and Science, for which he scored below average. (Killeen ISD records) |
| Aug. | Chris enrolled in the fourth grade at Bellaire Elementary. During this school year, Chris received an A in Science and B's in Math, Social Studies, and Language Arts. He received S's in Health and Fine Arts, and E's in Art and PE. He was absent a total of four days. (Killeen ISD records) |
| Unknown | By the time he was nine years old Chris was becoming more aggressive with his mother. Once when angered, he got close to her and used his chest to bump her chest, yelling at Lisa to hit him. Eventually, Lisa lost her temper and shoved him to move him away from her. She had a flashback to Vialva's abuse, confused Chris for his father, and shoved him into a wall. Chris dented the wall with his head. (Interview of Lisa Brown) |

## 1990

| | |
|---|---|
| **May 10** | **10th Birthday** |
| Aug. | Chris enrolled in the fifth grade at Bellaire Elementary. During this school year, Chris received B's in Math, Social Studies, and Science and a C in Language Arts. He received S's in Health, Fine Arts, and Art, and an E in PE. The teacher noted a couple of times that Chris had bad days and good days. He would be disruptive in class and make a comment about everything. (Killeen ISD records) Chris' fifth grade teacher often encouraged Lisa to take Chris to a mental health professional. (Interview of Lisa Brown) |
| Oct. | Chris took the Texas Assessment of Academic Skills Test. Chris mastered Writing and Reading, but not Math. (Killeen ISD records) |
| Nov. 15 | Chris was referred to Dr. Constance Fournier by Dr. Debbie Douty for behavioral problems in school. Dr. Fournier also interviewed Chris' mother, Lisa. At that time Lisa was a security specialist and she, Chris and his half-sister, Audrey, were living in Killeen. (Dr. Fournier's records) |

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

*Vialva Chronology, Page 17*

Lisa reported to Dr. Fournier that Chris was not performing up to his ability in class. Chris did fairly well in school the last two years, however, he really liked his teachers. But now his grades and attitude had plummeted. (Dr. Fournier's records)

According to counseling records, Lisa was engaged to someone who literally jilted her a couple of years prior; the man was stationed in Germany and was transferred to Saudi Arabia. (Gillhouse, presumably.) This situation put considerable stress on the family. They have made a couple moves in the last years but they have been positive moves. (Dr. Fournier's records)

Chris told Dr. Fournier that the best thing about school was PE and the worse thing was all his subjects. He was involved with soccer activities. Chris reported that he had friends in school. Chris often had trouble sleeping because he didn't want to sleep. He would go to bed very late. Chris reported that he had nightmares rarely and they were usually associated with scary movies. Chris reported that he would get so mad that he wanted to punch a wall, but he denied any suicidal ideation. He would worry about his mother when she cried and that something bad would happen to her. (Dr. Fournier's records)

He told Dr. Fournier that the reason he was talking with her was because he talks too much in class and he gets in trouble a lot by hitting, calling names, and having a temper tantrum. This has always been a problem for him and he wanted to change. (Dr. Fournier's records)

Chris was given the Piers-Harris and the results indicated that in general he was functioning in the average range, as compared with other children. (Dr. Fournier's records)

Diagnostic Impression: Axis I - Oppositional defiant disorder, rule out attention deficit-hyperactivity disorder; Axis II - none; Axis III-none. It was recommended that Chris and his mother return for individual therapy. (Dr. Fournier's records)

## 1991

April 15        Chris took the Metropolitan Achievement Test. Chris scored average in all areas. (Killeen ISD records)

**** *DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT* ****

*Vialva Chronology, Page 18*

**May 10**               **11th Birthday**

Unknown

By age eleven, the least little thing would cause Chris to lose his temper. He would punch holes in walls and then return to calm like nothing had happened. (Interview of Lisa Brown)

July 19

Chris was picked up by the Killeen Police for Theft under $20. A Warning Notice was given to his parents from the Youth Services Unit, Killeen Police Department. (Killeen Police Department records)

late July

Lisa informed Chris he was scheduled to see a juvenile probation officer with regard to the Theft charge. His response was to say he would rather die than go to jail. Chris ran into the kitchen and placed a butcher knife to his throat. (Interview of Lisa Brown)

Aug.

Chris enrolled in the sixth grade at Nolan Middle School. During this school year, he received A's in Band and PE, B's in English, and Science, C's in Math and Reading. He failed History. (Killeen ISD records)

Up until he entered junior high, Chris had always referred to himself as "white". During junior high, he began to refer to himself as "mixed." (Interview of Lisa Brown)

Chris played football during his sixth through ninth grade years. He told his mother the game was a way to vent his anger. (Interview of Lisa Brown)

**1992**

Unknown

As a result of his war-time service, Gillhouse underwent a personality change. When he returned from overseas Gillhouse seemed to hate everyone, drank all the time, and became very promiscuous. He no longer had patience with Chris and even told Chris that it was his fault that Gillhouse and Lisa would not be getting married. This broke Chris' heart. During the years since this break up, Lisa has sometimes told Chris that she blames him for Gillhouse leaving her. (Interview of Lisa Brown)

Unknown

At age nine, Audrey visited with her father for the first time since she was an infant. (Interview of Lisa Brown)

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

*Vialva Chronology, Page 19*

Jan. 13

Lisa called Dr. Stuart Coles of the Scott and White Clinic and reported Chris had a suicidal gesture. She requested a referral to a psychiatrist. Arrangements were made for a re-evaluation on an urgent basis. (Scott and White Clinic records)

Feb. 24

Chris and Lisa met with Dr. William Rae for an evaluation concerning Chris' suicidal gesture in January. Chris had gotten into some trouble with the police for breaking into an abandoned building, and it was at that point he stated he was going to kill himself. Chris had put a knife to his throat and stated, "If I have to go to jail, I'd rather be dead". (This was the July, 1991 incident.) Chris was diagnosed with oppositional-defiant disorder and dysthymia. Dr. Rae recommended that Chris be considered for medication for his dysthymia. Chris would be referred to Dr. Gail Eisenhauer for medication. It was suggested that Lisa get some counseling for herself. Chris would also benefit from individual psychotherapy. It was also recommended that Chris and Lisa be engaged in a dialogue concerning modifying his behavior. (Scott and White Clinic records)

March 05

Lisa's mother died of breast cancer. (Interview of Lisa Brown)

March 28

Chris kept his appointment with Dr. Rae. Clinic notes indicate Chris was in a good mood and he indicated he had not gotten into very much trouble. Chris stated he felt very picked on by his mother and by his peers because of his mixed racial origin. Chris does not feel he fits in with either the black or the white children. This creates a considerable amount of frustration for him. (Scott and White Clinic records)

Lisa was seen separately. She was very stressed out because her mother had died two weeks before. It was clear to Dr. Rae that Lisa needed a more significant support system. (Scott and White Clinic records)

April 02

Lisa took Chris into the clinic because he complained of pain in his right knee. X-ray obtained and looked normal, Chris was given crutches for a week. (Scott and White Clinic records)

**May 10**

**12th Birthday**

May 21

Dr. Eisenhauer began prescribing Imipramine for Chris. (Prescription

*\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\**

*Vialva Chronology, Page 20*

records)

| | |
|---|---|
| June | Lisa began dating Joe Massey. He would eventually become her third failed marriage. (Interview of Lisa Brown) |
| July 03 | Chris was seen in the Emergency Room after he had been exposed to tear gas while playing with a container of the gas. Chris was given Imipramine, 50 mg. Eye exam was totally benign. Chris was released with no further treatment. (Scott and White Hospital records) The "gas" was actually a can of mace. (Interview of Chris Vialva) |
| Aug. | Chris enrolled in the seventh grade at Nolan Middle School. During this school year, he received an A in PE, and B's in Art, English, Language Arts, Math, Reading, and History. (Killeen ISD records) He continued to play football. (Interview of Lisa Brown) |
| Unknown | Sometime during the seventh grade, Chris got into a fight at school with a student who called him a "zebra". The teacher did not punish Chris, since he had been provoked by a racial slur. His mother bought Chris a hat with the slogan "Not black. Not white. Human". (Interview of Lisa Brown) |
| Aug. 24 | Lisa brought Chris into the Clinic to see Dr. Douty for sore throat, stiff neck, congestion, and cough. He was diagnosed with tonsillitis and nasopharyngitis. Keflex, 250mg was prescribed for treatment. (Scott and White Clinic records) |
| Sept. 16 | Lisa brought Chris into the Clinic to see Dr. Douty for chest pains, described as a sharp pain that hurt enough to make him cry. At the time, Chris was on Tofranil, 50mg at bedtime, which he took for his psychological problems. (Scott and White Clinic records) |
| Sept. 24 | Chris was assigned to detention hall after school: he repeatedly disrupted his science class and responded in a rude, agitated manner to his science teacher. (Killeen ISD records) |
| Dec. 09 | Chris' parents were requested to attend a conference by the Bell County Juvenile Probation Department in reference to Criminal Trespass. (Bell County Juvenile Probation records) |

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

1480

*Vialva Chronology, Page 21*

## 1993

Feb. 08

Chris was assigned to detention hall after school: he repeatedly misbehaved by disrupting his science class. (Killeen ISD records)

March 04

Lisa married her third husband, Joe Massey. Massey is described as immature and as a man not equipped to marry into a ready-made family, especially with a child who had behavioral problems. A month after the wedding, Lisa came home to find Massey sitting on Chris' chest as a means to restrain him. After this happening a few more times, Lisa told Massey "Don't make me choose between you and Chris." (Interview of Lisa Brown)

**May 10**

**13th Birthday**

Unknown

At some time during her marriage to Joe Massey, Lisa became frustrated with Chris and "unloaded." She called him an "ungrateful little shit" and reminded him she had almost died more than once while trying to protect him from his father's abuse. She felt he had no appreciation for all she'd done for him. (Interview of Lisa Brown)

June 15

Chris was seen by Gail Eisenhauer M.D., P.A. She noted "Chris would need supportive psychotherapy on an as-needed basis. He would need consistency, firm limits, yet nurturing at home. He will need an educational system that challenges him yet also does not get into power struggles with him". Chris had been in outpatient psychotherapy for approximately one year by this time. He and his mother were active participants in the therapy. Chris was also on Imipramine for some depressive and oppositional symptoms. (Army Exceptional Family Member Program Medical Summary)

Aug.

Chris enrolled in eighth grade at Nolan Middle School. During this school year, he received an A in PE, B's in Reading and Science, and C's in Algebra, English, and History. (Killeen ISD records) He continued to play football, until quitting because he sat on the bench too often (due to his small size). (Interview of Lisa Brown)

Sept.

