NO. W-99-CR-70(1)

**FILED**

JUN 1 4 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff/Respondent, | |
| v. | CRIMINAL NO. W-99-CR-70(1) |
| | WO4C163 |
| CHRISTOPHER ANDRE VIALVA, Defendant/Movant. | |

The Honorable Walter Smith
Chief United States District Judge

## VOLUME II - APPENDIX OF EXHIBITS [REDACTED]

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TITLE 28, UNITED STATES CODE, SECTION 2255

Susan M. Otto
Federal Public Defender
Lisa S. McCalmont
Assistant Federal Public Defender
215 Dean A. McGee Avenue, Suite 109
Oklahoma City, Oklahoma  73102
Telephone: (405) 609-5930
Facsimile: (405) 609-5932

ATTORNEYS FOR
DEFENDANT/MOVANT
CHRISTOPHER ANDRE VIALVA

JUNE 14, 2004

374

1531

## INDEX TO EXHIBITS VOLUME II (GROUNDS VI-XI)

### GROUND VI

Edward J. Bronson, *Severance of Co-Defendants in Capital Cases: Some
Empirical Evidence*, Discussion Paper Series, No. 94-1 21-22, 14
(College of Behavioral and Social Sciences, Cal. St. Univ., Chico, 1994) .............. VI-A

Declaration of Kevin McNally (June 6, 2004) (severance) .......................... VI-B

### GROUND VII

Affidavit of Tina Dickson Erdmann ........................................... VII-A

Declaration of Jane McHan ................................................. VII-B

Declaration of Daneen Milam ............................................... VII-C

Psychosocial History of Christopher Vialva ................................... VII-D

Declaration of Debbie ("Dee") Bynum ........................................ VII-E

Declaration of Rowallan Vialva .............................................. VII-F

Declaration of Jacorby Smith ............................................... VII-G

Declaration of James Davidson .............................................. VII-H

Declaration of Jessica Haskins .............................................. VII-I

Declaration of Jenell Hamilton .............................................. VII-J

Declaration of Charlene Burke .............................................. VII-K

Declaration of Patrick Brockett ............................................. VII-L

Declaration of Mark Cunningham ............................................ VII-M

Inmate Triennial Report, with update of Counselor Bruce Ryherd,
United States Penitentiary, Terre Haute, Indiana ............................... VII-N

Declaration of Stanley Schwieger (April 12, 2004) .............................. VII-O

Supp. Rec. on Appeal ..................................................... VII-P

1532



CDN Homepage          HAT Contents          DPRC Contents

HAT
Supporting the Federal Capital Defense Lawyer
DPRC

# SEVERANCE OF CO-DEFENDANTS IN CAPITAL CASES: SOME EMPIRICAL EVIDENCE

Edward J. Bronson
Department of Political Science
College of Behavioral and Social Sciences
California State University, Chico
Discussion Paper Series No. 94-1

*There has been very little research conducted on the effects of joinder on co-defendants. This article summarizes the available findings on severance of co-defendants, reviews the related research on severance of charges, and then presents new data, focusing on the effects of joinder of capital co-defendants at penalty phase. These data suggest that jurors are more likely to opt for death and have greater difficulty individualizing their penalty decisions in joined trials.*

## Table of Contents

**I. INTRODUCTION**

**II. PROBLEMS IN MULTI-DEFENDANT CAPITAL CASES**

**III. THE ROLE OF SOCIAL SCIENCE**

**IV. RESEARCH ON JOINED CHARGES**

**V. NEW EMPIRICAL DATA ON JOINDER IN CAPITAL**

**VI. CONCLUSIONS ON SEVERANCE/JOINDER EXPERIMENT**

Exhibit VI-A

1535

# I. INTRODUCTION

The problem of whether to sever co-defendants in criminal trials is a continuing dilemma. Courts prefer joinder because of its efficiency. There can be significant savings of time and money, and witnesses are not re-traumatized with a second recitation of their testimony. Prosecutors prefer joinder for the same reasons; in addition a joined trial can provide a substantial tactical advantage to the prosecutor if defendants blame each other or if otherwise inadmissible evidence is introduced.

Defense attorneys generally prefer severed trials, but it is often difficult to prove that a defendant will be prejudiced. Appellate courts are reluctant to reverse a trial judge's decision to reject severance, and the appellate decisions refusing to overturn convictions in those cases have generated case law that gives the appearance of a virtual per se rule favoring joinder. It would seem, however, that there is a distinction between, on the one hand, the legal standard that an appellate court adopts in ruling that a trial court judge's decision on joinder was not so egregious as to violate due process, and, on the other hand, the standard that a subsequent trial court judge adopts in deciding on a severance motion. It would be a matter of concern if that trial judge, believing that joinder would be unfair and prejudicial, nevertheless did not sever because case law or the fear of reversal would not require it.

# II. PROBLEMS IN MULTI-DEFENDANT CAPITAL CASES

## A. Capital Cases.

Apparently, one reason for such concern is the seriousness of the possible penalty. A more relevant concern to the social scientist is that capital trials, by their very nature, impose a special burden on fact finders in the penalty phase. That burden is, as the United States Supreme Court said, the

> consideration of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. [1]

Thus, a penalty phase jury must individualize its decision. This requirement is more difficult with multiple defendants. It will be hard for a jury to consider individually each defendant's penalty phase mitigation in many situations with two defendants. Where there are more than two defendants, it will be harder still.

By no means do I suggest some sort of per se rule of severance in capital cases. However, as *Keenan* teaches, courts should be more open to severance in a capital case when there are other factors present that may lead to prejudice.

## B. Dilution of Mitigation.

Life experience is the heart of penalty phase presentations. Suppose, in one scenario, that multiple defendants present an "abused childhood" penalty defense. That might be a compelling argument for one defendant, but it will lose its impact if retold for each defendant. The impact of the plea for mercy will tend to be discredited, depriving some or all the defendants of individualized penalty consideration.

Another possibility: If the parents of one defendant urge the jury to spare the life of their son, what is the

impact for those defendants whose parents do not make that plea?

Court decisions instruct us that lingering doubt is a legitimate and common consideration in a penalty phase. But in a joint penalty phase with multiple defendants, this potential mitigating circumstance of individualized guilt may be lost.

## C. Race.

Of potential concern in many cases is that the defendants may be members of minority groups. Research tends to show that people tend to stereotype in such a situation, what has been called "out group homogeneity," so that people who are not a part of the group attribute more similarities to the group members than they would to their own group.

## D. Juror Memory.

There is the problem of juror memory: Which facts applied to which defendants? Some aggravation evidence that comes into evidence as admissible only against one defendant could raise serious problems for co-defendants and prevent individualized decision making.

## E. Special Problems.

The limited research and the prior legal decisions themselves often deal with relatively simple problems. But the possible problems are many, and may be cumulative. There may be more than two co-defendants. The problems are difficult if there are only two, but the difficulties increase geometrically as additional capital defendants are added. Thus, meaningful juror consideration of the penalty issues in the case may be prevented. In one case, all three defendants wield the murder weapon. In another case the defendants are quite young and all present similar penalty-phase mitigation. Sometimes each defendant attempts to blame the co-defendants.

While difficulties arise if the penalty-phase mitigation is similar for each defendant, equally intractable problems may arise if defense counsel choose different approaches to the penalty phase. Even the exercise of shared peremptory challenges will be much more difficult. Similar problems can arise in the guilt phase as well, and they constitute one of the standard reasons supporting severance. The problems which occur in the capital penalty phase, however, can be more serious and sometimes more subtle. They can determine who lives and who dies. To encounter the classic finger pointing at the penalty phase is quite different from when done it is done in the guilt phase.

## F. Jury Selection.

Non-capital co-defendants in a capital trial have an additional issue. In a joint trial the jury would necessarily be death-qualified. The United States Supreme Court has held that the rights of a non-capital co-defendant who did not seek a severance were not violated when he was tried by a death-qualified jury. *Buchanan V. Kentucky* (1987) 483 U.S. 402. While death qualification, standing alone, might not require a severance, it is a factor that militates in favor of severing the non-capital defendants. Even the *Lockhart* Court acknowledged that "'death-qualification' produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries."[2]

There are other voir dire problems in a capital case. Joinder of multiple capital (and non-capital) defendants

leads to several problems, both in the voir dire questioning, written or oral, and in the exercise of peremptory and cause challenges. Will defense counsel be required to agree about some or all the challenges? When some attorneys are only concerned with guilt-phase jurors, and others are primarily concerned with penalty-phase jurors, concurrence on whom to challenge is unlikely. The competing tactical concerns clash.

What happens if an attorney has a client facing the death penalty and wishes to voir dire jurors about an issue that can only arise if the case reaches the penalty phase? The issue may be inadmissible and prejudicial during the guilt phase, but if an attorney expects his or her client to be convicted, he or she can tactically decide to raise the issue in voir dire. The court must decide whether the co-defendants should be penalized by revealing the information to the jury during the voir dire, thus prejudicing their guilt trials, or whether the first attorney should be prevented from seeking the necessary information.

What if multiple capital defendants take opposing sides on cause challenges? Is the court not then placed in the untenable position of committing possible error irrespective of the ruling?

## G. Confessions.

Bruton[3] makes the introduction of a confession a special and sometimes insuperable problem with joined defendants. The related problem of admissions also creates barriers to a fair trial. While there are alternatives such as redaction, they raise problems all their own. What is the court to do when it must redact potentially mitigating statements as to a co-defendant from another defendant's confession? Confessions are a prime example of the difficulty jurors have in considering evidence limited to fewer than all the defendants.

## H. Prejudicial Associations with Co-Defendants.

Some defendants bring qualities that could negatively affect their co-defendants. One defendant might have a significant prior criminal record. Another defendant may face additional serious charges. Even though prior records, uncharged criminal activities, and other matters may not be cross-admissible, jury members are likely to attribute some of these qualities to defendants who do not possess them. This can happen through confusion or stereotyping. Research tends to show that people do stereotype in such a situation, the process of assuming "out group homogeneity," so that people who are not a part of the group attribute more similarities to the group members than they would to their own group.

A particularly serious matter arises where one defendant has escaped or attempted to do so. Escape charges are prejudicial at the guilt trial, where such evidence is used to establish consciousness of guilt. A greater negative effect for a defendant who was not involved in the escape would arise at the penalty phase. The possibility of escape tends to undercut one of the most important arguments in support of life imprisonment without possibility of parole, that society can be protected from dangerous defendants without the necessity of executing them.[4]

This process of lumping co-defendants together is a common pattern. An example arose in a recent change-of-venue motion in a capital murder case in California involving nine co-defendants. A survey of a representative cross-section of 395 jury eligible respondents was conducted. Those who recognized the case (N = 345, 87.3%) were asked the following prejudgment question:

The authorities have accused nine people of the murder and of other charges, including torture, kidnapping, and robbery. Based on what you have read, heard or seen about the case, do you believe that those accused are **definitely guilty**; **probably guilty**; **definitely not guilty**; or **probably not guilty** of murder?

Of the 345, 178 (51.6%) were willing to say that all nine defendants were either definitely or probably guilty. Only 13 respondents voiced concern with answering the guilt question as to all nine defendants. Of those,

two still said the defendants were definitely guilty, and six said they were probably guilty. These defendants became an "out-group" that respondents lumped together in judging guilt primarily because they were charged together.[5]

There is also a tendency for people to attribute group characteristics in the direction of the most extreme example in the group.[6] Thus the least culpable defendant may be prejudiced by his or her association with the co-defendants; yet those codefendants will also be prejudiced because the jury will compare them with the less iniquitous.

## I. Defendant Testimony.

The possibility that only some of the defendants may testify at the penalty phase is also a potential problem in a joint trial. For example, if one of the defendants takes the stand and others do not, jurors might be very likely to draw very damaging inferences from the "refusal" of the co-defendants to testify. Second, exonerating testimony is sometimes made unavailable by the pressures of a joint trial.

## J. Confusion Arising from the Evidence, and Mutually Exclusive or Antagonistic Defenses.

When multiple defendants clash, confusion is increased. Reliability can be undermined. Furthermore, each defendant faces not only the regular prosecutor, but one or more de facto *qui tam* prosecutors as well.

## K. Practical Problems.

There are also practical problems to be considered. For example, there is the problem of space. Courtrooms often are not designed to accommodate groups of defendants with their separate lawyers and investigators. The ability of counsel to discuss issues with their clients, with reasonable privacy, becomes a problem, as does security, transportation, and other mundane matters. Scheduling, hearing of motions, and simply running an orderly trial become difficult. Separate juries, if used, present serious obstacles. Keeping them apart, finding space for them, seating them appropriately in the courtroom (while preserving the privacy of lawyer-client confidentiality), and preventing prejudicial speculation about what is being going on while the other jury is in the courtroom are illustrative of the complexities. While these logistical problems may be tolerable in the ordinary case, these concerns can give rise to constitutional error or serious unfairness in. a capital case.

## III. THE ROLE OF SOCIAL SCIENCE

Social science may be able to play a role in helping to understand whether joinder creates unacceptable levels of prejudice in particular cases. The social evidence may be divided into three general types. The first category is the research on joined charges, much of which provides insights into the effects of joining defendants.

The second area is that of related social science studies. By a related study I mean the kind of study that

1539

Case 6:99-cr-00070-ADA    Document 374    Filed 06/14/04    Page 8 of 156

deals with illuminating the way in which jurors make decisions, handle their biases, respond accurately on voir dire, etc. Included would be such matters as prospective jurors' willingness to put aside prejudicial and irrelevant information when instructed to do so by the trial judge.[7] There are many other such studies conducted by other social scientists. Some go beyond jurors' willingness to follow instructions, and deal with their ability to follow the instructions. The results suggest that jurors have great difficulty in following the law in such situations, even when they are properly instructed. Furthermore, when they are not under the social-desirability pressure of responding to a judge in a courtroom, many jurors are unwilling even to profess their willingness to follow the court's instructions in certain situations. These studies are in addition to those that deal directly with severance issues, either of charges or of defendants.

The third area is the most directly relevant, studies of the effect of joinder of defendants. There is only one such reported study, but this article presents some additional data on the subject.

## IV. RESEARCH ON JOINED CHARGES

### A. General.

Most of the social science research on severance deals with joined charges, not joined defendants. No doubt that is because it is much easier to design a study to measure the effects of such joinder.[8] However, much of the social science evidence from the joint-charge studies (and the language from the joint-charge severance cases) is relevant on the issue of severance of defendants.

The joinder of defendants and the joinder of multiple charges share the policy justification of judicial economy, but there is an important difference. The defendant is said to have an equalizing advantage when charges are joined: first, the defendant may benefit from concurrent sentencing; second, the defendant may avoid the draining impact of serialized charging. There is no concomitant advantage to a defendant from joinder with other defendants.[9]

There are seven published empirical studies on joinder of charges.[10] They are designed to explore the major theories of prejudice that arise in joinder of charges. The three theories are as follows: (1) jurors may be confused and fail to segregate the evidence as to the specific charges ("jury confusion"); (2) the jury may accumulate evidence across charges ("accumulation"); (3) the jury may infer a defendant's criminal disposition from the joined charges ("criminal inference").[11]

While the studies are methodologically distinct, the general pattern is that a control group of subjects is used to pre-test the offenses to measure the percentage of guilty verdicts when the charges are presented separately. Mock jurors then hear the evidence of the joined offenses, voting on guilt. They are asked about the process that led to the verdicts. They are also asked about their recall of specific evidence, relating to "jury confusion;" they rate the evidence to test for "accumulation;" and then rate the defendant on qualities such as dangerousness, likeability, credibility, and honesty, relating to "criminal inference."

The studies found some evidence of jury confusion although most of the studies did not find this linked to biased verdicts. That may be due to the fact that other research demonstrates that memory of specific facts is not strongly correlated with general impressions.[12] There was not much support demonstrated for the accumulation theory. The criminal inference theory was strongly supported, however. Jurors were persuaded by the multiple charges that the defendant had a criminal personality, a negative "halo effect"[13] that led to biased verdicts.

1540

While the studies differed somewhat on the causes of bias, all found a greater likelihood of conviction with joinder. The biasing effect increased significantly as the number of joined offenses increased.

As noted, this research is not directly addressed to the problems of bias in trials of joined defendants. Nevertheless, some of the findings are applicable. The robust relationship between joinder and jurors drawing a criminal inference (from the other joined criminal activity) is troubling. A criminal defendant linked to other co-defendants, particularly when his individuality is lost to that of the worst co-defendant, may suffer from the acquired negative halo. Juror confusion can also be a major problem. Finally, the studies demonstrated the lack of effect of cautionary instructions.

## B. Instructions As a Curative.

Judicial instructions are often seen as a curative when courts are concerned about possible prejudice that could arise from refusal to sever. Some courts believe that joint trial problems can be obviated with an appropriate instruction, telling jurors to "unring the bell." There has been research on, first, the professed *willingness* of prospective jurors to follow judicial instructions; and, second, on their *ability* to do so. I will discuss some of that research below. First, the research suggests that jurors have much difficulty understanding judicial instructions.[14]

Second, jurors may often be unwilling to follow the court's instructions. In connection with severance and change-of-venue motions in other cases, social scientists have tested prospective jurors' willingness to put aside prejudicial and irrelevant information when instructed to do so by the trial judge. Some studies go beyond jurors' willingness to follow instructions, and deal with their ability to follow the instructions. The results suggest that jurors have great difficulty in following the law in such situations, even when they are properly instructed. Furthermore, when they are not under the social-desirability pressure of responding to a judge in a courtroom, many jurors are unwilling even to profess their willingness to follow the court's instructions in certain situations.[15]

In a venue survey about a defendant named Melton, respondents were asked the following question:

Now suppose that you're a juror in a criminal trial -- like the Shawn Melton case. The case has been widely reported in the newspapers and on TV and radio. Assume that during the trial you remember a news story that told about a confession that the defendant made to the police. But suppose the confession isn't presented during the trial. The judge instructs you that you must make your decision about guilt or innocence only on the evidence you heard in court. Without the confession, the prosecution's case is weak; it would not convince you beyond a reasonable doubt of the defendant's guilt. In reaching your verdict, which would you do?

I would not consider the confession even though it might mean the defendant will go free.

I would take the confession into consideration in reaching my verdict since it shows the defendant's guilt.

Of 386 respondents of this representative cross-section of jury-eligible people in the county, 194 (50.3%) said they would follow the court's instructions, but 156 (40.5%) would ignore the court and the law, 28 (7.3%) said they didn't know, and 8 (2.1 %) refused to answer. Thus, only half even said they would ignore the pretrial publicity, and surely many of those would have great difficulty doing so, even if they tried.[16]

In a case involving severance of charges in San Diego, the survey results were even more disturbing. Respondents were asked about their ability to follow the judge's instructions to ignore a certain statement. Only 25.6% said they would do so; 67.5% said they would consider the statement, and 6.7% gave a don't know or refusal response.[17]

1541



Even when jurors conscientiously try to follow instructions, they often have great difficulty in doing so. There are several studies investigating this problem. For example, those interested in decision making by jurors have written about a process called "hindsight bias,"[18] a distortion in judgment caused by attitudes or knowledge that a juror has. For example, a juror instructed to consider a defendant's criminal record only for purposes of credibility, but not as evidence of guilt, may try to do so. But knowledge of the defendant's incriminating past may lead the juror to view other evidence through a prism of guilt.[19] In an important study that provided some insight into why death-qualified juries were more conviction prone, the authors wrote that, "ambiguous information tends to be interpreted in a way that maintains people's initial beliefs and confirms their expectations.[20] The authors found that jurors predisposed to convict resolved ambiguous testimony consistent with a prosecution theory, or "script," of the case, finding the prosecution's witnesses more credible than the defense's, the prosecution's version of the facts more plausible, the inference from the facts more consistent with guilt, and the witnesses' attributions more favorable to the prosecution. Such jurors even had a lower threshold of conviction.

One of the many studies on the ineffectiveness of judicial instructions noted that jurors were unaware of the extent to which they had been biased in their decision making by the improperly considered evidence.[21]

The classic statement of the lack of effectiveness of judicial instructions to cure the incurable came 25 years ago in the leading case dealing with a possible issue in any joined case: "'The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction ... *Bruton v. United States.*[22]

One last comment on the efficacy of judicial instruction in the context of a death penalty trial is in order. When jurors are instructed to perform unrealistic tasks, such as ignoring what they know or putting aside prejudices, it is a tenuous proposition to rely on when jurors are deciding guilt, -- where the rules are reasonably straightforward. But to expect them to do so in the penalty phase, when their very role is to bring to the jury all the community's biases -- vengeance, mercy, and a dozen more -- is even more unrealistic.

## V. NEW EMPIRICAL DATA ON JOINDER IN CAPITAL CASES

### A. Introduction.

As noted above, there is a fair amount of research on the effects of joinder of charges, but only one study on the effect of joinder of co-defendants.[23] In that study, the thrust of the evidence was that jurors would have great difficulty considering separately the guilt evidence and each individual defendant's mitigating penalty-phase evidence. That study demonstrates a prejudicial impact on the facts of that case, but more empirical research is needed.[24]

In the current study, the question was whether the joinder of three capital defendants in a case in which all participated in the killing and in which the penalty phase evidence was similar for all defendants will result in an unfair penalty determination by a jury. The hypothesis was that if jurors decide the penalties for the three defendants in a joint trial, then, first, they will be more likely to favor death, and, second, they will be less likely to make the individualized decisions that the law requires.

### B. Method.

1542

The data for this study were obtained by administering a set of questionnaires to two groups of subjects. The first group was 236 college students from Chico State University. The group was reduced to 167 by eliminating those who would not be eligible to serve as a juror in a capital trial. Of the 69 excluded, 23 were non-citizens, 2 were under 18 years of age, and 44 were not death-qualified, indicating either that they would never vote for the death penalty (Witherspoon excludables -- WEs) (29) or that they would always vote for the death penalty (ADPs) (15).

Of the 167 qualified subjects, there were 95 females and 72 males. The mean age was 22.53, and 95 of the subjects were in the age group of 18-21. All were enrolled either in Psychology or Political Science classes, both lower and upper division.

The second group of subjects was 98 residents of Butte County who had been placed in the jury pool by the Jury Commissioner for 1992. The names and addresses of 300 jury pool members, chosen in the standard manner by computer, were supplied to the experimenter, who mailed each a questionnaire with a cover letter and a return envelope. Of the 98 who responded, 22 were not death-qualified, indicating either that they would never vote for the death penalty (9) or that they would always vote for the death penalty (13). Two additional questionnaires were rejected because the questions were not answered, leaving a net of 74 qualified respondents. Of these, 42 were women and 32 were men. The mean age was 46.01.[25]

Thus there were 241 qualified respondents, 167 students and 74 jury pool members.

## C. Design.

To test the hypothesis that a juror would be more likely to vote for the death penalty for a defendant tried jointly with co-defendants than if the defendant were tried separately, subjects were given one of four questionnaire versions (Composite, Able, Baker, or Charlie). In all four versions the crime was described in some detail, a murder-robbery-burglary involving three defendants (Able, Baker, and Charlie). In the composite version the respondent was then asked to assume that his or her jury had unanimously found the three defendants guilty of murder, robbery, and burglary. The respondent was also told that the jury had found that all the "special circumstances" charged against the defendants in the case are true -- that the murder was committed in the course of a robbery, by lying in wait, and by torture. The respondent was also told, in accordance with California law, that since the defendants have been convicted of murder with special circumstances, the only punishment is either the death penalty or life imprisonment without the possibility of parole (LWOP).

The nature of a penalty trial was described, and the respondents were then instructed on the meaning of aggravating and mitigating circumstances and the process of deciding between death and LWOP, in accordance with applicable CALJIC instructions.

The respondent was presented with an extensive description of both aggravating and mitigating evidence for each defendant, including such factors as the brutality of the crime, the role of each defendant, his prior criminal background, and his social history.[26] In the composite version, respondents were told, "The judge instructs the jury that it must decide the punishment for each defendant separately and that the defendants need not necessarily receive the same punishment."

Respondents then voted either for the death penalty or for LWOP for each defendant. They were also asked for any reasons considered in reaching a decision.

The three other versions described severed trials, one for each defendant.[27] The same full scenario of the crime was presented, but the penalty phase evidence concerned only the penalty phase evidence for that individual defendant, and the respondent was asked to make a penalty decision only on that defendant. e.g., "The judge now instructs you to consider your penalty verdict only as to defendant Charlie."

The scenarios produced a good division of penalty decisions. Overall (including both the joined and

1543



composite versions), 56.6% of the verdicts were for death, and 43.4% were for LWOP.[28][28] Interestingly, jury pool members and students voted for the death penalty at almost exactly the same rate, 56.1 % for jury pool members, and 56.8% for students. There was some variation between defendants: overall, Able got death on 37.4% of the questionnaires, Baker got death on 76.3%, and Charlie got death on 58.2%. Thus, it would seem that the respondents saw the penalty decisions as fairly even overall, and that, at least in a general overall way, they were also able to see meaningful differences between the defendants.

## D. Results.

The results will be discussed in three ways. First, the combined results of the two groups, students and jury pool members, will be noted. Then each of the two groups will be examined separately.

### 1. Combined Results.

Table I shows the penalty verdicts combined across the two studies and for all three defendants. The table shows that respondents voted for death 65.1% of the time when defendants were tried jointly, but just 47.2% of the time when the defendant was tried alone. This provides evidence that joinder, at least in some cases, makes it more likely that a defendant will receive the death penalty. This result was highly statistically significant.[29]

**Table 1. Combined Results for Subjects Who Would Be
Eligible to Serve As Capital Juror** (N = 241[30])
(All Defendants, Both Studies)

| Death Penalty When Joined | Death Penalty When Severed | LWOP When Joined | LWOP When Severed |
|---|---|---|---|
| 65.1%(127) | 47.2%(83) | 34.9%(68) | 52.8%(93) |

P <.001

Table II breaks out the penalty verdicts by defendant. As can be seen, each of the defendants is more likely to receive the death penalty when tried jointly than when his case is severed.

**Table II. Combined Results for Subjects Who Would Be Eligible
to Serve As Capital Jurors** (N = 241)
(All Defendants, Both Studies, By Defendant)

| SCENARIO | DEATH PENALTY | LWOP |
|---|---|---|
| Able (joined) (65) | 43.1% (28) | 56.9% (37) |
| Able (severed) (66) | 31.8% (21) | 68.2% (45) |
| Baker (joined) (65) | 80.0% (52) | 20.0% (13) |
| Baker (severed) (53) | 71.7% (38) | 28.3% (15) |
|  |  |  |

1544

| Charlie (joined) (65) | 72.3% (47) | 27.7% (18) |
| Charlie (severed) (57) | 42.1 % (24) | 57.9% (33) |

P for Able< .10; for Baker n.s.; for Charlie <.001

## Non-individualized Decision Making.

An important legal requirement is that the penalty verdict be individualized. Thus a process that tends to treat co-defendants as semi-fungible is troubling. In this study there was a strong tendency for respondents to lump the three defendants together in penalty phase decision making. There were 65 composite questionnaires.[31] In 36 of them the respondents gave the same penalty verdict for all three defendants (24 death verdicts for all three, 12 LWOPs for all three).

Intuitively this result -- giving the same penalty verdict for all three defendants seems very high, but there is a way to test this finding. If a coin comes up heads three times in a row, that is much higher than pure chance. We would expect that the chances of that happening are just one in eight -- the odds of it happening once (1/2) times the odds of it happening the next time (1 /2) times the chances of it happening a third time (1/2). The combined chances of three consecutive heads or three consecutive tails are thus one in four, 1/8 + 1/8.

The chances that a respondent would vote for the death penalty for any of the defendants in this experiment are best measured by what the respondents actually did, shown in Table III. These data allow us to compute the a priori odds that a respondent would vote the same punishment for all three defendants if the decisions were independent of each other, like coin flips.[32]

**Table III. Measuring the Level of Support**
**for Each Penalty for Each Defendant**
**(Both Studies, Both Formats)**

| | Able | Baker | Charlie |
| --- | --- | --- | --- |
| **Death Penalty %** | 37.4% | 76.3% | 58.2% |
| **LWOP %** | 62.6% | 23.7% | 41.8% |

Statistically, we would expect that respondents would vote for the death penalty for all three defendants just 16.61% of the time,[33] yet death verdicts for all three defendants were cast on 36.92% of the composite version questionnaires. Similarly, we would expect all three votes for LWOP just 6.20% of the time,[34] yet it actually happened 19.46% of the time. Put another way, we would have expected that just 22.81% of the respondents would have chosen the same verdict for all three defendants, but in practice it happened 55.38% of the time.[35] This would suggest that the penalty decisions were not individualized, but rather that the respondents were tending to make a collective penalty judgment.

In fact the above analysis may seriously understate the problem of how non-individualized penalty phase decision making favors death in joint trials. That is because the probability was

calculated based on the percentage of death votes both in joined and severed trials. But joinder increases the likelihood of death verdicts, thus bootstrapping the expected percentage of death verdicts. If we calculate the likelihood of three death verdicts just in severed trials, using the percentages in Table IV, the chance of death verdicts for all three defendants drops from 16.61% in joint trials to just 9.60% in severed trials.[36] The data from this experiment suggest that, relatively speaking, all three defendants are likely to receive death verdicts roughly four times as often (36.92% compared to 9.60%) in joint trials as in severed ones.

**Table IV. Measuring the Level of Support
for Each Penalty for Each Defendant**
*(Both Studies, Severed Formats Only)*

|  | Able | Baker | Charlie |
|---|---|---|---|
| Death Penalty % | 31.8% | 71.7% | 42.1% |
| LWOP % | 68.2% | 28.3% | 57.9% |

## 2. The Significance of the Comments by Respondents.

### a. A partial explanation of why joined penalty trials are prejudicial.

The final question asked on the questionnaire, after the respondent votes either for the death penalty or LWOP, is as follows: "What are some of the reasons you considered in making your decision?" A content analysis of the responses shows that the respondents tended to focus either on the defendant's role in the crime or on his social history. Only a few of the respondents seemed to weigh the aggravating factors against the mitigating ones. In the composite format, 23 of the 65 respondents lumped the defendants together or gave exactly the same comment for the penalty for each defendant. e.g., one said, "the crime," for each defendant; another wrote "premeditation" for each, then added, "all have equal guilt." Another wrote, "I do not take tragic upbringings or bad home-lives into question when it comes to murder ... It is too bad these three men were not more properly punished for their crimes when they were juveniles ...." Another respondent wrote, "Brutally committing murder" for Able, then "same as above" for Baker and "same as above" for Charlie.

The most revealing insight from examining the comments is that respondents were much more likely to consider the childhood and social history of the defendant when they heard the case in the severed version. The data are shown in Table V. Respondents were far more likely to comment on a defendant's social history/mitigation evidence in the severed state than in the joined penalty scenario.

The Able penalty phase comments are instructive. In the composite scenario, just 22 of the 65 respondents, 34%, made some comment about Able's brutal childhood in explaining their verdicts. Of these, 8 viewed his social history as mitigating, leading to an LWOP verdict, and 10 saw the evidence as possibly mitigating but no excuse.[37] There were three respondents who indicated that Able might be capable of rehabilitation, probably based on some positive aspects of his background; they voted for LWOP. One other respondent wrote that Able's history indicated his violence and that he was a habitual offender.

**Table V. Percentage of Respondents
Mentioning Defendant's Social History**

| Defendant | Composite Scenario | Severed Scenario |
|---|---|---|
| Able | 33.8% (22/65) | 56.1% (37/66) |
| Baker | 33.8% (22/65) | 64.2% (34/53) |
| Charlie | 38.5% (25/65) | 66.7% (38/57) |
| All Defendants | 35.4% (69/195) | 61.9% (109/176) |

When the Able case was presented to respondents in a severed format, 37 of 66 respondents, 56%, explained their verdict with a comment about Able's childhood or social history. Thus, relatively speaking, respondents were over one and one-half times more likely (1.66) to take note of the crux of Able's penalty defense. Of these, 25 saw his social history as mitigating.[38] There were 9 who stated that his bad life did not constitute an excuse,[39] and 3 thought he might be rehabilitated, presumably based on his abused background and attempts at reform.

Furthermore, as shown in Table VI, in the separate penalty trial, over three-fourths of those who gave social history as a reason for their penalty decision on Able considered that evidence as supporting LWOP, while in the joined penalty scenario, just half saw that evidence as sufficiently mitigating to justify LWOP for Able.

Similar patterns were observed with respect to both Baker and Charlie, as shown in Tables V and VI.[40] Thus it would seem that one mechanism by which defendants fare better in severed penalty trials is that jurors are more likely to consider who they are, and how they came to do what they did. Perhaps jurors who hear such a sad story once will be more attentive and sympathetic to it than those who hear it, or some variation thereof, several times.[41]

**Table VI. Impact of Defendant's Social History**
**Social History Use to Support LWOP**

| Defendant | Composite Scenario | Severed Scenario |
|---|---|---|
| Able | 47.8% (11/23) | 75.7% (28/37) |
| Baker | 26.1% (6/23) | 23.5% (8/34) |
| Charlie | 47.8% (11/22) | 63.2% (24/38) |
| All Defendants | 40.6% (28/69) | 55.0% (60/109) |

Social history evidence is used in mitigation in an attempt to personalize the convicted murderer, as the defense attorney attempts to individualize and humanize the defendant. If jurors are less likely to consider such evidence in joint penalty hearings, the function of the jury to individualize its penalty decision-making may be adversely affected. The defendant becomes a stereotype again, just another murderer engaged in the apparently routine practice of justifying his act by blaming others.

b. **Validity.**

1547



In an experiment of this sort, one must be concerned with the question of external validity, that is, the extent to which the experiment measures what it is supposed to measure in the real world. Questionnaires are not trials. The relative length and detail of the questionnaire are of some help in seeking verisimilitude, as are the instructions that accompanied it. The written responses indicate that the respondents took their task seriously; many responses were detailed and showed emotional intensity.

It should be noted that this was a study of prospective jurors, not juries. However, juror votes are the building blocks of jury verdicts. Deliberation rarely changes the initial majority decision. Kalven and Zeisel wrote many years ago in their classic *The American Jury*, "The deliberation process might well be likened to what the developer does for an exposed film: it brings out the picture, but the outcome is pre-determined."[42]

## 3. The Student Study.

The overall data from the college student study are shown in Table VII. Fewer than half (46.7%) voted for the death penalty when the trials were severed, but almost two-thirds (65.9%) chose death in joined trials. Table VIII breaks down the penalty decisions for each decision. For each defendant, respondents were more likely to vote for death when the penalty trial was joined.

**Table VII. Overall Verdict Choices for College Student Subjects Who Would Be Eligible to Serve As Capital Juror (N = 167)[43] (All Defendants)**

| Death Penalty When Joined | Death Penalty When Severed | LWOP When Joined | LWOP When Severed |
|---|---|---|---|
| 65.9%(89) | 46.7%(57) | 34.1%(46) | 53.3%(65) |

P <.005

**Table VIII. College Student Verdicts by Defendant**

| Scenario | Death Penalty | LWOP |
|---|---|---|
| Able (Joined) | 40.9% (18) | 59.1% (26) |
| Able (Severed) | 34.1% (15) | 65.9% (29) |
| Baker (joined) | 81.8% (36) | 18.2% (8) |
| Baker (severed) | 67.5% (27) | 32.5% (13) |
| Charlie (joined) | 70.5% (31) | 29.5% (13) |
| Charlie (severed) | 39.5% (15) | 60.5% (23) |

For Able, P n.s.; for Baker, P < . 10; for Charlie, P < .005.

## 4. The Juror Pool Study.

1548

The overall data from juror pool study are shown in Table IX. Fewer than half (48.1 %) voted for the death penalty when the trials were severed, but almost two-thirds (63.3%) chose death in joined trials. Table X breaks down the penalty decisions for each decision. For defendants Able and Charlie, respondents were more likely to vote for death when the penalty trial was joined. However, respondents were more likely to vote for death for Baker in the severed condition.

**Table IX. Overall Verdict Choices for Juror Pool Subjects Who Would Be Eligible to Serve As Capital Jurors (N = 74) (All Defendants)[44]**

| Death Penalty When Joined | Death Penalty When Severed | LWOP When Joined | LWOP When Severed |
|---|---|---|---|
| 63.3% (38) | 48.1%(26) | 36.7%(22) | 51.9%(28) |

P <.10

**Table X. Juror Pool Verdicts for Each Defendant**

| Scenario | Death Penalty | LWOP |
|---|---|---|
| Able (Joined) | 50.0% (10) | 50.0% (10) |
| Able (Severed) | 27.3% (6) | 72.7% (16) |
| Baker (joined) | 70.0% (14) | 30.0% (6) |
| Baker (severed) | 84.6% (11) | 15.4% (2) |
| Charlie (joined) | 70.0% (14) | 30.0% (6) |
| Charlie (severed) | 47.4% (9) | 52.6% (10) |

P Able < .10; for Baker n.s.; for Charlie < .10

With respect to the jury pool respondents' reversal on Baker, there are two points to be made. First, there were six LWOP votes for Baker in the composite format. On five of those votes, the respondent voted for LWOP for all three defendants, the lumping-together tendency discussed above. If it is true that in joined penalty trials there are two forces operating, one a pro-death bias, and the other a tendency to lump defendants together, it may be that the lumping effect overcame the pro-death bias as to Baker. Second, this process may come into play especially for defendants who are most likely to receive the death penalty, as was true for Baker in the crime scenario in this experiment.[45] Another way to view the impact of a joined capital trial is that, most importantly, it makes death penalty verdicts more likely, but, secondarily, that it generates a leveling effect, wherein the most likely death candidates do a little better and the most likely LWOP candidates do significantly worse than the difference in their cases might suggest.[46]

## VI. CONCLUSIONS ON SEVERANCE/JOINDER EXPERIMENT

1549

Case 6:99-cr-00070-ADA     Document 374     Filed 06/14/04     Page 18 of 166

Data from the experiment support the hypothesis that joinder in a three-defendant penalty trial leads to a higher percentage of death verdicts and to less individualized decision making. There is also some evidence that jurors will be less likely to consider important social history mitigating evidence in a joined penalty trial.

This study of joinder and severance of co-defendants is case specific, and therefore has limitations in terms of its generalizability. There is a need for researchers to explore whether the problems of prejudice in this case scenario also occur in other factual contexts. It is an area in which little research has been done, and it is to be hoped that with other approaches, we will be able to help identify and understand the implications for fair trial and judicial economy raised by joinder and severance.

*My special thanks to Geoffrey A. Braun, who obtained support for the study and who participated in the design and analysis of the empirical work. My thanks also to the judges of the Butte County Superior Court, who permitted the use of prior jury lists, and to Jury Commissioner Sandra Jones who was helpful in many ways.

## FOOTNOTES

1. *California v. Ramos* (1983) 463 U.S. 992, 1001, n. 13 (citation omitted). As the California Supreme Court said:

   > A capital penalty jury ... is charged with a responsibility different in kind from ... guilt phase decisions: its role is not merely to find facts, but also -- and most important -- to render an individualized, *normative* determination about the penalty appropriate for the particular defendant -- i.e., whether he should live or die.

   *People v. Brown* (1988) 46 Cal.3d 432, 448 (emphasis in original).

2. *Lockhart v. McCree* (1986) 476 U.S. 162, 173.

3. *Bruton v. United States* (1967) 391 U.S. 123.

4. In the study discussed below, § V, one jury panel member wrote, in explaining why he or she had voted in favor of the death penalty: "He (the penalty phase defendant) could perhaps be persuaded into escaping prison to again be influenced to killing again."

5. *People v Dodds, et. al.* (Trinity County, 1993).

6. Note, "Rethinking Criminal Joinder: An Analysis of the Empirical Research and Its Implications for Justice," 52 *Law & Contemporary Problems* 325, 338-39 (citation omitted) (1989).

7. Some of these studies are cited below, § IV.

8. See Note, "Rethinking Criminal Joinder: An Analysis of the Empirical Research and Its Implications for Justice," 52 *Law & Contemporary Problems* 325 (1989). The author notes, "No empirical research has been published to date dealing with the potential for prejudice in trials of joined criminal defendants." *Id.*, 338.

9. It has been suggested that some joined defendants could benefit because of a consistency of result and/or from giving the jury an overall view of the case.

10. Kerr, N., & Sawyers, G., "Independence of Multiple Verdicts Within a Trial by Mock Jurors," 10 *Representative Research in Social Psychology* 16 (1979); Horowitz, A., Bordens, K., & Feldman, M., "A Comparison of Verdicts Obtained in Severed and Joined Criminal Trials," 10 *Journal of Applied Social Psychology* 444-456 (1980); Bordens, K., & Horowitz, I., "Information Processing in Joined and Severed Trials," 13 *Journal of Applied Social Psychology* 351 (1983); Tanford, S., & Penrod, S., "Biases in Trials Involving Defendants Charged with Multiple Offenses," 12 *Journal of Applied Social Psychology* 453 (1982); Tanford, S., & Penrod, S. "Social Inference Processes in Juror Judgments of Multiple Offense Trials," 47 *Journal of Personality & Social Psychology* 749 (1984); Tanford, S., Penrod, S., & Collins, R., "Decision Making in Joined Criminal Trials: The Influence of Charge Similarity, Evidence Similarity, and Limiting Instructions," 9 *Law & Human Behavior* 319 (1985); Greene, E., & Loftus, E., "When Crimes Are Joined at Trial: Institutionalized Prejudice?" 9 *Law & Human Behavior* 193 (1985).

11.    Note, "Rethinking Criminal Joinder An Analysis of the Empirical Research and Its Implications for Justice," 52 *Law & Contemporary Problems* 325, 327 (1989). A fourth theory of prejudice identified by the courts, that a defendant may become embarrassed or confounded in presenting separate defenses, has not been tested empirically.

12.    *See id.*, n. 39

13.    *Id.*, n. 46

14.    It has been found repeatedly that even after service as a trial juror, a substantial proportion of persons is unable to understand correctly the principles of presumption of innocence, burden of proof, and reasonable doubt. *See*, Strawn, D. and Buchanan, R., "Jury Confusion: A Threat to Justice," 59 Judicature 478 (1976) (50% of instructed jurors did not understand after trial that the defendant did not have to present evidence of innocence); Sales, B., et al., Making Jury Instructions Understandable, (1981) (average comprehension level among 1,000 jurors of attempted murder trial instructions was 51%). The subjects of both studies cited were actual jurors.

The most recent study (including a literature review) is Reifman, A., Gusick, S., & Ellsworth, P., "Real Jurors' Understanding of the Law in Real Cases," 16 *Law & Human Behavior* (1992).

15.    There is an excellent general review of some of the literature of the effectiveness of judicial instructions, plus a review of the findings of the curative powers of such instructions in joinder of charges cases, in Note, "Rethinking Criminal Joinder: An Analysis of the Empirical Research and Its Implications for Justice," 52 *Law & Contemporary Problems* 325, 333-36 (1989). The author concluded that based on empirical studies, "curative instructions, as used by the courts today, are insufficient to counter the prejudicial effects of joinder." *Id.*, at 336.

16.    The data are reported in *Declaration in Support of a Change of Venue Motion: A Highly Publicized Criminal Case* (E. Bronson), in E. Krauss & B. Bonora, Eds., *Jurywork: Systematic Techniques* (2nd ed.) (Appendix E-2). New York: Clark Boardman, 1987, 1989 rev. Reprinted as part of Ch. 7, pp. 7-78 to 7-122, 1990 rev.

17.    The survey was conducted in connection with *People v. Maier* (San Diego Superior Court, 1988).

18.    *E.g.*, Kagehiro, D., et al., "Hindsight Bias and Third-Party Consentors To Warrantless Police Searches," 15 *Law & Human Behavior* 305 (1991); Casper, J., "Juror Decision Making, Attitudes, and the Hindsight Bias," 13 *Law & Human Behavior* 291 (1989).

19.    One study found that subjects tended to ignore the limiting instruction. Juries with the criminal record information were likely to discuss it as evidence the defendant committed the crime. Hans, V. & Doob, A., "Section 12 of the Canada Evidence Act and the Deliberation of Simulated Juries," 18 *Criminal Law Quarterly* 235 (1976).

20.    Thompson, W., et al., "Death Penalty Attitudes and Conviction Proneness: The Translation of Attitudes into Verdicts," 8 *Law & Human Behavior* 95, 98 (citations omitted) (1984).

21.    Thompson W., "Inadmissible Evidence and Juror Verdicts," 40 *Journal of Personality & Social Psychology* 453 (1981).

22.    (1967) 391 U.S. 123, 129 (citations omitted). The Court added, "'A jury cannot "segregate evidence into separate intellectual boxes. *Id.*, at 13 1.

23.    The results of that research were reported in Heaney, L., "Severance Motions: Successful Application of Social Science Evidence," July/August 1988 *Forum* 20.

24.    In addition, a good deal of very practical evidence was presented to the court on the kinds of difficult problems that can arise under certain circumstances in joint trials, particularly in the penalty phase of capital cases.

25.    Nine were in their twenties, including one aged 20 and one aged 21.

26.    The guilt and penalty scenarios of the composite questionnaire were 3,078 words in length, plus the introduction and questionnaire portions, including a brief death qualification. For experiments of this type, this questionnaire is quite long. While not approaching the length of a trial, it is much longer than, for example, the questionnaire scenarios used to obtain verdict or penalty decisions in the standard change-of-venue questionnaire.

27.      The guilt and penalty scenarios of the severed questionnaires averaged 1,672 words in length plus the introduction and questionnaire portions, including a brief death qualification. The reduction in length from the composite scenario was obtained by omitting the penalty scenarios of the co-defendants.

28.      These results are comparable to those obtained in actual capital trials that go to penalty phase in California, in which death verdicts are returned approximately 50% of the time. California Appellate Project, Recap, August 13, 1990, p. 30.

29.      The chi-square (X2) test is used to determine the probability (P) that the two variables (joined trial death verdicts and severed trial death verdicts) are associated by chance. X2 is a standard and basic statistical technique. Social scientists generally agree that a P of .05 or less means that a result is statistically significant; such a relationship will occur by chance only five times in a hundred. A result of .01 or less (fewer than one chance in a hundred) is said to be highly statistically significant. In Table I there is less than one chance in a thousand (P < .001) that these results could have occurred by chance, that is, that there is no relationship between the death penalty decisions and whether that decision is made in the joined or in the severed condition.

When P is between .05 and .10, the results are said to be marginally statistically significant. The X2 test is very sensitive to sample size, so it is difficult to demonstrate statistical significance with small samples. The sample sizes in most of the variations in this experiment were relatively small, so it required large disparities to produce statistical significance. However, even when the results do not yield results that are statistically significant, the results may still be significant from a policy point of view, since a larger sample size that produced the same results would show statistical significance, assuming, of course, that the observed pattern remained unchanged.

30.      There were 241 respondents, of whom 65 had the composite scenario and 176 had single individual scenarios. Thus there were 195 penalty decisions in the joint scenario and 176 penalty decisions in individual scenarios, a total of 371 decisions.

One death qualified respondent from the jury pool with the composite scenario was unable to decide on any penalty. That questionnaire was excluded.

31.      An additional respondent "hung" on all three penalty decisions. This questionnaire was excluded from the analysis. Some believe that a juror inclined toward hanging is usually a plus for the defense.

32.      It could be argued that penalty decisions in joined capital trials are not like coin tosses, since they are not discrete events. That argument may prove too much if it means that jurors' penalty decisions in joint trials are not individualized.

33.      374 (Able) x .763 (Baker) x .582 (Charlie).

34.      626 (Able) x .237 (Baker) x .418 (Charlie).

35.      These calculations included only those who voted for a penalty for each defendant. There were 65 such respondents with composite version questionnaires. An additional respondent "hung" with respect to all defendants. That respondent was omitted from these calculations.

36.      318 (Able) x .717 (Baker) x .421 (Charlie).

37.      One of these respondents still voted for LWOP; the rest voted for death.

38.      One voted for death (it was "kinder"), and the rest chose LWOP.

39.      One still voted for LWOP.

40.      It might be argued that this finding is tautological, that is, since more respondents voted for LWOP in the severed scenario, we would expect to find more references to the mitigating social history evidence. But respondents given the severed scenario were also more likely to cite but discount the social history evidence when they voted for the death penalty. The point is that the respondents appeared to weigh the social history arguments more seriously in the severed scenarios.

In the Baker scenario, there is a small reversal in Table VI. However, in the severed scenario, many gave mitigating weight to Baker's background, but still struck the balance in favor of death.

41.      This is a variation on the approach taken by lawyers considering a bench trial before an experienced trial judge, -- and that judge's

probable view of the classic defense, "I bought it from some dude on the comer." A jury might be willing to buy the defendant's story (or at least have a reasonable doubt) that he acquired the stolen television set from the "dude on the comer" who offered him the set for $10 in order to buy milk for his young child. Judges have been desensitized by hearing such stories too often.

Death-qualified jurors, who are by definition sympathetic to the death penalty, might be willing to vote for less than death for one defendant with a tragic childhood, but to accept the defense for multiple defendants cuts against the grain.

42.      H. Kalven & H. Zeisel, *The American Jury* 489 (1966).

43.      There were 236 respondents. Of these, 23 were non-citizens, two were under 18, and 44 were not death qualified (15 ADPs and 29 WEs), leaving a net of 167 qualified respondents; 45 had the composite scenario, 44 had the severed Able scenario, 40 had the severed Baker scenario, 38 had the severed Charlie scenario. There are more responses than respondents because those with the composite scenario (45) voted on all three cases.

44.      300 questionnaires were mailed out, with 98 responding. Of these, 13 were ADPs, 9 were WEs, and two respondents did not answer, leaving a net of 74 qualified respondents. Table shows their responses. 20 had the composite scenario, 22 had the severed Able scenario, 13 had the severed Baker scenario, 19 had the severed Charlie scenario. The response rate is reasonable for a single (no follow-up) mailed questionnaire.

45.      An additional point is that because of the lower return rate of Baker questionnaires from jury pool members plus a fewer number that were submitted by death-qualified respondents, the number of usable Baker questionnaires was significantly smaller than for Able or Charlie (13 for Baker, compared with 22 for Able and 19 for Charlie). The smaller sample size can lead to a situation where a shift in just one or two votes can alter the relationships.

The combined verdicts, adding together both the students and the jury pool members, still show a greater likelihood of death verdicts for Baker in the joined penalty hearing.

46.      This view is contrary to the view of some lawyers, that the most culpable defendant is at great risk in a joint trial because the comparatively aggravated nature of his case makes a death verdict even more likely, and that the least culpable defendant might have some advantage in a joint trial because he will be compared to the most egregious defendants.

1553

1554

## DECLARATION OF KEVIN McNALLY

1. I currently serve, along with David Bruck of South Carolina and Richard Burr of Texas, as Federal Death Penalty Resource Counsel, assisting court-appointed and defender attorneys charged with the defense of capital cases in the federal court. I have served in that capacity since the inception of the Resource Counsel Project in January, 1992. The Project is funded and administered under the Criminal Justice Act by the Defender Services Division of the Administrative Office of the United States Courts.

2. My responsibilities as federal resource counsel include the monitoring of all federal capital prosecutions throughout the United States in order to assist in the delivery of adequate defense services to indigent capital defendants in such cases. This effort includes the collection of data on the initiation and prosecution of federal capital cases, and on the defense services provided in such cases under the Criminal Justice Act.[1]

3. In order to carry out the duties entrusted to me, I maintain a comprehensive list of federal death penalty prosecutions and information regarding these cases. I accomplish this by obtaining indictments, pleadings of substance (including sealed documents), notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy with defense counsel. The Project's information regarding federal capital prosecutions has been relied

---

[1] The work of the Federal Death Penalty Resource Counsel Project is described in a report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm. The Subcommittee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

Exhibit VI-B

upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

4. 94 federal capital "prosecutions" or indictments have reached the trial stage in the modern era, involving 142 capital defendants. In thirty-four of these prosecutions the capital defendant did not have a co-defendant, at least by the time of trial.[2] Sixty-eight of these capital prosecutions have resulted in 101 penalty verdicts.[3]

---

[2]1) *United States v. David Ronald Chandler* (N.D. AL CR No. 90-CR-H-266-E); 2) *United States v. Louis Jones* (N.D. TX CR No. 6-95 CR 0015-C); 3) *United States v. Anthony Battle* (N.D. GA CR No. 1:95 CR 528); 4) *United States v. David Paul Hammer* (M.D. PA CR No. 4-96-CR-239); 5) *United States v. Theodore Kaczynski* (E.D. CA CR No. S-96-259 & D. NJ CR No. 96-607); 6) *United States v. Aquilia Marcivicci Barnette* (W.D. N.C. CR No. 3:97CR23-P); 7) *United States v. Deric Frank* (S.D. NY CR No. 97 CR 269 (DLC)); 8) *United States v. Howard L. Smith, Jr.* (E.D. VA CR No. 97-341-A); 9) *United States v. Jeremiah Locust* (W.D. NC CR No. 2:98CR185); 10) *United States v. James A. Finley* (W.D. NC CR No. 4:98CR243); 11) *United States v. Kristin Gilbert* (D. MA CR No. 98-30044-MAP); 12) *United States v. Christopher Wills* (E.D. VA CR No. 99-00396); 13) *United States v. Marvin Gabrion* (W.D. MI CR No. 1:99-CR-76); 14) *United States v. Joseph Minerd* (W.D. PA CR No. 99-215); 15) *United States v. Keith Nelson* (W.D. MO CR No. 99-138H-01); 16) *United States v. Christopher Thomas* (E.D. VA CR No. 99-477-A); 17) *United States v. Richard Alan Jackson* (W.D. NC CR No. 00-CR-74-ALL); 18) *United States v. Coleman Johnson* (W.D. VA CR No. 3:00CR00026); 19) *United States v. Carl Waldon* (M.D. FL CR No. 3:00-CR-436-J25-TJC); 20) *United States v. Brian Patrick Regan* (E.D. VA CR No. 01-CR-405-ALL); 21) *United States v. Michael O'Driscoll* (M.D. PA CR No. 4:CR-01-277); 22) *United States v. Jay Lentz* (E.D. VA CR No. 01-CR-150-ALL); 23) *United States v. Emile Dixon* (E.D. NY CR No. 01-CR-389-ALL); 24) *United States v. Gary Sampson* (D. MA CR No. 01-CR-10384-ALL); 25) *United States v. Wesley Ira Purkey* (W.D. MO CR No. 01-CR-308-ALL); 26) *United States v. Sherman Lamont Fields* (W.D. TX CR No. 01-CR-164-ALL); 27) *United States v. Luis Gonzales-Lauzan* (S.D. FL CR No. 02-CR-20572-ALL); 28) *United States v. William Emmett LeCroy* (N.D. GA CR No. 02-CR-38-ALL); 29) *United States v. Alfred Bourgeois* (S.D. TX CR NO. 02-216-ALL) and 30) *United States v. Meier Jason Brown* (S.D. GA CR No. CR 403-1). In 31) *United States v. Dhinsa* (E.D. NY CR No. 97-672 (S-3) (ERK)); 32) *United States v. Robert Williams and Marvin Damon* (E.D. VA CR No. 3:95CR45); 33) *United States v. Jose Denis* (S.D. FL CR No. 99-00714 CR (KING)) and 34) *United States v. Steven Satcher* (D. MD CR No. AW 00-0105), the non-capital co-defendant(s) had pled guilty by the time of trial.

[3]Ten trials, involving twelve defendants, ended in guilty pleas. 1) *United States v. Stacy Culbert* (E.D. MI CR No. 91-81127); 2) *United States v. Michael Murray* (M.D. PA CR No. 92-200); 3) *United States v. Robert Williams and Marvin Damon* (E.D. VA CR No. 3:95CR45); 4) *United States v. Everett Spivey* (D. NM CR No. 95-491 LH); 5) *United States v. Jason DeLaTorree* (D. NM CR No. 95-538-MV); 6) *United States v. Theodore Kaczynski* (E.D. CA CR No. S-96-259

1556

5. Forty-three of these prosecutions which have commenced trial have involved multiple capital defendants and fifty-nine prosecutions have involved multiple capital or non-capital defendants. Of the multi-defendant federal capital prosecutions (60), some form of severance, either from non-capital or capital co-defendants, has been granted in forty-one cases or 68%.[4] Of the multi-

---

& D. NJ CR No. 96-607); 7) *United States v. Deric Frank* (S.D. NY CR No. 97 CR 269 (DLC)); 8) 9) *United States v. Wilfredo Acosta-Martinez and Carlos Ivan Llera-Plaza* (E.D. PA CR No. 98-362); 10) 11) *United States v. Antonio and Robert Carpenter* (W.D. TN CR NO. 99-20155) and 12) *United States v. Satcher* (D. MD CR No. AW00-0105). Seven prosecutions ended after the guilt phase. 13) 14) and 15) *United States v. Edward Alexander Mack, et al.* (S.D. FL CR No. 93-252-CR-UUB); 16) 17) *United States v. Mario Castillo and Gerardo Jacobo* (C.D. CA CR No. 99-83-(A)-DT) and 18) 19) *United States v. Joel Rivera Alejandro and Hector Acosta Martinez* (D. PR CR No. 99-044 (SEC)). The defendant committed suicide in 20) *United States v. Pretlow* (D.N.J. 90-CR-238). The government withdrew the death penalty in 21) *United States v. Jeremiah Locust* (W.D. NC CR No. 2:98CR185); 22) *United States v. Kevin Wyrick* (W.D. MO CR No. 94-00194-01-12-CR-W-9) and 23) *United States v. Jeremiah Locust* (W.D. NC CR No. 2:98CR185). The defendant was convicted of a lesser-included offense in 24) *United States v. Howard L. Smith, Jr.* (E.D. VA CR No. 97-341-A) and 25) *United States v. Christopher Thomas* (E.D. VA CR No. 99-477-A). The jury was deadlocked in 26) *United States v. Ricky Lee Brown* (N.D. WV CR No. 1:98CR34); 27) *United States v. Walter Church* (W.D. VA CR No. 00-CR-104-ALL) and 28) 29) 30) *United States v. Carl Knorr, Richard McIntosh and David Michael Sahakian* (S.D. IL CR No. 99-40044). A mistrial was granted in 31) *United States v. Victor Rodriguez* (E.D. PA CR No. 98-362), who then pled guilty. Six defendants are currently in trial. *United States v. Keon Moses, Michael Lafayette Taylor and Aaron Demarco Foster* (D. MD CR No. 02-CR-410-ALL); *United States v. Charles Wesley Gilmore and Walter Lefight Church* (W.D. VA CR No. 00-CR-104-ALL) and *United States v. Alfred Bourgeois* (S.D. TX CR No. 02-CR-216-ALL).

[4] 1) *United States v. Alex Cooper and Darnell Davis* (N.D. IL CR No. 89-CR-580)(separate trials); 2) *United States v. David Ronald Chandler* (N.D. AL CR No. 90-CR-H-266-E)(non-capital co-defendant severed); 3) *United States v. Bilal Pretlow* (D. NJ CR No. 90-CR-238)(non-capital co-defendant severed); 4) *United States v. Thomas Pitera* (E.D. NY CR No. 90-0424 (RR))(non-capital co-defendant severed); 5) *United States v. Richard Tipton, et al.* (E.D. VA CR No. 3-92-CR-68))(fourth capital co-defendant severed); 6) *United States v. John Javilo McCullah, et al.* (E.D. OK CR No. 1:92-032-S)(separate penalty hearings before the same jury); 7) *United States v. Juan Raul Garza* (S.D. TX CR No. CR-93-009))(non-capital co-defendant severed); 8) *United States v. Reginald Brown, et al.* (E.D. MI CR No. 91-81127)(separate trials); 9) *United States v. Bruce Webster and Orlando Hall* (N.D. TX CR No. 4:94-CR-121-Y)(separate trials); 10) *United States v. Len Davis and Paul Hardy* (E.D. LA CR No. 94-381)(separate penalty hearings before the same jury); 11) *United States v. Phouc Nguyen and Bountaem Chanthadara* (D. KS CR No. 94-10129-01)(separate trials); 12) *United States v. Dennis Moore and Kevin Wyrick* (W.D. MO CR No. 94-00194-01-12-CR-W-9) (separate penalty hearings before the same jury); 13) *United States v. Timothy McVeigh and Terry Nichols* (D. CO CR No. 96-CR-68-M) (separate trials); 14) *United States v.*

155

capital defendant prosecutions (43), some form of severance has been granted in thirty instances[5] or

---

Everett Spivey and Richard Haworth (D. NM CR No. 95-491 LH) (separate trials); 15) *United States v. Jason de la Toree, et al.* (D. NM CR No. 95-538-MV) (separate trials); 16) *United States v. Jeffrey Williams Paul and Trinity Ingle* (W.D. AR CR No. 6:96CR60022) (separate trials); 17) *United States v. Quan Ray and Darrell Johnson* (N.D. IL CR No. 96 CR 379) (separate trials); 18) *United States v. Norris G. Holder and Billie Jerome Allen* (E.D. MO CR 4:97-CR-0141-ERW(TCM) (separate trial); 19) *United States v. Marvin Lee Holley and Charles Holland* (N.D. AL CR No. 96-B-0208-NE) (separate trials); 20) *United States v. Anthony Jones* (D. MD CR No. WMN-96-0458) (separate trials); 21) *United States v. Chevy Kehoe and Daniel Lee* (D. AR CR No. LR-CR-97-243) (separate penalty hearings before the same jury); 22)*United States v. Ricky Lee Brown, Barbara M. Brown and Janette A. Ables* (N.D. WV CR No. 1:98CR34) (separate trials); 23) *United States v. Cornelius Peoples and Xavier Lamar Lightfoot* (W.D. MO CR No. 98-00149-02-CR-W-6) (separate penalty hearings before the same jury); 24) *United States v. Sinisterra, et al.* (W.D. MO CR No. 98-00311-01/05-CR-W-2) (separate penalty hearings before the same jury); 25) *United States v. Willis Haynes and Dustin Higgs* (D. MD CR No. PJM-98-0502) (separate trials); 26) *United States v. Daymon Smith and Kenneth Tatum* (E.D. TX CR No. 2:99 CR 5) (separate trials); 27) *United States v. Marcus Sanders* (D. AL CR No. 98-0056-CB) (separate trials); 28) *United States v. Lemond Garrett* (S.D. GA CR No. 4-99-133) (separate trials); 29) *United States v. Mariano Martinez, Gerardo Jacobo and Mario Castillo* (C.D. CA CR No. 99-83-(A)-DT) (separate trial for Martinez); *Gerardo Jacobo and Mario Castillo* (C.D. CA CR No. 99-83-(A)-DT) (separate trial for Martinez); 30) *United States v. Mohamed Rashed Daoud Al-'Owhali and Khalfan K. Mohamed* (S.D. NY CR No. S6 98 CR 1023) (one non-capital co-defendant severed; separate penalty hearings before the same jury); 31) *United States v. Billy Lyon and Charles Stewart* (W.D. KY CR No. 4:99-CR-11-M) (three separate trials for two capital and one non-capital co-defendant); 32) *United States v. Julius Omar Robinson and L.J. Britt* (N.D. TX CR No. 00-CR-260-ALL) (separate trials); 33) *United States v. Kevin Gray, et al.* (D. DC CR No. 1:00CR00157) (separate trial for some non-capital defendants), 34) *United States v. James Edward Frye and Billy D. Cooper* (S.D. MS CR No. 01-CR-8-ALL) (separate trials) and 35) *United States v. Samuel Ealy and Walter Church* (W.D. VA CR No. 00-CR-104-ALL) (separate trials); 36) *United States v. Wilfredo Martinez Acosta* (E.D. PA CR No. 98-362) (separate trial for non-capital defendant); 37) *United States v. Carl Haskell* (W.D. MO CR No. 00-CR-395-ALL) (separate trial); 38) *United States v. Aaron Haynes and William Maxwell* (W.D. TN CR No. 01-CR-20247-ALL) (separate trials for capital defendants, as well as non-capital defendants); 39) *United States v. Lezmond Mitchell* (D. AZ CR No. 01-CR-1062-ALL) (separate trial for non-capital defendant); 40) *United States v. Gray and Moore* (D. DC CR No. 1:00 CR 00157) (separate trial for some non-capital defendants) and 41) *United States v. Alejandro and Martinez* (D. PR CR No. 99-044 (SEC)) (separate trial for non-capital defendants).

[5] 1) *United States v. Alex Cooper and Darnell Davis* (N.D. IL CR No. 89-CR-580) (separate trials); 2) *United States v. Richard Tipton, et al.* (E.D. VA CR No. 3-92-CR-68) (one of four capital defendants severed due to late arrest); 3) *United States v. John Javilo McCullah, et al.* (E.D. OK CR No. 1:92-032-S) (separate penalty hearings before the same jury); 4) *United States v. Reginald Brown, et al.* (E.D. MI CR No. 91-81127) (separate trials); 5) *United States v. Bruce Webster and Orlando Hall* (N.D. TX CR No. 4:94-CR-121-Y) (separate trials); 6) *United States v. Len Davis and Paul Hardy* (E.D. LA CR No. 94-381) (separate penalty hearings before the same jury); 7) *United*

70% and was being considered in another[6] when the jury acquitted the three defendants. In the remaining multi-capital defendant prosecutions, no pre-trial motion was filed by the capital defendants in two cases[7] or was opposed by one defendant [8] in a third case. In a fourth case, a

---

States v. Phouc Nguyen and Bountaem Chanthadara (D. KS CR No. 94-10129-01) (separate trials); 8) United States v. Dennis Moore and Kevin Wyrick (W.D. MO CR No. 94-00194-01-12-CR-W-9) (separate penalty hearings before the same jury); 9) United States v. Timothy McVeigh and Terry Nichols (D. CO CR No. 96-CR-68-M) (separate trials); 10) United States v. Everett Spivey and Richard Haworth (D. NM CR No. 95-491 LH) (separate trials); 11) United States v. Jason de la Toree, et al. (D. NM CR No. 95-538-MV) (separate trials); 12) United States v. Jeffrey Williams Paul and Trinity Ingle (W.D. AR CR No. 6:96CR60022) (separate trials); 13) United States v. Quan Ray and Darrell Johnson (N.D. IL CR No. 96 CR 379) (separate trials); 14) United States v. Marvin Lee Holley and Charles Holland (N.D. AL CR No. 96-B- 0208-NE) (separate trials); 15) United States v. Anthony Jones (D. MD. No. WMN-96-0458) (separate trials for capital and non-capital defendants); 16) United States v. Norris G. Holder and Billie Jerome Allen (E.D. MO CR 4:97-CR-0141-ERW(TCM) (separate trials); 17) United States v. Chevy Kehoe and Daniel Lee (D. AR CR No. LR-CR-97-243) (separate trials); 18) United States v. Ricky Lee Brown, Barbara M. Brown and Janette A. Ables (N.D. WV CR No. 1:98CR34) (separate trials); 19) United States v. Cornelius Peoples and Xavier Lamar Lightfoot (W.D. MO CR No. 98-00149-02-CR-W-6) (separate penalty hearings before the same jury); 20) United States v. Sinisterra, et al. (W.D. MO CR No. 98-00311-01/05-CR-W-2) (separate penalty hearings before the same jury); 21) United States v. Willis Haynes and Dustin Higgs (D. MD CR No. PJM-98-0502) (separate trials); 22) United States v. Daymon Smith and Kenneth Tatum (E.D. TX CR No. 2:99 CR 5) (separate trials); 23) United States v. Mariano Martinez (C.D. CA CR No. 99-83-(A)-DT) (separate trial for Martinez); 24) United States v. Mohamed Rashed Daoud Al-'Owhali and Khalfan K. Mohamed (S.D. NY CR No. S6 98 CR 1023) (one non-capital co-defendant severed; separate penalty hearings before the same jury); 25) United States v. Billy Lyon and Charles Stewart (W.D. KY CR No. 4:99-CR-11-M) (three separate trials for two capital and one non-capital co-defendant); 26) United States v. Julius Omar Robinson and L.J. Britt (N.D. TX CR No. 00-CR-260-ALL) (separate trials); 27) United States v. James Edward Frye and Billy D. Cooper (S.D. MS CR No. 01-CR-8-ALL) (separate trials); 28) United States v. Samuel Ealy and Walter Church (W.D. VA CR No. 00-CR-104-ALL) (separate trials); 29) United States v. Carl Haskell (W.D. MO CR No. 00-CR-395-ALL) (separate trials) and 30) United States v. Haynes and Maxwell (W.D. TN CR No. 01-CR-20247-ALL) (separate trials).

[6]United States v. Edward Alexander Mack, et al. (S.D. FL CR No. 93-252-CR-UUB).

[7]United States v. Jean Claude Oscar, et al. (E.D. VA CR No. 93-CR-131) (no pretrial motion filed); United States v. Shaheem and Raheem Johnson (E.D. VA CR No. 97-00314-A) (involved two brothers who wanted to be tried together).

[8]United States v. Tyrone Walker and Walter Diaz (N.D. NY CR No. 94-CR-328).

1556

pretrial guilty plea by one of two capital defendants mooted the issue.[9]  Severance was denied in six other multi-capital defendant prosecutions.[10] The final two joint capital defendant trials involved two brothers and identical evidence.[11]  In one, the jury did not find the existence of an aggravating circumstance, so as to consider the death penalty.[12]

6.  In another category of cases, twelve capital prosecutions reached the trial stage which have involved a single capital defendant and one or more non-capital defendants.  Severance was granted in eight cases (or 67%),[13] not requested by the capital defendant in two others,[14] and opposed by the capital defendant in another.[15]  In the tenth case, the non-capital co-defendants had pled guilty.[16]  In another case, the defendant plead guilty the night before jury selection.  Severance of

---

[9]*United States v. Robert Williams and Marvin Damon* (E.D. VA CR No. 3:95CR45).

[10] 1)*United States v. LaFawn Bobbitt & Rashi Jones* (E.D. VA CR No. 97 CR 129); 2) *United States v. Jeremiah Martel Rodgers and Jonathan Lawrence* (N.D. FL CR No. 3:98CR73 (RV)); 3) *United States v. Christopher Vialva and Brandon Bernard* (W.D. TX CR No. W99CR070); 4) *United States v. Khalfan Mohamed and Mohamed Rashed Daoud Al-'Owhali* (S.D. NY CR No. S6 98 CR 1023) (although one non-capital defendant was severed). *United States v. Bin Laden, et al.,* 109 F.Supp.2d 211 (S.D. NY 2000); 5) *United States v. Gray,* 2001 WL 1344859 (D. DC) and *United States v. Matthews, McMillian and Tucker* (N.D. NY CR No. 00-CR-269-ALL).

[11]*United States v. Antonio and Robert Carpenter* (W.D. TN CR No. 99-20155).

[12]*United States v. Reynaldo and Baldemar Villareal* (E.D. TX CR No. 9:91-CR4).

[13]1) *United States v. Chandler* (N.D. Ala. No. CR-90-H-266-E); 2) *United States v. Pretlow* (D.N.J. 90-CR-238); 3) *United States v. Garza* (S.D. Tex. No. CR-93-009); 4) *United States v. Anthony Jones* (D. MD. No. WMN-96-0458); 5) *United States v. Stitt* (E.D. VA 2:98CR47); 8) *United States v. Sanders* (D. AL CR No. 98-0056-CB); 6) *United States v. Garrett* (S.D. GA CR No. 4-99-133); 7) *United States v. Martinez* (C.D. CA CR No. 99-83-(A)-DT) and 8) *United States v. Mitchell* (D. AZ CR No. 01-CR-1062-ALL).

[14]*United States v. Stitt* (E.D. VA 2:98CR47) and *United States v. Johnny Davis* (E.D. LA CR No. 01-CR-282-ALL) (but the non-capital co-defendant's motion was denied).

[15]*United States v. Murray* (M.D. Penn. No. CR-92-200).

[16]*United States v. Dhinsa* (E.D. NY CR No. 97-672 (S-3) (ERK)).

non-capital defendants had been granted. *United States v. Rollack,* 64 F.Supp.2d 255 (S.D.N.Y. 1999). *See also United States v. Haworth,* 168 F.R.D. 659 (D. NM 1996); *United States v. Gomez,* 111 F.Supp.2d 571 (E.D. PA 2000). *But see United States v. Aiken,* 76 F.Supp.2d 1346 (S.D. FL 1999); *United States v. Edelin,* 118 F.Supp.2d 36 (D. DC 2000) and *United States v. Gray,* 2001 WL 1344859 (D. DC).

7. In declarants's experience, district court practice in deciding joint trial issues in federal capital prosecutions results in a greater percentage of separate trials/hearings than that encountered in non-capital federal criminal practice.

8. The information detailed herein is maintained in the ordinary course of business of the Federal Death Penalty Resource Counsel Project, was not prepared in anticipation of its being used in litigation, and is accurate to the best of my knowledge, ability and belief.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 6th day of June, 2004.

Kevin McNally
Federal Death Penalty Resource Counsel

x:\rcp materials\litigation guides\severance\declarations\severance dec.wpd

1562

COUNTY OF DODGE      )

                       )    ss

STATE OF WISCONSIN   )

## AFFIDAVIT

I, Tina Dickson Erdmann, being first duly sworn, do hereby aver and state:

1)     My name is Tina Erdmann. I am of legal age and I reside in the State of Wisconsin. I read and write the English language fluently;

2)     I am making this statement voluntarily. I have not been promised anything, or forced, induced, or otherwise improperly persuaded to make this statement. I understand the Declaration may be used in legal proceedings concerning my nephew, Christopher Vialva;

3)     Several years ago, I was diagnosed as suffering from major depression and treated with a variety of medications. Based on my symptoms and my reaction to the medication, I have been evaluated for bipolar disorder. Although I take medication daily, I still experience episodes when I become very ill. I have gone on spending sprees, charging large amounts of money to my credit cards. I have found myself in my car, or in some place away from my home, and had no memory of how I got there. I am aware when I am becoming ill. In 2002, it was determined that I am disabled as a result of my bipolar disorder. I receive benefits monthly. I am making this affidavit with full understanding of its contents. I have reviewed the affidavit, made changes I felt were necessary, and I have noted any changes in the final copy in pen, with my initials;

4)     I am the second oldest daughter and second oldest surviving child of Phyllis and James Dickson. My older sister is Deborah "Dee" Dickson Bynum. My next youngest sibling is my sister, Lisa Dickson Brown. I am Christopher Vialva's maternal aunt. There were two boys in our family, James Michael Dickson, who was born six years after Lisa, and Mark Dickson, who was born when James was a toddler. James developed cancer when he was 16. The cancer went into remission for a time, but James died of cancer when he was 23. Our mother was diagnosed with breast cancer when our youngest brother, Mark, was one year old. Four years after James died, our mother died of cancer that had spread to her bones. Both of my sisters and I have been diagnosed with bipolar disorder, major depression, manic depression, and/or post traumatic stress disorder. All of us suffer from disabling migraine headaches. While we were growing up, our mother had spells that I now understand were probably some form of depression. There were two adults and five children living in a twelve foot by fifty-four foot trailer. Mother had bad headaches. She would send the three girls out with a package of crackers and tell us not to come back until she called us for lunch;

Page 1 of 3

Exhibit VII-A

1563



5) I remained in Wisconsin while Lisa and Dee moved to Texas. Lisa enlisted in the Army, against our father's wishes. I visited Lisa in Texas. She was very "gung-ho" about being in the Army. Lisa married Rowallan Vialva, who I knew as "Tony", while they were in Georgia. I knew this was going to be a problem because our father told Lisa that if she joined the Army she would end up a "nigger whore";

6) Lisa lost a baby before she gave birth to Christopher. I think it was an ectopic pregnancy and she lost the baby as a result. I went to Texas to take care of her. During that visit, Lisa showed me a walk-in closet in the house that she called Tony's "voodoo room". On the floor of the closet, there were black candles, bottles that Lisa said contained chicken blood, and a copy of the Koran. Tony wasn't there during this visit;

7) Sometime later, Lisa and I were both pregnant. She was living with me in Wisconsin. As her due date got closer, Lisa had to go to Texas for her maternity benefits through the military. Our babies were born three weeks apart. Christopher was sick almost immediately and had to be hospitalized. Lisa told me Tony wore tank ear muffs to block out Christopher's crying after she brought him home. Lisa told me Tony abused both of them. Our father wouldn't have anything to do with Christopher because he was black. I thought it was odd that Lisa listed Christopher's race as white on his birth certificate. Lisa told me since Christopher was half white and half black, she had the right to chose what it would say on the certificate since she was going to raise him;

8) Lisa brought Christopher to Wisconsin and they both stayed with me. I remember Christopher cried and drooled excessively all the time. He was allergic to everything and was fed soy based formula. I got up in the middle of the night with my daughter and went to the kitchen. I could see Lisa sitting on the landing to our basement. She was holding Christopher out from her, as if she wanted to throw him down the stairs. She kept saying, "He won't shut up." I took Christopher from her and told her to go outside. I was terrified Lisa was going to drop Christopher. Lisa eventually went back to Texas with Christopher;

9) When Christopher was about two years old, I was visiting them in Texas. Christopher was in the seat of the shopping cart at the base exchange. He started crying, apparently for candy, when we got to the checkout. Lisa drew her hand back and slapped him across the face, telling him, "If you embarrass me, I'll embarrass you." Christopher was much too small to understand this. Because of Lisa's behavior, I feared for Christopher;

Page 2 of 3

15 64

10) Christopher's color was always an issue with Lisa while he was growing up. I think it got worse in some ways after Christopher's sister, Audrey, was born. Audrey's father is white and Christopher noticed he was a different color from her when they were little. Lisa brought both children to Wisconsin when she separated from Audrey's father. She left the children with me while she stayed with Dee in Killeen. Lisa was trying to get a job on Fort Hood as a civilian employee. Dee and I both offered to adopt Christopher and Audrey. Dee is married to an African American and has no children of her own. Lisa would not even consider it. The children lived with us five months and were starting to get attached to us. I had to tell Lisa to come get them if she wasn't going to let me adopt them. Lisa told me the day Christopher turned 18 was the happiest day of her life. I remember her rejoicing that she was no longer responsible for him. She told me, "My life sentence is complete." I took this to mean Lisa was ready to be rid of him. I feel Lisa blamed Christopher and Audrey for her disappointments in life and her failure to achieve her personal dreams;

11) When Christopher was charged with murder, I had been remarried for only two months. It was very overwhelming for my new husband. I felt I could not help Lisa at that point. I did not understand that the information I knew about our family, Lisa, and her children, could be helpful. Lisa was telling us what was happening with the case. None of the lawyers on Christopher's case explained what mitigation was or how we could have helped. I believe I spoke with a female investigator once, but no one followed up with me. The situation was very hard for all of us. If it would have been explained to me, I would have tried to help Christopher in his trial.

x _Lisa Erdmann_

_Tina Erdmann_

Tina Erdmann

Subscribed and sworn to before me this __12__ day of May, 2004.

_[signature]_

Notary Public

My Commission Number is _____

My Commission Expires: __May 1, 2005__

Page 3 of 3

1565

VII

1566

## DECLARATION OF JANE McHAN, LCSW

I, Jane McHan, declare under penalty of perjury that the following statement is true and correct, to the best of my information and belief:

1) My name is Jane McHan. I have a Master's Degree in Social Work (MSW) from Rutgers University, which includes specific training in interviewing, assessment of and intervention with individuals, families, groups and communities, problem solving, research, planning, and resource development. I am licensed as a Master Clinical Social Worker (LCSW) in the State of Texas. I have over 25 years' experience in the social work field, including expertise in the areas of medical social work, developmental disabilities, mental retardation, mental health, children and families, as well as specialized training in death penalty mitigation;

2) I was hired by Susan Otto, Federal Public Defender, to provide expert services as a mitigation specialist in the case of Christopher Andre Vialva. My qualifications to serve in this capacity are detailed on my resume, attached hereto as Exhibit 1;

3) During the course of my work, I reviewed information from the following sources:

- Christopher Vialva's records, including:
  - ➢ Medical records
  - ➢ Mental health records
  - ➢ School records
  - ➢ Employment records
  - ➢ Law enforcement records: arrests, community supervision and jail;

- Christopher's mother, Lisa Brown's, records, including:
  - ➢ Medical records
  - ➢ Mental health records
  - ➢ Military records
  - ➢ Divorce records;

- Christopher's aunt, Dee Bynum's, records, including:
  - ➢ Medical records
  - ➢ Mental health records;

- Christopher's aunt, Tina Erdmann's, records, including:
  - ➢ Medical records
  - ➢ Mental health records;

Exhibit VII-B

## DECLARATION OF JANE McHAN

3) Continued:

- Interviews provided by Susan Otto, with:
  - ➢ Christopher's grandfather, James Dickson
  - ➢ Christopher's aunt, Dee Bynum
  - ➢ Christopher's aunt, Tina Erdmann;

- Personal and/or phone interviews with:
  - ➢ Christopher Vialva
  - ➢ Christopher's mother, Lisa Brown
  - ➢ Lisa's husband, Richard Brown
  - ➢ Christopher's aunt, Dee Bynum
  - ➢ Christopher's father, Rowallan Vialva
  - ➢ Christopher's sister, Audrey Mabrey
  - ➢ Christopher's half-brother, Thomas Vialva
  - ➢ Christopher's Alternative Ctr. counselor, Elaine Clark
  - ➢ Christopher's friend, Jacorby Smith
  - ➢ Christopher's friend, James Davidson
  - ➢ Christopher's friend, Jessica Haskins
  - ➢ Christopher's friend, Ben Sims
  - ➢ Ben Sims' mother, Charlene Burke
  - ➢ Christopher's former girlfriend, Jenell Hamilton
  - ➢ Terry Brown's mother, Alice Brown;

4) During the course of my work, I spent 70 hours conducting interviews, 30 hours reviewing records, and 50 hours completing my report, as well as many hours traveling, making phone calls, emailing, attempting to locate individuals, and conferring with the legal team;

5) Work was performed under the time pressure of the Federal Public Defender's filing deadline. If I had been retained for trial, it would have been anticipated that at least 300 hours would have been needed to conduct a thorough mitigation investigation. I would have used the additional time to conduct several additional interviews. If the interviews had been attempted soon after Christopher's arrest, it is possible that these individuals would have been more likely to participate; however, at this late date, some have moved away, are more difficult to locate, or are not as willing to cooperate. Their memories are also not as clear as they may have been at the trial level. Some of these people are:

- ➢ Rhonda Mamizuka, friend
- ➢ Cedric Young, friend

15268



## DECLARATION OF JANE McHAN

5) Continued:
- ➤ Jim Gillhouse, former boyfriend of Lisa Brown
- ➤ Bob Pittman, school official
- ➤ Silvia Sealey, Rowallan Vialva's "second mother"
- ➤ Dawn Sealey, the mother of another of Rowallan Vialva's children
- ➤ Vidya Seecheran, one of Rowallan Vialva's ex-wives
- ➤ Fanny Stroh and J.L. Moland, Christopher's former teachers
- ➤ Nikki Yancey, friend
- ➤ Lily and Tenicio Rodriguez, former neighbors;

Other interviewees needed further follow up. More hours could have been spent with Christopher to continue to explore his experiences. Additional time could have been used to examine Christopher's difficulties in school and how the failure to properly modify his program led to subsequent problems;

6) If I had been retained at trial, I would have had an ongoing dialogue with the defense attorneys regarding a number of issues evident in Christopher's case, as outlined in my summary and assessment, including the family history of mental illness, neurological and mental health concerns for Christopher, exposure to violence as a witness and as a victim, poor parenting, an absent father, an emotionally needy and immature mother, inappropriate roles assigned to Christopher at an early age, a chaotic environment, and learning difficulties. These issues could have been utilized by the defense in the guilt/innocence phase of trial to allow the jury to begin to visualize the whole of Christopher's experience. It would have been important for the defense attorneys to "frontload" such information in the first stage to contradict the government's assertions about Christopher's gang involvement, his leadership role, and the allegation that he was the "mastermind" behind the crime. Christopher's young mental age, his emotional disorders, and his cognitive issues have an impact on his ability to engage in sophisticated planning, which was imperative for the jury to know;

7) If I had participated at trial, I would have suggested that the defense present the mitigation case through a combination of expert and lay witnesses. My suggestions would have included the following:

- ➤ Utilizing a neuropsychologist to examine Christopher and his mother to make a definitive diagnosis of both, then to provide testimony regarding the genetic components of bipolar disorder, the effects of Christopher's mother's mental health issues on Christopher and his sister, to explain Christopher's neurological deficits and how they affect his thinking, feeling and behavior, to explain Christopher's mental health, intellectual and educational strengths and needs, and to explain how his actions are related to his disability, in a way that was understandable to the jury;

**DECLARATION OF JANE McHAN**

7) Continued:

➤ Utilizing a gang expert to discuss specifics about gangs in Killeen, to define what makes a true "gang," to compare the 212 Piru with known gangs, and to address Christopher's involvement;

➤ Utilizing an educational specialist to explain how and why a student may be classified as "disabled" under Section 504, what such classification means for his educational program, how his disability affects his learning, how his behavior is related to his disability, and to discuss the failure of the school system to properly implement modifications which could have helped him;

➤ Christopher's mother to discuss her own and the family's difficulties;

➤ Christopher's father to explain why he was not present in Christopher's life, to express his regret that he did not know about Christopher's problems and to assert that he would have taken Chris in if he had been aware;

➤ Christopher's aunt, Dee Bynum, to discuss Lisa Brown's poor parenting, the extensive family history of mental illness from a personal perspective, and her own desire to take Christopher as her son and raise him;

➤ Audrey Mabrey to discuss Christopher's protective stance toward her and the inappropriate manner in which he was delegated to be her "father figure" from a young age;

➤ Charlene Burke, mother of Ben Sims, to discuss Christopher's need for a stable adult in his life and her guilt for refusing to take him in when he needed her;

➤ Jacorby Smith and James Davidson to discuss their friendship with Christopher, their observation that he was not a violent person, that he was "sacrificed" by Lisa Brown when she moved to another part of town and ripped him away from his support system, as well as to give their first-hand observations of the Killeen gang scene;

➤ Jessica Haskins and Jenell Hamilton to demonstrate Christopher's sensitive side, the young man who wrote poetry, appeared depressed and emotional about his life, who had dreams and goals and wanted to improve his situation, the young man who respected women greatly and "cherished" his mother and his girlfriend;

1570

## DECLARATION OF JANE McHAN

7) Continued:
> Additionally, if work had been completed earlier, it is possible that others could have been included, such as individuals noted in paragraph five, school personnel and former mental health counselors;

8) I believe the information I could have developed at trial could have formed the core of an effective second stage presentation that could have resulted in a sentence other than death. The jury needed the opportunity to learn of the many hardships faced by Christopher in his young life, to understand his mental illness and the pervasive nature of the family's mental illness in shaping his upbringing and experience, his cognitive deficits, his ability to be a kind and thoughtful person, his youth at the time of the offense, and the many people who loved him and spoke positively of him. With this complete portrait of Christopher, the jury would have been able to make a more appropriate decision about his punishment.

I certify under penalty of perjury that the foregoing Declaration, consisting of eight paragraphs, is true and correct. Executed this 6th day of June, 2004, in Abilene, Texas.

Jane McHan, LCSW
Mitigation Specialist

Witness



**Jane Rice McHan, LCSW**
**5249 US Hwy. 277 South, Apt. 110**
**Abilene, Texas  79605**
**(915) 691-5331**

## EDUCATION:
Master of Social Work (MSW) in Social Work Administration
Rutgers University
May, 1981

Bachelor of Arts, Sociology with Social Work concentration
Southwest Texas State University
December, 1976

## ADDITIONAL TRAINING:
1.5 Social Work CEU's required annually for license renewal, including .3 CEU's in ethics

"Making the Case for Life IV--Mitigation Investigation and Jury Selection in Capital Cases"
National Association of Criminal Defense Lawyers
Houston, Texas
September 15-17, 2000

Americans with Disabilities Act training series provided through employer
February, March, April, May, 1998

40 hour commercial mediation training
Settlement Consultants, Inc.,  Dallas, Texas
August, 1994

## LICENSURE AND PROFESSIONAL MEMBERSHIPS:
Texas State Board of Social Worker Examiners:  License #6663
Licensed Clinical Social Worker (LCSW)

National Association of Social Workers
Academy of Certified Social Workers

## PROFESSIONAL EXPERIENCE:
**September, 2000 to Present**
**Mitigation Specialist**
I assist the defense team in investigating mitigating factors pertinent in death penalty cases.  This includes providing a comprehensive bio-psycho-social history of the client and family by interviewing the client, family, collateral contacts and agency representatives familiar with the client, reviewing all appropriate medical, educational, psychological and other agency records, utilizing research pertinent to the client's situation in order to gain an understanding of his or her life situation, and making recommendations to the defense team.
**Jane R. McHan**
**PROFESSIONAL EXPERIENCE, continued**

Exhibit 1

157a

**May, 1989 to Present**
**Social Work Consultant**
Mitchell County Hospital
Colorado City, Texas
I provide quarterly social work consultation to this rural hospital to assure compliance with Medicare and Joint Commission requirements for social work services. I review documentation, consult with staff regarding social work issues relevant to their patients, see patients as needed, and provide ongoing training to designated social services employees

**May, 1998 to September, 2003**
**Program Director**
Parent Case Management Program
West Texas Rehabilitation Center
4601 Hartford
Abilene, TX 79605
I was responsible for developing and implementing policies, procedures and budget for the Program, which is funded by the Texas Department of Health to provide case management to children with special health care needs and their families. I assured that
the Program was in compliance with TDH regulations, and maintained regular communication with TDH staff. I completed an annual application for continuation funding in the amount of $295,000. In addition to supervising six employees on two campuses, I maintained a caseload of approximately 20 children, coordinated services with the Pediatric Department of West Texas Rehabilitation Center, participated in WTRC management activities, coordinated a twice-yearly cleft palate clinic, advocated for children with special health care needs, and participated in community coalitions working for children.

**August, 2001 to June, 2002**
**Social Worker**
Abilene Area Dialysis Center
1802 Pine Street
Abilene, TX 79601
Part time social worker on an as-needed basis. Performed intakes and psychosocial assessments, updated social histories, met with patients and families to discuss needs and concerns, provided general social work services.

**March, 1997 to May, 1998**
**Assistant Program Director/Social Services Coordinator**
Parent Case Management Program
West Texas Rehabilitation Center
Provided social work services (intake, assessment, service plan development, information and referral, follow-up, supportive counseling) to approximately 30 children with special health care needs and their families, provided social work consultation to program staff, participated in local boards, committees and coalitions on behalf of children with special health care needs. Assisted Program Director with policies, procedures and regulatory requirements; assisted with supervision of staff; responsible for daily operations of Abilene office, as Program Director was housed in San Angelo.
**Jane R. McHan**
**PROFESSIONAL EXPERIENCE, continued**

1573



**June, 1993 to March, 1997**
**Social Services Coordinator**
Parent Case Management Program
West Texas Rehabilitation Center
Responsibilities as outlined above.

**March, 1986 to June, 1993**
**Director of Social Work**
West Texas Rehabilitation Center
As a "one-person department," I was responsible for providing social work services to persons of all ages with a variety of disabling conditions, including intake, assessment, coordination of team planning, family conferences, staffings, individual, family and group counseling, and information and referral services. Coordinated an Early Childhood Intervention team for children aged birth to three in Ward, Winkler and Reeves counties. Coordinated cleft palate clinic. Participated in management activities. Represented WTRC on local committees, boards and planning entities.

**June, 1984 to March, 1986**
**Staff Social Worker**
West Texas Rehabilitation Center
Responsibilities as above, except for management activities.

**August, 1981 to June, 1984**
**Social Worker III**
Abilene State School
Abilene, Texas
Provided social work supervision to a staff of 13 social workers in a facility for persons with mental retardation. Maintained a caseload of approximately 60 persons who were provided with social work services.

**July, 1978 to August, 1979**
**Caseworker**
McLennan County Juvenile Probation
Waco, Texas
Provided supervision and social work services to adolescents and children referred to the juvenile justice system.

**June, 1977 to July, 1978**
**Caseworker**
Providence Hospital
Waco, Texas
Provided medical social work services to persons with chronic and acute illness.

**Jane R. McHan**

**COMMUNITY ACTIVITIES:**
National Association of Social Workers, Abilene Unit, Chairperson
National Association of Social Workers, Texas State Chapter, Board member, Social
        Justice Committee member
Taylor, Jones, Callahan Counties CRCG (Community Resource Coordination
        Group), Vice Chair
Abilene Child Centered Educational Support Services (ACCESS), Board
        Member and Volunteer
King David's Kids, Support program for children with special needs and their families,
        Board Member and Volunteer
West Texas Autism Center, Board member and volunteer
Hardin-Simmons University and Abilene Christian University, Social Work Field
        Placement Supervisor
Hardin-Simmons University Social Work Department, Adjunct Faculty
Peace Action/Texas, Council of Representatives
Pastors for Peace, host family

Past Activities:
Abilene Unit NASW Chairperson, Abilene Unit NASW Steering Committee, NASW
Texas State Board Member, Chair of NASW Texas Social Policy and Action Committee,
Chair of NASW Texas Political Action Committee (TPACE)
Family Outreach Board Secretary and Volunteer
Task Force for the Medically Underserved, San Angelo, Steering Committee
Abilene Independent School District, "Just for the Kids" Task Force
Texas Health and Human Services Commission, Long Term Care Initiatives
        Committee, Member representing children and families, Austin

**HONORS:**
National Association of Social Workers--Abilene Unit's Social Worker of the Year
1992 and 1994

1575

1576

# DECLARATION

I, Daneen Milam, do hereby declare the following to be true and correct, under penalty of perjury:

1.  My name is Daneen A. Milam, I am over 21 years of age and competent in all respects to make this declaration. I hold a Ph.D. in Educational Psychology from Texas A & M University. I am a licensed Psychologist and certified as a Health Service Provider in the State of Texas. My license number is 2-2661. I am board certified (a Diplomate) in clinical neuropsychology by the American Board of Professional Neuropsychology. I practice clinical neuropsychology in San Antonio, Texas where I have been the director of an assessment center for more than fifteen years. I have served on the editorial board of Archives of Clinical Neuropsychology, the official scholarly journal of the National Academy of Neuropsychology, for the past five years. Much of my present clinical practice is in the area of forensic neuropsychology and I have conducted more than 20 examinations of criminal defendants. I have testified in excess of seventy five (75) times as an expert witness in the state courts of Texas for the Texas Department of Family and Protective Services, Child Protective Services, and twelve (12) times as an expert witness in state murder trials.

2.  I have been retained as an expert in neuropsychology by the Federal Public Defender for the Western District of Oklahoma, to assist in the representation of Mr. Christopher Vialva. My qualifications to serve as an expert in this field are enumerated in my curriculum vitae appended to this declaration as **Exhibit 1**.

3.  My analysis of this case involved two parts. First I reviewed records and other testimonial information to assess what Chris's trial team could have known about the need for a neuropsychological evaluation of Chris before trial. Next I performed a neuropsychological evaluation of Chris.

4.  In order to assess what trial counsel should have known about the need for a neuropsychological evaluation of Chris, I have reviewed portions of the testimony from the trial in the in *United States v. Christopher*

Exhibit VII-C
1577

*Vialva*. Specifically, I reviewed the testimony of Richard Wayne Brown, Lisa D. Brown, and Mark Cunningham. I have reviewed Chris's medical health records, criminal theft records, and the Tyler Counseling and assessment records. I have also reviewed Lisa Brown's records, Deborah Bynum's records, Tina Erdmann's records and reviewed the current research on Streptococcus. I have interviewed Lisa Brown, Deborah Bynum, Jacorby Smith, James Davidson, Jessica Haskins, Janelle Hamilton, and Richard Brown. Finally I have reviewed Chris's school records and reviewed various interviews of the mitigation specialist, Ms. Jane McHan who provided information on Rowallan Vialva and statements of school personnel from the local alternative school.

5. There are multiple, overlapping indicators in this background information that would have led a neuropsychologist or similar specialist with this information, to suspect that Chris may suffer from organic brain damage and/or Bi-Polar Disorder. Firstly, a review of his family history indicates a strong maternal history of Bi-Polar disorder. Both of Chris's maternal Aunts, his cousin have been diagnosed as suffering from Bi-Polar disorder and his mother was diagnosed with depression. His maternal Grandmother and his sister have not been formally diagnosed, but also show signs of Bi-Polar disorder from their social histories. There is a strong genetic predisposition to Bi-Polar disorder and the strong presence in his family history should have been a signal to anyone evaluating his records that this was an issue requiring further investigation. Secondly, there are a number of factors in Chris's life history which indicate organic brain damage and/or Bi-Polar Disorder which are described in the following paragraphs.

6. Christopher Vialva was born on May 10th, 1980. Shortly after Christopher's birth his mother had a grand mal seizure. By the time he was eleven days old he was back in the hospital with a blood infection concurrent with an infection of his right eye. Due to the antibiotics given to control this condition, the medical records indicate that there was an "infiltration" of the tissue of his head and his "whole head became spongy."

7. Chris was rushed back to the hospital and remained in the hospital for 17 days. His symptoms included diarrhea, a draining right eye, not

1578



feeding well, and a high temperature. He was an irritable infant and he was finally diagnosed with Streptococcus, Type B, Opideimidis.  At present there is ongoing research to study the neuroimmune processes underlying the central nervous system impact of streptococcal infections.  The research is generically called PANDA (Pediatric Autoimmune Neuropsychiatric Disorders Associated with Streptococcus).  At present, research is studying the impact of Streptococcus infections on attention deficit disorder, autism and separation anxiety.

8.    Chris continued to have problems during his infancy.  Lisa Brown reports that Chris had extreme milk allergies and he was eventually diagnosed with a right ventricular hypertrophy.  The contact with his pediatrician ended here as his mother began divorce proceedings and moved out of the Houston area.

9.    By age 10 Chris was exhibiting severe behavioral problems.  His mother reports that he was still wetting the bed each night and had to be "double diapered." His temper tantrums had become rage episodes and he put his fist through walls. He slashed a counter top and cut a hole in the screen door.  His sister was 7 and was described as "the perfect child." Lisa had by now married and divorced again and had begun to have a long string of "uncles" in the house. His psychological evaluation undertaken by Dr. Constance Fournier noted severe behavior problems and Chris tended to hit, call names and mistreated his younger sister, who was his responsibility a significant amount of the time.  The family was constantly moving and Chris was often left in charge of his sister while his mother went out to work and then to bars. He was having trouble sleeping.  He was given a diagnosis of Oppositional Defiant Disorder and dysthymia and was placed on tricyclic antidepressants (imipramine).

10.    At age 11 Chris made his first suicidal gesture after a long history of suicidal ideation.  A variety of issues were identified as troubling Chris at this time. First, in his psychological report dated February 24, 1992, William A. Raf Ph.D., noted that Chris was "sad because he did not have any friends."  Chris stated his school mates called him names because he was biracial. When he acted out in school his mother would go to school, make a scene with the teacher and call school personnel

1579

"prejudiced." His mother attributed most, if not all, of his problems to his biracial status. Next, at this period of time, Lisa had at least two more significant relationships. Each time, Lisa would pay attention to the men and ignore and neglect her children. Chris noted that "she cared more about the men than she did about us." Chris developed a strong bond with one of Lisa's boyfriends, Jim Gilhouse, however, Gilhouse became upset when Lisa refused to set limits with her children. Lisa told Chris that Jim had left because he "could not handle his [Chris's] bad behavior." Chris was devastated and threatened to kill himself. He held a knife to his throat. Thirdly, Chris was with a friend who was stealing and Chris subsequently stated he would rather die than go to jail. Comparing across these issues, Chris was depressed, and not gaining problem solving skills.

11.  At no point was a serious evaluation of Chris's problems undertaken. Bi-Polar was never considered, although several adult member of the family were being diagnosed with this disorder. His mother reports he was still wetting the bed at night. School personnel described him as "disrespectful, belligerent, and exhibiting no remorse." Chris's perception of the situation was quite different "people just don't like me, they don't want me around, I can see it in their faces."

12.  By age 15, Chris had broken his arm, had hernia surgery, and complained of chest pains. After numerous complaints, and going to the ER more than once, a doctor noticed a swelling in his chest. An EKG was given and he was found to have a "very small breast bone on the right side." The EKG showed an incomplete right bundle branch block. At no time did anyone do a complete workup of his large number of disorders and suggest that Chris's behavior problems, emotional problems, and physical problems might be connected.

13.  At 15, school personnel described Chris as having behavior problems and no close friends. This is consistent with earlier reports of identity issues. Chris appears to have dealt with those identity issues by taking on the values and qualities of the group around him. He developed a constructive social support group with Jacorby Smith, James Davidson, and Cedric Young. But when Lisa Brown moved Christopher away from this support group he began to identify with a group of young boys who took on the trappings of a gang affiliation. This gang affiliation



provided Chris with identity, support and acceptance that was not forthcoming at home. Clearly, according to all reports, Chris was a follower and was easily influenced due to his need for acceptance. Adverse consequences flowed from being associated with this new set of friends with whom Chris engaged in smoking marijuana cigarettes laced with embalming fluid, called wicky sticks. Research indicates that such cigarettes may cause significant neurological damage.

14. At age 17, Chris was kicked in the head during a fight. This injury took three months for the swelling to completely dissipate. Chris vomited for two days after the fight and was lethargic for a week. He was often described as immature, and exhibited many of the symptoms of Bi-Polar disorder. He consistently exhibited extremes of mood and emotion. He could not sleep at night, was often irritable and angry. Had he been diagnosed as Bi-Polar, which would have been reasonable given the number of family members diagnosed with this disorder, his medication would have been a mood stabilizing drug. Instead, he was diagnosed as ODD, r/o ADHD and given an antidepressant which often makes a bad situation worse in Bi-Polar Disorders. Thus, it appears that Chris was never properly evaluated and diagnosed and that the treatment interventions he received may thus have been ineffective.

15. Had Chris been evaluated prior to his capital murder trial and had a psychiatric professional been provided with the full information above, I believe that any reasonably competent psychiatric professional would have recognized the need to require Chris to undergo a complete neuropsychological evaluation.

16. The records I have reviewed establish that Chris has displayed symptoms strongly suggestive of organic brain damage and Bi-Polar Disorder from a very early age and trial counsel should have known that Chris should have had a neuropsychological evaluation before trial.

17. The next part of my analysis of this case involved performing a neuropsychological evaluation of Chris. I traveled to Terre Haute, Indiana in April, 2004 to examine and evaluate Chris in an examination room. We were alone in the room; three to four guards sat at a table outside the room and observed us through a glass partition. Chris was

1581



allowed to work without handcuffs but remained shackled throughout the evaluation.

18. I first conducted a clinical interview with Chris. Secondly I performed a mental status exam to check his orientation to time, place, person and to ensure that he was both willing and able to complete the evaluation. I spent approximately 10 hours over two days conducting formal neuropsychological testing, along with a formal assessment of intellectual potential and memory skills. Chris was given portions of the Halstead-Reitan Neuropsychological Battery for Adults and several psychological and neuropsychological tests such as: Reynolds Intellectual Assessment Scales, Wide Range Achievement Test-3, Weschler Memory Scale-III Abbreviated, Comprehensive Trail Making Test, Verbal Fluency, Purdue Pegboard Test, Bender, and Draw-A-Person. I also used projective measures such as: the Rorschach, Personality Assessment Inventory, Millon Clinical Multiaxial Inventory-3, and Sentence Completion. Finally, I measured potential malingering with the Validity Indicator Profile. These tests are all accepted and recognized as reliable within the neuropsychological community. Chris was found to be making a good faith effort and not malingering.

19. On certain key aspects of the neuropsychological examination, Chris scored in a range generally considered to reflect organic impairment of the brain. He exhibits, across most instruments, an inability to inhibit impulsive responses and disturbances of muscular control resulting from deficits, in the central nervous system called constructional dyspraxia. He exhibited verbal attentional deficits, impulsivity, organizational deficits and the partial loss of the ability to perform coordinated acts. The results tend to indicate frontal and temporal lobe dysfunction that is exhibited in poor planning and organization skills which have a significant impact on a person's ability to benefit from feedback and alter behavior.

20. Comparing across the records reviewed and his neuropsychological evaluation, these performance patterns establish that, from a young age, Chris consistently displayed distractibility, and impulsive behavior, often to the extent that he endangered his own or others' physical safety. Due to his mood disturbance he had a reduced ability to

1582



perceive the consequences of his actions and a neurological difference was seen as oppositional behavior.

21. Comparing across his structured and unstructured personality measures, Chris exhibited a state of cognitive disarray that indicates his lack of organizational skills were not purposeful or neglectful on his part. He exhibited a clear pattern of Bi-Polar characteristics that included depression, immaturity, poor problem solving, and poor regulation of thoughts, feelings and abilities.

22. Bi-Polar Disorder is a medical problem that is not the result of lack of will power. It is a biological and chemical malfunction. The effects of Chris's inherited disorder were no doubt aggravated by the chaotic, traumatic home environment in which he spent his formative years. Children who suffer from Bi-Polar disorder require intensive limit setting and a stable environment. For example, see the interview of the family of a Bi-Polar child which is attached hereto as Exhibit 2, which discusses the need for structure in a Bi-Polar child's life. The impact of positive structure on Chris is most clearly demonstrated by his good behavior and privileges earned at the U.S.P. at Terre Haute. It appears extremely unlikely that any adult in Chris's home could provide this kind of structure and stability. This problem was particularly exacerbated by his Mother's mental disorder. I performed a thorough evaluation of Lisa Brown based upon an eight (8) hour psychological evaluation indicated a strong Bi-Polar profile, with a concurrent diagnosis of Borderline Personality Disorder. Her ability to provide a structured and stable environment was significantly impaired by her longstanding (early childhood onset) mental disorder. This would have an impact on her ability to successfully parent Chris throughout his life, and was probably the reason for a long history of poor parenting decisions such as leaving a 7 year old in charge of a 4 year old, and bringing a succession of abusive men into their home. This was particularly damaging to Christopher given his Bi-Polar disorder. Additionally, as a likely byproduct of her Borderline Personality Disorder, Lisa has a long history of projecting her problems and the consequences of her problems onto Chris's biracial status. The impact to Chris is that, in addition to all of the other issues he faced, Chris was taught that his mere existence was a problem, indeed, he says "before

1583



this case, I didn't think I would live past 21, things were so bad, I always expected my life to get worse."

23. Due to his distractibility, Chris was often misdiagnosed as Attention Deficit Disorder with Hyperactivity (ADHD). However, while Bi-Polar children are distractible, the primary problem is poor mood regulation. The appropriate medication for Bi-Polar children is a mood regulator. Stimulants, which are the drug of choice for ADHD, make a mood disorder worse. In addition, life stressors, difficult relationships and disruption of sleep cycles bring on symptoms and impact the course of a Bi-Polar episode.

24. Children of parents who have been diagnosed with Bi-Polar Disorders are at high risk for developing Bi-Polar disorder and the risk is several times that of the general population. Some estimate the risk to be 1:4 for developing some kind of mood disorder. It is almost unbelievable that this diagnosis was never considered when Bi-Polar was diagnosed for so many of his family members. None of this is a choice made by Chris Vialva. He did not choose to be born with a significant number of physical anomalies that so often lead to poor regulation of behavior. He did not choose to have Streptococcus. He did not choose to be born into a dysfunctional family marked by physical and emotional abuse, neglect and alcohol abuse.

25. There is a growing body of knowledge that indicates the average child does not become a fully functioning mature adult until the early twenties. See **Exhibit 3** to this declaration. Christopher, with all of his neuropsychological deficits, would have a high probability of being two to three years younger in brain development than his age peers. Therefore, he has less control than other adolescents and less ability to foresee consequences of actions. The conclusions that his neuropsychological deficits would cause him to behave even younger than his chronological age is corroborated by the comments of his male peers who describe him as "silly" "a follower" and a "clown." This is also consistent with his association during the crime with boys closer to his mental age rather than his chronological age. A review of the sequence of events of the crime are consistent with a poorly planned and executed event where these four boys were responding as children to unfolding and unplanned occurrences. Clearly, the neuropsychological

1584



evaluation of Christopher Vialva reveals an individual who was incapable of assessing and responding to a rapidly changing situation. In addition, his poor ability to think and plan (a frontal lobe function) makes him particularly unsuited to control the situation throughout the day. When combined with a Bi-Polar nature and the consequences of a much younger mental status, Chris did not have the cognitive skills to control the situation; it spiraled out of his control.

26.    I understand the mitigation factors presented to the jury on behalf of Christopher were as follows:

> IV(A).    Christopher Vialva was subjected to emotional and physical abuse as a child, and was deprived of parental guidance and protection.
>
> IV(B).    Christopher Vialva has responded well to structured environments in the past.
>
> IV(C).    Christopher Vialva was nineteen at the time of the offense.
>
> IV(D).    Another defendant or defendants in the crime who may be equally culpable in the crime will not be punished by death.

It is my opinion that the foregoing list of mitigating factors does not accurately capture the neuropsychological impairments under which Christopher suffers.

27.    Additionally, the jury did not have available for consideration the fact that Bi-Polar disorder is amenable to medical treatment. Chris's intellectual potential is well within normal limits and would serve as a protective factor that would enable him to learn, adjust, and improve in a prison setting, as indeed he has.

28.    Without a thorough evaluation and differential diagnosis, the presentation of the defense case at the punishment phase of Chris's trial was inadequate, and failed to inform the jury of many important and relevant aspects of his psychological functioning. Without access to this

Page 9 of 10

1585

information, the jury would not be able to make a fair and balanced assessment of his personal moral culpability.

I, Daneen Milam, declare under penalty of perjury that the foregoing is true and correct. Executed on this 25th day of May, 2004, in San Antonio, Texas.

DANEEN MILAM Ph.D., ABPN

1586

# VITA

## DANEEN A. MILAM, Ph.D., ABPN

2515 McCullough Avenue,  Suite 101
San Antonio, Texas  78212
(210) 736-1762  Work
(210) 736-3156  Fax
(210) 415-0099  Cell
(210) 699-8200  Home
dmilam@stic.net  Email

## EDUCATIONAL BACKGROUND

MA.             Trinity University, 1978

Ph.D.           Texas A&M University, 1982

University of Texas Health Science Center
Post Doctoral Fellowship in Neuropsychology, 1984-1985

## LICENSURE AND CERTIFICATIONS

Licensed and Certified as a Psychologist by the Texas State Board of Examiners, License Number 2661.

Diplomate in Neuropsychology awarded by The American Board of Professional Neuropsychology.

Certified as a Sex Offender Treatment Provider by the Council of Sex Offender Treatment.  Listed in the Texas Register as an Approved Provider.

Certificate of Proficiency in the Treatment of Alcohol and Other Psychoactive Substance Use Disorders by The American Board Of Professional Psychology.

Decl. of Daneen Milam
(May 25, 2004)

Exhibit 1

1587

## SPECIALIZED SKILLS AND TRAINING

Post Doctoral Fellowship, University of Texas Health Science Center, Department of Pediatrics, Division of Adolescent Medicine, 1985 - 1986.

Advanced training in the administration and interpretation of Neuropsychological Measures, principally the Halstead-Reitan Neuropsychological Battery.

Advanced training in diagnosing and formulating treatment plans and supervision of master's level mental health professionals.

Advanced training in planning, organizing and implementing training programs.

Advanced training in intervention strategies with sexual assault perpetrators.

Specialized training in the assessment of incompetency to stand trial and fitness to proceed, under the recent statute enacted by the Texas Legislature.

## CURRENT SPECIAL INTERESTS

Major Areas Of Interest:

Forensic Neuropsychology
Crisis Intervention / Substance Abuse / Family Violence
Trauma Resolution
Juvenile Offenders
Vocational Rehabilitation
Comprehensive Disability Analysis
Sexual Abuse Intervention Strategies

## PROFESSIONAL ORGANIZATIONS

National Academy of Neuropsychology
American Psychological Association - Divisions 16, 40, 42
Bexar County Psychological Association

## AFFILIATE MEMBERSHIPS

University of Texas Health Science Center at San Antonio
Bexar County Hospital District

2.



# PROFESSIONAL WORK EXPERIENCE

**Private Practice:**    September 1984 - Present

Director of The McCullough Assessment Center. The Center provides twenty to thirty psychological, neuropsychological, and independent medical evaluations for a wide variety of area agencies, insurance companies and court ordered evaluations.

In-depth psychotherapy with children, adolescents and adults in crisis. Presenting problems tend to be substance abuse, sexual abuse and family violence.

**Consultantships:**    1984 - Present

1998 - 2002    Adjunct Faculty, The Fielding Institute, Postgraduate Neuropsychological Certification Program. Provided advanced training in brain behavior relationships and clinical assessment to psychologists. This program meets the American Psychological Association, Division 40 guidelines for post doctoral training in Neuropsychology.

1997- Present    Associate Director of Health Care Delivery Programs Division of Medical Horizons Unlimited

1993 - Present    Assessment And Therapy Contract with the Texas State Department of Protective and Regulatory Services, Child Protecting Services. Provide assessment and therapy for children and adults who are under investigation for child abuse, sexual assault, and/or neglect.

## Clinical Experience:

1993 - Present    Approved provider of psychological and assessment services for the Texas Rehabilitation Commission (Social Security Administration Disability determination Consulting Examiner).

3.

1589

## Clinical Experience (Continued):

**1992 - Present**
Approved provider of vocational rehabilitation assessment for the Texas Rehabilitation Commission on a contractual basis. Have provided assessment of over two hundred individuals for an extensive number of Texas Rehabilitation counselors in offices throughout the city of San Antonio.

**Sept. 1991 -**
**Dec. 1992**
Our Lady of the Lake University - Taught Individual Assessment in the Master's Program and Neuropsychological Assessment in the PSYD Program.

**Nov. 1990 -**
**Mar. 1991**
Clinical Director of the Children's Dual Track Neuropsychological Program at Afton Oaks Hospital. In addition, provided neuropsychological evaluations for children, adolescents and adults on a sole source contract basis.

**1988 - 1991**
St. Mary's University - Taught Individual Assessment in the Master's Program for School Psychologists and Licensed Professional Counselors.

**1988 - 1989**
Provided psychological evaluations for the Adolescent and Pediatric Ward at Colonial Hills Hospital on a sole source contractual basis.

**Jan. 1987 -**
**Sep. 1987**
Provided Clinical evaluation of employees seeking unescorted access to secure areas at the South Texas Nuclear Power Plant.

**1986 - 1987**
Provided assessment and psychotherapy for juvenile offenders through the Guadalupe County Juvenile Probation Department.

**1984 - Present**
Presented over 50 eight-hour workshops for Mental Health Professionals throughout Texas. Workshops included: Sexual Abuse Intervention Strategies, Counseling Techniques for Adolescents, Suicide Intervention Strategies and Psychotherapy Techniques With Children. These workshops have been endorsed by the National Board of Certified Counselors; Texas State Board of Examiners of Professional Counselors and the Texas Department of Human Resources.

4.

1590

## Clinicial Experience (Continued):

1982-1983        San Antonio State Hospital
Reviewed Client records and performed clinical interviews to determine appropriate placement of clients who had been recommended for participation in Aversive Behavior programs.

## PUBLIC SERVICE

Serves on the Editorial Board of the Archives Of Clinical Neuropsychology

Serves as an Examiner for The American Board Of Professional Neuropsychology, and as a reviewer of submitted work samples.

## PRESENTATIONS - STATE AND NATIONAL

May 2004         The impact of Sexual Abuse on Capital Murder. Mitigation: An Explanation not an Excuse. Sponsored by The Center for American and International Law, Dallas, Texas

March 2002       The Neuropsychologist's Role In Mitigation Against The Death Penalty In Capital Murder Cases. Hosted by the Texas Defenders Service, Austin, Texas

June 2001        The Impact Of Neglect In Brain Behavior Relations: A Therapist's Guide To Understanding Difficult Children. Hosted by the Texas Association Of Child Advocates.

June 1999        Pediatric Neuropsychology: From Skinner's Box To The Functional MRI. Hosted by the Fielding Institute at New York University Medical Center, New York, New York.

January 1999     Behavioral Ramifications Of Sexual Abuse And Physical Abuse In School Aged Children. Texas Association Of Foster Parents Regional Meeting, San Antonio, Texas.

5.

November 1998    Use Of Psychological Evaluations In Identifying Effects of Physical And Sexual Abuse In Children And Adolescents. Texas Department Of Protective And Regulatory Services Quarterly Meeting, San Antonio, Texas.

6.

**n p r** This article is print ready and will remain available for 24 hours | Instructions for saving

» Search for another transcript

» Most Requested Transcripts

» NPR home page

## Profile: Nine-year-old Benjamin, who has bipolar disorder, lives in a psychiatric facility for boys, where treatment is designed to moderate mood swings and teach him to manage his own behavior

May 17, 2004

STEVE INSKEEP, host: This is MORNING EDITION from NPR News. I'm Steve Inskeep in Washington.

RENEE MONTAGNE, host:

And I'm Renee Montagne in Los Angeles.

Last September we aired a story about Benjamin, a nine-year-old boy with **bipolar** disorder. His family was having great difficulty coping with him. His moods and behaviors were unpredictable and changed rapidly throughout the day. At times his parents felt under siege from his violent rages. Now Ben is living full-time in a psychiatric treatment facility for boys. Michelle Trudeau visited Ben with his mother and has a report on what is happening to him in treatment.

MICHELLE TRUDEAU reporting:

Ben left home on Saturday, October 20th on a mild Southern California afternoon. Ben's mom and dad piled his duffel bag, a box of books, a reading chair and a special quilt his mom had made him into their van and drove 20 minutes east to The Sycamores Residential Treatment Program in Pasadena. It was a trip Ben remembers vividly.

BENJAMIN: I just kept hoping that it was a dream.

TRUDEAU: Really?

BENJAMIN: That it's not happening, and I'd just wake up and that it would be a nightmare and I'll be over the bad stuff.

TRUDEAU: Really? 'Cause you just didn't want to come or...

BENJAMIN: I just did not want to go here.

TRUDEAU: Ben's been away from home before. Five times over the past two years he's spent a week or two in a psychiatric hospital. Children with **bipolar** disorder often have what's called rapid cycling, continuous, extreme spikes of highs and lows, swinging from explosive to giddy to disconsolate several times in a day. Researchers believe that specific brain abnormalities underlie many of these symptoms. Ben's mother April says when Ben came home from his hospital stays, his behavior eventually would escalate again into destructive rages.

APRIL: He would throw things at us. I had a big metal box he threw at my head. He bruised up the whole side of my face. Before his first hospitalization, he threatened his father with a kitchen knife. He had said, `Well, if you're just not going to do what I want you to do, I might

Decl. of Daneen Milam (May 25, 2004)    Exhibit 2

1593

as well just stab you then.' And he ran and got a kitchen knife.

TRUDEAU: Ben's rages became unmanageable and directed dangerously not only at his parents, but toward his six-year-old sister and his classmates.

APRIL: We came to a point where we knew he needed more than we could do for him.

TRUDEAU: The Sycamores is one of only a handful of residential psychiatric facilities in the Los Angeles area that take children as young as Ben. Typically children with severe mental illnesses don't get this kind of care. Instead they end up going in and out of psychiatric hospitals for short stays when their symptoms are severe. But Ben's parents were reaching for something different. They hope that such an intense intervention might have lasting effects. They pushed hard to get financial support from Los Angeles County, the school district and their own medical insurance to pay the $70,000 a year The Sycamores might cost.

(Soundbite from The Sycamores)

Unidentified Woman: Hey, Ben.

BENJAMIN: Hello. This is my cottage.

TRUDEAU: What's the name of this cottage?

BENJAMIN: Roland(ph). The name of this cottage is Roland.

TRUDEAU: Good. Let's walk down this way, OK?

BENJAMIN: OK.

TRUDEAU: Living in Roland Cottage(ph) are 14 boys ages seven to 12. The majority of children here have serious mood disorders such as **bipolar** disorder or severe clinical depression.

This is your hallway?

BENJAMIN: Yeah.

TRUDEAU: And do you know all the kids that are here?

BENJAMIN: Yes.

TRUDEAU: But his mother April says Ben hasn't made friends here yet. It's a problem he's had all his life. In some ways, Ben's mature beyond his 10 years, but in social interactions with his peers, Ben is quite immature, easily angered, explosive and then later self-punishing. Here at Roland Cottage, the full-time staff encourages Ben to talk, day or night, about things that upset him.

Now what is your typical day like here?

BENJAMIN: I think by 6:30 we get up, we get dressed, we do our hygiene, we have our meds-- take our meds.

TRUDEAU: Ben takes several psychiatric medications: Trileptal, Luvox, Risperdal. The Sycamores psychiatrist closely monitors Ben's symptoms and can fine-tune the dosages of his medicines, depending on how he's doing, another benefit of the close and long-term oversight at The Sycamores.

Then after breakfast, go to school?

BENJAMIN: Yeah. At school from 8:00 till 2:00.

TRUDEAU: At The Sycamores school, the ratio of student to teacher is 3:1, and importantly, the teachers are specially trained in child mental health. Ben's mom April says that Ben is doing much better school work here.

APRIL: I knew he'd do well here. Any time he's in the hospital, he does super well because it's the minute by minute by minute structure. He just craves it. It's like he doesn't have any way of internalizing the structure. It has to be imposed, and the chaos of just normal family is still too much for him to handle.

TRUDEAU: April sees this when Ben comes home on weekends. His behaviors deteriorate back to aggressiveness and hostility. So his parents come to The Sycamores once a week for their own therapy, to learn how to help a child with a severe mood disorder as well as to recognize that Ben's angry outbursts during weekends at home may be partly due to his anger at his parents for sending him away.

You want to interview your mom?

BENJAMIN: Sure.

APRIL: OK, Ben. What would you like to ask?

BENJAMIN: Why did you decide to put me here?

APRIL: Because I wanted to find out if we could give you a chance at leading a normal childhood. That's why. Because the way things were at home were not good, with all the yelling all the time and all the fighting, and things were hard all the time for you.

BENJAMIN: Why did you choose this place to put me instead of any other place?

APRIL: I knew that the people here were good people and you would be safe here.

TRUDEAU: During the months prior to coming to The Sycamores, Ben's **bipolar** illness had taken an alarming turn. He began talking about hurting himself and of killing himself. Suicide does occur in children as young as Ben. April knew The Sycamores' staff would watch over Ben 24/7.

Unidentified Man: OK. So how you doing, Benjamin?

BENJAMIN: Good.

Unidentified Man: Pretty good? That's good.

BENJAMIN: (Singing) Twinkle, twinkle, little star. How I wonder what you are.

TRUDEAU: All Ben's activities throughout the day are organized around practicing what he learns in therapy in a safe, structured environment, like during this music lesson. The psychiatric medicines he's on help control the severe mood swings, but beyond that, talk therapy helps Ben learn fundamental behaviors, such as to express his feelings with words, not aggression, to take criticism, to handle failure and find strategies for making friends.

Unidentified Man: Keep on going. C, C.

BENJAMIN: (Singing) ...twinkle little...

TRUDEAU: Therapist Mark Emmett(ph) says incorporating such behavioral changes will take time, something he talks to Ben about directly.

Mr. MARK EMMETT (Therapist): We don't have a date or a time, but we would like to see you home as soon as possible, as soon as you're ready and as soon as things in your house are ready for you to be there so that you can go home and be successful where you don't have to come back.

BENJAMIN: OK.

TRUDEAU: The average length of stay for boys in residential care at The Sycamores is about two years. But therapist Emmett hopes Ben may be able to go home by this September after being at The Sycamores for less than a year.

Mr. EMMETT: So what about you? What do you think is going to be a good time frame for you to go home?

BENJAMIN: Oh...

Mr. EMMETT: Besides tomorrow?

BENJAMIN: Or today.

Mr. EMMETT: Yeah.

BENJAMIN: I'd say I think I'd be home when people think I'm ready and when I think I'm ready.

Mr. EMMETT: You'll let us know when you think you're ready?

BENJAMIN: Yeah.

Mr. EMMETT: OK.

TRUDEAU: And if The Sycamores treatment track record holds for Ben, he'll learn the essential behavioral skills and learn how to live with a bewildering mental illness so he'll be able to successfully live at home once again. Michelle Trudeau, NPR News.

MONTAGNE: It's 11 minutes before the hour.

Copyright ©1990-2004 National Public Radio®. All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to National Public Radio. This transcript may not be reproduced in whole or in part without prior written permission. For further information, please contact NPR's Permissions Coordinator at (202) 513-2000.

SCIENCE

**A flood of hormones,
behaviors that make**

# TEENS TICK

FIVE YOUNG MEN IN SNEAKERS AND JEANS TROOP INTO A WAITING ROOM at the National Institutes of Health Clinical Center in Bethesda, Md., and drape themselves all over the chairs in classic collapsed-teenager mode, trailing backpacks, a CD player and a laptop loaded with computer games. It's midafternoon, and they are, of course, tired, but even so their presence adds a jangly, hormonal buzz to the bland, institutional setting. Fair-haired twins Corey and Skyler Mann, 16, and their burlier big brothers Anthony and Brandon, 18, who are also twins, plus eldest brother Christopher, 22, are here to have their heads examined. Literally. The five brothers from Orem, Utah, are the latest recruits to a giant study that's been going on in this building since 1991. Its goal: to determine how the brain develops from childhood into adolescence and on into early adulthood.

It is the project of Dr. Jay Giedd (pronounced *Geed*), chief of brain imaging in the child psychiatry branch at the National Institute of Mental Health. Giedd, 43, has devoted the past 13 years to peering inside the heads of 1,800 kids and teenagers using high-powered magnetic resonance imaging (MRI). For each volunteer, he creates a unique photo album, taking MRI snapshots every two years and building a record as the brain morphs and grows. Giedd started out investigating the developmental origins of attention-deficit/hyperactivity disorder (ADHD) and autism ("I was going alphabetically," he jokes) but soon discovered that so little was known about how the brain is supposed to develop that it was impossible to figure out where things might be going wrong.

In a way, the vast project that has become his life's work is nothing more than an attempt to establish a gigantic control group. "It turned out that normal brains were so interesting in themselves," he marvels. "And the adolescent studies have been the most surprising of all."

Before the imaging studies by Giedd and his collaborators at UCLA, Harvard, the Montreal Neurological Institute and a dozen other institutions, most scientists believed the brain was largely a finished product by the time a child reached the age of 12. Not only is it full-grown in size, Giedd explains, but "in a lot of psychological literature, traced back to [Swiss psychologist Jean] Piaget, the highest rung in the ladder of cognitive development was

BRAIN CIRCUITRY

Photograph for TIME by Brooks Kraft—Corbis

**Decl. of Daneen Milam
(May 25, 2004)**

**Exhibit 3**

sure. But also a host of structural changes in the brain. Can those explain the
adolescence so exciting—and so exasperating? By Claudia Wallis



## SCIENCE

about age 12—"formal operations." In the past, children entered initiation rites and started learning trades at about the onset of puberty. Some theorists concluded from this that the idea of adolescence was an artificial construct, a phenomenon invented in the post–Industrial Revolution years. Giedd's scanning studies proved what every parent of a teenager knows: not only is the brain of the adolescent far from mature, but both gray and white matter undergo extensive structural changes well past puberty. "When we started," says Giedd, "we thought we'd follow kids until about 18 or 20. If we had to pick a number now, we'd probably go to age 25."

Now that MRI studies have cracked open a window on the developing brain, researchers are looking at how the newly detected physiological changes might account for the adolescent behaviors so familiar to parents: emotional outbursts, reckless risk taking and rule breaking, and the impassioned pursuit of sex, drugs and rock 'n' roll. Some experts believe the structural changes seen at adolescence may explain the timing of such major mental illnesses as schizophrenia and bipolar disorder. These diseases typically begin in adolescence and contribute to the high rate of teen suicide. Increasingly, the wild conduct once blamed on "raging hormones" is being seen as the by-product of two factors: a surfeit of hormones, yes, but also a paucity of the cognitive controls needed for mature behavior.

In recent years, Giedd has shifted his focus to twins, which is why the Manns are such exciting recruits. Although most brain development seems to follow a set plan, with changes following cues that are pre-programmed into genes, other, subtler changes in gray matter reflect experience and environment. By following twins, who start out with identical—or, in fraternal twins, similar—programming but then diverge as life takes them on different paths, he hopes to tease apart the influences of nature and nurture. Ultimately, he hopes to find, for instance, that Anthony Mann's plan to become a pilot and Brandon's to study law will lead to brain differences that are detectable on future MRIS. The brain, more than any other organ, is where experience becomes flesh.

Throughout the afternoon, the Mann brothers take turns completing tests of intelligence and cognitive function. Between sessions they occasionally needle one another in the waiting room. "If the other person is in a bad mood, you've got to provoke it," Anthony asserts slyly. Their mother Nancy Mann, a sunny paragon of patience



who has three daughters in addition to the five boys, smiles and rolls her eyes.

Shortly before 5 p.m., the Manns head downstairs to the imaging floor to meet the magnet. Giedd, a trim, energetic man with a reddish beard, twinkly blue eyes and an impish sense of humor, greets Anthony and tells him what to expect. He asks Anthony to remove his watch, his necklace and a high school ring, labeled KEEPER. Does Anthony have any metal in his body? Any piercings? Not this clean-cut, soccer-playing Mormon. Giedd tapes a vitamin E capsule onto Anthony's left cheek and one in each ear. He explains that the oil-filled capsules are opaque to the scanner and will define a plane on the images, as well as help researchers tell left from right. The scanning will take about 15 minutes, during which Anthony must

CHRIS USHER FOR TIME



**GIRLS GO FIRST** Brain density peaks at about age 11 in girls and 12½ in boys

lie completely still. Dressed in a red sweat shirt, jeans and white K-Swiss sneakers, he stretches out on the examining table and slides his head into the machine's giant magnetic ring.

MRI, Giedd points out, "made studying healthy kids possible" because there's no radiation involved. (Before MRI, brain development was studied mostly by using cadavers.) Each of the Mann boys will be scanned three times. The first scan is a quick survey that lasts one minute. The second lasts two minutes and looks for any damage or abnormality. The third is 10 minutes long and taken at maximum resolution. It's the money shot. Giedd watches as Anthony's brain appears in cross section on a computer screen. The machine scans 124 slices, each as thin as a dime. It will take 20 hours of computer time to process the images, but the analysis is done by humans, says Giedd. "The human brain is still the best at pattern recognition," he marvels.

Some people get nervous as the MRI machine clangs noisily. Claustrophobes panic. Anthony, lying still in the soul of the machine, simply falls asleep.

### CONSTRUCTION AHEAD

ONE REASON SCIENTISTS HAVE BEEN SURprised by the ferment in the teenage brain is that the brain grows very little over the



**The ... is the part capable of deciding, ... take out the garbage, and**

**THE MANN BOYS** From left, Brandon, 18; Skyler, 16; Corey, 16; and Anthony, 18

course of childhood. By the time a child is 6, it is 90% to 95% of its adult size. As a matter of fact, we are born equipped with most of the neurons our brain will ever have—and that's fewer than we have in utero. Humans achieve their maximum brain-cell density between the third and sixth month of gestation—the culmination of an explosive period of prenatal neural growth. During the final months before birth, our brains undergo a dramatic pruning in which unnecessary brain cells are eliminated. Many neuroscientists now believe that autism is the result of insufficient or abnormal prenatal pruning.

What Giedd's long-term studies have documented is that there is a second wave of proliferation and pruning that occurs later in childhood and that the final, critical part of this second wave, affecting some of

our highest mental functions, occurs in the late teens. Unlike the prenatal changes, this neural waxing and waning alters not the number of nerve cells but the number of connections, or synapses, between them. When a child is between the ages of 6 and 12, the neurons grow bushier, each making dozens of connections to other neurons and creating new pathways for nerve signals. The thickening of all this gray matter—the neurons and their branch-like dendrites—peaks when girls are about 11 and boys 12½, at which point a serious round of pruning is under way. Gray matter is thinned out at a rate of about 0.7% a year, tapering off in the early 20s. At the same time, the brain's white matter thickens. The white matter is composed of fatty myelin sheaths that encase axons and, like insulation on a wire, make nerve-signal transmissions faster and more efficient. With each passing year (maybe even up to age 40) myelin sheaths thicken, much like tree rings. During adolescence, says Giedd, summing up the process, "you get fewer but faster connections in the brain." The brain becomes a more efficient machine, but there is a trade-off: it is probably losing some of its raw potential for learning and its ability to recover from trauma.

Most scientists believe that the pruning is guided both by genetics and by a use-it-or-lose-it principle. Nobel prizewinning neuroscientist Gerald Edelman has described that process as "neural Darwinism"—survival of the fittest (or most used) synapses. How you spend your time may be critical. Research shows, for instance, that practicing piano quickly thickens neurons in the brain regions that control the fingers. Studies of London cab drivers, who must memorize all the city's streets, show that they have an unusually large hippocampus, a structure involved in memory. Giedd's research suggests that the cerebellum, an area that coordinates both physical and mental activities, is particularly responsive to experience, but he warns that it's too soon to know just what drives the buildup and pruning phases. He's hoping his studies of twins will help answer such questions: "We're looking at what they eat, how they spend their time—is it video games or sports? Now the fun begins," he says.

No matter how a particular brain turns out, its development proceeds in stages, generally from back to front. Some of the brain regions that reach maturity earliest—through proliferation and pruning—are those in the back of the brain that mediate direct contact with the environment by

# INSIDE THE BRAIN

The brain undergoes two major developmental spurts, one in the womb and the second from childhood through the teen years, when the organ matures by fits and starts in a sequence that moves from the back of the brain to the front

## Nerve Proliferation ...

By age 11 for girls and 12½ for boys, the neurons in the front of the brain have formed thousands of new connections. Over the next few years, most of these links will be pruned

## Corpus Callosum

Thought to be involved in problem solving and creativity, this **bundle of nerve fibers** connects the left and right hemispheres of the brain. During adolescence, the nerve fibers thicken and process information more and more efficiently

## Prefrontal Cortex

The CEO of the brain, also called the **area of sober second thought,** is the last part of the brain to mature—which may be why teens get into so much trouble. Located just behind the forehead, the prefrontal cortex grows during the preteen years and then shrinks as neural connections are pruned during adolescence

## Basal Ganglia

Larger in females than in males, this part of the brain acts like a **secretary to the prefrontal cortex** by helping it prioritize information. The basal ganglia and prefrontal cortex are tightly connected: at nearly the same time, they grow neuron connections and then prune them. This area of the brain is also active in **small and large motor movements,** so it may be important to expose preteens to music and sports while it is growing

## Amygdala

This is the emotional center of the brain, home to **such primal feelings as fear and rage.** In processing emotional information, teens tend to rely more heavily on the amygdala. Adults depend more on the rational prefrontal cortex, a part of the brain that is underdeveloped in teens. That may explain why adolescents often react more impulsively than adults



DIRECTION OF BRAIN DEVELOPMENT

Parietal lobe

Corpus callosum

Basal ganglia

Occipital lobe

Prefrontal cortex

Hippocampus

Amygdala

Temporal lobe

Cerebellum



SCIENCE

## ... and Pruning



Those that are used and reinforced—the pathways involved in language, for example—will be strengthened, while the ones that aren't used will die out

### ☐ Cerebellum

Long thought to play a role in physical coordination, this area may also regulate certain thought processes. More sensitive to environment than to heredity, the cerebellum supports activities of higher learning like **mathematics, music and advanced social skills.** New research shows that it changes dramatically during adolescence, increasing the number of neurons and the complexity of their connections. The cerebellum is the only part of the brain that continues growing well into the early 20s

## Time-Lapse Brain

Gray matter wanes as the brain matures. Here, 15 years of brain development are compressed into five images showing a shift from red (least mature) to purple (most mature)



Age 5

Age 8

Age 12

front

Age 16

50
40
30
20
10
0   Percentage of gray matter   Age 20

controlling such sensory functions as vision, hearing, touch and spatial processing. Next are areas that coordinate those functions: the part of the brain that helps you know where the light switch is in your bathroom even if you can't see it in the middle of the night. The very last part of the brain to be pruned and shaped to its adult dimensions is the prefrontal cortex, home of the so-called executive functions—planning, setting priorities, organizing thoughts, suppressing impulses, weighing the consequences of one's actions. In other words, the final part of the brain to grow up is the part capable of deciding, I'll finish my homework and take out the garbage, and *then* I'll IM my friends about seeing a movie.

"Scientists and the general public had attributed the bad decisions teens make to hormonal changes," says Elizabeth Sowell, a UCLA neuroscientist who has done seminal MRI work on the developing brain. "But once we started mapping where and when the brain changes were happening, we could say, Aha, the part of the brain that makes teenagers more responsible is not finished maturing yet."

### RAGING HORMONES

HORMONES, HOWEVER, REMAIN an important part of the teen-brain story. Right about the time the brain switches from proliferating to pruning, the body comes under the hormonal assault of puberty. (Research suggests that the two events are not closely linked because brain development proceeds on schedule even when a child experiences early or late puberty.) For years, psychologists attributed the intense, combustible emotions and unpredictable behavior of teens to this biochemical onslaught. And new research adds fresh support. At puberty, the ovaries and testes begin to pour estrogen and testosterone into the bloodstream, spurring the development of the reproductive system, causing hair to sprout in the armpits and groin, wreaking havoc with the skin, and shaping the body to its adult contours. At the same time, testosterone-like hormones released by the adrenal glands, located near the kidneys, begin to circulate. Recent discoveries show that these adrenal sex hormones are extremely active in the brain, attaching to receptors everywhere and exerting a direct influence on serotonin and other neurochemicals that regulate mood and excitability.

The sex hormones are especially active

in the brain's emotional center—the limbic system. This creates a "tinderbox of emotions," says Dr. Ronald Dahl, a psychiatrist at the University of Pittsburgh. Not only do feelings reach a flash point more easily, but adolescents tend to seek out situations where they can allow their emotions and passions to run wild. "Adolescents are actively looking for experiences to create intense feelings," says Dahl. "It's a very important hint that there is some particular hormone-brain relationship contributing to the appetite for thrills, strong sensations and excitement." This thrill seeking may have evolved to promote exploration, an eagerness to leave the nest and seek one's own path and partner. But in a world where fast cars, illicit drugs, gangs and dangerous liaisons beckon, it also puts the teenager at risk.

That is especially so because the brain regions that put the brakes on risky, impulsive behavior are still under construction.



**MASTER SCANNER Giedd positions Anthony Mann in the MRI machine at the NIH Clinical Center**

"The parts of the brain responsible for things like sensation seeking are getting turned on in big ways around the time of puberty," says Temple University psychologist Laurence Steinberg. "But the parts for exercising judgment are still maturing throughout the course of adolescence. So you've got this time gap between when things impel kids toward taking risks early in adolescence, and when things that allow people to think before they act come online. It's like turning on the engine of a car without a skilled driver at the wheel."

### DUMB DECISIONS

INCREASINGLY, PSYCHOLOGISTS LIKE STEINberg are trying to connect the familiar patterns of adolescents' wacky behavior to the new findings about their evolving brain structure. It's not always easy to do. "In

## SCIENCE

all likelihood, the behavior is changing because the brain is changing," he says. "But that is still a bit of a leap." A critical tool in making that leap is functional magnetic resonance imaging (fMRI). While ordinary MRI reveals brain structure, fMRI actually shows brain activity while subjects are doing assigned tasks.

At McLean Hospital in Belmont, Mass., Harvard neuropsychologist Deborah Yurgelun-Todd did an elegant series of fMRI experiments in which both kids and adults were asked to identity the emotions displayed in photographs of faces. "In doing these tasks," she says, "kids and young ado-

ists. Teenage ranting ("That teacher hates me!") can be better understood in this light.

At Temple University, Steinberg has been studying another kind of judgment: risk assessment. In an experiment using a driving-simulation game, he studies teens and adults as they decide whether to run a yellow light. Both sets of subjects, he found, make safe choices when playing alone. But in group play, teenagers start to take more risks in the presence of their friends, while those over age 20 don't show much change in their behavior. "With this manipulation," says Steinberg, "we've shown that age differences in decision

and addictive effects of drugs and alcohol. Dopamine, the brain chemical involved in motivation and in reinforcing behavior, is particularly abundant and active in the teen years.

Why is it so hard to get a teenager off the couch and working on that all important college essay? You might blame it on their immature *nucleus accumbens*, a region in the frontal cortex that directs motivation to seek rewards. James Bjork at the National Institute on Alcohol Abuse and Alcoholism has been using fMRI to study motivation in a challenging gambling game. He found that teenagers have less activity in this region than adults do. "If adolescents have a motivational deficit, it may mean that they are prone to engaging in behaviors that have either a really high excitement factor or a really low effort factor, or a combination of both." Sound familiar? Bjork believes his work may hold valuable lessons for parents and society. "When presenting suggestions, anything parents can do to emphasize more immediate payoffs will be more effective," he says. To persuade a teen to quit drinking, for example, he suggests stressing something immediate and tangible—the danger of getting kicked off the football team, say— rather than a future on skid row.

Persuading a teenager to go to bed and get up on a reasonable schedule is another matter entirely. This kind of decision making has less to do with the frontal lobe than with the pineal gland at the base of the brain. As nighttime approaches and daylight recedes, the pineal gland produces melatonin, a chemical that signals the body to begin shutting down for sleep. Studies by Mary Carskadon at Brown University have shown that it takes longer for melatonin levels to rise in teenagers than in younger kids or in adults, regardless of exposure to light or stimulating activities. "The brain's program for starting nighttime is later," she explains.



Hormone surges make them

An immature cortex gives them

Melatonin throws their                    out of whack

lescents rely heavily on the amygdala, a structure in the temporal lobes associated with emotional and gut reactions. Adults rely less on the amygdala and more on the frontal lobe, a region associated with planning and judgment." While adults make few errors in assessing the photos, kids under 14 tend to make mistakes. In particular, they identify fearful expressions as angry, confused or sad. By following the same kids year after year, Yurgelun-Todd has been able to watch their brain-activity pattern—and their judgment—mature. Fledgling physiology, she believes, may explain why adolescents so frequently misread emotional signals, seeing anger and hostility where none ex-

making and judgment may appear under conditions that are emotionally arousing or have high social impact." Most teen crimes, he says, are committed by kids in packs.

Other researchers are exploring how the adolescent propensity for uninhibited risk taking propels teens to experiment with drugs and alcohol. Traditionally, psychologists have attributed this experimentation to peer pressure, teenagers' attraction to novelty and their roaring interest in loosening sexual inhibitions. But researchers have raised the possibility that rapid changes in dopamine-rich areas of the brain may be an additional factor in making teens vulnerable to the stimulating

### PRUNING PROBLEMS

THE NEW DISCOVERIES ABOUT TEENAGE brain development have prompted all sorts of questions and theories about the timing of childhood mental illness and cognitive disorders. Some scientists now believe that ADHD and Tourette's syndrome, which typically appear by the time a child reaches age 7, may be related to the brain proliferation period. Though both disorders have genetic roots, the rapid growth of brain tissue in early childhood, especially in regions rich in dopamine, "may set the stage for the increase in motor activities and tics," says Dr. Martin Teicher, director of developmental biopsychiatry

# SCIENCE

research at McLean Hospital. "When it starts to prune in adolescence, you often see symptoms recede."

Schizophrenia, on the other hand, makes its appearance at about the time the prefrontal cortex is getting pruned. "Many people have speculated that schizophrenia may be due to an abnormality in the pruning process," says Teicher. "Another hypothesis is that schizophrenia has a much earlier, prenatal origin, but as the brain prunes, it gets unmasked." MRI studies have shown that while the average teenager loses about 15% of his cortical gray matter, those who develop schizophrenia lose as much as 25%.

## WHAT'S A PARENT TO DO?

BRAIN SCIENTISTS TEND TO BE RELUCTANT to make the leap from the laboratory to real-life, hard-core teenagers. Some feel a little burned by the way earlier neurological discoveries resulted in *Baby Einstein* tapes and other marketing schemes that misapplied their science. It is clear, however, that there are implications in the new research for parents, educators and lawmakers.

In light of what has been learned, it seems almost arbitrary that our society has decided that a young American is ready to drive a car at 16, to vote and serve in the Army at 18 and to drink alcohol at 21. Giedd says the best estimate for when the brain is truly mature is 25, the age at which you can rent a car. "Avis must have some pretty sophisticated neuroscientists," he jokes. Now that we have scientific evidence that the adolescent brain is not quite up to scratch, some legal scholars and child advocates argue that minors should never be tried as adults and should be spared the death penalty. Last year, in an official statement that summarized current research on the adolescent brain, the American Bar Association urged all state legislatures to ban the death penalty for juveniles. "For social and biological reasons," it read, "teens have increased difficulty making mature decisions and understanding the consequences of their actions."

Most parents, of course, know this instinctively. Still, it's useful to learn that teenage behavior is not just a matter of willful pigheadedness or determination to drive you crazy—though these, too, can be factors. "There's a debate over how much conscious control kids have," says Giedd, who has four "teenagers in training" of his own. "You can tell them to shape up or ship out, but making mistakes is part of how the brain optimally grows." It might be more useful to help them make up for what their brain still lacks by providing structure, organizing their time, guiding them through tough decisions (even when they resist) and applying those time-tested parental virtues: patience and love.    —With reporting by Alice Park/New York



BROOKS KRAFT—CORBIS FOR TIME

## 7 Rules for Parents

Drawing on the latest scientific studies of adolescents, Laurence Steinberg, a professor of psychology at Temple University, offers this advice for the parents of teens:

**1. WHAT YOU DO MATTERS**
Many parents mistakenly believe that by the time children have become teenagers, there's nothing more a parent can do. Wrong. Studies clearly show that good parenting continues to help teenagers develop in healthy ways, stay out of trouble and do well in school.

**2. YOU CAN'T BE TOO LOVING**
Don't hold back when it comes to pouring on the praise and showing physical affection. There is no evidence that adolescents are harmed by having parents who are unabashedly loving—as long as you don't embarrass them in front of their friends.

**3. STAY INVOLVED**
Many parents who were actively involved in their child's life during the early years withdraw when their child becomes a teenager. This is a mistake. It's just as important for you to be involved now—maybe even more so. Participate in school programs. Get to know your child's friends. Spend time together.

**4. ADAPT YOUR PARENTING**
Many parenting strategies that work at one age stop working at the next stage of development. As children get older, for example, their ability to reason improves dramatically, and they will challenge you if what you are asking doesn't make sense.

**5. SET LIMITS**
The most important thing children need from their parents is love, but a close second is structure. Even teenagers need rules and limits. Be firm but fair. Relax your rules bit by bit as your child demonstrates more maturity. If he or she can't handle the freedom, tighten the reins and try again in a few months.

BONDING: Don't be afraid to pour on the praise and show physical affection

**6. FOSTER INDEPENDENCE**
Many parents erroneously equate their teenager's drive for independence with rebelliousness, disobedience or disrespect. It's healthy for adolescents to push for autonomy. Give your children the psychological space they need to learn to be self-reliant, and resist the temptation to micromanage.

**7. EXPLAIN YOUR DECISIONS**
Good parents have expectations, but in order for your teenager to live up to them, your rules and decisions have to be clear and appropriate. As your child becomes more adept at reasoning, it's no longer good enough to say "Because I said so."

*Laurence Steinberg's most recent book is The 10 Basic Principles of Good Parenting (Simon & Schuster)*

**Christopher Andre Vialva**
**Psychosocial History**
**May 28, 2004**

## Mother, Lisa Dickson Brown, and her family of origin:

1. **Lisa Gaye Dickson** was born to **Phyllis Dolores Shaver Dickson** and **James Michael Dickson** on 1-13-59 in Clovis, New Mexico.

   **Phyllis Dolores Shaver Dickson**
2. Phyllis Dickson was born on 12-22-33 in East Peoria, IL. She was the youngest of **Albert Shaver** and **Maude Fitzgerald Shaver's** 13 children. Phyllis had several physical health problems, as well as possible mental health issues which were undiagnosed and untreated. According to Lisa's sister, **Dee Bynum**, Phyllis Dickson was "moody, withdrawn, and would cry at the drop of a hat." Dee feels that Phyllis was probably bi-polar, but this was not diagnosed. The family moved often with James Dickson's military service, and eventually settled in Wisconsin. They lived in a trailer in the country and were somewhat isolated. Phyllis would put the children outside for hours on end, sometimes eight to ten hours at a time, with a few sandwiches or snacks to eat. They would explore their acreage, build forts, climb trees and invent games to play. Although Dee realizes now that this was not necessarily the best parenting, she enjoyed the freedom and fun of being outside with her siblings. She states that her mother often "took out her moods on the children."

3. Dee states that Phyllis was pregnant ten or 12 times. "She lost a boy before she had me. Then me. There were other children between Lisa and Mike, but she lost all of those babies." Dee believes that most of her mother's depression was linked to those pregnancies and miscarriages.

4. Lisa Brown also recalls her mother being "very moody," and "a stick in the mud." "We couldn't get her out of the house to save her life." Although Lisa feels that her father "taught me how to love," she feels that her mother, "taught me the practical things in life. She would not allow us to love her." Lisa states that she was always "a Daddy's girl" and did not have a good relationship with her mother. When Phyllis got ill at age 32, "she stayed sick after that, till she died at 57."

5. Phyllis had both breasts removed at age 32 and later had cataracts removed from both eyes. According to Lisa, her mother had cancer of the breast, lung, and brain over a 25-year period before she died. One of Phyllis' sisters went blind from cataracts at a young age. Lisa reports that most of her mother's immediate family suffered from a variety of cancers and none of them have lived past the age of 62.

1

Exhibit VII-D

**James Dickson**

6. James Dickson was born on 12-23-35 in McAlester, Oklahoma. His birth name was **Earl Jennings**. His biological father, **George Delbert Jennings**, died of tuberculosis, and his biological mother died giving birth to James (Earl). James was adopted by **Marian and George Dickson** after being left at an orphanage in Joplin, Missouri. James had four brothers and four sisters, but he knows nothing of his biological siblings. James states, "I ran away when I was fourteen and went to a ranch in Boulder, Colorado. On July 4, 1948, I got down on my knees and prayed to God. I was 15. I prayed for God to send me someone of the fair sex. I started walking and was picked up by some friends. Later, we picked up two girls. One of them was Phyllis. She told her girlfriend, 'You see that boy? I'm going to marry him.' Phyllis was the love of my life." They were married two years later when he was 17 and she was 19.

7. James has an adopted sister, possibly named **Beth Ann**, married name thought to be **Baxter**, according to Lisa. She comments that her father might be celebrating his birthday on the wrong date, as one of her sisters is doing genealogical research and has some indications that the information they have had is wrong.

8. When interviewed, James spun a number of convoluted and fantastic stories about his experiences in life. He was a "jungle fighter," and obtained his third degree black belt. Because of this specialized training, he reports that he was assigned to all of the various branches of the military. James reports that he flew in the military, though he was not rated as a pilot. He states that the colonel "just turned the plane over to me." Because of James' skill and knowledge, he was able to avert a crash, even though flight control gave him contradictory instructions. On another occasion, he noted problems on a commercial flight and, as he expected, the plane landed and the passengers were put on another one. James claims to have invented a machine that used gravity to generate electricity. "Some men, you know, the ones in the 'suits' made it clear" that he had to lose the plans if he wanted to live. He had sold the plans for $1 million to a German entrepreneur, who was killed after meeting with James. He left the military after about 8 ½ years because of ulcers, later settling in Wisconsin.

9. Dee reports that James was a drinker at times. "He drank with his buddies, then came home in the middle of the night demanding his dinner. One night when I was really little, he came home at 2:00 AM, drunk and demanding." Dee remembers that her mother "said no, for once. He got aggressive. She picked up the glass ketchup bottle, broke it on the table and turned on him and said, 'now what are you going to do?' My eyes were as big as saucers."

10. James has remarried and he and his wife are engaged in prospecting in Wisconsin. He has problematic relationships with his daughters, although he does not seem to know why. "I can't understand why no one calls me. I sent Tina a birthday card and she went ballistic. I don't know why they get mad at me. I gave those girls everything growing up. I took each one of them to town, bought them dresses,

1607



"$15.00, $20.00 apiece. I provided for them. Now they won't speak with me. I fell out with Tina over her religion. Same thing with Lisa and her Messianic religion."

11.  According to Lisa, James has had two strokes, numerous ulcers, diverticulitis, and pneumonia. He was once "a big smoker," but quit a few years ago. Lisa's relationship with her father has been difficult over the course of her life. He "disowned" her for marrying Rowallan Vialva and they did not speak for many years. She states that they reconciled after Christopher's sentencing. "We kinda patched things up. He apologized after Chris went to Death Row. We are trying to rebuild our relationship."

12.  Lisa accuses James of calling Chris a "nigger," which she couldn't tolerate. James flatly denies this. "I hate that word. If it were up to me, I would take that word out of the English language." He does admit that he told Lisa that Christopher was "bad seed, because he was and is."

**Lisa Dickson Brown**

13.  Lisa feels that she was overprotected as a child. She had a very strict Seventh Day Adventist religious upbringing. Because the Sabbath was kept on Saturdays, the children could not participate in very many extracurricular school activities. Other children made fun of them because they couldn't take part. She states that her father told her at age ten that he had never loved her like he loved his other children and that he had doubts if she was his child. On the other hand, she claims that she was always a "Daddy's girl" and was closer to her father than to her mother while she was growing up. Her father served in the Air Force so was away a good part of her early life. Three of those years, he was in Japan, where the family could have accompanied him, "but my mother wouldn't go." Lisa states that her father later told her that both of her parents had affairs during those years and "he wasn't sure if he would have a family to come home to."

14.  James recalls coming home on leave when he was in Japan. Phyllis and the girls were living with her mother, Maude. James walked from the next town, five miles away. Three men in a car picked a fight with him. He "whipped two of them senseless," then walked on to Maude's, where he confronted Phyllis, demanding to know "who is he?" Phyllis confessed she was involved with an Army captain. James challenged the "pencil pushing desk jockey" to fight "for his girls." James told Phyllis, "No man is taking my children from me." The captain reportedly decided to get out of the picture after James demanded that he sign a waiver of liability before he beat him up. James was proud of his fighting and his ability to win Phyllis back by a show of force.

15.  When Lisa got to high school, her father became more lax with his rules and allowed her to go out for track. She was not allowed to dance or to wear make-up. She recalls, "One of the worst spankings of my life happened when I put Vaseline on my eyelashes to make it look like I was wearing mascara." She only

3

had two dates in high school, one to the Junior Prom and one to the Senior Homecoming, "and both had to be chaperoned." She laughingly recalls, "When my older sister went out on dates, we two younger girls had to go with her. We were ornery and would sit between her and her date." She explains that the family lived 45 minutes out on a farm in Wisconsin and their father required that a boy had to come out and ask his permission in person to take one of his girls on a date. She asks, "How many guys would do that?"

16. Lisa did well in school but received little encouragement from her parents. Following her graduation, she enlisted in the Army in 1977. She reports that she was raped while in Basic Training at Fort Jackson, S.C. She and another young woman had gone off Post on a pass and were at a club. She reports that a murder had been committed and the police were searching for the perpetrator. She and her friend were waiting in line, trying to get a cab to get back to Post before their curfew. The cabs were running late because they were each being stopped and searched at the gate to the Post because of the murder. Some men offered the girls a ride. Lisa states, "The other girl acted like she knew them and I would be safe with her. I was naïve, but she was from New York and very street smart. We stopped at a gas station and then they said they were going to go to their apartment." Lisa protested, stating that they had to get back to the Post. She states that she figured out later that the other girl wanted drugs from the guys so she did not put up an argument about going to their apartment. One man and the other girl went into a room and the second man started talking to Lisa, saying he wanted to get to know her better and so on. Lisa states, "I was still a virgin, had only been kissed once." The man took her to a bedroom area and pulled a knife. He wanted her to perform oral sex on him, but she "didn't even know what that was." He threw her on the bed and tried to rape her, but she told him she was on her period. He then sodomized her and cut her with the knife. She managed to get away from him and found the other girl shooting up heroin in the bathroom. Lisa ran from house to house, finally finding a cab driver who had just gone off duty who agreed to return her to the Post. Lisa states that she was taken to the hospital and had to have stitches. However, there is nothing in her military medical records to substantiate this claim.

17. She states that she was raped a second time at Ft. Jackson by a drill sergeant "who had had his eye on me from the beginning. He took advantage of my naiveté. It started out consensual but ended up rape." **Tina Erdmann,** Lisa's sister, remembers visiting Lisa at Ft. Jackson. Lisa took her to meet the drill sergeant and admitted that she was having a sexual relationship with him even though he was married. Tina states, "Lisa dressed and acted provocatively as an adult."

18. Lisa served as a Personnel Actions Specialist in the Army. She received several commendations for her work and completed a Primary Leadership Course. Tina states, "Lisa was totally gung-ho about the Army."

4

19. According to military medical records, Lisa was seen in the clinic for a pregnancy test on 1-5-78. The test was negative. She then presented in the clinic the same day, crying, with flu-like symptoms. On 1-11-78, she was seen in the Emergency Room for chest pain and a history of a "heart murmur," hyperventilating. She was also seen several times for knee pain and was later diagnosed with a healing stress fracture of her left lower femur. She was still in Basic Training and having difficulty with her knees and right hip. On May 5, 1978, she was seen again in the clinic for possible pregnancy and anorexia secondary to nausea, but was not found to be pregnant. On August 16, 1978, Lisa was again seen for possible pregnancy; test results are not noted in her records. In September, 1978, she was seen for a "knot" on the left side of her pelvic region, along with sores on her labia and vaginal area. The knot was found to be a swollen lymph node and antibiotics were prescribed. She denied having intercourse.

20. She continued to serve in the military and met Rowallan Vialva, Christopher's father, while they were both stationed at Ft. Benning, GA.

**Debbie (Dee) Dickson Bynum**

21. Lisa is the third of five children. Her eldest sister is **Debbie Lynn Dickson Bynum**, who was born on 4-10-55 in Clovis, New Mexico. She prefers to go by "Deb" or "Dee," stating that her name was never Debra or Deborah, but just "Debbie," which she doesn't like. Dee lives in Killeen, Texas, with her husband, Larry. Dee states that she left home as soon as she could. She was tired of being responsible for all of the children in the family. Especially after her mother became ill, Dee took care of the house and the other children. She describes herself as "a problem kid. I had to have it told to me more than once, every time. I was smoking at 9, smoking dope a year later, drinking, getting drunk." She considers her father "emotionally and verbally abusive." She was punished by being hit with a belt, but does not consider this abusive. The family lived in a 12x60 trailer. About her mother sending the children outside all day, she says, "It was small and I guess she couldn't stand having us all in there at once." Growing up, Dee went everywhere with her father. He wanted a boy, and she was his boy. They did things outside together.

22. Dee recalls that she had "deep, black moods" when she was a teenager. She painted her room black. "I would get to the point that I couldn't stand to see anyone, hear anyone, let alone speak to anyone. I still get like that sometimes."

23. She left home and went to work for a Mr. Jackson, who ran heavy equipment. She learned how to run backhoes, forklifts and graders. She lived with Mr. Jackson and his wife, but reports that Mrs. Jackson became jealous and Dee left. She then joined the Army. "The Army saved me. I got discipline, purpose. The Army tells you exactly what is expected of you to do your job. I didn't have to be a drunk or a drug user to be someone."

24.  Her first husband was abusive. "I married the first man who said anything nice to me. He turned out to be a wife beater. I was pregnant and he told me he didn't want me to lose my figure. He made me fix him bacon and eggs. I got sick and he hit me. I was pregnant once again with him. I lost that baby after 4 ½ months. He beat me, kicked me in the stomach. We had a baby boy, in the toilet." Dee left her husband, ending her abuse.

25.  Dee married **Larry Bynum**, an African-American man, in 1984. She lost a baby with Larry and then had to have a hysterectomy. She served in the Army for 14 years as a communications specialist, did administrative work, ran a personnel office, and worked as a recruiter. She was medically discharged when she was about to make E-8. She has had migraines for years and they were getting worse. After leaving the military, she worked in real estate and day care. She had several car accidents. She became a merchandiser, working in stores in the Killeen area. She has not worked since November, 2002, due to health issues, including migraines and back problems, as well as anxiety, insomnia alternating with hypersomnia, hypothyroidism, and bipolar disorder, which was diagnosed four or five years ago. Dee has undergone treatment for the bipolar disorder and feels that she is doing well at this time. She has been treated with the following medications: Prozac, Clonazepam, Depakote, and Wellbutrin, among a host of others for her physical ailments. She has participated in individual and group therapeutic treatment. She is on 100% disability. Her husband, Larry, has also worked in real estate and is now a full time student working on a two year degree to be a network analyst with computers. Dee and Larry are Jehovah's Witnesses and very involved in religious activities.

**Tina Dickson Erdmann**

26.  Lisa's second sister is **Tina Marie Dickson Erdmann,** who was born on 9-21-58 in Clovis, New Mexico, and currently resides in Beaver Dam, Wisconsin. Tina remembers the day when her father sat the children down and told them that their mother was very sick and the doctor said that she wouldn't live for five years. This was very frightening to the children who were old enough to understand. Tina also recalls that her mother would send the girls outside "with a package of Graham crackers" for the day. Tina remembers her upbringing as strict and very isolated. The girls were not allowed to date or to engage in many of the activities at school. Tina calls Lisa "unattractive as a girl—her hair was never right and her clothes never seemed to fit." She states that Lisa only had about two dates in high school, not because her father wouldn't allow it but because "she was never asked." Tina states that her dad was "a great dad. I don't know what happened to him. He was the kind of dad all the kids wanted to be around. He would take you places and do things with you. I don't know what happened." Reportedly, James told his children that Mrs. Dickson, his adoptive mother, was "an evil woman" who abused him and sent him to work on a farm with people who treated him brutally. When Tina was 24, she went to meet Mrs. Dickson and found her to be "a perfectly nice older woman. She said they adopted Daddy, but he never wanted to stay with them. He kept running away from their home. They sent

Daddy to live on a farm to 'work off his orneriness.'" Mrs. Dickson thought that James felt threatened when they adopted a daughter. Tina seems puzzled and bothered by the disparity between her father's account of his life and her own impressions of Mrs. Dickson. Tina has fallen out of favor with her father, but doesn't understand why. She states that she married white men, as opposed to her sisters. Her father has disowned her because of her choice of religion. She is hurt that he would not attend her son's wedding.

27. Tina has several health problems including fibromyalgia, irritable bowel disorder, temporomandibular joint problems, some cognitive issues, and sleep problems, as well as bipolar disorder, as noted by Nancy Selfridge, MD. Tina has been seen in occupational therapy for arm and shoulder pain.

28. She has been treated with a number of medications for her bipolar disorder, including Methylpenidate, Wellbutrin, Clonazepam, Effexor, Ambien, Zantac, Lexapro, Celexa, Serzone, Trazodone, and Lithium Carbonate. In 2003, she had an inpatient hospitalization after a suicide attempt. She states that her bipolar disorder sometimes manifests itself in compulsive shopping. Tina is married to Jim Erdmann, who also suffers from depression. They have two grown children.

29. Following Lisa's birth, her parents had two sons, **James Michael Dickson**, who was born on 4-11-65 in Portage, Wisconsin, and **Mark Damon Dickson**, who was born on 2-15-67 in Portage.

**James Michael Dickson**

30. James died of cancer in October, 1987, at age 23. He had a rare cancer of his clavicle at 16, which went into remission and then recurred in other parts of his body in his twenties. According to Lisa, his death certificate states that he died of a heart attack from an overabundance of fluid in his lungs. His father, James, preferred to call him **"Mike or Michael."** James states that he and Mike were "best friends" and shared a love of military history, history in general, and specialized information about a variety of topics. James states, "Phyllis was the love of my life, but I have to admit that I miss Michael more than I miss her." Tina states that "Jimmy" was born cross-eyed and was in special education classes. Everything was a struggle for him. He developed an enlarged muscle in his shoulder when he was 16, which turned out to be malignant. "They wanted to take all of the muscles and the arm but he refused." He was treated for cancer at that time. When he was 23, he was involved in a car accident in Texas while delivering pizzas. A chest X-ray revealed "black spots" all over his lungs. He had not lived in Texas long enough to receive state benefits and had no insurance, so Tina drove down to bring him back to her home. She had small children at the time. His illness progressed and his negative attitude got worse along with it. Tina states that her daughter drew a picture for him and he threw her out of the room. Tina couldn't take it any more and notified her parents that they were going to have to put Jimmy in a nursing home. He died within a year of his diagnosis. James Dickson, the father, states that "Mike" was in line to be the

7

manager of nine Pizza Huts in Amarillo, Texas when he got sick. James and Phyllis were also living in Amarillo at the time, and their son had followed them there after a few months. James saw him with his shirt off at a swimming pool and noticed a spot on his back. Mike said it was a pimple, but James states that he knew better. James believes that food is the source of illness.

**Mark Damon Dickson**

31. **Mark Dickson** lives in Arlington, Wisconsin. According to James, Mark is a genius at heating and air conditioning. However, "Mark can't commit to more than one thing at a time. He couldn't take the responsibility of a business, so he continues to work for someone else, on a wage." James also noted that Mark has a very bad temper. Mark was unwilling to talk with anyone connected with Chris' case and all family members seemed to agree that there was no point in pushing the issue with Mark.

## Father, Rowallan Allcie Vialva, and his family of origin:

32. **Rowallan Allcie Vialva** was born on March 8, 1953 in Victoria County, Trinidad, West Indies, at the San Fernando General Hospital. ("Rowallan" is the correct spelling of Mr. Vialva's first name. He states that the Army listed his name as "Rowlland" and that is how it is spelled on his Social Security card and other official documents, though it is incorrect).

33. He is unaware of his birth weight and length. He was ill as a baby, although he is not sure of the diagnosis. He states that he had "some kind of illness and could have died." He is not sure if he went home from the hospital and was then readmitted, or if he was kept in the hospital for a length of time from birth. He states that he had "continuous diarrhea, possible dysentery."

34. His father was **Allcie Alkana Houlder**; DOB uncertain, who died at age 87 in 1985. Rowallan's mother is **Albertina Vialva**, born in 1923 (perhaps October 16). She is currently living in England.

35. Because Rowallan was ill as an infant and his mother did not feel she could properly care for him, he was sent to live with his **Uncle Wilson** and **Auntie Jane** in Palo Seco, about 30 miles from San Fernando, for about the first four years of his life. Wilson was his mother's brother.

36. Albertina Vialva had eight children before Rowallan. According to Rowallan, his mother began having children at about age 13 or 14. She had 13 children in total:

37. **Kenneth McArno**    (now aged about 65, lives in Trinidad)

38. **Henry Chinapoo**    (now aged about 62 or 63, lives in Venezuela)

39. **Phyllis Chinapoo Langdon**  (deceased at age 62 of liver cancer)

8

1013

40. **A baby girl who died at birth**

41. **Aldwyn Houlder**          (deceased at age 52 of a heart attack; same father Rowallan)

42. **Francis Vialva**          (now aged about 53, lives in Trinidad)

43. **Owen Vialva** (deceased at age 49 of pneumonia after contracting the disease in jail; reportedly, his stepson was involved with "some drug lords," the police came to search the house, Owen allowed the search and cocaine was found; Owen was given a jail sentence and became ill in jail)

44. **Oliver Houlder**          (same father as Rowallan, in his 50's, lives in England)

45. **Rowallan**

46. **Granville Houlder**   (same father as Rowallan, now aged about 50, lives in Trinidad)

47. **Billy Houlder**  (same father as Rowallan, now aged about 47, lives in England)

48. **Gwen Houlder**  (same father as Rowallan; now aged about 43 or 44, lives in England)

49. **Noel Houlder**  (male; same father as Rowallan, in his early 40s, lives in England)

50. Rowallan also has four stepsiblings on his father's side:

51. **Gerald Houlder**  (now aged about 64, lives in Trinidad)

52. **Argarta Houlder**     (female; deceased in her 60's, was a diabetic; had surgery to have a toe removed and developed complications leading to her death)

53. **Jean Houlder**  (deceased of pneumonia, was living in England, developed pleurisy and did not recover)

54. **Frankie Houlder**  (male; now aged about 56, lives in Trinidad)

55. According to Rowallan, his mother lived with Mr. McArno and then with Mr. Chinapoo, having children with each of them. She later developed a relationship with Mr. Houlder and became pregnant with Aldwyn Houlder. She was involved with other men, resulting in the births of Francis and Owen Vialva. At the same time, while Ms. Vialva and Mr. Houlder were apart, Mr. Houlder fathered Frankie Houlder with another woman. Later, Ms. Vialva and Mr. Houlder reconciled and Oliver was born. The rest of Ms. Vialva's children were fathered by Mr. Houlder.

56.  Mr. Houlder was not sure that Rowallan was his child. He did not want him in the house, which was another reason that Rowallan was sent to live with his aunt and uncle. Rowallan states that he was told that he was "given" to his aunt and uncle "to keep." He remembers that he "had a good time" with them and was the only child in the house, so he was provided with a great deal of attention. He had fun with the neighbors and does not remember any negative experiences about his early years with his relatives. When he was three and a half or four years old, his mother came back to get him. He calls that a "dreaded day." He did not want to leave, and his aunt and uncle fought to keep him. He remembers his aunt saying that they had taken him in to raise. He stated, "Kids need role models, a parent's love and attention." He felt that he was getting those things with his aunt and uncle, but would not get them with his mother. Although his aunt and uncle did not want him to leave, his mother was persistent and took him off with her. She told his aunt and uncle that she was taking him home, but instead took him to live with his maternal grandmother, **Deniscia Vialva**. Rowallan's father and mother were living together with the rest of the children. Rowallan's understanding was is that his father did not want him in the house.

57.  Rowallan remembers that he loved living with his grandparents as well. His sister Phyllis was already living there. He refers to Phyllis as "a hidden child." She had grown up living with their **Aunt Viola,** one of their mother's sisters, in Belmont, Port of Spain. When Viola died of cancer at age 40, Phyllis was sent to live with their grandmother. Rowallan states that there "were allegations that my father was making passes at Phyllis, so she couldn't be in the house." She was about 13 or 14 when she went to live with their grandmother. According to Rowallan, "we had a ball there." He reports that his grandmother was "a very loving woman, cherished her grandchildren, we were well taken care of." Deniscia Vialva reportedly never asked her daughter for any money or any assistance in raising the children. She received $10 a month in pension money, which Rowallan states was a good bit of money at the time. Deniscia's husband, **Julio,** and her son, **Austin**, also lived in the household. Austin was a woodcutter and contributed to the family's income.

58.  Rowallan's grandmother would take the children to visit their parents in San Fernando. The children would go to play while the adults chatted. There were occasional arguments about Rowallan going back to live with his parents. When he was six or seven years old, his mother took him back home again. He did not want to return but she was adamant. His brother, Granville, came with his mother to pick him up from his grandmother's home. Rowallan was trying to keep Granville from walking too close to the street and "got a slap across the chops" from his mother. When he returned to San Fernando, Rowallan felt that he was "backwards, from the country." He first attended a private school (he cannot remember the name) and then was transferred to the Boys' Roman Catholic School. He reports that he "had a sleeping disorder, would doze off in class between one and two P.M., or daydream." He was removed from that school and sent to Mon Repos Roman Catholic School at age seven, where he remembers "doing very well." However, his brother Oliver was attending Coffee English

10

Catholic School and his mother transferred him so that they could be in the same school.

59. He began the First Standard at age eight. He explains that each standard involves 14 subjects and one will attend 1st through 3rd Standards in Trinidad. After the 3rd Standard, students take an exam which will determine their eligibility for college (equivalent to high school in the US). The exam is called "Eleven Plus," because most students take it around their 11th birthday or within some months of their birthday. Students who do not perform well on this exam will only be permitted to advance to high school if their parents pay for it. In each Standard, a student is expected to be ranked in the top 10 to move onto the next Standard. Rowallan stated that he was always ranked between 3rd and 9th. He did well on his exams and was admitted to Presentation College.

60. Rowallan was miserable at home and felt he was being treated "like a slave." His parents had him carrying water, doing many chores, cleaning, and selling eggs for money. There was no water in the house. Rowallan had to walk to a public tap down the street and bring water home. The family used an outhouse. At age 10, he ran away to his grandmother's home and stayed with her for less than a year. He was then returned to his parents. He continued to have difficulties at home. In the evenings, he would sell sweepstakes tickets at the rum shops and stores. On one occasion, a woman won a good deal of money on the sweepstakes. Rowallan's mother received "a consolation prize" because she is the one who purchased the book of tickets to sell. Instead of giving Rowallan some of the money for selling the tickets, she paid for Oliver's college. Rowallan states that he is still hurt by that.

61. At around the same time, Rowallan had taken an interest in horses and was spending time with a local horse trainer. His goal was to become a jockey and he wanted to obtain his apprentice license at age 14. However, his father "soured it" for him by going to the paddock and telling the trainer that he did not want his son hanging around there any more. The trainer told Rowallan that he could not come back because of his father's wishes.

62. Between 11 and 12, Rowallan ran away to his grandmother's once again. His father had disowned him. His mother sent two of his brothers to fetch him back and an argument ensued. The police were called and Rowallan was taken to the police station. He was taken to court for being "out of control" and was sent to the Boys Industrial School for two weeks. He did not see anyone in his family and did not have a change of clothes for two weeks. He felt abandoned and deserted and stated that this is something else that still hurts him to this day. He was given three-years' probation and returned to his parents. After a few months, he left again and went from house to house, hiding from his father. He stayed with his grandmother, then with his Uncle Austin, then went to his godparents' home. He worked on a chicken farm.

63.  "The basic foundation I needed from my parents was not there. My uncle and my grandmother were the ones who provided that. The bond between child and parent was not there." Rowallan states, "I hated my father and my mother so much, but I persevered." Later, when his father was dying, Rowallan "had some chats with him, but I never asked him why he'd done what he'd done."  He believes that his mother loved some of her children more than others and that she still "creates a stigma between the kids." His mother lives in England and they do not have a relationship at all. He states, "my mother never did one thing for me." "I learned to be a loner. Now at my age, I find myself trying to get closer to my own kids.  I put so much love into my own kids because I didn't want them to go through the things I went through."

64.  Because the situation at home continued to be difficult for Rowallan, he went to live with the parents of some of his schoolmates when he was 12 or 13. He states that he "used to talk with the mom about my problems." They knew he had run away and needed a place to stay. He was welcomed with "open arms."

65.  After his aspirations to be a jockey were thwarted by his father, Rowallan became involved in swimming and joined the national junior swim team in Trinidad. Because he was so afraid that his father would again ruin his chances of succeeding at something, Rowallan even took the step to use a false name for swimming. He chose the name **"Winston Ayong."** He states that he just made it up himself. He was about 13 or 14 when he began swimming competitively. His coach was named **Joey Kaufmann**, a man who had a positive influence on Rowallan. He states, "Joey gave me good advice about how to set yourself in life, have a good reputation and not be a vagabond, a hoodlum." "I began to work on this, with his guidance." Rowallan competed in all four strokes. He swam daily, early in the morning, before school. On the weekends, he went to the beach and practiced with the lifeguards, "even on Christmas and Easter." Rowallan performed well on the swim team and developed a name for himself (although not his real name).

66.  Because the swim team practiced in a different town than his school, he finished working out at 7:00 A.M. and then had to commute back to school by 8AM. It was difficult for him to do this every day. He walked the streets and found an elderly woman and her daughter-in-law who were willing to take him in and let him live with them so that he would not have to commute any longer. He lived with them for about a year when he was around 14 to 15 or 16 years old.  He cannot remember their names now.

67.  Rowallan continued to perform well with the swim team and had an opportunity to go to the Junior Olympics in Miami. He needed a passport so had to admit his false name to his coach. He explained the situation and his coach was somehow able to obtain a passport for him in his false name. Rowallan went to the Junior Olympics and came in 4th in the freestyle.



68. He finished college in Trinidad and went to England to study at Westham University. He majored in general subjects and obtained a bachelor's degree. He continued to swim for the Trinidad national team.

69. After university, Rowallan returned to Trinidad and obtained a job selling shirts for a factory in Port of Spain. He went to his father and asked if he could provide him with some help. His father stated that he had no money to offer. Rowallan told him he did not want money, but wanted to travel and perhaps go to America. He was wondering if his father could assist him in any way. His father told him that he had a cousin, **Sonny,** who lived in New York. First, Rowallan went to St. Croix and his father set him up to stay with a lodge brother for a few months. Rowallan worked as a carpenter's helper, saved his money, and moved to New York to live with Sonny. Before leaving St. Croix. he developed a relationship with **Jackie Glasgow.** They were married in St. Croix around 1972 and she gave birth to his first child, **Devon** on 8-19-73.

70. While in New York, Rowallan was attending school at New York State University, majoring in a pre-law course of study. He completed one year before receiving a draft notice. He was drafted into the US Army and given US citizenship. He continues to have a dual citizenship in both the US and Trinidad.

71. Rowallan was stationed at Ft. Campbell, Kentucky. Jackie was still living in St. Croix and he wanted her to come to the US with him. Her mother was ill and Jackie did not want to leave her. Eventually, Jackie and Devon came to the States and Jackie's mother was treated for cancer in New York. After her mother died, Jackie returned with her body to St Croix and then did not come back to the States She felt that she should stay in St. Croix to help her father. She and Rowallan agreed to a divorce.

72. Rowallan notes that none of his family members wrote to him while he was in the Army. He admits that he even wrote himself some letters just so he could receive some mail. He is still hurt by the lack of interest and concern on the part of his parents throughout his life.

73. At Fort Campbell, Rowallan met **Cathy Jackson** and they were together for about a year between 1972 and 1973. They planned to get married, but Rowallan was having difficulty finding out the status of his divorce from Jackie. He tried to locate her but was told she had left St. Croix for New York or New Jersey. Cathy gave birth to Rowallan's daughter, **Joy,** on 2-2-73. Because the divorce was in question, Cathy remained with her parents in Kentucky and finished college, later joining the Air Force. Meanwhile, Rowallan was transferred to Panama. He had some contact with Cathy and Joy from Panama and throughout the years he communicated with them by letter, sending money to help with Joy's support. His last contact with Joy was in 1993. They met in Houston and had a good visit. Since that time, he has lost touch with her, due to accidentally deleting his address

13

book data. He has attempted to find her with no success. He is not sure of Cathy's whereabouts.

74. In 1975, Rowallan returned from Panama and was sent to Ft. Lewis, WA. While in Washington, Rowallan participated in swimming and track and field. He had an opportunity to go to the Olympics but his supervisors would not allow it.

75. During this time, he was a good friend with a woman named **Carol Hogan.** She was interested in marriage but, in 1976, he was sent to Italy for a 36-month tour and he did not think it would be realistic to continue his relationship with her. However, he only completed a few months of his assignment in Italy. He states that there were "bad earthquakes" there that bothered him. Additionally, he was affected by a skydiving accident which claimed the lives of two of his friends while he was a paratrooper there. He requested a transfer to Germany and was sent to Mannheim, where he served from 1977 to 1978.

76. While stationed in Germany, Rowallan came to Trinidad on vacation in 1976. He spent some time hanging out with old school friends in a beach house. He was "a great friend" with **Dawn Sealy**, the daughter of his "second mom." He and Dawn had some attraction to each other over the years and had a relationship while he was home. They did not ever discuss marriage or children. She became pregnant with his daughter, **Natasha**, who was born on 11-23-77. They have always remained in contact and continue to be "like a family."

**Lisa Dickson and Rowallan Vialva:**

77. According to Lisa, she only had two dates in her life prior to meeting Rowallan Vialva. She describes herself as "naïve, off-the-farm-dumb." She states that Vialva was a "con man," who easily impressed her as an older man who spoke five languages. She states that he "goes after naïve types and won't have children with a woman unless she is a virgin." "Once she has a child with him, he won't have sex with her again." Lisa was 19 when she married Vialva on 10-6-78. Both were in the Army at Ft. Benning, GA, at the time.

78. Rowallan recalls meeting Lisa at the swimming pool at Ft. Benning. They began talking and went out to dinner. A few nights later, he walked over to her barracks to say hello and make a date. He went to the person in charge of the quarters and asked for Lisa. He saw her walking with some others and called out her name. Lisa looked at him "like she had never seen me before," and started screaming. He left the building and went back to his barracks, unsure of her reaction. Later, a military police officer and his commanding officer came to him and stated that he had been accused of assaulting a young lady. He was given orders not to speak to Lisa. A week later, she contacted him and told him she was sorry for what happened. He informed her that she had caused him a lot of problems and he was going forward for a court martial. She suggested to him that if they got married, the charges would be dropped. According to Rowallan, Lisa could not back out of

14

the charges once they were filed, or she would get in trouble herself for lying. He went to a JAG officer and asked about the situation. He and Lisa then went to a justice of the peace and got married.

79. Lisa states that Vialva was very controlling and abusive throughout their relationship. He controlled her movement and activities. He made many accusations against her. He would hit, punch and beat her regularly. The military police were called to their home on numerous occasions. Vialva was eventually court-martialed and kicked out of the military. Lisa states that he had 15 different charges against him, some of which were related to his repeated abuse of his wife. He had already been court-martialed once when he lived in Germany and was on probation. Lisa reports that Vialva kicked her in the right temple on one occasion, causing her to lose her vision for three days. She woke up with her head under a faucet.

80. On 10-26-78, Lisa was seen in the military clinic for possible pregnancy. She stated that she had had unprotected sex and was about eleven days late with her period. On 11-13-78, Lisa returned to the clinic stating that her previous pregnancy test results were never returned and she requested another test. Apparently, this was again negative. In January, 1979, Lisa was seen in the clinic complaining of intermittent nausea and vomiting for the past month, with a ten-pound weight loss. "Pt. has been under increasing stress at work and other." She was not using birth control. The physician noted, "Pt. has been trying to conceive since January, 1978, unsuccessfully." He noted that she had "infertility with depression." This time, her pregnancy test was positive.

81. Lisa presented to the clinic on February 28, 1979 complaining of cramps, headaches and vomiting for the previous two days. She also stated she had been bleeding for four days. She "seems to be in a very highly emotional state (depress)." She stated she was diagnosed pregnant on January 27 but had a spontaneous abortion. An addendum noted, "Emotionally upset because of inconsistency in results of pregnancy test. Apparently two positive—thought she was pregnant, then told she was not pregnant. This caused a lot of anxiety and depression as she does not know whether she is pregnant or not. She very much wants to be pregnant as she states she doesn't feel like a whole woman until she has had a child. This indecisiveness has apparently started to cause problems in marital life." On the same date, Maj. Jack Goode, MD, noted, "Since January, the patient has had two positive and two negative pregnancy tests, the last one being negative on February 27, 1979. Because of these tests and questionable adnexal mass and pain, the patient was presented for evaluation of possible ectopic pregnancy and/or adnexal mass." Lisa was admitted to the hospital and diagnostic laparoscopy was performed on March 1, 1979. She was found to have no adnexal masses, no evidence of pelvic inflammatory disease and no ectopic pregnancy. She was discharged on the second day following surgery to seven days of convalescent leave. At the very end of the note, the physician stated, "It should be mentioned that the patient was having some domestic problems and was

15



advised that she had a social worker available to her if she desired consultation." No further notes were made in this regard.

82. Lisa and Vialva were married for about three years, though they were together less than a year of that time. According to Lisa, Vialva required her to be covered from head to toe when she left the house, unless she was on duty. He did not want anyone else to "see what he had." He would not allow her to use the phone or visit with anyone. He would not permit her to drive to work and she would have to wait for him to pick her up. He would be absent for days at a time and she would not know where he was. She speculates that he may have been involved in selling drugs. She also believed that he practiced some kind of witchcraft or voodoo as she went into a forbidden closet in their home and observed various religious items. She believed that his mother was a "voodoo woman in Trinidad."

83. Lisa states that Rowallan raped her when they were at Fort Benning. He had taken her off Post to a motel room and said he had duty. She waited and waited and he didn't come back. She took a cab and went back on Post to look for him, recruiting one of her girlfriends to go with her. She found Rowallan with another woman in another motel. She went back to her motel room and he later assaulted her in the room. She states, "We were married, but I considered it rape."

84. Rowallan's memories of his marriage sharply contradict those of his ex-wife. He states that he and Lisa were living in base housing when he had about one year left in the military. On Saturdays, he would help with a kids'' swimming team and he was also playing on a soccer team himself. On one occasion, he came home and Lisa was not there. He called to see if she was on duty and she was not. He went into the closet to get his soccer gear and noticed her military jacket hanging there. He found a letter in her pocket, one that she had written to her platoon officer stating that she wanted to be with him. When she came home, she told Rowallan that she had been to this platoon officer's home just to talk with him. Rowallan confronted her with the letter and they argued about the situation.

85. He would send letters and gifts to his daughter Natasha in Trinidad. When he did not have time to go to the post office, he asked Lisa to mail a letter for him. He found out many years later that she had torn up the letter and written another one in its place to Natasha's mother, Dawn. In the letter, Lisa stated that she was married to Rowallan now and didn't want Dawn to have contact with him. When he was interviewed, Rowallan provided the original letter for copying. In it, Lisa refers to him as "Hamlet" and tells Dawn that he is her husband and Lisa does not want him to be involved with Dawn any longer.

86. Dee Bynum recalls an incident in which she states that Rowallan tried to rape her. She was visiting Lisa and they had gone out. Tipsy, they fell asleep together on the bed. Dee woke up in the middle of the night, with Rowallan "trying to get me to have sex with him, with Lisa on the bed." Dee protested and Rowallan

16

reportedly stated, "It's okay, she's drunk anyway." Dee began to scream and Lisa woke up. Rowallan "tried to blame it on me coming on to him," Dee remembers. She states that Lisa didn't believe her for the longest time, and thought she was coming on to Rowallan. It was only in the last few years that Lisa accepted that they did not have sex. Dee describes Rowallan as "an abuser."

87.    Rowallan reports one occasion, working a long shift, causing him to miss a meal. He asked his superior officer if he could run home and get something to eat. When he arrived, unannounced, Lisa was dressed to go out. She told him she was going somewhere with her girlfriends. He went back to his duty station and ran into his sergeant, who asked where he had been. Rowallan explained the situation. He was sent home for leaving his duty station and told to see his commander the following Monday. When he got home, he and Lisa got into an argument. Lisa began screaming and the neighbors called the military police, who came and arrested him. A female officer kicked the door in. On that Monday, he saw his commander for an Article 15 regarding leaving his post without permission. Lt. Bennett, who had told him he could go home and eat, was willing to give a deposition, but "was getting pressure." "The marriage stuff entered in." He spoke with a JAG officer who seemed to be helpful, but about 15 minutes before the hearing, Rowallan was told that an officer in training would be handling the case. He was given 30-days hard labor and then released after 21 days. When he was released, he saw Lisa in a car with a man named Stan.

88.    Lisa tells a different story about this incident. She states that neighbors called the Military Police because they could hear an altercation between Rowallan and Lisa. When the MP's arrived, Rowallan was choking Lisa over a stair rail. Rowallan became further enraged when a female officer asked him to identify himself, going through his mail when he refused. He then attacked the officer and was arrested for assault. He served 30 days hard labor for this offense. A court martial was initiated, but he continued to live with Lisa after he served his 30 days. During this time, she became pregnant with Chris. In October, 1979, Lisa was seen in the clinic for possible pregnancy and this time, she did receive an accurate positive result. Rowallan was discharged from the Army and moved to Houston. He doubted that Chris was his baby because of the timing of Lisa's pregnancy.

89.    Rowallan denies that he was ever physically abusive toward Lisa. He states that he may have pushed her during the argument they had regarding her letter to her platoon officer. He states that she was verbally abusive toward him but that they did not have physical altercations. He denies having anything to do with Voodoo or that he had a Voodoo altar in their home. He was raised in the Catholic faith and states that he always had a room set up for prayers, including a Bible and a rosary, but that he was never involved in any other spiritual practice. All of his children except Christopher were baptized in the Catholic religion.

17

90. Lisa completed a medical history report for her separation from the Army on a pregnancy discharge. She noted that she had a history of frequent or severe headaches, dizziness or fainting spells, car and airsickness, and an allergy to penicillin. She went on to document that she had an appendectomy at age 18 and laparoscopy at age 20. She also noted that she had "tubal pregnancy surgery" with Dr. Goode in 1978. She has reported having a tubal pregnancy prior to her pregnancy with Chris, but it appears from records that surgery revealed no tubal pregnancy at all. There is also no official notation of a miscarriage, other than Lisa's comments to medical personnel, though it is noted that she had two positive pregnancy tests prior to conceiving Christopher.

91. Rowallan states that he did not like Ft. Benning at all. He wanted to get out of the service and go to Texas. He told Lisa he was leaving. "I was mad. She more or less ruined my military career. I shut the door. Then for some reason, I contacted her to let her know I got there (Texas) okay. She told me she was pregnant, was taking a pregnancy discharge, and coming to Texas with me. I wasn't sure if he (Chris) was mine, to tell the truth."

92. Lisa states that Rowallan invited her to move to Houston to join him. She had hopes that he had changed and would be a father to their child. However, when she got to Houston, he continued his beatings of Lisa. She went to her sister Tina's home in Wisconsin. Prior to Chris' birth, Lisa returned again to Rowallan, but he continued to be abusive toward her. Two weeks before Chris was born, Rowallan drove Lisa to San Antonio, where she could receive military medical care, and dropped her off.

93. Christopher was born on May 10, 1980. Rowallan reports that he has never seen Christopher's birth certificate. After Chris came home from the hospital, Lisa called Rowallan at work one day to tell him that Chris was very sick and going back to the hospital. "He had some kind of meningitis that could cause brain damage and a speech impediment. He was in the hospital for 10 days," Rowallan recalls. He states that Lisa spent most of the time with Chris in the hospital because Rowallan was working, but he tried to go up and relieve her when he could.

94. Lisa reports that Rowallan bit the infant Christopher on his stomach, leaving marks. She states that this is what made up her mind to divorce Rowallan, because she would not let her child be harmed. Rowallan denies biting Christopher, stating that this is a "pathological lie." He recalls that suddenly, Lisa and Chris disappeared to Wisconsin to her sister Tina's house. Rowallan called Tina and she told him that Lisa was having problems with him (Rowallan). At the time, Rowallan thought maybe Lisa was having postpartum depression. He flew to Wisconsin and took a cab to Tina's house. He was not permitted to stay in her home so obtained a motel room. Lisa came to the motel so they could talk, but at some point, the police arrived. Tina had become concerned that Lisa was still gone and called the police. Rowallan went back to Texas.

18



95. In November 1980, Lisa called Rowallan to say she had filed for divorce. She told him that the case would be heard two days later. He thought this was awfully fast to have the court hearing, but did not know anything about it any sooner. He thought a case would take longer. He stated that he could not do much financially, but would help her in any way he could. He then cut off communication with her.

96. Rowallan states that he never knew Lisa to be a drinker. "She talks a lot. She's very loose with the red rag in her mouth." He and Lisa never talked much about religion. She knew he was a Catholic. He tried to get her to go to church with him when they were married, but she wouldn't.  They went to a Baptist church once. She claimed to be an Adventist but never attended services. He never really knew much about her family background. He recalls that, when she lived in Wisconsin, she walked a pet chicken around on a string. He thought it was odd that she would put the string around its neck so that when she pulled on the string, it would choke the bird.

97. Lisa and Rowallan were married from 10-6-78 to 9-2-81.  They were married in Chattahoochie County, Cussetta, Georgia and divorced in Columbia County Court, Portage, Wisconsin.

## Christopher's Birth and Early History

98. Lisa reports having a difficult pregnancy with Chris, including complications with toxemia, hypertension, and spotting.  She reports having had a miscarriage and a tubal pregnancy  prior to this pregnancy and was fearful that she would lose the baby.  Medical records are unclear about these prior pregnancies. Although Lisa did have two positive pregnancy tests prior to conceiving Chris, there is no indication that she received any treatment for a miscarriage.  She had a laparoscopy in 1978, which did not reveal a tubal pregnancy, and no other records could be found to indicate a tubal pregnancy occurred.  Lisa also has stated that she is a "spontaneous aborter" and has to be careful during the first trimester of a pregnancy.  Tina Erdmann recalls that she and Lisa were pregnant at the same time and that Lisa had lost a baby prior to her pregnancy with Chris.  She does seem to think that Lisa had an ectopic pregnancy.  Tina came to Texas to take care of Lisa.  She states that Rowallan Vialva was not there and that Tina saw his closet with chicken blood and the Koran in it.

99. Although Lisa feels that she has been depressed all of her life, she states that the first time she seriously thought about suicide was during her pregnancy with Chris, because Rowallan was beating her severely.  She states that she "just wanted him to kill me and get it over with."  However, she wanted the baby and did not do anything to harm herself because of her feelings for her unborn child.

100. **Christopher Andre Vialva** was born by forceps delivery in San Antonio on Saturday, May 10, 1980 at 12:55 PM.  Lisa's water broke early so labor had to be induced.  Chris' birth weight was 7 lbs, 8 oz., and he was 22 inches long.  His

19

16/24

chest was 12 ¾ inches and his head was 14 ½ inches. His "birth rating" (probably APGAR score) was 8.9. He had low blood sugar and jaundice following birth. He took his first bottle of Enfamil on Mother's Day, May 11. He was released from the hospital in good condition.

101.    At 11 days old, Christopher was admitted to the Texas Children's Hospital with a 101 degree fever, irritability, difficulty feeding, and drainage from his eyes. He was diagnosed with Sepsis-Group B streptococcus, and Conjunctivitis caused by Influenza B by Dr. Jovita Falgout. Chris was treated with IV antibiotics, including Ampicillin, Gentamicin and Penicillin. He appeared to respond well to treatment, though lab testing following the first ten days of antibiotic treatment revealed that he continued to test positive for strep. Further treatment was provided for seven more days. Nursing notes indicate that Chris' mother was holding the baby or was present in his room when most of the daily documentation was made. During most reporting periods, Chris was afebrile, had stable vital signs, was taking formula successfully, sleeping well, alert while awake, and gaining weight during his hospital stay. A Social Services Note on 6/4/80 indicates that a referral was made by Dr. Falgout for a social worker to consult with Lisa. Marilyn Hansen, social worker/graduate student, indicated, "Besides concern for the child, the mother is dealing with personal problems, i.e., impending divorce. The father has had little contact with the child since hospitalization and provides no emotional support for mother. Mother's anxiety level is down. I will see her again before discharge." On 5/30/80, Nursing notes indicate, "Parents at bedside.". On 6/4/80, Nursing notes indicate, "Parents left to return later tonight." Most other Nursing notes only mention "mother." Chris was discharged, "doing fine," on 6/7/80. There were no further Social Services notes found in the records.

102.    Lisa and Chris left Texas for Lisa's sister Tina's home in Wisconsin. Tina recalls that Chris cried all the time and was allergic to everything. Tina states that he was a "soy baby," though Lisa has stated that he had to be wet-nursed by his aunt. Lisa told Tina that Rowallan had rejected Christopher. Rowallan reportedly took to wearing tank earmuffs to block out Chris' cries.

103.    Tina reports an incident in which she arose in the middle of the night with her daughter. While she was in the kitchen, she heard a noise on the landing of the basement stairs. Lisa was sitting on the top step holding Chris out ("like Michael Jackson"), shaking him as if she were going to throw him into the basement. Tina said, "Lisa, what are you doing with that baby?" Lisa replied, "He won't shut up." Terrified that Lisa would drop the baby, Tina told her, "Put that baby down and go outside. Just walk away from him." Lisa complied and Tina collected Christopher from the top of the steps.

104.    According to Tina, James Dickson would not have anything to do with Christopher "because he was Black." Tina thought that it was very strange that Lisa put "white" as Chris' race on his birth certificate. Tina believes that Lisa

20



was discouraged from staying in Wisconsin because of her father's attitude, prompting her to take Chris back to Texas. James Dickson more than once reminded Lisa that he had predicted her downfall if she went against his wishes.

105. Developmental milestones in Chris' baby book were noted as follows:

106. He held an object at three months, although this was most likely reflexive and not voluntary. He was also reported to hold a bottle by himself at three months, which is probably unlikely, and to stand assisted at three months, which is most likely a common reflex in infants and not actual "standing." Chris was reported to turn over at 3 ¾ months, discover his hands at four months, sit in a chair at four months (most probably with some support), and discover his feet at five months. According to notes in his baby book, Chris sat alone at six months, pulled up, crawled and climbed at eight months, creeped at eight months, one week, stood alone at nine months, walked with assistance at nine months and walked alone at ten months. Most babies will creep before they crawl, but it is possible that Chris did both at about the same time. Based on his mother's entries, it appears that Christopher's developmental milestones were met on time or early. He did not appear to have any delays or difficulties with his motor skills.

107. He began taking cereal at four weeks and juice at eight weeks, vegetables and solid food at four months, drank from a cup with help at nine months and alone at 13 months, and ate table food at 8 ½ months.

108. At age 5 months, Chris was saying "Gaga" and "Dada." He said "bye-bye" at one year.

109. His teeth began erupting at age 6 ¾ months, with 16 teeth in place by age 16 months.

110. He had his first haircut at age 15 months.

111. Lisa began to potty train Chris at 16 months.

112. Chris' weight and length were documented as follows:

113. One week         7 lbs., 13 oz.      22"
114. Two weeks        9 lbs., 4 oz.       22"
115. One month        10 lbs, 15 oz.      23"
116. Three months     17 lbs.            26 ¾"
117. Five months      18 ½ lbs.          28 ½"
118. Ten months       22 lbs.            31"
119. 16 months        25 lbs.            33"
120. Two years        33 lbs.            3 ft.
121. Four years       38 lbs.
122. Five years       45 lbs.

21

| 123. | Six years | 45 lbs. | 47" |
| 124. | Nine years | 64 lbs. | 53 ¾" |
| 125. | 13 years | 85 lbs. | 5'1" |
| 126. | 14 years | 97 lbs. | 5'2" |

127. Chris was a "Spotlite Photo Magazine Winner" at nine months old, in 1981. His first birthday was celebrated with his family at their home at 5693 Atlee Ave. in Jacksonville, FL. His mother entered him in a "Pretty Baby" contest in 1982, which he won. Lisa has pictures of Chris in a sailor outfit, smiling his big smile.

128. Many nicknames were given to Chris and noted in his baby book: Baldy, Christmas, Chrisy, Mr. Clean, Buddah, Monk, Sweetie Cakes, Pumpkin Nose, Hercules, Shithead.

## Rowallan Vialva's life after his divorce from Lisa:

129. Lisa called him from Germany once, when she was living there with her next husband, **Robert Mabrey**. Rowallan stated, "there was a black-out after that, we had no contact." He always wondered about Chris and how he was doing. Then about a year and a half later, she called him again, stating she was back in the US and had a baby girl.

130. When he was in the military, Rowallan completed some correspondence courses through the University of Virginia. While living in Houston in the 1980's, Rowallan attended Elkins Technical School. He received a Bachelor of Science degree in Information Technology from the University of Houston in 1983.

**Sharon Mohammed**

131. In 1984, Rowallan met **Sharon Mohammed** in Houston, He was working for McDonald Douglas. They were married in 1985. He stated, "It was a great relationship, the best of life, and the biggest nightmare." Her father was from India and the family was Muslim. Rowallan was banned from their home. They did not like Blacks. Her parents would come to the outside of the house, but would not come in. He thought this was embarrassing. It would have been better to move away, but there were difficulties in finding better assignments. Rowallan and Sharon had a son, **Thomas**, on 1-26-86. In January 1987, he was laid off due to the economy and cutbacks.

132. In April 1987, he went to work for Honeywell. Sharon's family had "disbarred" her. She was not happy, though she was willing to make the sacrifice to be with him. All of her sisters were married to Caucasians. Rowallan felt like the outsider. Finally, "I gave in and said, 'make your family happy.'" "I was never welcome." They were divorced in 1988. He states, "it was not a bitter divorce, she just asked for help with Thomas, child support to be paid."

133. Rowallan stayed in Houston for a time and worked on getting his house sold. In December of that year, there was a layoff for about a month and then he was recalled. He was also certified in Process Engineering in 1993, after attending training in Houston and Phoenix for two years. Sharon remained in Houston, remarried, and has another child. She works in accounting. Thomas is in Houston, but living with an aunt because he does not get along with his stepfather. Rowallan has remained in contact with Thomas and there are plans for Thomas to come to Trinidad this summer (2004).

**Thomas Vialva**

134. Thomas Vialva lives in Missouri City, Texas with his aunt and uncle, Kevin and Cheryl Sullivan. He does not recall living with Rowallan Vialva, although he has seen pictures of the two of them from the time that the family was together. He states that he was two or three when his parents divorced. He remembers Rowallan calling to check on him from time to time. This decreased when Thomas was six or seven years old, when Thomas thinks that Rowallan left the United States. After that time, Thomas heard from him about every six months. Thomas grew up with his mother in the Houston area. Thomas states, "I've grown up hearing bad things about my dad. My mother is actually the only one who doesn't say a lot of bad things about him. Her family doesn't like him and had bad experiences with him." When asked what some of those bad experiences were, Thomas states, "My dad used to hit my mom." When asked where he heard that, he states, "My mom told me he hit her. If I would get into a dispute with my mom, she would stop and say I sounded just like my father." He also notes that Rowallan has many children and that Thomas' family has impressed upon him the need to be more responsible. "If I was interested in a girl, they would give me a talk, tell me not to go spreading my seed all over." "If I act aggressive, they talk to me about it. Everything goes back to my dad." Thomas states, "I don't want to walk in my father's shoes."

135. For the last couple of years, Thomas has lived with his aunt and uncle, Cheryl and Kevin Sullivan. His mother remarried several years ago and he does not like his stepfather, John Karl. Thomas has a stepbrother, Benjamin Karl, who is about 8 years old.

136. Thomas states that he has sometimes been depressed and had insecurity about his life, his father, and growing up. When asked, he states that he does not think that he has been overly depressed, "just a normal part of growing up." He then states that his mother did take him to "two or three psychologists when I was starting high school because she was afraid I was going to do something to myself." However, he states that he was never suicidal, "I like my life. I just didn't get along with my step dad. We would have arguments, almost getting physical a few times." Thomas states that he does not have ADHD or any learning problems. He is unaware of mental health issues within his family.

23



137.	Thomas contacted Chris about a year and a half or two years ago after learning about him from his father. Thomas and Rowallan reunited at that time and have attempted to improve their relationship. Thomas and Chris have been corresponding. Thomas does not ask him about their father, remarking, "That is not a good topic." He feels that Chris wants to talk about positive things and mostly Chris wants to hear about Thomas' life. Chris encourages him to get his education, recommends books for him to read, and tries to help him steer clear of the problems that Chris had. Thomas also talks with Chris' mom, Lisa, on occasion. He describes Lisa as "a very loving mom. She continues to stand by Chris. I'm more used to moms who would say, 'my son made a mistake and he deserves what he gets.'" When asked if that is what his mother would say, Thomas laughs, "I'm not sure what she would do."

138.	Thomas will graduate from Dulles High School this year. He has had a job with Southwest Electronic Energy through the Co-Op Program at school this year and it will become a full time job this summer. He has already been accepted to the University of Houston. He plans to major in business and hopes to go to law school.

## Giselle Banfield

139.	In 1993, Rowallan was sent to Puerto Rico with Honeywell. While in Puerto Rico, he would go back and forth to Trinidad to visit. He would buy clothes wholesale in Puerto Rico and sell them in Trinidad. He met **Giselle Bansfield** and had a short-lived relationship with her while he was traveling back and forth between Puerto Rico and Trinidad. They never discussed marriage or a long-term relationship, but had twin daughters together, **Desha and Chenell,** on 11-22-94. He states that he has a great relationship with the twins and sees them regularly. He is still friends with Giselle. No formal arrangements were made for child support, but he helps as needed.

## Vidya Seecheran

140.	In 1994, while in Trinidad, he met **Vidya Seecheran**. He gave her some clothes to sell for a percentage. They started communicating by phone and he would visit about once a month. She became pregnant with their daughter, **Vanessa.** Rowallan was assigned to Brazil for three to four months and Vidya joined him in PR and in Brazil. Vanessa was born on 10-31-95. Rowallan and Vidya got married because of her immigration status, so she could stay with him. She was an Indian and came from a Hindu family. Once again, the family did not accept Rowallan because of his race and the fact that he was a Christian. He states, "After being in the US and in the military, I had come to feel that people had simmered down and there were not so many racial problems, but those still existed. Religious problems seemed to be the worst. She would be banned from the family. It was kept quiet about Vanessa until we came back to Trinidad again." Vanessa was baptized in the Catholic faith, but now attends a Hindu temple. He states that "she looks more Indian so she is more accepted." He has still never been to Vidya's family's home. "I am from the disliked race." Vidya

24

moved to the US with Rowallan. "When we first met, we talked about my other kids but she didn't realize that I wanted them to visit." Vidya did not like any of Rowallan's other children. "She never wanted to be around my family. It's a bloody mess." In 1997, Natasha was not doing well in school and hanging around with the wrong crowd. She moved to Tennessee to live with Rowallan and Vidya. "She didn't like Natasha at all, thought she was lazy and wouldn't help around the house. This caused problems between us." Natasha's academic skills were not up to par when she came to the US so Rowallan helped her enroll in a community college. He was transferred to Chocolate Bayou, TX for two months and then the family moved to Borger, TX. Problems continued between Rowallan and Vidya and they were divorced in 2002 after moving to Savannah, GA with Honeywell. When the case was filed, "Vidya thought she was above the law, fired her lawyer, and took Vanessa back to Trinidad. When the case was called, I told the lawyer she had left. I was given full custody of Vanessa. When I called Vidya, she basically said, 'take the divorce and stick it where the sun don't shine.'" Vidya and Vanessa are living in Trinidad. Although Rowallan has custody, he claims it would be a terrible fight if he tried to take Vanessa. He maintains contact with Vanessa through visits and phone calls. He states that Vidya wants to get back together but he said, "no."

141. Rowallan's grandmother died at the age of 91. His Uncle Wilson and Auntie Jane, who helped raise him, are also deceased. His father died in 1985. His mother is now 72 years old and the last of her immediate family still living. She is in Illford, Essex, England.

142. Rowallan himself has had several medical problems. He is a diabetic and has had two heart surgeries. He was having a great deal of stress from the difficulties in his relationship with Vidya. He states that he "went to work to avoid her." He began having strange heart pains, a sort of pulling sensation. His daughter, Natasha, took him to the Emergency Room and he was found to have two clogged arteries. He had stints placed in two separate surgeries in 2001 and 2002. He was living in Savannah, GA at the time. He was then told to avoid stress and fights. He states that Vidya would "argue all the time."

143. He is now living in Trinidad with his "second mom," Sylvia Sealy, while awaiting a job with a refinery.

144. Family history was discussed. To the best of Rowallan's knowledge, the following information is correct.

**Medical:**
145. Rowallan and his half sister, Argarta, are diabetic. Rowallan, his brother, Aldwyn, and two uncles, Joe and Austin, had heart problems. His Uncle Wilson had a "stomach abscess." His Uncle Sidney was diagnosed with Alzheimer's. Rowallan's brother, Owen, and half-sister, Jean, had respiratory illnesses.



**Mental health issues:**

146. Rowallan does not recall or have knowledge of any family members with obvious mental health problems or diagnoses.

**Alcohol/other drugs:**

147. "Drinking is a pastime, especially for men." Rowallan's father drank, but Rowallan did not consider him a problem drinker. Rowallan's brother, Kenneth, is a drinker, "can just see a beer and get drunk:" Uncle Austin and his wife were both drinkers and would argue with one another when intoxicated. Rowallan is not aware of anyone with drug problems.

**Learning problems/school problems:**

148. Rowallan "can't really say." He states that the school system is different in Trinidad than the US and it would be hard for him to know if anyone had any learning problems. He did state in his interview that he had a "sleeping disorder" in school and would "daydream," having difficulty paying attention at times.

**Lisa Brown's life after divorcing Rowallan Vialva:**

149. When Chris was five weeks old, Lisa separated from Rowallan Vialva. She went to stay with her sister, Tina, in Wisconsin until Chris was about 10 ½ months old. She states, "My sister had to spoon feed me because I was so depressed about the situation and wouldn't eat. I weighed less than 100 pounds and looked like a skeleton. I was depressed about the abuse I had endured and about raising a child as a single parent. I had been suicidal during my pregnancy, but now I had a reason to live."

150. She reunited with **Robert Mabrey**, whom she had known earlier. She moved to Florida to see if they could have a chance to work things out together. Her divorce was not yet final. She states that she had to file twice because Rowallan Vialva could not be found.

151. After the divorce was final, she married Mabrey on 9-14-81. The family moved from Florida to Louisiana because Mabrey had decided to go back into the Army. Chris had a 104-degree fever and no insurance, so they took him straight to the military hospital after the wedding at the Justice of the Peace. Chris had "some kind of flu and would spike a really high fever any time he got sick. He doesn't get sick much, but when he does, he's dying sick." She, Chris and Robert Mabrey lived at Ft. Polk, LA. Lisa states that, prior to Mabrey's military service, he used speed, pot and downers. "Rob's mother always liked me because I got him off drugs and he knew he couldn't take a chance in the military." Mabrey began to become abusive in their marriage. Lisa reportedly suffered a miscarriage because Mabrey beat her.

152. The only time Lisa recalls him being abusive toward Chris was when Chris was about 16 months old and he urinated on Mabrey when Mabrey was changing his diaper. Mabrey took Chris into the bathroom and spanked him. Lisa had to

26



threaten to call the police to get him to come out of the bathroom. The family lived in Louisiana for about 18 months and then had orders for Germany.

153. Lisa became pregnant with her daughter **Audrey** prior to leaving for Germany. Mabrey had previously been stationed there and Lisa found out that he contacted a German girl he had known to let her know he was coming back. He wanted to see her, "now that she was old enough to date." Lisa had gone to the doctor to obtain an IUD and found out she was already pregnant. Mabrey told her that if they were not going to stay together, he did not even want to see the baby. She states that he beat her to try to make her miscarry again. He was honest and told Lisa that he wanted to pursue this other relationship. They made plans to separate and he brought her to her sister's (Dee) at Fort Hood. "He went to the store to get cigarettes and never came back, emptied the bank account on the way out of town." Lisa was within two weeks of delivery with Audrey.

154. Later, Mabrey called from his mother's house and said maybe they could work things out, but he wanted to see his family before he left. Mabrey told Lisa if she didn't have the baby before her birthday (Lisa's), then he was leaving. Lisa states that she had to chart her fluids and temperature in order to get pregnant, so she felt confident that her dates were accurate. She was talking with Mabrey on the phone and her water broke. Her brother in law took her to the hospital. Lisa later called Mabrey to tell him about Audrey's birth. After Mabrey lived in Germany for a time, he told Lisa that he wanted to try again to have a relationship with her. Lisa, Chris and Audrey moved to Germany when Audrey was about 6 ½ months old. They were stationed at Lee Barracks, near Mainz, Germany.

155. According to Lisa, there were "quite a few domestic violence incidents" while in Germany. Mabrey was "mostly a choker, more so than a hitter. He was more of a mental abuser. He would wait until ten minutes before I had to go to work and then hide the car on base somewhere. It inconvenienced me, but he wasn't smart enough to disable it. It would make me late, looking for the car, taking the kids to day care and getting to work." Lisa was singing with a band, which Mabrey didn't like. He would tell her that she would get rich and famous and then wouldn't need him any more. "He never used his paycheck for our support." Lisa worked at government jobs on base, as a secretary in three different jobs over time. Mabrey caused trouble with her manager with the band. "I auditioned three times for a band that had lost its female lead vocalist; they were about to do a record deal. Rob had a problem with the manager being Black." He felt that because her first husband was Black, he would lose her to another Black man. "The manager told Rob that I had something that would make us both rich, but you have to learn to back off." The manager told Lisa that she would have to get Mabrey under control or he would no longer be her manager. Eventually, he did stop managing Lisa because of issues with Mabrey.

156. In 1985, Mabrey filed for divorce and requested an "early return of dependents" to the U.S. Lisa's boss was going to try to find her a job that did not require her

27

to have a "sponsor" in the military, but it was going to take time, and according to Lisa, Mabrey stated that "he was going to make things as inconvenient as possible." He walked the paperwork through channels to get it expedited. Lisa was told that she and Chris were leaving but Audrey was staying. She protested and Mabrey's commanding officer gave him an order to take her and the children to the airport and ordered an allotment be made to Lisa for child support. Lisa states that Mabrey was having an affair with a lieutenant in the battalion, which was considered a breach of conduct, but she (Lisa) was not doing anything illegal or immoral for which to be sent home. Lisa later found out that Mabrey's affair was with a man and that Mabrey was bisexual.

157. Lisa denies that Mabrey was ever abusive toward the children. The only incident she can recall, other than Mabrey spanking Chris when he was a baby, was when Chris was about five years old. Mabrey was in a physical altercation with Lisa, and Chris jumped up on his back to try to get him off his mother. Mabrey managed to get Chris off his back but didn't take any action against him. Lisa states, "if Rob ever acted like he was tempted to do something to the kids, I would direct him toward myself." Mabrey did not like the fact that Chris was biracial. He would tell Lisa, "Tell people he's adopted, or that he's Hispanic, but not Black." Chris would overhear these comments. At age 3 or 3 ½, Chris asked her, "Why do I have this funny brown stuff all over me and my sissy doesn't?" Lisa told him he was special, that he got it from his Daddy.

158. Chris remembers his life with Mabrey differently. He states that his earliest memory is of his sister's father "whipping my ass. He used to kick my ass when he got home from work." Chris would always sit in one particular chair in their home. "I would be sitting in the chair sucking my thumb. He would walk in the door, take off my belt and whip me." Chris grew to think that the whippings had something to do with him sucking his thumb. "He would walk in wearing his BDU's, snatch me out of the chair and whip my ass." Now Chris thinks it has to do with his race. He remembers that Mabrey "did whip Mama some." He vaguely remembers trying to intervene. With Mabrey, "I wasn't old enough to understand. I didn't know if it was the right or the wrong thing at the time. Now I think it was abuse." Chris was around Mabrey from before age 3 to age 5. At least twice a week, he "whipped my ass with a belt." He doesn't remember being hit elsewhere. He doesn't know if Mabrey left marks. He doesn't remember where his mother was when this was happening.

159. Although Lisa denies that Mabrey was abusive toward the children, records from the Scott and White Clinic indicate that she told a counselor there that Mabrey was abusive to her and her children.

160. Dee Bynum, Lisa's sister, recalls Robert Mabrey as well. She calls him "a manipulator, user, creep to end all creeps, abuser, abused the kids, Chris and Audrey both." She remembers receiving a call from Lisa in the middle of the night when she and Lisa were both living in Germany. "Lisa said Rob had locked

28



her out of the apartment with the babies and wouldn't let her in. I went to get her. I pounded on the door and he told me to get away or he would call the MP's." Dee didn't give up until Mabrey finally opened the door and let them in. He told Dee to steer clear of him.

161.    Chris has other memories of his life in Germany, such as going swimming, going to see an air show, and going to "Fantasialand." He recalls that he was "usually in the house or next door at the babysitter's, a big fat woman." He reports that he was "terrified" the first time he stayed with her. His mother left him and he kept running down the stairs. "The lady would make us take naps while her 'stories' were on. She would put me in her son's room by myself. I would watch cartoons and Star Search."

162.    Lisa was married to Robert Mabrey from 9-14-81 to 5-16-86. They were married in Duval County, Jacksonville, Florida and divorced in Beauregard Parris, Deridder, Louisiana.

**Audrey Mabrey:**

163.    When Audrey was born, "that was Chris' baby," according to Lisa Brown. He loved her as an infant. Lisa shows pictures of a proud Chris holding his baby sister. She was born on 1-21-83, weighing 7 pounds. Again, Lisa's water broke early and forceps had to be used for an induced delivery.

164.    By all accounts, Chris was the primary caregiver for his younger sister. Audrey states, "I remember him picking me up from school. We would walk home and he would stay with me. I was about six years old. As he got older, he would get frustrated with the responsibility of taking care of me and just put me in Mom's closet and go do whatever he wanted. We did not have a good relationship when we were younger. He was mostly frustrated with me. When I was 14 or 15, I was surprised that he actually hugged me and said, 'I love you' at my birthday party."

165.    Audrey remembers having a babysitter when she was about two years old and one later who had a deaf daughter, but her only consistent sitter was Chris. "My mom would go to clubs at night and he would baby-sit." "I looked at him as not only my brother, but my father figure. He was my caretaker. Mom gave him too much control and responsibility at an early age."

166.    Chris recalls that he and his sister were left at home alone "a lot." They would put football jerseys on and stuff pillows up under them to play football on the floor. They would play Monopoly and watch comedy shows on TV. They "got along fine, had fun." He recalls that he probably started babysitting Audrey when he was about age 7, in second grade. They had a babysitter when he was in first grade. On the weekends, his mom would take Audrey with her and let Chris do his own thing. His mom taught him, "if the phone rings twice, then hangs up, then calls back, it's Mom. Don't answer the door for anyone." He walked Audrey home from school every day till he was in the 8th grade. A lot of times,

1634

Chris felt resentful; he wanted to do things with his friends but had to watch his sister.

167. At age five, Audrey would go to bed at night and Chris "would do what he wanted to do." When asked what she meant, she states, "He would molest me. He would make me do oral sex on him. He was around 8 or 9. One time he asked if he could 'perform vaginally' and I said 'no.' Mom came in and we both got a spanking. It happened ten times or less, but stopped after we got caught. He seemed scared of my mom."

168. Audrey states, "Chris got ahold of my mom's porno videos at a young age. He made me watch one once. He and his buddies watched one once and he sent one of his friends into a room with me and a condom and said we couldn't come out till we did something. But we knew each other and we didn't do anything. Mom had at least two porno videos. We got grounded one time because they were missing and had to stay grounded till they came back to her."

169. When Audrey was about six, she and Chris were walking home from school and they started throwing pebbles down a hill. The cops came and took them to their babysitter's, saying that the pebbles could have struck a car and broken someone's windshield.

170. "I remember Chris doing some vandalism, going into a building and spray-painting it. Once he broke a lady's window, supposedly by accident. Another time, he broke a window on purpose--I was with him. He was always in trouble with the cops."

171. Audrey remembers, "I came home from school one day when I was about 9 or 10 and he was angry about something. He put a butcher knife to my throat and was going to kill me. I called Mom to make him quit."

172. Lisa recounts Audrey's 11th or 12th birthday, when "Chris and one of his friends crashed the party and he was acting like a clown." They were all dancing. Chris called Lisa out of her room and said, "Mom, show them your moves." Lisa states that she used to win about $300 extra every month entering dance contests. Audrey was upset that her Mom was "being cool, stealing her friends." When Chris and Audrey were pre-teens, they wouldn't touch each other in pictures. Later, they would play a game at the mall where they would pretend they were boyfriend and girlfriend to make other girls jealous. Then they would laugh and say they were brother and sister. Lisa states, "they were almost like twins."

173. Audrey regards Chris as "a very angry child and teenager. He would knock the wind out of me, but then would snap out of it and be a loving brother, asking if I was okay. He was very protective of me. If anyone would put their hands on me, hit me, he was the first one to defend me. But then he would hit me himself. I didn't understand that." When asked if she was afraid of Chris, she states, "Of

30

course I was scared of him as a kid. Scared is not the word. Petrified. Chris would beat me up in front of whoever. Our friend Jayre would tell him, 'One day she will be able to beat you.' Jayre would give me ideas about what I could do to get Chris." On one occasion when Audrey was 14 or 15, their mother was not home and there were some mutual friends of hers and Chris over at the house. Chris started saying they had to go, embarrassing Audrey in front of them. "He pins me down on the couch, choking me. I got my leg up high enough to kick him in the jaw. I called the cops. I was sick of my mom not defending me. When she came home and found out about it, I was grounded but nothing happened to Chris. My mom never really defended me. Always took his side and said I was an instigator."

174. Chris remembers that his mother told him that he was the man of the house when she divorced Audrey's dad. He took that seriously. When his sister started junior high, she "was boy crazy" and couldn't be found at times. Chris always had to be the one to go and find her, rather than doing what he wanted to do. Lisa recalls, "As they got older, they were not as close. Chris stalked Audrey because she lost her virginity at age 12. We knew what this boy was up to. Audrey made up elaborate lies. I bought this house over here (her current residence on Kim St.) to get out of the area, wanted to get Audrey away from this boy. He and Audrey were in the same grade. Audrey said it was the only way she could keep him. She started having periods soon after that and I was worried she could get pregnant. Chris was stalking the boy, he was on patrol. He thought of himself as the father. After that, he lost respect for Audrey and their relationship did not recoup from that. Chris was a sophomore in high school before he lost his virginity. He said he would not be like his dad and leave babies all around. After his arrest, four or five girls said that they had his baby or were pg but he was not with any of them. I guarantee you if I didn't do anything else right, I did that right. He didn't leave anything behind."

175. Chris states that he had to "take out the trash, clean up, take care of Audie; when do I get to be a kid?" Later, he started doing what he wanted to do and felt like he had earned it. He would sometimes think, "It is her (mom's) job, why do I have to do it?" Sometimes he wanted to do something with his friends but his mom was going out to the clubs. "Sometimes I liked the responsibility, but I got all the chores without any of the rewards. I really just wanted my mom to be home because we didn't see her much and she would be mad when she got home. She had a headache and didn't want to hear your voice. She hasn't seen you all day, but your voice annoys her as soon as she gets there. She was always mad, angry, stressed out, her feet hurt. As soon as she got home, I'd leave the house."

176. "I was so tired of being in the house, I wouldn't go home till all my friends had to go home. Sometimes, I'd go to my friends' houses so I wouldn't have to go home. I would walk around looking for trouble. I would feel like a caged dog let out of a kennel, would run amok."

31



177.    Audrey states, "Chris would talk to himself. He had full out conversations. I could hear him in another room when I was at the house. Later, when he was in jail, he told Mom he thought he was schizophrenic."

178.    "I don't remember my mom a lot when I was young," Audrey states. "I was on the Honor Roll in Elementary school and she would come for the awards. I remember Christmas and birthdays. I remember her cooking sucked. I fell asleep in a bowl of mac and cheese once. I remember watching "ET" on TV; we dragged the table to the living room and ate spaghetti while we watched. Mom would always have a boyfriend for a year or two and they'd go away. I was always cool with them. Mom would worry about me, I was so trusting."

179.    Audrey feels that her mother's boyfriends were pretty good guys. Audrey is still in touch with Jim Gillhouse. "Cowboy (Cecil Prime) was cool. He would help me with volleyball. When I was in 6th grade, I was a good little girl. In 7th grade, I got rebellious. I hated Joe Massey, but he went away soon. Rich (Brown) is a complete jerk. He was cool at first, but once he married Mom, he was a jerk toward us. He wanted her to get rid of us. It's not an answer to have your wife choose your kids or you."

180.    "Mom came to sports events. She wasn't a bad mom, she just wasn't there. She never protected me. She just wanted to play mom when we screwed up. She never asked, 'How was your day at school? Do you need help with homework?' She had too many tasks at once: keep a job, keep a boyfriend, maintain finances."

181.    Audrey and Chris got closer before he was arrested. "I was 16. I would go smoke pot with him and his friends. We would all hang out all the time. I had bought some weed. Chris and Rich had been fighting and my mom kicked Chris out. You just don't put your son out on the street. Mom was out walking. Came back and said he had to leave. I said I was going with him. We went to Billy Rorie's house. Terrell Brown was there. They were all smoking. One guy was hogging the sweet. I said something, he got mad and said 'shut up before I slap you.' Chris defended me. Chris and I left together. I would sneak him back into the house. Rich came home for lunch one day, left, and came back. Chris was on the phone and ran to his room. Rich left. Chris or Brandon, one or the other called each other. Chris was walking around [prior to this time] with Little Tony and Greg. Little Tony had a gun and stashed it in a bush because they saw some cops. Chris was saying they had to go back and get the gun. Brandon came by and Chris had already left the house. Apparently, he met Brandon at the corner."

182.    Dee states, "Audrey is ruined, too, she's just not in the pen. She deals with things by body piercing, tattoos, sleeping with every man she can." Dee wishes she could have been more involved in the lives of Chris and Audrey, but "Lisa wouldn't allow it." Dee states that Lisa would not permit anyone to discipline her kids; Dee offered to baby-sit them but told Lisa that she would have to be able to

32



spank them if they needed it. Lisa would not agree to this so Dee did not have much contact with the kids while they were growing up.

183. Audrey lives in New York City and works at a restaurant. Her boyfriend is a homicide police officer.

**Life after Robert Mabrey:**

184. Chris recalls that his mother had surgery (maybe to have her tubes tied) before the family returned to the States from Germany. He stayed with his Aunt Tina in Wisconsin and met his two cousins, James and Angie. He doesn't remember much about any conversations that they had. They would go sledding and his aunt would bake cookies. They had a "mean" Scottish terrier dog. He and his sister were riding on a sled, hit a tree and his sister "got a goose egg on her head." "I don't remember if I got in trouble for that." His aunt was the first one to whip him with a paddle. "It was a big paddle like a racquet ball paddle." "I don't remember my mom whipping me. Only my step dad laid hands on me."

185. Tina Erdmann recalls that Chris and Audrey lived with her for five months when Lisa was separated from Robert Mabrey. Lisa was staying on the couch at their sister, Dee's. Both Tina and Dee offered to adopt the children, but Lisa wouldn't hear of it. Tina finally told Lisa that if she wasn't going to let her adopt the children, Lisa would have to come and get them. Dee remembers that Lisa wasn't trying very hard to get a job in Texas. "She was stuck on getting a job at Fort Hood, for the benefits, and after six months, you've got the job for life." Dee recalls that Lisa left the house after everyone was asleep, stole Dee's car and went to clubs. She wasn't a big drinker, but she liked to dance and "hook up" with men. Larry caught her one night, got a buddy to take him to the club and picked up the car. Dee confronted Lisa after that episode. Lisa told her that "she wasn't going to let her kids run her life." Dee told her, "That's what being a parent is." Dee now states, "My sister has always been a very selfish, self-serving person, manipulates people, knows what buttons to push. She had already been thrown out of Tina's house, wanted to party all the time, not be responsible for her kids, care for them or keep them clean. Lisa is not validated without a man in her life. She was always searching for a man. When the children were young, Lisa was on a dating frenzy."

186. Chris remembers that his Aunt Tina flew on a plane with him and Audrey to Texas and they stayed with Aunt Dee and Uncle Larry. Larry was "cool" and the funniest guy Chris had ever met. He was a dee-jay and would spin records when they were there. Larry is African American.

187. Chris states that after they moved out of his aunt's house, it would be the first time that it would just be his mom, Chris and his sister by themselves. His mom worked a lot. His sister was at the babysitter's all day and he was in school. After school, he would pick up his sister and they would stay home by themselves till their mom got home from work. His mom would fix them something to eat

33

1038

while getting herself ready for her second job, then they would not see her till the next morning.

188. Dee recalls visiting Lisa's apartment in Killeen when the children were young. Lisa came out to the pool wearing a skinny tube top and a thong. She had Chris and Audrey with her. Dee remembers all of the women reacting to it. "I told Lisa to go put something on. She retorted, 'I have everything covered up.' I told her she needed to be thinking about rape, which is not just about power but opportunity." Dee states that Lisa was bodybuilding at the time and had a job at the Officer's Club which was "basically stripping." She "wasn't wearing much for that job." There was "a steady stream of men in and out of the two bedroom apartment. The walls were thin. She told me the kids didn't know anything. I told her I didn't see how they couldn't have known."

189. When he was six or seven years old, Chris would "sneak out to the Laundromat to play video games." He would do this only when his mother was home with Audrey, otherwise, he would have to stay with his sister.

190. Lisa would go out "all the time." When Chris was ages 8-11, she "would go out to the clubs a lot." Chris would get mad about it. He would try to stay up and wait for her to come home, but he would fall asleep. He would wake up in the morning and "see some guy's boots by the coffee table. I would know what the deal was. I would see some guy I'd never met walk out."

**James Gillhouse:**

191. Lisa was with **Jim Gillhouse** from March 1989 to sometime in 1992. "He had a good relationship with Chris. He was an illegitimate child, so was more open to other children. His son has Down syndrome. Chris was small, athletic, outgoing, Jim enjoyed that. He wanted a son who could do athletic things. Chris was nine years old or just short of it." Gillhouse was good to the kids and Chris seemed to like him like no one else she had dated or married. Then Gillhouse went to the first Gulf War and came back alcohol dependent. "They ripped his heart out over there, took his soul and everything else with it. Chris had dreams while he was gone in the war, said he would survive and come back to be their dad." Gillhouse was sent to Germany and then to Saudi Arabia, back to Germany and then to Alabama to train on a different aircraft. He ended up in Ft. Bliss, Texas. "We got engaged after he returned, but after several months, it was obvious that he was drinking all the time. He didn't care about his physical appearance. He was a positive guy before he left, but when he got back, he was negative and hated everyone and everything."

192. They broke up and he moved to Fort Carson, CO, eventually retiring. He was teaching flight school in Alabama most recently. "He has been married twice since we were together. His wives have been jealous and paranoid. They know we were soul mates. But the man I knew doesn't exist any more." "Both of the

kids adored Jim. Chris felt he could be his son because their complexions were similar."

193. Chris reports that his mother always says he liked Jim Gillhouse. "I liked Jim, he was cool, he was good with his own kids, would go outside and play, take you to ball games, toss the football, go to the batting cages. We'd actually do things. The other guys were just interested in being alone with Mama, getting the kids out of the way. Jim was a good racquetball player, I went with him. None of the other guys were interested in us." "I stopped liking him when he snapped on me verbally. We went to see him in El Paso. I was arguing with my sister. He said 'shut the fuck up.' It just shocked me."

**James Ziglar:**

194. **James Ziglar** was the only Black man that Chris recalls his mother dating. He would whip Chris with a weight belt. "Mom gave him the authority to punish me." Ziglar had a son named Bo. "We would spend the night with them." "Mom and James had an altercation about another woman, maybe his ex-wife, who was in his life. Mom and us kids walked all the way across town to get home." Audrey also recalls the whipping with the weight belt. "James lifted weights a lot. He had weight belt and he beat us with it once. We were at his house, supposed to be asleep."

**Joe Massey:**

195. Lisa's third marriage was to **Joe Massey** from 3-4-93 to 5-16-95 in Killeen, Bell County, Texas. She describes Joe Massey as "too young to be a father." He went to Europe six months after their wedding and "wasn't around much." She does recall that Massey once "let Chris hit on him because he felt Chris needed to let his anger out." Massey was sent to Germany on an unaccompanied tour because Chris was in the Exceptional Family Member Program (due to his ADHD) and he couldn't be served properly at the base in Germany. The family stayed behind in Killeen. Not too long after Massey went to Germany, he called Lisa and admitted that he had been unfaithful to her. She told him she was going to file for divorce, but agreed to wait until they saw each other face-to-face at Christmas time. In the meantime, she met Cecil "Cowboy" Prime at a bar on the same night that Massey had told her about cheating on her.

196. According to Dee Bynum, Joe Massey was "young and dumb. He went to Germany and had an affair. His and Lisa's relationship didn't last long. He was a loser."

197. Christopher remembers Joe Massey: "Joe, her ex-husband, would snatch me up. She gave him the authority to punish me. I would get so annoyed, irritated, felt I would snap." Once, Chris left the room to avoid an altercation with Joe. Chris went up to his bedroom closet. Joe broke down the door, "snatched me up, wouldn't let me leave the room, got me down on the floor. There were sneaker marks on the wall from me trying to push off. Joe grabbed my whole body and

35

held me down, pushed me into the floor." As Joe was leaving the room, Chris jumped on his back and gave him a "choke hold, he was red in the face, falling down." Chris' mother came into the room and told Chris to let Joe go. Chris complied and Joe grabbed him by the neck and held him up against the wall. Chris states his mom "wouldn't speak up for me."

**Cecil "Cowboy" Prime:**

198.    Lisa was drunk and her girlfriend prevented her from doing anything with Prime on the night they met in a club. However, they began seeing each other and he moved in with her a few months before Massey came back from Germany. She states that Massey was upset with her when he found out that Prime was living with her, stated that it was "out of character for her." She and Massey were divorced by then.

199.    Prime moved in with Lisa because she was leasing a house and didn't think she could afford it by herself. He claimed he was sterile. He wanted to see if it would work out with her kids. "He and Chris butted heads. Cowboy was a redneck and didn't hesitate to say he didn't like Black folks. He rode a motorcycle. He wouldn't allow us to watch BET (Black Entertainment Television) or listen to Black music if he was home. When we went out, I could not dance to songs by Black artists. He and Chris got into an argument about something. Chris went upstairs and was about to slam his door, but Cowboy stuck his foot in the door to stop him. They never saw eye to eye after that. Chris could sense that he was prejudiced. Cowboy and I were not together very long."

200.    Regarding "Cowboy," Dee states, "I hated his guts. I couldn't stand him. He was so full of himself. Said he was some kind of special ops guy. He came to the house a few times and would sit back like he was observing things. He would never let his picture be taken."

201.    Cecil Prime was a racist, according to Chris. "He was a basic redneck, tried to come in the house and run the show." He wouldn't let Chris watch BET (Black Entertainment Television), black shows or videos, or listen to black music. He kicked a hole in Chris' bedroom door because Chris wouldn't listen to him. "He didn't give a damn about me. He acted weird around me, didn't know how to relate. He tried to talk cool with me."

**Lisa's current information and marriage to Richard Brown:**

202.    Lisa has been married to **Richard Brown** since 2-14-98. Their relationship has been problematic for some time, although on the surface, they appear to be getting along fairly well. "Richard was real nice in the beginning. He didn't act prejudiced, was nice to the kids, did things for them. All of a sudden, he decided they were using him and he did a 180-degree turn. When they came to serve the search warrant on Chris, they (police) were just talking to me. I called Rich because I didn't want to be alone and his First Sergeant let him come home. The police separated me from him as soon as I told them that Chris had driven the car

36

here on the day of the murder. Richard went state's evidence on him. He said that Chris put a hit on him, but it was Audrey. I found a letter in her room, that she was going to find one of Chris' boys to kill Richard. Audrey was always writing letters to herself, as a diary of her thoughts. It was just in a notebook. I kept it for a while and threw it away later. I did show it to Rich." According to Lisa, Rich thought that Chris was dealing drugs out of the house. "Rich supposedly broke up a deal in the garage. He also said he found two spoons in the freezer. After Chris' birthday party one year, I developed some film and there were pictures of a bong. Rich did drugs when he was young. He was abused by his father. He is a lot more streetwise than I am. He thinks I am naïve, that my kids are doing things that I refuse to acknowledge, that I let my kids walk all over me." Lisa states, "I never let any man in my life be the authority figure over my kids. They always went into overkill."

203.    Chris states that he and Richard Brown do not get along, although Chris feels that he tried to ignore a lot of things that bothered him, thinking that he would be out of the house eventually (before the offense) and that his mom deserved a chance at happiness. He states that Rich and Audrey have also had problems and one of the reasons Audrey left home was that she and Rich didn't get along; that their mom chose Rich over her kids again. He also states, "Rich doesn't have the heart or the courage to put his hands on me. I honestly think he's scared of me. He would not put his hands on my sister if I was out there."

204.    Dee likes Richard. She states, "I immediately had a gut feeling that he would be good for the kids, but it might have been too late. Lisa would not allow him to be a father figure. Lisa wouldn't back him up. I expected them to split up after the first few years, thought he would have moved on."

205.    Richard states that he and Lisa have difficulties at times, primarily about Audrey. He states that Christopher could be hard to get along with, but "honestly, I have more respect for Chris than I do for Audrey." Richard feels that he and Chris had a good relationship part of the time, that Chris was trying to improve his behavior, helping Rich build the front porch of their house and talking with each other while they were working. Rich feels that Audrey has no respect and is nothing but trouble. He indicates that if Audrey were ever to come back to live with Lisa, he would leave. "That would be the end of it."

206.    Rich is retired from the Army and attending college classes at the moment. Lisa states, "He just quit his second job since he retired." She is not happy about this because she has medical problems affecting her job and is currently on a medical leave because of increased migraines and stress. She feels that "all Rich cares about is whether I will still be getting paid while I am on a medical leave. He is no emotional support to me." She claims that his only response to her medical leave was, "will you still be bringing in some money?" She feels that this demonstrates his lack of compassion toward her and the situation. She will still be paid for her leave, so that alleviates some of the stress between herself and

37

Richard.  She states that when she told Richard she was feeling suicidal, his response was, "If you are so religious, you shouldn't be having those thoughts," or "I can't understand why you are having those thoughts if you are so religious." "Richard is just concerned about his VA stuff, about his back and his disability." She claims that she is "worth more dead than alive, with a $175,000 life insurance policy and the house.  He wants me to keep having income."

207.    Lisa states that she talked with her "shrink" about issues with Richard and the counselor thinks she should consider a separation and divorce.  "I don't believe in divorce, especially in the religion I'm in.  We are just living in the same house."

208.    Her Lexipro has been increased to help her cope with the stress in her life.

209.    "I have thought about suicide many other times throughout my life.  I have been depressed most of my life, just not under a doctor's care for a long time due to a lack of insurance.  Depression runs in the family, but mine is also situational.  I have major depression and PTSD with panic attacks.  My counselor thinks this has nothing to do with PTSD.  I disagree, but he says he's the professional."

210.    Lisa has been having ongoing problems at work.  Her counselor told her, "You can't expect the boss not to go after you if you are fucking with the chain of command."  Lisa claims, "I always win these cases, but hate to go through the mess."  When asked about "these cases," she explains that she has had a few grievance cases with her employer.  She filed an EEOC case after not being promoted and that was resolved in 1996 with a promotion.  Two years later, she received another promotion but it was not the two-rank promotion she felt she was entitled to receive, only a one-rank promotion.  The current case she explains as "more of a whistleblower thing."  Lisa reported her boss for four violations of security regulations.  He is now "retaliating, saying that I am abusing my sick leave, that I don't really have migraines. I have had exemplary reviews, monetary awards, and commander's achievement awards.  There is nothing he can say about my performance."

211.    Dr. Guttakonda in Temple, Texas has treated Lisa for 12-14 years for migraines. When she is stressed, she has more migraines.  At least twice a month, she has such severe migraines that she loses her vision and experiences vomiting.  Her boss is going back two years to try to show a trend in her sick leave, that she consistently takes off at certain times.  Lisa spoke with the union and employee assistance people and they reportedly told her, "It looks bad on him that he's just digging for something."

212.    Lisa works as the Assistant Security Officer for the Operational Test Command of Fort Hood.

**Rowallan's contacts with Chris:**

213. In 1987, while married to Sharon, Rowallan contacted Lisa's sister, Tina, to find out Lisa's whereabouts. Tina let Lisa know and he had a conversation with Lisa. He states that she was "nice" at the time. He made plans to go and see Chris in Killeen. He states that they "chatted a bit, I took him a remote control car, I may have cooked for them because she liked the way I cooked." He states that he still has a picture of that visit. After that, he would call about every two weeks to see how Chris was doing. Lisa moved and gave Rowallan her new address. He called and said he wanted to visit. "I walked in and it was like a storm hit the house. She and her husband were mad. I talked with Chris for five or ten minutes. I came home to find summons all over the door for child support. We went to court. She was hot, walked past me like she didn't know me. I was ordered to pay $300 a month child support. No problem." He then switched jobs to Honeywell. "One day, I called to see how Chris was doing and she was very insulting." After that, he cut off communication. He was not given visitation in the custody hearing.

214. Chris states that he didn't meet his "real dad" till he was 7. He didn't know who he was. His father came over with a woman on Chris' birthday. "I don't know who he is. I remember he bought me a remote control car. It was a really cool car. Mama couldn't afford to keep it in batteries."

215. He has only seen him three times in his whole life. Two of the three times Chris did not know who his father was. There was an occasion in which Chris and his sister were with a babysitter when his father came over, gave him an envelope and told him to keep it till his mama came home. It was a card with $100 in it. There was "no conversation, he just stayed 20 seconds and left." The third time was when he visited Chris for 20 minutes at the county jail (McLennan County, after arrest). Chris related, "I was kinda mad about the visit; he wouldn't answer any questions." Chris wanted to ask his father many things, because he felt all he had heard over the years was his mother's side. He stated, "I don't call him Dad. He didn't do anything for me all my life." Chris wanted to ask him, "why did you beat up my mama? Why did you not want custody?" Reportedly his father stated that Chris was not his child when Lisa went for child support, but when the judge said they would do a DNA test, Rowallan backed down. Chris wants to know, "why didn't you invite me to visit?" He wants to know about his siblings. Rowallan did tell Chris about his older half-sister, Tasha, and his younger half-sister, Vanessa. His father was living with Vanessa and her mother when Chris last saw Rowallan. Chris learned about his half-brother, Thomas, by accident about two years ago. Thomas' cousin got an email from Chris' dad with a website address for death row. Thomas wrote to Chris out of the blue. At first, Chris "thought he was BS-ing, but he was legit." He described Thomas as "a smart kid, about to graduate from high school, lives in Missouri City, TX, with his aunt because he was having problems with his step dad."

39

216.    In 1999, Rowallan was living in Amarillo. He had divorced Sharon and was married to Vidya, but she did not like his daughter, Natasha and they were having serious problems. He got laid off from his job about the same time. Lisa contacted him to let him know that Chris had been arrested. He got in touch with some lawyers he knew in Houston, but was told that Chris' case would cost anywhere from $80,000 to $90,000. He did not have this kind of money. Lisa then let him know that Chris would have some court appointed lawyers. He asked their names and she gave him contact information for Stan Schwieger. He contacted Mr. Schwieger and asked some questions about his qualifications and about the case. He states that Mr. Schwieger gave him very general answers and told him that there was going to be a death penalty expert on the case, someone who had experience with federal cases, but that person was in California at the time handling another case. Mr. Schwieger reportedly stated that he would get back with Rowallan, but he did not. Rowallan attempted to call him once or twice, but did not reach him. Rowallan was not told the name of Mr. Schwieger's co-counsel.

217.    Rowallan went to the McLennan County Jail to visit with Chris. He was given permission to visit for a day since he traveled a distance to see Chris. Lisa was there at the same time but did not communicate very much with Rowallan, He states, "She acted like I wasn't there. This was bad news. I told Chris I didn't know what kind of environment he grew up in. I have bitterness toward Lisa. Chris asked questions but I didn't want to go into problems about Lisa because I knew they were close." Rowallan feels that if he had known that Chris was having problems, in with the wrong crowd, put out of his house, he could have offered some help. He would have taken Chris in if he needed a place. He wanted to be involved in his life but there were so many problems with Lisa that he eventually thought it was best to let it go. His fervent hope was that when Chris was 17 or 18, he would find his dad and they could develop a relationship.

218.    Rowallan states that Chris has been in touch with some of his stepsiblings since his arrest. He has communicated with Devon, Natasha, Thomas, and Vanessa. It is difficult for him to maintain contact because of his situation, not being able to use the Internet and so on. Rowallan also feels that some problems were caused because anything that Chris' siblings told him, Chris would then repeat to his mother and Lisa would tell Vidya.

219.    Rowallan reports that most of his family in Trinidad do not know of Christopher's situation. Rowallan feels that it would be difficult to talk with them about what has happened. No other family members have been in trouble. He states that Chris' siblings have had a hard time knowing that Chris is in prison and about the circumstances Rowallan states that Chris told him that he(Chris) did not like the men coming in and out of their home and that he would fight with them. Chris reportedly told his father that he has a weakness for taking orders, being ordered around (that he doesn't like this). Rowallan has questions about the offense; he

40

asked Chris why he did not run away from the situation? "I never knew there were problems. I would have tried to get Christopher. There are problems with the court appointing which parent gets the child. If child support is being paid, there should be some kind of audit to see how the money is being spent. I couldn't claim Chris on income tax because Lisa was, even though I was paying support. She wanted the child support money, but she needed parenting herself." Rowallan states that he heard that Chris wanted to see him when he was 14, but his mother wouldn't let him. "I didn't want to rock the boat. I thought one day Christopher would find me. I'm blaming myself. I should have been more involved."

220. "There's one thing in life you want to establish and that is a reputation. But not a reputation of violence, one you can be proud of. I tried to instill that in my kids."

**Chris' relationship with his mother:**

221. Chris states that he has a "good relationship" with his mother, "but it is weird at times." When he was age 7, "the rent money came up missing." His mother accused him of taking it, but he had no idea where it was. She accused him for a long time, but it eventually showed up. "She knows I am a hooligan, but she loves me anyway." Still, she thought that he did the wrong thing at times. "She was rough on me at first but got lenient later." They always had a close relationship. "She would confide in me." "I can talk with her about anything, although I <u>don't</u> always do that. There have been times I have been mad at her, when she gets in these relationships and blames me if there are problems." When Chris got kicked out of the house before the offense, "she said she would kill herself if Rich (stepfather Richard Brown) left her over my behavior." Chris felt that his mother would take the side of men over him. "It would irk the hell out of me." He stated, "My mama could do no wrong in my eyes. She's not like that, would choose someone else over me."

222. His mother told him that he was the man of the house when she divorced Audrey's dad. He took that seriously. When his sister started junior high, she "was boy crazy" and couldn't be found at times. Chris always had to be the one to go and find her, rather than doing what he wanted to do.

223. He stated he had to "take out the trash, clean up, take care of Audie; when do I get to be a kid?" Later, he started doing what he wanted to do and felt like he had earned it. He would sometimes think, "It is her (mom's) job, why do I have to do it?" Sometimes he wanted to do something with his friends but his mom was going out to the clubs. "Sometimes I liked the responsibility, but I got all the chores without any of the rewards. I really just wanted my mom to be home because we didn't see her much and she would be mad when she got home. She had a headache and didn't want to hear your voice. She hasn't seen you all day, but your voice annoys her as soon as she gets there. She was always mad, angry, stressed out, her feet hurt. As soon as she got home, I'd leave the house."

41



224. "I was so tired of being in the house, I wouldn't go home till all my friends had to go home. Sometimes, I'd go to my friends' houses so I wouldn't have to go home. I would walk around looking for trouble. I would feel like a caged dog let out of a kennel, would run amok."

225. "I've been mad at my mom plenty of times but I always forgive her. Sometimes I think I hate her or want to hate her but then I think about all of the things she sacrificed to keep us alive. I hate it that she is weak, a pushover, lets men take advantage of her. I dislike that about her. She would give them too much power, would give them reign over her castle."

226. Chris states that sometimes he felt that his mother put herself and her needs first instead of her kids. He and his sister would bad-mouth her behind her back. He states that his sister "holds it against her (their mother)." He states that his mother says she doesn't think Audie loves her, but is maybe finally finding a way to love her. He states that his mother thinks her relationship with Audrey is improving, but Chris has his doubts.

227. His mother always says that he is her favorite child but he doesn't like to hear it. He doesn't remember his mother ever apologizing for her behavior. "She will cry sometimes on the phone if I bring anything up. She still hurts for some of the things she's done."

228. He recalls that when he was 9 or 10, his mother "came home pissy drunk. Her friend Diane brought her home, took her in the bedroom and laid her down. She tried to hug me but walked right past me. She was talking crazy. She has often told me that she wanted to die back then." He states that he didn't see her that drunk again. Sometimes he could tell she'd been drinking. "She said she didn't drink much, couldn't afford it."

229. On one occasion, the school called Child Protective Services. Chris had received a progress report and "tried to slip it to Mom real quick in the morning when she was busy; thought she wouldn't notice, just sign it." He reports that his mother "was really mad; I had never seen her so mad. She whipped my ass good with my belt; I was jumping all over the bed trying to escape." He was wearing shorts and the teacher noticed welts on his leg. She sent him to the school nurse, who called CPS. He remembers being "terrified," but not scared of being taken away, scared that his mother "would be even more pissed and whip my ass again." He reports that his mother "did whip me again for reporting to CPS."

230. Chris states that his mother "was good at ass whipping." He remembers one time when he was 9 or 10 when his mother sent him to his room "to put on as many pairs of pants as possible." He can't remember why he was in trouble. When he came out, she made him pull down each pair of pants so he could have "a bare ass whipping."

42

231.   "She's very fanatical about the religious thing now.   Some kind of Messianic Jews.   This has been since I got locked up.   She seems to do certain things because of me.   They had some kind of pageant and she dressed up like an African queen.   I was thinking, 'don't let her go in Black-face.'"

232.   He describes his mother as "square as a pool table and twice as green."   Once she found a small pinch of weed in his room and jumped to the conclusion that he was selling drugs.   He is not sure if she knew about his smoking pot.   She didn't know he was carrying guns till he got the weapons charge.

233.   They had difficulties when he was a teenager.   He caused problems with her boyfriends because he did not want them around.   He wanted to go out and do as he pleased without abiding by rules.   He felt that he was always in trouble for one thing or another.   When he was kicked out of the house prior to the offense, he didn't know what to do.   He had always been the protector of his mother and his sister and then he felt as if "my services were no longer needed."

**Education:**

234.   Before Chris was school aged, Lisa was not working outside the home and spent a good deal of time with him.   Lisa bought Chris a set of encyclopedia with a learning system, spiral books with a "magic pen."   He would touch a square to give an answer and the correct answer would cause the pen to light up.   She states, "this held his interest and I worked with him extensively.   He was way ahead in Kindergarten."

235.   Chris began Kindergarten in Germany.   He was tested to have a high IQ and wanted to go into the Talented and Gifted program, but they moved back to the US.   After the family returned to the States, Chris started exhibiting signs of ADHD.   His Kindergarten teacher in Killeen was "constantly putting him in time out."   Lisa felt that the teacher was prejudiced against Chris.   The teacher was white, but the principal and assistant principal were both Black females.   Lisa went to talk with them and they would tell her they "just didn't know what Chris had done this time."   Lisa feels that the teacher just didn't want to deal with him.   Lisa told the school, "If I get one indication that this is racially motivated, I will have your job."   Chris continued to have problems the rest of the year. He kept getting sent to the office "but no one knew why.   He would be in the principal's office with no note, no real reason, two to three times a week."

236.   **Mrs. Ingrid Weeks** was Chris' Kindergarten teacher at Peebles Elementary.   On his report card for the 5th Six Weeks, she noted, "Chris needs to listen and control his talking."   He received grades of S (Satisfactory) and S- in all subjects: Language Arts, Math, Social Studies and Science.   In Citizenship, he received N (Needs Improvement) in participates in class, controls talking, listens, and follow directions.   He received S in demonstrates acceptable work habits, takes care of

43

materials, demonstrates good citizenship. He had mastered virtually all skills expected of him in Kindergarten.

237. Chris states, "School was all right. It was weird there. I was the only bi-racial kid in my elementary school in Killeen. Kids ask you questions like, 'what are you?' I didn't say nothing at first. I told my mom and she said, 'tell them you're special.'" He laughs and says, "I didn't think that would get me no place."

238. According to records, as well as discussions with Lisa, Chris and others, Chris had difficulties in school from the beginning. Although he could usually do his work, he had trouble paying attention, completing his work, and was disruptive in the classroom.

239. His second grade teacher tried to flunk him "because she was racist." He had good grades on his papers, but his report card "was bad." His mom would confront the school about it. He may have been pulled out of school for a couple of days, but completed the year in the same classroom.

240. Chris changed schools the next year. His mom was dating a pilot and she took over his lease when he moved away.

241. In third grade, Chris loved his teacher, **Ms. Dodgrill.** "She was nice. She was diabetic and would eat in class. I got put in a 'special desk' where they seclude you because I talked a lot."

242. In February, 1989, Chris mastered all sections of the Grade 3 TEAMS statewide standardized test, which includes math, reading and writing. He was at Bellaire Elementary at the time.

243. Chris' fourth grade teacher was **Mrs. Walker.** She was also "very nice." Chris reports that he "got in a lot of fights that year, race crap again." There were some "Mexican dudes" who thought he was Mexican but wouldn't admit it. One of the Mexicans had a girlfriend who liked Chris. At recess, Chris was pushing her in a swing and her boyfriend got mad, so they had to fight. But still, he felt that this was "a good class." He met Jonathan Walker, the first other biracial kid he ever met. He describes Jonathan as " a big, tall, fat kid." They met because they were both being paddled at the same time.

244. In fifth grade, Chris was in **Ms. Campbell's** class. He states that she was "very old, burned out, strict, don't talk to nobody." "I would get fidgety, antsy, didn't want to sit still." He was put in a desk in the back of the room by a bookcase for months at a time. For every hour he was quiet, he would earn a chip. The teacher put an hourglass on his desk. If he earned enough chips, he could buy "stuff like protractors, stupid stuff." He states that he didn't care about the rewards, but thought if he "accumulated enough chips, she would let me go to my normal desk." One time, he jumped up on his desk and gave her the finger, but she didn't

44

see him. Another student told her about it and he was taken to the principal. He reported that in fifth grade, "the school was getting tired of me. They were glad it was my fifth grade year."

245. Chris was tested for ADHD in his fifth grade year, when Lisa finally had insurance. He was put under 504 modifications. Lisa also recalls that his 5th grade teacher put Chris at a desk on the other side of a bookshelf all year. "She darned near retired over him, he tried her nerves so bad."

246. In October 1990, Chris took the Grade 5 TEAMS statewide standardized test. He mastered the reading and writing portions but did not master the math portion of the test. Also in 5th grade, Chris was administered the Metropolitan Achievement standardized test. He achieved a National Percentile of 53 in Total Reading, 72 in Total Math, and 90 in Total Language. His National Percentile rating for the Basic Battery of tests was 75 and for the Total Complete Battery, it was 81. His National Stanine Score for Total Reading was 5 (average), for Total Math, 5 (average), for Total Language, 8 (above average), Total Complete Battery, 7 (above average).

247. Throughout elementary school, Chris' report cards indicate fairly good grades, from A's to C's for the most part, but his behavior continued to interfere with the teacher's ability to maintain order in the classroom. He was regularly disciplined for talking too much, not completing his work, having a bad attitude, and disrupting class. It does not appear that serious efforts were made to address these issues, other than punishing Chris and reporting to his mother.

248. At the same time, Chris was recognized for awards and honors during his early school years. In 1987, he received a "Happy Gram" congratulating him for making the A and B Honor Roll for the 4th Six Weeks. He was also given a service award that year.

249. In 1988, he received Certificates of Honor for Service and for Outstanding Attendance.

250. In 1990, Chris was awarded a certificate for Outstanding Volleyball Skills, and a certificate for completing Basic First Aid training from the Red Cross.

251. In May, 1991, Chris received a certificate for reaching the attainment level of performance for physical fitness by the Amateur Athletic Union of the US. That year, he also participated in the Friendship Festival at Nolan Middle School.

252. In 1992, he received a Certificate of Merit for grade improvement and was honored with an athletic award for being the runner-up in a 3 on 3 contest.

253. In sixth grade, "the school was starting a crusade to get me to alternative school." He was "disruptive, interrupting, talking, being a clown." He started playing the

trumpet in the band. He reports that he loved band, that playing an instrument came easily to him. He was "first chair" all year. He states, "kids tend to enjoy things they are good at." He would learn a song quickly and then want to goof off. The band director was a "big, fat white guy with glasses. He could play every instrument. He was good." However, the band director "would be in another part of the room and still know I was the one messing around."

254.    In Sept., 1992, Chris was given Detention for disrupting science class and having a rude, agitated response to the teacher.

255.    Chris wanted to be in the symphonic band in 7th grade and felt he was entitled to be there since he was good at his instrument. However, the band director stated that he clowned around too much and he was going to put Chris in the concert band instead, which Chris considered an insult. At the same time, Chris wanted to play football. Since he couldn't be in symphonic band, he quit band altogether to concentrate on football.

256.    In Feb., 1993, Chris was given Detention for disrupting science class and then taken to the Discipline Council for a hearing for continuous disruption, defiance and negative attitude.

257.    In 8th grade, he reports that he got into a fight and cussed a teacher out twice, either cussed one teacher out twice or cussed two teachers out, he can't quite remember. There was a teacher who had kicked Chris out of his 6th grade class and then he had him again for science in 8th grade. Chris was put into on-campus suspension several times that year.

258.    "Things started changing in 9th grade." He was playing high school ball, "trying to get older girls." He was still small and "didn't get much play." He had a great Spanish teacher, described as "the best teacher I ever had." He remembers having a 100, a 99 and a 98 in her class over three 6-week grading periods for the first semester. Then he had a "bogus" teacher where the class was "crazy, chaotic, everyone talking and laughing." He met two girls named Jessica and Michelle. "Jessica was very fine. They were tall girls. I was barely 100 lbs. at the time. They were cool." He felt that he could get away with a lot more in that class because the whole class was so rowdy. The teacher would confiscate things from the kids and put the items in her desk. Later, Chris would steal the items back and give them to the students. He states that he clowned too much and stayed in trouble.

259.    In high school football, there were two teams. Chris was "last string on the #2 team." The coach decided to make a third team, so he was put on the #3 team, "the gray team." Chris states that he understands now his coach's motives, so that every level of player could get some playing time, but it was embarrassing. He states the coach said about Chris, "He has the heart and is fast as greased lightning, but he is so small." Chris felt that the coach did not take him seriously.

.46

"We would get crushed every game. I didn't get to play much." Chris quit football his sophomore year. He would get into trouble in class and then his coach "had wild punishment." He would make Chris run a certain length of the field and do somersaults with all of his gear and pads on. He would make him roll down the field.

260. Chris states, "I was acting a fool in class." He then transferred to Killeen High his junior year. He wanted to play football again. He states that the guys on the Killeen High team didn't like him too much because he had transferred from Killeen Ellison, which was a cross-town rival. The Killeen High coach reportedly called Ellison and Chris states, "I am not sure what the (Ellison) coach told him, but the new coach said I couldn't play." "There was a lot of favoritism. If you were not on Varsity, you got treated like crap." Chris reports after that, "I just became a full time knuckle head."

261. He failed his sophomore English class at Killeen High. He stated that he showed up late for class and the teacher called him "Christopher," which he doesn't like except from his Mama. He said, "Huh?" She said, "You don't say that...." He told her, "You are here to teach me English, not manners." She sent him to the principal. He had her again in summer school and "she was nice then."

262. In March 1996, Chris took the exit level TAAS standardized test. This was required for all students to graduate. He mastered the writing portion, but did not master reading or math. He had difficulty with word meaning, relationships and outcomes, inferences and generalizations, addition, subtraction, multiplication and division, problem solving using solution strategies, and problems solving using mathematical representation. On the reading portion, Chris scored a 64, with a score of 70 needed to pass. In math, he scored 64, also needing 70 to pass.

263. In October 1996, Chris retested the exit level TAAS. This time, he did master reading but again did not master the math portion, though he did improve his score to a 67. He had difficulty with algebraic/mathematical relationships and functions, geometric properties and relationships, probability and statistics, subtraction, division, evaluation of the reasonableness of a solution.

264. On 12/3/96, a meeting was held regarding Chris' enrollment in the 504 Program. His modifications were documented as follows: Chris would have shortened length of his tests, and teachers would provide positive reinforcement. He would try to keep a notebook for his parents and teachers to sign (there are no specifics for this so it is unclear if it is related to having assignments finished, behavior, or both). He was to be referred to Communities in Schools, which provides counseling and other services to students. Teachers were to be notified of his diagnosis of ADHD. If he got out of control, teachers were to send to the guidance center or allow him to step outside of the classroom for a short time to cool off. Teachers were also to be notified that Chris had a bladder problem and should be allowed bathroom privileges as needed.

47



265.    Every time there was a problem, the 504 Committee would meet and Lisa was told that his behavior was not related to his disability. He would then be sent to a disciplinary council. Lisa reports that Chris' teachers told her that they never read his 504 papers or put his modifications into place.

266.    In high school, Chris' behavior deteriorated severely. In 10th grade, he had nine violations of the Student Code of Conduct, usually involving disruption of class, insubordination, rudeness to teachers, or not following instructions. He was disciplined with two Saturday Detention Hall placements and with on-campus suspension twice. In 11th grade, he had many infractions and placed in on-campus suspension three times, then suspended from school twice. He was identified as a "gang affiliate." He continued to cause disruptions in the classroom and on the school bus, cursing, refusing to follow instructions, and continually talking and interrupting his classes. The 504 Committee met and determined that "this student has a handicapping condition which adversely affects a major life activity which requires modification of the educational program."

267.    Although the school officials documented that Christopher did, indeed, have a disability under federal anti-discrimination legislation, and modifications were in place for working with him, there is little evidence that any consideration was given to his disability when considering his behavior at school. There were several "Manifestation Determination" meetings held, in which the student's disability is discussed and a determination made if the behavior was related to the disability. Although it seems obvious that at least a part of Christopher's acting out behavior was related to his diagnoses of ADHD and/or ODD, as well as possible other mental health issues, each Manifestation Determination meeting ended with the conclusion that Chris' behavior and disability were not related. Therefore, he was subject to the same rules as any other student and was disciplined accordingly.

268.    On 5-8-97, **Katie Bernstein**, Section 504 Coordinator, sent a letter to Lisa Brown requesting updated medical information regarding Christopher's disability. On 8-21-97 Ms. Bernstein sent a second letter to Lisa Brown requesting updated documentation of Christopher's disability and notifying her that an eligibility meeting would be held on 9/3/97. On 10-15-97, Ms. Bernstein sent a letter to Lisa Brown informing her that the 504 Committee met on 10-8-97 and was recommending psychological testing of Christopher through the Special Education Department, since his previous medical and psychological information was four years old. Chris' mother was not present at the meeting.

269.    On 12-9-97, **Michael E. Campbell, PhD**, provided testing to the Killeen Independent School District to determine if Chris was eligible for Special Education based on an Emotional Disturbance. Chris was described as "temperamental and moody, disrespectful toward adults, having poor temper control, poor peer relationships, irritable and easily annoyed, decision making skills are poor, refuses to comply with adult rules and requests, angry and

1653



withdrawn, uncooperative attitude, aggressive with peers." He was found to meet DSM IV diagnostic criteria for Oppositional Defiant Disorder, Severe, and ADHD. It was recommended that he would function best in a highly structured classroom with an emotionally supportive teacher. "Discipline and corrective statements should be administered in a calm manner with specific expectations. He may benefit from access to a school counselor to address anger issues and improve his social skills. There was evidence of homicidal ideation, which should be monitored. He reports being kicked in the head during a fight and feeling disoriented." On the Projective Drawings, Chris' placement of the figure indicates aggressive tendencies, feelings of inadequacy, dependency, assaultive tendencies and a need for physical power. Campbell concluded, "Chris is in control of his behavior and chooses inappropriate means of getting attention." At the time, he did not feel that Chris met the criteria to be classified as Emotionally Disturbed for school district purposes.

270. On 1-5-97, a Comprehensive Individual Assessment/Determination of Eligibility and Educational Need meeting was held at school. "Based on the information collected, the student's in-school and out-of-school behavior does not appear to influence his educational placement and programming and ability to follow school disciplinary rules." Chris had a Full scale IQ on WAIS III of 101. (Verbal 100, Performance 102). "His potential for academic achievement should be average. He does not appear to meet eligibility criteria as a handicapped student."

271. On 1-21-98, a Special Education Admission, Review, Dismissal meeting was held. Christopher was not found to be eligible for Special Education under the rules for that service. Although Dr. Campbell found Christopher to have diagnoses of ODD and ADHD, he did not find him eligible for a label of Emotionally Disturbed, which would have qualified him for Special Education. Chris continued to be carried as a 504 student, entitling him to special modifications which did not appear to be put into place with any regularity or consistency.

272. On 2-13-98, Chris had another student hearing for seven infractions of the Student Code of Conduct, including insubordination and ongoing disruption of his classes. It was determined again that Chris' behavior was not related to his disability. On 2-20-98, he had a campus level hearing for repetitious misconduct, was expelled for two days and sent to the Alternative Center in Nolanville from 2-23-98 for the rest of the school year.

273. While at the Alternative Center, Chris continued to have difficulties, and was brought to another hearing on 5-14-98 for 12 more infractions of the same sort, disrupting class, and being insubordinate. He did complete several of his academic classes while at the Alternative Center and maintained good grades.

274. The following school year, Chris was arrested for assault with a deadly weapon and was reassigned to the Alternative Center again because of his arrest. He was there from 11-4-98 until 3-11-99. By 3-1-99, he had been charged with twelve

49



more infractions of the Student Code of Conduct. He returned to Killeen High on 3-11-99 and was suspended for three days on 3-26-99 for gang affiliation. On 4-6-99, he had another hearing for eight infractions and was suspended pending a Due Process Hearing, which was held on 4-12-99 for repetitious misconduct. He was returned to the Alternative Center. Chris completed the requirements for high school graduation but was not allowed at school events, including the graduation ceremony.

275. Chris explains that he was kicked out of high school three times. At the first of his senior year, there was a drive-by shooting. He was there, but he was not the shooter. He was charged with aggravated assault with a deadly weapon. It was school policy that he would have to go to alternative school for nine weeks. He stated he was there longer than nine weeks because he was sent in the middle of a grading period.

276. The second time he was kicked out was because he was "disrupting class too much" and the teacher heard him cursing.

277. The third time, he had just been back from alternative school for about a week. There was an assembly and he wouldn't sit with his class, was sitting with a girl instead. Her teacher noticed and wanted to take him to the office. "He put his hands on me, wanted to call the campus police." The next day, the campus police, vice principal and that particular teacher came up to him and said he was threatening a student in the hallway. There was a campus level hearing. He was kicked out of school. His mom threatened to sue. He was told "you can have your diploma, but never set foot on campus again." He couldn't go to any school functions. He didn't go to graduation, but did graduate.

278. When Chris attended the Alternative Center, Lisa states that he had a 97 to 98 average. She was told she should just leave him there "because he's doing so well." Chris was sent to Alternative School over outbursts in class, "not anything violent." Lisa states that she had to pay an $85 fine twice because of his behavior at school. She went before a judge and explained what ADHD was. The judge reportedly stated that that changed the picture and gave her a lesser fine. She feels the school should have notified the judge that Chris had ADHD. She states, "They were looking for negatives because they thought he was gang related."

279. **Elaine Clark,** school counselor, was responsible for Chris' school schedule at the Alternative Center, and for discussing his behavior with him as needed. She states that she had several occasions to speak with Chris about his behavior on campus. "He was disruptive, disobedient, insubordinate, not a well-behaved boy." She describes Chris as "very spoiled." When asked in what way, she states, "His mother was always interceding for him." Ms. Clark had several occasions to interact with Lisa Brown and describes her as "very defensive of Chris," and that Lisa "felt that his problems were due to attention deficit."

50

280.  Chris is described as "a very bright young man who did never did try very hard." He was a "negative leader," which Ms. Clark defines as "having leadership abilities but not using them in a positive way." Some of the other students looked up to him and followed his lead, but this was related to problem behaviors such as disrupting class. "He was smart and could have done many other things, but chose not to."

281.  Ms. Clark states that she felt at the time that Chris would end up in some kind of trouble if he didn't get himself under control. She states that she would have remembered him even if there had not been a trial because he was in trouble quite a bit. She feels that he blamed everything on others and would not take responsibility for his own behavior. "Nothing was ever his fault." He could control his behavior if he wanted to do so, and she saw him demonstrate this on some occasions. She feels he was very much involved in the gang life and that his gang was a "real" gang. She did not see any evidence of mental health issues. She states she cannot recall any concerns about drug or alcohol abuse.

282.  Ms. Clark feels that it is tragic to see Chris' life wasted, but that he made the choices that got him where he is today. She feels that he was unable to accept responsibility for himself and constantly wanted to blame others for his problems. She feels he may have gotten this from his mother.

283.  The Alternative Center serves a range of 50 to 130 or 140 students at a time. All come through a disciplinary hearing at their local school district. They are referred for three reasons: repetitious misconduct, drug and alcohol related offenses (possessing, using or selling), or violent/dangerous misconduct, including felony arrests. There are ten teachers at the Alternative Center and students are taught all of the subjects they will need to graduate. Many of the students are talented in art, writing, and athletics, but cannot make it on their home campus because of behavior. The school serves all academic levels, from students needing "life skills" classes to those who were in Talented and Gifted or Advanced Placement classes. The majority of students only attend one "session" and then never come back. A session consists of the nine-week grading period when a student is referred, and the nine-week period following, so the length of time will vary, depending on when the student was referred. To return to his or her home campus, the student must be passing five classes, have good behavior and have good attendance (as defined by state guidelines). If a student cannot control his or her behavior, an expulsion hearing is held and he or she may then be sent to the Juvenile Justice Alternative Education Program, which is more restrictive.

**Friends:**

284.  **Jayre Sherrod** was a friend in middle school. He and Chris met in elementary school; Jayre had been held back in 3rd or 4th grade. They played kickball and baseball together but drifted apart when they got older. In 7th or 8th grade, Chris

51

had a girlfriend named Victoria. She was friends with another girl named Nicole, who was a friend of Chris'. Nicole's mother was the leasing agent at the apartment complex where Chris lived at the time. Chris saw Vicki hanging around with Jayre and another guy. Jayre said he had sex with Vicki. Chris was still a virgin. When he heard this, he stated, "I acted like I wasn't mad, but I really was mad." He and Jayre went to the store to get some sodas. Jayre went to his house and Chris went home, then later went to the park, where he saw Jayre with Vicki. "I was so pissed." He didn't do anything at the time. Jayre came over "and cracked a couple of jokes with me." Chris left, but they were not close any more after that.

285.   In 7th grade Chris liked a girl named Janae "a whole bunch." "She was the finest girl in school." She lived two buildings over from Chris. Chris had a new best friend named Steven Cooley and Janae lived across from Steven. Chris introduced himself to her and started visiting her on a daily basis. They never did really get together. She came to a pool party the summer before they started high school and admitted she had had a crush on him, but she moved away before school started.

286.   He went with a girl named Bianca in 6th and 7th grade, on two different occasions. Then he went with a friend of hers, a girl who was "the tallest girl in school." He was only 4'11" himself.

287.   Chris recalls his "homeboys" and good friends from middle school, James Davidson, called "Cat," and Jacoby Smith, called "Bird." He and "Bird" were real tight in football and had classes together. They got to be better friends in high school. The three of them hung out in high school, lived in the same general neighborhood and rode to school together. Jessica Haskins was also a good friend in high school. Jenell Hamilton was Chris' last girlfriend before he was arrested.

**Jacorby "Jay" Smith**

288.   **Jacorby Smith** met Christopher Vialva at Nolan Middle School, in 6th or 7th grade. They both played football and started "chillin" at school. Jacorby then moved to the same neighborhood where Chris lived so they started hanging out with each other outside of school as well. They continued to be good friends until Chris moved from the Willow Springs area to another part of town (where his mother and stepfather still live, on Kim St.). Jacorby states that they were still close at first and Jacorby would come to pick Chris up so they could do things together. But after awhile, Chris started hanging around with another crowd, the "gang." Jacorby did not like those guys and didn't see any point in the "gang" stuff. He states, "I didn't think it was a real gang. It just seemed like a bunch of punks. I've been to Dallas and seen a real gang."

289.   He states that Chris was always a good guy and was never the type to act like he was "so bad." One time, they had an argument and Jacorby threatened to beat him up. Chris just left, like he didn't want to fight. They could never stay mad at

52

each other for long. Jacorby didn't take the gang stuff seriously. He thought it was "a bunch of crap." He told Chris it was stupid to be fighting over colors, red or blue, who's wearing what. "You are fighting over a crayon box." He also told Chris that he (Jacorby) and some of their other friends were "already in the biggest gang at school...the Varsity football team," so didn't need the gang involvement. Jacorby feels that maybe Chris just wanted to be a part of something, belong to something. He had been an "all right" running back when he was younger, but he didn't have much of a chance to play football in high school and stopped playing.

290. "He was always a good kid coming up. We would play football, walk around, go to the mall. We always had good times, would spend two hours at the mall talking to girls. All was good till he moved across town. He never got into major trouble till he moved. His mom moved them because she was trying to get Audrey away from a boy, but she sacrificed Chris." Jacorby states that there are some problems in the Willow Springs area, but the part of town Chris moved to "was known for stuff going down, drugs, gangs, etc. They had the Long Branch Crips. Things got worse...you move away from your friends..."

291. Jacorby remembers that Chris had some arguments with his mother and sister, but nothing that seemed out of the ordinary. Chris was very overprotective of his sister. Chris seemed to get along okay with his stepfather. He may have sometimes been depressed but he didn't talk about things with his male friends. He didn't know his biological father much and said he had a lot of brothers and sisters he didn't know. But he didn't talk about his problems, didn't want to seem "soft" around his homeboys.

292. Jacorby knew that Chris smoked cigarettes but didn't think he used drugs or alcohol much, if at all. He didn't realize that Chris had been kicked out of his house prior to the offense, but thinks that could have been depressing to him.

293. The offense was a shock to Jacorby. He states, "I never thought Chris really had the guts to do something like that." Jacorby was home from college for the summer, working at a day care center. He went to a convenience store to get gas and ran into Chris and some of Chris' friends. They were talking about how they hadn't seen each other in a long time, etc. Chris told him he was about to go on a "paper chase." Jacorby states that this means he was going to get some money, but "it doesn't mean that he's getting it from an ATM." Jacorby thought maybe he was going to sell some marijuana. Jacorby didn't recognize the car. "It was burgundy or red, like a Cutlass or a Buick type car." Another young man was outside the car and two were in the backseat of the car. Jacorby didn't know any of them except Chris. The guy on the outside had a can of lighter fluid. Chris was calm, didn't appear nervous. Later, their friend James Davidson told Jacorby that Chris was arrested for a carjacking. When Jacorby first heard the news about the murders, he didn't even realize that it might have been related; he thought they were two different incidents. He heard that Chris was accused of being the

53

triggerman, but Jacorby states, "I couldn't believe he could do that. I wouldn't think he'd have the guts."

294.    Jacorby attended college at Troy State University in Troy, Alabama. He completed a bachelor's degree in criminal justice in 2002. He also went on to one year of graduate school in criminal justice at Troy State before returning to Killeen in 2003. He is currently enrolled in the Police Academy in Killeen. He is not married and has no children.

295.    He has not had any contact with Chris since his arrest. He wants Chris to know that he is praying for him and that he's "got his back, no matter what."

296.    In discussing his friendship with Chris, Jacorby states, "if he hadn't moved away, he wouldn't be in this situation now." Jacorby states that he (Jacorby) was the leader of their foursome of friends and that he "would have kept Chris in line." Chris was the kind of guy who might suggest an activity but he could be overruled by his friends and Jacorby would ultimately make the decision because he was typically the only one with a car. He feels that Chris lost his way when he could not see his old friends as much and didn't have someone like Jacorby to help him make good decisions. The other three guys in their original group of four, Jacorby, James and Cedric, have all ended up doing well with their lives. James is married, with three children, and works as a security guard. Cedric is attending college in Utah on a track scholarship. Although they did not live in the best neighborhood, either, they were able to keep their goals alive and to pursue a better life. Jacorby feels that Chris would have been able to do the same if he had stayed with them. He states that there were gangs in Willow Springs, too, so if Chris really wanted to be in a gang, he could have done that there just as easily. But once his support system was gone, he was more susceptible to joining a gang to "belong."

**James Davidson**

297.    **James Davidson** moved to Killeen from Oklahoma in 1985. He met Chris in 6th grade in 1994. James got into a fight with another boy and then Chris started talking to him. At one time, they liked the same girl. Chris lived across town at the time and it was a good walk so they didn't see each other much outside of school at first. Later, Chris moved to the Willow Springs area, where James was living, and then they were only about three blocks apart. They hung out together all the time after that (probably about 9th grade). They would play football and go to the mall together. Around 11th grade, Chris moved again, out of the Willow Springs area, and they would still see each other some of the time, but Chris started having other friends.

298.    He and Chris had good times, "chillin' at the house," hanging out, before Chris moved. He hadn't really been into any big trouble at that time. "He was the smart one." James is not sure if he smoked or drank; he states that he never saw

54



it. He never saw Chris act violent. He states, "Chris was a wimp. I can't even see him being violent."

299. Sometimes Chris would be upset about his dad not being there, about having to protect his sister. Sometimes he had arguments with his mom. A lot of times, he just stayed at home, playing Sega or Nintendo. He seemed to be "cool" with his step dad, Rich, and Rich would sometimes talk with the other guys when they were at the house.

300. Once at school, Chris said he had to use the bathroom and the teacher wouldn't let him go. He kept saying he needed to go, so the teacher told him to go in the trash can, which he did. James thought this was really funny. They had "fun times" together as kids. They have an audiotape of all of them "riding in a jeep, laughing and talking, eating chips, farting. Just having fun being together."

301. Chris seemed to be a happy person most of the time. Chris was the kind of person who could "drink all night and then take a test the next day and make a 95 on it. He could run ten miles and get tired, but still lift weights afterwards."

302. James felt that something bad might happen someday because of the gang stuff. He heard that the woman (victim) was trying to talk Chris out of it, reading the Bible. James thought Chris didn't really want to do it. He was maybe forced into it, though James is not sure who would have forced him. James knew the other guys by face but didn't know their names. "This just doesn't seem like something Chris would do."

303. The night before it happened, their friend Jacorby Smith ran into Chris at a convenience store getting gas. Chris said they were "gonna run a paper chase." James states that he doesn't know exactly what that means. James thinks now that the people might have already been in the trunk of the car. But he says, "Chris ain't that crazy. He wouldn't do something stupid like that."

304. James states that he, Jacorby Smith and Cedric Young were Chris' best friends. Before Chris went to court, Jacorby told James that Lisa Brown did not want James to testify. James states, "I thought that was rude. I was pissed off. I almost wanted to punch her out." He thinks Lisa thought he was not sophisticated enough to sound articulate. He states that he laughs easily when he is nervous or the subject is difficult, so maybe Lisa was afraid he would laugh on the stand and it would look bad. Sometime in 2000, he was at Lisa and Richard's house and wanted to bring it up, but he didn't.

305. James has not been in touch with Chris for a while. He tried to visit him in Belton, but for some reason, he couldn't get on the visitation list. He sees Chris' sister Audrey at times and tells her to tell Chris hello for him. Chris did call him once in 2002 and James was surprised to hear from him.

306. James attended Mary Hardin-Baylor University for a year. He burned up the engine on his father's car, so returned to Killeen and attended Central Texas College, but didn't finish. He was taking computer courses. He has had several jobs over the past few years; worked at Wal-Mart, Hobby Lobby, at Ft. Hood. He has been on his present job at Texas Star Security for about four weeks. James' wife, Deanna, is a homemaker and they have three sons, Daelen, age 4, Donovan, age 2, and Jaeden, age 4 months.

**Benjamin Sims**

307. **Ben Sims** met Chris Vialva in 1995 or 1996, when they were in 10th grade in Killeen, Texas. Ben had been living with his mother in the Dallas area and did not get along with her new boyfriend. He went to live with his uncle, Eric Sims, and Eric's wife in Killeen. Ben thinks that he may have met Chris at a basketball game. They became friends and started hanging out at school. He states, "we were best friends, hung out together before, during and after school in our 10th grade year. I would pick him up every morning for school. We just hung out, dated girls who were friends, sometimes went to play pool." In 11th grade, Ben got in trouble at school for fighting and went back to live with his mom. One of his uncle's rules was that he could not get into any trouble at school, so he had to leave his uncle's home. Ben laughingly states that Chris was accused of being in the same fight, but Chris was not even with him that day.

308. Ben states that he never saw Chris initiate any violent behavior. He would get into fights at times, but only if someone else instigated it. Ben states that they knew people who were in gangs, primarily "Bloods," but Chris was not involved in a gang at the time they were friends. "We didn't know any 'good' kids; fell into the wrong crowd and it was hard to get out."

309. According to Ben, Chris had no issues with being a bi-racial individual. Ben does think that Chris was depressed at times and remembers that he did have problems with his mother once in awhile, but nothing Ben considered serious. Ben recalls Chris' sister, Audrey being "in and out of trouble, mostly with guys." Ben and Chris had plans for Chris to move to Dallas with him, finish school and both of them would join the Marine Corps. "We both just wanted to get the hell out of Killeen." Later, Ben finished high school and joined the Marines at age 17, but Chris was on probation and couldn't join.

310. It was shocking to Ben to learn that Chris was accused of such a crime. Ben had left for the Marines and was in Pensacola, FL when he heard of Chris' arrest. "There's no way in hell he would do the things they said he'd do. He was probably the most nonviolent person we hung out with. He was the last one you would expect this from. He didn't want to fight. He mostly wanted to hang out with girls."

311. Ben was stationed at Camp Lejeune in North Carolina for the duration of his Marines service after boot camp and training. He was a helicopter mechanic and

served for 3 years, 11 months. Part of his time was spent in Croatia and Kosovo in a peacekeeping role. He received a bad conduct discharge after being charged with underage drinking on three occasions. He states that he joined so young and was still under 21 after being in the Marines for almost 4 years. He is attempting to have his discharge upgraded. He is presently living with his girlfriend, Shannon Quinn, in Greenville, SC. He has never been married and has no children. He is working as a load-out man for Southeastern Freight.

**Jessica Haskins**

312.    **Jessica Haskins** met Chris in her senior year in high school, or the summer before school started that year. She thinks that he was a junior at the time. She met him through her best friend, Nikki Yancey, who was friends with Chris and hung out with him more than she did at the time. Chris and Nikki would come over to Jessica's house. After a while, Jessica dated Chris for about a month. She states that their relationship was "cool, we didn't fight." However, when she found out that Chris was hanging out with a gang, she did not like it. She states that the gang members "got into some fights, but I thought they were just immature. No one at school was afraid of them. They were just wannabe's, didn't know the first thing about it." She is not sure how involved Chris was. She was still his friend, but didn't want to hang out with him at parties because the gang guys would always get into fights. But she would still go to his house and talk with him.

313.    When they were together, he liked being at her house instead of with the guys. "He seemed to feel safe there and didn't have to prove himself." Jessica feels that he wanted to get out of the gang but "felt trapped." She states he would "be depressed and talk about his life...his family...he wanted things to be different between him and his mom and sister. He felt different, like something was wrong with him. He felt depressed about life, trying to fit in."

314.    Jessica was never present when Chris got into fights. She never saw him act in a violent way. He was nice to her. He would act jealous of her other male friends and didn't want to lose her friendship. Sometimes he would sit on the curb and just be quiet, "stare into space like he was blacked out or something." At times, he would talk for hours. He said his life was hard growing up; his father beat his mom. He would sometimes get along with Rich (Richard Brown, stepfather) and sometimes not. But Chris thought Rich was a good man for his mom.

315.    "His sister was trouble. He would get into it with her about guys. They would argue. He would push his sister or hold her down if she came at him, but I never saw him hit her."

316.    "They (he and his friends) used to drink. He never wanted me to know anything bad about him. I used to preach to him, preach to everyone in high school. They would hate me," she laughs.

57



317. Jessica states that she never could have imagined that Chris could commit this crime. He did have a tendency to be moody, "one minute happy, then very depressed, as if he was going to cry." She was at her mom's house after he got arrested. She talked with him on the phone. "I was real mean to him, saying 'I can't believe it—what were you thinking—what's wrong with you?' He said he didn't want to talk about it and 'I don't know what I just did.'"

318. Jessica has had a difficult life herself. Her mother is German and her father African American. They split up when she was small. Her father, Mark Haskins, has been in and out of jail in Ohio. Her mother, Henriette Haskins, has had difficulty supporting the family on a regular basis. Jessica has been responsible for helping her mother and other family members from an early age. She has an older sister, Michelle Hendrichs, who is full German, age 32, and lives in Germany. Another sister, Jennifer Hendrichs, is 29 and lives in Killeen. Jessica's mother then had another daughter, Dominique Graves, in 1994, and Jessica was made responsible for caring for her little sister. She had to get up in the morning and take care of the baby before school, and discontinue some of her extracurricular activities because of her responsibilities at home. In 1998, Jessica gave birth to her daughter, Shianne Elaine Haskins, and has raised her as a single parent. She has moved her mother and her younger sister into her apartment with her because they seem unable to make it on their own. At times, she wishes she could have more of her own life. Still, she has maintained a positive attitude and worked toward her goals. Jessica has been employed in several jobs since high school, including West Telemarketing, a nurse's aide at several nursing homes, and a mental health associate working with troubled and abused children. She entered the Police Academy in Temple, Texas, in October, 2003 and graduated on February 6, 2004. She is a patrol officer and loves her work. She hopes to help people as a police officer.

**Jenell Hamilton**

319. **Jenell** and Chris worked together at West Telemarketing in 1999. Prior to that time, she knew him a little because their families lived in the same area of town. She states she "really just knew him to say 'hi'." Jenell and Audrey Mabrey, Chris'' sister, were also friends because they were in the school choir together.

320. In 1999, Jenell and Chris attended a week long training class for West Telemarketing. At first she would not talk with him. She had "heard things about him, like that he had gotten out of jail not long before." But after awhile, she let that go and they exchanged telephone numbers. They began to talk and get to know one another. She states, "it was hard to take him at first. He was serious but he could be funny at times. Sometimes he would say things that were serious, but I thought he was being funny." She states that she made it a point that she would not be involved in any gang related activities. He told her he was no longer involved in a gang.

321. She states that Chris loved to write poetry and loved to rap. His mother had taken

him to the Navy recruiter and he had done very well on the test that he was given. She is not sure what happened after he took the test, but he scored well. He and Jenell would talk about Chris' mom and about life in general. "He cherished his mother, loved her a lot. She had been married numerous times and he talked about things he went through. He felt he was the protector. Before she married Rich, she had a younger guy in the military. He seemed to want her to choose between him and her kids." Jenell knew Richard Brown, Lisa's current husband. Jenell liked him and thought he and Lisa were both good people. Jenell states that they all got close after Chris got locked up. Jenell also had a close friendship with Chris' sister, Audrey. Jenell felt like she was an older sister to Audrey. Jenell states, "Audrey thought her mom loved Chris more than her. Her mom would do anything for Chris, but not her. Chris was spoiled, would get his way, regardless. He could get anything he wanted from his mom."

322. Jenell describes Chris as "a good boyfriend." She states that they had a "very close relationship." He was very poetic. He was into modeling, and had an offer of a modeling job in Dallas. Both Chris and Jenell were interested in fashion. "He knew he was nice looking." "We had a lot we wanted to do." He was 19 and she was not quite 18 when they were together. He had graduated and was happy about it. At the time, she was not sure where the relationship was heading, but they "talked about goals and things we wanted in life." She wanted to become a doctor and he was very supportive of her. Chris was never abusive or threatening to Jenell. "He cherished me more than anything and we held onto each other." They would go bowling, go to friends' houses, would sometimes drink together, "just liked being together, the two of us." Chris would laugh at things she would do. They laughed a lot together. She recalls that they did not have too many arguments. "He would never get off the phone on bad terms. He would want to resolve it, not go to bed with a problem and have to face it in the morning. He was very mature at 19."

323. "He was trying to change his life. His mom wouldn't let his friends come over. His mom told me that she moved out of Willow Springs to escape the gang, but it only got worse. Lisa was very focused on his life and trying to change it. She would say he was like his dad. His dad was very abusive to Lisa. She told me about this. Chris knew his dad but didn't talk about him a lot. Lisa talked about Chris'' dad hanging her over a staircase and it was terrifying for him (Chris) to see. He didn't mention his dad much."

324. Jenell and Chris went to middle school together but didn't really know each other. He told her later that he didn't feel he fit in with blacks or whites, and mostly hung around with whites in middle school. It is pretty common around Ft. Hood to see biracial kids. He became more comfortable hanging around with black kids as he got older. Audrey also seemed to prefer hanging around with black kids.

325. Academically, "he was smart but didn't apply himself. He had problems with

absences and so on." He and Jenell went to different high schools so did not meet again till after he had graduated.'

326. While they were dating, Chris told her he was not involved in gang activity, but he was still hanging around with the same guys. She remembers Terry "Last" Brown, Brandon "Dip" Bernard, "Little Tony" Sparks, the other Chris (Chris Lewis), Billy Rorie, Joey and JJ, Joey's brother (the Presleys). She states that in the beginning of her relationship with Chris, he did not hang around with them as much, but seemed to be seeing them more and more as it got closer to the time of the offense. He told her about some of the incidents he had been involved with earlier, something about a shoot-out at Whataburger, but she wasn't sure who was involved with that. Her sister's boyfriend got beaten up by some of Chris' friends at one point. During 1998 and 1999, there was a lot of fighting going on between groups of guys. Before she knew Chris, some guys beat him up at a carnival.

327. She remembers only one incident in which she observed Chris with a gun. In May of 1999, the last day of school, all of their friends were at a barbeque at the lake. She thought he had a gun in the waistband of his pants. She told him to put it away and he gave it to Tony. That was the only time she knew that he had a gun. She states that she really tried to keep him out of trouble.

328. About two weeks prior to the offense, Jenell had gone to El Paso to visit a childhood friend. She had stopped working at West before graduation. She states that she had spoken to Chris on the phone while she was in El Paso and "there was a lot going on." He had been kicked out of his house. She asked him, "where will you be when I get back?" He said, "Probably in a ditch." Jenell spoke with Audrey and Audrey told her that their mom said he could come back home. While Jenell was in El Paso, she woke up one morning crying and screaming from a nightmare that the cops were chasing Chris. She spoke with him on the phone and asked him to promise that he would not get into any trouble. He told her that he wouldn't. When Jenell returned from El Paso, she saw the story on the news about two people being murdered and that it was thought to be gang related. Then she saw his picture and that of the other boys on TV. She was in shock.

329. When they were together, Chris did not drink or do drugs much. He would smoke with his friends. When she went to El Paso, "everything flipped. Everything got bad when he quit his job, he thought I might not come back."

330. Jenell states, "Lisa was choosing Rich over the kids when she kicked Chris out. Lisa told me that she didn't want to lose Rich. Rich was a very good man. Lisa feels bad because she would have let Chris come back when he got a job, but she never had a chance to tell him that. One of them, Lisa or Rich, had threatened to commit suicide. Lisa was very sensitive and a lot of things were hard for her to take. Rich was tired of Chris not doing anything, not taking out the trash. Chris quit work and then wouldn't do anything around the house. Rich went to Lisa and

60



said he wanted Chris to change, but Lisa defended Chris. Rich's prior marriage had not gone well. He would say his ex-wife was not ambitious. She didn't have anything going for her. He'd been married 14 or 15 years and he was going to have to pay her some of his retirement. Rich is very funny, likes to joke and laugh. I call them Mom and Dad. They were both very helpful to me."

331.  She still can't believe Chris would be involved in killing anyone. "I never had any sense that he would be violent as in taking the lives of people he didn't know. Violent in terms of gang activity, but I didn't think any of them could do something like that." She has unanswered questions but doesn't like to ask or bring them up. He told her he needed money. Jenell states that she and Lisa could never believe that Chris would ever harm a female. He was always respectful of females and considered himself the protector of his mother and sister.

332.  Jenell was still with Chris during the year he was in jail awaiting trial and he continued to be supportive of her plans. His parents were also encouraging of her. Rich had been a drill sergeant and gave her lots of information about what to expect as she was planning to join the Air Force. Chris noticed that she had lost some weight because she was working out prior to joining the service. Jenell went to Waco with Lisa every Saturday to visit Chris is jail. "The visitations were horrible. We had to wait an hour for a twenty minute visit and I had to share with his mom."

333.  When Chris' trial was coming up, Jenell was in Tech School at Brooks AFB in San Antonio. She states that one later called her at her duty station. She now feels that she "was not ready for it at the time." No one specifically asked her to come or to testify. She thinks Lisa may have asked her if she would testify but Jenell doesn't remember what she said. She was having a very difficult time with the whole situation.

334.  Jenell has not talked with Lisa since 2001. Jenell feels that she has drifted away. "After Chris got his verdict, he told me to let it go." She and Chris have been in touch on occasion, but not in the last four months or so. She was living four hours from Killeen and didn't keep in touch with Lisa and Rich. "It was very hard, the whole situation. I had so many hopes and dreams for our relationship that it was hard to believe it happened."

335.  Jenell was in the Air Force for four years. She was involved in bio-environmental engineering. She would visit the AF industrial shops, making sure they were in compliance with regulations, would do water testing, check on hazardous noise, check audio booths used for hearing tests, waste water testing, storm water sampling, cheek for mold, asbestos and lead. She was stationed at Sheppard AFB in Wichita Falls, TX. She had planned to obtain a business degree but found out that she had quite a few college hours toward a degree in occupational education. Her plan now is to return to Wayland Baptist College and finish her bachelor of science degree in occupational ed. She is also in the AF Reserve. Eventually, she

61



would like to move to Atlanta, GA after finishing her degree. Her stepfather has family in Atlanta and she likes the big city.

336.    She is concerned that Chris "has not opened his mouth" to talk about what really happened at the time of the offense. She states, "He is honest. He acted like he signed a contract that he would never snitch on his friends. I don't like it that he wouldn't open his mouth and talk about what others did. He has a lot of pride. In all the news articles, there are no comments from Chris." "All of the statements were from Brandon, Terry, the other Chris. There was no hair, no fingerprints from Chris. Maybe I have a sense of denial, it's hard to deal with it. It's hard to believe he would kill two innocent people he didn't know. Brandon stated he got a call from Chris to bring lighter fluid. Brandon didn't have any money so he brought gasoline. Said there was too much evidence."

337.    Jenell wrote a rap song called "June 21st" about the incident. The first time she talked with him in jail, she brought up the dream she had in El Paso. She said, "you didn't listen to me. I told you about the dream and you didn't listen." Her parents had been giving her "crap" about staying with him and saying, "If he really cared about you, he would think of you before doing something." He told her, "I was not the last one with the gun." During the interview, she played a tape recording of a poem she wrote, called "Lost Love."

338.    A year ago, Jenell was treated for anorexia and bulimia. She states that she was always concerned about her weight but it didn't really come to light till about 2001. She told Chris about it and he wrote her a letter saying he could see how it could happen because of some incidents in her life. She did not wish to discuss those incidents in the interview. She states that she has written a lot of poetry herself about things she has gone through. When Chris was in McLennan County jail, they would write poems back and forth, two lines each and then send it back for the other to add two more lines.

339.    Jenell's mother is Jacqueline Hamilton. Her stepfather is Jackie Harris. Jenell has two sisters, Lewanna Hamilton, age 25, and Lerissa Hamilton, age 23, both of whom live in Killeen. Jenell also has a 10 year old brother, Dorrial Graves. Jenell's mom has an in-home day care center where she keeps her grandchildren and a few other children. Jackie Harris works at the Wal-Mart Distribution Center.

**Charlene Burke**

340.    **Charlene Burke** met Chris Vialva through her son, Benjamin Sims. Her family was living in Garland, Texas and she was having trouble with Ben being involved with a gang. She states, "Garland was a hotbed of gangs at the time." Her brother and his wife lived in Killeen, where her brother was stationed at Ft. Hood. They agreed to take Ben in to get him away from Garland. Charlene met both Chris and Brandon (Bernard) when they would come home with Ben for the weekend.



She states that Chris would say, "your mom cooks, she's here with you when you need her, what's wrong with you?" Charlene looked upon Chris and Brandon as just two more kids like her son. She welcomed them into her home. She never had any trouble with them at all. She feels that they needed parenting, someone to draw limits, tell them when to be home, tell them what they could and couldn't do.

341. "If Chris got out today, he would be welcome in my home. He was in my home when my (now) 7 year old was just a baby and I trusted him around him. I have no fear of these young men. They are not cold-blooded killers. They needed a steady loving parent. I made a serious mistake when I would not let them come live with me. They wanted to live with my son, finish school and join the Marines. I had a new baby, a job, and my son Ben to take care of; I didn't think I could handle it. I will regret that for the rest of my life. I will never forgive myself, though they have both forgiven me and I know God has forgiven me. I feel as if they are my own sons. They are the first ones to send me a birthday card, Mother's Day cards, write me letters."

342. Charlene admits that she does not have much good to say about Chris' mother, Lisa Brown. When she talked with Lisa when the boys were teenagers, "she didn't seem to care where he was, who he lived with. She wasn't there for him." Charlene describes Lisa as "the base whore. The scariest thing to her was not how her kids were doing, but not having a man in bed with her. She was shunned by her own family for having a biracial kid, so that probably affected her. She was not a good mom, didn't try her best. She had a lack of concern for her children. I know she's different now, but she wasn't like that then." Lisa and Charlene talk sometimes now, but Charlene still has a hard time with Lisa. Charlene feels that there are things that need to be discussed but Lisa "just wants to talk about the glory of God." Lisa has asked her to go with her if Chris is executed. Charlene agreed, but doesn't want to think about it.

343. In Charlene's opinion, Chris was very smart and was mostly bored at school. He was not stimulated enough and found it hard to conform, so got into trouble. She never saw him as depressed, though she did feel that he had issues with being bi-racial. "He would talk about being 'different.' It bothered him that one side of his family didn't want to have anything to do with him (his mother's relatives). He found some kind of acceptance in the gang."

344. She saw Chris primarily as "a lady's man." He was always very respectful toward her and her husband. He was the older brother to Audrey, the one who made sure she had lunch. "He should have never been put in that position." Charlene feels that Audrey is "lost." She has been to Charlene's home on a couple of occasions. Most were no problem, but once Audrey showed up with another girl and they were driving to Oklahoma with a baby in the car. Audrey and her friend were both drunk. Charlene would not allow them to stay.

I U68



345.  Charlene does not think that Chris was ever a violent person. "To this day, I have never heard of an innocent person being harmed by him, other than this crime. He and Benjamin never said that they had ever harmed anyone. They would get into street fights, school fights, but nothing serious."

346.  She was devastated when she heard of the offense. "At first, I didn't believe it. I read it in the newspaper and thought it was wrong, the wrong name. I had to call my son and make sure of Chris' last name. I called Seagoville (where Chris was held) and couldn't get definite information. I thought it was a carjacking at first. I left a message for Chris and Brandon to call me. They called collect and told me, "It's a bunch of shit that went down—wrong place at the wrong time." She believes that the offense was committed before Chris and Brandon arrived on the scene (though this is just her theory). Chris and Brandon were known by the law and considered a "menace." They were wanted off the streets. Chris' mom told her that a black man on the jury took a ride with Brandon's parents without realizing who they were and he told them that the jury had already made up its mind. Charlene also heard that the judge was crying in the trial and feels that that was inappropriate. She is afraid that if Benjamin had been in Killeen at the time, he would have been with Chris and would have been in the same situation now.

347.  Charlene corresponds with Chris fairly regularly. She sends him money and other needed items. She allows him to call her collect. She states that Chris has gone through a lot of depression since being incarcerated. He was hearing voices at night and the isolation was getting to him.

348.  She lives in Royse City with her husband of 11 years, Frank Burke, and their 7-year-old son, Tristan. Charlene has worked for Southwestern Bell for 25 years, 23 of which she was an operator, and the last two years she has worked in the Home Entertainment Division with Direct TV. She will retire in two years. She states they stay busy with family activities and have never been involved in any trouble. Ben's father committed suicide when Ben was 18 months old and it was just the two of them for many years. She feels that many children are struggling because they come from a one-parent home and do not have the direction they need.

**Medical:**

349.  As previously noted, Chris was hospitalized at 11 days of age for Group B Strep and Conjunctivitis.

350.  Due to "pigeonitis" at birth, Chris had serial casting on both legs and feet at the age of three months.

351.  In 1981, Chris was hospitalized with a 103-degree fever and "some sort of flu."

352.  At age three, Chris was bitten all over his body by fire ants and became very swollen.

64

353. At age four, Chris fell into a radiator at the family apartment in Germany, hitting his head. He vomited but did not become unconscious. He received no treatment.

354. At age six, Chris was getting off the school bus when he was pelted with rocks thrown by other children. He was hit in the head and carries a scar from this incident, though he received no treatment. Lisa states that this was "the first racial incident," in which other children made fun of him for being biracial.

355. At age eight, Chris broke his arm playing tag with neighborhood children.

356. On 4-2-92, Chris was seen by Dr. Truman Douty at the Scott and White Clinic for pain in his right knee. It was reported that Chris had kicked a boy while he was swinging about a week before this and that his knee was still hurting. Dr. Douty noted that there was some tenderness, but no joint problems were evident and X-rays were within normal limits. Chris was put on crutches for a week, given Advil and told to use hot soaks on his knee.

357. On 7-3-92, Chris was seen in the Emergency Room in Killeen for accidental exposure to tear gas to both his eyes. His eye exam was within normal limits. No treatment was provided. Chris later stated that the "tear gas" was actually a can of mace.

358. On 9-16-92, Chris was seen by Dr. Douty for chest pains he experienced the night before. His mother described them as sharp pains and stated that they were strong enough to make him cry. Chris was taking Tofranil 50 mg at bedtime and Dr. Douty recommended that his Tofranil level be checked.

359. On 8-24-93, Chris was seen by Dr. Douty for a sore throat, stiff neck, congestion and cough. Dr. Douty diagnosed nasopharyngitis and tonsillitis and prescribed Keflex.

360. On 10-18-93, Dr. Douty saw Chris for a left inguinal hernia. Chris was referred to Dr. Custer for a surgery consultation.

361. On 10-21-93, Chris was evaluated by Dr. Monford Custer regarding hernia surgery and it was scheduled for 10-28-93.

362. On 10-28-93, Dr. Custer performed surgery for Chris' left inguinal hernia. No complications were noted and no further problems were found.

363. On 11-16-93, Chris went for a follow up visit with Dr. Custer and no problems were noted. He was healing appropriately and reported no concerns.

364. On 5-13-94, Dr. Douty evaluated Chris for a spot on the inside of his right bicep area. It was described as a lesion with a slightly raised border. Dr. Douty diagnosed it as possible pityriasis rosea-Harold patch and provided Nizoral for treatment.

365.    On 7-27-94, Chris was treated for a distal right radial fracture of his wrist that he sustained while playing football on the high school freshman team. Dr. Steven Smith evaluated Chris and had him placed in a full arm cast for 3 ½ to 4 weeks then short arm cast for about 3 weeks after that. No PE for 6-8 weeks. At the time, it was noted that he weighed 98 pounds.

366.    On 11-15-94, he had a follow up visit with no problems noted.

367.    On 12-6-94, Chris went to the clinic for a wart on his left hand. He did not want it frozen so was prescribed Occlusal HP nightly. At the same time, his mother requested that his Tofranil be increased from 50 to 75 mg.

368.    On 5-9-95, Chris was seen by Dr. Douty for an EKG.

369.    On 10-20-95, Dr. Douty saw Chris for a complaint of swelling of his chest. Dr. Douty reassured Chris that this was normal adolescent gynomastia. Chris weighed 113 pounds at this visit.

370.    On 6-14-96, Dr. Douty saw Chris for a ganglion cyst on the dorsum of his right hand. He was referred to Dr. Robert Weber.

371.    On 4-2-96, Chris was seen for a cardiac auscultation. After his EKG, there was some concern about heart problems resulting from the Imipramine he had been taking for mental health reasons. Dr. Louis Reed was checking to see if his S2 split would close appropriately on deep inspiration. Exam was fine. Diagnostic impression: History of low atrial rhythm by EKG. A cardiac consult with Dr. Houck was requested.

372.    On 6-25-96, Dr. Robert Weber saw Chris for the ganglion cyst, no intervention needed.

373.    On 7-23-96, Dr. Trent Pettijohn, Cardiologist, evaluated Chris and requested an echocardiogram with a possible bubble study. It was noted that Chris weighed 126 pounds.

374.    On 7-31-96, the Echocardiogram revealed normal heart structures. "No problems noted. Abnormal EKG probably just showed increased voltage due to his thin body habitus and young age. No need for further follow up since he is off Imipramine," advised Dr. Pettijohn.

375.    On 9-25-96, Chris was treated for a laceration of the chin by Dr. Reed. He had fallen, hitting his chin on the gym floor while playing basketball, and needed three stitches.

376.    On 8-21-97, DR. Edward E. Bunch evaluated Chris for a possible head injury. He was involved in a fight the week before, kicked in the head, in the left parietal

66

occipital area. Chris had noticed increased swelling. He did not have a loss of consciousness, visual problems or headache. X-ray was within normal limits. No problems were noted. Chris was advised to monitor the hematoma and refrain from further injury.

377. On 8-4-98, Chris was seen by Dr. Richard Winkler for keloids behind both ear lobes due to piercings. He was referred for an ENT consult.

378. On 3-31-99, Bilateral earlobe masses were removed by Dr. Rick Visor.

379. On 4-6-99, Dr. Visor saw Chris for follow up, removed sutures and injected sites with Kenalog. He appeared to be healing well.

380. On 5-11-99, Dr. Visor saw Chris for follow up. His earlobes were well healed and injected with Kenalog and Lidocane.

381. At the end of his senior year in 1999, Chris was taken to the Emergency Room and treated for alcohol poisoning after passing out and being left in his driveway by friends. A neighbor called an ambulance.

**Drugs and alcohol:**

382. Chris started smoking pot at age 15. He states that he didn't really smoke a lot until age 17. He got into it steadily more heavily between 16 and 18. He didn't have any money to buy it when he was younger. He moved to the house where his mother lives now and "a dude came around with a joint;" they got high together. He states, "This is my thing." At age 17, he estimates that he smoked about a half ounce a day. Prior to that, he smoked at least once a week. "When I got my own money, I smoked big blunts all the time." He smoked weed dipped in formaldehyde, called "wet," 5 or 6 times altogether. He states it is a small, skinny joint, "a whole 'nother high." He states that he could "smoke weed all day long, but one $10 stick of 'wet' would keep me high all day." He could smoke a whole ounce, no problem. He tried cocaine once; didn't really feel anything, but noticed he was being angry. Four GI's drove up next to him and his friends in a car. Chris asked them "what the fuck you looking at?" and got a tire iron to go after them. They ran off. He didn't like cocaine and never did it again. He states he already had a bad temper and didn't need it to be worse. He saw what it did to his homeboys. He was just "hungry, horny and happy" on weed. He never saw anyone rob a liquor store on weed, just sit back and chill, listen to music.

383. He and his sister smoked blunts together. They enjoyed that; it was a "family thing, bonding." She started at a younger age, 12 or 13.

384. He reports that he was not much into alcohol or other drugs.

385. When he was 17 or 18, a friend's parents went out of town and everyone was invited over. They were all drinking and smoking pot. One of Chris' friends

67



videotaped the whole night. Chris threw up. On the tape, he was crawling on all fours to a girl named Nikki, laying his head on her stomach, "dry humping" a stool. As teenagers, he and his friends liked to throw parties, have people coming over. They were a close-knit group, homeboys, saw each other on a daily basis. Most lived in the same neighborhood.

386. On Senior Skip Day, all the seniors went to the lake. He got really drunk; had a tall bottle of gin and nothing to eat. He reportedly drank a half bottle of vodka. They were riding around in a car. When they got back to the lake, "the liquor got to me, hit me like a ton of bricks, I passed out in the car." He woke up in an ambulance. The people he was with had taken him home, but no one was there and he didn't have a key. They just laid him out in the driveway, face down. His neighbors called the ambulance and he was taken to the hospital.

**Mental Health Issues:**

387. There is a strong history of mental illness running throughout Chris' extended family. His grandfather, James Dickson, displays somewhat bizarre thinking and behavior, though it is not known if he was ever diagnosed with mental illness. James tells long, convoluted stories about his exploits, saving a plane from crashing even though he did not have pilot training, being a "jungle fighter," inventing a machine that creates electricity from gravity but having his plans destroyed at threat of death. He has had problematic relationships with his daughters over the years and has been described as "emotionally and verbally abusive" by his eldest daughter, Dee. He seems to have little insight into these relationship issues and continues to make hurtful comments to his children.

388. Phyllis Dickson is described as very moody, irritable, and withdrawn. Lisa states that her mother "wouldn't let us love her." Phyllis would "cry at the drop of a hat," and "take her moods out on the children." She would often send the girls out of the house for the length of the day to fend for themselves.

389. In looking back, Lisa Brown states that she feels she was depressed most of her life. She was seen for a psychological evaluation at the Pauquette Center for Mental Health and Guidance in Portage, Wisconsin in February, 1980. At the time, she was in the process of divorcing Rowallan and reported numerous occasions of physical abuse. She was described as being "emotionally distraught, oftentimes becoming depressed and feeling trapped during her marriage. Her self-esteem was quite low. Ms. Viala comes from a family replete with physical confrontation and extramarital relationships." Dr. Eric Hummel, clinical psychologist, did not find any psychological features which would warrant serious concern regarding her potential ability to parent Christopher. However, he did caution that "given Ms. Vialva's personality, her biggest drawbacks in regard to child rearing could be her overprotectiveness and reliance on the relationship for her emotional fulfillment. As her individual life increases in stability, the reliance on the parent-child relationship for self-nurturance should decrease."

1473

390. Lisa has been suicidal at times, beginning when she was pregnant with Christopher. She reports that she was anorexic and had to be "spoon fed" by her sister, Tina, during the time after she initially left Rowallan. She initiated counseling in 1993 after Chris' incarceration and has been seen by David Stulman, PhD, in Killeen since that time. However, prior to Chris' arrest, she was not receiving treatment for her emotional difficulties. Lisa has been diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood, and Post Traumatic Stress Disorder. She has reported anxiety, depression, emotional/physical/sexual abuse issues, grief, guilt, hopelessness/helplessness, panic attacks, poor concentration, and sleep disturbance to Dr. Stulman. She is receiving supportive counseling to help deal with Chris' incarceration and placement on Death Row, marital issues, issues with Audrey, and at work. She has been on the following medications: Lexapro, Xanax, Topamax, Prozac, and Ambien. She has recently experienced an increase in her depression and is on a medical leave from work because of this. Lisa is experiencing increased migraines and a great deal of stress while dealing with Chris' appeals. She has again been experiencing suicidal thoughts, stating that the only reason she has to live is to see her son's case through to its conclusion.

391. Lisa's sisters, Dee Bynum and Tina Erdmann, have both been diagnosed with bipolar disorder. Both are on medication and have had extensive counseling. Tina has suicidal tendencies and her illness manifests itself in overspending and excessive shopping at times.

392. Dee thinks that their mother was probably bipolar, too, but was never diagnosed. She feels that Lisa is probably also bipolar.

393. Chris has experienced behavioral problems from a young age. He states that he feels he was depressed as a child. He felt a great deal of stress with the responsibilities he was given as "the man of the house" when his mother and Robert Mabrey were divorced. He has had difficulty fitting in, finding his identity and feeling self-worth. From his first years in school, his attitude and behavior were identified as problematic by his teachers. He has received some intervention over the years, but none that seems to have been satisfactory in addressing his needs.

394. On 11-15-90, Chris was referred to Constance Fournier, PhD, at the Scott and White Clinic because of behavior problems at school. He and his mother were interviewed and the Piers-Harris Children's Self Concept Scale was administered. Lisa was concerned that Chris was not performing up to ability at school. Dr. Fournier noted that there had been multiple changes in the family situation. Lisa had been engaged to someone and that was broken off. Now she was engaged to someone who was stationed in Saudi Arabia. The family had moved a couple of times, but described as positive moves. Finances were better than in the past.

69



395. Chris was described as "bright, but somewhat provocative in his behavior." Additional notes state that he clearly enjoyed being the center of attention. He had trouble sleeping, didn't want to sleep. He didn't report any feelings of sadness. He reported that he got mad at his teacher and about having to do homework. He got grumpy with his sister a lot for bugging him. Sometimes he got so mad that he wanted to punch a wall but denied suicidal ideation. He worried a lot about his mother crying or that something bad will happen. If he had three wishes, he would be a famous artist, be rich and have three more wishes. He admitted talking too much in class and getting in trouble a lot for hitting, calling names and having a temper tantrum. He reported that this had always been a problem for him and that he did want to change.

396. Test results indicated average functioning as compared with other children.

397. Impressions of Dr. Fournier: Chris seemed to be quite a handful at home and his mother was somewhat overwhelmed in trying to handle him. She herself had several significant stressors in her life, not sleeping and feeling subjectively depressed, having what appeared to be flashbacks of Chris' father assaulting her, especially when she got into arguments with Chris. Lisa had lost most of her support system and felt quite alone in trying to deal with her difficulties. Dr. Fournier noted, "This is felt to contribute greatly to the behavior style of Christopher."

398. Dr. Fournier's impressions were Oppositional Defiant Disorder and rule out Attention Deficit Hyperactivity Disorder.

399. Dr. Fournier recommended that Lisa seek her own support system and return for a child management conference. It was also recommended that Chris return for individual therapy to focus on problem solving and more appropriate expression of feelings.

400. There were no additional records found that would indicate that Chris or his mother followed through with these recommendations.

401. Later, on 1/13/92, Stuart L. Coles, MD received a message from Lisa stating that Chris had a suicidal gesture over the weekend and she was requesting a referral to the Psychiatric Service.

402. On 2/24/92, William A. Rae, PhD, saw Chris regarding the reported suicidal gesture. Dr. Rae's notes indicate that Chris had been picked up by the police for being inside an abandoned building with some other boys. His mother reported that he had seemed depressed. He put a knife to his throat and said, "If I have to go to jail, I'd rather be dead." Dr. Rae noted that Chris had a history of trouble with the police, having been picked up for being with another boy who had stolen from a store, prior to this most recent offense.

70

1675



403.    This appears to be the only suicidal gesture made by Chris to date.

404.    Dr. Rae documented that Chris had been previously evaluated by Dr. Constance Fournier. Dr. Rae stated that Chris was having discipline problems at home and school. Lisa described him as "a constant discipline problem." She stated that he was, at times, abusive toward his sister. He was defiant at school. Chris was negative toward receiving any intervention, "I am not going to any shrink." Dr. Rae noted that return appointments with Dr. Fournier had not been kept in the past, although they were recommended. Lisa reportedly told Dr. Rae that she didn't feel that an appointment once a month was enough. Dr. Rae also noted that Lisa had not followed through with recommendations to seek help for herself. He noted that her stress had increased because her mother was now terminally ill.

405.    Chris broke down and cried when he was asked about his biological father. He admitted that he was sad because he was not accepted by other kids. He reported that his mother was frequently angry with him and he stated he "gets no rewards for doing positive things." Dr. Rae noted, "It is clear that he feels that his sister gets more attention and praise than him. He is clearly very upset and burned out. He likes nothing about school. He dislikes both his natural father and his stepfather."

406.    Dr. Rae's impression was that Christopher continued to show signs of ODD, with significant dysthymia, feelings of hopelessness, low self-esteem and irritable moods. Dr. Rae stated that there were indications that his mother may have protected him but had not been particularly rewarding and supporting a positive self-concept. Chris' feelings toward his father centered around rejection. Chris was not suicidal, but clearly unhappy and depressed. However, he was not particularly open to intervention.

407.    It was recommended that Chris be seen by Dr. Gail Eisenhauer for possible medication. Dr. Rae recommended that Lisa receive counseling, but noted that she did not appear to be very interested in this. He recommended that Chris receive individual psychotherapy and that he and his mother both return for behavior modification assistance to help their relationship and Chris' behavior.

408.    On 3-28-92, Chris and his mother returned for individual visits with Dr. Rae. Chris reported that he had not been in much trouble and appeared to be in a good mood. He did state that he felt picked on by his mother and that he didn't fit in with other kids because of his race. Lisa was under stress because her mother had died two weeks earlier. Dr. Rae believed that Lisa was in need of a more significant support system.

409.    Chris was seen by Dr. Gail Eisenhauer and Imiprimine was prescribed. Apparently, Dr. Eisenhauer continued to see Chris for medication management from April, 1992. The physician later wrote a letter to Dr. Debbie Douty in March, 1993, stating that Chris was still under her care and still taking

71

Imipramine.  She felt that Chris was making progress, but "was having a recurrence of depression and anger recently."  She wanted to continue seeing Chris.  Chris continued to take medication but received no counseling in the following two years.

410.   On 11-29-95, a phone message was left by Lisa asking for a referral for Chris to Children's Psychiatry at the Scott and White Clinic.

411.   On 2-12-96, Helen Zaphiris, MD evaluated Chris.  She stated that he was having continuing problems at home and at school.  According to his mother, Chris was terrorizing his sister and aggressive toward his mother, belittling her, becoming easily agitated and angry.  He would threaten to run away if she tried to discipline him, and had in fact, run away twice recently, once over night.  He had discontinued taking his medication about four months prior to this.  Her impressions were ADHD, combined type, conduct disorder, problems with primary support system and educational problems.  He had an EKG, which showed an incomplete right bundle branch block.  He agreed to a trial of Tenex, since the heart issue might be affected by the Imipramine and Chris did not like taking the medication.  He agreed to attend counseling for anger management.

412.   On 3/5/96, Chris was seen for a medication check.  It was reported by his mother that he seemed less angry and irritable.  Chris reported sometimes feeling lethargic on the medication but stated that his mother was forcing him to take it.  Dr. Zaphiris suggested  adding Wellbutrin, but Chris adamantly refused.  He reluctantly agreed to continue taking Tenex but was angry he was being forced to take medication.  He was not considered suicidal.

413.   From 2/2/96 through 5/16/96, Chris attended individual counseling with Kerry Gist, LMSW-ACP,  to work on anger management, interpersonal interaction and trust issues.  He seemed to be learning to control his behavior  better.  A kid at school called him a "half breed" and he thought about being assaultive, but just stared the kid down.  At the same time, he said he did not have any particular feelings about being biracial.  He did not want to go to any kind of group therapy.  His mother discussed feelings about him being sexually active and not wanting him to repeat his father's patterns.  He discussed school problems, feeling that he was being treated unfairly by certain teachers at school.  Over time, he warmed up to therapist and began to "greet" her instead of just showing up.  At the last documented session, Ms. Gist discussed Audrey's behavior problems with Lisa and strongly recommended getting Audrey into therapy as well.  There are no further therapy notes and Chris has indicated that he only saw Ms. Gist for a couple of months.

414.   On 5/13/96, Chris was seen after running out of Tenex and reporting being easily annoyed, irritable and having difficulty falling asleep.  Dr. Zaphiris reported that Chris  "doesn't care about the future, whatever happens, happens."  He denied



suicidal ideation. Dr. Zaphiris suggested Zoloft for his dysthymia but he refused. He agreed to continue Tenex.

415. On 12-9-97, Michael E. Campbell, PhD, provided testing to the Killeen Independent School District to determine if Chris was eligible for Special Education based on an Emotional Disturbance. Chris was described as temperamental and moody, disrespectful toward adults, having poor temper control, poor peer relationships, irritable and easily annoyed, decision making skills are poor, refuses to comply with adult rules and requests, angry and withdrawn, uncooperative attitude, aggressive with peers. He was found to meet DSM IV diagnostic criteria for ODD, Severe, and ADHD. It was recommended that he would function best in a highly structured classroom with an emotionally supportive teacher. Discipline and corrective statements should be administered in a calm manner with specific expectations. He may benefit from access to a school counselor to address anger issues and improve his social skills. There was evidence of homicidal ideation, which should be monitored. He reports being kicked in the head during a fight and feeling disoriented. On the Projective Drawings, Chris' placement of the figure indicates aggressive tendencies, feelings of inadequacy, dependency, assaultive tendencies and a need for physical power. Campbell concluded that Chris is in control of his behavior and chooses inappropriate means of getting attention. At the time, he did not feel that Chris met the criteria to be classified as ED for school district purposes.

416. On 1-5-97 a Comprehensive Individual Assessment/Determination of Eligibility and Educational Need meeting was held at school. "Based on the information collected, the student's in-school and out-of-school behavior does not appear to influence his educational placement and programming and ability to follow school disciplinary rules." Chris had a Full scale IQ on WAIS III of 101. (Verbal 100, Performance 102). His potential for academic achievement should be average. He does not appear to meet eligibility criteria as a handicapped student."

417. Chris reports feeling depressed as a child, feeling that he didn't fit in, having difficulty trusting people. "I have a problem with authority. I don't like men. I have a hard time with men. The only friend I have is my codefendant and a friend locked up in Bell County. I have trust issues. I get burned every time I try to trust somebody. People have hustled me out of shit, have testified against me, taken advantage. People stab you in the back. Everybody I've run into has burnt me. I won't write in a journal because I am afraid someone will find it and read it. I don't open up to people. Nothing is sacred (in prison). All mail is read, phone calls monitored. I've developed a paranoia about people knowing my business. I always think someone's trying to hustle me. I've let my mama hold money for me, trying to save it, and she's spent it.. I don't have a whole lot of trust in people. I wear it on my arm, a chip on my shoulder."

418. "I despise shrinks. When I'm severely mad, I get silent. The next thing is the physical. Words have not brought me to put hands on someone. But if someone

1478



initiates the physical, I will respond. If someone is messing with me all week, I will think about it all night, it stays in my mind and I can't think about anything else. I have to stand my ground, show people what the line is. I give people too much leeway, let it build up, then I snap."

419. Chris reported that he has days when he feels "off," as if "something isn't right, something's going to happen." He will call home and something has happened, not necessarily anything bad or major. He gets restless, sometimes paces in his cell. He stated that he "has cabin fever, gets it real easy." "I would rather take an ass whipping than get grounded, would rather be able to move around." He tries to figure out why he is feeling that way. He will ask Dip (Brandon Bernard) if it is a weird day. Sometimes Dip thinks there's something weird going on, too. Chris will still get "antsy" on the weekend.

420. "Most people I know are locked up. Everybody I hung with came from broken homes and poverty. Parents were apart, no one believed in us, we were outcasts, do what you can do to get by. I know I ain't shit. We never thought much of ourselves."

421. It was his mother's idea for him to see a counselor at Scott and White when he was a teenager. His mother wanted to know "why I was acting up, grades slipping." He thinks he was in junior high at the time. He had previously been to see a counselor at Cedar Creek, a place outside of Belton. He thinks "the lady at Scott and White just gave me meds." He did not like going, "I thought psychiatrists were for crazy people; regular people don't go there. I thought my mama was telling me I was crazy. I would rather be in school-ironic-but I would go to school when I was sick because I wanted to be with people.

422. He was on Imipramine and Tenex as a teenager. He thought they were antidepressants. "They calmed me down, helped me focus on school or whatever." Then he states he didn't remember feeling any different on the medication. He didn't like it and thought it would stunt his growth. He states that his mother thought it made a difference in his behavior, but he is not sure.

423. He feels that he was depressed as a kid. "Ever since my mom started dating when we came back to the States, I felt neglected, too young to be having this kind of stress on me. I thought I was adopted. I didn't think I could be a part of this family; I don't look like them, I don't act like them. I stuck out so much. I couldn't talk to my mama about racial issues, like the incident at the 7-11 (when he and some friends were falsely accosted by the police). I was the oddball at my house. I didn't fit in." He relates an incident to illustrate this point. When his mother married Richard Brown, Richard's kids came down. "They are all pasty white. We were taking pictures and I am standing in the back because I am the tallest. But then they pull down a brown background." Chris felt that he was invisible in the picture and no one had the sensitivity to realize that it was not a good idea to use a brown background.

74



424. "My dreams are crazy dreams." Chris has dreams that someone is trying to hurt him, that he is in a fight. He dreams he is in the prison population and has to fight. There is usually a conflict with someone. Occasionally he dreams about women.

425. Chris states that sometimes he has dreams and later the dreams will really happen. He gives an example of dreaming about an argument with someone and then having the exact argument take place. He states that this has happened all his life. Usually it will just be a small encounter, maybe five minutes. He believes that sometimes whatever he says or does in the dream, the same thing must happen in real life. Even if he tries to change what he says or does, purposely tries to do something different from the dream, he "can't help it" and can't keep the same incident from happening in life. He states that his mother and grandmother did this, too. He stated that he had a dream about his mother meeting Jim Gillhouse. Chris did not know Gillhouse's name, but recognized his face when he met him. He once had a dream detailing the movie "Kingdom Come," which he did not watch till the day after the dream. He stated that most of his dreams don't make sense. When he was younger, he had dreams about saving his sister from monsters.

426. When he first arrived in Terre Haute, he would see shadows at night. The CO said it was just the officers doing the count, but it wasn't, according to Chris. He is not sure what he was seeing. Chris denies hearing voices. He states that he will replay conversations in his head and respond out loud, debating with himself. Sometimes he will sit in his cell and yell something out because he is talking with himself about something that has happened.

427. His sister Audrey describes Chris as "a very angry child and teenager. He would knock the wind out of me, but then would snap out of it and be a loving brother, asking if I was okay. He was very protective of me. If anyone would put their hands on me, hit me, he was the first one to defend me. But then he would hit me himself. I didn't understand that." Chris would talk to himself. "He had full out conversations. I could hear him in another room when I was at the house. Later, when he was in jail, he told Mom he thought he was schizophrenic."

428. Some of Chris' friends feel that he was depressed as a teenager. Jessica Haskins and Jenell Hamilton both saw Chris struggle with his emotions and his family situation. He would withdraw and stare silently into space. He was sad about his life, at times becoming tearful and talking at length about his worries. Jessica remembers, "When he wasn't sad, he was fun to be around, funny, a nice person, someone who could be outgoing. But he seemed depressed a lot of the time. He didn't care about life then. He used to talk about goals when he wasn't depressed, maybe joining the Army." She saw him cry once or twice when he was depressed about something, but he wouldn't talk about it.

75

429. "The last few months before the offense, he was real depressed," Jessica continues. "He wouldn't smile at all. I was supposed to pick him up to look for a job and forgot. This was either the day of the offense or the day before. I feel bad; I know he wanted to talk. He said, 'I really need to talk to you.' He had called every day, needing to talk, but I was busy with a lot of things." She feels guilty now that she wasn't there for him and perhaps things would have been different.

430. Jenell remembers that Chris always tried to be cheerful and happy, "but his moods would change really quickly." She relates one incident in which they had been to Whataburger. She made some kind of joke about his food and he gave her a very serious look, balled the burger up, and threw it away, although he had only eaten about two bites, "When his moods changed like that, I knew he was serious. In a sense, I knew he wasn't happy."

431. Chris feels that, at the time of the offense, his life was out of control. "I lost my job, had no loot, my mama's threatening to kill herself if her husband leaves her because of me, I had nowhere to stay. I got kicked out (of his mother's house), spent the night in a van, snuck into the house to get clothes. I was on a collision course." He stated that he felt betrayed by his mother and his friends. "I found out my friends didn't give a damn, I had no one to fall back on." "I took it serious that I was the protector of the house. If someone is given a trade their whole life and then it's taken away from them, what do you do? It was my job to take care of my mama and then my services were no longer needed. It's a panicky feeling. I was in survival mode. I felt like I was drowning when I got kicked out. If I could have transitioned in the house, I might have made it. But I had nothing, was backed into a corner; if I didn't figure out something quick, I would die. I was real mad at my step dad because I thought he had something to do with it."

432. "I had applied for jobs, but no one called. I had a felony. No armed services would have me. No place to live, no clothes, no money, no job. Couldn't pay my probation. Homeless, no car, no money. Couldn't stay with any of my friends. There were too many people in the house at Billy's. Dip's mama wouldn't let anyone stay there. JJ's mama was looking mean, didn't like me. I had nowhere to go. Cat and Bird were both off at college. I was shit out of luck."

433. "If I could have found a drug dealer in the neighborhood, I probably would have robbed him and started selling drugs. I never wanted to do that because of the harm it does to the community. I was getting desperate."

**Exposure to inappropriate sexual activity:**

434. Chris states that he and his sister had an 18 or 19-year-old babysitter at times when he was 7 or 8 years old. His mother would work late and he and Audrey would sometimes spend the night with the young woman. He remembers, "She would get naked and walk around in front of me. She seemed to do it to see my reaction. I was taught to cover my face if someone was naked, so I did that at

first. She did it so much that I eventually didn't always cover my face. She had a small one-bedroom apartment with no door to the bedroom. She and her boyfriend would go at it while we were there." He doesn't remember if the woman ever did anything to him.

435.    He states that he never saw his mother engaging in sexual acts, but could hear her with men. "I was mad. I didn't really like it. I would look at my mama as the most virtuous woman you could meet. I thought she was being promiscuous and it hurt me. I was real defensive about it growing up. I didn't want anyone saying anything about her. I wanted to protect her chastity." He could not recall any other exposure to sexual activity as a child.

436.    Audrey recalls that their mother had at least two pornographic videos in their home, which Chris would sometimes watch with his friends.

437.    Dee Bynum remembers that "Lisa was on a dating frenzy" when the kids were young. "Lisa did not feel validated without a man." Dee was concerned about all of the men in and out of the house and told Lisa so. Lisa told Dee that the kids did not know what was going on. However, Chris recalls from an early age waiting up for his mother, being unable to stay awake till she got home, and then arising the next morning to see "some guy's boots by the coffee table."

**Biracial issue:**

438.    The family lived near a military base, so it just happened that there were biracial kids in the area. Several in Chris' group or gang were biracial, but the rest were Black. "It was kind of even, but maybe the biracial guys just stood out." Chris states that he made up his mind early on that he would have a Black identity. He felt there was no way he could fit in the white world. He felt he would always be questioned and people would assume he was Black. He does not think that this is as big an issue as some have tried to make it out to be.

439.    People would look at his mom funny when they (she and Chris) were together. One time at the pool, a woman kept staring, so his mom pulled down his pants so the woman could see his butt.

440.    "I saw racism everywhere," Chris says. He feels that many of his mother's boyfriends and husbands did not accept him because of his race. His mother feels that he was discriminated against in school.

441.    There are a variety of opinions from others about this issue. Dee Bynum believes that Chris was confused about his racial identity and unsure about where he fit in. Because she is married to an African American man, she and her husband offered to take Chris and raise him as their own. Dee felt that Chris would fit in with them and that her husband, Larry, could help him with the Black part of his identity. Lisa would not allow it and the discussion was finally dropped. Jenell Hamilton states that Chris told her he hung out with white kids in middle school,

77

but gravitated toward the Black kids when he got to high school. Eventually he and his sister seemed to feel more comfortable with Blacks. Jacorby Smith and Chris' other male friends do not seem to feel this was an issue at all. Jacorby states that Chris could get lots of girls because of his looks and could date both Black and white girls because he could fit in with both.

442. Still, it seems to have been an issue for Chris at some points in his life. He mentioned in several counseling sessions that he did not fit in. He and his mother both point out that kids would ask him "what are you?" and he wasn't sure what to say when he was young. His mother recalls other children taunting him and on one occasion, throwing rocks at him.

**Employment:**

443. As a teenager, Chris had occasional jobs such as helping people move. He never mowed lawns, stating that he had allergies and didn't like it. His mom bought him a mask and goggles to mow their yard. His eyes would end up swollen. His allergies acted up in the summer.

444. When he was 16, he got a job through a summer hire program at Ft. Hood. He was working at Darnell Hospital, unpackaging and repackaging computer discs. He states that "the lady gave me vague directions and I did it wrong. I fucked that up." He was then moved "to help a secretary lady, answered phones while she was on break, entered logs." He would watch TV or sleep during his lunch break. He was bored. He worked half days, 20 hours a week that summer.

445. Later, while still in high school, he worked for West Telemarketing, selling long distance for AT&T. He states it was an easy job, easy money. He was inside, where there was air conditioning. He had to wear dress clothes and a tie to work. He got to know Jenell Hamilton, a future girlfriend, as they went to a week of training together. Chris worked there for three months. He was fired based on a point system for missing work. He had accumulated some points for missing some days. He signed up for an overtime day on a Sunday to make up some missed hours, but then changed his mind and crossed his name out. He came in the following Monday and was told he was expected to be there Sunday and was fired because it put him over his points. He went to the Human Resources Director and explained that he had scratched his name off the list for the overtime day. However, his boss would not confirm this, so his termination was upheld.

**Gang:**

446. "It wasn't really a gang in the beginning," Chris states. It started with Chris and James Pressley; they "got cool" their junior year in high school. James was supposedly a "Blood" from Georgia. They started hanging out pretty tough, but were not really trying to be a "chapter." Others started hanging out with them. The summer before their senior year, about twelve of them hung out at the Brookside Apartments. Chris stated, "red was always my favorite color anyway.

78

Everyone around us started wearing red and calling us Bloods." They became the 212 Piru, a set of the Bloods.

447. Before school started that year, they got into a fight with some guys outside a teen nightclub. This "made a buzz around town." They got to school and were proud of themselves. "We really weren't a gang, but everyone said we were." They were wearing red and the cops started asking questions. The campus police took a picture of Chris and called him a "gang affiliate." According to Chris, "the whole school before that was Crips. Even before the gang thing, I would wear red, but now other people thought it was safe to wear red." The "gang" started getting into fights outside of school, at parties or after parties, at Whataburger, around town. They "didn't really have any beefs" themselves, but started helping a guy who was getting beaten up in the neighborhood. It began to escalate. Chris was already stealing and selling a couple of bags of weed on occasion. They began to fight with other groups or individuals a lot. "Eventually we got into gun play. These other guys are gonna get tired of getting beat up and bring out guns." They started carrying weapons and having drive-by's. Chris' friend Paul got shot, but was okay. Maurice was shot above the eye. Jimmy was shot in the chin. All were shot with buckshot. "We had beat these dudes up the week before at the teen club. I went home. There was another fight, the guys went back to the projects and my friends drove by, shooting." Paul also got stabbed another time. Chris carried a .22 for a while. He states that he took it everywhere. He had to walk by some guys' houses that he had a beef with, in order to get to his friend Dip's (Brandon's) house. After Chris got the gun, these guys didn't bother him any more.

448. He didn't have a car so usually walked around the neighborhood. He stated that he would get shot at "leaving a party or whatever," in retaliation. He got involved in shootings and drive-by's. He is not sure but doesn't think he actually ever hit anyone. On the case he got arrested for, he didn't have a gun, but wanted to go along on the drive-by.

449. "Really, we were just dudes who hung around together. But people didn't like us, so conflicts get started and never die. Everyone trying to one-up each other."

450. He was involved in a shoot-out. He and his girlfriend were near a car. "She ducks down, grabs my legs. I was looking, still standing. I think I kinda wanted to get shot." He states that he didn't really care. "I didn't think anyone had the guts to shoot me."

451. "I was on a self-destructive path. It started as something harmless, but it didn't end up that way. If there were gonna call us a gang, I was gonna be the baddest gang member ever. No one really cared about me."

452. However, Chris' girlfriend, Jenell Hamilton, encouraged him to think about the future and some goals that he might pursue. He stated, "I was moving away from

79

that lifestyle (gang), thinking about the future, talking to Jenell, wanting to make a mature decision."

453.    At school, Chris was identified as a gang affiliate. Most of his friends from his youth did not consider the gang to be a serious one, that the members were mostly "wannabe's." Jacorby Smith and James Davidson state that Chris was more interested in girls than in gang activity. James calls him "a wimp" and states that he never wanted to fight. Jacorby laughingly states that there was no way that the Bloods were a "real" gang. He states that he has been in Dallas and in Montgomery, Alabama, where the gangs are dangerous, violent, and a real threat. He does not believe that any of the gangs in Killeen are that bad. He describes a gang member as someone who "has a nice car, money, gold in his mouth, weapons, stays low key so he won't get caught." He laughs about the idea that Chris didn't even have a car and had to walk everywhere; "How much of a gang member can he be without a car?" He feels that real gangs are very organized in terms of their lifestyle and activities, and that he saw little evidence of that with Chris and his friends. Jacorby states that he and his other friends, James Davidson and Cedric Young, were not happy with Chris' gang involvement, but did not think it was anything serious. Jacorby goes on to compare Killeen gangs with the gangs from Waco, which he states are "a lot worse" and that the gang activity in Waco is serious. He feels that the gang situation in Killeen was minor.

454.    Once, James was at Chris' house and saw pictures of guys in red bandannas, "Bloods." He thought Chris wasn't so big into the gang thing, just testing it. His friends "kinda laughed at him, asking him what he was doing." They stopped seeing him as much, though they would still run into him at parties and around town. He started getting into the gang stuff and they didn't like it. Sometimes he would ignore them when he saw them, "thinking he was big and bad." James would get mad and try to fight Chris. Sometimes Chris would be with other guys and act like he didn't know his old friends. This bothered James. Then Chris would call them back and "make excuses." He was trying to be with his "partners," backing up his gang members if there was another gang around.

455.    According to Jessica Haskins, there was a time when Chris wanted to get out of the gang but he told her that the other guys said they would hurt him if he wanted out. "They kept making him do things he didn't want to do. He said they were his family. I said if you get involved in something stupid, don't call me any more."

456.    Jenell Hamilton feels that the gang activity was serious and that there were many gang problems in Killeen at the time. When asked if she thought that Chris' group of friends were really in a 'gang," Jenell states," For Killeen, it seemed to be a real gang. In the newspapers in 1997 to 1999, there was lots going on in gangs." Elaine Clark at the Alternative School is convinced that the gang was very real and very serious.



457. Audrey Mabrey remembers that Chris was the first one "jumped in" to the 212 Piru. She states that the gang "had an official name, had meetings, but it seemed like at first they were more interested in getting girls and making money." Audrey feels that problems escalated because other gangs wanted to cause problems with the Bloods and then it became a vicious cycle, with retaliations all around. Several individuals note that Chris was never one to initiate trouble, but would defend himself or his friends if necessary.

**Tattoos:**

458. Chris' mom took him for his first tattoo three days after his 18th birthday. "It was her suggestion." "She has a tattoo on her butt, but I haven't seen it. She offered, but I declined." He had a bulldog tattooed onto his left forearm. He wanted something "tough but inexpensive." He thought it was "cool." The second tattoo he had done was a skull smoking a cigarette, located on his right shoulder down to near his elbow. Above the skull, "Goldie," his street name, is written, and below the skull are the words, "mackin till I die." He was called "Goldie" because of a movie called "The Mack," which included a light skinned pimp character who wore a lot of gold chains. Chris states that he obtained this tattoo because he wanted one which was more personal. He laughingly states that he wanted a top-hat on the skull, but, "I was "a little guy and there wasn't enough room." He explains that someone who is "mackin" is a ladies' man. When Chris was in the county jail, he had his third tattoo done, which shows the words, "trust no one" on his right forearm. He explains, "I have trust issues." His fourth tattoo stretches across the backs of both arms with the word "friend" on his left arm and "or foe" on the right. He explains, "in the street, friends greet each other with their left hand," so he wanted the word "friend" on his left arm. "I was saying to myself, you never know if somebody is down with you or not." His last tattoo, on his right bicep, contains the words "don't plex," along with the shape of Texas and the town of Killeen in the middle of it, as well as a hand holding a pistol. He states that he wanted to represent his hometown, and say, "don't mess with guys from Killeen." He calls it "tough guy stuff."

**Criminal behavior:**

459. Chris had some minor involvement with the law as a youngster, being with a boy who had stolen something from a store, and being caught in an abandoned building with some other boys. He was given a warning notice on 8-12-91 for theft under $20 from the HEB store in the first instance and charged with criminal trespass in the second. According to his sister, he engaged in some acts of vandalism such as breaking windows.

460. He received citations for not wearing a seatbelt speeding in 1997. He paid a $58.00 fine. He was later charged with Disorderly Conduct (using profane language) and fined $71.25. He was stopped for speeding at 60 miles per hour in a 40 miles per hour zone in late 1997. In January, 1998, he appeared in Teen Court and was required to write a 300-word theme on dangerous speeding and complete community service at the Animal Control Center.



461.  Chris admits shoplifting as a teenager. He would sometimes run into a store and run out with clothes. He states, "A theft case ain't nothing." He was "never scared of getting in trouble with the authorities" He "never liked cops, didn't trust them." When he was 17, he was going to a party with his homeboys. They stopped at a 7-11 and went into an open back door to use the bathroom. One would run in when another ran out. Chris was the last one out. There was a cop across the street, who ran over and put his pistol to Chris' face. All his friends were lined up against the cop's car. The officer thought they were robbing the store. Everyone was cuffed. Chris was cussing the cop out. He was face down on the ground in his brand new clothes. They were let go as they were not actually involved in a crime.

462.  On 6-19-98, Chris was arrested with some other youths for shoplifting clothing at Foley's in the Temple Mall and evading arrest. He was given a plea agreement for a fine of $200, court costs of $209.25, 12 months probation, periodic urinalysis, Life Skills training, $40 a month community supervision fee, 100 hours community service and $30 transfer fee. The charge of evading arrest was dropped. Chris completed the Life Skills Offender Program successfully and completed community service at the Clements Boys Club.

463.  On 7-2-98, Chris was arrested for evading detention after a call was received about juveniles in need of supervision (drinking alcohol), and he ran away from the officers responding to the call. The case was dismissed.

464.  Chris was arrested for unlawfully carrying a weapon on 7-11-98. An officer was sent to a report of juveniles in violation of curfew. A Ruger .22 caliber pistol was found under the rear of the front passenger seat of the vehicle, after the occupants had given permission for a search. Chris admitted that the gun was his. He went voluntarily to the police station and stated that the gun belonged to him. He was not licensed to carry a gun. Chris was sentenced to a $100.00 fine, $184.25 court costs, and 60 days in the Bell County jail, with 30 days' credit given for time served awaiting his court date.

465.  On 9-15-98, Chris was arrested for aggravated assault with a deadly weapon. He was apprehended after a drive-by shooting. Chris states that he was in the vehicle but was not the shooter. He pled guilty and was given 10 years' community supervision, with stipulations for fines, classes and community service. In January, 1999, an order was made to amend the conditions of Chris' supervision, in which he was required to add restitution for medical expenses for one of the victims of the drive-by shooting. In June, 1999, his supervising officer, Margarita Michura reported that Chris had reported and paid as instructed until May, 1999. He completed the required Life Skills class on January 23, 1999. He tested positive for THC on May 11, 1999. He failed to comply with a sanction to attend Substance Abuse Group meetings weekly. He was then sanctioned for Cognitive Training, which he did complete.

466.    Chris was then arrested for burglary in May, 1999 and for the carjacking of the Bagleys in June, 1999. His supervising officer noted that Chris had failed to comply with the direction of the court and a more structured environment should be considered.

467.    Burglary of a habitation was charged in May, 1999. Several items were stolen from the homes of Malcolm Coats and Pierre Balentine. An attempt was made to burglarize the home of John Mitten. While awaiting disposition on this case, Chris was arrested for the capital case for which he is now in prison.

468.    In July, 1999, a Motion to Adjudicate was filed. Chris had violated 8 conditions of his community supervision, including failure to abstain from using drugs, failure to report to his supervising officer in June, 1999, failure to pay court costs, failure to pay restitution, failure to participate in substance abuse testing, failure to work faithfully and satisfactorily participate in community service projects (he completed no hours of the required 300 hours at the Animal Shelter), failure to complete an Anger Management program and therapy, and the commission of an additional offense (burglary) while on community supervision.

**Hopes and dreams:**

469.    At one time, Chris wanted to be a boxer. He saw the "Rocky" movies and was interested in that life. His mother would not let him get into boxing. On another occasion, he was approached about being a model. He went to a meeting with an agency, but it didn't work out. He didn't have transportation or the ability to follow through with what was required.

470.    "If I could start over, I would go back to the day I caught the felony. That changed my life. I got kicked out of school, couldn't get a job, couldn't get in the military. Or I would go back to when I started football. I would try harder, go to the gym, and make a better effort at being an athlete. Take it more serious." "I would open up more, talk to more females. I was kind of shy back then. Shy makes you reluctant to do stuff. Once I got taller, things changed. People looked at me different. I grew four inches and was still growing between my sophomore and junior years. People noticed. I would have gone to school. I loved football. When they moved me to the C team, I felt my hobby was taken from me. I wanted to be like Jerry Rice."

471.    "I wanted to be rich, have a beautiful gal. Get the things I wanted to get. If I was rich, I would open up a charity for battered women, would have a mentoring program for kids in the community. Use businesspeople, not just sports people." Chris quoted part of a song by the Notorious B.I.G., "You're not getting out of the hood unless you sell crack rock or you got a wicked jump shot." He feels that there is truth in that statement. He feels the odds of going to the pros are so small. "Kids need to be exposed to money and money management. We spend beyond our means. We'd rather look rich than be rich."



472. "What people say and what they do is two different things. People say I am smart but they don't act that way." Chris wanted to go to college but had no money and no grades for a scholarship. He wanted to own his own business some day, or go into the military, but they wouldn't have him. He thought he could get a business degree and have a record store or start his own record label, or maybe go into real estate.

473. He enjoys a variety of music, including rap and R&B. He likes reading books by Black authors such as Donald Goins, and Black consciousness books. He is interested in the history of Trinidad and Tobago.

474. Chris leans toward Islam for religion and reads the Koran and the Bible. He does not do everything that is required of those participating in Islam, but is interested in pursuing this path. There is not a Muslim minister at the prison and he has been told there is no one available to provide spiritual guidance in the ways of Islam. There are a Pentecostal minister and a Catholic priest who have both been friendly to him in the past but do not seem to support him in his quest to learn more about Islam. He states, "I need a spiritual advisor." He feels that the unavailability of a Muslim minister "hinders me from my path."

**Summary and Assessment:**

475. Christopher Vialva's life has been one of missed opportunities. In our society, we espouse the belief that every child has the right to a safe and happy childhood, loving parents and family members, an appropriate and meaningful education, and we have hope that if he or she needs help with any area of life, that help will be available.

476. In Chris' case, he was failed at each point. Although his mother, Lisa Brown, loves Chris, she comes from a background which has made it difficult for her to appropriately demonstrate her love for him. Her own mother was cold, "wouldn't allow us to love her," and probably had mental health issues which were never addressed. Lisa's father was strict and overbearing, with many unreasonable rules, considered "mentally and verbally abusive" by Lisa's sister, Dee. Their father reportedly told Lisa that he didn't love her as much as his other children because he doubted that she was his. Lisa acknowledges that she has been depressed most of her life and has had suicidal thoughts several times over the years, beginning when she was pregnant with Chris. Both of Lisa's sisters, Dee and Tina, have been diagnosed with bipolar disorder. Tina has been suicidal and both Dee and Tina have been in therapy and on medication over time. Dee feels that their mother was probably bipolar and that Lisa may be bipolar herself, though her only diagnoses at present are depression and Post Traumatic Stress Syndrome. Lisa has been in therapy and on medication for several years as well. Lisa's brother, Mark, refused to be interviewed for Chris' case, but has been described by all family members as "having a bad temper."

84

1689



477.    Lisa relates that she was raped twice while she was in Basic Training for the Army, when she was still a virgin and inexperienced in sexual matters, although these allegations have not been substantiated. She then went on to have a series of problematic relationships with men whom she describes as abusive and cold. She relates many instances of abuse from Rowallan Vialva, Chris' father and Robert Mabrey, her daughter Audrey's father, as well as other men she dated and married. Lisa's sister Dee states that Lisa "was in a dating frenzy" when the children were small and "did not feel validated without a man." Dee goes on to say that Lisa chose many "losers" who treated her badly. Dee considers Lisa's current husband, Richard, the only decent man with whom Lisa has had a relationship, but Lisa describes Richard as "totally emotionally unsupportive" and one who is only concerned about his own needs.

478.    Rowallan Vialva, Chris' father, was raised in Trinidad, primarily by other family members because his own mother and father did not want him. He was shuffled between homes and was disowned by his father at an early age, because his father did not acknowledge that he was his son. Rowallan's mother had 13 children with a number of men, beginning when she was 13 years old. She is also described as "cold" and Rowallan has no relationship whatsoever with her to this day. Rowallan grew up in poverty, having to haul water, use an outhouse, and work for the family's support even as a young child. He began running away at age 10 and left home for good as a teenager, even going to the extreme point of asking strangers if he could live with them. He eventually left Trinidad and came to the U.S. for college, later joining the Army. He denies being abusive toward Lisa during their marriage and tells many stories that conflict with hers about their difficult relationship. Rowallan has had a series of short-lived relationships and marriages with several women prior to his marriage to Lisa and following his divorce from Lisa. He has eight children from seven different women. In general, he has found it difficult to maintain relationships with these women or with his children. His 18-year-old son, Thomas, admits to being seen by a psychologist when he was in high school because his mother "was afraid I was going to do something to myself." He denies being suicidal but also has issues with his biological father and does not get along with his stepfather so is living with other relatives.

479.    Chris came into the world to a mother who was emotionally distraught and a father who was emotionally and physically absent. He was hospitalized at 11 days old, adding to the family's stress, and possibly to neurological issues for himself. His parents were divorced soon after his birth, though not before his father had an opportunity to "bite him on his stomach" according to Lisa (though Rowallan denies this). Lisa then renewed a relationship with Robert Mabrey, with whom she had been previously involved. Lisa's physical and emotional abuse was continued by Rob. They lived in Germany for a time and both Lisa and her sister Dee relate stories of Rob's controlling and abusive behavior. Although Lisa denies that Rob abused Chris and his baby sister Audrey (Rob's daughter), Chris states that his earliest memories involve Rob coming home from

·85

1690



work, taking Chris' belt off him, and using it to "whip my ass." He was less than 3 years to 5 years old at the time. Chris was not sure what he had done to provoke Rob, but thought it had something to do with sucking his thumb. He later came to the conclusion that Rob did not like him because he (Chris) was biracial. Lisa remembers that Rob was embarrassed about Chris' heritage and wanted Lisa to say that he was adopted or Hispanic, not Black.

480.    After Rob and Lisa divorced, Lisa took the children to her sister, Tina's house in Wisconsin and then to Fort Hood. Tina and Dee both state that Lisa was not interested in being a mother, but wanted to "party," go to clubs and meet men. Lisa had difficulties with both her sisters, who tried to advise her that she needed to pay better attention to her children. Dee states that Lisa had a parade of men in and out of her house. Dee was concerned about Chris and Audrey being exposed to this but Lisa told her they didn't know what was going on. However, Chris reports that he would try to wait up for his mother, eventually falling asleep, only to wake up in the morning with "some guy's boots next to the coffee table. I knew what the deal was."

481.    Chris did not have the opportunity to experience childhood as we think of it. He was made responsible for his sister, Audrey, at a young age. After her divorce from Rob Mabrey, Lisa told Chris that he was now "the man of the house," and was responsible for taking care of her and Audrey. He was five years old. Today, Chris says, "This is a responsibility I took seriously. I felt I had to protect my mama and my sister." While Lisa worked two jobs and went out to clubs at night, Chris was responsible for taking care of Audrey, feeding her, walking her home from school and monitoring her activities. Although in some ways he admits to liking the responsibility, most of the time he felt resentful and wondered why his mother would not do her job. He wanted to do things with his friends but was confined to the house with his sister, not able to answer the phone or the door. Audrey remembers that Chris was "mostly frustrated with me and would lock me in a closet so he could go do what he wanted to do." Over the years, Chris was upset that his mother would come home, get something for them to eat and then leave again, whether for work at a second job or to go out. He remembers that even though they had not seen her all day, "she would not want to hear your voice, she had a headache, she was stressed out." Chris and Audrey had an occasional babysitter who was 18 or 19 and would "walk around naked in front of me" and "go at it with her boyfriend in a bedroom with no door." His mother apparently had at least two pornographic videos that he viewed and he reports being able to hear his mother having sex with men in their home, though he never observed it.

482.    Chris heard nothing but negatives about his father and wondered why his father had left him behind and never visited. He saw his father only twice during his formative years and did not know who he was. Chris had questions about his father's side of the family and questions about the issues between his parents, but he was never able to discuss those. He admits to being confused about his racial

identity as a small child, but came to regard himself as a Black individual as he got older. His male friends do not seem to see this as an issue, but his mother, aunt, and former girlfriend state that he felt he was "different" and didn't fit in with either race. His Aunt Dee offered to adopt him raise him when he was small because her husband is Black and she thought he would feel comfortable with them, but Chris' mother would not allow it.

483.  From Kindergarten on, Chris had difficulties in school. He could usually do the work, but acted out in class, was disruptive, didn't do his assignments and had problems focusing. Lisa was called to school on numerous occasions. She felt that some of Chris' problems were a result of racism, that some of his teachers and school officials did not like him because he was biracial. Chris stated that he did not fit in, did not really know who he was. He was seen in counseling at age 10, and told the counselor that he was sad because he didn't fit in. Sometimes kids would make fun of him. By 5th grade, Chris was having more and more behavioral problems. Because Lisa finally had health insurance, she had him tested and diagnoses of Oppositional Defiant Disorder and rule/out ADHD were given. He was qualified as having a disabling condition under Section 504 of federal antidiscrimination law, which entitled him to special considerations and modifications at school.

484.  Meanwhile, Lisa continued to have a series of men in her life, very few of whom were supportive or involved with Chris. He feels that most of them just wanted to be with his mother and couldn't have cared less about him or his sister. Some were openly hostile or racist toward him. One man, Jim Gillhouse, was kind to Chris and Audrey and they liked him a great deal. He went to the Gulf War and came back a changed man, alcohol dependent, surly and incommunicative. Lisa states that the war "took his soul." Chris was heartbroken when Jim seemed to turn on him, too, telling him to "shut the fuck up" and insinuating that Chris was the reason that he and Lisa couldn't work things out.

485.  When Chris was evaluated for behavior in 1990, Dr. Constance Fournier recommended ongoing counseling for him and for his mother, who appeared to need a great deal of support herself. This was not done and no further contacts were noted until Chris made a suicidal gesture in 1992 after getting picked up by the police for being in an abandoned building with some other boys. He held a knife to his throat and told his mother that he would rather be dead than go to jail. He was seen again and counseling was recommended for both himself and his mother. They returned for one follow up visit and apparently were not seen again other than for medication rechecks for the next several years. Chris was on Imipramine. He continued to have behavior issues at school, having several referrals for misconduct in middle school. As his sister reached puberty, she began to act out sexually and Chris felt more responsible for her, "tracking her down and bringing her home from some boy's house." He states that he might want to do something with his friends but his mother would make him go look for his sister.

87

1692



486.    Chris had some good friends in middle school and they seemed to provide some of the support that he needed. They would hang out, go to the mall, walk around the neighborhood together. This seems to be the most carefree time of his life, though he continued to be responsible for Audrey. He still had behavior issues at school and had problems with the men around the house.

487.    By high school, Chris' behavior was more and more problematic both at home and at school. He would get into verbal disagreements with his mother and her boyfriends or husband, occasionally coming to physical altercations with some of these men. He felt it was his duty to protect his mother and if he could run some guy off with his behavior, he would. During this time, it appears that very little accommodation was made for Chris' disability at school. He was charged with infractions of the Student Code of Conduct on numerous occasions but it was never found that his behavior was in any way related to his disabling condition and therefore he was administered the same punishment that a nondisabled student would receive, ranging from on campus placement to Saturday detention to suspension. Although there were specific modifications in place about how to deal with his behavior, including giving him time to step outside the classroom and cool off, none of these appear to have been utilized.

488.    When Chris was in 11th grade, his mother moved the family to another part of town, partly to get away from "gangs," but mostly to remove Audrey from proximity to a young man with whom she was already sexually active at age 12. By all accounts, this seems to be a major turning point in Chris' life. He was moved away from his good friends, Jacorby, James and Cedric, who had been the most significant support system he had ever had. Although the Willow Springs neighborhood was not the best and Chris had been in some minor trouble there, all of his friends who remained in that neighborhood have finished high school, gone on to higher education or training and are leading productive lives today. They have all stated that they feel that Chris would have been all right if he had stayed there, but that his mother "sacrificed him" by moving away. They feel that Chris was looking for somewhere to belong and he found that in the gang life in the Long Branch neighborhood.

489.    By 1996, Chris was having continual trouble at school, at home and in the community. He was referred back to the Scott and White Clinic and re-evaluated. He had discontinued his Imipramine on his own a few months before being seen by Dr. Helen Zaphiris. An abnormal EKG had concerned Chris' mother and the physician, so his medication was changed to Tenex. It was later noted that the abnormal EKG was probably just the result of Chris' thin frame and young age. Chris also agreed to attend counseling with Kerry Gist, LMSW-ACP, and did attend several sessions for about four months.

490.    In 1997, he was evaluated for Special Education and found to have diagnoses of ADHD and ODD, but amazingly, did not meet criteria for the label of Emotionally Disturbed which would have qualified him for Special Education

88

Services. He continued under the 504 umbrella, though it does not appear that any special considerations were given to Chris' disability. As his behavior deteriorated, Chris was sent to the school district's Alternative Center on three different occasions. He became more involved with the 212 Piru, a set of the Bloods gang. Most of those who know Chris do not feel that the gang involvement was serious, but a place for him to belong. His sister states that it seemed to be more about finding girls and money than anything else. His friends state that Chris was always more interested in girls than fighting, "a lady's man." However, his involvement with the law also escalated as he was charged with felony possession of a weapon. Chris obtained his high school credits but was not permitted to graduate with his class.

491. His friends indicate that there were times when Chris appeared very depressed about his family situation and his life in general. He had goals to join the military but these were shattered when he was arrested for the felony. He had thoughts of going to college and majoring in business so that he could be independently employed someday. He worked a summer job at Ft. Hood while in high school and then a job at West Telemarketing prior to this offense. His life began to spiral out of control when he lost his job and his mother and stepfather kicked him out of the house. His behavior had been problematic for some time and his mother was not sure what to do. She felt that if she kicked him out, he would be forced to get a job and become more responsible. However, Chris states that he went into a panic, not knowing what he would do to take care of himself. He had nowhere to turn. His girlfriend, Jenell, was out of town in El Paso and none of his friends could take him in. He felt abandoned, that no one cared about him. He also felt that he was worthless, that his mother had told him for years that it was his job to take care of her and his sister, but now "my services were no longer needed."

492. Some children are able to cope with a variety of traumas and disruptions in their lives, but when there are a myriad of difficulties compounding one another, it is extremely difficult to recover. Chris' life is one containing many "what if?" questions. What if his mother and father were both better equipped to be parents and to interact appropriately with one another and with Chris? What if Lisa's mental health issues had been addressed at an early age and she had received appropriate treatment? What if Lisa had been more stable in her relationships when Chris was a child? What if Chris had been allowed to be a child rather than a mini-adult, raising his sister, something he was ill-prepared to do? What if Lisa had more support in her life and was therefore more able to be a mother to Chris and Audrey? What if Aunt Dee and Uncle Larry had raised Chris, or even if they had been a more constant presence in his life, so that he could have had a strong racial identity and a strong father figure? What if Chris had had an appropriate diagnosis, ongoing counseling and appropriate medication to address his problems? What if the school district had attempted to truly address Chris' learning issues and the way that his behavior was impacted by his disability?



493.    It is evident that, had Chris had the opportunity to have more appropriate parenting and family stability, proper evaluation and ongoing treatment of his mental health issues, a strong father figure, and a truly supportive educational environment, his life could have been dramatically different. Along with these issues, Chris was young (19) and had still immature brain development at the time of the offense, as well as possible neurological and learning issues which had not been properly addressed.

494.    There are many mitigating factors which could have been brought to the forefront in Chris' trial. If the mitigation specialist had had the proper time and funding to interview Chris, family members, friends and collateral contacts, as well as to perform a thorough records review, this information could have been presented to the jury for careful consideration. First and foremost, Chris' family history of mental illness could have been explored and a thorough evaluation of Chris and his mother would have revealed additional important information. Experts could have discussed Chris' need for structure and balance in his life, as well as the benefits of appropriate intervention over the years. The jury could have heard an explanation regarding the genetic components of bipolar disorder and the effects that mental health issues have on individuals and families. A large number of family members are diagnosed with or suspected of having mental health issues, including both of his maternal grandparents, his mother and her two sisters, possibly one of her brothers, and Chris himself. Additionally, Chris' father, Rowallan, comes from a family in which his biological mother was cold and uncaring, his father "disowned" him, and he has a history of being emotionally distant from Chris. Rowallan's son, Thomas, has undergone evaluation for depression as well.

495.    Chris feels that he was depressed during his growing-up years. His diagnoses of ADHD and Oppositional Defiant Disorder may have been inaccurate. He was on medications which may have been inappropriate for his needs. He did not receive consistent counseling or intervention to address his problems. He also had physical problems which could have caused brain dysfunction, including a forceps delivery, serious illness at age eleven days, high fevers, being held over a railing and shaken by his mother as an infant, being hit in the head with rocks as small boy, and having swelling of the head after a fight as a teenager.

496.    Discussion of Chris' family structure and the difficulties within the family would have helped to explain his acting out behaviors. Chris was struggling to understand his emotionally needy mother, his absent father, a variety of men in and out of his life, none of whom were a stable father figure, his early responsibility to "take care of" his mother and sister, his racial identity and a desire to find a place to fit in, as well as his own confusing emotional state.

497.    When he had problems in school, Chris was not provided with appropriate intervention to help him deal with the issues at hand, but instead was regularly punished for behaviors which were likely influenced by his disability. Although

90

Chris was considered a "disabled individual" under Section 504 of federal civil rights legislation, his disability was not adequately taken into consideration when addressing discipline problems at school. With a diagnosis of ADHD, impulsivity, poor decision making, poor planning, and impaired ability to consider consequences are all part of the disorder. These were exactly the kinds of problems he was having in school, but the school repeatedly decided that his problems had nothing to do with his disability. Even if the diagnosis was incorrect, the school had a responsibility to address Chris' problems in a way that was related to his disability as it was documented at the time. It doesn't appear that his modifications were ever seriously considered.

498.  Chris witnessed violence toward his mother and was a victim of abuse by his first stepfather, Robert Mabrey, as well as by a number of other men with whom his mother had intimate relationships. In addition to physical violence, he experienced emotional abuse in the form of racism and pervasive feelings of not being wanted or being able to fit in with his own family. He felt rejected by his biological father and his maternal grandfather. He was inappropriately exposed to sexual behavior at a young age.

499.  His youth and immaturity were factors to be considered, as well as his incomplete brain development at the age of 19, especially in higher order thinking abilities.

500.  Finally, there was much "good person" evidence to be considered. Although Chris had a somewhat problematic relationship with his sister, Audrey, she still considered him her "father figure" as well as her brother, her primary caregiver, and her protector. She states that he would stand up for her no matter what. Chris' female friends state that he was kind and considerate, that he had a great deal of respect for females and they could never see him as one who could be violent toward a woman. Jenell Hamilton states that she felt "cherished." She and Jessica Haskins could have shed light on the sensitive side of Chris, the young man who was poetic and romantic, who had difficulty dealing with his emotions at times, who spoke of hopes, dreams and goals. Chris' male friends could have painted a picture of a young man who liked to have fun, who would rather be with girls than fight, who was a "lady's man" and not a violent criminal. All of them were shocked to learn of Chris' involvement in such a crime and still · state that they cannot believe he was capable of killing. Even though his friends did not come from the best of circumstances themselves, they have all turned out well, with degrees or technical training, good jobs and responsible lives. They each feel that Chris would have had a different life if he could have had the support system that they had. Charlene Burke, the mother of Chris' friend, Ben, saw Chris as "a lost kid who just needed someone to care about him." She does not feel that he should be feared and would welcome him into her home today, regretting that she did not take him in when he was a teenager and needed a place to stay. Chris has maintained contact with his younger half-brother, Thomas and continually encourages him to educate himself, read, make plans and set goals so that his path will be different.

501. The jury did not have an opportunity to see Chris Vialva as a whole person. They were unable to make a good decision about his punishment because they did not have all of the information they needed to do so. With a complete mitigation investigation and the testimony of appropriate witnesses, their decision could have been one which granted life.

Jane McHan, LCSW
Mitigation Specialist

92

1697

11/98