

## DECLARATION OF DEBBIE BYNUM

I, Debbie Bynum, declare under penalty of perjury that the following statement is true and correct, to the best of my information and belief:

1)    My name is Debbie Bynum. I am of legal age and reside in the State of Texas. I read and write the English language fluently;

2)    I am making this statement voluntarily. I have not been promised anything, forced, induced, or otherwise improperly persuaded to make this statement. I am not suffering under any physical or emotional impairment that prevents me from understanding the contents of this statement;

3)    Christopher Vialva's mother, Lisa Brown, is my sister. Our life growing up was nomadic; we moved around a lot and had no clear family structure. There is a history of mental illness within our family. I have been diagnosed with bipolar disorder, as has our other sister, Tina Erdmann, who has suicidal tendencies as well. I believe that our mother may have had bipolar disorder. She had mood swings and was very erratic at times. She would be up one minute, then crying and isolating herself the next. Our mother had few friends and would cry at the drop of a hat. She took her moods out on the children. At times, she would put us out in the yard for 8-10 hours at a time. We learned to fend for ourselves, play games, build a fort on our land, climb trees. I believe that Lisa Brown has mental health issues that she has never addressed;

4)    I did not have much to do with Chris' upbringing. His mother was in and out of my life. She lived with me once when Chris and Audrey were little and she got a job on Fort Hood. We had a falling out because she stole my car. She had already been thrown out of our sister Tina's home because Lisa wanted to party all the time and not be responsible for her kids;

5)    Lisa has always seemed to feel that she was not validated without a man in her life. She was always searching for a man. When the children were young, Lisa was on a dating frenzy. She had many men in and out of her home. She thought the children did not realize what was going on when she had men spending the night, but I believe they were affected by this. Most of Lisa's husbands and boyfriends were abusive in some way. Her current husband, Richard Brown, is the only one who has wanted to be a real husband and provider. There were many men in Christopher's life but none were a father figure. He grew up seeing men treat his mother disrespectfully;

6)    I believe that Chris had an identity problem. He was not sure if he was Black, White, or in-between. Later, he decided he was Black. I am married to a Black man and I offered to take Chris when he was young and raise him in our family. I felt he would fit in with us, but Lisa said "absolutely not." It was

1

Exhibit VII-E

discussed several times and then dropped. Chris liked me and my husband, Larry, and I feel it would have been a better situation for him. I believe that none of Lisa' men ever accepted Chris. He never felt welcome. He could never really fit in. Some of them did not like Chris because he was of mixed race. Some were openly racist. Chris definitely had esteem issues;

7)    Lisa asked me to testify in Chris' trial but I told her I would not. I believe in the death penalty and believe that a person should be punished if he commits a crime. I also did not know anything good to say about Chris. All I had heard from Lisa was about the trouble he had been in and the things he had done that she didn't approve of;

8)    I was never contacted by any lawyer, investigator or anyone else working on Chris' case. I did not realize that I could have helped Chris simply by relating the information that I knew about his family situation and about our family's mental health issues. I thought I would be expected to get up on the stand and talk about what a good person he was and I was not comfortable with that. No one explained to me that there was other information that was important to his case. I would have been willing to testify to the information outlined in this declaration if I had been asked.

I certify under penalty of perjury that the foregoing Declaration, consisting of eight paragraphs, is true and correct. Executed this ___4th___ day of May, 2004, in Killeen, Texas.

_Debbie L. Bynum_
Debbie Bynum

Witnessed by        _Jane McHan_
                    Jane McHan

2

1701

DECLARATION

I, Rowallan A. Vialva, being of lawful age, do hereby verify and state:

1)      I am a citizen of both the United States and Trinidad. I reside currently in Trinidad, West Indies;

2)      I read and write the English language fluently;

3)      My ability to see, hear, and understand written and spoken information is not impaired by age, mental or physical infirmity, medication, or any chemical substances. I am making this Declaration voluntarily, free of threats, promises, or coercion;

4)      I am the father of Christopher Vialva. I met Christopher's mother, Lisa Dickson, when were both serving in the United States Army, stationed at Fort Benning, Georgia. Lisa and I married shortly after we met, at her suggestion, to resolve a situation she caused that could have affected adversely my military career. We had difficulties getting along with each other from the beginning. When Lisa told me she was pregnant, I was unsure if the child was mine, but I still wanted to do what I could to help. I was out of the Army by the time Lisa informed me she was pregnant. She decided to join me in Houston, in spite of the fact we were still having problems;

5)      Christopher was born May 10, 1980. Just a few days later, Lisa called me at work and said Christopher was sick. He was hospitalized. I understood the diagnosis was the type of meningitis that could cause permanent brain damage and speech impairment. This was my first civilian job in the United States and I could not take off from work for extended periods of time. Lisa stayed at the hospital with Christopher while I worked. I went to the hospital and stayed so she could get some rest. After Christopher was released from the hospital, Lisa took him to Wisconsin to her sister Tina's house. I visited them once over a weekend. Tina made it clear they did not like me. Lisa came to the motel where I was staying. We were supposed to have dinner and talk about our situation. The police knocked on the door. Tina had sent them to look for Lisa. Lisa and I separated shortly after this. She called me later to say she had filed for divorce;

Page 1 of 3

Exhibit VII-F
1702



*Declaration of Rowallan Vialva*

6)   I paid child support into the court, as ordered.  Lisa was given sole custody of Christopher.  I did not have visitation rights.  I had no contact with Lisa or Christopher for several years.  When Christopher was about seven or eight years old, I felt I should try to make some kind of contact with him.  I bought him a remote controlled car, the first present I ever gave him.  Lisa was not happy that I was visiting.  Christopher did not know me and felt trying to press the issue would only make things worse;

7)   Throughout the years Christopher was growing up, Lisa never called me or contacted me to say she was having trouble with him.  Lisa knew the company where I was working and could have contacted me.  I have three sons, including Christopher, and five daughters.  If I would have known Christopher was getting into trouble, was having difficulty in school, or was hanging around with troublemakers, I would have taken him to raise in my home;

8)   I learned that Lisa accused me of biting Christopher when he was a baby and hurting him.  This is a pathological lie;

9)   I was raised in the Catholic Church and I raised my other children as Catholics.  It is my practice to keep a place in my house where I pray.  I have my Bible and rosary in this area.  I have never practiced voodoo, or any other form of spiritualism or religion;

10)   I learned of Christopher's arrest when Lisa called me.  I was living and working in the United States at that time.  I tried to retain two lawyers in Houston, Texas to represent Christopher, but they required $80,000.00 to $90,000.00.  I did not have that amount of money available to me.  I was still discussing the matter with them when Lisa called to say the State was providing lawyers and experts for Christopher.  I called the lawyer Lisa said was representing Christopher.  I spoke with him on the telephone once  The lawyer, Stan Schwieger, said he was working with an expert in federal death penalty cases.  I asked him some questions about what he was going to do.  He gave me very general answers.  I thought he was going to call me back, but he never did.  I tried calling the lawyer again, I believe twice, but he was not in.  The lawyer never called me back;

11)   I went to see Christopher at jail in Waco.  Because I was from out of town, I was allowed to visit all day.  I believe this was in January, after I was laid off from my job.  Lisa was also at the jail.  She made no attempt to discuss the case with me, or to discuss Christopher with me.  I was trying to keep up with case by reading accounts on the Internet.  Lisa spoke with me a few times and gave me a few details about how the case was developing;

1703

*Declaration of Rowallan Vialva*

12)     Neither Lisa nor Mr. Schwieger mentioned I could have helped Christopher. I did not know I could have testified for him. I was not contacted by any lawyer or investigator working on the case until March, 2004;

13)     I would have done anything I could to help Christopher in his trial. My relationship with Christopher's mother deterred me from trying to be part of his life while he was growing up. It was always my hope that when he got to be eighteen, he would find me and we could talk. I supported myself since I left home at the age of thirteen. I remember what it was like to feel alone in the world and afraid for what was going to become of me. If I would have known Christopher was put out of his house, I would have let him stay with me and helped him get a job. Not being part of Christopher's life is a great regret for me. I would have explained all of this to the jury, if the lawyer would have told me I could.

In accordance with Title 28, United States Code, Section 1746, I verify, under penalty of perjury under the laws of the United States of America, that the foregoing Declaration, consisting of thirteen paragraphs, is true and correct.

Executed in San Fernando, Trinidad, West Indies, on the __/2__ day of April, 2004.

Rowallan A. Vialva

Witnessed by:

Jane McHan

**Page 3 of 3**

/704

1705

## DECLARATION OF JACORBY SMITH

I, Jacorby Smith, declare under penalty of perjury that the following statement is true and correct, to the best of my information and belief:

1) My name is Jacorby Smith. I am of legal age and reside in the State of Texas. I read and write the English language fluently;

2) I am making this statement voluntarily. I have not been promised anything, forced, induced, or otherwise improperly persuaded to make this statement. I am not suffering under any physical or emotional impairment that prevents me from understanding the contents of this statement;

3) I met Christopher Vialva in middle school in Killeen, Texas. We were in 6th or 7th grade at the time. We played football and started hanging around together in school. Later, I moved to Chris' neighborhood and we saw each other more often outside of school. We always had good times. We would spend two hours at the mall, looking for girls, played football, walked around the neighborhood and hung out with our friends. He was just a normal kid like everyone else; he was a good kid coming up. He never got into any major trouble.

4) We were close friends until Chris and his family moved to another part of Killeen and we were not able to see each other as often any more. I believe we were in 11th grade. His mother moved them because she wanted to get his sister, Audrey, away from a boy. But she sacrificed Chris. We would still get together on occasion. I had a car by then, and I would go to pick him up sometimes. Chris began to make friends with another crowd, some guys who were considered to be a gang. Things were good with us until he moved across town. The Willow Springs area, where we both lived at first, had some problems, but it was even worse in the Long Branch area, where Chris and his family moved. They had the Long Branch Crips there. Things got worse for Chris. It was hard for him to move away from his friends;

5) I did not think Chris and his new crowd were a real gang; to me, it just seemed like a bunch of punks. I thought it was stupid to get into fights over the wearing of certain colors. I told Chris once that it was a bunch of crap to fight over a crayon box. I did not take the gang thing seriously. I told him I was already part of the biggest "gang" in high school—the Varsity football team. I think Chris just wanted to be part of something. He had been an all-right running back in football, but they wouldn't give him a chance when we got older in high school, so he stopped playing;

6) Chris was never the type to act like he was so bad. One time, we were about to get into a fight and he just left my house. He did not want to fight me;

Exhibit VII-G

1706

7)    Chris did not know his biological father.  He said he had lots of brothers and sisters he didn't know.  He sometimes had arguments with his mother and sister, but they never seemed serious.  Chris was overprotective of his sister.  He seemed to get along all right with his stepfather.   He never talked much about any problems he might be having.  I think he did not want to appear "soft" around his homeboys.  He may have been depressed at times, but it mostly seemed like he wanted to be a part of something;

8)    I never would have thought that Chris would have had the guts to be involved in such a crime.  At the time of the offense, I was home from college and working for the summer.  I ran into Chris at a convenience store, getting gas.  We talked for a few minutes.  There was another guy standing outside the car with some lighter fluid.  There were two other guys in the backseat of the car.  I did not know any of them.  Chris said they were on a paper chase (going to get some money).  They were in a burgundy or red car, either a Cutlass or some kind of Buick.  Chris was calm and didn't seem nervous or anything.  Later, my friend James Davidson told me that Chris was arrested in a carjacking.  When I saw the report about the murders, I thought it was a separate incident.  I never would have thought the two incidents were related.  I heard that Chris was accused of being the triggerman, but I couldn't believe he could do that.  I wouldn't think that he would have the guts;

9)    When Chris said he was going on a paper chase, I just thought that he might be selling marijuana or something petty.  I didn't know he had been kicked out of his house.  That could have depressed him, especially if he thought his mother was choosing her husband over her own child;

10)   Before Chris' trial, no one ever contacted me to gain information or to ask me to testify on Chris' behalf.  My mother told me that someone called the house asking for me and she told them I was away at college.  They just dropped it then.  They never asked her how to track me down or how to contact me.  I know that Chris called me at my grandparents' house that same summer, so if he could find me, surely Chris' lawyers could have found me.  I did not understand how important my testimony could have been in a death penalty case.  I was completely willing to testify or to help in any way I could.  James Davidson, Cedric Young and I were Chris' best friends for a good part of his life.  None of us were contacted by any attorney or investigator working for Chris.

I certify under penalty of perjury that the foregoing Declaration, consisting of 10 paragraphs, is true and correct.  Executed this ___3rd___ day of May, 2004, in Killeen, Texas.

_Jacorby Smith_
Jacorby Smith

Witnessed by _Jane McHan_
Jane McHan

1707

1708

## DECLARATION OF JAMES DAVIDSON

I, James Davidson, declare under penalty of perjury that the following statement is true and correct, to the best of my information and belief:

1)   My name is James Davidson. I am of legal age and reside in the State of Texas. I read and write the English language fluently;

2)   I am making this statement voluntarily. I have not been promised anything, forced, induced, or otherwise improperly persuaded to make this statement. I am not suffering under any physical or emotional impairment that prevents me from understanding the contents of this statement;

3)   I met Christopher Vialva in 1994, when we were in 6th grade in Killeen, Texas. Chris lived across town, so we did not see each other a lot at first. Later, Chris moved to the Willow Springs area, where I was living, and then we lived about three blocks apart. At that time, we began hanging out together regularly. We would play football and go to the mall together;

4)   In 11th grade, Chris moved from the Willow Springs area to the Long Branch area of Killeen. We still saw each other from time to time, but he started to hang around with other friends. On one occasion, I was at his house and saw pictures of guys wearing red bandannas, "Bloods." I didn't think Chris was very big into the gang, but just testing it. Sometimes he would ignore his old friends when he saw us, and I didn't like that. A couple of times, I tried to fight him for acting like he didn't know us, but he wouldn't fight;

5)   Chris was never in much trouble when he was younger. I always thought he was really smart. I never saw him act violent toward anyone. I thought he was a wimp and couldn't see him behaving in a violent way;

6)   At times, Chris would be upset about his dad not being around and about having to protect his sister. Sometimes he had arguments with his mom. A lot of the time, he would just stay at home, playing Nintendo or Sega. He seemed to be cool with his stepdad, Richard Brown;

7)   I was shocked to hear about the crime Chris is accused of. It doesn't seem like something Chris would do. I thought maybe he was forced into it, but I am not sure who would force him. I knew his codefendants by face, but I didn't know their names;

8)   I was one of Chris' best friends growing up. No lawyer, investigator, or anyone associated with his case contacted me before his trial. I was not aware that my testimony could have been used to help Chris. I did not understand

1

Exhibit VII-H

the way that a death penalty case is conducted. No one explained to me that it could be important for me to discuss my knowledge of Chris' life and circumstances. I would have been willing to testify if I had known that I could have helped.

I certify under penalty of perjury that the foregoing Declaration, consisting of eight paragraphs, is true and correct. Executed this __3__ day of May, 2004, in Killeen, Texas.

James Davidson

Witnessed by

Jane McHan

2

1710

1711

**DECLARATION OF JESSICA HASKINS**

I, Jessica Haskins, declare under penalty of perjury that the following statement is true and correct, to the best of my information and belief:

1)      My name is Jessica Haskins. I am of legal age and reside in the State of Texas. I read and write the English language fluently;

2)      I am making this statement voluntarily. I have not been promised anything, forced, induced, or otherwise improperly persuaded to make this statement. I was not suffering under any physical or emotional impairment that prevents me from understanding the contents of this statement;

3)      I met Christopher Vialva in my senior year of high school or the summer before school started that year. I believe he was a junior in high school at the time. We were friends and then dated for about one month. After we dated, we remained close friends until the time of his arrest. I still consider us to be friends, though we have not been in touch on a regular basis over the past two to three years;

4)      During high school, I knew that Chris was hanging around with some guys who were considered a "gang." I did not like this and I told him as much. I considered them to be "wannabe's" and did not think they were a serious gang. No one at school was afraid of them. I was not sure how involved Chris was, but the most I knew about was that they got into fights at parties;

5)      When we were dating, Chris liked being at my house instead of with the guys. He seemed to feel safe there and didn't have to prove himself. I believe that he wanted to get out of the gang but he felt trapped. At times, he would appear depressed and talk about his life and his family. He wanted things to be different between him and his mom and sister. He felt different, like something was wrong with him. He felt depressed about life, trying to fit in. Sometimes he would sit on the curb and just be quiet, staring into space like he was blacked out or something. At times, he would talk for hours. He said his life was hard growing up and that his biological father beat his mom. He would sometimes get along with Rich (Richard Brown, stepfather) and sometimes not. However, Chris thought Rich was a good man for his mom. Chris was very protective of his mother and his sister. His sister had a lot of problems and he worried about her;

6)      I was never present when Chris got into fights. I never saw him act in a violent way. He was always nice to me and treated me with respect;

1

Exhibit VII-I

1712



7)      When he wasn't sad, Chris was fun to be around, funny, a nice person, someone who could be outgoing.  But he seemed depressed a lot of the time. He didn't care about life then.  He used to talk about goals when he wasn't depressed, such as joining the Army. He did have a tendency to be moody, one minute happy, then very depressed, as if he was going to cry.  I saw him cry once or twice when he was depressed about something, but he wouldn't talk about it.  During the last few months before the offense, he seemed unusually depressed.  He wouldn't smile at all. I was supposed to pick him up to look for a job and I forgot.  This was either the day of the offense or the day before.  I feel bad; I know he wanted to talk.  He said, "I really need to talk to you."  He had called every day, needing to talk, but I was busy with a lot of things.  I feel guilty that I should have been there for him and maybe things would have been different;

8)      I never could have imagined that Chris could commit this crime.  He did not seem to be the kind of person who would hurt someone.  I talked with him on the phone after he was arrested.  I was real mean to him, telling him I couldn't believe it and asking him what was wrong with him.  He said he didn't know what he had done;

9)      No lawyer, investigator, or anyone associated with Chris' case contacted me prior to his trial.  I did not know how the legal system worked and did not realize that my testimony could have helped Chris.  I have always been willing to testify for him but no one talked with me about it or explained how my testimony could have been helpful.

I certify under penalty of perjury that the foregoing Declaration, consisting of nine paragraphs, is true and correct.  Executed this _____ day of May, 2004, in Killeen, Texas.

_____
Jessica Haskins

Witnessed by  _____
Jane McHan

2

1713

1714



## DECLARATION OF JENELL HAMILTON

I, Jenell Hamilton, declare under penalty of perjury that the following statement is true and correct, to the best of my information and belief:

1) My name is Jenell Hamilton. I am of legal age and I reside in the State of Texas. I read and write the English language fluently;

2) I am making this statement voluntarily. I have not been promised anything, forced, induced, or otherwise improperly persuaded to make this statement. I am not suffering from any physical or emotional impairment that prevents me from understanding the contents of this statement;

3) I attended middle school in Killeen, Texas with Christopher Vialva. I was a year younger than he was. We did not know each other very well at that time, but I knew who he was from school and from our families living in the same neighborhood. In 1999, we were both working at West Telemarketing in Killeen, Texas. We became friends and started dating. I became acquainted with Chris's family because of my relationship with him. I knew his mother, Lisa Brown, and his stepfather, Richard Brown. I felt like an older sister to Chris's sister Audrey. Everyone in the family talked with me at one time or another about Chris, their lives together, and the problems they had shared. I had my share of problems growing up, too, so I felt close to all of them. Chris told me his mother had been married several times. Before Lisa married Richard, she was involved with a younger man who was in the military. That situation turned bad when the man tried to force Lisa to choose between him and her children. Chris said he felt like he had been Lisa's protector throughout the years, in many of the situations in the home. I believed this because Chris's mother seemed to have a very close relationship with him;

4) Chris told me when he was in middle school he felt he never fit in with either the white or the black kids. Since Killeen is a military town, there are lots of mixed race children, but that never made things easier. When Chris was younger, he hung around with the white kids. Chris seemed more comfortable around black people the older he got I knew Chris hung around in school with a group of teenaged boys who called themselves a gang. I did not want anything to do with any of that. Before Chris and I started dating, he told me he was out of that activity. Chris's mother moved the family out of the Willow Springs neighborhood because of the gang activity. From time to time, Lisa would tell Chris that certain friends of his couldn't come over to the house. I knew several of the guys Chris hung around with, including Terry Brown, Brandon Bernard, Tony Sparks, Chris Lewis, Billy Rorie, and some of the Presleys;

Exhibit VII-J

1715



*Declaration of Jenell Hamilton*

5) Chris and I had many of the same interests. We often talked about our plans for the future and what we wanted to do with our lives. I told Chris I wanted to be a doctor. Chris was very supportive of me. Poetry was one of the things we had in common. Chris wrote poetry and liked to rap. He was good at both. Chris was never verbally or physically abusive to me. He was very kind to me and always very considerate of my feelings. I felt he cherished me. We had very few disagreements and he would not let the day pass without resolving things. He would not hang up the telephone until we had talked out whatever little problem we had. In that way, Chris seemed mature for his age. Chris tried really hard to be happy and cheerful around me. I hurt his feelings once or twice without meaning to, and his mood would change immediately. I could tell there were lots of things he wasn't happy about in his life. I felt he was trying to make positive changes. Chris's mother was telling him he was starting to act like his father. This was a very negative thing for Lisa to say because she told me how abusive Chris's father had been to her. Chris knew who his father was, but never had much contact with him;

6) I quit working at West Telemarketing ~~after~~ before not I graduated from high school. In June, 1999, I went to El Paso to visit a childhood friend. I called Chris from El Paso. He said there was a lot going on. His mother kicked him out of the house because he wasn't working. I asked him where he would be when I got back. He answered, "Probably in a ditch." Based on Chris's relationship with his mother, I knew this would be really hard for him. I heard about Chris being arrested from a report on TV. The charges against Chris were so out of character from anything I had experienced with him. I had a very hard time dealing with the accusations against Chris. Even though the jury convicted Chris, I still have a very hard time believing he would hurt a woman because it is so unlike anything he ever did when we were together;

7) I continued my relationship with Chris, even though my parents didn't want me to. I visited Chris while he was in the McLennan County jail. I joined the Air Force and was in training when Chris was in trial. I think one of the lawyers called me at my duty station. I also think Lisa Brown asked me if I would testify for Chris. The situation was very hard for me at the time. No one explained how my testimony could have helped. I did not understand how death penalty cases were tried and how my testimony could have been used to help Chris. As difficult as it would have been for me at the time, I would have testified for Chris if I would have understood why my testimony would have mattered.

1716

*Declaration of Jenell Hamilton*

I certify under penalty of perjury that the foregoing Declaration, consisting of seven paragraphs, is true and correct. Executed this 2I day of April, 2004, in KILLEEN, Texas.

Jenell Hamilton

Witnessed by _____
Jane McHan

\7\7

1718

# DECLARATION OF CHARLENE BURKE

I, Charlene Burke, declare under penalty of perjury that the following statement is true and correct, to the best of my information and belief:

1) My name is Charlene Burke. I am of legal age and reside in the State of Texas. I read and write the English language fluently;

2) I am making this statement voluntarily. I have not been promised anything, forced, induced, or otherwise improperly persuaded to make this statement. I am not suffering under any physical or emotional impairment that prevents me from understanding the contents of this statement;

3) I met Christopher Vialva through my son, Benjamin Sims. Benjamin had gone to live in Killeen with my brother and his wife because we were having some problems in Garland, where we were living at the time. My brother was stationed at Fort Hood. While Benjamin was living with my brother, he would often come home on weekends and he started bringing Chris home with him The boys were in 10th grade;

4) Chris was always polite and respectful when he was in my home. He called me "Ms. Charlene" and my husband "Mr. Frank." I never had any difficulties with Chris. I felt about him the same way I feel about my own son. I never saw him behave in a violent way. I knew that he had been involved in some fights at school and on the streets, but I did not think they were anything serious. I had a new baby at the time and I completely trusted Chris to be around my infant son;

5) I believe that Chris' mother was not very involved in Chris' life. We had a few phone conversations and she did not seem to care where Chris was or whom he was staying with. Instead of being concerned about her children, she seemed more concerned about finding a man for herself. She was regarded as the "base whore." In my opinion, she was not a good mother. She was not there for Chris or his sister, Audrey. Chris' mother expected Chris to be the caretaker for Audrey. Chris was the one who made sure that Audrey had lunch and was taken care of. I don't believe that Chris should have been put in that position;

6) Chris was very smart and seemed to be bored in school. I do not believe that he had enough stimulation at school and he found it hard to conform, which is why he may have been in some trouble there;

7) I did not see Chris as depressed, but I felt that he was searching for a way to belong. He seemed to find acceptance in the gang. He seemed to have some difficulty being a bi-racial individual and would talk about feeling "different." It bothered him that some of his mother's family would not have anything to

Exhibit VII-K

1719

do with him because he was bi-racial. I know that he has been depressed since being incarcerated. He had a hard time dealing with the isolation and would hear voices at night;

8) At one time, Chris asked to come and live with my family. He and Benjamin had plans to finish school and go into the Marines. We considered it, but I felt that I could not handle the responsibility since I had a job, a new baby, and my son, Benjamin, to take care of. I will regret this decision for the rest of my life. I feel guilty that I did not allow Chris to come and live with us, because I feel that he would not be in the situation he is in now if I had done so. I cannot forgive myself for letting him down, even though he has forgiven me;

9) If Chris were to be released from prison today, he would be welcome in my home. I do not see him as a cold-blooded killer. I was devastated when I heard of the offense and could not believe that he was involved. I thought that his name was wrong in the news article. I still cannot imagine that Chris would commit such a crime. I feel that there is information that we do not know about what really happened and who was really responsible;

10) I was not contacted by any attorney, investigator, or other person working on Chris' case. I would have been happy to testify for him at his trial. I had a difficult time finding out any information at all and did not know that I could have helped him.

I certify under penalty of perjury that the foregoing Declaration, consisting of ten paragraphs, is true and correct. Executed this ___18 th___ day of May, 2004, in Richardson , Texas.

Charlene Burke
Charlene Burke

Witnessed by:

Signature

Printed name

2

1720

# DECLARATION

I, Patrick Lee Brockett, do hereby declare the following to be true and correct, under penalty of perjury:

1.  I am of lawful age and reside in Austin, Texas.

2.  I hold a Ph.D. in Mathematics from the University of California at Irvine, California. I am the Director of the Risk Management and Insurance Program at the University of Texas at Austin. I hold the Gus S. Wortham Chair in Risk Management and Insurance at the University of Texas at Austin. I am the Director of the Center for Risk Management and Insurance at the University of Texas at Austin. I am a professor in the Departments of Management Science and Information Systems, Finance, and Mathematics at the University of Texas at Austin. I am a Janey Slaughter Briscoe Fellow at the IC $^2$ Institute.

3.  Among other professional memberships, I am a fellow of the American Association for the Advancement of Science, the Institute of Mathematical Statistics, the American Statistical Association, and the Royal Statistical Society. I am a Special Member of the ASTIN Section of the International Actuarial Association, and an Academic Corresponding Member of the Casualty Actuarial Society. I am the former Director of the Actuarial Science program at the University of Texas at Austin and have won several awards for my research in actuarial science.

4.  I am Editor of the *Journal of Risk and Insurance*, a Member of the Distinguished Honorary Editorial Board, *North American Actuarial Journal*, a Member of the Editorial Board of the journal *Applied Stochastic Models in Business and Industry*, and an Associate Editor of *Insurance: Mathematics and Economics*.

5.  I have been retained as an expert in actuarial science by the Federal Public Defender for the Western District of Oklahoma to assist in the representation of Mr. Christopher Vialva. My qualifications to serve as an expert in this field are enumerated in my *curriculum vitae* appended to this declaration as **Exhibit 1**.

6.  To prepare my opinion in this case, I reviewed the testimony and documents

Exhibit VII-L

itemized in the list which is appended to this declaration as **Exhibit 2**.

7.    At Mr. Vialva's trial, the defense presented Dr. Mark Cunningham as an expert in violence risk assessment at capital sentencing. (XV Tr. 2960-3115). Dr. Cunningham testified about "using statistical information from various groups to best estimate the likelihood of an individual defendant behaving violently in prison." (XV Tr. 2965). He further testified that "group statistical data [could] help educate us about the likelihood of capital offenders being violent in prison." (XV Tr. 2966).

8.    Dr. Cunningham compared his analysis of his violence risk assessment methodology to that of the insurance industry. He explained to the jury that the insurance industry has:

> been commercially involved in the business of risk assessment for hundreds of years. For example, your automobile insurance. When my son turned sixteen, my insurance rates went up for a thousand a year, and that's based on the insurance company's experience with sixteen-year-old male, unmarried drivers, and they used that group to basis to then estimate the likelihood of my son having an accident in the community. Similar sorts of applications of group statistics occur in medicine. In fact, any scientifically-informed practice of medicine or psychology is directly connected with group statistics. For example, if I go to the doctor and he diagnoses a cancer, one of the first questions that I have is, "What's my prognosis?" Well, the prognosis is the five-year survival rate of people with a similar cancer, and we consider what my chances are. Or even if I go to the doctor and have an infection, he prescribes an antibiotic for me, that's also based on group statistics, that a large number of patients that have this particular infection were given this antibiotic in the drug trials, and this percentage of them responded favorably with this small percentage of side effects, and that's how he knows to give that medication to me. So, group statistical information is extensively used in a number of different applications in our culture.

(XV Tr. 2966-67).

9.    Dr. Cunningham described the "base rate" as "how often something happens in the group. The fancy definition is, it's the statistical prevalence of a particular behavior over a set period of time." (VX Tr. 2981). He said, knowing the base rate is "the single most important piece of information necessary to make an *accurate prediction*." (XV Tr. 2981) (emphasis added).

10.   Dr. Cunningham is describing using group statistical data to predict individual group member behavior. Dr. Cunningham immediately misinforms the jury when he compares violence risk prediction to insurance industry risk assessment. The insurance industry uses group statistical methods to fairly allocate premium dollars collected on a group setting to payments of losses incurred in a group setting. A principal difference between insurance industry predictions of risk of loss and violence risk prediction is that the insurance industry predicts the risk of loss of the group to assess *its* (the insurance company's) risk, not the risk of an individual, whereas violence risk prediction purports to predict the risk that an individual will engage in violent conduct. The insurance industry has vastly more data supporting its analysis of risk, giving greater assurance of the statistical validity of the analysis. Moreover, the insurance industry tends to exclude applications to "voluntary acts." Prison violence, however, is primarily a voluntary act and reflects an individual, rather than a group, decision. Violence assessment is intrinsically an individual matter. There is, thus, a fundamental difference between the two applications and the legitimacy which the methodology has as applied to the insurance industry cannot be imputed to Dr. Cunningham's violence risk prediction.

11.   That is not to say, however, that the data on which Dr. Cunningham relies cannot be used at all – indeed there are legitimate uses for such data. One valid use of group statistical data is to predict how the *group* of inmates will likely behave (predicting group behavior as does the insurance industry). Scientifically legitimate uses of the data to which Dr. Cunningham refers (occurrences of prison violence) would use the data to assess the risk of violence in the group and then adjust prison guard, security strength, or confinement conditions accordingly. Indeed, Sorensen reports that the initial use of such data was for "making housing and security decisions in prisons." *See* Sorensen (2000) at 1258.

12.   Further, the data Dr. Cunningham discusses validly describes a very low

historical rate of violence in prisons. For example, one study on which Dr. Cunningham relies describes a rate of 0.1% for inmate involved homicides in prison, which is far lower than that in the general community. *See* Sorensen (2000) at 1256. To the extent that a jury may overestimate or misperceive the opportunity for violence in a prison community, the numbers Dr. Cunningham reports can be validly used to disabuse the jury of those notions.

13. However, when Dr. Cunningham begins to speak in specifics about which personal attributes might add to a risk of violence and how one might predict the risk of violence for a specific individual, his statements lose scientific legitimacy.

14. For example, Dr. Cunningham described characteristics like membership in a gang and youth as factors which increase the risk of violence. (XV Tr. 3008 (age); 3046 (gang); 3068 (number or risk factors)). Dr. Cunningham's conclusions regarding these factors and their relationship to violence risk prediction is taken from studies like that authored by Sorensen in 2000. Sorensen's study describes a correlation between certain predictive factors and violence among incarcerated inmates. There are several comments that should be made about the ability of these attributes to enhance an understanding regarding violence in prisons. The "actuarial" methods presented in the violence assessment literature as applied by Dr. Cunningham ignore correlations between individual predictor variables and hence, the interpretation that the effect of the different variables on violence propensity is "additive" is statistically incorrect. For example, Sorensen (2000) at 1265 reports that robbery or burglary during the commission of the original offense increases the likelihood of violence by 7.4%. Similarly having an age of over 35 decreases the likelihood by 14.4%. If robbery/burglary is correlated with age, then the effect of robbery/burglary could actually be to decrease violence propensity due to age effects on type of crime committed. To assume independence (and additivity) of effects is statistically unjustified and potentially highly misleading. Therefore, it is an error to cumulate or sum the attributes, as Dr. Cunningham has done (XV Tr. 3068), as if having more of them made a person more likely to be violent.

15. The studies on which Dr. Cunningham relies provide no analysis of whether these attributes (gang, age, etc.) are proxies for other characteristics. For example, it is not clear at all whether the real producing cause of violence is the

1725



presence of mental illness, substance abuse, absence of education, or social or peer pressure. Without knowing whether the attributes are individually and independently correlative with violence and that the attributes are not proxies for some other characteristics, these characteristics simply do not have the significance ascribed to them by Dr. Cunningham at trial.

16. Indeed, Dr. Cunningham should have known better than suggest the effect of these variables is even relevant at trial because he has previously noted that such attributes have been rejected by other workers who "found that neither offense characteristics nor the offenders [sic] race, age, or prior criminal history significantly differed between those who committed violent acts in prison and those who did not. These researchers were not able to identify a pre-confinement variable that served as a predictor of who would commit these violent institutional acts." Mark D. Cunningham & Thomas J. Reidy, *Integrating Base Rate Data in Violence Risk Assessments at Capital Sentencing,* 16 BEHAV. SCI. L. 71, 87 (1998).

