**Steven C. Losch**
**Attorney at Law**
**906 Delia Drive**
**Longview, Texas 75601**

Licensed to Practice in Texas, New York, Fifth and Eleventh Circuits

903-234-1373 phone
903-753-2059 fax

October 22, 2001

Re: <u>United States v. Vialva</u>, No. 00-50523;
    <u>Allridge v. Johnson</u>, No. 4:95-MC063-Y (N.D. Tex.- Ft. Worth Div.)

Mr. Robert Flaig
Case Manager
U.S. Court of Appeals
Fifth Circuit
600 Camp St.
New Orleans, La. 70130.

Dear Mr. Flaig:

I am the attorney for appellant Christopher Vialva and petitioner James Allridge in the above numbered and entitled capital cases. The <u>Allridge</u> case does not have a Fifth Circuit cause number, but a certificate of appealability was granted by the district court last week. I am writing to inform you that I will be entering the hospital for emergency surgery on my spine on October 24, 2001, I do not know at this time how long I will be incapacitated, but it may not be possible for me to travel to New Orleans for the oral argument in Mr. Vialva's case and file my brief in Mr. Allridge's case without an extension of the deadline. I will file the appropriate motions when my surgery is completed and I receive notice of the date for the oral argument in <u>Vialva</u> and a briefing schedule in <u>Allridge</u>. In the mean time, please place a copy of this letter in the file for each case and take any other steps that you deem appropriate to ensure that the panels are aware of the problem.

You can leave messages on my answering machine, but I may not be able to return them promptly. My mail will be forwarded to me each day. Thank you for your assistance.

Respectfully,

Steven Losch

Exhibit VIII-B
1882

1883

RECEIVED

JAN 15 2003

BY:_____

MR. SCHWIEGER,

I'M WRITING TO YOU CONCERNING MY BRIEF THAT IS BEING PREPARED FOR THE SUPREME COURT. THE LAST TIME WE SPOKE I MENTIONED INCORPORATING AN ISSUE FROM THE RING VS. ARIZONA CASE. IT PERTAINS TO THE FACT THAT IN FEDERAL CAPITAL PROSECUTION, IN ORDER TO SEEK THE DEATH PENALTY, THE FDPA MENS REA ELEMENT AND THE STATUTORY AGGRAVATING FACTORS MUST BE FOUND BY A GRAND JURY AND BE SET FORTH IN THE INDICTMENT. YOU ADVISED ME THAT IT WAS BEST TO WAIT UNTIL MY WRIT TO BRING THE ISSUE IN. I HAVE READ NEW CASES PERTAINING TO THE PARTICULAR ISSUE. THAT BEING SAID, I REQUEST THAT THE ISSUE BE ADDED TO MY BRIEF FOR THE SUPREME COURT. IN DOING THAT, I ALSO REQUEST YOU RESEARCH THE FOLLOWING CASES: PAUL HARDY VS. UNITED STATES, DONALD FELL VS. UNITED STATES, RING VS. ARIZONA, HAMLING VS. UNITED STATES, LENTZ VS. UNITED STATES. THE ARGUMENT USED IN THE UNITED STATES VS. PAUL HARDY IN MY OPINION THE BEST CONCERNING THE ISSUE. USE IT AS A MAIN GUIDELINE FOR OUR ARGUMENT. I'M NOT ASKING YOUR ADVICE ON THIS. I WANT IT DONE.

Exhibit VIII-C

1884

WHEN YOU RECIEVE THIS LETTER I WANT YOU TO SCHEDULE AN ATTORNEY CALL WITH THE UNIT COUNSELOR HERE.

THANK YOU,

CHRISTOPHER VICTORI

#91909080

P.S. I WANT A COPY OF THE NEW BRIEF BEFORE IT IS FILED. THAT MEANS BEFORE IT IS SENT TO THE SUPREME COURT.

1885

1886

RECEIVED
JAN 1 6 2003
BY:_____

DEAR STAN SCHWIEGER,

A COPY OF THIS WAS SENT TO THE
5TH CIRCUIT COURT OF APPEALS CLERK.

CHRISTOPHER VIALVA

Exhibit VIII-D

1887

11 JAN 03

DOCKET NUMBER: 00-50523
; UNITED STATES OF AMERICA
V. CHRISTOPHER ANDRÉ VIALVA

DEAR CLERK,

I HAVE JUST RECIEVED 1 COPY OF MY BRIEF (PETITION FOR WRIT OF CERTIORARI). IN PREVIOUS CONVERSATIONS I HAVE SPOKEN TO MY ATTORNEY STAN SCHWIEGER ABOUT SUPPLEMENTING AN ISSUE PERTAINING TO MY INDICTMENT. I'M REFERRING TO THE RING V. ARIZONA CASE. IN THOSE CONVERSATIONS I ALSO TOLD MY ATTORNEY STAN SCHWIEGER TO SEND 1 COPY OF MY BRIEF IN ADVANCE, SO I MAY REVIEW IT. I WANTED TO CHECK TO SEE IF MY INSTRUCTIONS WERE FOLLOWED, AND STILL HAVE TIME TO CORRECT THEM IF MY INSTRUCTIONS WERE NOT FOLLOWED. WHEN I RECIEVED 1 COPY OF MY BRIEF IT WAS TOO LATE TO CORRECT THE MISTAKES BEFORE IT WAS FILED. AFTER READING THE BRIEF I NOTICED THE RING V. ARIZONA CASE WAS NOT ADDED TO IT, NOR WAS THE ISSUE PERTAINING TO IT. THE ISSUE AND CASE RELATE TO MY CASE. MY CO-DEFENDANT BRANDON BERNARD FILED THAT SAME ISSUE. WE HAVE THE SAME INDICTMENT. I AM A CAPITAL CASE AND MY LIFE IS AT STAKE. MY ATTORNEY'S MISTAKES AND NEGLEGENCE IS DETRIMENTAL TO MY LIFE. I WROTE AND SENT A LETTER CERTIFIED MAIL CONCERNING THIS SITUATION. I RECIEVED

1888

NO RESPONSE. MY REQUEST IS FOR MORE TIME TO ADD THIS ISSUE TO MY PETITION FOR WRIT OF CERTIORARI. THANK YOU FOR YOUR TIME.

CHRISTOPHER VIALVA

1889

**NO EXHIBITS FOR GROUND IX**

1890

1891

## <u>DECLARATION OF KEVIN McNALLY</u>

Kevin McNally hereby declares under penalty of perjury, 28 U.S.C. § 1746, that the following is true and correct:

1. With David Bruck of South Carolina and Richard Burr of Houston, Texas, I currently serve as Federal Death Penalty Resource Counsel (FDPRC). The purpose of this project, which is funded by the Defender Services Division of the Administrative Office of the United States Courts, is to assist court-appointed and defender attorneys with the defense of federal death-penalty cases at the trial, appellate, post-conviction and clemency stages of such cases. I have served in that capacity since the inception of the Resource Counsel Project in January, 1992. The responsibilities of the FDPRC include the monitoring of federal capital prosecutions throughout the United States, in order to ensure the delivery of cost-effective and adequate defense services to indigent capital defendants in such cases.[1] This includes the collection of data on the utilization of the federal death penalty, both as to prosecutions brought under the 1988 so-called "Drug Kingpin" death penalty statute, 21

---

[1] In May 1998, the role of the Federal Death Penalty Resource Counsel Project was described, at pp. 28-30, in a report prepared by a Judicial Conference Subcommittee on Federal Death Penalty Cases. That report (commonly called the Spencer Committee Report) "urge[d] the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project . . . which has become essential to the delivery of high quality, cost-effective representation in death penalty cases . . . ." *See,* "Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation," (May 1998), at p. 50. The Report is available online at http://www.uscourts.gov/dpenalty/. The Report's recommendations were later adopted by the Judicial Conference of the United States.

Exhibit X-A

\ ४G २

U.S.C. § 848(e) *et seq.,* and those brought pursuant to the "Federal Death Penalty Act of 1994." 18 U.S.C. §3591 *et seq.*

2. In order to carry out my responsibilities, the FDPRC maintains a comprehensive list of all federal death penalty prosecutions and information regarding each defendant. This information is regularly updated, and is checked for accuracy whenever possible against any available United States government information regarding federal capital prosecutions and/or with defense counsel in those cases. The Project's information regarding practices in federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts. The Project also attempts to collect penalty-phase verdict sheets reflecting the actual findings of federal juries at the penalty phase of aggravating and mitigating circumstances.

3. I have been asked by counsel for Christopher Vialva to provide information to the Court regarding certain of the data that the Project has collected. I am prepared to testify as a witness as well. The areas I was asked to provide data concern: (1) the frequency with which the federal death penalty has been sought and imposed since 1988; (2) the race of the defendants as to whom a capital prosecution has been authorized; and (3), the frequency with which the federal death penalty is authorized and imposed on a regional basis.

2

1843

I.

**FREQUENCY WITH WHICH THE FEDERAL DEATH PENALTY
IS SOUGHT AND IMPOSED**

4. The Project has collected information regarding all federal executions and all potential and actual federal death penalty prosecutions initiated pursuant to 21 U.S.C. § 848(e) *et seq.,* enacted in 1988, and/or 18 U.S.C. §3591, *et seq.,* enacted in 1994.

5. Based on the Project's figures, as well as the reports published by the Department of Justice in September 2000 and June 2001, it appears that the "pool" of potential capital defendants in the system since 1988 totals 2,056.[2] This figure is current as of June 5, 2004. This consists of 52 cases reviewed prior to the 1995 Death Penalty Protocols put into place by Attorney General Reno,[3] 682 reviewed by Ms. Reno after the Protocols went into effect, 440 reviewed by Attorney General Ashcroft, and an additional 231 cases identified by United States Attorneys as potential capital cases that were never submitted for review.[4] The Project has identified additional cases that fall into this later category, *i.e.,* cases that were never

---

[2]Of these 2,056 defendants, 211 are currently pending review by the Department of Justice, bringing the total defendants reviewed to 1,845.

