# BOP EXECUTION PROTOCOL



**SENSITIVE - LIMITED OFFICIAL USE ONLY**

USA002551

Exhibit XI-F

1932

**FEDERAL BUREAU OF PRISONS**
**EXECUTION PROTOCOL MANUAL**

Page

INTRODUCTION    General Provisions ............................. 1

    I.      Purpose of Manual ........................ 1
    II.     Organization............................. 1
    III.    Cross References......................... 1
    IV.     Policy .................................. 1


CHAPTER 1       Pre-Execution Checklist ..................... 4

    I.      General Provisions ...................... 4
    II.     Establishing an Execution Date ......... 4
    III.    Period of Time Between Establishment
            of an Execution Date to Thirty Days
            Prior to the Execution ................. 5
    IV.     Period of Time Between Twenty-Nine
            to Fourteen Days Prior to the
            Execution .............................. 9
    V.      Period of Time Between Thirteen to
            Seven Days Prior to the Execution ...... 10
    VI.     Period of Time Between Six to Three
            Days Prior to the Execution ........... 10
    VII.    Period of Time Between Two Days to
            One Day Prior to the Execution ........ 11


CHAPTER 2       Execution Checklist .......................... 14

    I.      General Provisions ...................... 14
    II.     Period of Time Between Twenty-Four to
            Twelve Hours Prior to the Execution .... 14
    III.    Period of Time Between Twelve to Three
            Hours Prior to the Execution ........... 15
    IV.     Period of Time Between Three Hours to
            Thirty Minutes Prior to the Execution .. 17
    V.      The Final Thirty Minutes Prior
            to the Execution ....................... 19
    VI.     Final Sequence of Events: Execution .... 20


CHAPTER 3       Post-Execution Checklist ..................... 23

    I.      General Provisions ...................... 23
    II.     Removing Witnesses from the Execution
            Facility ............................... 23
    III.    Removal of the Body of the
            Condemned Individual ................... 24
    IV.     Site Clean-up .......................... 24

USA002552

1933

V.    Returning to Routine Operations ........ 24

CHAPTER 4    Command Center ................................. 25

I.      General Provisions ..................... 25
II.     Location, Role and Function ........... 25
III.    Command Center Staffing ............... 26
IV.     Radio Communication ................... 26
V.      Resources ............................. 27

CHAPTER 5    Contingency Planning .......................... 28

I.      General Provisions .................... 28
II.     Specific Procedures ................... 28
III.    Execution Witness Management .......... 30
IV.     Reservation Security Plan ............. 32

CHAPTER 6    News Media Procedures ......................... 35

I.      General Provisions .................... 35
II.     Condemned Individual Interviews........ 36
III.    Media Orientation ..................... 36
IV.     Media Center Operations................ 38
V.      The Execution Information Center....... 43

CHAPTER 7    Stays, Commutations and Other Delays .......... 46

I.      General Provisions .................... 46
II.     Presidential and Judicial Authority
        to Interrupt Execution ................ 46
III.    Communication of Pardons, Stays,
        Commutations or Delays ................ 47
IV.     Procedures to Implement Last-Minute
        Stays ................................. 48

APPENDICES    Appendix A - Memorandum of Agreement Between
                           Federal Bureau of Prisons and
                           Witness ........................... 49
              Appendix B - Media Witness Press Pool
                           Agreement ......................... 50
              Appendix C - Sample Letter to Media ........... 51

USA002553

## INTRODUCTION:  GENERAL PROVISIONS

I.  **Purpose of Manual**

The purpose of this manual is to outline Federal Bureau of Prisons (BOP) policy and procedures for planning and carrying out the execution of a person convicted of a capital offense.  These procedures should be observed and followed as written unless deviation or adjustment is required, as determined by the Director of the BOP or the Warden.  This manual explains internal government procedures and does not create any legally enforceable rights or obligations.

II.  **Organization**

This manual provides specific time related checklists for pre-execution, execution and post execution procedures as well as detailed procedures related to the execution process, command center operations, contingency planning, news media procedures, and handling stays, commutations and other delays.

III.  **Cross References**

A.    Title 28, Code of Federal Regulations, Chapter 1, Part 26

B.    Title 28, Code of Federal Regulations, Chapter 1, Part 1

C.    Inmate Systems Management – Program Statement 5800.07, Paragraph 807

D.    Searching, Detaining, Non-Inmates; Arresting Authority; Metal Detectors – Program Statement 5510.03

E.    Contact with News Media – Program Statement 1480.03

F.    Accounting Management Manual – Program Statement 2000.2, Chapter 10950

G.    Command Centers – Operations Memorandum 075.92

IV.  **Policy**

A.  It is the policy of the BOP that the execution of a person sentenced to death under Federal law by a court of competent authority and jurisdiction be carried out in an efficient and humane manner.

B.  The BOP will make every effort in the planning and preparation of an execution to ensure that the execution process:

1.    faithfully adheres to the letter and intent of the law;

1

USA002554

2.  is handled in a manner that minimizes the negative impact on the safety, security, and operational integrity of the correctional institution in which it occurs and the BOP in general;

3.  accommodates the public's right to obtain information concerning the event;

4.  reasonably addresses the privacy interests of those persons for whom the law, and BOP policy require such privacy;

5.  provides sufficient contingency planning to ensure that unforeseen problems can be addressed and overcome;

6.  allows for stays of execution, commutations and other delays in the execution countdown;

7.  provides an opportunity for interested persons to exercise their First Amendment rights to demonstrate for or against capital punishment in a lawful manner; and

8.  ensures a firm and adequate response to unlawful civil disobedience, trespass, or other violations of the law by persons attempting to disrupt or prevent the execution.

C.  The BOP will seek the arrest and encourage the prosecution of persons, including but not limited to those who:

1.  violate prohibitions against filming, taping, broadcasting, or otherwise electronically documenting the death of the condemned individual;

2.  trespass or otherwise enter upon BOP property without proper permission and clearance from the Warden;

3.  participate in unlawful demonstrations;

4.  unlawfully attempt to disrupt, prevent, or otherwise interfere with the execution;

5.  being inmates, are involved in disruptive, assaultive, or other lawfully proscribed behavior related to an execution; or

6.  unlawfully threaten, intimidate, or terrorize persons involved in the execution process.

D.  BOP staff involved in the execution will make every effort within the limits of these policies and procedures and the laws of the United States, to:

2

USA002555

1936

1. display appropriate levels of professionalism, restraint, and courtesy in interaction with witnesses, demonstrators, news media, and other non-staff persons during the execution process;

2. prevent emotion or intimidation from hindering efforts to carry out assigned duties; and

3. conduct themselves at all times in a manner reflecting the solemnity and sensitivity of the occasion.

E. BOP Mental Health and Religious Services personnel will be available for counseling sessions with all personnel participating directly in an execution process, before and after an execution.

F. Each execution will be fully evaluated by the institution, region, and Central Office staff. If warranted, recommendations will be made and considered in order to improve procedures.

3

USA002555

1937

CHAPTER 1:    PRE-EXECUTION CHECKLIST

I.   General Provisions

  A.   Purpose of Chapter

    1.   The purpose of this chapter is to provide a checklist of procedures and events that should occur between the period of time prior to the establishment of an execution date and 24 hours prior to the execution.

    2.   Full detail will not be provided for each procedure or event in this chapter.  For detail, refer to specific chapters which follow.

    3.   This chapter covers the following time periods:

      a.   prior to the execution date being established;

      b.   establishment of the execution date to thirty days prior to the execution;

      c.   twenty-nine to fourteen days prior to the execution;

      d.   thirteen to seven days prior to the execution;

      e.   six to three days prior to the execution; and

      f.   forty-eight to twenty-four hours prior to the execution.

  B.   Policy

    1.   A systematic countdown to execution must be completed to ensure that all procedures and events necessary to adequately prepare for the execution are completed in a timely manner.

    2.   Absent intervention by the court system or the President as noted in Chapter 7, delays in the countdown process will only occur in extraordinary situations relating to the security and good order of the institution as approved by the Director of the BOP.

II.   Establishing an Execution Date

   After a sentencing hearing is conducted in a United States District Court resulting in a determination that a criminal defendant be sentenced to death for commission of an offense described in a Federal statute, and the sentencing judge signs the appropriate Judgment and Order:

4

USA002557

1938

A.    Except to the extent a court orders otherwise, the Director of the BOP will designate a date, time, and place for the execution of the sentence. On June 18, 1993, the Director of the BOP established the United States Penitentiary, Terre Haute, Indiana, as the site of such executions. The following individuals/offices will be advised in writing of the execution date: the sentencing judge, Attorney General, Office of the Deputy Attorney General, Office of the Pardon Attorney, the Assistant Attorney General for the Criminal Division, the Chief of the Capital Crimes Unit, Director of the United States Marshals Service (USMS), the Office for Victims of Crime, Assistant Director for Correctional Programs Division, Assistant Director for General Counsel and Review Division, appropriate Regional Director, United States Attorney's Office for the district of conviction, United States Attorney's Office for the Southern District of Indiana and Warden of USP Terre Haute.

B.    Under current federal regulations, the date established will be no sooner than 60 days from the entry of the judgment of death (28 C.F.R. § 26.3(a)(1)) and notice of it must be given to the defendant no later than 20 days before the execution (28 C.F.R. § 26.4(a)). If the date designated passes by reason of a stay of execution, then a new date will be promptly designated by the Director of the BOP when the stay is lifted.

C.    The Warden of USP Terre Haute will notify, in writing, the condemned individual under sentence of death, of the date designated by the Director for execution at least 90 days in advance. If the designated execution date is stayed, notice of the new execution date must be given no later than 20 days before the execution, if time permits and if not, as soon as possible. If the execution date is set by a judge, the Warden will notify the condemned individual, in writing, as soon as possible. The Warden will include information concerning the clemency application process in the written notice. Under 28 C.F.R. §1.10(b), a petition for commutation of sentence should be filed no later than 30 days after the condemned individual has received notification from the Warden of the execution date.

D.    Unless the President interposes, the execution of the sentence will not be stayed on the basis of the condemned individual filing a petition for executive clemency.

III.  <u>Period of Time Between Establishment of an Execution Date to Thirty Days Prior to the Execution</u>

The following procedures should be completed between the time an execution date is set and 30 days prior to the execution.

USA002558

1939

A.    Briefing the Condemned Individual

As soon as practical after establishment of the execution date, the Warden at USP Terre Haute or designee, will personally brief the condemned individual regarding relevant aspects of the execution process including information contained in items C through F of this section.  A briefing sheet outlining these aspects of the execution will be given to the condemned individual.  If requested, a copy of the briefing sheet will be given to a representative identified by the condemned individual. In addition, the Warden will ascertain the inmate's religious preference.

B.    Condemned Individual's Choice of Witnesses

When the condemned individual is informed by the Warden of the execution date, he/she will be advised that he/she may designate not more than one spiritual adviser, two defense attorneys, and three adult friends or relatives (at least 18 years old) to be present at the execution.  The condemned individual will be asked to submit the list of his/her witnesses to the Warden no later than 30 days after notification of the date of the scheduled execution.

C.    Disposition of Personal Property and Accounts

The Warden will review the options available to the inmate for property/account distribution and will ask the condemned individual to provide instructions, no later than 14 days prior to the execution, concerning the disposition of the personal property and funds in any accounts controlled or administered by the BOP.  If the condemned individual fails to provide instructions for such disposition, the property/accounts will be disposed of in accordance with the Accounting Management Manual and Inmate Systems Management Manual.

D.    Organ Donation

The condemned individual's body will not be used for organ donation.

E.    Disposition of Body

The Warden will review options available to the condemned individual following the release of the body to the Vigo County Coroner.  He will ask the condemned individual to provide instructions concerning the disposition of his/her body no later than 14 days prior to the execution.  If the condemned individual fails to provide instructions, the body will be handled in accordance with the Accounting Management Manual.

6

USA002559

F.  **Designation of Persons Required to Assist with the Execution**

1.  Those persons necessary to carry out the execution will be identified.

    a.  The Warden, with the assistance of the Director, USMS, and the Director, BOP, will be responsible for identifying, selecting and obtaining the services of the individuals administering the lethal injection.

    b.  The Warden is responsible for selection of the persons involved in perimeter security, transportation, and command post operations, as well as crowd control, support functions and access screening.

2.  Individuals will be identified for placement in all vital or important positions. Alternates will also be identified. The Assistant Director, Correctional Programs Division, Regional Director, and the Warden will determine which positions require alternates and will ensure adequate coverage is provided.

3.  No officer or employee of the Department of Justice will be required to be in attendance at or participate in any execution if such attendance or participation is contrary to the moral or religious convictions of the officer or employee. Staff participation in the execution process must be on a voluntary basis.

G.  **Other Approved Witnesses**

1.  In addition to the United States Marshal designated by the Director of the USMS (hereafter called the "Designated United States Marshal") and the Warden, the following persons will be present at the execution.

    a.  Necessary personnel selected by the Designated United States Marshal and the Warden.

    b.  Those attorneys of the Department of Justice whom the Deputy Attorney General determines are necessary.

    c.  Not more than the following numbers of persons selected by the Warden:

        (1)  eight citizens (in identifying these individuals, the Warden, no later than 30 days after the setting of an execution date, will ask the United States Attorney for the jurisdiction in

7

USA002560

1941

which the condemned individual was prosecuted to recommend up to eight individuals who are victims or victim family members to be witnesses of the execution); and

(2)  ten representatives of the press.

2.  No other person will be present at the execution, unless such person's presence is granted by the Director of the BOP.  No person younger than 18 years of age will witness the execution.

3.  The Warden will notify all witnesses of the date, time and place of the execution as soon as practicable before the designated time of execution.

H.  <u>Contact with the Vigo County Coroner</u>

1.  The Warden will contact the Vigo County Coroner to coordinate the Coroner's role.

2.  The Vigo County Coroner will be requested to provide direction concerning:

a.  transfer of custody of the body of the executed individual from the Warden to the Vigo County Coroner;

b.  transportation of the body from the Execution Room to the Vigo County Coroner's facility; and

c.  security arrangements during the transfer.

I.  <u>Briefing of Institution Staff</u>

1.  It is necessary to maintain, as nearly as possible, normal prison operations throughout the execution process.

2.  Local prison administrators should be briefed by the Warden, as appropriate, on plans for the execution, restrictions on access, crowd control, additional security procedures, etc., on an on-going basis.

3.  As soon as plans begin to evolve which will affect general prison operations, briefings should begin and continue until operations return to normal.

8

USA002561

1942

IV.  **Period of Time Between Twenty-Nine to Fourteen Days Prior to the Execution**

A.  **Witnesses**

1.  To the extent possible, the Warden will develop a final list of citizen and condemned individual's witnesses.

2.  All witnesses/participants will be required to sign an agreement prior to being cleared and added to the witness list.  Included in the document will be an agreement to be searched before entering the Execution Facility and not to photograph or make any other visual or audio recording of the execution (see Appendix A).

B.  **Qualified Person**

The Warden will finalize arrangements for a qualified person to be present at the execution and to declare the executed individual deceased.

C.  **Condemned Individual's Property and Accounts**

The Warden will finalize arrangements for disposition of the condemned individual's property and accounts no later than 14 days prior to the scheduled execution date.

D.  **Disposition of Body**

The Warden will finalize arrangements with the Vigo County Coroner for disposition of the body, security for the Vigo County Coroner's vehicle, and transfer of custody of the body in accordance with appropriate State and local laws.

E.  **Selection of Executioner(s)**

The Warden, with the assistance of the Director, USMS and Director, BOP, will finalize the selection of executioner(s) and their alternates.

F.  **Training**

1.  The Warden will ensure that appropriate training sessions are held for persons involved in the various aspects of the execution event.

2.  Not all of the persons involved need to practice together.  Individual teams will practice as units, with inter-team practices scheduled, as necessary by the Warden, to facilitate coordination and smooth interaction.

USA002562

1943



V. **Period of Time Between Thirteen to Seven Days Prior to the Execution**

A. **Condemned Individual's Property and Accounts**

All paperwork regarding disposition of property and accounts should be completed.

B. **Food Services**

At least seven days prior to execution, the Warden or designee will contact the condemned individual to arrange for his/her last meal.

C. **Purchase of Substances to be Used in Lethal Injection**

The Warden will ensure the purchase of lethal substances to be used in the execution. Once purchased, these lethal substances will be secured in the institution until called for by the Warden.

D. **Law Enforcement Coordination**

1. The Warden will meet with Federal, State, and local law enforcement personnel to coordinate support related to the execution.

2. Joint practices should be conducted between law enforcement staff involved to ensure coordination and interaction is well defined and understood.

E. **Restrictions on Condemned Individual's Visitors**

Beginning seven days prior to the designated date of execution, the condemned individual will have access only to his/her spiritual advisers (not to exceed two), his/her defense attorneys, members of his/her family, and the officers and employees of the institution. Upon approval of the Director of the BOP, the Warden may grant access to such other proper persons as the condemned individual may request.

VI. **Period of Time Between Six to Three Days Prior to the Execution**

A. **Witnesses**

Non-media witness agreements should be signed by the witnesses and reviewed by the Warden or designee.

1. The Warden will provide a final list of witnesses to the:

   a. Assistant Director, Correctional Programs Division;

   b. Assistant Director, Information, Policy, and Public Affairs Division;

10

USA002563

1944

    c.   Regional Director;

    d.   Director, USMS; and

    e.   local United States Marshal (referred to hereafter as the Designed United States Marshal)

    f.   United States Attorney's Office - District of conviction

    g.   United States Attorney's Office - Southern District of Indiana

2.   Persons who refuse to sign agreements will not be allowed to attend the execution.

**B.**   **Brief Affected Law Enforcement Agencies**

The Warden will ensure that staff from other law enforcement agencies who have not participated in practice sessions or have not otherwise been briefed previously will be briefed and their responsibilities explained.

**C.**   **Condemned Individual's Property and Accounts**

Verify arrangements are complete.

**D.**   **Executioner(s)**

An individual designated by the Warden will:

1.   review with executioner(s) and alternates arrangements for their transportation and escort to the Execution Facility; and

2.   review with participants' arrangements for security of executioner(s) and protection of their identities.

**E.**   **Equipment Check/Inventory**

All equipment necessary to conduct the execution will be inventoried and checked at least 72 hours prior to the execution by individuals designated by the Warden.

**VII.**   **Period of Time Between Two Days to One Day Prior to the Execution**



(b)(2) & (b)(7)(F)

11

USA002564

19145



(b)(2) & (b)(7)(F)

B.   **Practices**

Final practices will be conducted as directed by the Warden.

C.   **Equipment Checks**

Maintenance staff should verify necessary installation of and test electrical, heating/air conditioning and communications equipment in:

1.   BOP Execution Facility;

12

USA002565

2.    Command Center.

D.    <u>Warden Contacts</u>

1.    To ensure that coordination efforts are in place, the following entities will be contacted by the Warden:

   a.    Department of Justice Command Center (to ensure communications, if required, by the Attorney General, the Supreme Court, the President of the United States and the affected United States Attorneys Offices);

   b.    BOP Director's Office;

   c.    USMS Director's Office; and

   d.    affected law enforcement agencies.

2.    Identify specific individuals who are contact persons for the entities/individuals listed in Subsection 1 above.

E.    <u>Equipment Check Verification by Warden</u>

1.    The Warden will ensure completion of pre-execution inventory and equipment check in the BOP Execution Facility.

2.    The Warden will verify that the Execution Facility's equipment checks have been completed.

13

USA002566

1947

## CHAPTER 2: EXECUTION CHECKLIST

I. General Provisions

    A. Purpose of Chapter

        1. This chapter provides a checklist of procedures and events that should occur during the final 24 hours prior to the execution.

    B. Policy

        1. It is the policy of the BOP that the countdown to the execution will be accomplished in a carefully coordinated manner.

        2. The execution will be carried out in a manner consistent with Federal law.

II. Period of Time Between Twenty-Four to Twelve Hours Prior to the Execution



(b)(2) & (b)(7)(F)

    B. Condemned Individual Communication

        1. Excluding calls to the condemned individual's Attorney(s) of Record and calls specifically approved by the Warden, the condemned individual's telephone privileges will be terminated 24 hours prior to the execution.

        2. The condemned individual's Attorney(s) of Record, spiritual adviser(s), immediate family members or other persons approved by the Director of the BOP, will be given visiting privileges during the final 24 hours as determined by the Warden. Visiting privileges will be suspended when preparations for the execution require suspension.

    C. Food Services

The Warden will contact the condemned individual to finalize arrangements for his/her final meal and ensure that it is properly prepared and served by staff.

14

USA002567

1948

D.   <u>Maintenance Response Team</u>

Beginning eight hours prior to an execution, the Facility Manager or other appropriate individual will ensure that a Maintenance Response Team is available to provide necessary maintenance and repair of systems at the Execution Facility or in other areas of the institution.



(b)(2) & (b)(7)(F)

III. <u>Period of Time Between Twelve to Three Hours Prior to the Execution</u>

A.   <u>Final Briefing</u>

 (b)(2) & (b)(7)(F)

2.   A final briefing will be held, attended by senior BOP and Marshals Service staff, the Warden, and representatives deemed appropriate by the Warden. The Warden will conduct the meeting, with senior staff providing guidance and policy decisions, as needed.

3.   During the briefing, participants will:

   a.   identify problems, develop solutions, and specify time lines;

   b.   provide status reports;

   c.   coordinate support services involvement; and

15

USA002568

       d.    conduct a final review of procedures.

B.   **Food Service**

The condemned individual will be served a final meal at a time determined by the Warden.

C.   **Visits**

Visits by family, attorneys, religious representatives, and other persons approved by the Director of the BOP, will be at the discretion of the Warden.

D.   **Restricting Access to Prison Property**

1.   During the final 12 hours prior to the execution, access to prison property will be limited to:

    a.   on-duty staff;

    b.   on-duty contract workers;

    c.   volunteers deemed necessary by the Warden;

    d.   approved delivery vehicles;

    e.   law enforcement personnel on business-related matters;

    f.   routine inmate visitors; and

    g.   other persons approved by the Warden.

2.   During the final eight hours:

    a.   all off-duty Department of Justice personnel will be required to leave institution property;



(b)(2) & (b)(7)(F)

E.   **Establishment of Command Center**



(b)(2) & (b)(7)(F)

16

USA002569

1950

IV.  **Period of Time Between Three Hours to Thirty Minutes Prior to the Execution**

    A.  **Pre-Execution Procedures**

        1.  The Warden will ensure that all countdown procedures for required activities and actions are progressing.

        2.  Immediate action to complete any unfinished required procedures will be initiated.

        3.  The Warden will designate a recorder who will begin logging execution activities in the official execution log book commencing three hours prior to the scheduled execution. The log will reflect, at a minimum, the time each of the following events occurs:

            a.  Condemned individual removed from Inmate Holding Cell;

            b.  Condemned individual strapped to gurney;

            c.  Arrival of government/community witnesses;

            d.  Arrival of condemned individual's authorized witnesses;

            e.  Arrival of media witnesses;

            f.  Opening of drapes;

            g.  Last statement by condemned individual and its transcription/recording by a BOP staff member;

            h.  Reading of Judgment and Commitment Order by Warden;

            i.  Warden informs U.S. Marshal that he is ready. U.S. Marshal states, "We are ready." Execution process begins.

            j.  Signal by Executioner(s) that lethal substances have been administered;

            k.  Determination of condemned individual's death through the EKG readout by designated qualified person;

            l.  Announcement of death of condemned individual by Warden;

            m.  Closing of drapes;

17

USA002570

1957

n.   Notification to outside media and demonstrators of condemned individual's death;

o.   Removal and transportation of media witnesses to media center;

p.   Removal of condemned individual's authorized witnesses;

q.   Removal of government/community witnesses;

r.   Restraint Team/Vigo County Coroner enter Execution Room to remove body;

s.   Removal of body to Vigo County Coroner's vehicle;

t.   Performance of any necessary cleaning chores;

u.   Directive by Warden to secure Execution Facility.

B.   **Execution Room Staff Assemble**

1.   The Executioner(s) will be escorted into the Execution Facility and will inventory supplies and ensure that everything is ready.



(b)(2) & (b)(7)(F)

3.   All other Execution Room staff will be assembled on-site for final instructions at least forty-five minutes prior to the scheduled execution.

C.   **Contact with the Department of Justice Command Center**

(b)(2) & (b)(7)(F)

18

USA002571





(b)(2) & (b)(7)(F)

V. <u>The Final Thirty Minutes Prior to the Execution</u>

    A.   <u>Final Sequence of Events; Preparation</u>

        1.   <u>Bringing the Condemned Individual to the Execution Room</u>

           At a time determined by the Warden, the condemned individual will be:

           a.   removed from the Inmate Holding Cell by the Restraint Team;

           b.   strip-searched by the Restraint Team and then dressed in khaki pants, shirt, and slip-on shoes.

           c.   secured with restraints, if deemed appropriate by the Warden;

           d.   escorted to the Execution Room by the Restraint Team.

        2.   <u>Restraint Team Procedures</u>

           In the Execution Room the ambulatory restraints, if any, will be removed, and the condemned

19

USA002572

individual will be restrained to the Execution Table.

3.  **Admit Witnesses**

a.  Subsequent to appropriate search procedures, witnesses will be admitted to the witness rooms at the direction of the Warden.

b.  The government/community witnesses will then enter and will be escorted to their assigned area.  The escorts will remain with the witnesses.

c.  The authorized witnesses invited by the condemned individual will be admitted and escorted to their assigned area.

1.  If any of the condemned individual's invited witnesses wish to be on-site, but not actually witness the execution, accommodations will be made for them by the Warden.

2.  Escorts will remain with the condemned individual's witnesses.  There will be a minimum of two escorts for each witness group.

d.  The last witnesses to be admitted will be the news media representatives.  The members of the news media selected to witness the execution will be escorted to their assigned area.  Escorts will remain with the news media witnesses and ensure their separation from the other witnesses while at the Execution Room.  Media witnesses will not be permitted to interview or question staff or other witnesses while at the Execution Facility.

VI.  **Final Sequence of Events:  Execution**

A.  **Staff Witnesses**

1.  Staff participating in the preparation for the execution will exit the Execution Room but stand by in an adjacent area.

2.  Staff members remaining to participate in and observe the execution will include the:

a.  Designated United States Marshal;

b.  Warden;

c.  Executioner(s);

20

USA002573

19 5A

d.    Other staff authorized by the Director of the BOP.

B.    Countdown

1.    Once the condemned individual has been secured to the table, at the direction of the Warden, staff inside the Execution Room will open the drapes covering the windows of the witness rooms.

2.    The Warden will ask the condemned individual if he/she has any last words or wishes to make a statement.  The condemned individual will have been advised in advance by the Warden that this statement should be reasonably brief.  This statement will be transcribed by a BOP staff member and provided to the media.

3.    At the conclusion of the remarks, or when the Warden determines it is time to proceed, the Warden will read documentation deemed necessary to the execution process.  The Warden will then advise the Designated United States Marshal that, "We are ready."  A prearranged signal will then be given by the Designated United States Marshal to the Warden, who will direct the executioner(s) to administer the lethal injection.

4.    If the execution is ordered delayed ███████ ██████ (b)2 ████████████ (b)7(F) ████, the Designated United States Marshal will instruct the Executioner(s) to step away from the execution equipment and will notify the condemned individual and all present that the execution has been stayed or delayed. The Warden will direct stand down procedures and return the institution to normal operations after the condemned individual has been returned to appropriate living quarters.

C.    Execution

After receiving the signal from the Designated United States Marshal, the Warden will direct the Executioner(s) to administer the lethal injection.

D.    Determination of Death

1.    After the lethal injection has been administered:

a.    The EKG will be monitored until apparent signs of life have ceased;

b.    Once the qualified person has determined that death occurred, the Warden and Designated United States Marshal will be so informed;

21

USA002574

1955

c.   the Warden will announce the time of death prior to the drapes being closed.

2.   The Designated United States Marshal will complete and sign the Return described in Section 26.2(b) of 28 C.F.R. and will file such document with the sentencing court.

22

USA002575

1956

## CHAPTER 3:  POST-EXECUTION CHECKLIST

I.  General Provisions

A.  Purpose of Chapter

The purpose of this chapter is to:

1.  provide the procedures to be followed after the execution, of the condemned individual;

2.  identify the responsibilities for tasks to be completed; and

3.  provide for the transfer of the body of the condemned individual from the custody of the BOP.

B.  Policy

It is the policy of the BOP that:

1.  the condemned individual will be examined by a specified qualified person following the administration of the lethal substances to ensure that death has occurred;

2.  the qualified person, when satisfied that death has occurred, will advise the Warden who will announce the time of death to the witnesses;

3.  the witnesses to the execution will then be removed from the Execution Facility and returned to their individual staging areas so that they may leave the institution.  News media witnesses will be removed to a secondary press location where they will participate in a press conference;

4.  the body of the condemned individual will be surrendered to the Vigo County Coroner;

5.  after removal of the body, the site will be cleaned and restored to its previous condition.

II.  Removing Witnesses from the Execution Facility

A.  After the pronouncement of death by the Warden, the witnesses will be escorted from the facility in the following order:

1.  news media witnesses;

2.  condemned individual's authorized witnesses; and

3.  government/community witnesses.

B.  Each group of witnesses will be kept separate from the others and escorted to waiting vehicles to be driven to separate designated sites.

23

USA002576

1957

III. <u>Removal of the Body of the Condemned Individual</u>

A.    After the witnesses have departed, the restraints will be removed from the condemned individual's body.

B.    The Vigo County Coroner or designee will be escorted into the Execution Facility.  The body will be removed by the Vigo County Coroner, who will place it in a coroner's vehicle for transportation.

IV.  <u>Site Clean-Up</u>

A.    Under the supervision of an individual designated by the Warden, staff will clean and secure the Execution Facility.

B.    Institution staff will be trained in infectious disease preventive practices and utilize appropriate precautions in cleaning up the Execution Facility.

C.    The Execution Facility will be locked and secured when the Warden is satisfied that clean-up has been completed.

V.   <u>Returning to Routine Operations</u>

A.    Following the execution, Department of Justice and BOP staff involved in the execution will be deactivated, as appropriate, under direction of the senior departmental, BOP and USMS staff on-site.

