FILED

DEC 0 8 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY
DEPUTY CLERK

# No. W-99-CR-70(1)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA,
Plaintiff-Respondent,

v.                                              Criminal No.  W-99-CR-70(1)

CHRISTOPHER ANDRE VIALVA,
Defendant-Movant.

### The Honorable Walter S. Smith, Jr.
### Chief United States District Judge

## RESPONSE TO MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE  [REDACTED]

**JOHNNY SUTTON**
United States Attorney

**Mark R. Stelmach**
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7090
Attorneys For Plaintiff-Respondent

411

# TABLE OF CONTENTS

**Pages**

ARGUMENTS AND AUTHORITIES ............................... 1-3

I. VIALVA'S CHALLENGE TO APPOINTMENT OF COUNSEL
UNDER SECTION 3005 HAS BEEN PROCEDURALLY DEFAULTED;
NEVERTHELESS, HIS CHALLENGE IS WITHOUT MERIT,
VIALVA DID RECEIVE THE ASSISTANCE OF TWO ATTORNEYS,
INCLUDING COUNSEL "LEARNED IN THE LAW APPLICABLE
TO CAPITAL CASES"; ANY LACK OF CONSULTATION
WITH THE PUBLIC DEFENDER PRIOR TO GOAINS' APPOINTMENT,
IF ERROR, WOULD HAVE BEEN HARMLESS ERROR ............ 3-15

II. VIALVA'S ASSERTION THAT HIS TRIAL COUNSEL HAD A
CONFLICT OF INTEREST HAS BEEN PROCEDURALLY DEFAULTED;
NEVERTHELESS, THIS GROUND IS WITHOUT MERIT,
VIALVA HAS NOT SHOWN THAT AN ACTUAL CONFLICT OF
INTEREST ADVERSELY AFFECTED HIS LAWYER'S PERFORMANCE;
HE HAS NOT MET BOTH REQUIREMENTS OF *STRICKLAND*;
PRIOR TO TRIAL, VIALVA WAS INFORMED OF THE POTENTIAL
CONFLICT, AND HE DECLINED TO REQUEST DIFFERENT COUNSEL;
IN FACT, VIALVA REQUESTED THAT MR. GOAINS CONTINUE
TO REPRESENT HIM; THIS HONORABLE COURT CONDUCTED
AN ADEQUATE INQUIRY; VIALVA WAIVED ANY POTENTIAL
CONFLICT ................................................. 16-58

III. VIALVA'S *BRADY* CLAIMS ARE PROCEDURALLY DEFAULTED;
VIALVA HAS NOT ESTABLISHED A *BRADY* VIOLATION;
VIALVA HAS NOT SHOWN ANY SIGNIFICANT EVIDENCE
THAT WAS WITHHELD AND THAT WOULD HAVE CAST DOUBT
ON THE TESTIMONY OF BROWN AND LEWIS;
VIALVA HAS NOT SHOWN ANYTHING THAT UNDERMINES
CONFIDENCE IN THE OUTCOME OF THE TRIAL .............. 59-99

2174

IV.  VIALVA'S CLAIM THAT COUNSEL WAS INEFFECTIVE
IN THE GUILT PHASEFOR FAILING TO OBTAIN
INCREASED FUNDING FOR EXPERT ASSISTANCE,
FAILING TO ADEQUATELY INVESTIGATE, AND
FAILING TO SUBJECT THE PROSECUTION TO ADEQUATE TESTING,
IS WITHOUT MERIT; VIALVA HAS FAILED TO SHOW
THAT HIS COUNSEL WAS INEFFECTIVE
OR THAT HE SUFFERED *STRICKLAND* PREJUDICE ............ 99-130

V.  VIALVA'S CHALLENGE THAT THE JURY'S CONSIDERATION
OF FUTURE DANGEROUSNESS  DANGEROUSNESS" VIOLATED HIS
DUE PROCESS RIGHTS HAS BEEN PROCEDURALLY DEFAULTED;
NEVERTHELESS, HIS CHALLENGE TO THIS
WELL-ESTABLISHED PRACTICE IS WITHOUT MERIT ...... 131-145

VI.  VIALVA'S CLAIM THAT COUNSEL WAS INEFFECTIVE,
FOR FAILING TO PERSUADE THIS HONORABLE COURT
TO GRANT HIS MOTION AND RENEWED MOTION FOR SEVERANCE,
DURING THE PENALTY PHASE OF THIS TRIAL, IS WITHOUT MERIT;
VIALVA HAS FAILED TO SHOW THAT COUNSEL WAS INEFFECTIVE
OR THAT HE SUFFERED *STRICKLAND* PREJUDICE .......... 146-168

VII.  VIALVA'S CLAIM, THAT COUNSEL WAS INEFFECTIVE
IN THE PENALTY PHASE FOR FAILING TO OBTAIN
INCREASED FUNDING FOR DEVELOPING VIALVA'S SOCIAL
MEDICAL, MENTAL, AND EMOTIONAL HISTORY,
IS WITHOUT MERIT; VIALVA HAS FAILED TO SHOW
THAT HIS COUNSEL WAS INEFFECTIVE
OR THAT HE SUFFERED *STRICKLAND* PREJUDICE .......... 169-186

2175

VIII.  VIALVA'S CLAIM, THAT THE GRAND JURY DID NOT
DETERMINE ALL OF THE ELEMENTS ESSENTIAL TO ESTABLISH
CAPITAL MURDER, HAS BEEN PROCEDURALLY DEFAULTED;
ADDITIONALLY, *APPRENDI* HAS NOT BEEN APPLIED
RETROACTIVELY IN HABEAS REVIES, SO THAT THIS APPRENDI-
TYPE CLAIM MAY NOT BE RAISED FOR THE FIRST TIME IN
SECTION 2255 REVIEW; NEVERTHELESS, IN THIS CIRCUIT,
ERROR UNDER RING HAS BEEN HELD TO BE HARMLESS ... 187-196

IX.  VIALVA'S CUMULATIVE-ERROR GROUND
IS WITHOUT MERIT; HE HAS SHOWN NO ERROR,
AND CERTAINLY NO PREJUDICIAL ERROR ................ 196-197

X.  VIALVA'S CHALLENGE, THAT THE FEDERAL DEATH PENALTY,
AS APPLIED, VIOLATES THE FIFTH AND EIGHTH AMENDMENTS,
HAS BEEN PROCEDURALLY DEFAULTED,
AS VIALVA FAILED TO RAISE THIS ISSUE
IN HIS DIRECT APPEAL,  AND HE HAS NOT SHOWN
CAUSE AND PREJUDICE IN SUPPORT OF THIS FAILURE;
NEVERTHELESS, HIS CHALLENGE IS WITHOUT MERIT  .... 197-203

XI.  VIALVA'S CHALLENGE, THAT THE LETHAL INJECTION
UNDER THE PROTOCOLS CURRENTLY IN FORCE
IN THE UNITED STATES BUREAU OF PRISONS AND ANY SIMILAR
PROTOCOLS WOULD VIOLATE THE EIGHTH AMENDMENT
HAS BEEN PROCEDURALLY DEFAULTED;
NEVERTHELESS, THIS GROUND IS WITHOUT MERIT;
LETHAL INJECTION HAS BEEN UPHELD
AGAINST NUMEROUS CHALLENGES ...................... 204-207

CONCLUSION .............................................. 208

CERTIFICATE OF SERVICE .................................. 209

# TABLE OF AUTHORITIES

**Cases**                                                        **Pages**

*Adanandus v. Johnson,*
    947 F.Supp 1021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-40

*Apprendi v. New Jersey,*
    530 U.S. 466 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191-193, 195

*Arizona v. Fulminante,*
    499 U.S. 279 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Atkins v. Virginia,*
    536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*Barefoot v. Estelle,*
    463 U.S. 880 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 132, 134, 143-145

*Barrientes v. Johnson,*
    221 F.3d 741 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*Beets v. Scott,*
    65 F.3d 1258 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 37

*Bousley v. United States,*
    523 U.S. 614 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

*Brady v. Maryland,*
    373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . 61, 78, 81-82, 87, 90, 91-94, 96-99

*Buchanan v. Kentucky,*
    483 U.S. 402 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154-156

*Burger v. Kemp,*
    483 U.S. 776 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

2177

*Campbell v. Wood,*
        18 F.3d 662 (9th Cir. 1994) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . 206-207

*Chapman v. California,*
        386 U.S. 18 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Coleman v. State,*
        881 S.W.2d 344 (Tex.Cr.App. 1994) (en banc) . . . . . . . . . . . . . . . . . . . . . 10

*Cooper v. Rimmer,*
        358 F.3d 655 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205-207

*Crockett v. McCotter,*
        796 F.2d 787 (5th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Cuyler v. Sullivan,*
        446 U.S. 335 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27, 30- 33, 44

*Dixon v. State,*
        886 S.W.2d 115 (Tex.App. - Waco 1993) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Dowthitt v. Johnson,*
        230 F.3d 733 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

*Engle v. Isaac,*
        456 U.S. 107 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

*Estelle v. Gamble,*
        429 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

*Flores v. Johnson,*
        210 F.3d 456 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

*Garcia v. Bunnell,*
        33 F.3d 1193 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . 32-36, 43-44, 47-48, 58

2178

*Glasser v. United States,*
      315 U.S. 60 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31

*Gregg v. Georgia,*
      428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137, 139

*Hall v. United States,*
      ___ F.3d ___, (N.D. Tex. 2004)(2004 WL 1908242) . . . . . . . . . . . 201, 203

*Hayes v. Maggio,*
      699 F.2d 198 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Holloway v. Arkansas,*
      453 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Hughes v. Johnson,*
      991 F.Supp. 621 (S.D.Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . 92, 96-97

*In Re Kemmier,*
      136 U.S. 436 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

*Johnson v. Cockerell,*
      301 F.3d 234 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

*Jones v. United States,*
      527 U.S. 373 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165-166

*Jurek v. Texas,*
      428 U.S. 262 (1976) . . . . . . . . . . . . . . . . . . . . . . . 132-137, 140, 143, 145

*Kotteakos v. United States,*
      328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kimmelman v. Morrison,*
      477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*Kyles v. Whitley,*
     514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*La Grand v. Stewart,*
     133 F.3d 1253 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

*Lincecum v. Collins,*
     958 F.2d 1271 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132-135

*Little v. Johnson,*
     162 F.3d 855 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 134, 135, 144

*Livingston v. Johnson,*
     107 F.3d 297 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196-197

*Lockett v. Ohio,*
     438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137, 162-163

*Lockhart v. Fretwell,*
     506 U.S. 364 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 42, 149

*Lockhart v. Johnson,*
     104 F.3d 54 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Lockhart v. McCree,*
     476 U.S. 162 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154-156

*Louisiana ex. rel. Resweber,*
     329 U.S. 459 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 206

*Lowenfield v. Phelps,*
     484 U.S. 231 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156, 165

*Martinez v. Johnson,*
     255 F.3d 229 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

*McCleskey v. Kemp,*
    481 U.S. 279 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199, 202

*McCullum v. Dretke,*
    89 Fed. Appx. 888 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

*McDuff v. State,*
    939 S.W.2d 607 (Tex.Cr.App. 1997) (en banc) . . . . . . . . . . . . . . . . . . 10-11

*Mitchell v. Maggio,*
    679 F.2d 77 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Moon v. United States,*
    1990 WL 106802 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 151-152

*Moreland v. Scott,*
    175 F.3d 347 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Morris v. Slappy,*
    461 U.S. 1 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Penry v. Lynaugh,*
    492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

*Rastafari v. Anderson,*
    278 F.3d 673 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 160-162, 166, 168

*Ring v. Arizona,*
    536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188-193

*Roche v. Anderson,*
    132 F.Supp.2d 688 (N.D. Ind. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*Rutherford v. Crosby,*
    385 F.3d 1300 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

*Strickland v. Washington,*
    466 U.S. 668 (1984) . . . . . . . . . . . 22-27, 42, 50, 54-56, 149-150, 159-160
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161, 184-185

*Strickler v. Green,*
    527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60-61

*Teague v. Lane,*
    489 U.S. 288 (1989) . . . . . . . . . . . . . . . . . . . . . . . 145, 166-167, 193

*Trass v. Maggio,*
    190 F.3d 288 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

*United States v. Acklen,*
    47 F.3d 739 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-25

*United States v. Ainsworth,*
    932 F.2d 358 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Armstrong,*
    517 U.S. 456 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199, 203

*United States v. Bagley,*
    473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Unites States v. Barnett,*
    197 F.3d 138 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

*United States v. Bernard,*
    299 F.3d 467 (5th Cir. 2002) . . . 6, 83, 102, 156-157, 160-161, 165-166, 196

*United States v. Bremers,*
    195 F.3d 221 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

*United States v. Boone,*
    245 F.3d 352 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Boutwell,*
    896 F.2d 884 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Boykoff,*
    186 F.Supp.2d 347 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

*United States v. Causey,*
    185 F.3d 407 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

*United States v. Cuong Gia Le,*
    316 F.Supp.2d 330 (E.D.Va. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*United States v. Edelin,*
    118 F.Supp. 2d 36 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

*United States v. Faubion,*
    19 F.3d 226 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Frady,*
    456 U.S. 152 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 22, 75, 191, 198

*United States v. Franklin,*
    213 F.Supp.2d 478 (478 (E.D.Pa. 2003) . . . . . . . . . . . . . . . . . . . . . . 40-41, 43

*United States v. Griffin,*
    324 F.3d 330 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

*United States v. Horton,*
    845 F.2d 1414 (7th Cir. 1988) . . . . . . . . . . . . . . . . 34, 39-40, 43, 49, 53, 58

*United States v. Hughes,*
    230 F.3d 815 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*United States v. Izydore,*
    167 F.3d 213 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Jones,*
    287 F.3d 325 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200, 202

*United States v. Marchant & Colson,*
    25 U.S. 480 (1827) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

*United States v. Miranda,*
    148 F.Supp.2d 292 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. McCullah,*
    76 F.3d 1087 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10

*United States v. Nutall,*
    180 F.3d 182 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

*United States v. Olano,*
    507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Pena-Rodriquez,*
    110 F.3d 1120 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

*United States v. Ransom,*
    515 F.2d 885 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

*United States v. Reavis,*
    48 F.3d 763 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

*United States v. Robinson,*
    367 F.3d 278 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . 188-189, 192-195, 197

2184

*United States v. Rocha,*
        109 F.3d 225 (5th Cir. 1997) .................................. 151

*United States v. Shareef,*
        190 F.3d 71 (2d Cir. 1999) .................................. 151

*United States v. Stumpf,*
        900 F.2d 842 (5th Cir. 1990) .................................. 7

*United States v. Tipton,*
        90 F.3d 861 (4th Cir. 1996) ........................ 153, 160, 163-165

*United States v. Torres-Gomez,*
        62 F.Supp.2d 402 (D. Puerto Rico 1999) ........................... 15

*United States v. Unruh,*
        855 F.2d 1363 (9th Cir. 1987) ........................... 34, 42-43

*United States v. Walker,*
        68 F.3d 931 (5th Cir. 1996) .................................. 24

*United States v. Webster,*
        162 F.3d 308 (5th Cir. 1999) ............................. 201, 203

*United States v. Weintraub,*
        871 F.2d 1257 (5th Cir. 1989) .................................. 7

*United States v. Williams,*
        544 F.2d 1215 (5th Cir. 1976) ............................... 8, 14

*Walton v. Angelone,*
        321 F.3d 443 (4th Cir. 2003) ............................. 188, 190

*Wheat v. United States,*
        486 U.S. 153 (1988) ......................................... 26

## ARGUMENTS AND AUTHORITIES

Prior Post-Conviction Motions

According to the docket sheet, this is the first motion by Vialva for post-conviction relief.

Hearing

If the motion, files, and records conclusively show that the prisoner is entitled to no relief, then a hearing is not required.  28 U.S.C. § 2255.

Introduction

After himself coming up with a plan to rob somebody, a "mission to make money," Christopher Vialva and his fellow gang members kidnaped Todd and Stacie Bagley and placed them in the trunk of the Bagleys' own vehicle.  When Vialva received the wrong PIN number for the ATM card he took from them, Vialva angrily threatened to kill them. Vialva tried to pawn Stacie's ring.  After riding around with the Bagleys in the trunk, instead of letting them go as others advised, he demanded that they be killed, because they had seen his face, and that the car be burned, to destroy fingerprints.  Two witnesses saw Vialva put on his executioner's mask and shoot the Bagleys with shots to their heads.  The car was set on fire.

Only fifty yards from the incinerated bodies of his victims, the gang's vehicle got stuck in a ditch.  Observers saw the gang hurriedly dispose of evidence in the woods.  Found were two firearms, charcoal lighter fluid cans, the victims' cards, and

2186

Vialva's own identification card. One observer believed that Vialva gave orders to the others and acted like their leader. DNA evidence from the mask was associated with Vialva.

Vialva received the assistance of two lawyers. One of his lawyers had considerable state capital trial experience. This lawyer had a longstanding desire for employment with the prosecutor's office, believed he would receive an offer from that office, and conferred with Vialva concerning the desirability of his continued representation. After a hearing, in which this Court asked whether Vialva wanted new counsel, and warned Vialva that he could not raise this matter later if he was unhappy with the outcome of the trial, Vialva waived any potential conflict and expressed his desire for representation by the same lawyers. Contrary to Vialva's assertion, the authorities establish that "the mere fact" that an attorney may have future employment plans with the prosecutor's office does not create an actual conflict, and a court will not indulge in the presumption that a defense attorney who is being considered for a position as a prosecutor is unable to represent a defendant in federal court to the best of his ability and with defendant's best interests in mind.

Vialva's lawyers vociferously represented Vialva. The egregious facts, overwhelming evidence, and aggravating factors resulted in the jury's imposing the death penalty for these heinous crimes. Vialva has not shown ineffective assistance

2

2187

or outcome-changing prejudice.

Many of Vialva's claims, intertwined with his ineffective assistance claims, have been procedurally defaulted. None have merit.

## VIALVA'S GROUND ONE

**VIALVA'S CHALLENGE TO APPOINTMENT OF COUNSEL UNDER SECTION 3005 HAS BEEN PROCEDURALLY DEFAULTED; NEVERTHELESS, HIS CHALLENGE IS WITHOUT MERIT, VIALVA DID RECEIVE THE ASSISTANCE OF TWO ATTORNEYS, INCLUDING COUNSEL "LEARNED IN THE LAW APPLICABLE TO CAPITAL CASES"; ANY LACK OF CONSULTATION WITH THE PUBLIC DEFENDER PRIOR TO GOAINS' APPOINTMENT, IF ERROR, WOULD HAVE BEEN HARMLESS ERROR**

(Responsive To Vialva's Issue I, 3-13)

### Background And Nature Of The Claim

<u>The Statute</u>

The statute providing for appointment of counsel in a capital case states, in relevant part that:

> the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours. In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts. . . .

