Vialva has not shown that the strategic choices in cross-examination of Brown were deficient. He has shown no prejudice.

**Lewis**

Vialva's motion alleges that defense counsel was ineffective in exploring all of Lewis prior inconsistent statements. Vialva alleges that "The reason for Mr. Lewis' retreat from his initial statement remained unexplored at the conclusion of cross-examination." The record demonstrates that Lewis also was confronted by dozens of instances of his prior inconsistent or incomplete statements. Lewis admitted time and again that he "lied" in his initial statement. The reason, however, was not unexplored. The reason Lewis gave was that he saw Vialva shoot the Bagleys, and therefore, he "put" everything on Vialva. He also lied to protect himself and others. Confronting Lewis with more of these instances would have been cumulative and would have brought the same explanation.

For example, The following are some details from Lewis' cross examination by counsel for both defendants.

Cross-Examination Of Lewis

One of Vialva's attorneys, Mr. Goains, had the first turn in cross-examining Lewis (2392). Mr. Goains elicited that, initially, Lewis was with Brown and Sparks at the Killeen Detention Center, and that they saw each other every day (23933).

118

2303

Counsel tried to elicit that the investigators and interrogators had been "mad" or harsh with him (2395-96). Lewis disagreed, and said that he had not been threatened (2395).

Lewis was asked how many "statements" he had made to authorities, and he estimated "three," although he was not "sure" (2395). Counsel indicated that he had seen only one statement, and the prosecutor indicated that there was only one statement, presumably meaning one written statement (2395). Lewis indicated he had not testified before the grand jury (2396).

Counsel reviewed Lewis' testimony that defendants were associated with the "Two-One-Two's" and "the Bloods" (2396). Lewis claimed that he did not know who was the "leader' of the Two-One-Two PIRUs, or who "held the crown" (2397).

Counsel reviewed Lewis' testimony that on the morning of June 21, 1999, after staying overnight in an abandoned house, Lewis ate a bowl of cereal at Sparks' house (2397). Counsel highlighted that, however, "that's not what you put in your statement" (2397).

Lewis was shown his written statement that he gave on June 22, 1999, where, instead, Lewis said that he had stayed overnight at "Tom's house," after first arriving

119

2304

there "[a]round eleven" (2398). Counsel got Lewis to admit that "nowhere in here the statement]" did he ever say that he had gone to Sparks' house (2398).

Counsel reviewed Lewis' testimony that they were at Sparks' house when they received word that Vialva had recovered the .22 caliber pistol from the bushes (2398). Lewis could not remember, or approximate, the time that happened (2399). Lewis could not remember the time that "some girls came over" (2399).

Counsel pointed out that as to the facts in Lewis' trial testimony, that Vialva "had gotten the .22 out of the bushes," and the girls had come over to Sparks' house, "that's not in your statement either, is it, Mr. Lewis?" (2399). Counsel also highlighted that their trip to Mickey's store and to the IGA had also been omitted from his statement (after giving Lewis time to examine his statement) (2399-2400).

Counsel emphasized more of Lewis' omissions from his statement (2400). Lewis admitted that his trial testimony on direct that Vialva pulled out one gun and that Sparks held the .22 caliber handgun was not contained in his written statement, even though Lewis agreed that this fact "would be a very important part of this case" (2400-01). Lewis admitted in his trial testimony about taking the victims' wallet and purse also was not contained in his written statement (2400-01). Lewis did not know what time this occurred, only that it was still light outside (2401).

Lewis admitted that his trial testimony about going to a couple of locations to

pawn the jewelry, and going back to get Vialva's identification, was not contained in his written statement (2400-01).

Lewis further admitted that his trial testimony, concerning the location where they had put the Bagleys in the trunk of their vehicle, at the back of some houses in Killeen, or the details as to how they put them in the trunk, was not contained in his written statement (2405). Lewis further admitted that his trial testimony, concerning a conversation about having a shootout with the police, was not contained in his written statement (2406).

In further cross-examination, Lewis agreed that Vialva had given money to Brown to buy lighter fluid, and that Brown had made that purchase (2406-07). Counsel compelled Lewis to agree, however, that in his statement, on the other hand, he had asserted that "Chris" went into the store to get lighter fluid saying that he was getting it "for a barbecue" (2407). Counsel further compelled Lewis to admit that this part of his statement was "a lie" (2407). Lewis did not know what time of day that the lighter fluid was purchased (2408).

Lewis denied ever seeing Brown's statement (2407). He did not recall whether agents had told him of the substance of Brown's statement (2407).

Lewis did not recall when Vialva put on his mask (2408). Lewis did not recall where Vialva and Bernard were standing when the shots were fired (2408-09).

121

In further cross-examination, Lewis reviewed his testimony that Brown and Bernard had come running up the hill carrying the cans of lighter fluid (2411). Counsel compelled Lewis to agree, however, that in his statement he had asserted that Vialva "just reached under the driver's seat, pulled out . . . the bag with the two bottles of lighter fluid and lit a cigarette with a disposal [sic] lighter" (2411).

Counsel reviewed Lewis' testimony that Brown, Bernard, and Vialva put lighter fluid on the Bagleys' vehicle (2412). Lewis testified that they put it "[a]ll over the car," and also the inside of the car, in the front seat, the back seat, by the passenger's side, and by the driver's side (2412). Counsel highlighted, however, that Lewis never mentioned in his statement that anyone other than Vialva had poured lighter fluid (2412).

Lewis reiterated his testimony that Vialva fired the shots, and that he saw Mr. Bagley's body "pop up" after the shot (2413). Lewis did not remember how Mr. Bagley was lying in the trunk (2413).

Lewis did not remember where Mr. Bagley was shot (2414). In his statement, however, he had said Mr. Bagley was shot in the center of his forehead (2414).

Lewis said he did not remember where Brown was standing for the shootings (2414). In his statement, however, he had said that "Terry" was standing by "Chris" near the left rear quarter panel of the car (2414-15). On the other hand, Lewis' trial

122

testimony had been that Vialva was standing at the back of the trunk (2414-15).

In further cross-examination, Lewis testified that he did not know who lit the Bagleys' vehicle on fire (2415). In his statement, however, Lewis said that: "I don't know exactly what was used to light the fire. It might have been the cigarette lit when he first got out of the car" (2416).

Cross-Examination By Mr. Hunt

Bernard's counsel also focused on Lewis' statement of June 22, the day after the shooting (2418). Lewis agreed with counsel that: "In that statement you know that you told the police a number of lies" (2418-19).

Lewis' assertion in his statement, that Vialva said that he was stopping for lighter fluid to have a barbecue, was also a lie (1419).

Lewis' assertion in his statement, that when Vialva "pulled up that dirt road to go up the hill, he said he was going to "his cousin's house." was also a lie (1419).

Counsel then pointed out that one matter in his statement that was true, the fact that the second gun was a Glock; Lewis said, however, that he could not remember that detail (2420).

Counsel then reminded Lewis that in his statement he said that at the shooting Vialva "called us all scared," or accused them of being cowards (2420). Lewis, however, admitted under cross-examination that this part of his statement also was a

123

"lie" (2421).

Counsel reminded Lewis that in his statement he said that "Chris popped the trunk open" (2421). Lewis, however, admitted that his trial testimony was that he did not know who opened the trunk (2421).

Counsel reminded Lewis that in his statement he said that Vialva shot Mr. Bagley in the center of his forehead, and that he saw the woman shot in the side of her head (2421-22). Lewis, however, admitted that during the shootings he was walking down the hill, and that he had not seen the locations of the shots, testifying that "[i]t was a lie, sir (2422).

Bernard's counsel again emphasized that "The truth is . . . you lied about a number of different things" (2422). Lewis agreed (2422).

Bernard's counsel clarified that Bernard was not a member of the "Two-One-Two PIRU" gang, but "hung around them" (2423). Bernard was instead a member of the "Four-One-Five Treetop Blood" (2423).

Lewis reviewed his belief that he was not subject to the death penalty (2423). Counsel asked if his attorney had given him a "ballpark figure" of how much time he expected to spend in prison (2424). Lewis responded: "one to life" (2424).

Lewis reiterated that he did not recall when Vialva put on his mask; and he did not know who was the leader of the Two-One-Two PIRU (2426).

124

Redirect

On redirect, the prosecutor elicited that although Lewis did not recall when Vialva put on his mask, Vialva was wearing the mask when the trunk was opened and when he shot the Bagleys (2426).

Lewis testified that no one had ever suggested to him about what he should say (2427).

As to "[t]he statement that we've spent a great deal of time reviewing," Lewis testified that this statement was "basically a lie" (2427).

In that statement, Lewis never mentioned Tony Sparks (2427). Lewis said the reason was that: "I was covering up for him," because at that time Sparks was not even in custody (2427).

In that statement, Lewis basically "put it on" Vialva (2427). The reason was "because he did it" (2428). "He had shot Mrs. Bagley and Mr. Bagley" (2428).

Although Lewis could not testify as to what time of day certain events occurred, he did know the order in which they occurred (2428). Lewis knew that they went to the Airfield Plaza ATM, and then they went to the Wendys (2428). Thus, if the ATM records reflected transactions at 4:11 in the afternoon, they went to Wendys thereafter (2429).

When Lewis turned around after partially running down the hill, and saw Vialva standing at the trunk "shooting Todd and Stacie Bagley," he did not notice where Brown or Bernard were standing (2429). That was because he "focused just on Christopher Vialva" (2429).

Lewis reiterated that no one had promised that he was going to receive a particular sentence.

Re-cross

On re-cross, although Lewis testified on re-direct that during the shootings he could not testify as to the location of Brown because he was focusing on Vialva, Lewis had to again admit that he could not even testify as to the location of Vialva (2431).

Lewis further acknowledged that he did "expect to have his time cut for testifying today" (2432).

Vialva has not shown that the strategic choices in cross-examination of Lewis were deficient. He has shown no prejudice.

126

## Gang Affiliation

Vialva argues that the Two-One-Two PIRU was not a local chapter of a larger gang organization, and although Investigator Chadwick tried to find some useful material, as an outsider he did not make much headway. Vialva believes that somehow counsel was ineffective for not showing that this was "not a genuine local affiliate of West Coast gangs," that this was just a group in which he rarely exercised any control. No ineffective assistance in this area, or prejudice, however, has been demonstrated.

Contrary to Vialva's assertion many witnesses testified that the Two-One-Two PIRU gang was affiliated with the Bloods. For example, at the trial Brown testified that Vialva was a member of the Two-One-Two PIRU gang, which was affiliated with the national Bloods gang (1861). The Bloods wore the color red (1862). Other gangs in Killeen were the "Crypts," "Folks," and "Vie-Lords" (1865). Lewis testified that he belonged to the Two-One-Two PIRU gang, which he also explained was a Bloods gang (2306, 2390, 2396). These gang members would know their own affiliation better than any "experts." There was no ineffective assistance in this area. Also this was no "club." Vialva was involved in strings of burglaries with fellow gang members. He was in a car with gang members when a man was murdered over a traffic incident. The instant offenses also show this gang was very dangerous.

Nevertheless, counsel for Bernard was able to elicit agreement from Brown that

127

being a member of a gang can be "kind of like a neighborhood thing" with the "kids in the neighborhood." There was no ineffective assistance with a point being covered by co-defendant's counsel. There was no prejudice.

Defense counsel also was very successful in eliciting evidence opining that Vialva was not the gang's "leader." For example, under cross-examination by Mr. Goains, Brown acknowledged that in the Two-One-Two PIRU gang, as in other gangs, there were no leaders, "[e]verone is considered equal" (1937). Also, Lewis testified that he did know who was the "leader" of the Two-One-Two PIRU gang.

### Mental Age

Next, the motion claims counsel was ineffective for failing to demonstrating that Vialva's mental deficiencies, which supposedly would have undermined that he acted deliberately and willfully. The motion emphasizes that Vialva has Attention Deficit Hyperactivity Disorder, and a study that Vialva was developmentally younger than his chronological age. This was not the kind of momentous medical information, however, that would have had much impact on his guilt.[34] Defense Counsel's theory was that the government had not proved its case with forensic evidence, and that

---

[34] *See, e.g.*, *United States v. Boykoff*, 186 F.Supp.2d 347, 348-50 (S.D.N.Y. 2002) (psychiatric expert's proposed testimony that defendant suffered from bipolar personality disorder and attention deficit disorder was not relevant to the issue of defendant's mens rea, and therefore not admissible where expert disclaimed an ability to connect disorders to the issue of criminal intent).

128

Brown and Lewis had lied so much, and had such an incentive to lie, that they could not be believed. The defense theory was not that Vialva performed the shootings, but was developmentally younger than his chronological age. This would not have been a good theory. Also, the weight of the evidence was against this mental excuse. Vialva was adamant about burning the car to eliminate fingerprints and killing the Bagleys because they had seen his face.

