NO. W-99-CR-70(1)

FILED

FEB 0 4 2005

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

## UNITED STATES DISTICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff/Respondent,<br><br>v.<br><br>CHRISTOPHER ANDRE VIALVA,<br>Defendant/Movant. | CRIMINAL NO.  W-99-CR-70(1) |

The Honorable Walter Smith
Chief United States District Judge

## REPLY TO RESPONDENT'S RESPONSE TO MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TITLE 28, UNITED STATES CODE, SECTION 2255

Susan M. Otto
Federal Public Defender
Lisa S. McCalmont
Assistant Federal Public Defender
215 Dean A. McGee Avenue, Suite 109
Oklahoma City, Oklahoma 73102
Telephone: (405) 609-5930
Facsimile: (405) 609-5932

ATTORNEYS FOR DEFENDANT/MOVANT
CHRISTOPHER ANDRE VIALVA

FEBRUARY 4, 2005

423

NO. W-99-CR-70(1)

## UNITED STATES DISTICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff/Respondent,<br><br>v.<br><br>CHRISTOPHER ANDRE VIALVA,<br>Defendant/Movant. | CRIMINAL NO.  W-99-CR-70(1) |

The Honorable Walter Smith
Chief United States District Judge

REPLY TO RESPONDENT'S RESPONSE TO MOTION TO
VACATE, SET ASIDE, OR CORRECT SENTENCE BY A
PERSON IN FEDERAL CUSTODY PURSUANT
TITLE 28, UNITED STATES CODE, SECTION 2255

Susan M. Otto
Federal Public Defender
Lisa S. McCalmont
Assistant Federal Public Defender
215 Dean A. McGee Avenue, Suite 109
Oklahoma City, Oklahoma 73102
Telephone: (405) 609-5930
Facsimile: (405) 609-5932

ATTORNEYS FOR DEFENDANT/MOVANT
CHRISTOPHER ANDRE VIALVA

FEBRUARY 4, 2005

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RECORD REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

GROUND I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
THE DISTRICT COURT FAILED TO COMPLY WITH THE STATUTORY
PROCEDURE FOR THE APPOINTMENT OF COUNSEL IN DEATH-ELIGIBLE
PROSECUTIONS, DENYING MOVANT CHRISTOPHER ANDRE VIALVA
ACCESS TO COUNSEL QUALIFIED TO DEFEND HIM IN A FEDERAL
CAPITAL PROSECUTION

    A.     Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
           1) Facts and Law Not In Dispute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
           2)     No Procedural Default Occurred . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
               a)     The Error Could Not Have Been Presented on Direct Appeal
                      and No Procedural Default Applies . . . . . . . . . . . . . . . . . . . . . 5
               b)     The Error is Structural and Implicates the Constitution . . . . . . . 10
               c)     Cause and Prejudice Can Be Demonstrated, if Procedural
                      Default Applies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    B.     Facts Relevant to Determination of the Merits . . . . . . . . . . . . . . . . . . . . . 12

    C.     Legal Authority Supporting Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

GROUND II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
MR. VIALVA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE
OF COUNSEL WAS ABRIDGED WHEN HIS TRIAL COUNSEL APPLIED FOR
EMPLOYMENT WITH THE UNITED STATES ATTORNEY'S OFFICE DURING
THE PENDENCY OF HIS TRIAL WITHOUT SECURING CONSENT BEFORE
THE CONFLICT AROSE OR AN EFFECTIVE WAIVER AFTER THE
CONFLICT HAD OCCURRED. THE CONFLICT CAUSED AN ADVERSE
EFFECT ON AND/OR PREJUDICE TO THE OUTCOME OF MR. VIALVA'S
TRIAL WHICH NECESSITATES REVERSAL AND A NEW TRIAL

    A.     Procedural Posture of this Claim - Ground II Has Not Been Procedurally
         Defaulted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.     The Standard of Review of "Self-Interest" Conflicts . . . . . . . . . . . . . . . . . 17

i

2400

C.      This Conflict Requires Relief Under Any Standard of Review .............. 17
        1)      Mr. Goains Was <u>Not</u> Mr. Vialva's Counsel of Choice  ............. 18
        2)      Mr. Goains Had An <u>Actual</u> Conflict That Prejudiced Mr. Vialva ...... 19
        3)      Mr. Vialva Did Not Waive His Right To Conflict-Free Counsel  ...... 23
        4)      Mr. Vialva Was Prejudiced By Counsel's Conflict ................ 26

GROUND III ............................................................ 28

THE GOVERNMENT'S FAILURE TO DISCLOSE MATERIAL EVIDENCE AS REQUIRED BY *BRADY v. MARYLAND* AND ITS PROGENY DEPRIVED CHRISTOPHER VIALVA OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL, SECURED BY THE FIFTH AMENDMENT.   THE SUPPRESSED EVIDENCE WOULD HAVE CAST DOUBT ON THE TESTIMONY OF THE COOPERATING DEFENDANTS, THE ONLY EVIDENCE IDENTIFYING MR. VIALVA AS THE PERSON WHO SHOT THE BAGLEYS. THE SUPPRESSION OF THE EVIDENCE IS PROSECUTORIAL MISCONDUCT THAT UNDERMINES CONFIDENCE IN THE OUTCOME OF THE TRIAL.   THE CONVICTIONS AND SENTENCES MUST BE VACATED AND A NEW TRIAL GRANTED

A.      Procedural Posture of this Claim ...................................... 28
        1)      Material Facts Not Disputed By Respondent ...................... 28
        2)      No Procedural Default of this Claim Occurred .................... 29

B.      Predicate Legal Authority .......................................... 31

C.      Facts Establishing Grounds for Relief ................................. 31

D.      Significance of the Omitted Evidence ................................. 31
        Terry Brown ...................................................... 32
        Christopher Lewis ................................................ 34
        Tony Sparks ...................................................... 35
        Brandon Bernard .................................................. 36
        Prejudice ........................................................ 37

GROUND IV ........................................................... 40

CHRISTOPHER VIALVA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY THE SIXTH AND EIGHTH AMENDMENTS DURING THE GUILT PHASE OF HIS TRIAL.   TRIAL COUNSEL FAILED TO OBTAIN FUNDING FOR NECESSARY EXPERT ASSISTANCE, RESULTING IN AN INADEQUATE INVESTIGATION OF FIRST STAGE ISSUES.  COUNSEL FAILED TO SUBJECT THE GOVERNMENT'S CASE TO ADVERSARIAL TESTING THROUGH PROPER CROSS EXAMINATION, OBJECTIONS, AND CHALLENGES.   BECAUSE OF INADEQUATE PREPARATION, COUNSEL FAILED TO PRESENT A COHERENT DEFENSE.  TRIAL COUNSEL'S FAILURES, INDIVIDUALLY

2401

AND CUMULATIVELY, UNDERMINE CONFIDENCE IN THE OUTCOME OF THE PROCEEDINGS. A NEW TRIAL IS THE SOLE REMEDY FOR THESE FAILURES

A.    Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

B.    Predicate Legal Authority - The Sixth Amendment and Supreme
      Court Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

C.    Specific Instances of Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . 41
      1)    Trial Counsel Failed to Obtain Funding for Necessary
            Experts, Resulting in Inadequate Investigation and
            Deficient Preparation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
      2)    Counsel failed to conduct an adequate investigation . . . . . . . . . . . . . . . 42
      3)    Counsel Failed to Subject the Government's Case to
            Requisite Adversarial Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
      4)    Counsel Failed to Present a Coherent Defense . . . . . . . . . . . . . . . . . . . . 46
      5)    Counsel Failed to Establish a Working Relationship
            with Mr. Vialva . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

D.    Conclusion - Mr. Vialva Was Prejudiced By Trial Counsel's Failures . . . . . . . . 47

GROUND V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
      A CAPITAL DEFENDANT'S PROPENSITY TO COMMIT VIOLENCE IN THE FUTURE CANNOT BE PREDICTED ACCURATELY. THE JURY'S CONSIDERATION OF " FUTURE DANGEROUSNESS" AS A FACTOR IN AGGRAVATION OF PUNISHMENT RESULTED IN THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY, IN VIOLATION OF THE RIGHT TO DUE PROCESS OF LAW SECURED BY THE FIFTH AMENDMENT. ASSESSMENTS OF FUTURE DANGEROUSNESS RELY ON GENERALIZATIONS ABOUT CONDUCT, RATHER THAN FACTS SPECIFIC TO THE DEFENDANT. THIS PROCESS DENIES THE DEFENDANT THE INDIVIDUALIZED SENTENCING REQUIRED BY THE EIGHTH AMENDMENT. THE GOVERNMENT'S INVOCATION AND THE JURY'S USE OF THE "FUTURE DANGEROUSNESS" NON-STATUTORY AGGRAVATING FACTOR DEPRIVED CHRISTOPHER VIALVA OF A CONSTITUTIONALLY ADEQUATE SENTENCING PROCESS

A.    Ground V Has Not Been Procedurally Defaulted . . . . . . . . . . . . . . . . . . . . . . . . 48

B.    Courts Have Accepted That the Texas Defender Study Indicates
      That Future Dangerousness Should Be Revisited as a Constitutional
      Aggravator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

C.    The Defense's Use of Dr. Cunningham . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

GROUND VI ............................................................................. 51

      MR. VIALVA'S TRIAL COUNSEL WERE INEFFECTIVE IN MOVING FOR SEVERANCE OF THE PENALTY PHASE OF THE TRIAL. MR. VIALVA WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL AND HIS EIGHTH AMENDMENT RIGHT TO AN INDIVIDUALIZED SENTENCING

      A.     Ground VI Has Not Been Procedurally Defaulted ....................... 51

      B.     Trial Counsel Were Ineffective In Failing to Present Evidence in Support of Motions for Severance of the Penalty Phase of the Capital Trials ........................................................ 52

GROUND VII ............................................................................ 54

      CHRISTOPHER VIALVA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY THE SIXTH AND EIGHTH AMENDMENTS DURING THE PENALTY PHASE OF HIS TRIAL. TRIAL COUNSEL'S FAILURE TO OBTAIN ADEQUATE FUNDING RESULTED IN A COMPLETE FAILURE TO DEVELOP AND PRESENT READILY AVAILABLE MITIGATION EVIDENCE. COUNSEL FAILED TO DEVELOP INFORMATION ABOUT CHRISTOPHER VIALVA'S MENTAL STATE, HIS UPBRINGING, HIS CHARACTER, AND HIS POTENTIAL. COUNSEL FAILED TO ADDRESS THE GOVERNMENT'S ALLEGATIONS ABOUT MR. VIALVA'S "FUTURE DANGEROUSNESS" AND FAILED TO PRESERVE ERROR ARISING FROM THE GOVERNMENT'S PRESENTATION OF THIS AND NON-STATUTORY AGGRAVATING FACTORS. AS A RESULT OF THESE FAILURES, COUNSEL PRESENTED NO EFFECTIVE DEFENSE TO THE DEATH PENALTY. TRIAL COUNSEL'S FAILURES, INDIVIDUALLY AND CUMULATIVELY, UNDERMINE CONFIDENCE IN THE OUTCOME OF THE SENTENCING PROCEEDINGS. A NEW TRIAL IS THE SOLE REMEDY FOR THESE FAILURES

      A.     Procedural Posture of this Claim ................................. 54

      B.     Legal Standard Applicable to this Ground .......................... 54

      C.     Specific Instances of Ineffective Assistance of Counsel ................. 55

           1) and 2)     Counsel Failed to Secure Adequate Funding for Necessary Resources and to Devote Adequate Time and to Investigate, Prepare, and Present a Mitigation Case ................... 55

      D.     Failure to Adequately Prepare, Present, and Preserve Error in the Case Against Future Dangerousness ....................................... 61

      E.     Conclusion ................................................... 63

2403

GROUND VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
    THE GRAND JURY DID NOT DETERMINE ALL OF THE ELEMENTS ESSENTIAL TO ESTABLISH CAPITAL MURDER. MR. VIALVA'S SUBSEQUENT CONVICTIONS AND SENTENCES OF DEATH WERE IMPOSED IN DEROGATION OF THE INDICTMENT CLAUSE OF THE FIFTH AMENDMENT. THE CONVICTIONS AND SENTENCES MUST BE VACATED

    A.     Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    B.     Facts Relevant to the Determination of this Claim . . . . . . . . . . . . . . . . . . . . . 64

    C.     Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
          1)    Teague v. Lane Does Not Bar Consideration of this Issue . . . . . . . . . . 64
          2)    This Issue Has Not Been Procedurally Defaulted . . . . . . . . . . . . . . . . . 67

GROUND IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
    THE DEATH SENTENCE IMPOSED ON MR. VIALVA WAS SUBSTANTIALLY INFLUENCED BY THE CUMULATIVE ERRORS IN THE GUILT AND PENALTY PHASES. A SENTENCE IMPOSED UNDER SUCH CIRCUMSTANCES VIOLATES MR. VIALVA'S CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW. THE SENTENCES OF DEATH MUST BE VACATED

    A.     Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

    B.     Argument and Authorities Supporting Claim for Relief . . . . . . . . . . . . . . . . . . 70

GROUND X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
    THE FEDERAL DEATH PENALTY IS UNCONSTITUTIONAL AS APPLIED IN VIOLATION OF THE EIGHTH AND FIFTH AMENDMENTS AND EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION SINCE IT HAS BEEN PURSUED AND IMPOSED DISPROPORTIONATELY AGAINST PEOPLE OF COLOR

    A.     Procedural Posture of this Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

    B.     Facts Supporting Claim of Disparate Impact . . . . . . . . . . . . . . . . . . . . . . . 73

    C.     Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

GROUND XI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
    THE LETHAL INJECTION OF MR. VIALVA UNDER THE PROTOCOLS CURRENTLY IN FORCE BY THE BUREAU OF PRISONS AND ANY SIMILAR PROTOCOLS VIOLATES THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT

2404

A.    Ground XI Has Not Been Procedurally Defaulted ......................... 75

B.    It Is Appropriate, Indeed Necessary, to Present this Claim in
a 2255 Motion .......................................................... 77

C.    Lethal Injection Protocol Dictates Outcome and the Risk of Harm in the
Federal Bureau Of Prisons's Protocol Is Foreseeable and Unnecessary ....... 78
1)    The Bureau Of Prisons Will Carry Out Mr. Vialva's
Execution Using Its Protocol, Not the Protocol of the
State of Texas ...................................................... 78
2)    The Bureau of Prisons's    Protocol Creates An
Unnecessary Risk of Harm .................................... 78

CONCLUSION ................................................................. 81

CERTIFICATE OF SERVICE ................................................... 83

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Apprendi v. New Jersey,*
530 U.S. 466 (2000) ............................................... 65, 67

*Beard v. Banks,*
124 S. Ct. 2504 (2004) ................................................ 66

*Brady v. Maryland,*
373 U.S. 83 (1963) .................. 9, 10, 15, 27, 29, 30, 31, 34, 36, 37, 38, 39, 71

*Eddings v. Oklahoma,*
455 U.S. 104 (1982) .................................................. 56

*Flanagan v. United States,*
465 U.S. 259 (1984) .................................................. 25

*Furman v. Georgia,*
408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) ................... 50

*Griffith v. Kentucky,*
479 U.S. 314 (1987) .................................................. 66

*Heflin v. United States,*
358 U.S. 415 (1959) ................................................... 5

*Hill v. United States*,
 368 U.S. 424 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Holloway v. Arkansas*,
 435 U.S. 475 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Johnson v. Zerbst*,
 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938) . . . . . . . . . . . . . . . . . . . . . 10

*Jones v. United States*,
 526 U.S. 227 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 67

*Kyles v. Whitley*,
 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 30, 36, 37

*Lockett v. Ohio*,
 438 U.S. 586  (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Lockhart v. Fretwell*,
 506 U.S. 364 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Massaro v. United States*,
 538 U.S. 500 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14, 15, 30, 40, 51

*Mickens v. Taylor*,
 535 U.S. 162 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Morris v. Slappy*,
 461 U.S. 1 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Murray v. Carrier*,
 477 U.S. 478 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 49, 76

*Nelson v. Campbell*,
 541 U.S. 637, 124 S. Ct. 2117 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 78

*Penry v. Lynaugh*,
 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Rhodes v. Chapman*,
 452 U.S. 337 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Ring v. Arizona*,
 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64, 66, 67, 68

*Schriro v. Summerlin,*
     124 S. Ct. 2519 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Smith v. Texas,*
     125 S. Ct. 400 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Smith v. United States,*
     360 U.S. 1 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Strickland v. Washington,*
     466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 46, 52, 58, 59

*Strickler v. Greene,*
     527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 30, 49, 77

*Teague v. Lane,*
     489 U.S. 288 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 67

*Tennard v. Dretke,*
     542 U.S. ____, 124 S. Ct. 2562 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 59

*United States v. Bagley,*
     473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 37

*United States v. Booker,*
     125 S. Ct. 738 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*United States v. Dominguez Benitez,*
     124 S. Ct. 2333 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Frady,*
     456 U.S. 152 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 16, 49, 76

*United States v. Mezzanatto,*
     513 U.S. 196 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Walton v. Arizona,*
     497 U.S. 639 (1990), *overruled by Ring v. Arizona,* 536 U.S. 584 (2002) . 64, 65, 66, 67

*Wheat v. United States,*
     486 U.S. 153 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25

*Wiggins v. Smith,*
     539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*Williams v. Taylor,*
     529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 59

*Zafiro v. United States,*
     506 U.S. 534 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Adanandus v. Johnson,*
     947 F. Supp. 1021 (W.D. Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Aldrich v. Johnson,*
     388 F.3d 159 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Anderson v. Johnson,*
     338 F.3d 382 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Beets v. Scott,*
     65 F.3d 1258 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

*Brewer v. Dretke, No. Civ.A.2:01-CV-0112-J,*
     2004 WL 1732312 (N.D. Tex. Aug. 2, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Bryant v. Scott,*
     28 F.3d 1411 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Dowthitt v. Johnson,*
     230 F.3d 733 (5th Cir. 2000), *cert. denied* 532 U.S. 915 (2001) . . . . . . . . . . . . . . 59, 60

*Garcia v. Bunnell,*
     33 F.3d 1193 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Haley v. Boles,*
     824 S.W.2d 796 (Tex. App. -Tyler 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24

*Hall v. United States, No. Civ.A 4:00-CV-422-Y, CRIM. 4:94-CR-121-Y,*
     2004 WL 1908242 (N.D. Tex., Aug. 24, 2004) . . . . . . . . . . . . . . . . . . . . . . . 72, 73, 74

*Harris v. Johnson,*
     323 F. Supp. 2d 797 (S.D. Tex. 2004), *rev'd on other grounds sub nom Harris v.*
     *Johnson,* 366 F.3d 414 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Ex Parte Hopkins,*
     __ S.W.2d __, 2004 WL. 307579 (Tex. Crim. App. Feb. 12, 2004) . . . . . . . . . . . . . . 80

*Hughes v. Johnson,*
     991 F. Supp. 621 (S.D. Texas 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Lewis v. Mayle*,
 391 F.3d 989, 996 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Livingston v. Johnson*,
 107 F.3d 297 (5th Cir.), *cert. denied* 522 U.S. 880 (1997) . . . . . . . . . . . . . . . . . . . . . 70

*Mickens v. Taylor*,
 240 F.3d 348 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Moreland v. Scott*,
 175 F.3d 347 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Moore v. Johnson*,
 194 F.3d 586 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Perillo v. Johnson*,
 205 F.3d 775 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Rutherford v. Crosby*,
 385 F.3d 1300 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 59

*Trass v. Maggio*,
 731 F.2d 288 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Ayala-Lopez*,
 319 F. Supp. 2d 236 (D.P.R. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54

*United States v. Bass*,
 266 F.3d 532 (6th Cir., 2001), *rev'd United States v. Bass*, 536 U.S. 862
 (2002) (*per curiam*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*United States v. Blankenship*,
 548 F.2d 1118 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Boone*,
 245 F.3d 352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Capua*,
 656 F.2d 1033 (5th Cir. Unit A 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Diozzi*,
 807 F.2d 10 (1st Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Dula*,
 989 F.2d 772 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 52

*United States v. Edelin,*
     134 F. Supp. 2d 59 (D.D.C., 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*United States v. Garcia,*
     517 F.2d 272 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Gordon,*
     346 F.3d 135 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 40

*United States v. Grammas,*
     376 F.3d 433 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Green,*
     324 F. Supp. 2d 311 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

*United States v. Guerra,*
     94 F.3d 989 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 68

*United States v. Higdon,*
     832 F.2d 312 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 51

*United States v. Horton,*
     845 F.2d 1414 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Hughes,*
     230 F.3d 815 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Izydore,*
     167 F.3d 213 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Johnson,*
     555 F.2d 115 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Jones,*
     287 F.3d 325 (5th Cir.), *cert. denied* 537 U.S. 1018 (2002) . . . . . . . . . . . . . . . . . . . . 74

*United States v. Placente,*
     81 F.3d 555 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Robinson,*
     367 F.3d 278 (5th Cir.), *cert. denied* 125 S.Ct. 623 (2004) . . . . . . 64, 65, 66, 67, 68, 69

*United States v. Rosario,*
     234 F.3d 347 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 48, 52, 76

*United States v. Sampson,*
   335 F. Supp. 2d 166 (D. Mass. 2004) ................................... 49

*United States v. Sipe,*
   388 F.3d 471 (5th Cir. 2004) ........................................ 38

*United States v. Stumpf,*
   900 F.2d 842 (5th Cir. 1990) ...................................... 6, 7, 8

*United States v. Unruh,*
   855 F.2d 1363 (9th Cir. 1987) ....................................... 22

*United States v. Watson,*
   496 F.2d 1125 (4th Cir. 1973) ..................................... 10, 11

*United States v. Webster,*
   392 F.3d 787 (5th Cir., 2004) ....................................... 74

*United States v. Weintraub,*
   871 F.2d 1257 (5th Cir. 1989) ...................................... 7, 8

*United States v. Williams,*
   544 F.2d 1215 (4th Cir. 1976) ..................................... 10, 11

*United States v. Williams,*
   No. S100CR.1008(NRB), 2004 WL. 2980027 (S.D. N.Y., Dec. 22, 2004) ......... 74

*Walton v. Angelone,*
   321 F.3d 442 (4th Cir.), *cert. denied* 539 U.S. 950 (2003) .................... 58

*Williams v. Washington,*
   59 F.3d 673 (7th Cir. 1995) ......................................... 54

*Willis v. Cockrell,*
   2004 WL 1812698 (W.D. Tex., Pecos Div., Aug. 9, 2004) ..................... 37

*Zuck v. Alabama,*
   588 F.2d 436 (5th Cir. 1979) ........................................ 20

**FEDERAL STATUTES**

18 U.S.C. § 924(j) ............................................................ 67

18 U.S.C. § 3005 ...................................................... 1, 3, 4, 14

18 U.S.C. § 3596 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

18 U.S.C. § 3591(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

18 U.S.C. § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

18 U.S.C. § 3593(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

18 U.S.C. § 3596 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

21 U.S.C. § 848 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 30, 58

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

**FEDERAL RULES**

Rule 7(b), Fed. R. Crim. P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Rule 32, Fed. R. Crim. P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Rule 33, Fed. R. Crim. P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**STATE STATUTES**

Tex. Crim. Proc. Code Ann. art. 43.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Tex. Gov't Code, tit. 2 Subt. G, App. A, Art. 10, § 9, Rule 1.06 (c)(1)
        (Vernon Supp. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Tex. Gov't Code, tit. 2 Subt. G, App. A, Art. 10, § 9, Rule 1.06, cmts. 7-11
        (Vernon Supp. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Texas Rules of Professional Conduct Rule 1.06(c) . . . . . . . . . . . . . . . . . . . . . . . . . 24

**MISCELLANEOUS**

*Guide to Judiciary Policies and Procedures* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 41

*Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness*, TEXAS DEFENDER SERV. (2004)
        http://www.texasdefender.org/DEADLYSP.PDF . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Job Negotiations with Adverse Firm or Party,*
      ABA Comm. on Ethics and Prof. Responsibility,
      Formal Op. 96-400, at \*1 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

http://www.bop.gov . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

AVMA Report on Euthanasia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

http::://www.deathpenaltyinfo.org/article.php?scid=8&did=478 . . . . . . . . . . . . . . . . . . . . . . . . . . 79

2A13

## INTRODUCTION

Respondent fundamentally misconstrued the scope and purpose of the post conviction review authorized by Title 28, United States Code, Section 2255. This misunderstanding is evident from Respondent's improper invocation of the defense of procedural default to issues that could not have been raised on direct appeal and which plainly required the development of extra record facts. Procedural default may not be imposed against any of the issues presented by Mr. Vialva. All of the issues raised by Mr. Vialva are properly before this Court and should be considered on the merits. In this regard, Respondent presented no evidence rebutting the factual allegations, documentary evidence, or expert opinions submitted by Mr. Vialva through his Exhibits. Similarly, Respondent did not challenge the veracity of the declarations, the qualifications of the experts, or any other predicate matter relating to the information contained in the Exhibits. All of the information contained in the Exhibits may be accepted by this Court as true.