Six months after Lisa married Joe Massey, he was transferred to Germany for a two-year tour. Lisa and her children could not accompany Massey because of Chris' medical problems. (There was not a hospital facility close enough to adequately care for Chris.)

*\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\**

*Vialva Chronology, Page 22*

(Interview of Lisa Brown)

Massey had moved out of Lisa's house two weeks before he left for Germany, as a trial separation. They had not planned to divorce, however. (Interview of Lisa Brown)

| | |
|---|---|
| Oct. 18 | Lisa brought Chris into the clinic when she discovered he had swelling of the groin. Exam revealed left inguinal hernia. Chris was scheduled for surgery with Dr. Custer. (Scott and White Clinic records) |
| Oct. 28 | Chris was admitted to Scott & White Memorial Hospital for hernia surgery. Chris tolerated the surgery well, was taken out of mask anesthesia and was transported to Day Surgery in stable and satisfactory condition for observation and discharge. (Scott and White Clinic records) |
| Nov. 16 | Chris was seen by Dr. Custer for a post-operative check following repair of inguinal hernia. The incision had healed well and the repair was intact; satisfactory postoperative course. (Scott and White Clinic records) |
| Nov. 23 | Chris was prescribed Imipramine, 25mg. (Scott and White Clinic records) |
| Dec. | Three months into his tour, Massey called Lisa and told her he'd been unfaithful. Lisa "went ballistic", went to a bar and became drunk, picked up a man for sex, and then had a ten month relationship with him. This man, Cecil "Cowboy" Prime, seemed to get along well with the children. Even though Lisa did not believe in "co-habitation prior to marriage, Prime moved his belongings into her home a little at time. Prime was often deployed and gone for weeks at a time. (Interview of Lisa Brown)<br><br>During Lisa's ten month relationship with Prime, Chris' behavior worsened. He did not think Prime was "good enough" for his mother. (Interview of Lisa Brown) |

**1994**

| | |
|---|---|
| May 05 | Chris was given a prescription for Imipramine 25 mg, three refills. (Scott and White Clinic records) |

*\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\**

148



*Vialva Chronology, Page 23*

| | |
|---|---|
| **May 10** | **14th Birthday** |
| May 13 | Lisa took Chris to the clinic after discovering he had developed a spot on the inside of his right arm in the bicep area.  Chris was hit in this area by a paint ball; the spot had been there for about a week or so.  Dr. Douty gave Chris some Nizoral to cover the area.  Lisa was advised to notify the doctor of his progress in re healing.  (Scott and White Clinic records) |
| Aug. | Chris enrolled in the ninth grade at Ellison High School.  At the end of the first semester, Chris received an A in PE, C's in Biology and English, and he failed Algebra, Spanish and World Geography. (Killeen ISD records) |
| Unknown | Once he started high school, Chris began referring to himself as "black", as opposed to "mixed".  (Interview of Lisa Brown) |
| Oct. | Prime left for good, because he was not ready for a family.  (Interview of Lisa Brown) |
| Oct. 18 | Chris hurt his right wrist while playing football.  X-ray showed a distal radial fracture, avulsion type.  A full arm plaster cast was placed on Chris' right arm.  Cast was removed approximately five weeks later. Scott and White Clinic records) |
| Dec. 06 | Lisa brought Chris into the clinic, complaining of a wart on his left hand.  Chris did not want it frozen; he was given Occlusal HP to use nightly.  Lisa wanted his Tofranil increased from 50 mg to 75 mg. The prescription was written and he was instructed to return in about two weeks to recheck the wart and get a follow-up EKG.  (Scott and White Clinic records) |
| Dec. 16 | Chris was prescribed Imipramine 50mg, two refills.  (Scott and White Clinic records) |

**1995**

| | |
|---|---|
| Unknown | Chris became involved in his first serious romantic relationship.  The girl, Ebony Jackson, was two years younger than Chris. Ebony had been sexually abused and a victim of incest as a child, and so their relationship was never one of physical intimacy.  Chris bought her a |

**\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\***

1483

dozen roses out of his first paycheck of his job. The relationship lasted about a year, ending when Ebony began using drugs. (Interview of Lisa Brown)

Jan 22 — Chris was issued a violation of the Student Code of Conduct. He did not dress for PE and then proceeded to disrupt the rest of the class. Chris was extremely belligerent to the teacher. (Killeen ISD records)

May 05 — Chris was seen in the clinic and given an EKG. (Scott and White Clinic records)

**May 10** — **15th Birthday**

May 16 — Lisa's divorce from Joe Massey was finalized, after two years and two months of marriage. (Interview of Lisa Brown)

Summer — During the summer after his ninth grade year, Chris played baseball. (Interview of Chris Vialva)

Unknown — Chris became a 212 Piru. The police harassed him and his gang friends all the time, even if they were just hanging out. (Interview of Chris Vialva)

Unknown — At age twelve, Audrey lost her virginity to a boy a few years older. Lisa had viewed the boy as a "womanizer" and had often had Chris follow the boy when Audrey was with him, in an effort to prevent sexual activity. (Interview of Lisa Brown)

Aug. — Chris enrolled in the tenth grade at Ellison High School. At the end of the first semester, Chris received an A in PE, and failed all other subjects. (Killeen ISD records) He had begun to refuse to take his medication, so Chris' behavior got worse. (Interview of Lisa Brown)

According to Chris, it was during his tenth grade year that he stopped playing football. Due to his problems in class, the football coach would require Chris to do "discipline runs" during practice. This combined with the fact that he was not getting many opportunities to play during games, caused Chris to quit the team. (Interview of Chris Vialva)

Sept. — Sometime during his tenth grade year, Chris lost his virginity. His

*\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\**

1484

mother had given him a box of condoms the year before, and was surprised when he asked her to buy him more. (Interview of Lisa Brown)

Oct. 20    Lisa brought Chris into the clinic, concerned about swelling on his chest. Exam was negative, normal adolescent gynecomastia. Counseling and reassurance were given. Chris also complained that every so often his ankles hurt; exam was negative. (Scott and White Clinic records)

Oct. 31    Chris left the classroom without permission. When he found out the teacher wrote it down, he knocked the teacher's paper on the floor. When the teacher told him to pick the papers up he said, "Hell no!" (Killeen ISD records)

Nov. 01    Chris was assigned to the school's On-Campus-Placement Center for continuous class disruption, disputing other students, and he made inflammatory remarks to others. He was assigned to the center for three days. (Killeen ISD records)

Nov. 03    Chris was given the prescription Imipramine 25 mg, no refills. (Scott and White Clinic records)

Nov. 14    A School Bus Incident Report was sent to Chris' parents. Chris repeatedly refused to stay seated while on the bus, refused to turn off his CD player, and threatened to have the bus driver fired. (Killeen ISD records)

Nov. 17    Chris was issued a violation of the Student Code of Conduct. He was disruptive, loud, rude, and antagonistic in class. Chris announced that he was in control and he would do what as he pleased. (Killeen ISD records)

Nov. 20    Chris was issued a violation of the Student Code of Conduct. He was disruptive, moved around the class room from seat to seat, and he would try to incite others to be disruptive. (Killeen ISD records)

Nov. 27    Chris was placed on Level I Probation at Ellison High School. Probation is one of the final attempts made in dealing with student discipline. As a result, Chris was not allowed to participate or attend any extracurricular activities. (Killeen ISD records)

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

*Vialva Chronology, Page 26*

| | |
|---|---|
| Nov. 29 | Lisa called the clinic, requesting a referral for a child psychologist. (Scott and White Clinic records) |

## 1996

| | |
|---|---|
| Feb. | Chris experienced problems with his heart, relating to the medication he had been prescribed for his behavior problems. (Interview of Lisa Brown) |
| Feb.-May | Chris received psychotherapy at the Scott & White Hospital. (Scott & White Hospital account statements) |
| Feb. 12 | Dr. Watson prescribed Guanfacine for Chris. (Prescription records) |

Imipramine was discontinued by Dr. Zaphiris due to abnormal EKG done 05/09/95. EKG showed ectopic atrial rhythm and incomplete right bundle branch block. Lisa was concerned because she had not been previously informed of these findings. Dr. Reed reviewed Chris' chart and did not find the EKG. It was decided to repeat the EKG to determine if the findings were temporary (secondary to Imipramine). (Scott and White Clinic records)

Chris was referred to Dr. Zaphiris by Dr. Douty for evaluation of ADHD and behavior problems including oppositional behavior.

Lisa reported to Dr. Zaphiris that Chris has a history of becoming agitated and angry very easily and in the past has become violent at home. Chris intimidates her and reminds her of his father who was physically abusive to her. When he first began taking Imipramine, she could see a small change, but Chris refused to take the medication. She also reported that Chris "terrorizes his sister" including pestering her and at times being physically aggressive. Chris belittles his mother in public, is very disrespectful, and with any minor disagreement, he threatens to run away. In fact, he had run away on two occasions, one time overnight.

After the risks, side effects, and benefits of Tenex were discussed with Lisa, it was agreed to a trial of Tenex, 1mg one-half tablet for 7 days, and then one-half tablet as needed, 45 tablets plus one refill. Chris was to go to counseling for anger management and "hopefully Lisa would receive counseling regarding behavioral management". (Scott

***** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

148

*Vialva Chronology, Page 27*

and White Clinic records)

Feb. 13

Chris was issued a violation of the Student Code of Conduct. Chris was disruptive in class and used profanity. (Killeen ISD records)

Feb. 21

Chris was issued a violation of the student Code of Conduct. Chris left class without permission. While in gym class he threw a baseball base like a frisbee and hit a girl in the back. Chris refused to put the base back in it's proper position. (Killeen ISD records)

Feb. 26

Chris met with Kerry L. Gist, LMSW-ACP, anger management therapist. Chris spoke about his conflicts with his mother and he hoped to gain her trust in the future because he wanted to get a job, obtain a driver's license and use her car. He also spoke about conflicts with his teachers. Some teachers were okay and showed him respect, others would 'mock him" and showed disrespect.

Ms. Gist also met with Lisa, with Chris' permission. Lisa told Ms. Gist that Chris has many issues with his self-esteem and identity. Ms. Gist stated in her report that Lisa "was particularly interested in patient's perceived difficulties with his identity". Chris does not know if he should identify himself as African-American or Anglo. According to this report, "Lisa has interpreted remarks made by Chris that indicated that Lisa and her daughter were somewhat racist". (Scott and White Clinic records)

Feb. 28

Chris was assigned to the school's On-Campus-Placement Center for leaving class without permission, class disruption, and use of profanity. (Killeen ISD records)

March

Chris took the Texas Assessment of Academic Skills Test. He did not meet the minimum expectations in Reading and Math, but he did meet the minimum expectations in Writing. (Killeen ISD records)

March 05

Chris was brought into the clinic by his mother for follow-up on the use of Tenex. Lisa reported that Chris seemed less angry and irritable with no explosive outbursts on the Tenex. Dr. Zaphiris continued the Tenex and requested that Chris return to the clinic in two months for follow-up. (Scott and White Clinic records)

March 14

Chris was brought into the clinic for therapy session with Ms. Gist.