17. Moreover, Dr. Cunningham is simply wrong when he says that understanding the base rate of historical violence can help predict how an individual will behave. The group statistical method is valid only as applied to a group. It can help predict the proportion of a similarly situated group which will exhibit a specific characteristic, but *not* which individual member will exhibit the characteristic. It is not meant to apply, nor is it legitimate in application, to an individual. Thus, I expressly disagree with Dr. Cunningham's statement that knowing the "base rate" the rate of past occurrences of violence in prison can be used to predict whether an individual will be violent in prison. The use to which Dr. Cunningham has put the statistical data he describes is strongly overstepping the constraints of the statistical methodology and confusing group averages for individual propensities.

18. Workers in the field of violence risk prediction have noted for decades the limitations of using actuarial methods as applied to violence predictions and/or individuals:

'Where this [actuarial] reasoning seriously trips is in prediction *applied to the single case* instead of to a population of cases. A fatal nonsequitur occurs in the reasoning that if 80 percent of the



> delinquents who come from broken homes are recidivists, then *this* delinquent from a broken home has an 80 percent chance of becoming a recidivist.'
>
> John Monahan, THE CLINICAL PREDICTION OF VIOLENT BEHAVIOR, *Statistical Approaches to Improving Clinical Predictions*, Ch. 4, at 66 (1995) (quoting P. Meehl, CLINICAL VERSUS STATISTICAL PREDICTION: A THEORETICAL ANALYSIS AND A REVIEW OF THE EVIDENCE (1954) at 20 (quoting Allport)) (emphasis added).

The "actuarial" approach to individual violence prediction is an incorrect interpretation of probability.

19. Similar problems were recognized by M. Dolan & M. Doyle, *Violence Risk Prediction*, BRIT. J. PSYCH. (2000), at 304. There, Dolan & Doyle noted that these "actuarial" analyses tend to *ignore individual variations in risk*, focuses on small numbers of potential risk factors, over focuses on static (demographic) variables, fails to prioritize clinically significant variables, and minimizes the role of professional judgment. If one's focus is entirely on group results (as is the case in the insurance industry) then variations can be discounted, however, this individual variation is precisely the focus of the violence assessment problem and cannot be statistically ignored.

20. These workers have accurately assessed some of the limitations in the methodology that Dr. Cunningham described – it cannot be used as a predictor of individual risk. This is information that was available to Mr. Vialva's counsel in the foregoing prior published studies and any reasonable investigation should have revealed the inapplicability of Dr. Cunningham's methodology in the assessment of future dangerousness to Mr. Vialva's counsel.

I, Patrick Lee Brockett, declare under penalty of perjury that the foregoing is true and correct. Executed on this 26th day of May, 2004, in Austin, Texas.

_____

Patrick Lee Brocket, Ph.D.

## Declaration of Patrick Lee Brockett
## Exhibit 2

### List of Testimony and/or Documents Reviewed

1. The trial testimony of Dr. Mark Cunningham in the trial of *United States v. Christopher Andre Vialva*, No. W-99-CR-070(1).

2. Jonathan R. Sorensen &Rocky L. Pilgram & , *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. CRIM. L. & CRIMINOLOGY 1251 (2000).

3. Mark D. Cunningham & Thomas J. Reidy, *Antisocial Personality Disorder and Psychopathy: Diagnostic Dilemmas in Classifying Patterns of Antisocial Behavior in Sentencing Evaluations*, 16 BEHAV. SCI. L. 333 (1998).

4. Mark D. Cunningham & Thomas J. Reidy, *Integrating Base Rate Data in Violence Risk Assessments at Capital Sentencing*, 16 BEHAV. SCI. L. 71 (1998).

5. Mark D. Cunningham & Thomas J. Reidy, *Don't Confuse Me With the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing*, 26 CRIM. J. & BEHAV. 20 (1999).

6. Thomas J. Reidy, Mark D. Cunningham & Jon R. Sorensen, *From Death to Life: Prison Behavior of Former Death Row Inmates in Indiana*, 28 CRIM. J. & BEHAV. 62 (2001).

7. Mark D. Cunningham & Thomas J. Reidy, *Violence Risk Assessment at Federal Capital Sentencing: Individualization, Generalization, Relevance, and Scientific Standards*, 29 CRIM. J. & BEHAV. 512 (2002).

8. John Monahan, *Violence Risk Assessment* in A. Goldstein (Ed.), HANDBOOK OF PSYCHOLOGY: FORENSIC PSYCHOLOGY (2003).

9. John Monahan, THE CLINICAL PREDICTION OF VIOLENT BEHAVIOR, ch. 4, *Statistical Approaches to Improving Clinical Predictions* (1995).

10. M. Dolan & M. Doyle, *Violence Risk Prediction*, BRIT. J. PSYCH. (2000).

Decl. of Patrick Lee Brockett
(May 26, 2004)

Exhibit 2

1728

# PATRICK LEE BROCKETT

HOME:  2902 Thousand Oaks Dr.      OFFICE:  Department of Management Science
Austin, Texas 78746                and Information Systems
(512) 327 9330                     McCombs School of Business
The University of Texas at Austin
Austin, Texas 78712-1177
Phone: (512) 471-6816
FAX:   (512) 471-0587
E-mail: brockett@mail.utexas.edu

## CURRENT POSITIONS AT THE UNIVERSITY OF TEXAS AT AUSTIN

Director, Risk Management and Insurance Program
Gus S. Wortham Memorial Chair in Risk Management and Insurance
Director, Center for Risk Management and Insurance
Professor in the Departments of Management Science and Information Systems,
Finance, and Mathematics
Janey Slaughter Briscoe Fellow at the $IC^2$ Institute

## OTHER POSITIONS

Member of Board of Directors, Texas Property and Casualty Guaranty
Association

## EDUCATION

B.A.   1970, (Mathematics) California State University at Long Beach, California
M.A.   1975, (Mathematics) University of California at Irvine, California
Ph.D.  1975, (Mathematics) University of California at Irvine, California

## PROFESSIONAL ACADEMIC BACKGROUND

1999 -      Director, Center for Risk Management and Insurance, University of Texas
at Austin

1995-       Director of the Risk Management and Insurance Program, University of
Texas at Austin

1995-       Gus S. Wortham Memorial Chairholder in Risk Management and
Insurance, University of Texas at Austin

1992-       Janey Slaughter Briscoe Fellow, $IC^2$ Institute, The University of Texas at
Austin

**Decl. of Patrick Lee Brockett**
**(May 26, 2004)**

1

**Exhibit 1**

1729

| | |
|---|---|
| 1998 -1999 | Director, Center for Management of Operations and Logistics, University of Texas at Austin |
| 1998 | Holder of the Thomas Bowles Chair in Actuarial Science, Georgia State University, Atlanta Georgia |
| 1996-1998 | Senior Associate Director, Center for Management of Operations and Logistics, University of Texas at Austin |
| 1992-1996 | Director of the Center for Cybernetic Studies, The University of Texas at Austin |
| 1989-1995 | Joseph H. Blades Professor of Risk Management and Insurance, The University of Texas at Austin |
| 1987-1989 | Paul V. Montgomery Centennial Professor of Actuarial Science, The University of Texas at Austin |
| 1986-1992 | Senior Research Fellow, $IC^2$ Institute, The University of Texas at Austin |
| 1986-1989 | Director, Actuarial Science Program, Department of Finance, The University of Texas at Austin |
| 1986-1989 | Professor of Finance and Actuarial Science, Department of Finance, The University of Texas at Austin |
| 1984-1986 | Richard Seaver Centennial Research Fellow, $IC^2$ Institute, The University of Texas at Austin |
| 1984-1986 | Paul V. Montgomery Centennial Fellow in Actuarial Science, The University of Texas at Austin |
| 1982-1986 | Associate Professor of Finance and Actuarial Science, Department of Finance, The University of Texas at Austin |
| 1981-1982 | Assistant Professor of Finance and Actuarial Science, Department of Finance, The University of Texas at Austin |
| 1981-2002 | Research Scientist, Applied Research Laboratories, The University of Texas at Austin |
| 1981 Winter Quarter | Instructor of Biostatistics, Department of Community and Environmental Medicine, The Medical School, University of California, Irvine Extensions |



1980-1981    Visitor, Department of Statistics, University of California at Riverside, Riverside, California

1977-1980    Assistant Professor, Departments of Mathematics and General Business, The University of Texas at Austin

1975-1977    Assistant Professor, Department of Mathematics, Tulane University, New Orleans, Louisiana

1970-1973    National Science Foundation Traineeship, Department of Mathematics, University of California at Irvine, Irvine, California

**ELECTED PROFESSIONAL SOCIETY FELLOWSHIPS**

The American Association for the Advancement of Science
The Institute of Mathematical Statistics
The American Statistical Association
The Royal Statistical Society
        (also elected Chartered Statistician by RSS)
The Operations Research Society of America (now INFORMS) (elected Full Member)

**OTHER PROFESSIONAL SOCIETY MEMBERSHIPS**

American Risk and Insurance Association (Immediate Past President)
ASTIN Section of the International Actuarial Association (Special Member)
Casualty Actuarial Society (Academic Corresponding Member)
Institute for Risk Management
Institute for Operations Research and Management Sciences (INFORMS)
Phi Kappa Psi Scholastic Honor Society
Risk and Insurance Management Society (RIMS)
Southern Risk and Insurance Association
Western Risk and Insurance Association

**CURRENT EDITORIAL POSITIONS**

1998-    Editor, *Journal of Risk and Insurance,* the flagship journal of the American Risk and Insurance Association and the most prestigious academic journal in risk management and insurance in the world

2000 -    Member of Distinguished Honorary Editorial Board, *North American Actuarial Journal.* This position is for a selected few who give advice on strategy and directions to the Editor and Editorial Board

3

1731



2000-         Member of the Editorial Board, *Applied Stochastic Models in Business and Industry* (formerly *Applied Stochastic Models and Data Analysis*)

1984-Present  Associate Editor, *Insurance: Mathematics and Economics*, one of the very top journals in actuarial science and insurance mathematics published in Europe

## PREVIOUS EDITORIAL POSITIONS

1999         Special Guest Editor of the *North American Actuarial Journal* Special Issue (January) on Genetic Testing and its Impact on the Insurance Industry

1997         Co Editor (with W.W. Cooper, A. Berger, and J. Pastor) Special Issue of the *European Journal of Operations Research* on new methodologies and directions in the evaluation of financial institutions.

1995- 2000    Associate Editor, *North American Actuarial Journal*, the flagship journal of the Society of Actuaries and the most prestigious academic journal in actuarial science in North America

1995-1998    Associate Editor for Book Reviews, *North American Actuarial Journal*

1991-1993.1  Associate Editor, *Naval Research Logistics*

1979-1980    Associate Editor, Book Review Section, *Journal of the American Statistical Association*

## EXTERNAL PROFESSIONAL HONORS AND AWARDS

ARIA Research Prize given by the Casualty Actuarial Society August 14, 2003 to "the author(s) of that paper published by the American Risk and Insurance Association (ARIA) which provides the most valuable contribution to casualty actuarial science".

ARIA Research Prize given by the Casualty Actuarial Society August 14, 2001 to "the author(s) of that paper published by the American Risk and Insurance Association (ARIA) which provides the most valuable contribution to casualty actuarial science".

International Brian Hey Prize Competition held by the Institute of Actuaries in England and the Scottish Faculty of Actuaries, Second Prize.  October, 2000

Finalist in David Rist Prize Competition for the most outstanding paper on military operations research, by the Military Operations Society, 1999

4

Winner of "Annual Prize" for the Best Paper of the Year for 1996 from the Society of Actuaries for the article "Actuarial Uses of Secondary Data: An Information Theoretic Approach"

Semi-finalist in Franz Edelman Competition for the most outstanding application of management science techniques in practice, Institute for Operations Research and the Management Sciences (INFORMS), 1995

Winner of the "Best Paper Award" for 1994 from the International Insurance Society, June 19-23, 1994 Madrid, Spain

Winner of "The Halmsted Prize for the Most Outstanding English Language Publication in Actuarial Science in the World (1993)," presented by The Society of Actuaries

Award for "Most Outstanding Statistical Application Article Published in any Journal, in any Field, and in any Language During 1990 or 1991," presented by the American Statistical Association (1992)

Award for "Outstanding Feature Article Published during 1986 in *The Journal of Risk and Insurance*" (with S.H. Cox, Jr. and R.C. Witt), presented by the American Risk and Insurance Association

Award for "Outstanding Communication Published During 1983 in *The Journal of Risk and Insurance*" presented by the American Risk and Insurance Association

Listed in *Who's Who in Science and Technology, Who's Who in the Southwest*, and *American Men and Women of Science*

## UNIVERSITY PROFESSIONAL HONORS AND AWARDS RECEIVED

Outstanding Graduate Teacher Award (University-wide competition), by The University of Texas at Austin Graduate School, 1995.

Award for Research Excellence, presented by The University of Texas CBA Foundation Advisory Council (1992)

Award for Outstanding Research Contributions, presented by The University of Texas CBA Foundation Advisory Council (1988)

Award for Research Excellence, presented by The University of Texas CBA Foundation Advisory Council (1984)

Dean's Fellow 1998, University of Texas at Austin College and Graduate School of Business

1733

Faculty Research Assignment, University of Texas Graduate School

## OTHER UNIVERSITY PROFESSIONAL AWARD NOMINATIONS

Management Science and Information Systems Department Nominee for College-wide Award for Outstanding Research Contributions (1996, 1997, 1999)

Management Science and Information Systems Department Nominee for University-wide Outstanding Graduate Teacher Award (1993)

Finance Department Nominee for College-wide Award for Research Excellence, (1991)

Nominated for Outstanding Professor Award, The Graduate Business Council (1987)

Nominated for Friar Society Teaching Award (1987)

Finance Department Nominee for University-wide Outstanding Graduate Teacher Award, (1989, 1992, and 1993)

Nominated for Outstanding Researcher Award, Golden Key National Honor Society (1987)

Nominated for Outstanding Teacher Award, Golden Key National Honor Society (1985)

## OFFICES IN PROFESSIONAL ORGANIZATIONS AND PROFESSIONAL SERVICE

2002-2003    Immediate Past President, American Risk and Insurance Association.

1999- 2003    Executive Committee Member for the Board of Directors, American Risk and Insurance Association.

2001-2002    President, American Risk and Insurance Association.

2000-    Member of Board of Directors, Texas Property and Liability Insurance Guaranty Association (Appointed as a Public Member by the Texas State Commissioner of Insurance)

2002-2003    Chair, Nomination Committee, American Risk and Insurance Association.

2000-2001    Chair, Finance Committee, American Risk and Insurance Association

2000-2001    Chair, Strategic Planning Committee, American Risk and Insurance Association

6

17 34



| | |
|---|---|
| 2000-2001 | President-Elect, American Risk and Insurance Association |
| 1999- 2000 | Member of the Society of Actuaries Task Force on Education and Qualifications 20005 |
| 2000- | Liaison, Society of Actuaries with the American Association for the Advancement of Science |
| 2000 | Organizer of International Annual Convention, American Risk and Insurance Association (2000) |
| 1999 –2000 | Vice President, American Risk and Insurance Association |
| 1996-2001 | Member of Board of Directors, American Risk and Insurance Association |
| 1998-2004 | Co-Chair (with Richard MacMinn) of the Meir Award for the most outstanding article published in the *Journal of Risk and Insurance* ten years previously which has "withstood the test of time", given by the American Risk and Insurance Association |
| 2002-2003 | Co-Chair (with Richard MacMinn) of the Robert C. Witt Award for the most outstanding article published in the *Journal of Risk and Insurance* during the previous year, by the American Risk and Insurance Association |
| 1998 | Organizer, Bowles Symposium on Genetic Technology and its Impact on Insurance Underwriting, Georgia State University, March 1998 |
| 1991 | Member of the Committee to determine Kulp-Wright book awards given by the American Risk and Insurance Association |
| 1990 | Member of the Committee to Determine Stickler Teaching Innovation Award given by the American Risk and Insurance Association |
| 1987-1988 | Member of the Nominating Committee for the American Risk And Insurance Association |
| 1985, 90, 92 | Member of the Committee to Determine Awards for the *Journal of Risk and Insurance*, American Risk and Insurance Association. |
| 1986-1988 | Supervisor and organizer of the Society of Actuaries examinations for the Austin, Texas examination center |
| 1985-1989 | Member of the National Science Foundation Measurement Methods and Data Improvement Advisory Panel |

7

1735



| 1985 | Member of the Program Coordinating Committee for the Annual Meeting of the American Risk and Insurance Association |
| --- | --- |
| 1985-95 | Member of the Society of Actuaries Committee on Relations With Statistical Societies |
| 1984 | Co-organizer (with S.H. Cox), Twentieth Annual Actuarial Research Conference, sponsored by the Society of Actuaries |
| 1979 | President, Austin Chapter of the American Statistical Association |
| 1978 | Vice President, Austin Chapter of the American Statistical Association |

## PUBLICATIONS

### Books

*Statistics, Probability and Their Applications,* (with A. Levine), W. B. Saunders Publishing Co., 1984 (Reprinted in Japan, by HRW International, 1986).

### Monographs

*An Analysis of Pricing and Availability Problems in the Texas Automobile Insurance Market,* (with Robert C. Witt and Paul Aird), National Association of Independent Insurers, 1993.

### Articles on Risk Management and Insurance

"The Underwriting Risk and Return Paradox Revisited," (with R. C. Witt), *Journal of Risk and Insurance* (December 1982), Vol. 49, No. 4, 621-627.

"Identifiability for Dependent Multiple Decrement/Competing Risk Models," (with B. C. Arnold), *Scandinavian Actuarial Journal* (1983), 117-172.

"When Does the $\beta^{th}$ Percentile Residual Life Function Uniquely Determine the Distribution?" (with B. C. Arnold), *Operations Research* (1983), Vol. 31, 391-396.

"A New Approach to the Resolution of the Classification Problem," (with M. Johnson and A. Levine), Structures De L'information, session speciale sur les Questionnaires, *Congres IEEE "Theorie de l'Information"* Groupe De Recherche 22, Associa a l'Institut de Programmation de Université Pierre et Marie Curie, June 1982, Paris, 51-65.

8

\17З6

"Adjusting Lifetables to Incorporate Pertinent Personal Profile Information," (with S. H. Cox, Jr.), Actuarial Research Clearing House (1983).

"On the Misuse of the Central Limit Theorem in Some Risk Calculations," *Journal of Risk and Insurance* (December 1983), Vol. 50, No. 4, 727-731. (This article won an award from The American Risk and Insurance Association for Outstanding Communication published in this journal in 1983).

"Risk Equivalent Return on Shareholders' Equity and Utility Assessment--a Comment on the paper by A. Longley-Cook," *Transactions of the Society of Actuaries* (1983), Vol. 35, 341-348. (This article was a finalist for the Halmsted Prize given by the Society of Actuaries for the best English language publication of the year in the world in Actuarial Science).

"Optimal Ruin Calculation Using Partial Stochastic Information," (with S.H. Cox, Jr.), *Transactions of the Society of Actuaries* (1984), Vol. 36, 49-62.

"General Bivariate Makeham Laws," *Scandinavian Actuarial Journal* (1984), 150-156.

"Statistical Adjustment of Mortality Tables to Reflect Known Information," (with S. H. Cox, Jr.), *Transactions of the Society of Actuaries* (1984), Vol. 36, 63-75.

"Self Insurance and the Probability of Financial Regret," (with S.H. Cox, Jr. and R. C. Witt), *Journal of Risk and Insurance* (December 1984), Vol. 51, 720-729.

"On the Inconsistency of Bayesian non-Parametric Estimators in Competing Risk/Multiple Decrement Models," (with B. C. Arnold, W. Torres, and A. L. Wright), *Insurance: Mathematics and Economics* (1984), Vol. 3, 49-55.

"Using a Standard Distribution and Client Data to Obtain a Client Loss Distribution," *Conference of Actuaries in Public Practice* (1985), Vol. 34, 503-511.

"Insurance Calculations Using Incomplete Information," (with S. H. Cox, Jr.), *Scandinavian Actuarial Journal* (1985), 94-108.

"Insurance Versus Self-Insurance: A Risk Management Perspective," (with S.H. Cox, Jr. and R.C. Witt), *Journal of Risk and Insurance* (June 1986), Vol. 53, 242-257. (This article won an award from The American Risk and Insurance Association for outstanding Feature Article published in this journal in 1986.)

"Information Theoretic Mortality Table Graduation," (with J. Zhang), *Scandinavian Actuarial Journal* (1986), 131-140.

"Linearity and Gaussianity of Interest Rate Data: an Empirical Time Series Test," (with N. Sipra), *Actuarial Science*, (Festschrift Volume in honor of V. M. Joshi) (1987), 173-183.

9

1737



"How Public Policy Can Define the Marketplace: The Case of Pollution Liability Insurance in the 1980's," (with Linda L. Golden and Paul Aird), *Journal of Public Policy and Marketing* (1990), Vol. 9, 211-226.

"Linear and Nonlinear Stochastic Process Models in the Financial Theory of Insurance Companies" (with Robert C. Witt), *Proceedings of the Business and Economic Statistics Section of the American Statistical Association,* (1990), 25-31.

"An Economic Overview of the Excess and Surplus Lines Insurance," (with Robert C. Witt and Paul Aird), *Journal of Insurance Regulation* (1990), Vol. 9, No. 2, 234-258.

"An Overview of the Reinsurance and the Reinsurance Markets," (with Robert C. Witt and Paul Aird), *Journal of Insurance Regulation* (March 1991), Vol. 9, No. 3, 432-454.

"Relevant Distributions for Insurance Prices in an Arbitrage Free Equilibrium," (with Robert C. Witt), *Journal of Risk and Insurance* (March 1991), Vol. 58, 13-29.

"Information Theoretic Approach to Actuarial Science: A Unification and Extension of Relevant Theory and Applications," *Transactions of the Society of Actuaries* (1991), Vol. 43, 73-135. (This paper won the Award for the Most Outstanding Statistical Application Article published in any journal during 1991. The award is presented by The American Statistical Association at their 1992 annual meeting).

"Discussion of Reitano's 'Statistical Analysis of Banded Data'," (with Samuel H. Cox), *Transactions of the Society of Actuaries* (1991), Vol. 43.

"The Schmitter Problem," (with M. Goovaerts and G. Taylor), *ASTIN Bulletin* (1991), Vol. 21, No. 1, 129-132.

"Information Theoretic Graduation of Multivariate Data" (with H. Li, Z. Huang, and D. Thomas), *Scandinavian Actuarial Journal* (1991), Vol. 2, 144-153.

"The Competition for Markets," (with Robert C. Witt and Paul Aird), *Risk Management* (April 1992), Vol. 39, No. 4, 49-53.

"Turmoil in the Texas Auto Insurance Market," (with Robert C. Witt), *Texas Business Review* (October 1993)

"A Neural Network Method For Obtaining An Early Warning of Insurer Insolvency," (with Linda L. Golden, William W. Cooper, and Utai Pitaktong), *Journal of Risk and Insurance* (September 1994), Vol. 61, No. 3, 402-424.

"Ambiguity, Risk Charges, and Insurance Pricing," (with G.C. Lai, S.W. Pottier, and R.C. Witt), *Proceeding of the International Insurance Society* (June 19-23, 1994)

10

1738

Madrid, Spain, pp. 298-311... (This paper won the "Best Paper Award" from the International Insurance Society for 1994 where it was presented).

"The Genetics Revolution: Insurer Needs versus Society's Ethics," (with E.S. Tankersley), *Contingencies* (January/February 1995), Vol. 7, No. 1, 13-16.

"Corporate Spin-offs as a Value Enhancing Technique when Faced With Legal Liabilities," (with Richard MacMinn), *Insurance: Mathematics and Economics* (April, 1995), Vol. 16, No. 1, 63-68.

"Obtaining a Life Table for Spinal Cord Injury Patients Using Information Theory," (with Yun Song), *Journal of Actuarial Practice* (1995), Vol. 3, No. 1, 77-91.

"Operations Research in Insurance: a Review," (with Xiaohua Xia), *Transactions of the Society of Actuaries*, (1996), Vol. 47, 1-74.

"Actuarial Uses of Grouped Data: An Information Theoretic Approach to Incorporating Secondary Data," (with S. Cox, Yun Song, F. Phillips, and B. Golany) *Transactions, of the Society of Actuaries*, (1996), Vol. 17, 75-99. (This article won the Annual Prize given by the Society of Actuaries for the best publication of the year in the *Transactions, of the Society of Actuaries*).

"Statistical Tests of Stochastic Process Models Used in the Financial Theory of Insurance Companies," (with R. C. Witt, B. Golany, N. Sipra, and X. Xia) Insurance, *Mathematics and Economics* (1996), Vol. 18, 73-79.

"Tort Reform and Mandated Insurance Rate Rollbacks," (with C. McClellan), *Texas Business Review* (February 1996).

"The Techniques for Management of Property Risk used by Universities," (with Stacy Youngdale) URMIA, *The University Risk Management and Insurance Association Journal*, Vol. 3, No. 1, (September 1996), 51-65.

"Bounds on the Price of Catastrophe Insurance Options on Futures Contracts," (with S. H. Cox, and J. Smith), published in *Securitization of Insurance Risks,*" Society of Actuaries Monograph Series (1996), Schaumburg, Ill.

"Using Computer Intensive Technologies to Aid Insurance Regulators: Early Detection of Insolvency and Fraud," (with Linda L. Golden and Xiaohua Xia), *Impact : How IC$^2$ Research Affects Public Policy and Business Markets* Edited by W.W. Cooper, D. Gibson, F.Y. Phillips, S. Thore and A. Whinston, Quorum Books, Westport , Connecticut, (1997), pp. 111-130.

"The Genetics Revolution, Economics, Ethics and Insurance," (with E. Susan Tankersley), *Journal of Business Ethics*. (1997) Vol. 16, pp. 1661-1676.

11



"A Case Study in Applying Neural Networks to Predicting Insolvency for Property and Casualty Insurers," (with W.W. Cooper, L.L. Golden, and X. Xia), *Journal of the Operational Research Society*, Vol. 48, (1997), 1153-1162.

"Technological Change and Its Impact on Risk Creation and Management," Chapter 18 in *International Risk and Insurance: Environments and Management.* Edited by Harold D. Skipper, Jr., Richard D. Irwin, Inc., Press, (1998) pp. 443-466

"Using Khonen's Self Organizing Feature Map to Uncover Automobile Bodily Injury Claim Fraud," (with Xiaohua Xia and Richard Derrig), *Journal of Risk and Insurance* (June 1998), Vol. 65, No. 2, 245-274.

"A Reexamination of the Relationship Between Preferences and Moment Orderings by Rational Risk Averse Investors" (with J. R. Garven), *Geneva Papers on Risk and Insurance Theory* (1998), Vol. 23, 127-137.

"DEA Evaluation of the Efficiency of Organizational Forms and Distribution Systems in the U.S. Property and Liability Insurance Industry" (with W. W. Cooper, L. L. Golden, J. J. Rousseau and Y. Yang), *International Journal of Systems Science* (1998), Vol. 29, No. 11, 1235-1247.

"Preface to the Issue on Genetic Testing," *North American Actuarial Journal* (1999), Vol. 3 No. 1, iii-iv.

"Genetic Testing, Insurance Economics, and Societal Responsibility" (with Richard D. MacMinn and Maureen Carter) *North American Actuarial Journal* (1999), Vol. 3 No. 11-20.

"Underwriting and Ambiguity: An Economic Analysis," (Gene C. Lai, Stephen W. Pottier, and Robert C. Witt) *The Journal of Insurance Issues* (Spring 1999), Vol. 22 No. 1, pp. 1-25.

"A New Stochastically Flexible Event Study Methodology with Application to Proposition 103" (with H. Chen and J. R. Garven) *Insurance, Mathematics and Economics* (November 1999), Vol. 25 No. 2, 197-217.

"Great (and not so Great) Expectations: An Endogenous Economic Explication of Insurance Cycles and Liability Crises" (with Gene C. Lai, Robert C. Witt, Hung-Gay Fung, and Richard D. MacMinn)), *Journal of Risk and Insurance* (December 2000), Vol. 67, No. 4. (This paper won second Prize in the International Brian

12

1740

Hey Prize Competition held by the Institute of Actuaries in England and the Scottish Faculty of Actuaries, presented October, 2000. This paper also won the ARIA Research Prize given by the Casualty Actuarial Society August 14, 2001 to "the author(s) of that paper published by the American Risk and Insurance Association (ARIA) which provides the most valuable contribution to casualty actuarial science".)

"Fraud Classification Using Principal Component Analysis of RIDITs" (2002) (With Richard A. Derrig, Linda L. Golden, Arnold Levine, and Mark Alpert) *Journal of Risk and Insurance* Volume 69 Number 3 (September), 341-372. (This paper won the ARIA Research Prize given by the Casualty Actuarial Society August, 2003 to "the author(s) of that paper published by the American Risk and Insurance Association (ARIA) which provides the most valuable contribution to casualty actuarial science".)

"Evaluating Solvency and Efficiency Performances in U.S. Property - Liability Insurance Companies" (2004) (with William W. Cooper, Linda L Golden, John J. Rousseau, and Yuying Wang) *European Journal of Operational Research* 154 492-514.

"The Impact of Provider Autonomy on HMO Efficiency," (with J. Semple, R. Chang and J.J. Rousseau, and Chuanhou Yang) in press, the *Journal of Risk and Insurance.*

"Financial Intermediary versus Production Approach to Efficiency of Marketing distribution systems and Organizational Structure of Insurance Companies," (with William W. Cooper, Linda L. Golden, John J. Rousseau and Yuying Wang), (accepted pending minor revisions), *Journal of Risk and Insurance.*

"Using Neural Networks to Predict Market Failure" (with Linda L. Golden, Jaeho Jang, and Chuanhou Yang) in Press in *Intelligent Techniques in The Insurance Industry,* Edited by Arnold Shapiro and Lakhmi Jain.

"The History and Future of Risk Research" (American Risk and Insurance Association Presidential Address accepted and now undergoing minor revisions), *Risk Management and Insurance Review.*

"Finance" in *Encyclopedia of Actuarial Science,* John Wiley Press, Jef Teugels and Bjørn Sundt editors

"Financial Engineering" in *Encyclopedia of Actuarial Science,* John Wiley Press, Jef Teugels and Bjørn Sundt editors

"Finance" in *Encyclopedia of Actuarial Science,* John Wiley Press, Jef Teugels and Bjørn Sundt editors

"Free Rider" in *Encyclopedia of Actuarial Science,* John Wiley Press, Jef Teugels and
Bjørn Sundt editors


## Articles on Theoretical Probability, Statistics, and Stochastic Processes

"Admissible Transformations of Measures," *Semigroup Forum* (1976), Vol. 12, 21-33.

"A Conditional Dichotomy Theorem for Processes with Independent Increments," (with
H. G. Tucker), *Journal of Multivariate Analysis* (1977), Vol. 7, No. 1, 13-27.

"Variational Sums of Infinitesimal Systems," *Zeitschrift fur Wahrcheinlichkeitstheorie
und verw. Gebiete* (1977), Vol. 38, 293-307.

"Approximating Moment Sequences to Obtain Consistent Estimates of Distribution
Functions," *Sankhya: The Indian Journal of Statistics*, Series A, Part 1 (1977),
Vol. 39, 32-44.

"Supports of Infinitely Divisible Measures on Hilbert Space," *Annals of Probability,*
(1977), Vol. 5, No. 6, 1012-1017.

"On a Characterization of RIDITS," (with A. Levine), *Annals of Statistics,* (1977), Vol. 5,
No. 4, 1245-1248.

"The Distribution of the Likelihood Ratio for Two Additive Processes," (with W. N.
Hudson and H. G. Tucker), *Journal of Multivariate Analysis* (1978), Vol. 1, No 3,
339-372.

"The Effect of Random Scale Changes on Limits of Infinitesimal Systems," *International
Journal of Mathematics and Mathematical Sciences* (1978), Vol. 8, No. 3,
339-372.

"Transformations of Discrete Data for Use with Fisher's Linear Discriminant Function,"
(with C. Wolf), *Proceedings of the Business and Economic Section of the
American Statistical Association* (1979), 569-573.

"M.D.I. Estimation via Unconstrained Convex Programming," (with A. Charnes and
W. W. Cooper), *Communications in Statistics Series B, Computation and
Simulation* (1980), Vol. 9, No. 3, 223-234.

"Zeros of Densities of Infinitely Divisible Measures," (with W.N. Hudson), *Annals of
Probability* (1980), Vol. 8, No. 2, 400-403.

"On the Unimodality of High Convolutions," (with J. H. B. Kemperman), *Annals of
Probability* (1982), Vol. 10, No. 1, 270-277.

1742



"Variational Sums and Generalized Linear Process," (with W. N. Hudson), *Stochastics* (1982), Vol. 8, No. 3, 181-192.

"Constructing a Unimodal Prior Distribution" (with A. Charnes and K. H. Paick), *Proceedings, Memorial del X Congreso de la Academia Nacional de Ingenieria de Mexico*, Cuidad Obregon, Mexico (September 1984), 145-148.

"Optimal Detection in Linear Reverberation Noise," in *Statistical Signal Processing*, E. Wegman and J. Smith, eds., Marcel Dekker, Inc. (1984), 133-140.

"The Likelihood Ratio Detector for Non-Gaussian Infinitely Divisible and Linear Stochastic Processes," *Annals of Statistics* (1984), Vol. 12, No. 2, 737-744.