[3]Prior to the Protocols, which went into effect on January 27, 1995, the Attorney General reviewed only reviewed those cases in which a United States Attorney requested permission to seek the death penalty. Potentially capital cases where the local determination was not to seek the death penalty were not reviewed by Main Justice. The major 2001 change wrought by the Protocols was a requirement that *all* potential death-penalty cases, whether the United States Attorney wished to pursue the death penalty or not, be submitted to Main Justice for review and ultimate decision by the Attorney General.

[4]*See* the discussion of this figure at n. 10 of the June 2001 Supplemental Justice Department Study.

3

submitted for review and/or charged as capital offenses even though there was justification for doing so.

6. From this group of 1,845 potential capital defendants, a total of 318 defendants have actually been authorized for capital prosecution. Thus, the Department of Justice has authorized capital prosecutions in approximately 17% (318/1,845) of the cases in which the penalty could have been sought. To date, juries have sentenced 38 defendants to death. Four death sentences have been set aside on appeal. Three defendants have been executed. One defendant was granted clemency[5] There are 30 defendants presently on the federal death row under an active sentence of death whose cases are in various stages of review via direct appeal or post-conviction proceedings brought pursuant to 28 U.S.C. § 2255. There are 64 cases presently pending or in trial.

## II.

### RACE OF DEFENDANTS AUTHORIZED FOR FEDERAL CAPITAL PROSECUTIONS

7. The racial composition of the pool of 318 defendants whose cases were authorized for a federal capital prosecution is as follows: (1) African-American, 164 (52%); (2) Latino, 56 (18%); (3) Caucasian, 80 (25%); and (4), "other," 18 (5%). These figures are current as of May 31, 2004.

---

[5]Two federal executions took place in the year 2001 (Timothy McVeigh and Juan Garza) and one in the year 2003 (Louis Jones). Messrs. McVeigh and Jones were executed pursuant to the Federal Death Penalty Act of 1994. Mr. Garza was executed pursuant to the 1988 enactment, 21 U.S.C. § 848(e).

4

1895

## III.

## REGIONAL VARIATIONS

8. Based on figures compiled by the Death Penalty Information Center (current as of May 31, 2004) the states which currently lead the nation in post-*Gregg* executions are Texas (322), Virginia (91), Oklahoma (73) and Missouri (61). The states whose federal districts have the most authorized federal death penalty prosecutions (including pending cases) are Virginia (39), New York (30), Texas (22) and Missouri (21). Federal districts in the following states have had more than one federal death sentence returned by juries: Texas (9), Missouri (6), Virginia (4), Georgia (3), Louisiana (2), Arkansas (2) and North Carolina (2). Of the 38 federal death sentences imposed by juries since 1988, 30 have come from the traditional "death belt" states. By way of contrast, there have been six federal death-penalty cases tried in New York State involving a total of nine defendants as follows: three trials in the Eastern District of New York, one in the Southern District of New York (two capital defendants) and two in the Northern District of New York (two capital defendants in each case).[6] No federal jury sitting in New York State has returned a death verdict, including the one case tried, *United States v. Bin Laden, et al.*, a case where two of the four defendants tried faced the death penalty for their roles in the simultaneous terrorist bombings of United States embassies in East Africa resulting in hundreds of deaths, thousands of injures, and the destruction of two United States Embassies.

_____

[6]These are figures current as of the date of this declaration.

5

9. I have also been asked by counsel for Christopher Vialva to provide information on the number of authorized federal death penalty cases, since 1988, by the state in which each such prosecution was brought. According to the Project's records, the following compilation accurately sets forth the particular state in which each of the 318 federal death penalty cases authorized since 1988 was prosecuted:

Alabama (5), Alaska (1), Arizona (5), Arkansas (5), California (15), Colorado (6), Connecticut (3), DC (11), Florida (11), Georgia (7), Hawaii (1), Illinois (12), Indiana (4), Iowa (4), Kansas (4), Kentucky (3), Louisiana (7), Maryland (12), Massachusetts (4), Michigan (15), Mississippi (3), Missouri (21), New Jersey (2), New Mexico (6), New York (30), North Carolina (10), Oklahoma (4), Pennsylvania (11), Puerto Rico (17), Tennessee (12), Texas (22), Vermont (2), Virginia (39), West Virginia (4).

I declare, under penalty of perjury, that the foregoing is true and correct. Executed on June 5, 2004.

KEVIN McNALLY

6

1898

11/28/03  12:03 FAX 404 581 0634        US ATTORNEY NDGA                                ☒003

## ЗMICAL SUBSTANCES PREPARATION

1. SODIUM PENTOTHAL: 2.5% kit, 25MG. 5/GRAMS/50 CC's sterile water used. Draw up in syringe using 16 ga. Needle (purple). Mark syringe. This is the first drug administered. Only one syringe is needed.

2. PANCURONIUM BROMIDE (PAVILON): Comes in vials. Glass tops must be broken off each vial. 12 vials are used for a total of 60 cc's. One syringe is administered for execution. Second drug given.

3. POTASSIUM CHLORIDE (KCL): (2) 60 CC SYRINGES ARE USED. This stops the heart. Use (6) vials (40 meg 20 ml.) Mark each syringe.

4. HEP LOCK FLUSH WITH FOOD COLOR: (1) 60CC SYRINGE: Use sterile water. Two vials 10ml.

After each step above use approximately 10 cc in line after each drug given, this flushes the IV line.

5. If IV set in both arms then the above amounts would be doubled.

## CHEMICAL SUBSTANCES PREPARATION

1. SODIUM PENTOTHAL: 2.5% kit, 25MG. 5/GRAMS/50 CC's sterile water used. Draw up in syringe using 16 ga. Needle (purple). Mark syringe. This is the first drug administered. Only one syringe is needed.

2. PANCURONIUM BROMIDE (PAVILON): Comes in vials. Glass tops must be broken off each vial. 12 vials are used for a total of 60 cc's. One syringe is administered for execution. Second drug given.

3. POTASSIUM CHLORIDE (KCL): (2) 60 CC SYRINGES ARE USED. This stops the heart. Use (6) vials (40 meg 20 ml.) Mark each syringe.

4. HEP LOCK FLUSH WITH FOOD COLOR: (1) 60CC SYRINGE: Use sterile water. Two vials 10ml.

After each step above use approximately 10 cc in line after each drug given, this flushes the IV line.

5. If IV set in both arms then the above amounts would be doubled.

## CHEMICAL SUBSTANCES PREPARATION

1. SODIUM PENTOTHAL: 2.5% kit, 25MG. 5/GRAMS/50 CC's sterile water used. Draw up in syringe using 16 ga. Needle (purple). Mark syringe. This is the first drug administered. Only one syringe is needed.

2. PANCURONIUM BROMIDE (PAVILON): Comes in vials. Glass tops must be broken off each vial. 12 vials are used for a total of 60 cc's. One syringe is administered for execution. Second drug given.

3. POTASSIUM CHLORIDE (KCL): (2) 60 CC SYRINGES ARE USED. This stops the heart. Use (6) vials (40 meg 20 ml.) Mark each syringe.

4. HEP LOCK FLUSH WITH FOOD COLOR: (1) 60CC SYRINGE: Use sterile water. Two vials 10ml.

After each step above use approximately 10 cc in line after each drug given, this flushes the IV line.

5. If IV set in both arms then the above amounts would be doubled.

Exhibit XI-A

1899

1900

1. Yellow:   Sodium Pentothol (10cc)
2. Black:    Saline (60cc)
3. Blue:     Pancuronium (60cc)
4. Blue:     Pancuronium (60cc)
5. Black:    Saline (60cc)
6. Red:      Potassium Chloride (60cc)
7. Red:      Potassium Chloride (60cc)

1. Yellow:   Sodium Pentothol (10cc)
2. Black:    Saline (60cc)
3. Blue:     Pancuronium (60cc)
4. Blue:     Pancuronium (60cc)
5. Black:    Saline (60cc)
6. Red:      Potassium Chloride (60cc)
7. Red:      Potassium Chloride (60cc)

1. Yellow:   Sodium Pentothol (10cc)
2. Black:    Saline (60cc)
3. Blue:     Pancuronium (60cc)
4. Blue:     Pancuronium (60cc)
5. Black:    Saline (60cc)
6. Red:      Potassium Chloride (60cc)
7. Red:      Potassium Chloride (60cc)

1. Yellow:   Sodium Pentothol (10cc)
2. Black:    Saline (60cc)
3. Blue:     Pancuronium (60cc)
4. Blue:     Pancuronium (60cc)
5. Black:    Saline (60cc)
6. Red:      Potassium Chloride (60cc)
7. Red:      Potassium Chloride (60cc)

1. Yellow:   Sodium Pentothol (10cc)
2. Black:    Saline (60cc)
3. Blue:     Pancuronium (60cc)
4. Blue:     Pancuronium (60cc)
5. Black:    Saline (60cc)
6. Red:      Potassium Chloride (60cc)
7. Red:      Potassium Chloride (60cc)

Exhibit XI-B

1901

1902

AFFIDAVIT OF MARK J. S. HEATH M.D.

STATE OF NEW YORK      )
                       )                    ss.
COUNTY OF NEW YORK     )

Mark J. S. Heath, a person of lawful age, deposes and states as follows

1.    My name is Mark J. S. Heath, M.D., I am an Assistant Professor of Clinical Anesthesiology in the Department of Anesthesiology at Columbia University in New York City, N.Y. I received my Medical Doctorate degree from the University of North Carolina at Chapel Hill in 1986 and completed residency and fellowship training in Anesthesiology in 1992 at Columbia University Medical Center. I am Board Certified in Anesthesiology, and am licensed to practice Medicine in New York State. My work consists of approximately equal parts of performing clinical anesthesiology, teaching residents, fellows and medical students, and managing a neuroscience laboratory. As a result of my training and research I am familiar and proficient with the use and pharmacology of the chemicals used to perform lethal injection.