B.    The Warden's designated public affairs representative will determine when to secure the media assembly site after the news conference is complete.

C.    The Warden will bring the institution security back to routine operations as he/she sees fit.

24

USA002577

1958

## CHAPTER 4:  Command Center

I.   General Provisions

A.   Purpose of Chapter

The purpose of this chapter is to:

1.   identify the role and function of the Command Center;

2.   specify the individuals authorized to staff the Command Center; and

3.   provide an inventory of the minimum resources required in the Command Center.

B.   Policy

It is the policy of the BOP that:

1.   the Bureau operate a local, emergency Command Center during the execution operation to:

a.   coordinate security, transportation, crowd control, access and other processes;

b.   provide policy and procedural advice, as needed, or upon request;

c.   coordinate inter-agency functions; and

d.   serve as an information processing and operations nerve center for the execution;

 (b)(2) & (b)(7)(F)

3.   sufficient resources be available in the Command Center to permit staff there to function efficiently.

II.  Location, Role and Function

A.   The Command Center will be operational prior to the scheduled execution and maintained for the duration of the execution operation, in an area identified by the Warden.

B.   The roles and functions of the Command Center include:

1.   coordinating the various personnel, components and elements of the execution operation;

25

USA002578

1959



(b)(2) & (b)(7)(F)

### III. Command Center Staffing

A.  Command Center staff should include the following positions:



(b)(2) & (b)(7)(F)

B.  The Command Center Director may include such other persons as may be needed, for the period of time required. During that time, an additional temporary pass will be issued to and worn by the person so admitted.

C.  Access to the Command Center will be limited to persons specifically authorized by the Command Center Director or Warden.

### IV. Radio Communication

A.  The official radio frequency for communication with personnel involved in the execution process will be determined by the Warden.

B.  Non-cellular telephones must be used for critical or confidential communications.

USA002579



(b)(2) & (b)(7)(F)

27

USA002580

CHAPTER 5:   CONTINGENCY PLANNING

I.    General Provisions

    A.   Purpose of Chapter

        The purpose of this chapter is to:

        1.   aid in the development of a predetermined contingency plan to assist staff in the management of the execution event and in responding to related emergency situations;

        2.   identify the role and function of staff needed to formulate and activate the plan, if needed; and

        3.   identify specific areas to stage staff and equipment.  The location of witness processing will be pre-determined by the Warden on a case-by-case basis.

    B.   Policy

        It is the policy of the BOP to:

        1.   prepare and test contingency plans;

        2.   identify all security measures needed to protect staff and inmates of an institution as well as BOP property; and

        3.   coordinate all resources to ensure the safety of the public, staff, and inmates.

II.   Specific Procedures

    A.   An individual identified by the Warden will prepare contingency plans related to an emergency occasioned by the execution, such as an institution disturbance, hostage taking, outside demonstration, outside assault on the facility, etc.  All plans will be reviewed and approved by the Warden and the Regional Director.

    B.   Plans will include provisions for:



(b)(2) & (b)(7)(F)

28

USA002581

1962



(b)(2) & (b)(7)(F)

29

USA002582



(b)(2) & (b)(7)(F)

30

USA002583

4. No pat or visual search of any witness will be conducted unless the Warden has reasonable suspicion to believe the witness is concealing weapons, drugs, audio or visual recording devices, or any other item not expressly authorized and the witness agrees to be searched. If the witness refuses to be searched, he/she will not be permitted to serve as a witness.

5. Staff at each staging area will notify the Command Center when all execution witnesses are accounted for and processed.

6. Escorts will remain at their assigned staging areas until the Command Center directs them to transport the witnesses to the Execution Facility.

B. **Transportation to the Execution Facility**



(b)(2) & (b)(7)(F)

3. Escorts will ensure that witness groups do not come into contact with each other.

4. Escorts will transport witnesses to the Execution Facility and notify the Command Center when each group of witnesses is secured in the assigned observation area.

5. Once each group is secured, the next group will be moved as directed by the Command Center.

6. The Command Center will be notified by the appropriate staff member when all groups are in place.

31

USA002584

7. The Command Center, in turn, will notify the Warden or designee.

C. <u>Transportation from the Facility</u>



(b)(2) & (b)(7)(F)

2. The groups will be returned to the staging areas by the escorts, who will ensure that no group comes in contact with another group.

3. Escorts will notify the Command Center as each group returns to the staging area.

4. The Command Center will direct each move to expedite departures and also to prevent groups from encountering one another in the parking lot.

5. Media witnesses will be returned to the Media Center to have a press pool briefing as outlined in Chapter 6.



(b)2

(b)7(F)

32

USA002585



(b)2
(b)7(f)

33

USA002586



3. The escort Lieutenant and escort teams will be available and will accompany execution witnesses.



(b)(2) & (b)(7)(F)

34

USA002587

1948

## CHAPTER 6:  NEWS MEDIA PROCEDURES

I.    General Provisions.

A.    Purpose of Chapter

This chapter describes the procedures and requirements for allowing representatives of the news media access to an inmate sentenced to death, as well as procedures for news media access to the execution.  This chapter also provides procedures for releasing information relating to the execution.

B.    Policy

The BOP recognizes the desirability of establishing procedures which afford the public information about its operations through the news media.  In accordance with established policy, reasonable efforts will be made to accommodate representatives of the news media before, during, and after a scheduled execution.  Media representatives will be treated in a fair and consistent manner in accordance with current policies and procedures of the BOP.  The agency has the responsibility, however, to ensure the orderly and safe operation of its institutions, and therefore must regulate media access.

C.    Roles

1.    Representatives of the news media are those individuals described in Program Statement 1480.03, Contact with News Media, whose principal employment is to gather and report news.

2.    The Warden will designate a specific staff member as the official representative to the news media regarding death penalty issues and the scheduled execution.

3.    The BOP Assistant Director, Information, Policy and Public Affairs Division, will coordinate the release of information to the news media and assist the Warden in the selection of individual news media witnesses.  The Department of Justice Office of Public Affairs will be kept informed of these matters.

35

USA002588

1969

II. <u>Condemned Individual Interviews</u>

A.  <u>Purpose</u>

As stated in Program Statement 1480.03, Contact with News Media, it is not the BOP's intent to provide publicity for an inmate or special privileges for the news media, but rather to ensure a better informed public.

B.  <u>Limits</u>

With this in mind, representatives of the news media may be permitted to conduct interviews with condemned individuals.  Guidelines regarding the frequency and length of interviews as well as accompanying security, will reflect BOP policy (Program Statement 1480.03, Contact with the News Media) and be established by the Warden, who will take into account available resources.

C.  <u>Prohibition</u>

Ordinarily, no media interviews will be permitted with the condemned individual once the execution date is within seven days.

III. <u>Media Orientation</u>

A.  <u>Definition</u>

No later than eight days before a confirmed execution date, the institution will hold a Media Orientation to provide media representatives with information on the scheduled execution.  No other press conference or Media Orientation regarding the execution will be scheduled or held until after the scheduled execution, except as provided below in subsection B.  Every effort will be made by the Warden's representative to notify local, State, and national media representatives of the scheduled Media Orientation.  Central Office Public Affairs staff will provide assistance to institution personnel in this area.

1.  All persons, including media representatives, must have appropriate identification to enter the institution on any occasion.  Media representatives must have appropriate press credentials.  This requirement includes camerapersons, sound technicians, and reporters.

2.  All individuals will be advised that they are subject to search of their person and equipment

36

USA002589

1970

prior to entering and prior to leaving a BOP facility.

B.    Updates Prior to the Execution

Commencing eight hours prior to the scheduled execution, the Warden's representative will provide the news media with regular briefings or updates of the execution process.

1.    No later than eight hours prior to the scheduled execution, a Media Center will be activated. Telephone lines, tables, risers for cameras and outlets for electrical equipment and cameras will be available. Restroom facilities (and if possible, vending machines) will also be provided.

2.    The Warden's designated representative will be present in the Media Center to provide regular announcements.

C.    Media Orientation Releases

During the Media Orientation, the following information will be made available to members of the media:

1.    General information regarding the scheduled execution and about the individual scheduled for execution.

2.    Specific information regarding procedures to be followed by the media on the date of the scheduled execution.

3.    Media representatives will be reminded that there are obvious security concerns about aircraft flying over Federal correctional facilities and therefore, their assistance and cooperation in this matter is expected.

4.    Media representatives will be informed of how the press pool will be established (see paragraph IV D 2) and advised that if they are selected as press pool witnesses to the execution, they will agree prior to the execution to:

    a.    sign the document designated as the Media Witness Press Pool Agreement (see Media Witness Press Pool Agreement, Appendix B);

    b.    be subject to a metal detection scanning;

37

USA002590

c.    not make any photographic, visual or audio recordings of the execution (each media witness will be provided only paper and a pencil or pen while in the execution witness area); and

d.    return to the Media Center after the execution to answer questions of all other media represented concerning their observations during the execution.

5.    After the Warden's representative, media pool witnesses and appropriate Department of Justice staff, if available, have addressed the media in the Media Center, the press briefing will be terminated and all media personnel will leave the Media Center.

## IV.    Media Center Operations

### A.    Requesting Authorization

1.    After an execution date is set by the court/Director of the BOP, and no sooner than twenty days prior to the scheduled execution, news media representatives will be advised, in writing, by the Warden's designated representative that they may request, in writing, authorization to participate in the institution's Media Center activity in the hours preceding the scheduled execution (see Sample Letter to Media, Appendix C).

The requests, which must be in writing, should be received by the Warden no later than ten days prior to the execution.  Requests must include names, social security numbers, and dates of birth for each representative of a media organization and his/her support staff.  Only those media organizations submitting written requests, within the stated time frame, will be considered for participation in Media Center activities.

2.    Requests for consideration may be granted by the Warden, provided they demonstrate that the requesting individual falls within the definition of "member of the press and broadcast media" set forth in BOP Program Statement 1480.03, Contact with News Media.

### B.    Possible Limitations

The number of media representatives may be limited by the Warden due to space and safety considerations, but

38

USA002591

1972

care will be taken to include representatives from both the print and broadcast media.

C.     Briefing Packets and Updates

1.     Packets

At the Media Center, commencing no later than eight hours prior to the scheduled execution, the Warden's representative will provide press briefing packets for reporters in the Media Center. The contents of the press briefing packet will include, but not be limited to, releasable information on the condemned individual, pool reporters (once selected), the sequence of events, and the history of Federal executions.

2.     Updates

Written updates generally will be distributed to the press on a regular basis beginning eight hours prior to the scheduled execution. Updates will include:

a.     a summary of activities related to the execution and sequence of events; and

b.     a summary, cleared by the Warden, of the condemned individual's activities during his/her final twenty-four hours.

D.     News Media Witness Selection

1.     Number in Attendance

The Warden will permit no more than 10 members of the media to witness the execution. The number of additional media representatives authorized to remain in the Media Center on the day of the execution may be limited, due to space and safety concerns.

2.     Pool Selection Process

a.     Press pool members will be selected by their peers at least three hours prior to the scheduled execution. Representatives from each of the following categories must be included:

(1)     one local newspaper (located within the city or town of the institution);

39

USA002592

1973

    (2)    three television news programs of a
               station or network holding an FCC
               license (at least two being national
               broadcast stations);

    (3)    one newspaper from the area where the
               crime was committed;

    (4)    two wire services;

    (5)    one radio station; and

    (6)    two print media organizations.

b.    Press pool witnesses will be selected from qualified media representatives who have been admitted into the institution's Media Center and who have provided staff with proper identification.  A list of media representatives will be compiled by the Warden's representative and furnished to the media for their review in the selection process.

3.    **Signed Agreement**

Media selected as press pool witnesses will then be required to agree to:

a.    act as a pool representative as described further in this chapter; and

b.    abide by all established conditions, rules, and regulations while in attendance at the execution; to include allowing a metal detector scan of their person.

4.    **Supplemental Representatives**

In the event the media are unable to identify witnesses in each of the above described categories, the Warden's designated representative may name other qualifying media representatives to attend, with a maximum of 10 being named.

40

USA002593

1974

**E.    Media Witnesses to the Execution**

1.    **Search Process**

Each media pool witness attending the execution will be scanned by a metal detector prior to admittance to the Execution Facility.

a.    No pat or visual search of any media pool witness will be conducted unless the Warden has reasonable suspicion to believe the media representative is concealing weapons, drugs, audio or visual recording devices, or any other items not expressly authorized and the media representative agrees to be searched. If the representative refuses to be searched, he/she will not be permitted to serve as a media witness.

1.    Electronic or mechanical recording devices include, but are not limited to, still, moving picture or video tape cameras, tape recorders or similar devices, and radio/television broadcasting devices.

2.    The representative will only be permitted paper and a pencil or pen as provided by institution staff.

2.    **Witness Briefing**

The 10 selected members of the news media will be required to sign both the witness agreement (Appendix A) and the Media Witness Press Pool Agreement (Appendix B). They must also attend the pre-execution briefing at the Media Center. This briefing, conducted by a representative of the Warden, will provide specific information on the event and expectations regarding their conduct. This will include:

a.    a review of approved materials that can be taken to the Execution Room;

b.    search procedures;

c.    escort procedures; and

d.    the role of pool reporters.

41

USA002594

3. <u>Prohibition of Substitutes</u>

No substitute media pool witness will be permitted after this briefing is conducted.

4. <u>Segregation after the Search</u>

After the search, all witnesses will be segregated and escorted to the Execution Facility. Media witnesses will not be permitted to have physical contact with any other persons during this time.

5. <u>Excluding Witnesses</u>

The Warden will not exclude any media witness duly selected in accordance with this chapter from attendance at the execution or cause a selected media witness to be removed from the media pool witness area unless the media witness:

a. refuses to submit to a reasonable search as outlined in these regulations;

b. faints, becomes ill, or requests to be allowed to leave during the execution;

c. causes a disturbance within the media pool witness area that disrupts the orderly progress of the execution as determined by the Warden's representative on site; or

d. fails to abide by the provisions of the Witness Agreement.

6. <u>The Execution Process</u>

The selected media pool witnesses will be escorted as a group to the execution location prior to the execution and will be allowed to remain there throughout the execution process. The Warden will designate a BOP Spokesperson to remain with the media pool witnesses throughout the process and to answer questions.

F. <u>Death Announcement</u>

Immediately following the execution and prior to the post-execution press pool briefing, a Warden's representative will read the following prepared statement to the press and demonstrators:

42

USA002595

1974

**SAMPLE STATEMENT**

(To be read at post execution press briefing and to any assembled members of the public.)

_____, Warden of _____,

reports that pursuant to the sentence of the United States

District Court in _____, _____
                                    (Condemned Individual's Name)

has been executed by lethal injection.

_____ was pronounced dead at
        (Condemned Individual's Name)

_____ on _____.
     (Time)              (Date)

G.  **Press Pool Post-Execution Briefing**

All news media press pool witnesses will, after being returned from the execution to the Media Center, immediately brief other media representatives covering the event.  The pool witnesses will provide an account of the execution and will endeavor to answer all questions asked of them by other media representatives. They will not report their observations regarding the execution to their respective news organizations until after the non-witness media representatives have had the benefit of the pool representatives' accounts of the execution.

H.  **Post Execution Press Conference**

If deemed necessary and appropriate, representatives of the Department of Justice, USMS and BOP will answer questions from the assembled media for no more than 30 minutes after the press briefing.

V.  **The Execution Information Center**

A.  **Responsibility**

The Warden's representative will establish and operate an Execution Information Center.

43

USA002596

197

B.    **Purpose**

The Execution Information Center:

1.    is a central processing point for all incoming media and public interest telephone calls pertaining to the scheduled execution;

2.    allows the institution's staff to handle normal and routine business;

3.    handles "crank" calls and bomb threats in accordance with BOP policy; and

4.    establishes a log of calls for future reference, investigation and evaluation.

C.    **Location**

1.    The Execution Information Center will be located in an area identified by the Warden.

2.    Only persons authorized by the Warden will be allowed in the Center's operational area.  Center staff are responsible for keeping the area clear of unauthorized personnel.

D.    **Schedule**

1.    The Execution Information Center will commence operations at least five working days prior to the scheduled execution.  The Information Center will operate twelve hours a day on the days prior to the scheduled execution and for the eighteen hours immediately preceding the scheduled execution. The Center will remain in operation until approximately one hour after the execution.

2.    The Warden's representative will arrange coverage of telephones, based on the volume of calls.

3.    Staffing for the Execution Information Center will be coordinated by the Warden's representative.

E.    **Screening Calls**

1.    **Types of Calls**

a.    **Business Calls**

Calls from BOP staff or other Federal agencies relating to the execution; or from

44

USA002597

1978

BOP staff relating to operational issues affected by the execution which may need to be forwarded to the Command Center.

b.   Personal Calls

Calls intended for individuals (staff or witnesses) connected with the execution.

c.   Inquiry Calls

Execution-related calls from the general public.

1.   Staff will endeavor to answer every call in a professional, courteous and efficient manner.

2.   If bomb threats are received, the staff member receiving the call will utilize established procedures. Bomb threats will be communicated to the Command Center immediately.

3.   If possible, all "crank" calls and calls considered to be an emergency, should be recorded and traced.

45

USA002598

## CHAPTER 7:   STAYS, COMMUTATIONS AND OTHER DELAYS

I.   General Provisions

A.   Purpose of Chapter

The purpose of this chapter is to:

1.   cite the entities capable of causing execution stays, commutations, and other delays;

2.   specify the manner of communicating such delays/commutations; and

3.   provide the procedures for implementing the delay/commutation.

B.   Policy

It is the policy of the BOP that:

1.   procedures must be in place to receive and ensure proper handling of legal interruptions of the execution countdown;

2.   staff understand their roles and the BOP's responsibilities in the event of such interruptions; and

3.   contingency plans provide methods for responding to:

a.   temporary delays;

b.   lengthy delays; and

c.   commutations.

II.   Presidential and Judicial Authority to Interrupt Execution

A.   President

1.   The United States Constitution confers upon the President the power to grant reprieves and pardons for offenses against the United States.  This has been held to include the power to grant conditional pardons and commute sentences.

2.   Neither Congress nor a State legislature can limit the President's power to pardon.

46

USA002599

1980

**B.**    <u>Courts</u>

A Federal court of competent jurisdiction may issue a stay of execution or invalidate a sentence of death as a result of appellate or collateral proceedings.

**III.** <u>Communication of Pardons, Stays, Commutations or Delays</u>

**A.**    <u>Prior to Final Execution Countdown</u>

If the BOP receives an order from a Federal court of competent jurisdiction or the President ordering a respite, reprieve, stay, commutation, pardon or other action which requires the suspension or termination of the execution:

1.    the Attorney General's Office will be contacted for consultation; and

2.    a decision will be made by the <u>Director of the BOP</u> concerning the status of planning and preparation for the execution.

**B.**    <u>During Final Execution Countdown</u>

1.    During the final twenty-four hours, the BOP and the USMS will maintain frequent contact with the Attorney General's Office through the



(b)(2) & (b)(7)(F)

**C.**    <u>Final Clearance for Execution</u>

At an appropriate time prior to the execution ▮▮▮▮▮ the Designated United States Marshal will verify clearance to continue with the execution ▮▮

(b)2
(b)7(F)

47

USA002600

## IV. Procedures to Implement Last-Minute Stays

A. Upon receiving a stay during the final countdown, the first effort will be to determine the probable length of the delay.

B. If the witnesses have not been moved from their staging areas, they will be held in those locations until further instructions are received from the Warden to proceed with or terminate the execution.

C. If witnesses are already at the Execution Facility and the condemned individual is restrained:

1. If the delay appears to be relatively lengthy, the condemned individual will be returned to the Holding Cell by the Restraint Team. The witnesses will be returned to their staging areas in the order listed. There they will await further information.

2. If the delay is likely to be relatively short in duration, the witnesses will remain in place. The drapes will be closed and the condemned individual will remain restrained on the table.

3. If the execution is indefinitely stayed, set for re-sentencing, commuted, or halted by pardon, the execution will be halted, and the condemned individual and witnesses will be immediately advised. Witnesses will be returned to their staging areas and the condemned individual returned to appropriate quarters in the institution.

48

USA002601

1982

Appendix A

MEMORANDUM OF AGREEMENT
BETWEEN
FEDERAL BUREAU OF PRISONS
AND WITNESS

This agreement is made between the Federal Bureau of Prisons and the following witness:

_____

In accordance with Title 28, Code of Federal Regulations, Section 26.4, the Federal Bureau of Prisons may allow you, as a witness, to be present at the execution. However, your presence at the execution is not a right and, in order to be entitled to be present, you will be required to agree to the following conditions:

1. You will not bring onto institution grounds anything constituting legal or illegal contraband under any applicable statute, regulation or policy, including, but not limited to, firearms, weapons, explosives, metal cutting tools, narcotic drugs, alcoholic beverages, or any item creating a threat to institution safety, security, or good order;

2. You agree to submit to a reasonable search for contraband and other searches as considered necessary by the Bureau of Prisons for entry into the institution;

3. You will conduct yourself in a lawful and orderly manner;

4. You will comply with all lawful directives of correctional personnel while on institution grounds;

5. You will not bring onto institution grounds any photographic or other visual or audio recording device; and

You have read, understand, and agree to the above. By signing this agreement, you agree to comply with its conditions and understand that failure to abide by them will result in your removal from institution grounds and could lead to prosecution for violation of Federal laws.

_____          _____
          (Witness)                              (Date)


_____          _____
     (Agency Representative)                     (Date)

49

USA002602

1983

## Appendix B

### MEDIA WITNESS PRESS POOL AGREEMENT

In consideration of having been selected as an official witness to the execution of _____ on _____, I, _____, hereby agree to act as a pool reporter and, not to interview non-media witnesses or Department of Justice staff at the Execution Facility.   Following the execution, I agree to return immediately to the Media Center to brief my colleagues there regarding the execution and answer their questions.   I also agree to file my story only after I have completed my responsibilities as a pool reporter.

NAME:    _____
                         (Signature)

ORGANIZATION:  _____

DATE:    _____


                         _____
                         (BOP Staff Witness)

50

USA002603

1984

## Appendix C

### SAMPLE LETTER TO MEDIA
(Re:   Media Center Operations)

In accordance with the provisions of 28 C.F.R., Part 26, Implementation of Death Sentences in Federal Cases,

_____ is scheduled to be executed
      (Condemned Individual's Name)

at _____ on _____.
      (Institution)         (Date)

No later than eight hours preceding the scheduled execution, a Media Center will be established at the _____ in
                                                   (Location)
Terre Haute, Indiana, and telephones will be available.  Should you desire to cover the event from the Media Center, or if selected, be a media pool witness, please submit your written request to me, via fax or by mail, so that it is received in my office no later than _____.
                              (Date 10 days prior to execution)

The request must include your name, the names of all support staff (sound technician, cameraperson, etc.) who may accompany you on this day.  Social security numbers and dates of birth for all participants, including yourself, must also be furnished in your letter so that appropriate security checks can be completed. You will be notified promptly if we have any concerns with your request.  Space is limited and admittance to the Media Center will have to be on a first-come, first-accommodated basis.

Should you desire to be considered to be a media pool witness to the execution, you will also be required to sign agreements consenting to a search prior to entering the execution facility, and agreeing to abide by all relevant conditions, rules and regulations.  Should you participate, your name is subject to being released to the media.

Please note that all media representatives will be required to sign a log and show proper press credentials in order to be admitted to the Media Center.

                            Sincerely,


                            Name
                            Title

51

USA002604

1986

BOARD OF MEDICOLEGAL INVESTIGATIONS
## OFFICE OF THE CHIEF MEDICAL EXAMINER

Central Office
901 N. Stonewall
Oklahoma City, Oklahoma 73117
(405) 239-7141   Fax (405) 239-2430

Eastern Division
1115 West 17th
Tulsa, Oklahoma 74107
(918) 582-0985   Fax (918) 585-1549

OFFICE USE ONLY

Re ____ ____ Co ____ ____

I hereby certify that this is a true
and correct copy of the original
document. Valid only when copy
bears imprint of the office seal.

By _____
Date _____

## REPORT OF INVESTIGATION BY MEDICAL EXAMINER

| DECEDENT First-Middle-Last Names (Please avoid use of initials)<br>ROBERT W. KNIGHTON | Age<br>62 | Birth Date<br>02/05/1941 | Race<br>WHITE | Sex<br>M |
|---|---|---|---|---|

HOME ADDRESS - No. - Street, City, State
OKLAHOMA STATE PENITENTIARY, MCALESTER, OK

| EXAMINER NOTIFIED BY - NAME - TITLE (AGENCY, INSTITUTION, OR ADDRESS)<br>CAROL BUTLER - HEALTH INFO SERVICES - OSP | | | | DATE<br>05/27/2003 | TIME<br>10:15 |
|---|---|---|---|---|---|
| INJURED OR BECAME ILL AT (ADDRESS)<br>OKLAHOMA STATE PENITENTIARY | CITY<br>MCALESTER | COUNTY<br>PITTSBURG | TYPE OF PREMISES<br>PRISON | DATE<br>05/27/2003 | TIME<br>18:25 |
| LOCATION OF DEATH<br>OKLAHOMA STATE PENITENTIARY | CITY<br>MCALESTER | COUNTY<br>PITTSBURG | TYPE OF PREMISES<br>PRISON | DATE<br>05/27/2003 | TIME<br>18:30 |
| BODY VIEWED BY MEDICAL EXAMINER<br>MCALESTER REGIONAL HEALTH CENTER | CITY<br>MCALESTER | COUNTY<br>PITTSBURG | TYPE OF PREMISES<br>MORGUE | DATE<br>05/27/2003 | TIME<br>19:25 |

IF MOTOR VEHICLE ACCIDENT:   ☐ DRIVER   ☐ PASSENGER   ☐ PEDESTRIAN

TYPE OF VEHICLE:   ☐ AUTOMOBILE   ☐ LIGHT TRUCK   ☐ HEAVY TRUCK   ☐ BICYCLE   ☐ MOTORCYCLE   OTHER:

| DESCRIPTION OF BODY | RIGOR | | | LIVOR | | EXTERNAL OBSERVATION | | | | NOSE | MOUTH | EARS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

EXTERNAL PHYSICAL EXAMINATION

RIGOR — Jaw ☐ Complete ☐ / Neck ☐ Absent ☑ / Arms ☐ Passing ☐ / Legs ☐ Passed ☐ / Decomposed ☐

LIVOR — Color PURPLE / Lateral ☐ / Posterior ☑ / Anterior ☐ / Regional _____

EXTERNAL OBSERVATION — Beard GREY / Hair BALD / Eyes: Color HAZEL / Mustache GREY / Opacities _____ / Pupils: R 4 MM L 4 NN / Body Length _____ Body Weight _____

BLOOD — NOSE ☐ MOUTH ☐ EARS ☐
OTHER — NOSE ☐ MOUTH ☐ EARS ☐

Significant observations and injury documentations - (Please use space below)
IV ACCESS IN THE RIGHT SUBCLAVIAN ARTERY. MULTIPLE IV ACCESS ATTEMPTS IN BOTH ANTECUBITAL FOSSA BILATERALLY. NO EVIDENCE OF TRAUMA OR PETECHIAE.

*Probable Cause of Death:*
**SODIUM PENTOTHAL/VECURONIUM/POTASSIUM CHLORIDE SYNERGISM**

*Manner of Death:*
Natural ☐   Accident ☐
Suicide ☐   Homicide ☑
Unknown ☐   Pending ☐

Case disposition:
Autopsy   Yes ☐   No ☑
Authorized by _____
Pathologist _____
Not a medical examiner case ☐

*Other Significant Medical Conditions:*

**MEDICAL EXAMINER:**
Name, Address and Telephone No.

FRED B. JORDAN M.D.
901 N. STONEWALL
OKLAHOMA CITY, OK 73117

I hereby state that, after receiving notice of the death described herein, I conducted an investigation as to the cause and manner of death, as required by law, and that the facts contained herein regarding such death are true and correct to the best of my knowledge.

FREO B. JORDAN M.D.
Signature of Medical Examiner

0303110

Date 6-4-03

Computer generated report

CME-1 (REV 7-98)

Exhibit XI-G

198 7

**FULL BODY, MALE — ANTERIOR AND POSTERIOR VIEWS (VENTRAL AND DORSAL)**



Name _Robert W Knighton_    Case No. _____

CME-1B6 (Series 1978)    Date _5-27-03_

1988

## BOARD OF MEDICOLEGAL INVESTIGATIONS

## OFFICE OF THE CHIEF MEDICAL EXAMINER

901 N.Stonewall
Oklahoma City, Oklahoma  73117

## REPORT OF LABORATORY ANALYSIS

OFFICE USE ONLY
Re. ___  Co. ___

I hereby certify that this is a true
and correct copy of the original
document. Valid only when copy
bear im-print by the office seal.

By _____

Date _____

ME CASE NUMBER:  0303110

DECENDANT'S NAME:  ROBERT W. KNIGHTON

MATERIAL SUBMITTED:  BLOOD, VITREOUS

LABORATORY NUMBER:  031434

DATE RECEIVED:          05/30/2003

HOLD STATUS:  60 DAYS

SUBMITTED BY:   SHERRY  BEDFORD INVESTIGATOR

MEDICAL EXAMINER:   SHERRY  BEDFORD INVESTIGAT

RESULTS:  NO TOXICOLOGICAL ANALYSIS REQUESTED

Ethyl Alcohol:

   Blood:

   Vitreous:

   Other:

Carbon Monoxide:

Tests Performed:

Results:

06/10/2003
DATE

PHILIP M. KEMP, Ph.D., DABFT
Chief Forensic Toxicologist

Please Note:  Unless notified in writing to the contrary, the specimen(s) submitted in this case will be discarded at the end of 60 days.

1990

## AFFIDAVIT OF CAROL WEIHRER

NO._____

IN THE COUNTY OF FAIRFAX          }

THE STATE OF VIRGINIA          }

BEFORE ME, the undersigned authority, did personally appear Carol Weihrer, and having been duly sworn, did state upon her oath the following:

"My name is Carol Weihrer. I underwent an eye operation in which full general anesthesia was administered, but the brain scrambling drugs were not effective. I therefore experienced what has come to be known as Anesthesia Awareness, in which a patient undergoing anesthesia becomes able to think lucidly, hear, perceive and feel everything going on during the surgery, but is unable to move.