18 U.S.C. § 3005.

Background And Nature Of The Claim

In the instant case, as recited by Movant, a criminal complaint was filed on June 22, 1999, charging Vialva with carjacking, and on June 24, Attorney Stanley Schwieger was appointed to represent Vialva (*See* Vialva's Motion at 3). On July 13, 1999, Vialva was charged in a four-count indictment, with three of the counts potentially involving the death penalty. On July 16, Mr. Schwieger filed a "Motion for Appointment of Co-Counsel in Death Penalty Case," in which he advised this Court: that he had "spoken to Mr. B. Dwight Goains, of Goains and Goains"; that "Mr. Goains has been lead counsel [in] several state capital murder trials, including State v. Kenneth Allen McDuff, in the 54th District Court of McLennan County, Texas"; that "Mr. Goains is a Texas board certified criminal law practitioner"; and that he "believ[ed] that Mr. Goains is 'learned in the law applicable to capital cases' [citing 18 U.S.C. § 3005 (1998)]" (*See* Vialva's Motion at 4). The motion also indicated that counsel would explore the potential of advocacy before the Attorney General's Death Penalty Review Committee to possibly influence that decision (*id.* at 3). This Court appointed Mr. Goains on July 21, 1999.

4

2189

In Vialva's first claim in his § 2255 motion, he does <u>not</u> contend that he failed to receive the assistance of two attorneys "of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours." Vialva merely claims that this Court erred in assigning counsel under this section by not considering the recommendation of the Federal Public Defender.

Vialva's initial claim is entirely without merit. First, this is a claim that could have been raised in Vialva's direct appeal by his two appellate counsel, and thus, this statutory claim has been procedurally defaulted. Further, even if deemed a constitutional claim, he has failed to demonstrate cause and prejudice. Second, the purpose of the statute, that Vialva receive the assistance of two attorneys "of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours," was satisfied without the need for consultation with the Federal Public Defender. The need for consultation was obviated by having a qualified, willing, and immediately available candidate. Any error in lack of consultation was harmless.

5

## Vialva's § 3005 Claim Is Without Merit

<u>This</u> <u>Claim</u> <u>Has</u> <u>Been</u> <u>Procedurally</u> <u>Defaulted</u>

As to this ground (Vialva's Motion at 3), Vialva alleges that:

> This issue was not raised on direct appeal. Stanley
> Schwieger, the first lawyer appointed by the trial court,
> continued representing Mr. Vialva on appeal. This post
> conviction proceeding is Mr. Vialva's first opportunity to
> present this claim with the assistance of independent
> counsel.

As discussed above, this ground complains that Mr. Goains was appointed by this Court, pursuant to § 3005, as counsel "learned in the law applicable to capital cases," without fulfilling the provision of the statute "that the court shall consider the recommendation of the Federal Public Defender organization." Vialva's section on the procedural background in his motion omits the fact that Mr. Goains did not represent Vialva on appeal. In addition to Mr. Schwieger from Waco, Texas, Vialva also had Steven C. Losch, from Longview, Texas, as his counsel for the direct appeal to the Fifth Circuit. *See, United States v. Bernard*, 299 F.3d 467, 471 (5th Cir. 2002). Thus, Mr. Losch, who had no involvement with the trial, was "independent counsel" who could have raised the technical omission of consultation with the Federal Public Defender under § 3005 as an issue in his direct appeal.[1] Also, Mr. Schwieger, could

---

[1] Elsewhere in his motion (Motion at 42), Vialva contends that the now-deceased Mr. Losch was incapacitated for all or part of this appeal (citing the declaration of Kay Losch). The declaration of

6

have discovered or realized that no consultation had occurred. This was not a statute that had recently changed. There was no impediment to raising this issue on direct appeal, except for this issue being a technical, very minor issue, with little prospect for success.

Errors that are not constitutional or jurisdictional in magnitude cannot be raised in a section 2255 motion, if those errors could have been raised on direct appeal. *United States v. Stumpf*, 900 F.2d 842, 845 (5th Cir. 1990). For example, violations of Rule 11 that could have been raised on direct appeal may not be presented in a collateral attack upon the defendant's sentence, unless the defendant shows that the error resulted in a complete miscarriage of justice or in a proceeding inconsistent with the rudimentary demands of fair procedure. *Id.* (citations omitted). Likewise, claims that a trial court violated Rule 32 in the course of imposing a sentence may not be brought pursuant to section 2255 when such claims could have been raised on direct appeal. *United States v. Weintraub*, 871 F.2d 1257, 1266 (5th Cir. 1989).

---

Kay Losch, however, indicates that Mr. Losch, who "specialized in capital cases particularly at the appeal stage," had his first surgery in November, 2001, after which he never fully recovered. The Fifth Circuit's docket sheet indicates that the record on appeal was "released to attorney Steven C. Losch" on March 26, 2001, and that a corrected brief for Vialva was filed on May 30, 2001. Thus, this appellate capital litigation specialist could have considered raising this issue.

As one court has observed, section "3005 does not embody a fundamental constitutional right." *United States v. Williams*, 544 F.2d 1215, 1218-19 (4th Cir. 1976).[2] Thus, the claims of these statutory violations are not of constitutional or jurisdictional magnitude.

Vialva received the counsel experienced in capital litigation provided for by § 3005. The alleged technical violation of lack of consultation with the Federal Public Defender prior to making such an appointment does not rise to the level of a lack-of-counsel claim of constitutional or jurisdictional magnitude. As discussed above, it is a claim that could have been easily raised on direct appeal by Mr. Losch, who had no involvement with the trial, and who was independent counsel, or Mr. Schwieger, who could have discovered or realized that no consultation had occurred. It is a claim that has been procedurally defaulted.

---

[2]

In *Williams*, 544 F.2d at 1218-19, a defendant, indicted for first-degree murder and convicted of second-degree murder, contended that his conviction should be reversed because he was entitled to the appointment of two counsel for the trial. The district court found that no request for two counsel had been made. *Id.* The Fourth Circuit, in interpreting a previous version of § 3005, held that "the right to two counsel granted by § 3005 does not embody a fundamental constitutional right of the sort which can be deemed waived only under the strict standard of *Johnson v. Zerbst. . .* ". *Id.* (citation omitted). The Fourth Circuit further held that "since the right is merely statutory, the [trial court] is not required to call it to the attention of the Defendant; and no prejudice to the Defendant will necessarily be presumed from a failure to do so." *Id.*

2193

Furthermore, a defendant's collateral attack on a conviction "may not do service for an appeal." *United States v. Frady*, 456 U.S. 152, 165-70 (1982). Therefore, a defendant who raises a constitutional or jurisdictional claim for the first time on collateral review, when those claims could have been asserted on direct appeal, must show both cause for his procedural default and actual prejudice due to any such errors. *Id.*[3] Significantly, the cause and prejudice standard is more rigorous than the plain error standard used on direct review. *Id.* at 170. Thus, even if the technical § 3005 lack-of-consultation violation is somehow considered to be of constitutional magnitude, Vialva has not shown both cause for his procedural default and actual prejudice due to any such error.

<u>Vialva</u> <u>Received</u> <u>The</u> <u>Assistance</u> <u>Of</u> <u>Counsel</u>
"<u>Learned</u> <u>In</u> <u>The</u> <u>Law</u> <u>Applicable</u> <u>To</u> <u>Capital</u> <u>Cases</u>"

As noted above, the current version of the relevant statute, § 3005, ensures that a defendant charged with a capital offense will be assigned, upon request, counsel "learned in the law applicable to capital cases." As discussed in a case that applied the version of § 3005 prior to the 1994 amendment, "[t]he plain meaning of the phrase 'learned in the law' refers to a person who has received a regular legal education, generally signified by admission to the bar." *United States v. McCullah*, 76 F.3d 1087,

---

[3] Direct appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception. *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).

1098 (10th Cir. 1996) (citing Black's Law Dictionary 889 (6th ed. 1990)). With the amended language, "learned in the law applicable to capital cases," Congress has added that counsel's expertise relate to prior capital litigation.

In the instant case, as noted above, in the motion for appointment of counsel under § 3005, Mr. Schwieger explained: that Mr. Goains had participated in "several state capital murder trials, including <u>State v. Kenneth Allen McDuff</u>, in the 54th District Court of McLennan County, Texas"; that "Mr. Goains is a Texas board certified criminal law practitioner"; and thus, that Mr. Goains was "learned in the law applicable to capital cases."

Indeed, published Texas state court opinions show that Mr. Goains was counsel in the capital cases of *McDuff v. State,* 939 S.W.2d 607 (Tex.Cr.App. 1997) (en banc), *Coleman v. State,* 881 S.W.2d 344 (Tex.Cr.App. 1994) (en banc), and *Dixon v. State,* 886 S.W.2d 115 (Tex.App.– Waco 1993). The *McDuff* case, involving a woman abducted from an Austin car wash who was then sexually assaulted and murdered, was a very high profile capital case (resulting in a change in venue for the trial to Guadalupe County). *See McDuff v. State,* 939 S.W.2d at 610.[4] Thus, it certainly was true that Mr. Goains was "learned in the law applicable to capital cases."

---

[4] Mr. Goains himself stated on the record that "over the last ten years I've tried eight capital murder cases." *See* Volume I of Vialva's Appendix Of Exhibits, Tab II-A, page 3

2195

Mr. Goains also had a significant amount of experience with federal criminal cases before this Court in Waco, Texas. This Court could make findings of fact as to Mr. Goains' prior appearances as well as his effectiveness.

Mr. Goains' federal practice has been mentioned in two published opinions from the Fifth Circuit. The first opinion, *United States v. Ainsworth*, 932 F.2d 358 (5th Cir. 1991), reflects that Mr. Goains represented one of the appellants before the Fifth Circuit concerning an issue of whether prior crimes should be considered consolidated for the purposes of computing criminal history under the guidelines. The second opinion, *United States v. Boutwell*, 896 F.2d 884 (5th Cir. 1990), concerning the standard for perfecting an *in forma pauperis* appeal, reflects that Mr. Goains had been retained counsel in this Court for the prosecution of Defendant Morris Allen Pritchett, and Mr. Goains had been appointed counsel for Defendant Lester Gene Boutwell.

Thus, Mr. Goains' participation in several state capital murder trials, including the very high profile *McDuff* case, his Texas board certification as a criminal law practitioner,[5] and his more than ten-years experience in federal criminal cases before

---

[5] As this Honorable Court is aware, the Texas Board of Legal Specialization certifies practitioners in certain fields, including criminal law. *See* Texas Board of Legal Specialization, General Questions, at http://www.tbls.org/FAQs/General.asp. To become board certified in a particular specialty area, an attorney must meet the following requirements: (1) have been licensed to practice law for at least five years; (2) have devoted a required percentage of practice to the specialty area for at least three years; (3) have handled a wide variety of matters in the area to demonstrate experience and involvement; (4) attended continuing education seminars regularly to keep legal training up to

11

this Court, made him well-qualified as someone "learned in the law applicable to capital cases."[6]

The apparent purpose of the consultation provision of the statute is to find qualified and experienced counsel "learned in the law applicable to capital cases," and who would be immediately available for appointment. Mr Goains was a qualified and experienced counsel "learned in the law applicable to capital cases," someone who was very familiar with handling federal cases before this Honorable Court, and who had already consented to the appointment. The need for the consultation aspect of the process was obviated by having a qualified, available attorney, familiar to this Honorable Court, ready to be appointed. Qualified counsel was appointed under the statute. There was no error. If there was an error it was harmless.

---

date; (5) been evaluated by fellow lawyers and judges; and (6) pass a 6-hour written examination. *Id.*

[6]

Vialva cites to *United States v. Miranda*, 148 F.Supp.2d 292, 294 (S.D.N.Y 2001), regarding standards for appointment of "learned counsel" under § 3005. In *Miranda*, a federal death penalty case, the district court cited the Spencer Committee Report that described the experience of the learned counsel referred to in the statute as distinguished prior experience in federal death penalty cases or "distinguished prior experience in state death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation." *Id.* The *Miranda* court recognized that it would have to look at practitioners from New Jersey to find counsel qualified in state death penalty cases. *Id.* at 294-97. In the instant case, Mr. Goains, was very familiar with Texas death penalty cases, as well as being a regular practitioner in the federal district court in Waco.

12

2197

There <u>Was</u> <u>No</u> <u>Reversible</u> <u>Error;</u>
<u>Any</u> <u>Potential</u> <u>Error</u> <u>Would</u> <u>Have</u> <u>Been</u> <u>Harmless</u>

Vialva candidly acknowledges that his specific issue is an issue of first impression, and thus, no court has ever reversed a conviction or granted post-conviction relief based on the consultation-with-the-Federal-Public-Defender provision of section 3005 (Motion at 8). Vialva cites a line of cases in which failure to appoint a second lawyer in a capital case has been deemed error requiring a new trial.[7] Vialva, however, received the assistance of two attorneys "of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours," and thus, these cases are not applicable.

As discussed above, the benefit provided under § 3005 is the assistance of two attorneys "of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours." The consultation with the Federal Public Defender provision facilitates the appointment of qualified and available counsel. In the instant case, qualified and available counsel had already been suggested to this Honorable Court. If suggested counsel was unsatisfactory or if selection from a greater range of choices was deemed necessary, this Court could have undertaken further investigation and consultation. With

---

[7] *See, e.g., United States v. Boone*, 245 F.3d 352 (4th Cir. 2001).

2198

qualified counsel available that was satisfactory to both defense co-counsel and this Court, a perfunctory call to the Federal Public Defender should not be absolutely mandated. Qualified counsel was appointed under the statute. There was no error. If there was an error it was harmless.

Vialva attempts to assert that a lack of consultation with the Federal Public Defender is a "structural" error (Motion at 8). Structural errors are "defects in the constitution of the trial mechanism which defy analysis by 'harmless-error' standards," such as "the total deprivation of the right to counsel at trial," or "a judge who was not impartial." *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991). Vialva received the assistance of two attorneys including "learned counsel" experienced in capital litigation. Lack of consultation with the Federal Public Defender prior to appointment of qualified counsel is not a structural error.[8]

Assuming Vialva had raised this first issue in his direct appeal (which he, in fact, failed to do), he would have been required to show that the lack of consultation, to which there was no objection, was "plain error." Vialva, however, has not shown, and could not show, that the lack of consultation with the Federal Public Defender prior to the appointment (1) was an error, (2) that was clear or plain, (3) that affected

---

[8]

As noted above, as one court has observed, section "3005 does not embody a fundamental constitutional right." *Williams*, 544 F.2d at 1218-19. Thus, a statutory violation could not amount to structural error.

14

his substantial rights, and (4) seriously affected the fairness, integrity or reputation of judicial proceedings. *See United States v. Olano*, 507 U.S. 725, 733-35 (1993).

Even if Vialva had objected in the district court to lack of consultation with the Federal Public Defender, any error was harmless. An error is harmless in some contexts if it is "harmless beyond a reasonable doubt,"[9] and in other contexts if the error did not have a "substantial and injurious effect or influence" vis-a-vis the judgment.[10] In the instant case, both standards would have been met.[11] Vialva received the assistance of two attorneys including "learned counsel" experienced in capital litigation. Lack of consultation with the Federal Public Defender prior to the appointment, if error, was harmless.[12]

---

[9]   *See Chapman v. California*, 366 U.S. 18, 24 (1967).

[10]   *See Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

[11]   Although it is Vialva that must show cause and prejudice for failure to raise this claim.

[12]

Compliance with some aspects of § 3005 has been found by at least one district court to be, as an alternative ruling, harmless error. In *United States v. Torres Gomez*, 62 F.Supp.2d 402 (D. Puerto Rico 1999), the defendant argued that he did not have the benefit of appointment of learned counsel prior to "the administrative hearing at the Death Penalty Committee of the DOJ" and thus, the appointment of learned counsel did not meet the "promptly" provision of § 3005 (where the court "shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases"). The court held that the appointment of learned counsel within 15 days of the notice of intent to seek the death penalty comported with the "promptly" statutory requirement. *Id.* at 407-08. The court further determined that: "Even assuming, *arguendo*, that the Court has failed to comply with § 3005, the same has been a harmless error, since defendant already has learned counsel, well before trial, and is free to rely on his assistance for a reconsideration hearing before the DOJ's Death Penalty Committee." *Id.* at 408 n.7.

15

## VIALVA'S GROUND TWO

## VIALVA'S ASSERTION THAT HIS TRIAL COUNSEL HAD A CONFLICT OF INTEREST HAS BEEN PROCEDURALLY DEFAULTED; NEVERTHELESS, THIS GROUND IS WITHOUT MERIT, VIALVA HAS NOT SHOWN THAT "AN ACTUAL CONFLICT OF INTEREST ADVERSELY AFFECTED HIS LAWYER'S PERFORMANCE"; HE HAS NOT MET BOTH REQUIREMENTS OF THE *STRICKLAND* TEST; PRIOR TO TRIAL, VIALVA WAS INFORMED OF THE POTENTIAL CONFLICT, AND HE DECLINED TO REQUEST DIFFERENT COUNSEL; IN FACT, VIALVA REQUESTED THAT MR. GOAINS CONTINUE TO REPRESENT HIM; THIS HONORABLE COURT CONDUCTED AN ADEQUATE INQUIRY; VIALVA WAIVED ANY POTENTIAL CONFLICT

(Responsive To Vialva's Issue II, 13-41)

### Background And Nature Of The Claim

Background

*Mr. Goains' Long-Standing Application To Become An AUSA*

As stated by Mr. Dwight Goains at the hearing on May 12, 2000 (discussed *infra*), "[a]s this Court is well aware, Your Honor, for about the last eight or ten years I've been trying to apply to be an Assistant United States Attorney."

*The Appointment As Vialva's Counsel*

As noted above, a criminal complaint was filed on June 22, 1999, charging Vialva with carjacking, and on June 24, Attorney Stanley Schwieger was appointed to represent Vialva (*See* Vialva's Motion at 3). On July 13, 1999, Vialva was charged in a four-count indictment, with three of the counts potentially involving the death

16

penalty. On July 16, Mr. Schwieger filed a "Motion for Appointment of Co-Counsel in Death Penalty Case," in which he advised this Court of Mr. Goains' experience in capital litigation and Mr. Goains' availability for appointment. This Honorable Court appointed Mr. Goains on July 21, 1999. The jury trial in this case began on May 15th 2000.

> *Mr. Goains' Application To The U.S. Attorney's Office*
> *Was Rejected In March Of 2000*

In a letter to Vialva's habeas counsel, Mr. Goains confirmed that he first interviewed for the position of Assistant United States Attorney in "[e]arly February, 2000). *See* Volume I of Vialva's Appendix Of Exhibits, Tab II-C. Mr. Goains related that he was informed that this application for employment with the United States Attorney's Office was rejected in "early March, 2000." *Id.* Mr. Goains further related that he sent a letter expressing his continued interest in the position of Assistant United States Attorney on "March 6, 2000." *Id.*

> *The Hearing*

On May 12, 2000, three days before the scheduled start of the trial, this Honorable Court conducted a pre-trial hearing concerning the potential conflict of Mr. Goains being Vialva's counsel for the upcoming capital trial, and Mr. Goains, having applied for a position as an Assistant United States Attorney in the United States

Attorney's Office for the Western District of Texas, and having "more than an excellent chance" of receiving an offer. *See* Volume I of Vialva's Appendix Of Exhibits, Tab II-B, page 3 (Transcript of Pre-Trial Hearing of May 12, 2000, at 10:30 a.m.) (Hereafter: "Tr. at 3").