Finally, this area of inquiry could be a two-edged sword. For example, in the penalty phase, Vialva's family members testified concerning Vialva's Attention Deficit Disorder and his medication (2890-91, 2956). Richard Brown asserted that Vialva had a short memory (2890-91). On cross-examination, the prosecutor asked Brown whether Vialva's "ADHA" would affect his knowledge of the difference between right and wrong, and Brown testified that it would not (2894). The prosecutor also asked whether Vialva's memory problems would allow him to remember he had only two bullets in a gun (2894).

## Coherent Defense

Vialva complains of the theory of his defense.  As discussed in more detail above, counsel vigorously challenged that the government had not proved its case with forensic evidence, and that Brown and Lewis had lied so much, and had such an incentive to lie, that they could not be believed.  Under the circumstances, against what the Fifth Circuit characterized as a strong case, this was the best possible theory.  No ineffective assistance in this area, or prejudice has been demonstrated.

## Relationship

Finally, Vialva claims he did not have a good relationship with his counsel.  Nothing he presents demonstrates that the defense team's professional assistance was deficient or that there was outcome-altering prejudice.

## VIALVA'S GROUND FIVE

## VIALVA'S CHALLENGE THAT THE JURY'S CONSIDERATION OF "FUTURE DANGEROUSNESS" VIOLATED HIS DUE PROCESS RIGHTS HAS BEEN PROCEDURALLY DEFAULTED; NEVERTHELESS, HIS CHALLENGE TO THIS WELL-ESTABLISHED PRACTICE IS WITHOUT MERIT

(Responsive To Vialva's Motion, Ground V, 92-105)

### This Ground Has Been Procedurally Defaulted

Vialva argues that the well-rooted practice, followed in the Texas state courts and elsewhere, of the jury's consideration in the punishment phase of his "future dangerousness," "resulted in the arbitrary and capricious imposition of the death penalty, in violation of the right to due process of law." This issue, however, was not raised in Vialva's direct appeal. Challenges to "future dangerousness" have been made for over a decade. Although the particular study by anti-death penalty adherents, cited by Vialva in support of this ground, may not have been available, for his direct appeal, similar studies were available, and the due-process argument could have been made on direct appeal, and was required to have been made on direct appeal, in order to preserve this issue.[35] Vialva has not demonstrated cause and prejudice for failure

---

[35] As Vialva concedes "Experts have argued for years that predictions of future dangerousness are impossible" (Motion at 95). In 1992, for example, a challenge was made to consideration of future dangerousness on the basis of a study by professors of Sam Houston State University concluding that defendants sentenced to death are no more likely to commit violent acts in the future than defendants sentenced to life imprisonment and released into the general prison population. *See Lincecum v.*

131

to make this ground in his direct appeal, and it has been procedurally defaulted.

## The Jury's Consideration Of "Future Dangerousness" Was Proper

In *Jurek v. Texas*, 478 U.S. 262, 276 (1976) the Supreme Court rejected the claim that the statutory aggravating factor of future dangerousness impermissibly relied on wholly speculative – that is, unproved and unprovable – predictions of defendant's future behavior. Instead, the *Jurek* Court insisted that the jury must "have before it all possible relevant information about the individual defendant whose fate it must determine." *Id.*

In *Barefoot v. Estelle*, 463 U.S. 880, 896-97 (1983), the Supreme Court explained that: "The suggestion that no psychiatrist's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel." The Supreme Court reiterated that the likelihood of a defendant's committing further crimes is a constitutional acceptable criterion for imposing the death penalty. *Id.*

In *Lincecum v. Collins*, 958 F.2d 1271, 1281-82 (5th Cir. 1992), Fifth Circuit held that the district court had properly rejected, without a hearing, the habeas petitioner's "claim that the inability of juries accurately to predict future dangerousness renders the Texas capital sentencing statute unconstitutional." In

---

*Collins, infra*, 958 F.2d at 1281.

132

*Lincecum*, the habeas petitioner challenged the jury's use of future dangerousness in imposing the death penalty on the basis of a study from Sam Houston State University concluding that defendants sentenced to death are no more likely to commit violent acts in the future than defendants sentenced to life imprisonment and released into the general prison population. *Id.*

The Fifth Circuit in *Lincecum*, in answering the challenge to the jury's consideration of future dangerousness that was supported by the study, explained that:

> The Supreme Court has never intimated that the factual correctness of the jury's prediction on the issue of future dangerousness, either in a particular case or over time bears upon the constitutionality of the Texas capital sentencing statute. In *Jurek v. Texas*, . . . the case in which the Court upheld the present Texas statute, a majority rejected the argument that the second special issue was vague and meaningless because it is impossible for juries to predict future behavior.

Although the university study suggested that there is a risk that juries are unable to make correct predictions about future dangerousness, the Fifth Circuit explained that the Supreme Court "acknowledged this risk and tolerated it in *Jurek*, and has done nothing in the ensuing years that would suggest it considers the risk constitutionally unacceptable." *Id.*

133

In *Little v. Johnson*, 162 F.3d 855, 862-863 (5th Cir. 1998), the Fifth Circuit specifically considered the admissibility of expert testimony from psychologists on the issue of future dangerousness. Following the Supreme Court precedent set in *Barefoot*, the court found that juries may hear such expert testimony. "If the jury may make up its mind about future dangerousness unaided by psychiatric testimony, jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors." *Id.* at 898-899.

In the instant case, Vialva makes the same challenge armed with a different study. In support of the proposition as to the inability of juries accurately to predict future dangerousness, Vialva cites a study, published by a capital-punishment opposition group, that of 155 inmates studied, "only eight (5%) engaged in assaultive behavior that result[ed] in treatment beyond first aid" during the time they have been incarcerated (Motion at 94). Of course, this study is self-serving. Furthermore, the fact of the commission of a small number of violent acts that required more than first aid, even if true, is a testament to the efficiency of prison authorities in successfully isolating these serious offenders, not to their abandonment of violence. Just as in *Lincecum*, although Vialva's new study also suggests that there is a risk that juries are unable to make correct predictions about future dangerousness, the Supreme Court has "acknowledged this risk and tolerated it in *Jurek*, and has done nothing in the ensuing

134

2319

years that would suggest it considers the risk constitutionally unacceptable."
*Lincecum*, 958 F.2d at 1281-82.

As in *Lincecum* and *Little*, the Fifth Circuit has consistently held that juries should not be restricted from considering future dangerousness as an aggravating circumstance in a death penalty proceeding. *See also*, *Flores v. Johnson*, 210 F.3d 456, 457 (5th Cir. 2000); *Martinez v. Johnson*, 255 F.3d 229, 245 (5th Cir. 2001); *Beazley v. Johnson*, 242 F.3d 248, 258 (5th Cir. 2001).

Vialva argues that the precedents set in *Jurek* and *Barefoot* no longer bind courts since at the time the opinions were given "no facts to demonstrate that neither juries nor experts can predict future dangerousness" and the results of the Texas Defender Service study provide a new world of information. (See Vialva's Brief at 97). Vialva presents no "facts" but a limited study of the same type previously offered to the Fifth Circuit. Vialva's argument to disregard the Supreme Court precedent set in *Jurek* is not a novel one. As recently as February of 2004 the Fifth Circuit has explicitly recognized its inability to overturn the binding Supreme Court precedent set in *Jurek. See McCullum v. Dretke*, 89 Fed. Appx. 888 (5th Cir. 2004) (citing *Jurek*) ("Because we cannot overrule binding Supreme Court precedent, we decline McCullum's invitation to reject *Jurek*."). Accordingly, because Vialva's claim would fail as a matter of law, he is entitled to no further consideration or relief.

### Evidentiary Standards For Capital Sentencing; Personal Interaction

Vialva asserts that evidence admitted at his sentencing did not meet the constitutional requirement that such evidence be "individualized" and "reliable." This argument is derived from a very broad reading of case law regarding the unconstitutionality of mandatory death sentencing schemes. Based on these standards, Vialva concludes that the expert testimony offered in his sentencing failed the individualization requirement because the experts did not base their testimony on personal interaction with him. Vialva fails to elucidate a specific standard for reliability but asks the court to follow the conclusions of the Texas Defender Service study.

Controlling case law requires that death sentencing procedures sentence defendants individually and with reliability. *Jurek* provides the standard for receipt of evidence that all relevant evidence should be presented to the jury. 428 U.S. at 276. The psychiatrist's and the psychologist's testimonies were properly admitted at Vialva's sentencing.

2321

<u>Personal</u> <u>Interaction</u> <u>Between</u> <u>The</u> <u>Expert</u> <u>And</u> <u>The</u> <u>Defendant</u> <u>Is</u> <u>Not</u> <u>Constitutionally</u> <u>Required</u> <u>For</u> <u>An</u> <u>Individualized</u> <u>Sentencing</u> <u>Procedure</u>

In order to constitutionally impose the death penalty, a statute must require that the sentencing authority consider "the character and record of the individual offender and the circumstances of the particular offense." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Since the demise of mandatory sentencing schemes, the Supreme Court has held that a defendant shall not be sentenced to death based only on the elements of the crime committed. *Gregg v. Georgia* 428 U.S. 153 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Zant v. Stephens*, 462 U.S. 862 (1983).

A contextual study of the requirement of individualization reveals the Court's desire for a sentencing procedure that guides the sentencing authority to consider the individual character of the defendant. The above listed cases (the cases on which Vialva bases his argument for individualization) do not hold that all testimony offered at sentencing must be based on personal interaction with the defendant. Such an interpretation of the requirement of individualization is unsubstantiated and in conflict with the rule in *Jurek* that the jury should "have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek*, 428 U.S. at 275. Thus, Vialva's claim that Dr. Cunningham's and Dr. Coons' testimony

137

was unconstitutionally admitted at sentencing is invalid.

*Development Of The Individualization Requirement*

In *Woodson* the Supreme Court found statutory sentencing schemes that automatically imposed the death penalty on certain criminals to be unconstitutional. 428 U.S. at 304. "The fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.* at 304. After the *Woodson* interpretation of the Eighth Amendment, legislatures were precluded from creating statutory schemes that sentenced a defendant to death without providing the defendant with the right to have the court consider his or her individual character as well as the circumstances of the crime.

*Function Of The Individualization Requirement*

The Supreme Court defines the function of the individualization requirement as acting to "genuinely narrow the class of persons eligible for the death penalty." *Zant*, 462 U.S. at 876. Furthermore, in order to provide individualized sentencing, a statute imposing the death penalty must "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Id.*

138

2323

By forcing courts to be more selective in imposing the death penalty, the requirement of individualization also functions to mitigate the risk that a death sentence will be imposed in an "arbitrary and capricious manner." *Gregg*, 428 U.S. at 188. To achieve this goal the Supreme Court instructs legislatures to create "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."*Id.*

*Gregg* speaks to the general structure of sentencing procedures and the duty to prevent imposing the death penalty in a random fashion. The jury should be guided to ask questions that facilitate consideration of the character of the defendant and the circumstances of the crime. For example:

> "Was it committed for money?" "Was it committed in a particularly heinous way or in a manner that endangered the lives of many persons?" "Does he have a record of prior convictions for capital offenses?" "Are there any special facts about this defendant that mitigate against imposing capital punishment (E.g., his youth , the extent of his cooperation with the police, his emotional state at the time of the crime)."

*Id* at 197-198.

The Supreme Court in *Gregg* in no way suggests limiting evidence offered in a death sentencing proceeding. On the contrary, the example questions listed above indicate that a broad scope of evidence should be admitted. The *Gregg* opinion must

139

2334

be read in conjunction with *Jurek* which allows a jury to "have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek*, 428 U.S. at 276.

### Vialva's Sentencing Procedure Was Constitutionally Individualized

A psychologist and a psychiatrist testified regarding the future dangerousness of Mr. Vialva. Dr. Cunningham testified for the defense, and Dr. Coons testified for the state. This testimony was not based simply on the fact that Vialva was a murderer, but instead went further to consider the specific character of Vialva and the circumstances of the crime he committed.

### Dr. Cunningham – Psychologist for the Defendant

In Dr. Cunningham's analysis of Vialva, he referred to Vialva's records including "educational records, psychological records, medical records, juvenile and adult offense records, records associated with these tragic offences, and very limited birth related records regarding his sister, as well" (2968). Dr. Cunningham also spoke at length to his mother on three occasions and his maternal aunt about Vialva's life experiences (2968). With this information, Dr. Cunningham presented to the jury a violence risk assessment of Vialva as well as "adverse developmental experiences and factors that seemed to interfere with and to damage [Vialva's] development as he was growing up" (2969).

140

Though Dr. Cunningham never spoke to Vialva, his testimony was based on facts specific to Vialva – his psychological and medical history, his childhood development, his prior offenses, and the specific circumstances of the offense at hand. This information satisfies the constitutional requirement for individuality because it guides the jury not to sentence him based only on the elements of the offense committed, but to consider Vialva's individual character and the particular circumstances of his offense.