The unrefuted evidence establishes a series of serious errors which, individually and collectively, require relief from the convictions and sentences of death entered against Christopher Vialva. The errors began with a violation of Title 18, United States Code, Section 3005, which imposed a mandatory duty on the appointing court to consult with the Federal Public Defender for the Western District of Texas or the Administrative Office of the United States Courts prior to appointing "learned counsel" in this capital prosecution. In this case, the failure to comply with the statute resulted in the appointment of learned counsel, who would not have been recommended for appointment. The attorney appointed through the improper process was operating under a nonwaivable conflict of interest that persisted throughout the trial. Mr. Vialva was prejudiced by his counsel's conflict, which had a direct injurious effect on counsel's representation.

1

2914

The performance of both trial counsel fell below recognized acceptable standards of practice. Counsel failed to secure adequate resources with which to prepare a defense and failed to utilize the resources they acquired effectively. Counsel were unprepared to challenge the prosecution's guilt stage case. Many viable challenges were available and, if raised, would have cast serious doubt on the most critical point of the prosecution's case. Counsel's minimal guilt stage efforts were hampered further by the prosecution's withholding exculpatory information that would have cast serious doubt on its theory of the case and, more importantly, on the veracity of its lynchpin witnesses.

Counsel were ineffective in the penalty phase as well. Counsel failed to challenge the "future dangerousness" aggravator, then compounded the error by presenting an expert who inflicted more harm to Mr. Vialva's case. Counsel proceeded into the most critical stage of trial without adequate time, resources, or a clear understanding of their client to a predictably disastrous conclusion. Mr. Vialva was prejudiced by his counsel's second stage failures because persuasive mitigation evidence existed that, if presented properly, would have persuaded at least one juror to spare Mr. Vialva's life.

There can be no confidence in the outcome of the guilt or penalty stages of this case based on the combined, continuing errors of trial counsel. Further, serious questions impugn the integrity of the death penalty process, beginning with the method used by the United States to select this case for capital prosecution, the bypassing of the grand jury as a safeguard for the charging process, and the administration of the execution process itself. Relief from these unconstitutional processes is warranted.

Respondent has answered these substantive issues by assuring the Court the evidence against Mr. Vialva was overwhelming and, thus, the convictions and sentences should be affirmed. This

2

unresponsive approach is especially unpersuasive in light of the undisputed facts and evidence presented by Mr. Vialva.

## RECORD REFERENCES

Mr. Vialva's *Motion to Vacate, Set Aside, or Correct Sentence By A Person in Federal Custody Pursuant Title 28, United States Code, Section 2255 and Brief in Support*, Docket Number 372, will be referred to as *§ 2255 Motion*.  The items contained in the Appendices to Mr. Vialva's *§ 2255 Motion*, Docket Numbers 373 and 374,  will be referred to by exhibit number, with specific reference to relevant page or paragraph numbers. The *Response to Motion to Vacate, Set Aside, or Correct Sentence*, filed by Respondent United States, Docket Number 418, will be referred to as *Response*, with specific reference to the relevant page number.

## GROUND I

**THE DISTRICT COURT FAILED TO COMPLY WITH THE STATUTORY PROCEDURE FOR THE APPOINTMENT OF COUNSEL IN DEATH-ELIGIBLE PROSECUTIONS, DENYING MOVANT CHRISTOPHER ANDRE VIALVA ACCESS TO COUNSEL QUALIFIED TO DEFEND HIM IN A FEDERAL CAPITAL PROSECUTION.**

**A.    Procedural Posture of this Claim**

*1)  Facts and Law Not In Dispute*

As a threshold argument to avoid a consideration of the merits, Respondent asserts this claim is procedurally defaulted because it was not raised on direct appeal.  Respondent misconstrues the record and the defense of procedural default in the context of this case.  Based on Respondent's assertions, the following facts and law are not in dispute.

Respondent has conceded the essential elements of the error claimed in Ground I. Respondent conceded the issue of appointment of counsel in this capital case is governed by Title 18, United States Code, Section 3005. *Response* at 3.  Respondent admitted Section 3005 includes

3

2416

an express provision directing that the appointing court "shall consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts." *Id.* Respondent admitted the "apparent purpose" of the consultation provision "is to find qualified and experienced counsel 'learned in the law applicable to capital cases,' and who would be immediately available for appointment." *Response* at 12. Respondent did not contest the veracity of the Declarations of Lucien Campbell and Richard Burr, submitted by Mr. Vialva. *See §2255 Motion,* Declaration of Lucien Campbell (Exhibit I-A); Declaration of Richard Burr (Exhibit I-B).

This Court appointed Mr. Goains after Mr. Schwieger filed his motion explicitly requesting the appointment of Mr. Goains as counsel "learned in the law." Doc. 19 (motion); Doc. 29 (order appointing co-counsel). The motion cited both Section 3005 and the relevant portion of the *Guide to Judiciary Policies and Procedures.* Doc. 19. The motion did not advise the Court explicitly of the requirement to consult with the Federal Public Defender and Mr. Schwieger did not undertake such consultation on the Court's behalf. *§ 2255 Motion,* Declaration of Stanley Schwieger ¶3 (Exhibit IV-L). Respondent did not submit affidavits rebutting the factual allegations contained in Declarations of Mr. Campbell, Mr. Burr, or Mr. Schwieger. The factual assertions and professional opinions expressed in the Declarations are thus admitted by Respondent as true. Respondent did not offer countervailing affidavits supporting the factual assertions advanced in its *Response* concerning the qualifications of Mr. Schwieger or Mr. Goains.

Accordingly, Respondent has conceded the Court violated the applicable law by failing to consult with the Federal Public Defender for the Western District of Texas, or with resource counsel retained by the Administrative Office of the United States Courts prior to appointing either Stanley Schwieger or Dwight Goains.

4

2417

Respondent notes counsel's summary of the procedural background "omits the fact that Mr. Goains did not represent Mr. Vialva on appeal." *Response* at 6. Counsel for Mr. Vialva agree Mr. Goains did not represent Mr. Vialva on direct appeal. Mr. Goains was employed by the United States Attorney for the Western District of Texas during the pendency of Mr. Vialva's appeal. *§ 2255 Motion*, Letter of Dwight Goains ¶¶6-8 (Exhibit II-C); Letter of Susan Otto ¶¶6-8 (Exhibit II-D).

### 2) *No Procedural Default Occurred*

Respondent's procedural default argument is pinioned on two factors: the appointment of Steven Losch, as "independent counsel" "who could have raised the technical omission of consultation with the Federal Public Defender under § 3005" on direct appeal (*Response* at 6); and the continued appointment on appeal of trial counsel Stanley Schwieger, who "could have discovered or realized that no consultation had occurred" (*id.* at 7). No procedural default occurred with regard to the issue presented in Ground I for the following individually dispositive reasons.

### a) *The Error Could Not Have Been Presented on Direct Appeal and No Procedural Default Applies*

Counsel for Mr. Vialva agree Section 2255 is not a substitute for the direct appeal process. Section 2255 performs a distinct, vital function as a component of the post conviction review of federal criminal convictions. Historically, Section 2255 has functioned as "an independent and collateral inquiry into the validity of the [federal] conviction." *Heflin v. United States*, 358 U.S. 415, 418 n. 7 (1959). An early formulation of the scope of Section 2255, discussed the "character or magnitude" of errors cognizable through Section 2255 review. *Hill v. United States*, 368 U.S. 424, 428 (1962). Cognizable errors include those that are jurisdictional or Constitutional, or that are a "fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission

5

2418

inconsistent with the rudimentary demands of fair procedure." *Id.* Further, a claim is cognizable if it presents "'exceptional circumstances where the need for the remedy afforded by the writ of *habeas corpus* is apparent.'" *Id.* (internal citations omitted); *and see* 28 U.S.C. § 2255 (a prisoner may move to vacate, set aside, or correct a sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, . . . or is otherwise subject to collateral attack . . ."). While an appellate court may grant relief on direct appeal based on a statutory, Constitutional, or jurisdictional error of the type recognized in *Hill*, the reviewing court's ability to determine the merits depends directly on the contents of the record on appeal.

Respondent does not attempt to argue the Federal Rules of Criminal or Appellate Procedure permit the development of extra-record facts to be included and considered during the direct appeal process. No such argument is tenable because no such procedure exists. Because the appellate court's scope of review is confined to the record on appeal, errors that require the development of additional facts are appropriate for consideration pursuant Section 2255. The cases cited by Respondent illustrate this point as well as the flaw in Respondent's procedural default argument.

In *United States v. Stumpf*, 900 F.2d 842 (5th Cir. 1990), the claimed error occurred the plea colloquy. The defendant complained he was not advised he might have to pay restitution or that he might be held liable to discharge a promissory note as conditions of his probation. *Id.* at 845. The government conceded no advisement was given, but argued the error was harmless. *Id.* at 844. The Fifth Circuit reviewed the record of the plea colloquy and found the trial court's imposition of an order of restitution "certainly did not work a complete miscarriage of justice or result in a proceeding inconsistent with the demand of fair procedure." *Id.* at 845. Thus, the trial court's error appeared, in its entirety, in the transcript and record of the proceedings.

A similar error was presented in *United States v. Weintraub*, 871 F.2d 1257 (5th Cir. 1989), a case that predated the revisions to federal sentencing effected by the Sentencing Reform Act. In *Weintraub*, the defendant complained the sentencing judge failed to inquire whether he or his counsel had the opportunity to review the presentence report. *Id.* at 1265. Characterizing the violation of Rule 32, FED. R. CRIM. P., as a "procedural error," the Fifth Circuit held Section 2255 did not permit relief since it was "'reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised on direct appeal and, would, if condoned, result in a complete miscarriage of justice.'" *Weintraub*, 871 F.2d at 1266 (*quoting United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. Unit A 1981)). The Fifth Circuit's characterized the error as "procedural" rather than substantive since Mr. Weintraub also complained of the manner in which his objections to the presentence report were resolved by the sentencing court, indicating he was not deprived of the opportunity to present substantive objections and arguments despite the trial court's deficient inquiry. *Id.*

Respondent cites *United States v. Frady*, 456 U.S. 152 (1982), a case that arose more than a decade before the AEDPA. As in *Stumpf* and *Weintraub*, *Frady* involved an error that was apparent from the face of the record. Mr. Frady asserted error occurred in the trial court's jury instruction on the essential element of malice. No contemporaneous objection was interposed. *Id.* at 157. Relief was denied in the lower court based on the absence of a challenge on direct appeal or during any of Mr. Frady's several prior post conviction motions. *Id.* at 159. The Supreme Court affirmed the denial of relief noting Mr. Frady, for the first time in nineteen years of extensive litigation, was abandoning his prior denial of any involvement in the offense in an attempt to gain the benefit of a lesser included offense instruction. *Id.* at 171. Factually and procedurally distinguishable from the instant case, *Frady* is apposite solely for the general proposition enunciated

7

by Respondent: a collateral attack on a conviction is not a substitute for an appeal. *Response* at 9.

Respondent does not explain how Mr. Losch, as "independent counsel," or Mr. Schwieger, as trial counsel, could have presented this issue on direct appeal. The information in the record consists of a Criminal Justice Act Form 30 containing the Court's order appointing Mr. Schwieger (Doc. 4), Mr. Schwieger's request for the appointment of Mr. Goains as "learned counsel" (Doc. 19), and the Court's order appointing Mr. Goains (Doc. 29). There is no evidence in the record establishing the Court failed to consult with either the Federal Public Defender or the resource counsel for the Administrative Office of the United States Courts. Those facts, essential to this claim, are established through the affidavits of Mr. Campbell and Mr. Burr. Respondent apparently wishes to place the burden of investigation on Mr. Schwieger. *Response* at 8. Even if Mr. Schwieger could have "discovered" the Court's failure to comply with Section 3005, that information would not have been part of the record on direct appeal. *Stumpf*, *Weintraub*, and *Frady* do not establish a procedural default that can be enforced to preclude review of the merits of this issue.

More closely analogous authority supports the conclusion this issue should be raised in post conviction rather than direct appeal and, concomitantly, no procedural default applies. In *Massaro v. United States*, 538 U.S. 500 (2003), the Supreme Court discussed the procedural default rule in the context of an ineffective assistance of counsel claim. The Court discussed the purpose for the procedural default rule:

> The procedural-default rule is neither a statutory nor a constitutional requirement, but is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments. We conclude that requiring a criminal defendant to bring ineffective-assistance-of-counsel claims on direct appeal does not promote these objectives.

*Id.* at 504. The Court explained its conclusion was based on the practical limitations of an appellate court:

> Applying the usual procedural-default rule to ineffective-assistance claims would have the opposite effect, creating the risk that defendants would feel compelled to raise the issue before there has been an opportunity fully to develop the factual predicate for the claim. Furthermore, the issue would be raised for the first time in a forum not best suited to assess those facts. This is so even if the record contains some indication of deficiencies in counsel's performance.

*Id.* An ineffective assistance of counsel claim brought on direct appeal would necessarily be based on a trial record ". . . not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate. . ." to judge the adequacy of counsel's performance or the prejudice resulting from inadequate representation. *Id.* at 505. The Fifth Circuit has applied this reasoning, declined to address ineffective assistance of counsel claims on direct appeal, and expressly noted Section 2255 motions as the appropriate mechanism for reviewing such claims. *E.g. United States v. Gordon*, 346 F.3d 135, 136-137 (5th Cir. 2003); *United States v. Grammas*, 376 F.3d 433, 435 n. 2 (5th Cir. 2004). Similarly, when facts substantiating a claim are developed during post conviction investigation, the Supreme Court has acknowledged federal habeas review as the appropriate procedure for considering claims based on the prosecution's violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See Kyles v. Whitley*, 514 U.S. 419, 431 (1995) (factual basis for claim revealed during state collateral review proceedings and federal habeas petitioner first exhausted claims through state process); *Strickler v. Greene*, 527 U.S. 263, 283 (1999) (failure to raise claim at trial excused; factual basis for claim unknown to counsel), 287 (failure to exhaust claim in state post conviction proceedings did not bar federal habeas review in light of Commonwealth's representations).

As in an ineffective assistance of counsel or *Brady* violation claim, the facts supporting the error presented in Ground I were developed through present counsel's post conviction investigation. These facts were not, and could not have been, included in the trial record presented on direct appeal to the Fifth Circuit. There has been no procedural default of this issue.

### b)     The Error is Structural and Implicates the Constitution

Quoting *United States v. Williams*, 544 F.2d 1215, 1218 (4th Cir. 1976), Respondent argued Section "3005 does not embody a fundamental constitutional right." *Response* at 8. In an effort to avoid a merits review, Respondent asserted the claimed error is not of "constitutional or jurisdictional magnitude." *Id.*

*Williams,* which also predates Federal Death Penalty Act of 1994 and the AEDPA, involved a first degree murder prosecution arising from a homicide on a military reservation. The opinion does not state whether the United States sought the death penalty against Mr. Williams, who was ultimately convicted of second degree murder. The defendant sought collateral review based on the alternative theories that the rights secured to him by Section 3005 were denied when his requests for two counsel went unanswered or, if his requests were not found in the record, that his right to counsel was violated in the absence of an affirmative waiver. *Williams*, 544 F.2d at 1218. Respondent focuses this Court's attention on a fragment of the Fourth Circuit's decision, but ignores the context:

> It is settled that a defendant in a capital case is entitled to the appointment of up to two counsel upon request. A failure to appoint two counsel under such a circumstance gives rise to an irrebuttable presumption of prejudice. *United States v. Watson*, 496 F.2d 1125 (4th Cir. 1973). This Court has recently held, however, that the right to two counsel granted by § 3005 does not embody a fundamental constitutional right of the sort which can be deemed waived only under the strict standard of *Johnson v. Zerbst*, 304 U.S. 458, 564, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *United States v. Blankenship*, No. 75-1148 (4 Cir. February 20, 1976) [548 F.2d 1118].

10

*Williams*, 544 F.2d at 1218. Respondent is apparently reading the third sentence in the quoted text as a conclusive holding that Section 3005 does not implicate Constitutional concerns. This reading is not supported by the text of *Williams* or by the Fourth Circuit's subsequent reaffirmation of the "irrebuttable presumption of prejudice" recognized in *Watson. United States v. Boone*, 245 F.3d 352, 359 (4th Cir. 2001).

The intent of Section 3005 and the guidance provided in the *Guide to Judiciary Policies and Procedures* is evident. Congress and the Judicial Conference of the United States intend that a defendant charged with a capital offense by the United States will receive the effective assistance of counsel mandated by the Constitution and the Supreme Court. Far from being a "technical, very minor issue," as Respondent suggests (*Response* at 7), this error at the critical initial appointment stage implicated Mr. Vialva's Sixth Amendment rights. There is no language in the statute or the *Guide* suggesting the procedure is optional. In fact, the language of the statute is unambiguous in its direction that the court "shall consider" the recommendations for appointment of counsel. Section 3005 is an integral part of enforcing the Sixth Amendment. Failing to comply with a statute that enforced a Constitutional right is qualitatively different than failing to advise a defendant of the possible imposition of restitution as a condition of probation, or failing to ask a defendant who has objected to a presentence report whether he and his counsel have had an opportunity to read the report. At least within the facts of this case, failure to comply with Section 3005 is a structural error implicating a death-sentenced defendant's Constitutional rights. Post conviction review through Section 2255 is fully appropriate.

11

c)      *Cause and Prejudice Can Be Demonstrated, if Procedural Default Applies.*

Even if this Court determined a  procedural default could be imposed on this issue, the default may be overcome if Mr. Vialva demonstrates cause for the default and prejudice resulting from the default.  Respondent agrees on this point, but argues that "even if deemed a constitutional claim, he [Mr. Vialva] has failed to demonstrate cause and prejudice." *Response* at 5.

Ineffective assistance of counsel, as well as a showing the factual or legal basis for the claim "was not reasonably available to counsel" are recognized as cause for a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *accord United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996); *United States v. Guerra*, 94 F.3d 989, 993 (5th Cir. 1996).  Further, ineffective assistance of appellate counsel falls within the ambit of "cause" excusing a procedural default.  *Guerra*, 94 F.3d at 994.  If, as Respondent contends, the error was patent to Mr. Schwieger, his failure to ensure the issue was raised on direct appeal is a separate instance of ineffective assistance of counsel.  Mr. Losch also failed to raise the issue.  Contrary to Respondent's assertion, Mr. Vialva is indeed asserting his Constitutional right to the effective assistance of counsel was violated when the Court bypassed the safeguards, codified by the statute and effectuated through the *Guide*, and appointed unqualified counsel to defend him.  Trial counsel's numerous failures are detailed in Mr. Vialva's *§ 2255 Motion*.  These failures establish prejudice to Mr. Vialva's rights, excusing any arguable procedural default.

**B.      Facts Relevant to Determination of the Merits**

Respondent has offered no facts rebutting the factual assertions presented in Ground I.  The facts admitted by Respondent were detailed, *supra*, in subsection (A)(1).

2424

## C.    Legal Authority Supporting Relief

Respondent's substantive argument consists of bald assertions that no error occurred because Mr. Vialva received the assistance of qualified counsel, despite the Court's violation of Section 3005. Since no evidence or authority is offered in support of Respondent's assertions, this Court is without a basis in fact or law to weigh the merits of Respondent's defense to Ground I. The remaining Grounds establish conclusively Mr. Vialva did not receive the effective assistance of counsel guaranteed by the Sixth Amendment.

Through the improvident suggestion of Mr. Schwieger, this Court appointed an attorney who had an actual conflict of interest that resulted in prejudice to Mr. Vialva. *See* Ground II. Trial counsel failed to marshal an adequate investigation of issues in the first stage, resulting in a failure to subject the government's case to appropriate adversarial testing, as well as a failure to present a coherent defense. Trial counsel's failures in the first stage, individually and cumulatively, were of such significance there can be no confidence in the out come of the proceedings. *See* Ground IV and Ground VI. Trial counsel failed completely in their obligation to investigate, prepare, and present an effective defense to the death penalty during the second stage of trial. *See* Ground VII. While other, equally compelling grounds for relief are presented in Mr. Vialva's *§ 2255 Motion*, trial counsel's pervasive ineffectiveness during both stages of this capital proceeding resulted in a Constitutionally defective process. The Court's initial departure from the statutory requirements of Section 3005 was the first error in the process.