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

1487

*Vialva Chronology, Page 28*

Chris has not had any anger outbursts and was not failing any classes. His main objective was to get a job. Chris was getting along better with his mother, mainly because she had been less strict. However, he continued to have trouble with his sister. Chris stated he did not like his sister. Lisa stated that Chris felt as if things were unfair and she made references to the patient's historic statements that because his sister is white and he is biracial that things were uneven. Chris did not talk about things being uneven; he just stated that he did not think that the consequences that his sister received made any impact on her.

For the first time, Chris talked about plans for his future in a positive way. He would like to become a coach and a science teacher. He was also interested in talking about colleges.

Chris continued to have trouble trusting others. He has friends, but feels he can not tell them anything of importance. (Scott and White Clinic records)

| | |
|---|---|
| March 15 | Chris was given an EKG, no incomplete RBBB noted, read as low right atrial rhythm and possible LVH. (Scott and White Clinic records) |
| March 28 | Chris met with Ms. Gist for a therapy session. Chris reported that the main thing going on in his life was he had lots of girlfriends and also that his mother's last husband was now living with them. |

Ms. Gist also met with Lisa, who reported that things have been going much better in the home and things were actually calm. However, Lisa was concerned that Chris had become active in regard to dating. According to Lisa, Chris told her he had been sexually active since September 1995. Chris has asked her to buy condoms for him. (Scott and White Clinic records)

April 02     Chris was seen by Dr. Reed for cardiac auscultation. Dr. Reed had been asked to examine Chris to make sure his S2 closes appropriately with deep inspiration. Upon examination, Dr. Reed found Chris' S2 did appear to close upon deep inspiration. (Scott and White Clinic records)

April 10     Chris met with Ms. Gist. Chris reported that things were going good. He was seeing several girls and was sexually active with multiple

**** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* ****

*Vialva Chronology, Page 29*

partners. He continued to have some difficulties at school. (Scott and White Clinic records)

| | |
|---|---|
| **May 10** | **16th Birthday** |
| May 13 | Chris ran out of his medication, Tenex several days ago and was seen by Dr. Zaphiris in the clinic. Without the Tenex Chris had trouble sleeping, was easily annoyed and tended to be irritable. Dr. Zaphiris recommended that Chris be placed on Zoloft. Chris refused any more medication. (Scott and White Clinic records) |
| Unknown | At age sixteen. Chris began smoking marijuana and drinking on a weekly basis. (Interview of Lisa Brown) |
| May 15 | Chris was assigned to the school's On-Campus-Placement Center for refusal to complete work and follow instructions, class disruption, and rude behavior. (Killeen ISD records) |
| May 16 | Chris met with Ms. Gist. Chris reported that things were going pretty well. However, Chris was worried about his sister and increased behavior problems. Chris has become very protective and his sister threatened to have gang members beat him up as a result. Ms. Gist strongly suggested that Lisa obtain therapy for her daughter. (Scott and White Clinic records) |
| May | Chris received the following grades at the end of the second semester of tenth grade: C's in Geometry and PE, and he failed all other subjects. (Killeen ISD records) |
| June 03 | Chris began working as a laborer at Fort Hood. (Employment records) |
| June 14 | Chris was seen in the clinic for a lump on his right hand. Upon examination, a ganglion cyst was found on the dorsum of the right hand. Dr. Douty referred him to Dr. Weber for aspiration steroid injections. (Scott and White Clinic records) |
| June 25 | Chris was seen by Dr. Weber for ganglion cyst on his right hand. However, Chris was wrestling and the mass popped and resolved spontaneously. He had no further symptoms. (Scott and White Clinic records) |

**** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* ****

*Vialva Chronology, Page 30*

| | |
|---|---|
| July 30 | Chris was given an Echocardiogram at Scott & White Memorial Hospital. It was determined that Chris had normal cardiac structures and no intra cardiac shunt. (Scott & White Memorial Hospital records) |
| July 31 | Chris and Lisa in to see Dr. Pettijohn for results of the Echocardiogram. This test revealed normal heart structures. (Scott & White Memorial Hospital records) |
| Aug. 09 | Chris resigned as a laborer at Fort Hood because he wanted to go on vacation with his family. (Employment records) |
| Aug. | Chris enrolled in the eleventh grade at Killeen High School. At the end of the first semester Chris received B's in Home Economics and US History, C in World Geography and he failed Geometry and English. (Killeen ISD records) |
| Aug. 19 | Chris was assigned to the school's On-Campus-Placement Center for disruptive behavior in the classroom. He was assigned for two days to the in-house suspension center. (Killeen ISD records) |
| Sept. 13 | Chris was assigned to the Saturday Detention Hall for two consecutive Saturdays for disruptive behavior. (Killeen ISD records) |
| Sept. 20 | Chris was issued a violation of the Student Code of Conduct for disruptive behavior in class. (Killeen ISD records) |
| Sept. 25 | The Killeen ISD Police Department issued a citation to Chris for Disrupting the Classroom Environment. He and his parents were requested to appear in J.P. Court to answer the charges. (Justice of the Peace, Garland K. Potvin records) |
| | Chris was assigned to three days to the On-Campus-Placement Center for class disruption and insubordination. (Killeen ISD records) |
| | Chris was seen in the clinic for laceration of his chin. Chris stated he hit his chin on the gym floor at school while playing basketball. His chin was closed with sutures and he was released. (Scott and White Clinic records) |
| Oct. | Chris took the Texas Assessment of Academic Skills Test. He |

*\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\**

1490

*Vialva Chronology, Page 31*

mastered Reading but not Math. (Killeen ISD records)

Oct. 03 — Chris was issued a violation of the Student Code of Conduct for inappropriate conduct towards others, class disruption, and use of profanity. (Killeen ISD records)

Oct. 18 — Chris was issued a violation of the Student Code of Conduct for class disruption. (Killeen ISD records)

Oct. 29 — Chris was issued a violation of the Student Code of Conduct for inappropriate behavior towards others, class disruption, and truancy. (Killeen ISD records)

Oct. 31 — Chris was issued a violation of the Student Code of Conduct for class disruption. (Killeen ISD records)

Nov. 01 — Chris was assigned to Saturday Detention Hall for class disruption, failure to obey, refused to be quiet, and the use of profanity. Chris said, "Hell! No one tells me what to do except my momma." (Killeen ISD records)

## 1997

Unknown — Lisa received a $13,000.00 lump sum payment of back child support from Audrey's father, Robert Mabrey after he was paid during an insurance settlement. (Interview of Lisa Brown)

Jan 05 — A comprehensive individual assessment was conducted with Chris to determine his eligibility for educational needs. Candace M. Massar M.Ed., Educational Diagnostician/Counselor conducted the assessment. **Summary:** Chris achieved a Verbal Scale IQ of 100 (+-7) and Performance Scale IQ of 102. This suggested that Chris' potential for academic achievement should be average. According to Dr. Massar, Chris appeared to be of average intellectual potential and achieved at a level commensurate with his potential. There was no evidence of a significant academic (or development) deficit in any area. Based on the data in the assessment, Chris did not appear to meet eligibility criteria as a handicapped student. No related service appears to be required. (Killeen ISD records)

Jan. 10 — Chris received a violation to the Student Code of Conduct for

*\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\**

1491

*Vialva Chronology, Page 32*

disruptive behavior in the classroom. As a result he was assigned to the On-Campus-Placement Center for three days. (Killeen ISD records)

April 02    Chris received a violation of the Student Code of Conduct for disruptive behavior in the class room. (Killeen ISD records)

April 17    Chris received a violation to the Student Code of Conduct for disruptive behavior in the classroom and the use of profanity. (Killeen ISD records)

April 20    The Killeen Police Department issued a Complaint Affidavit to Chris for No Seat Belt. Chris and his parents were ordered to appear before the Municipal Judge concerning this affidavit. (Bell County Court records & Killeen Police Department records)

April 23    Chris was assigned to On-Campus-Placement Center for disruptive behavior in the classroom and the use of profanity. (Killeen ISD records)

May 05    Chris was assigned to On-Campus-Placement Center for 14 days. He was also placed on Level 1 Probation through the first session of the 97-98 school year. (Killeen ISD records)

**May 10**    **17th Birthday**

May    Chris received the following grades at the end of the second semester of eleventh grade: A in PE, B's in Home Economics, Science and US History, C in English, and he failed Geometry. (Killeen ISD records)

Aug.    Chris enrolled in the twelfth grade at Killeen High School. At the end of the first 9 weeks he received B's in all subjects; English, Psychology, and Government. (Killeen ISD records)

Aug. 21    Chris was brought into the clinic for a head injury he received one week ago as a result of being kicked on the left side of his head. Chris noticed an increase in swelling since the injury. He did not lose consciousness, did not have visual problems and did not experience headaches. Chris was told to avoid further trauma to his head, monitor hematoma, and return to the clinic if needed. (King's

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

*Vialva Chronology, Page 33*

Daughters Clinic records)

Sept. 29          Chris received a verbal warning for being with students involved in a gang related activity. He as warned and sent back to class. (Killeen ISD records)

Oct. 14           Chris received time out for disruptive behavior in the classroom. (Killeen ISD records)

Oct. 31           Chris had a conference with the counselor for disruptive behavior in the class. (Killeen ISD records)

Nov. 03           Chris had a conference with the counselor for truancy. (Killeen ISD records)

Nov. 19           Chris was assigned to the On-Campus-Placement Center for three days; he was disruptive in the classroom. (Killeen ISD records)

Nov. 29           The Killeen Police Department issued a Complaint Affidavit to Chris for Speeding/No Driver's License. The case was set for trial in Teen Court in December. Chris received the following punishment: write a 300 word paper on the dangers of speeding, draw a poster showing what happened, and complete community service with the animal shelter (which he did). (Municipal Court records, Killeen Police Department records)