"Computation of Minimum Cross Spectral Density Estimates: An Unconstrained Dual Convex Programming Method," (with A. Charnes and K. H. Paick), *IEEE Transactions on Information Theory* (March 1986), Vol. IT-32, No. 2, 236-242.

"Quadratically Constrained Information Theoretic Analysis," (with J. Zhang), *SIAM Journal of Applied Mathematics* (August 1987), Vol. 47, No. 4, 871-885. (This article was nominated for the award by the American Statistical Association for the most outstanding statistical application paper of the year.)

"Nonlinear and Non-Gaussian Ocean Noise," (with M. J. Hinich and G. Wilson), *Journal of the Acoustical Society of America* (October 1987), Vol. 84, No. 4, 1386-1394.

"Variance Bounds Using a Theorem of Polya," (with B. C. Arnold), *Statistics and Probability Letters* (April 1988), Vol. 6, No. 5, 321-326.

"Bispectral Based Tests for the Detection of Gaussianity and Linearity in Time Series," (with M. J. Hinich and D. Patterson), *Journal of the American Statistical Association* (September 1988), Vol. 83, No. 403, 657-664.

"Bispectral Characterization of Ocean Acoustic Time Series: Nonlinearity and Non-Gaussianity," (with M. J Hinich and G. Wilson), in *Topics in Non-Gaussian Signal Processing*, E. Wegman, S. Schwartz, and J. Thomas, eds., Springer-Verlag (1989), 2-16.

"An Information Theoretic Approach for Identifying Shared Information and Asymmetric Relationships Among Variables," (with Linda L. Golden and Mary R. Zimmer), *Multivariate Behavioral Research* (October 1990), Vol. 25, No. 4, 479-502.

"An Information Theoretic Approach to Geometric Programming," (with A. Charnes), *Mathematics of Operations Research* (November 1991), Vol. 16, No. 4, 888-889.

"On Distributions Whose Component Ratios are Cauchy," (with Barry C. Arnold), *The American Statistician* (1992) Vol. 46, No. 1, 25-26.

1743



"The Golden Numerical Comparative Scale Format for Economical Multiobject/ Multiattribute Comparison Questionnaires," (with L.L. Golden, G. Album, and J. Zatarain), *Journal of Official Statistics* (1992), Vol. 8, No. 1, 77-86.

"Information Theoretic Unimodal Density Estimation," (with A. Charnes and K.H. Paick), *IEEE Transactions on Information Theory* (May 1995), Vol. 41, No 3, 824-829.

"Constructing a Unimodal Bayesian Prior Distribution from Incompletely Assessed Information," (with Linda L. Golden and Kwang H. Paick), in *Advances in Econometrics:  Applying Maximum Entropy to Econometric Problems*, Thomas Fomby, Ed. (1997) Vol. 12 pp. 201-216.

"A Comparative Analysis of Neural Network and Statistical Methods for Predicting Consumer Choice," (With Patricia West and Linda Golden), *Marketing Science* (1997) Vol. 16 No. 4 pp. 370-391.

### Articles on Business and Social Science

"A Methodology for Determining High Risk Components in Urban Environments," (with W. Bertrand and A. Levine), *International Journal of Epidemiology* (1979), Vol. 8, No. 2, 161-166.

"A Characterization of Divergence with Applications to Questionnaire Information," (with P.D. Haaland and A. Levine), *Information and Control* (1979), Vol. 41, No., 1-8.

"Information Theoretic Stepwise Selection of Discriminating Discrete Variables," (with P. D. Haaland and A. Levine), *Memorial del V Congreso de la Academia Nacional de Ingenieria de Mexico* (September 1979), 229-232.

"Spatial Relationships Among Epidemiological and Community Populations," (with M. Lewis), *Psychological Bulletin* (1980), Vol. 88, No. 2, 296-306.

"Statistical Recognition of Trends in Monitoring Systems," (with J. H. B. Kemperman), *Methods of Information in Medicine* (1980), Vol. 19, No. 2, 106-122.

"A Note on the Numerical Assignment of Scores to Ranked Categorical Data," *Journal of Mathematical Sociology* (1981), Vol. 8, 91-101.

"Information Theoretic Analysis of Questionnaire Data," (with A. Levine and P. Haaland), *IEEE Transactions on Information Theory* (July 1981), Vol. 1T-27, No. 4, 438-446.

"The Unimodal Maximum Entropy Distribution," *Economic Letters* (1983), Vol. 12, 261-267.

16

1744



"Chance Constrained Programming Approach to Cost Volume Profit Analysis," (with A. Charnes, W. W. Cooper, and H. C. Shin), *Accounting Review* (1984), Vol. 59, No. 3, 474-487.

"Probability Bounds on Downtimes," (with M. J. Hinich), *Naval Research Logistics Quarterly* (1985), Vol. 32, 329-335.

"The Numerical Comparative Scale in Country Image Studies," (with J. Zatarain, L.L. Golden, G. Album, and R. Kerin), *Proceedings of the National Institute of Decision Sciences Conference* (1986), Vol. 1, 515-517.

"The Effect of Alternative Scoring Techniques on the Analysis of Rank Ordered Categorical Data," (with L. L. Golden), *Journal of Mathematical Sociology* (1987), Vol. 12, No. 4, 383-414.

"Cost-Volume-Utility Analysis with Partial Stochastic Information," (with A. Charnes, W.W. Cooper, and H.C. Shin), *The Quarterly Review of Economics and Business* (Autumn 1987), Vol. 27, No. 3, 70-90.

"A Class of Utility Functions Containing All The Common Utility Functions," (with L. L. Golden), *Management Science* (August 1987), Vol. 33, No. 8, 955-964.

"Generating Ordered Families of Lorenz Curves by Strongly Unimodal Distributions," (with B. C. Arnold, C. A. Robertson, and B. Y. Shu), *Journal of Business and Economic Statistics* (April 1987), Vol. 5, No. 2, 305-308.

"A New Method for Identifying Asymmetric Relationships Among Variables: Information Theory Applied to Affect, Location Convenience and Patronage Frequency," (with Linda L. Golden and Mary R. Zimmer) *Proceedings of the Winter Educator's Conference of the American Marketing Association* (1989).

"A Stochastic Process Model for Venture Capital Decisions," (with S. Cox and J. Gerberman), *Proceeding of the Business and Economic Statistics Section of the American Statistical Association* (1990), 306-311.

"Chance Constrained Programming Approach to Empirical Analyses of Mutual Fund Investment Strategies" (with A. Charnes, W.W. Cooper, K.H. Kwon and T.W. Ruefli), *Decision Sciences* (March/April 1992), Vol. 23, No. 2, 385-408.

"A Comment on 'Using Rank Values as an Interval Scale' by Dowling and Midgley," (with Linda L. Golden), *Psychology and Marketing* (May/June 1992), Vol. 9, No. 3, 255-261.

"The Contributions of A. Charnes to Statistics" (with L. Seiford), *Systems and Management Science by Extremal Methods*, F.Y. Phillips and J.J. Rousseau, eds., Kluwer Academic Publishers, Boston/Dordrecht/London (1992), 69-88.

1745



"Risk, Return, Skewness, and Preference" (with Yehuda Kahane), *Management Science* (June 1992), Vol. 38 No. 6, 851-866.

"On the Relationship Between Multiattribute Preference Relations and Summary Univariate Preferences for Risk Averters," (with J.H.B. Kemperman). Conditionally accepted for publication in *Management Science* pending a revision.

"A Generalized Data Envelopment Analysis Model:  Unification and Extension of Existing Methods for Efficiency Analysis of Decision Making Units," (with Gang Yu and Q.L. Wei), *Annals of Operations Research* (1996), Vol. 66, 47-89.

"Using Rank Statistics for Determining Programmatic Efficiency Differences in Data Envelopment Analysis," (with B. Golany), *Management Science* (March 1996), Vol. 42 No. 3, 466-472.

"Information Theory as a Unifying Statistical Approach for Use in Marketing Research," (with A. Charnes, W.W. Cooper, D.B. Learner and F.Y. Phillips) *European Journal of Operations Research*, (1995), Vol. 84, 310-329.

"Flexible Purchase Frequency Modeling," (with Linda L. Golden and Harry H. Panjer) *Journal of Marketing Research* (February 1996), Vol. 33, 94-107.

"Construction of all DEA Efficient Surfaces of the Production Possibility Set under the Generalized Data Envelopment Analysis Model," (with G. Yu, Q. Wei, and L. Zhou). *European Journal of Operational Research* (1996), Vol. 95, 491-510.

"A Study of Evaluation of Mutual Fund Investment Strategies," (with W. W. Cooper, K. H. Kwon, and T. W. Ruefli), appears in *Essays in Decision Making:  A Volume in Honor of Stanley Zionts* (Berlin: Springer-Verlag 1996), Edited by Mark Karwan, Jaap Spronk and Jyrke Wallenius, 237-274.

"An Application of Rank statistics to DEA and OECD Country Productivity (with Linda L. Golden and Shan Li) *Northeast Decision Sciences Institute  1996 Proceedings,* Edited by Shaw Chen, Omnipress Printers, Madison WI, April, 1996, pp. 575-577.

"New Approaches for Analyzing and Evaluating the Performance of Financial Institutions,"  (with A. N. Berger, W. W. Cooper, and J.T. Pastor), Preface to Special Issue of *European Journal of Operational Research,* Vol. 98, No. 2, April, 1997, pp. 170-174.

"Data Transformations in DEA Cone-Ratio Envelopment Approaches for Monitoring Bank Performances," (with A. Charnes, W. W. Cooper, Z. M. Huang, and D. B. Sun), *European Journal of Operational Research,* (April 16, 1997) Vol. 98, No. 2, pp. 250-268.

"Forecasting and Allocation of US Army Recruiting Resources" (with B. Golany, J. J. Rousseau, D. A. Thomas, and L. Zhou), *Military Operations Research,* (1997) Vol. 3 No. 3, pp. 13-29. (This paper was a Semi-finalist in Franz Edelman Competition for the most outstanding application of management science techniques in practice, by the Institute for Operations Research and the Management Sciences (INFORMS) in 1995, and also a Finalist for the David Rist Prize for the most outstanding paper on military operations research awarded by the Military Operations Society, 1999)

"Identification of Pareto-Efficient Facets in Data Envelopment Analysis," (with U. Pitaktong, J. Mote, and J. Rousseau), *The European Journal of Operations Research,* (September 1998) Vol. 109, No.3, pp. 559-570.

"Inefficiency and Congestion in Chinese Production Before and After the 1978 Economic Reforms," (with W. W. Cooper, Yuying Wang and Hong-Chul Shin), *Socio-Economic Planning Science,* (1998) Vol. 32, No. 1, pp. 1-20.

"Analysis of Intertemporal Efficiency Trends Using Rank Statistics With an Application to Evaluating the Macro Economic Performance of OECD Nations" (with Boaz Golany and Shan Li), *Journal of Productivity Analysis,* (1998) Vol. 11, 169-182.

"Identification of Target Firms and Functional Areas For Strategic Benchmarking," (with Linda L. Golden, S. Sarin and J. Gerberman), *The Engineering Economist* (2001) Volume 46, Number 4, 274-299.

"An Analysis of the Efficiency of Joint Service Advertising versus Service Specific Advertising for Recruiting Success," (with William W. Cooper, Honghui Deng, Linda L. Golden, Major Michael J. Kwinn and David Thomas ) *Military Operations Research Journal,* (2002) Volume 7, Number 4, 57-76.

"DEA evaluations of long- and short-run efficiencies of digital vs. physical product 'Dot Com' companies," (with Barua, A., W.W.Cooper, H. Deng, T.W. Ruefli and A. Whinston) *Socio-Economic Planning Sciences* (to appear 2004).

"Alternative Statistical Regression Studies of the Effect of Joint and Service Specific Advertising on Military Recruitment" (with W.W. Cooper, Subal Kumbhakar, Michael Kwinn and Daniel McCarthy) accepted to appear, *Journal of the Operational Research Society*

"Using DEA to Identify and Manage Congestion" (with W. W. Cooper, H. Deng, Linda Golden, and Tim Ruefli) To appear, Journal of Productivity Analysis

"Commentary on "a review of research on the negative accounting relationship between risk and return: Bowman's paradox by M.N. Nickel and M.C. Rodriguez"", 2003 (with William W. Cooper, K. H. Kwon and T. W. Ruefli) *Omega*, 31 No. 5 Pages 409-412



"Authors' Reply", 2003 (with William W. Cooper, K. H. Kwon and T. W. Ruefli)
*Omega*, 31 No. 5 Pages 417-421

"Underwriting Risk" in *Encyclopedia of Financial Engineering,*

"Lapse Risk" in *Encyclopedia of Financial Engineering,*

**Book Reviews**

*Modern Actuarial Risk Theory (Modern ART)* by Rob Kass, Marc Goovaerts, Jan Dhaene,
and Michel Denuit, Kluwer Academic Publishers; ISBN: 0792376366; (2001),
Accepted to appear in *Journal of Risk and Insurance.*

*Law of the Internet* by George B. Delta and Jeffrey H. Matsuura, Aspen Law & Business
Publishers 1999 (with Linda L. Golden), Reviewed in *Journal of Risk and
Insurance* Vol. 68, No. 2 (June 2001) pp.372-374.

*Law of Insurance Contract Disputes, Second Edition* by Jeffrey W. Stempel, Aspen
Publishers 2000, Reviewed in *Journal of Risk and Insurance* Vol. 68, No. 1
(March 2001) pp.209-212.

*Mathematical Models in Finance,* Edited by S. D. Howison, F. P. Kelly and P, Chapman
and Hall Publishing Company 1995, ISBN 0 412 63070 2, Reviewed in *North
American Actuarial Journal.* Vol. 1, No. 1 (April 1997) p.110

*Against the Gods: The Remarkable Story of Risk,* by Peter L. Bernstein John Wiley and
Sons, Inc. Publishing Company, New York 1996, ISBN 0 471-12104-5 (with
Henry Wurts), Reviewed in *North American Actuarial Journal.* Vol. 1, No. 2
(April 1997) pp. 105-107.

*Rupp's Insurance and Risk Management Glossary,* by Richard V. Rupp, NILS Publishing
Company, Chatsworth, California 1996, ISBN 0-89246-446-1, Reviewed in *North
American Actuarial Journal.* Vol. 1, No. 2 (April 1997) p. 107.

*Insurance Risk Models* Harry H. Panjer.and Gordon E. WIllmot, Society of Actuaries
Publishers, Chicago, Ill. (1992), Reviewed in *Journal of Risk and Insurance*
(March 1994), Vol. 61, No. 1, 156-157.

*Progress in Decision, Utility and Risk Theory,* Attilla Chikán, ed., Kluwer Academic
Publishers, Dortrecht/Boston/London (1991), Reviewed in *Journal of Risk and
Insurance* (June 1993), Vol. 60, No. 11, 333-334.

*Multivariate Analysis of Variance and Repeated Measures: A Practical Approach For
Behavioral Scientists,* by D. J. Hand and C. C. Taylor, Chapman and Hall (with

1748

Linda L. Golden) Reviewed in *Journal of Marketing Research* (February 1991), Vol. 28, 114-115.

*Psychological Foundations of Economic Behavior*, by Paul Albanese (Ed.), Praeger Publishers (with Linda L. Golden) Reviewed in *Journal of Marketing Research* (February 1991), Vol. 28, 115-116.

*Stochastic Processes in Underwater Acoustics*, by C.R. Baker, Springer-Verlag, Lecture Notes in Control and Information Sciences #85. (with M.J. Hinich), Reviewed in *Journal of the Acoustical Society of America* (1989).

*Managerial Decision Analysis*, by Danny Samson, Irwin Press (with Antoine Laurence), Reviewed in *Journal of Risk and Insurance* (1989) Vol. 57, p. 581.

*Model Selection*, by H. Linhart and W. Zucchini, John Wiley and Sons, Reviewed in *Journal of Marketing Research* (May 1988), Vol. 25, 214-215.

*Stochastic Methods in Economics and Finance*, by A. Malliaris and W. Brock, (with S. H. Cox, Jr.) Reviewed in *Journal of the American Statistical Association* (1984), Vol. 80, 236-237.

*Comparative Statistical Inference (2nd edition)*, by Vic Barnett, Reviewed in *Journal of the American Statistical Association* (1983), Vol. 78, No. 382, 503.

*Techniques in Operations Research Vol. 2, Models, Search and Randomization*, by B. Conolly, Reviewed in *Journal of the American Statistical Association* (1982), Vol. 77, 688.

*Mathematical Programming for Operations Researchers and Computer Scientists*, by A. Holtman, Reviewed in *Journal of the American Statistical Association* (1982), Vol. 77, 688.

*Information Theory as Applied to Chemical Analysis*, by Eckschlager and Stepanek, John Wiley Interscience (1979), Reviewed in *Journal of the American Statistical Association* (1981). Vol. 76, 209.

*The H-Function with Applications in Statistics and Other Disciplines*, by A. M. Mathai and R. K. Saxena, Halsted Press, Reviewed in *Journal of the American Statistical Association* (1980), Vol. 75, 241- 242.

*The Asymptotic Theory of Extreme Order Statistics*, by Janos Galambos, John Wiley Interscience (1978), Reviewed in *Journal of the American Statistical Association* (1980), Vol. 75, 473-474.



*Decomposition of Superpositions of Density Functions and Discrete Distributions*, by Pal Medgyessy, Halsted Press, Reviewed in *Journal of the American Statistical Association* (1978), Vol. 73, 895-896.

*Characterizations of the Normal Probability Law,* by A. M. Mathai and G. Pederzole, Halsted Press, Reviewed in *Journal of the American Statistical Association* (1978), Vol. 73, 896.

*Two Essays on Entropy,* by Rudolf Carnap, University of California Press, Reviewed in *Journal of the American Statistical Association* (1978), Vol. 73, 896.

## GRANTS AND CONTRACTS RECEIVED

| | |
|---|---|
| 1999 | Validation Procedures for Property-Casualty Claim Fraud Indicators' (with Richard Derrig and Xiaohua Xia) from the National Association of Insurance Commissioners |
| 1997-1998 | Genetic Testing and Insurance." Granting Organization: Actuarial Education and Research Fund (AERF), Society of Actuaries |
| 1994-1995 | "Revalidation and Upgrade of the Enhanced FAARS-SHARE Model." Granting Organization: U.S. Army Research Office |
| | "Alternative Technical Methods for Predicting Insolvency of Life and Health Companies" (with James Jarrett), from the Texas Department of Insurance |
| | "A Validation of the Texas Early Warning System" (with James Jarrett), from the Texas Department of Insurance |
| 1992 | "Reserve Forecasting and Allocation of Army Recruiting Resources Study -- Sequential Hierarchical Allocation of Resource Elements (FAARS-SHARE) Systems." Granting Organization: U.S. Army Research Office |
| 1999-1993 | "Development of a Vector Extremal Model for the Navy's Awaiting Instruction Problem," (with Gang Yu). Granting Organization: Office of Naval Research |
| 1993-1994 | "An Analysis of Pricing and Availability Problems in the Texas Auto Insurance Market" (with Bob Witt). Granting Organization: National Association of Independent Insurers |
| | Research Grant from The Actuarial Education and Research Fund of The Society of Actuaries for "Operations Research in Insurance" |

1990-1991    "An Analysis Focused Taxonomy of Risk, Uncertainty, Ambiguity and Incomplete Information in Modeling and Decision Making in Insurance Operations." Granting Organization:  College of Business Administration Summer Research Award

University Research Institute-Small Research Grant ($500)
University Research Institute - Faculty Research Assignment (One semester off with pay for Spring 1991)

"Statistical Models for Early Warning Systems of Insurance Company Insolvencies," (with W.W. Cooper). Granting Organization:  Texas State Auditor's Office

1989-1990    CBA Faculty Academic Development and Research Committee - Summer research award

University Research Institute-Small Research Grant ($500)

"Information Theoretic Unification of Solutions of Problems in Actuarial Science: Research and Study Note." Granting Organization:  Actuarial Education and Research Fund (AERF), Society of Actuaries

1988-1989    CBA Faculty Academic Development and Research Committee - Summer research award

1987-1988    "Chebychev Systems of Functions as a Unifying Technique for some problems in Finance, Economics, and Insurance." College of Business Administration Summer Research Award

1986-1987    "Information Theoretic Analysis of Discrete Data." Granting Organization: College of Business Administration Summer Research Award

1986-1987    "Computation of Information Theoretic Statistics." Granting Organization: University Research Institute

1986-1987    "Computation of Information Theoretic Statistics." Granting Organization:  IBM Project Quest (joint with L. L. Golden and R.A. Peterson)

1984-1987    "Non Gaussian Ocean Surveillance" (with the Applied Research Laboratories, The University of Texas at Austin). Sponsor:  Office of Naval Research

23



1980-1984    "Characterization of Non-Gaussian Stochastic Processes in Underwater Acoustics and Development of Signal Processing Algorithms." (Joint effort with C. Baker, University of North Carolina, and the Applied Research Laboratories, The University of Texas at Austin).  Sponsor: Office of Naval Research

1978-1980    "Statistical Tools for Determining Fitness to Fly." Contracting Organization:  U.S. Air Force (Brooks Air Force School of Aerospace Medicine, San Antonio, Texas). Co-Principal Investigator:  G. Shea

1978    "Statistical Analysis of Stochastic Processes with Independent Increments." Granting Organization:  National Science Foundation

1976    "Admissible Transformations of Measures on Locally Compact Groups." Granting Organization:  Tulane University Committee on Faculty Research

## INVITED ADDRESSES, LECTURES, AND PAPERS PRESENTED

1974    "An Index for Convergence of Sums of Independent Random Variables," November 1974 meeting of the American Mathematical Society at the University of Southern California

1975    "A Methodology for Inverting Mixing Distributions," April 1975, University of Wisconsin-Parkside Mathematics Department

"Estimating Mixing Distribution Functions via Moments," Tulane University Mathematics Department, New Orleans, April 1975

1976    "Limit Distributions of Sums Under Mixing of the Scale Parameter," Invited talk at March 1976 meeting of the Institute of Mathematical Statistics held at Texas A & M University

"Admissible Transformations of Measures," January 1976 meeting of the American Mathematical Society in San Antonio, Texas

"Support of Infinitely Divisible Measures on Hilbert Space," special session on probability and statistics, November 1976, meeting of American Mathematical Statistics in Albuquerque, New Mexico

1977    "Design and Mathematical Analysis of Questionnaires," Colloquium Lecture, Department of General Business, December 1977, The University of Texas at Austin

24

|752



1978     "Approximating Moment Sequences to Obtain Consistent Estimates of Distribution Functions," January 1978 Annual Meeting of American Mathematical Society in Atlanta, Georgia.

Chairman, session on Probability Theory and Stochastic Processes, January 5, 1978 Annual Meeting of American Mathematical Society, Atlanta, Georgia

"A Methodology for the Analysis of Categorical Questionnaires," January 1978 lecture, Brooks Air Force Base, Biomedical Computation Division, San Antonio, Texas

"A Characterization of Information Divergence with an Application to Questionnaire Information," American Mathematical Society Meeting, April 1978, San Francisco, California

"A Mathematical Analysis of Questionnaires," Austin Chapter of the American Statistical Association, May 1978

"Zeros of the Densities of Infinitely Divisible Probability Measures," Colloquium, Mathematics Department, Tulane University, October 1978

"Information Theory and Statistics," Mathematics Department Colloquium, Tulane University, October 1978

1979     "Recognition of Trends in Health Monitoring Systems with Low Reliability Data," Austin Chapter, American Statistical Association, January 1979 meeting

"Discriminant Analysis with Categorical Information," invited talk, April 30, 1979 meeting, Operations Research Society of America, New Orleans

"Non-parametric Tests for Trends," Department of Mathematics Colloquium Lecture, Tulane University, May 1979

"Information Theoretic Discrete Variable Selection," June 1979 meeting of the Institute of Mathematical Statistics, Los Angeles

"Minimum Discrimination Information Estimation via Unconstrained dual Convex Programming," September 1979, Fifth Congress of the National Academy of Engineering of Mexico (National Academy of Sciences of Mexico), Morelia, Mexico

"Monitoring Adverse Reactions to Drugs by Non-parametric Statistical Methods," October 1979, Colloquium, University of Louisville, Louisiville, Kentucky

25



1980    "Discrimination Without Training Samples, with Applications to World Health Organization Data," February 1980, Department of Statistics Colloquium, University of California, Riverside

"High-Low Discriminant Analysis of Categorical Data Using RIDITS," invited presentation for session on discriminant analysis, Biometric Society Meeting, March 1980, Charleston, South Carolina

"Statistical Techniques for Determining Fitness to Fly," March 1980, Brooks Air Force School of Aerospace Medicine, San Antonio, Texas

"Statistical Model for Survival Incorporating Time Dependent Covariates," Austin Chapter, American Statistical Association, May 1980

"Unimodality of High Convolutions," Department of Mathematics Colloquium, October 1980, University of California, Riverside

"Using Time Dependent Covariates to Assess Survival Probabilities with an Application to Heart Disease," December 1980, Colloquium, University of California, Irvine, Community & Environmental Medicine, and Southern Occupational Health Center

1981    "Analysis of Categorical Questionnaires with an Application to Marketing Research," Seminar in the Finance Workshop, January 1981, Graduate School of Management, University of California, Irvine

"A Periodic Check Up Statistical Model for Heart Disease in Air Force Fliers," February 1981 Colloquium, California State University at Long Beach

"Periodic Check Up Survival Analysis Model," April 1981 Colloquium, Department of Statistics, University of California, Riverside

1982    "Self Insurance and Regret," April 1982, Risk Theory Seminar (Sponsored by the American Risk and Insurance Association), Columbus, Ohio

"Identifiability of Competing Risk Models," June 1982, Institute of Mathematical Statistics, San Diego, California

1983    "Self Insurance and Disutility," Southwestern Risk and Insurance Association, January 1983, Newport Beach, California

"Likelihood Detection for Infinitely Divisible Processes," February 1983, Department of Mathematics Colloquium, Tulane University

1754



"Non-Parametric Density Estimation," June-July 1983, Non Gaussian Signal Processing Conference (sponsored by the Office of Naval Research)

"Optimal Choice Among Risky Assets for a Class of Utilities Containing All Common Utility Functions," Operations Research Society of America, November 1983 Special Session on Quantitative Methods in Financial Decision Analysis

"On Market Efficiency and the Lognormal Distribution of Returns," Operations Research Society of America, November 1983 Special Session on Quantitative Methods in Financial Decision Analysis

Organizer and chairman of Special Session on Quantitative Methods in Financial Decision Analysis, Operations Research Society of America, November 1983

1984    "Bispectral Analysis of Underwater Acoustical Data," Non-Gaussian Signal Processing Conference, Princeton, N. J., March 1984, sponsored by the Office of Naval Research

"Constructing a Unimodal Prior Distribution," National Academy of Engineering of Mexico, Cuidad Obregon, Sonora, Mexico, September 1984

"A Method for Constructing a Unimodal Prior Density," Actuarial Research Conference, Society of Actuaries, Berkeley, California, October 1984

1985    "An Empirical Statistical Test of the Linear and Gaussian Time Series Models for Interest Rate Series," May 1985 Symposia on Statistics and Festschrift for Joshi, London Ontario, Canada

"Information Theoretic Methods for Insurance Calculations," August 1985, American Risk And Insurance Association annual meeting, Vancouver, British Columbia, Canada

1986    "Financial Consideration of Risk--Pluses and Minuses," Operations Research Society of America, November 1986, Special Session on Quantitative Methods in Financial Decision Analysis

1987    "Comparison of Risk Characteristics of Individual Decision Makers," (invited) International Risk Theory Symposium, Mathematics Institute, Oberwolfach, Germany

"The Contributions of A. Charnes to Statistical Thought," (with L. Seiford), Symposium Honoring A. Charnes on his Seventieth Birthday, Austin Texas.

27

1755



1989    "A New Method for Identifying Asymmetric Relationships Among Variables: Information Theory Applied to Affect, Location Convenience and Patronage Frequency," (with Linda L. Golden and Mary R. Zimmer), Winter Educator's Conference of the American Marketing Association, February 1989, St. Petersburg, Florida

1990    "Linear and Nonlinear Time Series Models in the Financial Theory of Insurance Companies," (co-authored with Robert C. Witt), Invited lecturer at the American Statistical Association Annual Meeting, Anaheim, California.  This session was jointly sponsored by the Business and Economic Statistics section of the ASA and by the Society of Actuaries

"Stochastic Process Models for Ventured Capital Decisions," (with Samuel Cox, and James Gerberman), Business and Economic Statistic section of the American Statistical Association annual meeting, Anaheim, California

"Risk, Return, Skewness and Preference," (with Yehuda Kahane), August 1990, The American Risk and Insurance Association Annual Meeting in Orlando, Florida

Discussant of the paper "Fuzzy Trends in Automobile Insurance," by J. David Cummins and Richard Derrig, at the American Risk and Insurance Association Annual Meeting in Orlando, Florida

1991    "Fun With Moment Problems--The Schmitter Problem," (invited) International Risk Theory Symposium, Mathematics Institute, Oberwolfach, Germany

"A Reexamination of the Relationship Between Moment Preferences And Utility," April 1991, the Risk Theory Seminar of the American Risk and Insurance Association, Penn State University

"Event Frequency Modeling: A Unification of the Mixed And Compound Poisson Distributions With Application To Purchase Frequency Events," (with Linda Golden and Harry Panjer), invited presentation, July 1991, ORSA/TIMS/SOBRAPO Joint International Conference, Rio de Janeiro, Brazil

"A Chance Constrained Programming Approach To Pension Plan Management," (with Abraham Charnes and Li Sun), August 1991, American Risk and Insurance Association Annual Meeting

1992    "Venture Capital Financing," Instituto Technologico De Monterey, April 10-11, 1992, Mexico City, Mexico

1993    "Superfund Reforms and the Impact on the Insurance Industry," July 1993, National Conference of Insurance Legislators (invited), Washington D.C.

1756



"The Genetics Revolution, Economics, Ethics, and Insurance," (with E. Susan Tankersley) August 1993, American Risk and Insurance Association Annual Meeting, San Francisco California

"Using Neural Networks to Detect Early Warnings of Insurance Company Insolvencies," (with Linda L. Golden, Utai Pitaktong, and W.W. Cooper), August 1993, American Risk and Insurance Association Annual Meeting, San Francisco, California

"Environmental Liability:  The Role of Insurance," American Public Power Association (invited), October 1993, Austin, Texas

Selected member of an eight-person international group of medical informatics specialists to go to Hungary (Budapest and Szeged) and Russia (Moscow and St. Petersburg) and meet with academic and scientific colleagues, and members of the Academy of Sciences in these countries

Chairman of session on Issues in Business Education, Fourth Symposium on Cross-Cultural Consumer and Business Studies, December 1993, Kahuku, Hawaii.

1994    "New Approach to Event Study Methodology with an Application to Proposition 103," August 1994, American Risk and Insurance Association Meeting

"Stochastic Process Models for Financial Time Series in Insurance," Meeting on Risk Theory, September 18-14, 1994, Mathematics Research Institute, Oberwolfach, Germany

"Information Theoretic Applications to Actuarial Science," Meeting on Risk Theory, September 18-14, 1994, Mathematics Research Institute,  Oberwolfach, Germany

1995    "Claims Made versus Occurrence:  Debunking Some Myths and Developing Some Finance Pricing Models," January 1995, Western Risk and Insurance Meeting, Las Vegas, Nevada

"Kohonen Feature Maps for Detecting Bodily Injury Fraud Claims in Automobile Insurance," January 1995, Massachusetts Automobile Insurance Bureau, Boston, Massachusetts

"Risk Management for Software Development Companies," American Defense Preparedness Association Test & Evaluation Symposium XI, January 31, 1995, held at the $IC^2$ Institute, Austin, Texas

29

1757



"Rank Statistical Methods for Detecting Efficiency Differences in Intertemporal DEA Analysis," Computational Economics Society Meeting, May 1995 Austin, Texas

"Information Asymmetries and Insurance Futures Options," The Bowles Symposium on the Securitization of Insurance Risks, May 24-26, 1995 Georgia State University, Atlanta, Georgia

"Pattern Recognition Methodology:  A New Approach for Identifying Fraudulent Claims in Government Programs," the National State Auditors Association Annual Conference, June 8-10, Phoenix, Arizona.

"Information Asymmetries and Insurance Futures Options, American Risk and Insurance Association Annual Meeting, August 1995, Seattle, Washington.

"Kohonen Feature Maps for Detecting Bodily Injury Fraud Claims in Automobile Insurance," American Risk and Insurance Association Annual Meeting, August 1995, Seattle, Washington.

1996    "An Application of Rank Statistics to DEA and OECD Country Productivity" (with Linda L. Golden and Shan Li)  Presented to the Northeast Decision Sciences Institute annual meeting, St. Croix, V.I., April  1996.

"The Use and Impact of Information Technology and the Internet on Risk Management and Insurance," Presented to the Austin Chapter of the CPCU, 1996

"The Effect of Provider Autonomy and the Efficiency of HMOs," (with John Rousseau and J. Semple) August, 1996, American Risk and Insurance Association Annual Meeting, Philadelphia, Penn

Houston Marine Insurance Seminar, attended and received $10,000 in scholarships for students in Risk Management and Insurance, Houston, Texas September, 1996

"Provider Autonomy and the Efficiency of HMOs," 1996, Health Care Management Seminar, University of Texas at Austin

"Risk Management and Business Risk", October 1996, Videotaped Interview for a PBS film documentary to be aired in 1997

Society of Actuaries Annual Meeting, attended and received Annual Prize for most outstanding publication in the *Transactions of the Society of Actuaries* for the year 1996, Orlando, Florida, November 1996

1758

"Issues in the Deregulation of Commercial Lines of Insurance," presented to NCOIL (National Conference of Insurance Legislators) Annual Meeting in Austin, Texas, November 18, 1996.