2.    Over the past several years, as a result of concerns about the mechanics of lethal injection as practiced in the United States, I have performed several hundred hours of research into the techniques that are used during this procedure. I have been admitted as an expert medical witness in courts in Georgia, Tennessee, Pennsylvania, and Louisiana. I have filed affidavits that have been reviewed by courts in the above states and also Virginia, New York, Oklahoma, Alabama, Texas, California, and by the United States Supreme Court. During court proceedings I have heard testimony from prison wardens who are responsible for conducting executions by lethal injection. I have testified before the Nebraska Senate Judiciary Committee regarding proposed legislation to adopt lethal injection. My research regarding lethal injection has involved both extensive conversations with recognized experts in the field and personal correspondence with the individuals responsible for introducing lethal injection as a method of execution in Oklahoma and the United States.

3.    My qualifications are further detailed in my curriculum vitae, a copy of which is attached hereto as Exhibit A and incorporated by reference as if fully rewritten herein.

4.    Based on my research, which has included among other things, review of Oklahoma's lethal injection procedures: the web page entitled "Capital Punishment" on the Oklahoma Department of Corrections web site; email correspondence with William Wiseman, the Oklahoma legislator who proposed lethal injection as a method of execution; email correspondence with Dr. A. Jay Chapman, the Oklahoma Medical Examiner who devised the sequence of drugs to be used for lethal injection; documents provided by Lisa McCalmont including the affidavit of Mike Mullin, the declaration of Patrick Ehlers, the affidavit of Catherine Burton, and an article entitled "Post-Furman Botched Executions",

1

Exhibit XI-C

1903

it is my current understanding that at this time Oklahoma uses the following protocol to execute condemned inmates.

The drugs are introduced in an alternating sequence, in alternating arms:

a) sodium thiopental in the left arm, followed by a flush of saline in the left arm;
b) vecuronium bromide in the right arm, followed by a flush of saline in the right arm;
c) potassium chloride in the left arm, followed by a flush of saline in the left arm;

The process is then repeated, with the chemicals introduced in a different order:

d) potassium chloride in the right arm, followed by a flush of saline in the right arm;
e) sodium thiopental in the left arm, followed by a flush of saline in the left arm; and finally
f) vecuronium bromide in the right arm, followed by a flush of saline in the right arm.

5.  In order for the above protocol to achieve the goal of a humane death, it is essential that the pentothal succeeds in rendering the inmate unconscious. If for any reason the pentothal fails to render and maintain unconsciousness, the inmate will experience conscious paralysis due to vecuronium. Conscious paralysis is a terrifying experience in which the inmate would suffer the agony of suffocation, amplified by the terror of being unable to struggle in any way. Further, if the dose of pentothal fails to render and maintain unconsciousness, the inmate will experience the agony of the injection of concentrated potassium. Concentrated potassium, when injected into a vein, causes an excruciating burning pain. This pain would extend from the site of the injection (possibly in the hand or foot) all the way to the heart. To summarize, failure of the pentothal to render and maintain a state of unconsciousness would result in the inmate experiencing suffocation, paralysis, terror, and agonizing pain.

6.  Pentothal is a potent sedative/hypnotic agent and it is most likely that, if it is successfully administered in sufficient dose and distributed within the circulation and to the central nervous system, the inmate will be rendered unconscious for a considerable period of time.

7.  The preparation and administration of intravenous drugs is a complex endeavor that requires training, experience, and proficiency. There are many steps involved in the achieving the successful administration of the correct dose of a drug, and there are many opportunities for problems to arise which can thwart the goal of successfully delivering the intended dose of a drug.

8.  Opportunities for problems with the administration of pentothal and other drugs during lethal injection include, but may not be limited to the following:

2

1914

a) Manufacturing error or problem, leading to a "bad batch" of drug with reduced or absent efficacy.

b) Errors in preparation: pentothal is delivered in powdered form and must be mixed into an aqueous solution prior to administration. This preparation requires the correct application of pharmaceutical knowledge and familiarity with terminology and abbreviations. Calculations are also required, particularly if the protocol requires the use of a concentration of drug that differs from that which is normally used. Vecuronium is also delivered in powdered form, meaning that the above considerations also apply to this drug (although failure to properly calculate and prepare the dose of vecuronium would not render the execution more inhumane).

c) Error in labeling of syringes.

d) Error in selecting the correct syringe during the sequence of administration.

e) Error in correctly injecting the drug into the intravenous line. If a "three-way stopcock" is used the stopcock may be turned in the wrong direction, resulting in a retrograde injection of the drug into the IV fluid bag rather than into the inmate. The design of three-way stopcocks is counterintuitive to many individuals and the error of retrograde injection is widespread in clinical practice. Even seasoned professionals are known to make this error. If an injection port is used without a stopcock, the IV tubing must be pinched or kinked upstream from the injection site, otherwise a retrograde injection into the intravenous fluid bag is likely to occur. Many individuals are not aware of this requirement. If the drug is retrogradely injected into the IV fluid bag it will be greatly diluted and would take a very long time to drip into the inmate.

f) The IV tubing may leak. An "IV setup" consists of multiple components that are assembled by hand prior to use. If the personnel who are injecting the drugs are not at the bedside but are instead in a different room or part of the room, multiple IV extension sets need to be inserted between the inmate and the administration site. Any of these connections may loosen and leak. In clinical practice it is important to maintain visual surveillance of the full extent of IV tubing so that such leaks may be detected. The configuration of the death chamber and the relative positions of the executioners and the inmate may hinder or preclude such surveillance, thereby causing a failure to detect a leak. Further, in many executions it is customary to cover the inmate's body and extremities with a sheet; if the IV tubing runs under a sheet it is difficult or impossible to detect the leakage of drugs during injection. In particular, if the IV tubing were to be incorrectly inserted into the hub of the catheter there would be leakage of the drug under the sheet and under the inmate's body that would not be detectable.

g) Incorrect insertion of the catheter. If the catheter is not properly placed in a vein the pentothal will enter the tissue surrounding the vein but will not be delivered to the central nervous system and will not render the inmate unconscious. This condition, known as infiltration, occurs with regularity in the clinical setting. Recognition of infiltration requires continued surveillance of the IV site during

3

the injection, and that surveillance should be performed by the individual who is performing the injection so as to permit correlation between visual observation and tactile feedback from the plunger of the syringe.

h) Migration of the catheter. Even if properly inserted, the catheter tip may move or migrate, so that at the time of injection it is not within the vein. This would result in infiltration, and therefore a failure to deliver the drug to the inmate's circulation and failure to render the inmate unconscious.

i) Perforation or rupture or leakage of the vein. During the insertion of the catheter the wall of the vein can be perforated or weakened, so that during the injection some or all of the drug leaves the vein and enters the surrounding tissue. The likelihood of this occurring is increased if too much pressure is applied to the plunger of the syringe during injection, because a high pressure injection results in a high velocity jet of drug in the vein that can penetrate or tear the vessel wall.

j) Even without damage or perforation of the vein during insertion of the catheter, excessive pressure on the syringe plunger during injection can result in tearing, rupture, and leakage of the vein due to the high velocity jet that exits the tip of the catheter. Should this occur, the drug would not enter the circulation and would therefore fail to render the inmate unconscious.

k) Securing the catheter. After insertion catheters must be properly secured by the use of tape, adhesive material, or suture. Movement by the inmate, even if restrained by straps, or traction on the IV tubing may result in the dislodging of the catheter. If this were to occur under a sheet it would not be detected, and the drug would not enter the inmate's circulation and would not render the inmate unconscious.

l) Failure to properly administer flush solutions between injections of drugs. Paralytic agents such as pancuronium and vecuronium cause pentothal to precipitate out of solution on contact, thereby interfering with the delivery of the drug to the inmate and to the central nervous system.

m) Failure to properly loosen or remove the tourniquet from the arm or leg after placement of the IV catheter will delay or inhibit the delivery of the drugs by the circulation to the central nervous system. This may cause a failure of the pentothal to render and maintain the inmate in a state of unconsciousness.

n) Restraining straps may act as tourniquets and thereby impede or inhibit the deliver of drugs by the circulation to the central nervous system. This may cause a failure of the pentothal to render and maintain the inmate in a state of unconsciousness. Even if the IV is checked for "free flow" of the intravenous fluid prior to commencing injection, a small movement within the restraints on the part of the inmate could compress the vein and result in impaired delivery of the drug.

9. Procedures related to and involving the administration of intravenous drugs should only be undertaken and performed by personnel possessing the requisite experience, training, credentialing, and proficiency. In the United States there are several professions whose members may possess the requisite experience, training, credentialing, and proficiency

4

1906

for administering and managing intravenous fluid and drug delivery. These include nurses, emergency medical technicians, physicians, dentists, veterinarians, and physician's assistants. It should be noted that phlebotomy training does not require acquisition of the requisite experience, training, credentialing, and proficiency for administering and managing intravenous fluid and drug administration. Phlebotomists are trained and experienced in the withdrawal of blood specimens; this is an entirely different endeavor from the administration of intravenous fluids and drugs.

10. The protocol for Oklahoma lethal injections fails to adequately describe, define, and establish the qualifications of the personnel who will be responsible for the conduct of the lethal injection procedure. Mike Mullin, in his affidavit, states that "all personnel involved in the execution process with the Oklahoma Department of Corrections have had extensive training and experience in the execution process". However, Mr. Mullin does not characterize the training of these individuals. Further, it is not clear who is responsible for providing the training and who is responsible for ascertaining that the participants are in fact properly trained. Unless he himself is qualified in a health care profession it would not be possible for Mr. Mullin to make a meaningful determination about whether a given individual is qualified to prepare and administer intravenous drugs and fluids. Further, his statement about the training of personnel is vague. In most executions many personnel are involved, but many of them have tasks and assignments that relate to security and hosting of witnesses rather than to the administration of fluids and drugs. It seems highly unlikely that in fact all personnel are highly trained in the and experienced in the administration of intravenous fluids and drugs. This statement therefore leaves uncertainty as to the training, expertise, and proficiency, if any, that possessed by the individuals who actually set up the IV system, place the IV catheters, and administer the drugs and flush solutions.