Based on my experience and subsequent study of the issue of Anesthesia Awareness, I believe that there is a tremendously dangerous chance that the condemned actually may be awake and aware during the execution process. The anesthetics used are of the short-acting type, probably only lasting five minutes or so. Since the execution process takes longer than that to complete, and a paralytic is used, the condemned may appear completely serene and comfortable while in essence, dying of smothering to death, because the lungs are also paralyzed, while awaiting the heart-stopping drug.

Having experienced this phenomenon myself, I can tell you it is a fate worse than death, and certainly would fall under the cruel and unusual punishment prohibition. I have attached to this Affidavit three booklets that I have written describing the problem of Anesthesia Awareness and what I, and others, went through when we awoke on during surgery. They are:

(1) *I Was Awake* (the surreal true account of my being on the operating table, fully awake and aware, yet completely helpless to communicate my plight
(2) *Listen to the Victims* (stories of other victims)
(3) *A Plea to Anesthesiologists and Nurse Anesthetists* (my attempt to get the attention of the anesthesia community and to try to explain to them the horror awareness victims undergo.

As to what is most pertinent in executions, the first shot should put the condemned to sleep. The drug that is being used now is designed to be very short acting—perhaps intended to last only five minutes or so. The second shot is the paralytic, one that is banned by the American Veterinary Association has banned even for use in euthanizing

Exhibit XI-H

1991

animals. This was not the exact same paralytic that was used on me, but I can swear that its re-application (twice in my case) burnt like the fires of hell. There were also problems with my breathing apparatus, and so I was deprived of complete ventilation for a short time. Anesthesia Awareness was the most terrifying, torturous experience you can imagine. The experience was, indeed, worse than death.

I am not a campaigner on death penalty issues. The stated mission of my organization is to prevent *anyone* from experiencing Anesthesia Awareness. There is no question that what happened to me was absolute torture. As the process of lethal injection creates a serious risk of a person experiencing the same thing that happened to me, I have grave concerns that lethal injection can amount to torture.

To the best of my knowledge, all of the foregoing is true and correct."

Signed: _Carol Weihrer_

Carol Weihrer
President and Founder
Anesthesia Awareness Campaign, Inc.
http://www.anesthesiaawareness.com

SWORN AND SUBSCRIBED BEFORE ME this 25th day of November, 2003

Signed: _____

Notary Public in and for the State of Virginia

1992

in this case?

THE WITNESS:  (Witness nods affirmatively.)

THE COURT:  Thank you.

CAROL WEIHRER, was called as a witness, and after having been first duly sworn, testified as follows:

DIRECT EXAMINATION

QUESTIONS BY MR. MACLEAN:

Q.  Ms. Weihrer, could you please state your full name?

A.  Carol Weihrer.

Q.  Could you please spell your second name, your last name?

A.  W-E-I-H-R-E-R.

Q.  Where are you from, Ms. Weihrer?

A.  Ruston, Virginia.

Q.  You are the president and founder of Anesthesia Awareness Campaign, Inc.  Is that correct?

A.  That's correct.

Q.  And that is a nonprofit tax exempt corporation?

A.  Organization, yes.

Q.  Organization.  When was that

organization formed?

A. I believe we were incorporated in June of 2000.

Q. What motivated you to form that corporation?

A. The mission of the organization is to educate the public about anesthesia awareness, and to bring to the attention of anesthesia professionals and other health care professionals the fact that this problem does exist and that it is a life-changing experience.

Q. Was there an event in your life that motivated you in this direction?

A. Yes. I had an eye removed or nucleated.

Q. And that was in January of 1998?

A. January 24th.

Q. Okay. In connection with your work have you participated in training events at hospitals sometimes called grand rounds?

A. Yes, I have.

Q. And what do you do in those grand rounds?

A. I'm usually allotted an hour to speak

to the anesthesia professionals, both the staff anesthesiologist and nurse anesthetist as well as the residents about anesthesia awareness, and then there's a question and answer period.

Q.    Where have you done this?

A.    St. Vincent's Hospital in New York City; at the University of Virginia Medical Center in Charlottesville, Virginia; at Old Dominion University nurse anesthetist program in Virginia Beach, Virginia; and a telephone grand round at Redwood, California.

Q.    Have you given testimony before in cases involving lethal injection?

A.    Once.

Q.    When was that?

A.    About three months ago.

Q.    Where was that?

A.    Louisiana.

Q.    Have you had the experience of being under the effects of a paralytic agent that would -- a neuromuscular blocking agent while not being fully anesthetized?

A.    Yes, I have.  That's what I refer to

1995

as anesthesia awareness.

Q. Please describe to the Court what happened.

A. You mean while I was under the anesthesia and paralyzed?

Q. Right.

A. It is the most terrifying, torturous experience you can imagine because you cannot move. I was as alert at that time as I am right now. I knew everything that was going on around me. I could repeat every word that was said around me. I could relate every feeling and every sensation that was going on, yet I could not alert the surgical team in any way that I was feeling everything. I was completely paralyzed.

Q. Were you able to think?

A. As clearly as I am right now.

Q. Were you able to move any part of your body?

A. The surgeon said that I moved once, but I don't remember being able to. I just remember using every ounce of my strength to try to move everything and realizing that they could not hear me or see me move

anything. And believing that as much effort as I was using, something had to be moving, but knowing in reality nothing was.

Q. Were there -- how many -- I mean, were there a number of other people in the operating room at the time?

A. Yes. There was the anesthesiologist, the surgeon, a resident and some nurses. And I was aware of who was standing where and whose voice was whose.

Q. After you came out of it afterwards, did anybody indicate to you that they were aware that you were conscious?

A. No.

Q. I think you described this experience as worse than death?

A. When I was on the table I felt tremendous heat coming twice. I believe it was while I was receiving paralytic drug. And I remember distinctly feeling I don't know if I'm following the proverbial light to heaven or whether I'm laying in hell, but I really don't care. I just have to get out of this situation.

And so in that case I would say that

1997

it was worse than death if I were willing to give up my life just to get out of the situation.

MR. MACLEAN:  Thank you.  That's all.

MS. REEVERS:  We don't have any questions for this witness, Your Honor.

THE COURT:  Thank you for your testimony.  Let me make sure that I have your name spelled correctly.

THE WITNESS:  W-E-I-H-R-E-R.

THE COURT:  I left out the first R.  Okay.  Thank you very much.  If you will assist Ms. Weihrer.

MR. MACLEAN:  Let me help.

THE COURT:  Yes.  Thank you. There's a step right there.  I think they showed it to you earlier.

MR. MACLEAN:  Your Honor, I'd like to call Warden Ricky Bell, please.

THE COURT:  Warden Bell, if you would come forward, please.  We're going to follow the same procedure with you as we have with all the witnesses.  Do you understand that the oath requires you to

1999

# 2000
# Report of the
# AVMA Panel on Euthanasia



Exhibit XI-I

2000

# 2000
# Report of the
# AVMA Panel on Euthanasia

Members of the panel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 671
Preface. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 671
Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 672
General considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 673
Animal behavioral considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 674
Human behavioral considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 674
Modes of action of euthanatizing agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 675
Inhalant agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 675
  Inhalant anesthetics. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 676
  Carbon dioxide . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 677
  Nitrogen, argon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 678
  Carbon monoxide . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 678
Noninhalant pharmaceutical agents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 679
  Barbituric acid derivatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 679
  Pentobarbital combinations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 680
  Chloral hydrate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 680
  T-61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 680
  Tricaine methane sulfonate (MS 222, TMS) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 680
  Potassium chloride in conjunction with prior general anesthesia. . . . . . . . . . . . . . . . . . . . . . . . . . . 680
  Unacceptable injectable agents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 681
Physical methods. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 681
  Penetrating captive bolt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 681
  Euthanasia by a blow to the head . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 681
  Gunshot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 682
  Cervical dislocation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 682
  Decapitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 682
  Electrocution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 683
  Microwave irradiation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 683
  Thoracic (cardiopulmonary, cardiac) compression . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 683
  Kill traps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 684
  Adjunctive methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 684
    Exsanguination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 684
    Stunning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 684
    Pithing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 685
Special considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 685
  Equine euthanasia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 685
  Animals intended for human or animal food . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 685
  Euthanasia of nonconventional species: zoo, wild, aquatic, and ectothermic animals. . . . . . . . . . . . . 685
    Zoo animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 686
    Wildlife. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 686
    Diseased, injured, or live-captured wildlife or feral species . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 686
    Birds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 686
    Amphibians, fish, and reptiles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 687
    Marine mammals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 687
  Euthanasia of animals raised for fur production . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 688
  Prenatal and neonatal euthanasia. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 688
  Mass euthanasia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 688
Postface. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 688
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 689
Appendix 1—Agents and methods of euthanasia by species. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 693
Appendix 2—Acceptable agents and methods of euthanasia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 694
Appendix 3—Conditionally acceptable agents and methods of euthanasia. . . . . . . . . . . . . . . . . . . . 695
Appendix 4—Some unacceptable agents and methods of euthanasia . . . . . . . . . . . . . . . . . . . . . . . . 696

2001

## Members of the AVMA Panel

Bonnie V. Beaver, DVM, MS, DACVB, (Chair) Department of Small Animal Medicine and Surgery, College of Veterinary Medicine, Texas A&M University, 4474 TAMU, College Station, TX 77843-4474, representing the AVMA Executive Board.

Willie Reed, DVM, PhD, DACVP, DACPV, Animal Health Diagnostic Laboratory, College of Veterinary Medicine, Michigan State University, B646 W. Fee Hall-AHDL, East Lansing, MI 48824-1316, representing the AVMA Council on Research.

Steven Leary, DVM, DACLAM, Division of Comparative Medicine, Washington University, Box 8061, St Louis, MO 63110, representing the AVMA Animal Welfare Committee.

Brendan McKiernan, DVM, DACVIM, Denver Veterinary Specialists, 3695 Kipling St, Wheat Ridge, CO 80033, representing the American Animal Hospital Association.

Fairfield Bain, DVM, DACVIM, DACVP, DACVECC, Hagyard-Davidson-McGee Associates PSC, 4250 Iron Works Pike, Lexington, KY 40511-8412, representing the American Association of Equine Practitioners.

Roy Schultz, DVM, MS, DABVP, 1114 N Frost Ave, Avoca, IA 51521, representing the American Board of Veterinary Practitioners.

B. Taylor Bennett, DVM, PhD, DACLAM, Biologic Resources Laboratory (MC533), University of Illinois at Chicago, 1840 W Taylor St, Chicago, IL 60612-7348, representing the American College of Laboratory Animal Medicine.

Peter Pascoe, BVSc, DVA, DACVA, DECVA, Department of Surgical and Radiological Sciences, School of Veterinary Medicine, University of California, Davis, CA 95616-8745, representing the American College of Veterinary Anesthesiologists.

Elizabeth Shull, DVM, DACVB, DACVIM (Neurology), Veterinary Specialty Consultation Services, 1505 Bob Kirby Rd, Knoxville, TN 37931, representing the American College of Veterinary Behaviorists.

Linda C. Cork, DVM, PhD, DACVP, Department of Comparative Medicine, School of Medicine, Stanford University, MSOB Building, Room X347, Stanford, CA 94305-5415, representing the American College of Veterinary Pathologists.

Ruth Francis-Floyd, DVM, MS, DACZM, Department of Large Animal Clinical Sciences, College f Veterinary Medicine, University of Florida, Box 100136, Gainesville, FL 32510-0136, representing the International Association of Aquatic Animal Medicine.

Keith D. Amass, DVM, Safe-Capture International Inc, PO Box 206, Mount Horeb, WI 53572, representing wildlife regulatory/conservation agencies.

Richard Johnson, PhD, Department of Physiological Sciences, College of Veterinary Medicine, University of Florida, Box 100144, Gainesville, FL 32610-0144, representing the Society for Neuroscience.

Robert H. Schmidt, MS, PhD, Department of Fisheries and Wildlife, Utah State University, Logan UT 84322-5210, representing the wildlife damage management profession.

Wendy Underwood, DVM, MS, DACVIM, Lilly Corporate Center, Eli Lilly and Co, Indianapolis, IN 46285, representing the National Institute for Animal Agriculture Euthanasia Task Force.

Gus W. Thornton, DVM, DACVIM, Massachusetts Society for the Prevention of Cruelty to Animals (MSPCA), American Humane Education Society (AHES), 350 S Huntington Ave, Boston, MA 02130, representing an animal protection agency.

Barbara Kohn, DVM, USDA/APHIS/Animal Care, 4700 River Road, Unit 84, Riverdale, MD 20737-1234, representing the USDA/APHIS.

## PREFACE

At the request of the AVMA Council on Research, the Executive Board of the AVMA convened a Panel on Euthanasia in 1999 to review and make necessary revisions to the fifth Panel Report, published in 1993.[1] In this newest version of the report, the panel has updated information on euthanasia of animals in research and animal care and control facilities; expanded information on ectothermic, aquatic, and fur-bearing animals; added information on horses and wildlife; and deleted methods or agents considered unacceptable. Because the panel's deliberations were based on currently available scientific information, some euthanasia methods and agents are not discussed.

Welfare issues are increasingly being identified in the management of free-ranging wildlife, and the need for humane euthanasia guidelines in this context is great. Collection of animals for scientific investigations, euthanasia of injured or diseased wildlife species, removal of animals causing damage to property or threatening human safety, and euthanasia of animals in excess population are drawing more public attention. These issues are acknowledged in this report and special considerations are described for handling animals under free-ranging conditions, where their needs are far different from those of their domestic counterparts.

This report is intended for use by members of the

veterinary profession who carry out or oversee the euthanasia of animals. Although the report may be interpreted and understood by a broad segment of the general population, a veterinarian should be consulted in the application of these recommendations. The practice of veterinary medicine is complex and involves diverse animal species. Whenever possible, a veterinarian experienced with the species in question should be consulted when selecting the method of euthanasia, particularly when little species-specific euthanasia research has been done. Although interpretation and use of this report cannot be limited, the panel's overriding commitment is to give veterinarians guidance in relieving pain and suffering of animals that are to be euthanatized. The recommendations in this report are intended to serve as guidelines for veterinarians who must then use professional judgment in applying them to the various settings where animals are to be euthanatized.

## INTRODUCTION

The term euthanasia is derived from the Greek terms *eu* meaning good and *thanatos* meaning death.[2] A "good death" would be one that occurs with minimal pain and distress. In the context of this report, euthanasia is the act of inducing humane death in an animal. It is our responsibility as veterinarians and human beings to ensure that if an animal's life is to be taken, it is done with the highest degree of respect, and with an emphasis on making the death as painless and distress free as possible. Euthanasia techniques should result in rapid loss of consciousness followed by cardiac or respiratory arrest and the ultimate loss of brain function. In addition, the technique should minimize distress and anxiety experienced by the animal prior to loss of consciousness. The panel recognized that the absence of pain and distress cannot always be achieved. This report attempts to balance the ideal of minimal pain and distress with the reality of the many environments in which euthanasia is performed. A veterinarian with appropriate training and expertise for the species involved should be consulted to ensure that proper procedures are used.

Criteria for painless death can be established only after the mechanisms of pain are understood. Pain is that sensation (perception) that results from nerve impulses reaching the cerebral cortex via ascending neural pathways. Under normal circumstances, these pathways are relatively specific, but the nervous system is sufficiently plastic that activation of nociceptive pathways does not always result in pain and stimulation of other (non-nociceptive) peripheral and central neurons can give rise to pain. The term nociceptive is derived from the word *noci* meaning to injure and *ceptive* meaning to receive, and is used to describe neuronal input caused by noxious stimuli, which threaten to, or actually do, destroy tissue. These noxious stimuli initiate nerve impulses by acting at primary nociceptors and other sensory nerve endings that respond to noxious and non-noxious stimuli from mechanical, thermal, or chemical activity. Endogenous chemical substances such as hydrogen ions, potassium ions, ATP, serotonin, histamine, bradykinin, and prostaglandins, as well as electrical currents, are capable of generating nerve impulses in nociceptor nerve fibers. Activity in nociceptive pathways can also be triggered in normally silent receptors that become sensitized by chronic pain conditions.[3,4]

Nerve impulse activity generated by nociceptors is conducted via nociceptor primary afferent fibers to the spinal cord or the brainstem where it is transmitted to two general sets of neural networks. One set is related to nociceptive reflexes (eg, withdrawal and flexion reflexes) that are mediated at the spinal level, and the second set consists of ascending pathways to the reticular formation, hypothalamus, thalamus, and cerebral cortex (somatosensory cortex and limbic system) for sensory processing. It is important to understand that ascending nociceptive pathways are numerous, often redundant, and are capable of considerable plasticity under chronic conditions (pathology or injury). Moreover, even the transmission of nociceptive neural activity in a given pathway is highly variable. Under certain conditions, both the nociceptive reflexes and the ascending pathways may be suppressed, as, for example, in epidural anesthesia. Under another set of conditions, nociceptive reflex actions may occur, but activity in the ascending pathways is suppressed; thus, noxious stimuli are not perceived as pain. It is incorrect to use the term pain for stimuli, receptors, reflexes, or pathways because the term implies perception, whereas all the above may be active without consequential pain perception.[5,6]

Pain is divided into two broad categories: (1) sensory-discriminative, which indicates the site of origin and the stimulus giving rise to the pain; and (2) motivational-affective in which the severity of the stimulus is perceived and the animal's response is determined. Sensory-discriminative processing of nociceptive impulses is most likely to be accomplished by subcortical and cortical mechanisms similar to those used for processing other sensory-discriminative input that provides the individual with information about the intensity, duration, location, and quality of the stimulus. Motivational-affective processing involves the ascending reticular formation for behavioral and cortical arousal. It also involves thalamic input to the forebrain and the limbic system for perceptions such as discomfort, fear, anxiety, and depression. The motivational-affective neural networks also have strong inputs to the limbic system, hypothalamus and the autonomic nervous system for reflex activation of the cardiovascular, pulmonary, and pituitary-adrenal systems. Responses activated by these systems feed back to the forebrain and enhance perceptions derived via motivational-affective inputs. On the basis of neurosurgical experience in humans, it is possible to separate the sensory-discriminative components from the motivational-affective components of pain.[7]

For pain to be experienced, the cerebral cortex and subcortical structures must be functional. If the cerebral cortex is nonfunctional because of hypoxia, depression by drugs, electric shock, or concussion, pain is not experienced. Therefore, the choice of the euthanasia agent or method is less critical if it is to be used on an animal that is anesthetized or unconscious, provided that the animal does not regain consciousness prior to death.

2003



An understanding of the continuum that represents stress and distress is essential for evaluating techniques that minimize any distress experienced by an animal being euthanatized. Stress has been defined as the effect of physical, physiologic, or emotional factors (stressors) that induce an alteration in an animal's homeostasis or adaptive state.[8] The response of an animal to stress represents the adaptive process that is necessary to restore the baseline mental and physiologic state. These responses may involve changes in an animal's neuroendocrinologic system, autonomic nervous system, and mental status that may result in overt behavioral changes. An animal's response varies according to its experience, age, species, breed, and current physiologic and psychologic state.[9]

Stress and the resulting responses have been divided into three phases.[10] Eustress results when harmless stimuli initiate adaptive responses that are beneficial to the animal. Neutral stress results when the animal's response to stimuli causes neither harmful nor beneficial effects to the animal. Distress results when an animal's response to stimuli interferes with its well-being and comfort.[11]

As with many other procedures involving animals, some methods of euthanasia require physical handling of the animal. The amount of control and kind of restraint required will be determined by the animal's species, breed, size, state of domestication, degree of taming, presence of painful injury or disease, degree of excitement, and method of euthanasia. Proper handling is vital to minimize pain and distress in animals, to ensure safety of the person performing euthanasia, and, often, to protect other people and animals.

An in-depth discussion of euthanasia procedures is beyond the scope of this report; however, personnel who perform euthanasia must have appropriate certification and training, experience with the techniques to be used, and experience in the humane restraint of the species of animal to be euthanatized, to ensure that animal pain and distress are minimized during euthanasia. Training and experience should include familiarity with the normal behavior of the species being euthanatized, an appreciation of how handling and restraint affects that behavior, and an understanding of the mechanism by which the selected technique induces loss of consciousness and death. Prior to being assigned full responsibility for performing euthanasia, all personnel must have demonstrated proficiency in the use of the technique in a closely supervised environment. References provided at the end of this document may be useful for training personnel.[12-21]

Selection of the most appropriate method of euthanasia in any given situation depends on the species of animal involved, available means of animal restraint, skill of personnel, number of animals, and other considerations. Available information focuses primarily on domestic animals, but the same general considerations should be applied to all species.

This report includes four appendices that summarize information from the text. Appendix 1 lists acceptable and conditionally acceptable methods of euthanasia, categorized by species. Appendices 2 and 3 provide summaries of characteristics for acceptable and condi-

tionally acceptable methods of euthanasia. Appendix 4 provides a summary of some unacceptable euthanasia agents and methods. Criteria used for acceptable, conditionally acceptable, and unacceptable methods are as follows: acceptable methods are those that consistently produce a humane death when used as the sole means of euthanasia; conditionally acceptable methods are those techniques that by the nature of the technique or because of greater potential for operator error or safety hazards might not consistently produce humane death or are methods not well documented in the scientific literature; and unacceptable techniques are those methods deemed inhumane under any conditions or that the panel found posed a substantial risk to the human applying the technique. The report also includes discussion of several adjunctive methods, which are those methods that cannot be used as the sole method of euthanasia, but that can be used in conjunction with other methods to produce a humane death.

## GENERAL CONSIDERATIONS

In evaluating methods of euthanasia, the panel used the following criteria: (1) ability to induce loss of consciousness and death without causing pain, distress, anxiety, or apprehension; (2) time required to induce loss of consciousness; (3) reliability; (4) safety of personnel; (5) irreversibility; (6) compatibility with requirement and purpose; (7) emotional effect on observers or operators; (8) compatibility with subsequent evaluation, examination, or use of tissue; (9) drug availability and human abuse potential; (10) compatibility with species, age, and health status; (11) ability to maintain equipment in proper working order; and (12) safety for predators/scavengers should the carcass be consumed.

The panel discussed the definition of euthanasia used in this report as it applies to circumstances when the degree of control over the animal makes it difficult to ensure death without pain and distress. Slaughter of animals for food, fur, or fiber may represent such situations. However, the same standards for euthanasia should be applied to the killing of animals for food, fur, or fiber, and wildlife or feral animals. Animals intended for food should be slaughtered humanely, taking into account any special requirements of the US Department of Agriculture.[22] Painless death can be achieved by properly stunning the animal, followed immediately by exsanguination. Handling of animals prior to slaughter should be as stress free as possible. Electric prods or other devices should not be used to encourage movement of animals and are not needed if chutes and ramps are properly designed to enable animals to be moved and restrained without undue stress.[23-27] Animals must not be restrained in a painful position before slaughter.

Ethical considerations that must be addressed when euthanatizing healthy and unwanted animals reflect professional and societal concerns.[28,29] These issues are complex and warrant thorough consideration by the profession and all those concerned with the welfare of animals. Whereas the panel recognizes the need for those responsible for the euthanasia of ani-

2004

mals to be cognizant of these issues, it does not believe that this report is the appropriate forum for an in-depth discussion of this topic.

It is the intent of the panel that euthanasia be performed in accordance with applicable federal, state, and local laws governing drug acquisition and storage, occupational safety, and methods used for euthanasia and disposal of animals. However, space does not permit a review of current federal, state, and local regulations.

The panel is aware that circumstances may arise that are not clearly covered by this report. Whenever such situations arise, a veterinarian experienced with the species should use professional judgment and knowledge of clinically acceptable techniques in selecting an appropriate euthanasia technique. Professional judgment in these circumstances will take into consideration the animal's size and its species-specific physiologic and behavioral characteristics. In all circumstances, the euthanasia method should be selected and used with the highest ethical standards and social conscience.

It is imperative that death be verified after euthanasia and before disposal of the animal. An animal in deep narcosis following administration of an injectable or inhalant agent may appear dead, but might eventually recover. Death must be confirmed by examining the animal for cessation of vital signs, and consideration given to the animal species and method of euthanasia when determining the criteria for confirming death.

## ANIMAL BEHAVIORAL CONSIDERATIONS

The need to minimize animal distress, including fear, anxiety, and apprehension, must be considered in determining the method of euthanasia. Gentle restraint (preferably in a familiar and safe environment), careful handling, and talking during euthanasia often have a calming effect on animals that are used to being handled. Sedation and/or anesthesia may assist in achieving the best conditions for euthanasia. It must be recognized that any sedatives or anesthetics given at this stage that change circulation may delay the onset of the euthanasia agent. Preparation of observers should also be taken into consideration.

Animals that are wild, feral, injured, or already distressed from disease pose another challenge. Methods of pre-euthanasia handling suitable for domestic animals may not be effective for them. Because handling may stress animals unaccustomed to human contact (eg, wildlife, zoo, and feral species), the degree of restraint required to perform any euthanasia procedure should be considered when evaluating various methods. When handling these animals, calming may be accomplished by minimizing visual, auditory, and tactile stimulation. When struggling during capture or restraint may cause pain, injury, or anxiety to the animal or danger to the operator, the use of tranquilizers, analgesics, and/or anesthetics may be necessary. A route of injection should be chosen that causes the least distress in the animal for which euthanasia must be performed. Various techniques for oral delivery of sedatives to dogs and cats have been described that may be useful under these circumstances.[30,31]

Facial expressions and body postures that indicate various emotional states of animals have been described for some species.[32-37] Behavioral and physiologic responses to noxious stimuli include distress vocalization, struggling, attempts to escape, defensive or redirected aggression, salivation, urination, defecation, evacuation of anal sacs, pupillary dilatation, tachycardia, sweating, and reflex skeletal muscle contractions causing shivering, tremors, or other muscular spasms. Unconscious as well as conscious animals are capable of some of these responses. Fear can cause immobility or "playing dead" in certain species, particularly rabbits and chickens. This immobility response should not be interpreted as loss of consciousness when the animal is, in fact, conscious. Distress vocalizations, fearful behavior, and release of certain odors or pheromones by a frightened animal may cause anxiety and apprehension in other animals. Therefore, for sensitive species, it is desirable that other animals not be present when individual animal euthanasia is performed.

## HUMAN BEHAVIORAL CONSIDERATIONS

When animals must be euthanatized, either as individuals or in larger groups, moral and ethical concerns dictate that humane practices be observed. Human psychologic responses to euthanasia of animals need to be considered, with grief at the loss of a life as the most common reaction.[38] There are six circumstances under which we are most aware of the effects of animal euthanasia on people.

The first of these is the veterinary clinical setting where owners have to make decisions about whether and when to euthanatize. Although many owners rely heavily on their veterinarian's judgment, others may have misgivings about making their own decision. This is particularly likely if an owner feels responsible for allowing an animal's medical or behavioral problem to go unattended so that euthanasia becomes necessary. When owners choose to be present during euthanasia, they should be prepared for what will happen. What drugs are being used and how the animal could respond should be discussed. Behaviors such as vocalization, muscle twitches, failure of the eyelids to close, urination, or defecation can be distressing. Counseling services for grieving owners are now available in some communities[39] and telephone counseling is available through some veterinary schools.[40,41] Owners are not the only people affected by euthanasia of animals. Veterinarians and their staffs may also become attached to patients they have known and treated for many years and may continue to struggle with the ethical implications of ending an animal's life.

The second is animal care and control facilities where unwanted, homeless, diseased, and injured animals must be euthanatized in large numbers. Distress may develop among personnel directly involved in performing euthanasia repeatedly. Emotional uneasiness, discomfort, or distress experienced by people involved with euthanasia of animals may be minimized. The person performing euthanasia must be technically proficient, use humane handling methods, understand the reasons for euthanasia, and be familiar with the

method of euthanasia being employed (ie, what is going to happen to the animal). When the person is not knowledgeable about what to expect, he or she may mistakenly interpret any movement of animals as consciousness and a lack of movement as loss of consciousness. Methods that preclude movement of animals are more aesthetically acceptable to most technical staff even though lack of movement is not an adequate criterion for evaluating euthanasia techniques. Constant exposure to, or participation in, euthanasia procedures can cause a psychologic state characterized by a strong sense of work dissatisfaction or alienation, which may be expressed by absenteeism, belligerence, or careless and callous handling of animals.[42] This is one of the principal reasons for turnover of employees directly involved with repeated animal euthanasia. Management should be aware of potential personnel problems related to animal euthanasia and determine whether it is necessary to institute a program to prevent, decrease, or eliminate this problem. Specific coping strategies can make the task more tolerable. Some strategies include adequate training programs so that euthanasia is performed competently, peer support in the workplace, professional support as necessary, focusing on animals that are successfully adopted or returned to owners, devoting some work time to educational activities, and providing time off when workers feel stressed.

The third setting is the laboratory. Researchers, technicians, and students may become attached to animals that must be euthanatized.[43] The same considerations afforded pet owners or shelter employees should be provided to those working in laboratories.

The fourth situation is wildlife control. Wildlife biologists, wildlife managers, and wildlife health professionals are often responsible for euthanatizing animals that are injured, diseased, in excessive number, or that threaten property or human safety. Although relocation of some animals is appropriate and attempted, relocation is often only a temporary solution to a larger problem. People who must deal with these animals, especially under public pressure to save the animals rather than destroy them, can experience extreme distress and anxiety.

The fifth setting is livestock and poultry slaughter facilities. The large number of animals processed daily can take a heavy toll on employees physically and emotionally. Federal and state agricultural employees may also be involved in mass euthanasia of poultry and livestock in the face of disease outbreaks, bioterrorism, and natural disasters.

The last situation is public exposure. Because euthanasia of zoo animals, animals involved in roadside or racetrack accidents, stranded marine animals, nuisance or injured wildlife, and others can draw public attention, human attitudes and responses should be considered whenever animals are euthanatized. Natural disasters and foreign animal disease programs also present public challenges. These considerations, however, should not outweigh the primary responsibility of using the most rapid and painless euthanasia method possible under the circumstances.