Mr. Goains began the hearing by explaining, in open court, in the presence of his client, Vialva, that (Tr. at 3):

> As this Court is well aware, Your Honor, for about the last eight or ten years I've been trying to apply to be an Assistant United States Attorney. Your Honor, several months ago I applied and it appears, at this time, that there [are] two positions open in Del Rio and one in Pecos. It also appear[s], your Honor, that there's more than an excellent chance I may receive a[n] offer for one of those positions as Assistant U.S. Attorney.

Mr. Goains further explained that (Tr. at 3-4):

> I'm a Board Certified Criminal Lawyer, Your Honor, and over the last ten years I've tried eight capital murder cases. I've gone over this with my client, Mr. Vialva. It's just a matter, Your Honor, we want to make sure that Mr. Vialva is clear that my applying for a U.S. Attorney position has absolutely nothing to do with his case, nor has the U.S. Attorney's office ever mentioned this case to me and I've never mentioned his case to the U.S. Attorney's Office. It's just a matter, Your Honor, that we want to make sure that, you know, in three months or four months or next week, if the offer comes in – and I can assure the Court if that offer does come in, I'm going to accept it – that Mr. Vialva, I want him to feel free and clear that I've always and will always do one-hundred percent what's in his best interest

18

and defend him, to the best of my ability. And I've gone over that with my client. And I've also asked Mr. Vialva if he would like me to formally withdraw from his case or ask for another attorney to be substituted, and it's my understanding that Mr. Vialva has no problems with myself and wishes I continue to represent him.

Vialva was then sworn, and he answered questions from Mr. Goains (Tr. at 4-5):

Q. Mr. Vialva, you and I have gone over the fact that I've applied for the U.S. Attorney's Office, is that correct?

A. Yes, sir.

Q. You understand I've been trying to do this for a long, long time?

A. Yes, sir.

Q. And, again, it – I guess, in the final outcome, I may get rejected, okay, but the bottom line is, I may also be offered a position, and if they do, I would accept it. But do you understand that that has absolutely no bearing on your case?

A. Yes, sir.

Q. And that we've been preparing for this case for several months now, Mr. Schwieger and I. Are you satisfied so far with our representation?

A. Yes, sir.

Q. Do you feel that we're doing everything in your best interest?

A. Yes, sir.

Q. Do you – would you wish for me to withdraw and have this

19

Honorable Court substitute counsel, or would you wish I continue representing you and assisting Mr. Schwieger, to the best of my ability?

A. I wish that you continue representing me.

The prosecutor then requested that this Court "inquire, to the extent there is any conflict, if there is any, that Mr. Vialva waives it and understands that that's permanent waiver of any type of potential issue" (Tr. at 5).

This Court then addressed Vialva (Tr. at 6):

Q. Mr. Vialva, two things. First of all, if you did want me to appoint you a different lawyer from Mr. Goains, then, I would certainly consider that. The other is, that if the Court accepts your decision, that this does not create a problem for you, then later on, if you're convicted, you couldn't come back and say, "Well, I didn't get a fair trial, because Mr. Goains had applied for a job with the U. S. Attorney's Office. Do you understand that?

Vialva answered "Yes, sir" (Tr. at 6).

*Mr. Goains Was Later Hired For The Alpine-Pecos Office*

Vialva's jury trial was completed and he was sentenced on June 13, 2000. On June 29, 2000, an order was entered granting Mr. Goains' motion to withdraw as Vialva's counsel (because Mr. Goains did not wish to represent Vialva during the appeals process).

20

The letter to Vialva's habeas counsel, also provides that on October 3, 2000, more than three months after withdrawing from Vialva's case, Mr. Goains interviewed for the position of Assistant United States Attorney. *See* Volume I of Vialva's Appendix Of Exhibits, Tab II-C. On October 6, 2000, a conditional offer of employment was extended to him. *Id.* On February 6, 2001, a final offer of employment was extended to him. *Id.* Mr. Goains took the oath of office as an Assistant United States Attorney on February 11, 2001. *Id.*

<u>Nature</u> <u>Of</u> <u>Claim</u>

In the caption of this claim, Vialva contends that he was denied his Sixth Amendment right to the effective assistance of counsel because one of his attorneys applied for employment with the United States Attorney's Office during the pendency if his trial (Motion at 13). Vialva also asserts that the conflict was not waivable, and he complaints the hearing conducted by this Court was inadequate. As discussed below, Vialva did not object to any possible conflict. Indeed, Vialva, understanding Mr. Goains' desire to continue to apply for a job as a prosecutor, specifically waived any objection to any potential conflict, did not ask for substitute counsel, and affirmatively stated he wanted Mr. Goains as one of his attorneys. To the extent that Vialva is arguing that Mr. Goains provided ineffective assistance by representing him ("to the best of my ability"), that claim, although cognizable, is without merit because

21

Vialva cannot show an actual conflict that adversely affected his lawyers performance; nor can he demonstrate the result-changing *Strickland* prejudice required by the Fifth Circuit. To the extent Vialva is raising claims as to a conflict of interest that could have been raised on direct appeal, he has not shown cause and prejudice for not raising these claims, and they have been procedurally defaulted.

### All Conflict-Of-Interest Claims, Except The Assertion That A Conflict Rendered Mr. Goains Constitutionally Ineffective According To *Strickland* Standards, Have Been Procedurally Defaulted

As discussed in the argument as to the first ground, a defendant's collateral attack on a conviction "may not do service for an appeal." *Frady*, 456 U.S. at 165-70 (1982). Therefore, a defendant who raises a constitutional or jurisdictional claim for the first time on collateral review, when those claims could have been asserted on direct appeal, must show both cause for his procedural default and actual prejudice due to any such errors. *Id.* The cause and prejudice standard is more rigorous than the plain error standard used on direct review. *Id.* at 70. Vialva has not shown both cause for his procedural default of non-ineffective assistance claims and actual prejudice due to any such error.[13]

---

[13] The allegedly conflicted defense counsel, Mr. Goains, was not part of Vialva's team of lawyers for his direct appeal. A conflict claim could have been raised on direct appeal (*see* footnote 1, *supra*).

22

### Standards Of Analysis Of Conflict Of Interest Claims

"In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely impacted his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980) (footnote omitted). The mere possibility of a conflict of interest "is insufficient to impugn a criminal conviction." *Id.* at 350.

In *Lockhart v. Johnson*, 104 F.3d 54, 57-58 (5th Cir. 1997), the Defendant-Appellant argued that his trial counsel's failure to provide conflict-free representation created a *per se* conflict of interest under *Cuyler v. Sullivan*. In *Lockhart*, however, the Fifth Circuit Court of Appeals explained that:

> As the district court observed, we have not read *Cuyler* this broadly. In *Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995) (en banc) . . . our *en banc* court determined that *Cuyler* is primarily reserved for the circumstances where counsel represents multiple clients with conflicting interests. We concluded that a petitioner asserting ineffective assistance of counsel claims predicated on some other conflict of interest must ordinarily satisfy both prongs of the test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 . . . . As in *Beets*, if we assume arguendo that petitioner's trial counsel breached some duty to Lockhart by continuing to represent him while counsel's firm was representing the trial judge in an unrelated civil matter, that breach does not establish a per se violation of petitioner's Sixth Amendment right to effective assistance. To warrant federal habeas relief under *Strickland*, petitioner must demonstrate error by counsel that fell below an objective standard of

reasonableness and that this error prejudiced his case. To establish the prejudice prong under *Strickland*, a petitioner must show a reasonable probability that counsel's error changed the result of the trial. . . . We agree with the district court that Lockhart demonstrated no basis for a finding of prejudice. . . In sum, petitioner fails to allege any steps his counsel took or failed to take as a result of this relationship that affected his defense.

### Standards Of Analysis Of Ineffective Assistance Claims

As noted above, in *Strickland v. Washington*, the Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel: a convicted defendant seeking relief must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, i.e., deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong. *Strickland*, 466 U.S. at 697.

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (*citing Strickland*, 466 U.S. at 690). "An attorney's performance, which enjoys a strong presumption of adequacy, is deficient if it is objectively unreasonable." *United States v. Walker*, 68 F.3d 931, 934 (5th Cir. 1995); *United States v. Acklen*, 47 F.3d

24

2209

739, 742 (5th Cir. 1995). The petitioner must prove that the conduct of trial counsel fell below the constitutional minimum guaranteed by the Sixth Amendment. *United States v. Faubion*, 19 F.3d 226, 228 (5th Cir. 1994) (citing *Strickland*, 466 U.S. at 686).

Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *Strickland*, 466 U.S. at 688-89, 104 S.Ct. at 2065. Petitioner "carries the burden of proof ... and must overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance." *Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986) (citations omitted); *Hayes v. Maggio*, 699 F.2d 198, 201-02 (5th Cir. 1983).

To prove prejudice under the *Strickland* standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. The *Strickland* court defined a reasonable probability as "a probability sufficient to undermine confidence in the outcome." *Id.* In making a determination as to whether prejudice occurred, courts must review the record to determine the "relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

## Vialva Was Entitled To Counsel Of His Choice:  Mr. Goains

The Sixth Amendment guarantees that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." Although not an unfettered privilege, a defendant has the Sixth Amendment right to choose his own counsel. *Wheat v. United States*, 486 U.S. 153, 159 (1988); *Morris v. Slappy*, 461 U.S. 1 (1983). A district court is afforded broad latitude in deciding whether countervailing considerations, such as a potential conflict of interest, require the rejection of a defendant's preferred counsel. *Wheat*, 486 U.S. at 159; *United States v. Izydore*, 167 F.3d 213, 220 (5th Cir. 1999).  As to the original design of the Sixth Amendment, the basic purpose of the right to counsel "is simply to ensure that criminal defendants receive a fair trial." *Strickland v. Washington*, 466 U.S. at 689; *Izydore*, 167 F.3d at 221.

In the instant case, after it was freely and clearly understood that although Mr. Goains had engaged in discussions of possible employment with the United States Attorney's Office, and maintained hopes of future employment with that office, Mr. Goains maintained "that I've always and will always do one-hundred percent what's in his best interest and defend him [Vialva], to the best of my ability." Mr. Goains had reviewed these considerations with Vialva, and asked if Vialva wanted him to withdraw from the case and ask for another lawyer to be substituted.  Vialva indicated

26

to Mr. Goains that he had "no problems" with Mr. Goains' representation and wished that he continue to represent him. In open court, under oath, Vialva asserted that: "I wish that you [Mr. Goains] continue representing me." This Honorable Court discussed the potential conflict with Vialva and was satisfied that there was no fatal conflict. This Court did not abuse its discretion in allowing Vialva to retain Mr. Goains, the counsel of his choice.

### There Was No Actual Conflict; The Hearing Was Adequate; Vialva Has Not Shown *Strickland* Prejudice

#### There Was No Actual Conflict

*Overview*

The rules of professional conduct provide some guidance as to the existence of a conflict of interest. As discussed below, a potential conflict does not necessarily become an actual conflict. The mere possibility of a conflict of interest "is insufficient to impugn a criminal conviction." *Cuyler* at 350.

Discussed below are a number of cases where defense attorneys have sought employment with the prosecution, where courts have found this resulted in no actual conflict of interest (the "mere fact" of defense counsel's "future employment plans did not create an actual conflict"), where courts have found imperfect but effective waivers, and where courts have found no *Cuyler* or *Strickland* prejudice. In the

27

instant case, Mr. Goains' desire for eventual employment as a prosecutor, after his rejection by the government prior to trial, and after the full discussion in open court with Vialva of all of the circumstances, did not equate to an actual conflict of interest during the trial. Furthermore, Vialva waived any potential conflict and affirmatively requested that Mr. Goains continue as his counsel. Vialva seems to argue that a violation of a rule, or the opinion of a paid expert that there was a violation of a rule, somehow equates to a per se violation and entitlement to habeas relief. On the contrary, Vialva has not made the necessary showing of any steps his counsel took or failed to take as a result of his counsel's desire for eventual employment with the government that affected his defense, and a reasonable probability that an error by counsel changed the result of the trial. Thus, Vialva has not established the elements of an actual conflict or the kind of prejudice required for post-conviction relief.

*Applicable Rules Of Professional Conduct*

Rule 1.7

Rule 1.7 of the Model Rules of Professional Conduct ("MRPC") (2000), titled "Conflict of Interest: General Rule," is the applicable rule concerning potential conflicts of interest and conflicts of interest.[14] Vialva's trial took place in May of

---

[14]    The relevant ethical standards often serve as an appropriate starting point for guidance concerning conflict or potential conflict analysis.

28

2000. The version of the rule as of 2000 provided:

Rule 1.7 Conflict of Interest: General Rule

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Material Limitation

Comment 4 to Rule 1.7 from the subsequent 2001 MRPC provides the following explanation of a material limitation.

"Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action of the client because of the lawyer's other responsibilities or interests.   The conflict in effect forecloses alternatives that would otherwise be available to the client...A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client ..."

29

Similarly, Comment 8 to Rule 1.7 in the 2003 rules describes a material limitation as a conflict that "in effect forecloses alternatives that would otherwise be available to the client. The mere possibility of subsequent harm does not itself require disclosure and consent." The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client. Rule 1.7, Comment 8 (2003). Interestingly, "Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide *guidance* to lawyers and to provide a structure for regulating conduct through disciplinary agencies...Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons." (Scope, Paragraph 6, 2001 MRPC).

### *The Instant Case Is Not Within Glasser*

Vialva relies heavily on *Glasser* as authority in support of his allegation of an actual conflict that adversely affected his lawyer's performance. However, as explained by the Supreme Court in *Cuyler*:

> In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely

30

2215

impacted his lawyer's performance. [footnote omitted] In *Glasser v. United States*, for example, the record showed that defense counsel failed to cross-examine a prosecution witness whose testimony linked Glasser to the crime and failed to resist the presentation of arguably inadmissible evidence. *Id.*, at 72-75, 62 S.Ct. at 464-67. The Court found that both omissions resulted from counsel's desire to diminish the jury's perception of a codefendent's guilt. Indeed, the evidence of counsel's "struggle to serve two masters [could not] seriously be doubted." *Id.*, at 75, 62 S.Ct. at 467. Since the actual conflict of interest impaired Glasser's defense, the Court reversed his conviction.

*Cuyler v. Sullivan*, 446 U.S. at 348-49. In the instant case, there is no such evidence of the active representation of conflicting interests and the adverse impact of that active conflict. As discussed below, the specific cases involving a defense lawyer who has pursued government or prosecutorial employment, have determined that such potential conflicts can be managed, and are not fatal to continued criminal defense representation.

### *Desire To Join The Government: The Case Law*

Vialva does not cite to any cases in which the desire or interest in government or prosecutorial employment has been found to be a *per se* conflict, or a case where the application of defense counsel for such employment has been fatal to continued representation so as to result in reversal of a conviction. This is understandable, as the weight of authority is that future employment plans, such as defense counsel's desire

31

2216

for government employment, or even acceptance of a position as a prosecutor with a district attorney's office, does not create an actual conflict. Under Vialva's theory, any defense attorney who desires or has applied to be a prosecutor has rendered ineffective assistance to all of his or her clients during those months or years of that process. This is an untenable theory. As shown below, where the potential for conflict has been disclosed, and there has been a commitment to the defense to make the best effort, there has been no error.

Garcia

The case of *Garcia v. Bunnell*, 33 F.3d 1193 (9th Cir. 1994), presented some issues very similar to the issues presented by Vialva in the instant case. In *Garcia*, in the morning of the first day of defendant's trial for the California state offenses of first-degree murder and assault with a deadly weapon, "[i]n an ex parte hearing on the morning of trial, defense counsel Craig Holmes announced that he had accepted a position, to commence at the end of the trial, with the prosecution - the San Joaquin County District Attorney's office." *Id.* at 1194-95. In *Garcia*, after the defendant "expressed reservations about proceeding," the trial court granted him a five-day continuance to seek advice. *Id.* at 1195. "After this hiatus, Garcia declared that he would accept Holmes' representation. The trial proceeded, and the jury found Garcia guilty as charged." *Id.* In his petition for habeas corpus relief, Garcia claimed that

32

there was an actual conflict of interest and that, "far from waiving his right to conflict-free representation he timely objected to Holmes' conflict of interest and the trial court's failure to inquire thus mandates reversal of his conviction." *Id.* at 1197-1200. The Ninth Circuit rejected these and other arguments. *Id.*

The court in *Garcia* noted that a conflict-of-interest claim under *Cuyler* required a demonstration by the defendant "'that a conflict of interest actually affected the adequacy of [counsel's] representation.'" *Id.* at 1198 (quoting *Cuyler*, 446 U.S. at 349-50). The court in *Garcia* found that "[t]he record on appeal discloses no such active representation of competing interests." *Id.* The court noted that Mr. Holmes, the defense counsel, "himself in no way suggested that he thought his advocacy for Garcia could be impaired; he merely thought it appropriate to alert the court." *Id.* The court in *Garcia* took cognizance of the Supreme Court's observations in *Burger v. Kemp*, 483 U.S. 776, 784 (1987) that, "we generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client," and in *Cuyler*, 446 U.S. at 347, that "trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel." *Id.* at 1198-99 (quoting *Burger* and *Cuyler*).

Significantly for the instant case, the Ninth Circuit therefore held in *Garcia* that "The **mere fact** of Holmes' **future employment plans did not create** an **actual**

conflict." *Id.* at 1199 (emphasis added). The *Garcia* court cited the cases of *United States v. Unruh*, 855 F.2d 1363 (9th Cir. 1987), and *United States v. Horton*, 845 F.2d 1414 (7th Cir. 1988), which are discussed below, in support of its holding.

The *Garcia* court also held that even if it were assumed that counsel was subject to an actual conflict of interest, the trial court may generally allow the attorney to proceed where there is a voluntary, knowing, and intelligent waiver. *Garcia* at 1195. Based on the trial court transcript, the Ninth Circuit held that Garcia "knowingly, intelligently, and voluntarily decided to accept continued representation from Holmes despite the potential conflict presented by Holmes' future employment." *Garcia* at 1195-98.

In support of this holding, the *Garcia* court reviewed the *in camera* hearing held by the trial court on the day of the scheduled trial. *Id.* at 1194-98. At that hearing, Garcia wanted more time to consider, as he had "reservations" about his defense counsel "going over to the other side," and he was worried that counsel might "strike a deal" or be "palsy-walsy" with the prosecutor. *Id.* at 1196. The trial court said Garcia was "certainly entitled to a couple of days" to think about his lawyer's continued representation, but that he probably would be reluctant to excuse counsel because there was nothing to indicate that he was inadequate counsel. *Id.* A few days later, the hearing resumed with Garcia announcing that his decision was "to stick with

34

Mr. Holmes at this time." *Id.* at 1197. Garcia reasoned that: "I think the fact that he was offered this position [as an assistant district attorney], I think that he very well deserves this position and I don't think they would have offered it to him if he wasn't a darned good choice for it." *Id.* The *Garcia* court recited that although it would indulge in every reasonable presumption against the waiver of fundamental rights, it concluded that "given the facts and circumstances of this particular case we do not doubt that Garcia knowingly, intelligently, and voluntarily **waived any rights even potentially implicated** by [defense counsel's] announcement [that at the conclusion of the trial he would join the prosecutor's office]. *Id.* at 1194-95, 1197 (emphasis added).