Vialva argues that since Dr. Cunningham based his conclusions on actuarial information, the testimony was not individualized. Even though predictions based on actuarial information rely on what others have done to predict what the defendant will do, these predictions are with consideration of specific traits of the defendant. The actuarial projections do not predict how "murderers" will probably behave in the future, but how a person with Vialva's similar circumstances will probably behave.

Dr. Cunningham described his analysis as beginning with a "base rate" adjusted with general characteristics of the defender, the prison setting that the person could potentially be placed in, measures taken to prevent violence in such a setting, and finally particular characteristics of the individual including "his age, his history of adjustment when he's been in confinement, and some other things that we would utilize to raise or lower that risk estimate somewhat" (2983-2984). Vialva's individual

character and circumstances were thus presented to the jury.

Dr. Coons – Psychiatrist for the Government.

Dr. Coons did not personally interact with Vialva, but instead thoroughly reviewed Vialva's records as did Dr. Cunningham. Dr. Coons considered Vialva's "history of violence and his attitude about violence and lack of remorse, planning to kill people simply for his own benefit to get away with something" in formulating his opinion (3159). Dr. Coons also considered the specific circumstances of the crime – the way he tricked the victims into letting them into their car, the deliberateness with which the victims were killed, the fact Vialva fell asleep after the arrest (3160-3162). Though Dr. Coons did not personally meet with Vialva, his testimony was based on Vialva's individual character and circumstances, not simply the elements of the crime. Such testimony is admissible under the requirement for individualization in sentencing proceedings.

The requirement of individualization in sentencing promulgated by the Supreme Court in *Woodson*, 428 U.S. at 304, to do away with mandatory sentencing schemes forces courts to look beyond the elements of the crime in sentencing and consider the "individual offender and the circumstances of the offense." Implying that such a rule requires all testimony to be derived from personal interaction with the defendant is inappropriate because it is unsubstantiated and in conflict with the rule in *Jurek* that

142

2327

juries should receive all relevant evidence. *Jurek*, 428 U.S. at 276. The testimony of both Dr. Cunningham and Dr. Coons was properly admitted at sentencing because it was based on an analysis of Vialva's individual character and the circumstances of the offense.

**The Expert Testimony Met The Constitutional Standard Of Reliability.**

Though no general standard for reliability has been given by the Supreme Court or the Fifth Circuit, both courts have described testimony from psychiatrists or psychologists on future dangerousness as sufficiently reliable with respect to the Constitution. Thus, the testimony of Dr. Cunningham and Dr. Coons was properly admitted as evidence to guide the jury in its determination of Vialva's future dangerousness.

In *Barefoot v. Estelle*, the Supreme Court considered the reliability of psychiatrists' expert testimony predicting the future dangerousness of a defendant and found such testimony to be admissible in death penalty sentencing procedures. The Court reasoned, "If the jury may make up its mind about future testimony, jurors should not be barred from hearing the views of the state's psychiatrists along with opposing views of the defendant's doctors." *Id.* at 898-899. The Supreme Court expressly refused to create a "constitutional rule barring an entire category of expert testimony." The Court based its decision on two conclusions: (1) that the testimony

143

2 328

is not "almost entirely unreliable" and (2) the adversarial system will allow the factfinder to "uncover, recognize, and take due account" of the deficiencies in expert testimony. *Id.* at 899.

The Fifth Circuit interpreted this Supreme Court precedent in *Little*, and extended the allowance for psychiatric testimony to include psychologists. *Little* recognized that while the accuracy of a psychologist's testimony may be questionable, this deficiency is overcome by the fact that the federal sentencing procedure is an adversarial process. Both the prosecutor and the defendant have full opportunity to reveal the inadequacies, rates of error, and other downfalls of the opposing party's expert testimony. *Little,* at 855 (citing *Barefoot*, 463 U.S. 880 (1983).

Vialva suggests that the conclusion presented in the study by the Texas Defender Service is a novel finding. This is incorrect. Courts have conceded that predicting the future dangerousness of defendants cannot be achieved without error, perhaps significant error. Neither courts nor psychologists and psychiatrists have concluded or agreed on the best method for predicting future dangerousness. Neither juries nor psychologists have a crystal ball; however, the rule set in *Barefoot* authorizes courts to admit such testimony to the jury during sentencing and rely on the adversarial nature of the sentencing procedure to mitigate the inadequacies of the testimony. 463 U.S. at 896-899.

2329

At the heart of Vialva's claim is the inability of psychiatrists or juries to predict the future dangerousness of a criminal. As discussed above, the assertion that psychologists and juries are unable to predict future behavior has been considered and rejected by the Supreme Court. *Jurek*, 428 U.S. at 274-276. "It is, of course not easy to predict future behavior." *Id.* It is not, however, an impossible task. *Id.* The *Jurek* court noted the prevalence in our criminal justice system of predicting future behavior. Bail procedures, sentencing procedures, and parole considerations all require the court to make a prediction of future behavior. "The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice." *Id.*

In summary, Vialva calls the court to reject the Supreme Court precedent in *Jurek* that allows juries to consider future dangerousness as an aggravating circumstance at sentencing. This claim was procedurally defaulted. Nevertheless, the Fifth Circuit has recently recognized *Jurek* as binding authority, thus Vialva's claim fails as a matter of law.

To the extent that Vialva is asking for a new rule of law, that claim must fail as being *Teague* barred. *See Teague v. Lane*, 489 U.S. 288, 301 (1989).

## VIALVA'S GROUND SIX

**VIALVA'S CLAIM THAT COUNSEL WAS INEFFECTIVE, FOR FAILING TO PERSUADE THIS HONORABLE COURT TO GRANT HIS MOTION AND RENEWED MOTION FOR SEVERANCE, DURING THE PENALTY PHASE OF THIS TRIAL, IS WITHOUT MERIT; VIALVA HAS FAILED TO SHOW THAT COUNSEL WAS INEFFECTIVE OR THAT HE SUFFERED *STRICKLAND* PREJUDICE**

(Responsive to Vialva's Ground VI, 106-12)

**Background: The Defense Team Did Move for Severance; Severance Was Raised As An Issue On Appeal**

Prior to trial, Vialva's attorneys moved for severance from his co-defendant Bernard at both the guilt and penalty phases of trial. In that motion, he argued that even if he was tried jointly with Bernard at the guilt phase, he should be granted a severance for the punishment phase. Vialva claimed that due to mutually antagonistic mitigating evidence, the jury would not be able to give him the individualized consideration required by the Eighth Amendment. The trial court denied Vialva's motion. He renewed his motion for a separate trial at the end of jury selection. The trial court again denied the motion. He renewed his request for severance at the start of the penalty stage, arguing simply that "this portion should be a bifurcated trial" (2708–09). The trial court told counsel "[t]hat's just not going to be granted" (2709).

146

On Vialva's direct appeal, he argued that the trial court should have declared a mistrial after Bernard proffered his Christian up-bringing and conversion to the Christian religion as mitigating factors, and then asked the jury to spare his life because he was not as bad as the appellant. *United States v. Bernard*, 299 F.3d 467, 475 (5th Cir. 2002). Vialva contended that this "evidence...implicitly prejudiced the jury against" him because he "lacked comparable mitigating evidence." *Id.* The Fifth Circuit reviewed this issue for plain error because Vialva did not specifically object to Bernard's mitigating evidence. *Id.* The court held that the pro-Bernard mitigating evidence "was not sufficiently 'mutually antagonistic' or 'irreconcilable' to [Vialva] to suggest, much less compel, severance at the penalty phase." *Id.* Furthermore, the court held that the mitigating evidence "was admissible and *not subject to challenge by Vialva.*" *Id.* at 475–76 (emphasis added).

## Nature Of The § 2255 Claim; Aspects Of The Claim Are Barred

Vialva contends that he was denied his Sixth Amendment right to effective assistance of counsel not because his trial counsel failed to move for severance, but because his trial counsel ineffectively and inadequately argued the issue of severance at trial (Motion at 106). He also claims that his appellate counsel ineffectively argued the severance issue on direct appeal. As a result of the ineffective assistance of his counsel, Vialva contends that he was denied his Eighth Amendment right to an

147

individualized sentencing proceeding (Motion at 107).

### Ineffective Assistance

As discussed below, Vialva has not shown ineffective assistance. Trial counsel made the appropriate motions. Vialva has not shown outcome-altering prejudice.

### Law Of The Case

To the extent Vialva ia making a claim similar to the one he raised on appeal, it is controlled by the law of the case. The Fifth Circuit has already held in this case that evidence at the penalty phase for the co-defendants was not sufficiently mutually antagonistic or irreconcilable to Vialva to suggest, much less compel, severance at the penalty phase.

### Procedural Default

To the extent Vialva is raising different claims than the ones he raised on direct appeal, they have been procedurally defaulted for failure to be raised on direct appeal, and failure to demonstrate cause and prejudice.

**Standard of Review for Claim of Ineffective Assistance of Counsel**

As discussed above, there is a two-prong test for evaluating claims of ineffective assistance of counsel. *Strickland*, 466 U.S. at 687. To succeed on an ineffective assistance of counsel claim, the petitioner must show: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense. *Id.*

<u>Deficient Performance</u>

Under the deficient performance prong of the *Strickland* test, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688) (internal quotations omitted). In making this determination, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). Judicial scrutiny of counsel's performance must be highly deferential, and every effort must be made not to allow this scrutiny to be clouded by hindsight. *Johnson v. Cockrell*, 301 F.3d 234, 239 (5th Cir. 2002). Therefore, courts must evaluate ineffective assistance of counsel claims under the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689).

149

Prejudice

Under the prejudice prong, the petitioner must demonstrate that counsel's errors were so serious that they deprived him of the right to a fair trial, "a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The Supreme Court defines a "reasonable probability" as a "probability sufficient to undermine confidence in the outcome." *Id.*

### Vialva's Counsel's Performance Was Not Deficient

Vialva claims that the severance issue was raised inadequately at trial and argued ineffectively on direct appeal. Specifically, in regard to trial counsel, he claims that the motion for severance of the penalty phase made at trial presented a "legal argument without any facts" (Motion at 110). Vialva fails to demonstrate that his counsel's performance on the severance issue–both at trial and on direct appeal–was deficient.

Adequacy Of Motion For Severance

A claim for ineffectiveness of counsel may be based on the failure to move for severance. *See, e.g., Rastafari v. Anderson*, 278 F.3d 673 (7th Cir. 2002) (rejecting claim that counsel was ineffective based, in part, on failure to move for severance

prior to sentencing); *Barrientes v. Johnson*, 221 F.3d 741, 774–76 (5th Cir. 2000) (rejecting claim of ineffective assistance of counsel based on failure to move for severance); *United States v. Shareef*, 190 F.3d 71 (2d Cir. 1999) (finding that failure to request severance provided no basis for new trial); *Trass v. Maggio*, 731 F.2d 288, 292 (5th Cir. 1984) (upholding petitioner's claim of ineffective assistance of counsel based on counsel's failure to move for a severance at trial); *Roche v. Anderson*, 132 F. Supp. 2d 688, 705 (N.D. Ind. 2001) (finding that failure to move for severance was not "well thought out" but no prejudice resulted). However, failure to file a severance motion does not constitute *per se* ineffective assistance of counsel. *See also Kimmelman v. Morrison*, 477 U.S. 365, 382–84 (1986). A claim for ineffectiveness of counsel may also be based on the failure to effectively move for severance, but this argument is rarely raised and more rarely successful. *See United States v. Rocha*, 109 F.3d 225, 229–30 (5th Cir. 1997) (rejecting petitioner's claim of ineffective assistance of counsel for failure to obtain a separate trial where "direct appeal correctly rejected his claim that he should have received a severance and the district court [on habeas] held that his counsel's failure to obtain something that he was not entitled to could not constitute ineffective assistance"). For example, failure to support a severance motion with relevant case law does not automatically constitute ineffective assistance of counsel. *See Moon v. United States*, 1990 WL 106802, at 2 (S.D.N.Y. Jul. 20, 1990)

(finding that trial counsel's failure to support motion for severance with citations to case law did not constitute ineffective assistance of counsel because the motion would have been denied in any event).

In support of his claim, Vialva fails to provide any cases upholding a claim of ineffective assistance of counsel for failure to effectively argue a motion to sever. Instead, relies upon one case that dealt with a claim of ineffective assistance of counsel for *failure to move* for severance (*see generally* Motion at 106–12). Vialva cites a single case from the Seventh Circuit, *Williams v. Washington*, 59 F.3d 673, pinpoint (7th Cir. 1995), which found ineffectiveness in part for *failing to move* for severance. *Id.* at 679–80. Counsel in *Williams* failed to move for discovery of any of the State's evidence; failed to file any pretrial motions; failed to read statements from the victim; failed to object to admission of the victim's statements; and, failed to move to exclude petitioner's husband's confession. *Id.* at 676–77.