The esoteric question of whether relief would be warranted if effective counsel were appointed, despite a violation of Section 3005, is not presented in this case. Respondent offers nothing more than the subjective opinion of its own counsel regarding the efforts of the trial attorneys, one of whom is now an employee of the Respondent and a colleague of its present

13

counsel. The arguments and authorities presented in Ground I of Mr. Vialva's *§ 2255 Motion* establish an undisputed violation of Title 18, United States Code, Section 3005 which, in light of the remaining errors, fully supports a finding of error meriting relief.

## GROUND II

**MR. VIALVA'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS ABRIDGED WHEN HIS TRIAL COUNSEL APPLIED FOR EMPLOYMENT WITH THE UNITED STATES ATTORNEY'S OFFICE DURING THE PENDENCY OF HIS TRIAL WITHOUT SECURING CONSENT BEFORE THE CONFLICT AROSE OR AN EFFECTIVE WAIVER AFTER THE CONFLICT HAD OCCURRED. THE CONFLICT CAUSED AN ADVERSE EFFECT ON AND/OR PREJUDICE TO THE OUTCOME OF MR. VIALVA'S TRIAL WHICH NECESSITATES REVERSAL AND A NEW TRIAL.**

**A.    Procedural Posture of this Claim - Ground II Has Not Been Procedurally Defaulted**

Respondent claims Mr. Vialva procedurally defaulted Ground II by failing to raise his trial counsel's conflict of interest on direct appeal. *Response* at 22. Respondent is wrong. Consistent with Fifth Circuit practice, Mr. Vialva characterized counsel's conflict of interest as a claim for ineffective assistance of counsel, a violation of the Sixth Amendment. *Compare § 2255 Motion* at 13 *with, e.g., Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000) (characterizing claim of conflict of interest as ineffectiveness of counsel in violation of the Sixth Amendment); *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc) (same). Claims of ineffective assistance of counsel need not, and indeed should not, be raised on direct appeal. *Massaro v. United States,* 538 U.S. 500, 504 (2003) ("We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal."); *United States v. Gordon,* 346 F.3d 135, 136-37 (5th Cir. 2003); *United States v. Higdon,* 832 F.2d 312, 313-14 (5th Cir. 1987) (noting "[t]he general rule in this circuit is that a claim of

14

ineffective assistance of counsel cannot be resolved on direct appeal when the claim has not been raised before the district court since no opportunity existed to develop the record on the merits of the allegations" and concluding such claims must be pursued in a 2255 motion).

*Higdon* and *Gordon* mention there are certain "rare" instances when a trial court record is sufficiently well developed to permit an ineffectiveness claim to be raised on direct appeal. *Gordon,* 346 U.S. at 136-37*; Higdon,* 832 F.2d at 314. However, in light of the Supreme Court's recent guidance, that rule cannot be read to require a defendant to raise ineffective assistance of counsel claims on direct appeal or face procedural default. *Massaro,* 538 U.S. at 504 (Petitioner may present an ineffective assistance of counsel claim in a 2255 motion, even if the claim could have been brought in direct appeal).

The rule that ineffective assistance of counsel claims should be presented in 2255 motions is founded in the common sense principle that arguments which "require development of facts outside the record . . . are more properly presented in a § 2255 petition" rather than a direct appeal. *United States v. Rosario,* 234 F.3d 347, 352 (7th Cir. 2000); *cf. United States v. Dula,* 989 F.2d 772, 776 & n.11 (5th Cir. 1993) (concluding alleged *Brady* violation more properly presented in 2255 motion rather than direct appeal because it turned on facts outside the original record).

Moreover, waiting to resolve ineffectiveness claims serves the principle that:

> rules of procedure should be designed to induce litigants to present their contentions to the right tribunal at the right time. Applying the usual procedural-default rule to ineffective-assistance claims would have the opposite effect, creating the risk that defendants would feel compelled to raise the issue before there has been an opportunity fully to develop the factual predicate for the claim. Furthermore, the issue would be raised for the first time in a forum not best suited to assess those facts. This is so even if the record contains some indication of deficiencies in counsel's performance. The better-reasoned approach is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under § 2255.

15

*Massaro*, 538 U.S. at 504 (internal quotations and citations omitted).

Extra-record fact development was critical to the development of Mr. Vialva's conflict claim. It was not in the trial record that Mr. Vialva's conflicted counsel applied and interviewed for his job with the United States Attorney's office ***before*** he consulted with Mr. Vialva. *§ 2255 Motion*, Exhibit II-E ¶ 9. It was not in the trial record that Mr. Goains's interview was conducted with the United States Attorney himself and was initially for a vacancy in the Waco office – the very office prosecuting his client. *Id.* ¶ 6. It was not in the trial record that Mr. Vialva's conflicted counsel did not recognize the significance of his conflict and only belatedly, three months after his initial interview with the United States Attorney's office, requested a hearing before the trial court. It was not in the trial record that, after trial, Mr. Goains continued to disserve his client by failing to preserve his records (Exhibit II-G) and by filing affidavits in support of the United States Attorney's office (Docs. 397, 398), while simultaneously refusing to answer basic questions about his representation of Mr. Vialva under oath for habeas counsel (*§ 2255 Motion*, Exhibit II-E ¶ 3). Finally, the full extent of Mr. Goains's deficient trial performance that was directly attributable to the conflict could not be known until unconflicted counsel[1] had the opportunity to conduct an investigation of extra-record facts which revealed the profound difference between what could and should have been presented in Mr. Vialva's defense that was not presented at trial. *See, e.g., § 2255 Motion*, Exhibits II-H; and II-I. The cause and prejudice standard of *United States v. Frady*, 456

---

[1]It is noteworthy that, at no time prior to the appointment of Mr. Vialva's habeas counsel, did he have access to counsel who did not play a role in the conflict issue. During direct appeal, Mr. Stan Schweiger was one of Mr. Vialva's lawyers. Mr. Schweiger evaluated the conflict issue during trial and made the determination that a waiver from Mr. Vialva on the record was the proper course of action. Having already resolved the issue in his own mind (albeit erroneously) Mr. Schweiger was in no position to raise the issue of conflict on direct appeal – he was a participant in the poor decisions which led to the insufficient remedy regarding the conflict.

U.S. 152, 167-68 (1982), is simply not relevant in this case, where the issues raised could not have been developed from the trial record alone.

**B.     The Standard of Review of "Self-Interest" Conflicts**

Mr. Vialva believes the conflict at issue requires a presumption of harm and automatic reversal. *See § 2255 Motion* at 32. Respondent has not addressed this contention. Instead, Respondent merely recites the *Cuyler/Sullivan* and *Strickland* standards without explanation of how they should be applied to this case. *Response* at 24-25. Mr. Vialva takes Respondent's silence as a concession he has assessed correctly the presumption of harm in this case.

Notwithstanding Respondent's silence, Mr. Vialva recognizes the law of conflicts is in a state of flux and the Fifth Circuit has limited application of the *Cuyler/Sullivan* standard primarily to instances of concurrent representation. *§ 2255 Motion* at 34 & n.11 (citing *Beets v. Scott*, 65 F.3d 1258, 1270 (5th Cir. 1995)). The Supreme Court has, however, not yet spoken to this issue. *See Mickens v. Taylor*, 535 U.S. 162, 174, 176 (2002) (stating the only question at issue is the effect of a trial court's failure to inquire into a potential conflict and noting the application of the *Cuyler/Sullivan* standard to cases other than concurrent representation is an "open question"). Several circuits have correctly rejected limiting *Cuyler/Sullivan* to cases of concurrent representation. *See Mickens*, 535 U.S. at 174 (collecting cases). Mr. Vialva objects to limiting *Cuyler/Sullivan* to concurrent representation conflicts and, in the event this Court so limits the application of that standard, preserves this issue for further review. *§ 2255 Motion* at 32 & n.10.

**C.     This Conflict Requires Relief Under Any Standard of Review**

Even under the most searching analysis and the most restrictive standard of review, Mr. Vialva is due relief for the unwaivable and egregious conflict of interest that compromised his lead counsel's representation in this death penalty case.

2A79

### 1)   *Mr. Goains Was <u>Not</u> Mr. Vialva's Counsel of Choice*

The first argument Respondent offers in response to the merits of Mr. Vialva's claim of conflict is to suggest that Mr. Goains was Mr. Vialva's "counsel of choice" and that Mr. Vialva was due the right to have Mr. Goains represent him, regardless of the conflict. *Response* at 26. Presumably Respondent makes this claim to place the analysis of this conflict on a par with cases in which a defendant has offered voluntarily to waive his right to conflict free counsel so he can retain counsel of his choice. *See id.* at 26 (citing *Wheat v. United States*, 486 U.S. 153, 157 (1988) (considering denial of right to counsel of choice over government objection regarding conflict); *United States v. Izydore*, 167 F.3d 213, 220 (5th Cir. 1999) (considering whether district court abused discretion in denying defendant right to counsel of choice in light of conflict)). These cases weigh two co-equal Sixth Amendment rights: the right to counsel of one's choice and the right to unconflicted counsel.

Considerable deference is naturally given to the defendant's knowing and willing choice of counsel. However, no such deference is appropriate in this case since Mr. Vialva did not choose Mr. Goains as his lawyer. Mr. Vialva is an indigent defendant. The Court appointed Mr. Goains on Mr. Schweiger's suggestion. Mr. Vialva had no role in selecting Mr. Goains and no ability to discharge Mr. Goains without the assistance of the Court. As an indigent defendant, Mr. Vialva was completely at the mercy of the federal system for appointment of counsel. As many courts have observed, in the areas of retention, discharge, and conflicts: "A clear distinction exists between paying clients and indigent defendants." *Haley v. Boles*, 824 S.W.2d 796, 798 (Tex. App. –Tyler 1992). The cases cited by Respondent are thus simply inapposite. The suggestion by Respondent that there can be any comparison between the rights of a defendant to knowingly retain conflicted

18

counsel and the right of an indigent defendant to have appointed counsel be free of conflict and show undivided loyalty is nothing less than outrageous.[2]

### 2)    Mr. Goains Had An *Actual* Conflict That Prejudiced Mr. Vialva

Respondent does not dispute that Mr. Goains entered into specific discussions regarding employment with the United States Attorney's Office during his representation of Mr. Vialva *before* consulting his client or the Court about the conflict. Respondent does not dispute that Mr. Goains never told Mr. Vialva or the Court that he had interviewed for a job with the very office that was prosecuting Mr. Vialva. Respondent does not dispute that Mr. Goains never told Mr. Vialva or the Court that his interview was conducted with the same United States Attorney who also attended Mr. Vialva's trial. Respondent does not dispute that Mr. Vialva never received the benefit of advice from independent counsel to assist him in considering the impact of the conflict on his case. Respondent does not dispute that Mr. Goains either lost or destroyed his records of Mr. Vialva's case. Respondent does not dispute that Mr. Goains willingly supplied the United States an affidavit regarding his conflict of interest, but that he was unwilling to provide Mr. Vialva's postconviction counsel a statement under oath regarding his representation. These admitted facts establish the existence of a conflict.

It is black-letter law that the client's consent to a conflict, if it can be given at all, must be obtained *before* the conflict materializes. *See, e.g., Job Negotiations with Adverse Firm or Party*, ABA Comm. on Ethics and Prof. Responsibility, Formal Op. 96-400, at *1 (1996) (establishing that

---

[2]Respondent's comparison of Mr. Vialva's situation to that described in *Morris v. Slappy*, 461 U.S. 1 (1983) is particularly inapt. *See Response* at 26. That case had nothing to with the right to conflict free counsel. Rather, the question was whether a defendant's right to counsel goes so far as to include the right to a "meaningful" relationship with counsel. *Slappy*, 461 U.S. at 3. Mr. Vialva does not ask for so much. All Mr. Vialva asks is for a trial conducted by a qualified attorney with undivided loyalty.

2431

conflict arises upon discussions of employment with an entity adverse to client unless consent to the discussions is first obtained). Absent that prior consent, the affected lawyer has an actual conflict. When Mr. Goains interviewed for a job with the United States Attorney's Office, he voluntarily entered into a situation in which his interests and that of his client were at odds. Mr. Goains had an actual conflict. *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979) ("An actual conflict of interest occurs when a defense attorney places himself in a situation inherently conducive to divided loyalties.").

As Lawrence Fox explained, Mr. Goains had conflict and "the conflict presented here is one of the most egregious one can imagine." *§ 2255 Motion*, Exhibit II-A at 6. Rather than controvert Mr. Fox's opinion with a contrary finding by an expert of equal stature, Respondent rests its opposition to Mr. Fox's analysis and opinion by impugning him as a "paid expert." *Response* at 28. Mr. Fox's qualification to render an opinion on legal ethics and conflicts of interest are unimpeachable. Among other things, Mr. Fox is the former chair of the American Bas Association Committee on Ethics and Professional Responsibility. He participated in the ABA Commission reviewing the Model Rules of Professional Conduct. He is the author of textbooks on legal ethics. *See § 2255 Motion*, Exhibit II-A. Moreover, as he stated in his opinion, he is hardly a "paid expert." Mr. Fox agreed to render his opinion for a paltry $1,250.00, a fee that he has not even asked to be paid. *Id*. at 3. If Respondent had any legitimate objection to this eminent lawyer's opinion on ethics, it would have moved to exclude the opinion by motion challenging the qualifications, or the reliability or relevance of Mr. Fox's opinions. Respondent has not done so because it cannot: no reputable expert in legal ethics would reach a contrary conclusion.

Respondent attempts support its argument that no actual conflict existed by citing cases in which courts have concluded that accepting offers of employment with a prosecutorial office does

20

not cause reversible error. However, the cases cited by Respondent are profoundly distinguishable and inapposite to the case at bar. For example, in *Adanandus v. Johnson*, the defense attorney was *not* contemporaneously seeking employment with the office prosecuting his client, as was the case here. 947 F. Supp. 1021, 1055 (W.D. Tex. 1996) (The defense attorney, who was a former prosecutor, was a candidate for the position of United States Attorney, which was not the agency responsible for prosecuting his client. Several years after trial the defense attorney became the Bexar county district attorney).

In *Garcia v. Bunnell*, the death penalty was not at issue, and the situation with regard to his lawyer's employment was not so extreme as it was in this case. In Mr. Garcia's case, his lawyer had accepted employment with the prosecutor's office. As Mr. Fox explains, confirmed employment presents a far less dangerous situation than that of Mr. Goains who still sought a much coveted and desired placement with the prosecutor's office. *Compare Garcia v. Bunnell*, 33 F.3d 1193, 1195 (9th Cir. 1994) *with § 2255 Motion*, Exhibit II-A at 5-6 (noting that this conflict is "even worse than the one that would have been created if Mr. Goains had already accepted an offer from the U.S. Attorney's office"). Moreover, Mr. Garcia engaged in an extended colloquy with the court and was granted five days in which to seek advice from family members and independent counsel – a protection not afforded Mr. Vialva. *Garcia,* 33 F.3d. at 1196-97. In fact, it was that extended colloquy and the meaningful dialogue with the court that led the Ninth Circuit to conclude Mr. Garcia had effectively waived his right to conflict free counsel when it found Mr. Garcia "received a longer continuance than he requested and, after the court explicitly discussed with him the possible conflict, was articulate and forthright in declaring his desire to proceed." *Id.* at 1197. No such conclusion can be drawn in this case. Mr. Vialva was not given the benefit of outside legal counsel. He was not given a continuance to consider his options. He did not engage in a colloquy with the

21

Court. Instead, Mr. Vialva was asked leading questions and gave only monosyllabic answers from which no inference regarding his understanding of his rights can be made.

Like *Garcia, United States v. Horton* was not a death penalty case. Moreover, the court specifically distinguished the case as not "a high-publicity criminal prosecution in which there was public interest, or anything else that would attract the attention of those involved in the selection and confirmation process." 845 F.2d 1414, 1420 (7th Cir. 1988). In contrast, as the first death penalty prosecution in the Western District of Texas, this was a high profile, high-publicity case. It did attract the attention of "those involved in the selection and confirmation process," Mr. Blagg, the United States Attorney with whom Mr. Goains had interviewed and from whom he hoped to secure employment, attended the trial and was introduced to the jury at trial.

In *Moreland v. Scott*, the defendant's claims regarding the conflict of interest were of an alleged promise to secure a more favorable deal once the defense attorney became the district attorney. 175 F.3d 347, 349 (5th Cir. 1999). Those claims were specifically rejected as incredible because they were raised after the death of defense counsel. *Id.* at 350. More importantly, the case turned on the reasonableness of counsel's advice to appeal rather than accept a plea bargain. *Id.* Subsequent action on the case showed that advice to be reasonable. No such contention can be made here. Mr. Goains's own statements set out the time line of his conflict of interest – one that existed at the time of trial and still exists today. Moreover, subsequent events show that independent legal analysis of Mr. Goains's conduct to fall far short of reasonable. *§ 2255 Motion,* Exhibit II-A at 10 ("The fact is there is no reasonable lawyer who would have advised Mr. Vialva to accept Mr. Goains as his lawyer with all these limitations on Mr. Goains' freedom of action.").

Finally, in *United States v. Unruh*, a non-capital case, an attorney conflict was briefly discussed, but not analyzed with respect to the issues presented in this case. 855 F.2d 1363 (9th Cir.

22

1987).  There was, for example, no clarification of whether counsel was retained or appointed, no discussion of disclosure and waiver, and the defendant claiming the conflict was granted a new trial on other grounds.  *Id.* at 1379.  The case is simply not on point.

In sum, none of the cases to which the Government cite squarely deal with the facts presented by this case: a high-profile, high-publicity capital trial, an indigent defendant, clear failure to disclose the magnitude of the conflict to the client and the court, no consultation with independent counsel, ineffective waiver, and proven harm.

### 3)    *Mr. Vialva Did Not Waive His Right To Conflict-Free Counsel*

Respondent next claims the record reflects Mr. Vialva made a knowing waiver of his right to unconflicted counsel at the May 12, 2000, hearing.  *Response* at 44.  Respondent is wrong.

As a threshold matter, it is important to recognize it was the prosecution, not the defendant or defendant's counsel who asked for a waiver in this case.  *See § 2255 Motion,* Exhibit II-B at 5 (Mr. Frazier asks the Court to exact a waiver from Mr. Vialva).  As the Court knows, presumptions about the correctness of and the prejudice resulting from waivers of constitutional rights are particularly questionable when the waiver has been requested by the prosecution.  *Cf. United States v. Diozzi,* 807 F.2d 10, 15-16 (1st Cir. 1986) (noting when the government seeks to compromise a defendant's Sixth Amendment rights, no prejudice need be shown).

But, even if it had been Mr. Goains who desired and sought the waiver, this was not a waivable conflict.  For conflict to be waivable, a lawyer must reasonably believe the representation of his client will not be adversely affected.  *See* TEX. GOV'T CODE, tit. 2 Subt. G, App. A, Art. 10, § 9, Rule 1.06 (c)(1) (Vernon Supp. 1999).  As Mr. Fox has opined, this conflict was not one which any reasonable lawyer would believe was waivable.  *See § 2255 Motion*, Exhibit II-A at 10. Respondent has offered no opinion in rebuttal to Mr. Fox.

2A35

However, even if this conflict could have been waived, it could only have been waived after Mr. Vialva had received full disclosure and the advice of independent counsel. TEX. GOV'T CODE, tit. 2 Subt. G, App. A, Art. 10, § 9, Rule 1.06, cmts. 7-11 (Vernon Supp. 1999). The hearing record demonstrates Mr. Goains was not candid with either Mr. Vialva or the Court regarding the facts of the conflict. No waiver that is based on less than a full understanding of the facts can ever be valid.

Even if Mr. Goains could have validly sought a waiver and had been candid, Mr. Vialva's status as an indigent defendant presents special concerns:

> While in most cases, compliance with the provisions of Texas Rules of Professional Conduct Rule 1.06(c) eliminates concerns about conflicts of interests, here Rule 1.06(c) provides no such relief. Even had [the defendant] affirmatively consented to [his lawyer's] continued representation, the [ethical] concerns would not have been laid to rest. A clear distinction exists between paying clients and indigent defendants. Because paying clients may contract for representation from the lawyer of their choice, they are free to accept or reject representation by a lawyer after having been informed of a conflict of interest. However, an indigent defendant is assigned the lawyer who will represent him. ***The indigent defendant's consent to continued representation under Rule 1.06(c)(2) does not embody the same degree of free choice as that of the paying client. Therefore, for purposes of the sixth amendment right to conflict-free representation, the solution provided by Rule 1.06(c)(2) will not suffice to alleviate a conflict of interest where the defendant is indigent.***

*Haley*, 824 S.W.2d at 798 (emphasis added). No care or consideration was taken of Mr. Vialva's indigent status, his vulnerability as the recipient of appointed counsel, his youth, his inexperience with the legal system, or his understanding of the consequences of his decision.

Not only was Mr. Vialva abandoned by his own lawyers, but he was also abandoned by the Court which made a deficient inquiry into the conflict. A review of the transcript shows the Court failed to follow the express guidelines set out by the Fifth Circuit for trial court inquiry into conflicts:

> As in Rule 11 procedures, the district court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the district court

24

as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections.

*United States v. Garcia*, 517 F.2d 272, 278 (5th Cir. 1975);[3] *Wheat*, 486 U.S. at 160 (When alerted as to the possible existence of a conflict of interest, the court must take proper steps to ascertain whether the conflicts warrant separate counsel.). There was no dialogue between the Court and Mr. Vialva. The Court did not assure Mr. Vialva he had the right to conflict free representation and the right to consult independent counsel. The Court did not give Mr. Vialva time to think about his options. Rather, on the Friday before trial began on Monday, Mr. Vialva was forced to trade his right to unconflicted counsel with his right to have a purportedly death penalty qualified counsel. He should not have had to make that choice. *United States v. Johnson*, 555 F.2d 115, 120 (3d Cir. 1977) (commenting that "[a] defendant in a criminal proceeding is entitled to certain rights and protections which derive from a variety of sources. He is entitled to all of them; he cannot be forced to barter one for another. When the exercise of one right is made contingent upon the forbearance of another, both rights are corrupted.").

In a factually similar situation, the Ninth Circuit recently held there can be no effective waiver when there is "no evidence that [the defendant] understood any of the specific ramifications of his waiver, since he did not seek the advice of outside counsel and had only a cursory discussion with the judge." *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (internal citations and quotations omitted). The Ninth Circuit reached this conclusion even though the defendant signed a written

---

[3] *Abrogated on other grounds by Flanagan v. United States*, 465 U.S. 259 (1984) (regarding immediate appealability of pre-trial disqualifications).

25

waiver, was advised to seek outside counsel, and given general advice on the potential adverse effect of such the conflict. *Id.* If there was no waiver for Mr. Lewis, there can be no waiver in this case, in which Mr. Vialva had no such protections. Mr. Vialva was not advised to seek counsel from an independent unconflicted lawyer. Rather, he was pressured to make a decision on the eve of trial and, if he had dared to ask for an unconflicted lawyer, he was not given any assurance that one would have been appointed, or that new counsel would have been given adequate time to prepare for his trial.