Dec. 09           Chris was interviewed by Michael E. Campbell, Ph.D., Psychologist. Dr. Campbell was to assess Chris for the Killeen ISD Special Education Department . This assessment was to determine if Chris was eligible for special education classes. **Summary:** Christopher's temper control is poor. He is easily frustrated and has difficulty concentrating. He is resistant to school authority figures. He refuses to comply with adult rules or requests. Christopher has homicidal ideation which should be monitored. Christopher is in control of his behavior and chooses inappropriate means of getting attention. At this time Christopher does not meet the state's criteria for classification as Emotionally Disturbed. Christopher meets the DSM-IV diagnostic criteria for Oppositional Defiant Disorder, Severe and Attention-Deficit/Hyperactivity Disorder. (Killeen ISD records)

Dec. 15           Chris was suspended from school for one day: rude and bad attitude

**** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* *** *DRAFT* ****

*Vialva Chronology, Page 34*

and the use of profanity.  (Killeen ISD records)

| | |
|---|---|
| Dec. 18 | The Killeen ISD Police Department issued a citation for Disorderly Conduct (Profane Language).  Chris and his parents were ordered to appear before Justice of the Peace Bill Cooke.  (Bell County Court records & Killeen ISD Police records) |
| Unknown | Lisa married Richard Brown, her fifth and current husband.  They had dated ten months prior to getting married.  (Interview of Lisa Brown) |

## 1998

| | |
|---|---|
| Feb. 11 | Chris received a violation for the Student Code of Conduct for inappropriate behavior towards others, refusal to show his I.D., disruptive behavior in class and truancy.  Chris was also suspended for five days for these violations.  (Killeen ISD records) |
| Feb. 20 | Chris and his mother were requested to attend a hearing pertaining to Chris' repetitious misconduct and extreme insubordination.  It was the recommendation of the campus administration that Chris be transferred to the Killeen Alternative School.  Chris began class at the alternative school on February 23.  (Killeen ISD records) |
| Feb. 23 | Chris enrolled in the Killeen Alternative School. |
| March 20 | Chris completed course work in Mathematics of Money with a grade of 86 and EFES with a grade of 87 at the Killeen Alternative Center.  (Killeen ISD records) |
| May 07 | Chris completed course work in Parent Child Development at the Killeen Alternative Center.  He received a grade of 98.  (Killeen ISD records) |
| **May 10** | **18th Birthday** |
| Unknown | Chris received a letter from the Killeen High School Registrar which informed him that he would complete graduation requirements during the 1998-1999 school year.  The letter also stated that Chris had passed all three portions of the Texas Assessment of Academic Skills.  (Killeen ISD records) |

***** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

1494

*Vialva Chronology, Page 35*

| | |
|---|---|
| **May 28** | Chris completed course work in English with a grade of 88 at the Killeen Alternative School. (Killeen ISD records) |
| **Unknown** | Chris received an A in Record Keeping while attending the Alternative High School. (Killeen ISD records) |
| **June 23** | Chris was arrested for Theft of Property Over $500 Under $1500 by the Temple Police Department. He was caught shoplifting at Foley's in the Temple Mall. Chris pled guilty to this charge and received the following punishment: $200 fine, 90 days in the Bell County Jail, pay court costs of $209.25, and community service. Conditions of Community Supervision included periodic urinalysis, Life Skills training, $40 per month community supervision fee, and complete 100 hours community service. Chris complied with all the above requirements and also paid Foley's $250 for damages. (Bell County Court & Temple P.D. records) |
| **July 02** | Chris was charged with Evading Detention. Police were called pertaining to three youths drinking in public. When police arrived, the youths ran. Chris was caught and transported to the Killeen Police Department Jail. (Killeen Police Department records) |
| **July 17** | Chris was charged with Unlawful Carrying a Weapon. Killeen Police received a report that several juveniles were violating the City of Killeen Youth Curfew Ordinance. Officers approached several juveniles sitting on the trunk of a car. The juveniles gave verbal consent for a search of the vehicle and officers discovered a handgun that belonged to Chris. Chris voluntarily accompanied officers to the police station. (Bell County Clerk records) |
| **Unknown** | Driving without Lights/No Driver's License |
| **Aug. 04** | Chris was seen in the clinic for nodules behind both earlobes. Chris had his ears pierced several times and this was the cause of the nodules. Chris experienced pain when he laid on his side and pressed his head against the pillow. Chris was told that these nodules would be difficult to treat. (King's Daughters Clinic records) |
| **Sept. 11** | The Evading Detention charge was dismissed because Chris entered a guilty plea in a companion case. (Killeen Police Department & Bell County Clerk records) |

*\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\**

1495

| | |
|---|---|
| Sept. 16 | Chris was arrested for Aggravated Assault with a Deadly Weapon by the Harker Heights Police Department. While in the Bell County Jail, Chris completed a Mental Disability/Suicide Intake Screening form. No problems were reported concerning his mental abilities and Chris did not have any suicide related symptoms. (Bell County Jail records)

The arrest occurred after Chris and four other youths participated in gang-related drive-by shooting. Chris was not alleged to be the shooter. While at the Bell County Jail, Chris threatened suicide to his mother. It was while Chris was locked up that Lisa first found gang paraphernalia in his room. (Interview of Lisa Brown) |
| Sept. 22 &23 | Chris sent two requests to the Classification officer; he wanted to work while incarcerated in the Bell County Jail as a trusty. These requests were denied. (Bell County Jail records) |
| Oct. 16 | Chris pled guilty to Aggravated Assault with a Deadly Weapon in the District Court of Bell County. He was placed on ten years Deferred Adjudication Community Supervision. His punishment included: pay court costs of $241.25, and pay bills incurred by the victims of $2055 for hospital and doctors costs. (Bell County Court records)

Chris terminated his affiliation with the 212 Piru after his incarceration, because he felt other incarcerated members had taken advantage of him financially while he was in jail. (Interview of Chris Vialva)

Chris' probation was not well supervised. On at least one occasion, he failed a drug screen but was not violated for it. Although a condition of his probation, Chris did not complete community service because the agency to which he was assigned did not have anything for him to do. Chris made an effort to stay out of trouble, and spent all of his time at home with his mother and step-father. He began attending church. Former friends (gang members) would come by the house and make fun of Chris for not going out with them. At some point, Chris was afraid to leave the house because the peer pressure was getting to him. (Interview of Chris Vialva) |
| Nov. 03 | Chris and his mother were requested to attend a hearing to respond to the charges of Aggravated Assault with a Deadly Weapon (off-campus). The campus administration recommended that Chris be |

**** *DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT* ****

*Vialva Chronology, Page 37*

transferred to the Alternative School. Chris was assigned to the Alternative School from November 04 through March 15, 1999. (Killeen ISD records)

Nov. 05    Chris was arrested on a Motion to Revoke Probation. He was released after posting $5000 bond. (Bell County Jail records)

Nov. 20    Chris was given one day detention because he gave the peace sign to a student who was waiting in the office. (Killeen ISD records)

Nov. 23    Chris was given one day detention for sleeping in class. (Killeen ISD records)

Nov. 24    Chris was given one day detention for mocking another student when she laughed. (Killeen ISD records)

Dec. 02    Chris completed course work in Record Keeping with a grade of 90 at the Killeen Alternative Center. (Killeen ISD records)

Dec. 04    Chris was suspended for three days after a verbal altercation with another student which almost lead to a fight. (Killeen ISD records)

Dec. 09    Chris was suspended for two days for use of profanity towards the bus driver. (Killeen ISD records)

Dec. 14    Chris completed course work in Government with a grade of 85 at the Killeen Alternative Center. (Killeen ISD records)

Chris received one day detention for arguing with the teacher. (Killeen ISD records)

**1999**

Jan. 05    Chris received one day detention for scoring only 17 points when the required minimum was 23. (Killeen ISD records)

Jan. 06    Chris received one day detention for disruptive behavior in class. (Killeen ISD records)

Jan. 27    Chris pled guilty to Unlawfully Carry a Weapon (committed on July 17, 1998), he was sentenced to 60 days in the Bell County Jail and

*\*\*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\*\**

*Vialva Chronology, Page 38*

fined $284.25.  (Bell County Clerk records)

| | |
|---|---|
| Feb. 03 | Chris received one day suspension because he refused to be quiet in class and talked back to the teacher.  (Killeen ISD records) |
| Feb. 16 | Chris completed course work in English with a grade of 84 at the Killeen Alternative Center.  (Killeen ISD records) |
| | Chris received one day detention for wearing red shoes and only scoring 17 in class.  (Killeen ISD records) |
| Feb. 19 | Chris completed course work in Psychology with a grade of 85 at the Killeen Alternative Center.  (Killeen ISD records) |
| Feb. 24 | Chris received one day detention for making hand signals to another student.  (Killeen ISD records) |
| March 01 | Chris received one day detention after he put his arm around a female student who showed her displeasure by knocking his arm away.  (Killeen ISD records) |
| March 09 | Chris received one day detention for clowning around in class.  (Killeen ISD records) |
| March 18 | Chris began working for West Telemarketing Corporation Outbound.  He earned $6.00 per hour and worked approximately 23 hours per week.  (Employment records) |
| March 24 | Chris received one day detention for disruptive behavior.  (Killeen ISD records) |
| April 06 | Chris was suspended from school for three days for gang affiliation.  (Killeen ISD records) |
| | Chris was seen in the clinic because he had had bilateral earlobe masses removed one week prior.  Sutures were removed and ears were injected with approximately 4 mg of Kenalog.   (King's Daughters Clinic records) |
| April 09 | Chris was suspended from school for two days.  This decision was based on a campus level hearing which referred Chris to a district level |

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

1498

*Vialva Chronology, Page 39*

hearing on February 12. (Killeen ISD records)

April 12 — Chris and his parents were requested to attend a hearing pertaining to his repetitious misconduct in school. The campus administration recommended that Chris be transferred to the Alternative Center. (Killeen ISD records) He had received a ticket for Gang Affiliation/Disrupting the Classroom Environment. Instead of being sent to the alternative school, education officials manipulated Chris' grades so that an extra P.E. credit could qualify as an "Elective", thereby making Chris a high school graduate. (Interview of Lisa Brown)

April 30 — Chris was seen in the ER at the Darnall Army Hospital, Fort Hood and was treated for alcohol poisoning. Chris had gotten drunk at a "senior party". Late that evening, a neighbor found Chris unconscious, laying in the driveway of his home and called an ambulance. His B.A. is believed to have been higher than 0.30%. (Interview of Lisa Brown)

**May 10** — **19th Birthday**

May 11 — Chris was seen in the clinic for follow-up concerning steroids for his ears. He was injected with 0.1 mg of Kenalog in each ear. (King's Daughters Clinic records)

Chris tested positive for THC. (Bell County District Attorney records)