1997   "An Evaluation of the Efficiency of Different Marketing Distribution Systems in the Insurance Industry" (With Linda Golden, John Rousseau and Yuying Wang), Western Risk and Insurance Association Annual Meeting, Santa Barbara, California, January 1997.

2000   "Fraud Classification Using Principal Component Analysis of RIDITs" August, 2000, American Risk and Insurance Association Annual Meeting, Boston, Mass.

"Current Issues and Research Topics in Risk Management," Actuaries Club of the Southwest, November 2000

2001   "Fraud Classification Using Principal Component Analysis of RIDITs" July, international Insurance Mathematics and Economics conference, invited Plenary Keynote address, Penn State University, State University Penn.

"DEA Evaluation of Efficiency of Marketing Distribution Systems in the U.S. Property-Liability Insurance Industry: A Financial Intermediary Approach" Western Risk and Insurance Association annual Meeting, January, 2001, Santa Barbara, Calif.

"Modeling and Predicting Automobile Insurance Fraud" Western Risk and Insurance Association annual Meeting, January, 2001, Santa Barbara, Calif.

"An Analysis of the Efficiency of Joint Service Advertising Versus Service Specific Advertising for Recruiting Success" (with William W. Cooper, Linda L. Golden, and Michael Kwinn) Military Operations Research Conference, West Point, June, 2001

"The History and Future of Risk Research" Invited Presidential Address, American Risk and Insurance Association Annual Meeting, Indianapolis, IN. August, 2001

2002   "Mediation as a Cost Containment Mechanism in Insurance:  Public Perceptions and Insurer Benefits," (with Linda Golden) presented to the Western Risk and Insurance Association Annual Meeting, January.

"Assessing Fraud with Unsupervised Learning," (with Richard Derrig, Linda L. Golden, Arnold Levine), presented to the Conference on "Insurance Claim Fraud: Developing the Models and Mining the Data," sponsored by the Insurance Fraud Bureau of Massachusetts and the Coalition Against Insurance Fraud and the Insurance Research Council, Newport, Rhode Island, November, invited.

31

1759



"Genetic Testing and Insurance" (with Richard MacMinn), Center for Risk and Insurance of the University of Nottingham Conference, London, England, April (Invited)

"Efficiency and Title Insurance" (with W.W.Cooper and U.Pitaktong) presented to the Western Risk and Insurance Association Annual Meeting, January.

"Technology and Risk Management" Session Chair at the Western Risk and Insurance Association Annual Meeting, January.

"The Role of Howard Tucker in Graduate Education" at Festschrift for Howard Tucker's 80th birthday Celebration, Irvine, California, October

2003    "The Role of PR in Risk Management," (with Anderson, Ronald and Linda L. Golden), Decision Sciences Conference, Maui, April, refereed.

"Genetic Testing and Adverse selection" (with Richard MacMinn) Western Risk and Insurance Association annual Meeting, January, 2003, Maui, Hawaii.

Genetic Testing" (with Richard MacMinn) European Group of Insurance Economist meeting, Zurich, Switzerland September 2003

"Credit Scoring and Insurance Underwriting" Testimony before the Texas Senate, February, 2003

"Credit Scoring and Insurance" Automobile Agents of Texas annual meeting, Keynote speech, September 18, 2003 San Antonio, TX

"Upcoming Issues in Insurance" Texas Public Policy Foundation February 2004

## Ph.D. STUDENTS SUPERVISED

| Name | Dissertation Title | Year |
|---|---|---|
| Sipra, Naim | *Essays on Financial Models: Portfolio Performance Measures, Capital Market Equilibrium with Redundant Assets, and Intertemporal Fisher Hypothesis* | 1986 |
| Sun, Li (Co-Chair, A. Charnes) | *On Some Problems of Chance Constrained Programming* | 1990 |
| Chang, Yang Chun (Co-Chair, A. Charnes) | *Chance Constrained Programming and Chebychev Systems with Applications* | 1990 |



| | | |
|---|---|---|
| Dalle Molle, John William (Co-Chair, M. Hinich) | *Higher Order Spectral Analysis and the Trispectrum* | 1992 |
| Pitaktong, Utai (Co-Chair, J. Mote) | *Data Envelopment Analysis and Applications* | 1993 |
| Chen, Hwei Mei | *A Dynamic Model for Event Study Methodology: an Examination of the Reaction to California's Proposition 103* | 1993 |
| Zhang, Changning | *Stochastic Programming and Optimal Salesforce Compensation Schemes* | 1994 |
| Li, Shan | *A New Approach to Sensitivity Analysis of the DEA Models and Their Applications to Ranking and Productivity Growth* | 1995 |
| Xia, Xiaohua | *The use of Artificial Intelligence Methods in Insurance Modeling* | 1996 |
| Song, Yun | *Information Theoretic Approaches to Actuarial Science* | 1996 |
| Swan, Scott (Co-Chair, M. Katabe) | *Essays on Robust Design: An Elaboration of the Typology, An Examination of Situational Performance Implications and a Conceptual Extension* | 1997 |
| Jang, Jaeho | *Comparative Analysis of Statistical Methods And Neural Networks for Predicting Life Insurers' Insolvency* | 1997 |
| Wang, Yuying | *Efficiency in the Property and Liability Insurance Industry* | 1997 |
| Magee, David | *Neural Network Method for Actuarial Claim Reserving* | 1998 |
| Zhou, Li | *The Navy's Awaiting Instruction Problem* | 1998 |
| Kang, Yu (Frank) | *Risk, Ambiguity and Insurance* | 1998 |
| Kwinn, Michael | *Efficiency of Joint versus Service* | 2000 |

33

17Lel

| | | |
|---|---|---|
| (Co-Chair, W.W. Cooper) | *Specific Advertising for Armed Service Recruiting* | |
| Mulong Wang (Co-Chair, R. MacMinn) | *Financial Derivatives in Corporate Risk Management* | *2001* |
| Yang, Chuanhou | Weather Derivatives | 2003 |
| Deng, Honghui (Co-Chair W.W. Cooper) | Congestion in the Chinese Economy | 2003 |

## Ph. D. STUDENT SUPERVISION IN PROCESS

| Name | Dissertation Title | Year |
|---|---|---|
| Jing (Jean) Ai | | |
| Georgios Chimonides | | |

## PARTIAL LISTING OF MEMBERSHIP ON PH.D. STUDENT COMMITTEES

| Name | Dissertation Title | Year |
|---|---|---|
| Diem, Janet | *Estimation in a Non-Stationary Markov Chain* | 1976 |
| Haaland, Perry | *A New Approach to Pattern Detection* | 1977 |
| Kung, Mabel | *Computational Procedures for Obtaining Least Absolute Value Estimates* | 1980 |
| Nathan, Edward C. | *An Examination of Auditor Decision Making Behavior in the Preparation of Audit Time Estimates* | 1981 |
| Harris, Michael | *Applications of Montmorillonite as an Excipient in Solid Dosage Forms* | 1981 |
| Halverson, Don Ray | *Discrete Time Detection of Signals in Dependent Non-Gaussian Noise* | 1981 |
| Kress, Moshe | *On Some Problems in Chance-Constrained and Intertemporal Network Planning* | 1981 |

34

| Rousseau, John | *Game Theoretic Methods in Analysis and Resolution of Cooperation and Conflict in Economics* | 1981 |
|---|---|---|
| Starks, Laura Ann | *The Investment Trust Relationship:  An Agency Theoretic Approach* | 1981 |
| Cackowski, Ted | *Optimal Capital Structure: The Risk of Bankruptcy and Regulated Industry* | 1982 |
| Duffuaa, Salih | *On Some Economic Distribution and Network Problems* | 1982 |
| Nelson, Abraham | *Goal Arc Methods in EEO Planning and Control* | 1982 |
| Yao, Harry | *On Some Chance Constrained Models for Finance and Management* | 1982 |
| Haksever, Cengiz | *Effective Solution of Non-Convex Multi-Objective Ratio Goals Problems* | 1983 |
| Al-Yafi, Adnan Abdulbadie | *Management of Some Large-Scale Logistical Problems of the Hajj* | 1983 |
| Lovegren, Victoria | *Informatics, Analysis, and Solution of a Class of Constrained Integer Network Problems* | 1984 |
| Zhang, Jianzhong | *Trust Region Methods for Nonlinear Optimization and Nonlinear Approximation Problems* | 1984 |
| Urrutia, Jorge | *Theoretical Derivation and Empirical Tests of Two Financial Models of Pricing* | 1984 |
| Lamm, Joan Marie | *The Theoretical and Empirical Aspects of Determining Underwriting Profit Margins* | 1983 |
| Misra, Lalatendu | *Two Aspects of the Theory of Delegated Portfolio Management* | 1985 |
| Moridaira, Soichiro | *Two Essays on Economic and Financial Theories of Insurance:  Optimal Futures for* | 1985 |

1743



|  |  |  |
|---|---|---|
| | *Insurance* Kuo, | |
| Cheng-Kun | *The Risk of Ruin in Futures Market Trading* | 1986 |
| Musumeci, James Joseph | *Impact of Real Return and Inflation Risks on Bond Maturity Decisions* | 1987 |
| Rodriguez, Ricardo J. | *Essays on Asymmetric Information and Financial Market Theory* | 1986 |
| Lee, Jeong Wan | *The Weekend Effect and the Nonlinear Model -- A Bilinear Approach* | 1986 |
| Ancel, Esther | *Estimations of the Statistical Parameters of Stock Returns Implied on Option Prices* | 1986 |
| Shin, Hong-Chul | *Optimal Hiring Decisions for Entry-Level Auditors in Public Accounting Firms* | 1985 |
| Song, Tiantai | *On Some Problems of Large Scale Network Algorithms* | 1985 |
| Golany, Boaz | *On Chance-Constrained, Competitive and Cooperative Evaluational Methods and Some Problems of Dynamic Management* | 1985 |
| Eechambadi, Narasimhan | *Efficiency Analysis of Market Response and the Marketing Mix: Extending Data Envelopment Analysis to a Competitive Environment* | 1985 |
| Moore, Leslie | *Ordering the Points in Factorial Experiments to Protect Against Early Termination* | 1985 |
| Sueyoshi, Toshiyuki | *Goal Programming and Distribution Free Statistical Estimation* | 1985 |
| Al-Faraj, Taqi N. | *Mathematical Models For Planning the Production, Refining and Marketing of Crude Oil and Refining Petroleum Products* | 1986 |
| Al-Zayer, Jamal A. | *On Some Mathematical Planning Models for the Management of the Oil, Gas, and Petrochemical Industry in Saudi Arabia* | 1986 |
| Childs, Barbara J. | *The Cost of Debt and Its Effect on* | 1986 |

1769

*Prices of Multi-Family Housing*

| | | |
|---|---|---|
| Chergui, Boumedienne | *On Optimization Methods for Gas Liquefaction Production in Algeria and for a Firewater Safety System for the Holy Area Of Mina, in Saudia Arabia* | 1986 |
| Dieck-Assad, Martin J. | *On Some Methods, Informatics and Applications of Data Envelopment Analysis* | 1986 |
| Gomez, Jose Alberto | *On Some Problems of Dynamic Distributional Planning for Petroleum Distillates in Mexico* | 1986 |
| Hanizavareh, Seyedabbas | *On Some Problems of Interval Linear Programming* | 1986 |
| Paick, Kwang | *An MDI Approach to Statistical Pattern Recognition and Related Applications* | 1986 |
| Divine, John Douglas | *Efficiency Analysis and Management of Not for Profit and Governmentally Regulated Organizations* | 1986 |
| Friar, Shirley A. | *Decision Making Under Risk:  An Experimental Study within a Business Context* | 1986 |
| Lie, Chin-Jen | *The Financial Decisions of a Stock Life Insurance Company:  Three Essays* | 1987 |
| Azad, Abbas | *An Application of Chance-Constrained Theory to Dynamic Bank Balance Sheet Management* | 1988 |
| Hogan, Arthur McClure | *Organizational Form and Asset Substitution* | 1988 |
| Wolfe, Michael David | *Constrained Network Modeling in the Management of Optimal Manpower Scheduling and Modifications Design* | 1988 |
| Park, Manyong | *Incremental Information Contained in SFAS No. 33 Disclosures:  A Closer Examination* | 1988 |
| Parker, Mary | *Multiparameter Estimation in Normal Distributions: The Slightly Unequal* | 1988 |



*Variance Case*

| | | |
|---|---|---|
| Rebello, Michael Joseph | *Managerial Compensation: A Human Capital Perspective* | 1989 |
| Zhang, Dagan | *Optimization of Pursuit and Reliability on Discrete Graphs* | 1989 |
| Farsi, Daryoush Darabi | *On Some Problems of Cyclical Scheduling in Integer Programming* | 1990 |
| Thomas, David Alan | *Data Envelopment Analysis Methods in the Management of Personnel Recruitment under Competition in the Context of U.S. Army Recruiting* | 1990 |
| Semple, John | *On a Class of Dual Methods for Quadratic Programming* | 1990 |
| Huang, Zhimin | *Vector Extremal Principles for Extensions of Game Theory and Data Envelopment Analysis* | 1991 |
| Schellhorn, Carolin D. | *The Role of Subordinated Debt in Regulating Financial Institution Riskiness* | 1991 |
| Kwon, Ku-Hyuk | *Chance Constrained Programming and Other Approaches to Risk in Strategic Management* | 1991 |
| Collins, James | *Strategic Risk: An Ordinal Approach* | 1991 |
| Gong, Linguo | *Sensitivity and Stability Analysis of Problems in Constrained Programming* | 1991 |
| Cannon, Susanne | *Financial Intermediation and Ownership Structure: Savings and Loan Associations Under Alternate Regimes* | 1991 |
| Hong, Soon Koo | *A Financial Theory of the Insurer's Capital Structure* | 1992 |
| Koo, Bon-Sung | *Solvency Surveillance in the Property/ Casualty Insurance Industry: A Financial* | 1992 |

38

17/06




| | *Analysis and Statistical Evaluation* | |
|---|---|---|
| Gerberman, James | *On Some Problems of Market Planning Evaluation and Analysis in the Presence of Competitive and Stochastic Effects* | 1992 |
| Li, Hongyu | *On Some Contributions to Productivity Analysis of Firms in an Industry Overtime* | 1992 |
| Li, Susan | *Optimal Decision Making in Restricted Markets* | 1992 |
| Park, Kyunguk | *A Signaling Model with the Investment Decision; A Hidden Knowledge Approach Markets* | 1993 |
| Baranoff, Etti | *Financial Analysis of the Life and Health Insurance Industry: A Disaggregated and Clustered Approach* | 1993 |
| Pottier, Steven | *Financial Economics of the Insurance Firm* | 1994 |
| Akkihal, Shivanand Irappa | *Analysis and Identification of Faults in Distributed Hypothesis Testing Systems* | 1995 |
| Jia, Jiamin | *Measures of Risk and Risk-Value Theory* | 1995 |
| Chatterjee, Abhijit | | |

## MASTER'S STUDENTS SUPERVISED

| | |
|---|---|
| Leone, Mark | [Mathematics/Statistics] |
| Wolfe, Candi | [Mathematics/Statistics] |
| Dalle Molle, John | [Mathematics] |
| Lawrence, Antoine | [Economics] |
| Kan, Kenny | [Accounting/Risk Management] |
| Jones, Mark | [Mathematics/Actuarial Science] |

## UNIVERSITY AND COLLEGE SERVICE

Interview candidates for Assistant Professor positions in Engineering, attend their talks, and write recommendation letters, 1977-1979, 1983, 1987

Chair--CBA Ad-Hoc Committee on the Mathematics requirement, 1982

Member--Center for Statistical Studies Advisory Board, (U.T. campus-wide coordinating committee), 1983-1992

Faculty Ad-Hoc Committee to Investigate Formation of a Department of Quantitative Methods, College of Business, The University of Texas at Austin, 1984

Admissions and Registration Committee of the General Faculty, The University of Texas at Austin, (1984-1986)

Member--CBA Faculty Academic Development and Research Committee, (1985-1986)

Member--Ad-Hoc Committee to Formulate Discussion Material On Statistics in the Business School for the CBA Faculty Retreat, 1985

Recruitment of High School Football Players: Help Athletic Department by showing recruits around the Business School and answering questions, 1985

Member--Presidential Committee for the Evaluation of the Dean, 1992

Member--MBA Revision Task Committee, 1992

Member--Planning Committee for Evaluating and Developing an Employee Assistance Program for The University of Texas at Austin, 1992

Member--Advisory Committee for UT Employee Assistance Program, 1992

Faculty Senate and University Council, 1992, 1993

CBA College Retreat Member 1992

University Police Department Advisory Committee, 1993

Member--University Research Institute Grant Evaluation Committee, 1993, 1994, 1995

Member--University Committee to Evaluate Small Research Grants, 1995

Member--University Faculty Welfare Committee, 1996-98

**DEPARTMENTAL SERVICE**



Budget Council Representative for Associate & Assistant Professors of Finance, 1982-86

Executive Committee Member, Department of Finance, 1986-1995

Actuarial Science Program Director, 1986-September 1989

Actuarial Science Advisor, Undergraduate and MBA, 1981-September 1989

Risk Management and Insurance Advisor, Undergraduate and MBA, 1989-1992

Member--Ad-Hoc Committee to Formulate Policy on Evaluating Full Professors, 1984

Member--Ph.D. Review Committee, 1984.

Chairman--Committee to Implement An Executive Committee for the Finance Department

Member--Ph.D. Admissions Committee, 1985-1988

Actuaries Club of the Southwest Scholarship Committee

Member--Wortham Chair Scholarship Committee

Actuarial Science Program Review Committee Finance Department

Finance Department Teaching and Research Awards Committee (acting chair 1984; chair 1985, co-chair 1986, member 1987 and 1992, chair 1993, member 1994))

Committee to Nominate Finance Department Internal Chair Candidates, 1985

Department Undergraduate Curriculum Committee (member 1985 and 1987, chair 1986)

Departmental Representative to University Human Subjects Committee

Director, Risk Management and Insurance Program, 1995-
1995-1992

Chairman, Risk Management and Insurance Scholarships

Member MSIS Department Budget Committee, 1995-

Chair, Risk Management Faculty Search Committee 1999-2001

41

Several Ad hoc Department Review Committees (Promotion reviews, Dean's Fellow
Recommendation Committee, etc.) 2000-2001

**MAJOR AREAS OF INTEREST**

Risk Management and Insurance
Managing Financial risk
Actuarial Science
Decision Analysis
Management Science
Statistical Analysis and Applications in Business
Information Theory
Probability Theory and Applications in Business
Stochastic Processes and Nonlinear Time Series

**COURSES TAUGHT IN AREAS OF EXPERTISE:**

Managing Environmental Risk
Managing International Risk
Mathematical Risk Theory
Risk Analysis and Management
Mathematical Theory of Risk
Introduction to Risk Management and Insurance
Economic and Financial Aspects of Risk Management and Insurance
Life and Health Insurance
Pension Theory
Property and Casualty Insurance
Actuarial Science: Theory of Interest
Actuarial Science: Single and Multiple Decrement Life Contingency Theory
and Applications
Stochastic Calculus in Finance and Business
Questionnaire Analysis
Statistics (Graduate and Undergraduate)
Probability (Graduate and Undergraduate)
Games, Gods and Gambling (History of the People and Ideas Responsible for the
Development of Probability and Statistics)
Information Theory
Biostatistics
Numerical Analysis
Differential Equations
Calculus
Linear Algebra

42

1771

## DECLARATION OF MARK CUNNINGHAM

I, Mark Cunningham, a person of lawful age, do hereby declare the following to be true and correct, under penalty of perjury:

1.  My name is Mark D. Cunningham, Ph.D., ABPP.  I am board certified in Forensic Psychology by the American Board of Professional Psychology.  I am licensed to practice in the state of Texas as well as ten (10) other states.  I have practiced in the fields of clinical and forensic psychology for over twenty (20) years.

2.  My curriculum vita is attached to this declaration as **Exhibit A** and incorporated as if fully rewritten herein.

3.  I first spoke with Mr. Stan Schwieger, trial counsel for Christopher Vialva, in April of 2000, regarding a potential assignment to address the issue of violence risk assessment, also known as future dangerousness, in Mr. Vialva's capital trial.  To assist Mr. Schwieger in obtaining funding for my services I executed an affidavit on April 17, 2000, regarding my qualifications and potential services.

4.  After funding was approved, I provided professional services to Mr. Vialva's defense team between May 17, 2000 and June 16, 2000.

5.  Typically, in performing a violence risk assessment as an evaluating witness at capital sentencing, I interview the defendant for approximately 3 to 5 hours. In this interview I obtain information regarding the pretrial custody context and procedures; the history of any prior confinements and adjustments to that confinement; response to prior structured settings such as school or employment; psychosocial history;  and any experience of psychological disorders and treatment. I review offense, criminal, correctional, juvenile, school, medical, and employment records.  I also review the chronology and other information collected by the defense in the mitigation investigation. I interview or rely on interview summaries conducted with family members and other third parties.

6.  If a mitigation history had not been done and I were tasked with performing a mitigation analysis, I would work with a mitigation specialist and would expect to receive a full document retrieval of medical, psychological/psychiatric, school, juvenile, social services, hospitalization, employment, military, criminal, correctional, and offense records. I would expect to receive and review criminal, psychiatric, employment histories and records of family members.  It is customary for the mitigation investigator to have identified and interviewed a wide range of third parties, including parents, siblings, grandparents, aunts and uncles on both sides of the family, ministers, neighbors, scout leaders, coaches, employers, teachers, peers, girlfriends, etc. I customarily receive summaries of those interviews and the contact information for those interviewees, permitting me to select those persons with information critical to the case for me to interview personally.

Page 1 of 6

Exhibit VII-M

1772

7. The purpose of the mitigation analysis would be to identify potential adverse developmental circumstances: medical, neurological/neuropsychological, psychological, genetic, parental, and/or community based. I also seek to identify and assess constructive aspects of the defendant's relationships and adaptations, including past positive adjustment to structure; relationships that reflect loyalty, attachment, sensitivity, concern, and/or protection that would indicate an ability to form attachments. These features may controvert presumptions of inability to act with empathy and affection.

8. The list of items enumerated on the document entitled "Capital Sentencing Evaluation" attached hereto as **Exhibit B** details the information available to me for my analysis of Mr. Vialva. I spoke with Mr. Vialva's mother, Lisa Brown, three times for a total of two and a half (2 ½) hours. My conversations with Ms. Brown occurred on June 4 and again on June 6, 2000. I spoke with Mr. Vialva's maternal aunt, Dee Bynum, for forty (40) minutes on June 6, 2000. I reviewed educational, psychological, and medical records on Mr. Vialva, as wells as juvenile and adult offense records, records related to the offense with which Mr. Vialva was charged and limited birth-related records regarding Mr. Vialva's sister. There is an obvious absence of extended family records, no conversations with the father, and no mental health history of Mr. Vialva's family. It was impossible to incorporate the missing information prior to trial, or to assess its potential significance.

9. I was called to testify by the defense at Mr. Vialva's capital sentencing on June 9, 2000.

10. I did not speak with Mr. Vialva before, during, or after his capital trial, nor did I perform a clinical examination or evaluation of Mr. Vialva at any time.

11. I do not recall whether Mr Schwieger explained to me his rationale for withholding my interview of Mr. Vialva. I have reviewed Mr. Schwieger's affidavit of April 12, 2004 regarding his expectation that a clinical interview of Mr. Vialva would result in a diagnosis of Antisocial Personality Disorder. Mr. Schwieger understood that my testimony regarding Mr. Vialva's future dangerousness would necessarily be more tentative because I had not met or evaluated Mr. Vialva personally.

12. Antisocial personality disorder [APD] is, according to the DSM-IV, a deeply ingrained, pervasive disregard, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood. It is characterized by a notable absence of ability to attach to others, with associated deficits in empathy for and respect for the rights of others. Because personality disorders, including APD, are intended to capture stable and enduring behavior patterns, these diagnoses should not be formed until an individual is an adult. Particular caution should be exercised in making a personality disorder diagnosis in persons in the zone of late adolescence and early adulthood as there is not yet a sufficient or enduring history to support such a diagnosis. With APD, it is also important to evaluate the presence of relationships and behaviors reflective of capacity for attachment that may

Page 2 of 6

contraindicate this diagnosis. Moreover, studies have suggested that as many as 80% of incarcerated inmates could be diagnosed with antisocial personality disorder. As such, neither a diagnosis of APD nor the presence of the associated features is reflective of anything other than that this individual is similar to most prison inmates. Accordingly, a diagnosis of antisocial personality disorder is not relevant to any prediction of institutional violence and is not, in and of itself, an indication of a particularly dangerous or incorrigible inmate. In my professional opinion, Mr. Schwieger's concern about antisocial personalty disorder was unwarranted for purposes of an assessment of Mr. Vialva's risk of future institutional violence.

13. I was only in the courtroom on the day of my testimony and not any other part of the trial. I did observe the rebuttal to my testimony offered by Dr. Coons and Anthony Davis.

14. At Mr. Vialva's trial, I was prepared to present slides describing my violence risk assessment and also to present extensive mitigation evidence. The testimony I prepared for Mr. Vialva's trial was outlined in a PowerPoint presentation which is attached hereto as **Exhibit C** (violence risk assessment (i.e. future dangerousness)) and **Exhibit D** (mitigation). Mr. Schwieger elected to use only selected slides from the detailed presentation that I had prepared.

15. I consider it vitally important that comprehensive mitigation evidence be presented in at capital sentencing. I was not tasked with creating a mitigation presentation by counsel. However, I realized that such a presentation by a mental health expert was not going to be made, and therefore prepared a basic mitigation presentation and conducted limited family interviews while the trial was underway. I made Mr. Vialva's trial counsel aware of my readiness and willingness to make a mitigation presentation because it was necessary that this component of the case be presented to the jury, and I did as much as I could in the time and information I had, revising the mitigation presentation on June 8, the day before my testimony at trial. The limited mitigation testimony I had prepared was under utilized. I had much more to say regarding Mr. Vialva's history and background, as well as the implications of this history than I was asked to present at trial.

16. In my professional opinion, the most effective way to present the risk assessment and mitigation evidence would be to take the slides in **Exhibits C and D** to this declaration and present those slides in their entirety in a linear fashion. Mr. Schwieger elected not to present the information I had prepared in its entirety or in a linear fashion because he did not understand the significance of presenting a coherent risk assessment and mitigation presentation. An example of such a presentation is attached hereto as **Exhibit E**.

17. I was not asked by Mr. Vialva's counsel to discuss the implications of Mr. Vialva's youthfulness, though I was prepared to do so including preparation of a slide that I would have further particularized in my testimony to Mr. Vialva and the adolescent features of the context and progression of the capital offense. Although Mr. Vialva at age 19 was legally

Page 3 of 6

an adult at the time of the crime, he was still an adolescent in terms of his brain development. Brain development, most particularly in the frontal lobes, continues to the mid-twenties. The frontal lobes are involved in judgment, impulse control, delay of gratification, appreciation of consequences, empathy, and responsibility. There is reason to believe that Mr. Vialva was developmentally younger than his chronological age secondary to the maturity delaying impact of psychological disorder including probable ADHD, developmental trauma, and corruptive community exposure. His developmental age is an important factor that the jury should have had available to them in evaluating Mr. Vialva's moral culpability for the crime of which he was convicted. This particular information is highly significant to the offense of which Mr. Vialva was convicted. The offense was particularly juvenile in its execution, as reflected in the associated peer group involvement, the two returns to his residence including interaction with his mother, the poor planning, and the almost certain apprehension by the authorities.

18.    I was not told that Mr. Vialva's family had a strong maternal family history of bipolar disorder. Had I known of the profound history of mental illness in Mr. Vialva's family, it would have impacted my analysis of Mr. Vialva in the following ways. Affective disorders such as bipolar disorder have a significant genetic predisposition, that may be reflected in the experience of a full syndrome in other family members or "partial penetration" manifested by symptoms on a continuum short of diagnostic criteria. Accordingly, the familial incidence of bipolar disorder has implications for Mr. Vialva's mother's adjustment and the associated quality of maternal care Mr. Vialva received. Further, when trying to understand Mr. Vialva's attention problems, impulsivity, irritability, mood lability, and behavior problems as a juvenile, this information could indicate the early onset of a bipolar disorder or partial genetic penetration. It is also possible that Christopher's juvenile diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) or Oppositional Defiant Disorder (ODD) was a misdiagnosis of early onset of bipolar disorder.

19.    The significance of this information to the violence risk assessment (future dangerousness) is twofold. Bipolar disorder or the experience of symptoms on this continuum can be controlled by medication, thereby minimizing the risk of disruptive behavior in a prison setting. Secondly, even if Christopher did not suffer from a bipolar continuum disorder himself, the effect of growing up in the bipolar family could assist in explaining why Christopher would seek a stable or structured interaction with other individuals via a youth gang affiliation, given that such structure was notably absent in his home environment. This information also places into context the risk that "gang" affiliation may present in prison, as prison is an environment which provides tremendous structure and stability without recourse to gang affiliation.

20.    Since the trial, I have learned that Mr. Vialva serves in a trustee like status in federal prison. He is given a broom and mop to clean recreational areas. He does laundry for as many as five inmates. He makes coffee that inmates and some correctional staff consume. He performs these activities without handcuffs and without incident. He has level two

1775

privileges to go to the group recreational room and watch TV, play ping-pong, exercise, and get sodas. He is adapting quite well in this environment. Mr. Vialva is a young man who needed structure and discipline in his life which, once provided, he has benefitted from. In my professional opinion, given the freedom of movement he has in prison and the privileges which he has earned, he is not considered an imminent danger by the Bureau of Prisons in the context of his present confinement. More specifically, the custody decisions presently being made about Mr. Vialva indicate that the Bureau of Prisons does not regard Mr. Vialva as an imminent risk. Mr. Viavla's behavior at this point is inconsistent with the jury's prediction that Mr. Vialva would be dangerous in the future.

21. In my publication *Violence Risk Assessment at Federal Capital Sentencing: Individualization, Generalization, Relevance, and Scientific Standards*, I referred to the use of violence risk assessment in federal trials. I commented that "Psychiatric testimony at capital federal sentencing based on clinical intuition ungrounded by empirical research on prison violence has occurred as recently as June 2000 (*U.S. v. Vialva*)." *Id.* at 531. When I made that comment, I was referring to the testimony of Richard E. Coons. Dr. Coons testified at Mr. Viavla's trial without the benefit of a personal examination of Mr. Vialva (but nevertheless relied on personality features of the defendant which, if reliable at all, must be based on accurate personality information gathered from, among other things, a personal interview) and without the benefit of personal interviews with his family or review of his psychiatric records. After being qualified as a psychiatrist, the clear inference of Dr. Coons's testimony is that his opinion is grounded in empirical research in violence risk assessment for a prison context. There is not, however, empirical evidence to support the risk factors relied on by Dr. Coons. These unsupported factors include planned vs. spontaneous offense, basic personality, conscience, deliberation, codefendant discussions, and lack of remorse (falling asleep post offense). I am aware of no research demonstrating that any of these factors is predictive of serious violence in American prisons. This is not surprising, most of these features are quite pervasive among prison inmates, and accordingly fail to predict who will commit the infrequent act of serious violence in prison. I would characterize Dr. Coons's testimony as classic "Grigson" like testimony that has been widely discredited in capital trials, and has been almost entirely absent from federal capital cases in the post-1994 era.

22. I testified at trial that group statistical analyses regarding the prison behavior of former death row inmates and other inmates groups is the best tool for assessing the likelihood of future institutional violence among capital defendants. I based my opinion on sound peer-reviewed scholarly papers and empirical studies, and correctional data from the Bureau of Prisons. This literature is summarized in the following peer-reviewed publications:

a. Jonathan R. Sorensen & Ricky L. Pilgram, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. CRIM. L. & CRIMINOLOGY 1251 (2000).



b.  Mark D. Cunningham & Thomas J. Reidy, *Antisocial Personality Disorder and Psychopathy: Diagnostic Dilemmas in Classifying Patterns of Antisocial Behavior in Sentencing Evaluations*, 16 BEHAV. SCI. L. 333 (1998).

c.  Mark D. Cunningham & Thomas J. Reidy, *Integrating Base Rate Data in Violence Risk Assessments at Capital Sentencing*, 16 BEHAV. SCI. L. 71 (1998).

d.  Mark D. Cunningham & Thomas J. Reidy, *Don't Confuse Me With the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing*, 26 CRIM. J. & BEHAV. 20 (1999).

e.  Thomas J. Reidy, Mark D. Cunningham & Jon R. Sorensen, *From Death to Life: Prison Behavior of Former Death Row Inmates in Indiana*, 28 CRIM. J. & BEHAV. 62 (2001).

f.  Mark D. Cunningham & Thomas J. Reidy, *Violence Risk Assessment at Federal Capital Sentencing: Individualization, Generalization, Relevance, and Scientific Standards*, 29 CRIM. J. & BEHAV. 512 (2002).

23.  In my opinion, the foregoing publications and my testimony represent the state of the art on violence risk assessment in capital sentencing.

24.  I did not work with an actuarial scientist in forming my opinions on violence risk assessment that is reflected in my publications and in my testimony at Mr. Vialva's trial.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 15th day of April, 2004, in Lewisville, Texas.