11. The failure of the Oklahoma Department of Corrections to provide any reasonable assurance about the qualifications of the personnel serves to compound the risk that one of the problems outlined in section 8 (a–n) above will occur. Therefore, the failure of the Oklahoma Department of Corrections to provide any reasonable assurance about the qualifications of the personnel serves to compound the risk that the inmate will not receive a successful administration of the intended dose of pentothal, and therefore will be subjected to torture rather than a humane execution.

12. Past lethal injection procedures conducted by the Oklahoma Department of Corrections raise deep concerns about the consistency and reliability with which inmates have been successfully anesthetized with pentothal. The successful administration of a large dose of pentothal causes the rapid onset of deep unconsciousness. As the drug takes effect, over a period of a few seconds, one may observe respiratory activity reminiscent of a sigh, cough or gasp. Such activity may repeat one or two times, but would then cease. Prolonged struggling, breathing, gasping, or the appearance of partial consciousness would be inconsistent with the successful administration of a large dose of pentothal. As an example, a description of the execution of Scott Dawn Carpenter on May 8, 1997 states that "as the drugs took effect, carpenter began to gasp and shake....this was followed by a guttural sound, multiple spasms and gasping for air until his body stopped

5

1907

moving three minutes later." This description does not comport with the successful administration of a large dose of pentothal. In particular, the successful administration of a large dose of pentothal would be expected to result in a rapid loss of consciousness and loss of all physical activity and movement, rather than the gasping and spasms that lasted for three minutes. As another example, the description of the execution of Robyn Lee Parks, which took place on March 10, 1992, states that "Parks had a violent reaction to the drugs used in lethal injection. Two minutes after the drugs were dispensed, the muscles of his jaw, neck, and abdomen began to react spasmodically for approximately 45 seconds. Parks continued to gasp and violently gag until death came, some eleven minutes after the drugs were first administered. Tulsa World reporter Wayne Greene wrote that the execution looked "painful and ugly" and "scary". "It was overwhelming, stunning, disturbing -- an intrusion into a moment so personal that reporters, taught for years that intrusion is their business, had trouble looking each other in the eyes after it was over." As with the execution of Scott Dawn Carpenter, this description is inconsistent with the successful administration of a large dose of pentothal. It is not possible to discern the reason for the failure to properly anesthetize these individuals. Nevertheless, description such as these raise deep concerns that one or more of the problems listed in section 8(a-n) above has occurred. As another example, witnesses to this execution of Loyd LaFevers on January 30, 2001 describe repeated gasping and efforts to lift his body from the gurney. Additionally, one witness describes a bruise or discoloration on one of Mr. LaFevers' arms, consistent with infiltration of the IV site. In this case it is quite possible for the prolonged gasping and struggling is that the IV site that was supposed to deliver the pentothal was infiltrated, and that the witnesses were observing Mr. LaFevers struggling to breathe as the paralytic agent took effect. Access to information regarding autopsy findings, and in particular, access to information regarding post-mortem blood pentothal levels, would likely be helpful in answering the important question of whether these and other lethal injection procedures were humane or cruel.

13. As described above, post-mortem blood levels of pentothal would likely be helpful in forming a rational determination as to whether lethal injection has been conducted in such a fashion as to provide consistent and reliable administration of pentothal. While I have not been provided access to information held by Oklahoma in this regard, it is worthwhile to comment on information provided by North Carolina, because the protocol and personnel used by North Carolina to perform lethal injections are similar to those used by Oklahoma. Review of toxicology reports of post-mortem blood pentothal levels in prisoners who were executed by lethal injection shows that there is a wide range of concentrations. Further, in the cases of some prisoners the measured level of pentothal was extremely low (Michael Earl Sexton - 3.7 mg/L, Desmond Keith Carter - trace, James R. Edwards 2.6 mg/L). Blood concentrations in this range are highly unlikely to produce unconsciousness. These reports were generated by the Office of the North Carolina Medical Examiner and there is no reason to believe that they are anything other than highly reliable. These reports raise serious concerns as to whether these inmates were adequately anesthetized during their lethal injection procedures. Because of the similarities between North Carolina's and Oklahoma's execution procedures, these reports also raise concerns therefore about the consistency and reliability with which Oklahoma

6

1908

has delivered humane anesthetizing doses of pentothal during the conduct of lethal injection. This concern is further amplified by the witness description noted in paragraph 12 above.

14. The Oklahoma lethal injection protocol is unusual or even unique in the way it uses two IV catheters for the injection of drugs. This protocol greatly increases the risk that an inmate will experience conscious paralysis and suffocation and pain during an execution. It is critical to note that in this protocol pentothal is injected in the left arm only. Therefore, if any of the problems enumerated in section 8 (a-n) should occur with respect to the left arm IV then the inmate will only receive vecuronium and potassium. This would result in an excruciatingly torturous death as a result of paralysis and asphyxiation from the vecuronium and burning pain in the vein and chest from potassium.

15. The unusual or unique method of using two IV catheters for the injections of drugs is blatantly reckless and inadequate, and raises serious concerns about the qualifications and experience of the personnel who designed the protocol. The protocol itself provides no information about the credentials or expertise of the individuals who designed the protocol. Mr. Mullin, in his affidavit, states that the individuals who designed the protocol are Medical Professionals in the Medical Examiner's Office and Oklahoma Department of Corrections Pharmacy. The great majority of medical professionals and pharmacists do not possess the requisite training and professional experience to design a humane lethal injection protocol. Lethal injection is modeled after the induction of general anesthesia, and the protocol should be conceived and designed by individuals with expertise in this area. In particular, it is strange that the Medical Examiner's office would be consulted. Medical Examiners are likely to be trained pathologists and are unlikely to have the requisite experience and training to participate in the design of a protocol that is modeled after the induction of general anesthesia.

16. The Oklahoma lethal injection protocol appears to make no provisions for the foreseeable situation in which intravenous access requires the placement of a central venous catheter via a cut-down procedure. In some individuals access to a superficial vein is difficult or effectively impossible. This problem has occurred during lethal injection procedures in many states including, according to the affidavit of Mike Mullin, Oklahoma. In the case described by Mr. Mullin, the Oklahoma DOC performed a cut-down procedure to establish intravenous access in a deep or central vein. Performance of a cut down procedure requires the availability of suitable equipment and supplies, and the presence of personnel who are specifically proficient in this procedure. The failure to require the availability of such equipment and personnel exposes inmates to the risk of unnecessary pain and injury, and may even result in death from hemorrhage or other complications.

17. The affidavit of Mr. Mike Mullin states that Oklahoma has used a variety of paralytic agents during the conduct of lethal injection procedures. These agents include curare, succinylcholine, and vecuronium. It is my strongly held opinion, to a high degree of medical certainty, that if sufficient doses of a barbiturate and potassium are successfully administered, that the use of paralytic agents is unnecessary to cause death. Further, it is my opinion to a high degree of medical certainty that the use of paralytic agents increases

7

the risk that an execution will be cruel and inhumane. In particular, the use of paralytic agents, compounded by the possibility of errors as described in 8(a-n) above, and further compounded by the failure to require the use of properly qualified personnel, and further compounded by the failure to obtain adequate expert guidance in the design of the protocol, exposes the inmate and the state of Oklahoma itself to a needlessly high and unacceptable risk of conducting cruel and inhumane executions. It is important to note that the professional community of veterinarians in the United States eschews the use of paralytic agents during euthanasia procedures for the same concerns about cruelty that are outlined in this affidavit.

18.   The selection or choice of an ultra-short acting barbiturate by Oklahoma also warrants comment. Veterinary guidelines suggest the use of a long acting barbiturate for animal euthanasia, the purpose being to prevent the anesthetic effect from wearing off prior to the death of the pet or animal. It is unclear why Oklahoma would select thiopental, which is an ultra-short acting barbiturate, as this choice increases the chance that an inmate would recover consciousness, while paralyzed, during an execution. In particular, if any of the problems outlined in section 8(a-n) above were to occur and were to result in the delivery of a sufficiently low dose of pentothal, the inmate would indeed wake up in the middle of the procedure. It would be helpful if Oklahoma could provide documentation of the discussions and deliberation that led to the decision to select an ultra-short acting barbiturate to achieve unconsciousness and anesthesia during lethal injection procedures.

19.   In summary, there are multiple areas in which the Oklahoma lethal injection protocol is deficient in providing a reasonable assurance that the procedure will be accomplished in a humane fashion. Further, as a result of these deficiencies, there is a real and unnecessary risk that inmates executed by lethal injection in Oklahoma will be subjected to excruciating agony and torture.

8

FURTHER AFFIANT SAYETH NOT.

_____
Mark J. S. Heath, M.D.

Subscribed and sworn to before me the _3_ day of March, by the person known to me to be Mark J. S. Heath.

_____
Notary Public

My commission expires: ___7/21/07___

My commission number is : __O2. PA6095971__

LIA PASCALE
Notary Public - State of New York
No. 02PA6095971
Qualified in New York County
My Commission Expires July 21, 2007

9

1911

Curriculum Vitae

1)   Date of preparation:   October 6, 2003

2)   Name:                  Mark J. S. Heath

     Birth date:            March 28, 1960
     Birthplace:            New York, NY
     Citizenship:           United States, United Kingdom

3)   Academic Training:

     Harvard University                          B.A., Biology, 1983

     University of North Carolina, Chapel Hill   M.D., 1987

     Medical License                             New York: 177101-1

4)   Traineeship:

     1987 – 1988   Internship, Internal Medicine, George Washington University Hospital, Washington, DC.

     1988 – 1991   Residency, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

     1991 – 1993   Fellowship, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

5)   Board Qualification:

     Diplomate, American Board of Anesthesiology, October 1991.

6)   Military Service:      None

7)   Professional Organizations:

     American Society of Anesthesiologists
     International Anesthesia Research Society
     Society of Cardiovascular Anesthesiology

8)   Academic Appointments:

     1993 – 2002     Assistant Professor of Anesthesiology, Columbia University, New York, NY

     2002 - present  Assistant Professor of Clinical Anesthesiology, Columbia University, New York, NY

9)   Hospital/Clinical Appointments:

EXHIBIT A

1912

1993 – present    Assistant Attending Anesthesiologist, Presbyterian Hospital, New York, NY.