## MODES OF ACTION OF EUTHANATIZING AGENTS

Euthanatizing agents cause death by three basic mechanisms: (1) hypoxia, direct or indirect; (2) direct depression of neurons necessary for life function; and (3) physical disruption of brain activity and destruction of neurons necessary for life.

Agents that induce death by direct or indirect hypoxia can act at various sites and can cause loss of consciousness at different rates. For death to be painless and distress-free, loss of consciousness should precede loss of motor activity (muscle movement). Loss of motor activity, however, cannot be equated with loss of consciousness and absence of distress. Thus, agents that induce muscle paralysis without loss of consciousness are not acceptable as sole agents for euthanasia (eg, depolarizing and nondepolarizing muscle relaxants, strychnine, nicotine, and magnesium salts). With other techniques that induce hypoxia, some animals may have motor activity following loss of consciousness, but this is reflex activity and is not perceived by the animal.

A second group of euthanatizing agents depress nerve cells of the brain, inducing loss of consciousness followed by death. Some of these agents release inhibition of motor activity during the first stage of anesthesia, resulting in a so-called excitement or delirium phase, during which there may be vocalization and some muscle contraction. These responses do not appear to be purposeful. Death follows loss of consciousness, and is attributable to cardiac arrest and/or hypoxemia following direct depression of respiratory centers.

Physical disruption of brain activity, caused by concussion, direct destruction of the brain, or electrical depolarization of neurons, induces rapid loss of consciousness. Death occurs because of destruction of midbrain centers controlling cardiac and respiratory activity or as a result of adjunctive methods (eg, exsanguination) used to kill the animal. Exaggerated muscular activity can follow loss of consciousness and, although this may disturb some observers, the animal is not experiencing pain or distress.

## INHALANT AGENTS

Any gas that is inhaled must reach a certain concentration in the alveoli before it can be effective; therefore, euthanasia with any of these agents takes some time. The suitability of a particular agent depends on whether an animal experiences distress between the time it begins to inhale the agent and the time it loses consciousness. Some agents may induce convulsions, but these generally follow loss of consciousness. Agents inducing convulsions prior to loss of consciousness are unacceptable for euthanasia.

Certain considerations are common to all inhalant agents. (1) In most cases, onset of loss of consciousness is more rapid, and euthanasia more humane, if the animal is rapidly exposed to a high concentration of the agent. (2) The equipment used to deliver and maintain this high concentration must be in good working order and in compliance with state and federal regulations. Leaky or faulty equipment may lead to

slow, distressful death and be hazardous to other animals and to personnel. (3) Most of these agents are hazardous to personnel because of the risk of explosions (eg, ether), narcosis (eg, halothane), hypoxemia (eg, nitrogen and carbon monoxide), addiction (eg, nitrous oxide), or health effects resulting from chronic exposure (eg, nitrous oxide and carbon monoxide). (4) Alveolar concentrations rise slowly in an animal with decreased ventilation, making agitation more likely during induction. Other noninhalant methods of euthanasia should be considered for such animals. (5) Neonatal animals appear to be resistant to hypoxia, and because all inhalant agents ultimately cause hypoxia, neonatal animals take longer to die than adults. Glass et al,[44] reported that newborn dogs, rabbits, and guinea pigs survived a nitrogen atmosphere much longer than did adults. Dogs, at 1 week old, survived for 14 minutes compared with a 3-minute survival time after a few weeks of age. Guinea pigs survived for 4.5 minutes at 1 day old, compared with 3 minutes at 8 days or older. Rabbits survived for 13 minutes at 6 days old, 4 minutes at 14 days, and 1.5 minutes at 19 days and older. The panel recommends that inhalant agents not be used alone in animals less than 16 weeks old except to induce loss of consciousness, followed by the use of some other method to kill the animal. (6) Rapid gas flows can produce a noise that frightens animals. If high flows are required, the equipment should be designed to minimize noise. (7) Animals placed together in chambers should be of the same species, and, if needed, should be restrained so that they will not hurt themselves or others. Chambers should not be overloaded and need to be kept clean to minimize odors that might distress animals subsequently euthanatized. (8) Reptiles, amphibians, and diving birds and mammals have a great capacity for holding their breath and anaerobic metabolism. Therefore, induction of anesthesia and time to loss of consciousness when using inhalants may be greatly prolonged. Other techniques may be more appropriate for these species.

## Inhalant anesthetics

Inhalant anesthetics (eg, ether, halothane, methoxyflurane, isoflurane, sevoflurane, desflurane, and enflurane) have been used to euthanatize many species.[45] Halothane induces anesthesia rapidly and is the most effective inhalant anesthetic for euthanasia. Enflurane is less soluble in blood than halothane, but, because of its lower vapor pressure and lower potency, induction rates may be similar to those for halothane. At deep anesthetic planes, animals may seizure. It is an effective agent for euthanasia, but the associated seizure activity may be disturbing to personnel. Isoflurane is less soluble than halothane, and it should induce anesthesia more rapidly. However, it has a slightly pungent odor and animals often hold their breath, delaying onset of loss of consciousness. Isoflurane also may require more drug to kill an animal, compared with halothane. Although isoflurane is acceptable as a euthanasia agent, halothane is preferred. Sevoflurane is less soluble than halothane and does not have an objectionable odor. It is less potent

than isoflurane or halothane and has a lower vapor pressure. Anesthetic concentrations can be achieved and maintained rapidly. Desflurane is currently the least soluble potent inhalant anesthetic, but the vapor is quite pungent, which may slow induction. This drug is so volatile that it could displace oxygen ($O_2$) and induce hypoxemia during induction if supplemental $O_2$ is not provided. Methoxyflurane is highly soluble, and slow anesthetic induction with its use may be accompanied by agitation. It is a conditionally acceptable agent for euthanasia in rodents.[46] Ether has high solubility in blood and induces anesthesia slowly. It is irritating to the eyes and nose, poses serious risks associated with its flammability and explosiveness, and has been used to create a model for stress.[47-50]

With inhalant anesthetics, the animal can be placed in a closed receptacle containing cotton or gauze soaked with an appropriate amount of the anesthetic,[51] or the anesthetic can be introduced from a vaporizer. The latter method may be associated with a longer induction time. Vapors are inhaled until respiration ceases and death ensues. Because the liquid state of most inhalant anesthetics is irritating, animals should be exposed only to vapors. Also, sufficient air or $O_2$ must be provided during the induction period to prevent hypoxemia.[51] In the case of small rodents placed in a large container, there will be sufficient $O_2$ in the chamber to prevent hypoxemia. Larger species placed in small containers may need supplemental air or $O_2$.[51]

Nitrous oxide ($N_2O$) may be used with other inhalants to speed the onset of anesthesia, but alone it does not induce anesthesia in animals, even at 100% concentration. When used by itself, $N_2O$ produces hypoxemia before respiratory or cardiac arrest. As a result, animals may become distressed prior to loss of consciousness.

Occupational exposure to inhalant anesthetics constitutes a human health hazard. Spontaneous abortion and congenital abnormalities have been associated with exposure of women to trace amounts of inhalation anesthetic agents during early stages of pregnancy.[52] Regarding human exposure to inhalant anesthetics, the concentrations of halothane, enflurane, and isoflurane should be less than 2 ppm, and less than 25 ppm for nitrous oxide.[52] There are no controlled studies proving that such concentrations of anesthetics are safe, but these concentrations were established because they were found to be attainable under hospital conditions. Effective procedures must be used to protect personnel from anesthetic vapors.

*Advantages*—(1) Inhalant anesthetics are particularly valuable for euthanasia of smaller animals (< 7 kg) or for animals in which venipuncture may be difficult. (2) Halothane, enflurane, isoflurane, sevoflurane, desflurane, methoxyflurane, and $N_2O$ are nonflammable and nonexplosive under ordinary environmental conditions.

*Disadvantages*—(1) Animals may struggle and become anxious during induction of anesthesia because anesthetic vapors may be irritating and can induce excitement. (2) Ether is flammable and explo-

sive. Explosions have occurred when animals, euthanatized with ether, were placed in an ordinary (not explosion proof) refrigerator or freezer and when bagged animals were placed in an incinerator. (3) Induction with methoxyflurane is unacceptably slow in some species. (4) Nitrous oxide will support combustion. (5) Personnel and animals can be injured by exposure to these agents. (6) There is a potential for human abuse of some of these drugs, especially $N_2O$.

*Recommendations*—In order of preference, halothane, enflurane, isoflurane, sevoflurane, methoxyflurane, and desflurane, with or without nitrous oxide, are acceptable for euthanasia of small animals (< 7 kg). Ether should only be used in carefully controlled situations in compliance with state and federal occupational health and safety regulations. It is conditionally acceptable. Nitrous oxide should not be used alone, pending further scientific studies on its suitability for animal euthanasia. Although acceptable, these agents are generally not used in larger animals because of their cost and difficulty of administration.

## Carbon dioxide

Room air contains 0.04% carbon dioxide ($CO_2$), which is heavier than air and nearly odorless. Inhalation of $CO_2$ at a concentration of 7.5% increases the pain threshold, and higher concentrations of $CO_2$ have a rapid anesthetic effect.[53-58]

Leake and Waters[56] reported the experimental use of $CO_2$ as an anesthetic agent for dogs. At concentrations of 30% to 40% $CO_2$ in $O_2$, anesthesia was induced within 1 to 2 minutes, usually without struggling, retching, or vomiting. For cats, inhalation of 60% $CO_2$ results in loss of consciousness within 45 seconds, and respiratory arrest within 5 minutes.[59] Signs of effective $CO_2$ anesthesia are those associated with deep surgical anesthesia, such as loss of withdrawal and palpebral reflexes.[60] Time to loss of consciousness is decreased by use of higher concentrations of $CO_2$ with an 80 to 100% concentration providing anesthesia in 12 to 33 seconds in rats and 70% $CO_2$ in $O_2$ inducing anesthesia in 40 to 50 seconds.[61,62] Time to loss of consciousness will be longer if the concentration is increased slowly rather than immersing the animal in the full concentration immediately.

Several investigators have suggested that inhalation of high concentrations of $CO_2$ may be distressing to animals,[63-66] because the gas dissolves in moisture on the nasal mucosa. The resulting product, carbonic acid, may stimulate nociceptors in the nasal mucosa. Some humans exposed to concentrations of around 50% $CO_2$ report that inhaling the gas is unpleasant and that higher concentrations are noxious.[67,68] A brief study of swine examined the aversive nature of $CO_2$ exposure[69] and found that 90% $CO_2$ was aversive to pigs while 30% was not. For rats, exposure to increasing concentrations of $CO_2$ (33% achieved after 1 minute) in their home cage produced no evident stress as measured by behavior and ACTH, glucose, and corticosterone concentrations in serum.[70]

Carbon dioxide has been used to euthanatize groups of small laboratory animals, including mice, rats, guinea pigs, chickens, and rabbits,[5,71-76] and to render swine unconscious before humane slaughter.[22,63,64] The combination of 40% $CO_2$ and approximately 3% CO has been used experimentally for euthanasia of dogs.[65] Carbon dioxide has been used in specially designed chambers to euthanatize individual cats[77,78] and other small laboratory animals.[51,72,79]

Studies of 1-day-old chickens have revealed that $CO_2$ is an effective euthanatizing agent. Inhalation of $CO_2$ caused little distress to the birds, suppressed nervous activity, and induced death within 5 minutes.[73] Because respiration begins during embryonic development, the unhatched chicken's environment may normally have a $CO_2$ concentration as high as 14%. Thus, $CO_2$ concentrations for euthanasia of newly hatched chickens and neonates of other species should be especially high. A $CO_2$ concentration of 60% to 70% with a 5-minute exposure time appears to be optimal.[73]

In studies of mink, high concentrations of $CO_2$ would kill them quickly, but a 70% $CO_2$ concentration induced loss of consciousness without killing them.[80] Some burrowing animals, such as rabbits of the species *Oryctolagus*, also have prolonged survival times when exposed to $CO_2$.[81] Some burrowing and diving animals have physiologic mechanisms for coping with hypercapnia. Therefore, it is necessary to have a sufficient concentration of $CO_2$ to kill the animal by hypoxemia following induction of anesthesia with $CO_2$.

*Advantages*—(1) The rapid depressant, analgesic, and anesthetic effects of $CO_2$ are well established. (2) Carbon dioxide is readily available and can be purchased in compressed gas cylinders. (3) Carbon dioxide is inexpensive, nonflammable, nonexplosive, and poses minimal hazard to personnel when used with properly designed equipment. (4) Carbon dioxide does not result in accumulation of tissue residues in food-producing animals. (5) Carbon dioxide euthanasia does not distort murine cholinergic markers[82] or corticosterone concentrations.[83]

*Disadvantages*—(1) Because $CO_2$ is heavier than air, incomplete filling of a chamber may permit animals to climb or raise their heads above the higher concentrations and avoid exposure. (2) Some species, such as fish and burrowing and diving mammals, may have extraordinary tolerance for $CO_2$. (3) Reptiles and amphibians may breathe too slowly for the use of $CO_2$. (4) Euthanasia by exposure to $CO_2$ may take longer than euthanasia by other means.[61] (5) Induction of loss of consciousness at lower concentrations (< 80%) may produce pulmonary and upper respiratory tract lesions.[67,84] (6) High concentrations of $CO_2$ may be distressful to some animals.

*Recommendations*—Carbon dioxide is acceptable for euthanasia in appropriate species (Tables 1 and 2). Compressed $CO_2$ gas in cylinders is the only recommended source of carbon dioxide because the inflow to the chamber can be regulated precisely. Carbon dioxide generated by other methods such as from dry ice, fire extinguishers, or chemical means (eg, antacids) is unacceptable. Species should be separated and cham-

bers should not be overcrowded. With an animal in the chamber, an optimal flow rate should displace at least 20% of the chamber volume per minute.[85] Loss of consciousness may be induced more rapidly by exposing animals to a $CO_2$ concentration of 70% or more by prefilling the chamber for species in which this has not been shown to cause distress. Gas flow should be maintained for at least 1 minute after apparent clinical death.[86] It is important to verify that an animal is dead before removing it from the chamber. If an animal is not dead, $CO_2$ narcosis must be followed with another method of euthanasia. Adding $O_2$ to the $CO_2$ may or may not preclude signs of distress.[67,87] Additional $O_2$ will, however, prolong time to death and may complicate determination of consciousness. There appears to be no advantage to combining $O_2$ with carbon dioxide for euthanasia.[87]

## Nitrogen, argon

Nitrogen ($N_2$) and argon (Ar) are colorless, odorless gases that are inert, nonflammable, and nonexplosive. Nitrogen comprises 78% of atmospheric air, whereas Ar comprises less than 1%.

Euthanasia is induced by placing the animal in a closed container that has been prefilled with $N_2$ or Ar or into which the gas is then rapidly introduced. Nitrogen/Ar displaces $O_2$, thus inducing death by hypoxemia.

In studies by Herin et al,[88] dogs became unconscious within 76 seconds when a $N_2$ concentration of 98.5% was achieved in 45 to 60 seconds. The electroencephalogram (EEG) became isoelectric (flat) in a mean time of 80 seconds, and arterial blood pressure was undetectable at 204 seconds. Although all dogs hyperventilated prior to loss of consciousness, the investigators concluded that this method induced death without pain. Following loss of consciousness, vocalization, gasping, convulsions, and muscular tremors developed in some dogs. At the end of a 5-minute exposure period, all dogs were dead.[88] These findings were similar to those for rabbits[89] and mink.[80,90]

With $N_2$ flowing at a rate of 39% of chamber volume per minute, rats collapsed in approximately 3 minutes and stopped breathing in 5 to 6 minutes. Regardless of flow rate, signs of panic and distress were evident before the rats collapsed and died.[85] Insensitivity to pain under such circumstances is questionable.[91]

Tranquilization with acepromazine, in conjunction with $N_2$ euthanasia of dogs, was investigated by Quine et al.[92] Using ECG and EEG recordings, they found these dogs had much longer survival times than dogs not given acepromazine before administration of $N_2$. In one dog, ECG activity continued for 51 minutes. Quine also addressed distress associated with exposure to $N_2$ by removing cats and dogs from the chamber following loss of consciousness and allowing them to recover. When these animals were put back into the chamber, they did not appear afraid or apprehensive.

Investigations into the aversiveness of Ar to swine and poultry have revealed that these animals will tolerate breathing 90% Ar with 2% $O_2$.[69,71] Swine voluntarily entered a chamber containing this mixture, for a food reward, and only withdrew from the chamber as they became ataxic. They reentered the chamber immediately to continue eating. Poultry also entered a chamber containing this mixture for a food reward and continued eating until they collapsed.[71] When Ar was used to euthanatize chickens, exposure to a chamber prefilled with Ar, with an $O_2$ concentration of < 2%, led to EEG changes and collapse in 9 to 12 seconds. Birds removed from the chamber at 15 to 17 seconds failed to respond to comb pinching. Continued exposure led to convulsions at 20 to 24 seconds. Somatosensory-evoked potentials were lost at 24 to 34 seconds, and the EEG became isoelectric at 57 to 66 seconds. Convulsion onset was after loss of consciousness (collapse and loss of response to comb pinch), so this would appear to be a humane method of euthanasia for chickens.[93] Despite the availability of some information, there is still much about the use of $N_2$/Ar that needs to be investigated.

*Advantages*—(1) Nitrogen and Ar are readily available as compressed gases. (2) Hazards to personnel are minimal.

*Disadvantages*—(1) Loss of consciousness is preceded by hypoxemia and ventilatory stimulation, which may be distressing to the animal. (2) Reestablishing a low concentration of $O_2$ (ie, 6% or greater) in the chamber before death will allow immediate recovery.[69]

*Recommendations*—Nitrogen and Ar can be distressful to some species (eg, rats).[85] Therefore, this technique is conditionally acceptable only if $O_2$ concentrations < 2% are achieved rapidly, and animals are heavily sedated or anesthetized. With heavy sedation or anesthesia, it should be recognized that death may be delayed. Although $N_2$ and Ar are effective, other methods of euthanasia are preferable.

## Carbon monoxide

Carbon monoxide (CO) is a colorless, odorless gas that is nonflammable and nonexplosive unless concentrations exceed 10%. It combines with hemoglobin to form carboxyhemoglobin and blocks uptake of $O_2$ by erythrocytes, leading to fatal hypoxemia.

In the past, mass euthanasia has been accomplished by use of 3 methods for generating CO: (1) chemical interaction of sodium formate and sulfuric acid, (2) exhaust fumes from idling gasoline internal combustion engines, and (3) commercially compressed CO in cylinders. The first 2 techniques are associated with problems such as production of other gases, achieving inadequate concentrations of carbon monoxide, inadequate cooling of the gas, and maintenance of equipment. Therefore, the only acceptable source is compressed CO in cylinders.

In a study by Ramsey and Eilmann,[94] 8% CO caused guinea pigs to collapse in 40 seconds to 2 minutes, and death occurred within 6 minutes. Carbon monoxide has been used to euthanatize mink[80,90] and chinchillas. These animals collapsed in 1 minute, breathing ceased in 2 minutes, and the heart stopped beating in 5 to 7 minutes.

In a study evaluating the physiologic and behavioral characteristics of dogs exposed to 6% CO in air, Chalifoux and Dallaire[95] could not determine the precise time of loss of consciousness. Electroencephalographic recordings revealed 20 to 25 seconds of abnormal cortical function prior to loss of consciousness. It was during this period that the dogs became agitated and vocalized. It is not known whether animals experience distress; however, humans in this phase reportedly are not distressed.[96] Subsequent studies have revealed that tranquilization with acepromazine significantly decreases behavioral and physiologic responses of dogs euthanatized with CO.[97]

In a comparative study, CO from gasoline engine exhaust and 70% $CO_2$ plus 30% $O_2$ were used to euthanatize cats. Euthanasia was divided into 3 phases. Phase I was the time from initial contact to onset of clinical signs (eg, yawning, staggering, or trembling). Phase II extended from the end of phase I until recumbency, and phase III from the end of phase II until death.[54] The study revealed that signs of agitation before loss of consciousness were greatest with $CO_2$ plus $O_2$. Convulsions occurred during phases II and III with both methods. However, when the euthanasia chamber was prefilled with CO (ie, exhaust fumes), convulsions did not occur in phase III. Time to complete immobilization was greater with $CO_2$ plus $O_2$ (approximately 90 seconds) than with CO alone (approximately 56 seconds).[54] In neonatal pigs, excitation was more likely to precede loss of consciousness if the pigs were exposed to a rapid rise in CO concentration. This agitation was reduced at lower flow rates, or when CO was combined with nitrogen.[98]

In people, the most common symptoms of early CO toxicosis are headache, dizziness, and weakness. As concentrations of carboxyhemoglobin increase, these signs may be followed by decreased visual acuity, tinnitus, nausea, progressive depression, confusion, and collapse.[99] Because CO stimulates motor centers in the brain, loss of consciousness may be accompanied by convulsions and muscular spasms.

Carbon monoxide is a cumulative poison.[96] Distinct signs of CO toxicosis are not evident until the CO concentration is 0.05% in air, and acute signs do not develop until the CO concentration is approximately 0.2% in air. In humans, exposure to 0.32% CO and 0.45% CO for one hour will induce loss of consciousness and death, respectively.[100] Carbon monoxide is extremely hazardous for personnel because it is highly toxic and difficult to detect. Chronic exposure to low concentrations of carbon monoxide may be a health hazard, especially with regard to cardiovascular disease and teratogenic effects.[101-103] An efficient exhaust or ventilatory system is essential to prevent accidental exposure of humans.

*Advantages*—(1) Carbon monoxide induces loss of consciousness without pain and with minimal discernible discomfort. (2) Hypoxemia induced by CO is insidious, so that the animal appears to be unaware. (3) Death occurs rapidly if concentrations of 4 to 6% are used.

*Disadvantages*—(1) Safeguards must be taken to prevent exposure of personnel. (2) Any electrical equipment exposed to CO (eg, lights and fans) must be explosion proof.

*Recommendations*—Carbon monoxide used for individual animal or mass euthanasia is acceptable for dogs, cats, and other small mammals, provided that commercially compressed CO is used and the following precautions are taken: (1) personnel using CO must be instructed thoroughly in its use and must understand its hazards and limitations; (2) the CO chamber must be of the highest quality construction and should allow for separation of individual animals; (3) the CO source and chamber must be located in a well-ventilated environment, preferably out of doors; (4) the chamber must be well lit and have view ports that allow personnel direct observation of animals; (5) the CO flow rate should be adequate to rapidly achieve a uniform CO concentration of at least 6% after animals are placed in the chamber, although some species (eg, neonatal pigs) are less likely to become agitated with a gradual rise in CO concentration;[98] and (6) if the chamber is inside a room, CO monitors must be placed in the room to warn personnel of hazardous concentrations. It is essential that CO use be in compliance with state and federal occupational health and safety regulations.

## NONINHALANT PHARMACEUTICAL AGENTS

The use of injectable euthanasia agents is the most rapid and reliable method of performing euthanasia. It is the most desirable method when it can be performed without causing fear or distress in the animal. When the restraint necessary for giving an animal an intravenous injection would impart added distress to the animal or pose undue risk to the operator, sedation, anesthesia, or an acceptable alternate route of administration should be employed. Aggressive, fearful, wild, or feral animals should be sedated or given a nonparalytic immobilizing agent prior to intravenous administration of the euthanasia agent.

When intravenous administration is considered impractical or impossible, intraperitoneal administration of a nonirritating euthanasia agent is acceptable, provided the drug does not contain neuromuscular blocking agents. Intracardiac injection is acceptable only when performed on heavily sedated, anesthetized, or comatose animals. It is not considered acceptable in awake animals, owing to the difficulty and unpredictability of performing the injection accurately. Intramuscular, subcutaneous, intrathoracic, intrapulmonary, intrahepatic, intrarenal, intrasplenic, intrathecal, and other nonvascular injections are not acceptable methods of administering injectable euthanasia agents.

When injectable euthanasia agents are administered into the peritoneal cavity, animals may be slow to pass through stages I and II of anesthesia. Accordingly, they should be placed in small cages in a quiet area to minimize excitement and trauma.

### Barbituric acid derivatives

Barbiturates depress the central nervous system in descending order, beginning with the cerebral cortex,

2010

with loss of consciousness progressing to anesthesia. With an overdose, deep anesthesia progresses to apnea, owing to depression of the respiratory center, which is followed by cardiac arrest.

All barbituric acid derivatives used for anesthesia are acceptable for euthanasia when administered intravenously. There is a rapid onset of action, and loss of consciousness induced by barbiturates results in minimal or transient pain associated with venipuncture. Desirable barbiturates are those that are potent, long-acting, stable in solution, and inexpensive. Sodium pentobarbital best fits these criteria and is most widely used, although others such as secobarbital are also acceptable.

*Advantages*—(1) A primary advantage of barbiturates is speed of action. This effect depends on the dose, concentration, route, and rate of the injection. (2) Barbiturates induce euthanasia smoothly, with minimal discomfort to the animal. (3) Barbiturates are less expensive than many other euthanasia agents.

*Disadvantages*—(1) Intravenous injection is necessary for best results and requires trained personnel. (2) Each animal must be restrained. (3) Current federal drug regulations require strict accounting for barbiturates and these must be used under the supervision of personnel registered with the US Drug Enforcement Administration (DEA). (4) An aesthetically objectionable terminal gasp may occur in unconscious animals. (5) These drugs tend to persist in the carcass and may cause sedation or even death of animals that consume the body.

*Recommendations*—The advantages of using barbiturates for euthanasia in small animals far outweigh the disadvantages. Intravenous injection of a barbituric acid derivative is the preferred method for euthanasia of dogs, cats, other small animals, and horses. Intraperitoneal injection may be used in situations when an intravenous injection would be distressful or even dangerous. Intracardiac injection must only be used if the animal is heavily sedated, unconscious, or anesthetized.

### Pentobarbital combinations

Several euthanasia products are formulated to include a barbituric acid derivative (usually sodium pentobarbital), with added local anesthetic agents or agents that metabolize to pentobarbital. Although some of these additives are slowly cardiotoxic, this pharmacologic effect is inconsequential. These combination products are listed by the DEA as Schedule III drugs, making them somewhat simpler to obtain, store, and administer than Schedule II drugs such as sodium pentobarbital. The pharmacologic properties and recommended use of combination products that combine sodium pentobarbital with lidocaine or phenytoin are interchangeable with those of pure barbituric acid derivatives.

A combination of pentobarbital with a neuromuscular blocking agent is not an acceptable euthanasia agent.

### Chloral hydrate

Chloral hydrate depresses the cerebrum slowly; therefore, restraint may be a problem for some animals. Death is caused by hypoxemia resulting from progressive depression of the respiratory center, and may be preceded by gasping, muscle spasms, and vocalization.

*Recommendations*—Chloral hydrate is conditionally acceptable for euthanasia of large animals only when administered intravenously, and only after sedation to decrease the aforementioned undesirable side effects. Chloral hydrate is not acceptable for dogs, cats, and other small animals because the side effects may be severe, reactions can be aesthetically objectionable, and other products are better choices.

### T-61

T-61 is an injectable, nonbarbiturate, non-narcotic mixture of 3 drugs used for euthanasia. These drugs provide a combination of general anesthetic, curariform, and local anesthetic actions. T-61 has been withdrawn from the market and is no longer manufactured or commercially available in the United States. It is available in Canada and other countries. T-61 should be used only intravenously and at carefully monitored rates of injection, because there is some question as to the differential absorption and onset of action of the active ingredients when administered by other routes.[1]

### Tricaine methane sulfonate (MS 222, TMS)

MS 222 is commercially available as tricaine methane sulfonate (TMS), which can be used for the euthanasia of amphibians and fish. Tricaine is a benzoic acid derivative and, in water of low alkalinity (< 50 mg/L as $CaCo_3$); the solution should be buffered with sodium bicarbonate.[104] A 10 g/L stock solution can be made, and sodium bicarbonate added to saturation, resulting in a pH between 7.0 and 7.5 for the solution. The stock solution should be stored in a dark brown bottle, and refrigerated or frozen if possible. The solution should be replaced monthly and any time a brown color is observed.[105] For euthanasia, a concentration ≥ 250 mg/L is recommended and fish should be left in this solution for at least 10 minutes following cessation of opercular movement.[104] In the United States, there is a 21-day withdrawal time for MS 222; therefore, it is not appropriate for euthanasia of animals intended for food.

### Potassium chloride in conjunction with prior general anesthesia

Although unacceptable and condemned when used in unanaesthetized animals, the use of a supersaturated solution of potassium chloride injected intravenously or intracardially in an animal under general anesthesia is an acceptable method to produce cardiac arrest and death. The potassium ion is cardiotoxic, and rapid intravenous or intracardiac administration of 1 to 2 mmol/kg of body weight will cause cardiac arrest. This is a preferred injectable technique for euthanasia of livestock or wildlife species to reduce the risk of toxicosis for predators or scavengers in situations where carcasses of euthanatized animals may be consumed.[106,107]

*Advantages*—(1) Potassium chloride is not a controlled substance. It is easily acquired, transported, and mixed in the field. (2) Potassium chloride, when used with appropriate methods to render an animal unconscious, results in a carcass that is potentially less toxic for scavengers and predators in cases where carcass disposal is impossible or impractical.

*Disadvantage*—Rippling of muscle tissue and clonic spasms may occur on or shortly after injection.

*Recommendations*—It is of utmost importance that personnel performing this technique are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously. Administration of potassium chloride intravenously requires animals to be in a surgical plane of anesthesia characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli. Saturated potassium chloride solutions are effective in causing cardiac arrest following rapid intracardiac or intravenous injection. Residual tissue concentrations of general anesthetics after anesthetic induction have not been documented. Whereas no scavenger toxicoses have been reported with potassium chloride in combination with a general anesthetic, proper carcass disposal should always be attempted to prevent possible toxicosis by consumption of a carcass contaminated with general anesthetics.

## Unacceptable injectable agents

When used alone, the injectable agents listed in Appendix 4 (strychnine, nicotine, caffeine, magnesium sulfate, potassium chloride, cleaning agents, solvents, disinfectants and other toxins or salts, and all neuromuscular blocking agents) are unacceptable and are absolutely condemned for use as euthanasia agents.