*Garcia* has direct application to the instant case. Like counsel in *Garcia*, Mr. Goains himself in no way suggested that he thought his advocacy for his client could be impaired; he merely thought it appropriate to alert the court. Indeed, the instant case has even less support for a potential conflict than the support found insufficient in *Garcia*. *Garcia*'s counsel had accepted a position with the prosecutor's office that would commence at the conclusion of the trial. Vialva's counsel, on the other hand, had been rejected by the prosecutor's office, and merely indicated that he had a continuing interest, an interest he had maintained over many years as a defense

35

attorney, in potential future employment with the United States Attorney's Office, and believed that his eventual prospects were excellent.

Additionally, while Garcia, at his *in camera* hearing on the morning of the scheduled trial, expressed his trust in his attorney ("I have faith in Mr. Holmes"), he also expressed some doubts (as to whether Mr. Holmes might be "palsy-walsy" with the district attorney). Vialva, on the other hand, at his hearing in open court, days before his trial, expressed no such doubts but on the contrary declared his satisfaction with the representation of both of his attorneys, stated his belief that they were "doing everything" in his best interest, testified that he did not wish Mr. Goains to withdraw, and announced that he wished Mr. Goains to continue to represent him ("I wish that you continue representing me").

In the instant case, just as in *Garcia*, "[t]he mere fact of [defense counsel's] future employment plans did not create an actual conflict." *Garcia* at 1199. Furthermore, in the instant case, just as in *Garcia*, even if there was a potential conflict, Vialva knowingly, intelligently, and voluntarily waived any rights even potentially implicated by defense counsel's announcement of his continuing interest in a future position with the prosecution. *Id.* at 1197.

Adanandus

In *Adanandus v. Johnson*, 947 F.Supp. 1021 (W.D.Tex. 1996), in a collateral attack, a defendant, convicted of a capital offense, claimed that his counsel was ineffective because he had been a "candidate for the position of United States Attorney for the Western District of Texas and later successfully ran for the office of Bexar County District Attorney." *Id* at 1054. Adanandus argued that because of what he characterized as a "conflict of interest," *Strickland* prejudice must be presumed. *Id.* The district court, however, based on Fifth Circuit authority, rejected that argument. *Id.* at 1054-55.

The district court explained:

> Petitioner argues further that because of this conflict of interest, prejudice within the meaning of *Strickland* must be presumed. However, in *Beets v. Scott*, [footnote omitted] the Fifth Circuit rejected such a broad ranging approach to conflict of interest issues. [footnote omitted] In so doing, the Fifth Circuit rejected a broad application of the presumed prejudice rule announced in *Cuyler v. Sullivan*, [footnote omitted] choosing instead a more pragmatic approach under which a petitioner asserting an ineffective assistance claim based on a purported conflict of interest must ordinarily satisfy both prongs of the *Strickland* test. [footnote omitted] Petitioner admits in his second amended petition his trial counsel revealed to him that he (attorney Hilbig) was a candidate for the U.S. Attorney position. Petitioner suggests this revelation was made in conjunction with a threat that withdrawal of said counsel would cause great delay in petitioner's trial. Assuming arguendo that

37

> petitioner's trial counsel breached some unspecified ethical standard in the course of advising petitioner of counsel's candidacy for the U.S. Attorney position, that breach does not establish a per se violation of petitioner's right to effective assistance.

*Id.* at 1054-55.

The district court in *Adanandus* went on to further explain that to establish ineffective assistance based on a conflict of interest where there had been no objection at trial, petitioner must demonstrate that an actual conflict adversely affected his attorney's performance. *Id.* The court further explained that the presumption-of-prejudice rule applied only in multiple representation cases, and not in cases such as Adanandus' claim of counsel's personal conflict. *Id.* The court determined that: "While the fact petitioner's trial counsel was engaged in seeking the position of U.S. Attorney at the time of petitioner's trial might have presented a potential conflict of interest, petitioner has alleged no facts showing this potential conflict ever evolved into an actual conflict [footnote omitted]." *Id.*[15]

*Adanandus* also applies to the instant case. Adanandus' counsel was an active candidate for the open position of U.S. Attorney while he was defense counsel. Vialva's counsel, on the other hand, had been rejected by the prosecutor's office, but

---

[15] Adanandus' contention was that trial counsel's candidacy for the U.S. Attorney tainted counsel's closing argument during the punishment phase because defense attorney Hilbig stated he firmly believed in the efficacy of the death penalty. *Id.* at 1054-55.

sought a future employment position with the United States Attorney's Office. Both Adanandus' counsel and Vialva's counsel eventually accepted positions as prosecutors.

The instant case, however, has even less support for a potential conflict than the support that was found insufficient in *Adanandus*. While Adananadus' counsel only informed his client of his future employment situation, Vialva's counsel instead advised Vialva of his future employment plans and called for a hearing before the trial judge in which Vialva decided to continue with his counsel. In the instant case, just as in *Adanandus*, while the fact that Vialva's trial counsel was interested in future employment with the United States Attorney's Office at the time of the trial might have presented a potential conflict of interest, Vialva has alleged no facts showing this potential conflict ever evolved into an actual conflict. *Id.* at 1055-56.

Horton

Similarly, in *United States v. Horton*, 845 F.2d 1414, 1418 (7th Cir. 1988), the Seventh Circuit held that there was no actual conflict of interest where defense counsel was seeking employment as United States Attorney at the time of trial proceedings. The *Horton* court noted that though it may be conceivable that an unprincipled defense attorney in line for a job as a prosecutor might take an action contrary to his client's best interests, "that is too fanciful upon which to base a per se rule of conflict." *Id.* at

39

1419-20. The Seventh Circuit held that: "We will not indulge in the presumption that a defense attorney who is being considered for a position as United States Attorney is unable to represent a defendant in federal court to the best of his ability and with defendant's best interests in mind. *Id.* In the instant case as well, Vialva's claim is based on the purely speculative and fanciful notion that Vialva's counsel took some action contrary to his best interests because of his goal to someday become a prosecutor. This Court also should reject Vialva's presumption that a defense attorney who is being considered for a position as an Assistant United States Attorney is unable to represent a defendant in federal court to the best of his ability and with defendant's best interests in mind. *Id.*

Moreland

Also, in *Moreland v. Scott*, 175 F.3d 347, 348-49 (5th Cir. 1999), The Fifth Circuit held that there was no actual conflict under *Cuyler* where defense counsel in a state capital murder trial knew that he would be running for district attorney in the next election.[16] Instead of being entitled to a presumption of prejudice, the petitioner was required to establish both prongs of the *Strickland* test. *Id.*[17]

---

[16] The Fifth Circuit has also held that where a defense attorney on a rape case also serves part-time as an assistant city attorney assigned to traffic court as a prosecutor, there is no actual conflict of interest requiring reversal of the conviction. *Mitchell v. Maggio*, 679 F.2d 77 (5th Cir. 1982).

[17] Additionally, In *United States v. Franklin*, 213 F.Supp.2d 478, 484-86 (E.D.Pa. 2003), the

Unruh

Finally, the case of *United States v. Unruh*, 855 F.2d 1363, 1379 (9th Cir. 1987), presented some issues very similar to the issues presented by Vialva in the instant case. In *Unruh*, Fowler, one of the co-appellants, claimed in his direct criminal appeal that "he was denied his sixth amendment right to effective assistance of counsel because his attorney, failed to inform him until just before trial that he had applied for employment with the United States Attorney [as an Assistant United States Attorney]." Fowler argued "that this conflict of interest adversely affected his attorney's performance," and he requested a remand for an evidentiary hearing. *Id*.

The Ninth Circuit in *Unruh*, noted that Fowler "provides no evidence of misconduct." *Id*. The circuit court found that Fowler's counsel "cross-examined 16 prosecution witnesses, objected to evidence, and succeeded in having a juror excused for talking to a prosecution witness during a break." *Id*. The court also found that the decision that Fowler should not testify was a matter of defense strategy. *Id*. Thus, the circuit court held in denying this claim that "nothing in the record suggests that

---

district court denied § 2255 relief based on the claim that petitioner's trial counsel in federal court was burdened by an actual conflict of interest in that simultaneous to his representation of petitioner, he was a candidate for the District Attorney of Lehigh County, Pennsylvania (a state prosecutor job). The court in *Franklin*, remarked that "[d]efendant supplies no support or authority for the proposition that a defense attorney's candidacy for a prosecution position creates an actual conflict of interest," and that he certainly supplied no authority for a situation where a defense attorney in federal court sought a local position in a different county from where the crime occurred. *Id*.

41

counsel allowed anything to adversely affect his representation," and "Fowler has not shown that he was victimized by ill-advised strategy produced by counsel's alleged conflict of interest." *Id.*

The facts and circumstances of the instant case weigh even more strongly for a finding of a lack of an actual conflict of interest. Unlike in *Unruh*, Vialva's counsel set up the hearing in which Vialva waived any potential conflict. Like, *Unruh*, Vialva has not shown anything in the record that suggests that counsel allowed anything to adversely affect his representation, nor has he shown that he was victimized by ill-advised strategy produced by counsel's alleged conflict of interest.[18]

> *According To The Case Law:*
> *There Was No Actual Conflict*

In summary, assuming this issue has not been procedurally defaulted, *Cuyler* requires that Vialva must demonstrate that an actual conflict of interest adversely impacted his lawyer's performance. As the Fifth Circuit held in *Lockhart*, however, *Cuyler* applied in circumstances where counsel represents multiple clients with conflicting interests. This was not such a situation. Thus, Vialva must instead satisfy both prongs of *Strickland*, something he has failed to do.

---

[18] Furthermore, Vialva's conflict claim is made on collateral review, not on direct appeal as in *Unruh*, and, as discussed below, he has not come close to showing *Strickland* prejudice.

42

As explained above, the authorities establish that "the mere fact" that an attorney may have future employment plans with the prosecutor's office does not create an actual conflict. *Garcia*, 33 F.3d at 1199. As discussed in *Adanandus*, 947 F.Supp. at 1054-55, even if an ethical standard is breached in the course of advising petitioner of counsel's candidacy for the U.S. Attorney position, that breach does not establish a *per se* violation of petitioner's right to effective assistance. And although it may be conceivable that an unprincipled defense attorney in line for a job as a prosecutor might take an action contrary to his client's best interests, "that is too fanciful upon which to base a per se rule of conflict"; a court "will not indulge in the presumption that a defense attorney who is being considered for a position as United States Attorney is unable to represent a defendant in federal court to the best of his ability and with defendant's best interests in mind." *Horton*, 845 F.2d at 1418. Just as in *Franklin*, 213 F.Supp.2d at 484-86, Vialva "supplies no support or authority for the proposition that a defense attorney's candidacy for a prosecution position creates an actual conflict of interest." In the instant case there is no *per se* conflict, and Vialva has not shown that Mr. Goains had an actual conflict of interest, or that he actively represented conflicting interests. As discussed immediately below, Vialva actually waived any conflict. Finally, as discussed in more detail below, Vialva certainly has not demonstrated *Strickland* prejudice.

43



## Vialva Made A Knowing Waiver At The Hearing

*Hearing Standards*

In cases of joint representation,[19] if the court knows or reasonably should know that a particular conflict exists, it must initiate an inquiry about the conflict. *Cuyler* 446 U.S. at 347. A defendant may waive his right to the assistance of counsel who is unhindered by conflicts. *Holloway v. Arkansas*, 435 U.S. 475, 483 n.5 (1978).[20]

*Vialva's Hearing*

Citing ethical guidelines providing that a potential conflict should be discussed with a client as soon as possible, Vialva argues that his counsel's potential conflict could not be waived because there is no evidence of Mr. Goains discussing the situation with Vialva at a date earlier than the pre-trail hearing. Vialva, however, cites no cases that have invalidated a pretrial waiver because it did not take place at an earlier time. On the contrary, in cases such as *Garcia*, *supra*, a pre-trial hearing was

---

[19] As discussed above, the instant case, on the other hand, is not one of joint representation triggering the analysis in *Cuyler*.

[20] Interestingly, in *Mickens v. Taylor*, 535 U.S. 162, 175 (2002), the Supreme Court explained that both *Sullivan v. Cuyler* and *Holloway* stressed the high probability of prejudice arising from multiple concurrent representation, and that thus, the Federal Rules of Criminal Procedure treat concurrent representation and prior representation differently, requiring a trial court inquiry into the former but not the latter. Therefore, particularly where, as here, no actual conflict has been shown, there was actually no necessity for a hearing; the hearing was just a good precautionary measure to explore the potential for conflict and to obtain a precautionary waiver for that potential conflict.

deemed an adequate occasion and opportunity for a defendant's waiver.

As noted above in the discussion of the hearing held by this Honorable Court on May 12, 2000, three days before the scheduled start of the trial, the potential conflict was discussed. Mr. Goains stated: that it was well-known that for about the last eight or ten years he had been trying to apply to be an Assistant United States Attorney; that several months prior to the hearing he had made that application; that, there were then two positions open, one in Del Rio and one in Pecos; and that he believed "there's more than an excellent chance" that he might receive one of these offers.

Mr Goains further explained: that he was a Board Certified Criminal Lawyer; and that over the last ten years he had tried a number of capital murder cases.[21]

Mr. Goains related that "I've gone over this with my client, Mr. Vialva." At the hearing, Mr. Goains wanted to make sure that Vialva understood that: he had applied for a position with the United States Attorney's Office; and that no one in "the U.S. Attorney's office ever mentioned this case to me and I've never mentioned his case to the U.S. Attorney's Office."

---

[21]

Vialva now complains that it may not have been clear whether Mr. Goins was applying for a position as a criminal or civil lawyer with the government. The obvious implication, however, is that this criminal law specialist was applying to be a prosecutor.

45

Although Mr. Goains wanted to make it clear that if he received an offer he was "going to accept it," counsel wanted Mr. Vialva "to feel free and clear that I've always and will always do one-hundred percent what's in his best interest and defend him, to the best of my ability. And I've gone over that with my client."

Finally, Mr. Goains related that "I've also asked Mr. Vialva if he would like me to formally withdraw from his case or ask for another attorney to be substituted, and it's my understanding that Mr. Vialva has no problems with myself and wishes I continue to represent him."

Vialva was then sworn, and he testified that he and Mr. Goains had reviewed the fact that Mr. Goains had "applied for the U.S. Attorney's Office." Vialva acknowledged that he understood Mr. Goains had "been trying to do this for a long, long time." Vialva further acknowledged that he understood that Mr. Goains would accept such a position, should it be offered, but that these circumstances would have no bearing on his case.

Vialva also acknowledged that his trial team had been preparing for the case for several months. Vialva testified that he was satisfied, so far, with their representation, and that he felt that his attorneys were doing everything in his best interest.

Mr. Goains asked Vialva if he wanted either to have counsel to withdraw and have this Honorable Court substitute counsel, or continue to represent him, with Mr. Schwieger, to the best of his ability. Vialva answered: "I wish that you continue representing me."

The prosecutor then requested that this Honorable Court "inquire, to the extent there is any conflict, if there is any, that Mr. Vialva waives it and understands that that's permanent waiver of any type of potential issue." This Honorable Court then addressed Vialva personally. This Court first indicated that it would "certainly" consider appointing an different lawyer if Vialva should so request. Finally, this Court made it clear to Vialva, in painstaking terms, if it accepted his decision to continue with Mr. Goains' representation, he could not later "come back and say, 'Well, I didn't get a fair trial, because Mr. Goains had applied for a job with the U.S. Attorney's Office.'" Vialva testified that he understood what the court was saying.

As discussed above, in *Garcia*, the court held that "the mere fact" that an attorney may have future employment plans with the prosecutor's office does not create an actual conflict, and that no actual conflict had been established. *Garcia*, 33 F.3d at 1199. The court also held that even if it were assumed that counsel was subject to an actual conflict of interest, the trial court may generally allow the attorney to proceed where there is a voluntary, knowing, and intelligent waiver. *Garcia*, at 1195.

47

Based on the trial court transcript, the Ninth Circuit held that Garcia knowingly, intelligently, and voluntarily decided to accept continued representation from Holmes despite the potential conflict presented by Holmes' future employment, and voluntarily waived any rights even potentially implicated by defense counsel's announcement that at the conclusion of the trial he would join the prosecutor's office. *Id.* at 1194-98.

The hearing in the instant case presented an even stronger case for finding that Vialva voluntarily waived any rights even potentially implicated by defense counsel's announcement concerning his application to join the prosecutor's office. While Garcia's counsel had accepted a position with the prosecutor's office that would commence at the conclusion of the trial, Vialva's counsel's did not then have an offer. While Garcia, at his *in camera* hearing on the morning of the scheduled trial, expressed some doubts as to whether his counsel, Mr. Holmes might be "palsy-walsy" with the district attorney, as a result of accepting an employment offer, Vialva, on the other hand, at his hearing in open court, days before his trial, expressed his satisfaction with the representation of both of his attorneys, stated his belief that they were "doing everything" in his best interest, testified that he did not wish Mr. Goains to withdraw ("I wish that you continue representing me"). Further, while the trial court in *Garcia* (at 1196) expressed some reluctance to appoint substitute counsel ("I would probably be reluctant to do that"), this Honorable Court expressed no such reluctance

48

(indicating that it would "certainly consider" appointing a different lawyer if Vialva should so request).

The hearing in the instant case recognized the potential for conflict, contained Mr. Goains' assurance that he would continue to represent Vialva to the best of his ability, warned Vialva that he could not later come back and complain, as he is doing in this motion, and encompassed Vialva's desire to have Mr. Goains' continued representation, with a waiver of any potential conflict. Vialva knowingly and voluntarily waived any rights even potentially implicated by defense counsel's announcement concerning his application to join the prosecutor's office.

No Ineffective Assistance Has Been Shown

In light of the authority that "the mere fact" that an attorney may have future employment plans with the prosecutor's office does not create an actual conflict, *Garcia*, 33 F.3d at 1199, that a court "will not indulge in the presumption that a defense attorney who is being considered for a position as United States Attorney is unable to represent a defendant in federal court to the best of his ability and with defendant's best interests in mind," *Horton*, 845 F.2d at 1418, and that there is no support for the proposition that a defense attorney's candidacy for a prosecution position creates an actual conflict of interest, in addition to Mr. Goains and Vialva's desire for Mr. Goains' continued representation, Vialva has not met the first prong of

49

2234

the *Strickland* test of showing that this decision was objectively unreasonable.

No Prejudice Has Been Shown

Vialva also has failed to show *Strickland* prejudice, that an ill-advised strategy, produced by a conflict of interest, created a reasonable probability that the result of the proceeding would have been different.

Vialva's first specific allegation of ineffective assistance is that "Mr. Goains asked no questions about the acquisition of gunshot trace evidence" (Motion at 36 (citing 1779)). An examination of the transcript shows that Special Agent Jonathan Blair, of the Army's Criminal Investigation Command, testified on direct examination: that finding trace evidence of barium and antimony may be evidence of gunshots being fired; that areas of the palm and hands are swabbed from suspects and tested for this trace evidence; that this evidence "can be lost very easily"; and that it is standard procedure to make these tests, even if the evidence may have been lost, "whatever" number of hours or days have past. (1772-77).   Agent Blair collected the kits for Vialva, Bernard, and Brown (1775). Agent Blair reiterated that "[b]ecause we are dealing with trace evidence . . . [it] can be destroyed or be lost very easily" (1777).