The government's research did not locate any federal case law in which courts upheld a claim of ineffective assistance of counsel for failure to effectively argue a motion to sever. Clearly, to show that counsel's performance fell below objective standards of reasonableness, more must be shown than a lack of success or failure to cite relevant authority.

<u>Missing</u> <u>Evidence</u>

Vialva also attempts to demonstrate that trial counsel's performance fell below an objective standard of reasonableness for failure to provide facts in support of its motion to sever the penalty phase. Vialva argues that trial counsel could have supplied the following additional facts to its "legal argument": (1) a study conducted in 1994 by Edward J. Bronson ("Bronson study") that reveals the problems that "inure in multi-defendant capital cases that never occur in typical criminal trials;" (2) Ohio and Georgia state law providing for separate trials for capital co-defendants upon request of the defendant; (3) and a declaration stating that in 70% of multi-capital defendant prosecutions, defendants have been severed (Motion at 110–12).

*Social Science Data.*

Courts often use social science data when making decisions. However, in the context of severance, social science data certainly is not binding authority, and therefore, it cannot be objectively unreasonable for counsel to fail to put it before the court. More importantly, in the severance context, social science data has proven fruitless. *See Buchanan v. Kentucky*, 483 U.S. 402 (1987); *Lockhart v. McCree*, 476 U.S. 162 (1986); *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996).

153

2338

In *Lockhart v. McCree*, the Supreme Court was presented with the issue whether "the Constitution prohibited removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of trial." *Id.* at 165. The petitioners in that case introduced into evidence fifteen social science studies in support of its claim that death qualification produced conviction-prone juries. *Id.* at 168–69. The Court, after pointing out numerous flaws with the studies, assumed for the purposes of its opinion that the studies were "both methodologically valid and adequate to establish that death qualification in fact produces juries somewhat more conviction-prone than non-death-qualified juries." *Id.* at 173 (internal quotations omitted). It then held, despite the evidence presented in the studies, that the Constitution does not prohibit death-qualification in capital cases, nor does it prohibit the removal for cause of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of trial. *Id.* at 165, 173.

The Supreme Court built upon its decision in *McCree* a year later in *Buchanan v. Kentucky*, 483 U.S. 402 (1987). In *Buchanan*, the Court held that the use of a death-qualified jury for joint trial of a capital and non-capital defendant did not violate the

154

non-capital defendant's Sixth Amendment right to an impartial jury. *Id.* at 414–20. The defendants in that case advanced many of the same arguments that were advanced in *McCree*, including many of the same social science studies. *Id.* at 415 n.16. The Court again assumed the validity of such studies and still found no constitutional violation. *Id.*

The Supreme Court's decisions in *McCree* and *Buchanan* indicate that even when social science data demonstrates prejudice, that prejudice alone is not enough to prove a constitutional violation. Regardless of how many studies Vialva's counsel may have presented to the trial court or to the Fifth Circuit on direct appeal, it is "the case law from the Supreme Court and from other federal courts" that controls a given court's disposition on the issue. *United States v. Edelin*, 118 F. Supp. 3d 36, 47–48 (D.D.C. 2000) (recognizing that however compelling defendants' social science studies may appear that they are less important in light of the assumptions made by the Supreme Court). The Supreme Court's jurisprudence as well as the Federal Rules of Criminal Procedure favor joinder of criminal defendants. The introduction of the Bronson study at trial or on appeal would have had no effect on the outcome of the severance issue. It was not objectively unreasonable for trial and appellate counsel to fail to include such a study, or others like it, in support of the motion to sever at trial or in the briefs on direct appeal.

155

*State Law Providing For Separate Trials For Capital Defendants.*

State law is not binding on federal courts in federal criminal cases. *See, e.g., United States v. Ransom*, 515 F.2d 885, 889 (5th Cir. 1975) (holding that federal constitutional standards are applicable in prosecutions for violations of federal criminal law, not state standards). Trial counsel's conduct cannot be said to have fallen below an objective standard of reasonableness for failure to cite to state statutes providing for separate trials of capital co-defendants. In addition, on direct appeal, appellate counsel did refer to several state capital cases in support of its argument that the trial court erred in denying severance at the punishment phase. The Fifth Circuit still affirmed the trial court's denial of the severance motion. *United States v. Bernard*, 299 F.3d 467, 475 (2002). Citations to state statutes would have no effect on trial court's determination of the severance issue.

*Other Federal Multi-Capital Defendant Prosecutions.*

Similar to the social science data, the declaration submitted by Vialva stating that in 70% of multi-capital defendant prosecutions, defendants have been severed, does not mandate severance in this case. Although the qualitative difference between the death penalty and other penalties calls for a greater degree of reliability when the death penalty is imposed, and that this includes the decision to jointly try capital co-defendants (*see Lowenfield v. Phelps*, 484 U.S. 231, 238–39 (1988); *Bernard*, 299

156

F.3d at 475), a "greater degree of reliability," however, does not require severance in all cases. The data submitted by Vialva on this motion demonstrates that multi-capital defendants are not automatically severed. In addition, there is no indication in the record or in federal case law that the submission of such data would have persuaded the court to grant severance in this case.

<u>Conclusion</u>

Neither trial or appellate counsel's representation on the issue of severance fell below an objective standard of reasonableness. Trial counsel twice moved the court to sever the petitioner from his co-defendant at the penalty phase of the trial. The last time that counsel renewed the motion for severance of the penalty phase the trial court responded, "That's just not going to be granted." XIV Tr. 2708–09. None of the evidence presented by Vialva in this motion would have influenced the trial court or the Fifth Circuit to change their decisions. Vialva does not point to any binding authority that his counsel failed to present.

On direct appeal, the Fifth Circuit acknowledged that it shared "Vialva's concern over the inherent tension between joinder and each defendant's constitutional entitlement to an individualized capital sentencing decision." *Bernard*, 299 F.3d at 475. Nevertheless, it still affirmed the decision of the trial court. *Id.* This is the law of the case

## Vialva Was Not Prejudiced by Trial or Appellate Counsel's Performance

The appropriate standard for determining whether counsel's performance prejudiced Vialva is whether there is a reasonable probability that had severance been granted at the punishment phase, the jury would have concluded that the "balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see United States v. Barnett*, 197 F.3d 138, 145 (5th Cir. 1999) (severance is necessary only when there is a serious risk that a "joint trial would compromise a specific trial right of one of the defendants, or [that it would] prevent the jury from making a reliable determination of guilt or innocence") (citation omitted). "The mere possibility that a separate trial may have offered a better chance of acquittal is insufficient" to establish prejudicial joinder. *United States v. Bremers*, 195 F.3d 221, 228 (5th Cir. 1999) (vacated and remanded for retrial on other grounds). " T h e defendant seeking severance must demonstrate a 'specific and compelling prejudice that resulted in an unfair trial and such prejudice must be of the type against which the trial court was unable to afford protection.'" *United States v. Causey*, 185 F.3d 407, 416 (5th Cir. 1999) (quoting *United States v. Pena-Rodriguez*, 110 F.3d 1120, 1128 (5th Cir. 1997)); *United States v. Nutall*, 180 F.3d 182, 187 (5th Cir. 1999); *see United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995) ("The party moving for severance must establish that actual prejudice would result from a joint trial."). Furthermore, a

158

2343

defendant does not suffer prejudice from joinder with co-defendants at his trial when there is sufficient evidence to convict. *United States v. Griffin*, 324 F.3d 330, 364–65 (5th Cir. 2003).

A court's limiting instructions will often cure any prejudice resulting from joint trial.[36] *Bernard*, 299 F.3d at 475 (citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993)); *United States v. Cuong Gia Le*, 316 F. Supp. 2d 330, 341 (E.D. Va. 2004) ("[I]nstructions given to the jury will remedy any risk of potential 'seepage' of any co-defendants' bad acts into the jury's capital sentencing determination.").

Even if Vialva were to succeed on the first prong of the *Strickland* analysis, he fails to meet the second. Vialva fails to clearly articulate the prejudice that he suffered. Rather, his argument suggests two avenues for prejudice. First, that "but for" counsel's deficient performance he would not have been given the death penalty. Second, that no matter how counsel performed, the joinder of capital defendants always results in prejudice, therefore, the Eighth Amendment requires severance of capital co-defendants in all cases. Neither avenue proves successful, and as a result, Vialva fails to demonstrate prejudice.

---

[36] In the instant case, the charge on punishment included, for example, that "The death penalty may only be imposed on the basis of a defendant's own individual conduct, character, background, and record. It may never be imposed out of a desire to treat two or more defendants equally" (Charge at 21). Mitigating factors were separately outlined for each defendant,

## The Result Would Have Been The Same

The Supreme Court has not directly considered the issue of severance of capital co-defendants at the penalty phase of the trial. The Fifth Circuit dealt with this issue on an as-applied basis in Vialva's direct appeal, and while it recognized the need for a "heightened degree of reliability" in capital cases, it found that pro-Bernard mitigating evidence that Vialva complained of was not sufficiently mutually antagonistic or irreconcilable to him to suggest, much less compel, severance at the penalty phase. *Bernard*, 299 F.3d at 475.

Both the Fourth and Seventh Circuits have dealt with the issue of severance of capital co-defendants. *Rastafari v. Anderson*, 278 F.3d 673 (7th Cir. 2002) (finding that petitioner was not prejudiced by counsel's failure to request severance of the sentencing-phase hearing from co-defendant in capital case where co-defendant offered mitigating evidence that petitioner did not have); *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996) (finding no abuse of discretion in trial court's denial of motion to sever the penalty phase of appellants' capital murder trials). Both cases dealt with similar arguments to the ones presented in this motion, and therefore are worth discussing in some detail. The Seventh Circuit decision will be discussed in the context of Vialva's "but for" prejudice argument. The Fourth Circuit decision will be discussed in the context of Vialva's Eighth Amendment argument.

160

In *Rastafari v. Anderson*, the petitioner was convicted on two counts of felony murder in Indiana State Court. 278 F.3d 673, 675 (7th Cir. 2002). The issue in that case was whether counsel's failure to move for severance prior to Phase II constituted ineffective assistance of counsel because it denied him an individualized sentencing hearing. The petitioner argued that because his co-defendant had some mitigating evidence that the petitioner did not have, petitioner was made to look more deserving of the death penalty than his co-defendant. *Id.* at 690–91. The facts in *Rastafari* are practically identical to the facts presented in this case: (1) trial of capital co-defendants; (2) mitigating evidence presented by one co-defendant that the other co-defendant did not have; (3) argument by the co-defendant that the mitigating evidence made him look more deserving of the death penalty; and (4) claim that this denied him an individualized sentencing hearing as required by the Eighth Amendment.

The Seventh Circuit held that the standard for determining whether the petitioner's counsel was ineffective for failing to move for severance prior to Phase II is "whether there is a reasonable probability that [had severance been granted] the sentencer...would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 691 (quoting *Strickland*, 466 U.S. at 695). The jury in that case received instructions that in determining whether to recommend a death sentence it could only consider the aggravating and mitigating factors that

161

applied to the petitioner. *Id.* Further, the Seventh Circuit found that

> Rouster's argument that he looked more deserving of the death penalty than Williams because of Williams' additional mitigating evidence is belied by the fact that the jury also recommended the death sentence for Williams.

*Id.* Just like the petitioner in *Rastafari*, Vialva's argument that he was prejudiced is completely "belied by the fact that the jury also recommended the death sentence" for Bernard, in spite of his mitigating evidence. *See id.* All along, at trial and on direct appeal, Vialva complained that Bernard's mitigating evidence would make him look worse than Bernard, but in the end, the jury held them equally culpable for the heinous and brutal nature of their crimes. Bernard's mitigating evidence proved to be of no value. Vialva offers no other evidence that in a separate proceeding the jury would have balanced the factors any differently.

> The Eighth Amendment Does Not Bar
> The Joint-Sentencing Phase Of Capital Co-Defendants

Vialva argues that "punishment should be directly related to the personal culpability of the criminal defendant." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), vacated on other grounds, *Atkins v. Virginia*, 536 U.S. 304 (2002); *Lockett v. Ohio*, 438 U.S. 586, 604–05. He further argues that "[o]ne jury conducting capital sentencing determinations for multiple defendants flies in the face of longstanding jurisprudence regarding the nature and scope of capital sentencing hearings." On this

162

motion, Vialva argues that an *individual* sentencing proceeding, separate and apart from any capital co-defendant, is required by the Eighth Amendment in a capital case, and that anything less than an *individual* sentencing proceeding is a *per se* violation of the Eighth Amendment and results in prejudice.