This was a classic case of a summary and swift "waiver" on the eve of trial that should be treated with the utmost skepticism. Mr. Vialva did not waive his right to conflict fee counsel.

### 4)    *Mr. Vialva Was Prejudiced By Counsel's Conflict*

Finally, even if prejudice is not presumed based on the *Culyer/Sullivan* standard and showing of an actual conflict, prejudice is easily proven in this case. Respondent asserts an analysis of prejudice in a capital trial, especially in the guilt phase of the trial, requires the defendant show that the result of the proceeding would have been different. Respondent is wrong. The analysis of prejudice does not focus on the outcome of a trial, but rather on whether the conflict, or other error, affects the adversarial balance of the trial. *Compare Response* at 50 *with Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). That task is particularly difficult when the conflict manifests itself primarily through "what the advocate finds himself compelled to *refrain* from doing." *Holloway v. Arkansas*, 435 U.S. 475, 490-91 (1978) (emphasis in original). Consequently, the causal connection between the conflict and prejudice is proved circumstantially, through evidence that the lawyer did something detrimental or failed to do something advantageous to one client that protected another's interests. "[B]oth taking action and failing to take actions that are clearly suggested by the circumstances can indicate an adverse effect." *Mickens v. Taylor*, 240 F.3d 348, 360 (4th Cir. 2001) (en banc) (internal

26

quotation omitted). Here, the defense waived cross examination of twenty-six witnesses in the guilt phase of the case. *See § 2255 Motion*, Exhibit II-I. Mr. Goains's inaction is inexplicable absent the effect of his conflict.

Respondent countered evidence of these clear omissions by suggesting Mr. Goains made up for his failure to cross examine witnesses in closing argument. For example, Respondent suggested Mr. Goains somehow cured the absence of adversarial testing of Respondent's case in the guilt phase by mentioning gunshot residue in his closing argument. But that is not correct. Mr. Goains stated in closing argument that, if Respondent had found gunshot residue on Mr. Vialva's hands, they would have been willing to tell the jury about the accuracy of those tests. *Response* at 53. All Mr. Goains did in closing argument was to convey to the jury there were no gunshot residue tests to inculpate his client. He did not explain to the jury why there were no such tests. Because Mr. Goains did not cross examine Respondent's witness on this point, the jury did not know there was no gunshot residue because Respondent used an outmoded and inadequate test. The jury did not know Respondent used inappropriate time cutoffs to justify failing to quantitate gunshot residue test samples. The jury did not know Respondent did not conduct testing because it did not want a test result that undermined its preconceived notion of guilt.

Respondent decided from the outset that Mr. Vialva, as the oldest person present, must be the driving force behind the crime. As the *Brady* evidence and other ineffective assistance of counsel evidence shows (*see § 2255 Motion* Grounds III, IV, and VII), Respondent made a decision early in the investigation about what happened, selected the defendants against whom they could seek the death penalty, and constructed a case on that ground, and that ground alone, and proceeded to withhold relevant exculpatory information from the defense about codefendants. There was no search for the truth. For Mr. Goains to pursue this line of cross examination and challenge, he

27

would have had to question directly the motives, the integrity, and the merits of Respondent's witnesses and evidence. This he could not do while his application for employment was pending, when his future employer was in the courtroom, and when those who could make recommendations on his behalf were opposing him as counsel and serving as witnesses in the case. Because of Mr. Goains's conflict, he was unable to put Respondent's motives and methods at issue. There can be no real question that Mr. Vialva was prejudiced by Mr. Goains's conflict. Relief is warranted on this issue.

**GROUND III**

**THE GOVERNMENT'S FAILURE TO DISCLOSE MATERIAL EVIDENCE AS REQUIRED BY *BRADY v. MARYLAND* AND ITS PROGENY DEPRIVED CHRISTOPHER VIALVA OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL, SECURED BY THE FIFTH AMENDMENT. THE SUPPRESSED EVIDENCE WOULD HAVE CAST DOUBT ON THE TESTIMONY OF THE COOPERATING DEFENDANTS, THE ONLY EVIDENCE IDENTIFYING MR. VIALVA AS THE PERSON WHO SHOT THE BAGLEYS. THE SUPPRESSION OF THE EVIDENCE IS PROSECUTORIAL MISCONDUCT THAT UNDERMINES CONFIDENCE IN THE OUTCOME OF THE TRIAL. THE CONVICTIONS AND SENTENCES MUST BE VACATED AND A NEW TRIAL GRANTED.**

**A.     Procedural Posture of this Claim**

Respondent reiterated its contention this Court should apply a procedural default to this claim for relief. Respondent's contention is, once again, unsupported by the law and the facts.

*1)     Material Facts Not Disputed By Respondent*

Mr. Vialva provided this Court with copies of the documents, notes, affidavits, and other information his counsel collected while preparing his *§ 2255 Motion*. The information was appended as exhibits to the *Motion* as well as a summary, in table form, comparing the information in the discovery materials to the omitted information. Respondent did not contest the veracity of the appended additional documents, nor did it contest the accuracy of counsel's account.

28

Respondent did not contend the evidence Mr. Vialva asserts was concealed was actually disclosed. Instead, Respondent claims:

> Prior to trial, the government had an "open file" discovery policy for the two defense teams. There would not have been a record of everything counsel examined.

*Response* at 59. Respondent offered no evidence in support of this assertion, either in the form of previously undisclosed documents or an affidavit from the Assistant United States Attorney who represented Respondent at trial. Counsel for Mr. Vialva recounted their efforts to verify what information was actually in the prosecution's "open file." Respondent did not dispute counsel's account. Respondent has consistently refused to provide the prosecutor's trial file for reconciliation with the information provided by one of Mr. Vialva's trial counsel. Respondent has objected to all discovery efforts advanced by counsel. Moreover, the prosecutor and the case agent have forestalled counsel's efforts to review the files compiled by the Federal Bureau of Investigation by denying counsel's Freedom of Information Act request. *See* Doc. 410, *Supplement to Motion for Discovery*, Exhibits 1 and 2. Since Respondent has not denied that the items of evidence specified in this Ground were withheld, the fact of Respondent's non-disclosure stands admitted.

Respondent did not deny the factual accuracy of the documents and information provided by Mr. Vialva in support of this Ground. Accordingly, the items of omitted information identified by Mr. Vialva, as well as the substantive content of the information, stand admitted as fact by Respondent.

### 2)    No Procedural Default of this Claim Occurred

Respondent did not cite a factually or legally analogous case in which procedural default has barred a district court's consideration of a *Brady* claim in a Section 2255 proceeding when proof of the claim required consideration of extra-record facts. Without reiterating all of the arguments and

2A41

authorities presented in Grounds I and II of this *Reply*, it is sufficient to note Respondent's argument is again based on a misapprehension of the applicable law and procedure.

The Supreme Court noted claims of *Brady* violations, like claims of ineffective assistance of counsel, "may be raised in postconviction proceedings such as a petition for habeas corpus, or a motion to vacate sentence under 28 U.S.C. § 2255. These proceedings permit greater development of the record." *United States v. Dominguez Benitez*, 124 S.Ct. 2333, 2340 n. 9 (2004), citing *Massaro v. United States*, 538 U.S. 500 (2003). Even if, as Respondent contends, the facts presented in the § *2255 Motion* could have been discovered by appellate counsel through independent investigation, no procedure exists through which the facts could have been included in the record on direct appeal. All of the cases cited by Mr. Vialva and Respondent involved *Brady* violations discovered after the direct appeal and, in some instances, after the state post conviction proceedings were concluded. *See Kyles v. Whitley* 514 U.S. 419, 431 (1995) (State capital prosecution; "Following direct appeal, it was revealed in the course of state collateral review that the State had failed to disclose evidence favorable to the defense."); *id.* at 431 (petitioner exhausted state remedies and presented the issue under the ambit of federal habeas review); *Strickler v. Greene*, 527 U.S. 263, 283 (1999) (failure to raise *Brady* claim at trial excused by suppression of documents by Commonwealth, counsel's reliance on the prosecutor's "open file policy," and the factual basis for the claim was unknown to counsel.); *id.* at 287 (failure to exhaust issue in State post conviction proceedings did not bar presentation of claim in federal habeas proceedings since Commonwealth maintained it had "voluntarily given full disclosure."); *United States v. Bagley*, 473 U.S. 667, 688 (1985) (prosecution"misleadingly induced" defense counsel into conclusion witnesses were not subject to impeachment based on bias; *Brady* claim presented on motion to vacate).

These authorities support fully the conclusion no procedural default may be enforced to preclude this Court's consideration of the merits of Ground III. But, to the extent trial or appellate counsel should have pursued further investigation, as Respondent asserts, their ineffectiveness is cause to excuse any claimed default. The demonstration of prejudice to Mr. Vialva is coincident with the demonstration of materiality in the withheld information. *See Bagley*, 473 U.S. at 682 (applying *"Strickland* formulation of the *Agurs* test for materiality").

**B.      Predicate Legal Authority**

Respondent does not dispute the legal authorities cited by Mr. Vialva delineating the parameters of *Brady* and the standards applicable determine the merits of this claim.

**C.      Facts Establishing Grounds for Relief**

Respondent essentially recapitulates the trial testimony of the Terry Brown and Christopher Lewis and provides a summary of Mr. Vialva's factual statement. These statements appear to be more in the nature of argument rather than a challenge to the veracity of the information presented by Mr. Vialva. Respondent has not provided evidence indicating the information submitted by Mr. Vialva's post conviction counsel was actually disclosed to trial counsel. To the extent a dispute remains concerning exactly what information was disclosed, the dispute can be resolved only through additional discovery and an evidentiary hearing.

**D.      Significance of the Omitted Evidence**

The bulk of Respondent's argument centers on its contention Mr. Vialva's trial counsel did an admirable job of cross examining Terry Brown and Christopher Lewis and, in any event, the omitted evidence was insufficient to overcome the "avalanche of evidence" against Mr. Vialva. *Response* at 59. Respondent extends its contention to assert the impossibility of any alternative theory regarding the identity of the person who shot the Bagleys. *Id.* at 60. Respondent offers this

31

Court nothing more than hyperbole and the personal opinion of its present counsel concerning trial counsel's efforts and the futility of any additional defense efforts. Such contentions are neither evidence nor logically persuasive argument. It is no response to argue the government's case was overwhelming when this Ground demonstrates one reason why trial counsel were unable to meaningfully challenge the account finally presented to the jury. Without repeating the facts and argument presented in the *§ 2255 Motion*, counsel offer the following points of clarification regarding the merits of this claim.

### *Terry Brown*

Despite Respondent's attempt to inflate the strength of the government's case, the only witness at trial who placed the gun in Mr. Vialva's hand and identified Mr. Vialva as the person who shot the Bagleys was Terry Brown. No forensic evidence corroborated this testimony. Christopher Lewis did not corroborate this aspect of Terry Brown's testimony. Based on the records provided by Mr. Schwieger and the additional information developed by post conviction counsel, it is evident Terry Brown was debriefed several times by the prosecution prior to trial and no record of the interviews were provided to trial counsel. At the same time, the prosecution was aware Terry Brown was providing significantly different accounts of his actions and his prior conduct to the Court, during the course of the juvenile transfer process. Some of the information, particularly Mr. Brown's account of his drug use on the day of the homicides, was highly material to his credibility as a witness. Mr. Brown's widely varying statements were more than mere inconsistencies. Both the content and the sequence of the statements were critical areas of impeachment of Mr. Brown and other government witnesses, including the investigating agents.

Respondent conflates the undisclosed information with Mr. Brown's statement to post conviction counsel in 2004. The significance of the 2004 statement is two-fold. First, the statement

32

corroborates the information Mr. Brown provided to the evaluator appointed by the Court in July, 1999. Second, the statement confirms Mr. Brown's testimony at trial represented the last in a series of accounts that evolved through repeated interviews and contacts with law enforcement. Respondent claims, "The .40 caliber murder weapon could not have been viably placed in the hands of any of the other defendants." *Response* at 60. Respondent's assertion patently ignores at least one very "viable" alternative that explains the presence of the ski mask at the crime scene.

According to the trial testimony, Mr. Brown and Mr. Bernard became involved after Mr. and Mrs. Bagley were placed in the trunk. Mr. Brown admitted he pointed a weapon at the back seat, towards the trunk, and offered to kill the Bagleys earlier in the day. The jury did not know Mr. Brown was intoxicated on a marijuana cigarette dipped in embalming fluid, following a binge of drug use. The jury did not know about Mr. Brown's history of violence that included the use of firearms, and about his efforts to diminish his own involvement in the episode in a continuing series of contacts with various authorities. If the jury would have heard this evidence, Mr. Brown's account at trial would have been placed in an entirely different context. If the jury would have heard the complete truth about Mr. Brown's exposure to punishment, his risk of capital prosecution by the Texas authorities would have been explained. In turn, Mr. Brown's understanding that anything "short of murder" would be resolved through his plea agreement, and his interest in presenting Mr. Vialva as the murderer would have been equally clear.

If this evidence would have been disclosed, a credible alternative sequence of events in which Mr. Vialva was not the person who shot the Bagleys would have been available to trial counsel.

33

*Christopher Lewis*

The undersigned counsel were able to present specific instances demonstrating the existence of withheld *Brady* material concerning Mr. Brown because he authorized his trial attorney to release his files and he agreed to speak with counsel. Counsel were unable to develop similar evidence concerning Mr. Lewis because he declined to meet with counsel or to communicate with them at all. Counsel provided the Court with the best information about Mr. Lewis available to them based, in part, on the parallel juvenile processes that applied to both Mr. Brown and Mr. Lewis. Respondent does not deny the information exists. Instead, Respondent faulted post conviction counsel for being unable to provide further details. *Response* at 92. In a similar vein, Respondent blamed any deficiencies in disclosure of Mr. Lewis's juvenile record on trial counsel who, Respondent claims, should have been able to find the omitted information through reasonable diligence. *Id.* at 94.

The omitted evidence of Mr. Lewis's juvenile record is not the type of readily available, generally accessible information that trial counsel could readily retrieve. Further, it begs the question to argue the government should be relieved of its affirmative obligation under *Brady* because trial counsel failed to conduct a sufficiently thorough independent investigation. Even if such an affirmative duty could be imposed on trial counsel under the facts of this case, the error and prejudice would persist as a claim of ineffective assistance of counsel. Without access to Respondent's files, it is impossible for post conviction counsel to distinguish the responsible party.

Since post conviction counsel were limited to the discrepancies in Mr. Lewis's accounts patent from the records disclosed to trial counsel, those variances were noted as indicia of Mr. Lewis's willingness to amend his version of events. Respondent complained that one of the variances, *viz:* who was responsible for throwing the .22 caliber pistol into the bushes "could not

34

have made any difference" since it occurred "the day before the murders, and this did not involve the murder weapon." *Response* at 94. Respondent misapprehended the significance of this point. Mr. Lewis was willing to agree with Respondent during his guilty plea that Mr. Vialva threw the pistol into the bushes. *§ 2255 Motion*, Exhibit III-M at 30. At trial, Mr. Lewis was willing to state under oath that he threw the pistol into the bushes. XI Tr. 2316. In fact, neither version was true. *See id.,* Exhibit III-U at (4). Mr. Lewis was the source of Federal Bureau of Investigation Agent Chadwick's grand jury testimony that Mr. Vialva lit the fire in the Bagleys' automobile. *Id.,* Exhibit III-T at 35. Mr. Lewis's account at trial excluded the possibility he could have seen Mr. Vialva light the fire, which avoided the significant problem that Respondent's theory of prosecution depended on Mr. Bernard being responsible for the fire. Mr. Lewis was a very young, highly malleable suspect in this crime. The record indicates he was completely willing to agree with the leading questions asked by Respondent. Any evidence, including the juvenile transfer proceeding evaluation, that related to Mr. Lewis's intellectual functioning, emotional capacity, history of drug use, history of medication, and prior involvement with law enforcement should have been disclosed to trial counsel.

### Tony Sparks

Respondent does not deny Mr. Sparks was interviewed multiple times and does not deny the existence of records of those interviews. Instead, Respondent cavils that Mr. Vialva has been unable to prove such evidence exists. The information provided by Mr. Vialva fully supports his contention Mr. Sparks could have provided evidence that cast doubt on the accounts given by Terry Brown and Christopher Lewis. Mr. Sparks could have provided information that cast doubt on Mr. Lewis's ability to recount events accurately and truthfully. *§ 2255 Motion,* Exhibit III-U at (4). Further, Mr. Sparks could have provided critical evidence impugning Respondent's contention Mr.

Vialva intended to kill the Bagleys from the outset. *Id.* Exhibit III-U at (5). Two possibilities exist: either all of this information was disclosed to trial counsel who, through Constitutionally ineffective representation, failed to use it; or, Respondent failed to disclose the information, in violation of *Brady*. Again, without access to Respondent's files, counsel are unable to identify which violation of Mr. Vialva's Constitutional rights is the source of this error.

### Brandon Bernard

Respondent faults post conviction counsel for being unable to prove the evidence of Mr. Bernard's failed plea negotiations were favorable to him. Respondent accuses counsel of "more *Brady* speculation and fishing expeditions." *Response* at 97. The case cited by Respondent is instructive in apposition.

In *Hughes v. Johnson*, 991 F.Supp. 621 (S.D. Texas 1998), a capital defendant convicted in Texas state court asked the federal court to conduct an evidentiary hearing on an internal investigation of the Texas Department of Public Safety. According to the petitioner, the internal investigation concerned the Trooper who was involved in his case. The federal court declined to conduct a hearing based on its determination:

> Petitioner fails to identify or describe, however, the investigation to which he refers. Indeed, there is absolutely no evidence whatsoever that any such investigation was conducted, as is required by *Kyles [v. Whitley]*.

*Hughes*, 991 F.Supp. at 639. Thus, the petitioner's request for further inquiry was denied because he was unable to make a *prima facie* demonstration that the evidence he sought to discover actually existed.

In this case, Respondent does not deny the government engaged in plea negotiations with Mr. Bernard. The motion for appointment of cocounsel filed by Mr. Bernard's counsel provides independent proof of this fact. Doc. 136. As Respondent admits, Mr. Bernard did not plead guilty

36

and did not testify against Mr. Vialva at trial. If it is not a reasonable conclusion from these facts that plea negotiations failed, Respondent offers no alternative explanation. Significantly, Respondent does not deny the existence of the information Mr. Vialva is requesting.

Unlike the petitioner in *Hughes*, Mr. Vialva has both identified and described the information he is requesting. There are ample indicia of the existence of the evidence. Mr. Vialva is entitled to further discovery and an evidentiary hearing on this issue.

### Prejudice

Finally, Respondent misapprehends the prejudice Mr. Vialva must demonstrate to be entitled to relief on this Ground. Respondent asserts throughout its response that no prejudice can be found from any of the *Brady* violations identified by Mr. Vialva because of the overwhelming evidence presented at trial. Respondent ignores the test for materiality and resultant prejudice:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. at 434, quoting *Bagley*, 473 U.S. at 678. The Court leaves no ambiguity on the second point misconstrued by Respondent. Materiality "is not a sufficiency of the evidence test," thus:

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Kyles*, 514 U.S. at 434-435; *accord Willis v. Cockrell*, 2004 WL 1812698 at *18-19 (W.D. Tex., Pecos Div., Aug. 9, 2004). Despite Respondent's attempted gloss on the facts, the government's

37

case for guilt and certainly its case for the death penalty hinged on proving Mr. Vialva was in control of the events and was the person who shot the Bagleys. Without forensic evidence, the government's case depended principally on the credibility of Terry Brown and secondarily on the credibility of Christopher Lewis. All of the withheld information bears on these points.

The Fifth Circuit has recognized and applied the standards for materiality and prejudice in federal prosecutions. This is not an instance in which the withheld information has no relation to the counts of conviction or is irrelevant to the jury's consideration of how the case was investigated. *Compare United States v. Hughes*, 230 F.3d 815 (5th Cir. 2000) (cited by Respondent, *Response* at 60-61). When the withheld information impugns the integrity of the jury trial, the Fifth Circuit has enforced the requirements of *Brady*. The Fifth Circuit has rejected the government's contention that even if evidence was withheld, no relief is warranted unless the evidence bears directly on the narrow issue of whether the defendant committed the offense.

> We are particularly troubled by the prosecutions affirmative misrepresentation concerning the scope of the benefits provided to the testifying aliens and its failure to divulge evidence that its star witness, Agent Cruce, personally disliked [defendant] Sipe. While the record unquestionably contained significant evidence of Sipe's guilt, the prosecution's withholdings prevented Sipe from exposing significant weaknesses in the government's case at every turn. Even if none of the nondisclosures standing alone could have affected the outcome, when viewed cumulatively in the context of the full array of facts, we cannot disagree with the conclusion of the district judge that the government's nondisclosures undermined confidence in the jury's verdict.

*United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) (affirming district court's grant of motion for new trial based on Rule 33, FED. R. CRIM. P., and *Brady* violations). As in *Sipe*, the withheld evidence in Mr. Vialva's case is directly relevant to credibility of the government's case. The same relief should be granted.

38

Contrary to Respondent's rhetoric, the evidence that Mr. Vialva was the person who shot the Bagleys was not overwhelming. Respondent was wholly dependent on the testimony of Terry Brown to prove Mr. Vialva shot the Bagleys and, by extension in the second stage, deserved the death penalty for his actions. Respondent has resisted all efforts of counsel to verify if its virtually unchallenged presentation was the result of trial counsel's ineffectiveness or its failure to disclose relevant evidence pursuant *Brady*. Respondent has offered nothing to ths Court on which a legally and factually supportable conclusion can be based.

Counsel believe the unrefuted facts prove Respondent violated its affirmative duty to disclose relevant evidence, as required by *Brady*. In light of the record in this case, relief in the form of a new trial is warranted. If this Court determines the evidence presented to this point is insufficient to grant relief, then Mr. Vialva's request for discovery should be granted. When discovery is completed, Mr. Vialva should be given an opportunity to supplement his pleadings with additional information and, if any disputed issues of fact remain, an evidentiary hearing should be conducted.