May 22 — Chris received his last pay check from West Telemarketing Corporation Outbound. (Employment records)

May 24 — Chris committed the offense of Burglary of a Habitation. (Bell County District Attorney records)

June 17 — Violation of Felony Probation, Chris failed to report to the Supervision Officer. (Bell County District Attorney records)

June 21 — Chris was arrested in connection with the murders of Stacie and Todd Bagley. Upon being lodged in the jail, Chris called his mother and threatened suicide. (Interview of Lisa Brown)

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

*Vialva Chronology, Page 40*

| | |
|---|---|
| June 22 | Medical Intake Record was taken by the McLennan County Jail Health Services. Chris reported he did not have any health problems and was not taking any medications. According to the Mental Disability/Suicide Intake Screening, Chris had no mental disabilities and had never considered suicide in the past or present. Chris reported that he was worried about his mother's health. (McLennan County Jail Medical records) |
| June 24 | Sgt. Larry Hromadka, McLennan County Jail Booking Desk, completed an Incident Report concerning Chris and Brandon Bernard. After speaking with U.S. Marshall Parnell McNamara, Chris and Bernard were labeled "Potentially Violent Aggressive". McNamara claimed that Chris and Bernard discovered in court that if they were to be found guilty they would face the death penalty. Therefore, McNamara summarized they were potentially violent. (McLennan County Jail records) |
| June 25 | A Search Warrant was issued to search Chris' house. (United States District Court records) |
| June 26 | Health Summary for Classification was completed, Chris did not have any restrictions concerning his housing and work assignments. (McLennan County Jail Medical records) |
| Aug. 03 | Incident Report: Chris reported that he had been bitten by a spider, his arm was swollen and red. Chris was taken to the medical unit. The nurses determined that the tattoo on his right forearm was infected. Chris was given Ibuprofen and Keflex. (McLennan County Jail Medical records) |
| Aug. 22 | Chris submitted a Sick Call Request. He complained of a headache, the chills, muscle soreness, sore throat, and fever. (McLennan County Jail Medical records) |
| Aug. 23 | Chris refused treatment from the medical unit. (McLennan County Jail Medical records) |
| Oct. 01 | Medical unit received search warrant from FBI for blood and hair samples. Chris said "You only have one shot at that so you better get it", referring to blood drawn by head nurse. (McLennan County Medical records) |

**** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT *** DRAFT ****

*Vialva Chronology, Page 41*

Oct. 19                    Chris filed a grievance, stating he was having problems with two
                          prison guards.  These two guards were harassing Chris and he felt
                          they were not conducting themselves in a professional manner.
                          (McLennan County Jail records)

**** *DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT \*\*\* DRAFT* \*\*\*\*

1501

1502

| | | TABLE 1: DEFENSE FAILURE TO CROSS EXAMINE WITNESSES<br><br>(THE PROSECUTION PRESENTED A TOTAL OF 60 WITNESSES OF WHOM 26 THE DEFENSE FAILED TO CROSS EXAMINE) | |
|---|---|---|---|
| WITNESS | SUBSTANCE OF TESTIMONY | DEFENSE WAIVES CROSS EXAMINATION | WHAT COULD HAVE BEEN ELICITED THROUGH CROSS EXAMINATION |
| Jonathan Bair | U.S. Army CID: Gun shot residue collection | IX Tr. 1779 *G | Manner and timing of gun shot residue collection. Use of outdated methodology and samples collected beyond recommended time frame due to fault of government. Should also have cross examined regarding government questioning of defendant Brown. |
| David Mark Eller | U.S. Army CID: Gun shot residue collection | IX Tr. 1785 *S | Manner and timing of gun shot residue collection. Use of outdated methodology and samples collected beyond recommended time frame due to fault of government. Should also have questioned regarding Lewis's diagram. |
| Catrice Winston | Evid. custodian Ft. Hood: how evid. was kept | IX Tr. 1796 *G | Collection and maintenance of additional evidence regarding accelerants on clothing of defendants. |
| William Hernandez | Spec. Agent CID: evidence collection | IX Tr. 1800 *G | Collection and maintenance of additional evidence regarding accelerants on clothing of defendants. |
| Brenda Henderson | Real Prop. Officer Ft. Hood: jurisdiction | IX Tr. 1809 *G | Concurrent jurisdiction of state over crime and foundation for exposure of Terry Terrell Brown to State of Texas death penalty. |
| David Vandiver | Texas Dept. Corrections: control of crime scene | IX Tr. 1811 *G | Numbers of law enforcement agencies with access to scene. When access to scene was gained. |
| Robert Williams | Chief Forensic Odontologist: ID of Todd Bagley | X Tr. 2054 *G | |
| Norma Garza | Forensic DNA: ID of Stacie Bagley | X Tr. 2073 ** | DNA testing of clothing or other samples for purposes of identifying victim blood on defendants. |
| Jeannine Nicosia | River Comm. C.U.: account activity | X Tr. 2121 *G | |

*G = waiver made by Mr. Goains.
*S = waiver made by Mr. Schwieger (under the direction of Mr. Goains in the first stage of the case).
** = witness passed without the Court giving the defense an opportunity to cross examine on the record.

Exhibit IV-I

1503

| WITNESS | SUBSTANCE OF TESTIMONY | DEFENSE WAIVES CROSS EXAMINATION | WHAT COULD HAVE BEEN ELICITED THROUGH CROSS EXAMINATION |
|---|---|---|---|
| Byron J. San Marco | Spec. Agent ATF: vehicle ID | X Tr. 2123 *G | |
| Joe Elmer | Texas State Fire: Soil samples, accelerant | X Tr. 2126 *S | |
| Robert J. Rimes | Church member: timing of victim activities | X Tr. 2147 *G | |
| Stephen J. Timmerman | Pastor: timing of victim activities | X Tr. 2151 *G | |
| Roger Whitehead | First National Bank: victim account activity | X Tr. 2162 *G | |
| Jeff Fholer | Killeen PD: recovery of evidence from Tony Sparks | X Tr. 2168 ** | |
| Curtis Magee | Acquaintance of defendants | XI Tr. 2233 ** | Gang membership, nature of gang. |
| Ricky Lynch | Acquaintance of defendants | XI Tr. 2276 *S | Gang membership, nature of gang. |
| Henry Amen | Tex. Dept. Public Safety: gun shot residue testing | XI Tr. 2282 *S | Failure to test for gun shot residue. Evidence collection and preservation techniques. |
| Raymond Pagel | Jewelry appraisal | XI Tr. 2288 *S | Object to relevance of appraisal evidence. Stipulate to ownership of ring. |
| Juneith Steubing | Killeen PD: June 21 curfew violation | XI Tr. 2294** | Object to relevance of Tony Sparks' interest in the Officer's weapon. |
| Alex Gerhart | Killeen PD: June 21 curfew violation | XI Tr. 2300 ** | Object to duplicative testimony of Officer Steubing. Question regarding why Mr. Vialva was upset. Did they know he had no home to go to? |
| Gary Serwatka | Super Pawn: pawing victim possessions | XII Tr. 2443 *S | Question regarding demeanor, nervousness, etc. of defendants. |

*G = waiver made by Mr. Goains.
*S = waiver made by Mr. Schwieger (under the direction of Mr. Goains in the first stage of the case).
** = witness passed without the Court giving the defense an opportunity to cross examine on the record.

| WITNESS | SUBSTANCE OF TESTIMONY | DEFENSE WAIVES CROSS EXAMINATION | WHAT COULD HAVE BEEN ELICITED THROUGH CROSS EXAMINATION |
|---|---|---|---|
| John Bowman | Killeen ISD Peace Officer: gangs | XII Tr. 2447 *S | Question regarding personal animus to Mr. Vialva. Question regarding gang activity in Killeen and the 212 PIRU in particular. Question regarding connection of local gangs to national organizations. Question regarding relationship between local Killeen gangs. |
| Dave Smith | IGA Foodliner: saw Mr. Vialva at store | XII Tr. 2451*S | Object to relevance of testimony. Witness was not accosted by Mr. Vialva and was not asked for a ride by Mr. Vialva, Mr. Sparks, or Mr. Lewis. Absence of any aggression against him by Mr. Vialva beyond "scowling". |
| John Aycock | Texas Ranger: Blood evidence | XII Tr. 2472 *G | Collection of blood evidence. Systematic evaluation of blood evidence at the scene and on the defendant's clothes. Absence of blood evidence on defendants. |
| Charles Woodard | Father of victim: ID watch of victim. | XII Tr. 2475*S | Stipulate to ownership of watch. Object to irrelevant testimony of Mr. Woodward as law enforcement officer and early introduction of victim testimony regarding last time he saw his daughter. |

*G = waiver made by Mr. Goains.
*S = waiver made by Mr. Schwieger (under the direction of Mr. Goains in the first stage of the case).
** = witness passed without the Court giving the defense an opportunity to cross examine on the record.

1505

1506



| ANGER: CA01001990720135535F | Div File No: | STATUS: ACTIVE |
|---|---|---|
| TYPE: CRIMINAL | RF-1999-00318 | BY: JOHN AYCOCK, SGT. 1001 |

1. CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY, FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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  W/F, 04/01/1971,
4. 06/21/1999     ( Monday )

manner in which it was spattered.  Some areas were observed that if the car had not been burned, could resemble blood spatter.  However, these areas were tested and found TMB negative for blood.  It would later be determined that these particular areas could have contained body material made from bursting portions of the bodies, due to heat.

1.125 This writer and laboratory personnel moved the edge of the trunk covering, or called weather and noise stripping, and discovered that the entire base underneath of that particular covering was saturated and soaked in blood.  It was during this procedure that the human tooth was discovered near the rear portion of the trunk of the victims' car.  As of the writing of this report, investigators have not determined which victims' tooth was found, but a determination will be made before this writer closes this file.  The importance of which victims' tooth was found is noted because investigators have been told that the male victim, Todd BAGLEY, was nearest the trunk opening, with the female victim, Stacie BAGLEY, behind her husband, closer to the back seat area of the car.  A tooth coming from Todd BAGLEY could be explained in that particular area, however, a tooth from his wife would be more difficult to explain, due to the place in which it was found.  The tooth was observed to be burned, which would mean that the tooth was out of the body during the fire, and causation of the tooth exiting the body could have a manner of determination as to blood spatter from a gunshot wound.  If the female victim was lying down in the trunk when she was shot in the face, the tooth would probably not be in the area it was found in, and blood spatter would be directed in a cone shape, away from the wound, and most probably it would be difficult to determine the existence of same.  However, if the female victim was raised up when shot in the face, losing the tooth and causing it to go into the area in which it was found in, blood back spatter from a gunshot wound might indeed go into a different mode and direction in a cone shape from that particular wound.  This might cause the blood spatter from the gunshot wound to be more easily recognized and discovered, possibly on the clothes of the shooter.  In any event, investigators became enthralled in the trunk to the extent that several hours were spent on it, examining it for additional possible evidence.