Mark D. Cunningham

177



# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology
*Board Certified in Forensic Psychology – American Board of Professional Psychology*
417 Oak Bend, Suite 260     Lewisville, Texas 75067
972-459-0658   Fax 972-459-0958

## CURRICULUM VITAE

### EDUCATION:

**Undergraduate:**   Abilene Christian University, Abilene, Texas
  <u>Bachelor of Arts</u>, magna cum laude (May 1973)
  Majors: Psychology, Mass Communications

**Graduate:**   Oklahoma State University, Stillwater, Oklahoma
  <u>Master of Science</u>  (December 1976)
  <u>Doctor of Philosophy</u> (December 1977)
  Specialty: Clinical Psychology  (APA accredited)

**Internship:**   National Naval Medical Center, Bethesda, Maryland
  (February 1977 to February 1978)
  Specialty: Clinical Psychology  (APA accredited)

### BOARD CERTIFICATION:

Forensic Psychology (1995), American Board of Professional Psychology (ABPP)

### PROFESSIONAL:

**1981 – 2002**   Clinical and Forensic Psychologist, Private practice
  Abilene, Texas
**2002 – date**   Clinical and Forensic Psychologist, Private practice
  Lewisville (Dallas), Texas

Clinical Psychology services include the evaluation and treatment of psychological disorders.  Forensic Psychology services include evaluation and consultation regarding child custody, personal injury, criminal competencies and responsibility, sentencing determinations, research literature, and other psycho-legal issues. I have provided forensic services in over 450 cases.

**1978 – 1981**   Clinical Psychologist (Lieutenant, MSC, USNR)
  Naval Submarine Medical Center, Groton, Connecticut

Exhibit A
Cunningham Decl.

1776

CURRICULUM VITAE (2)

## ACADEMIC APPOINTMENTS:

1981 - 1983  Assistant Professor: Psychology Department,
Hardin-Simmons University, Abilene, Texas

1978 - 1980  Instructor (part-time): Psychology Department,
Old Dominion University (U.S. Submarine Base Extension);
Mohegan Community College, Norwich, Connecticut

1974 - 1977  Teaching Assistant: Psychology Department
Oklahoma State University, Stillwater, Oklahoma

## PROFESSIONAL LICENSES:

Licensed Psychologist:

| | | |
|---|---|---|
| Arkansas #98-17P | Colorado #2305 | Idaho #PSY-379 |
| Illinois #071-006010 | Indiana #20041376 | Louisiana #794 |
| New Mexico #0768 | Oregon #1333 | South Carolina #764 |
| Tennessee #2255 | Texas #2351 | |

## PROFESSIONAL AFFILIATIONS:

Board Certified in Forensic Psychology, American Board of Professional Psychology
(examiner)
Fellow, American Academy of Forensic Psychology (workshop teaching faculty)

Certificate of Professional Qualification in Psychology (CPQ)
National Register of Health Service Providers in Psychology

American Psychological Association
Texas Psychological Association
Abilene Psychological Association, 1981-2002 (President, 1983-84, 1994-95)

## EDITORIAL:

Ad hoc reviewer: <u>Assessment</u>
<u>Behavioral Sciences & the Law</u>
<u>Law & Human Behavior</u>

1779

CURRICULUM VITAE (3)

## PROFESSIONAL AWARDS:

Navy Commendation Medal - for meritorious service as a clinical psychologist,
Naval Submarine Medical Center, 1978-1980

Al Brown Memorial Award - for outstanding achievement, NIMH Sex Therapy Training
Program, Yale University School of Medicine, 1979-1981

## SCHOLARLY PUBLICATIONS:

*Chapters in edited books:*

Cunningham, M.D. & Goldstein, A.M. (2003). Sentencing determinations in death
penalty cases (pp. 407-436). In A. Goldstein (Ed.), Forensic psychology (vol. 11
of 12). I. Weiner (Ed.), Handbook of psychology. New York: John Wiley & Sons.

Cunningham, M.D. (in press). Special issues in capital sentencing. In M.A. Conroy, P.
Lyons, & P. Kwartner (Eds.), Forensic evaluations under Texas law: Selected
criminal issues. To be published by the Capacity for Justice.

*Papers in peer-reviewed journals:*

Cunningham, M.D. & Murphy, P.J. (1981). The effects of bilateral EEG biofeedback on
verbal, visual-spatial, and creative skills in learning disabled male adolescents.
Journal of Learning Disabilities, 14, 204 -208.

Cunningham, M.D. & Reidy, T.J. (1998). Integrating base rate data in violence risk
assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M.D., & Reidy, T.J. (1998). Antisocial personality disorder and psychopathy:
Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing
evaluations. Behavioral Sciences & the Law, 16, 333-351.

Cunningham, M.D., & Reidy, T.J. (1999). Don't confuse me with the facts: Common
errors in violence risk assessment at capital sentencing. Criminal Justice and
Behavior, 26, 20-43.

Cunningham, M.D. & Vigen, M.P. (1999). Without appointed counsel in capital
postconviction proceedings: The self-representation competency of Mississippi
Death Row inmates. Criminal Justice and Behavior, 26, 293-321.

## CURRICULUM VITAE (4)

Reidy, T.J., Cunningham, M.D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

Cunningham, M.D. & Reidy, T.J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

Cunningham, M.D. & Reidy, T.J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. Criminal Justice and Behavior, 29, 512-537.

Cunningham, M.D. & Vigen, M.P. (2002). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. Behavioral Sciences & the Law, 20, 191-210.

Shuman, D.W., Cunningham, M.D., Connell, M.A, & Reid, W.H. (2003). Interstate forensic psychology consultations: A call for reform and proposal for a model rule. Professional Psychology: Research and Practice, 34, 233-239.

*Invited case reports and teaching points:*

Cunningham, M.D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (152-171). New York: Oxford University Press.

Cunningham, M.D. (2002). Competence to be executed [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (96-114). New York: Oxford University Press.

Cunningham, M.D. (2002). How do you evaluate the accuracy of different sources of third-party information? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (171-173). New York: Oxford University Press.

Cunningham, M.D. (2002). Why and how do you attribute information to sources in a forensic mental health assessment? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, Forensic mental health assessment: A casebook (114-115). New York: Oxford University Press.

1781

## Capital Sentencing Evaluation

**Re:**    U.S. v Christopher Andre Vialva, Criminal No. W-99-CR-070 in U.S. District
Court, Western District of Texas, Waco Division

**Defendant:**    Christopher Vialva

**Dates and Techniques of Evaluation:**

6/4/00  Telephone interview of Lisa Dickson Brown, 45 minutes
6/5/00  Telephone interview of Lisa Dickson Brown, 70 minutes
6/6/00  Telephone interview of Dee Bynum, 54 minutes
6/6/00  Telephone interview of Lisa Dickson Brown, 80 minutes

**Records Reviewed:**

-    Life History Chronology

**Educational:**

-    Peebles Elementary – Kindergarten, 1986
-    Hay Branch Elementary – Grades 1-2, 1986-1988
-    Bellaire Elementary – Grades 3-5, 1988 – 1991
-    Nolan Middle School; - Grades 6-8, 1991 – 1994
-    Ellison High School – Grades 9-10, 1994-1996
-    Killeen High School – Grades 11-12, 1996-1998
-    School discipline records
-    504 Disability Student records
-    Special Education Department (Psychological Report)
-    Achievement Tests

**Lab Reports:**

-    Lab reports regarding evidence submitted
-    Documents of Texas Department Public Safety

-    Investigator Statements of Dan Worline and

Exhibit B
Cunningham Decl.

**Agency Reports:**

- CID Final Report
- CID Interim CID report dated 6-21-99
- CID Agent activity summaries
- Game Warden MP report
- Fort Hood, Fire Department
- Bell County Sheriff's Radio Log
- FBI Statements and interviews
- Texas Ranger Reports

**Other Records:**

- List of Evidence Recovered
- FIB 200 List
- CID 100 List
- CID2 Evidence Chart/Defense 300
- Investigation Report
- Bell County Case Paperwork
- Autopsy Reports
- Crime Scene Photograph List
- Expert Resumes:  D. Michael Smith, Lonnie D. Ginsberg, and Brian Wraxall
- Maps of Fort Hood and Crime Scene area
- Location/description lists
- Subject list/parties to case
- Articles related to Brain Spect Imaging in Psychiatry
- Population Estimates per Counties in Texas

**Criminal Juvenile Records:**

- Theft Under $20 (7-1991) – Killeen Police Dept. and Bell County Juvenile Court
- Criminal Trespass (12-9-92) – Killeen Police Dept. and Bell County Juvenile Court
- Disrupting the Classroom (9-25-96) – Killeen Police Dept. and Bell County Juvenile Court
- Failure to Use Seat Belt (4-20-97) – Killeen Police Dept. and Bell County Juvenile Court
- Speeding/No Driver's License (11-29-97) – Killeen Police Dept. and Bell County Juvenile Court
- Disorderly Conduct (Profane Language) (12-18-97) – Killeen Police Department and Bell County Juvenile

**Criminal Adult Records:**

- Theft (6-19-98) – Temple Police Dept., Bell County D.A., and Bell County Court

- Evading Detention/Arrest (7-2-98) – Killeen Police Department, Bell County D.A. and Bell County Court
- Unlawfully Carrying A Weapon (7-19-98) – Killeen Police Department, Bell County D.A. and Bell County Court
- Aggravated Assault With A Deadly Weapon (9-15-98) – Bell County D.A., Killeen Police Dept., Harker Heights Police Department, and Bell County Court
- Burglary of Habitation (5-24-99) – Bell County Sheriff's Office, Bell County D.A., and Bell County Court

## Incarceration Records:

- Bell County Jail (9-16-98 and 11-5-98)
- McLennan County Jail – Current Offense  6-21-99 to present
- McLennan County Jail medical records 6-21-99 to present

## Probation Records:

- Juvenile
- Adult

## Records Pertaining to Christopher's Family:

(Mother)

- Military records
- Military medical records
- Mental Health records/Pauquette Center
- Divorce records

(Sister)

- Military medical records

## Violence Risk Assessment

U.S. v Christopher Vialva

---

## The Question of Future Danger to Society in Capital Cases

- Historical informal observations of murderers in prison and on parole
- The Texas death penalty statute and future danger to society
- The nature of science - gathering information rather than speculating
- The opportunity for scientific study of former death row inmates
- The collection of general information on inmate violence
- The application of violence risk assessment methods
- Standard allegation of future dangerousness in federal capital cases

Cunningham, M.D. & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26,* 20-43.

---

## Risk Components

### Will there be violence?

1. What probability?

2. Of what form of violence?

3. At what time period?

4. In what context?

Cunningham, M.D. & Reidy. T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law, 16,* 71-95.

---

## Risk Components

### Will this driver have an accident?
1. What probability?
2. Of what type of accident?
3. At what age?
4. In what  locale?

### Will there be violence?
1. What probability?
2. Of what form of violence?
3. At what time period?
4. In what context?

---

Exhibit C
Cunningham Decl.

1785

## Risk Assessment Techniques

*More Scientific*

1. **Actuarial**

   (insurance company method)

2. **Pattern**

   (using patterns of how the individual behaved in the past to estimate behavior in similar situations)

3. **Intensive clinical evaluation**

   (short-term convergence, long-term personality trends)

4. **Hypothetical inference**

   (stargazing, dot-to-dot)

*Less Scientific*

Morris, N., & Miller, M. (1985). Predictions of dangerousness. In M. Tonry & N. Morris (Eds.), *Crime and justice: An annual review of research (Vol. 6)* (pp.1-50). Chicago: University of Chicago Press.
Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law. 16*, 71-95.

## Models of Violence Risk Assessment:

A. **Monahan (1981)**
   1. Actuarial methods, and
   2. Dispositional/interactional/contextual approaches.
B. **Morris & Miller (1985)**
   1. Actuarial (using how people like him have behaved to estimate how he will behave); and
   2. Anamnestic (using how the individual behaved in the past to estimate behavior in similar circumstances);
   3. Clinical (using life experience, training, knowledge of mental illness, observations, and diagnosis to estimate future behavior).
C. **Hall (1987)**
   1. *Long-range violence* is best estimated by the base rate of violence in the group to which the individual belongs.
   2. *Short-term (next several months) violence* potential is a function of the interaction of historical variables (nature of violent exposure, experience, and behavior), current operating variables (long-term disposition and short-term triggers), opportunity variables, and inhibitory variables.
   3. *Imminent (next several days) violence* is a function of perpetrator variables, contextual stimuli, victim characteristics, and inhibitory factors.
D. **Serin & Amos (1995)**
   1 Derive a group base rate estimate from relevant group demographic and dispositional factors.
   2.Consider clinical information regarding past use of violence, disinhibitors, and persistence of antisocial behavior in conservatively revising the group base rate estimate to an individual base rate estimate.
   3. Evaluate what risk management variables and what contextual factors might be modified to reduce the likelihood of violence.
   4. Establish a final revised estimate of violence potential.

## Base rate:

How often something happens

The statistical prevalence of a particular behavior over a set period of time.

The fundamental group statistic.

The single most important piece of information necessary to make an accurate prediction.

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law. 16*, 71-95.
Monahan, J. (1981). *Predicting violent behavior: An assessment of clinical techniques.* Beverly Hills: Sage.
Smith, S. M. (1993). The prediction of dangerous behavior. In P. J. Resnick (Ed.).*Forensic Psychiatry Review Course. American Academy of Psychiatry and the Law.* 539-541.

## Actuarial Steps

1. Identify general characteristics

2. Review experience

3. Establish base rate (historic percentage)

4. Adjust base rate for context

5. Adjust base rate for individual differences

6. Adjust base rate for preventive measures

7. Compare to other base rates

Cunningham, M.D. & Reidy, T.J.(1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences and the Law. 16*, 71-95.
Cunningham, M.D. & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26*, 20-43.
Monahan, J. (1981). *Predicting violent behavior: An assessment of clinical techniques.* Beverly Hills: Sage.
Serin, R. C. & Amos, N. L. (1995). The role of psychopathy in the assessment of dangerousness. *International Journal of Law and Psychiatry. 18*, 231-238.

1786

## Base Rates Relevant to Likelihood of Violence in Prison

1. Capital offenders and murderers in the general prison population
2. Assaults by inmates in Federal prison
3. Homicide of inmates or staff in state and Federal prison
4. Disciplinary infractions of short-term and long-term inmates
   - age at admission to prison
   - seriousness of infraction
   - fights/assaults among long-term inmates
5. Aging effects on criminality and violence

## Base Rates Relevant to Likelihood of Violence in Prison

1. Capital offenders and murderers in the general prison population
2. Assaults by inmates in Federal prisons
3. Homicide of inmates or staff in state and Federal prison
4. Disciplinary infractions of short-term and long-term inmates
   - age at admission to prison
   - seriousness of infraction
   - fights/assaults among long-term inmates
5. Aging effects on criminality and violence

Cunningham, M.D. & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior*, 26, 20-43.

## Why capital offender base rates apply to capital inmates in BOP

- Offense histories sufficiently violent and aggravated that a death sentence was sought and returned.

- Research indicates that capital juries are concerned with a defendant's future danger whether it is alleged at trial or not. Future danger was a primary element in one of the Texas studies.

- Prison facilities and procedures have broad similarity.

- Consistency of findings
  - diverse geographic regions
  - diverse time periods
  - diverse prison settings
  - diverse capital statutes
  - diverse capital offense characteristics

### Reported Serious Violent Rule Violations



(Average yearly number of violations per 100 inmates)

| | | |
|---|---|---|
| Released death row (90) | 1.61 | |
| Life Sentence (107) | 2.60 | |
| Systemwide (38,246) | 11.66 | |
| Darrington (1,712) | 19.54 | |

Marquart, J., Ekland-Olson, S., & Sorenson, J. (1989). Gazing into the crystal ball: Can jurors accurately predict dangerousness in capital cases? *Law & Society Review*, 23(3), 449-468.

1787

## A Few Bad Apples

-- 8 (out of 90) of the inmates released from death row have been identified as gang members and have been confined indefinitely in administrative segregation.

-- 6 (out of 107) of the control life sentence group have been identified as gang members and have been confined indefinitely in administrative segregation.

### VS.

-- 2/3 of both groups have never been in solitary confinement (punishment for serious disciplinary infractions).

-- 90% of both the former death row inmates and the life sentence inmates held trustee status.

---

### Furman Commutees: Serious Rule Violations Across 15 years

- 533 former death row inmates nationwide
- prison behavior over a 15 year period after removal from death row



Marquart, J. & Sorensen, J. (1989). A national study of the *Furman*-commuted inmates: Assessing the threat to society from capital offenders. *Loyola of Los Angeles Law Review, 23 (5), 5-28.*

---

### Sorensen & Wrinkle (1996)

*Disciplinary records review 1977-1992*
(Missouri state prisons)

    93  death row inmates
   323  life-without-parole inmates
   232  life-with-parole inmates
   648  total

### Three groups similar in assaultive rule violations

*Cumulative prevalence across 15 years:*

1/3 minor assaults
2/3 more serious assaults
1.2% inmate homicide
78.2% no assaults

Sorensen, J. & Wrinkle, R. D. (1996). No hope for parole: Disciplinary infractions among death-sentenced and life-without-parole inmates. Criminal Justice and Behavior, 23, 542-552.

---

### Prison Behavior of New Jersey Capital Offenders Following Commutation (34) or Retrial (21)

- 55 released from death row
- between 1907 and 1960
- in regular prison population serving term of imprisonment

No allegations of unmanageable behavior



0%

Bedau, H. (1964). Death sentences in New Jersey, 1907-1960. *Rutgers Law Review, 19,* 1-64.

1788

## *Furman* Commutees
### vs.
## Life Sentence Inmates

| Death Row Commutees | Life Sentence Inmates |
|---|---|
| N = 47 | N = 156 (128 murd., 28rapists) |
| 32 years old | 30 years old |
| followed 1973-1988 (10yrs) | followed 1973-1988 (11yrs) |
| no prison homicides | no prison homicides |

### *Serious Infractions*

 

### *Aggravated Assault / Fighting with Weapon*

 

Marquart, J.W., Ekland-Olson, S., & Sorensen, J.R. (1994). *The Rope, the chair, & the needle: Capital punishment in Texas, 1923-1990.* Austin: University of Texas Press

---

## Commuted Texas Capital Offenders:
### Prison Behavior

- 100 death row inmates commuted
- Pre-Furman: 1924-1972
- Averaged 12 years in general prison population
- 80 committed no violent infractions



violent offenses 20%

0 inmate/officer violence

no violent offenses 80%

Marquart, J.W., Ekland-Olson, S., & Sorensen, J.R. (1994). *The rope, the chair, & the needle: Capital punishment in Texas, 1923-1990.* Austin: University of Texas Press.

---

BOP Assaultive Infractions
## Capital Defendants Convicted and Sentenced to Life

- 1995-1998
- 25 capital inmates reported
  - 2 inmates - aggravated assaults (8%)
  - 2 inmates - simple assaults (8%)
  - 1 inmate - weapons contraband charges (4%)



- 11 inmates had no disciplinary write-ups of any sort

*Source of data:* Correspondence of Miles Harer, BOP, 12-14-98

---

## Factors Associated with Violence In First 6 months in Federal Prison Confinement

▾ Younger inmates

▾ More prior arrests & convictions

▾ Had not resided in major cities

▾ Severity of current offense did NOT predict inmate violence.

*Cooper R., & Werner P., Predicting Violence in newly admitted inmates. Criminal Justice and Behavior. 17, 431-447.*



### AVERAGE NUMBER OF PRISON RULE VIOLATIONS PER INMATE PER YEAR BY OFFENSE, 1986

| ADMISSION OFFENSE | AVERAGE ANNUAL # OF INFRACTIONS PER INMATE |
|---|---|
| TOTAL | 1.5 |
| VIOLENT OFFENSES | 1.4 |
| HOMICIDE | 0.9 |
| MANSLAUGHTER | 0.8 |
| ASSAULT | 1.5 |
| ROBBERY | 1.9 |
| RAPE | 1.1 |
| PROPERTY OFFENSES | 1.8 |
| DRUG OFFENSES | 0.9 |
| PUBLIC ORDER | 1.1 |

SOURCE: BUREAU OF JUSTICE STATISTICS-SPECIAL REPORT 1989

---

## The Relationship of Offense History to Prison Adjustment

- Past violence in the community is not strongly or consistently associated with prison violence.
- Current offense, prior convictions, and escape history are only weakly associated with prison misconduct.
- Severity of offense is not a good predictor of prison adjustment.

Alexander, J. & Austin, J. (1992). *Handbook for Evaluating Objective Prison Classification Systems.* San Francisco: National Council on Crime and Delinquency. Sponsored by U.S. Department of Justice.

National Institute of Corrections, U.S. Department of Justice. (1992) *Jail Classification System Development: A Review of the Literature*, revised edition.

---



### Frequency of Assaults in Federal Prison: Total Population and High Security

Harer, M. (1992). Assaults on BOP staff and inmates - where and when they occur. *Research Forum*, 2, 1-19. U.S. Department of Justice, Federal Bureau of Prisons.

---

## Annual Base Rates of Assault in Federal Prison

- **Inmate-on-Staff**

  *Any assault:*

  approx. 1% a year
  approx. 1 inmate in 100
  1 assault every 86 inmate years

  *Serious/major assault:*

  approx. .02% a year
  approx. 1 inmate in 5,000
  1 assault every 4,310 inmate years
  1 staff homicide every 200,000 inmate years (1994-1995)

- **Inmate-on-inmate**

  *Any assault:*

  approx. 1% a year
  approx. 1 inmate in 100
  1 assault every 90 inmate years

  *Serious/major assault:*

  approx. .2% a year
  approx. 1 inmate in 500
  1 assault every 454 inmate years

1 inmate homicide every 9,000 inmate years (1994-1995)

1790









1791





## Arrests for Violent Offense and Murder by Age Group

### United States 1995

(chart with legend: Murder & Nonnegligent Manslaughter; Any Violent Offense)

*Source of data:* Maguire, K. & Pastore, A.L.,eds. (1997). Sourcebook of Criminal Justice Statistics - 1996. U.S. Department of Justice, Bureau of Justice Statistics. Washington,D.C.

## Base Rate of Inmate and Staff Homicide (1995)

**Inmate-on-inmate homicide**

Federal = 7   per 100,000 inmates

State   = 5.6 per 100,000 inmates

**Inmate-on-staff homicide**

Federal = 1 per100,000 inmates

State   = 1 per 1,000,000 inmates

*(State & Federal = 1.5 per 1,000,000 inmates)*

**Comparison** ( Murder & Non-negligent homicide):

| | | |
|---|---|---|
| United States | = | 6.8 per 100,000 |
| Texas | = | 6.8 per 100,000 |
| Houston | = | 14.1 per 100,000 |
| Age 65+ | = | 1.1 per 100,000 |

Maguire, K. & Pastore, A.L.,eds. (1997, 1999). Sourcebook of Criminal Justice Statistics - 1996/1998. U.S. Department of Justice, Bureau of Justice Statistics. Washington,D.C.

## Summary of Prison Violence Base Rate Findings

- Commuted capital offenders have a very low rate of serious violent infractions.
- Seriousness of offense does not predict prison violence.
- Federal prisoners have very low rates of serious violence toward inmates, and extremely low rates of serious violence against staff.
- Rates of inmate and staff homicide in prison are lower than the general population.
- Violent offenders represent almost half of the state prison population. Murderers represent over 11% of the state prison population.
- Almost half of long-term inmates are murderers.
- Disciplinary infraction rates are *lower* for long-term inmates than short-term inmates, with fights/assaults representing only a 1/9 of total infractions.
- Infraction rates are progressively lower as an inmate ages. This is consistent with multiple studies which demonstrate markedly decreasing rates of criminality and violence with aging.

## Individualized Likelihood of Violence in BOP – Chris Vialva

### Relative to Base Rates

| *Increased Risk* | *Decreased Risk* |
|---|---|
| • Age | • No serious violence in jail awaiting trial |
| | • High school graduate |
| | • Continued contact with family |
| | • Availability of medication and counseling support |

## Antisocial Personality Disorder: Diagnostic Soundness Problems

**1. Shifting diagnostic criteria**
- DSM II APD share no common criteria with DSM-III, one with DSM-III-R
- Diagnostic criteria changes not driven by research

**2. Innumeracy of symptom variations**
- DSM -III-R = 3.5 million, DSM-IV = 400,000

**3. Absence of symptom weighting**
- Pervasive pattern of any three of seven
- Different subtypes likely to vary in important ways

**4. Temporal instability**
- Interrater reliability of APD diagnosis with repeated evaluations only 42.9% to 58.8%
- Lower prevalence rates over age 45 than those younger than 45
- Aging out by fourth decade with remission or reduced criminal behavior, substance abuse and other antisocial acts

**5. APD overlap with Substance Use Disorders**
- Repeated illegal acts, deceitfulness, impulsivity, aggressiveness, recklessness, irresponsibility apply to both
- Difficult to determine if substance disorder is causing antisocial conduct, or APD is causing substance disorder

## Antisocial Personality Disorder:
## Prevalence Among Prison Inmates

**Estimates of an APD diagnosis in an incarcerated male population range from 49-80% as cited by Widiger & Corbitt, 1995:**

| | | |
|---|---|---|
| Guze et al. (1969) | Sociopathy | 79% |
| Hare (1980) | DSM III APD | 76% |
| Hare (1985) | DSM III APD | 49% |
| Hare (1991) | DSM III/III-R APD (10 data sets) | 80% |
| Cote & Hodgins (1990) | NIMH DIS | 61% |
| Hart et al. (1992) | DSM III-R APD | 64% |



The diagnosis of Antisocial Personality Disorder alone then describes little about prison behavior and recidivism outcome except that the individual is similar to most prison inmates, and thus APD is not in and of itself an indication of a particularly dangerous or incorrigible inmate.

Widiger, T.A. & Corbitt, E. (1995). Antisocial personality disorder. In W.J. Livesley (Ed.), *The DSM-IV personality disorders* (pp.103-134). New York: Guilford Press.

1793

## Limitations of the PCL-R at Capital Sentencing

- Inadequate research on PCL-R and prison violence
- Existing research on PCL-R and prison violence is flawed
- Scant research on PCL-R and old age
- Some evidence of "burnout" after age 40
- Insufficient research with:
    - Ethnic minorities
    - Females
    - Adolescents

## Custody Options

U.S. Minimum security prison

U.S. Low security prison

U.S. Medium security prison

U.S. Penitentiary (high security), general population

U.S. Penitentiary  Marion (high security)

U.S. Penitentiary (high security)
    administrative detention / administrative safe

ADX Florence, general population unit

ADX Florence, control unit (several years)

ADX Florence, control unit (long-term)



## ADX Florence

- single cell, bar door and steel door
- window faces inner recreation yard
- 23 hour a day lockdown
- meals in cell



- double escort, shackled behind back
- 1-2 fifteen minute phone calls monthly, (monitored)
- no contact visits, glass has one hour hammer rating, (monitored)
- mail x-rayed, opened, read

1794









1795





## Administrative Maximum Penitentiary
Florence, Colorado    6-19-98

### General Information
| | |
|---|---|
| •Current Population | 417 |
| •Rated Capacity | 490 |
| •Percent Under Capacity | 15% |
| •Housing Units | 9 |
| •Control, Special Housing, High Security, General Population (3), Intermediate, Transitional, Pre-Transfer | |

### Sentence Imposed
| | |
|---|---|
| •21 Years to Life (1997) | 46.0% |
| •Life Sentences (1997) | 25.0% |
| •Average Sentence | 36.3 Years |

### Reason for Referral
| | |
|---|---|
| •Inmate murder/attempt | 22.3% |
| •Assaults on inmates | 20.0% |
| •Assaults on staff | 17.1% |
| •Greater security - increased monitoring needs / concerns | 12.9% |
| •Escape behavior | 9.2% |
| •Rioting | 4.6% |
| •Court Commitment | 4.1% |

ADX Florence
## General Population and Step-Down Unit Operations

### General Population Units
restraints and two officer escorts when removed from cells
12 hours weekly of out of cell exercise in small groups
meals in cell, shower in cell
*12 month minimum*

### Intermediate Unit
restraints and two officer escorts when removed from cells
several hours daily out of cell on ranges
meals in common area on range
out of cell exercise in large outside rec. yard / gymnasium
*8 month minimum*

### Transitional Unit
escorted off unit unrestrained in small groups to
    programming areas
*4 month minimum*

### Pre-Transfer Unit
unrestrained when out of cells and when escorted
employed in UNICOR for half the day
meals in institutional dining hall
*12 month minimum*

## ADX Control Unit

- in cell 23 hours a day
- sliding outer steel door, sliding inner bar door
- legs shackled and hands handcuffed behind back before removed from cell or otherwise moved
- triple escort when out of cell
- 7 hours out-of-cell solitary exercise weekly
- meals taken in cell

- *duration:*

  *-until able to function in a less restrictive environment without posing a threat to others or to the orderly operation of the institution (CFR 541.50)*

## ADX Assaultive Infractions

Cumulative admissions 11/94 to 10/98 = 1007



.075
.0029
.0119
.0029

- Without Weapon on Staff
- With Weapon on Staff
- Without Weapon on Inmate
- With Weapon on Inmate
- No assault

.9073

*Source of data:* FCC Florence Legal, 12-14-98
(Correctional Services Significant Incidents Report Form 583)

1797



# Mitigation

## U.S. v Christopher Vialva



Psychological Disorder
Drug Dependency
Criminal Activity

Person

Intact Family



Psychological Disorder
Drug Dependency
Criminal Activity

Person

Intact Family

Family History of Substance Dependence / Psychological Disorder



Psychological Disorder
Drug Dependency
Criminal Activity

Person

Intact Family

Family History of Substance Dependence / Psychological Disorder

Modeled Substance Abuse



Psychological Disorder
Drug Dependency
Criminal Activity

**Family History of Substance Dependence / Psychological Disorder**

**Modeled Substance Abuse**

**Developmental Trauma / Abandonment / Instability**



Positive Peer Relationships
Modeling of Positive Values
Consistency
Structure
Stability
Acceptance & Affirmation
Intact Family

Psychological Disorder
Drug Dependency
Criminal Activity

**Family History of Substance Dependence / Psychological Disorder**

**Modeled Substance Abuse**

**Developmental Trauma / Abandonment / Instability**



Corruptive influences

Psychological Disorder
Drug Dependency
Criminal Activity

Choices

**Family History of Substance Dependence**

**Modeled Substance Abuse**

**Developmental Trauma / Abandonment / Instability**

*Risk and protective factors for serious, violent, and chronic juvenile offenders*

# U.S. Department of Justice Model

- Prevention approaches seek to interrupt the processes that cause problem behavior.

- Research over the past 30 years has identified precursors to delinquency and violence, called risk factors, as well as protective factors that buffer an individual against risk factors and inhibit the development of behavior problems.

- Approaches that reduce risk factors while enhancing protective factors are likely to provide the strongest form of prevention.

U.S. Department of Justice (June 1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders. Juvenile Justice Bulletin: OJJDP Update on Programs. NCJ 153571. Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

1799

*U.S. Department of Justice Model*

**Risk Factors for Violence and Delinquency**

**Conception to age 6:**
- Perinatal difficulties
- Minor physical abnormalities
- Brain damage
- Family history of criminal behavior and substance abuse
- Family management problems
- Family conflict
- Parental attitudes favorable toward, and parental involvement in, crime and substance abuse

---

*U.S. Department of Justice Model*

**Risk Factors for Violence and Delinquency**

**Age 6 through adolescence:**
- Extreme economic deprivation
- Community disorganization and low neighborhood attachment
- Transitions and mobility
- Availability of firearms
- Media portrayals of violence
- Family management problems
- Family conflict
- Parental attitudes favorable toward, and parental involvement in, crime and substance abuse
- Early and persistant antisocial behavior
- Academic failure
- Lack of commitment to school
- Alienation and rebelliousness
- Association with peers who engage in delinquency and violence
- Favorable attitudes towards delinquent and violent behaviors
- Constitutional factors (e.g. low intelligence, hyperactivity, attention-deficit disorders)

---

*U.S. Department of Justice Model*

**Protective Factors that Inhibit Violence and Delinquency**
- Individual characteristics:
  - Female gender
  - Intelligence
  - Positive social orientation
  - Resilient temperament

- Social bonding to positive role models:
  - Family members
  - Teachers
  - Coaches
  - Youth leaders
  - Friends

- Healthy beliefs and clear standards for behavior, including those that promote nonviolence and abstinence from drugs.

- Effective early interventions

---

*U.S. Department of Justice (April 2000)*

**Predictors of Youth Violence**

- Office of Juvenile Justice and Delinquency Prevention coordinated
- 22 researchers brought together for 2 years
- Analyzed current research on risk and protective factors in the occurrence of serious youth violence
- Synthesis of 66 studies, plus research reports, plus longitudinal data
- Identified individual, family, school, peer-related, and community/neighborhood risk factors
- Cumulative impact: the larger the number of risk factors the youth was exposed to, the greater the probability of violent behavior in the community.

Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000). Predictors of youth violence. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

1800

*U.S. Department of Justice (April 2000)*

**Individual factors**
- Hyperactivity, concentration problems, restlessness, and risk taking (x 2 - 5)
- Aggressiveness (x .5 - 6)
- Early initiation of violent behavior (x 6)
- Involvement in other forms of antisocial behavior
- Beliefs and attitudes favorable to deviant or antisocial behavior.

**Family factors**
- Parental criminality (x 0 - 3.8)
- Child maltreatment
- Poor family management practices (x 2)
- Low levels of parental involvement
- Poor family bonding and family conflict
- Residential mobility (±)
- Parental attitudes favorable to substance abuse and violence (x 2)
- Parent-child separation

Hawkins et. al. (2000)

---

*U.S. Department of Justice (April 2000)*

**School factors**
- Academic failure
- Low bonding to school
- Truancy and dropping out of school
- Frequent school transitions
- High delinquency rate schools

**Peer-related factors**
- Delinquent siblings
- Delinquent peers
- Gang membership (x 3-4)

**Community and neighborhood factors**
- Poverty (x 2)
- Community disorganization (crime, drug-selling, gangs, poor housing)
- Availability of drugs and firearms
- Neighborhood adults involved in crime
- Exposure to violence and racial prejudice

**Situational factors**

Hawkins et. al. (2000)

---

## Youthfulness = Immaturity

- Brain development continues to age 25, particularly in the frontal lobes.

| | |
|---|---|
| judgment | empathy |
| impulse control | responsibility |
| delay of gratification | |
| appreciation of consequences | |

- Characteristics of adolescence confirmed by research*:

  ...adolescents tend to be less mature, more impulsive, and less capable of controlling their conduct and thinking in terms of long-range consequences. Adolescence is a stage of human development in which one's character and moral judgment are incomplete and still undergoing formation.