10) Honors:

Magna cum laude, Harvard University
Alpha Omega Alpha, University of North Carolina at Chapel Hill
First Prize, New York State Society of Anesthesiologists Resident Presentations, 1991

11) Fellowship and Grant Support:

Foundation for Anesthesia Education and Research, Research Starter Grant Award, Principal Investigator, funding 7/92 - 7/93, $15,000.

Foundation for Anesthesia Education and Research Young Investigator Award, Principal Investigator, funding 7/93 - 7/96, $70,000.

NIH    KO8 "Inducible knockout of the NK1 receptor"
Principal Investigator, KO8 funding 12/98 - 11/02,
$431,947 over three years
(no-cost extension to continue through 11/30/2002)

NIH    RO1 "Tachykinin regulation of anxiety and stress responses"
Principal Investigator, funding 9/1/2002 – 8/30/2007
$1,287,000 over 5 years

12) Departmental and University Committees:

Research Allocation Panel (1996 – 2001)
Institutional Review Board (Alternate Boards 1-2, full member Board 3)
(2003 - present)

13) Teaching:

Lecturer and clinical teacher: Anesthesiology Residency Program, Columbia University and Presbyterian Hospital, New York, NY

Advanced Cardiac Life Support Training

Invited Lecturer:

*NK1 receptor functions in pain and neural development*, Cornell University December 1994

*Anxiety, stress, and the NK1 receptor*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

*Anesthetic Considerations of LVAD Implantation*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

1913

*NK1 receptor function in stress and anxiety*, St. John's University Department of Medicinal Chemistry, March 2002

*Making a brave mouse (and making a mouse brave)*, Mt.Sinai School of Medicine, May 2002

*Anesthetic considerations of LVAD implantation*.  Recurrent lecture at Columbia University LVAD implantation course.

14)    Grant Review Committees:    None

1914

15)    Publications:

Original peer reviewed articles
*    Santarelli, L., Gobbi, G., Debs, P.C., Sibille, E. L., Blier, P., Hen, R., Heath, M.J.S. (2001). Genetic and pharmacological disruption of neurokinin 1 receptor function decreases anxiety-related behaviors and increases serotonergic function. Proc. Nat. Acad. Sci., 98(4), 1912 – 1917.

*    King, T.E. [δ], Heath M. J. S[δ]., Debs, P, Davis, MB, Hen, R, Barr, G. (2000). The development of nociceptive responses in neurokinin-1 receptor knockout mice. Neuroreport.;11(3), 587-91    δ authors contributed equally to this work

*    Heath, M. J. S., Lints, T., Lee, C. J., Dodd, J. (1995). Functional expression of the tachykinin $NK_1$ receptor by floor plate cells in the embryonic rat spinal cord and brainstem. Journal of Physiology 486.1, 139 -148.

*    Heath, M. J. S., Womack M. D., MacDermott, A. B. (1994). Subsance P elevates intracellular calcium in both neurons and glial cells from the dorsal horn of the spinal cord. Journal of Neurophysiology 72(3), 1192 - 1197.

McGehee, D. S., Heath, M. J. S., Gelber, S., DeVay, P., Role, L.W. (1995) Nicotine enhancement of fast excitatory synaptic transmission in the CNS by presynaptic receptors. Science 269, 1692 - 1696.

Morales D, Madigan J, Cullinane S, Chen J, Heath, M. J. S., Oz M, Oliver JA, Landry DW. (1999). Reversal by vasopressin of intractable hypotension in the late phase of hemorrhagic shock. Circulation. Jul 20;100(3):226-9.

LoTurco, J. J., Owens, D. F., Heath, M. J. S., Davis, M. B. E., Krigstein, A. R. (1995). GABA and glutamate depolarize cortical progenitor cells and inhibit DNA synthesis. Neuron 15, 1287 - 1298.

Kyrozis A., Goldstein P. A., Heath, M. J. S., MacDermott, A. B. (1995). Calcium entry through a subpopulation of AMPA receptors desensitized neighboring NMDA receptors in rat dorsal horn neurons. Journal of Physiology 485.2, 373 - 381.

McGehee, D.S., Aldersberg, M. , Liu, K.-P., Hsuing, S., Heath, M.J.S. , Tamir, H. (1997). Mechanism of extracellular $Ca^{2+}$-receptor stimulated hormone release from sheep thyroid parafolicular cells. Journal of Physiology: 502,1, 31 - 44.

Kao, J., Houck, K., Fan, Y., Haehnel, I., Ligutti, S. K., Kayton, M. L., Grikscheit, T., Chabot, J., Nowygrod, R., Greenberg, S., Kuang, W.J., Leung, D. W., Hayward, J. R., Kisiel, W., Heath, M. J. S., Brett, J., Stern, D. (1994). Characterization of a novel tumor-derived cytokine. Journal of Biological Chemistry 269, 25106 - 25119.

Dodd, J., Jahr, C.E., Hamilton, P.N., Heath, M.J.S., Matthew, W.D., Jessell, T.M. (1983). Cytochemical and physiological properties of sensory and dorsal horn neurons that transmit cutaneous sensation. Cold Spring Harbor Symposia of Quantitative Biology 48, 685 -695.

1915

Pinsky, D.J., Naka, Y., Liao, H., Oz, M. O., Wagner, D. D., Mayadas, T. N., Johnson, R. C., Hynes, R. O., Heath, M.J.S., Lawson, C.A., Stern, D.M. Hypoxia-induced exocytosis of endothelial cell Weibel-Palade bodies. Journal of Clinical Investigation 97(2), 493 - 500.

## Case reports                    none

## Review, chapters, editorials

*        Heath, M. J. S., Dickstein, M. L. (2000). Perioperative management of the left ventricular assist device recipient. Prog Cardiovasc Dis.;43(1):47-54.

*        Dickstein. M.L.. Mets B. Heath M.J.S. (2000). Anesthetic considerations during left ventricular assist device implantation. Cardiac Assist Devices pp 63 – 74.

*        Heath, M. J. S. and Hen, R. (1995). Genetic insights into serotonin function. Current Biology 5.9, 997 -999.

*        Heath, M.J.S., Mathews D. (1990). Care of the Organ Donor. Anesthesiology Report 3, 344-348.

*        Heath, M. J. S., Basic physiology and pharmacology of the central synapse. (1998) Anesthesiology Clinics of North America 15(3), 473 - 485.

## Abstracts

Heath, M.J.S., Davis, M., Santarelli L., Hen H. (2002). Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus. IARS American-Japan Congress A-15.

Heath, M.J.S., Davis, M., Santarelli L., Hen H. (2002). Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus. Anesthesiology 95:A-811.

Heath, M.J.S., Davis, M., Santarelli L., Hen H. (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212

Heath, M.J.S., Davis, M., Santarelli L., Hen H. (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212.

Heath, M.J.S., Santarelli L, Hen H. (2001) The NK1 receptor is necessary for the stress-evoked expression of c-Fos in the paraventricular nucleus of the hypothalamus. Anesthesia and Analgesia 92; S233.

Heath, M.J.S., Santarelli L, Debs P, Hen H. (2000). Reduced anxiety and stress responses in mice lacking the NK1 receptor. Anesthesiology 93: 3A A-755.

1916

Heath, M.J.S., King, T., Debs, P.C., Davis M., Hen R., Barr G. (2000). NK1 receptor gene disruption alters the development of nociception. Anesthesia and Analgesia; 90; S315.

Heath, M.J.S., Lee, J.H., Debs, P.C., Davis, M. (1997). Delineation of spinal cord glial subpopulations expressing the NK1 receptor. Anesthesiology; 87; 3A; A639.

Heath, M.J.S., MacDermott A.B. (1992). Substance P elevates intracellular calcium in dorsal horn cells with neuronal and glial properties. Society for Neuroscience Abstracts; 18; 123.1.

Heath, M.J.S., Lee C.J., Dodd J. (1994). Ontogeny of NK1 receptor-like immunoreactivity in the rat spinal cord. Society for Neuroscience Abstracts; 20; 115.16.

Heath, M.J.S., Berman M.F. (1991) Isoflurane modulation of calcium channel currents in spinal cord dorsal horn neurons. Anesthesiology 75; 3A; A1037.

1918

# Papers

# Ethnographic study of incidence and severity of intravenous drug errors

Katja Taxis, Nick Barber

## Abstract

**Objectives** To determine the incidence and clinical importance of errors in the preparation and administration of intravenous drugs and the stages of the process in which errors occur.
**Design** Prospective ethnographic study using disguised observation.
**Participants** Nurses who prepared and administered intravenous drugs.
**Setting** 10 wards in a teaching and non-teaching hospital in the United Kingdom.
**Main outcome measures** Number, type, and clinical importance of errors.
**Results** 249 errors were identified. At least one error occurred in 212 out of 430 intravenous drug doses (49%, 95% confidence interval 45% to 54%). Three doses (1%) had potentially severe errors, 126 (29%) potentially moderate errors, and 83 (19%) potentially minor errors. Most errors occurred when giving bolus doses or making up drugs that required multiple step preparation.
**Conclusions** The rate of intravenous drug errors was high. Although most errors would cause only short term adverse effects, a few could have been serious. A combination of reducing the amount of preparation on the ward, training, and technology to administer slow bolus doses would probably have the greatest effect on error rates.

## Introduction

Intravenous therapy is a complex healthcare technology. In the United Kingdom, as in most other European countries, nurses generally prepare and administer intravenous drugs prescribed by doctors. Administration of intravenous therapy is associated with considerable risk—for example, patients have died when cytotoxic drugs have been given intrathecally instead of intravenously.[1] The UK Department of Health has made this particular type of error one of its prime targets in increasing patient safety.[2] Similar initiatives have been proposed in the United States.[3]

Little prospective research has been done into the incidence, causes, and severity of intravenous drug errors. Single site studies carried out on one or two wards have reported errors in preparing and administering intravenous drugs of 13%-84%,[4-7] but the studies used different definitions and did not assess the severity of errors. Epidemiological studies using retrospective record review have shown that adverse drug events are common but have not provided detailed analysis of the type of errors.[8-11] We therefore conducted an ethnographic prospective study using defined measures to determine the incidence of errors in preparing and administering intravenous drugs, to identify the stages in the process in which errors occur, and to evaluate their clinical importance.