## PHYSICAL METHODS

Physical methods of euthanasia include captive bolt, gunshot, cervical dislocation, decapitation, electrocution, microwave irradiation, kill traps, thoracic compression, exsanguination, stunning, and pithing. When properly used by skilled personnel with well-maintained equipment, physical methods of euthanasia may result in less fear and anxiety and be more rapid, painless, humane, and practical than other forms of euthanasia. Exsanguination, stunning, and pithing are not recommended as a sole means of euthanasia, but should be considered adjuncts to other agents or methods.

Some consider physical methods of euthanasia aesthetically displeasing. There are occasions, however, when what is perceived as aesthetic and what is most humane are in conflict. Physical methods may be the most appropriate method for euthanasia and rapid relief of pain and suffering in certain situations. Personnel performing physical methods of euthanasia must be well trained and monitored for each type of physical technique performed. That person must also be sensitive to the aesthetic implications of the method and inform onlookers about what they should expect when possible.

Since most physical methods involve trauma, there is inherent risk for animals and humans. Extreme care and caution should be used. Skill and experience of personnel is essential. If the method is not performed correctly, animals and personnel may be injured. Inexperienced persons should be trained by experienced persons and should practice on carcasses or anesthetized animals to be euthanatized until they are proficient in performing the method properly and humanely. When done appropriately, the panel considers most physical methods conditionally acceptable for euthanasia.

### Penetrating captive bolt

A penetrating captive bolt is used for euthanasia of ruminants, horses, swine, laboratory rabbits, and dogs.[108] Its mode of action is concussion and trauma to the cerebral hemisphere and brainstem.[109,110] Captive bolt guns are powered by gunpowder or compressed air and must provide sufficient energy to penetrate the skull of the species on which they are being used.[109] Adequate restraint is important to ensure proper placement of the captive bolt. A cerebral hemisphere and brainstem must be sufficiently disrupted by the projectile to induce sudden loss of consciousness and subsequent death. Accurate placement of captive bolts for various species has been described.[109-112] A multiple projectile has been suggested as a more effective technique, especially for large cattle.[109]

A nonpenetrating captive bolt only stuns animals and should not be used as a sole means of euthanasia (see "Stunning" under "Adjunctive Methods").

*Advantage*—The penetrating captive bolt is an effective method of euthanasia for use in slaughterhouses, in research facilities, and on the farm when use of drugs is inappropriate.

*Disadvantages*—(1) It is aesthetically displeasing. (2) Death may not occur if equipment is not maintained and used properly.

*Recommendations*—Use of the penetrating captive bolt is an acceptable and practical method of euthanasia for horses, ruminants, and swine. It is conditionally acceptable in other appropriate species. The nonpenetrating captive bolt must not be used as a sole method of euthanasia.

### Euthanasia by a blow to the head

Euthanasia by a blow to the head must be evaluated in terms of the anatomic features of the species on which it is to be performed. A blow to the head can be a humane method of euthanasia for neonatal animals with thin craniums, such as young pigs, if a single sharp blow delivered to the central skull bones with sufficient force can produce immediate depression of the central nervous system and destruction of brain tissue. When properly performed, loss of consciousness is rapid. The anatomic features of neonatal calves, however, make a blow to the head in this species unacceptable. Personnel performing euthanasia by use of a blow to the head must be properly trained and monitored for proficiency with this method of euthanasia, and they must be aware of its aesthetic implications.

## Gunshot

A properly placed gunshot can cause immediate insensibility and humane death. In some circumstances, a gunshot may be the only practical method of euthanasia. Shooting should only be performed by highly skilled personnel trained in the use of firearms and only in jurisdictions that allow for legal firearm use. Personnel, public, and nearby animal safety should be considered. The procedure should be performed outdoors and away from public access.

For use of a gunshot to the head as a method of euthanasia in captive animals, the firearm should be aimed so that the projectile enters the brain, causing instant loss of consciousness.[51,112-114] This must take into account differences in brain position and skull conformation between species, as well as the energy requirement for skull bone and sinus penetration.[109,115] Accurate targeting for a gunshot to the head in various species has been described.[114,116-119] For wildlife and other freely roaming animals, the preferred target area should be the head. The appropriate firearm should be selected for the situation, with the goal being penetration and destruction of brain tissue without emergence from the contralateral side of the head.[120] A gunshot to the heart or neck does not immediately render animals unconscious and thus is not considered to meet the panel's definition of euthanasia.[121]

*Advantages*—(1) Loss of consciousness is instantaneous if the projectile destroys most of the brain. (2) Given the need to minimize stress induced by handling and human contact, gunshot may at times be the most practical and logical method of euthanasia of wild or free-ranging species.

*Disadvantages*—(1) Gunshot may be dangerous to personnel. (2) It is aesthetically unpleasant. (3) Under field conditions, it may be difficult to hit the vital target area. (4) Brain tissue may not be able to be examined for evidence of rabies infection or chronic wasting disease when the head is targeted.

*Recommendations*—When other methods cannot be used, an accurately delivered gunshot is a conditionally acceptable method of euthanasia.[114,122-125] When an animal can be appropriately restrained, the penetrating captive bolt is preferred to a gunshot. Prior to shooting, animals accustomed to the presence of humans should be treated in a calm and reassuring manner to minimize anxiety. In the case of wild animals, gunshots should be delivered with the least amount of prior human contact necessary. Gunshot should not be used for routine euthanasia of animals in animal control situations, such as municipal pounds or shelters.

## Cervical dislocation

Cervical dislocation is a technique that has been used for many years and, when performed by well-trained individuals, appears to be humane. However, there are few scientific studies to confirm this observation. This technique is used to euthanatize poultry, other small birds, mice, and immature rats and rabbits. For mice and rats, the thumb and index finger are placed on either side of the neck at the base of the skull or, alternatively, a rod is pressed at the base of the skull. With the other hand, the base of the tail or the hind limbs are quickly pulled, causing separation of the cervical vertebrae from the skull. For immature rabbits, the head is held in one hand and the hind limbs in the other. The animal is stretched and the neck is hyperextended and dorsally twisted to separate the first cervical vertebra from the skull.[72,111] For poultry, cervical dislocation by stretching is a common method for mass euthanasia, but loss of consciousness may not be instantaneous.[134]

Data suggest that electrical activity in the brain persists for 13 seconds following cervical dislocation,[127] and unlike decapitation, rapid exsanguination does not contribute to loss of consciousness.[128,129]

*Advantages*—(1) Cervical dislocation is a technique that may induce rapid loss of consciousness.[84,127] (2) It does not chemically contaminate tissue. (3) It is rapidly accomplished.

*Disadvantages*—(1) Cervical dislocation may be aesthetically displeasing to personnel. (2) Cervical dislocation requires mastering technical skills to ensure loss of consciousness is rapidly induced. (3) Its use is limited to poultry, other small birds, mice, and immature rats and rabbits.

*Recommendations*—Manual cervical dislocation is a humane technique for euthanasia of poultry, other small birds, mice, rats weighing < 200 g, and rabbits weighing < 1 kg when performed by individuals with a demonstrated high degree of technical proficiency. In lieu of demonstrated technical competency, animals must be sedated or anesthetized prior to cervical dislocation. The need for technical competency is greater in heavy rats and rabbits, in which the large muscle mass in the cervical region makes manual cervical dislocation physically more difficult.[130] In research settings, this technique should be used only when scientifically justified by the user and approved by the Institutional Animal Care and Use Committee.

Those responsible for the use of this technique must ensure that personnel performing cervical dislocation techniques have been properly trained and consistently apply it humanely and effectively.

## Decapitation

Decapitation can be used to euthanatize rodents and small rabbits in research settings. It provides a means to recover tissues and body fluids that are chemically uncontaminated. It also provides a means of obtaining anatomically undamaged brain tissue for study.[131]

Although it has been demonstrated that electrical activity in the brain persists for 13 to 14 seconds following decapitation,[132] more recent studies and reports indicate that this activity does not infer the ability to perceive pain, and in fact conclude that loss of consciousness develops rapidly.[127-129]

Guillotines that are designed to accomplish decapitation in adult rodents and small rabbits in a uniformly instantaneous manner are commercially available.



Guillotines are not commercially available for neonatal rodents, but sharp blades can be used for this purpose.

*Advantages*—(1) Decapitation is a technique that appears to induce rapid loss of consciousness.[127-129] (2) It does not chemically contaminate tissues. (3) It is rapidly accomplished.

*Disadvantages*—(1) Handling and restraint required to perform this technique may be distressful to animals.[83] (2) The interpretation of the presence of electrical activity in the brain following decapitation has created controversy and its importance may still be open to debate.[127-129,132] (3) Personnel performing this technique should recognize the inherent danger of the guillotine and take adequate precautions to prevent personal injury. (4) Decapitation may be aesthetically displeasing to personnel performing or observing the technique.

*Recommendations*—This technique is conditionally acceptable if performed correctly, and it should be used in research settings when its use is required by the experimental design and approved by the Institutional Animal Care and Use Committee. The equipment used to perform decapitation should be maintained in good working order and serviced on a regular basis to ensure sharpness of blades. The use of plastic cones to restrain animals appears to reduce distress from handling, minimizes the chance of injury to personnel, and improves positioning of the animal in the guillotine. Decapitation of amphibians, fish, and reptiles is addressed elsewhere in this report.

Those responsible for the use of this technique must ensure that personnel who perform decapitation techniques have been properly trained to do so.

### Electrocution

Electrocution, using alternating current, has been used as a method of euthanasia for species such as dogs, cattle, sheep, swine, foxes, and mink.[113,133-138] Electrocution induces death by cardiac fibrillation, which causes cerebral hypoxia.[135,137,139] However, animals do not lose consciousness for 10 to 30 seconds or more after onset of cardiac fibrillation. It is imperative that animals be unconscious before being electrocuted. This can be accomplished by any acceptable means, including electrical stunning.[25] Although an effective, 1-step stunning and electrocution method has been described for use in sheep and hogs, euthanasia by electrocution in most species remains a 2-step procedure.[25,63,140]

*Advantages*—(1) Electrocution is humane if the animal is first rendered unconscious. (2) It does not chemically contaminate tissues. (3) It is economical.

*Disadvantages*—(1) Electrocution may be hazardous to personnel. (2) When conventional single-animal probes are used, it may not a useful method for mass euthanasia because so much time is required per animal. (3) It is not a useful method for dangerous, intractable animals. (4) It is aesthetically objectionable because of violent extension and stiffening of the limbs, head, and neck. (5) It may not result in death in

small animals (< 5 kg) because ventricular fibrillation and circulatory collapse do not always persist after cessation of current flow.

*Recommendations*—Euthanasia by electrocution requires special skills and equipment that will ensure passage of sufficient current through the brain to induce loss of consciousness and cardiac fibrillation in the 1-step method for sheep and hogs, or cardiac fibrillation in the unconscious animal when the 2-step procedure is used. Although the method is conditionally acceptable if the aforementioned requirements are met, its disadvantages far outweigh its advantages in most applications. Techniques that apply electric current from head to tail, head to foot, or head to moistened metal plates on which the animal is standing are unacceptable.

### Microwave irradiation

Heating by microwave irradiation is used primarily by neurobiologists to fix brain metabolites *in vivo* while maintaining the anatomic integrity of the brain.[141] Microwave instruments have been specifically designed for use in euthanasia of laboratory mice and rats. The instruments differ in design from kitchen units and may vary in maximal power output from 1.3 to 10 kw. All units direct their microwave energy to the head of the animal. The power required to rapidly halt brain enzyme activity depends on the efficiency of the unit, the ability to tune the resonant cavity and the size of the rodent head.[142] There is considerable variation among instruments in the time required for loss of consciousness and euthanasia. A 10 kw, 2,450 MHz instrument operated at a power of 9 kw will increase the brain temperature of 18 to 28 g mice to 79 C in 330 ms, and the brain temperature of 250 to 420 g rats to 94 C in 800 ms.[143]

*Advantages*—(1) Loss of consciousness is achieved in less than 100 ms, and death in less than 1 second. (2) This is the most effective method to fix brain tissue *in vivo* for subsequent assay of enzymatically labile chemicals.

*Disadvantages*—(1) Instruments are expensive. (2) Only animals the size of mice and rats can be euthanatized with commercial instruments that are currently available.

*Recommendations*—Microwave irradiation is a humane method for euthanatizing small laboratory rodents if instruments that induce rapid loss of consciousness are used. Only instruments that are designed for this use and have appropriate power and microwave distribution can be used. Microwave ovens designed for domestic and institutional kitchens are absolutely unacceptable for euthanasia.

### Thoracic (cardiopulmonary, cardiac) compression

Thoracic (cardiopulmonary, cardiac) compression is used to euthanatize small- to medium-sized free-ranging birds when alternate techniques described in this report are not practical.[144]

---

2014

*Advantages*—(1) This technique is rapid. (2) It is apparently painless. (3) It maximizes carcass use for analytical/contaminant studies.

*Disadvantages*—(1) It may be considered aesthetically unpleasant by onlookers. (2) The degree of distress is unknown.

*Recommendations*—Thoracic (cardiopulmonary, cardiac) compression is a physical technique for avian euthanasia that has applicability in the field when other methods cannot be used. It is accomplished by bringing the thumb and forefinger of one hand under the bird's wing from the posterior and placing them against the ribs.[144] The forefinger of the other hand is placed against the ventral edge of the sternum, just below the furculum. All fingers are brought together forcefully and held under pressure to stop the heart and lungs. Loss of consciousness and death develop quickly. Proper training is needed in the use of this technique to avoid trauma to the bird. Cardiopulmonary compression is not appropriate for laboratory settings, for large or diving birds,[144] or for other species.

## Kill traps

Mechanical kill traps are used for the collection and killing of small, free-ranging mammals for commercial purposes (fur, skin, or meat), scientific purposes, to stop property damage, and to protect human safety. Their use remains controversial, and the panel recognizes that kill traps do not always render a rapid or stress-free death consistent with criteria for euthanasia found elsewhere in this document. For this reason, use of live traps followed by other methods of euthanasia is preferred. There are a few situations when that is not possible or when it may actually be more stressful to the animals or dangerous to humans to use live traps. Although newer technologies are improving kill trap performance in achieving loss of consciousness quickly, individual testing is recommended to be sure the trap is working properly.[145] If kill traps must be used, the most humane available must be chosen,[146-148] as evaluated by use of International Organization for Standardization (ISO) testing procedures,[149] or by the methods of Gilbert,[150] Proulx et al,[151,152] or Hiltz and Roy.[153]

To reach the required level of efficiency, traps may need to be modified from manufacturers production standards. In addition, as specified in scientific studies, trap placement (ground versus tree sets), bait type, set location, selectivity apparatus, body placement modifying devices (eg, sidewings, cones), trigger sensitivity, and trigger type, size, and conformation are essential considerations that could affect a kill trap's ability to reach these standards.

Several kill traps, modifications, and set specifics have been scientifically evaluated and found to meet the aforereferenced standards for various species.[151,152,154-167]

*Advantage*—Free-ranging small mammals may be killed with minimal distress associated with handling and human contact.

*Disadvantages*—(1) Traps may not afford death within acceptable time periods. (2) Selectivity and efficiency is dependent on the skill and proficiency of the operator.

*Recommendations*—Kill traps do not always meet the panel's criteria for euthanasia. At the same time, it is recognized that they can be practical and effective for scientific animal collection when used in a manner that ensures selectivity, a swift kill, no damage to body parts needed for field research, and minimal potential for injury of nontarget species.[168,169] Traps need to be checked at least once daily. In those instances when an animal is wounded or captured but not dead, the animal must be killed quickly and humanely. Kill traps should be used only when other acceptable techniques are impossible or have failed. Traps for nocturnal species should not be activated during the day to avoid capture of diurnal species.[168] Trap manufacturers should strive to meet their responsibility of minimizing pain and suffering in target species.

## Adjunctive methods

Stunning and pithing, when properly done, induce loss of consciousness but do not ensure death. Therefore, these methods must be used only in conjunction with other procedures,[123] such as pharmacologic agents, exsanguination, or decapitation to euthanatize the animal.

### EXSANGUINATION

Exsanguination can be used to ensure death subsequent to stunning, or in otherwise unconscious animals. Because anxiety is associated with extreme hypovolemia, exsanguination must not be used as a sole means of euthanasia.[170] Animals may be exsanguinated to obtain blood products, but only when they are sedated, stunned, or anesthetized.[171]

### STUNNING

Animals may be stunned by a blow to the head, by use of a nonpenetrating captive bolt, or by use of electric current. Stunning must be followed immediately by a method that ensures death. With stunning, evaluating loss of consciousness is difficult, but it is usually associated with a loss of the menace or blink response, pupillary dilatation, and a loss of coordinated movements. Specific changes in the electroencephalogram and a loss of visually evoked responses are also thought to indicate loss of consciousness.[60,172]

**Blow to the head**—Stunning by a blow to the head is used primarily in small laboratory animals with thin craniums.[9,173-175] A single sharp blow must be delivered to the central skull bones with sufficient force to produce immediate depression of the central nervous system. When properly done, consciousness is lost rapidly.

**Nonpenetrating captive bolt**—A nonpenetrating captive bolt may be used to induce loss of consciousness in ruminants, horses, and swine. Signs of effective stunning by captive bolt are immediate collapse and a several second period of tetanic spasm, followed by slow hind limb movements of increasing frequency.[60,176]



Other aspects regarding use of the nonpenetrating captive bolt are similar to the use of a penetrating captive bolt, as previously described.

Electrical stunning—Alternating electrical current has been used for stunning species such as dogs, cattle, sheep, goats, hogs, fish and chickens.[133,134,140,177,178] Experiments with dogs have identified a need to direct the electrical current through the brain to induce rapid loss of consciousness. In dogs, when electricity passes only between fore- and hind limbs or neck and feet, it causes the heart to fibrillate but does not induce sudden loss of consciousness.[139] For electrical stunning of any animal, an apparatus that applies electrodes to opposite sides of the head, or in another way directs electrical current immediately through the brain, is necessary to induce rapid loss of consciousness. Attachment of electrodes and animal restraint can pose problems with this form of stunning. Signs of effective electrical stunning are extension of the limbs, opisthotonos, downward rotation of the eyeballs, and tonic spasm changing to clonic spasm, with eventual muscle flaccidity.

Electrical stunning should be followed promptly by electrically induced cardiac fibrillation, exsanguination, or other appropriate methods to ensure death. Refer to the section on electrocution for additional information.

### PITHING

In general, pithing is used as an adjunctive procedure to ensure death in an animal that has been rendered unconscious by other means. For some species, such as frogs, with anatomic features that facilitate easy access to the central nervous system, pithing may be used as a sole means of euthanasia, but an anesthetic overdose is a more suitable method.

## SPECIAL CONSIDERATIONS

### Equine euthanasia

Pentobarbital or a pentobarbital combination is the best choice for equine euthanasia. Because a large volume of solution must be injected, use of an intravenous catheter placed in the jugular vein will facilitate the procedure. To facilitate catheterization of an excitable or fractious animal, a tranquilizer such as acepromazine, or an alpha-2 adrenergic agonist can be administered, but these drugs may prolong time to loss of consciousness because of their effect on circulation and may result in varying degrees of muscular activity and agonal gasping. Opioid agonists or agonist/antagonists in conjunction with alpha-2 adrenergic agonists may further facilitate restraint.

In certain emergency circumstances, such as euthanasia of a horse with a serious injury at a racetrack, it may be difficult to restrain a dangerous horse or other large animal for intravenous injection. The animal might cause injury to itself or to bystanders before a sedative could take effect. In such cases, the animal can be given a neuromuscular blocking agent such as succinylcholine, but the animal must be euthanatized with an appropriate technique as soon as the animal can be controlled. Succinylcholine alone or without sufficient anesthetic must not be used for euthanasia.

Physical methods, including gunshot, are considered conditionally acceptable techniques for equine euthanasia. The penetrating captive bolt is acceptable with appropriate restraint.

## Animals intended for human or animal food

In euthanasia of animals intended for human or animal food, chemical agents that result in tissue residues cannot be used, unless they are approved by the US Food and Drug Administration.[179] Carbon dioxide is the only chemical currently used for euthanasia of food animals (primarily swine) that does not result in tissue residues. Physical techniques are commonly used for this reason. Carcasses of animals euthanatized by barbituric acid derivatives or other chemical agents may contain potentially harmful residues. These carcasses should be disposed of in a manner that will prevent them from being consumed by human beings or animals.

Selection of a proper euthanasia technique for free-ranging wildlife must take into account the possibility of consumption of the carcass of the euthanatized animal by nontarget predatory or scavenger species. Numerous cases of toxicosis and death attributable to ingestion of pharmaceutically contaminated carcasses in predators and scavengers have been reported.[107] Proper carcass disposal must be a part of any euthanasia procedure under free-range conditions where there is potential for consumption toxicity. When carcasses are to be left in the field, a gunshot to the head, penetrating captive bolt, or injectable agents that are nontoxic (potassium chloride in combination with a nontoxic general anesthetic) should be used so that the potential for scavenger or predator toxicity is lessened.

## Euthanasia of nonconventional species: zoo, wild, aquatic, and ectothermic animals

Compared with objective information on companion, farm, and laboratory animals, euthanasia of species such as zoo, wild, aquatic, and ectothermic animals has been studied less, and guidelines are more limited. Irrespective of the unique or unusual features of some species, whenever it becomes necessary to euthanatize an animal, death must be induced as painlessly and quickly as possible.

When selecting a means of euthanasia for these species, factors and criteria in addition to those previously discussed must be considered. The means selected will depend on the species, size, safety aspects, location of the animals to be euthanatized, and experience of personnel. Whether the animal to be euthanatized is in the wild, in captivity, or free-roaming are major considerations. Anatomic differences must be considered. For example, amphibians, fish, reptiles, and marine mammals differ anatomically from domestic species. Veins may be difficult to locate. Some species have a carapace or other defensive anatomic adaptations (eg, quills, scales, spines). For physical methods, access to the central nervous system may be difficult because the brain may be small and difficult to locate by inexperienced persons.

## Zoo Animals

For captive zoo mammals and birds with related domestic counterparts, many of the means described previously are appropriate. However, to minimize injury to persons or animals, additional precautions such as handling and physical or chemical restraint are important considerations.[16]

## Wildlife

For wild and feral animals, many recommended means of euthanasia for captive animals are not feasible. The panel recognizes there are situations involving free-ranging wildlife when euthanasia is not possible from the animal or human safety standpoint, and killing may be necessary. Conditions found in the field, although more challenging than those that are controlled, do not in any way reduce or minimize the ethical obligation of the responsible individual to reduce pain and distress to the greatest extent possible during the taking of an animal's life. Because euthanasia of wildlife is often performed by lay personnel in remote settings, guidelines are needed to assist veterinarians, wildlife biologists, and wildlife health professionals in developing humane protocols for euthanasia of wildlife.

In the case of free-ranging wildlife, personnel may not be trained in the proper use of remote anesthesia, proper delivery equipment may not be available, personnel may be working alone in remote areas where accidental exposure to potent anesthetic medications used in wildlife capture would present a risk to human safety, or approaching the animal within a practical darting distance may not be possible. In these cases, the only practical means of animal collection may be gunshot and kill trapping.[13,180-184] Under these conditions, specific methods chosen must be as age-, species-, or taxonomic/class-specific as possible. The firearm and ammunition should be appropriate for the species and purpose. Personnel should be sufficiently skilled to be accurate, and they should be experienced in the proper and safe use of firearms, complying with laws and regulations governing their possession and use.

Behavioral responses of wildlife or captive nontraditional species (zoo) in close human contact are very different from those of domestic animals. These animals are usually frightened and distressed. Thus, minimizing the amount, degree, and/or cognition of human contact during procedures that require handling is of utmost importance. Handling these animals often requires general anesthesia, which provides loss of consciousness and which relieves distress, anxiety, apprehension, and perception of pain. Even though the animal is under general anesthesia, minimizing auditory, visual, and tactile stimulation will help ensure the most stress-free euthanasia possible. With use of general anesthesia, there are more methods for euthanasia available.

A 2-stage euthanasia process involving general anesthesia, tranquilization, or use of analgesics, followed by intravenous injectable pharmaceuticals, although preferred, is often not practical. Injectable anesthetics are not always legally or readily available to those working in nuisance animal control, and the distress to the animal induced by live capture, transport to a veterinary facility, and confinement in a veterinary hospital prior to euthanasia must be considered in choosing the most humane technique for the situation at hand. Veterinarians providing support to those working with injured or live-trapped, free-ranging animals should take capture, transport, handling distress, and possible carcass consumption into consideration when asked to assist with euthanasia. Alternatives to 2-stage euthanasia using anesthesia include a squeeze cage with intraperitoneal injection of sodium pentobarbital, inhalant agents ($CO_2$ chamber, CO chamber), and gunshot. In cases where preeuthanasia anesthetics are not available, intraperitoneal injections of sodium pentobarbital, although slower in producing loss of consciousness, should be considered preferable over intravenous injection, if restraint will cause increased distress to the animal or danger to the operator.

Wildlife species may be encountered under a variety of situations. Euthanasia of the same species under different conditions may require different techniques. Even in a controlled setting, an extremely fractious large animal may threaten the safety of the practitioner, bystanders, and itself. When safety is in question and the fractious large animal, whether wild, feral, or domestic, is in close confinement, neuromuscular blocking agents may be used immediately prior to the use of an acceptable form of euthanasia. For this technique to be humane, the operator must ensure they will gain control over the animal and perform euthanasia before distress develops. Succinylcholine is not acceptable as a method of restraint for use in free-ranging wildlife because animals may not be retrieved rapidly enough to prevent neuromuscular blocking agent-induced respiratory distress or arrest.[185]

## Diseased, Injured, or Live-Captured Wildlife or Feral Species

Euthanasia of diseased, injured, or live-trapped wildlife should be performed by qualified professionals. Certain cases of wildlife injury (eg, acute, severe trauma from automobiles) may require immediate action, and pain and suffering in the animal may be best relieved most rapidly by physical methods including gunshot or penetrating captive bolt followed by exsanguination.

## Birds

Many techniques discussed previously in this report are suitable for euthanasia of captive birds accustomed to human contact. Free-ranging birds may be collected by a number of methods, including nets and live traps, with subsequent euthanasia. For collection by firearm, shotguns are recommended. The bird should be killed outright by use of ammunition loads appropriate for the species to be collected. Wounded birds should be killed quickly by appropriate techniques previously described. Large birds should be anesthetized prior to euthanasia, using general anesthetics.

### AMPHIBIANS, FISH, AND REPTILES

Euthanasia of ectothermic animals must take into account differences in their metabolism, respiration, and tolerance to cerebral hypoxia. In addition, it is often more difficult to ascertain when an animal is dead. Some unique aspects of euthanasia of amphibians, fishes, and reptiles have been described.[13,51,186,187]

**Injectable agents**—Sodium pentobarbital (60 to 100 mg/kg of body weight) can be administered intravenously, intraabdominally, or intrapleuroperitoneally in most ectothermic animals, depending on anatomic features. Subcutaneous lymph spaces may also be used in frogs and toads. Time to effect may be variable, with death occurring in up to 30 minutes.[1,187,188] Barbiturates other than pentobarbital can cause pain on injection.[189]

**Clove oil**—Because adequate and appropriate clinical trials have not been performed on fish to evaluate its effects, use of clove oil is not acceptable.

**External or topical agents**—Tricaine methane sulfonate (TMS, MS-222) may be administered by various routes to euthanatize. For fish and amphibians, this chemical may be placed in water.[190-193] Large fish may be removed from the water, a gill cover lifted, and a concentrated solution from a syringe flushed over the gills. MS 222 is acidic and in concentrations $\geq$ 500 mg/L should be buffered with sodium bicarbonate to saturation resulting in a solution pH of 7.0 to 7.5.[105] MS 222 may also be injected into lymph spaces and pleuroperitoneal cavities.[194] These are effective but expensive means of euthanasia.

Benzocaine hydrochloride, a compound similar to TMS, may be used as a bath or in a recirculation system for euthanasia of fish[184] or amphibians.[13] Benzocaine is not water soluble and therefore is prepared as a stock solution (100 g/L), using acetone or ethanol, which may be irritating to fish tissues. In contrast, benzocaine hydrochloride is water soluble and can be used directly for anesthesia or euthanasia.[105] A concentration $\geq$ 250 mg/L can be used for euthanasia. Fish should be left in the solution for at least 10 minutes following cessation of opercular movement.[104]

The anesthetic agent 2-phenoxyethanol is used at concentrations of 0.5 to 0.6 ml/L or 0.3 to 0.4 mg/L for euthanasia of fish. Death is caused by respiratory collapse. As with other agents, fish should be left in solution for 10 minutes following cessation of opercular movement.[195,196]

**Inhalant agents**—Many reptiles and amphibians, including chelonians, are capable of holding their breath and converting to anaerobic metabolism, and can survive long periods of anoxia (up to 27 hours for some species).[197-202] Because of this ability to tolerate anoxia, induction of anesthesia and time to loss of consciousness may be greatly prolonged when inhalants are used. Death in these species may not occur even after prolonged inhalant exposure.[203] Lizards, snakes, and fish do not hold their breath to the same extent and can be euthanatized by use of inhalant agents.

**Carbon dioxide**—Amphibians,[1] reptiles,[1] and fish[203-205] may be euthanatized with $CO_2$. Loss of consciousness develops rapidly, but exposure times required for euthanasia are prolonged. This technique is more effective in active species and those with less tendency to hold their breath.

**Physical methods**—Line drawings of the head of various amphibians and reptiles, with recommended locations for captive bolt or firearm penetration, are available.[13] Crocodilians and other large reptiles can also be shot through the brain.[51]

Decapitation with heavy shears or a guillotine is effective for some species that have appropriate anatomic features. It has been assumed that stopping blood supply to the brain by decapitation causes rapid loss of consciousness. Because the central nervous system of reptiles, fish, and amphibians is tolerant to hypoxic and hypotensive conditions,[13] decapitation must be followed by pithing.[188]

**Two-stage euthanasia procedures**—Propofol and ultrashort-acting barbiturates may be used for these species to produce rapid general anesthesia prior to final administration of euthanasia.