It was certainly not ineffective assistance not to cross-examine the brief testimony of this collection agent.  Further examination would have caused him to state a third time that this trace evidence can be destroyed or be lost very easily.

50

Next, Vialva's second, and related, specific allegation of ineffective assistance is that "Mr. Schwieger, under the direction of Mr. Goains in the first stage, failed to cross examine government witnesses on chemical testing for gunshot residue" (citing 2282).

The record shows that this witness, Henry Amen, a Trace Evidence Specialist with the Texas Department of Public Safety Crime Lab in Austin, testified that one of his jobs as a Trace Evidence Specialist was to take the swabs, put them in a liquid to separate the residue, and then use an "inductively coupled plasma" instrument that tests an electronically charged fine vapor for the wavelength of light, and thus, identifies the presence of barium, antimony, and lead (2280). Prior to testing on the samples in the gunshot residue kits, however, Amen considered a notation on the samples and determined that they had been collected "beyond four hours from the time the incident occurred" (2279). Based on his training and experience, and based on the DPS "procedural guidelines," Amen made no tests on the kits because of the lack of probability that any residue would remain after that amount of time and the lack of reliability, the danger of false positives from contact with other areas that might contain those trace elements ("our procedure . . . is that after four hours, we do not do analysis on gunshot residue kits") (four hours is the "scientifically accepted cutoff time, after which those kits are not analyzed) (2279-82). Amen's final bit of testimony

51

(from a total of only seven pages) was that those kits would not render any type of useful evidence (2282). Mr. Schwieger had no questions on cross-examination on behalf of Vialva (2282). Bernard's lawyer, Mr. Hunt also elected not to cross-examine the technician who performed no tests.

Years after the fact, Vialva has found an expert who asserts, *inter alia*: that the swabs on Vialva were taken more than eight hours after the shootings; that the atomic absorption test, the one discussed by the DPS expert at trial, is the older of the two principal methods of gunshot residue analysis; and that scanning electron microscopy is the other principal and more "modern" and more "sensitive" method (Vialva's Exhibit II-H). Thus, in his motion, Vialva argues that counsel was ineffective for not cross-examining Blair and Amen as to their "outdated and outmoded tests" that were insufficiently sensitive (Motion at 36).

This argument is without merit. Vialva received the benefit of a lack of evidence of residue linking him to firing a weapon. Mr. Goains followed what is often the best strategy, to not ask questions and present the lack of evidence in argument. For example, in his closing argument, Mr. Goains stated:

> How about gunpowder residue? Was there any found on Mr. Vialva's hands? Was there any gunpowder residue found on his clothing? Absolutely none. Of course, the Government is going to tell you that, "Well, listen, after four hours you can't find gunpowder residue.' Well, Ladies

52

and Gentlemen, you get to use your own reason and common sense, These Defendants were arrested immediately out there on that road. No one was allowed to leave the scene. You absolutely heard no evidence that anyone was allowed to wash their hands or take a shower. And I'll tell you what, Ladies and Gentlemen, if they had of found residue on Mr. Vialva's hands and – or on his clothing, I guarantee one thing, you would have seen it then, and they would have been telling you that test was very, very accurate.

(2622, 2625-26). Thus, strategically, defense counsel used the lack of results and the type of test to his advantage.

Vialva has not met his burden of making the necessary demonstration under this issue. First, even under Vialva's imaginative theories for not asking questions, Mr. Schwieger had no potential conflict. The transcript does not indicate any instruction by Mr. Goains to Mr. Schwieger to refrain from asking any questions. Also, Bernard's counsel had no potential conflict. Thus, Vialva's theory involves the mere speculation that Mr. Goains wanted to please the prosecution to the detriment of his client (an unwarranted assumption according to *Horton*, 845 F.2d at 1418 (a court "will not indulge in the presumption that a defense attorney who is being considered for a position as United States Attorney is unable to represent a defendant in federal court to the best of his ability and with defendant's best interests in mind")). Vialva's theory further speculates that somehow, Mr. Goains, as a direct consequence of the alleged

conflict, convinced Mr. Schwieger not to ask any questions. This speculation is unsupported and unwarranted.

Second, although criticizing methodology was a possible avenue of cross-examination, it was not unprofessional strategy to simply accept, at this early stage of the trial, this lack of evidence against his client, and argue that lack of evidence in closing. There was no great opportunity missed. Vialva has failed to demonstrate that counsel's decision was below the wide range of reasonable professional assistance. Next, Vialva has completely failed to show that the alleged ineffective assistance, or lack of questioning here by Mr. Schwieger, resulted from Goains' active conflict of interest. Finally, there certainly was no *Strickland* prejudice. The evidence against Vialva was overwhelming. Vialva was caught with his gang confederates yards away from the burning bodies of the victims. The .40 caliber Glock was found nearby. All of the witnesses reflected that Vialva planned on killing the Bagleys and he was the shooter. Indeed, there is no viable alternative explanation. There could be no outcome-affecting prejudice.[22]

---

[22]

Vialva claims that Mr. Goains missed the opportunity with some witnesses to show that he had "no 'leadership' role in the gang" (Motion at 37). This fact was established, however, by other evidence. For example, Brown testified on cross-examination by Mr. Goains that in the Two-One-Two PIRU gang there were no leaders ("everyone is considered equal") (1937). Lewis testified on cross-examination by Mr. Goains that he did not know who was the "leader" of the Two-One-Two PIRUs, or who "held the crown" (2397). Vialva also complains that testimony about the gang being nationally affiliated should have been challenged. That complaint is without merit. Many witnesses

Vialva also complains of Mr. Goains' lack of cross-examination of Brown as to his potential exposure to the death penalty in state court, and Vialva's belief that there was a "deal" which eliminated that exposure (Motion at 38).[23] As can be seen from the transcript, Brown was cross-examined vigorously by Mr. Goains. Brown's motivation for cooperating was covered in cross-examination. After Bernard's counsel established that "the bottom line" of his plea agreement was for Brown to "get a lower sentence" (1957), Mr. Goains got Brown to acknowledge that although, at trial Brown was admitting to more conduct that he did in earlier statements, he was not "protected" by his "plea bargain agreement" (1962).[24] Vialva has failed to demonstrate that counsel's decision was below the wide range of reasonable professional assistance. Vialva has completely failed to show that the alleged ineffective assistance, or lack of questioning, resulted from Mr. Goains' active conflict of interest. Finally,

---

testified the Two-One-Two PIRU gang was part of the Bloods.

[23]

Apparently the source of Vialva's belief that there was an agreement as to the state death penalty is Brown's years-after-the-fact declaration in support of Vialva's motion (Vialva's Appendix, Volume I, Tab II-J). This declaration, however, makes no mention of the state death penalty or any "deal" involving the state death penalty.

[24]

In closing argument Mr. Goains' co-counsel reminded the jury in discussing the witness relationship factor: "Well what about Terry Brown? What about the Plea Bargain Agreement that he had with the Government. Recall who decides whether Terry Brown and the other Defendants are telling the truth in this matter. . . . in order for them to benefit, – and that's what they are looking for, a benefit – the Government decides whether they are telling the truth in this matter or not." (2614).

55

Vialva certainly has not demonstrated *Strickland* prejudice.

Vialva also complains that cross-examination should have been used to emphasize the lack of forensic evidence linking him to the crime. Further, Vialva believes that the prosecutor's statement that the physical evidence and the non-criminal witnesses "explain and support the facts" should have been vigorously objected to as false. But, of course, the prosecutor's statement was not false. The getaway car, yards from their immolated victims, was physical evidence. The Glock .40 caliber murder weapon, thrown into the nearby bushes was physical evidence, as were the discarded clothes and lighter-fluid cans. ATM evidence was also supportive. Nevertheless, in his closing argument Mr. Goains emphasized: "Well, let's start with the physical evidence and let's ask ourselves, Ladies and Gentlemen, is there any trace evidence to link Mr. Vialva with the murders of Mr. and Mrs. Bagley? And, Ladies and Gentlemen, I submit to you, there's absolutely zero" (2624) (with Mr. Goains going on to highlight the lack of hair, blood, fingerprints, and gunpowder residue (2624-25) (and later reiterating "the bottom line is this. The physical and trace evidence to directly link those murders to Mr. Vialva is zero" (2626))).

Again the strategy of using the lack of evidence in argument was sound. Vialva has failed to demonstrate that counsel's decision was below the wide range of reasonable professional assistance. Vialva has completely failed to show that the

2241

alleged ineffective assistance, or lack of questioning, resulted from Mr. Goains' active conflict of interest. Finally, Vialva certainly has not demonstrated *Strickland* prejudice.

### Mr. Goains Was A Vociferous Advocate

Finally, the record shows, and this Honorable Court could find, that Mr. Goains was a very active advocate for Vialva. He frequently objected to government witness' testimony. As noted above, Mr. Goains' argument was that there was "zero" forensic evidence linking Vialva to the shootings (2624, 2626), and that the witnesses had lied so many times, and had such a large interest in pleasing the government[25] that they should not be believed.[26] He argued that the witnesses had been coached and had refined their testimony. The problem for the defense was that they were caught yards away from their victims, a lot of physical evidence was discovered where defendants had stashed it, and the gang members' testimony at trial was very believable and largely corroborated.

---

[25] For example Mr. Goains argued: "Mr. Brown and Mr. Lewis have every reason to lie. They have every reason to change their stories. You see, now they have a Plea Bargain. The Government, they hope, is going to ensure that they get a lesser sentence" (2627).

[26] Another example of Mr. Goains' argument was that: "Brown testified that Bernard started the fire. Well, what did Lewis' statement say? Lewis' statement was that, 'I don't know exactly what he, Vialva, used to light the fire. It might have been the cigarette he had lit when he first got out of the car.' Of course, again, Ladies and Gentlemen, their testimonies have changed. And, of course, none of these witnesses were coached to say anything" (2629).

## Conclusion

Vialva failed to raise this issue in his direct appeal and it is procedurally defaulted. "[T]he mere fact" that an attorney may have future employment plans with the prosecutor's office does not create an actual conflict. *Garcia*, 33 F.3d at 1199. Vialva's underlying assumptions are entirely unwarranted. An attorney wanting to be hired as a prosecutor would want to demonstrate that he is an outstanding trial lawyer, not that he is weak. And although it may be conceivable that an unprincipled defense attorney in line for a job as a prosecutor might take an action contrary to his client's best interests, "that is too fanciful upon which to base a per se rule of conflict"; a court "will not indulge in the presumption that a defense attorney who is being considered for a position as United States Attorney is unable to represent a defendant in federal court to the best of his ability and with defendant's best interests in mind." *Horton*, 845 F.2d at 1418. Mr. Goains presented the potential for conflict to his client and the court. In the instant case, there was no *per se* conflict, and Vialva has not shown that Mr. Goains had an actual conflict of interest, or that he actively represented conflicting interests. Vialva knowingly and voluntarily waived any conflict. Vialva has not demonstrated ineffective assistance caused by a conflict or *Strickland* prejudice.

2243

## VIALVA'S GROUND THREE

## VIALVA'S *BRADY* CLAIMS ARE PROCEDURALLY DEFAULTED; VIALVA HAS NOT ESTABLISHED A *BRADY* VIOLATION; VIALVA HAS NOT SHOWN ANY SIGNIFICANT EVIDENCE THAT WAS WITHHELD AND THAT WOULD HAVE CAST DOUBT ON THE TESTIMONY OF BROWN AND LEWIS; VIALVA HAS NOT SHOWN ANYTHING THAT UNDERMINES CONFIDENCE IN THE OUTCOME OF THE TRIAL

(Responsive To Vialva's Ground III, 41-60)

### General Background And Overview

Prior to trial, the government had an "open file" discovery policy for the two defense teams.  There would not have been a record of everything counsel examined.

The essence of this claim is that evidence of prior inconsistent debriefing statements was withheld that would have significantly aided in the impeachment of two of the co-defendants that testified at the trial: Brown and Lewis.  As discussed in this section, the prior inconsistencies between their prior statements and their trial testimony were extensively utilized and exploited by Mr. Goains, and other defense counsel, in cross-examining Brown and Lewis, and in final argument to the jury.

Vialva has not shown a reasonable probability that any evidence he now points to would have changed the result of the trial.  As discussed elsewhere, there was an avalanche of evidence against Vialva. Vialva and the other defendants were apprehended literally yards from the immolated bodies of their victims.  All of the

59

evidence points to Vialva's leadership in the crimes. The .40 caliber murder weapon could not have been viably placed in the hands of any of the other defendants. Inconsistencies between the statements and the testimony of the co-defendants had already been highlighted for the jury. The additional evidence Vialva now points to would have been largely cumulative.

### Standards Of Analysis

The starting premise with regard to a *Brady*[27] claim is that "the prosecution has a duty to turn over impeachment evidence favorable to an accused when 'there is a reasonable probability that, had the evidence been disclosed, to the defense, the result of the proceeding would have been different.'" *United States v. Hughes*, 230 F.3d 815, 819 (5th Cir. 2000) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "There are three components to a *Brady* violation. First, the evidence must be favorable to the accused, a standard that includes impeachment evidence. Second, the State must have suppressed the evidence. Third, the defendant must have been prejudiced" (which is "the materiality component"). *Id.* (citing *Strickler v. Green*, 527 U.S. 263, 281-82 (1999)).

"The materiality inquiry turns on the question of whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as

---

[27] *Brady v. Maryland*, 373 U.S. 83 (1963).

to undermine confidence in the verdict.'" *Id.* (quoting *Kyles v. Whitley*, 154 U.S. 419, 435 (1995)). It is the defendant that "has the burden to establish a reasonable probability that the evidence would have changed the result." *Id.* (citing *Strickler* at 291). If there is more than one violation, the cumulative effect must be considered. *Id.* (citing *Kyles* at 421-22). If a reviewing court finds that the defendant did not establish a reasonable probability that the evidence in question would have produced a different result, the other *Brady* components need not be considered. *Id.*

### Background: Defense Counsels' Cross-Examination Of Brown

Background: Cross-Examination Of Brown
By Vialva's Counsel, Mr. Goains

First to cross-examine Brown was one of Defendant Vialva's attorneys, Mr. Goains. Brown testified that in the "Duce-Nine Bloods," as in the "Two-One-Two PIRU" gang, there were no leaders; "[e]veryone is considered equal" (1937).

The defense went on to examine Brown's motivation, eliciting from Brown that he agreed to cooperate "a short while" after he was arrested "for the purpose of getting a lesser sentence" (1937). While his plea agreement required him to testify truthfully, Brown agreed with defense counsel that "the U.S. Attorney had the sole discretion to determine whether you're telling the truth" (1937-38).

Next, the defense explored perceived inconsistencies in Brown's prior statements (1938-40). Defense counsel elicited from Brown that it was true that he had given several prior statements (1938).

Defense counsel asked Brown: "And in each of these statements, you changed your statements, didn't you?" (1938). Brown responded: "In each statement, it wasn't a matter of changing it. It was a matter of adding more detail . . . of being more specific" (1938).

Defense counsel replied (1938-39):

> Okay. We're going to go through those in just a minute. But my question to you, isn't it true that each of those statements are dramatically different?

Brown responded "No, sir" (1939).

Defense counsel then produced Defendant's Exhibit 5, Brown's statement at the Army's CID office (1929). Counsel read portions from this statement, and Brown agreed that he said in this statement that: he was at a friend's house (Billy Rorie's house), when Brandon Bernard came by in his car, a gray Park Avenue, and picked him up; at "18:30 or 19:00," which would be "about 6:30 to 7:00 o'clock" (1940). Defense counsel asked, based on Brown's prior statement that the first time he saw Vialva was between 6:30 and 7:00 p.m., "That's not even close to the information you just gave this jury, correct? (1940). Brown responded (1940):

62

2247

> The first statement that I made was like I said in the CIA (sic) office, that was before the deal was even approached, and this was before any information was known on the matters.

It was then reiterated that Brown's statement "was before they cut you any kind of deal," and "before anything was even known" (1940).

Defense counsel focused on further inconsistencies. Initially, in this statement, Brown denied knowing: who set "the car on the hill" on fire; how the vehicle found to be on fire had arrived at that spot; and who killed the people found in the trunk of the burned vehicle (1941). Defense counsel made the point: "[That is a] little different statement that you just gave to the jury, wouldn't you agree with me?" (1941). Brown replied (1941):

> Yes. And like I noted, that was way before any of this had came into action , before the deal was offered. And like I said, that was before that they even knew that we had did the crime.

Brown testified that he did not make his "deal" with the government until "a few months" after his arrest (1942).

Defense counsel then turned to another voluntary statement given by Brown "a little bit later," at 12:30 on June 22 (1941-42, 1944; Def.Ex. 6). Defense counsel first reviewed a portion of Brown's direct testimony (1942-43):

> Now, if I heard you correctly, when you just testified to the

63

jury, you told them that you were standing approximately in this area (Indicating), is that correct, when the first shot was made?

Brown replied: "No sir. . . . I stated that I was standing on that side of the car, but further back. . . . I said that's the position that I was standing there when they – when he was talking to Christopher Lewis and Brandon Bernard" (1942-43).

Defense counsel asked: "How far back" (1943). Brown responded: "Far back enough where I couldn't see the back of the trunk. I had a good view of Mr. Bagley, though" (1943). Brown estimated his distance from the car as: "I imagine about from here to the big-screen TV, maybe" (1943).

As to Vialva's position in relation to the Bagleys' vehicle, the following exchange took place (1943):

Q. Okay. And where did you state Mr. Vialva was?

A. Right by the – by the tail light of the – that side, yes.

Q. Right here, sir (Indicating)? How far back?

A. It wasn't far back.

Q. A foot, two foot?

A He was pretty close.

As to the position of Mr. Bagley, and Brown's position at the time of the shootings, the following exchange took place (1943-44):

64

Q. Now, you said you could see Mr. Bagley. What position was Mr. Bagley in?

A. He was laying down on his right side.

Q. Okay. Now that's what you just told the jury, correct?

A. Yes, sir.

Q. Isn't it true that you stated in your other statement, "I could see the trunk was shut. Vialva was outside of the car, behind the trunk, and was yelling at the man and the woman to be quiet. I stopped because I could not take it anymore. I turned around and started to walk down towards Brandon's car." Do you remember making that statement?

A. On the day that – the day after we were arrested?

Defense counsel then confronted Brown with other statements in Defendants' Exhibit 6, relating to the jury that Brown had stated in this statement: that "'When I got there, Brandon was already waiting at the car,'" and thus, that Brown "had totally left this position and went back to where Mr. Brandon's car was parked" (1944). Brown agreed that he previously had made statements to that effect (1944).

Defense counsel continued by reading Brown's statement of June 22, which included the assertion: "'Once I arrived at the car, I heard two shots.' Isn't that what you said" (1944). Brown agreed he had made that statement on June 22 (1944).

Defense counsel asked Brown to again "show us . . . where was Mr. Brandon's Vehicle?" (1944). Brown replied that "it was on the – on the right side, right past the

65

cattle guard" (1944). The spot was indicated to the jury on the map (1944-45).

Defense counsel reiterated that: "And you were all the way back here (Indicating), in this area, before you heard the two shots, correct?" (1945). Brown responded: "Yes, sir, that's what I said at that period of time" (1945).