In *United States v. Tipton*, the appellants challenged the district court's denial of their several motions for severance of their trials in the capital-penalty phase. *Id.* at 892. The appellants argued that joint-penalty trials reduce the jury's ability to give individualized consideration of aggravating and mitigating factors in arriving at their sentencing determinations. *Id.* In support of their argument, they pointed to two things: (1) social science studies that suggested that joint trials at the penalty phase lead to a higher percentage of death verdicts and to less individualized decision-making; and (2) the Supreme Court's recognition in *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), of the constitutionally-grounded need for "a greater degree of reliability when the death sentence is imposed." *Tipton*, 90 F.3d at 892.

The Fourth Circuit agreed with the position that the "trial court's discretion as to severance in the capital-penalty phase must be considered so constitutionally constrained [by the Supreme Court's individualized consideration jurisprudence] at its outer limits and, as a corollary, that [its] standard of review is for abuse of a discretion so constrained." *Id.* The Fourth Circuit did not accept the appellant's

163

characterization that "joint capital sentencing hearings are *prima facie* inconsistent with the Eighth Amendment," and it found that the appellants *conceded* that "joint trials are not *per se* unconstitutional." *Id.* The Fourth Circuit found that the trial court did not abuse its discretion in conducting a joint penalty-phase trial, especially in light of the fact that the relevant statutory provision in that case required that the penalty hearing shall be conducted before the same jury that determined guilt. *Id.* at 892–93. The court recognized that there is always a threat to individualized consideration in such circumstances, but was satisfied that the trial court's frequent instructions on the need to give each defendant's case individualized consideration sufficed to reduce any risk to acceptable levels. *Id.*

Vialva, similar to the defendants in *Tipton*, argues in part that social science data proves prejudice, and that the Eighth Amendment requires severance at the penalty phase of capital trials. The Fourth Circuit did not find either the social science data or the legal arguments persuasive, and neither should this court. Joint trials of capital co-defendants are constrained by the Supreme Court's Eighth Amendment jurisprudence, but they are not so inherently prejudicial as to be a *per se* violation of the Eighth Amendment. Vialva is asking this Honorable Court to provide an over broad reading of the authority.

The simple fact is that where two or more persons are jointly charged in the same indictment with a capital offense, they do not have the *right*, by law, to be tried separately. *United States v. Marchant & Colson*, 25 U.S. 480, 480–81 (1827) (Story, J.). The determination of whether the defendants are to be tried "severally, separately, and apart" is a matter of discretion for the trial court. *Id.* Two or more defendants may be charged together if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions constituting an offense or offenses. FED. R. CRIM. P. (8)(b). There is no exception to this rule for capital co-defendants in the Federal Death Penalty Act ("FDPA"), or in the case law. There is no authority indicating that the severance of capital defendants should be evaluated under a different standard than non-capital defendants.

Trial courts must be "especially sensitive" to the existence of the tension between joinder and each defendant's constitutional entitlement to an individualized sentencing decision in capital cases, which "demand a heightened degree of reliability." *United States v. Bernard*, 299 F.3d 467, 475 (5th Cir. 2002) (citing *Lowenfield v. Phelps*, 484 U.S. 231, 238–39 (1988)); *United States v. Tipton*, 90 F.3d 861, 891–92 (1996)). However, the FDPA provides sufficient safeguards that ensure a heightened degree of reliability. *See* 18 U.S.C.A. §§ 3591–3597. The FDPA has also been upheld by the Supreme Court. *See, e.g., Jones v. United States*, 527 U.S. 373, 382 (1999).

<u>There</u> <u>Was</u> <u>No</u> <u>Prejudice</u>

Vialva fails to demonstrate that "but for" his counsel's deficient performance, there is a reasonable probability that the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Rastafari v. Anderson*, 278 F.3d 673, 691 (7th Cir. 2002). As a result, his claim for ineffective assistance of counsel for failure to effectively argue for severance must be denied.

## Non-Ineffective Assistance Claims Are Procedurally Barred Or Teague Barred

Interspersed within Vialva's ineffective assistance of counsel argument is the claim that joinder at the penalty phase of capital co-defendants violates the Eighth Amendment. Vialva failed to present this issue to the Fifth Circuit on his direct appeal. *Bernard*, 299 F.3d at 475 n.5 (noting that the court was "not faced with any broad question concerning the advisability of joint trials in federal capital cases"). To that extent, the claim is procedurally defaulted and Vialva must show cause and prejudice to succeed. He fails to meet this standard.

To the extent that Vialva is asking for a new rule of law, that claim must fail as well. New rules are not applied or announced in cases on collateral review unless they fall into one of two exceptions. *Teague v. Lane*, 489 U.S. 288, 301 (1989). "[A] case announced a new rule when it breaks new ground or imposes a new obligation on the

States or the Federal government" or, in the alternative, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Id.* In addition, Vialva cannot cloak his claim for a new rule of law by an argument for ineffective assistance of counsel.

Current Eighth Amendment precedent does not dictate severance of capital co-defendants at the penalty phase of a joint trial. If this Court were to hold otherwise, it would most certainly be announcing a "new rule" under *Teague v. Lane*. New rules are only permitted on collateral review in one of the following two circumstances: (1) if it places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," ; or (2) if it is essentially a "watershed rule of criminal procedure" implicating the "fundamental fairness of trial." *Teague*, 489 U.S. at 311–12. Severance of capital co-defendants at the penalty phase of trial does not fit into either category.

167

2352

## Conclusion

Vialva's claim that trial counsel was ineffective for failing to persuade this Court for severance of the penalty phase of the trial is without merit, as is his argument that appellate counsel ineffectively argued the issue before the Fifth Circuit on direct appeal. First, Vialva fails to demonstrate that trial and appellate counsel's performance fell below an objective standard of reasonableness. Second, Vialva fails to demonstrate prejudice, that the outcome of the sentencing phase would have been different "but for" his counsels' performance, or that his sentencing proceeding was not "fair" or "individualized" as required by the Eighth Amendment. Third, Vialva cannot, in a roundabout way through an ineffective assistance of counsel claim, ask for a new rule of law on collateral review that the Eighth Amendment be used to bar the joinder of capital co-defendants at the penalty phase of trial. His ineffective assistance of counsel claim must fail.

168

2353

## VIALVA'S GROUND SEVEN

## VIALVA'S CLAIM, THAT COUNSEL WAS INEFFECTIVE IN THE PENALTY PHASE FOR FAILING TO OBTAIN INCREASED FUNDING FOR DEVELOPING VIALVA'S SOCIAL MEDICAL, MENTAL, AND EMOTIONAL HISTORY, IS WITHOUT MERIT; VIALVA HAS FAILED TO SHOW THAT HIS COUNSEL WAS INEFFECTIVE OR THAT HE SUFFERED *STRICKLAND* PREJUDICE

(Responsive To Vialva's Ground VII, 106-44)

### Adequate Funding And Preparation For Mitigation

Vialva first argues that counsel failed to secure sufficient funding for mitigation specialists. Vialva's defense team secured Ms. Francis, who, according to Vialva's motion was paid $5,760, and then was authorized an additional $3,000 (Motion at 117). Vialva also had the assistance of Dr. Cunningham, who had the longest segment of testimony of any witness at the penalty phase.

Vialva complains that lack of funding resulted in an inadequate social history. As discussed below, however, Vialva's social history was adequately developed for the jury.

169

## Social History

Specifically, Vialva asserts that his counsel was ineffective for failing to investigate and present the following facts at the punishment phase:

(1) that Vialva was raised in profoundly chaotic circumstances;

(2) that chaos was the direct result of Vialva's mother's illness;

(3) that Vialva's mother suffered from mental and emotional disorders that caused her to engage in self-destructive behavior;

(4) that Vialva's half-sister, Audrey Mabrey suffered the impact of her mother's illness;

(5) that Christopher and Audrey had to shift for themselves at a very young age;

(6) that Vialva's mother became involved in a series of abusive relationships that had negative effects on both children;

(7) that Vialva's biological father was excluded from Vialva's life at a young age;

(8) that Vialva had problems in school and problems at home;

(9) that Vialva had symptoms of disorder;

(10) that the family moved to keep him away from gang activity, but the place they moved to was bad for gangs;

(11) that Vialva was able to form friendships and attachments;

(12) that Vialva was well-liked by his positive peer group;

(13) that Vialva treated his girlfriends with respect and concern;

(14) that the mother of one of Vialva's friends thought Vialva's mother was not very involved in Vialva's life.

## Medical And Emotional Health Issues

Next, Vialva also asserts that his counsel was ineffective for failing to investigate and present the following facts at the punishment phase:

(1) that Vialva had physical trauma at birth

(2) that Vialva had a history of serious illness as an infant;

(3) that Vialva developed behavioral disturbances;

(4) that Vialva had a number of injuries and head injuries;

(5) that Vialva had bi-polar disorder;

(6) that Vialva had Attention Deficit Hyperactivity Disorder;

(7) that Vialva had depression, inability to concentrate, irritability, and impulsiveness;

(8) and that he had a chaotic home that exacerbated his medical problems;

171

## Educational And Peer Influences

Next, Vialva asserts that his counsel was ineffective for failing to investigate and present the following facts at the punishment phase:

(1) that Vialva was well-liked by others;

(2) that Vialva was not bound by gang affiliations; and

(3) Vialva had friends and family that knew him and loved him.

### Many Of These Matters Were, In Fact, Presented To The Jury

Vialva's arguments are without merit. Vialva's assertion "[t]hat the jury heard none of this evidence," is incorrect. Significantly, as discussed below, these and other matters of Vialva's social history, medical and emotional history, and educational and peer influences were, in fact, presented to the jury.

<u>Young</u>

At the penalty phase, Vialva's defense presented testimony from Vialva's friend, Cedrick Young, who testified that Vialva had been his next-door neighbor and that: Vialva "made people laugh"; "[h]e is a comedian"; "[a]ll of the adults in the neighborhood liked him"; [h]e got along with everybody"; "he never caused any trouble"; he was helpful to his family (2870). These matters that his counsel, in fact, presented to the jury, related to the following above-listed points Vialva alleges his counsel did not make:

172

(11) that Vialva was able to form friendships and attachments;

(12) that Vialva was well-liked by his positive peer group;

(1) that Vialva was well-liked by others; and

(3) that Vialva had friends and family that knew him and loved him.

<u>Brown</u>

Vialva's defense presented testimony from Richard Brown, who was married to Vialva's mother. Brown, an Army combat engineer, testified that one year prior to his testimony, in 1999, Vialva had helped him build a patio (2887). Vialva was trying to "turn his life around" and "get away from the gang stuff" (2888). These matters that his counsel, in fact, presented to the jury, related to the following above-listed points Vialva alleges his counsel did not make:

(11) that Vialva was able to form friendships and attachments;

(12) that Vialva was well-liked by his positive peer group;

(1) that Vialva was well-liked by others;

(2) that Vialva was not bound by gang affiliations; and

(3) that Vialva had friends and family that knew him and loved him.

Brown further testified, relating to gang affiliations, that Vialva took steps to get out of the gang, and that he would not even take telephone calls from others, but "they just wouldn't let him alone" (2888). Brown further testified that Vialva had a

serious girlfriend that "was absolutely wonderful (888).

Brown further testified that Vialva had taken a test to join the Navy, that he had finished high school, and that his attitude was good; Vialva was a "really good boy" (2889-90). When Brown married Vialva's mother, Vialva gave his blessing and told him to take care of his mom (2892). These matters that his counsel, in fact, presented to the jury, related to the following above-listed points Vialva alleges his counsel did not make:

(11) that Vialva was able to form friendships and attachments;

(1) that Vialva was well-liked by others; and

(2) that Vialva had friends and family that knew him and loved him.

Brown further testified that Vialva's memory was short, that he had ADHD, and he would forget things quickly (2890-91).

Lisa Brown (Vialva's Mother)

Lias Brown, Vialva's mother, testified that she had been married a number of times (2902). She related that she had grown up in a strict home; that she was only allowed to have two dates (2903).

After she enlisted in the Army, when she was 18 years old, she got engaged to Robert Mabry (2904). When she found out that Mabry was unfaithful, she broke the engagement (2905).

Brown then met Vialva's father, Roland Vialva (2905).   Roland Vialva was from Trinidad (2905).  Roland Vialva did not assault her before they were married, he just "bit" her on the shoulder (2906).  They were married in October after having known each other six weeks (2906).

By Thanksgiving of 1978 Roland Vialva was "being abusive" (2906).  She testified: "He would hit me, choke me, and hit me with things" (2906).  He "controlled" every aspect of her life (2907).  When he beat he, her took her into the bathroom where her screams could not be heard (2910).

Roland Vialva was "into witchcraft" (2907).  He had a closet with "lizard tails snake eyes and tarot cards" (2907). He had "numerous mistresses" (2908).  He had "wads of money" and a gambling habit (2909).

After Roland Vialva abused her, he was incarcerated by the Army (2909). He moved out, and she had to leave the quarters and find a smaller apartment (2911). She got a pregnancy discharge from the Army (2911).