## GROUND IV

**CHRISTOPHER VIALVA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY THE SIXTH AND EIGHTH AMENDMENTS DURING THE GUILT PHASE OF HIS TRIAL. TRIAL COUNSEL FAILED TO OBTAIN FUNDING FOR NECESSARY EXPERT ASSISTANCE, RESULTING IN AN INADEQUATE INVESTIGATION OF FIRST STAGE ISSUES. COUNSEL FAILED TO SUBJECT THE GOVERNMENT'S CASE TO ADVERSARIAL TESTING THROUGH PROPER CROSS EXAMINATION, OBJECTIONS, AND CHALLENGES. BECAUSE OF INADEQUATE PREPARATION, COUNSEL FAILED TO PRESENT A COHERENT DEFENSE. TRIAL COUNSEL'S FAILURES, INDIVIDUALLY AND CUMULATIVELY, UNDERMINE CONFIDENCE IN THE OUTCOME OF THE PROCEEDINGS. A NEW TRIAL IS THE SOLE REMEDY FOR THESE FAILURES.**

### A.    Procedural Posture of this Claim

Respondent did not comment on Mr. Vialva's explanation of the procedural posture of this case. Respondent tacitly conceded this issue is properly before the Court. *See Massaro v. United States*, 538 U.S. 500 (2003); *United States v. Gordon*, 346 F.3d 135, 136-137 (5th Cir. 2003).

### B.    Predicate Legal Authority - The Sixth Amendment and Supreme Court Precedent

Respondent cited no authority in support of its arguments, other than a reference to the published opinion affirming Mr. Vialva's convictions and sentences. Respondent conceded the legal standards applicable to ineffective assistance of counsel claims and to the standards of performance recognized as applicable to attorneys defending capitally charged defendants. The standards and controlling case authority are discussed in detail in Mr. Vialva's *§ 2255 Motion*, beginning at 60 and continuing through page 62. Each of the elements of ineffective assistance of counsel presented in Mr. Vialva's *Motion* are linked to the standards promulgated by the American Bar Association and embraced by the Supreme Court. Since there is no dispute between the parties about these standards or their applicability, no further discussion or clarification is necessary.

C.     **Specific Instances of Ineffective Assistance of Counsel**

1)     *Trial Counsel Failed to Obtain Funding for Necessary Experts, Resulting in Inadequate Investigation and Deficient Preparation.*

Respondent fundamentally failed to comprehend the error alleged by Mr. Vialva in Ground IV. Respondent's evident confusion begins with its characterization of the error arising from trial counsel's failure to obtain adequate funding for necessary experts and the resulting lack of adequate preparation to defend Mr. Vialva. Respondent seized on the defense team's request for funding to hire Leon Cheney as a criminal investigator and noted this Court granted the funding request. From this single fact, Respondent concluded, "this was not conduct falling below an accepted standard of reasonableness; there was no *Strickland* prejudice." *Response* at 99. This argument is wholly unresponsive to the issue Mr. Vialva presented.

Counsel for Mr. Vialva will not reiterate all of the facts and argument presented in the *§ 2255 Motion*, beginning at page 62 and continuing to page 67. The inadequacy of trial counsel's efforts are detailed for the Court's review. The salient point, which Respondent did not address, is that trial counsel failed to provide this Court with sufficient information on which to base its decisions regarding funding and continuances. Trial counsel did not advise this Court of the appropriate procedures that could have secured the time and resources necessary to represent Mr. Vialva properly. Although trial counsel provided the Court with citations to some of the relevant portions of the *Guide to Judiciary Policies and Procedures*, none of those processes were invoked through a budgeting process, documented requests for funding, or a properly supported request for continuance when, as the trial was beginning, critical defense preparation remained unfinished.

Respondent apparently confused the issue of trial counsel's failure to obtain adequate funding, argued in Ground IV (C)(1), with the issue of trial counsel's failure to conduct an adequate

41

investigation, argued in Ground IV (C)(2). The statistics regarding the length of time afforded Mr. Vialva to prepare for trial were discussed in the latter section. Nevertheless, in response to the argument trial counsel failed to secure adequate funding, Respondent attempted to dismiss the evidence concerning timing by commenting:

> Vialva contends that the preparation time for his two lawyers was "less time than half of the defendants confined on death row." But this just means that Vialva was in the middle of the pack. Vialva's underlying assumption is his argument, that more preparation time necessarily results in a better defense, is not supported by case authority.

*Response* at 100. Respondent focused on one of the statistics cited by Mr. Vialva. Respondent did not dispute, or even address, the fact the majority of federal capital defendants were given more time to prepare than Mr. Vialva (*§ 2255 Motion*, Exhibit IV-E at 1), or the fact that Mr. Vialva was given less time to prepare than two-thirds of the capital defendants who received a non-death verdict (*id.* at 3). Mr. Vialva was not simply "in the middle of the pack," but well outside the norm of defendants charged with capital offenses in federal court. Counsel for Mr. Vialva agree that having more time to prepare does not necessarily ensure "a better defense," but the reverse of the syllogism is true: having insufficient time and insufficient funding to prepare a defense virtually guarantees counsel will fail to provide the effective assistance of counsel required by the Constitution. The proof of this syllogism is found in the record of this case.

### 2) *Counsel failed to conduct an adequate investigation.*

The facts concerning the amount of time available to trial counsel and the amount of time trial counsel spent preparing Mr. Vialva's case were addressed in subsection IV (C)(2) of Mr. Vialva's *§ 2255 Motion*. Beyond the preceding comment about Mr. Vialva's being in "the middle of the pack," Respondent did not address the following salient facts:

42

1)     From fiscal year 1992 through fiscal year 1997, the average total attorney hours per representation in federal capital trials was 1,889 hours with 1,480 of those hours spent out of court. *Spencer Committee Report*, cited in 2003 ABA Guidelines 6.1, Commentary, n. 116;

2)     Mr. Goains, lead counsel in the guilt stage, spent 463.90 hours in out of court preparation. Mr. Schwieger, the principal author of team's motion practice, spent 580.40 hours in out of court preparation.

3)     The *combined* out of court efforts of counsel totaled 1,073.30 hours, 405.70 hours less than the average out of court hours per attorney noted by the ABA and Spencer Subcommittee;

4)     The *combined* total for both lawyers, for both in court and out of court work, was 1,295.2 hours, 593.8 hours less than the 1,889 average hours per attorney noted by the ABA and the Spencer Committee.

Similarly, Respondent did not address the evidence presented by Mr. Vialva in support of this claim, specifically, the sworn declarations of Leon Cheney (Exhibit IV-F) and Kent Christianson (Exhibit IV-G), who were retained by defense counsel. This unrefuted evidence establishes that trial counsel failed to conduct a timely, thorough, and complete examination of the crime scene and the physical evidence. Counsel failed to confer with Mr. Christianson and so proceeded with a line of unhelpful cross examination about physical evidence. Counsel failed to use Mr. Cheney to investigate the bystanders, resulting in a disastrous attempt to suggest the bystanders were involved in the homicides.

Respondent did not acknowledge the Supreme Court's controlling direction that counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation." *Strickland v. Washington*, 466 U.S. 668, 690-691 (1984). Respondent offered no evidence that counsel limited their investigative efforts based on "reasonable professional judgments." No such evidence exists.

43

Respondent attempted to excuse trial counsel's failures by asserting the case against Mr. Vialva was "strong." Respondent asserted Mr. Vialva has yet to make a "viable showing of alternative perpetrators" and from this, concluded trial counsel cannot be blamed for failing to develop an alternative suspect "where there clearly were no good candidates." *Response* at 102. Respondent ignored the evidence presented by counsel in support of Ground III and the effect of the omitted evidence on the defense presentation. Respondent's chief witnesses were two obvious alternative suspects. But, since trial counsel failed to investigate this case properly, they were unprepared either to subject the government's case to meaningful adversarial testing or to present a coherent theory of defense. Both avenues were available, as explained in Mr. Vialva's *§ 2255 Motion.*

### 3)    Counsel Failed to Subject the Government's Case to Requisite Adversarial Testing.

Mr. Vialva presented five specific points of the prosecution's case that trial counsel failed to subject to effective adversarial testing: forensic testing (*§ 2255 Motion* at 73-76); the testimony of Terry Brown (*id.* at 76-80); the testimony of Christopher Lewis (*id.* at 80-82); evidence of gang affiliation (*id.* at 82-83); and Mr. Vialva's mental age at the time of the offense (*id.* at 83-85). Within the five points, counsel for Mr. Vialva identified specific instances of trial counsel's failure and substantiated the fact trial counsel could have presented evidence that rebutted the prosecution's theory of the case. In lieu of repeating all of the arguments and evidence presented in Mr. Vialva's *§ 2255 Motion*, the following references reflect the deficiencies of trial counsel and the evidence submitted in support of Mr. Vialva's claim for relief:

1)    Failure to challenge discrepancies in law enforcement's account of evidence collection and preservation (Exhibit IV-I Table1);

44

2455



2)      Ineffective cross examination of serological evidence (X Tr. 1991-1993);

3)      Failure to pursue testing of clothing and failure to pursue cross examination of testimony indicating blood should have been recoverable from clothing of person in proximity to the victims. (IX Tr. 1924-1925, Testimony of Terry Brown; Exhibit VII-J ¶ 1.125, Texas Ranger Report);

4)      Failure to challenge absence of gunshot residue evidence. (Exhibit IV-F ¶ 7, Declaration of Leon Cheney; Exhibit IV-K, Declaration of Robert White);

5)      Failure to pursue, develop, and present effective impeachment of Terry Brown, including requesting unsealing of federal juvenile proceedings, pursuing information about Brown's drug use on the day of the homicides, and Brown's exposure to State capital charges. (Exhibit III-H, CID Report; XI Tr. 2187 and Exhibit III-S ¶¶ 12, 14; Gov. Ex. 39; IX Tr. 1959, 1960, Exhibit IV-L);

6)      Failure to pursue, develop, and present effective impeachment of Christopher Lewis. (Exhibit III-H at 6.4, CID Report of contacts; Exhibit III-T, grand jury testimony of Agent Chadwick; XI Tr. 2421-2422, 2416);

7)      Failure to develop investigate and present relevant evidence rebutting government's theory concerning Mr. Vialva's "gang affiliation." (Exhibit IV-K at ¶6, Declaration of Leon Cheney; Exhibit IV-M, Declaration of Dwight Stewart);

8)      Failure to develop and present evidence of Mr. Vialva's mental age relevant to issue of intent and to rebut government's theory of his leadership role. (Exhibit IV-H, Declaration of Tena Francis and Exhibit B, Draft Social History; Exhibit VII-A, Declaration of Time Erdmann; Exhibit VII-C, Declaration of Dr. Daneen Milam; Exhibit VII-M, Declaration of Mark Cunningham).

Again, Respondent offered this Court no countervailing evidence that might excuse or explain trial counsel's deficient performance. Instead, Respondent quoted portions of the trial transcript, provided a synopsis of the trial, and asserted as a conclusion that defense counsel's efforts were reasonable strategy and effective representation. As support for the latter contention,

Respondent commended the cross examination of various witnesses as evidence of trial counsel's effective performance. Respondent offered no legal or factual support for the contention any of trial counsel's actions were strategic decisions, deliberately made after adequate research, investigation, and deliberative process. The Fifth Circuit has rejected explicitly the idea cross examination at trial, no matter how vigorous, can cure counsel's failure to conduct proper pretrial preparation. Failure to prepare for trial results in a deficient challenge to the prosecution's case. *See Anderson v. Johnson*, 338 F.3d 382, 391-391 (5th Cir. 2003) (citing *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994)). When the prosecution's case rests, as it did in this case, on the testimony of an eyewitness, and counsel fails to prepare to challenge that evidence, both prongs of *Strickland* are met and relief is warranted. *Anderson*, 338 F.3d at 393-394.

### 4)    *Counsel Failed to Present a Coherent Defense.*

Respondent relied on its summary of the trial and the Fifth Circuit's characterization of the prosecution as a "strong case" in response to the legal authorities and facts presented by Mr. Vialva. Respondent relied, once again, on the unsupported assertion, "No ineffective assistance in this area, or prejudice has been demonstrated." *Response* at 130. Respondent's opinion, unsupported by law or facts that rebut Mr. Vialva's detailed and documented claims, provides no basis for this Court to use in its determination of the merits of this claim.

### 5)    *Counsel Failed to Establish a Working Relationship*
### *with Mr. Vialva.*

Respondent did not dispute the affirmative duty placed on trial counsel by the ABA Guidelines. Respondent did not take issue with the fact Mr. Goains, who was in charge of the first stage presentation, spent 16.30 hours conferring with Mr. Vialva, with two of those hours spent discussing his prospective employment with the United States Attorney. Respondent did not take

issue with the fact Mr. Schwieger, who was responsible for the second stage presentation, spent 26.40 hours in conference with Mr. Vialva. Respondent did not dispute the fact counsel's failure to confer with Mr. Vialva was not offset by extensive, fruitful contact with other members of the defense team. Respondent offered this Court no expert opinion, legal authority, or other evidence indicating trial counsel fulfilled the duties recognized as critical by the American Bar Association.

**D.      Conclusion - Mr. Vialva Was Prejudiced By Trial Counsel's Failures**

In support of this claim, Mr. Vialva has offered facts, legal authorities, and sworn declarations establishing trial counsel's performance was deficient. Mr. Vialva has also demonstrated through facts, legal authorities, and sworn declarations that he was prejudiced by his trial counsel's deficient performance. Mr. Vialva proceeded to trial for his life with lawyers who failed to secure the most basic tools necessary to prepare an adequate defense. Even without the benefit of time and resources, trial counsel were still in possession of information that would have lead reasonably prudent attorneys to pursue weaknesses in the government's case, to exploit discrepancies patent from the records in their possession, and to demand disclosure of further information that was clearly in the possession of the prosecution. In each of these respects, counsel failed. Respondent is asking this Court to rely on the Fifth Circuit's comment that the case against Mr. Vialva was "strong" as a basis to determine any further efforts by counsel would have been useless. The unrefuted evidence, the agreed standards of practice, and the legal authorities presented by Mr. Vialva compel the opposite conclusion. This Court can repose no confidence in the outcome of guilt stage of this capital trial. Relief in the form of a new trial is required.

## GROUND V

**A CAPITAL DEFENDANT'S PROPENSITY TO COMMIT VIOLENCE IN THE FUTURE CANNOT BE PREDICTED ACCURATELY. THE JURY'S CONSIDERATION OF " FUTURE DANGEROUSNESS" AS A FACTOR IN AGGRAVATION OF PUNISHMENT RESULTED IN THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY, IN VIOLATION OF THE RIGHT TO DUE PROCESS OF LAW SECURED BY THE FIFTH AMENDMENT. ASSESSMENTS OF FUTURE DANGEROUSNESS RELY ON GENERALIZATIONS ABOUT CONDUCT, RATHER THAN FACTS SPECIFIC TO THE DEFENDANT. THIS PROCESS DENIES THE DEFENDANT THE INDIVIDUALIZED SENTENCING REQUIRED BY THE EIGHTH AMENDMENT. THE GOVERNMENT'S INVOCATION AND THE JURY'S USE OF THE "FUTURE DANGEROUSNESS" NON-STATUTORY AGGRAVATING FACTOR DEPRIVED CHRISTOPHER VIALVA OF A CONSTITUTIONALLY ADEQUATE SENTENCING PROCESS.**

**A.    Ground V Has Not Been Procedurally Defaulted**

Respondent argued Mr. Vialva procedurally defaulted Ground V by failing to raise the claim on direct appeal. This claim is grounded in the new information provided in the Texas Defender Study issued in 2004. *See Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness*, TEXAS DEFENDER SERV. (2004) [hereinafter "TDS Study"].[4] Direct appeal counsel could not have previously raised this challenge, because the factual bases for the claim were not available at the time of direct appeal.

Even if some information was available to indicate that direct appeal counsel should have challenged the constitutionality of the future dangerousness aggravator, such a challenge would have required extra-record factual development and the challenge therefore could not have been brought in a direct appeal context. *See United States v. Rosario*, 234 F.3d 347, 352 (7th Cir. 2000) (claims requiring extra record fact development should be brought in the first instance in a 2255 motion).

---

[4]The full study from the Texas Defender Service is available at: http://www.texasdefender.org/DEADLYSP.PDF.

48

But, even if the standards of procedural default are applied, Mr. Vialva can easily meet the cause and prejudice standard. *United States v. Frady*, 456 U.S. 152, 167-69 (1982) ("cause" element of cause and prejudice standard met by showing that omission of issue on direct appeal not fairly attributable to petitioner); *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (Cause turns on whether the prisoner can show some objective factor external to the defense that impeded counsel's efforts to comply with the state's procedural rule.). Mr. Vialva cannot be held accountable for procedurally defaulting a claim that could not have been developed at the time of direct appeal. Moreover, it is axiomatic that a sentence of death exacted using an unconstitutional aggravator that lacks the requisite reliability and individuality causes Mr. Vialva prejudice. It is equally clear the outcome of Mr. Vialva's trial would have been different in the penalty phase if the death penalty had been stricken, or evidence of the inherent inability of lay jurors or experts to make determinations of future dangerousness would have been presented. *Strickler v. Greene*, 527 U.S. 263, 289 (1999) (Prejudice is established if there is a "reasonable probability that the result of the trial would have been different."). Mr. Vialva thus meets the standard for cause and prejudice, even if the standard is applied erroneously to this issue. *Id.*

**B.    Courts Have Accepted That the Texas Defender Study Indicates That Future Dangerousness Should Be Revisited as a Constitutional Aggravator.**

Since Mr. Vialva's *§ 2255 Motion* was filed, at least one court has agreed that, based on new facts available in the Texas Defender Study, there is considerable doubt that a future dangerousness aggravator can be constitutionally applied. In *United States v. Sampson*, 335 F. Supp. 2d 166, 222-23 (D. Mass. 2004), the court expressed concern, in light of studies on future dangerousness like the one conducted by the Texas Defender Service:

whether it is impossible for lay jurors, as well as for trained experts, to predict future dangerousness with the level of reliability necessary to ensure that the death penalty is not being "wantonly and ... freakishly imposed." *Furman v. Georgia*, 408 U.S. 238, 310, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Stewart, J., concurring).

* * *

[And whether] . . . the evolution of the law, and of scientific research, presents the question of whether it can now be said that future dangerousness can generally be predicted with sufficient reliability to assure that the death penalty is not being imposed arbitrarily and capriciously.

For all the reasons presented, Mr. Vialva believes no jury can ever make an accurate, appropriately individualized, or reliable determination on future dangerousness. *See § 2255 Motion* at 92-105. Specifically, Mr. Vialva believes the Texas Defender Study is new information that points out the inherent defect in future dangerousness analyses. Even if this Court is unwilling to review the use of a future dangerousness aggravator based on newly available data, Mr. Vialva is entitled to present this issue and preserve the claim for review by higher courts.[5]

## C.    The Defense's Use of Dr. Cunningham

Respondent expressed the belief Ground V must fail because the defense expert on future dangerousness purportedly individualized his statistical analysis of Mr. Vialva's potential future dangerousness with various facts about Mr. Vialva's family life. *Response* at 140-41. Respondent misunderstood the starting point for Dr. Cunningham's analysis was a flawed scientific and statistical premise. People are not numbers. In rebuttal to the methodology used by Dr. Cunningham, post conviction counsel offered the affidavit of Dr. Brockett who clearly explained why statistical analyses of behavior, which are the key to every prediction of future dangerousness,

---

[5]To the extent Respondent's response to Ground V deals with Dr. Cunningham's individualized consideration of Mr. Vialva (*Response* at 140-45), that issue is addressed in trial counsel's ineffective investigation, preparation, and presentation of a case in mitigation in Ground VII.

are fundamentally flawed. Respondent offered nothing in response to Dr. Brockett's compelling conclusion. *See § 2255 Motion*, Exhibit VII-L. The inaccuracy and inadequacy of the information used by Dr. Cunningham is discussed, *infra*, in Ground VII. But, even if the information used by Dr. Cunningham would have been complete, no amount of personal detail about Mr. Vialva's circumstances would rescue Dr. Cunningham's methodology. That methodology was flawed from the outset as founded in a fundamentally erroneous presumption that statistical methods can provide useful data in analyzing the future behavior of individuals. Respondent is simply wrong when it claims Mr. Vialva had the benefit of a Constitutionally sufficient individualized sentencing determination.

## GROUND VI

**MR. VIALVA'S TRIAL COUNSEL WERE INEFFECTIVE IN MOVING FOR SEVERANCE OF THE PENALTY PHASE OF THE TRIAL. MR. VIALVA WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL AND HIS EIGHTH AMENDMENT RIGHT TO AN INDIVIDUALIZED SENTENCING.**

**A.      Ground VI Has Not Been Procedurally Defaulted**

Respondent asserted this issue was, in part, procedurally defaulted. *Response* at 147. Respondent is wrong. This Ground is plainly cast as a claim that trial counsel were ineffective in failing to secure a severance in the penalty phase of the proceedings. As discussed previously, *supra*, ineffective assistance of counsel claims can and should be presented in post conviction proceedings. *See Massaro v. United States,* 538 U.S. 500, 504 (2003); *United States v. Higdon*, 832 F.2d 312, 313-14 (5th Cir. 1987).

Moreover, the facts establishing trial counsel's ineffectiveness are the social studies that were available, but not used, to support the motion for severance. These studies were not part of the trial record and thus not presented in the direct appeal. Neither the law of the case nor the rule of

procedural default bar Mr. Vialva from raising these extra record facts now in support of his claim of ineffective assistance of counsel. *See § 2255 Motion*, Exhibits VI-A and VI- B; *United States v. Rosario*, 234 F.3d 347, 352 (7th Cir. 2000); *cf. United States v. Dula*, 989 F.2d 772, 776 & n.11 (5th Cir. 1993) (concluding the extra record fact development in support of Brady violation required presentation in 2255 motion).

**B.     Trial Counsel Were Ineffective In Failing to Present Evidence in Support of Motions for Severance of the Penalty Phase of the Capital Trials.**

The failure to move for severance can support a claim for ineffectiveness of counsel and should do so here. *See Trass v. Maggio*, 731 F.2d 288 (5th Cir. 1984) (finding ineffectiveness in noncapital case for failing to move for severance); *Williams v. Washington*, 59 F.3d 673, 682 (7th Cir. 1995) (failure to consider seeking a severance was not objectively reasonable).

It is axiomatic, and hardly needs to be emphasized, that "[i]n a death penalty case . . . concerns about reliability are heightened, particularly as to severance." *United States v. Green*, 324 F. Supp. 2d 311, 324 (D. Mass. 2004). But, despite the seriousness of the issue of severance, counsel failed to support the motion for severance with any facts justifying severance. Although the range of reasonable professional judgments is wide, courts universally recognize that ineffective assistance is generally clear in the context of a complete failure to investigate or a failure to obtain facts on which a claim could be made. *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984). Counsel's performance in this case clearly fell below reasonable professional standards for the defense of a capital case, indeed, below the standards for any first year law student who is taught that the signal requirement of a legal brief is citation to relevant legal authority and facts relevant to the argument.