08/25/1999 3:56:15 PM

Exhibit IV-J  1567

1508

## DECLARATION OF ROBERT S. WHITE

I, Robert S. White, a person of lawful age, do hereby declare the following to be true and correct, under penalty of perjury:

1.  My name is Robert S. White. I am an expert in the field of Gunshot Residue (GSR) Analysis. My qualifications to serve in this capacity include, among other things: a Bachelor of Science degree in chemistry from Fairmont State College (1961); thirty years with the West Virginia State Police Department where I worked as a uniformed police officer and forensic chemist; and service as the Supervisor and Director of the West Virginia State Forensic Laboratory for ten years. I started and directed the Gunshot Residue program for the state of West Virginia and have performed GSR testing for 30 years.

2.  In addition to the foregoing training and experience, I have received specialized forensic training in GSR analysis from, among other places, the FBI Academy and Scotland Yard. I have been trained in the analysis of gunshot residue by the Atomic Absorption (AA) Spectrometry method as well as the Scanning Electron Microscopy (SEM) method.

3.  I have been a guest speaker at the FBI Gunshot Residue Seminar (keynote speaker) as well as a speaker at the American Academy of Forensic Scientists (Gunshot residue and SEM analysis).

4.  I am a fellow of the American Academy of Forensic Sciences (AAFS).

5.  I have been qualified to serve as an expert witness in both Federal and State courts and have served in that capacity over 1200 times.

6.  Further details regarding my qualifications to render an opinion in this case are included on my curriculum vita which is attached to this declaration as **Exhibit 1** and incorporated as if fully rewritten herein.

7.  I was contacted by counsel for Christopher Andre Vialva in the case *United States v. Vialva*, Criminal No. W-99-CR-70(1) in the Western District of Texas for the purposes of reviewing the trial testimony on gunshot residue collection and analysis. For this purpose, I reviewed the following pages of the trial transcript: Tr. 1692-1707; 1748; 1772-85; and 2276-83.

8.  Testimony from the trial indicates that the prosecution believed the crime to have occurred between approximately 8:00 to 8:30 p.m. on June 21, 1999.

9.  Between 12:00 a.m. and 12:30 a.m., law enforcement became specifically aware that a gun had likely been discharged in the commission of this crime. (Tr. 1706); (Tr. 1748).

10. Clothing was taken from Mr. Vialva at approximately 5:55 a.m. on June 22, 1999. (Tr.

Page 1 of 4

Exhibit IV-K

1509

1698).  Clothing was taken from co-defendants Terry Terrell Brown and Brandon Bernard  at approximately the same time.  (Tr. 1698).

11.     A gun shot residue kit was collected from Mr. Vialva at 5:50 a.m. on June 22, 1999.  (Tr. 1784).  A gun shot residue kit was collected from Mr. Bernard at 4:25 a.m. on June 22, 1999.  (Tr. 1784).  A gun shot residue kit was taken from Mr. Brown at 6:15 a.m. on June 22, 1999.  (Tr. 1784).  A gun shot residue kit was taken from Mr. Lewis at 2:15 p.m. on June 22, 1999.  (Tr. 1782).

12.     Henry Amen, a representative from the Texas Department of Public Safety Crime Lab in Austin, Texas testified that, because the GSR kits were taken over four hours after the commission of the crime, they were not analyzed.  (Tr. 2279).  Mr. Amen was apparently concerned about the length of time before evidence collection and the possibility of false positives arising from contact with a police car.  (Tr. 2281).

13.     The testimony at trial describes the gun shot residue evidence in this case was collected for atomic absorption analysis.  (Tr. 1773; 1782).

14.     Gunshot residue is a gas composed of the primer components  as it comes out of a firearm when it is discharged at high temperatures.  As these gases hit the cooler air, they condense into individual particles.  This gunshot residue is made up of particles that are a combination of the elements barium, antimony, and lead.  There are two principal methods for analyzing putative gunshot residue: atomic absorption and scanning electron microscopy.

15.     Atomic absorption ("AA") is the older of the two methods of gunshot residue analysis.  Evidence for AA analysis is gathered by using cotton tipped swabs that have had a few drops of nitric acid deposited on them and then rubbed over the suspects hands.  The swabs are stored in sealed containers and then rehydrated with nitric acid in a laboratory and tested for the presence of (and ratio between) barium, antimony, and lead, the elements commonly found in cartridge primers.  AA is a chemical test that uses an atomic absorption spectrometer. AA cannot identify gunshot residue per se; rather the test identifies the relative amounts of metals present, not the presence or absence of gun shot residue itself.

16.     Scanning electron microscopy ("SEM") is the other principal (and more modern) method of testing for gunshot residue. The SEM analysis uses a different kind of data collection where, instead of swabs, residue is collected using a double sided sticky tape which is dabbed on the surface of the person or object on which residue may have been deposited. The SEM method has a  resolution of about 1 micron in size and can identify actual particles of gun shot residue rather than just the elements of which gun shot residue is comprised.

17.     The SEM method for analyzing gunshot residue has two principal advantages over the AA method.  First, its resolution permits the analysis of traces of gunshot residue that are well below the resolution of the AA method.  This is most important in gunshot residue

Page 2 of 4

analysis where time until testing may have reduced the volume of gunshot residue available for testing or the type of weapon used may tend to deposit very limited residue. Second, the test is for gunshot residue itself, not the component metals of residue. Therefore, the SEM test is less subject to false "positives" where, for example, the results of the test might erroneously indicate persons like a plumber who is exposed to antimony in his work, has been exposed to gunshot residue.

18.     In sum, the SEM analysis is more sensitive and more specific than the AA method and, as a result, the AA method is being replaced by the SEM method in many laboratories.

19.     In Mr. Vialva's case, there were a number of problems with the gun shot residue evidence collection and analysis.

20.     First, the government used a method of evidence collection and analysis (the AA method) that is not consistent with the best practices for gunshot residue collection and analysis in 1999. The SEM method should have been used.

21.     Second, the government waited too long to collect gun shot residue evidence. The government collected the gun shot residue evidence as many as nine hours after the commission of the crime and as many as five hours after the government was aware that there was a gun used in the commission of the crime. The lengthy time between awareness that a gun was used in the commission of the crime and the evidence collection is inexcusable. Gun shot residue is highly fugitive, and to be able to secure accurate tests it is critical to gather evidence as soon as possible after the commission of the crime. It is advisable that evidence collection be done at the crime scene. But if it is not possible to perform a gunshot residue collection at the scene, it is critical that the evidence be gathered as soon as possible thereafter. Here, the government waited much longer than it needed to gather the evidence. Not only did the government wait an excessively long time to collect the residue, the government does not even appear to know whether any of the suspects in this case had washed their hands before evidence collection. It is the government's obligation to know what suspects in its custody have been doing during the time in custody; here, the government appears not to know.

22.     Third, the government failed to test the evidence it collected. Mr. Amen, of the Texas Department of Public Safety Crime Lab, testified that the gunshot samples collected in this case could not be tested because of the lapse of time and possible exposure to gun shot residue contamination. Although I agree that the length of time since exposure to gun shot residue in this case creates the possibility that no gunshot residue will be found, I disagree that no test should have been made. A gunshot residue analysis either shows the presence or absence of gunshot residue. There is no room for using the method of analysis to predetermine that no residue will be present.

23.     If the gun shot residue analysis had been performed in this case and had not yielded an

1511



identification of gun shot residue, one possible conclusion would be it was the mishandling of evidence collection (through the unnecessary length of time between discharge of the weapon and evidence collection) or the type of test used (the AA as opposed to the SEM analysis) which contributed or resulted in the lack of gun shot residue.

24.    More timely evidence collection, using more sensitive evidence collection methods and more sensitive evidence analysis could have yielded results which might have identified the shooter in this case.

25.    After reviewing the foregoing testimony in Mr. Vialva's case it is not reasonable, in my professional opinion as a gun shot residue expert, to fail to attack the government's evidence collection and handling of gun shot residue.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this __8__ day of __June__, 2004, in Charleston, West Virginia.

_____
Robert S. White

1513

## DECLARATION

I, Stanley Schwieger, do hereby declare to the best of my knowledge or recollection at this time:

1)      I am of lawful age and reside in Waco, Texas;

2)      I am an attorney licensed to practice by and subject to the rules of the Texas Bar Association. I was the first attorney appointed to represent Christopher Vialva in his federal capital prosecution initiated in the Western District of Texas, Waco Division, Case No. W-99-CR-70. I think that I knew at the time I was appointed that it was a potential death penalty prosecution. I did not contact Lucien Campbell, the Federal Public Defender for the Western District of Texas, or anyone from his office prior to being appointed to the case. At the time I was appointed, I had never represented a defendant as lead counsel in a State capital prosecution, nor had I participated in other federal capital prosecutions;

3)      I was present at Mr. Vialva's initial appearance June 23, 1999, and his preliminary and detention hearing, June 24, 1999. I do not recall when, but I placed a telephone call to Richard Burr, who I was told provided assistance to lawyers appointed in Federal capital cases. The Federal Death Penalty Resource Counsel sent me some material, including pleadings from other Federal capital prosecutions. I do not recall when, but I filed a motion requesting the appointment of co-counsel, requesting the appointment of Mr. Dwight Goains. I had known Mr. Goains since I graduated from law school and I had worked on non-capital cases with him. I did not confer with Richard Burr or Lucien Campbell before making this request, nor am I aware of any requirement to do so. Furthermore, Mr. Campbell did not call me during any time that I remained as trial counsel for Mr. Vialva;

4)      Mr. Goains filed the first litigation budget. I was responsible for filing most of the pretrial motions. Mr. Goains was lead counsel as far as I was concerned, since he had trial experience in State capital cases. He was in charge of the first stage and I assisted with some of the witnesses. I was responsible for the second stage. Mr. Goains and I had worked with Leon Cheney in the past. He was the fact investigator Mr. Goains requested in the initial budget application. Mr. Goains requested approval for money to hire Kent Christianson to assist with the crime scene evaluation. I do not recall working with Mr. Christianson before. I conferred with Richard Burr about a mitigation specialist. He suggested Tena Francis and that is who Mr. Goains identified in the initial budget application;

5)      I do not recall when, but there was a meeting attended by Mr. Goains and me, Tena Francis, Leon Cheney, and Richard Burr. Mr. Goains had included a request for a psychiatrist or psychologist in the budget application. Ms. Francis wanted to get the