- Factors that delay maturity:

| | |
|---|---|
| Low IQ | Psychological disorder |
| Developmental trauma | Substance abuse |
| Peer isolation and rejection | |
| Corruptive community or family | |

*Brief of the American Society for Adolescent Psychiatry and the American Orthopsychiatric Association filed as an *amici curiae* in *Thompson v Oklahoma* (1986) in the U.S. Supreme Court.

---

## What Accounts for the Differences In Outcome?

Trauma
- Sexual abuse history
- Physical abuse history
- Psychological abuse history
- Childhood neglect history

Predisposing and Contextual Factors
- Genetic factors
- Neurological and physical vulnerabilities
- Harsh and negative environments
- Troubled interpersonal relationships
- Accidents of the environment

Protective Factors
- Secure attachments in infancy and early childhood
- Supportive relationships
- Being in touch with the memories and pain of childhood maltreatment
- A supportive confidant to confide in

Choices

Masten, A.S. & Garmezy, N. (1985). Risk, vulnerability, and protective factors in developmental psychopathology. In *Advances in clinical child psychology (Vol 8)* (pp. 1-52). New York: Plenum Press.
Gilgun, J.F. (1990). Factors mediating the effects of childhood maltreatment. In M. Hunter (Ed.), *The sexually abused male* (pp. 177-190). New York: Lexington Books.

1801

## Healthy Development:
### Early Childhood

Secure, stable relationship with parents.



## Healthy Development:
### Middle Childhood

Continued security and stability across childhood.
Supportive parental involvement in expanding competencies.



## Healthy Development:
### Adolescence

Positive same sex role models.
Gradual reduction in structure tied to responsible independence.



## Healthy Development:
### Late Adolescence -
### Early Adulthood

Intact capabilities and available opportunities.
Adult mentoring, assistance, guidance.



1802

## Emotionally Damaging Factors

- Multi-generational family distress
- Rejected and abandoned by father and step-fathers
- Disrupted development
    - Attention Deficit Hyperactivity Disorder
    - Emotionally disturbed
    - Neuropsychological insults
- Overwhelmed maternal resources
- Physical and emotional abuse
- Observed domestic violence
- Inadequate parental structure and guidance
- Bi-racial identity confusion
- Corruptive community influence
- Immaturity

## Why talk about family history?

- Family behavior patterns and effects are multi-generational

- The child is predisposed through heredity

- Families shape the child

- Childhood is formative: The child is the father of the man

## Core Principle:
## Healthy Development Depends on Family Relationships

- The quality of the attachments to parents and other members of the family during childhood is central to how the child will relate to and value other members of society as an adult.

Ainsworth, M.D.S. (1979). Infant-mother attachment. *American Psychologist, 34.* 932-937.

Meloy, J.R. (1988). *The psychopathic mind: Origins, dynamics, and treatment.* Northvale,N.J.: Jason Aronson.

Ressler, R.K., Burgess, A.W., & Douglas, J.E. (1988). *Sexual homicide: Patterns and motives.* New York: Lexington Books.

Sroufe, L.A. (1979). The coherence of individual development: Early care, attachment, and subsequent developmental issues. *American Psychologist, 34.* 834-841.

## Multi-generational Family Distress

### Mother (Lisa)
- Parents chronically estranged. Father emotionally abused mother.
- Father judgmental, rejecting of children. Told Lisa that he never loved her and doubted that she was his child.
- Mother detached, cold, not affectionate
- Raped in U.S. Army basic training. Became pregnant and miscarried.
- Married Rowlland "Tony" Vialva who was obsessively possessive and extremely violent towards her.
- Returned to Tony Vialva despite severe beatings.
- Lisa kicked in the head and blinded for three days.
- Lisa was permanently estranged from her father because her child was fathered by a Black man.
- Lisa became anorexic.
- Lisa married Robert Mabry who rejected Chris, was unfaithful, was jealous and possessive, and was psychologically and physically abusive of Lisa.
- Lisa was raped again.
- Lisa stayed absent from the children - worked extra jobs as a dancer in a club, cocktail waitress.
- Desperate to always have a boyfriend, dressed provocatively

18.03

- Spent excessively on clothes, cars.
- Related to children as a friend rather than as a mother.
- Lisa had recurrent PTSD flashbacks - hid in the closet for several hours after a visit by Tony Vialva.
- Lisa became involved with Jim Gillhouse. After his return from the Gulf, Gillhouse drank heavily and was promiscuous.
- Lisa married Joe Massey – 11 years younger.
- After Massey told her he had been unfaithful overseas, Lisa picked up Cecil "Cowboy" Prime in a bar and began a 10 month live-in relationship.
- Lisa married Richard Brown.

### Father (Rowlland "Tony" Vialva)
- Drug dealer.
- Obsessive, controlling, regularly violently abusive towards Lisa.
- Fathered 6 children by other women while married to Lisa.
- Uninvolved and abusive of Chris.
- Discharged from military for domestic violence and other charges.
- Has fathered 15 children by 13 women

### Stepfather (Robert Mabry)
- Ashamed that Chris was bi-racial.
- Unfaithful, but possessive and jealous of Lisa.
- Uninvolved with children.
- Abandoned Lisa and Chris.
- Physically and psychologically abusive of Lisa.

### Step-father (Jim Gillhouse)
- Lied about separation from wife
- Heavy drinker and promiscuous after return from the Gulf

### Stepfather (Joe Massey)
- Immature.
- Unfaithful to Lisa.

### Stepfather (Cecil "Cowboy" Prime)
- Live-n while Lisa still married to Massey who was overseas.

### Stepfather (Richard Brown)

## Disrupted Attachments

- Children are more vulnerable than adults to changes in their environment.
- Normal child development depends of a stable relationship with a caring adult. A secure attachment to a parent figure is fundamentally important for healthy psychological development.
- Traumatic disruptions in parent-child relationship may cause both immediate emotional distress and bewilderment, as well as serious lasting psychological harm.
- Adverse impacts of disruptions in the emotional bond of a child with a parent include:
  damage to identity         lowered self-esteem
      psychological disorders         intellectual & academic
  deficits   impaired capacity to trust and care for others
  deficient identification with social ideals
          - any of which may result in problematic behavior.

- Longitudinal studies have demonstrated that infants separated from their primary parent after 6-7 months of age all showed evidence of social-emotional maladjustment. Many of these children still displayed signs of psychological problems on 10-year follow-up -- particularly in their capacity to establish relationships.
- Foster care studies identify adverse effects on the child if moved through sequential foster care settings or re-placements.

Curtis, C. (1980). The psychological parent doctrine in custody disputes between foster parents and biological parents. *Columbia Journal of Law and Social Problems, 16*, 149-191.
Yarrow, L.J., Goodwin, M.S., Manheimer, H., & Milowe, I.D. (1973). Infancy experiences and cognitive personality development at 10 years. In L.J. Stone, H.T. Smith, & L.B. Murphy (Eds.) (pp. 1274-1281), *The competent infant: Research and Commentary.* New York: Basic Books.
Pardeck, J.T. (1983). Empirical analysis of behavioral and emotional problems of foster children as related to re-placement in care. *Child Abuse and Neglect, 7,* 75-78.

## Overwhelmed Maternal Resources

- Rejected and abused in childhood.
- Battered and dominated across her marriage to Tony Vialva.
- Separated from Tony when Chris only a month old.
- Not allowed to re-enlist in the U.S. Army.
- Emotionally desperate for boyfriend. All the men she was involved with emotionally or physically abused her.
- Raped twice.
- Physically assanlted by second husband, Robert Mabry.
- A week after Audrey's birth, Mabry went for cigarettes and never returned.
- Followed Mabry to Germany.
- Mabry did not help with the children and withheld sex.
- Sleep deprived, psychologically abused, physically assaulted by Mabry.
- Left children with sister for 2 months while she settled in Killen.
- After separation from Mabry, worked 3 jobs, 6 days weekly.
- Post-traumatic Stress Disorder symptoms. Panic attacks required E.R. treatment.
- Jim Gillhouse deployed overseas. Profoundly different on return. Discovered he lied about his marital separation.
- Mother died of breast cancer.
- Joe Massey 11 years younger. Deployed overseas. Unfaithful.
- Extramarital co-habitation with Cecil "Cowboy" Prine

1804

## Effects of Mother's Psychological Problems

- Genetic predisposition

- Reduced parenting effectiveness
  Relationship instability
  Household instability
  Poor supervision
  Minimal, inconsistent discipline
  Neglect
  Abuse

- Faulty modeling

## Impact of Child Neglect

- More psychologically damaging than physical abuse
  No stability or security in parental attachment
  No stability or security in daily life or practical care
  Basic physical and emotional needs go unmet

  Distorted primary structure - cognitive, perceptual, emotional, interpersonal
  Terror of world that is out of control
  Damaged capacity and skills to relate to others
  Identity of being incompetent and unlovable
  Absence of external controls leads to poor internal controls

  Markedly increased risk for psychological disorder
  Markedly increased risk for behavior problems in childhood, violent and criminal behavior in adolescence and adulthood

## Effects of Insufficient Parental and Community Structure and Guidance

- Healthy child development requires structure, limit setting and guidance through discipline. This fundamental tenet is supported by research.

- In the absence of parental limit setting there is grave risk to psychological health and positive socialization.

- Children need order and external structures to develop internal structures and capacity for self-guidance.

- When guidance is not provided self-control does not develop and aggression can unfold.

- Quite simply, lack of parental discipline contributes to aggressiveness and predisposes to violence in the community.

Friday, J.C. (1994). The psychological impact of violence in underserved communities. Journal of Health Care for the Poor and Underserved. 6, 403-409.
Patterson, G. R., DeBaryshe, B. D., & Ramsey, E. (1989). A developmental perspective on antisocial behavior. American Psychologist. 44, 329-335.
Staub, E. (1996). Cultural-societal roots of violence. American Psychologist. 51, 117-132.

## Physical & Emotional Abuse

- Father left bite marks on Chris' torso in infancy
- Stepfather Robert Mabry isolated Chris from his mother
- Mabry ashamed that Chris was bi-racial. Asked Lisa to tell others that he was Mexican and adopted
- Mabry enraged at Chris as toddler - welts from buttocks to knees.
- When Chris attempted to intervene in Mabry's physical abuse of Lisa, Mabry lashed out at Chris
- Mabry fed the children nothing but toast for two weeks while Lisa was hospitalized
- After his post-Gulf personality change, Jim Gillhouse withdrew from the children and told Chris that it was Chris' fault that Jim and Lisa were not going to marry. Lisa blamed Chris as well.
- When Chris was age 9 Lisa pushed him against the wall so hard his head dented the sheetrock
- Lisa called Chris profane names when frustrated.

1805

## Impact of Emotional Abuse

- Damaged attachment
    - Disturbed relationship models
    - Distrust of relationships
    - Distorted identity and eroded self-esteem
    - Powerlessness
    - Futility
    - Anger
    - Fantasy/vulnerability to idealized relationship
- Recurrent confusion
- **Constant terror and fearfulness**
- Psychological disorders
- Behavior problems

## Effects of Abuse and Neglect on Children

- Abused and neglected children may show a variety of initial and long-term psychological, emotional, physical, and cognitive effects including:

| | |
|---|---|
| *Low self esteem* | *Withdrawal* |
| *Depression* | *Poor peer relations* |
| *Anger* | *Acting-out* |
| *Exaggerated fears* | *Anxiety disorders* |
| *Suicidal feelings* | *Sleep disturbance* |
| *Poor concentration* | *Lack of trust* |
| *Eating disorders* | *Secretive behavior* |
| *Overly compliant* | *Overly rebellious* |
| *Regressive behavior* | *Drug or alcohol problems* |
| *Health problems* | |

American Psychological Association Presidential Task Force on Violence and the Family (1996)

## Effects of Abuse and Neglect on Children (2)

- Child abuse and neglect can seriously affect a person's physical and intellectual development and can lead to difficulties in self-control.

- Abused and maltreated children are more likely than non-abused children to be arrested for delinquency, adult criminal behavior, and violent criminal behavior.

- When abused children are not given appropriate treatment for the effects of abuse, the lifetime cost to society per abused child is very high.

## Observed Domestic Violence

- Tony repeatedly and savagely assaulted Lisa. The last time he kicked her so hard in the head she lost her vision for three days.
- Mabry was jealous and constantly accused Lisa of affairs.
- Mabry physically assaulted Lisa regularly. Lisa fought back.
- Chris at age 4-5 was attempting to intervene by jumping on Mabry's back during assaults on Lisa.

1806

## Effects of Observed Domestic Violence

- Children who are exposed to parental violence, even if they are not targets of this violence, have reactions similar to those of children exposed to other forms of child maltreatment.

American Psychological Association Presidential Task Force on Violence and the Family (1996)

---

  **Confused Racial Identity**

- Called a "Honky" by his father
- Rejected by his maternal grandfather
- Baby-sitter made bigoted remarks



- Mabry ashamed of him and told Lisa to tell others his was an adopted Mexican child

---

- At age 3 asked his mother: "Why do I have this funny brown stuff on me?"

- Teased by peers



- After meeting his father at age 8 referred to himself as "White"

- Age 11 counseling notes described Chris as feeling very picked on by his mother and his peers because of his mixed racial origin. Did not feel that he fit in with either black or white children.

---

- In junior high began to describe himself as "Mixed"

- Wore a hat: "Not black. Not white. Human"

- Lisa expressed to counselor concerns about Chris' confused racial identity when he was age 15



- In high school identified himself as "Black"

1807

## Peer Isolation and Rejection

- Age 6 suffered cuts to his head from being pelted with rocks.



- Picked on because he was bi-racial
- Called a "zebra" in middle school
- Disruptive and aggressive behavior alienated peers

## Impact of Peer Isolation and Rejection

- Loneliness
- Reduced self-esteem
- Feelings of being different, defective, unlovable
- Lost "socialization" of childhood - competence, social skills, closeness to others, friendship, empathy, community, values, ambition
- No substitute adult mentors
- No alternative family models
- No alternative models for how to relate to others in a healthy fashion
- Broad social risk factor

Parker, J.G. & Asher, S.R. (1987). Peer relations and later personal adjustment: Are low-accepted children at risk? *Psychological Bulletin. 102.* 357-389.

---

*Disrupted development:*
## Attention Deficit Hyperactivity Disorder

*Inattention*
*Impulsivity*
*Excessive motor activity*

- 1st Grade: not getting his work done, excessive talking
- 2nd Grade: needs to calm down, out of chair too much, watching or worrying about someone else, does not complete assignments
- 3rd Grade: trouble completing assignments, excessive talking
- 4th Grade: difficulty staying on task, talking out – says anything to anyone at anytime
- Age 10 referred to Dr. Constance Fournier for behavior problems at school. ADHD identified as a possible diagnosis
- 6th Grade: grade performance declines – recurrent problem for the remainder of school years
- School and community behavior problems increased across early and mid-adolescence
- Age 17 ADHD diagnosed by Dr. Michael E. Campbell

*Disrupted development:*
## Implications of ADHD in Adolescence

- 83% of hyperactive children still met criteria for ADHD as teenagers
- Hyperactive children often have a co-existing behavior disorder:
  - 59% Oppositional Defiant Disorder
  - 43% Conduct Disorder
- Hyperactive + Conduct Disorder teens abused substances at 2-5 times the rate of pure hyperactives or controls.
- Three times as many hyperactive adolescents fail a grade as compared to normal adolescents (29.3% vs. 10%).
- Hyperactive teens were suspended from school 10 times more often and expelled 7 times more often than normal teens.
- Hyperactive teens are at substantially higher risk for negative outcomes:

| psychiatric | social |
| legal | academic |
| family functioning | |

Barkley, R.A. (1990). *Attention Deficit Hyperactivity Disorder: A handbook for diagnosis and treatment.* New York: Guilford Press.

1808

*Disrupted development:*

## Implications of ADHD and Childhood Behavior Disorder in Adulthood

- Adults with a history of ADHD are more likely to develop conduct disorders, alcoholism, and sociopathy.
- Relatives of individuals with ADHD are more likely to suffer ADHD, antisocial behaviors, and mood disorders.
- Individuals with a history of childhood hyperactivity are 7 times more likely to suffer from an antisocial personality disorder or drug abuse problem.
- Childhood hyperactivity has a significant relationship with alcohol problems and violent offending.
- The combination of ADHD and conduct disorder was a strong risk factor for adult criminality.
- **A childhood history of ADHD and/or conduct disorder is commonly observed among male prison inmates:**

  **Conduct Disorder History: 63%** (vs. 6-16% community)
  **ADHD history:** **41%** (vs. 3-5 % community)

- Only 11% of ADHD children as adults are free of any psychiatric diagnosis, function well, and have no significant symptoms of their disorder.

Barkley, R.A. (1990). *Attention Deficit Hyperactivity Disorder: A handbook for diagnosis and treatment.* New York: Guilford Press.
Vitelli, R. (1996). Prevalence of Childhood Conduct and Attention-Deficit Hyperactivity Disorders in adult maximum-security inmates. *International Journal of Offender Therapy and Comparative Criminology, 40 (4),* 263-271.

---

*Disrupted development:*

## Emotionally Disturbed

- Age 7 disrespectful to teacher and peers
- Age 9 becoming more aggressive with mother
- Age 10 had good days and bad days at school, referred to Dr. Fournier.



**Diagnosis:** Oppositional-defiant disorder
        Rule out ADHD
**Recommendation:** Individual psychotherapy for Chris and for Lisa

---

- Age 11 sudden temper outbursts
- Age 11 suicide gesture by holding a butcher knife to his throat
- Age 11 evaluated by Dr. William Rae
    **Diagnosis:** Oppositional-defiant disorder
            Dysthymic disorder
    **Recommendation:** Medication; Individual psychotherapy for Chris and Lisa
- Age 12 Imipramine prescribed by Dr. Eisenhauer, outpatient psychotherapy
- Increasingly frequent school behavior problems
- Age 15 Imipramine discontinued and Tenex prescribed by Dr. Zaphiris

---

## Impact of School Failure

ADHD and emotional problems

↓

Disruptive behavior

↓

Academic failure

↓

Reduced bonding to school

↓

Rejection by functional peers

↓

Identification with deviant peers



**Corruptive Influences**

**Conduct Disorder**

*Stress*

Poor Judgment
Impulsiveness
Irritability
Aggressiveness

**ADHD**

**Youthfulness**

## Damaged Development:
### Early Childhood

- Pregnancy complications
- Jaundiced at birth and hospitalized with blood infection
- Physically abused by father
- Mother overwhelmed
- Abandoned by father
- Rejected and physically abused by stepfather
- Mother often absent
- Chronic fighting and observed domestic violence



## Damaged Development:
### Middle Childhood

- Abandoned by stepfather
- Mother absent working 3 jobs
- Perpetual rotation of mother's boyfriends
- Inadequate supervision and guidance from mother
- Untreated ADHD – disruptive in school



## Damaged Development:
### Middle childhood

- Emotionally disturbed, ADHD
- Rejected and ridiculed by peers
- Racial identity confusion
- Mother in emotional turmoil



1810

## Damaged Development: Adolescence

- Disillusionment of relationship with Jim Gilmore
- Discontinued medication
- Racial identity confusion
- Deterioration in school grades
- Drift toward marginal peers



## Late Adolescence

- Poor maternal supervision
- Mother's continued relationship instability
- Untreated ADHD and emotional disorder
- Disruptive behavior and school failure
- Gang involvement
- Group criminal behavior



## Federal Prison



## Mixed Adjustment

**Damaged Adjustment**          **Healthy Adjustment**



1811



1812



Mitigation

U.S. v Christopher Vialva



Person   Intact Family

Psychological Disorder
Drug Dependency
Criminal Activity



Person   Intact Family

Psychological Disorder
Drug Dependency
Criminal Activity

**Family History of Substance Dependence / Psychological Disorder**



Person   Intact Family

Psychological Disorder
Drug Dependency
Criminal Activity

**Family History of Substance Dependence / Psychological Disorder**

**Modeled Substance Abuse**

Exhibit D
Cunningham Decl.

1813



Psychological Disorder
Drug Dependency
Criminal Activity

**Family History of Substance Dependence / Psychological Disorder**

**Modeled Substance Abuse**

**Developmental Trauma / Abandonment / Instability**



Psychological Disorder
Drug Dependency
Criminal Activity

**Family History of Substance Dependence / Psychological Disorder**

**Modeled Substance Abuse**

**Developmental Trauma / Abandonment / Instability**



Corruptive influences

Psychological Disorder
Drug Dependency
Criminal Activity

**Family History of Substance Dependence**

**Modeled Substance Abuse**

**Developmental Trauma / Abandonment / Instability**

---

*Risk and protective factors for serious, violent, and chronic juvenile offenders*

## U.S. Department of Justice Model

- Prevention approaches seek to interrupt the processes that cause problem behavior.

- Research over the past 30 years has identified precursors to delinquency and violence, called risk factors, as well as protective factors that buffer an individual against risk factors and inhibit the development of behavior problems.

- Approaches that reduce risk factors while enhancing protective factors are likely to provide the strongest form of prevention.

U.S. Department of Justice (June 1995). Guide for implementing the comprehensive strategy for serious, violent, and chronic juvenile offenders. Juvenile Justice Bulletin: OJJDP Update on Programs. NCJ 153571. Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

1814



*U.S. Department of Justice Model*

**Risk Factors for Violence and Delinquency**

**Conception to age 6:**
- Perinatal difficulties
- Minor physical abnormalities
- Brain damage
- Family history of criminal behavior and substance abuse
- Family management problems
- Family conflict
- Parental attitudes favorable toward, and parental involvement in, crime and substance abuse

*U.S. Department of Justice Model*

**Risk Factors for Violence and Delinquency**

**Age 6 through adolescence:**
- Extreme economic deprivation
- Community disorganization and low neighborhood attachment
- Transitions and mobility
- Availability of firearms
- Media portrayals of violence
- Family management problems
- Family conflict
- Parental attitudes favorable toward, and parental involvement in, crime and substance abuse
- Early and persistant antisocial behavior
- Academic failure
- Lack of commitment to school
- Alienation and rebelliousness
- Association with peers who engage in delinquency and violence
- Favorable attitudes towards delinquent and violent behaviors
- Constitutional factors (e.g. low intelligence, hyperactivity, attention-deficit disorders)

*U.S. Department of Justice Model*

**Protective Factors that Inhibit Violence and Delinquency**
- Individual characteristics:
  - Female gender
  - Intelligence
  - Positive social orientation
  - Resilient temperament

- Social bonding to positive role models:
  - Family members
  - Teachers
  - Coaches
  - Youth leaders
  - Friends

- Healthy beliefs and clear standards for behavior, including those that promote nonviolence and abstinence from drugs.

- Effective early interventions

*U.S. Department of Justice (April 2000)*

**Predictors of Youth Violence**

- Office of Juvenile Justice and Delinquency Prevention coordinated
- 22 researchers brought together for 2 years
- Analyzed current research on risk and protective factors in the occurrence of serious youth violence
- Synthesis of 66 studies, plus research reports, plus longitudinal data
- Identified individual, family, school, peer-related, and community/neighborhood risk factors
- Cumulative impact: the larger the number of risk factors the youth was exposed to, the greater the probability of violent behavior in the community.

Hawkins, J.D., Herrenkohl, T.I., Farrington, D.P., Brewer, D., Catalano, R.F., Harachi, T.W., & Cothern, L. (April 2000). Predictors of youth violence. Juvenile Justice Bulletin. U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

1815

*U.S. Department of Justice (April 2000)*

**Individual factors**
- Hyperactivity, concentration problems, restlessness, and risk taking (x 2 - 5)
- Aggressiveness (x .5 - 6)
- Early initiation of violent behavior (x 6)
- Involvement in other forms of antisocial behavior
- Beliefs and attitudes favorable to deviant or antisocial behavior.

**Family factors**
- Parental criminality (x 0 - 3.8)
- Child maltreatment
- Poor family management practices (x 2)
- Low levels of parental involvement
- Poor family bonding and family conflict
- Residential mobility (±)
- Parental attitudes favorable to substance abuse and violence (x 2)
- Parent-child separation

Hawkins et. al. (2000)

---

*U.S. Department of Justice (April 2000)*

**School factors**
- Academic failure
- Low bonding to school
- Truancy and dropping out of school
- Frequent school transitions
- High delinquency rate schools

**Peer-related factors**
- Delinquent siblings
- Delinquent peers
- Gang membership (x 3-4)

**Community and neighborhood factors**
- Poverty (x 2)
- Community disorganization (crime, drug-selling, gangs, poor housing)
- Availability of drugs and firearms
- Neighborhood adults involved in crime
- Exposure to violence and racial prejudice

**Situational factors**

Hawkins et. al. (2000)

---

# Youthfulness = Immaturity

- Brain development continues to age 25, particularly in the frontal lobes.

  | judgment | empathy |
  | impulse control | responsibility |
  | delay of gratification | |
  | appreciation of consequences | |

- Characteristics of adolescence confirmed by research*:

  …adolescents tend to be less mature, more impulsive, and less capable of controlling their conduct and thinking in terms of long-range consequences. Adolescence is a stage of human development in which one's character and moral judgment are incomplete and still undergoing formation.

- Factors that delay maturity:

  | Low IQ | Psychological disorder |
  | Developmental trauma | Substance abuse |
  | Peer isolation and rejection | |
  | Corruptive community or family | |

*Brief of the American Society for Adolescent Psychiatry and the American Orthopsychiatric Association filed as an *amici curiae* in *Thompson v Oklahoma* (1986) in the U.S. Supreme Court.

---

# What Accounts for the Differences In Outcome?

Trauma
- Sexual abuse history
- Physical abuse history
- Psychological abuse history
- Childhood neglect history

Predisposing and Contextual Factors
- Genetic factors
- Neurological and physical vulnerabilities
- Harsh and negative environments
- Troubled interpersonal relationships
- Accidents of the environment

Protective Factors
- Secure attachments in infancy and early childhood
- Supportive relationships
- Being in touch with the memories and pain of childhood maltreatment
- A supportive confidant to confide in

Choices

Masten, A.S. & Garmezy, N. (1985). Risk, vulnerability, and protective factors in developmental psychopathology. In *Advances in clinical child psychology (Vol 8)* (pp. 1-52). New York: Plenum Press.

Gilgun, J.F. (1990). Factors mediating the effects of childhood maltreatment. In M. Hunter (Ed.), *The sexually abused male* (pp. 177-190). New York: Lexington Books.

1816



**Healthy Development:**
Early Childhood

Secure, stable relationship with parents.



**Healthy Development:**
Middle Childhood

Continued security and stability across childhood.
Supportive parental involvement in expanding competencies.



**Healthy Development:**
Adolescence

Positive same sex role models.
Gradual reduction in structure tied to responsible independence.



**Healthy Development:**
Late Adolescence -
Early Adulthood

Intact capabilities and available opportunities.
Adult mentoring, assistance, guidance.

1817

## Emotionally Damaging Factors

- Multi-generational family distress
- Rejected and abandoned by father and step-fathers
- Disrupted development
    - Attention Deficit Hyperactivity Disorder
    - Emotionally disturbed
    - Neuropsychological insults
- Overwhelmed maternal resources
- Physical and emotional abuse
- Observed domestic violence
- Inadequate parental structure and guidance
- Bi-racial identity confusion
- Corruptive community influence
- Immaturity

## Why talk about family history?

- Family behavior patterns and effects are multi-generational

- The child is predisposed through heredity

- Families shape the child

- Childhood is formative: The child is the father of the man

## Core Principle:
## Healthy Development Depends on Family Relationships

- The quality of the attachments to parents and other members of the family during childhood is central to how the child will relate to and value other members of society as an adult.

Ainsworth, M.D.S. (1979). Infant-mother attachment. *American Psychologist, 34,* 932-937.
Meloy, J.R. (1988). *The psychopathic mind: Origins, dynamics, and treatment.* Northvale,N.J.: Jason Aronson.
Ressler, R.K., Burgess, A.W., & Douglas, J.E. (1988). *Sexual homicide: Patterns and motives.* New York: Lexington Books.
Sroufe, L.A. (1979). The coherence of individual development: Early care, attachment, and subsequent developmental issues. *American Psychologist, 34,* 834-841.

## Multi-generational Family Distress

**Mother (Lisa)**

- Parents chronically estranged. Father emotionally abused mother.
- Father judgmental, rejecting of children. Told Lisa that he never loved her and doubted that she was his child.
- Mother detached, cold, not affectionate
- Raped in U.S. Army basic training. Became pregnant and miscarried.
- Married Rowlland "Tony" Vialva who was obsessively possessive and extremely violent towards her.
- Returned to Tony Vialva despite severe beatings.
- Lisa kicked in the head and blinded for three days.
- Lisa was permanently estranged from her father because her child was fathered by a Black man.
- Lisa became anorexic.
- Lisa married Robert Mabry who rejected Chris, was unfaithful, was jealous and possessive, and was psychologically and physically abusive of Lisa.
- Lisa was raped again.
- Lisa stayed absent from the children – worked extra jobs as a dancer in a club, cocktail waitress.
- Desperate to always have a boyfriend, dressed provocatively

18l8

- Spent excessively on clothes, cars.
- Related to children as a friend rather than as a mother.
- Lisa had recurrent PTSD flashbacks - hid in the closet for several hours after a visit by Tony Vialva.
- Lisa became involved with Jim Gillhouse. After his return from the Gulf, Gillhouse drank heavily and was promiscuous.
- Lisa married Joe Massey – 11 years younger.
- After Massey told her he had been unfaithful overseas, Lisa picked up Cecil "Cowboy" Prime in a bar and began a 10 month live-in relationship.
- Lisa married Richard Brown.

**Father (Rowlland "Tony" Vialva)**
- Drug dealer.
- Obsessive, controlling, regularly violently abusive towards Lisa.
- Fathered 6children by other women while married to Lisa.
- Uninvolved and abusive of Chris.
- Discharged from military for domestic violence and other charges.
- Has fathered 15 children by 13 women

**Stepfather (Robert Mabry)**
- Ashamed that Chris was bi-racial.
- Unfaithful, but possessive and jealous of Lisa.
- Uninvolved with children.
- Abandoned Lisa and Chris.
- Physically and psychologically abusive of Lisa.

**Step-father (Jim Gillhouse)**
- Lied about separation from wife
- Heavy drinker and promiscuous after return from the Gulf

**Stepfather (Joe Massey)**
- Immature.
- Unfaithful to Lisa.

**Stepfather (Cecil "Cowboy" Prime)**
- Live-n while Lisa still married to Massey who was overseas.

**Stepfather (Richard Brown)**

# Disrupted Attachments

- Children are more vulnerable than adults to changes in their environment.
- Normal child development depends of a stable relationship with a caring adult. A secure attachment to a parent figure is fundamentally important for healthy psychological development.
- Traumatic disruptions in parent-child relationship may cause both immediate emotional distress and bewilderment, as well as serious lasting psychological harm.
- Adverse impacts of disruptions in the emotional bond of a child with a parent include:
  damage to identity      lowered self-esteem
      psychological disorders      intellectual & academic deficits  impaired capacity to trust and care for others deficient identification with social ideals
          - any of which may result in problematic behavior.

- Longitudinal studies have demonstrated that infants separated from their primary parent after 6-7 months of age all showed evidence of social-emotional maladjustment. Many of these children still displayed signs of psychological problems on 10-year follow-up – particularly in their capacity to establish relationships.
- Foster care studies identify adverse effects on the child if moved through sequential foster care settings or re-placements.

Curtis, C. (1980). The psychological parent doctrine in custody disputes between foster parents and biological parents. *Columbia Journal of Law and Social Problems, 16,* 149-191.
Yarrow, L.J., Goodwin, M.S., Manheimer, H., & Milowe, I.D. (1973). Infancy experiences and cognitive personality development at 10 years. In L.J. Stone, H.T. Smith, & L.B. Murphy (Eds.) (pp. 1274-1281), *The competent infant: Research and Commentary.* New York: Basic Books.
Pardeck, J.T. (1983). Empirical analysis of behavioral and emotional problems of foster children as related to re-placement in care. *Child Abuse and Neglect, 7,* 75-78.

# Overwhelmed Maternal Resources

- Rejected and abused in childhood.
- Battered and dominated across her marriage to Tony Vialva.
- Separated from Tony when Chris only a month old.
- Not allowed to re-enlist in the U.S. Army.
- Emotionally desperate for boyfriend. All the men she was involved with emotionally or physically abused her.
- Raped twice.
- Physically assaulted by second husband, Robert Mabry.
- A week after Audrey's birth, Mabry went for cigarettes and never returned.
- Followed Mabry to Germany.
- Mabry did not help with the children and withheld sex.
- Sleep deprived, psychologically abused, physically assaulted by Mabry.
- Left children with sister for 2 months while she settled in Killen.
- After separation from Mabry, worked 3 jobs, 6 days weekly.
- Post-traumatic Stress Disorder symptoms. Panic attacks required E.R. treatment.
- Jim Gillhouse deployed overseas. Profoundly different on return. Discovered he lied about his marital separation.
- Mother died of breast cancer.
- Joe Massey 11 years younger. Deployed overseas. Unfaithful.
- Extramarital co-habitation with Cecil "Cowboy" Prime

1819

## Effects of Mother's Psychological Problems

- Genetic predisposition

- Reduced parenting effectiveness
    Relationship instability
    Household instability
    Poor supervision
    Minimal, inconsistent discipline
    Neglect
    Abuse

- Faulty modeling

## Impact of Child Neglect

- More psychologically damaging than physical abuse
    No stability or security in parental attachment
    No stability or security in daily life or practical care
    Basic physical and emotional needs go unmet

    Distorted primary structure - cognitive, perceptual, emotional, interpersonal
    Terror of world that is out of control
    Damaged capacity and skills to relate to others
    Identity of being incompetent and unlovable
    Absence of external controls leads to poor internal controls

    Markedly increased risk for psychological disorder
    Markedly increased risk for behavior problems in childhood, violent and criminal behavior in adolescence and adulthood

## Effects of Insufficient Parental and Community Structure and Guidance

- Healthy child development requires structure, limit setting and guidance through discipline. This fundamental tenet is supported by research.