## Participants and methods

We used a purposive sampling strategy to select study hospitals and study wards, with the aim of exploring the preparation and administration of intravenous drugs in a range of settings. We selected a university teaching hospital and a non-teaching general hospital of similar size (about 20 wards and 400 beds). We did a pilot study to determine the frequency of use of intravenous drugs on each ward and then selected a total of 10 wards with high, medium, and low usage.

Both hospitals operated a typical British ward pharmacy service. Doctors recorded prescriptions on formatted inpatient drug charts, and nurses used the charts to determine the doses due and record the administration of drugs. Ward pharmacists ordered drugs that were not stored on the ward and reviewed the appropriateness of prescribed drugs every weekday. Nurses usually prepared and administered intravenous drugs on the wards, but cytotoxic drugs were prepared centrally by the pharmacy department. Nurses had to attend a one day training course before they were allowed to give intravenous drugs. A guide to preparation and administration of intravenous drugs was available on each ward.

### Identification of errors

We defined an intravenous drug error as a deviation in preparation or administration of a drug from a doctor's prescription, the hospital's intravenous policy, or the manufacturer's instructions. The clinical appropriateness of the prescription was not assessed. All errors had to have the potential to adversely affect the patient, so deviations from hospital procedures, such as not checking name bands or not labelling infusions, were not considered as errors if the correct drug was given to the patient. Deviations from prescribed administration time were not considered errors. We excluded errors if they were corrected by a member of

Department of Practice and Policy, School of Pharmacy, University of London, London WC1 1AX
Katja Taxis
*assistant professor in pharmacy*
Nick Barber
*professor of the practice of pharmacy*

Correspondence to:
K Taxis,
Pharmazeutische Biologie,
Pharmazeutisches Institut, Universität Tübingen, Auf der Morgenstelle 8,
72076 Tübingen,
Germany
katja.taxis@uni-tuebingen.de

bmj.com 2003;326:684

Exhibit XI-D

1919

Papers

staff or the patient before administration. Errors were related to particular actions; multiple errors could occur in each case of preparation and administration.

We chose a prospective ethnographic research method to collect data. A trained and experienced observer (KT) accompanied nurses during intravenous drug rounds. She recorded the preparation and administration of each drug on a standard form. Information came from observation and talking informally to staff. The researcher intervened in a discreet and non-judgmental manner when she became aware of a potentially serious error; these incidents were still included as an error. Ward staff were told that we were investigating common problems of preparing and administering intravenous drugs; this disguised observation method has been shown to be valid.[12] The researcher avoided the word error to prevent the study from appearing threatening to staff. Each nurse gave permission for observation.

Data were collected on 6-10 consecutive days on each ward between June 1999 and December 1999. To be representative, the study included weekends and all times of drug rounds on each ward. The researcher attended two to three drug rounds out of the four that took place each day.

### Importance of errors

We used a validated scale to assess the clinical importance of intravenous drug errors.[13] Briefly, four experienced healthcare professionals (one doctor, one nurse, and two pharmacists) scored the potential clinical importance of each drug error on a visual analogue scale between zero (labelled as no harm) and 10 (death). The mean score was calculated for each drug error. Mean scores below 3 suggested a minor outcome, scores of 3-7 a moderate outcome, and scores above 7 a severe outcome.

### Analysis of data

The data on the incidence of intravenous drug errors is expressed in two ways: errors per dose and errors per process stage (boxes 1 and 2). KT classified the errors and NB checked them. We calculated proportions and 95% confidence intervals using standard methods.[14]

## Results

A total of 113 nurses and one doctor were observed over 76 days (table 1). Table 2 shows the number of



Box 1: Classification of intravenous drug errors according to stage of occurrence (categories are mutually exclusive)

Preparation stage:
Identification of prescription
Preparation process:
    Ready for administration
    One step preparation, eg measuring a drug solution
    Multiple step preparations, eg measuring and diluting a drug solution, reconstitution of a drug

Administration stage:
Identification of the patient
Administration process:
    Bolus dose injection, usually 3 to 5 min
    Intermittent infusion
    Continuous infusion

Box 2: Classification of type of intravenous drug errors (categories are mutually exclusive)

Preparation errors:
Preparation of wrong drug
Preparation of an unauthorised drug
Errors in solvent/diluent (use of wrong solvent/diluent or wrong volume)
Preparation of wrong dose
Omission of prescribed drug
Other

Administration errors:
Administration to wrong patient
Fast administration of bolus dose through a peripheral line
Fast administration of bolus dose through a central line
Incompatibility errors
Other

**Table 1** Position of staff included in the study

| Staff grade | No of observations |
| --- | --- |
| Staff nurse | 280 |
| Ward manager/sister | 73 |
| Bank/agency nurse | 62 |
| Student nurse | 11 |
| Doctor | 4 |
| Total | 430 |

observations on each ward. All the nurses agreed to participate. On three occasions ward managers asked the researcher not to observe a particular drug round as the general workload on the ward was high. Altogether 1042 doses of intravenous drugs, representing 35 different drugs, were prescribed for 106 patients during the study. Our observations were representative for the study period: 41% (430) of all intravenous drug doses prescribed were observed; administrations of 91% (32) of the prescribed drugs was observed at least once; and 92% (98) of patients who were prescribed regular intravenous drugs were observed at least once. The researcher intervened in 12 cases to prevent an error reaching the patient.

One or more errors occurred in the preparation and administration of 212 out of 430 intravenous drug doses (error rate 49%, 95% confidence interval 45% to

**Table 2** Number of observations by type of ward

| Type of ward | No of observations |
| --- | --- |
| University teaching hospital: | |
| General medical ward | 41 |
| Renal ward | 41 |
| Cardiothoracic surgical ward | 42 |
| Coronary intensive care unit | 67 |
| Neonatal ward | 29 |
| Oncology ward | 33 |
| Non-teaching hospital*: | |
| General surgical ward | 64 |
| General medical ward | 58 |
| Intensive care unit | 39 |
| Paediatric ward | 16 |
| Total | 430 |

*Former district general hospital.



Papers

54%). A total of 249 errors were identified. Preparation errors occurred in 32 intravenous doses (7%), administration errors in 155 doses (36%), and both types of error in 25 doses (6%). Errors were potentially severe in three doses (1%), potentially moderate in 126 (29%), and potentially minor in 83 (19%). Box 3 describes the three severe errors and typical examples of moderate and minor errors.

The figure shows the incidence of errors at each stage of drug preparation and administration. Most preparation errors were associated with multiple step preparations—for example, drugs that required reconstitution with a solvent and addition of a diluent. Typical errors were preparing the wrong dose or selecting the wrong solvent. All three severe errors occurred at this stage. A few errors occurred in identifying prescriptions—for example, not seeing a drug order. Most errors occurred when giving bolus doses, with errors in 172/235 (73%) doses. In most of these cases (163, 95%) the dose was given faster than recommended, which is usually three to five minutes; more than half of these errors (85, 52%) were considered to be of potential moderate severity. Table 3 gives a more detailed analysis of the type and severity of the errors.

## Discussion

We found a high incidence of errors in the preparation and administration of intravenous drugs. Although most were unlikely to cause lasting harm, some were serious. The sample was taken from two types of hospital and included a range of patients, nurses, drugs, drug administration times, ward specialties, and frequency of drug administration on the ward. We have used explicit methods, definitions, and tools that we hope others can use elsewhere for research and audit.

Although the proportion of serious errors is small, the number of patients and intravenous doses in a hospital means that errors may be more common than expected. A point prevalence study we carried out in the university teaching hospital (400 beds) showed that about 112 (28%) of inpatients received intravenous drugs, resulting in more than 300 doses a day. Although we cannot extrapolate with any precision, our data suggest that at least one patient will experience a potentially serious intravenous drug error every day in a hospital of that size. Hence, intravenous drug errors are a potential source of serious harm for patients and risk reduction strategies should be developed accordingly.

### Reducing the risks

Our analysis shows that the two weak stages in the system are drugs that require multiple step preparation and administration of doses as a bolus. Several strategies could be used to reduce multiple step preparation errors. Centralised preparation of intravenous drugs by the pharmacy department was suggested in the 1970s in the United Kingdom but was rarely adopted.[15] Centralised preparation of intravenous drugs is common in the United States[16] but not in Europe, apart from in specialised areas such as oncology.[17] The evidence for centralised services is currently weak, and it is unclear whether they are cost effective or improve the quality of the service.[18-21] An alternative strategy would be to purchase ready



### Box 3: Examples of intravenous drug errors

**Potentially severe errors**
- The whole content of a vial containing 125 000 international units of heparin was prepared as a continuous infusion, resulting in a five times overdose (severity score 8.4; general medical ward, teaching hospital). Comment: Haemorrhage is one of the serious, potentially life threatening complication of an overdose of heparin.
- A nurse injected 750 mg vancomycin into an infusion bag of 0.9% sodium chloride (already connected to the patient's cannula) without mixing the solution. The patient is likely to have initially received a concentrated solution of vancomycin as a bolus (severity score 7.3; renal ward, teaching hospital). Comment: Rapid infusions of vancomycin carry the risk of reactions such as severe hypotension (including shock and cardiac arrest) and flushing of the upper body.
- A patient's continuous infusion of adrenaline (epinephrine) was interrupted for about 10 minutes as the new infusion had not been prepared in advance (severity score 7.5; intensive care unit, non-teaching hospital). Comment: This patient's blood pressure decreased to about 50/30 mm Hg. A bolus dose of adrenaline and midazolam was given to stabilise him until the adrenaline infusion was restarted.