In zoos and clinical settings, neuromuscular blocking agents are considered acceptable for restraint of reptiles if given immediately prior to administration of a euthanatizing agent.

Most amphibians, fishes, and reptiles can be euthanatized by cranial concussion (stunning) followed by decapitation, pithing, or some other physical method.

Severing the spinal cord behind the head by pithing is an effective method of killing some ectotherms. Death may not be immediate unless both the brain and spinal cord are pithed. For these animals, pithing of the spinal cord should be followed by decapitation and pithing of the brain or by another appropriate procedure. Pithing requires dexterity and skill and should only be done by trained personnel. The pithing site in frogs is the foramen magnum, and it is identified by a slight midline skin depression posterior to the eyes with the neck flexed.[187]

**Cooling**—It has been suggested that, when using physical methods of euthanasia in ectothermic species, cooling to 4 C will decrease metabolism and facilitate handling, but there is no evidence that whole body cooling reduces pain or is clinically efficacious.[206] Local cooling in frogs does reduce nociception, and this may be partly opioid mediated.[207] Immobilization of reptiles by cooling is considered inappropriate and inhumane even if combined with other physical or chemical methods of euthanasia. Snakes and turtles, immobilized by cooling, have been killed by subsequent freezing. This method is not recommended.[13] Formation of ice crystals on the skin and in tissues of an animal may cause pain or distress. Quick freezing of deeply anesthetized animals is acceptable.[208]

### MARINE MAMMALS

Barbiturates or potent opioids (eg, etorphine hydrochloride [M 99] and carfentanil) are the agents of choice for euthanasia of marine mammals,[209] although it is recognized their use is not always possible and can

be potentially dangerous to personnel. An accurately placed gunshot may also be a conditionally acceptable method of euthanasia for some species and sizes of stranded marine mammals.[51,209,210]

For stranded whales or other large cetaceans or pinnipeds, succinylcholine chloride in conjunction with potassium chloride, administered intravenously or intraperitoneally, has been used.[211] This method, which is not an acceptable method of euthanasia as defined in this report, leads to complete paralysis of the respiratory musculature and eventual death attributable to hypoxemia.[209] This method may be more humane than allowing the stranded animal to suffocate over a period of hours or days if no other options are available.

### Euthanasia of animals raised for fur production

Animals raised for fur are usually euthanatized individually at the location where they are raised. Although any handling of these species constitutes a stress, it is possible to minimize this by euthanatizing animals in or near their cages. For the procedures described below, please refer to previous sections for more detailed discussion.

Carbon monoxide—For smaller species, CO appears to be an adequate method for euthanasia. Compressed CO is delivered from a tank into an enclosed cage that can be moved adjacent to holding cages. Using the apparatus outside reduces the risk to humans; however, people using this method should still be made aware of the dangers of CO. Animals introduced into a chamber containing 4% CO lost consciousness in $64 \pm 14$ seconds and were dead within $215 \pm 45$ seconds.[80] In a study involving electroencephalography of mink being euthanatized with 3.5% CO, the mink were comatose in $21 \pm 7$ seconds.[212] Only 1 animal should be introduced into the chamber at a time, and death should be confirmed in each case.

Carbon dioxide—Administration of $CO_2$ is also a good euthanasia method for smaller species and is less dangerous than CO for personnel operating the system. When exposed to 100% $CO_2$, mink lost consciousness in $19 \pm 4$ seconds and were dead within $153 \pm 10$ seconds. When 70% $CO_2$ was used with 30% $O_2$, mink were unconscious in 28 seconds, but they were not dead after a 15-minute exposure.[80] Therefore, if animals are first stunned by 70% $CO_2$, they should be killed by exposure to 100% $CO_2$ or by some other means. As with carbon monoxide, only one animal should be introduced into the chamber at a time.

Barbiturates—Barbiturate overdose is an acceptable procedure for euthanasia of many species of animals raised for fur. The drug is injected intraperitoneally and the animal slowly loses consciousness. It is important that the death of each animal be confirmed following barbiturate injection. Barbiturates will contaminate the carcass; therefore the skinned carcass cannot be used for animal food.

Electrocution—Electrocution has been used for killing foxes and mink.[135] The electric current must pass through the brain to induce loss of consciousness before electricity is passed through the rest of the body. Electrical stunning should be followed by euthanasia, using some other technique. Cervical dislocation has been used in mink and other small animals and should be done within 20 seconds of electrical stunning.[213] Use of a nose-to-tail or nose-to-foot method[135] alone may kill the animal by inducing cardiac fibrillation, but the animal may be conscious for a period of time before death. Therefore, these techniques are unacceptable.

### Prenatal and neonatal euthanasia

When ovarian hysterectomies are performed, euthanasia of feti should be accomplished as soon as possible after removal from the dam. Neonatal animals are relatively resistant to hypoxia.[44,214]

### Mass euthanasia

Under unusual conditions, such as disease eradication and natural disasters, euthanasia options may be limited. In these situations, the most appropriate technique that minimizes human and animal health concerns must be used. These options include, but are not limited to, $CO_2$ and physical methods such as gunshot, penetrating captive bolt, and cervical dislocation.

### POSTFACE

This report summarizes contemporary scientific knowledge on euthanasia in animals and calls attention to the lack of scientific reports assessing pain, discomfort, and distress in animals being euthanatized. Many reports on various methods of euthanasia are either anecdotal, testimonial narratives, or unsubstantiated opinions and are, therefore, not cited in this report. The panel strongly endorses the need for well-designed experiments to more fully determine the extent to which each procedure meets the criteria used for judging methods of euthanasia.

Each means of euthanasia has advantages and disadvantages. It is unlikely that, for each situation, any means will meet all desirable criteria. It is also impractical for this report to address every potential circumstance in which animals are to be euthanatized. Therefore, the use of professional judgment is imperative.

Failure to list or recommend a means of euthanasia in this report does not categorically condemn its use. There may occasionally be special circumstances or situations in which other means may be acceptable. For research animals, these exceptions should be carefully considered by the attending veterinarian and the Institutional Animal Care and Use Committee. In other settings, professional judgment should be used.

The panel discourages the use of unapproved products for euthanasia, unless the product has a clearly understood mechanism of action and pharmacokinetics, and studies published in the literature that scientifically verify and justify its use. Those responsible for euthanasia decisions have a critically important responsibility to carefully assess any new technique, method, or device, using the panel's criteria. In the absence of definitive proof or reasonable expectation, the best interest of the animal should guide the decision process.

References cited in this report do not represent a comprehensive bibliography on all methods of euthanasia. Persons interested in additional information on a particular aspect of animal euthanasia are encouraged to contact the Animal Welfare Information Center, National Agricultural Library, 10301 Baltimore Blvd, Beltsville, MD 20705.

The Panel on Euthanasia is fully committed to the concept that, whenever it becomes necessary to kill any animal for any reason whatsoever, death should be induced as painlessly and quickly as possible. It has been our charge to develop workable guidelines for veterinarians needing to address this problem, and it is our sincere desire that these guidelines be used conscientiously by all animal care providers. We consider this report to be a work in progress with new editions warranted as results of more scientific studies are published.

Acknowledgment: The panel acknowledges the assistance of Ms. Julie Horvath and Dr. David Granstrom in coordinating the preparation and circulation of various drafts of the report. The panel also acknowledges and thanks Dr. Laurence Roy, Dr. Leah Greer, and the many other individuals and organizations that provided valuable review, criticism, and input to the panel through the many drafts of the report. The research and humane communities were especially helpful in shaping important changes and additions to the report.

## References

1. Andrews EJ, Bennet BT, Clark JD, et al. 1993 Report on the AVMA panel on euthanasia. *J Am Vet Med Assoc* 1993;202:230–247.

2. *Webster's ninth new collegiate dictionary*. Springfield: Merriam-Webster Inc, 1990.

3. Wall PD. Defining pain in animals. In: Short CE, Poznak AV, eds. *Animal pain*. New York: Churchill-Livingstone Inc, 1992;63–79.

4. Vierck CJ, Cooper BY, Ritz LA, et al. Inference of pain sensitivity from complex behaviors of laboratory animals. In: Chapman CR, Loeser JD, eds. *Issues in pain measurement*. New York: Raven Press, 1989;93–115.

5. Breazile JE, Kitchell RL. Euthanasia for laboratory animals. *Fed Proc* 1969;28:1577–1579.

6. Zimmerman M. Neurobiological concepts of pain, its assessment and therapy. In: Bromm B, ed. *Pain measurement in man: neurophysiological correlates of pain*. Amsterdam: Elsevier Publishing Co, 1984;15–35.

7. Kitchell RL, Erickson NH, Carstens E, et al, eds. *Animal pain: perception and alleviation*. Bethesda: American Physiological Society, 1983.

8. Kitchen N, Aronson AL, Bittle JL, et al. Panel report on the colloquium on recognition and alleviation of animal pain and distress. *J Am Vet Med Assoc* 1987;191:1186–1191.

9. National Research Council. *Recognition and alleviation of pain and distress in laboratory animals*. Washington, DC: National Academy Press, 1992.

10. Breazile JE. Physiologic basis and consequences of distress in animals. *J Am Vet Med Assoc* 1987;191:1212–1215.

11. McMillan FD. Comfort as the primary goal in veterinary medical practice. *J Am Vet Med Assoc* 1998;212:1370–1374.

12. Grier RL, Clovin TL. *Euthanasia guide (for animal shelters)*. Ames, Iowa: Moss Creek Publications, 1990.

13. Cooper JE, Ewbank R, Platt C, et al. *Euthanasia of amphibians and reptiles*. London: UFAW/WSPA, 1989.

14. Greyhavens T. *Handbook of pentobarbital euthanasia*. Salem, Ore: Humane Society of Willamette Valley, 1989;1–126.

15. *Operational guide for animal care and control agencies*. Denver: American Humane Association, 1988.

16. Fowler ME, Miller RE, eds. *Zoo and wild animal medicine: current therapy 4*. Philadelphia: WB Saunders Co, 1999;1–747.

17. Clark R, Jessup DA. *Wildlife restraint series*. Salinas, Calif: International Wildlife Veterinary Services Inc, 1992.

18. Kreeger T. *Handbook of wildlife chemical immobilization*. Laramie, Wyo: Wildlife Veterinary Services Inc, 1996.

19. Nielsen L. *Chemical immobilization of wild and exotic animals*. Ames, Iowa: Iowa State University Press, 1999.

20. McKenzie A, ed. *The capture and care manual*. South Africa: Wildlife Decision Support Services/The South African Veterinary Foundation, 1993.

21. Amass K, Neilsen L, Brunson D. *Chemical immobilization of animals*. Mount Horeb, Wis: Safe-Capture International Inc, 1999.

22. Humane slaughter regulations. *Fed Reg* 1979;44:68809–68817.

23. Grandin T. Observations of cattle behavior applied to design of cattle-handling facilities. *Appl Anim Ethol* 1980;6:19–31.

24. Grandin T. Pig behavior studies applied to slaughter-plant design. *Appl Anim Ethol* 1982;9:141–151.

25. Grandin T. Farm animal welfare during handling, transport, and slaughter. *J Am Vet Med Assoc* 1994;204:372–377.

26. Grandin T. Objective scoring of animal handling and stunning practices at slaughter plants. *J Am Vet Med Assoc* 1998;212:36–39.

27. Grandin T. Effect of animal welfare audits of slaughter plants by a major fast food company on cattle handling and slaughter practices. *J Am Vet Med Assoc* 2000;216:848–851.

28. Tannenbaum J. Issues in companion animal practice. In: *Veterinary ethics*. Baltimore: The Williams & Wilkins Co, 1989;208–225.

29. Rollin BE. Ethical question of the month. *Can Vet J* 1992;33:7–8.

30. Ramsey EC, Wetzel RW. Comparison of five regimens for oral administration of medication to induce sedation in dogs prior to euthanasia. *J Am Vet Med Assoc* 1998;213:240–242.

31. Wetzel RW, Ramsay EC. Comparison of four regimens for oral administration of medication to induce sedation in cats prior to euthanasia. *J Am Vet Med Assoc* 1998;213:243–245.

32. Beaver BV. *Feline behavior: a guide for veterinarians*. Philadelphia: WB Saunders Co, 1992;1–276.

33. Houpt KA. *Domestic animal behavior for veterinarians and animal scientists*. 3rd ed. Ames, Iowa: Iowa State University Press, 1998;1–495.

34. Hart BL. *The behavior of domestic animals*. New York: WH Freeman & Co, 1985;1–390.

35. Beaver BV. *Canine behavior: a guide for veterinarians*. Philadelphia: WB Saunders Co, 1999;1–355.

36. Beaver BV. *The veterinarian's encyclopedia of animal behavior*. Ames, Iowa: Iowa State University Press, 1994;1–307.

37. Schafer M. *The language of the horse: habits and forms of expression*. New York: Arco Publishing Co, 1975;1–187.

38. Hart LA, Hart BL, Mader B. Humane euthanasia and companion animal death: caring for the animal, the client, and the veterinarian. *J Am Vet Med Assoc* 1990;197:1292–1299.

39. Neiburg HA, Fischer A. *Pet loss, a thoughtful guide for adults and children*. New York: Harper & Row, 1982.

40. Hart LA, Mader B. Pet loss support hotline: the veterinary students' perspective. *Calif Vet* 1992;Jan-Feb:19–22.

41. Pet loss support hotlines (grief counseling). *J Am Vet Med Assoc* 1999;215:1804.

42. Arluke A. Coping with euthanasia: a case study of shelter culture. *J Am Vet Med Assoc* 1991;198:1176–1180.

43. Wolfle TL. Laboratory animal technicians: their role in stress reduction and human-companion animal bonding. *Vet Clin North Am Small Anim Pract* 1985;15:449–454.

44. Glass HG, Snyder FF, Webster E. The rate of decline in resistance to anoxia of rabbits, dogs, and guinea pigs from the onset of viability to adult life. *Am J Physiol* 1944;140:609–615.

45. Booth NH. Inhalant anesthetics. In: Booth NH, McDonald LE, eds. *Veterinary pharmacology and therapeutics*. 6th ed. Ames, Iowa: Iowa State University Press, 1988;181–211.

46. Wixon SK, Smiler KL. Anesthesia and analgesia in rodents. In: Kohn DF, Wixson SK, White WJ, et al, eds. *Anesthesia and analgesia in laboratory animals*. New York: Academic Press Inc, 1997;165–203.

47. Knigge U, Soe-Jensen P, Jorgensen H, et al. Stress-induced release of anterior pituitary hormones: effect of H3 receptor-mediat-

2020

ed inhibition of histaminergic activity or posterior hypothalamic lesion. *Neuroendocrin* 1999;69:44–53.

48. Tinnikov AA. Responses of serum conticosterone and corticosteroid-binding globulin to acute and prolonged stress in the rat. *Endocrine* 1999;11:145–150.

49. Zelena D, Klem DT, Barna I, et al. Alpha 2-adrenoreceptor subtypes regulate ACTH and beta-endorphon secretions during stress in the rat. *Psychoneuroendocrin* 1999;24:333–343.

50. Van Herck H, Baumans V, DeBoer SF, et al. Endocrine stress response in rats subjected to singular orbital puncture while under diethyl-ether anaesthesia. *Lab Anim* 1991;25:325–329.

51. *Humane killing of animals.* Preprint of 4th ed. South Mimms, Potters Bar, Herts, England: Universities Federation for Animal Welfare, 1988;16–22.

52. *Occupational exposure to waste anesthetic gases and vapors.* No. 77-140. Washington, DC: Department of Health, Education, and Welfare (National Institute for Occupational Safety and Health), 1977.

53. Lecky JH, ed. *Waste anesthetic gases in operating room air: a suggested program to reduce personnel exposure.* Park Ridge, Ill: The American Society of Anesthesiologists, 1983.

54. Simonsen HB, Thordal-Christensen AA, Ockens N. Carbon monoxide and carbon dioxide euthanasia of cats: duration and animal behavior. *Br Vet J* 1981;137:274–278.

55. Klemm WR. Carbon dioxide anesthesia in cats. *Am J Vet Res* 1964;25:1201–1205.

56. Leake CD, Waters RM. The anesthetic properties of carbon dioxide. *Curr Res Anesthesiol Analg* 1929;8:17–19.

57. Mattsson JL, Stinson JM, Clark CS. Electroencephalographic power—spectral changes coincident with onset of carbon dioxide narcosis in rhesus monkey. *Am J Vet Res* 1972;33:2043–2049.

58. Woodbury DM, Rollins LT, Gardner MD, et al. Effects of carbon dioxide on brain excitability and electrolytes. *Am J Physiol* 1958;192:79–90.

59. Glen JB, Scott WN. Carbon dioxide euthanasia of cats. *Br Vet J* 1973;129:471–479.

60. Blackmore DK, Newhook JC. The assessment of insensibility in sheep, calves and pigs during slaughter. In: Eikelenboom G, ed. *Stunning of animals for slaughter.* Boston: Martinus Nijhoff Publishers, 1983;13–25.

61. Coenen AML, Drinkenburg WHIM, Hoenderken R, et al. Carbon dioxide euthanasia in rats: oxygen supplementation minimizes signs of agitation and asphyxia. *Lab Anim* 1995;29:262–268.

62. Kohler I, Meier R, Busato A, et al. Is carbon dioxide ($CO_2$) a useful short acting anaesthetic for small laboratory animals? *Lab Anim* 1998;33:155–161.

63. Hoenderken R. Electrical and carbondioxide stunning of pigs for slaughter. In: Eikelenboom G, ed. *Stunning of animals for slaughter.* Boston: Martinus Nijhoff Publishers, 1983;59–63.

64. Gregory NG, Moss BW, Leeson RH. An assessment of carbon dioxide stunning in pigs. *Vet Rec* 1987;121:517–518.

65. Carding AH. Mass euthanasia of dogs with carbon monoxide and/or carbon dioxide: preliminary trials. *J Small Anim Pract* 1968;9:245–259.

66. Britt DP. The humaneness of carbon dioxide as an agent of euthanasia for laboratory rodents. In: *Euthanasia of unwanted, injured or diseased animals for educational or scientific purposes.* Potters Bar, UK: UFAW, 1987;19–31.

67. Danneman PJ, Stein S, Walshaw SO. Humane and practical implications of using carbon dioxide mixed with oxygen for anesthesia or euthanasia of rats. *Lab Anim Sci* 1997;47:376–385.

68. Anton F, Euchner I, Handwerker HO. Psycophysical examination of pain induced by defined $CO_2$ pulses applied to nasal mucosa. *Pain* 1992;49:53–60.

69. Raj ABM, Gregory NG. Welfare implications of gas stunning pigs 1. Determination of aversion to the initial inhalation of carbon dioxide or argon. *Anim Welfare* 1995;4:273–280.

70. Hackbarth H, Kppers N, Bohnet W. Euthanasia of rats with carbon dioxide-animal welfare aspects. *Lab Anim* 2000;34:91–96.

71. Raj ABM, Gregory NG. Investigation into the batch stunning/killing of chickens using carbon dioxide or argon-induced hypoxia. *Res Vet Sci* 1990;49:364–366.

72. Hughes HC. Euthanasia of laboratory animals. In: Melby EC, Altman NH, eds. *Handbook of laboratory animal science.* Vol 3. Cleveland, Ohio: CRC Press, 1976;553–559.

73. Jaksch W. Euthanasia of day-old male chicks in the poultry industry. *Int J Stud Anim Prob* 1981;2:203–213.

74. Kline BE, Peckham V, Hesic HE. Some aids in handling large numbers of mice. *Lab Anim Care* 1963;13:84–90.

75. Kocula AW, Drewniak EE, Davis LL. Experimentation with in-line carbon dioxide immmobilization of chickens prior to slaughter. *Poult Sci* 1961;40:213–216.

76. Stone WS, Amiraian K, Duell C, et al. Carbon dioxide anesthetization of guinea pigs to increase yields of blood and serum. *Proc Care Panel* 1961;11:299–303.

77. Euthanasia (carbon dioxide). In: *Report and accounts 1976-1977.* South Mimms, Potters Bar, Herts, England: Universities Federation for Animal Welfare, 1977;13–14.

78. Hall LW. The anaesthesia and euthanasia of neonatal and juvenile dogs and cats. *Vet Rec* 1972;90:303–306.

79. Blackshaw JK, Fenwick DC, Beattie AW, et al. The behaviour of chickens, mice and rats during euthanasia with chloroform, carbon dioxide and ether. *Lab Anim* 1988;22:67–75.

80. Hansen NE, Creutzberg A. Simonsen HB. Euthanasia of mink (*Mustela vison*) by means of carbon dioxide ($CO_2$), carbon monoxide (CO) and nitrogen ($N_2$). *Br Vet J* 1991;147:140–146.

81. Hayward JS, Lisson PA. Carbon dioxide tolerance of rabbits and its relation to burrow fumigation. *Aust Wildl Res* 1978;5:253–261.

82. Bereger-Sweeney J, Berger UV, Sharma M, et al. Effects of carbon dioxide-induced anesthesia on cholinergic parameters in rat brain. *Lab Anim Sci* 1994;44:369–371.

83. Urbanski HF, Kelly SF. Sedation by exposure to gaseous carbon dioxide-oxygen mixture: application to studies involving small laboratory animal species. *Lab Anim Sci* 1991;41:80–82.

84. Iwarsson K, Rehbinder C. A study of different euthanasia techniques in guinea pigs, rats, and mice. Animal response and postmortem findings. *Scand J Lab Anim Sci* 1993;20:191–205.

85. Hornett TD, Haynes AP. Comparison of carbon dioxide/air mixture and nitrogen/air mixture for the euthanasia of rodents: design of a system for inhalation euthanasia. *Anim Technol* 1984;35:93–99.

86. Smith W, Harrap SB. Behavioral and cardiovascular responses of rats to euthanasia using carbon dioxide gas. *Lab Anim* 1997;31:337–346.

87. Hewett TA, Kovacs MS, Artwohl JE, et al. A comparison of euthanasia methods in rats, using carbon dioxide in prefilled and fixed flow rate filled chambers. *Lab Anim Sci* 1993;43:579–582.

88. Herin RA, Hall P, Fitch JW. Nitrogen inhalation as a method of euthanasia in dogs. *Am J Vet Res* 1978;39:989–991.

89. Noell WK, Chinn HI. Time course of failure of the visual pathway in rabbits during anoxia. *Fed Proc* 1949;8:119.

90. Vinte FJ. *The humane killing of mink.* London: Universities Federation for Animal Welfare, 1957.

91. Stonehouse RW, Loew FM, Quine JP, et al. The euthanasia of dogs and cats: a statement of the humane practices committee of the Canadian Veterinary Medical Association. *Can Vet J* 1978;19:164–168.

92. Quine JP, Buckingham W, Strunin L. Euthanasia of small animals with nitrogen; comparison with intravenous pentobarbital. *Can Vet J* 1988;29:724–726.

93. Raj ARM, Gregory NG, Wotton SR. Changes in the somatosensory evoked potentials and spontaneous electroencephalogram of hens during stunning in Argon-induced anoxia. *Br Vet J* 1991;147:322–330.

94. Ramsey TL, Eilmann HJ. Carbon monoxide acute and chronic poisoning and experimental studies. *J Lab Clin Med* 1932;17:415–427.

95. Chalifoux A, Dallaire A. Physiologic and behavioral evaluation of CO euthanasia of adult dogs. *Am J Vet Res* 1983;44:2412–2417.

96. Haldane J. The action of carbonic oxide in man. *J Physiol* 1895;18:430–462.

97. Dallaire A, Chalifoux A. Premedication of dogs with acepromazine or pentazocine before euthanasia with carbon monoxide. *Can J Comp Med* 1985;49:171–178.

98. Lambooy E, Spanjaard W. Euthanasia of young pigs with carbon monoxide. *Vet Rec* 1980;107:59–61.

99. Lowe-Ponsford FL, Henry JA. Clinical aspects of carbon monoxide poisoning. *Adverse Drug React Acute Poisoning Rev* 1989;8:217–240.

100. Bloom JD. Some considerations in establishing divers' breathing gas purity standards for carbon monoxide. *Aerosp Med* 1972;43:633–636.

101. Norman CA, Halton DM. Is carbon monoxide a workplace teratogen? A review and evaluation of the literature. *Ann Occup Hyg* 1990;34:335–347.

102. Eechter LD. Neurotoxicity of prenatal carbon monoxide exposure. Research report. *Health Effects Inst* 1987;Vol:3–22.

103. Wojtczak-Jaroszowa J, Kubow S. Carbon monoxide, carbon disulfide, lead and cadmium—four examples of occupational toxic agents linked to cardiovascular disease. *Med Hypotheses* 1989;30:141–150.

104. Noga E. *Fish disease: diagnosis and treatment.* St. Louis: CV Mosby, 1996;1–367.

105. Stoskopf MK. Anaesthesia. In: Brown LA, ed. *Aquaculture for veterinarians: fish husbandry and medicine.* Oxford, UK: Pergamon Press, 1993;161–167.

106. Lumb W. Euthanasia by noninhalant pharmacologic agents. *J Am Vet Med Assoc* 1974;165:851–852.

107. Barbiturates. In: Ciganovich E, ed. *Field manual of wildlife diseases.* US Department of the Interior/US Geological Survey, Biological Resources Division, Information and Technical Report 1999-2001.

108. Dennis MB, Dong WK, Weisbrod KA, et al. Use of captive bolt as a method of euthanasia in larger laboratory animal species. *Lab Anim Sci* 1988;38:459–462.

109. Blackmore DK. Energy requirements for the penetration of heads of domestic stock and the development of a multiple projectile. *Vet Rec* 1985;116:36–40.

110. Daly CC, Whittington PE. Investigation into the principal determinants of effective captive bolt stunning of sheep. *Res Vet Sci* 1989;46:406–408.

111. Clifford DH. Preanesthesia, anesthesia, analgesia, and euthanasia. In: Fox JG, Cohen BJ, Loew FM, eds. *Laboratory animal medicine.* New York: Academic Press Inc, 1984;528–563.

112. Australian Veterinary Association. Guidelines on humane slaughter and euthanasia. *Aust Vet J* 1987;64:4–7.

113. Carding T. Euthanasia of dogs and cats. *Anim Reg Stud* 1977;1:5–21.

114. Longair JA, Finley GG, Laniel M-A, et al. Guidelines for euthanasia of domestic animals by firearms. *Can Vet J* 1991;32:724–726.

115. Finnie JW. Neuroradiological aspects of experimental traumatic missile injury in sheep. *N Z Vet J* 1994;42:54–57.

116. Blackmore DK, Madie P, Bowling MC, et al. The use of a shotgun for euthanasia of stranded cetaceans. *N Z Vet J* 1995;43:158–159.

117. Blackmore DK, Bowling MC, Madie, P, et al. The use of a shotgun for emergency slaughter or euthanasia of large mature pigs. *N Z Vet J* 1995;43:134–137.

118. Denicola AJ. Non-traditional techniques for management of overabundant deer populations. *Wildl Soc Bull* 1997;25:496–499.

119. McAninch JB, ed. Urban deer: a manageable resource? In *Proceedings.* Symp 55th Midwest Fish Wildl Conf 1993;1–175.

120. Finnie JW. Traumatic head injury in ruminant livestock. *Aust Vet J* 1997;75:204–208.

121. Blackmore DK, Daly CC, Cook CJ. Electro-encephalographic studies on the nape shooting of sheep. *N Z Vet J* 1995;43:160–163.

122. *On-farm euthanasia of swine—options for the producer.* Perry, Iowa: American Association of Swine Practitioners and Des Moines, Iowa: National Pork Producers, 1997.

123. *Practical euthanasia of cattle: considerations for the producer, livestock market operator, livestock transporter, and veterinarian.* Rome, Ga: American Association of Bovine Practitioners, 1999.

124. *The emergency euthanasia of horses.* Sacramento: California Department of Food and Agriculture and Davis, Calif: University of California's Veterinary Medical Extension, 1999.

125. *The emergency euthanasia of sheep and goats.* Sacramento: California Department of Food and Agriculture and Davis, Calif: University of California's Veterinary Medical Extension, 1999.

126. Gregory NG, Wotton SB. Comparison of neck dislocation and percussion of the head on visual evoked responses in the chicken's brain. *Vet Rec* 1990;126:570–572.

127. Vanderwolf CH, Buzak DP, Cain RK, et al. Neocortical and hippocampal electrical activity following decapitation in the rat. *Brain Res* 1988;451:340–344.

128. Derr RF. Pain perception in decapitated rat brain. *Life Sci* 1991;49:1399–1402.

129. Holson RR. Euthanasia by decapitation: evidence that this technique produces prompt, painless unconsciousness in laboratory rodents. *Neurotoxicol Teratol* 1992;14:253–257.

130. Keller GL. Physical euthanasia methods. *Lab Anim* 1982;11:20–26.

131. Feldman DB, Gupta BN. Histopathologic changes in laboratory animals resulting from various methods of euthanasia. *Lab Anim Sci* 1976;26:218–221.

132. Mikeska JA, Klemm WR. EEG evaluation of humaneness of asphyxia and decapitation euthanasia of the laboratory rat. *Lab Anim Sci* 1975;25:175–179.

133. Warrington R. Electrical stunning, a review of the literature. *Vet Bull* 1974;44:617–628.

134. Lambooy E, van Voorst N. Electrocution of pigs with notifiable diseases. *Vet Q* 1986;8:80–82.

135. Loftsgard G, Raathen S, Helgebostad A. Electrical stunning of mink. *Vet Rec* 1972;91:132–134.

136. Hatch RC. Euthanatizing agents. In: Booth NH and McDonald LE, eds. *Veterinary pharmacology and therapeutics.*6th ed. Ames, Iowa: Iowa State University Press, 1988;1143–1148.

137. Croft PG, Hume CW. Electric stunning of sheep. *Vet Rec* 1956;68:318–321.

138. Roberts TDM. Electrocution cabinets. *Vet Rec* 1974;95:241–242.

139. Roberts TDM. Cortical activity in electrocuted dogs. *Vet Rec* 1954;66:561–567.

140. Anil MH, McKinstry JL. Reflexes and loss of sensibility following head-to-back electrical stunning in sheep. *Vet Rec* 1991;128:106–107.