Defense counsel then asked whether Brown had made the statement that "a car was carjacked at Mickey's" (1945). Brown replied: that he and Brandon had gone into the laundromat, they had come out, and the others were gone (1945).

Defense counsel established that Brown knew Andrea York (as his girlfriend that he "live[d] with") and Billy Rorie, and that Christopher Lewis was sometimes referred to as "Little Chris" (1945-46). Counsel asked Brown (1946):

> Isn't it true that you told Billy Rorie and Andrea York, "They said that 'Little Chris,' who is "Chris" Lewis, "had pulled a gun on the man and woman," isn't that what you told them?

Brown denied making that statement (1946). Brown denied making the statement that "'Little Chris' put the people in the trunk of the car'" (1947). Brown maintained that: "To this current day, I still don't know who put them in the car" (1947).

Defense counsel asked whether Brown's trial testimony, that he had conversations with Mrs. Bagley at Billy Rorie's house, was reflected in any of his prior statements (1947). Brown replied that he had provided this information in giving

66

prior statements but that he did not know whether it was included by the draftors of those statements (1947).

Counsel asked for a reason why "someone" would "put a mask on if they were fixing to shoot someone" (1947). Brown responded that he did not know such a reason (1948).

Brown again testified that the .22 caliber firearm belonged to Sparks, and the .40 caliber handgun belonged to Bernard (1948).

Finally, Brown could not estimate the time between purchasing the lighter fluid and the shootings (1948). Brown did say that they went "straight out that way" after he and Bernard met up with Vialva and Lewis (1948).

Background: Cross-Examination Of Brown
By Bernard's Counsel, Mr. Hunt

One of Bernard's attorneys, Mr. Russell D. Hunt, Jr., next cross-examined Brown (1948). Bernard's counsel reminded Brown that he had testified that merely because someone is a member of a gang, that does not mean that he will join with another gang member to commit a crime (1949). Brown agreed, and explained that:

> What was said is, just like – let's say, for instance, you're a Blood and I'm a Blood. Just because you're a Blood doesn't mean I'm going to do a crime with you. I can choose – you know, I might choose [to be] a regular person, so to speak. Just because you're with the organization doesn't mean that you do crimes together.

Counsel also elicited from Brown that merely because a person is a member of such an organization does not mean that the person commits any crimes (1949). Brown agreed with defense counsel that being a member of a gang can be "kind of like a neighborhood thing" with the "kids in the neighborhood," and that there are lots of different neighborhood gangs, and different neighborhood "Bloods" gangs (1950).

Bernard's counsel next pointed out that Brown's trial testimony had been that Bernard was a member of the "Two-One-Two PIRU" gang (1950). Defense counsel asked: "and that's not right, is it?" (1950). Brown agreed with counsel, Bernard instead was a member of the "Four-One-Five" Bloods gang (1950-51).

Defense counsel asked whether, when they were riding around the grocery store parking lots, "you certainly didn't encourage them to find somebody to rob, and tell them it would be a good idea to do that, did you?" (1951). Brown, however, admitted that "[a]t the IGA parking lot, I'd – I pointed out somebody that was riding [past]" (1951).

Counsel asked (1952):

> Okay. After there were a couple of abortive attempts where they sort of tried to talk to some people, didn't never get a ride, didn't do anything like that, and after you went to Mickey's the first time, did you all say anything to them like, "oh, you guys aren't really going to rob anybody. You aren't really going to jack anybody"

68

Counsel received the favorable reply from Brown that (1952):

> I can't recall if we had said it to them, but me and Brandon,
> I know we had discussed it. I don't remember if they were
> in our presence at the time.

Counsel recapitulated: "So, maybe when they were out running around, talking to people, you were talking to each other, saying, "oh, they're not really going to rob anybody," – (1952). Brown responded: "Yes" (1952).

Next, counsel's questions recounted that after they went to Mickey's, and the laundromat next to Mickey's, "and saw that the three young men, the two "Chris'" and Tony were not there anymore," Brown and Bernard went to the IGA parking lot, where there was an ATM machine, and then went to the Winn-Dixie where "[y]ou guys," "actually put in a job application" (1953). Counsel elicited that the purpose for applying was that they both really "wanted to get jobs" (1953).

Counsel again brought out that while Brown was in the park and Vialva said he was going to have to kill the people, Brown "doubted" Vialva "was actually going to do that" (1954). Counsel probed Brown for the basis of that knowledge, and Brown responded that he had known Vialva for "quite a while," and "I knew that wasn't the type of person that he was," and that he believed Vialva would not "go to that extent" (1954).

Counsel then focused on what Brown had told Bernard regarding his intentions

69

toward the Bagleys (1955). Counsel asked Brown (1955):

> Okay. Then, after you had the conversation where you say you didn't believe Vialva would really shoot the people, you said you got into Brandon's car, and told Brandon about the plan, but certainly, you didn't tell Brandon, "We're going to go out in the countryside and shoot these people," right?

Counsel received the response "No sir" (1955).

The following colloquy then took place (1955):

> Q. Okay. You didn't mention that part of it at all?
>
> A. I just basically told him the basics. I didn't know exactly what was going to happen, but I told him the basics.
>
> Q. Okay. That you all were going to go out to the countryside?
>
> A. Not basically the countryside, but that the car would be burned.

Counsel then recounted Brown's direct testimony that Brown put lighter fluid in the back seat and Bernard put lighter fluid in the front seat (1955). Counsel got Brown to agree that "after the shooting occurred," Brown "poured lighter fluid in the trunk" (1955).

Brown agreed that he thought the people were dead already (1956). Brown did not put lighter fluid into the trunk to "torture" the people in some way (1956).

70

Counsel clarified that "Chris" Lewis was called "Little Chris" to differentiate him from "Chris" Vialva (1957). Also, Tony Sparks was known as "Little Goldie" to differentiate him from Vialva, who was known as "Goldie" (1957).

Finally, Bernard's counsel focused on the benefits Brown received from his plea agreement and his motivation for cooperation (1957-59). Counsel was able to get Brown to agree that "the bottom line" of his plea agreement was so Brown "would get a lower sentence (1957).

Counsel also said: "Certainly, you know you're not going to be put to death for these cases, as long as you comply with your plea agreement, is that right?" (1958). Brown replied affirmatively (1958).

Bernard's counsel asked Brown some questions concerning Brown's counsel's advice (1958-59). Brown revealed that his counsel advised him that taking the plea agreement "was a lot better than what I would get, you know, trying to take it to trial" (1958-59).

Background: Redirect-Examination Of Brown

The prosecutor's redirect touched on only a few points, which was covered in less than three pages of transcript (thereby limiting further re-cross examination) (1959-61). Brown agreed that as part of his plea agreement he had waived his status as a juvenile (1959). Brown understood that under federal law, juveniles could not

71

be executed (1959).

As to the two statements he made right after he was arrested, Brown agreed that he "did not tell the full truth in those statements" (1960). Brown was asked whether he also omitted in those statements the fact that he "had poured lighter fluid on the car and in the trunk of the vehicle" (1960-61). Brown asserted that when he made the first statement, the authorities had little to no information (1961). And when he made the second statement, the authorities in the Army's CID office had some information, and that Brown "just confirmed, basically, whatever he said" (1961).

Brown agreed that the information in his trial testimony about what he himself did in committing this crime, he "didn't even put in those statements" (1961). In his trial testimony he was "not only telling more on other people," but he was "telling more" on himself (1961).

Background: Re-Cross Examination Of Brown

Finally, Vialva's counsel asked "[j]ust a couple of follow-up questions (1961). Brown acknowledged that although, at trial, he was admitting to more conduct than he did in his earlier statements, he was now "protected" by his "plea bargain agreement" (1962).

Vialva's counsel quoted part of one of Brown's prior statements where he said "'I told them that we would take them to the park, then call the police and tell them

72

where they were'" (1962). He further quoted from the statement that Brown said "I told both Lewis and Vialva to take them to the park and leave them there and we would call the police" (1962). Counsel asked: "Does that sound like – I mean, you're basically the one giving the orders?" (1962). Brown replied that they had asked him what course of action to follow, and "that was the only thing that I could think of" (1962).

Counsel followed up on Brown's assertion that for the second statement he had "basically just confirmed what the officer had said" (1963). Counsel asked Brown if he made the statement or the officer made the statement (1963). The following colloquy then took place (1963):

> A. He just told me that basically I knew the information that they knew, and that's what I said. I didn't tell them about me doing anything. I didn't make those statements until later on.
>
> Q. So, you're saying the officer told you what happened, you agreed with it, and that's what's in this statement?
>
> A. Not actually told me everything that happened, but he knew who the shooter was.
>
> Q. And you agreed with that?
>
> A. Yes.

**Vialva Has Not Avoided Procedural Default On His *Brady* Claims;
Vialva Has Not Shown The Specified Evidence Was Favorable;
Vialva Has Not Shown The Specified Evidence Was Suppressed;
Vialva Has Not Shown  Prejudice, That The Specified Evidence
Would Have Put The Whole Case In A Different Light**

General Claims

Vialva's exact claims of suppressed evidence are somewhat difficult to unravel. Vialva seems to be asserting that his counsel did not receive the prior inconsistent statements of Brown and Lewis.  As shown above, however, Vialva's counsel was armed with their prior statements and the admissions that initially both Brown and Lewis lied and lied extensively as to their part in the crimes and the role of their fellow gang members.  In fact, the gist of Brown's testimony was that he initially denied everything and then only admitted facts during subsequent interviews and statements as those facts became known to the investigators. It was only after each of them had decided to fully cooperate and testify, that they revealed the truth about the murders and their part in the murders.  This background was fully explored before the jury. The jury chose, nevertheless, to believe their compelling trial testimony. After acknowledging dozens of omissions and inconsistencies in prior statements, other omissions and inconsistencies of the same nature in other statements would have been cumulative and not material.

74

## Procedural Default

A defendant's collateral attack on a conviction "may not do service for an appeal." *Frady*, 456 U.S. at 165-70. Therefore, a defendant who raises a constitutional or jurisdictional claim for the first time on collateral review, when those claims could have been asserted on direct appeal, must show both cause for his procedural default and actual prejudice due to any such errors. *Id.* Significantly, the cause and prejudice standard is more rigorous than the plain error standard used on direct review. *Id.* at 170. Bernard had the assistance of two fine appellate lawyers for his direct appeal. Bernard failed to raise these claims on direct appeal. He has not shown cause and prejudice regarding this failure. These *Brady* claims have been procedurally defaulted.

## Vialva Admits Disclosure Of Multiple Prior Statements

Under the heading "Information Disclosed to the Defense Prior to Trial," Vialva's motion admits that substantial evidence for impeachment of Brown and Lewis was disclosed to the defense prior to trial (Motion at 46-49). The first example is Brown's first statement, taken by CID Agent Meraz, the "Sworn Statement of Terry Brown," dated June 22, 1999, at 5:42 a.m., which Vialva characterizes as "completely false in all material respects." Thus, with this first statement the defense team had abundant impeachment evidence for Brown's trial testimony.

75

Next, at 4:30 p.m. on the same day, June 22, "Terry Brown signed a second statement" (Motion at 46). Vialva states in his motion that:

> In this version, Mr. Brown claimed he twice attempted to persuade Mr. Vialva to leave the Bagleys' automobile in the park and they will call the police. Mr. Brown claimed Mr. Vialva said the victims "knew too much." Mr. Brown gave an account of driving to Old Nolanville Road with Brandon Bernard, approaching the Bagley's vehicle, but turning around "because I couldn't take it anymore," and returning to where Bernard was standing with his automobile. In this version, Mr. Brown did not see who shot the Bagleys or who set the fire.

Thus, although Brown related some of the same evidence in his trial testimony, the defense team had even more ammunition to cross-examine Brown on discrepancies.

Next, Vialva's motion cites to "Agent Nelson's activity log" which reflects that Mr. Brown told the agent "he had not been totally truthful" (Motion at 47). According to Vialva, Agent Nelson's log reflects that Brown was re-interviewed on and off approximately 12 times (id.). Vialva states that the notes further reflect that Brown incrementally provided further details, requested time to "think about a particular incident, and would then "provide info consistent with BERNARD's statement" (id.).

Vialva's motion quotes from the "Final CID Report" which notes that: "Agent's comment: A sworn statement was not taken by SA NELSON as the US Attorney and SA CHADWICK stated no further written statements would be taken" (id.).

76

Vialva's motion then states that the CID report reflects that Bernard was interviewed at an unspecified time on June 22. In that interview "Mr. BERNARD stated Mr. VIALVA shot Mr. T. BAGLEY and Mrs. S. BAGLEY in the head, then started the vehicle on fire" (*id.*).

Vialva's motion then quotes from a photocopy of FBI Agent Evan Rae's handwritten notes, dated June 29, 1999, which reflect that "Mr. Bernard admitted buying the lighter fluid with Terry Brown and witnessing 'both Chris were pooring [sic] lighter fluid inside the car" (Motion at 48). The motion notes a lack of a statement from Bernard about Vialva's participation, and a lack of documentation (*id.*).

Vialva's motion next notes a statement of Game Warden Volk "to CID" in which the agent recounts seeing a blood spatter on the roadway where one of the subjects was located, and a "sweeping motion" by that subject as if to cover the blood spatter, and later that the game warden reported seeing blood on Vialva's shoe (Motion at 48-49).

Finally, Vialva's Motion cites to the "Final CID report" concerning "a debriefing of Mr. Brown in the presence of his court appointed attorney, indicating that: "Mr. Brown said he and Mr. Bernard purchased the lighter fluid in the automobile, but maintained he poured it on his undershirt"; Mr. Brown said Mr.

Vialva shot Mr. Bagley 'in the head,' but Mr. Brown 'claimed he turned away' before Mr. Vialva fired the second shot" (Motion at 49). The notes indicate the debriefing ended with the agent's comment that "no written statement was taken from Master BROWN at the time because the investigators believed Master BROWN was not completely truthful in all his testimony" (*id.*).

<u>Vialva's</u> <u>Specific</u> <u>Claims</u> <u>Of</u> <u>Brady</u> <u>Violations</u>

*The Specific Claims*

Vialva's specific *Brady* violation claims seem to be under the heading "Material Information Suppressed by the United States" (Motion at 49-54) and other headings (54-57). Some of his claims are not separately delineated.

*Failure Of Agents To Record All Of Brown's Statements*

Vialva's first specific claim of improperly withheld evidence is that after Brown gave two written statements, and had admitted that he had not been completely truthful, the agents, and "the government," somehow violated *Brady* by failing to record Brown's further statements. This claim is without merit. First, Vialva cites no authority to the effect that an agent has an obligation to reduce a statement to writing when the agent is convinced that a suspect is not being truthful, or that this is a *Brady* violation. Second, the lack of a written statement is described in the "Final CID report." Vialva does not claim that this report was suppressed. Thus, this further-

78

2263

statements claim could have been made on direct appeal. He has shown no cause and prejudice for its omission. The claim has been procedurally defaulted. Third, Vialva has not shown the evidence was favorable. Fourth, Vialva has not shown evidence was suppressed. Fifth, Vialva cannot show materiality. Again and again, in Brown's trial testimony, Brown explained that his initial statements had not been completely truthful, that he had falsely mitigated his own conduct and the conduct of fellow gang members. In fact, he said he would admit a fact to agents only when they had learned of it independently. Thus, this "evidence" would have been completely cumulative. Finally, the essential evidence is that Brown saw Vialva shoot Mr. Bagley. There was no evidence from any witness that another person shot Mr. Bagley.

*Brown's Statement About Lighter Fluid, And Other Statements*
*At The Debriefing On November 5, 1999, With His Counsel*

Vialva's next specific *Brady* claim is that "the government bears responsibility for suppressing the substance of a debriefing conducted by Agent Chadwick and ATF Agent Myers on November 5, 1999, in the presence of Mr. Brown's counsel," where during that debriefing, Brown stated: "Terry [Sparks] put lighter fluid in the trunk right after the shooting, then Brandon threw the match through the front window of the passengers seat" (Motion at 50 (citing the "Notes of Robert Swanton")). Vialva further contends that Brown's statement at the November 5 debriefing is at variance

from the factual basis for Brown's plea, which provided that "Before the trunk was shut, and at the direction of Vialva, Brown poured some lighter fluid into the trunk area. At the direction of Christopher Vialva, Bernard then lit a match and threw it inside the vehicle" (id.). Vialva claims that the absence from Brown's debriefing of evidence concerning Vialva's leadership and orders could have been used in impeaching Brown. Vialva also claims that Brown's debriefing information is contradictory to evidence that "the windows in the automobile were up at the time of the fire."

Vialva further claims that "[t]he matches were an area of weakness" in Brown's testimony, as Brown testified that he went back into the Mickey's store to get matches, but that after the fire was started the matches that he had gotten from the store were on the front passenger's side of Bernard's car (Motion at 50-51).

Finally, as part of this claim, Vialva complains, based on hints in written telephone messages, that government agents apparently interviewed Brown on March 15, 2000, and interviewed him prior to trial on "May 25 and June 8, 2000" (Motion at 51). Vialva says he has no information regarding these interviews as "it appears the government suppressed any information that was inconsistent with or contradictory to the final version of events presented to the jury" (id.).

This specific claim also is without merit. Basically, Vialva is complaining that at the November 5, debriefing Brown gave a statement about Sparks putting lighter fluid in the trunk right after the shooting, and then Bernard throwing the match through the front window of the passenger's seat, and that Brown's counsel recorded the statement in his notes but that the agents failed to do so. First, Vialva has not shown that an agent has a non-discretionary obligation to continue to take notes when the agent believes the witness is not being truthful, or that this is a *Brady* violation.

Second, Vialva's counsel made this discovery by starting an inquiry based on the "CID report" which discussed the fact of the November 5 debriefing. Thus, this claim could have been made on direct appeal by his appellate defense team, who had every incentive to discovery potential *Brady* violations. He has shown no cause and prejudice for its omission. The claim has been procedurally defaulted.

Third, Vialva has not demonstrated that any evidence from Brown's November 5 debriefing was favorable. Evidence that Vialva poured lighter fluid would have been consistent with Lewis' trial testimony that he saw Vialva pour lighter fluid (2372), and it would have been further evidence against Vialva.

Fourth, Vialva has not shown the evidence was suppressed. His suppression theories are speculative.

Fifth, Vialva cannot show materiality. Again and again, in Brown's trial

81

testimony, he explained that his pre-trial statements had not been completely truthful, that he had falsely mitigated his own conduct and the conduct of fellow gang members. In fact, he said he would admit a fact to agents only when they had learned of it independently. Thus, this "evidence" would have been completely cumulative.

Furthermore, there has been no showing that Brown's counsel's notes were accurate and complete, or that he retained a complete set of notes.