Roland Vialva relocated to Houston (2912). She moved to join him, as she "wanted to give him a chance to be a father to his child" (2912). In Houston, however he "continued to be abusive" (2912).  He was abusive mentally and physically (2912-13).  Brown went to live with her sister Tina in Wisconsin (2913).

Out of economic necessity, she moved back to Texas to deliver her child (2913). She had no money. Roland Vialva was not supporting her (2514).

Roland Vialva did not attend her delivery (2915). Roland Vialva did not see the defendant, Christopher Vialva, until Christopher was five days old (2915).

Christopher was light-complected at birth (2915). She left the baby with Roland Vialva one time, and she heard Christopher scream, and Christopher had large bite marks and bruises on his stomach (2915-16).

These matters that Vialva's counsel, in fact, presented to the jury, related to the following above-listed points Vialva alleges his counsel did not make:

(1) that Vialva was raised in profoundly chaotic circumstances;

(2) that chaos was the direct result of Vialva's mother's illness;

(3) that Vialva's mother suffered from mental and emotional disorders that caused her to engage in self-destructive behavior;

(6) that Vialva's mother became involved in a series of abusive relationships that had negative effects on both children;

(13) that Vialva treated his girlfriends with respect and concern;

(14) that the mother of one of Vialva's friends thought Vialva's mother was not very involved in Vialva's life.

(3) that Vialva developed behavioral disturbances;

176

(6) that Vialva had Attention Deficit Hyperactivity Disorder,;

(7) that Vialva had depression, inability to concentrate, irritability, and impulsiveness;

(8) that he had a chaotic home that exacerbated his medical problems;

Vialva's mother further testified that when Christopher was 11 days old, he was hospitalized with a serious blood infection (2916). Vialva's father did not visit him. Exhibits were introduced concerning the social worker's report of her deprivation.

Brown decided to "escape" from Roland Vialva so he would not harm her or "Chris" (2929). Prior to her escape, however, Roland kicked her on the right side of her head and she lost her vision for three days (2920). She went back to live with her sister (2920). She filed for divorce (2929).

When Christopher Vialva was in the hospital he had to take massive doses of antibiotics but "his veins kept collapsing" (2928). Fluid collected in Christopher's head (2928). His "whole head became spongy" (2928).

Brown then became reacquainted with her first fiancé, Mabry (2930). She was rejected by the Army because she had a grand mal epileptic seizure after Christopher's delivery (2931). She moved to Florida with Mabry (2930). She followed him to Louisiana (2932). She married him because she had no insurance and Christopher needed hospitalization (2937). Mabry also began to abuse "Chris" physically (2936).

177

She related that:

> He was changing Christopher's diaper, and Christopher urinated on him in the process, and he took him into the bathroom in our apartment and locked the door and began hitting him. . .

(2936). She threatened to call the police, but Mabry grabbed her by the throat and threatened to kill her (2936).

Brown and Mabry went to Germany (2937). There, Mabry would "choke" her and beat her (2937).

In Germany, Brown worked in several jobs (2938). She worked a 40 hour per week government job (2938). She also worked in a band (2938). Christopher was taken care of by baby sitters (2938).

Christopher one day asked her: "Mama, Why do I have this funny brown stuff on me and 'sissy' doesn't?" (2939). Because the violence escalated, she got another divorce (2939).

When Christopher was six, she moved back to Texas (2940). She worked at a full time job as a civilian assistant in the military (from 7:30 a.m. to 4:30 p.m. (2940-41). Then she worked at another job from 5:00 p.m. to 9:00 p.m. Then she also worked as a cocktail waitress until 3:00 a.m. (2940-41). Chris was taken care of by baby sitters. She spent very little time with "Chris' (2942).

178

These matters that Vialva's counsel, in fact, presented to the jury, related to the following above-listed points Vialva alleges his counsel did not make:

(1) that Vialva was raised in profoundly chaotic circumstances;

(5) that Christopher and Audrey had to shift for themselves at a very young age;

(6) that Vialva's mother became involved in a series of abusive relationships that had negative effects on both children;

(1) that Vialva had physical trauma at birth; and

(2) that Vialva had a history of serious illness as an infant.

Brown further testified that Christopher had trouble in school because of his attention deficit disorder (2945). When Roland Vialva visited, Christopher rejected him (2945). That Christopher had a problem with his racial identity (2946).

Brown further testified that she started dating Jim Gillhouse (2947). At first, he related to Christopher very well, and they formed a strong male bond (2948). After Gillhouse came back from the Gulf War, however, Gillmore had changed. Gillmore said to Christopher that he had wanted to marry his mother, but because of Christopher's bad behavior, he was not going to marry her (2949). Christopher said to his mother if he had been a better boy, Jim would still be there (2958). At school, the kids called Christopher "zebra" (2949). Christopher got into fights (2950).

When Christopher entered middle school he was taking medication for attention

179

deficit disorder (2953). The medication helped control his hyperactivity (2953).

In 1993 Brown married Joe Massey (2953). He wanted to discipline Christopher, but she would not give her approval (2954). During this time, Christopher had angry outbursts (2954). She divorced Massey.

She began to live with Cecil Pry (2955). At 14 Years old, Christopher stopped taking medication for his attention deficit disorder because of medical complications revealed in an EKG (2956).

Christopher's grades dropped (2958). He got into trouble at school (2958). She was still working long hours (2959).

Vialva's mother described him as "He has a very good heart, but he doesn't trust people" (2958). She described Christopher's relationships with two young ladies (2958). Christopher "went out of his way to buy them flowers" and treat them well (2958).

These matters that Vialva's counsel, in fact, presented to the jury, related to the following above-listed points Vialva alleges his counsel did not make:

(1) that Vialva was raised in profoundly chaotic circumstances;

(2) that chaos was the direct result of Vialva's mother's illness;

(3) that Vialva's mother suffered from mental and emotional disorders that caused her to engage in self-destructive behavior;

(6) that Vialva's mother became involved in a series of abusive relationships that had negative effects on both children;

(13) that Vialva treated his girlfriends with respect and concern;

(14) that the mother of one of Vialva's friends thought Vialva's mother was not very involved in Vialva's life.

(3) that Vialva developed behavioral disturbances;

(6) that Vialva had Attention Deficit Hyperactivity Disorder,;

(7) that Vialva had depression, inability to concentrate, irritability, and impulsiveness; and

(8) that he had a chaotic home that exacerbated his medical problems;

<u>Dr.</u> <u>Cunningham</u>

Dr. Mark Cunningham's testimony, also highlighted mitigating factors while discussing risk factors. He discussed Vialva's circumstances from birth to age six. He related that prior to Christopher's birth, his mother had toxemia and hypertension; that there was the presence of mild physical abnormalities or brain damage, a family history of criminal behavior and substance abuse, and his biological father engaged in a criminal degree of domestic violence (3037).

Dr. Cunningham further testified: that there were family management problems, which means that the parent is not disciplining the child and setting limits in an

appropriate fashion; that Vialva's mother was extensively absent, particularly between the ages of three and eight years old, as she was gone working and pursuing relationships a very large part of the time; and that there is a history in this case of domestic violence that crosses almost all of his mother's relationships (3037-38).

Dr. Cunningham further explained that family conflict was present and continuing across Vialva's childhood and early adolescence, with domestic abuse and verbal conflict; and there are some conflict problems that begin early on that are associated with attention deficit disorder (which is a mild brain disorder), and also from a failure to effectively establish parental limits and boundaries (3038-39).

Dr. Cunningham further testified that Vialva's mother would not allow the doctors to give the first choice in medication, and she instead insisted that they had to try something else, which meant identifying a medication that was not as effective, and ultimately caused some cardiovascular problems for him, which was a failure of early intervention.

Dr. Cunningham also discussed emotionally damaging factors to Christopher, including: multigenerational family distress; rejection and abandonment from his father and stepfathers; his emotional development was disrupted by ADD; he had emotional disturbances or psychological disorders, and also by head injuries; he observed domestic violence; he had identity confusion; and disrupted attachments

182

damaging his ability to bond with others and value other people (3054).

These matters that Vialva's counsel, in fact, presented to the jury, related to the following above-listed points Vialva alleges his counsel did not make:

(1) that Vialva was raised in profoundly chaotic circumstances;

(2) that chaos was the direct result of Vialva's mother's illness;

(3) that Vialva's mother suffered from mental and emotional disorders that caused her to engage in self-destructive behavior;

(5) that Christopher and Audrey had to shift for themselves at a very young age;

(6) that Vialva's mother became involved in a series of abusive relationships that had negative effects on both children;

(7) that Vialva's biological father was excluded from Vialva's life at a young age;

(8) that Vialva had problems in school and problems at home;

(9) that Vialva had symptoms of mental disorder;

(14) that Vialva's mother was not very involved in Vialva's life.

(1) that Vialva had physical trauma at birth

(2) that Vialva had a history of serious illness as an infant;

(3) that Vialva developed behavioral disturbances;

(4) that Vialva had head injuries;

(6) that Vialva had Attention Deficit Hyperactivity Disorder,;

(7) that Vialva had depression, inability to concentrate, irritability, and impulsiveness;

(8) and that he had a chaotic home that exacerbated his medical problems.

Additionally, Dr. Cunningham testified about Vialva's healthy attributes: that he finished high school despite all his problems; that he continued to be bonded to his mother, despite the dysfunctional relationship; that he was protective of his younger sister; and that he had a long-term dating relationship with his girlfriend (3070).

### The Social, Medical, And Emotional Health Evidence Was Presented; The Strategy Selected Was Reasonable

The entire record shows that much of the social, medical, emotional health evidence that Vialva raises in this motion was, in fact, presented to the jury. Vialva has not demonstrated ineffective assistance. As discussed above, to demonstrate that counsel's performance was constitutionally deficient a movant must show errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The presumption is that counsel has made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. Vialva's criticisms in hindsight are without merit. Vialva's counsel argued that Vialva's harsh upbringing, physical and emotional abuse, and medical problems

184

were mitigating factors. Additionally, the use of Dr. Cunningham to counter future dangerousness through the use of his statistical method was reasonable. Dr. Cunningham was a clinical and Board Certified forensic psychologist, a Diplomate (one of only nine in Texas), a specialist in risk assessment, who had testified in numerous capital cases (2960, 2963, 2964,2965, 3072-73). Vialva has not shown that it was unreasonable to employ Dr. Cunningham's approach.[37]

The strategy taken by Bernard's counsel, to humanize Bernard, and avoid a battle of experts also failed. In *Rutherford v. Crosby*, 385 F.3d 1300, (11th Cir. 2004) the Florida courts determined that counsel's decision, that is was unnecessary to engage a mental health expert or to obtain and present more detailed mental health evidence, was sensible in light of the punishment-phase strategy to "humanize" defendant and portray him as a hard-working, family oriented, "Boy Scout" type. The Eleventh Circuit affirmed the denial of habeas relief, based on a lack of *Strickland*

---

[37]

In *Dowthitt v. Johnson*, 230 F.3d 733, 751 (5th Cir. 2000), the courd denied petitioner's claim that trial counsel was deficient during closing arguments during the penalty phase. Dowthitt faulted counsel for arguing that: Dowthitt suffered from a disease that resulted in his acting in a "frenzy, like the feeding of a shark or something," and Dowthitt would not be a future danger by positing that his only victims in prison would be "effeminate men." *Id* The court emphasized that while they would not endorse every aspect of counsel's statements, taken in full context, counsel was arguing that Dowthitt's actions were not deliberate and he did not present a continuing danger. *Id.* The court would not second-guess strategic decisions based on *Strickland.Id.*

185

prejudice.[38]

## There Could Have Been No Prejudice

Finally, Vialva cannot show that any approach would have fared better before this jury. It was Vialva that demanded that the Bagleys be killed because they had seen his face. It was Vialva that decided to burn the vehicle. It was Vialva that mercilessly shot the Bagleys in the head after they had begged for their lives. Vialva had committed dozens of burglaries with Bernard and Brown. Vialva was with gang members in a car, when one of them murdered a man over a traffic matter. The murders were committed in a terrible manner, to obtain money, after substantial planning, and to preclude information to law enforcement. Vialva was likely to commit future acts of violence. The facts would have doomed the strategy he proposes in hindsight.