Not only was counsel's performance deficient, it is clear prejudice resulted from counsel's failure to present evidence in support of severance. When confronted with the evidence that Mr. Vialva's trial counsel could have and should have presented, other courts have concluded capital defendants were entitled to severance. *See, e.g., United States v. Ayala-Lopez*, 319 F. Supp. 2d 236, 240 (D.P.R. 2004) (noting heightened standard in capital cases and noting with approval the data in the declaration of Kevin McNally [in this case, *§ 2255 Motion*, Exhibit VI-B] in consideration of severance in capital case and granting motion for severance). The factual data supporting severance highlights the important concerns that: (1) arguments in mitigation of one defendant will tend to be an argument against mitigation of the other; (2) the order in which the defendant's present their mitigation defenses can affect outcome; and (3) joint penalty phase trials risks "trial by ambush." *Green*, 324 F. Supp. 2d at 326 (concluding severance of penalty phase of codefendants in capital case necessary). Indeed, in the penalty phase of a capital trial "the government has to give notice of aggravating factors, [but] a codefendant does not." *Id*. The problems that the absence of notice creates "potentially rise above simple fairness and may raise Sixth Amendment confrontation issues and Eighth Amendment concerns about individualized treatment at the punishment phase." *Id*. Of course, that is exactly what happened in this case. Without warning of Mr. Bernard's strategy, Mr. Vialva was forced to adjust his mitigation presentation to compete with Mr. Bernard's presentation of a stable family life and traditional Christian values. By failing to sever the penalty phase of this capital case, these defendants were particularly vulnerable to the jury's impermissible weighing of relative, rather than individual, culpability in violation of their Constitutional right to an individualized sentencing determination.

This case presents the question of whether the right to a fair and individualized sentencing is a "specific trial right" compromised by joint trial in violation of the Eighth Amendment and the

rule of law set out in *Zafiro*. *Zafiro v. United States*, 506 U.S. 534, 538 (1993) (severance required when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants"). Counsel in this case failed to support the claim for severance with facts. To counsel's knowledge, the only other court that has addressed this issue squarely, when presented with appropriate support, answered in the affirmative. *See Ayala-Lopez*, 319 F. Supp. 2d at 240. Mr. Vialva was clearly prejudiced by counsel's ineffective presentation of this critical issue. Based on the record, there can be no confidence in the outcome of the penalty of this trial. Relief is warranted.

## GROUND VII

**CHRISTOPHER VIALVA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED TO HIM BY THE SIXTH AND EIGHTH AMENDMENTS DURING THE PENALTY PHASE OF HIS TRIAL. TRIAL COUNSEL'S FAILURE TO OBTAIN ADEQUATE FUNDING RESULTED IN A COMPLETE FAILURE TO DEVELOP AND PRESENT READILY AVAILABLE MITIGATION EVIDENCE. COUNSEL FAILED TO DEVELOP INFORMATION ABOUT CHRISTOPHER VIALVA'S MENTAL STATE, HIS UPBRINGING, HIS CHARACTER, AND HIS POTENTIAL. COUNSEL FAILED TO ADDRESS THE GOVERNMENT'S ALLEGATIONS ABOUT MR. VIALVA'S "FUTURE DANGEROUSNESS" AND FAILED TO PRESERVE ERROR ARISING FROM THE GOVERNMENT'S PRESENTATION OF THIS AND NON-STATUTORY AGGRAVATING FACTORS. AS A RESULT OF THESE FAILURES, COUNSEL PRESENTED NO EFFECTIVE DEFENSE TO THE DEATH PENALTY. TRIAL COUNSEL'S FAILURES, INDIVIDUALLY AND CUMULATIVELY, UNDERMINE CONFIDENCE IN THE OUTCOME OF THE SENTENCING PROCEEDINGS. A NEW TRIAL IS THE SOLE REMEDY FOR THESE FAILURES.**

**A.    Procedural Posture of this Claim**

Respondent does not dispute this issue is properly before this Court for consideration.

**B.    Legal Standard Applicable to this Ground**

Respondent does not dispute the applicability of the legal standards governing trial counsel's performance identified in Mr. Vialva's *§ 2255 Motion*. Respondent cites three cases in support of

its assertions trial counsel's performance satisfied the Constitutional standards imposed by *Strickland.* Those cases will be discussed *infra* in the factual context of Respondent's argument.

**C.    Specific Instances of Ineffective Assistance of Counsel**

*1) and 2)        Counsel Failed to Secure Adequate Funding for Necessary Resources and to Devote Adequate Time and to Investigate, Prepare, and Present a Mitigation Case.*

Respondent does not challenge the qualifications, the method, or the expert opinions of Tena Francis (Exhibit IV-H), Jane McHan (Exhibits VII-B and VII-D), and Dr. Daneen Milam (Exhibit VII-C). The opinions of these experts are examined in detail in Mr. Vialva's *§ 2255 Motion* and will not be reiterated in detail in this *Reply.* In summary, the declarations establish trial counsel began their presentation for Mr. Vialva's life with a "woefully inadequate" social history. Exhibit IV-H at ¶ 20 (Francis). Because trial counsel did not have adequate information, their decision to rely on the testimony of Mr. Vialva's mother, his most recent stepfather, one of his childhood friends, and an expert whose testimony was more damaging than helpful, cannot be deemed strategic. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (counsel's failure to uncover and present voluminous mitigating evidence did not result from tactical decision since counsel had not fulfilled "obligation to conduct a thorough investigation of defendant's background" consonant with ABA Standards); *and Wiggins v. Smith*, 539 U.S. 510, 527-528 (2003) (". . . counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible.").

Mr. Vialva was prejudiced by his trial counsel's failures. As detailed in Mr. Vialva's *§ 2255 Motion*, there was wealth of mitigation evidence that bore directly on his moral culpability, which was the central issue for the jury's determination in the penalty phase. Exhibit VII-C  at ¶¶25-28 (Milam); Exhibit VII-B at ¶¶6-8 (McHan); *and see Williams*, 529 U.S. at 398 (mitigating evidence

2446

that may not wholly rebut future dangerousness yet "may well have influenced the jury's appraisal of his moral culpability."); *Wiggins*, 539 U.S. at 535 ("Petitioner thus has the kind of troubled history we have declared relevant in assessing a defendant's moral culpability." (citing *Penry v. Lynaugh*, 492 U.S. 302 (1989), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Lockett v. Ohio,* 438 U.S. 586 (1978))).    If the omitted evidence would have been presented, there is a reasonable probability at least one juror would have been persuaded to spare the life of nineteen year old Christopher Vialva. *See Moore v. Johnson*, 194 F.3d 586, 620-621 (5th Cir. 1999) (Trial counsel's failure to investigate mitigating evidence of defendant's history of deprivation and neglect, coupled with counsel's failure to use mitigation evidence that was patent without further inquiry, constituted deficient performance and prejudiced defendant in the penalty phase.); *Brewer v. Dretke,* No. Civ.A.2:01-CV-0112-J, 2004 WL 1732312, at *5 (N.D. Tex. Aug. 2, 2004) (relief granted pursuant *Tennard v. Dretke*, 542 U.S. ___, 124 S.Ct. 2562 (2004); court noted petitioner, who was nineteen years old at the time of offense, presented evidence of an abused childhood, depression, mental health treatment, and susceptibility; these facts "might serve as a basis for a sentence less than death." (internal citations omitted.))  .

Respondent has not provided this Court with affidavits or declarations rebutting either the factual statements of the lay witnesses or the opinions of the exerts.    Instead, Respondent recapitulated the information contained in Ms. Francis's preliminary report and compared the items of information identified as significant by post conviction counsel to the trial transcript.    The apparent purpose of Respondent's account appears to be that Mr. Vialva's jury heard substantially the evidence through the four witnesses called by trial counsel.    Respondent suggested post conviction counsel were attempting to mislead this Court. *See Response* at 72 ("Vialva's assertion '[t]hat the jury heard none of this evidence,' is incorrect.").    Although Respondent provided no

56

citation for this quotation, it appears to be a paraphrase of the last full paragraph in the subsection relating to trial counsel's failure to develop an adequate social history. *§ 2255 Motion* at 122. It is Respondent who is misguiding this Court.

The omitted information refers to the evidence provided by Ms. McHan, Dr. Milam, Tina Erdmann (Exhibit VII-A), Debbie Bynum (Exhibit VII-E), Rowallan Vialva (Exhibit VII-F), Jacorby Smith (Exhibit VII-G), James Dickson (Exhibit VII-H), Jessica Haskins (Exhibit VII-I), Jenell Hamilton (Exhibit VII-J), and Charlene Burke (Exhibit VII-K). In fact, none of the evidence from these witnesses was heard by the jury. Moreover, Ms. Francis's preliminary social history report, to which Respondent makes repeated reference, was not presented to the jury. Ms. Francis was not called as witness either to discuss the contents of her preliminary report or to verify it for admission as an exhibit. Records of Mr. Vialva's hospitalization for a "blood infection" when he was eleven days old were admitted during the course of Lisa Brown's testimony. XIV Tr. 2916; Defendant Vialva's Trial Exhibit 12. But, none of the witnesses presented by trial counsel, including Dr. Cunningham, explained how the various components of Mr. Vialva's childhood illnesses and injuries, chaotic family life, history of misdiagnosis and improper medication, mental age, emotional condition, intelligence, and positive character traits combined to militate against a sentence of death. Without this critical omitted evidence, the jury had only fragments of disjointed information and no context or frame of reference for weighing what little information was presented. There is a reasonable probability the outcome of the penalty proceedings would have been different if the jury would have received a complete history of Mr. Vialva's nineteen years, with documentation and explanation from experts qualified to comment on the evidence.

Respondent relied on three cases in support of its contention trial counsel's inaction prior to trial and minimal presentation during the second stage were reasonable decisions. The

57

2468

distinguishing facts of the cases cited by Respondent illustrate the error in Mr. Vialva's trial and the need for relief from those errors at this juncture.

Respondent relied on *Rutherford v. Crosby,* 385 F.3d 1300 (11th Cir. 2004), as support for its assertion trial counsel's "decision" not to present additional mental health evidence was reasonable. *Response* at 185. *Rutherford* involved a capital conviction in the Florida State courts. The resolution of the petitioner's *Strickland* claim by the Florida appellate court was subject to the deferential standard of review applicable in federal habeas review pursuant Title 28, United States Code, Section 2254(d). *Id.* 385 F.3d at 1309. Immediately after the jury returned its verdict recommending death, trial counsel submitted two mental competency evaluations that were completed prior to trial. Mr. Rutherford refused to allow his counsel to use the reports. *Id.* at 1310. The Eleventh Circuit discussed in detail the efforts expended by trial counsel to develop mitigation evidence, including evidence of Mr. Rutherford's family life, his alcohol abuse, and the continuing impact of his military service in Vietnam. With regard to the latter area of inquiry, the Eleventh Circuit noted, "Rutherford did what he could to impede his counsels' best efforts and brought about any shortcomings in that part of the investigation." *Id.* at 1312. There is no evidence trial counsel expended similar effort in Mr. Vialva's case, or that Mr. Vialva thwarted any avenue of investigation counsel attempted to pursue. *Rutherford* reaffirms the *Strickland* standard. It does not excuse the errors and omissions committed by counsel in this case.

Respondent cited *Walton v. Angelone,* 321 F.3d 442 (4th Cir.), *cert. denied* 539 U.S. 950 (2003), apparently as additional support for the principle recognized in *Rutherford. Response* at 186, n. 38. *Walton* also involved deferential federal court review of death sentences imposed after pleas of guilty and after the process was subjected to appellate scrutiny by State courts. As in *Rutherford,* trial counsel conducted an extensive investigation into his client's background. Trial

58

counsel provided six separate bases for his decision to present a mitigation case based on Mr. Walton's history of peacefulness and good character as opposed to a presentation based on Mr. Walton's mental illness. The six bases included an absence of helpful mental health evidence, the absence of any family history of mental illness, evidence of the defendant's malingering, and vulnerability of the defense expert to damaging cross examination. *Id.* at 458. There is no evidence Mr. Vialva's trial counsel made an informed strategic decision based on similar information, developed through a thorough investigation.

Finally, Respondent cited *Dowthitt v. Johnson,* 230 F.3d 733 (5th Cir. 2000), *cert. denied* 532 U.S. 915 (2001), apparently for the proposition the court "would not second-guess strategic decisions based on *Strickland." Response* at 185, n. 37. *Dowthitt* involved a Texas State capital conviction, presented for federal habeas review. Regarding the issue of counsel's failure to present mitigation evidence, the State of Texas argued State case law "has discounted evidence not relevant to the crime or future dangerousness." *Dowthitt,* 230 F.3d at 744. Mr. Dowthitt countered that, under *Williams v. Taylor,* the "nexus" requirement for mitigation evidence was erroneous. To the extent *Dowthitt* is advanced by Respondent in support of a similar requirement in this case, no such requirement is enforceable. *Tennard v. Dretke,* 124 S.Ct. at 2571-2572; *and see Smith v. Texas,* 125 S.Ct. 400, 403 (2004) (granting relief pursuant *Tennard,* Court recognized mitigation included evidence petitioner was diagnosed with potentially organic learning disabilities and speech handicaps causing him to be placed in special classes, his family life was troubled, and he was nineteen years old when he committed the crime).

Further, Mr. Dowthitt's counsel attempted to secure the type of mitigating evidence provided in the declarations of Mr. Vialva's family, friends, and experts. As in *Rutherford,* counsel's efforts were frustrated by an uncooperative client and witnesses who did not want to become involved.

59

2470

*Dowthitt*, 230 F.3d at 748-749.  Mr. Dowthitt failed to substantiate his claims of ineffective assistance of counsel with affidavits to establish the existence of mitigating evidence that remained undeveloped by trial counsel.  *Id.* at 748, n. 19.  On the other hand, the court was presented with affidavits from Mr. Dowthitt's trial counsel in which they explained their strategic choices based on facts that related directly to the theory of the case.  *Id.* at 749.  The factual presentation in this case is the exact reverse of *Dowthitt*: Mr. Vialva has provided the Court with extensive documentation establishing counsel's errors and omissions; Respondent has offered no countervailing explanatory affidavit.  In fact, no such affidavit could be produced by Respondent.

One of Mr. Vialva's trial counsel, who had primary responsibility for the penalty phase defense presentation, provided an affidavit to this Court.  Mr. Schwieger detailed the difficulties caused by the lapse in funding for the defense experts.  Exhibit IV-O at ¶5.  Mr. Schwieger admitted he depended on Mr. Vialva's mother, Lisa Brown, "to help collect records and other mitigation and fact information."  *Id.*  Mr. Schwieger admitted Rowallan Vialva initiated contact with him, but neither he nor Ms. Francis contacted Mr. Vialva's biological father again.  *Id.*  Mr. Schwieger admitted the psychiatrist he hired, against the advice of his mitigation specialist (Exhibit IV-H at ¶¶12, 14), found evidence of organic brain dysfunction and recommended further testing of Mr. Vialva by a neuropsychologist.  Exhibit IV-O at ¶7.  Although Mr. Schwieger obtained additional funds and hired a neuropsychologist, the testing was never completed.  *Id.*  Mr. Schwieger stated he did not present evidence about Mr. Vialva's mental or emotional condition through a neuropsychologist or any other mental health professional during the second stage "because of a decision by myself and Mr. Goains."  *Id.*  Mr. Schwieger offers this Court no further explanation of his "decision," but it is clear from the record that it was a decision made in an absence of full investigation and without benefit of any expert opinion.

### D.    Failure to Adequately Prepare, Present, and Preserve Error in the Case Against Future Dangerousness

Mr. Vialva raised a specific claim of ineffective assistance in the second stage based on counsel's failure to prepare, present, and preserve error in the case against future dangerousness. *§ 2255 Motion*, Ground VII(D).  By way of response, Respondent referenced the limited family history factors of which the defense's future dangerousness expert, Dr. Cunningham, was aware, followed by the bald assertion Mr. Vialva has failed to show "that is was unreasonable to employ Dr. Cunningham's approach." *Response* at 185, 181-182.

Respondent never addressed, much less rebutted, the specific issues set forth in Mr. Vialva's claim: (1) defense counsel gave Dr. Cunningham an inadequate amount of time to perform his analysis of Mr. Vialva's case (*§ 2255 Motion* at 128); (2) for no meritorious reason, defense counsel withheld from Dr. Cunningham a personal interview with Mr. Vialva (*id.* at 125-26, 129); (3) the defense failed to convey compelling and relevant personal and family history regarding Mr. Vialva to Dr. Cunningham; (4) in the absence of a personal interview and analysis, Dr. Cunningham's violence risk assessment was based on "actuarial" studies of violence in prisons that is erroneous and scientifically unfounded (*id* at 132, 134); and (5) Dr. Cunningham's testimony opened the door to damaging Government experts (*id.* at 138).   Respondent's silence on these points is understandable.

There is really nothing Respondent can say in response to these issues.  The defense failed to investigate and therefore failed to appreciate that Mr. Vialva's family suffered from a profound history of bipolar disorder that affected both Mr. Vialva's mother as well as Mr. Vialva.  *§2255 Motion* at 122–23; Exhibit VII-C ¶¶ 17-28.  The defense failed to have Mr. Vialva evaluated by a neuropsychologist, despite a specific recommendation from their expert psychiatrist to do so.  *Id.*,

Exhibit VII-O. Because the defense failed to uncover Mr. Vialva's family history of mental illness, the defense failed to convey that information to Dr. Cunningham. *Id.,* Exhibit VII-M ¶¶ 18-22. The defense failed to give Dr. Cunningham an appropriate amount of time to prepare his case on future dangerousness. *Id.,* Exhibit VII-M ¶ 4. Dr. Cunningham was still conducting basic interviews with the family while the trial was underway. *Id.* Defense counsel withheld a personal interview with Mr. Vialva from Dr. Cunningham because they assumed, totally erroneously, that a defendant who has been labeled "antisocial" would necessarily be determined to be dangerous in the future by Dr. Cunningham. *Id.* ¶ 11. Defense counsel failed to discuss with Dr. Cunningham the most basic aspects of his method for analyzing future dangerousness. Accordingly, counsel failed to appreciate that, in the absence of a personal interview, Dr. Cunningham would rely, erroneously and inappropriately, on statistical methods for evaluating dangerousness[6] and would conclude Mr. Vialva would be dangerous in the future.

There is no excuse for these omissions by defense counsel. The omissions were not part of a reasonable defense strategy based on facts or sound medical advice. These omissions came from inattention, inexperience, and incompetence. Dr. Cunningham's testimony would have been markedly different if properly advised by counsel of relevant information. *See, e.g.,* Exhibit VII-M ¶ 18. Mr. Vialva should not suffer the consequences of his trial counsel's failures.

---

[6]In response to Ground V (but not in response to Ground VII), Respondent claims Dr. Cunningham adjusted his statistical evaluation of future dangerousness with family information. Resp. at 140-41. What Respondent does not address is that, through counsel's ineffectiveness, the information Dr. Cunningham used to modify his statistical analysis was fundamentally deficient and indeed, in many respects, erroneous. It is difficult to see how one can start with a completely erroneous premise, as Dr. Cunningham did with his statistical analysis of future dangerousness, and adjust it so that it becomes accurate, reliable, and relevant. But even if one could, hypothetically, make such an adjustment, it cannot be done when counsel fails to uncover or withholds relevant information for no meritorious reason, as was done here.

### E.    Conclusion

Mr. Vialva's counsel failed to provide Constitutionally adequate representation at the most critical stage of these proceedings.  Even if Respondent's inflated account of the strength of its guilt stage presentation is accepted as true, there is no legitimate, fact based, strategically cognizable reason for counsel's abrogation of their duties in the penalty stage.  A compelling mitigation presentation could have been developed if trial counsel would have obtained the necessary resources and used those resources effectively.  Instead, counsel's misguided, uninformed efforts resulted in a penalty stage presentation every bit as disastrous as their guilt stage defense.  The undisputed legal standards by which this Ground must be evaluated compel this Court to grant relief from the death sentences imposed on Mr. Vialva.  A new trial of the penalty phase is required.

### GROUND VIII

**THE GRAND JURY DID NOT DETERMINE ALL OF THE ELEMENTS ESSENTIAL TO ESTABLISH CAPITAL MURDER.  MR. VIALVA'S SUBSEQUENT CONVICTIONS AND SENTENCES OF DEATH WERE IMPOSED IN DEROGATION OF THE INDICTMENT CLAUSE OF THE FIFTH AMENDMENT. THE CONVICTIONS AND SENTENCES MUST BE VACATED.**

### A.    Procedural Posture of this Claim

Mr. Vialva acknowledged his trial counsel failed to challenge the sufficiency of the indictment and his appellate counsel failed to present this issue on direct appeal to the Fifth Circuit or to the Supreme Court through a petition for writ of *certiorari*.  Respondent raised procedural default as a defense to this claim.  *Response* at 190-191.  Further, Respondent argued Mr. Vialva is seeking retroactive application of *Ring v. Arizona*, 536 U.S. 584 (2002), in contravention of *Teague v. Lane*, 489 U.S. 288 (1989).  *Response* at 193.  Respondent also conflated Mr. Vialva's factual statements regarding ineffective assistance as a "sub-argument" not included in the statement of the

63

Ground.    *Id.* at 195.    Counsel for Mr. Vialva believe this Ground presents an important Constitutional issue meriting full consideration by this Court.  Since Respondent invoked the doctrine of procedural default as a defense, clarification of the procedural issues implicated in this Ground, as well as the applicable law, is necessary.

**B.    Facts Relevant to the Determination of this Claim**

Respondent did not dispute the statement of facts detailing the history of the charging documents and the sequence of events on direct appeal.  These undisputed facts establish that the superceding indictment on which Mr. Vialva proceeded to trial did not charge either the mental state elements enumerated in Title 18, United States Code, Section 3591(a), or the statutory aggravating factors enumerated in Section 3592.  It is undisputed the jury was required to find at least one of the predicate factors of Section 3591 and at least one of the statutory aggravating factors of Section 3592 beyond a reasonable doubt before Mr. Vialva was eligible for the death penalty.  18 U.S.C. § 3593(e).

**C.    Argument and Authorities**

**1)    *Teague v. Lane* Does Not Bar Consideration of this Issue**

Respondent recast the issue presented in Ground VIII into a narrow question of whether *Ring v. Arizona* applies to this federal capital prosecution.  Respondent characterized the issue presented by Mr. Vialva as an "*Apprendi*-type claim" that may not be raised on collateral review. *Response* at 187, 191.  Respondent cited *United States v. Robinson*, 367 F.3d 278 (5th Cir.), *cert. denied* 125 S.Ct. 623 (2004), for the assertion the indictment process at the time of Mr. Vialva's prosecution was controlled by *Walton v. Arizona*, 497 U.S. 639 (1990), *overruled by Ring v. Arizona*, 536 U.S. 584 (2002), and therefore the United States was not required to present the mental state or aggravating factors to the grand jury.  *Response* at 188.  The latter contention was offered in support of

2475

Respondent's argument *Ring* announced a "new rule of constitutional criminal procedure," applicable only prospectively. *Id.* citing *Robinson,* 367 F.3d at 284. All of Respondent's contentions hinge on the threshold question whether this Constitutional issue case be presented in this collateral review process.