Exhibit IV-L

\5\4

social history done before we hired a mental health professional. I spoke with Mr. Burr about several issues in the case, including the juror questionnaire and jury selection. We hired Dr. William Reid, a psychiatrist, before Ms. Francis completed her investigation and report. I felt that there were mental health issues that could not wait for the completion of her report, which was not due to be finished in time to resolve these issues;

5)  Even though our proposed initial budget exceeded $7,500.00, the district court did not send the budget to the Fifth Circuit for approval. When we exceeded the $7,500.00 maximum, the funding stopped. Tena Francis was one of the experts whose work stopped because of the lapse in funding. I had been depending on Mr. Vialva's mother, Lisa Brown, to help collect records and other mitigation and fact information. Christopher's biological father, Rowallan Vialva, called me once, according to my records, on July 14, 1999. I did not speak with him again. As far as I know, Ms. Francis did not contact him either;

6)  We had to seek a writ of mandamus from the Fifth Circuit to get more funding. The matter was sent back to Judge Smith. On May 15, 2000, the day we began jury selection, Judge Smith approved part of our funding request. According to my records, he granted an additional $3,000.00 for Tena Francis's work. I made a record on all the work she still needed to complete. I did not request a continuance;

7)  As part of the funding request, we received approval to hire and funding to retain Gary Mears, Ph.D., a neuropsychologist based in Texas. The request to hire a neuropsychologist was based on Dr. Reid's conclusion that Mr. Vialva showed indications of organic brain dysfunction. I was aware that testing was performed at some point in May, 2000. I do not recall if I did or did not receive a copy of the tests, nor did I receive a report from Dr. Mears. As far as I am aware, Dr. Mears never evaluated Mr. Vialva, although I have no independent recollection of this. I did not present any evidence about Mr. Vialva's mental or emotional health during the penalty phase through a neuropsychologist or any other mental health professional because of a decision by myself and Mr. Goains;

8)  I called three lay witnesses during the second stage, Ms. Brown, Christopher's stepfather, Richard Brown, and one of Christopher's friends, Curtis Magee. I also called Dr. Mark Cunningham to testify about the future dangerousness non-statutory aggravating factor. I asked Dr. Cunningham not to interview Mr. Vialva, in part because Mr. Vialva was diagnosed with anti-social personality disorder by Dr. Reid, and I felt that this diagnosis, along with the circumstances of the crime, would be far more damaging to the trial of the case than to allow the examination;

9)  I researched the issue of jurisdiction, mainly because I was aware of military appellate court case that limited federal jurisdiction as to certain areas under military

1515

control. A principal area of defense for us was trying to prove the victims were not shot as they lay in the trunk. We felt if we could do that, we could defeat Federal jurisdiction over murder charges. I felt we had a legal defense to the carjacking that would remove the case from Federal court completely.

I, Stanley Schwieger declare the above facts are to the best of knowledge.

Executed on this ___7___ day of June, 2004, in Waco, Texas.

_____
STANLEY SCHWIEGER

1517

COUNTY OF NUECES          )
                                            )
STATE OF TEXAS              )


**AFFIDAVIT**

I, Dwight Stewart, being first duly sworn, do hereby aver and state:

1)      My name is Dwight Stewart.  I am of legal age and I reside in the State of Texas. I read and write the English language fluently;

2)      I have been retained by the Federal Public Defender for the Western District of Oklahoma to assist in collecting information about street gangs in Killeen, Texas, specifically, the "212 PIRU".  I am qualified by education, experience, and training in the field of juvenile justice.  A copy of my *curriculum vitae* is attached to this Affidavit.  I have testified as an expert on subjects related to gangs, such as tattoos, graffiti, and other symbolism;

3)      During the course of my employment, I have studied the structure and dynamics of gangs, with an emphasis on youth gangs that form in the social contexts of schools and neighborhoods.  I have interviewed past and present gang members, for a number of purposes.  In my experience, many gang members remain reluctant to speak about the membership and authority roles in the gangs, even if they are no longer active members of the gangs themselves.  I have gained information from gang members on the condition that I will not reveal their identities.  Gathering information from confidential sources is an accepted best method of gathering accurate information.  It is similar to a law enforcement officer's use of confidential informants;

4)      In preparation for conducting my investigation, I reviewed information provided to me by the Federal Public Defender that was introduced during the trial of Christopher Vialva.  I reviewed the trial testimony of  Gregory Hardin Lynch, John Bowman, Gary Hall, John Wedge, Dr. Richard Coons, and Anthony Davis.  I was advised by counsel that the defense offered no evidence that explained why young men and women become involved in gangs or how the structure of 212 PIRU related to the activities of the members.  The best information about a particular gang can be gathered during the time the members are in place.  Particularly with youth gangs that are associated with schools or neighborhoods, the membership is constantly changing;

Page 1 of 3

Exhibit IV-M

1518

5)  Based on the information I was able to gather five years later, I believe I, or a person with my training and experience, could have assisted the defense of this case. At a minimum, I could have helped prepare cross-examination of the government's witnesses. For example, several witnesses called by the prosecution testified to the nationwide status of the Bloods are a "nationwide gang" and identified the 212 PIRU as a group affiliated with the Bloods. I agree the Bloods are a gang organization that originated in Los Angeles, California. The Bloods have affiliates nationwide. The members of the 212 PIRU identified themselves as "Bloods" rather than "Crips" or some other, larger organization. But, I have found no evidence that the 212 PIRU were operating under the direct authority of Bloods leadership from California. Instead, the group seems to have been started by one family from Georgia, about nine years ago. The 212 PIRU do not operate under the rules that apply in California. For example, they will associate with other, rival groups in response to intrusions by gangs from nearby towns. Also, the rival groups live in the same neighborhoods. This is a variation from the strict territorial boundaries observed in California. I found no monetary or criminal enterprise link between the 212 PIRU and the Los Angeles organization. If the 212 PIRU were truly affiliated, you would expect to see the local group selling drugs, stealing, or engaging in other criminal conduct for the benefit of a Bloods set in Los Angeles. My assessment of this group is supported by information from contemporaries of Mr. Vialva who was familiar with the members and its activities in Killeen during the relevant period;

6)  Dr. Richard Coons testified, "If they're a member of a gang on the outside, they'll be a member of the gang on the inside." Mr. Anthony Davis testified in detail about the structure and operation of Bloods gangs in prisons. Again, I agree the Bloods operate inside prisons. I disagree that a teenager who enters prison as a youth gang member will automatically be part of a gang in prison, or that the gang will automatically accept him as a member. It depends on the individual; there are times when offenders decide prison gang life is not for them. Therefore, the offender decides to get his degree, GED, join a religious group, or stay to their self. I believe defense counsel could have challenged the assumptions of Dr. Coons and Mr. Davis in their rebuttal testimony;

7)  I believe the defense failed to collect and present relevant available information that would have assisted the jury in its assessment of the witnesses and the government's theory. For example, I have found no evidence indicating the carjacking and subsequent deaths of the Bagleys were ordered or sanctioned by the people who started this group, or that any activity of the group was promoted, furthered, or assisted by those events;

Page 2 of 3

1519

8)    I also believe the defense could have presented evidence explaining the difference between organized gangs and associations like the 212 PIRU. Information from Mr. Vialva's contemporaries indicates he liked to be part of a group, but seldom exercised control over the group. Mr. Vialva formed friendships in the Willow Springs neighborhood. He was a member of that group, but was not the dominant personality. Mr. Vialva's ability to associate with those friends was limited by his lack of transportation when the family moved to the Long Branch area of Killeen. Within Mr. Vialva's new group, he was, at most, a "soldier" as opposed to a leader.

Dwight Stewart

Subscribed and sworn to before me this _24_ day of May 2004.

MARGARITA F. VASQUEZ
Notary Public, State of Texas
My Commission Expires Aug. 21, 2004

Notary Public

Page 3 of 3

1520

6019 Rainmaker
San Antonio, Texas, 78238
210-684-9244

# Dwight Stewart

## ➢ OBJECTIVE

To acquire a challenging position with an organization that requires a professional dedication and utilization of my formal education, employment history, and experience.

## ➢ WORK HISTORY

**Trainer and Research Specialist, Texas School Safety Center, (July 2001- Current)**
Duties includes: Researching programs and issues relating to school violence prevention and safety as well as make information available to law enforcement personnel, school administrators, legislators, and interested community members. Conduct School safety reviews and serves as a trainer for the Texas School Safety Center.

**Parole Officer, ( Super Intensive Supervision Officer), Texas Department of Criminal Justice ( Jan. 2000 – June, 2001)**
Duties include: Performs routine caseworker duties involving parole investigations, supervision of parolees, and liaison activities with criminal justice agencies, social service agencies, and other public and private entities. Work includes obtaining information and preparing documentation related to parolees and parole supervision activities. Work is performed under moderate supervision with limited latitude for the exercise of independent judgment in individual cases and in the handling of frequent special problems. SISP: Officer of record on the parole supervision system completes and submits the violation summary for warrant review requests resulting from SISP release violations, conducts criminal history (NCIC/TCIC) computer checks, **schedules and presents evidence at hearings (revocation/preliminary).**

**Facility Manager, San Marcos Boot camp, Community Corrections Inc. (Jan. 1996- Dec. 1999)**
Duties Included: Overseeing all phases of the daily including staff schedules, maintenance, food service, educational programs, purchases and housekeeping, facilitating communication within all units of the juvenile probation department and other entities of the community. Supervised expenditures and aided in preparation of annual budget as directed by the Chief Juvenile Probation Officer. Reporting death, abuse, and neglect of any detained child in accordance with the law. Conducted investigations of alleged mistreatment of juveniles. Monitored youth complaints and employee grievances.

Exhibit A

1521

**Assistant Facility Manager**, Medina Co Pre-Adjudication Facility and Detention Center, Community Corrections Inc. (Jan 1994-Dec 1995)
Duties included: Acts as facility manager in manger's absence. Assistant Director Responsible for the safety and security of juveniles and staff. Monitor juvenile's location at all times. Ensures staff compliance with facility policy and procedure. Informs facility manager of any potential problems and events.

**Juvenile Probation Officer**, Comal County Juvenile Probation Department (193-1994)
Duties Included: Coordination of the Intensive Supervision Department, supervision of high-risk youth, provides for the care, protection and wholesome moral, mental, and physical development of the juvenile clients, and protecting the community by controlling the commission of the unlawful acts per section 5101 of the Texas Family Code. Program development, casework documentation, supervision planning, electronic monitoring, home visitations, referrals to outside agencies, courtroom testimony, group facilitation, an officer of the court.