- In the absence of parental limit setting there is grave risk to psychological health and positive socialization.

- Children need order and external structures to develop internal structures and capacity for self-guidance.

- When guidance is not provided self-control does not develop and aggression can unfold.

- Quite simply, lack of parental discipline contributes to aggressiveness and predisposes to violence in the community.

Friday, J.C. (1994). The psychological impact of violence in underserved communities. Journal of Health Care for the Poor and Underserved, 6, 403-409.
Patterson, G. R., DeBaryshe, B. D., & Ramsey, E. (1989). A developmental perspective on antisocial behavior. American Psychologist, 44, 329-335.
Staub, E. (1996). Cultural-societal roots of violence. American Psychologist, 51, 117-132.

## Physical & Emotional Abuse

- Father left bite marks on Chris' torso in infancy
- Stepfather Robert Mabry isolated Chris from his mother
- Mabry ashamed that Chris was bi-racial. Asked Lisa to tell others that he was Mexican and adopted
- Mabry enraged at Chris as toddler - welts from buttocks to knees.
- When Chris attempted to intervene in Mabry's physical abuse of Lisa, Mabry lashed out at Chris
- Mabry fed the children nothing but toast for two weeks while Lisa was hospitalized
- After his post-Gulf personality change, Jim Gillhouse withdrew from the children and told Chris that it was Chris' fault that Jim and Lisa were not going to marry. Lisa blamed Chris as well.
- When Chris was age 9 Lisa pushed him against the wall so hard his head dented the sheetrock
- Lisa called Chris profane names when frustrated.

1820

## Impact of Emotional Abuse

- Damaged attachment

  Disturbed relationship models

  Distrust of relationships

  Distorted identity and eroded self-esteem

  Powerlessness

  Futility

  Anger

  Fantasy/vulnerability to idealized relationship

- Recurrent confusion
- Constant terror and fearfulness
- Psychological disorders
- Behavior problems

## Effects of Abuse and Neglect on Children

- Abused and neglected children may show a variety of initial and long-term psychological, emotional, physical, and cognitive effects including:

| | |
|---|---|
| Low self esteem | Withdrawal |
| Depression | Poor peer relations |
| Anger | Acting-out |
| Exaggerated fears | Anxiety disorders |
| Suicidal feelings | Sleep disturbance |
| Poor concentration | Lack of trust |
| Eating disorders | Secretive behavior |
| Overly compliant | Overly rebellious |
| Regressive behavior | Drug or alcohol problems |
| Health problems | |

American Psychological Association Presidential Task Force on Violence and the Family (1996)

## Effects of Abuse and Neglect on Children (2)

- Child abuse and neglect can seriously affect a person's physical and intellectual development and can lead to difficulties in self-control.

- Abused and maltreated children are more likely than non-abused children to be arrested for delinquency, adult criminal behavior, and violent criminal behavior.

- When abused children are not given appropriate treatment for the effects of abuse, the lifetime cost to society per abused child is very high.

## Observed Domestic Violence

- Tony repeatedly and savagely assaulted Lisa. The last time he kicked her so hard in the head she lost her vision for three days.
- Mabry was jealous and constantly accused Lisa of affairs.
- Mabry physically assaulted Lisa regularly. Lisa fought back.
- Chris at age 4-5 was attempting to intervene by jumping on Mabry's back during assaults on Lisa.

## Effects of Observed Domestic Violence

- Children who are exposed to parental violence, even if they are not targets of this violence, have reactions similar to those of children exposed to other forms of child maltreatment.

American Psychological Association Presidential Task Force on Violence and the Family (1996)

---

## Confused Racial Identity




- Called a "Honky" by his father
- Rejected by his maternal grandfather
- Baby-sitter made bigoted remarks

- Mabry ashamed of him and told Lisa to tell others his was an adopted Mexican child

---

- At age 3 asked his mother: "Why do I have this funny brown stuff on me?"

- Teased by peers



- After meeting his father at age 8 referred to himself as "White"

- Age 11 counseling notes described Chris as feeling very picked on by his mother and his peers because of his mixed racial origin. Did not feel that he fit in with either black or white children.

---

- In junior high began to describe himself as "Mixed"

- Wore a hat: "Not black. Not white. Human"

- Lisa expressed to counselor concerns about Chris' confused racial identity when he was age 15



- In high school identified himself as "Black"

1822

## Peer Isolation and Rejection

- Age 6 suffered cuts to his head from being pelted with rocks.



- Picked on because he was bi-racial
- Called a "zebra" in middle school
- Disruptive and aggressive behavior alienated peers

## Impact of Peer Isolation and Rejection

- Loneliness
- Reduced self-esteem
- Feelings of being different, defective, unlovable
- Lost "socialization" of childhood - competence, social skills, closeness to others, friendship, empathy, community, values, ambition
- No substitute adult mentors
- No alternative family models
- No alternative models for how to relate to others in a healthy fashion
- Broad social risk factor

Parker, J.G. & Asher, S.R. (1987). Peer relations and later personal adjustment: Are low-accepted children at risk? *Psychological Bulletin, 102,* 357-389.

---

*Disrupted development:*
## Attention Deficit Hyperactivity Disorder

*Inattention*
*Impulsivity*
*Excessive motor activity*

- 1st Grade: not getting his work done, excessive talking
- 2nd Grade: needs to calm down, out of chair too much, watching or worrying about someone else, does not complete assignments
- 3rd Grade: trouble completing assignments, excessive talking
- 4th Grade: difficulty staying on task, talking out – says anything to anyone at anytime
- Age 10 referred to Dr. Constance Fournier for behavior problems at school. ADHD identified as a possible diagnosis
- 6th Grade: grade performance declines – recurrent problem for the remainder of school years
- School and community behavior problems increased across early and mid-adolescence
- Age 17 ADHD diagnosed by Dr. Michael E. Campbell

*Disrupted development:*
## Implications of ADHD in Adolescence

- 83% of hyperactive children still met criteria for ADHD as teenagers
- Hyperactive children often have a co-existing behavior disorder:
  - 59% Oppositional Defiant Disorder
  - 43% Conduct Disorder
- Hyperactive + Conduct Disorder teens abused substances at 2-5 times the rate of pure hyperactives or controls.
- Three times as many hyperactive adolescents fail a grade as compared to normal adolescents (29.3% vs. 10%).
- Hyperactive teens were suspended from school 10 times more often and expelled 7 times more often than normal teens.
- Hyperactive teens are at substantially higher risk for negative outcomes:
  - psychiatric          social
  - legal               academic
  - family functioning

Barkley, R.A. (1990). *Attention Deficit Hyperactivity Disorder: A handbook for diagnosis and treatment.* New York: Guilford Press.

1823

*Disrupted development:*
## Implications of ADHD and Childhood Behavior Disorder in Adulthood

- Adults with a history of ADHD are more likely to develop conduct disorders, alcoholism, and sociopathy.
- Relatives of individuals with ADHD are more likely to suffer ADHD, antisocial behaviors, and mood disorders.
- Individuals with a history of childhood hyperactivity are 7 times more likely to suffer from an antisocial personality disorder or drug abuse problem.
- Childhood hyperactivity has a significant relationship with alcohol problems and violent offending.
- The combination of ADHD and conduct disorder was a strong risk factor for adult criminality.
- **A childhood history of ADHD and/or conduct disorder is commonly observed among male prison inmates:**

  **Conduct Disorder History: 63%** (vs. 6-16% community)
  **ADHD history:          41%** (vs. 3-5 % community)

- Only 11% of ADHD children as adults are free of any psychiatric diagnosis, function well, and have no significant symptoms of their disorder.

Barkley, R.A. (1990). *Attention Deficit Hyperactivity Disorder: A handbook for diagnosis and treatment.* New York: Guilford Press.
Vitelli, R. (1996). Prevalence of Childhood Conduct and Attention-Deficit Hyperactivity Disorders in adult maximum-security inmates. *International Journal of Offender Therapy and Comparative Criminology, 40 (4).* 263-271.

---

*Disrupted development:*
## Emotionally Disturbed

- Age 7 disrespectful to teacher and peers
- Age 9 becoming more aggressive with mother
- Age 10 had good days and bad days at school, referred to Dr. Fournier.



<u>Diagnosis</u>: Oppositional-defiant disorder
      Rule out ADHD
<u>Recommendation</u>: Individual psychotherapy for Chris and for Lisa

---

- Age 11 sudden temper outbursts
- Age 11 suicide gesture by holding a butcher knife to his throat
- Age 11 evaluated by Dr. William Rae
      <u>Diagnosis</u>: Oppositional-defiant disorder
              Dysthymic disorder
      <u>Recommendation</u>: Medication; Individual psychotherapy for Chris and Lisa
- Age 12 Imipramine prescribed by Dr. Eisenhauer, outpatient psychotherapy
- Increasingly frequent school behavior problems
- Age 15 Imipramine discontinued and Tenex prescribed by Dr. Zaphiris

---

## Impact of School Failure

ADHD and emotional problems

↓

Disruptive behavior

↓

Academic failure

↓

Reduced bonding to school

↓

Rejection by functional peers

↓

Identification with deviant peers

1824



## Damaged Development:
### Early Childhood

- Pregnancy complications
- Jaundiced at birth and hospitalized with blood infection
- Physically abused by father
- Mother overwhelmed
- Abandoned by father
- Rejected and physically abused by stepfather
- Mother often absent
- Chronic fighting and observed domestic violence



## Damaged Development:
### Middle Childhood

- Abandoned by stepfather
- Mother absent working 3 jobs
- Perpetual rotation of mother's boyfriends
- Inadequate supervision and guidance from mother
- Untreated ADHD – disruptive in school



## Damaged Development:
### Middle childhood

- Emotionally disturbed, ADHD
- Rejected and ridiculed by peers
- Racial identity confusion
- Mother in emotional turmoil





### Damaged Development: Adolescence

- Disillusionment of relationship with Jim Gilmore
- Discontinued medication
- Racial identity confusion
- Deterioration in school grades
- Drift toward marginal peers



### Late Adolescence

- Poor maternal supervision
- Mother's continued relationship instability
- Untreated ADHD and emotional disorder
- Disruptive behavior and school failure
- Gang involvement
- Group criminal behavior



### Federal Prison



### Mixed Adjustment

Damaged Adjustment      Healthy Adjustment



15826



1827

1828

```
THAHF          *              PROG    'S REPORT          *      07-16-2003
PAGE                                                            08:07
```

RSP OF: THA TERRE HAUTE USP          US DEPARTMENT OF JUSTICE BUREAU OF PRISONS
        HWY 63 SOUTH
        TERRE HAUTE, IN 47808
        812 238-1531
NAME: VIALVA, CHRISTOPHER ANDRE      REGNO: 91909-080 AGE(DOB): 23/05-10-1980

| INMATE REVIEWED/SIGNATURE | DATE | STAFF SIGNATURE |
|---|---|---|
| X | 7-16-2003 | |

TYPE OF PROGRESS REPORT:
INITIAL ___ SIH ___ TRIENNIAL ___ PRE-RELEASE ___ TRANSFER ___ OTHER: _____

PRESENT SECURITY/CUSTODY LEVEL:
  HIGH    /MAX

OFFENSE/VIOLATOR OFFENSE:
SENTENCE IMPOSED AND TERM OF SUPERVISION:

 T18:2119 & 2  CARJACKING. (CT 1)
 T18:1111(A)(B) & 2  FIRST DEGREE MURDER ON A GOVERNMENT
 RESERVATION, AIDING AND ABETTING.  (CTS 3 & 4)
 T18:1117  CONSPIRACY TO COMMIT MURDER. (CT 2)
 DEATH                           /

DATE COMPUTATION BEGAN: 06-13-2000

| DAYS FSGT/WSGT/DGCT: | DAYS GCT OR EGT/SGT: | MONTHS SERVED: |
|---|---|---|
| 0    /0    /0 | 0 | + JAIL CREDIT - INOP TIME<br>M:      37 D:  4<br>+ 356    JC - 0          INOP |

| PROJECTED RELEASE DATE: UNKNOWN | PROJECTED RELEASE METHOD: DEATH SENT |
|---|---|

DETAINERS/PENDING CHARGES:
NONE ON FILE

CO-DEFENDANTS: (LIST CO-DEFENDANTS, SENTENCE LENGTH AND PAROLE ACTION IF
PAROLABLE)


DISTRIBUTION: ORIGINAL TO INMATE, COPY TO USPO, COPY TO USPC
             CENTRAL FILE - SECTION TWO                    BP-CLASS-3


(INSTRUCTIONS: EXHAUSTIVE RESEARCH IS REQUIRED AND IS TO BE COMPREHENSIVE IN
EACH SECTION.  THIS REPORT IS TO REFLECT AN EVALUATION OF THE INMATE'S PAST
STATUS, AN ASSESSMENT OF HIS/HER CURRENT STATUS, AND POTENTIAL FOR FUTURE
PERFORMANCE.)

*Inmate Vialva is currently on Phase II & is employed as a Unit Orderly. B. [signature] Unit Counselor.*

*Received 1 June 2004*

Exhibit VII-N

1829

NAME: VIALVA, CHRISTOPHER ANDRE        REGNO: 91909-080              DATE: 07-16-2003

------------------------ INSTITUTIONAL ADJUSTMENT --------------------------
(A SUMMARY OF INMATE'S PAST AND CURRENT INSTITUTIONAL ADJUSTMENT.
GIVE A BRIEF INTERPRETATION WHEN IT WILL CLARIFY AN UNDERSTANDING OF THE
INMATE'S ADJUSTMENT.)


A.  PROGRAM PLAN: (IDENTIFY PROGRAM PLANS ESTABLISHED AT INITIAL CLASSIFICATION
    AND SUBSEQUENT PROGRAM REVIEWS.)

    At inmate Vialva's initial classification and during subsequent reviews, it was recommended that he
    participate in the Inmate Financial Responsibility Program, leisure and recreational activities,
    physical fitness program, maintain clear conduct and maintain a positive attitude with staff.

B.  WORK ASSIGNMENTS: (SENTRY WILL CAPTURE WORK DATA - SUMMARIZE INSTITUTION
    WORK HISTORY AND CURRENT ASSIGNMENT(S).  SPECIFY DUTIES, HOURS WORKED,
    PROMOTIONS, SKILLS, DEGREE OF COMPETENCE, RELATIONSHIP WITH SUPERVISORS AND
    CO-WORKERS AND OTHER SIGNIFICANT ASPECTS OF THE INMATE'S ADJUSTMENT TO THE
    JOB (E.G., ATTITUDE, PUNCTUALITY, WILLINGNESS TO ACCEPT AND COMPLETE
    ASSIGNMENTS, WILLINGNESS TO ACCEPT SUPERVISION.) (SEE PS ON PROGRESS
    REPORTS)

    On 08-30-2001, Vialva was assigned to the Food Service Wrap Program where he remained until
    12-31-2002.  On that date, he was assigned as the unit orderly.  On 06-26-2003, he returned to the Food
    Service Wrap Department, where he remains to date.  Work reports indicate that he is an average worker.

| INST | WORK ASSIGNMENT | | START DATE | STOP DATE |
|------|------|------|------|------|
| THA | FS-WRAP | F/S SILVERWARE WRAPPERS/SCU | 07-07-2003 | CURRENT |
| THA | FS-WRAP | F/S SILVERWARE WRAPPERS/SCU | 06-26-2003 | 06-27-2003 |
| THA | ORD D | ORD D UNIT-SCU | 12-31-2002 | 01-28-2003 |
| THA | FS-WRAP | F/S SILVERWARE WRAPPERS/SCU | 08-30-2001 | 12-31-2002 |

C.  EDUCATIONAL/VOCATIONAL PARTICIPATION: (SENTRY WILL CAPTURE EDUCATION DATA -
    SUMMARIZE INSTITUTION HISTORY AND ACCOMPLISHMENTS.  SPECIFICALLY ADDRESS
    THE INMATE'S ACADEMIC STRENGTHS AND WEAKNESSES.  FOR VOCATIONAL
    PARTICIPATION, IDENTIFY SPECIFIC SKILLS LEARNED AND DEGREE OF COMPETENCE,
    RELATIONSHIP WITH INSTRUCTORS AND OTHER STUDENTS, AND OTHER SIGNIFICANT
    ASPECTS OF THE INMATE'S PARTICIPATION IN TRAINING E.G., ATTITUDE
    PUNCTUALITY, WILLINGNESS TO ACCEPT AND COMPLETE ASSIGNMENTS, WILLINGNESS TO
    ACCEPT INTRUCTIONS.) (SEE THE PS ON PROGRESS REPORTS)

    Educational records indicate that he is currently enrolled in the SCU Legal Research Program and has
    not participated in any other educational programs during his term of confinement.

------------------------ EDUCATION INFORMATION --------------------------
| FACL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|------|------|------|------|------|
| THA | ESL HAS | ENGLISH PROFICIENT | 09-17-2000 1541 | CURRENT |
| THA | GED HAS | COMPLETED GED OR HS DIPLOMA | 11-06-2000 1250 | CURRENT |

------------------------- EDUCATION COURSES --------------------------
| SUB-FACL | DESCRIPTION | START DATE | STOP DATE | EVNT AC LV | HRS |
|------|------|------|------|------|------|
| THA | SCU ACE LEGAL RESEARCH | 06-20-2001 | CURRENT | | |

D.  COUNSELING PROGRAMS: (SUMMARIZE INSTITUTION COUNSELING HISTORY AND IDENTIFY
    CURRENT PARTICIPATION IN COUNSELING PROGRAMS INCLUDING PROGRAM DESCRIPTION,
    HOURS COMPLETED, LEVEL OF PARTICIPATION, AND BENEFIT DERIVED.)

    Inmate Vialva has not been involved in any structured counseling programs.  However, he meets with his
    correctional counselor on an as needed basis.

E.  INCIDENT REPORTS: (SENTRY WILL CAPTURE INCIDENT REPORTS.  FOR PROHIBITED
    ACTS OF GREATEST SEVERITY, INCLUDE A BRIEF ACCOUNT OF THE INCIDENT.)

    Inmate Vialva has received three incident reports during his term of confinement.
--------------------------------------------------------------------------
UDC HEARING DATE/TIME: 01-28-2003 1425      INCIDENT DATE/TIME: 01-26-2003 1720
   307  REFUSING TO OBEY AN ORDER - FREQ: 1
        LP OTHER   / 6 MONTHS / CS
        COMP:    LAW:    REMOVE FROM PHASE I TO PHASE II.
   312  BEING INSOLENT TO STAFF MEMBER - FREQ: 1
        LP OTHER   / 7 DAYS / CS
        COMP:    LAW:    REMOVAL OF TELEVISION PRIVILEGES FOR 7 DAYS BEGINN
                         ING 1-28-03 THRU 2-04-03.

1830

NAME: VIALVA, CHRISTOPHER DRE        REGNO: 91909-080      DATE: 07-16-2003

--------------------------------------------------------------------------------
UDC HEARING DATE/TIME: 08-30-2000 0830    INCIDENT DATE/TIME: 08-29-2000 1030
    307  REFUSING TO OBEY AN ORDER - FREQ: 1
         CONFISCATE / CS

         COMP:    LAW:    CONFISCATE HAT AND MAIL HOME
         LP COMM    / 60 DAYS / CS
         COMP:    LAW:    LOSS OF COMMISSARY FOR 60 DAYS
         LP OTHER   / 30 DAYS / CS / SUSPENDED 180 DAYS
         COMP:    LAW:    LOSS OF TV SUSPENDED FOR 180 DAYS CLEAR CONDUCT

F.  INSTITUTIONAL MOVEMENT: (SENTRY WILL CAPTURE INMATE MOVEMENT)

    INSTITUTION      ASSIGNMENT      REASON FOR MOVEMENT          EFFECTIVE DATE
    THA SCU          A-DES           US DISTRICT COURT COMMITMENT  07-17-2000

G.  PHYSICAL AND MENTAL HEALTH: (INDICATE ANY SIGNIFICANT MENTAL OR PHYSICAL
    HEALTH PROBLEMS.  INCLUDE EMPLOYABILITY AND LIMITATIONS, AND MEDICAL
    CONCERNS OR ANY MEDICATION NEEDED WHILE IN A CCC.)

    Inmate Vialva is maintained on regular duty status with no medical restrictions.

H.  PROGRESS ON FINANCIAL RESPONSIBILITY PLAN: (IDENTIFY FINANCIAL OBLIGATIONS,
    THE DISTRICT, THE AMOUNT, PAYMENT PLANS, AND PAYMENTS MADE (INCLUDE COIF).)

    At the time of sentencing, the court imposed a $400 Felony Assessment.  Inmate Vialva is currently
    participating in the Inmate Financial Responsibility Program at a rate of $25 per quarter.  To date, he
    has an outstanding balance of $250.00.

    FRP ASSIGNMENT                              START DATE
    PART            FINANC RESP-PARTICIPATES    06-10-2002

I.  RELEASE PREPARATION PROGRAM & RELEASE PLANS: (IDENTIFY THE RELEASE NEEDS OF
    THE INMATE AND INVOLVEMENT IN THE RELEASE PREPARATION PROGRAM.  THIS INCLUDES,
    BUT IS NOT LIMITED TO, TRAINING RECEIVED.  INCLUDE A THOROUGH REVIEW OF THE
    INMATE'S COMMUNITY RESOURCES, RELEASE PLANS,  AND INFORMATION REGARDING
    POSSIBLE CCC TRANSFER.)

    CMA ASSIGNMENT (REL PREP)                   START DATE
    RPP EXEMPT         RELEASE PREP PGM EXEMPT   10-30-2000

    TEN PERCENT DATE: N/A

    RESIDENCE: N/A

    EMPLOYMENT: N/A

    USPO: (PROVIDE CHIEF'S NAME AND ADDRESS IN THE SENTENCING DISTRICT.
    ADDITIONALLY, IF RELOCATION OF SUPERVISION IS REQUESTED PROVIDE CHIEF'S NAME
    AND ADDRESS IN THE RELEASE DISTRICT.)

    Ruby J. Lehrmann
    A-405 Federal Building
    727 Durango Boulevard
    San Antonio, TX 78206-1203

J. RELEASE NOTIFICATIONS:


    OFFENDER IS SUBJECT TO RELEASE NOTIFICATION PROVISIONS UNDER 18 USC 4042(B)
    DUE TO:
         CURRENT CONVICTION FOR A CRIME OF VIOLENCE

         18 USC 4042(B) NOTIFICATIONS APPLY TO INMATES RELEASING TO THE
         COMMUNITY WITH SUPERVISION

    IS OFFENDER SUBJECT TO RELEASE NOTIFICATION PROVISIONS UNDER 18 USC 4042(C)
    DUE TO A CONVICTION FOR CERTAIN SEXUAL OFFENSES.

         ( ) YES   (XX) NO

         18 USC 4042(C) NOTIFICATIONS APPLY TO INMATES RELEASING TO THE
         COMMUNITY

1831

NAME: VIALVA, CHRISTOPHER ...DRE        REGNO: 91909-080        DATE: 07-16-2003

DNA TEST STATUS: NEED

    DNA TESTING APPLIES TO INMATES WITH A QUALIFYING OFFENSE

DICTATED BY: _____ CASE MANAGER (DATE)  7-16-03
            ISCU BRAD SHOEMAKER, EXT. 386

DATE TYPED: 07-16-2003

REVIEWED BY: _____ UNIT MANAGER (DATE)  7-16-03
        SCU RANDY WHITE, EXT. 558

1832

1833

## DECLARATION OF STANLEY SCHWIEGER

I, Stanley Schwieger, do hereby declare the following to be true and correct, under penalty of perjury:

1.     I am of lawful age and reside in Waco, Texas.

2.     I am an attorney licensed to practice by and subject to the rules of the Texas Bar Association. I was one of the attorneys appointed to represent Christopher Vialva in his federal capital prosecution initiated in the Western District of Texas, Waco Division, Case No. W-99-CR-70.

3.     On April 24, 2000, I sought funding from the Court to obtain the services of a forensic psychologist to testify on the issue of violence risk assessment. On May 9, 2000, I received approval and funding from the Court, and thereafter retained Dr. Mark D. Cunningham to testify on Mr. Vialva's behalf.

4.     Prior to retaining Dr. Cunningham, I had retained Dr. William Reid, psychiatrist, to assist me in Mr. Vialva's case. Dr. Reid told me that, if fully evaluated by a psychologist, Mr. Vialva would likely be diagnosed as having Antisocial Personality Disorder. After receiving that information, I made a strategic decision to withhold a personal interview/evaluation of Mr. Vialva by Dr. Cunningham. At trial, Dr. Cunningham said his conclusions regarding Mr. Vialva were necessarily tentative because he had not personally met, interviewed, or evaluated Mr. Vialva.

5.     Mr. Vialva's trial began on May 15, 2000, with jury voir dire. On May 24, 2000, the jury panel was sworn and opening statements were had. After a seven day break in proceedings, the penalty phase of the trial began on June 8, 2000. Dr. Mark Cunningham testified on behalf of Mr. Vialva's defense on June 9, 2000.

I, Stanley Schwieger declare under penalty of perjury that the foregoing is true and correct. Executed on this _12_ day of April, 2004, in Waco, Texas.

_____

_____
STANLEY SCHWIEGER

Exhibit VII-O

1834

1835

FILED

JAN 18 2001

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY
DEPUTY CLERK

1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | Criminal Action Nos. |
| | * | W-99-CR-070(1)&(2) |
| VS. | * | |
| | * | |
| CHRISTOPHER ANDRE VIALVA and | * | June 12, 2000 |
| BRANDON BERNARD | * | Waco, Texas |
| * * * * * * * * * * * * * * * * | * | |

BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING,

AND A JURY

SUPPLEMENT TO THE RECORD (COURT'S CHARGE ON PUNISHMENT)

APPEARANCES:

For the Government:            Mr. James William Blagg,
                              Mr. Mark L. Frazier
                                      -and-
                              Capt. Scott L. Frost
                              Assistant U. S. Attorneys
                              P. O. Box 828
                              Waco, Texas    76703-0828

For Defendant Vialva:         Mr. B. Dwight Goains
                              Goains & Goains
                              Attorneys at Law
                              P. O. Box 1200
                              Cameron, Texas    76250-1200

                                      -and-

                              Mr. Stanley L. Schwieger
                              Attorney at Law
                              P. O. Box 975
                              Waco, Texas    76703-0975

For Defendant Bernard:        Mr. Russell D. Hunt, Sr.
                                      -and-
                              Mr. Russell D. Hunt, Jr.
                              Attorneys at Law
                              P. O. Box 726
                              Waco, Texas    76703-0726

LASER BOND FORM A    PENGAD · 1-800-631-6989

325

Exhibit VII-P

18336

2

Court Reporter:                    Morris W. Bowen, CSR
                                   Official Court Reporter
                                   United States District Court
                                   P. O. Box 1908
                                   Waco, Texas   76703


Proceeding recorded by mechanical stenography, transcript

produced by notereading.

1837

3

SUPPLEMENTAL RECORD – JUNE 12, 2000

EXCERPT PROCEEDINGS

(Convened at 1:30 p.m.)

(Jury in.)

THE COURT:  Be seated everyone.  Ladies and Gentlemen, I'm going to read you now the law that applies to this phase of the trial.  Some of it will sound familiar to you, because some of it you've heard before, but I have to read it to you again.

COURT'S CHARGE TO THE JURY ON PUNISHMENT

THE COURT:  "Members of the Jury:

"As reflected in your verdict previously returned, you have found each defendant guilty of the offenses with which they were charged in counts one, two, three and four, of the Indictment.  The law of the United States provides that the punishment for the offenses in counts one, three and four, may be death.  As members of the jury, it is now your responsibility to determine whether the defendants should be sentenced to death or to life imprisonment without possibility of release on counts one, three and four.

"In making this determination, you will be called upon to decide whether, beyond a reasonable doubt, certain aggravating factor or factors exist and, if so whether those aggravating factor or factors sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor,

LASER BOND FORM A  ⊛  PENGAD · 1-800-631-6989

\1838

4

whether the aggravating factor or factors alone are sufficient to justify a sentence of death.

"An aggravating factor is a specified fact or circumstance which might indicate, or tend to indicate, that a defendant should be sentenced to death.  A mitigating factor is any aspect of a defendant's character or background, any circumstance of the offense, or any other fact or circumstance which might indicate or tend to indicate, that a defendant should not be sentenced to death.

"First, I will repeat some general instructions which apply in every case, for example, instructions about burden of proof and how to judge the believability of witnesses.  Then I will give you some specific rules of law about this particular case, and finally I will explain to you the procedures you should follow in your deliberations.

"You as jurors, are the judges of the facts.  But in reaching your decision as to the facts -- it is your sworn duty to follow all of the rules of law as I explain them to you.

"You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you.  You must not substitute or follow your own notion or opinion as to what the law is or ought to be.  It is your duty to apply the law as I explain it to you, regardless of the consequences.

"It is also your duty to base your decision solely

1839

upon the evidence and information, without prejudice or sympathy. That was the promise you made and the oath you took before being accepted by the parties as jurors, and they have the right to expect nothing less.

"It is your duty to determine the facts. In doing so, you must consider only the evidence and information presented during the trial and punishment phase, including the sworn testimony of the witnesses and the exhibits. Remember that any statements, objections, or arguments made by the lawyers are not evidence. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing to call your attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding upon you.

"Also, do not assume from anything I may have done or said during the trial or punishment phase that I have any opinion concerning any of the issues in this case. Except for the instructions to you on the law, you should disregard anything I may have said during these proceedings in arriving at your own findings as to the facts.

"In deciding whether aggravating or mitigating factors exist, you may consider any evidence that was presented during the guilt phase of the trial and the penalty phase of the trial.

1840

6

You may also make deductions and reach conclusions that reason and common sense lead you to draw from facts which have been established from the testimony and other evidence in the case. While you must consider all of the evidence, you are not required to accept any of the evidence as true or accurate. You alone determine issues of credibility and how much weight, if any, to give testimony and other evidence.

"You are the sole judges of the credibility or 'believability' of each witness and the weight to be given the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses who testified in this case. You should decide whether you believe what each person had to say, and how important that testimony was. In making that decision I suggest that you ask yourself a few questions: Did the person impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness have any relationship with either the government or the defense? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses? These are a few of the considerations that will help you determine the accuracy of what each witness said.

"In making up your mind and reaching a decision, do

1841

not make any decisions simply because there were more witnesses on one side than on the other.  Do not reach a conclusion on a particular point just because there were more witnesses testifying for one side on that point.  Your job is to think about the testimony of each witness you have heard and decide how much you believe of what each witness had to say.

"The testimony of a witness may be discredited by showing that the witness testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something, or failed to say or do something, which is inconsistent with the testimony the witness gave at this trial.

Earlier statements of a witness were not admitted in evidence to prove that the contents of those statements are true.  You may consider the earlier statements only to determine whether you think they are consistent or inconsistent with the trial testimony of the witness and therefore whether they affect the credibility of that witness.

"If you believe that a witness has been discredited in this manner, it is your exclusive right to give the testimony of that witness whatever weight you think it deserves.

"Neither Defendant testified during this stage of the trial.  You may not attach any significance to this fact or even discuss it in your deliberations.  Under our constitution, a defendant has no obligation to testify or present any other evidence.  Thus, no adverse inference may be drawn against a

defendant who does not take the stand.

"In the punishment phase of this trail, the government called as one of its witnesses an alleged accomplice, Terry Terrell Brown, named as a co-defendant in the indictment, with whom the government has entered into a plea agreement providing for the dismissal of some charges and a lesser sentence than the co-defendant would otherwise be exposed to for the offense to which the co-defendant plead guilty.  Such plea bargaining, as it is called, has been approved as lawful and proper, and is expressly provided for in the rules of this Court.

"An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from testifying.  On the contrary, the testimony of such a witness may alone be of sufficient weight to support a finding of intent or aggravation, if the jury finds that the testimony establishes and element of the intent or aggravation beyond a reasonable doubt.  However, you should not make a finding of intent or aggravation upon the unsupported testimony of an alleged accomplice unless you believe that testimony beyond a reasonable doubt.  You should keep in mind that such testimony is always to be received with caution and weighed with great care.  The fact that an accomplice has entered a plea of guilty to the offense charged is not evidence, in and of itself, of any element of intent or aggravation.

"If scientific, technical, or other specialized

9

knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify and state and opinion concerning such matters.

"Merely because an expert witness has expressed an opinion does not mean, however, that you must accept this opinion. The same as with any other witness, it is up to you to decide whether you believe this testimony and choose to rely upon it. Part of that decision will depend on your judgment about whether the witness's background or training and experience is sufficient for the witness to give the expert opinion that you heard. You must also decide whether the witness's opinions were based on sound reasons, judgment, and information.

"The government bears the burden of proving beyond a reasonable doubt the existence of any aggravating factors upon which it seeks to rely. While this burden is a heavy one, it is not necessary that a particular aggravating factor be proven beyond all possible doubt. It is only required that the government's proof exclude any 'reasonable doubt' about the particular aggravating factor being considered. A 'reasonable doubt' is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act

10

upon it without hesitation in the most important of your own affairs.  The defendants do not have the burden of disproving the existence of any aggravating factor.  Indeed, the law does not require the defendants to produce any evidence at all, and no inference whatever may be drawn from the election of a defendant not to testify.  The burden is wholly upon the government to prove the existence of a particular aggravating factor beyond a reasonable doubt.