**Potentially moderate errors**
- A nurse measured 0.2 mg metoclopramide using a 1 ml syringe and then drew up 0.9% sodium chloride into the same syringe. This was administered as a bolus dose. Using this preparation technique, the metoclopramide contained in the dead space of the syringe (hub and needle) was also administered to the patient, resulting in a two to three times overdose (severity score 7.0; neonatal ward, teaching hospital). Comment: Side effects include extrapyramidal effects, which are more likely in children. There are also reports of cardiac conduction abnormalities.
- A patient's lunchtime dose of 750 mg cefuroxime was omitted because of his transfer to another ward at lunchtime (severity score 4.1; cardiothoracic surgical ward, teaching hospital). Comment: Successful anti-infective therapy depends on achieving effective levels.
- Administration of 80 mg furosemide (frusemide) over 45 seconds through a peripheral vein (severity score 6.1; general surgical ward, non-teaching hospital). Comment: The recommended duration of administration was 20 min (4 mg/min). Tinnitus and deafness are among the side effects reported after rapid administration.

**Potentially minor errors**
- Preparation of 1.2 g co-amoxiclav using 10 ml instead of 20 ml water for injection (severity score 2.8; general surgical ward, non-teaching hospital). Comment: The drug may not dissolve completely when insufficient solvent is used. Concentrated solutions may also increase the risk of thrombophlebitis.
- Administration of 500 mg amoxicillin/10 ml of water by injection over 2.5 minutes rather than through a peripheral vein over 3-5 minutes (severity score 2.9; general medical ward, teaching hospital). Comment: More rapid administration may damage the blood vessels but is unlikely in this case.

prepared intravenous drugs from pharmaceutical companies.

The effect of the above changes would have to be assessed carefully. New types of errors could be



| | Bolus dose injection 172/235 (73%) |
|---|---|
| Ready for administration 0/53 | Identification of prescription 12/430 (3%) → One step preparation 0/32 → Identification of patient 0/430 → Intermittent infusion 15/163 (9%) |
| Multiple step preparation 50/345 (14%) | Continuous infusion 0/32 |

Stages and errors in preparation and administration of intravenous drugs (numbers of errors/number of observations of each stage)

1921

## Papers

**Table 3** Type and clinical importance of errors in preparation and administration of intravenous drugs. Values are numbers (percentages) of errors in 430 observations

| Type of error* | Importance of error | | | Total |
| --- | --- | --- | --- | --- |
| | Minor | Moderate | Severe | |
| **Preparation errors:** | | | | |
| Errors in solvent/diluent | 20 (5) | 16 (4) | 0 | 36 (8) |
| Wrong dose | 0 | 11 (3) | 1 (0.2) | 12 (3) |
| Omission | 0 | 12 (3) | 0 | 12 (3) |
| Other | 0 | 0 | 2 (0.5) | 2 (0.5) |
| **Administration errors:** | | | | |
| Fast bolus dose (peripheral line) | 64 (15) | 63 (15) | 0 | 127 (30) |
| Fast bolus dose (central line) | 14 (3) | 22 (5) | 0 | 36 (8) |
| Incompatibilities | 1 (0.2) | 11 (3) | 0 | 12 (3) |
| Other | 3 (7) | 9 (2) | 0 | 12 (3) |

*No errors were observed in the categories of preparing the wrong drug, using an unauthorised drug, or administration to the wrong patient.

introduced, such as transmission errors from the ward to the preparation department.[22] Furthermore, nurses who are no longer used to preparing intravenous drugs may make serious errors if they have to prepare drugs in an emergency.

Technical solutions could reduce the frequent errors from rapid bolus injections—for example, a pump that prevents fast administration of bolus doses. Staff training could improve awareness of drugs that have a high risk of adverse effects when given too fast. A warning could also be put on the drugs by the pharmacy.

**Validity of study**

The effect of the observer on the observed is often discussed as a possible limitation of ethnographic observation methods.[23] The error rate may be even higher in the absence of the researcher. However, a previous observation based study using a similar method showed that the drug error rate is unlikely to be affected by the observer, even if the observer occasionally intervenes.[12] Modification of behaviour is minimal once the researcher is an accepted member of the group and part of the social context.[24] The researcher seemed to have been accepted in our study, and some initial activities by nurses, such as wearing gloves to make up the doses, were soon abandoned. Using an observation based approach allowed us to explore drugs errors that would not have been documented and therefore missed by studies relying on review of hospital records.[8 9 11]

**Conclusions**

Our study shows that errors in the preparation and administration of intravenous drugs remain a concern in the United Kingdom, 25 years after the problem was first highlighted. Steps to ensure the correct administration of bolus doses and to reduce mistakes in making up drugs that require multiple step preparation will have the greatest effect on error rates.

We thank the staff of the two participating hospitals.

Contributors: KT and NB designed the study and wrote the paper. KT collected the data and was responsible for data analysis. KT and NB are guarantors.

Funding: School of Pharmacy, University of London. The guarantors accept full responsibility for the conduct of the study, had access to the data, and controlled the decision to publish.

Competing interests: None declared.

Ethical approval: The ethics committees of the participating hospitals approved the study.

**What is already known on this topic**

Errors in preparing and administering intravenous drugs can cause considerable harm to patients

Reduction of drug errors is a government health target in the United Kingdom and the United States

**What this study adds**

Errors occurred in about half of the intravenous drug doses observed

Errors were potentially harmful in about a third of cases

The most common errors were giving bolus doses too quickly and mistakes in preparing drugs that required multiple steps

1  Dyer C. Doctors cleared of manslaughter. *BMJ* 1999;318:148.
2  Department of Health. *Building a safer NHS for patients.* London: Stationery Office, 2001.
3  Institute of Medicine Committee on the Quality of Health Care in America. *To err is human.* Washington: National Academy Press, 2000.
4  Thur MP, Miller WA, Latiolais CJ. Medication errors in a nurse-controlled parenteral admixture program. *Am J Hosp Pharm* 1972;29:298-304.
5  Hartley GM, Dhillon S. An observational study of the prescribing and administration of intravenous drugs in a general hospital. *Int J Pharm Pract* 1998;6:38-45.
6  O'Hare MCB, Gallagher T, Shields MD. Errors in the administration of intravenous drugs. *BMJ* 1995;310:1536-7.
7  Clark CM, Bailie GR, Whitaker AM, Goldberg LA. Parenteral drug delivery—value for money? *Pharm J* 1986;236:453-5.
8  Brennan TA, Leape LL, Laird N, Herbert L, Localio AR, Lawthers AG, et al. Incidence of adverse events and negligence in hospitalized patients. *N Engl J Med* 1991;324:370-6.
9  Leape LL, Brennan TA, Laird N, Lawthers AG, Localio AR, Barnes BA, et al. The nature of adverse events in hospitalized patients. *N Engl J Med* 1991;324:377-84.
10  Wilson RM, Runciman WB, Gibberd RW, Harrison BT, Newby L, Hamilton JD. The quality in Australia health care study. *Med J Aust* 1995;163:458-71.
11  Vincent C, Neale G, Woloshynowych M. Adverse events in British hospitals: preliminary retrospective record review. *BMJ* 2001;322:517-9.
12  Dean B, Barber N. Validity and reliability of observational methods for studying medication administration errors. *Am J Health Syst Pharm* 2001;58:54-9.
13  Dean BS, Barber ND. A validated, reliable method of scoring the severity of medication errors. *Am J Health Syst Pharm* 1999;56:57-62.
14  Gardner MJ, Altman DG. *Statistics with confidence.* London: BMJ Publications, 1989.
15  Department of Health and Social Security. *Report of the working party on the addition of drugs to intravenous infusion fluids (Breckenridge report).* London: DHSS, 1976.
16  Brzozowski DF, Hale KM, Segal R, Mirtallo JM. Pharmacists' opinion about and compliance with recommendations for intravenous admixture practices. *Am J Health Syst Pharm* 1987;44:2077-84.
17  Delaney T. EAHP survey of hospital-based pharmaceutical services in Europe, 1995. *Eur Hosp Pharm* 1996;2:92-105.
18  Armour DJ, Cairns CJ, Costello I, Riley SJ, Davies EG. The economics of a pharmacy-based central intravenous additive service for pediatric patients. *PharmacoEconomics* 1997;10:386-94.
19  Chan R, Ryan M, Moriarty S, Feely J, Sabra K. The impact of a centralized reconstitution of intravenous additives service on administration times of intravenous antibiotics. *Eur J Hosp Pharm* 1993;3:93-5.
20  Cousins DH, Lee M, Stanaway M, Neary C. Implementation and evaluation of a centralised IV additive service for antibiotic injections. *Pharm J* 1989;242:HS14-6.
21  Wilson M. An evaluation of the cost effectiveness of a centralised intravenous admixture service. *Proc Guild* 1990;27:3-11.
22  Allan Flynn E, Pearson RE, Barker KN. Observational study of accuracy in compounding iv admixtures at five hospitals. *Am J Health Syst Pharm* 1997;54:904-12.
23  Mays N, Pope C. Observational methods in health care settings. *BMJ* 1995;311:182-4.
24  Weick KE. Systematic observational methods. In: Lindzey G, Arouson E, eds. *The handbook of social psychology.* Reading: Addison-Wesley, 1968:357-421.

*(Accepted 30 January 2003)*

X

1923

**College of Physicians & Surgeons** of Columbia University | *New York, N.Y. 10032*

MARK J. S. HEATH, M.D.
Assistant Professor of Clinical Anesthesiology
Department of Anesthesiology

DIVISION OF CARDIOTHORACIC ANESTHESIA
Milstein Hospital Building 4GN
177 Fort Washington Avenue

*Phone: (212) 305-2162*
*FAX: (212) 305-3204*
*Email: mh22@columbia.edu*

December 20, 2003

To Whom It May Concern:

My name is Mark Heath, M.D., I am an Assistant Professor of Clinical Anesthesiology in the Department of Anesthesiology at Columbia University in New York City, N.Y. I received my Medical Doctorate degree from the University of North Carolina at Chapel Hill in 1986, completed residency and fellowship training in Anesthesiology in 1992 at Columbia University Medical Center, and Board Certified in Anesthesiology. My work consists of approximately equal parts of performing clinical anesthesiology, teaching residents, fellows and medical students, and managing a neuroscience laboratory. As a result of my training and research I am familiar and proficient with the use and pharmacology of the chemicals used to perform lethal injection.