141. Stavinoha WR. Study of brain neurochemistry utilizing rapid inactivation of brain enzyme activity by heating and mirowave irradiation. In: Black CL, Stavinoha WB, Marvyama Y, eds. *Microwave irradiation as a tool to study labile metabolites in tissue.* Elmsford, NY: Pergamon Press, 1983;1–12.

142. Stavinoha WB, Frazer J, Modak AT. Microwave fixation for the study of acetylcholine metabolism. In: Jenden DJ, ed. *Cholinergic mechanisms and psychopharmacology.* New York: Plenum Publishing Corp, 1978;169–179.

143. Ikarashi Y, Marvyama Y, Stavinoha WB. Study of the use of the microwave magnetic field for the rapid inactivation of brain enzymes. *Jpn J Pharmacol* 1984;35:371–387.

144. Gaunt AS, Oring LW. *Guidelines to the use of wild birds in research.* Washington DC: The Ornithological Council, 1997;1–52.

145. Federal Provincial Committee for Humane Trapping. *Final report: committee of the federal provincial wildlife conference.* Ottawa: Canadian Wildl Service, 1981;1–172.

146. *Agreement on international humane trapping standards.* The European Community, the Government of Canada, and the Government of the Russian Federation. Department of Foreign Affairs and International Trade, 1997;1–32.

147. Canadian General Standards Board. *Animal (mammal) traps—mechanically powered, trigger-activated killing traps for use on land.* No. CAN/CGSB-144.1-96. Ottawa: Canadian General Standards Board, 1996;1–36.

148. Nolan JW, Barrett MW. *Description and operation of the humane trapping research facility at the Alberta Environmental Centre, AECV90-R3.* Vegreville, AB: Alberta Environmental Centre, 1990.

149. *Animal (mammal) traps-part 4: methods for testing killing trap systems used on land or underwater, TC 191, ISO/DIS 10990-4E.* International Standardization Organization, 2000;1–15.

150. Gilbert FF. Assessment of furbearer response to trapping devices. In: Chapman JA, Pursley D, eds. *Worldwide furbearer conference proceedings.* Frostburg, Md: 1981;1599–1611.

151. Proulx G, Barrett MW. Evaluation of the Bionic Trap to quickly kill mink (Mustela vison) in simulated natural environments. J Wildl Dis 1991;27:276–280.

152. Proulx G, Barrett MW. Field testing of the C120 magnum trap for mink. Wildl Soc Bull 1993;21:421–426.

153. Hiltz M, Roy LD. Rating killing traps against humane trapping standards using computer simulations, in Proceedings. 19th Vertebrate Pest Conf 2000.

154. Proulx G, Barret M. Evaluation of the Bionic Trap to quickly kill fisher (Martes pennanti) in simulated natural environments. J Wildl Dis 1993;29:310–316.

155. Proulx G, Pawlina IM, Wong RK. Re-evaluation of the C120 magnum and bionic traps to humanely kill mink. J Wildl Dis 1993;29:184.

156. Proulx G, Barrett MW, Cook SR. The C120 Magnum with pan trigger: a humane trap for mink (Mustela vison). J Wildl Dis 1990;26:511–517.

157. Proulx G, Kolenosky AJ, Cole PJ. Assessment of the Kania trap to humanely kill red squirrels (Tamiasciurus hudsonicus) in enclosures. J Wildl Dis 1993;29:324–329.

158. Proulx G, Kolenosky AJ, Badry MJ, et al. Assessment of the Savageau 2001-8 trap to effectively kill arctic fox. Wildl Soc Bull 1993;21:132–135.

159. Proulx G, Kolenosky AJ, Cole PJ, et al. A humane killing trap for lynx (Felis lynx): the Conibear 330 with clamping bars. J Wildl Dis 1995;1:57–61.

160. Proulx G, Barret MW, Cook SR. The C120 Magnum: an effective kill trap for marten. Wildl Soc Bull 1989;17:294–298.

161. Proulx G, Cook SR, Barrett MW. Assessment and preliminary development of the rotating jaw Conibear 120 trap to effectively kill marten (Martes americana). Can J Zool 1989;67:1074–1079.

162. Naylor BJ, Novak M. Catch efficiency and selectivity of various traps and sets used for capturing American martens. Wildl Soc Bull 1994;22:489–496.

163. Hill EP. Evaluation of improved traps and trapping techniques. Alabama Department of Conservation and Natural Resources P-R Project Report W-44-5 Job IV-B:1-19.

164. King CM. The effects of two types of steel traps upon captured stoats (Mustela erminea). J Zool (Lond) 1995;553–554.

165. Cooper JE, Ewbank R, Platt C, et al. Euthanasia of amphibians and reptiles. London: UFAQ/WSPA, 1989.

166. Twitchell C, Roy LD, Gilbert FF, et al. Effectiveness of rotating-jaw killing traps for beaver (Castor canadensis), in Proceedings. North Am Aquatic Furbearer Symp 1999.

167. Warburton B, Hall JV. Impact momentum and clamping force thresholds for developing standards for possum kill traps. N Z J Zool 1995;22:39–44.

168. Guidelines for the capture, handling, and care of mammals as approved by the American Society of Mammalogists. J Mammal 1998;79:1416–1431.

169. Improving animal welfare in US trapping programs. Washington, DC: International Association of Fish and Wildlife Agencies, 1997.

170. Blackmore DK. Differences in behaviour between sheep and cattle during slaughter. Res Vet Sci 1984;37:223–226.

171. Gregory NG, Wotton SB. Time to loss of brain responsiveness following exsanguination in calves. Res Vet Sci 1984;37:141–143.

172. Blackmore DK. Non-penetrative percussion stunning of sheep and calves. Vet Rec 1979;105:372–375.

173. Canadian Council on Animal Care. Guide to the care and use of experimental animals. Vol 1. Ottawa: Canadian Council on Animal Care, 1980.

174. Green CJ. Euthanasia. In: Animal anaesthesia. London: Laboratory Animals Ltd, 1979;237–241.

175. Clifford DH. Preanesthesia, anesthesia, analgesia, and euthanasia. In: Fox JG, Cohen BJ, Loew FM, eds. Laboratory animal medicine. Orlando: Academic Press Inc, 1984;527–562.

176. Finnie JW. Neuropathologic changes produced by non-penetrating percussive captive bolt stunning of cattle. N Z Vet J 1995;43:183–185.

177. Gregory NG, Wotton SB. Effect of slaughter on spontaneous and evoked activity of the brain. Br Poult Sci 1986;27:195–205.

178. Eikelenboom G, ed. Stunning of animals for slaughter. Boston: Martinus Nijhoff Publishers, 1983;1–227.

179. Booth NH. Drug and chemical residues in the edible tissues of animals. In: Booth NH, McDonald LE, eds. Veterinary pharmacology and therapeutics. 6th ed. Ames, Iowa: Iowa State University Press, 1988;1149–1205.

180. Acceptable field methods in mammalogy: preliminary guidelines approved by the American Society of Mammalogists. J Mammal 1987;68(Suppl 4):1–18.

181. American Ornithologists' Union. Report of committee on use of wild birds in research. Auk 1988;105(Suppl):1A–41A.

182. American Society of Ichthyologists and Herpetologists, Herpetologist League, Society for the Study of Amphibians and Reptiles. Guidelines for the use of live amphibians and reptiles in field research. J Herpetol 1987;21(suppl 4):1–14.

183. American Society of Ichthyologists and Herpetologists, American Fisheries Society, American Institute of Fisheries Research Biologists. Guidelines for use of fishes in field research. Copeia Suppl 1987;1–12.

184. Cailliet GM. Fishes: a field guide and laboratory manual on their structure, identification, and natural history. Belmont, Calif: Wadsworth, 1986.

185. Schwartz JA, Warren R, Henderson D, et al. Captive and field tests of a method for immobilization and euthanasia of urban deer. Wildl Soc Bull 1997;25:532–541.

186. Zwart P, deVries HR, Cooper JE. The humane killing of fishes, amphibia, reptiles and birds. Tijdsehr Diergeneeskd 1989;114:557–565.

187. Burns R. Considerations in the euthanasia of reptiles, fish and amphibians, in Proceedings. AAZV, WDA, AAWV Joint Conference 1995;243–249.

188. National Research Committee on Pain and Distress in Laboratory Animals. Recognition of pain and distress in laboratory animals. Washington DC: National Academy Press, 1992.

189. Heard DJ. Principles and techniques of anesthesia and analgesia for exotic practice. Vet Clin North Am Small Anim Pract 1993;23:1301–1327.

190. Canadian Council on Animal Care. Guide to the use and care of experimental animals. Vol 2. Ottawa: Association of Universities and Colleges of Canada, 1984;1–16.

191. Harrell L. Handling euthanasia in production facilities. In: Schaeffer DO, Kleinow KM, Krulisch L, eds. The care and use of amphibians, reptiles and fish in research. Bethesda, Md: Scientists Center for Animal Welfare, 1992;129.

192. Ferguson HW. Systemic pathology of fish. Ames, Iowa: Iowa State University Press, 1989.

193. Letcher J. Intracelomic use of tricaine methane sulfonate for anesthesia of bullfrogs (Rana catesbeiana) and leopard frogs (Rana pipens). Zoo Biol 1992;11:242–251.

194. Brown LA. Anesthesia in fish. Vet Clin North Am Small Anim Pract 1988;18:317–330.

195. Josa A, Espinosa E, Cruz JI, et al. Use of 2-phenoxyethanol as an anesthetic agent in goldfish (Cyprinus carpio). Vet Rec 1992;131:468.

196. Noga EJ. Fish disease. Diagnosis and treatment. St Louis: Mosby, 1996.

197. Brannian RE, Kirk E, Williams D. Anesthetic induction of kinosternid turtles with halothane. J Zoo Anim Med 1987;18:115–117.

198. Calderwood HW. Anesthesia for reptiles. J Am Vet Med Assoc 1971;159:1618–1625.

199. Jackson OF, Cooper JE. Anesthesia and surgery. In: Cooper JE, Jackson OF, eds. Diseases of the reptilia. Vol. 2. New York: Academic Press Inc, 1981;535–549.

200. Johlin JM, Moreland FB. Studies of the blood picture of the turtle after complete anoxia. J Biol Chem 1933;103:107–114.

201. Moberly WR. The metabolic responses of the common iguana, Iguana iguana, to walking and diving. Comp Biochem Physiol 1968;27:21–32.

202. Storey KB. Life in a frozen state: adaptive strategies for natural freeze tolerance in amphibians and reptiles. Am J Physiol 1990;258:R559–R568.

203. Burns R, McMahan B. Euthanasia methods for ectothermic vertebrates. In: Bonagura JD, ed. Continuing veterinary therapy XII. Philadelphia: WB Saunders Co, 1995;1379–1381.

204. Cooper JE, Ewbank R, Platt C, et al. Euthanasia of amphib-

ians and reptiles. London: Universities Federation for Animal Welfare and World Society for the Protection of Animals, 1989.

205. Zwart P, deVries HR, Cooper JE. Humane methods of killing fish, amphibians and birds. *Tijdschr Diergeneedkd* 1989;114:557–565.

206. Martin B. Evaluation of hypothermia for anesthesia in reptiles and amphibians. *ILAR News* 1995;37:186–190.

207. Suckow MA, Terril LA, Grigdesby CF, et al. Evaluation of hypothermia-induced analgesia and influence of opioid antagonists in Leopard frogs (*Rana pipiens*). *Pharmacol Biochem Behav* 1999;63:39–43.

208. Schaffer DO. Anesthesia and analgesia in nontraditional laboratory animal species. In: Kohn DF, Wixson SK, White WJ, et al. eds. *Anesthesia and analgesia in laboratory animals*. San Diego: Academic Press Inc, 1997;337–378.

209. Greer LL, Rowles T. Euthanasia. In: Dierauf LA, ed. *CRC handbook of marine mammal medicine: health, disease, and rehabilitation*. 2nd ed. Boca Raton, Fla: CRC Press, in press.

210. Blackmore DK, Madie P, Bowling MC, et al. The use of a shotgun for euthanasia of stranded cetaceans. *N Z Vet J* 1995;43:158–159.

211. Hyman J. Euthanasia in marine animals. In: Dierauf LA, ed. *CRC handbook of marine mammal medicine: health, disease, and rehabilitation*. Boca Raton, Fla: CRC Press, 1990;265–266.

212. Lambooy E, Roelofs JA, Van Voorst N. Euthanasia of mink with carbon monoxide. *Vet Rec* 1985;116:416.

213. *Recommended code of practice for the care and handling of mink*. Ottawa: Agriculture Canada, 1988;1–17.

214. Singer D. Neonatal tolerance to hypoxia: a comparative-physiological approach. *Comp Biochem Physiol* 1999;123:221–234.

215. Ludders JW, Schmidt RH, Dein J, et al. Drowning is not euthanasia. *Wildlife Soc Bull* 1999;27(3):1.

## Appendix 1

Agents and methods of euthanasia by species (refer to Appendix 4 for unacceptable agents and methods.)

| Species | Acceptable* (refer to Appendix 2 and text for details) | Conditionally acceptable† (refer to Appendix 3 and text for details) |
|---|---|---|
| Amphibians | Barbiturates, inhalant anesthetics (in appropriate species), $CO_2$, CO, tricaine methane sulfonate (TMS, MS 222), benzocaine hydrochloride, double pithing | Penetrating captive bolt, gunshot, stunning and decapitation, decapitation and pithing |
| Birds | Barbiturates, inhalant anesthetics, $CO_2$, CO, gunshot (free-ranging only) | $N_2$, Ar, cervical dislocation, decapitation, thoracic compression (small, free-ranging only) |
| Cats | Barbiturates, inhalant anesthetics, $CO_2$, CO, potassium chloride in conjunction with general anesthesia | $N_2$, Ar |
| Dogs | Barbiturates, inhalant anesthetics, $CO_2$, CO, potassium chloride in conjunction with general anesthesia | $N_2$, Ar, penetrating captive bolt, electrocution |
| Fish | Barbiturates, inhalant anesthetics, $CO_2$, tricaine methane sulfonate (TMS, MS 222), benzocaine hydrochloride, 2-phenoxyethanol | Decapitation and pithing, stunning and decapitation/pithing |
| Horses | Barbiturates, potassium chloride in conjunction with general anesthesia, penetrating captive bolt | Chloral hydrate (IV, after sedation), gunshot, electrocution |
| Marine mammals | Barbiturates, etorphine hydrochloride | Gunshot (cetaceans < 4 meters long) |
| Mink, fox, and other mammals produced for fur | Barbiturates, inhalant anesthetics, $CO_2$ (mink require high concentrations for euthanasia without supplemental agents), CO, potassium chloride in conjunction with general anesthesia | $N_2$, Ar, electrocution followed by cervical dislocation |
| Nonhuman primates | Barbiturates | Inhalant anesthetics, $CO_2$, CO, $N_2$, Ar |
| Rabbits | Barbiturates, inhalant anesthetics, $CO_2$, CO, potassium chloride in conjunction with general anesthesia | $N_2$, Ar, cervical dislocation (< 1 kg), decapitation, penetrating captive bolt |
| Reptiles | Barbiturates, inhalant anesthetics (in appropriate species), $CO_2$ (in appropriate species) | Penetrating captive bolt, gunshot, decapitation and pithing, stunning and decapitation |
| Rodents and other small mammals | Barbiturates, inhalant anesthetics, $CO_2$, CO, potassium chloride in conjunction with general anesthesia, microwave irradiation | Methoxyflurane, ether, $N_2$, Ar, cervical dislocation (rats < 200 g), decapitation |
| Ruminants | Barbiturates, potassium chloride in conjunction with general anesthesia, penetrating captive bolt | Chloral hydrate (IV, after sedation), gunshot, electrocution |
| Swine | Barbiturates, $CO_2$, potassium chloride in conjunction with general anesthesia, penetrating captive bolt | Inhalant anesthetics, CO, chloral hydrate (IV, after sedation), gunshot, electrocution, blow to the head (< 3 weeks of age) |
| Zoo animals | Barbiturates, inhalant anesthetics, $CO_2$, CO, potassium chloride in conjunction with general anesthesia | $N_2$, Ar, penetrating captive bolt, gunshot |
| Free-ranging wildlife | Barbiturates IV or IP, inhalant anesthetics, potassium chloride in conjunction with general anesthesia | $CO_2$, CO, $N_2$, Ar, penetrating captive bolt, gunshot, kill traps (scientifically tested) |

*Acceptable methods are those that consistently produce a humane death when used as the sole means of euthanasia. †Conditionally acceptable methods are those that by the nature of the technique or because of greater potential for operator error or safety hazards might not consistently produce humane death or are methods not well documented in the scientific literature.

*Continued on next page.*

# Appendix 2

Acceptable agents and methods of euthanasia—characteristics and modes of action (refer to text for details)

| Agent | Classification | Mode of action | Rapidity | Ease of performance | Safety for personnel | Species suitability | Efficacy and comments |
|---|---|---|---|---|---|---|---|
| Barbiturates | Hypoxia attributable to depression of vital centers | Direct depression of cerebral cortex, subcortical structures, and vital centers; direct depression of heart muscle | Rapid onset of anesthesia | Animal must be restrained; personnel must be skilled to perform IV injection | Safe except human abuse potential; DEA-controlled substance | Most species | Highly effective when appropriately administered; acceptable IP in small animals and IV |
| Benzocaine hydrochloride | Hypoxia attributable to depression of vital centers | Depression of CNS | Very rapid, depending on dose | Easily used | Safe | Fish, amphibians | Effective but expensive |
| Carbon dioxide (bottled gas only) | Hypoxia attributable to depression of vital centers | Direct depression of cerebral cortex, subcortical structures, and vital centers; direct depression of heart muscle | Moderately rapid | Used in closed container | Minimal hazard | Small laboratory animals, birds, cats, small dogs, rabbits, mink (high concentrations required), zoo animals, amphibians, fish, some reptiles, swine | Effective, but time required may be prolonged in immature and neonatal animals |
| Carbon monoxide (bottled gas only) | Hypoxia | Combines with hemoglobin, preventing its combination with oxygen | Moderate onset time, but insidious so animal is unaware of onset | Requires appropriately maintained equipment | Extremely hazardous, toxic, and difficult to detect | Most small species including dogs, cats, rodents, mink, chinchillas, birds, reptiles, amphibians, zoo animals, rabbits | Effective; acceptable only when equipment is properly designed and operated |
| Inhalant anesthetics | Hypoxia attributable to depression of vital centers | Direct depression of cerebral cortex, subcortical structures, and vital centers | Moderately rapid onset of anesthesia, excitation may develop during induction | Easily performed with closed container; can be administered to large animals by means of a mask | Must be properly scavenged or vented to minimize exposure to personnel | Some amphibians, birds, cats, dogs, furbearing animals, rabbits, some reptiles, rodents and other small mammals, zoo animals, fish, free-ranging wildlife | Highly effective provided that subject is sufficiently exposed; either is conditionally acceptable |
| Microwave irradiation | Brain enzyme inactivation | Direct inactivation of brain enzymes by rapid heating of brain | Very rapid | Requires training and highly specialized equipment | Safe | Mice, rats | Highly effective for special needs |
| Penetrating captive bolt | Physical damage to brain | Direct concussion of brain tissue | Rapid | Requires skill, adequate restraint, and proper placement of captive bolt | Safe | Horses, ruminants, swine | Instant loss of consciousness, but motor activity may continue |
| 2-Phenoxyethanol | Hypoxia attributable to depression of vital centers | Depression of CNS | Very rapid, depending on dose | Easily used | Safe | Fish | Effective but expensive |
| Potassium chloride (intracardially or intravenously in conjunction with general anesthesia only) | Hypoxia | Direct depression of cerebral cortex, subcortical structures, and vital centers secondary to cardiac arrest. | Rapid | Requires training and specialized equipment for remote injection anesthesia, and ability to give IV injection of potassium chloride | Anesthetics may be hazardous with accidental human exposure | Most species | Highly effective, some clonic muscle spasms may be observed |
| Tricaine methane sulfonate (TMS, MS 222) | Hypoxia attributable to depression of vital centers | Depression of CNS | Very rapid, depending on dose | Easily used | Safe | Fish, amphibians | Effective but expensive |

# Appendix 3

Conditionally acceptable agents and methods of euthanasia—characteristics and modes of action (refer to text for details)

| Agent | Classification | Mode of action | Rapidity | Ease of performance | Safety | Species suitability | Efficacy and comments |
|---|---|---|---|---|---|---|---|
| Blow to the head | Physical damage to brain | Direct concussion of brain tissue | Rapid | Requires skill, adequate restraint, and appropriate force | Safe | Young pigs < 3 weeks old | Must be properly applied to be humane and effective |
| Carbon dioxide (bottled gas only) | Hypoxia due to depression of vital centers | Direct depression of cerebral cortex, subcortical structures and vital centers; direct depression of heart muscle | Moderately rapid | Used in closed container | Minimal hazard | Nonhuman primates, free-ranging wildlife | Effective, but time required may be prolonged in immature and neonatal animals |
| Carbon monoxide (bottled gas only) | Hypoxia | Combines with hemoglobin, preventing its combination with oxygen | Moderate onset time, but insidious so animal is unaware of onset | Requires appropriately maintained equipment | Extremely hazardous, toxic, and difficult to detect | Nonhuman primates, free-ranging wildlife | Effective; acceptable only when equipment is properly designed and operated |
| Cervical dislocation | Hypoxia due to disruption of vital centers | Direct depression of brain | Moderately rapid | Requires training and skill | Safe | Poultry, birds, laboratory mice, rats (< 200 g), rabbits (< 1 kg) | Irreversible; violent muscle contractions can occur after cervical dislocation |
| Chloral hydrate | Hypoxia from depression of respiratory center | Direct depression of brain | Rapid | Personnel must be skilled to perform IV injection | Safe | Horses, ruminants, swine | Animals should be sedated prior to administration |
| Decapitation | Hypoxia due to disruption of vital centers | Direct depression of brain | Rapid | Requires training and skill | Guillotine poses potential employee injury hazard | Laboratory rodents; small rabbits; birds; some fish, amphibians, and reptiles (latter 3 with pithing) | Irreversible; violent muscle contraction can occur after decapitation |
| Electrocution | Hypoxia | Direct depression of brain and cardiac fibrillation | Can be rapid | Not easily performed in all instances | Hazardous to personnel | Used primarily in sheep, swine, foxes, mink (with cervical dislocation), ruminants, animals > 5 kg | Violent muscle contractions occur at same time as loss of consciousness |
| Gunshot | Hypoxia due to disruption of vital centers | Direct concussion of brain tissue | Rapid | Requires skill and appropriate firearm | May be dangerous | Large domestic and zoo animals; reptiles, amphibians, wildlife, cetaceans (< 4 meters long) | Instant loss of consciousness, but motor activity may continue |
| Inhalant anesthetics | Hypoxia due to depression of vital centers | Direct depression of cerebral cortex, subcortical structures, and vital centers | Moderately rapid onset of anesthesia; excitation may develop during induction | Easily performed with closed container; can be administered to large animals by means of a mask | Must be properly scavenged or vented to minimize exposure to personnel; ether has explosive potential and exposure to ether may be stressful | Nonhuman primates, swine; ether is conditionally acceptable for rodents and small mamals; methoxyflurane is conditionally acceptable for rodents and small mammals. | Highly effective provided that subject is sufficiently exposed |
| Nitrogen, argon | Hypoxia | Reduces partial pressure of oxygen available to blood | Rapid | Used in closed chamber with rapid filling | Safe if used with ventilation | Cats, small dogs, birds, rodents, rabbits, other small species, mink, zoo animals, nonhuman primates, free-ranging wildlife | Effective except in young and neonates; an effective agent, but other methods are preferable |
| Penetrating captive bolt | Physical damage to brain | Direct concussion of brain tissue | Rapid | Requires skill, adequate restraint and proper placement of captive bolt | Safe | Dogs, rabbits, zoo animals, reptiles, amphibians, free-ranging wildlife | Instant loss of consciousness but motor activity may continue |
| Pithing | Hypoxia due to disrution of vital centers, physical damage to brain | Trauma of brain and spinal cord tissue | Rapid | Easily performed but requires skill | Safe | Some ectotherms | Effective, but death not immediate unless brain and spinal cord are pithed |
| Thoracic compresion | Hypoxia and cardiac arrest | Physical interference with cardiac and respiratory function | Moderately rapid | Requires training | Safe | Small- to medium-sized free-ranging birds | Apparently effective |



## Appendix 4

Some unacceptable agents and methods of euthanasia (refer to text for details)

| Agent or method | Comments |
|---|---|
| Air embolism | Air embolism may be accompanied by convulsions, opisthotonos, and vocalization. If used, it should be done only in anesthetized animals. |
| Blow to the head | Unacceptable for most species. |
| Burning | Chemical or thermal burning of an animal is not an acceptable method of euthanasia. |
| Chloral hydrate | Unacceptable in dogs, cats, and small mammals. |
| Chloroform | Chloroform is a known hepatotoxin and suspected carcinogen and, therefore, is extremely hazardous to personnel. |
| Cyanide | Cyanide poses an extreme danger to personnel and the manner of death is aesthetically objectionable. |
| Decompression | Decompression is unacceptable for euthanasia because of numerous disadvantages. (1) Many chambers are designed to produce decompression at a rate 15 to 60 times faster than that recommended as optimum for animals, resulting in pain and distress attributable to expanding gases trapped in body cavities. (2) Immature animals are tolerant of hypoxia, and longer periods of decompression are required before respiration ceases. (3) Accidental recompression, with recovery of injured animals, can occur. (4) Bleeding, vomiting, convulsions, urination, and defecation, which are aesthetically unpleasant, may develop in unconscious animals. |
| Drowning | Drowning is not a means of euthanasia and is inhumane. |
| Exsanguination | Because of the anxiety associated with extreme hypovolemia, exsanguination should be done only in sedated, stunned, or anesthetized animals. |
| Formalin | Direct immersion of an animal into formalin, as a means of euthanasia, is inhumane. |
| Household products and solvents | Acetone, quaternary compounds (including $CCl_4$), laxatives, clove oil, dimethylketone, quaternary ammonium products*, antacids, and other commercial and household products or solvents are not acceptable agents for euthanasia. |
| Hypothermia | Hypothermia is not an appropriate method of euthanasia. |
| Neuromuscular blocking agents (nicotine, magnesium sulafte, potassiumchloride, all curariform agents) | When used alone, these drugs all cause respiratory arrest before loss of consciousness, so the animal may perceive pain and distress after it is immobilized. |
| Rapid freezing | Rapid freezing as a sole means of euthanasia is not considered to be humane. If used, animals should be anesthetized prior to freezing. |
| Strychnine | Strychnine causes violent convulsions and painful muscle contractions. |
| Stunning | Stunning may render an animal unconscious, but it is not a method of euthanasia (except for neonatal animals with thin craniums). If used, it must be immediately followed by a method that ensures death. |
| Tricaine methane sulfonate (TMS, MS 222) | Should not be used for euthanasia of animals intended as food. |

*Roccal D Plus, Pharmacia & Upjohn, Kalamazoo, Mich.

2028

# DECLARATION

I, Patrick J. Ehlers, Jr., declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:

1.    I am an attorney and have practiced law since 1994 in the area of criminal defense. I am admitted to the Oklahoma State Bar, all federal district courts in Oklahoma, the United States Court of Appeals for the Tenth Circuit, the Supreme Court of the United States, the United States District Court of Oregon and the United States Court of Appeals for the Ninth Circuit.

2.    I relocated from Oklahoma to Oregon in the summer of 2003. Immediately prior to relocation I was employed with the Capital Habeas Unit ("CHU") of the Federal Public Defender for the Western District of Oklahoma. I was with the CHU for approximately four and half years. During that time my practice was focused exclusively on capital representation in federal court. After leaving the CHU, I took a position with the Federal Public Defender for the District of Oregon. Presently I represent indigent criminal defendants in federal court in all types of cases at trial, on appeal, and in habeas corpus proceedings. As part of that work I represent a capital client and continue my work in the area of death penalty litigation.

3.    During my work at the CHU, I represented a man named Loyd LaFevers. His efforts to appeal his conviction and sentence were unsuccessful and on January 30, 2001 he was executed by the State of Oklahoma.

4.    I was one of the witnesses who attended Mr. LaFevers' execution. I had witnessed two other executions prior to the execution of Mr. LaFevers. I was personally present at the execution of Charles Foster and the execution of Mark Fowler.

5.    In fact, Mr. Fowler's execution took place exactly on week prior to the execution of Mr. LaFevers. As a result, Mr. LaFevers' execution was one of two executions that I personally

Exhibit XI-J

2029

3- 1-04; 6:08PM   ;                                                    15033265524;#   2

witnessed in a two week period in January, 2001.

6.    In addition to my personal experience with witnessing executions I had, prior to witnessing the execution of Mr. LaFevers, consulted with my colleagues in the CHU regarding executions they had witnessed.

7.    Based on my personal experience, the lethal injection execution of Mr. LaFevers did not go normally and in my opinion his execution was flawed. The executions that I had witnessed previously followed a predictable pattern and were consistent with other executions that I had discussed with colleagues.

8.    Normally an execution would begin with an individual being able to look at the witnesses but very quickly the person would become unconscious, breath deeply, and then die.

9.    Mr. LaFevers' execution did not proceed in this manner. Mr. LaFevers remained conscious for a noticeably longer period of time. When he lifted his head off of the gurney to look at witnesses he was able to keep his head up and remained conscious.

10.    His eyes stayed open and he did not slip into unconsciousness quickly. I generally recall that he may have exhibited some shaking in his limbs. I specifically recall that he appeared to have a bruise or some discoloration and swelling in the area of his left arm. This is one of the places were he had an IV tube.

11.    I have witnessed the effects of an IV infiltration (misplacement of an IV needle that delivers fluid outside of the vein as opposed to into the vein). Having seen the effects of an IV infiltration previously, it was my conclusion that Mr. LaFevers may have also suffered from such an infiltration.