As to the specific statement Vialva claims was somehow suppressed, Brown's November 5, statement, which apparently, according to Brown's attorney's notes, provided that "Terry [Sparks] put lighter fluid in the trunk right after the shooting, then Brandon threw the match through the front window of the passengers seat," Vialva has not shown it to be material. Brown's trial testimony was: that he and Bernard spread the lighter fluid in the interior of the vehicle (1918-20), that he saw Vialva shoot Mr. Bagley but that he turned away as Vialva shot Mrs. Bagley (1924-25), that he put lighter fluid in the trunk (1929), and that he did not actually see Bernard set the car on fire (1926, 1928-29), but that, based on the relative positions of the defendants who were not then running down the hill, Bernard was the likely starter of the fire (1929-30). Thus, the inconsistencies would have been that Brown admitted at trial that he poured lighter fluid into the car, something he previously attributed to Sparks, and that the match would have come through an open car door

82

(perhaps at window height) instead of an open car window. As discussed above, Brown acknowledged that in his prior versions of events he had not told the complete truth. The jury was free to decide if Brown's trial testimony was credible, even in light of his past omissions and inconsistencies. These matters would have been cumulative to the impeachment that was performed by the defense teams. The debriefing statement, even if accurately recorded by the lawyer, was not material.

As to Vialva's immediate direction to pour the fluid and light the match, The evidence was that Vialva "insisted on killing the Bagleys and burning their car to eliminate the witnesses and the gangs' fingerprints." *Bernard*, 299 F.3d at 472. He insisted on this course of action a number of times. Whether Vialva gave the immediate directions again or not, the other gang members were clearly following his wishes.

Finally, as to Vialva's materiality argument that the matches were "an area of weakness" in Brown's testimony, Brown testified at trial that while running down the hill, he looked back and he observed that the Bagleys' vehicle had been set on fire (1926, 1928-29); he also saw that the trunk of the Bagleys' vehicle had been closed, but he did not see who had closed it (1930). At the time of the shooting, Lewis was running down the hill (1925). After Brown saw that the car was on fire, he observed Bernard start to run away from the car (1929). Vialva's position remained behind the

83

trunk of the car (1930). Brown testified that, based on these observations, the only person who could have lit the Bagleys' vehicle on fire was Bernard (1930). Brown then switched shirts with Lewis (1930-32). Bernard also then had run down the hill (1931). Brown noticed the book of matches they had obtained from the Mickey's store were on the front passenger's side of Bernard's Buick (1931). Brown could not say whether Bernard had then put the matches back into the car, or whether the matches had remained in the vehicle (1931). Thus, based on the trial testimony, Vialva's counsel was free to argue that the lack of matches was a weakness in the case, while the prosecution could argue that Bernard could have used the matches and then returned them to the car.[28] Vialva has not shown suppression of material evidence that could have had an influence on the outcome of the trial.

### Brown's Prior Criminal Record

Next, Vialva seems simply to note that at the November 5, 1999, debriefing Brown admitted to: selling a stolen firearm to Bernard, engaging in burglaries, beating a man during a fight at a carnival, participating in a drive-by shooting, his continuing affiliation with the Bloods, possession of a firearm, and "pointing a firearm at the back seat of the Bagley's automobile and offering to kill the Bagleys" (Motion at 52). To

---

[28] Additionally, the presence of matches is not in any way surprising. Vialva smoked cigarettes and cigars. Vialva had purchased cigarettes and cigars that afternoon.

84

the extent this is a *Brady* claim, it fails for lack of specificity. The claim also fails for any number of reasons.

First, Brown's criminal incidents could have been discovered through the exercise of reasonable diligence. Vialva and Brown together participated in dozens of burglaries. They were gang members who previously had acted together in gang activities. Vialva would have known about Brown's criminal history or would have known who to contact for further information.

Second, this claim could have been made on direct appeal by his appellate defense team, who had every incentive to discovery potential *Brady* violations, such as withholding of Brown's prior criminal record. He has shown no cause and prejudice for its omission. The claim has been procedurally defaulted.

Third, Vialva has not shown the evidence was suppressed. He has not shown that the government withheld information concerning Brown's prior criminal record.

Fourth, Vialva cannot show materiality. At the beginning of his direct testimony at trial,      Brown related that he had pleaded guilty to aiding and abetting the murder of Todd and Stacie Bagley, and to possession of a .22 caliber pistol during that offense (1855-58). At the time of his testimony, he was awaiting sentencing on those charges (1857). Brown's prior criminal record of convictions consisted of a conviction for trespassing, one or two years prior to this testimony, for which he had

85

gone to jail and paid a fine (1859-60). Brown stated that Vialva and Bernard were members of a Killeen gang, the "Two-One-Two PIRU," which was affiliated with the national "Bloods" gang (1861). Brown also became a member of the "Bloods" gang, after he had joined the "Duce-Nine Bloods" in Omaha, Nebraska (1861-62). Brown testified that he felt a "bond" with other "Bloods" gang members (1862). This gang's territory included the Heather Glen and Long Branch neighborhoods (1864-65). It was "common" for members of the same gang to join together in committing crimes (1866-67). Brown testified extensively about possession of a firearm during the Bagleys' kidnaping, and taking a gun in hand and offering to shoot the Bagleys. (1866).

Thus, Brown's gang membership, past involvement in criminal activity, and his involvement in the instant offenses was explored before the jury. Any additional past bad conduct would likely not have had any additional marginal effect. Vialva has not shown suppression of material evidence that could have had an influence on the outcome of the trial.

### Plea-Negotiation Process

Vialva argues that "[t]he government did not disclose the full extent of its communications with Mr. Brown regarding the plea negotiation process" (Motion at 52-53). Specifically Vialva claims that "[a]lthough Brown's publicly filed plea agreement contained no promise for a downward departure, the subject was discussed

86

2271

by the parties to the agreement" (*id.*).  Vialva's proof for this assertion is that Brown's counsel said at sentencing that this Honorable Court should consider a downward departure based on an anticipated § 5K1.1 motion (*id.*).

Vialva also includes as a *Brady* claim that the federal prosecutor failed to disclose an understanding or agreement with state authorities regarding the potential for prosecuting Brown in state court.

This claim fails for a number of reasons.  First, the plea-agreement claim could have been made on direct appeal by his appellate defense team, who had every incentive to discovery potential *Brady* violations, such as claims of provisions in plea agreements with insider witnesses based on comments in sentencing transcripts. All of these matters could have been investigated.  Vialva has shown no cause and prejudice for its omission on direct appeal.  The claim has been procedurally defaulted.

Third, Vialva has not shown any evidence was suppressed.  Vialva merely speculates as to a secret agreements within Brown's plea agreement. Counsel's comment that he believed a substantial assistance motion could be forthcoming was wishful thinking.  Brown's statement in 2004, made for Vialva's habeas counsel, does not mention anything about the state death penalty.

Fourth, Vialva cannot show materiality.  As to Brown's actual understanding of his plea agreement, reflected in his testimony at trial, Brown explained that he was

87

awaiting sentencing on the federal charges (1857), and he had received no promises as to his sentence; it was "strictly up to the judge" (1858-59). On cross-examination, Bernard's counsel explored the benefits Brown received from his plea agreement and his motivation for cooperation (1957-59). Counsel was able to get Brown to agree that "the bottom line" for entering into his plea agreement was so Brown "would get a lower sentence" (1957).[29] Bernard's Counsel also asked Brown some questions concerning Brown's counsel's advice (1958-59). Brown revealed that his counsel advised him that taking the plea agreement "was a lot better that what I would get, you know, trying to take it to trial" (1958-59).

Thus, Brown's belief that his testimony could lower his sentence was fully explored before the jury, and was argued at closing in challenging his credibility. Vialva has not shown suppression of material evidence that could have had an influence on the outcome of the trial.

*Smoking A Blunt*

Vialva notes that "The United States was aware that another witness, Gregory Lynch, said Mr. Brown was smoking a 'blunt,' a 'cigar with marijuana,' when Mr.

---

[29] Bernard's counsel also said to Brown: "Certainly, you know you're not going to be put to death for these cases, as long as you comply with your plea agreement, is that right?" (1958). Brown replied affirmatively (1958).

2273

Sparks retrieved the Glock from Mr. Lynch. XI Tr. 2187" (Motion at 53).[30] Vialva cites Lewis' testimony at trial for this evidence.

This claim is also without merit. First, this claim could have been made on direct appeal by his appellate defense team. Vialva has shown no cause and prejudice for its omission on direct appeal. The claim has been procedurally defaulted. Second, Vialva has not shown any evidence was suppressed. Third, Vialva cannot show materiality. The jury heard that Lewis observed Brown smoking a "Blunt." The defense was free to argue that Brown's testimony consequently should not have been believed. Vialva has not shown suppression of material evidence that could have had an influence on the outcome of the trial.

[*Response To Redacted Argument Within Government's Addendum*]

[UP TO PAGE 92]

---

[30]

Vilava also notes that Brown has given a statement (on April 29, 2004) in which he admitted that he was smoking a "wet," a marijuana cigarette dipped in embalming fluid" (motion at 53-54). Vialva does not even intimate that Brown contemporaneously disclosed this information to agents or that the government withheld this evidence (*id.*).

91

*Christopher Lewis*

Next, Vialva makes a group of seemingly *Brady* claims in connection with Christopher Lewis.  Vialva first notes that Lewis initially gave a six-page statement "that "contained numerous false statements and omissions," and that Lewis acknowledged these false statements and omissions at trial (Motion at 54). This does not constitute a *Brady* claim..

Vialva states that the government confirmed only one statement had been disclosed to the defense.  Vialva does not identify another written statement.  He speculates that there were other written statements.

This claim has been procedurally defaulted.  Additionally, as discussed above, in *Hughes v. Johnson*, 991 F.Supp. 621, 639 (S.D.Tex. 1998), the habeas petitioner

92

speculated that there had been an undisclosed "internal DPS investigation" which allegedly yielded information inconsistent" with a state trooper's testimony, in violation of *Brady*. The court explained that these claims were not worthy of an evidentiary hearing to develop evidence, as there was no evidence of such an investigation, and petitioner had not made the required showing under *Brady* or *Kyles*. *Id.* Similarly, Vialva has not made the required showing.

Next, Vialva maintains that "[t]he government's suppression of Mr. Lewis's prior inconsistent statements is evident" (Motion at 55). Vialva, however, does not point to a specific statement that was withheld.

Vialva complains that while Agent Chadwick testified before the grand jury that "Mr. Vialva lit the fire in the Bagleys' automobile . . . Mr. Lewis's account of the events excluded him from being in a position to see who lit the fire" (Motion at 55). Lewis' trial testimony, however, is unambiguous in Lewis' admission that he was running down the hill and he did not see who lit the fire.[32] This does not constitute a *Brady* claim.

Acknowledging that "this may seem a minor factual point," Vialva next complains that Lewis agreed to the factual statement at his guilty plea hearing that on

---

[32]

Vialva is not claiming that he did not have access to Agent Chadwick's grand jury testimony.

93

the day prior to the murders, Vialva had thrown the .22 caliber pistol into the weeds, but that at trial, Lewis admitted he himself threw the pistol into the weeds (Motion at 55). Vialva has not shown that factual-basis information could not have been discovered by the defense team by reasonable diligence, in attendance at the proceedings. Also, this claim could have been made on direct appeal by his appellate defense team. Vialva has shown no cause and prejudice for its omission on direct appeal. The claim has been procedurally defaulted. Additionally, Vialva has not shown that any evidence was suppressed. Finally, Vialva cannot show materiality, that this was evidence that could have had an influence on the outcome of the trial. Lewis was confronted with a number of discrepancies between his initial debriefing and his trial testimony. One more minor point, one-day distant in time from the murders, would not have made any difference. Also this event occurred the day before the murders, and this did not involve the murder weapon.

Next, Vialva claims that "[t]rial counsel's files do not reflect the disclosure of Lewis' criminal history" (Motion at 55). To the extent this is a *Brady* claim, Vialva has failed to show that Lewis' criminal history could not have been discovered by the defense team by reasonable diligence. Vialva himself certainly knew about Lewis' past criminal and gang conduct, and where to find additional information. Vialva has failed to show any of this evidence was admissible in impeachment. Also, this claim

94

could have been made on direct appeal by his appellate defense team. Vialva has shown no cause and prejudice for its omission on direct appeal. Thus, this claim has been procedurally defaulted. Additionally, Vialva has not shown that any evidence was suppressed. Finally, Vialva cannot show materiality, that this was evidence that could have had an influence on the outcome of the trial. At the trial, Lewis testified he had a criminal record of offenses committed prior to committing the offenses against the Bagleys (2302). Lewis also testified that he previously had committed the offense of Assault with Bodily Injury, resulting from getting into a fight (2303-04), and he was on supervision for this offense when he was arrested (2303).

### Tony Sparks

Next, under the "Tony Sparks" heading, Vialva's Motion notes that in "the final CID report" Sparks "denied any knowledge of the offenses under investigation" in his affidavit of June 28, 1999 (Motion at 56) (Vialva's Exhibit III-H at 13). Vialva does not claim to have been denied access to this report prior to trial (*id.*).

Vialva's motion next notes: that Sparks "has admitted he was carrying the .22 in his shoe and threw it into the bushes when they were confronted by Killeen police officers"; and that Sparks now claims "there was no plan to kill the Bagleys before he

95

was dropped off at his house" (Motion at 56) (citing statement of Ranada Gentry).[33]

Vialva's motion cites to a statement made by Sparks on May 18, 2004, to Ms. Gentry, a member of Vialva's habeas team (Vialva's Exhibit III-U). Of course, these 2004 statements cannot be the subject of a *Brady* claim.

Vialva's motion, however, argues that "[b]ased on the files available to counsel at this time, it is likely Mr. Sparks was contacted more than once by the authorities prior to his guilty plea," and "[t]here is no information about prior contacts in trial counsel's files" (Motion at 56).

To the extent this is a *Brady* claim, the possibility of Sparks' prior additional statements could have been raised on direct appeal by his appellate defense team. Vialva has shown no cause and prejudice for its omission on direct appeal. Thus, this claim has been procedurally defaulted. Significantly, Vialva has not shown that any evidence was suppressed. Finally, Vialva cannot show materiality, that any mystery evidence could have had an influence on the outcome of the trial. As noted above, this is the kind of *Brady* speculation and fishing expeditions rejected in *Hughes*, 991 F.Supp at 639 (because no evidence of proposed *Brady* evidence, the claims were not

---

[33] In this statement, Sparks admits that outside the Mickey's store he and Lewis talked the Bagleys into giving them a ride, and that the plan was to "rob them." Sparks said that when he was dropped off "no definite decision had been made about what to do with the Bagleys." Sparks confirmed that he took the Bagleys' jewelry when he left the car. *See* Vialva's Exhibit III-U.

worthy of an evidentiary hearing).

*Brandon Bernard's Anticipatory Plea Proffer*

In the final "*Brady*" claim in Vialva's motion, Vialva notes that Bernard's initial statement was followed by proffer, and that Bernard's counsel believed a plea would be negotiated (Motion at 56-57). Vialva argues that the substance of the proffer, the details of the plea negotiations, and "the reason for the government's ultimate refusal to resolve Mr. Bernard's case were not disclosed to Mr. Vialva's trial counsel," and that this was "improperly suppressed" (*id.*).

To the extent this is a *Brady* claim, it could have been made on direct appeal by his appellate defense team. Vialva has shown no cause and prejudice for its omission on direct appeal. Thus, this claim has been procedurally defaulted. Nevertheless, Vialva has not met the *Brady* requirements. Vialva has not shown that the "evidence" was favorable to him. Of course, Bernard did not testify against Vialva, and thus, this was not impeachment material. Vialva has not shown that the proffer or negotiations or government work product could have been admissible at his trial. Finally, Vialva cannot show materiality, that any mystery evidence could have had an influence on the outcome of the trial. This is more *Brady* speculation and fishing expeditions denounced in *Hughes*, 991 F.Supp at 639.

97

Prejudice

The lack of Vialva's demonstration of prejudice has been noted above for each of Vialva's claims. It should be clear, however, that Vialva's final claims of prejudice are somewhat misleading. Vialva asserts that Brown was "heavily intoxicated on embalming fluid throughout the entire day impairing both his perception of events and his own behavior" (Motion at 59). Again, this assertion is from the 2004 statement prepared to support this motion. The 2004 statement is not *Brady* material.

As to Brown's prior criminal activities, also as noted above, much of this activity was elicited in Brown's testimony. Vialva, who committed dozens of offenses with Brow, was in a position to provide that information.

As to Brown's pattern of "tailoring his story to the government for his own benefit," as also discussed above, Brown acknowledged that he initially did not provide a truthful statement, and he agreed that he would acknowledge facts only as investigators discovered them. The government was free to argue that Brown acknowledged true facts, and the defense was free to argue that he was malleable, and acknowledged what the agents wanted him to acknowledge. The jury was able to evaluate this information, as well as, deciding whether to believe his compelling trial account of the murders.

Finally, Vialva has shown no secret agreement concerning the state death

98

penalty. Brown's 2004 statement does mention the state death penalty. There were no secret agreements.

Vialva has not shown any of the Brady requirements. He has not shown that any undisclosed evidence could have had an influence on the outcome of the trial.

## VIALVA'S GROUND FOUR

### VIALVA'S CLAIM THAT COUNSEL WAS INEFFECTIVE IN THE GUILT PHASE FOR FAILING TO OBTAIN INCREASED FUNDING FOR EXPERT ASSISTANCE, FAILING TO ADEQUATELY INVESTIGATE, AND FAILING TO SUBJECT THE PROSECUTION TO ADEQUATE TESTING, IS WITHOUT MERIT;  VIALVA HAS FAILED TO SHOW THAT HIS COUNSEL WAS INEFFECTIVE OR THAT HE SUFFERED *STRICKLAND* PREJUDICE

(Responsive To Vialva's Motion, Ground IV, 60-92)

### Obtaining Funding For Experts

Under this issue, Vialva's first specific contention of ineffective assistance is that his trial team failed to obtain funding for "necessary experts" (Motion at 62). Vialva first complains that defense counsel provided insufficient support or justification for the appointment of Leon Cheney as a criminal investigator. This Honorable Court, however, granted the motion for Cheney's appointment. Thus, this was not conduct falling below an accepted standard of reasonableness; there was no *Strickland* prejudice.

99

2284

Also under this section, Vialva asserts that the defense team was ineffective in its failure to "request additional time to complete the experts' work," and that counsel failed to recognize that evidence of Vialva's "cognitive disorders" to rebut the evidence regarding premeditation and substantial planning. This argument also is without merit.

Defense requested and obtained four motions to continue the trial (motions filed on: August 31, 1999; November 12, 1999; January 3, 2000; and February 28, 2000). The first trial setting was for September 13, 1999. The first continuance motion obtained an additional 91 days. The second continuance motion obtained an additional 28 days. The third continuance motion obtained an additional 63 days. And the fourth continuance motion obtained an additional 63 days. Vilava characterizes this effort at obtaining more time as: "counsel eked out 307 days to prepare a defense." A more appropriate characterization is that counsel ably obtained four continuances, and the defense team had almost a year to prepare for the trial.

Vialva contends that the preparation time for his two lawyers was "less time than half of the defendants confined on death row." But this just means that Vialva was in the middle of the pack. Vialva's underlying assumption is his argument, that more preparation time necessarily results in a better defense, is not supported by case authority. Vialva's defense options were limited by his apprehension yards from his

100

shot and incinerated victims, and the fact that his fellow gang members and co-defendants testified against him.

In any event, Vialva has not shown that his counsel were ineffective in refraining from seeking a fifth continuance. A fifth continuance would not necessarily have been granted. He has not met his burden of showing that it was conduct falling below an accepted standard of reasonableness. Importantly, Vialva has not shown that with additional time there would have been a reasonable probability that the result of the proceeding would have been different.