---

[38]

In *Walton v. Angelone*, 321 F.3d 442, 465 (4th Cir. 2003), Walton claimed that his counsel failed to investigate and present mitigating mental health evidence. Specifically, he asserted that his counsel was ineffective for failing to pursue a sentencing strategy to show that Walton was a schizophrenic who could be treated with medication to reduce his dangerousness and that it was mental illness that accounted for his behavior at sentencing. *Id.* Instead counsel presented a mitigation case that presented him as a good young man despite what he had done. *Id.* The Court determined that Wilson could not show that his counsel's performance fell below an objective standard of reasonableness. *Id.*

## VIALVA'S GROUND EIGHT

## VIALVA'S CLAIM, THAT THE GRAND JURY DID NOT DETERMINE ALL OF THE ELEMENTS ESSENTIAL TO ESTABLISH CAPITAL MURDER, HAS BEEN PROCEDURALLY DEFAULTED; ADDITIONALLY , *APPRENDI* HAS NOT BEEN APPLIED RETROACTIVELY IN HABEAS REVIEW, SO THAT THIS *APPRENDI*-TYPE CLAIM MAY NOT BE RAISED FOR THE FIRST TIME ON SECTION 2255 REVIEW; NEVERTHELESS, IN THIS CIRCUIT, UNDER *ROBINSON*, EVEN IN A CASE UNDER DIRECT APPEAL, ERROR UNDER *RING* HAS BEEN HELD TO BE HARMLESS

(Responsive To Vialva's Ground VIII, 144-55)

### Background And Nature Of The Claim

The Indictment And Trial Took Place In 2000;
The Jury Ruled On The Aggravating Factors And The Special Issues

The last of the superseding indictments against Vialva and Bernard was filed on March 28, 2000. The trial of Vialva and Bernard was conducted and completed in May and June of 2000.

At the conclusion of the trial, this Honorable Court read the decision of the jury concluding that the aggravating factors were present beyond a reasonable doubt (3279-3286).

<u>In 2000, The Instant Case Was Controlled</u>
<u>By The Supreme Court's *Walton* Decision</u>

As the Fifth Circuit has explained in *United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004), prior to the *Ring* decision in 2002, *infra*, "our analysis of the use of sentencing factors in a capital case was controlled by *Walton v. Arizona*, 497 U.S. 639 . . . (1990), wherein the Court determined that aggravating factors are not independent offenses, but only standards used to help a jury decide between death and life imprisonment."

<u>In 2002, In The *Ring* Decision, The Supreme Court</u>
<u>Announced A New Rule Of Constitutional Procedure</u>

As the Fifth Circuit further explained in *Robinson*, 367 F.3d at 284, in 2002, in *Ring v. Arizona*, 536 U.S. 584 (2002), "[t]he Court held that where an aggravating factor renders a defendant eligible for death, it is 'the fundamental equivalent of an element of a greater offense' and therefore must be proven to a jury beyond a reasonable doubt." *Robinson* (citing and quoting *Ring* at 609). The Fifth Circuit characterized the change as "a new rule of constitutional criminal procedure." *Robinson* at 284.

In *Robinson*, the appellant, in a direct criminal appeal, argued that the pre-*Ring* indictment was constitutionally defective because it failed to allege the statutory aggravating factors that made Robinson eligible for the death penalty. *Id.* at 283. The

188

Fifth Circuit held that "the absence of an indictment on the aggravating factors used to justify a death sentence is not structural error and is susceptible to harmless error review." *Id.* at 286. The Fifth Circuit further held in *Robinson* that the district court had "properly relied on the then-binding *Walton* decision, and that the *Ring*-error was mere harmless error, as the petit jury's unanimous findings were, at a minimum, persuasive evidence of what a grand jury would have found if the government had charged the aggravating factors it intended to prove to render the defendant eligible for the death penalty. *Id.* at 287-89.

In the instant case, just as the appellant in *Robinson*, Vialva also argues that his pre-*Ring* indictment was constitutionally defective because it failed to allege the statutory aggravating factors that made him eligible for the death penalty. Similarly, this Honorable Court "properly relied on the then-binding *Walton* decision."

This instant case, however, is very much different than *Robinson* in that Robinson raised his *Ring-Apprendi* issue in his direct criminal appeal, while Vialva, failed to raise this issue or type of issue on direct appeal. Certainly, because the law in this circuit is that the aggravating-factor indictment error is harmless error, Vialva cannot be entitled to habeas relief on this issue.

**Vialva Has Procedurally Defaulted On This Issue**

The trial of Vialva and Bernard, in which no aggravating-factors-as-elements-must-be-presented-to-the-grand-jury claim was made, was conducted and completed in May and early June of 2000. *Apprendi* was decided on June 26, 2000. The Fifth Circuit's docket sheet indicates that the record on appeal, for Vialva's direct criminal appeal was "released to attorney Steven C. Losch," one of Vialva's two appellate attorneys, on March 26, 2001. A corrected brief for Vialva's direct criminal appeal was filed on May 30, 2001.

The Supreme Court granted certiorari in *Ring v. Arizona* on January 11, 2002 (*see Ring v. Arizona*, 534 U.S. 1103). As noted by the Supreme Court, certiorari was granted in *Ring* "to allay uncertainty in the lower courts caused by the manifest tension between *Walton* and the reasoning of *Apprendi*." *Ring*, 536 U.S. at 596 (citing cases going back to 2000 questioning whether *Apprendi* affected *Walton*). The Supreme Court heard argument in *Ring* on April 22, 2002.

As discussed by the Supreme Court, the analysis in *Ring* is based on applying the reasoning of *Apprendi*. *Ring* at 595-610. In *Robinson* the Fifth Circuit characterizes error under *Ring* as *Apprendi* error. *Robinson*, 367 F.3d at 284, 285.

As noted above, a defendant's collateral attack "may not do service for an appeal," and a constitutional claim raised for the first time on collateral review must show both cause and prejudice for his procedural default and actual prejudice due to any such errors. *Frady*, 456 U.S. at 165-70. The cause-and-prejudice standard is even more rigorous than the plain-error standard. *Id.* at 170.

Certainly, *Apprendi*-type claims, such as made in *Ring*, could have been made by Vialva's two appellate attorneys. Indeed, as noted above, the arguments made in *Ring* were known and available when Vialva's appellate brief was filed in the Fifth Circuit. This was not a "novel" claim.

Vialva notes that the now-deceased Mr. Losch was incapacitated for all or part of this appeal (citing the declaration of Kay Losch). The declaration of Kay Losch, however, indicates that Mr. Losch, who "specialized in capital cases particularly at the appeal stage," had his first surgery in November, 2001, after which he never fully recovered. The Fifth Circuit's docket sheet indicates that the record on appeal was "released to attorney Steven C. Losch" on March 26, 2001, and that a corrected brief for Vialva was filed on May 30, 2001. Thus, this appellate capital litigation specialist could have considered raising this issue. Vialva's other appellate attorney also could have raised this issue in his appellate brief. Vialva has not shown good "cause" for failing to raise this issue in his direct appeal. Nor can he show prejudice.

191

In *Bousley v. United States*, 523 U.S. 614, 622-24 (1998), the petitioner offered two explanations for his default in an attempt to demonstrate "cause." The Supreme Court first rejected the argument that the legal basis for the claim was not reasonably available to counsel where the claim was not novel, as similar challenges had previously been made. *Id.* The Court also rejected the argument that, because of existing circuit law, it would have been "futile" to raise the claim, because "futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." *Id.* at 623 (internal quotation of *Engle v. Isaac*, 456 U.S. 107, 130 n.35 omitted).

Certainly, Vialva cannot demonstrate the prejudice requirement. Just as in *Robinson*, any *Ring*-error here was mere harmless error, as the petit jury's unanimous findings were, at a minimum, persuasive evidence of what a grand jury would have found if the government had charged the aggravating factors it intended to prove to render the defendant eligible for the death penalty. *Robinson* at 287-89. If an error is harmless it cannot, by definition, be prejudicial.

Finally, the cause and prejudice standard may be avoided by showing "actual innocence" (more likely than not that no reasonable juror would have convicted him). *See, e.g.*, *Bousley*, 523 U.S. at 622-23. Vialva is light-years away from attempting to make that showing, and he has waived this claim.

### Vialva's *Ring* Claim Does Not Have Retroactive Application

In his § 2255 motion, Vialva is attempting to apply the *Ring* decision retroactively. In *Teague v. Lane*, 489 U.S. 288, 310 (1989), the Supreme Court held that new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rule is announced, unless the new rule places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.[39] In *Robinson*, 367 F.3d at 284, the Fifth Circuit characterized the *Ring* extension of *Apprendi* as "a new rule of constitutional criminal procedure." The *Ring* procedural rule should not be applied retroactively to Vialva's trial on habeas review; it is *Teague* barred.

---

[39] The *Teague* doctrine is founded on the notion that one of the principal functions of habeas corpus is to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted. *Teague*, 489 U.S. at 312-13. Consequently, unless a new rule of criminal procedure is of such nature that without it the likelihood of an accurate conviction is seriously diminished, there is no reason to apply the rule retroactively on habeas review. *Id.* In the instant case, the petit jury found the aggravating factors beyond a reasonable doubt; there was no risk that the innocent would be convicted or a diminishing of the likelihood of an accurate conviction; there is no reason to apply the rule retroactively on habeas review.

193

**Even In A Direct Appeal, *Robinson* Holds *Ring* Error Was Harmless**

As noted above, In *Robinson*, the appellant, in a direct criminal appeal, made the same argument as Vialva makes here in his habeas motion, that the pre-*Ring* indictment was constitutionally defective because it failed to allege the statutory aggravating factors that made Robinson eligible for the death penalty. *Id.* at 283. The Fifth Circuit held in *Robinson* that "the absence of an indictment on the aggravating factors used to justify a death sentence is not structural error and is susceptible to harmless error review." *Id.* at 286. The Fifth Circuit further held in *Robinson* that the *Ring*-error was mere harmless error, as the petit jury's unanimous findings were, at a minimum, persuasive evidence of what a grand jury would have found if the government had charged the aggravating factors it intended to prove to render the defendant eligible for the death penalty. *Id.* at 287-89. Thus, in the instant case, *Robinson* holds that any *Ring* error would have been harmless. *Id.*

Vialva believes *Robinson* was wrongly decided. This argument against binding circuit law must be raised in a different forum.

**Vialva's Ineffective Assistance Sub-Arguments Must Fail,
As The Fifth Circuit Has Determined *Ring*-Error Harmless In This Context**

As noted above, in his § 2255 motion (Motion at 144), Vialva characterizes this issue in the main heading as: "The Grand Jury Did Not Determine All Of The Elements Essential To Establish Capital Murder. Mr. Vialva's Subsequent Convictions And Sentences Of Death Were Imposed In Derogation Of The Indictment Clause Of The Fifth Amendment. The Convictions And Sentences Must Be Vacated." Thus, this is a Fifth Amendment claim under the Indictment Clause. Ineffective assistance of counsel is not mentioned in the heading. The issue should be analyzed as discussed above.

Nevertheless, within this issue in Vialva's motion, he complains that trial counsel should have raised an *Apprendi-Ring* claim. He also complains that appellate counsel should have raised a *Ring* claim.

Vialva has not shown that counsel was ineffective in failing to raise this issue. Moreover, if *Ring* error in this context is harmless error under *Robinson*, then, by definition, Vialva could not show *Strickland* prejudice, that the outcome of a proceeding would have been different.

195

As Vialva notes (Vialva's Motion at 150-51), Benrnard's counsel raised *Ring* error prior to the appellate decision, and the Fifth Circuit, in an alternative ruling, found that it could not be plain error. Vialva has not shown that appellate counsel was ineffective in failing to raise this issue. Moreover, if *Ring* error in this context is harmless error under *Robinson*, and it did not qualify as not plain error (which has a component of prejudice), then, by definition, Vialva could not show *Strickland* prejudice, that the outcome of a proceeding would have been different. Furthermore, the Fifth Circuit's ruling is the law of the case.

## VIALVA'S GROUND NINE

### VIALVA'S CUMULATIVE-ERROR GROUND IS WITHOUT MERIT; HE HAS SHOWN NO ERROR, AND CERTAINLY NO PREJUDICIAL ERROR

(Responsive To Vialva's Ground IX, 155-65)

Vialva's claim of cumulative error is without merit. Just as in the direct appeal, there was no significant cumulative error impact. *See Bernard*, 299 F.3d at 488. Counsel's overall performance was not outside the wide range of professionally competent assistance. Any errors, viewed separately and cumulatively did not render the result of either the guilt or penalty phase unreliable. Vialva has not demonstrated either deficient performance by his trial counsel or any cumulative errors approaching constitutional dimension. *See Livingston v. Johnson*, 107 F.3d 297, 309-10 (5th Cir.

196

1997).

## VIALVA'S GROUND TEN

**VIALVA'S CHALLENGE, THAT THE FEDERAL DEATH PENALTY, AS APPLIED, VIOLATES THE FIFTH AND EIGHTH AMENDMENTS, HAS BEEN PROCEDURALLY DEFAULTED, AS VIALVA FAILED TO RAISE THIS ISSUE IN HIS DIRECT APPEAL, AND HE HAS NOT SHOWN CAUSE AND PREJUDICE IN SUPPORT OF THIS FAILURE; NEVERTHELESS, HIS CHALLENGE IS WITHOUT MERIT**

(Responsive To Vialva's Motion, Ground X, 159-60)

### Background And Nature Of The Claim

Vialva argues that according to the Death Penalty Resource Counsel, out of a pool of 1,845 potential capital defendants, a total of 318 (or 17%) have actually been authorized for capital prosecution. Within that group of 318 defendants, "the death penalty has been sought disproportionately against African-Americans at a rate of 52%."