Counsel maintain the position expressed in Mr. Vialva's *§ 2255 Motion.* The failure of the United States to submit the mental state and statutory aggravating factors to the grand jury violated the rights secured to Mr. Vialva in the Indictment Clause of the Fifth Amendment. This requirement existed at the time of Mr. Vialva's prosecution. The Supreme Court expressly recognized the carjacking statute, which formed the basis of the capital prosecution, enumerated distinct offenses with distinct degrees of punishment. *Jones v. United States,* 526 U.S. 227, 232 (1999). Unlike the State capital defendant in *Walton,* Mr. Vialva had an absolute right to have his case considered first by the grand jury. *Jones,* not *Walton,* controlled the indictment process in this case. Unlike the petitioner in *Apprendi v. New Jersey,* 530 U.S. 466 (2000), Mr. Vialva could not waive his right to be indicted by the grand jury. *See* Rule 7(b), FED. R. CRIM. P.; *Smith v. United States,* 360 U.S. 1, 9 (1959) (Fifth Amendment requires indictment in federal prosecutions; ". . . safeguard may be waived, but only in those proceedings which are noncapital."); *and United States v. Mezzanatto,* 513 U.S. 196, 202 (1995) (recognizing decision in *Smith*). The failure of the United States to submit the qualifying mental state and statutory aggravating elements to the grand jury resulted in a failure to properly invoke the jurisdiction of this Court to conduct a capital sentencing proceeding. This is a structural flaw in the jurisdiction of these proceedings that was never waived by trial and appellate counsel's successive failures to present the issue for review.

65

Even if this Court agrees with Respondent's characterization of this issue as seeking the application of a new rule of criminal procedure, the Constitutional issue presented in the claim may be considered properly on collateral review. The Supreme Court explained the *Teague* process:

> Under *Teague*, the determination whether a constitutional rule of criminal procedure applies to a case on collateral review involves a three-step process. First, the court must determine when the defendant's conviction became final. Second, the court must determine the "legal landscape as it then existed," and ask whether the Constitution, as interpreted by the precedent then existing, compels the rule. That is, the court must decide whether the rule is actually "new." Finally, if the rule is new, the court must consider whether it falls within either of the two exceptions to nonretroactivity.

*Beard v. Banks*, 124 S. Ct. 2504, 2510 (2004) (internal citations omitted). When a decision of the Supreme Court results in a "new rule," the rule "applies to all criminal cases still pending on direct review." *Schriro v. Summerlin*, 124 S. Ct. 2519, 2522 (2004), citing *Griffith v. Kentucky*, 479 U.S. 314 (1987); *and see United States v. Booker,* 125 S. Ct. 738, 745 (2005) ("As these dispositions indicate, we must apply today's holdings—both the Sixth Amendment holding and our remedial interpretation of the Sentencing Act—to all cases on direct review."). If, as Respondent contended, *Ring* announced a new rule applicable to federal capital prosecutions, its holding is applicable to Mr. Vialva's case since his direct appeal was pending when *Ring* was decided. *Ring* applies to this case and *Teague* does not bar consideration of the issue in this collateral proceeding.

Even if this Court believes further analysis is required, the third step identified by the Supreme Court requires this Court to determine if the rule is "actually new," within the meaning of *Teague*. Respondent flatly maintains *Robinson* is dispositive. *Response* at 193; *and see Robinson*, 367 F.3d at 284 ("Before *Ring*, our analysis of the use of sentencing factors in capital cases was controlled by *Walton v. Arizona* (citation omitted)."). *Robinson* is distinguishable in at least one critical respect. Mr. Robinson's capital prosecution was predicated on violations of Title 21, United

States Code, Section 848, and Title 18, United States Code, Section 924(j). *Robinson,* 367 F.3d at 282, n. 1. No ruling similar to *Jones* delineated the substantive nature of the various punishments enumerated in the drug trafficking statutes. Arguably, the federal courts' first inkling of the Constitutional significance of drug amounts and other sentencing factors was provided in *Apprendi.* The "legal landscape" of drug and firearms prosecutions may have been circumscribed only by *Walton,* as the Fifth Circuit held, but *Jones* was decided four months before Mr. Vialva's first indictment was returned, altering the contours of the "legal landscape" for carjacking prosecutions. Thus, the error in the indictment arose before *Ring* was decided; *Robinson* is not dispositive of the third step. *Teague* does operate as a bar to consideration of this issue.

Respondent's reliance on *Robinson* is misplaced and its construction of *Teague* is simply incorrect. If this Court is persuaded *Ring* was a new rule, Mr. Vialva's case was not final when *Ring* was decided and there is no bar to its application. If *Ring* did not announce a new rule of criminal procedure, *Teague* imposes no bar to prevent this Court's consideration of the error presented by this issue.

### 2)    *This Issue Has Not Been Procedurally Defaulted*

As a correlative to the *Teague* argument, Respondent asserted this claim was procedurally defaulted when Mr. Vialva's appellate counsel failed to raise the error on direct appeal. *Response* at 190. Mr. Vialva agrees this issue should have been raised first, in the district court, and subsequently during the direct appeal to the Fifth Circuit. Mr. Vialva explained in detail why he believes his trial counsel were ineffective in the first instance for failing to raise this issue prior to trial. Respondent did not address the importance of *Jones.* Similarly, Respondent did not contend counsel were prohibited from raising this issue initially in the district court. Counsel's initial error persisted through the direct appeal process.

Counsel detailed the course of Mr. Vialva's representation on appeal. Although Respondent took issue with whether Mr. Losch was experiencing any incapacity before his emergency cervical spine surgery in late October or November, 2001, it is unquestioned Mr. Schwieger was left in charge of the direct appeal prior to its disposition by the Fifth Circuit and was solely responsible for the petition for writ of *certiorari*. Whether as a result of Mr. Losch's deteriorating health or of Mr. Schwieger's continued failure to appreciate the significance of the issue, the patently obvious jurisdictional challenge to the indictment was not raised during the direct appeal. Mr. Vialva provided the Court with his letters to Mr. Schwieger and to the Clerk of Court in which he protested the omission of the issue in his petition for writ of *certiorari*. Exhibits VII-C and VII-D. Respondent misconstrued this portion of Mr. Vialva's argument as a separate claim of ineffective assistance of counsel omitted from the statement of the grounds for relief. *Response* at 195. Mr. Vialva included this information anticipating Respondent's invocation of procedural bar, giving fair notice of the facts on which he would base his assertion of "cause," overcoming any procedural bar. As discussed *supra*, ineffective assistance of counsel is "cause," permitting Mr. Vialva to meet the first criterion excusing a procedural bar. *United States v. Guerra*, 94 F.3d 989, 993 (5th Cir. 1996).

Respondent asserted Mr. Vialva is unable to demonstrate prejudice since any *Ring* error would have been deemed harmless in the direct appeal. Respondent relied solely on *Robinson* for this point. *Response* at 194. *Robinson* was decided in April, 2004, two years after Mr. Vialva's direct appeal. The issue presented in *Robinson* was legally and factually distinguishable, as discussed previously. Citing *Robinson*, Respondent contended that any error in the indictment process was cured by the jury's finding the elements of death eligibility beyond a reasonable doubt, defeating any claim of prejudice. *Response* at 194. It is highly debatable whether a *post hoc* rationalization of an acknowledged Constitutional violation would survive Supreme Court scrutiny. As the Fifth Circuit

68

2479

noted, "*Ring*'s Sixth Amendment holding applied with equal force in the context of a Fifth Amendment Indictment Clause challenge, even though the Supreme Court has yet to hold as much in a capital case." *Robinson*, 367 F.3d at 284.

The prejudice to Mr. Vialva is two fold. First, trial counsel's failure to challenge the indictment prejudiced Mr. Vialva by depriving him of his Fifth Amendment right to have this matter considered by a grand jury, the members of which had not be subjected to procedures that established their willingness to impose the death penalty. A grand jury may have reached a different conclusion about the mental state and statutory aggravating factors, altering the manner in which this case was presented to the petit jury. Second, trial and appellate counsel's combined and continuing failure to preserve this issue for appellate review prejudiced Mr. Vialva by depriving him of the right to a merits review of this claim. The division between the Circuit, acknowledged by the Fifth Circuit in *Robinson*, make this issue ripe for Supreme Court review on *certiorari*. To presume, as Respondent has, that a violation of a bedrock Constitutional protection in a capital case results in no prejudice when the accused is ultimately convicted and sentenced to death is without support in the Supreme Court's jurisprudence. Moreover, as discussed previously, procedural default is a doctrine applied to ensure the orderly consideration of issues. It is not a mechanism to defeat the otherwise properly invoked jurisdiction of a federal court to consider an issue of Constitutional significance.

This issue warrants full consideration of the merits by this Court. The error committed by Respondent in the initiation and prosecution of this case undermines confidence in the outcome of the proceedings. In light of the clear Constitutional error, enforcement of the death sentences would be a fundamental miscarriage of justice. Relief in the form of a new trial is warranted.

## GROUND IX

**THE DEATH SENTENCE IMPOSED ON MR. VIALVA WAS SUBSTANTIALLY INFLUENCED BY THE CUMULATIVE ERRORS IN THE GUILT AND PENALTY PHASES.  A SENTENCE IMPOSED UNDER SUCH CIRCUMSTANCES VIOLATES MR. VIALVA'S CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW.  THE SENTENCES OF DEATH MUST BE VACATED.**

**A.      Procedural Posture of this Claim**

Respondent does not dispute that this claim is properly before the Court for consideration.

**B.      Argument and Authorities Supporting Claim for Relief**

Respondent asserted there are no errors "approaching constitutional dimension" in this case, thus there is no basis to conduct a cumulative error analysis. *Response* at 196.  Respondent cited one Fifth Circuit decision in support of its argument, but did not otherwise assail the arguments and authorities presented in Mr. Vialva's *§ 2255 Motion*.  The case authority cited by Respondent supports fully Mr. Vialva's contention this Court should consider the cumulative effect of the separate Constitutional errors, in the event it does not determine one or more of the errors individually dispositive to compel relief.

The case cited by Respondent, *Livingston v. Johnson*, 107 F.3d 297 (5th Cir.), *cert. denied* 522 U.S. 880 (1997), is not in conflict with the authorities cited by Mr. Vialva.  But, the factual distinctions between Mr. Livingston's claims and Mr. Vialva's are instructive.  Mr. Livingston's first stage case involved directly conflicting theories of false eyewitness identification and accidental shooting.  The reasonableness of trial counsel's decision to pursue the former theory was reviewed under pre-AEDPA standards by the federal court.  Mr. Livingston was unable to demonstrate the existence of a viable defense that was not developed because of government misconduct or trial counsel's failure to prepare properly a first stage defense.  Trial counsel's affidavit documented his

2481

efforts and the basis for his decision, derived after a full investigation. *Livingston,* 107 F.3d at 305, n. 6; 306-307. Similarly, the attorney responsible for the second stage defense presentation provided an affidavit explaining the difficulties he encountered attempting to develop evidence of Mr. Livingston's peaceful behavior. While trial counsel's efforts may have been deficient, Mr. Livingston apparently offered no affidavits or other evidence tending to establish the existence of mitigation evidence trial counsel could have developed through the exercise of reasonable diligence. *Id.* at 307-308. It should be noted that the federal district court engaged in a cumulative error analysis to determine whether the totality of counsel's errors rendered the guilty or penalty phases of the State trial unreliable. *Id.* at 309.

In contrast, Mr. Vialva has provided this Court with detailed, sworn declaration establishing the factual bases for each of his claims. This evidence supports claims presented in Grounds I through VIII of Mr. Vialva's *§ 2255 Motion*. All of the claims are predicated on violations of Mr. Vialva's Constitutional rights, as detailed with supporting legal authorities in the individual grounds. Unlike Mr. Livingston, Mr, Vialva has substantiated his claims with facts and legal authorities. Respondent has offered no countervailing facts, nor has it assailed the veracity of the evidence Mr. Vialva has presented.

Mr. Vialva has established he was denied his Constitutional right to effective assistance of counsel, caused through the deficient performance of unqualified counsel, one of whom was operating under a conflict of interest throughout the trial, appointed in derogation of controlling statutory procedures. Mr. Vialva has established Respondent violated its affirmative obligation pursuant *Brady v. Maryland,* depriving him of a fair trial and compounding the prejudice resulting from the deficient representation of trial counsel. All of these Constitutional errors, individually and certainly collectively, undermine any confidence in the result of the guilt and penalty stages of Mr.

71

Vialva's trial. Mr. Vialva has established prejudice by demonstrating the existence of viable evidence for the defense. If the jury would have been presented with the evidence Mr. Vialva has developed, there is a reasonable probability the outcome of the proceedings would have been different. Relief from the Constitutionally infirm convictions and sentences of death is warranted. has, that a violation of a bedrock Constitutional protection in a capital case results in no prejudice when the accused is ultimately convicted and sentenced to death is without support in the Supreme Court's jurisprudence. Moreover, as discussed previously, procedural default is a doctrine applied to ensure the orderly consideration of issues. It is not a mechanism to defeat the otherwise properly invoked jurisdiction of a federal court to consider an issue of Constitutional significance.

This issue warrants full consideration of the merits by this Court. The error committed by Respondent in the initiation and prosecution of this case undermines confidence in the outcome of the proceedings. In light of the clear Constitutional error, enforcement of the death sentences would be a fundamental miscarriage of justice. Relief in the form of a new trial is warranted.

## GROUND X

**THE FEDERAL DEATH PENALTY IS UNCONSTITUTIONAL AS APPLIED IN VIOLATION OF THE EIGHTH AND FIFTH AMENDMENTS AND EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION SINCE IT HAS BEEN PURSUED AND IMPOSED DISPROPORTIONATELY AGAINST PEOPLE OF COLOR.**

### A.    Procedural Posture of this Claim

Mr. Vialva acknowledged his trial counsel failed to present a challenge either to the death penalty authorization process or to the racial disparity in prosecution resulting from the process. Respondent raised procedural default as a defense to this issue and claimed Mr. Vialva is unable to establish cause or prejudice excusing his default. *Response* at 198. Respondent raised a similar defense to a selective prosecution claim presented in *Hall v. United States*, No. Civ.A 4:00-CV-422-

72

Y, CRIM. 4:94-CR-121-Y, 2004 WL 1908242 (N.D. Tex., Aug. 24, 2004). The district court concluded Mr. Hall established cause and prejudice to overcome any procedural bar on this issue. The district court noted the selective prosecution claim "is based on statistics that were not available at the time of his [Hall's] trial or appeal." *Id.* 2004 WL 1980242 at *4. The same reasoning applies in this case.

As Kevin McNally averred in his Declaration, the information on which his analysis is based is drawn from statistics complied by the Federal Death Penalty Resource Project and reports from the Department of Justice. The first two Department of Justice Reports used by Mr. McNally were published in September 2000 and June 2001. Exhibit X-A at ¶5. Thus, Mr. Vialva's trial preceded the first Department of Justice report by several months. The unavailability of statistics to support a claim based, at least for a *prima facie* demonstration of selective prosecution, on race constitutes cause. Since it is undisputed Mr. Vialva is an American of African-Caribbean descent, he is within the group of persons whose prosecution was tainted by race selective criteria. Prejudice to Mr. Vialva's Fifth Amendment, Eighth Amendment, and Equal Protection rights is demonstrated by these facts, sufficient to overcome the procedural default claimed by Respondent. This issue is properly before the Court.

### B.    Facts Supporting Claim of Disparate Impact

The information submitted in support of this claim was derived from information released to the public by the Department of Justice. Respondent does not dispute the accuracy or veracity of the information detailed in the Declaration of Kevin McNally. Respondent did not supplement the record with any additional information that might enable this Court to resolve the issue on the merits without further factual development.

73

2484

## C.    Argument and Authorities

Counsel are aware this issue has been considered previously in several courts, through pretrial challenges to the charging process and on appeal. *United States v. Jones,* 287 F.3d 325 (5th Cir.), *cert. denied* 537 U.S. 1018 (2002) (appeal from denial of post conviction relief); *United States v. Webster,* 392 F.3d 787 (5th Cir., 2004) (appeal from denial of post conviction relief); *Hall v. United States, supra,* (district court decision denying post conviction relief); *United States v. Williams,* No. S100CR.1008(NRB), 2004 WL 2980027 (S.D. N.Y., Dec. 22, 2004) (order ruling on pretrial motions); *United States v. Bass,* 266 F.3d 532 (6th Cir., 2001), *rev'd United States v. Bass,* 536 U.S. 862 (2002) (*per curiam*) (pretrial ruling dismissing death penalty based on racial discrimination affirmed by Circuit, reversed and remanded by Supreme Court); *United States v. Edelin,* 134 F. Supp.2d 59 (D.D.C., 2001) (pretrial motion to preclude imposition of death penalty). These cases illustrate the difficulty in proving a claim of disparate racial impact in the enforcement of the federal death penalty. All of the referenced cases discuss, in varying detail, the statistical information provided by the Department of Justice and the conclusions that might be supported from those statistics. In each instance, the defendant's claims were found deficient because, despite the undisputed numerical disparities, no conclusive proof of racial animus prompting the disparity was manifest. But, the United States Department of Justice has never been required to provide its criteria or its protocols for judicial scrutiny.

Counsel believe the Department of Justice's policies, protocols, and criteria must be disclosed to permit full evaluation of this claim. A separate motion requesting discovery of the Department's criteria and protocols, and requesting an evidentiary hearing will be filed coincident with this *Reply*.

2485

## GROUND XI

### THE LETHAL INJECTION OF MR. VIALVA UNDER THE PROTOCOLS CURRENTLY IN FORCE BY THE BUREAU OF PRISONS AND ANY SIMILAR PROTOCOLS VIOLATES THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT

#### A.    Ground XI Has Not Been Procedurally Defaulted

Finally, Respondent asserted Mr. Vialva procedurally defaulted his claim that the federal protocol for lethal injection violates the Eighth Amendment by raising this claim for the first time in his *§ 2255 Motion. Response* at 204-05. Respondent is wrong for a number of reasons.

First, the factual bases for the claim were not available at the time of direct appeal, so direct appeal counsel could not have raised the claim. Mr. Vialva was sentenced June 12, 2000. His direct appeal was filed May 30, 2001. These events occurred before a reasonable person, or reasonable attorney, could have known the Federal Bureau of Prisons's lethal injection protocol posed an unnecessary risk of harm.

The first indication the Bureau of Prisons had adopted an execution protocol that entailed an unnecessary risk of harm occurred on June 11, 2001, when the Bureau carried out its first execution by lethal injection. *See* http://www.bop.gov. Moreover, it was not until the American Veterinary Medicine Association [hereinafter, AVMA] promulgated its report on euthanasia March 1, 2001, that any reasonable person could have become aware that any prison was using a suite of chemicals in its execution protocol that created an unnecessary risk of harm. *See § 2255 Motion*, Exhibit XI-I, AVMA Report on Euthanasia at 680-81 (prohibiting use of any paralytic agent in conjunction with potassium chloride without a protocol to verify the subject has reached a surgical plane of anesthesia before potassium chloride administration); *see also* Affidavit of Mark Heath (March 24, 2004) (commenting that, without the benefit of expert medical advice, it would not be possible for a person

75

who was not medically trained to understand the risks of lethal injection protocols), *attached hereto* as Exhibit XI-L.

Given the time frame in which the factual bases for Mr. Vialva's claim against lethal injection were developed, prior counsel could not have known there was a problem with the federal lethal injection protocol, or ascertained the facts necessary to frame a challenge to that protocol. Therefore, procedural default standard cited by Respondent is simply inapplicable to this claim.

Even if direct appeal counsel would have been able to appreciate the problems with lethal injection, the facts supporting the instant challenge required extra record fact development. For example, before making a claim the Bureau of Prisons's protocol violated the Eighth Amendment, it was imperative to acquire and review the federal lethal injection protocol. The protocol was not in the trial record of this case and could not have been included as the factual basis on for an issue on direct appeal. *See United States v. Rosario*, 234 F.3d 347, 352 (7th Cir. 2000) (claims requiring extra record fact development should be brought in the first instance in a 2255 motion). Clearly, direct appeal counsel could not have raised this issue on direct appeal.

Finally, even if procedural default is considered by the Court, Mr. Vialva can easily meet the cause and prejudice standard for excusing such default. *United States v. Frady*, 456 U.S. 152, 167-69 (1982) ("cause" element of cause and prejudice standard met by showing that omission of issue on direct appeal not fairly attributable to petitioner); *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (Cause turns on whether the prisoner can show some objective factor external to the defense that impeded counsel's efforts to comply with the state's procedural rule.). Mr. Vialva cannot be held accountable for failure to present a claim the facts of which could not have been developed at the time of direct appeal. Moreover, it is axiomatic that execution by a cruel and unusual process clearly causes Mr. Vialva prejudice and there is a reasonable probability the outcome of his trial would have

76

248

been different in the penalty phase if the death penalty had been struck entirely, or if evidence of its cruelty been presented. *Strickler v. Greene*, 527 U.S. 263, 289 (1999) (Prejudice is established if there is a "reasonable probability that the result of the trial would have been different."). Mr. Vialva meets the standard for cause and prejudice, even if procedural default is considered applicable to this issue. *Id.*

**B.      It Is Appropriate, Indeed Necessary, to Present this Claim in a 2255 Motion.**

Although Respondent did not expressly address this issue, implicit in its *Response* is the contention Mr. Vialva's lethal injection claim should not be presented through a post conviction proceeding. In *Nelson v. Campbell*, 541 U.S. 637, __, 124 S. Ct. 2117, 2123 (2004), the Supreme Court left open the possibility that a "method of execution claim" which results in the invalidation of the sentence of death may not be brought in a 42 U.S.C. § 1983 lawsuit. Recently, the Fifth Circuit affirmed the dismissal of a Section 1983 challenge to the Texas method of lethal injection, concluding dismissal was proper because the claim "will effectively prevent the state from carrying out [the Defendant's] execution." *Aldrich v. Johnson*, 388 F.3d 159, 161 (5th Cir. 2004). Mr. Vialva is entitled to a procedural process to raise this valid claim that the protocols and methods currently employed by the Bureau unnecessarily risk conscious suffering and constitute cruel and unusual punishment.