## ➤ EDUCATION

**B.A. Degree in Criminal Justice, University of Texas at San Antonio, (1992)**
**Attended: Sam Houston State University – (1989-1991)**
**San Antonio College- (1987-1989)**

## ➤ SKILLS

- Excellent Communication Skills (written and Oral)
- Excellent Listening Skills
- Good Organization and Interpersonal Skills
- Excellent Motivational Character
- Program Development and Implementation
- Knowledge of Criminal Justice System
- Knowledge of Public and Community Relations
- Computer Literate
- Crisis Intervention
- Conflict Resolution
- Gang /ISP officer Comal County Juvenile Probation Dept.
- Ropes Facilitator
- TCIC/NCIC training
- TDCJ Global Tracking System Training
- Certified gang awareness trainer (asian gangs, street gangs, and prison gangs)
- Conducted Trainings on – Bullying, Well Managed Classroom, Indicators of Violent Behavior, Gang Awareness, Crises Management Planning, and Anger Management

## ➤ LICENSES AND CERTIFICATES

- **Certified Juvenile Probation Officer**, TX. Juv. Prob. Commission, (2-28-95)
- **Certified Child Care Worker**, Texas Youth Commission, (12-11-92)
- **Certified School Safety Officer**, Region 18, Midland TX, (4-19-02)
- **Certified Boys town USA – Well Managed Classroom**, (7-14-02)
- **Certified Gang Awareness Trainer**- National Gang Crime Research Center, (8-15-2003, 8-16-2003)

1522

> ## AWARDS RECEIVED

- Academic- Athletic Achievement Award
- New Hope Baptist Church Academic Scholarship Recipient
- Recipient of Bexar County Adult Probation Citizenship Award
- R.O.T.C. Cadet of the Month Recipient
- Community Corrections Inc. Appreciation/ Achievement Award

> ## MEMBERSHIPS/AFFILIATIONS

- 1996 Board of Directors, Guadalupe Valley Council on Drugs and Alcohol

- 1996 Board of Directors, Comal County Teen- Connection STAR Program

- Member of Omega Psi Phi Fraternity Inc.

- Member of Hays County Criminal Justice Association

- Member of National Association of Blacks in Criminal Justice

- Member of Texas Juveniles Probation Officers Association

- Member of Texas Juvenile Detention Officers Association

- 1997 Georgia Aftercare Start-up Team (Community Corrections Inc)

- 1998 Desert Hills Residential Treatment Center Closure Team (C.C.I.)

- TDCJ Global Tracking System Team- The offender wears a tamper resistant bracelet that maintains radio contact with lightweight portable tracking devise stores and communicates data about offender location. Offender location can be monitored at any time.

- Member of Texas Gang Investigators Association

- Trainer for the National Gang Crime Research Center

- PMAB, PRT- Restraint Certified

1523

## WORKSHOPS AND KEY NOTE SPEECHES:

Presenter, De Valle Independent School District, De Valle, Texas on "Gang Awareness," August 7, 2001.

Presenter, North Lamar Independent School District, Paris, Texas on "Indicators of Violent Behavior," August 13, 2001.

Presenter, Euless/HEB Independent School District, Dallas, Texas on "Gang Awareness," August 16, 2001.

Presenter, Krum Independent School District, Liberty, Texas, on Indicators of Violent Behavior," August 22 & 23, 2001.

Presenter, Ysleta Independent School District, El Paso, Texas on "Gang Awareness", August 29 & 30, 2001.

Presenter, Manor Independent School District, Manor, Texas on "Gang Awareness", September 20, 2001.

Presenter, Brazos County Juvenile Probation Department, Bryan, Texas on "Indicators of Violent Behavior", October 23, 2001.

Presenter, Goliad Independent School District, Big Springs, Texas on "Bullying". October 16, 2001.

Presenter, Region 20, San Antonio, Texas on "Gang Awareness" November 1 & 2 2001.

Presenter, Region 3, Victoria, Texas on " Tough as Necessary", November 5, 2001.

Presenter, Region 3, Victoria, Texas on "Tough as Necessary", November 5, 2001.

Presenter, Carrollton-Farmers Independent School District, Dallas, Texas, on "Indicators of Violent Behavior", December 3 & 4, 2001.

Presenter Brownsville Independent School, District, Brownsville, Texas on " Indicators of Violent Behavior", January 8, 2002.

Presenter, Devine Independent School District, Devine, Texas on "Gang Awareness", January 21, 2002.

Presenter, Prairie View A & M University, Prairie View, Texas on " Gang Awareness", January 24, 2002.

Presenter, Kaufman ISD, Kaufman, Texas on " Gang Awareness", February 1. 2002.

Presenter, Pharr Police Department, Pharr, Texas on "Indicators of Violent Behavior", March 12 & 13, 2002.

Presenter, Prairie View A & M University, Prairie View, Texas on "Gang Awareness", March 22, 2002.

1524

Presenter, Ft. Worth Independent School District, Ft. Worth, Texas on " Indicators of Violent Behavior", April 4, 2002.

Presenter, Houston-Tillotson College, Austin, Texas on " Gang Awareness", April 6, 2002.

Presenter, Hernandez Middle School, San Marcos, Texas on "Bullying", April 29- May 30, 2002.

Presenter, Tom Green Elementary, Kyle, Texas on "Bullying", May 31, 2002.

Presenter, South Texas Youth Conference, Laredo, Texas on "Gang Awareness", July 23, 2002.

Presenter, Region 20 Education Service Center, San Antonio, Texas on " Indicators of Violent Behavior", July 24 & 25, 2002.

Presenter, Richardson Independent School District, Dallas, Texas on "Indicators of Violent Behavior", August 22 & 23, 2002.

Presenter, John F. Kennedy High School, San Antonio, Texas on "Gang Awareness", September 27, 2002.

Presenter, Vernon Independent School District, Vernon, Texas on "Bullying", October 10 & 11, 2002.

Presenter, Balancing Education Conference, Dallas, Texas on "School Safety Reviews", October 13-15, 2002.

Presenter, Rockport High School, Rockport, Texas o "Bullying", October 14, 2002.

Presenter, Winston Elementary, San Antonio, Texas on " Gang Awareness", October 16, 2002.

Presenter, Southwest Texas State University, San Marcos, Texas on " Gang Awareness", November 5, 2002.

Presenter, Athens Independent School District, Athens, Texas on "Bullying", November 6 & 7, 2002.

Presenter, Winston Elementary, San Antonio, Texas on "Gang Awareness", November 12, 2002.

Presenter, Alief Independent School District, Houston, Texas on "Gang Awareness", November 14, 2002.

Presenter, Laredo Independent School District, Laredo, Texas on "Bullying", November 16, 2002.

Presenter, Laredo Border Conference, Laredo, Texas on "Indicators of Violent Behavior", November 19-21, 2002.

Presenter, Brownsville Independent School District, Brownsville, Texas on "Gang Awareness", January 6-7, 2003

1525

Presenter, Mc Allen Independent School District, McAllen, Texas, on "Anger Management", January 10, 2003

Presenter, Houston - Alief Youngblood, Houston, Texas, on "Bullying", January 22, 2003

Presenter, Region 20, San Antonio, Texas, on "Gang Awareness", February 5-6, 2003

Presenter, Houston -Alief H.S., Houston, Texas, on "Gang Awareness", February 17, 2003

Presenter, Laredo Independent School District, Laredo, Texas, on "Gang Awareness", April 7, 2003

Presenter, Dallas Richardson H.S., Dallas, Texas, on "Gang Awareness", April 28-29, 2003

Presenter, Alvarado Independent School District, Ft. Worth, Texas on "Crises Planning", June 3, 2003

Presenter, Texas School Food Service Association, Ft. Worth, Texas on "Anger Management", June 15-16-2003

Presenter, Region 20, San Antonio, Texas, "Bullying", June10-11, 2003

Presenter, Region 10, Rockwall, Texas, "Bullying, Gang Awareness, Crises Planning", August 5, 2003

Presenter, Region 10, Dallas, Texas, " Bullying", August 21-22, 2003

Presenter, Texas Criminal Defense Lawyers, Plano, Texas, on "Gang Awareness", August 28, 2003

Presenter, Region 9, Wichita Falls, Texas, on "Bullying, Gang Awareness, Crises Planning", September 15, 2003

Presenter, Region 19, El Paso, Texas, on "Bullying, Gang Awareness, Crises Planning"' September 17, 2003

Presenter, Devine M.S., Devine, Texas, on "Gang Awareness", September 30, 2003

Presenter, Region 12, Waco, Texas, on "Crises Planning", October 6, 2003

Presenter, Stell Middle School, Brownsville, Texas, on "Bullying", October 13, 2003.

Presenter, Los Fresnos High School, Los Fresnos, Texas, on "Gangs and Bullying", October 18, 2003.

Presenter, Safe Schools Conference, Austin, Texas, on "Gangs", October 21, 2003.

Presenter, Judson DAEP, Converse, Texas, on "Crises Planning", October 29, 2003.

Presenter, Region 8, Mt. Pleasant, Texas, on "Bullying, Anger Management, and Crises Planning", November 4, 2003.

1526

Presenter, Region 6, Conroe, Texas, on "Anger Management, and Conflict Resolution", December 3, 2003.

1527

# Dwight Stewart

**Training and Research Specialist**
**Texas School Safety Center is located within the Center for**
**Initiatives in Education**
**College of Education**
**Southwest Texas State University**

**Dwight Stewart** is the Training and Research Specialist for the Texas School Safety Center. Mr. Stewart has conducted numerous of school safety site assessments and specialized trainings on Gang Awareness, Bullying, Conflict Resolution, Anger Management, Crises Management planning, and Indicators of Violent Behavior for individuals across the State of Texas. Mr. Stewart worked over ten years in the field of Criminal Justice and has an extensive background in youth violence prevention and school safety planning. He has served on the Board of Directors for the Comal County Teen Connection Boys and Girls Shelter, Travis County Underage Drinking Prevention Task Force, Guadalupe Valley Council on Drugs and Alcohol, and Texas Association Against Sexual Assault. Mr. Stewart received his B.A. in Criminal Justice from University of Texas at San Antonio. Dwight Stewart is a nationally certified trainer in the area of Gang Violence (National Gang Crime Research Center). Mr. Stewart is a former Juvenile Boot camp Administrator, Juvenile Detention Assistant Administrator, Juvenile Probation Officer and State Parole Officer (SISP Unit).

1528

**NO EXHIBITS FOR GROUND V**

1529

1530