"Under the law of the United States, before you may consider whether the penalty of death, rather than life imprisonment without the possibility of release, is an appropriate punishment in the case for a defendant as to counts one, three or four, you must as a preliminary matter unanimously agree that the government has proven beyond a reasonable doubt that the defendant then under consideration:

"(1) intentionally killed the victim, Todd A. Bagley (as to counts one or three) or Stacie L. Bagley (as to count four); or

"(2) intentionally inflicted serious bodily injury that resulted  in the death of the victim, Todd A. Bagley (as to counts one or three) or Stacie L. Bagley (as to count four); or

"(3) intentionally participated in an act, contemplating that the life of the victim, Todd A. Bagley (as to counts one or three) or Stacie



11

L. Bagley (as to count four), would be taken or intending that the lethal force would be used in connection with a person other than one of the participants in the offense, and the victim, Todd A. Bagley (as to counts one or three) or Stacie L. Bagley (as to count four), died as a result of the act; or

"(4) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to someone other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and the victim, Todd A. Bagley (as to counts one or three) or Stacie L. Bagley (as to count four), died as a result of the act.

"In considering the question of intent, you may consider only the intent of the defendant then under consideration.

"If the government does not satisfy each of you beyond a reasonable doubt, based on the evidence presented during either the guilt or punishment phase, that the defendant then under consideration intentionally caused the death of Todd A. Bagley (as to counts one or three) or Stacie L. Bagley (as to count four), in one or more of the four foregoing ways, you

12

should return a finding to that effect, and no further deliberations will be necessary.

"However, if you unanimously find beyond a reasonable doubt that the defendant then under consideration intentionally caused the death of Todd A. Bagley (as to counts one or three) or Stacie L. Bagley (as to count four), in one or more of the four foregoing ways, you will then proceed to determine whether the government has proven beyond a reasonable doubt the existence of any of the alleged statutory aggravating factors.

"If you unanimously find that at least one of the elements of intent and at lease one statutory aggravating factor exist, all of you then must weigh the aggravating factors you have all found to exist and each of you must weight any mitigating factors you individually have found to exist, to determine the appropriate sentence.  However, I instruct you now that only the aggravating and mitigating factors -- not the elements of intent -- are to be weighed in determining the appropriate sentence; and you must not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater -- you must consider the wight and value of each factor.

"'Serious bodily injury' means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or

1847

13

physical rehabilitation.

"In this case the government has alleged four statutory aggravating factors  as to counts one, three and four of the indictment.  They are, that:

"a)  the defendant committed the offense in an especially heinous, cruel or depraved manner in that it involved torture or serious physical abuse to the victim;

"b)  the defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value;

"c)  the defendant committed the offense after substantial planning and premeditation to cause the death of a person;

"d)  the defendant intentionally killed or attempted to kill more than one person in a single criminal episode.

"In considering the question of intent, as it relates to aggravating factors, you may consider only the intent of the defendant then under consideration, as each defendant must be considered separately.

"To establish the aggravating factor that a defendant committed the offense in an especially heinous, cruel, or depraved manner, the government must prove beyond a reasonable doubt that the offense involved either torture or serious

1848

physical abuse to the victim. The terms 'heinous,' 'cruel,' or 'depraved' are stated in the disjunctive: any one of them individually may constitute an element of this aggravating factor. 'Heinous" means extremely wicked or shockingly evil, where the offense was accompanied by such additional acts of torture or serious physical abuse of the victim as to set it apart from other offenses. 'Cruel' means that the defendant intended to inflict a high degree of pain by torturing the victim in addition to killing the victim. 'Depraved' means that the defendant relished the killing or showed indifference to the suffering of the victim, as evidenced by torture or serious physical abuse of the victim.

"'Torture' may include mental as well as physical abuse of the victim. In either case, the victim must have been conscious of the abuse at the time it was inflicted. Furthermore, the defendant must have specifically intended to inflict severe mental or physical pain or suffering upon the victim, apart from killing the victim.

"'Serious physical abuse' means a significant or considerable amount of injury or damage to the victim's body above and beyond that necessary to commit the killing. Serious physical abuse -- unlike torture -- may be inflicted either before or after death and does not require that the victim be conscious of the abuse at the time it was inflicted. However, the defendant must have specifically intended the abuse apart

15

from the killing.

"Pertinent factors in determining whether commission of the offense by the defendant was especially heinous, cruel, or depraved include, but are not necessarily limited to, the following: infliction of gratuitous violence upon the victim above and beyond that necessary to commit the offense; senselessness of the killing; helplessness of the victim; and relishing of the killing by the defendant.

"The word 'especially' should be given its ordinary, everyday meaning of being highly or unusually great, distinctive, peculiar, particular, or significant.

"The phrase 'pecuniary value' means anything of value belonging to Todd A. Bagley or Stacie L. Bagley in the form of money, property or anything having economic value.

"To establish the existence of the aggravating factor of substantial planning and premeditation, the government must prove beyond a reasonable doubt that the defendant committed the offense after substantial planning and premeditation.  The words 'substantial planning and premeditation' should be given their ordinary, everyday meaning.  'Planning' means mentally formulating a method for doing something or achieving some end.  'Premeditation' means thinking or deliberating about something and deciding whether to do it beforehand, and is the result of planning or deliberation.  'Substantial planning and premeditation' means a considerable or significant amount of

16

planning and premeditation, beyond any minimal premeditation that may have been required as an element of the offense of conviction.

"The amount of time needed for premeditation depends upon the person and the circumstances.  It must be long enough for the accused, after forming the intent, to be fully conscious of that intent.  However, there is no requirement that the government prove that the defendant deliberated for any particular period of time before committing the offense.

"You should consider all of the facts and circumstance preceding, surrounding, and following the killing which tend to shed light upon the condition of mind of the defendant, before and at the time of the killing.  No fact, no matter how small, no circumstance, no matter how trivial, which bears upon the question of premeditation, should escape your careful consideration.

"The phrase 'single criminal episode' means an act or series of related criminal acts which occur within a relatively limited time and place and are directed at the same person or persons or are part of a continuous course of conduct.

"If the government does not prove to each of you beyond a reasonable doubt that at least one of the four elements of intent listed on page 8 exists, you should return a finding to that effect, and no further deliberations will be necessary.

"In the event that you unanimously find that the

17

government has proven beyond a reasonable doubt the existence of at least one of the four elements of intent listed on page 8 and the existence of at least one of the statutory aggravating factors, as listed on pages 9 and 10, then you must consider whether the government has proven beyond a reasonable doubt the existence of any non-statutory aggravating factors.  As is the case for the statutory aggravating factors, you must unanimously agree on the existence of any of the alleged non-statutory circumstance beyond a reasonable doubt.

"The non-statutory aggravating factors that the government has alleged in this case as to counts one, three and four, which you should consider as to each defendant, are:

"(1) That the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others in that the defendant has engaged in a continuing pattern of violent conduct, has threatened other with violence, or has demonstrated low rehabilitative potential;

"(2) The defendant has caused injury, harm and loss to the family of Todd A. Bagley (as to counts one or three) or the family of Stacie L. Bagley (as to count four) because of the victim's  personal characteristics as an individual human being and the impact of the death upon the victim's family; and

18

"(3) The defendant committed the offense for the purpose of preventing the victim from providing information and assistance to law enforcement authorities in regard to the investigation or prosecution of the defendant.

"Whether any aggravating factor -- statutory or non-statutory -- has been sufficiently established is for you alone to determine, but the only aggravating factors that you may consider are those that I have outlined for you in these instructions.

"In the event that the government proves beyond a reasonable doubt the existence of one or more aggravating factors as outlined above, you must then consider whether the defendant then under consideration has proven the existence of any mitigating factors before you may consider whether the penalty of death is an appropriate punishment for that defendant.

The law of the United States provides a list of some mitigating factors that you as jurors must consider if you find one or more of them to be present by a preponderance of the evidence. These are called statutory mitigating factors. However, this list is not to be viewed as a complete list of the mitigating factors you may consider. Indeed, each of you may consider any factor you, as an individual, find has been established by a preponderance of the evidence that relates to

1853

19

any aspect of a defendant's character or background, any circumstance of the offense, or any other fact or circumstance, which you, as an individual, conclude indicates or tends to indicate that the defendant under consideration should not be sentenced to death.

"The mitigating factors relied upon by Christopher Andre Vialva are:

"1)  Christopher Vialva was subjected to emotional and physical abuse as a child, and was deprived of parental guidance and protection;

"2)  Christopher Vialva has responded well to structured environments in the past;

"3)  Christopher Vialva was nineteen at the time of the offense;

"4)  Another defendant or defendants who may be equally culpable in the crime will not be punished by death;

"5)  Any other factors in Christopher Vialva's background, record, or character or any other circumstance of the offense that may mitigate against the imposition of the death sentence.

"The mitigating factors relied upon by Brandon Bernard are:

"1)  Another defendant or defendants who may be equally culpable in the crime will not be punished by

1854

20

death;

"2)   Brandon Bernard was eighteen at the time of the offense;

"3)   Brandon Bernard has demonstrated remorse regarding the offense;

"4)   Any other factors in Brandon Bernard's background or character that may mitigate against the imposition of the death sentence.

"As I stated earlier, a mitigating factor does not have to be included in the list that I have read in order for it to be considered by any one of you.  In addition to the mitigating factors previously specified, mitigating factors may include any matter related to any aspect of a defendant's character or background, any circumstances of the offense, or any other factor or circumstance the defendant offers as a basis for returning a recommendation of life imprisonment without the possibility of release instead of death.  Thus, if there are any such mitigating factors, whether or not specifically argued by defense counsel, which are established in your mind by a preponderance of the evidence, then you must consider them in your deliberations.

"One mitigating factor on which Christopher Andre Vialva and Brandon Bernard rely is, 'that another person, equally culpable in the crime, will not be punished by death.' If you find that to be the case, you may take that into account

1855

21

as a reason not to impose the death penalty. The law requires consideration of this mitigating factor to allow juries to consider what is fair, considering all of the persons responsible for an intentional murder, before imposing a sentence of death.

"I caution you, however, that this is a mitigating factor only. By that I mean that the sentences to be imposed on other person in this case may only be considered by you as a reason to decide against the death penalty. The sentences of the other participants in a murder may never be considered as a reason to impose the death penalty on a particular defendant. Under federal law, a person who is under the age of eighteen at the time of the commission of the crime cannot be sentenced to death.

"The death penalty may only be imposed on the basis of a defendant's own individual conduct, character, background and record. It may never be imposed out of a desire to treat two or more defendants equally. Under the law, such a mitigating factor may indicate life without the possibility of release is the appropriate and just sentence; but it cannot be used as justification for the entry of a death sentence against the defendant under consideration.

"You will also recall that I previously told you that all twelve of you had to unanimously agree that a particular aggravating circumstance was proven beyond a reasonable doubt



22

before you consider it.  Quite the opposite is true with regard to mitigating factors.  A finding with respect to a mitigating factor may be made by any one or more of the members of the jury, and any member who finds the existence of a mitigating factor may consider such factor established regardless of whether any other jurors agree that such mitigating factor has been established.

"The burden of establishing the existence of any mitigating factor is on the defendant.  However, the defendant need only establish the existence of a mitigating factor by a preponderance of the evidence, rather than beyond a reasonable doubt.  A  preponderance of the evidence simply means an amount of evidence that is enough to persuade you that a contention is more likely true than not true or that a mitigating factor is more likely present than not present.

"After you have completed your findings as to the existence or absence of any aggravating or mitigating factors, you will then engage in a weighing process.  In determining whether a sentence of death is appropriate, each of you must weigh, in your own mind, any aggravating factor or factors that the jury unanimously finds to exist beyond a reasonable doubt -- whether statutory or non-statutory -- against any mitigating factor or factors that one or more of you find to exist by a preponderance of the evidence.  You shall consider whether the aggravating factor or factors found to exist sufficiently out

1857

23

weigh the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death.  Based upon this consideration, you the jury, by unanimous vote, shall recommend whether the defendant should be sentenced to death or sentenced to life imprisonment without the possibility of release.

"If you unanimously conclude that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of any mitigating factor, that the aggravating factor or factors alone are sufficient to justify a sentence of death, you shall record your determination that a sentence of death is justified on Decision Form C.

"If, after weighing the aggravating and mitigating factors, you unanimously conclude that a sentence of life without the possibility of release is justified, you shall record your determination that a sentence of life without the possibility of release is justified on Decision form D.

"If you recommend the imposition of a death sentence, the Court is required to impose that sentence.  If you recommend a sentence of life without the possibility of release, the Court is required to impose that sentence.  Keep in mind, however, that regardless of your findings with respect to aggravating and mitigating factors, you are never required to recommend a death

24

sentence.

"In reaching your findings about the aggravating and mitigating factors in this case, the instructions I gave you earlier about determinations of credibility issues apply equally here. In other words, you alone determine the credibility of the witnesses and the weight to give to their testimony and the other evidence. Also, in determining whether to recommend a death sentence, you must avoid any influence of passion, prejudice, or sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you.

"The process of weighing aggravating and mitigating factors against each other or weighing aggravating factors alone, if there are no mitigating factors, in order to determine the proper punishment, is not a mechanical process. In other words, you should not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater; you should consider the weight and value of each factor.

"The law contemplates that different factors may be given different weights or values by different jurors. Thus, you may find that one mitigating factor outweighs an aggravating factor or even all aggravating factors combined. If so, you should recommend that a sentence other than death be imposed. Similarly, you may find that a particular aggravating factor

1859

25

outweighs all mitigating factors combined.  If so, you may recommend that a sentence of death be imposed.  You and you alone are to decide what weight or value is to be given to a particular factor in your decision-making process.

"In order to return a verdict recommending the penalty to be imposed upon a defendant, all twelve of you must unanimously vote in favor of that penalty.

"To reach a decision, all of you must agree.  Your verdict must be unanimous as to each special finding on each count of conviction.  Your deliberations will be secret.  You will never have to explain your verdict to anyone.

"It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so as to the issues related to punishment.  Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors.  During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong.  But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

"Remember at all times you are judges -- judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

"In your consideration of whether the death sentence

26

is justified, you must not consider the race, color, religious beliefs, national origin, or sex of either the defendants or the victims. You are not to recommend a sentence of death unless you have concluded that you would impose a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of either the defendant under consideration or the victims.

"To emphasize the importance of this consideration, when you retire to begin deliberations, you will be given decision forms which contain a certificate that must be signed by each juror. When you have reached a decision, each of you is to sign the certificate attesting that consideration of race, color, religious beliefs, national origin, or sex of the defendant under consideration or the victims was not involved in reaching your individual decision, and attesting that each of you would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin or sex of the defendant under consideration or the victims.

"As you retire to begin your deliberations, you will be provided with a form entitled 'Special Findings Form' on which you should record your determinations as to intent, the existence of any aggravating factor or factors, and the existence of any mitigating factor or factors, as to each count of conviction which carries death as a possible punishment. You

27

will also be provided with four forms entitled 'Decision For A, B, C, and D' on which you will record your decision regarding your sentencing recommendation.  The forms are self-explanatory: Decision Form A should be used if you determine that a sentence of death should not be imposed because the government failed to proven beyond a reasonable doubt the existence of one of the elements of intent.  Decision Form B should be used if you determine that a sentence of death should not be imposed because the government failed to prove beyond a reasonable doubt the existence of any statutory aggravating factor.  Decision Form C should be used if you unanimously recommend that a sentence of death should be imposed.  Decision Form D should be used if you unanimously recommend that a sentence of imprisonment for life without the possibility of release should be imposed.

"The first thing that you should do is select a foreperson who may be the same individual that presided during the guilt phase, or someone else.  He or she will preside over your deliberations and sill speak for you in the courtroom.

"A Special Findings Form has been prepared for you convenience as to each defendant and as to each count of conviction in which death is a possible punishment.

"The foreperson will write the unanimous answer of the jury in the space provided for each special finding.  At the conclusion of your deliberations, the foreperson should date and sign the Special Findings Form.

"If you need to communicate with me during your deliberations, the foreperson should write the message and give it to the court security officer.  I will either reply in writing or bring you back into the courtroom to answer your message.

"Bear in mind that you are never to reveal to any person, not even to the Court, how the jury stands, numerically or otherwise, on any special finding, until after you have reached a unanimous decision.

"It is proper again to add a final caution.  Nothing that I have said in these instructions -- and nothing that I have said or done during the trial -- has been said or done to suggest to you what I think your decision should be.  What the decision should be is your exclusive duty and responsibility,"

The Government has been allotted an hour total for its arguments, each defendant has been allotted 30 minutes.  We'll probably take a break after we've heard from one of the Defendants.

Do you want me to warn you after any particular time, Mr. Frost?

MR. FROST:  Fifteen minutes, Your Honor.

THE COURT:  Fifteen?

MR. FROST:  Yes, sir.

(Argument of counsel followed.)

* * *

29

THE STATE OF TEXAS     )

COUNTY OF McLENNAN     )

I, Morris W. Bowen, Certified Shorthand Reporter and Official Court Reporter in and for the United States District Court, Western District of Texas, at the time of this trial, do hereby certify that the foregoing pages 1 thru 28 constitute an accurate EXCERPT TRANSCRIPT of my shorthand notes in the above entitled and numbered cause on the dates reflected therein, and that such transcript was prepared under my direction and supervision.

I Certify that the transcript fees charged and page format used comply with the requirements of this Court and the Judicial Conference of the United States.

TO CERTIFY WHICH, witness my signature set hereto in the City of Waco, County of McLennan, State of Texas on this the 16th day of January     A.D., 2001.

Morris W. Bowen, CSR # 107
Official Court Reporter
U. S. District Court
Room 304, P. O. Box 1908
Waco, Texas    76703

1865

# DECLARATION OF BENJAMIN SIMS

I, Benjamin Sims, declare under penalty of perjury that the following statement is true and correct to the best of my information and belief:

1)  My name is Benjamin Sims. I am of legal age and reside in the State of South Carolina. I read and write the English language fluently;

2)  I am making this statement voluntarily. I have not been promised anything, forced, induced, or otherwise improperly persuaded to make this statement. I am not suffering under any physical or emotional impairment that prevents me from understanding the contents of this statement;

3)  I met Christopher Vialva in 1995 or 1996, when we were in 10th grade together in Killeen, Texas. I had moved to Killeen to live with my uncle and his wife, who were stationed at Fort Hood. My mother was living in Garland and had a new boyfriend that I did not get along with. Chris and I became best friends and hung out together before school, during school and after school. Most days, I picked him up and took him to school. For a while, we dated girls who were best friends. Once in awhile, we went to play pool. Mostly, we just hung out together;

4)  I never saw Chris initiate any violent behavior. He would get into fights at times, but only if someone else instigated them. When I knew him, he was not in a gang. We did know some people who were in gangs, primarily "Bloods," but that is because the gangs were prevalent in the area and we couldn't help but be acquainted with individuals who were involved;

5)  I do not recall Chris having any issues with being a bi-racial individual. I do believe that he seemed to be depressed at times. He had problems with his mother on occasion, but nothing I considered to be serious. He had concerns about his sister, who was in and out of trouble;

6)  When we were in 11th grade, I got in trouble for fighting at school and had to go back to live with my mother, because one of my uncle's rules was that I could not get into trouble at school if I was living with him. Chris and I made plans to finish school and go to the Marines together;

7)  I was shocked when I learned that Chris was accused of this offense. He was the last person I would have expected to be involved in such a crime. He was mostly interested in hanging out with girls. He didn't want to fight. He was probably the most nonviolent person we hung out with. I do not think he could do the things they said he did;

8)  I was never contacted before now by any attorney, investigator, or anyone else working on Chris' case. I was in Pensacola, FL in the Marines when I found

1

Exhibit VII-Q

out about his arrest. I would have come back to testify for him if I had known that I could have helped him, but no one explained that to me.

I certify under penalty of perjury that the foregoing Declaration, consisting of eight paragraphs, is true and correct. Executed this ___76th___ day of May, 2004 in Greenville, NC.

Benjamin Sims

Witnessed by: _Claudia DeJong_
Signature

_____
Printed name

2

18 67

1868

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

RECEIVED

APR 0 1 2000

BY:_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. W-99-CR-070(1) |
| | ) |
| CHRISTOPHER ANDRE VIALVA, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## AMENDED NOTICE OF INTENT TO SEEK THE DEATH PENALTY

COMES NOW the United States of America, pursuant to 18 U.S.C. § 3593(a), by and through its undersigned counsel, and notifies the Court and the Defendant, CHRISTOPHER ANDRE VIALVA in the above-captioned case that the Government believes that the circumstances of the offenses charged in Counts One, Three and Four of the Second Superseding Indictment are such that, if the Defendant is convicted of one or more of these offenses, a sentence of death is justified under Chapter 228 (Sections 3591 through 3598) of Title 18 of the United States Code, and that the Government will seek the sentence of death for the Defendant, CHRISTOPHER ANDRE VIALVA, for these offenses:   Carjacking which resulted in the death of Todd A. Bagley, in violation of 18 U.S.C. § 2119 and 2, and first degree murder (premeditated and felony murder), within the special maritime and territorial jurisdiction of the United States, of Todd A. Bagley and Stacie L. Bagley, in violation of Title 18, United States Code, § 1111, 2, 7(3) all of which carry a possible sentence of death.

Exhibit VIII-A 1869

The Government proposes to prove the following factors as justifying a sentence of death, if the Defendant is convicted of one or more of these crimes.

## COUNT ONE

## CARJACKING RESULTING IN DEATH

A.    Statutory Proportionality Factors Enumerated under 18 U.S.C. § 3591(a)(2)(A)-(D).

1.    **Intentional Killing.**  That the Defendant, CHRISTOPHER ANDRE VIALVA intentionally killed Todd A. Bagley. Section 3591(a)(2)(A).

2.    **Intentional Infliction of Serious Bodily Injury.** That the Defendant, CHRISTOPHER ANDRE VIALVA intentionally inflicted serious bodily injury that resulted in the death of Todd A. Bagley.  Section 3591(a)(2)(B).

3.    **Intentional Acts to Take Life or Use Lethal Force.** That the Defendant, CHRISTOPHER ANDRE VIALVA intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, Todd A. Bagley died as a direct result of the act.  Section 3591(a)(2)(C).

4.    **Intentional Act That Created a Grave Risk of Death.**  That the Defendant, CHRISTOPHER ANDRE VIALVA intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person,

2

1870

other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Todd A. Bagley died as a result of that act. Section 3591(a)(2)(D).

B.    Statutory Aggravating Factors Enumerated under 18 U.S.C. § 3592(c).

1.    **Previous Conviction of Violent Felony Involving Firearm.**  That the Defendant, CHRISTOPHER ANDRE VIALVA has previously been convicted of a felony offense involving a firearm.  On October 15, 1998, CHRISTOPHER ANDRE VIALVA pled guilty to aggravated assault with a deadly weapon in Bell County, Texas.  Section 3592(c)(2)

2.    **Heinous, Cruel, or Depraved Manner of Committing Offense.**  That the Defendant, CHRISTOPHER ANDRE VIALVA committed the offense in an especially heinous, cruel, and depraved manner. Section 3592(c)(6).

3.    **Pecuniary Gain.**  That the Defendant, CHRISTOPHER ANDRE VIALVA committed the offense in expectation of the receipt of something of pecuniary value.  Section 3592(c)(8).

4.    **Substantial Planning and Premeditation.**  That the Defendant, CHRISTOPHER ANDRE VIALVA committed the offense after substantial planning and premeditation.  Section 3592 (c)(9).

5.    **Multiple Killings or Attempted Killings.**  That the Defendant, CHRISTOPHER ANDRE VIALVA killed Todd A. Bagley and Stacie L. Bagley in one single criminal episode.

3

1871

C. <u>Other, Non-Statutory, Aggravating Factors Identified under 18 U.S.C. § 3593(a)(2)</u>.

1. **Future Dangerousness of CHRISTOPHER ANDRE VIALVA.**

That the Defendant, CHRISTOPHER ANDRE VIALVA is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others. <u>Simmons</u> v. <u>South Carolina</u>, 114 S.Ct. 2187, 2193 (1994). In addition to the capital offenses charged in the Indictment and the statutory and non-statutory aggravating factors alleged in this Notice, CHRISTOPHER ANDRE VIALVA has engaged in a continuing pattern of violent conduct, has threatened others with violence, has demonstrated low rehabilitative potential, and/or has demonstrated lack of remorse.

2. **Vileness of the Crime.** CHRISTOPHER ANDRE VIALVA's conduct in committing the offense, apart from the other aggravating factors, was substantially greater in degree than that described in the definition of the crime. <u>Smith</u> v. <u>Commonwealth</u>, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), <u>cert. denied</u>, 441 U.S. 967 (1979).

3. **Victim Impact Evidence.** The Defendant, CHRISTOPHER ANDRE VIALVA caused injury, harm, and loss to Todd A. Bagley's family because of his personal characteristics as individual human beings and the impact of the death upon his family. <u>Payne</u> v. <u>Tennessee</u>, 111 S.Ct. 2597, 2608-09 (1991).

4. **Victim was Killed in an Effort to Obstruct**

4

Justice. The Defendant, CHRISTOPHER ANDRE VIALVA committed the offense for the purpose of preventing the victims from providing information and assistance to law enforcement authorities in regard to the investigation or prosecution of the defendants.

## COUNT THREE

### FIRST DEGREE (PREMEDITATED AND FELONY) MURDER WITHIN SPECIAL MARITIME AND TERRITORIAL JURISDICTION OF THE UNITED STATES

A. Statutory Proportionality Factors Enumerated under 18 U.S.C. § 3591(a)(2)(A)-(D).

1. **Intentional Killing.** That the Defendant, CHRISTOPHER ANDRE VIALVA intentionally killed Todd A. Bagley. Section 3591(a)(2)(A).

2. **Intentional Infliction of Serious Bodily Injury.** That the Defendant, CHRISTOPHER ANDRE VIALVA intentionally inflicted serious bodily injury that resulted in the death of Todd A. Bagley. Section 3591(a)(2)(B).

3. **Intentional Acts to Take Life or Use Lethal Force.** That the Defendant, CHRISTOPHER ANDRE VIALVA intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Todd A. Bagley died as a direct result of the act. Section 3591(a)(2)(C).

4. **Intentional Act That Created a Grave Risk of**

5

1873

**Death.** That the Defendant, CHRISTOPHER ANDRE VIALVA intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Todd A. Bagley died as a result of that act. Section 3591(a)(2)(D).

B.    Statutory Aggravating Factors Enumerated under 18 U.S.C. § 3592(c).

1.    **Previous Conviction of Violent Felony Involving Firearm.** That the Defendant, CHRISTOPHER ANDRE VIALVA has previously been convicted of a felony offense involving a firearm. On October 15, 1998, CHRISTOPHER ANDRE VIALVA pled guilty to aggravated assault with a deadly weapon in Bell County, Texas. Section 3592(c)(2)

2.    **Heinous, Cruel, or Depraved Manner of Committing Offense.** That the Defendant, CHRISTOPHER ANDRE VIALVA committed the offense in an especially heinous, cruel, and depraved manner. Section 3592(c)(6).

3.    **Pecuniary Gain.** That the Defendant, CHRISTOPHER ANDRE VIALVA committed the offense in expectation of the receipt of something of pecuniary value. Section 3592(c)(8).

4.    **Substantial Planning and Premeditation.** That the Defendant, CHRISTOPHER ANDRE VIALVA committed the offense after substantial planning and premeditation. Section 3592 (c)(9).

6

5.    **Multiple Killings or Attempted Killings.**  That the Defendant, CHRISTOPHER ANDRE VIALVA killed Todd A. Bagley and Stacie L. Bagley in one single criminal episode.

C.   Other, Non-Statutory, Aggravating Factors Identified under 18 U.S.C. § 3593(a)(2).

1.    **Future Dangerousness of CHRISTOPHER ANDRE VIALVA.** That the Defendant, CHRISTOPHER ANDRE VIALVA is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others. Simmons v. South Carolina, 114 S.Ct. 2187, 2193 (1994).  In addition to the capital offenses charged in the Indictment and the statutory and non-statutory aggravating factors alleged in this Notice, CHRISTOPHER ANDRE VIALVA has engaged in a continuing pattern of violent conduct, has threatened others with violence, has demonstrated low rehabilitative potential, and/or has demonstrated lack of remorse.

2.    **Vileness of the Crime.**  CHRISTOPHER ANDRE VIALVA's conduct in committing the offense, apart from the other aggravating factors, was substantially greater in degree than that described in the definition of the crime.  Smith v. Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), cert. denied, 441 U.S. 967 (1979).

3.    **Victim Impact Evidence.**  The defendant, CHRISTOPHER ANDRE VIALVA caused injury, harm, and loss to Todd A. Bagley's family because of his personal characteristics as an

7

1875

individual human being and the impact of the death upon his family.  <u>Payne</u> v. <u>Tennessee</u>, 111 S.Ct. 2597, 2608-09 (1991).

4.   **Victim was Killed in an Effort to Obstruct Justice.**  The Defendant, CHRISTOPHER ANDRE VIALVA committed the offense for the purpose of preventing the victims from providing information and assistance to law enforcement authorities in regard to the investigation or prosecution of the defendants.

<u>**COUNT FOUR**</u>

**FIRST DEGREE (PREMEDITATED AND FELONY) MURDER WITHIN SPECIAL MARITIME AND TERRITORIAL JURISDICTION OF THE UNITED STATES**

A.   <u>Statutory Proportionality Factors Enumerated under 18 U.S.C. § 3591(a)(2)(A)-(D)</u>.

1.   **Intentional Killing.**  That the Defendant, CHRISTOPHER ANDRE VIALVA intentionally killed Stacie L. Bagley. Section 3591(a)(2)(A).

2.   **Intentional Infliction of Serious Bodily Injury.** That the Defendant, CHRISTOPHER ANDRE VIALVA intentionally inflicted serious bodily injury that resulted in the death of Stacie L. Bagley.  Section 3591(a)(2)(B).

3.   **Intentional Acts to Take Life or Use Lethal Force.** That the Defendant, CHRISTOPHER ANDRE VIALVA intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in

8

18716

the offense, and Stacie L. Bagley died as a direct result of the act.   Section 3591(a)(2)(C).

4.   **Intentional Act That Created a Grave Risk of Death.**   That the Defendant, CHRISTOPHER ANDRE VIALVA intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Stacie L. Bagley died as a result of that act. Section 3591(a)(2)(D).

B.    Statutory Aggravating Factors Enumerated under 18 U.S.C. § 3592(c).

1.    **Previous Conviction of Violent Felony Involving Firearm.**   That the Defendant, CHRISTOPHER ANDRE VIALVA has previously been convicted of a felony offense involving a firearm.   On October 15, 1998, CHRISTOPHER ANDRE VIALVA pled guilty to aggravated assault with a deadly weapon in Bell County, Texas.   Section 3592(c)(2)

2.    **Heinous, Cruel, or Depraved Manner of Committing Offense.**   That the Defendant, CHRISTOPHER ANDRE VIALVA committed the offense in an especially heinous, cruel, and depraved manner. Section 3592(c)(6).

3.    **Pecuniary Gain.**   That the Defendant, CHRISTOPHER ANDRE VIALVA committed the offense in expectation of the receipt of something of pecuniary value.   Section 3592(c)(8).

9

4.    **Substantial Planning and Premeditation.**  That the
Defendant, CHRISTOPHER ANDRE VIALVA committed the offense after
substantial planning and premeditation.   Section 3592 (c)(9).

5.    **Multiple Killings or Attempted Killings.**  That the
Defendant, CHRISTOPHER ANDRE VIALVA killed Todd A. Bagley and
Stacie L. Bagley in one single criminal episode.

C.   Other, Non-Statutory, Aggravating Factors Identified
under 18 U.S.C. § 3593(a)(2).

1.    **Future Dangerousness of CHRISTOPHER ANDRE VIALVA.**
That the Defendant, CHRISTOPHER ANDRE VIALVA is likely to commit
criminal acts of violence in the future which would be a
continuing and serious threat to the lives and safety of others.
Simmons v. South Carolina, 114 S.Ct. 2187, 2193 (1994).   In
addition to the capital offenses charged in the Indictment and
the statutory and non-statutory aggravating factors alleged in
this Notice, CHRISTOPHER ANDRE VIALVA has engaged in a continuing
pattern of violent conduct, has threatened others with violence,
has demonstrated low rehabilitative potential, and/or has
demonstrated lack of remorse.

2.    **Vileness of the Crime.**  CHRISTOPHER ANDRE VIALVA's
conduct in committing the offense, apart from the other
aggravating factors, was substantially greater in degree than
that described in the definition of the crime.   Smith v.
Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), cert.
denied, 441 U.S. 967 (1979).

-10

3.    **Victim Impact Evidence.**    The Defendant,

CHRISTOPHER ANDRE VIALVA caused injury, harm, and loss to Stacie

L. Bagley's family because of her personal characteristics as an

individual human being and the impact of the death upon her

family.    Payne v. Tennessee, 111 S.Ct. 2597, 2608-09 (1991).

4.    **Victim was Killed in an Effort to Obstruct**

**Justice.**    The Defendant, CHRISTOPHER ANDRE VIALVA committed the

offense for the purpose of preventing the victims from providing

information and assistance to law enforcement authorities in

regard to the investigation or prosecution of the defendants.

Respectfully submitted,

JAMES WILLIAM BLAGG,
United States Attorney

By: _____
MARK L. FRAZIER
Assistant United States Attorney

By: _____
SCOTT L. FROST
Special Assistant
United States Attorney

Dated: _March 30_ , 2000

11

1879

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the _30th_ day of _March_ , 2000, a true and correct copy of the foregoing notice of intent to seek the death penalty was mailed via first class mail, postage prepaid thereon, to the following attorneys of record:

Stan Schwieger
P.O. Box 975
Waco, Texas 76703

(254) 756-5795

Dwight Goains
P.O. Drawer 1200
112 W.2d
Cameron, Texas 76520
(254) 697-6681

_____
Assistant United States Attorney

12

1880

1881