Over the past several years, as a result of concerns about the mechanics of lethal injection as practiced in the United States., I have performed several hundred hours of research into the techniques that are used during this procedure. I have been admitted as an expert medical witness in courts in Georgia, Tennessee, Pennsylvania, and Louisiana. I have filed affidavits that have been reviewed by courts in the above states and also Virginia, New York, Alabama, and by the United States Supreme Court. During court proceedings I have heard testimony from prison wardens who are responsible for conducting executions by lethal injection. I have testified before the Nebraska Senate Judiciary Committee regarding proposed legislation to adopt lethal injection. My research regarding lethal injection has also involved extensive conversations with recognized experts in the field.

I have reviewed documents provided by Mr. Brian Mendelsohn related to the lethal injection procedure used by the U.S. Federal Government. These

Exhibit XI-E
1924

documents include one entitled "CHEMICAL SUBSTANCES PREPARATION", one (untitled) that lists the sequence and colors of the syringes to be used, and three partially redacted logs of procedures performed on inmates "Garza", "Jones", and "McVeigh".

These documents raise multiple concerns about the Federal lethal injection procedure, and fail to provide any reasonable assurance that executions will be free of needless cruelty and suffering.

1)   The protocol uses pancuronium bromide (misspelled as "Pavilon" in the protocol).   Pancuronium paralyzes all voluntary muscles, but does not affect sensation, consciousness, cognition, or the ability to feel pain and suffocation. If the thiopental and potassium are to be given in doses sufficient to cause death, there is no place in the protocol for pancuronium. The use of pancuronium places the condemned inmate at risk for conscious experience of paralysis, suffocation, and the excruciating pain of the intravenous injection of high dose potassium chloride.  The use of pancuronium in the euthanasia of household pets such as dogs and cats is prohibited by many veterinary guidelines in this and other countries for precisely the reasons outlined above.   The use of pancuronium therefore fails to comport with the evolving "standard of decency" regarding the ending of life in animals, let alone humans.

2)  The protocol uses sodium thiopental, apparently in a single injection from a single syringe.  The original design of the lethal injection protocol calls for the "continuous intravenous administration of an ultrashort-acting barbiturate" (Oklahoma Statutes, Title 22 Criminal Procedure, Chapter 17 part 1014 A).  The use of a continuous administration of the ultrashort-acting barbiturate is essential to ensure continued and sustained unconsciousness during the administration of pancuronium and potassium chloride.  The failure of the Federal lethal injection protocol to follow this requirement of continuous infusion places the inmate at needless risk for conscious experience of paralysis, suffocation, and the excruciating pain of the intravenous injection of high dose potassium chloride.

3)   The protocol provides no specifications regarding the timing of the administration of the drugs, thereby compounding the risks described above in 1) and 2).   While information is provided regarding the timing of drug administration in three executions, there is no statement in the protocol specifying the timing that is to be followed during future execution procedures.

4)   The protocol provides no specifications regarding the set-up of the intravenous bag of fluids, the drip chamber, the flow regulator, the intravenous tubing, the stopcocks or injection ports or means of injection.

5)  The protocol provided no specifications regarding the training, credentials, certification, experience, or proficiency of the personnel who will be performing the procedure.  The correct and safe management of intravenous drug and fluid administration  requires a significant level of professional acumen, and can not be adequately performed by personnel lacking the requisite experience.

6)  The protocol provides no "equipment list", and is thereby lacking in any assurance that the necessary equipment and supplies are present to ensure that the placement of the intravenous catheter can be performed without needless suffering.

7)   The protocol provides no guidance for dealing with the foreseeable circumstance wherein intravenous access cannot be obtained in the arm or leg. In this setting, state lethal injection protocols typically specify the use of a "cut-down" procedure.   No equipment or supplies for performing a cut-down procedure are listed in the federal protocol, nor is there information regarding the training, experience, credentials, expertise, credentials, certification, experience, or proficiency of the personnel who would perform the "cut down" procedure.

8)   Regarding the preparation of the drugs, the protocol provides no information regarding the credentials, certification, experience, or proficiency of the personnel who will be responsible for the mixing of the thiopental from powder form, or for the drawing up of the drugs into the syringes.  Preparation of drugs, particularly for intravenous use, is a technical task requiring significant training in pharmaceutical concepts and calculations.

9)  The protocol specifies the use of "FOOD COLOR" in the flush solution.  The protocol does not specify what type of food coloring is to be used or its dose or concentration.  The protocol does not specify that the food coloring be approved for intravenous use.  The use of food coloring does not contribute to the death of the condemned inmate, its use is therefore unwarranted and constitutes a desecration of the body of the inmate in life and in death.  To my knowledge food coloring is not used in the lethal injection protocol of any state.

10)   Intravenous administration of food coloring is never performed in any clinical setting.  Its use in the Federal lethal injection protocol likely stems from a perceived need to assist the executioners in ensuring that the intravenous

administration is effectively accomplished. Any perceived need for such assistance strongly suggests that the executioners are otherwise lacking in the requisite experience to ensure successful administration of the drugs. This calls into question the expertise of the executioners, and thereby raises deep concerns that as currently contemplated the protocol is lacking in sufficient safeguards to minimize needless pain and suffering.

11) The protocol specifies that the flush solution should be sterile water. Water, if not supplemented with electrolytes or colloid constituents, is hypotonic and therefore causes hemolysis (rupture of blood cells). Water, whether sterile or not, is never by itself injected intravenously. The specification of "sterile water" as opposed to, for example, "sterile saline" in Federal lethal injection protocol suggests that it was not devised, designed, or drafted by personnel possessing the requisite familiarity with the administration of intravenous drugs and solutions.

12) Some comments on the choice of abbreviations is warranted. The protocol uses "MG" as an abbreviation of "milligrams"; "milligrams" should be abbreviated "mg". The protocol uses "CC" to abbreviate "cubic centimeters"; "cubic centimeters" should be abbreviated "cc". The protocol uses "KCL" as an abbreviation for "potassium chloride", "potassium chloride" should be abbreviated "KCl". These unusual abbreviations indicate that the personnel responsible for drafting and approving the Federal lethal injection protocol lack working familiarity with these terms, and suggest that they do not possess adequate credentials, certification, experience, or proficiency to be responsible for devising and designing the procedure.

13) Further, the sodium pentothal is described as "5/GRAMS/50 CC's". This descriptive terminology is highly unusual or perhaps never-used in reference to drug constitution. One of the "/" symbols is redundant, thereby rendering the entire expression devoid of physical or pharmaceutical meaning. As in 11) above, this highly unusual abbreviation indicates that the personnel responsible for drafting and approving the Federal lethal injection protocol lack working familiarity with these terms, and suggests that they do not possess adequate credentials, certification, experience, or proficiency to be responsible for devising and designing the procedure.

14) Further, regarding spellings of drugs, "pentothal" is incorrectly spelled "pentothol", and "Pavulon" is incorrectly spelled "Pavilon". Errors such as these bespeak a lack of working familiarity with basic medicinal terminology and suggest that the personnel who drafted the protocol do not possess adequate credentials, certification, experience, or proficiency to responsibly design,

-4-

1927

devise, and draft the lethal injection procedure. Further, the presence of these errors suggests that the protocol was not reviewed by any person or group possessing the requisite medical, veterinary, or pharmaceutical professional experience.

15) The page describing the colors and sequence of syringes to be used is difficult to interpret. Of the gravest concern, it appears to specify that only 10 cc of the total 50 cc of sodium thiopental be administered. This would represent a dose of only 1 gram, which is significantly lower than that specified in any state lethal protocol of which I am aware. 1 gram of thiopental does not provide adequate assurance that the condemned prisoner will not be conscious while paralyzed by pancuronium, suffocating, and experiencing the excruciating agony of intravenous concentrated potassium chloride administration. Further, the inconsistency between the specification of 50 cc on one page and 10 cc on another renders the entire protocol not interpretable with respect to the crucial aspect of the pentothal dose. Further, the presence of this alarming inconsistency suggests that the protocol was not reviewed by any person or group possessing the requisite medical, veterinary, or pharmaceutical experience.

16) The execution protocols of most states require the presence of witnesses. The use of pancuronium effectively nullifies the ability of witnesses to discern whether or not the condemned prisoner is experiencing a peaceful or agonizing death. Regardless of the experience of the condemned prisoner, whether he or she is deeply unconscious or experiencing the excruciation of suffocation, paralysis, and potassium injection, he or she will appear to witnesses to be serene and peaceful. If the Federal lethal injection protocol requires witnessing, a matter regarding which I am not informed at this time, the use of pancuronium violates such a requirement, and thereby represents an additional deficiency in the protocol.

Taken together, the procedural flaws detailed above provide compelling evidence that the Federal lethal injection protocol has been devised, designed, and drafted by personnel lacking the requisite experience and familiarity with the technicalities of the procedure. The procedure itself deviates substantially and significantly from one that would provide reasonable assurance that needless pain and suffering is avoided. Multiple elements and components of the protocol place the condemned inmate at needless risk of excruciating pain and suffering. No evidence is provided of any review or scrutiny by any persons or panel or commission possessing the requisite professional expertise to provide an assurance, both to the prisoner and to the citizens of the United States, that the procedure will be humane.

-5-

-6-

I affirm that everything I have stated herein is true to the best of my knowledge.

Mark Heath, M.D.
New York City, NY
December 20, 2003

-6-

1929

## DECLARATION OF MARK J. S. HEATH

I, Mark Heath, a person of lawful age, do hereby declare the following to be true and correct, under penalty of perjury:

1.     My name is Mark J. S. Heath. On December 20, 2003, I authored a letter describing my concerns regarding the Federal death penalty lethal injection protocol. What is contained in that Dec. 20, 2003, is my true and correct opinion on the federal death penalty and I herein state that, under penalty of perjury, that the statements in the Dec. 20, 2003, letter are true and correct and accurate to the best of my knowledge.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 17th day of May, 2004, in New York, New York.

_____
Mark J. S. Heath

Page 1 of 1

1931