12.    If this in fact did happen, it would be consistent with the drugs from that IV tube not being delivered normally into the vein and thereby reducing the effective delivery of the drugs

2020

3- 1-04;  6:08PM  ;                                                                          15033265524;#   3

injected into the left arm.

13.    At the time of Mr. LaFevers' execution, autopsies were not normally performed on persons executed in Oklahoma unless one was requested.

14.    I was certain that Mr. LaFevers' execution was flawed and for that reason I called the medical examiner's office to request an autopsy. Mr. LaFevers's execution took place at about 9:00 p.m. on January 30, 2001. The first time I was able to get a mobile phone signal following the execution was at about midnight that same evening.

15.    In my call to the medical examiner's office I explained that it was my opinion that the execution had not gone normally and also that I suspected an IV infiltration may have been the cause.

16.    My request for an autopsy was only satisfied in part. While Mr. LaFevers was examined by autopsy, I was surprised to learn following his execution that no dissection of his left arm had been done. Thus, no conclusive determination was ever made regarding the possibility of an infiltration. Following the autopsy Mr. LaFevers was cremated.

17.    I witnessed two additional executions following the execution of Mr. LaFevers. I was present at the execution of David Woodruff and Walanzo Shabaka Robinson. Of the five executions I have witnessed, Mr. LaFevers' execution stands out in particular as a flawed lethal injection caused by some mistake in the administration of the drugs given to him intravenously.

18.    While I do not recall the specifics of a meeting with prison officials that followed the execution of Mr. LaFevers, I do recall discussing my concerns regarding the problems with Mr. LaFevers' execution. During those discussions I remember that a prison official indicated to me that if an infiltration did occur that it may have been the result of an executioner pushing one of the hypodermic plungers too quickly or with too much force.

2031

3- 1-04; 6:08PM    ;                                                                                    15033265524;#    4

I recall this in particular because it impressed upon me the idea that there is certainly room for human error in the lethal injection process. In the case of Mr. LaFevers, if that human error did occur, it appeared to cause Mr. LaFevers to suffer an execution unlike any other that I have witnessed.

Executed on March 1, 2004.

Patrick J. Ehlers, Jr.

2032

Death Penalty Information Center                    http://www.deathpenaltyinfo.org/article.php?scid=8&did=4



Death Penalty Information Center

# Post-Furman Botched Executions



Advanced search | Search tips

by Michael L. Radelet, University of Colorado

1. August 10, 1982. Virginia. **Frank J. Coppola**. Electrocution. Although no media representatives witnessed the execution and no details were ever released by the Virginia Department of Corrections, an attorney who was present later stated that it took two 55-second jolts of electricity to kill Coppola. The second jolt produced the odor and sizzling sound of burning flesh, and Coppola's head and leg caught on fire. Smoke filled the death chamber from floor to ceiling with a smokey haze.[1]

2. April 22, 1983. Alabama. **John Evans**. Electrocution. After the first jolt of electricity, sparks and flames erupted from the electrode attached to Evans's leg. The electrode burst from the strap holding it in place and caught on fire. Smoke and sparks also came out from under the hood in the vicinity of Evans's left temple. Two physicians entered the chamber and found a heartbeat. The electrode was reattached to his leg, and another jolt of electricity was applied. This resulted in more smoke and burning flesh. Again the doctors found a heartbeat. Ignoring the pleas of Evans's lawyer, a third jolt of electricity was applied. The execution took 14 minutes and left Evans's body charred and smoldering.[2]

3. Sept. 2, 1983. Mississippi. **Jimmy Lee Gray**. Asphyxiation. Officials had to clear the room eight minutes after the gas was released when Gray's desperate gasps for air repulsed witnesses. His attorney, Dennis Balske of Montgomery, Alabama, criticized state officials for clearing the room when the inmate was still alive. Said noted death penalty defense attorney David Bruck, "Jimmy Lee Gray died banging his head against a steel pole in the gas chamber while the reporters counted his moans (eleven, according to the Associated Press)."[3] Later it was revealed that the executioner, Barry Bruce, was drunk.[4]

4. December 12, 1984. Georgia. **Alpha Otis Stephens**. Electrocution. "The first charge of electricity ... failed to kill him, and he struggled to breathe for eight minutes before a second charge carried out his death sentence ..."[5] After the first two minute power surge, there was a six minute pause so his body could cool before physicians could examine him (and declare that another jolt was needed). During that six-minute interval, Stephens took 23 breaths. A Georgia prison official said, "Stephens was just not a conductor" of electricity.[6]

5. March 13, 1985. Texas. **Stephen Peter Morin**. Lethal Injection. Because of Morin's history of drug abuse, the execution technicians were forced to probe both of Morin's arms and one of his legs with needles for nearly 45 minutes before they found a suitable vein.[7]

6. October 16, 1985. Indiana. **William E. Vandiver**. Electrocution. After the first administration of 2,300 volts, Vandiver was still breathing. The execution eventually took 17 minutes and five jolts of electricity.[8] Vandiver's attorney,

Exhibit XI-K

2034

Herbert Shaps, witnessed the execution and observed smoke and the smell of burning. He called the execution "outrageous." The Department of Corrections admitted the execution "did not go according to plan."[9]

7. August 20, 1986. Texas. **Randy Woolls**. Lethal Injection. A drug addict, Woolls helped the execution technicians find a useable vein for the execution.[10]

8. June 24, 1987. Texas. **Elliot Rod Johnson**. Lethal Injection. Because of collapsed veins, it took nearly an hour to complete the execution.[11]

9. December 13, 1988. Texas. **Raymond Landry**. Lethal Injection. Pronounced dead 40 minutes after being strapped to the execution gurney and 24 minutes after the drugs first started flowing into his arms.[12] Two minutes after the drugs were administered, the syringe came out of Landry's vein, spraying the deadly chemicals across the room toward witnesses. The curtain separating the witnesses from the inmate was then pulled, and not reopened for fourteen minutes while the execution team reinserted the catheter into the vein. Witnesses reported "at least one groan." A spokesman for the Texas Department of Correction, Charles Brown (sic), said, "There was something of a delay in the execution because of what officials called a 'blowout.' The syringe came out of the vein, and the warden ordered the (execution) team to reinsert the catheter into the vein."[13]

10. May 24, 1989. Texas. **Stephen McCoy**. Lethal Injection. He had such a violent physical reaction to the drugs (heaving chest, gasping, choking, back arching off the gurney, etc.) that one of the witnesses (male) fainted, crashing into and knocking over another witness. Houston attorney Karen Zellars, who represented McCoy and witnessed the execution, thought the fainting would catalyze a chain reaction. The Texas Attorney General admitted the inmate "seemed to have a somewhat stronger reaction," adding "The drugs might have been administered in a heavier dose or more rapidly."[14]

11. July 14, 1989. Alabama. **Horace Franklin Dunkins, Jr**. Electrocution. It took two jolts of electricity, nine minutes apart, to complete the execution. After the first jolt failed to kill the prisoner (who was mildly retarded), the captain of the prison guard opened the door to the witness room and stated "I believe we've got the jacks on wrong."[15] Because the cables had been connected improperly, it was impossible to dispense sufficient current to cause death. The cables were reconnected before a second jolt was administered. Death was pronounced 19 minutes after the first electric charge. At a post-execution news conference, Alabama Prison Commissioner Morris Thigpen said, "I regret very very much what happened. [The cause] was human error."[16]

12. May 4, 1990. Florida. **Jesse Joseph Tafero**. Electrocution. During the execution, six-inch flames erupted from Tafero's head, and three jolts of power were required to stop his breathing. State officials claimed that the botched execution was caused by "inadvertent human error" -- the inappropriate substitution of a synthetic sponge for a natural sponge that had been used in previous executions.[17] They attempted to support this theory by sticking a part of a synthetic sponge into a "common household toaster" and observing that it smoldered and caught fire.[18]

13. September 12, 1990. Illinois. **Charles Walker**. Lethal Injection. Because of equipment failure and human error, Walker suffered excruciating pain during his execution. According to Gary Sutterfield, an engineer from the Missouri State Prison who was retained by the State of Illinois to assist with Walker's execution, a kink in the plastic tubing going into Walker's arm stopped the deadly chemicals from reaching Walker. In addition, the intravenous needle was inserted pointing at Walker's fingers instead of his heart, prolonging the execution.[19]

14. October 17, 1990. Virginia. **Wilbert Lee Evans**. Electrocution. When Evans was hit with the first burst of electricity, blood spewed from the right side of the

mask on Evans's face, drenching Evans's shirt with blood and causing a sizzling sound as blood dripped from his lips. Evans continued to moan before a second jolt of electricity was applied. The autopsy concluded that Evans suffered a bloody nose after the voltage surge elevated his high blood pressure.[20]

15. August 22, 1991. Virginia. **Derick Lynn Peterson**. Electrocution. After the first cycle of electricity was applied, and again four minutes later, prison physician David Barnes inspected Peterson's neck and checked him with a stethoscope, announcing each time "He has not expired." Seven and one-half minutes after the first attempt to kill the inmate, a second cycle of electricity was applied. Prison officials later announced that in the future they would routinely administer two cycles before checking for a heartbeat.[21]

16. January 24, 1992. Arkansas. **Rickey Ray Rector**. Lethal Injection. It took medical staff more than 50 minutes to find a suitable vein in Rector's arm. Witnesses were kept behind a drawn curtain and not permitted to view this scene, but reported hearing Rector's eight loud moans throughout the process. During the ordeal Rector (who suffered from serious brain damage) helped the medical personnel find a vein. The administrator of State's Department of Corrections medical programs said (paraphrased by a newspaper reporter) "the moans did come as a team of two medical people that had grown to five worked on both sides of his body to find a vein." The administrator said "That may have contributed to his occasional outbursts." The difficulty in finding a suitable vein was later attributed to Rector's bulk and his regular use of antipsychotic medication.[22]

17. April 6, 1992. Arizona. **Donald Eugene Harding**. Asphyxiation. Death was not pronounced until 10 1/2 minutes after the cyanide tablets were dropped.[23] During the execution, Harding thrashed and struggled violently against the restraining straps. A television journalist who witnessed the execution, Cameron Harper, said that Harding's spasms and jerks lasted 6 minutes and 37 seconds. "Obviously, this man was suffering. This was a violent death .. . an ugly event. We put animals to death more humanely."[24] Another witness, newspaper reporter Carla McClain, said, "Harding's death was extremely violent. He was in great pain. I heard him gasp and moan. I saw his body turn from red to purple."[25] One reporter who witnessed the execution suffered from insomnia and assorted illnesses for several weeks; two others were "walking vegetables" for several days.[26]

18. March 10, 1992. Oklahoma. **Robyn Lee Parks**. Lethal Injection. Parks had a violent reaction to the drugs used in the lethal injection. Two minutes after the drugs were dispensed, the muscles in his jaw, neck, and abdomen began to react spasmodically for approximately 45 seconds. Parks continued to gasp and violently gag until death came, some eleven minutes after the drugs were first administered. Tulsa World reporter Wayne Greene wrote that the execution looked "painful and ugly," and "scary." "It was overwhelming, stunning, disturbing -- an intrusion into a moment so personal that reporters, taught for years that intrusion is their business, had trouble looking each other in the eyes after it was over."[27]

19. April 23, 1992. Texas. **Billy Wayne White.** Lethal Injection. White was pronounced dead some 47 minutes after being strapped to the execution gurney. The delay was caused by difficulty finding a vein; White had a long history of heroin abuse. During the execution, White attempted to assist the authorities in finding a suitable vein.[28]

20. May 7, 1992. Texas. **Justin Lee May**. Lethal Injection. May had an unusually violent reaction to the lethal drugs. According to one reporter who witnessed the execution, May "gasped, coughed and reared against his heavy leather restraints, coughing once again before his body froze ..."[29] Associated Press reporter Michael Graczyk wrote, "Compared to other recent executions in Texas, May's reaction was more violent. He went into a coughing spasm, groaned and gasped, lifted his head from the death chamber gurney and would have arched his back if he had not been belted down. After he stopped

breathing, his eyes and mouth remained open."[30]

21. May 10, 1994. Illinois. **John Wayne Gacy**. Lethal Injection. After the execution began, the lethal chemicals unexpectedly solidified, clogging the IV tube that lead into Gacy's arm, and prohibiting any further passage. Blinds covering the window through which witnesses observed the execution were drawn, and the execution team replaced the clogged tube with a new one. Ten minutes later, the blinds were then reopened and the execution process resumed. It took 18 minutes to complete.[31] Anesthesiologists blamed the problem on the inexperience of prison officials who were conducting the execution, saying that proper procedures taught in "IV 101" would have prevented the error.[32]

22. May 3, 1995. Missouri. **Emmitt Foster**. Lethal Injection. Seven minutes after the lethal chemicals began to flow into Foster's arm, the execution was halted when the chemicals stopped circulating. With Foster gasping and convulsing, the blinds were drawn so the witnesses could not view the scene. Death was pronounced thirty minutes after the execution began, and three minutes later the blinds were reopened so the witnesses could view the corpse.[33] According to William "Mal" Gum, the Washington County Coroner who pronounced death, the problem was caused by the tightness of the leather straps that bound Foster to the execution gurney; it was so tight that the flow of chemicals into the veins was restricted. Foster did not die until several minutes after a prison worker finally loosened the straps. The coroner entered the death chamber twenty minutes after the execution began, diagnosed the problem, and told the officials to loosen the strap so the execution could proceed.[34] In an editorial, the St. Louis Post-Dispatch called the execution "a particularly sordid chapter in Missouri's capital punishment experience."[35]

23. January 23, 1996. Virginia. **Richard Townes, Jr.** Lethal Injection. This execution was delayed for 22 minutes while medical personnel struggled to find a vein large enough for the needle. After unsuccessful attempts to insert the needle through the arms, the needle was finally inserted through the top of Mr. Townes's right foot.[36]

24. July 18, 1996. Indiana. **Tommie J. Smith**. Lethal Injection. Because of unusually small veins, it took one hour and nine minutes for Smith to be pronounced dead after the execution team began sticking needles into his body. For sixteen minutes, the execution team failed to find adequate veins, and then a physician was called.[37] Smith was given a local anesthetic and the physician twice attempted to insert the tube in Smith's neck. When that failed, an angio-catheter was inserted in Smith's foot. Only then were witnesses permitted to view the process. The lethal drugs were finally injected into Smith 49 minutes after the first attempts, and it took another 20 minutes before death was pronounced.[38]

25. March 25, 1997. Florida. **Pedro Medina**. Electrocution. A crown of foot-high flames shot from the headpiece during the execution, filling the execution chamber with a stench of thick smoke and gagging the two dozen official witnesses. An official then threw a switch to manually cut off the power and prematurely end the two-minute cycle of 2,000 volts. Medina's chest continued to heave until the flames stopped and death came.[39] After the execution, prison officials blamed the fire on a corroded copper screen in the headpiece of the electric chair, but two experts hired by the governor later concluded that the fire was caused by the improper application of a sponge (designed to conduct electricity) to Medina's head.

26. May 8, 1997. Oklahoma. **Scott Dawn Carpenter**. Carpenter was pronounced dead some 11 minutes after the lethal injection was administered. As the drugs took effect, Carpenter began to gasp and shake. "This was followed by a guttural sound, multiple spasms and gasping for air" until his body stopped moving, three minutes later.[40]

27. June 13, 1997. South Carolina. **Michael Eugene Elkins**. Lethal Injection.

Because Elkins's body had become swollen from liver and spleen problems, it took nearly an hour to find a suitable vein for the insertion of the catheter. Elkins tried to assist the executioners, asking "Should I lean my head down a little bit?" as they probed for a vein. After numerous failures, a usable vein was finally found in Elkins's neck.[41]

28. April 23, 1998. Texas. **Joseph Cannon**. Lethal Injection. It took two attempts to complete the execution. After making his final statement, the execution process began. A vein in Cannon's arm collapsed and the needle popped out. Seeing this, Cannon lay back, closed his eyes, and exclaimed to the witnesses, "It's come undone." Officials then pulled a curtain to block the view of the witnesses, reopening it fifteen minutes later when a weeping Cannon made a second final statement and the execution process resumed.[42]

29. August 26, 1998. Texas. **Genaro Ruiz Camacho**. Lethal Injection. The execution was delayed approximately two hours due, in part, to problems finding suitable veins in Camacho's arms.[43]

30. October 5, 1998. Nevada. **Roderick Abeyta**. It took 25 minutes for the execution team to find a vein suitable for the lethal injection.[44]

31. July 8, 1999. Florida. **Allen Lee Davis**. "Before he was pronounced dead ... the blood from his mouth had poured onto the collar of his white shirt, and the blood on his chest had spread to about the size of a dinner plate, even oozing through the buckle holes on the leather chest strap holding him to the chair."[45] His execution was the first in Florida's new electric chair, built especially so it could accommodate a man Davis's size (approximately 350 pounds). Later, when another Florida death row inmate challenged the constitutionality of the electric chair, Florida Supreme Court Justice Leander Shaw commented that "the color photos of Davis depict a man who -- for all appearances -- was brutally tortured to death by the citizens of Florida."[46] Justice Shaw also described the botched executions of Jesse Tafero and Pedro Medina (q.v.), calling the three executions "barbaric spectacles" and "acts more befitting a violent murderer than a civilized state."[47] Justice Shaw included pictures of Davis's dead body in his opinion.[48] The execution was witnessed by a Florida State Senator, Ginny Brown-Waite, who at first was "shocked" to see the blood, until she realized that the blood was forming the shape of a cross and that it was a message from God saying he supported the execution.[49]

32. May 3, 2000. Arkansas. **Christina Marie Riggs**. Riggs dropped her appeals and asked to be executed. However, the execution was delayed for 18 minutes when prison staff couldn't find a suitable vein in her elbows. Finally, Riggs agreed to the executioners' requests to have the needles in her wrists.[50]

33. June 8, 2000. Florida. **Bennie Demps**. It took execution technicians 33 minutes to find suitable veins for the execution. "They butchered me back there," said Demps in his final statement. "I was in a lot of pain. They cut me in the groin; they cut me in the leg. I was bleeding profusely. This is not an execution, it is murder." The executioners had no unusual problems finding one vein, but because Florida protocol requires a second alternate intravenous drip, they continued to work to insert another needle, finally abandoning the effort after their prolonged failures.[51]

34. December 7, 2000. Texas. **Claude Jones**. Jones was a former intravenous drug abuser. His execution was delayed 30 minutes while the execution "team" struggled to insert an IV into a vein. He had been a longtime intravenous drug user. One member of the execution team commented, "They had to stick him about five times. They finally put it in his leg." Wrote Jim Willett, the warden of the Walls Unit and the man responsible for conducting the execution, "The medical team could not find a vein. Now I was really beginning to worry. If you can't stick a vein then a cut-down has to be performed. I have never seen one and would just as soon go through the rest of my career the same way. Just when I was really getting worried, one of the medical people hit a vein in the left leg. Inside calf to be exact. The executioner had warned me not to panic as

2037

Death Penalty Information Center                    http://www.deathpenaltyinfo.org/article.php?scid=8&did=

it was going to take a while to get the fluids in the body of the inmate tonight because he was going to push the drugs through very slowly. Finally, the drug took effect and Jones took his last breath."[52]

35. June 28, 2000. Missouri. **Bert Leroy Hunter.** Hunter had an unusual reaction to the lethal drugs, repeatedly coughing and gasping for air before he lapsed into unconsciousness.[53] An attorney who witnessed the execution reported that Hunter had "violent convulsions. His head and chest jerked rapidly upward as far as the gurney restraints would allow, and then he fell quickly down upon the gurney. His body convulsed back and forth like this repeatedly. ... He suffered a violent and agonizing death."[54]

36. November 7, 2001. Georgia. **Jose High.** High was pronounced dead some one hour and nine minutes after the execution began. After attempting to find a useable vein for 39 minutes, the emergency medical technicians under contract to do the execution abandoned their efforts. Eventually, one needle was stuck in High's hand, and a physician was called in to insert a second needle between his shoulder and neck.[55]

Endnotes
1. Deborah W. Denno, Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death over the Century, 35 WILLIAM & MARY L. REV. 551, 664-665 (1994).
2. For a description of the execution by Evans's defense attorney, see Russell F. Canan, Burning at the Wire: The Execution of John Evans, in FACING THE DEATH PENALTY: ESSAYS ON A CRUEL AND UNUSUAL PUNISHMENT 60 (Michael L. Radelet ed. 1989); see also Glass v. Louisiana, 471 U.S. 1080, 1091-92 (1985).
3. David Bruck, Decisions of Death, THE NEW REPUBLIC, Dec. 12, 1984, at 24-25.
4. Ivan Solotaroff, The Last Face You'll Ever See, 124 ESQUIRE 90, 95 (Aug. 1995).
5. Two Charges Needed to Electrocute Georgia Murderer, N.Y. TIMES, Dec. 13, 1984, at 12.
6. Editorial, N.Y. TIMES, Dec. 17, 1984, at 22.
7. Murderer of Three Women is Executed in Texas, N.Y. TIMES, March 14, 1985, at 9.
8. Killer's Electrocution Takes 17 Minutes in Indiana Chair, WASH. POST, Oct. 17, 1985, at A16.
9. Indiana Executes Inmate Who Slew Father-In-Law, N.Y. TIMES, Oct. 17, 1985, at 22.
10. Killer Lends A Hand to Find A Vein for Execution, L.A. TIMES, Aug. 20, 1986, at 2.
11. Addict Is Executed in Texas For Slaying of 2 in Robbery, N.Y. TIMES, June 25, 1987, at A24.
12. Drawn-out Execution Dismays Texas Inmates, DALLAS MORNING NEWS, Dec. 15, 1988, at 29A.
13. Landry Executed for '82 Robbery-Slaying, DALLAS MORNING NEWS, Dec. 13, 1988, at 29A.
14. Witness to an Execution, HOUS. CHRON., May 27, 1989, at 11.
15. John Archibald, On Second Try, Dunkins Executed for Murder, BIRMINGHAM NEWS, July 14, 1989, at 1.
16. Peter Applebome, 2 Jolts in Alabama Execution, N.Y. TIMES, July 15, 1989, at 6.
17. Cynthia Barnett, Tafero Meets Grisly Fate in Chair, GAINESVILLE SUN, May 5, 1990, at 1; Cynthia Barnett, A Sterile Scene Turns Grotesque, GAINESVILLE SUN, May 5, 1990, at 1; Bruce Ritchie, Flames, Smoke Mar Execution of Murderer, FLORIDA TIMES- UNION (Jacksonville), May 5, 1990, at 1; Bruce Ritchie, Report on Flawed Execution Cites Human Error, FLORIDA TIMES-UNION (Jacksonville), May 9, 1990, at B1.
18. Bill Moss, Chair Concerns Put Deaths on Hold, ST. PETERSBURG TIMES, July 18, 1990, at 1B.
19. Niles Group Questions Execution Procedure, UNITED PRESS INTERNATIONAL, Nov. 8, 1992 (LEXIS/NEXUS file).
20. Mike Allen, Groups Seek Probe of Electrocution's Unusual Events,

2/4/2004 8:31 AJ

2038

RICHMOND TIMES-DISPATCH, Oct. 19, 1990, at B1; Mike Allen, Minister Says Execution Was Unusual, RICHMOND TIMES- DISPATCH, Oct. 20, 1990, at B1; DeNeen L. Brown, Execution Probe Sought, WASH. POST, Oct. 21, 1990, at D1.

21. Karen Haywood, Two Jolts Needed to Complete Execution, THE FREE-LANCE STAR (Fredericksburg, Vir.), Aug. 23, 1991, at 1; Death Penalty Opponents Angry About Latest Execution, RICHMOND TIMES-DISPATCH, Aug. 24, 1991, at 1; Virginia Alters its Procedure for Executions in Electric Chair, WASH. POST, Aug. 24, 1991, at B3.

22. Joe Farmer, Rector, 40, Executed for Officer's Slaying, ARKANSAS DEMOCRAT-GAZETTE, Jan. 25, 1992, at 1; Joe Farmer, Rector's Time Came, Painfully Late, ARKANSAS DEMOCRAT GAZETTE, Jan. 26, 1992, at 1B; Sonja Clinesmith, Moans Pierced Silence During Wait, ARKANSAS DEMOCRAT GAZETTE, Jan. 26, 1992, at 1B; Marshall Frady, Death in Arkansas, THE NEW YORKER, Feb. 22, 1993, at 105.

23. Gruesome Death in Gas Chamber Pushes Arizona Toward Injections, N.Y. TIMES, Apr. 25, 1992, at 9.

24. Charles L. Howe, Arizona Killer Dies in Gas Chamber, S.F. CHRON., Apr. 7, 1992, at A2.

25. Id.

26. Abraham Kwok, Injection: The No-Fuss Executioner, ARIZONA REPUBLIC, Feb. 28, 1993, at 1.

27. Wayne Greene, 11-Minute Execution Seemingly Took Forever, TULSA WORLD, Mar. 11, 1992, at A13.

28. Another U.S. Execution Amid Criticism Abroad, N.Y. TIMES, Apr. 24, 1992, at B7.

29. Robert Wernsman, Convicted Killer May Dies, ITEM (Huntsville, Tex.), May 7, 1992, at 1.

30. Michael Graczyk, Convicted Killer Gets Lethal Injection, HERALD (Denison, Tex.), May 8, 1992.

31. Scott Fornek and Alex Rodriguez, Gacy Lawyers Blast Method: Lethal Injections Under Fire After Equipment Malfunction, CHICAGO SUN-TIMES, May 11, 1994, at 5; Rich Chapman, Witnesses Describe Killer's 'Macabre' Final Few Minutes, CHICAGO SUN-TIMES, May 11, 1994, at 5.

32. Rob Karwath & Susan Kuczka, Gacy Execution Delay Blamed on Clogged IV Tube, CHICAGO TRIB., May 11, 1994, at 1 (Metro Lake Section).

33. Because they could not observe the entire execution procedure through the closed blinds, two witnesses later refused to sign the standard affidavit that stated they had witnessed the execution. Witnesses to a Botched Execution, ST. LOUIS POST- DISPATCH, May 8, 1995, at 6B.

34. Tim O'Neil, Too-Tight Strap Hampered Execution, ST. LOUIS POST-DISPATCH, May 5, 1995, at B1; Jim Slater, Execution Procedure Questioned, KANSAS CITY STAR, May 4, 1995, at C8.

35. Witnesses to a Botched Execution, ST. LOUIS POST-DISPATCH, May 8, 1995, at 6B.

36. Store Clerk's Killer Executed in Virginia, N.Y. TIMES, Jan. 25, 1996, at A19.

37. The involvement of this anonymous physician violated rules of both the American Medical Association and the Indiana State Medical Association. Sherri Edwards & Suzanne McBride, Doctor's Aid in Injection Violated Ethics Rule: Physician Helped Insert the Lethal Tube in a Breach of AMA's Policy Forbidding Active Role in Execution, INDIANAPOLIS STAR, July 19, 1996, at A1.

38. Id.; Suzanne McBride, Problem With Vein Delays Execution, INDIANAPOLIS NEWS, July 18, 1996, at 1.

39. Doug Martin, Flames Erupt from Killer's Headpiece, GAINESVILLE SUN, March 26, 1997, at 1. Medina was executed despite a life-long history of mental illness, and the Florida Supreme Court split 4-3 on whether to grant an evidentiary hearing because of serious questions about his guilt. This puts to rest any conceivable argument that Medina could have been guilty "beyond a reasonable doubt." Medina v. State, 690 So.2d 1241 (1997). The family of the victim had joined in a plea for executive clemency, in part because they believed Medina was innocent. Id., at 1252, n. 6. Even the Pope appealed for clemency. Martin, op. cit.

40. Michael Overall & Michael Smith, 22-Year-Old Killer Gets Early Execution, TULSA WORLD, May 8, 1997, at A1.

41. Killer Helps Officials Find A Vein At His Execution, CHATTANOOGA FREE PRESS, June 13, 1997, at A7.

42. Cannon was executed for a crime committed when he was 17 years old. 1st

Death Penalty Information Center                                    http://www.deathpenaltyinfo.org/article.php?scid=8&did=4

Try Fails to Execute Texas Death Row Inmate, ORLANDO SENT., Apr. 23, 1998, at A16; Michael Graczyk, Texas Executes Man Who Killed San Antonio Attorney at Age 17, AUSTIN AMERICAN-STATESMAN, Apr. 23, 1998, at B5.

43. Michael Graczyk, Reputed Marijuana Smuggler Executed for 1988 Dallas Slaying, ASSOCIATED PRESS, August 27, 1998.

44. Sean Whaley, Nevada Executes Killer, LAS VEGAS REVIEW- JOURNAL, Oct. 5, 1998, at 1A.

45. Davis Execution Gruesome, GAINESVILLE SUN, July 8, 1999, at 1A.

46. Provenzano v. State, 744 So.2d 413, 440 (Fla. 1999).

47. Id.

48. Id., at 442-44.

49. Mary Jo Melone, A Switch is Thrown, and God Speaks, ST. PETERSBURG TIMES, July 13, 1999, p. 1B.

50. Ron Moore, "At Last I can be with my Babies," SCOTTISH DAILY RECORD, May 4, 2000, at 24.

51. Rick Bragg, Florida Inmate Claims Abuse in Execution, N.Y. TIMES, June 9, 2000, at A14; Phil Long & Steve Brousquet, Execution of Slayer Goes Wrong; Delay, Bitter Tirade Precede His Death, MIAMI HERALD, June 8, 2000.

52. Sarah Rimber, "Working Death Row," N.Y. TIMES, Dec. 17, 2000, at 1

53. David Scott, Convicted Killer Who Once Asked to Die is Executed, ASSOCIATED PRESS, June 28, 2000.

54. Letter from attorney Cheryl Rafert to Missouri Governor Mel Carnahan, June 30, 2000.

55. Rhonda Cook, "Gang leader executed by injection Death comes 25 years after boy, 11, slain" ATLANTA JOURNAL CONSTITUTION, Nov. 7, 2001, p. B1.

- See also, **Methods of Execution** and **Descriptions of Execution Methods**

**Home | About DPIC | Privacy Policy**

©2004 Death Penalty Information Center

2/4/2004 8:31 AM

2040

2041