### Investigation

Vialva's motion postulates that counsel was so busy with pre-trial motions and responses that there was not enough time for trial preparation. The defense team, however, was composed of two lawyers to share the burden on pre-trial litigation and pre-trial preparation.

Vialva's motion theorizes that counsel did not personally investigate the crime scene. It is acknowledged by Vialva, however, that two of the defense team's experts, Cheney and Kent Christianson, examined the crime scene on multiple occasions, providing counsel with any necessary information. Furthermore the trial team's argument was that there was "zero" forensic evidence at the crime scene to tie the shootings to Vialva.

The motion complains that the lack of utilization of investigators prevented the defense from targeting alternative suspects. In the direct criminal appeal of this case, the Fifth Circuit observed, in analyzing claims that the prosecutor's argument in response to defense counsel's argument was excessive, commented on the strength of the evidence against Vialva, and that given the strength of that case, those remarks could not have denied Vialva a fair trail. *See Bernard*, 299 F.3d at 488. The Fifth Circuit was correct. The case against Vialva was very strong. Even years later, the motion makes no viable showing of alternative perpetrators. Although trial defense counsel raising the possibility of alternative perpetrators, in conjunction with arguing that the government had not proven its case, was reasonable, lack of investigation to actually find alternative perpetrators, where there clearly were no good candidates, could not have constituted ineffective assistance. Reasonable professional judgment supported the limitation on investigation.

### Meaningful Adversarial Testing

Vialva's motion complains that counsel did not subject the government's case to meaningful adversarial testing. The first proposed example is the lack of forensic evidence. This has already been discussed, above. Basically, with the exception of some DNA evidence from the mask, many experts' testimony related to various testing, the negative results that were obtained, and possible reasons tor the lack of

findings. Certainly it was a reasonable strategy by Vialva's counsel to accept this lack of evidence as a weapon to use on behalf Vialva in closing argument. Getting your own experts to also say of the same testing that no evidence linked Vialva to the shooting would have been cumulative (and not as effective as having that lack of evidence come from the prosecution's witnesses). As to the gunpowder residue, the defense made an effective argument as to the absence of such evidence. As to the DNA testing and findings, defense counsel made a reasonable argument as to its limited efficacy and findings.

The following are some examples of Vialva's counsels' arguments as to the lack of forensic evidence in closing argument:

> (By Mr. Schwieger) [arguing that Dr. Sing's testimony of the lack of fire and presence of medium petroleum distillate in the trunk was in conflict with Brown's account of pouring lighter fluid in the trunk] (2614-15).

> Now, let's talk about that ski mask for a minute. The clock is ticking and he dons a ski mask. Now, let's remember exactly what that ski mask represents, Because the Government has made a big issue out of this and they even went to the expense of having DNA ran on that. Well, what does that DNA tell you? Let's remember the probabilities, Ladies and Gentlemen. First of all, the probabilities were that he was a possible donor. He could not be excluded as a donor. . . . Does it tell us anything like, did he wear it that night? No. It mainly means that it's possible . . . (2617-18).

103

And then they say well, okay. Somehow "Chris" Vialva is able to shoot those two people in the trunk and the shell casings land in there. Well, look at that shell casing, Ladies and Gentlemen. Does it look as though it was sooted up, melted? Because the temperatures in that car reached 2200 degrees, according to the State Fire Marshal? (2618)

(by Mr. Goains) Well, let's start with the physical evidence and let's ask ourselves, Ladies and Gentlemen, is there any trace evidence to link Mr. Vialva with the murders of Mr. and Mrs. Bagley? And, Ladies and Gentlemen, I submit to you, there's absolutely zero." Did they find any hair from the victims on Mr. Vialva's clothing? No. Did they find any blood from the victims on the Defendant's clothing? No. Well, how – how might you get blood? Well if you shoot someone, you may get blood pattered on your clothes. . . . Was there blood from those victims on the Defendant? The answer is no. Did they find any fingerprints matching the Defendant's on the Bagleys['] vehicle? The answer's no. [arguing that even with a burned car there would be fingerprints on the outside from, for instance, shutting the door] . . . (2624-25).

How about gunpowder residue? Was there any found on Mr. Vialva's hands? Was there any gunpowder residue found on his clothing? Absolutely none. Of course, the Government is going to tell you that, "Well, listen, after four hours you can't find gunpowder residue.' Well, Ladies and Gentlemen, you get to use your own reason and common sense, These Defendants were arrested immediately out there on that road. No one was allowed to leave the scene. You absolutely heard no evidence that anyone was allowed to wash their hands or take a shower. And I'll tell you what, Ladies and Gentlemen, if they had of found residue on Mr. Vialva's hands and – or on his clothing, I guarantee one thing, you would have seen it then, and they would have been telling you that test was very,

104

very accurate (2625-26).

Now, let's talk about some accelerants.  We've heard testimony about lighter fluid, Mr. Lewis stating the Mr. Vialva sprayed lighter fluid on the vehicle.  They collected his clothing.  Did they find any accelerant on Mr. Vialva? Absolutely zero . . . (2626).

Ladies and Gentlemen, the bottom line is this.  The physical and trace evidence to directly link those murders to Mr. Vialva is zero" (2626).

Thus, as demonstrated above, the assertion that defense counsel did not subject the lack of forensic evidence to meaningful testing is entirely inaccurate.

### Brown

Vialva's motion alleges that defense counsel was ineffective fo failing to secure all of Brown's prior inconsistent statements.  As discussed above, the record demonstrates, however, that Brown was confronted by dozens of his prior inconsistent or incomplete statements.  At first, Brown testified that the debriefings just left out some details.  Brown later acknowledged that he indeed lied in these debriefings, to protect himself and others.  He only admitted the facts that the investigation had already uncovered.  Confronting him with more of these instances of the same nature would have been cumulative and would have brought the same explanation. Vialva's counsel made the strongest point when he characterized Brown's agreement with interrogating officers as unthinking agreement, rather than Brown admitting what was

105



true, but only what was already known.

For example, The following are some details from Brown's cross examination by counsel for both defendants (set forth in greater detail above).

Cross-Examination Of Brown
By Vialva's Counsel, Mr. Goains

First to cross-examine Brown was one of Defendant Vialva's attorneys, Mr. Goains.  Brown testified that in the "Duce-Nine Bloods," as in the  Two-One-Two PIRU" gang, there were no leaders; "[e]veryone is considered equal" (1937).

The defense went on to examine Brown's motivation, eliciting from Brown that he agreed to cooperate "a short while" after he was arrested "for the purpose of getting a lesser sentence" (1937).  While his plea agreement required him to testify truthfully, Brown agreed with defense counsel believing that "the U.S. Attorney had the sole discretion to determine whether you're telling the truth" (1937-38).

Next, the defense explored inconsistencies in Brown's prior statements (1938-40).  Defense counsel elicited from Brown that it was true that he had given several prior statements (1938).

Defense counsel asked Brown: "And in each of these statements, you changed your statements, didn't you?" (1938). Brown responded: "In each statement, it wasn't a matter of changing it.  It was a matter of adding more detail . . . of "being more

2291

specific" (1938).

Defense counsel replied (1938-39):

> Okay. We're going to go through those in just a minute.
> But my question to you, isn't it true that each of those
> statements are dramatically different?

Brown responded "No, sir" (1939).

Defense counsel then, however, produced Defendant's Exhibit 5, Brown's statement at the Army's CID office (1929). Counsel read portions from this statement, and Brown agreed that he said in this statement that: he was at a friend's house (Billy Rorie's house), when Brandon Bernard came by in his car, a Buick Park Avenue, and picked him up; at "18:30 or 19:00," which would be "about 6:30 to 7:00 o'clock" (1940). Defense counsel asked, based on Brown's prior statement that the first time he saw Vialva was between 6:30 and 700 p.m., "That's not even close to the information you just gave this jury, correct? (1940). Brown responded (1940):

> The first statement that I made was like I said in the CIA
> (sic) office, that was before the deal was even approached,
> and this was before any information was known on the
> matters.

It was then reiterated that Brown's statement "was before they cut you any kind of deal," and "before anything was even known" (1940).

Defense counsel focused on further inconsistencies. Initially, in this statement,

107

Brown denied knowing:  who set "the car on the hill" on fire; how the vehicle found to be on fire had arrived at that spot; and who killed the people found in the trunk of the vehicle found burned (1941).  Defense counsel made the point: "[That is a] little different statement that you just gave to the jury, wouldn't you agree with me?" (1941).  Brown replied (1941):

> Yes.  And like I noted, that was way before any of this had came into action , before the deal was offered.  And like I said, that was before that they even knew that we had did the crime.

Brown testified that he did not make his "deal" with the government until "a few months" after his arrest (1942).

Defense counsel then turned to another voluntary statement given by Brown "a little bit later," at 12:30 on June 22 (1941-42, 1944; Def.Ex. 6).  Defense counsel first reviewed a portion of Brown's direct testimony (1942-43):

> Now, if I heard you correctly, when you just testified to the jury, you told them that you were standing approximately in this area (Indicating), is that correct, when the first shot was made?

Brown replied: "No sir. . . . I stated that I was standing on that side of the car, but further back" (1942) . . . "I said that's the position that I was standing there when they – when he was talking to Christopher Lewis and Brandon Bernard" (1943).

Defense counsel asked: "How far back" (1943).  Brown responded: "Far back

2293

enough where I couldn't see the back of the trunk. I had a good view of Mr. Bagley, though" (1943). Brown estimated his distance from the car as: "I imagine about from here to the big-screen TV, maybe" (1943).

As to Vialva's position in relation to the Bagleys' vehicle, the following exchange took place (1943):

> Q. Okay. And where did you state Mr. Vialva was?
>
> A. Right by the–by the tail light of the–that side, yes. . . .
>
> Q. A foot, two foot?
>
> A He was pretty close.

As to the position of Mr. Bagley, and Brown's position at the time of the shootings, the following exchange took place (1943-44):

> Q. Now, you said you could see Mr. Bagley. What position was Mr. Bagley in?
>
> A. He was laying down on his right side.
>
> Q. Okay. Now that's what you just told the jury, correct?
>
> A. Yes, sir.
>
> Q. Isn't it true that you stated in your other statement, "I could see the trunk was shut. Vialva was outside of the car, behind the trunk, and was yelling at the man and the woman to be quiet. I stopped because I could not take it anymore. I turned around and started to walk down towards Brandon's car." Do you remember making that statement?

109

A. On the day that – the day after we were arrested?

Defense counsel then confronted Brown with other statements in Defendants' Exhibit 6, relating to the jury that Brown had stated in this statement: that "'When I got there, Brandon was already waiting at the car," and thus, that Brown "had totally left this position and went back to where Mr. Brandon's car was parked" (1944). Brown agreed that he previously had made statements to that effect (1944).

Defense counsel continued by reading Brown's statement of June 22, which included the assertion: "'Once I arrived at the car, I heard two shots.' Isn't that what you said" (1944). Brown agreed he had made that statement on June 22 (1944).

Defense counsel asked Brown to again "show us . . . where was Mr. Brandon's Vehicle?" (1944). Brown replied that "it was on the – on the right side, right past the cattle guard" (1944). The spot was indicated to the jury on the map (1944-45).

Defense counsel reiterated that: "And you were all the way back here (Indicating), in this area, before you heard the two shots, correct?" (1945). Brown responded: "Yes, sir, that's what I said at that period of time" (1945).

Defense counsel established that Brown knew Andrea York (as his girlfriend that he "live[d] with") and Billy Rorie, and that Christopher Lewis was sometimes referred to as "Little Chris" (1945-46). Counsel asked Brown (1946):

Isn't it true that you told Billy Rorie and Andrea York,

110

"They said that 'Little Chris,' who is "Chris" Lewis, "had pulled a gun on the man and woman," isn't that what you told them?

Brown denied making that statement (1946). Brown denied making the statement that "'Little Chris' put the people in the trunk of the car'" (1947). Brown maintained that: "To this current day, I still don't know who put them in the car" (1947).

Defense counsel asked whether Brown's trial testimony, that he had conversations with Mrs. Bagley at Billy Rorie's house, was reflected in any of his prior statements (1947). Brown replied that he had provided this information in giving prior statements but that he did not know whether it was included by those recording those statements (1947).

Cross-Examination Of Brown
By Bernard's Counsel, Mr. Hunt

One of Bernard's attorneys, Mr. Russell D. Hunt, Jr., next cross-examined Brown (1948). Bernard's counsel reminded Brown that he had testified that merely because someone is a member of a gang, that does not mean that he will join with another gang member to commit a crime (1949). Brown agreed, and explained that:

> What was said is, just like – let's say, for instance, you're a Blood and I'm a Blood. Just because you're a Blood doesn't mean I'm going to do a crime with you. I can choose – you know, I might choose [to be] a regular person,

111

so to speak. Just because you're with the organization doesn't mean that you do crimes together.

Counsel also elicited from Brown that merely because a person is a member of such an organization does not mean that the person commits any crimes (1949). Brown agreed with defense counsel that being a member of a gang can be "kind of like a neighborhood thing" with the "kids in the neighborhood," and that there are lots of different neighborhood gangs, and different neighborhood "Bloods" gangs (1950).

Bernard's counsel next pointed out that Brown's trial testimony had been that Bernard was a member of the "Two-One-Two PIRU" gang (1950). Defense counsel asked: "and that's not right, is it?" (1950). Brown agreed with counsel, Bernard instead was a member of the "Four-One-Five" Bloods gang (1950-51).

Defense counsel asked whether, when they were riding around the grocery store parking lots, "you certainly didn't encourage them to find somebody to rob, and tell them it would be a good idea to do that, did you?" (1951). Brown, however, admitted that "[a]t the IGA parking lot, I'd – I pointed out somebody that was riding [past]" (1951).

Counsel asked (1952):

> Okay. After there were a couple of abortive attempts where they sort of tried to talk to some people, didn't never get a ride, didn't do anything like that, and after you went to Mickey's the first time, did you all say anything to them

112

> like, "oh, you guys aren't really going to rob anybody.  You
> aren't really going to jack anybody"

Counsel received the favorable reply from Brown that (1952):

> I can't recall if we had said it to them, but me and Brandon,
> I know we had discussed it.  I don't remember if they were
> in our presence at the time.

Counsel recapitulated: "So, maybe when they were out running around, talking to people, you were talking to each other, saying, "oh, they're not really going to rob anybody," – (1952). Brown responded: "Yes" (1952).

Next, counsel's questions recounted that after they went to Mickey's, and the laundromat next to Mickey's, "and saw that the three young men, the two "Chris'" and Tony were not there anymore," Brown and Bernard went to the IGA parking lot, where there was an ATM machine, and then went to the Winn-Dixie where "[y]ou guys," "actually put in a job application" (1953).  Counsel elicited that the purpose for applying was that they both really "wanted to get jobs" (1953).

Counsel again brought out that while Brown was in the park and Vialva said he was going to have to kill the people, Brown "doubted" Vialva "was actually going to do that" (1954). Counsel probed Brown for the basis of that knowledge, and Brown responded that he had known Vialva for "quite a while," and "I knew that wasn't the type of person that he was," and that he believed Vialva would not "go to that extent"

113

(1954).

Counsel then focused on what Brown had told Bernard regarding his intentions toward the Bagleys (1955). Counsel asked Brown (1955):

> Okay. Then, after you had the conversation where you say you didn't believe Vialva would really shoot the people, you said you got into Brandon's car, and told Brandon about the plan, but certainly, you didn't tell Brandon, "We're going to go out in the countryside and shoot these people," right?

Counsel received the response "No sir" (1955).

The following colloquy then took place (1955):

> Q. Okay. You didn't mention that part of it at all?
>
> A. I just basically told him the basics. I didn't know exactly what was going to happen, but I told him the basics.
>
> Q. Okay. That you all were going to go out to the countryside?
>
> A. Not basically the countryside, but that the car would be burned.

Counsel then recounted Brown's direct testimony that Brown put lighter fluid in the back seat and Bernard put lighter fluid in the front seat (1955). Counsel got Brown to agree that "after the shooting occurred," Brown "poured lighter fluid in the trunk" (1955).

Brown agreed that he thought the people were dead already (1956). Brown did

114

not put lighter fluid into the trunk to "torture" the people in some way (1956).

Counsel clarified that "Chris" Lewis was called "Little Chris" to differentiate him from "Chris" Vialva (1957). Also, Tony Sparks was known as "Little Goldie" to differentiate him from Vialva, who was known as "Goldie" (1957).

Finally, Bernard's counsel focused on the benefits Brown received from his plea agreement and his motivation for cooperation (1957-59). Counsel was able to get Brown to agree that "the bottom line" of his plea agreement was so Brown "would get a lower sentence (1957).

Counsel also said: "Certainly, you know you're not going to be put to death for these cases, as long as you comply with your plea agreement, is that right?" (1958). Brown replied affirmatively (1958).

Bernard's Counsel asked Brown some questions concerning Brown's counsel's advice (1958-59). Brown revealed that his counsel advised him that taking the plea agreement "was a lot better that what I would get, you know, trying to take it to trial" (1958-59).

Redirect-Examination Of Brown

The prosecutor's redirect touched on only a few points, which was covered in less than three pages of transcript (thereby limiting further re-cross examination) (1959-61). Brown agreed that as part of his plea agreement he had waived his status

115

2300

as a juvenile (1959). Brown understood that under federal law, juveniles could not be executed (1959).

As to the two statements he made right after he was arrested, Brown agreed that he "did not tell the full truth in those statements" (1960). Brown was asked whether he also omitted in those statements the fact that he "had poured lighter fluid on the car and in the trunk of the vehicle" (1960-61). Brown asserted that when he made the first statement, the authorities had little to no information (1961). And when he made the second statement, the authorities in the Army's CID office had some information, and that Brown "just confirmed, basically, whatever he said" (1961).

Brown agreed that the information in his trial testimony about what he himself did in committing this crime, he "didn't even put in those statements" (1961). In his trial testimony he was "not only telling more on other people," but he was "telling more" on himself (1961).

Re-Cross Examination Of Brown

Finally, Vialva's counsel asked "[j]ust a couple of follow-up questions (1961). Brown acknowledged that although, at trial, he was admitting to more conduct than he did in his earlier statements, he was now "protected" by his "plea bargain agreement" (1962).

Vialva's counsel quoted part of one of Brown's prior statements where he said

116

2301

"'I told them that we would take them to the park, then call the police and tell them where they were'" (1962). He further quoted from the statement that Brown said "I told both Lewis and Vialva to take them to the park and leave them there and we would call the police" (1962). Counsel asked; 'Does that sound like – I mean, you're basically the one giving the orders? (1962). Brown replied that they had asked him what course of action to follow, and "that was the only thing that I could think of" (1962).

Counsel followed up on Brown's assertion that for the second statement he had "basically just confirmed what the officer had said" (1963). Counsel asked Brown if he made the statement or the officer made the statement (1963). The following colloquy then took place (1963):

> A. He just told me that basically I knew the information that they knew, and that's what I said. I didn't tell them about me doing anything. I didn't make those statements until later on.
>
> Q. So, you're saying the officer told you what happened, you agreed with it, and that's what's in this statement?
>
> A. Not actually told me everything that happened, but he knew who the shooter was.
>
> Q. And you agreed with that?
>
> A. Yes.

117