Vialva argues that these and other statistics demonstrate that the authorization process by which the Department of Justice selects those defendants who will face the death penalty, may be impermissibly influenced by the defendant's race, in violation of equal protection and the Fifth and Eighth Amendments. Vialva's argument is entirely without merit.

197

**This Claim Has Been Procedurally Defaulted;**
**Bernard Has Failed To Show Cause And Prejudice For His Failure**
**To Raise This Claim in His Direct Appeal**

As noted above, a defendant's collateral attack on a conviction "may not do service for an appeal." *Frady*, 456 U.S. at 165-70. Therefore, a defendant who raises a constitutional or jurisdictional claim for the first time on collateral review, when those claims could have been asserted on direct appeal, must show both cause for his procedural default and actual prejudice due to any such errors. *Id.* The cause and prejudice standard is more rigorous than the plain error standard used on direct review. *Id.* at 70. Vialva has not shown both cause for his procedural default and actual prejudice due to any such error.

Vialva also has not shown anything in the way of prejudice. With the overwhelming evidence against him as to guilt, and all of the aggravating factors, he cannot show that a different result would have been reached with different criteria.

## Standards Of Analysis

### *Armstrong*

In *United States v. Armstrong*, 517 U.S. 456 (1996), the Supreme Court addressed the appropriate standard for establishing a constitutional selective-prosecution claim. The *Armstrong* Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their duties. *Id.* at 464-65. The Court explained that in order for a criminal defendant to dispel this presumption and establish that he has been selectively prosecuted on the basis of his race, he must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. *Id.* In order to establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.*

### *McCleskey*

In *McCleskey v. Kemp*, 481 U.S. 279, 294-97 (1987), the petitioner made a claim of selective prosecution based on the "Baldus Study," which reported that the Georgia prosecutors sought the death penalty in 70% of the cases involving black defendants and white victims, 32% of the cases involving white defendants and white victims, 15% of the cases involving black defendants and black victims, and 19% of the cases involving white defendants and black victims. *Id.* at 287. The Court in

199

*McCleskey* determined that a court may be allowed to make a finding of a constitutional violation (or *prima facie* finding thereof) in very limited circumstances if the data presents a "stark" enough picture, but that the Baldus report did not so qualify. In the instant case, Vialva has not presented statistics more stark than in *McCleskey*.

## Vialva Has Failed To Meet His Burden Under *Armstrong*, *McCleskey*, *Webster*, And *Jones*; This Issue Is Foreclosed By The Law Of This Circuit

### <u>Jones</u>

In *United States v. Jones*, 287 F.3d 325, 333-35 (5th Cir.), *cert. denied*, 537 U.S. 1018 (2002), the Fifth Circuit was presented with a report by an appellant titled "Department of Justice, The Federal Death Penalty System: A Statistical Survey (1988-2000)," prepared by the Department of Justice, in support of a selective prosecution claim. The report provided that, between 1995 and 2000, the Attorney General of the United States authorized 159 death-penalty prosecutions from 682 potential death-penalty cases, and that of those 159 cases, there were 44 white defendants, 71 black defendants, 32 Hispanic defendants, and 12 "other" defendants. *Id.* The Fifth Circuit held that this evidence was insufficient to establish a *prima facie* case for selective prosecution. *Id.*

200

*Webster*

In *United States v. Webster*, 162 F.3d 308, 333-35 (5th Cir. 1999), the appellant presented statistical evidence in support of a claim of selective prosecution that 66% of federal death penalty cases involved African-American defendants. The Fifth Circuit denied this claim and held that because Webster had not shown that other similarly situated individuals of other races were not prosecuted for the death penalty, and he failed to establish a discriminatory purpose on the part of the Department of Justice. *Id.* The Fifth Circuit further held that his 66% African-American-defendants statistics did not rebut the presumption of good faith on the part of the prosecution. *Id.*[40]

*Hall*

In *Hall v. United States of America*, __ F.3d __ (N.D.Tex. 2004) (2004 WL 1908242), Hall made a selective-prosecution claim for relief under § 2255 that the government violated his constitutional rights because it used ethnicity as a basis for seeking the death penalty against African-Americans such as himself. In support of his claim, Hall cited statistics maintained by the Federal Death Penalty Resource

---

[40] The court in *Webster* explained that to establish the claim of selective prosecution the defendant must show: first, that he has been singled out for prosecution but others similarly situated of a different race were not prosecuted; and second, that the discriminatory selection of him is invidious or in bad faith, in that it rests on an impermissible consideration such as race. *Webster*, 162 F.3d at 333-34) (citations omitted).

Center that purportedly indicate that the Department of Justice has authorized the death penalty in 199 cases, 76% of which had non-white defendants and 52% of which involved an African-American defendant (*see* page 27-28 of the Westlaw opinion). Further, of these defendants, 47.5% of white defendants obtained a plea deal for a lesser sentence, while 27.2% of African-Americans obtained such plea deals. *Id.* The district court held, however, that this statistical evidence was insufficient to establish a *prima-facie* selective-prosecution case. *Id.* (citing *Jones*, 287 F.3d at 333-35. Furthermore, the district court held that his statistical evidence was not sufficient to establish the "some evidence" standard necessary to establish good cause for discovery. *Id.* at n. 11.

Conclusion

In *McCleskey*, the Supreme Court rejected a claim of selective prosecution based on statistical reporting that the Georgia prosecutors sought the death penalty in 70% of the cases involving black defendants and white victims, finding that this data did not present a "stark" enough picture. In *Jones*, the Fifth Circuit held that a report, providing that between 1995 and 2000, the Attorney General of the United States authorized 159 death-penalty prosecutions, of which approximately 45% were black defendants, was insufficient to establish a *prima facie* case for selective prosecution. In *Webster*, 162 F.3d 308, 333-35 (5th Cir. 1999), the Fifth Circuit held that statistical

2387

evidence, showing that 66% of federal death penalty cases involved African-American defendants, did not rebut the *Armstrong* presumption of good faith on the part of the prosecution, and did not show that other similarly situated individuals of other races were not prosecuted for the death penalty, nor a discriminatory purpose on the part of the Department of Justice. And in *Hall*, the court rejected a selective-prosecution claim for relief under § 2255, based on statistics maintained by the Federal Death Penalty Resource Center that purportedly indicated that the Department of Justice has authorized the death penalty in 199 cases, 76% of which had non-white defendants and 52% of which involved an African-American defendant, as this statistical evidence was insufficient to establish a *prima-facie* selective-prosecution case. Vialva has failed to establish a *prima-facie* selective-prosecution case. Just as in *Webster*, Vialva has failed to show: first, that he has been singled out for prosecution but others similarly situated of a different race were not prosecuted; and second, that the discriminatory selection of him is invidious or in bad faith, in that it rests on an impermissible consideration such as race. *Webster*, 162 F.3d at 333-34). His claim is foreclosed by Fifth Circuit authority.

## VIALVA'S GROUND ELEVEN

## VIALVA'S CHALLENGE, THAT THE LETHAL INJECTION UNDER THE PROTOCOLS CURRENTLY IN FORCE IN THE UNITED STATES BUREAU OF PRISONS AND ANY SIMILAR PROTOCOLS WOULD VIOLATE THE EIGHTH AMENDMENT HAS BEEN PROCEDURALLY DEFAULTED; NEVERTHELESS, THIS GROUND IS WITHOUT MERIT; LETHAL INJECTION HAS BEEN UPHELD AGAINST NUMEROUS CHALLENGES

(Responsive To Vialva's Motion, Ground XI, 161-73)

### Background And Nature Of The Claim

Vialva finally contends that his lethal injection under the protocols currently in force in the United States Bureau of prisons and any similar protocols would violate the Eighth Amendment. Vialva argues that the Bureau of Prisons' lethal injection protocol creates a substantial risk that he will consciously suffer or suffer excruciating pain as he is put to death.

### This Claim Has Been Procedurally Defaulted; Vialva Has Failed To Show Cause And Prejudice For His Failure To Raise This Claim in His Direct Appeal

As noted above, a defendant's collateral attack on a conviction "may not do service for an appeal." *Frady*, 456 U.S. at 165-70. Therefore, a defendant who raises a constitutional or jurisdictional claim for the first time on collateral review, when those claims could have been asserted on direct appeal, must show both cause for his

204

procedural default and actual prejudice due to any such errors. *Id.* The cause and prejudice standard is more rigorous than the plain error standard used on direct review. *Id.* at 70. Vialva has not shown both cause for his procedural default and actual prejudice due to any such error. Nevertheless, this claim is entirely without merit. Lethal injection is the method used in 37 of the 38 states with the death penalty.

### Standards Of Analysis

The Eighth Amendment prohibits punishments that involve the unnecessary and wanton inflictions of pain, or that are inconsistent with evolving standards of decency that mark the progress of a maturing society. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). Punishments are cruel when they involve torture or a lingering death. *In re Kemmier*, 136 U.S. 436, 447 (1890).

The constitutionality of lethal injection has been continuously upheld as a method of execution. *See, e.g., Cooper v. Rimmer*, 358 F.3d 655, 657 (9th Cir. 2004) (rejecting challenge to the California protocols for lethal injection); *LaGrand v. Stewart*, 133 F.3d 1253, 1265 (9th Cir. 1998) (rejecting challenge to the Arizona protocols for lethal injection). In fact, as noted in *Cooper*, "[e]xecution by lethal injection is now used by 37 of the 38 states with the death penalty." *Cooper*, 358 F.3d at 559 and n. 3 (collecting statutes).

The Supreme Court has recognized that unforseeable accidents do not add a

205

constitutionally impermissible element of cruelty to an execution. *Louisiana ex rel. Resweber*, 329 U.S 459, 464 (1947). Thus, "[t]he risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review." *Campbell v. Wood*, 18 F.3d 662, 682 (9th Cir. 1994) (en banc).

### Vialva's Claim Is Without Merit

As noted above, Vialva challenges the Bureau of Prisons lethal injection protocols because he believes there is no assurance the protocol used by the Bureau of Prisons will render and maintain him unconscious during the injection of the lethal drugs, and thus, the speculation is that a painful death might result.

A similar challenge was made in *Cooper*, a § 1983 case, where the court explained that "[l]ike other states, California uses a combination of three chemicals to carry out an execution by lethal injection: sodium pentothal, a barbiturate sedative; pancuronium, a neuromuscular blocking agent; and potassium chloride, which stops the heart." *Cooper*, 358 F.3d at 657 (citing statute). The court further explained that a condemned inmate is administered five grams of thiopental sodium which renders the inmate unconscious, and thus, the inmate will not experience pain for the time period necessary to complete the execution. *Id.* at 658. The court in *Cooper* determined that Cooper's allegation of unnecessary pain and suffering was "purely speculative." *Id.* at 658-59 (citing *Campbell*, *supra*, that risk of accident cannot and

206

2391

need not be eliminated from the execution process ). Cooper did not show that he was subject to an unnecessary risk of unconstitutional pain or suffering. *Id.*

Similarly, Vialva's allegation of unnecessary pain and suffering is purely speculative. The risk of accident cannot and need not be eliminated from the execution process. Vialva has not shown that he is subject to an unnecessary risk of unconstitutional pain or suffering.

The federal death penalty protocol follows the procedure of the state where sentence was imposed. 18 U.S.C. § 3596. The Texas state protocol is nearly the same as the California protocol (with sodium thiopental instead of sodium pentothal (the same substance), and the same pancuronium and potassium chloride) (*see* Texas Department of Criminal Justice, Death Row Facts). Just as in *Cooper*, Vialva's allegation of unnecessary pain and suffering is "purely speculative." *Cooper*, at 658-59. Lethal injection using sodium thiopental does not constitute cruel and unusual punishment. *Woolls v. McCotter*, 798 F.2d 695, 697-98 (5th Cir. 1986). This claim is without merit.

## **CONCLUSION**

For the foregoing reasons, Movant's motion for § 2255 relief should be denied.

Respectfully submitted,

JOHNNY SUTTON

United States Attorney

By:

Mark R. Stelmach
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas  78216
(210) 384-7090
Pennsylvania Bar Number 28964

208

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing Brief for the United States of America and computerized disk have been mailed or express mailed to Susan M. Otto, Federal Public Defender, and Lisa A. McCalmont, AFPD, 215 Dean A. McGee Avenue, Suite 109, Oklahoma City, Oklahoma 73102 on this the 8th day of December, 2004.

Mark R. Stelmach
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7090
Pennsylvania Bar Number 28964

209