2488



**C.**    **Lethal Injection Protocol Dictates Outcome and the Risk of Harm in the Federal Bureau Of Prisons's Protocol Is Foreseeable and Unnecessary**

> ***1)***    ***The Bureau Of Prisons Will Carry Out Mr. Vialva's Execution Using Its Protocol, Not the Protocol of the State of Texas***

Respondent expressed the belief the Bureau of Prisons intends to execute Mr. Vialva using the protocols employed in the State of Texas. *Response* at 207. Respondent's argument shows how completely it misunderstood the issues in Ground XI.

The Bureau of Prisons is required to carry out executions using the same method as the State in which the crime occurred. *See* 18 U.S.C. § 3596 (the execution shall be carried out "in the manner prescribed by the law of the State in which the sentence is imposed"). The laws of Texas require an execution to be performed "by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death." TEX. CRIM. PROC. CODE ANN. art. 43.14. The statute does not require a specific protocol. Thus, the Bureau of Prisons was authorized to adopt its own protocol for carrying out executions and has done so. Regardless of any extant finding that a particular State's methodology passes constitutional muster, the Bureau's protocol must be evaluated independently for its Constitutionality. The cases Respondent cited in which the protocols of some States have been found Constitutionally adequate are simply inapposite to controvert the contentions presented by Mr. Vialva. Mr. Vialva maintains the Bureau of Prisons uses a protocol that unnecessarily risks harm.

> ***2)***    ***The Bureau of Prisons's Protocol Creates An Unnecessary Risk of Harm.***

Indisputably, protocol affects the Constitutionality of lethal injection. *See Nelson v. Campbell*, 124 S. Ct. at 2123-25 (accepting that a State's adoption of a protocol for achieving venous

78

2488

access for lethal injection can violate the Eighth Amendment); *Harris v. Johnson*, 323 F. Supp. 2d 797, 809 (S.D. Tex. 2004) (facts presented support a finding that "the protocol for lethal injection in Texas violates evolving standards of decency that guide the Eighth Amendment analysis"), *rev'd on other grounds sub nom, Harris v. Johnson*, 366 F.3d 414 (5th Cir. 2004) (concluding that Plaintiff had not met standard for delay in bringing claim and stay of execution). Lethal injection is a complicated medical process. Like any operation, to be humane, lethal injection must be carried out with qualified personnel, proper drug dosages administered by a method and in a sequence guaranteed to assure that the drugs function as intended. The choices made by the Federal Bureau of Prisons regarding these and other details of the execution process determine whether the process will be humane or whether they violate evolving standards of decency.[7]

Contrary to Respondent's contention that the "risk of accident . . . need not be eliminated from the execution process," the Eighth Amendment commands obviation of unnecessary risks of harm. *Compare* Resp. at 207, *with Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) ("Among 'unnecessary and wanton' inflictions of pain are those that are totally without penological justification."). The unnecessary risks of harm in the Bureau's protocol can and should be removed from the process.

Moreover, it is not merely "speculative," as Respondent claims, that harm will result from the Bureau of Prisons's protocol. *Response* at 206. The Bureau of Prisons has selected a suite of

---

[7] The Federal Bureau of Prisons has executed comparatively few people. However, the States have executed many people and, in so doing, have experienced an inordinate degree of "protocol" problems. *See, e.g.*, http://www.deathpenaltyinfo.org/article.php?scid=8&did=478 (describing a host of protocol-related issues including detached intravenous (IV) lines, kinks in IV lines, clogged IV lines, etc.). It is indeed frightening to think that, if these represent the observable flaws in lethal injection, what other problems might be occurring when the inmate is paralyzed and unable to signal distress.

2490

chemicals, one of which is absolutely prohibited in the euthanization of animals unless a qualified person ascertains the subject has reached a surgical plane of anesthesia. No one fulfills that step in the Bureau's protocol. The failure to observe this simple, yet critical, step in the process creates an unacceptably high risk of conscious suffering for an inmate sentenced to death.[8] There are other unnecessary risks of harm in the Bureau of Prisons's protocol. It is unnecessary for the Bureau to use unqualified personnel to insert and maintain intravenous catheters. It is likewise for the Bureau to use *food coloring* in the intravenous lines.

Indeed, the absence of any factual rebuttal by Respondent to any of the claims Mr. Vialva has raised regarding protocol is telling. *Cf. Harris*, 323 F. Supp. 2d at 809 ("Other than calling Mr. Harris' claims speculative and specious, and other than referring to two grossly irrelevant cases, Defendants offer no argument against the merits of Plaintiff's claim."). It is now uncontested by Respondent that the Federal Bureau of Prisons uses a procedure an expert anesthesiologist has

---

[8]The veterinary prohibition against using pancuronium bromide or other similar paralytic agent has been recognized by jurists as a measure of the evolving standard of decency that is the touchstone of the Eighth Amendment jurisprudence.

> [T]here is a national trend recognizing that the use of pancuronium bromide is inhumane in the euthanasia of animals.

> Especially poignant is our own legislature's action in banning the chemical. Clearly, the State of Texas has acted to eliminate the cruel and inhumane euthanasia of animals by limiting the procedures and chemicals that can be used to euthanize. It stands to reason that what is cruel and inhumane for use in animals is also cruel and inhumane for use in human beings. Therefore, a national trend that recognizes that pancuronium bromide is inhumane for use in animals can also be said to be a national trend that recognizes that pancuronium bromide is inhumane for use in human beings.

*Ex Parte Hopkins*, __ S.W.2d __, 2004 WL 307579, at * 1 (Tex. Crim. App. Feb. 12, 2004) (Price, J., dissenting from denial of stay of execution) (footnotes omitted); *see also Harris*, 323 F. Supp. 2d at 809.

determined creates an unnecessary risk of harm. In the absence of any factual or legal rebuttal, Mr. Vialva is due relief on this claim and an order directing the Federal Bureau of Prisons to conduct executions in a manner that complies with the Constitution, or not at all.

## CONCLUSION

Post conviction review safeguards the integrity of the judicial process by providing an effective mechanism through which jurisdictional, statutory, and other Constitutional errors may be identified and redressed. This case is example of the importance of post conviction review. Christopher Vialva did not receive Constitutionally adequate representation. As a result, the prosecution's cases for guilt and for death were submitted to the jury without substantial challenge. Through this post conviction process, Mr. Vialva has demonstrated, through evidence and case law, that a defense at both stages was indeed possible. Moreover, the nature and quantity of the evidence presented by Mr. Vialva establishes there is a reasonable probability that if the jury would have been presented with the complete defense, a different result would have been reached in the guilt and penalty stages.

The test is whether there can be any confidence in the outcome of this capital case, in light of the errors and omissions now evident. Respondent has presented no countervailing evidence to rebut, refute, or diminish the evidence presented by Mr. Vialva. Mr. Vialva's unchallenged evidence should be admitted as true and accorded full persuasive weight. Relief can and should be granted on the record as presented. If this Court finds there is a dispute concerning a material fact, this matter should be set for an evidentiary hearing.

Counsel for Mr. Vialva are well aware of the seriousness of this case. Counsel are equally aware of the importance of protecting the integrity of the judicial process in a case of this magnitude, to ensure the Constitutional rights of the accused. The errors in this case are many and all implicate

2492

Constitutional concerns. This Court is empowered to grant relief from these Constitutional errors. A new trial of both the guilt and sentencing stages is warranted based, individually and cumulatively, on the errors raised in Grounds I, II, III, IV, VIII, and IX. At a minimum, a new trial of the sentencing stage is warranted based, individually and cumulatively, on the errors presented in Grounds V, VI, VII, X, and XI. Counsel incorporate by reference the prayer for relief submitted in Mr. Vialva's *§ 2255 Motion.* Counsel for Mr. Vialva request this relief on his behalf, and any other relief that may be warranted under the law and the facts of this case.

Respectfully submitted,

SUSAN M. OTTO
Oklahoma Bar No. 6818
Federal Public Defender
Western District of Oklahoma

LISA S. MCCALMONT
Texas Bar No. 24007629; Oklahoma Bar No. 17096
Assistant Federal Public Defender
Death Penalty Federal Habeas Corpus Division
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73112
Telephone: 405-609-5930
Facsimilie: 405-609-5932

COUNSEL FOR DEFENDANT/MOVANT
CHRISTOPHER ANDRE VIALVA

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of February, 2005, a true and correct copy of the foregoing Reply was mailed postage prepaid to:

Mark Stelmach
Assistant United States Attorney
816 Congress Avenue, Suite 1000
Austin, Texas 78701
Counsel for Respondent

Rob Owen
Law Offices of Owen & Rountree, L.L.P.
P.O. Box 40428
Austin, Texas 78704

Robert Gombiner
Assistant Federal Public Defender
1111 Third Avenue   Suite 1100
Seattle, Washington 98101

Counsel for Brandon Bernard

SUSAN M. OTTO

83

2494

## AFFIDAVIT OF MARK J. S. HEATH M.D.

STATE OF Florida )
                                                    )          SS.
COUNTY Palm Beach )

Mark J. S. Heath, a person of lawful age, deposes and states as follows

1. My name is Mark J. S. Heath, M.D., I am an Assistant Professor of Clinical Anesthesiology in the Department of Anesthesiology at Columbia University in New York City, N.Y. I received my Medical Doctorate degree from the University of North Carolina at Chapel Hill in 1986 and completed residency and fellowship training in Anesthesiology in 1992 at Columbia University Medical Center. I am Board Certified in Anesthesiology, and am licensed to practice Medicine in New York State. My work consists of approximately equal parts of performing clinical anesthesiology, teaching residents, fellows and medical students, and managing a neuroscience laboratory. As a result of my training and research I am familiar and proficient with the use and pharmacology of the chemicals used to perform lethal injection.

2. Over the past several years, as a result of concerns about the mechanics of lethal injection as practiced in the United States, I have performed several hundred hours of research into the techniques that are used during this procedure. I have been admitted as an expert medical witness in courts in Georgia, Tennessee, Pennsylvania, and Louisiana. I have filed affidavits that have been reviewed by courts in the above states and also Virginia, New York, Oklahoma, Alabama, Texas, California, North Carolina, South Carolina, and by the United States Supreme Court. During court proceedings I have heard testimony from prison wardens who are responsible for conducting executions by lethal injection. I have testified before the Nebraska Senate Judiciary Committee regarding proposed legislation to adopt lethal injection. My research regarding lethal injection has involved both extensive conversations with recognized experts in the field and personal correspondence with the individuals responsible for introducing lethal injection as a method of execution in Oklahoma and the United States.

3. My qualifications are further detailed in my curriculum vitae, a copy of which is attached hereto as Exhibit A and incorporated by reference as if fully rewritten herein.

4. In my professional opinion, a lay person who reads the 2000 AMVA Report on Euthanasia of Animals would not understand the significance of that report to the lethal injection of human beings. Understanding the risks associated with the drug protocols (and the prohibition in the AVMA report on paralytic agents used in combination with drugs intended to induce unconsciousness) requires evaluation by a trained medical expert, such as an anesthesiologist or veterinarian. Understanding the risks of the drug protocols when combined with the manner of intravenous drug delivery likewise requires medical expertise. It is notable that this report has been available to physicians and

Exhibit XI-L

2495

wardens within departments of corrections across the United States, and yet the protocols for lethal injection have not been brought into compliance with the AVMA Report.

5.  Information has only recently become available regarding the ineffectiveness of the lethal injection process in delivering the drugs intended to induce unconsciousness to the condemned inmate.  As an example, in February of 2004 I received autopsy reports of inmates executed by lethal injection in North Carolina.  The blood pentothal levels were highly variable, and in several cases were too low to be consistent with the successful administration of an anesthetic quantity of pentothal. This new information is critical because it supplies objective evidence to buttress the concerns about whether inmates undergoing lethal injection are unconscious.

6.  As another example, in March 2004 I received autopsy reports of inmates executed by lethal injection in South Carolina.  The blood pentothal levels were highly variable, and in several cases were too low to be consistent with the successful administration of an anesthetic quantity of pentothal. This new information is critical because it supplies objective evidence to buttress the concerns about whether inmates undergoing lethal injection are unconscious.  Further, when combined with the autopsy data released by North Carolina it provides evidence that the problems with lethal injection are not restricted to one state, and indeed are likely to be widespread.

7.  Based on documents made available to me by Ms. McCalmont, including the affidavit of Warden Mike Mullin, Oklahoma has over the decade made substantive changes in the mechanical details of the protocol used for lethal injection.  The medical significance of these changes is evident to individuals with expertise in the use of anesthetic agents, but in my professional opinion would not be evident to individuals without such training, including many non-anesthesiologist physicians and including lay individuals.

8.  Based on my research into lethal injection, which includes a great number of conversations it is my firm belief that the majority of lay individuals are not aware of the problem of conscious paralysis.  I did not become aware of this problem until the third year of my medical training when I first cared for a patient who had been administered pancuronium.  Based on attending court proceedings on lethal injection and based on reviewing transcripts from hearings on lethal injection it is also clear to me that the majority of guards and wardens who participate in lethal injections are not aware of the problem of conscious paralysis.

2496

FURTHER AFFIANT SAYETH NOT.

_____
Mark J. S. Heath, M.D.

Subscribed and sworn to before me the 24th day of March 2004, by the person known to me to be Mark J. S. Heath.

_____
Notary Public

My commission expires: June 7, 2005

My commission number is : DD032235  .

Karey Warren
My Commission DD032235
Expires June 07 2005

Page 3 of 3

2497

## Curriculum Vitae

1) Date of preparation:  October 6, 2003

2) Name:  Mark J. S. Heath

   Birth date:  March 28, 1960
   Birthplace:  New York, NY
   Citizenship:  United States, United Kingdom

3) Academic Training:

   | | |
   |---|---|
   | Harvard University | B.A., Biology, 1983 |
   | University of North Carolina, Chapel Hill | M.D., 1987 |
   | Medical License | New York:  177101-1 |

4) Traineeship:

   1987 – 1988  Internship, Internal Medicine, George Washington University Hospital, Washington, DC.

   1988 – 1991  Residency, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

   1991 – 1993  Fellowship, Anesthesiology, Columbia College of Physicians and Surgeons, New York, NY

5) Board Qualification:

   Diplomate, American Board of Anesthesiology, October 1991.

6) Military Service:  None

7) Professional Organizations:

   American Society of Anesthesiologists
   International Anesthesia Research Society
   Society of Cardiovascular Anesthesiology

8) Academic Appointments:

   1993 – 2002  Assistant Professor of Anesthesiology, Columbia University, New York, NY

   2002 - present  Assistant Professor of Clinical Anesthesiology, Columbia University, New York, NY

9) Hospital/Clinical Appointments:

2498

1993 – present    Assistant Attending Anesthesiologist, Presbyterian Hospital, New York, NY.

10)    Honors:

Magna cum laude, Harvard University
Alpha Omega Alpha, University of North Carolina at Chapel Hill
First Prize, New York State Society of Anesthesiologists Resident Presentations, 1991

11)    Fellowship and Grant Support:

Foundation for Anesthesia Education and Research, Research Starter Grant Award, Principal Investigator, funding 7/92 - 7/93, $15,000.

Foundation for Anesthesia Education and Research Young Investigator Award, Principal Investigator, funding 7/93 - 7/96, $70,000.

NIH    KO8 "Inducible knockout of the NK1 receptor"
Principal Investigator, KO8 funding 12/98 - 11/02,
$431,947 over three years
(no-cost extension to continue through 11/30/2002)

NIH    RO1 "Tachykinin regulation of anxiety and stress responses"
Principal Investigator, funding 9/1/2002 – 8/30/2007
$1,287,000 over 5 years

12)    Departmental and University Committees:

Research Allocation Panel (1996 – 2001)
Institutional Review Board (Alternate Boards 1-2, full member Board 3)
(2003 - present)

13)    Teaching:

Lecturer and clinical teacher: Anesthesiology Residency Program, Columbia University and Presbyterian Hospital, New York, NY

Advanced Cardiac Life Support Training

Invited Lecturer:

*NK1 receptor functions in pain and neural development*, Cornell University December 1994

*Anxiety, stress, and the NK1 receptor*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

*Anesthetic Considerations of LVAD Implantation*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

2499

*NK1 receptor function in stress and anxiety,* St. John's University Department of Medicinal Chemistry, March 2002

*Making a brave mouse (and making a mouse brave),* Mt.Sinai School of Medicine, May 2002

*Anesthetic considerations of LVAD implantation.* Recurrent lecture at Columbia University LVAD implantation course.

14)    Grant Review Committees:    None

2500

15)    Publications:


**Original peer reviewed articles**

*    Santarelli, L., Gobbi, G., Debs, P.C., Sibille, E. L., Blier, P., Hen, R., **Heath, M.J.S.** (2001). Genetic and pharmacological disruption of neurokinin 1 receptor function decreases anxiety-related behaviors and increases serotonergic function. **Proc. Nat. Acad. Sci**., 98(4), 1912 – 1917.


*    King, T.E. [δ], **Heath M. J. S**[δ]., Debs, P, Davis, MB, Hen, R, Barr, G. (2000). The development of nociceptive responses in neurokinin-1 receptor knockout mice. Neuroreport.;11(3), 587-91    δ authors contributed equally to this work


*    **Heath, M. J. S.**, Lints, T., Lee, C. J., Dodd, J. (1995). Functional expression of the tachykinin $NK_1$ receptor by floor plate cells in the embryonic rat spinal cord and brainstem. **Journal of Physiology** 486.1, 139 -148.


*    **Heath, M. J. S.**, Womack M. D., MacDermott, A. B. (1994). Subsance P elevates intracellular calcium in both neurons and glial cells from the dorsal horn of the spinal cord. **Journal of Neurophysiology** 72(3), 1192 - 1197.


McGehee, D. S., **Heath, M. J. S.**, Gelber, S., DeVay, P., Role, L.W. (1995) Nicotine enhancement of fast excitatory synaptic transmission in the CNS by presynaptic receptors. **Science** 269, 1692 - 1696.


Morales D, Madigan J, Cullinane S, Chen J, **Heath, M. J. S.**, Oz M, Oliver JA, Landry DW. (1999). Reversal by vasopressin of intractable hypotension in the late phase of hemorrhagic shock. Circulation. Jul 20;100(3):226-9.


LoTurco, J. J., Owens, D. F., **Heath, M. J. S.**, Davis, M. B. E., Krigstein, A. R. (1995). GABA and glutamate depolarize cortical progenitor cells and inhibit DNA synthesis. **Neuron** 15, 1287 - 1298.


Kyrozis A., Goldstein P. A., **Heath, M. J. S.**, MacDermott, A. B. (1995). Calcium entry through a subpopulation of AMPA receptors desensitized neighboring NMDA receptors in rat dorsal horn neurons. **Journal of Physiology** 485.2, 373 - 381.


McGehee, D.S., Aldersberg, M. , Liu, K.-P., Hsuing, S., **Heath, M.J.S.** , Tamir, H. (1997). Mechanism of extracellular $Ca^{2+}$-receptor stimulated hormone release from sheep thyroid parafolicular cells. **Journal of Physiology**: 502,1, 31 - 44.


Kao, J., Houck, K., Fan, Y., Haehnel, I., Ligutti, S. K., Kayton, M. L., Grikscheit, T., Chabot, J., Nowygrod, R., Greenberg, S., Kuang, W.J., Leung, D. W., Hayward, J. R., Kisiel, W., **Heath, M. J. S.**, Brett, J., Stern, D. (1994). Characterization of a novel tumor-derived cytokine. **Journal of Biological Chemistry** 269, 25106 - 25119.


Dodd, J., Jahr, C.E., Hamilton, P.N., **Heath, M.J.S.**, Matthew, W.D., Jessell, T.M. (1983). Cytochemical and physiological properties of sensory and dorsal horn neurons that transmit cutaneous sensation. **Cold Spring Harbor Symposia of Quantitative Biology** 48, 685 -695.





Pinsky, D.J., Naka, Y., Liao, H., Oz, M. O., Wagner, D. D., Mayadas, T. N., Johnson, R. C., Hynes, R. O., **Heath, M.J.S.**, Lawson, C.A., Stern, D.M. Hypoxia-induced exocytosis of endothelial cell Weibel-Palade bodies. **Journal of Clinical Investigation** 97(2), 493 - 500.

**Case reports**                  none

**Review, chapters, editorials**

*         **Heath, M. J. S.**, Dickstein, M. L. (2000). Perioperative management of the left ventricular assist device recipient. Prog Cardiovasc Dis.;43(1):47-54.

*         Dickstein, M.L., Mets B, **Heath M.J.S.** (2000). Anesthetic considerations during left ventricular assist device implantation. Cardiac Assist Devices pp 63 – 74.

*         **Heath, M. J. S.** and Hen, R. (1995). Genetic insights into serotonin function. **Current Biology** 5.9, 997 -999.

*         **Heath, M.J.S.**, Mathews D. (1990). Care of the Organ Donor. **Anesthesiology Report** 3, 344-348.

*         **Heath, M. J. S.**, Basic physiology and pharmacology of the central synapse. (1998) **Anesthesiology Clinics of North America** 15(3), 473 - 485.

**Abstracts**

**Heath, M.J.S.**, Davis, M., Santarelli L., Hen H. (2002). Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus. IARS American-Japan Congress A-15.

**Heath, M.J.S.**, Davis, M., Santarelli L., Hen H. (2002). Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus. Anesthesiology 95:A-811.

**Heath, M.J.S.**, Davis, M., Santarelli L., Hen H. (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212

**Heath, M.J.S.**, Davis, M., Santarelli L., Hen H. (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212.

**Heath, M.J.S.**, Santarelli L, Hen H. (2001) The NK1 receptor is necessary for the stress-evoked expression of c-Fos in the paraventricular nucleus of the hypothalamus. Anesthesia and Analgesia 92; S233.

**Heath, M.J.S.**, Santarelli L, Debs P, Hen H. (2000). Reduced anxiety and stress responses in mice lacking the NK1 receptor. Anesthesiology 93: 3A A-755.

2502

**Heath, M.J.S.,** King, T., Debs, P.C., Davis M., Hen R., Barr G. (2000). NK1 receptor gene disruption alters the development of nociception. Anesthesia and Analgesia; 90; S315.

**Heath, M.J.S.,** Lee, J.H., Debs, P.C., Davis, M. (1997). Delineation of spinal cord glial subpopulations expressing the NK1 receptor. Anesthesiology; 87; 3A; A639.

**Heath, M.J.S.,** MacDermott A.B. (1992). Substance P elevates intracellular calcium in dorsal horn cells with neuronal and glial properties. Society for Neuroscience Abstracts; 18; 123.1.

**Heath, M.J.S.,** Lee C.J., Dodd J. (1994). Ontogeny of NK1 receptor-like immunoreactivity in the rat spinal cord. Society for Neuroscience Abstracts; 20; 115.16.

**Heath, M.J.S.,** Berman M.F. (1991) Isoflurane modulation of calcium channel currents in spinal cord dorsal horn neurons. Anesthesiology 75; 3A; A1037.

2503

2504