UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

UNITED STATES OF AMERICA,
    Plaintiff,

    v.

CHRISTOPHER ANDRE VIALVA,
    Defendant.

CAPITAL CASE
NO. W-99-CR-00070(1)-ADA
Execution Date: Sept 24, 2020

**GOVERNMENT'S RESPONSE TO MOTION TO ENJOIN
THE BUREAU OF PRISONS AND U.S. MARSHALS SERVICE
FROM EXECUTING DEFENDANT**

Defendant Christopher Vialva has filed a motion pursuant to 28 U.S.C. § 1651(a) (the All Writs Act) to enjoin the Bureau of Prisons ("BOP") and the U.S. Marshals Service from carrying out his execution on September 24, 2020. Vialva contends that (1) this Court stayed his execution in its judgment dated June 16, 2000, and has never lifted the stay; (2) the judgment does not allow the Attorney General to set his execution date; (3) the U.S. Marshals Service is not permitted to supervise his execution until this Court issues a warrant authorizing it to do so; and (4) BOP lacks authority to execute him because it has failed to follow pre-execution procedures required by Texas law. Each of Vialva's claims lacks merit, and he does not come close to satisfying the stringent standards for enjoining a scheduled execution. His motion for an injunction should be denied.

**BACKGROUND**

**I.    The Murders of Todd and Stacie Bagley**

In 1999, Vialva, Brandon Bernard, and three other members of a street gang in Killeen, Texas, carjacked and murdered Todd and Stacie Bagley. *United States v. Bernard*, 299 F.3d 467, 471–73 (5th Cir. 2002). Vialva and fellow gang members initially developed a plan to abduct and rob a motorist at gunpoint, lock the victim in the trunk of his car, use the victim's bank card to

make ATM withdrawals, and then abandon the vehicle (with the victim still locked in the trunk) in a remote area. *Id.* at 471.

Vialva and his accomplices drove around town searching for a suitable victim, and eventually chose Todd and Stacie Bagley, youth ministers visiting Killeen from Iowa. 299 F.3d at 471-72. While Todd used a pay phone and his wife, Stacie, waited in their car, the group approached Todd and asked for a ride. *Id.* at 472. Todd agreed, and Vialva and two of his accomplices got into the back seat of the Bagleys' car. *Id.* After giving Todd directions, Vialva pulled a handgun on Todd and stated that "the plans have changed." *Id.* The trio then robbed the Bagleys, forced the Bagleys into the trunk of their car, and drove around in the car for several hours attempting to empty the Bagleys' bank accounts from multiple ATMs and pawn Stacie's wedding ring. *Id.*

While locked in the trunk, the Bagleys spoke to Vialva's accomplices through the car's rear panel, discussing their faith and explaining that God's blessings were available to anyone. 299 F.3d at 472. Later, after one accomplice told Vialva that he no longer wanted to go through with the crime, Vialva "insisted on killing the Bagleys and burning their car to eliminate the witnesses" and any incriminating fingerprints. *Id.* Vialva drove to his home, where he retrieved a ski mask and clothing. *Id.* Meanwhile, the Bagleys pleaded with Vialva's accomplices for their lives. *Id.*

When Bernard and another gang member rejoined the group, "Vialva repeated that he had to kill the Bagleys because they had seen his face." 299 F.3d at 472. Bernard purchased lighter fluid, *id.*, and Vialva, Bernard, and two other gang members then drove the Bagleys' car (with the Bagleys still in the trunk) and Bernard's car to a remote location on the Fort Hood military installation. 299 F.3d at 472–73. Bernard helped pour lighter fluid in the Bagleys' car, while the Bagleys sang and prayed in the trunk. *Id.* at 472. Stacie said, "Jesus loves you" and "Jesus, take

care of us." *Id.* Vialva replied, "Shut the fuck up, bitch, I'm about to open the trunk and I don't want to hear that shit." ECF No. 312 at 225. He then put on his mask, ordered the trunk opened, and shot the Bagleys. *Id.* at 472–73. Vialva shot Todd in the head at close range, killing him instantly. But his shot to the side of Stacie's face merely knocked her unconscious. *Id.* Bernard then set fire to the car, killing Stacie, who died of smoke inhalation. *Id.* at 473.

The gang's escape was foiled when Bernard's car slid off the road into a muddy ditch 50 yards away from the Bagley's burning car. People responding to the fire saw the gang members hastily throwing items into a wooded area beside the road; law enforcement officers would later find the murder weapon, the second gun, cans of lighter fluid, and other evidence in that area. ECF No. 314 at 209–12; ECF No. 312 at 49, 76–88; ECF No. 311 at 41, 60–62, 89–92. The four men were arrested after first responders discovered the Bagleys' charred bodies in the car's trunk. 299 F.3d at 473.

## II.     Trial and Direct Appeal

A jury found Vialva guilty on three capital counts: carjacking resulting in death, in violation of 18 U.S.C. § 2119; conspiracy to murder the Bagleys, in violation of 18 U.S.C. §§ 1111, 1117; and murdering the Bagleys within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111. *See* 299 F.3d at 474. Following a capital sentencing hearing, the jury unanimously and beyond a reasonable doubt found several statutory and non-statutory aggravating factors for each count, and further determined that the aggravating circumstances outweighed any mitigating factors. *Id.* The jury unanimously recommended that Vialva be sentenced to death, and the district court imposed that sentence pursuant to the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3591 *et seq.* 299 F.3d at 474.  As relevant here, the district court's judgment of conviction and sentence stated:

3

> … As to [the capital counts], the defendant is hereby committed to the custody of the U.S. Bureau of Prisons until exhaustion of the procedures for appeal of the judgment of conviction and review of the sentences. Upon exhaustion of appeals, the sentence of DEATH will be implemented by the defendant being released from the custody of the U.S. Bureau of Prisons to the custody of the United States Marshals, who shall supervise the execution of the defendant in the manner prescribed by the laws of Texas.
>
> The time, place and manner of execution are to be determined by the Attorney General, provided the time shall not be sooner than 61 days nor later than 90 days after the date of this judgment. If an appeal is taken from this conviction and sentence, execution of the sentence shall be stayed pending further order of this Court upon receipt of the mandate of the Court of Appeals.

ECF No. 289 at 2.

The Fifth Circuit affirmed "the judgment[] of the district court" on direct appeal. 299 F.3d at 489. The court of appeals subsequently denied rehearing *en banc* and issued its mandate on October 23, 2002. ECF No. 342. The Supreme Court denied certiorari. *Vialva v. United States*, 539 U.S. 928 (2003).

## III.   Post-Conviction Proceedings

In 2004, Vialva moved under 28 U.S.C. § 2255 to vacate his death sentence. ECF No. 372. This Court denied his § 2255 motion and denied his request for a certificate of appealability ("COA"). ECF No. 449. The Fifth Circuit likewise denied a COA, *United States v. Bernard*, 762 F.3d 467, 483 (5th Cir. 2014), and the Supreme Court denied certiorari, *Vialva v. United States*, 136 S. Ct. 1155 (2016).

In 2017, Vialva filed a motion under Federal Rule of Civil Procedure 60(b)(6), seeking relief from the district court's judgment denying his § 2255 motion. ECF No. 553. He claimed that Judge Smith, who had presided over the trial and denied Vialva's § 2255 motion, was unfit to preside over the § 2255 proceedings. This Court (Judge Yeakel) dismissed Vialva's Rule 60(b)(6) motion for lack of jurisdiction as an uncertified successive § 2255 motion, and denied a COA. ECF No.

570. The Fifth Circuit denied a COA, *United States v. Vialva*, 904 F.3d 356, 358 (5th Cir. 2018), and the Supreme Court denied certiorari, *Vialva v. United States*, 140 S. Ct. 860 (2020).

### IV.    Setting of Execution Date

On July 31, 2020, BOP—at the direction of the Attorney General—scheduled Vialva's execution for September 24, 2020. ECF No. 673; *see* 28 C.F.R. § 26.3(a) (providing that, "[e]xcept to the extent a court orders otherwise, a sentence of death shall be executed . . . [o]n a date and at a time designated by the Director of the Federal Bureau of Prisons, which date shall be no sooner than 60 days from the entry of the judgment of death"). On the same day, the Warden of USP Terre Haute (where Vialva is confined) delivered a letter to Vialva—and sent a copy to his attorney— providing "official notification" under 28 C.F.R. § 26.3(a) of the date "for the implementation of [Vialva's] death sentence." ECF No. 675, Exh. 1.

## LEGAL FRAMEWORK

"An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). In order to qualify for injunctive relief, a party "must establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006). In the capital context, a defendant who challenges the methods or procedures for carrying out a death sentence, but not the sentence itself, must show that use of existing methods or procedures rather than proffered alternatives will cause him irreparable injury; the mere existence of his death sentence is not enough. *See Hill v. McDonough*, 547 U.S. 573, 580-81 (2006); *Wood v. Collier*, 836 F.3d 534, 542 (5th Cir. 2016). In assessing the public interest and the potential harms of

enjoining an execution, a court must take into account "'the State's strong interest in enforcing its criminal judgments without undue interference'" from courts—particularly where a capital defendant brings a claim shortly before his sentence is due to be carried out. *Murphy v. Collier*, 919 F.3d 913, 915 (5th Cir. 2019) (per curiam) (quoting *Hill*, 547 U.S. at 584) (addressing similar standards for granting a stay of execution).

## ARGUMENTS

This Court should deny Vialva's attempt to enjoin BOP and the U.S. Marshals Service from carrying out his death sentence. None of Vialva's claims has merit, nor has he shown that the balance of equities favors precluding the government from carrying out his lawful sentence.

*First*, although this Court's judgment provided for a stay of Vialva's death sentence while he appealed, that stay expired long ago. If the stay does technically remain in effect, the Court should lift it now.

*Second*, the language in the judgment authorizing the Attorney General to set an execution date between 61 and 90 days from the date of the judgment was meant to provide Vialva time to appeal and to ensure that his sentence would be carried out expeditiously in the unlikely event he decided not to challenge it. Nothing in the judgment suggests that those time limits also constrain the Attorney General's exercise of his discretion to set Vialva's execution date *after* all avenues for appeal and post-conviction review are exhausted. And even if the judgment were construed in that manner, an injunction would be unnecessary because this Court could fix any problem by issuing its own order ratifying the execution date BOP has already set.

*Third*, contrary to Vialva's argument, no statute, regulation, or court decision supports the proposition that federal law requires the issuance of a warrant of execution to empower the U.S. Marshals Service to supervise the implementation of a death sentence. And even if Vialva's claim

had merit, this Court should resolve it by issuing an order confirming that the Marshals may proceed with the execution, not by enjoining the execution.

*Fourth*, BOP is not required to follow Texas's procedures related to setting an execution date, issuing a warrant, and notifying the prisoner. As three courts of appeals have held, federal law requires (at most) that BOP follow state law on the manner of effectuating death, such as the choice of execution method. Neither the FDPA nor the Department of Justice regulations that govern death sentences require BOP to comply with a State's pre-execution procedural requirements.

Vialva cannot satisfy his heavy burden of showing that he is entitled to an injunction preventing his execution.  His motion should be denied.

## I.      No Stay of Execution is Presently in Effect.

This Court's June 16, 2000 judgment stated that, "[i]f an appeal is taken from [Vialva's] conviction and sentence, execution of the sentence shall be stayed pending further order of this Court upon receipt of the mandate of the Court of Appeals." ECF No. 289 at 2. The Fifth Circuit issued its mandate on October 23, 2002, affirming Vialva's convictions and death sentence. ECF No. 342. Vialva nonetheless argues that, because this Court never issued a "further order" expressly lifting the stay after the court of appeals issued its mandate, the judgment remains "currently stayed by its own terms" and the government is precluded from carrying out his execution. Motion at 3. That argument lacks merit.

First, Vialva's judgment also states that, "[u]pon exhaustion of appeals, the sentence of DEATH will be implemented by the defendant being released from the custody of the U.S. Bureau of Prisons to the custody of the United States Marshals, who shall supervise the execution of the defendant in the manner prescribed by the laws of Texas." ECF No. 289 at 2. That language clearly

7

directs BOP and the Marshals to carry out Vialva's execution once his appeals are exhausted. The Court's additional reference to a "stay[ ] pending further order of this Court," when read in that context, should not be interpreted to require an express order lifting the stay once the events that justified the stay have passed.

Second, since the court of appeals issued its mandate, this Court has issued several orders that are incompatible with the continuation of a stay, including (1) the denial of Vialva's § 2255 motion, ECF No. 449; (2) the denial of Vialva's motion to reconsider and amend that judgment, ECF No. 473; (3) the dismissal of Vialva's motion for relief under Rule 60(b)(6), ECF No. 570; and (4) the denial of COAs to review those orders. A defendant is not entitled to a stay of execution "as a matter of right," *Murphy*, 919 F.3d at 915 (quotation marks omitted), and must instead justify a stay by, *inter alia*, "ma[king] a strong showing that he is likely to succeed on the merits." *Nken v. Holder*, 556 U.S. 418, 434 (2009); *see Murphy*, 919 F.3d at 915. This Court's orders rejecting all of Vialva's challenges to his convictions and death sentence after the court of appeals issued its mandate affirming the Court's judgment on direct appeal demonstrate beyond any doubt that this Court did not consider the requirements for a continuing stay to be satisfied.

Even if a stay technically remains in effect 20 years after the judgment, however, it would not warrant the extraordinary relief of enjoining Vialva's execution. As explained, Vialva long ago completed the appeal contemplated in the judgment, and this Court and the Fifth Circuit have repeatedly determined that Vialva's further challenges to his convictions and sentence lack merit. He is therefore no longer entitled to a stay. Accordingly, if this Court determines that a stay is still in effect, the government requests that it be lifted.

**II.    The Court's Statement Authorizing the Attorney General to Set an Execution Date 61 to 90 Days After the Date of the Judgment Does Not Preclude the Attorney General from Scheduling Vialva's Execution for September 24, 2020.**

This Court's judgment provides that "[t]he time, place and manner of execution are to be determined by the Attorney General provided the time shall not be sooner than 61 days nor later than 90 days after the date of this judgment." ECF No. 289, at 2. Vialva maintains that, because "it is well past 90 days from June 16, 2000, this delegation of authority to the Attorney General in the judgment is long expired," and that the judgment therefore provides no authority for the Attorney General or BOP to set his execution date.  Motion at 3.

That argument lacks merit. The 61-to-90-day provision is an artifact from model sentencing language used under 21 U.S.C. § 848, which was repealed in 2006. *See* Admin. Office of U.S. Courts, *The Presentence Investigation Report (Publication 107)*, Appx. F at 12 (revised Mar. 2006), available at https://www.scribd.com/document/67389653/Publication-107; 7A Fed. Proc. Forms § 20:978. As the commentary to the model language explains, "[t]he 61-day delay [was] intended to allow for an appeal to be filed," whereas "[t]he 90-day maximum period [was] suggested to provide a reasonable period within which the sentence can be carried out." *Publication 107*, Appx. F at 12 n.23. It would not be possible to "carr[y] out" the sentence within 90 days if the defendant appealed, however, and thus the model language provided for a stay of the "execution of the judgment" "[i]f an appeal is taken from the conviction and sentence." *Id.* at 12. As explained, the same stay language appears in Vialva's judgment, directly after the 61-to-90-day provision. ECF No. 289 at 2.  The judgment further provides that BOP should retain custody of Vialva "until exhaustion of the procedures for appeal of the judgment of conviction and review of the sentences," and that "[u]pon exhaustion of appeals, the sentence of DEATH will be implemented" by BOP and the Marshals. *Id.*

When read in context, therefore, the 61-to-90-day provision in Vialva's judgment addresses only the Attorney General's authority to set an execution date *before* an appeal is filed: the 61-day threshold provided sufficient time for Vialva to appeal, while the 90-day limit ensured that his sentence would be carried out expeditiously in the unlikely event Vialva decided not to challenge it. But there is no indication that those limits were meant to apply *after* Vialva appealed. Rather, as the judgment recognizes, an appeal would freeze Vialva's death sentence, and BOP's authority to schedule and proceed with the execution would thereafter be constrained by the statutory requirement of "exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence," 18 U.S.C. § 3596(a), not by Court-imposed time limits linked to the date of the judgment. That interpretation comports with the Executive Branch's longstanding authority to set dates of execution pursuant to its constitutional obligation to "take care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *cf. United States v. Tipton*, 90 F.3d 861, 902-03 (4th Cir. 1996) (concluding that "absent directly preempting congressional action, the Attorney General had constitutional and statutory authority to provide by regulation the means for executing death sentences" imposed under former 21 U.S.C. § 848). It also makes sense. Indeed, the illogic of Vialva's position—under which the Attorney General would be forced to set an execution date within 90 days of the judgment even if an appeal made it impossible to carry out an execution on that date, or else forever forfeit his ability to set an execution date at all—strongly suggests that it is not what the Court intended.

But even if this Court believed that the judgment inflexibly precludes the Attorney General from scheduling Vialva's execution more than 90 days after the date of judgment, it would not warrant an injunction. By its terms, the 61-to-90-day provision applies only to the Attorney General. ECF No. 289 at 2. Although the Executive Branch's authority to implement a court's

judgment imposing the death penalty by setting the execution date is not dependent on a separate authorization by the Judiciary, nothing would prevent this Court from issuing an order ratifying the date BOP has already selected. Vialva argues that the Court has the power to set an execution date, Motion at 6-8, and thus cannot complain if this Court were to adopt the existing date. Such an order, although not necessary, would also be consistent with historical practice. *See, e.g.*, *Holden v. Minnesota*, 137 U.S. 483, 495-96 (1890) (holding that Constitution permits either the executive or judiciary to set a date of execution). Accordingly, if this Court were to conclude that Vialva's claim has merit, it could remedy the situation by ratifying BOP's decision to schedule his execution for September 24, 2020, rather than enjoining it. *See, e.g. United States v. Lee*, 2020 WL 3921174, at *5 (E.D. Ark. July 10, 2020) (entering similar order "confirm[ing] . . . that DOJ had and has the authority to implement Mr. Lee's death sentence on July 13, 2020").

**III.    Federal Law Does Not Require A Formal Warrant Directing the U.S. Marshal to Supervise an Execution.**

Vialva contends that that the U.S. Marshals Service cannot lawfully supervise his execution because this Court has never issued "a warrant to empower and direct" the Marshals to do so. Motion at 4. No such warrant is required. The statutes and regulations governing the conduct of federal executions themselves direct the Marshals to supervise executions. *See, e.g.*, 18 U.S.C. § 3596(a) ("[W]hen the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence."); 28 C.F.R. § 26.3(a)(4) (directing that a death sentence shall be executed "[b]y a United States Marshal designated by the Director of the United States Marshals Service, assisted by additional personnel selected by the Marshal and the Warden of the designated institution and acting at the direction of the Marshal"). Vialva identifies no statute, regulation, or

11

judicial decision that would require a court to issue an additional order authorizing the Marshals to perform the functions already assigned to them by law.

Vialva's contrary argument principally relies on an 1818 opinion of the Attorney General, which addressed the question of whether President Monroe could issue a warrant "fix[ing] the day for the execution" in a case involving "mail-robbers" tried in Maryland. 1 Op. Atty. Gen. 228 (1818). The Attorney General observed that there was "no uniform rule to guide the conduct of the President in this respect," which "can be prescribed by Congress only." *Id.* The Attorney General further observed that, although federal courts had generally followed "the practice of the State courts in which they hold their sessions" in deciding whether to set an execution date by court order, "there is no law—that is, no positive act of Congress—which gives to the courts of the United States the express power of fixing the day." *Id.* In the absence of any congressional action, the Attorney General determined that the President had inherent power to issue warrants setting the date of an execution "in all cases where they are made necessary by the practice of the State in which the sentence is passed." *Id.*

Setting aside whether current federal law requires compliance with state warrant procedures (which is addressed in the next section), nothing in the Attorney General's opinion suggests that the Marshals may not proceed with an execution unless a court specifically orders them to do so. The opinion addresses whether the President may issue a "warrant" setting an execution date, not whether any additional "warrant" is necessary to authorize the U.S. Marshals to carry out a lawful death sentence. And the Attorney General concluded that, in the absence of congressional action to the contrary, it was the President—not the courts—that should issue a "warrant" setting the date. As Vialva recognizes, even two hundred years later, "Congress has remained silent on this specific question." Motion at 6. Accordingly, even if a warrant were

necessary in addition to the governing statutory and regulatory provisions, BOP's determination (as directed by the Attorney General) that Vialva should be executed on September 24, 2020— memorialized in a formal letter served on Vialva and his counsel, ECF No. 675, Exh. 1—would satisfy that requirement. *See* 28 U.S.C. § 566(c) (authorizing Marshals to "execute all lawful writs, process, and orders issued under the authority of the United States"); *see also United States v. Mitchell*, --- F.3d ---, 2020 WL 4815961, at *2 (9th Cir. Aug. 19, 2020) (observing that warden's letter to federal prisoner informing him of execution date functions as an "Execution Warrant" that provides "'official notification'" of the government's intent to carry out his death sentence).

Equally unavailing is Vialva's reliance on language from 28 C.F.R. § 26.2(b), which requires the government to append to its proposed judgment and order a "Return by which the designated United States Marshal may inform the court that the sentence of death has been executed." That regulation allows (but does not require) the Marshal to inform the sentencing court that its judgment had been carried out *after* the execution. It does not indicate that the issuance of a judicial warrant is a condition precedent to the implementation of the death sentence.

In any event, this Court *has* directed the Marshals to supervise the execution. As explained, Vialva's judgment specifically states that, "[u]pon exhaustion of appeals, the sentence of DEATH will be implemented by the defendant being released from the custody of the U.S. Bureau of Prisons to the custody of the United States Marshals, *who shall supervise the execution of the defendant in the manner prescribed by the laws of Texas*." ECF No. 289 at 2 (emphasis added); *cf.* 28 U.S.C. § 566(a) (requiring Marshals to "obey, execute, and enforce all orders of the United States District Courts"). To the extent this Court believes that further judicial authorization is necessary, it could simply issue an order confirming that the Marshals are indeed permitted to do

13

what the governing judgment, statute, and regulation already require them to do. The Court should not, however, enjoin the execution.

## IV.    Federal Law Does Not Require BOP To Comply With Texas's Pre-Execution Procedures.

Finally, Vialva claims he is entitled to an injunction because the FDPA requires that the "implementation of [a death] sentence" be "in the manner prescribed by the law of the State in which the sentence is imposed," 18 U.S.C. § 3596(a), and BOP's pre-execution procedures do not track Texas's pre-execution procedures. Specifically, Vialva focuses on Texas's requirements that a court set the execution date at least 91 days in advance, Tex. Code Crim. P. art. 43.141(a), (c); that, within ten days of issuing the order setting the date of execution, the court also "issue a warrant under the seal of the court for the execution of the sentence of death" that includes information about the offense and "command[s] the director [of the relevant prison] to proceed" with the execution, *id.* art. 43.15(a); and that copies of the warrant and the execution-date order be served on defense counsel, *id.* art. 43.141(b-1) & 43.15(b). Vialva's claim lacks merit for two independent reasons.

First, the government's longstanding reading of the FDPA is that § 3596(a)'s directive to implement a federal death sentence in the "manner prescribed by" state law requires only that BOP follow the State's "top-line choice among execution methods, such as the choice to use lethal injection instead of hanging or electrocution," not additional procedural details of the kind Vialva invokes. *In re Federal BOP Execution Protocol Cases*, 955 F.3d 106, 112 (D.C. Cir. 2020) (per curiam), *cert. denied*, 2020 WL 3492763 (S. Ct. June 29, 2020); *see, e.g.*, Gov't Br. in Opp. at 14-24, *Bourgeois v. Barr*, No. 19-1348 (U.S. June 19, 2020). That interpretation of the FDPA is articulated persuasively by Judge Katsas in his concurring opinion in the D.C. Circuit's recent FDPA litigation, *see Protocol Cases*, 955 F.3d at 114-21, and was strongly suggested by the three

14

Supreme Court Justices who addressed the issue in an earlier phase of that litigation, *see Barr v. Roane*, 140 S. Ct. 353, 353 (2019) (statement of Alito, J.).

The government's interpretation of § 3596(a) is consistent with the history of federal death penalty statutes. Section 3596(a)'s "manner" requirement is derived from the original federal execution statute—the Crimes Act of 1790—which for more than 140 years unambiguously used "manner" to refer to a general method of execution ("hanging"). *See Protocol Cases*, 955 F.3d at 115 (Katsas, J., concurring); *see also Roane*, 140 S. Ct. at 353 (statement of Alito, J.) (analyzing "the use of the term 'manner' in prior federal death penalty statutes"). In 1937, Congress amended the statute, replacing "hanging" with "the manner prescribed by the laws of the State within which the sentence is imposed." Pub. L. No. 75-156, 50 Stat. 304. As the Supreme Court has explained, "if a word is obviously transplanted from another legal source," it presumably "brings the old soil with it." *Hall v. Hall,* 138 S. Ct. 1118, 1128 (2018) (citation omitted). That is what the 1937 Act did, retaining the meaning of "manner" in the federal execution context as a reference to "the local mode of execution"—*e.g.*, "death by hanging," electrocution, or lethal injection. *Andres v. United States*, 333 U.S. 740, 745 n.6 (1948).

In 1994, Congress "carried forward the relevant language and" substance of the 1937 Act in the FDPA. *Protocol Cases*, 955 F.3d at 117 (Katsas, J., concurring); *accord id.* at 148 (Tatel, J., dissenting) ("By using virtually identical language in FDPA section 3596(a), Congress signaled its intent to continue the same system" as the 1937 Act). The FDPA therefore requires what the 1937 Act required: compliance with "the local mode of execution," such as lethal injection, but not all procedural details of state law. *Andres*, 333 U.S. at 745 & n.6. Because BOP conducts federal executions using lethal injection, 28 C.F.R. § 26.3(a)(4)—the same top-line method of

15

execution as Texas, *see Wood*, 836 F.3d at 536—the federal government has fully complied with the FDPA provision that Vialva invokes, and it need not follow additional state procedures.

Second, even if the Court were not inclined to resolve that issue, Vialva's claim would still fail because—as every court of appeals to have interpreted the FDPA has held—"Section 3596(a) cannot be reasonably read to incorporate every aspect of the forum state's law regarding execution procedure." *Peterson v. Barr*, 965 F.3d 549, 554 (7th Cir. 2020), *stay denied*, 2020 WL 3964236 (S. Ct. July 14, 2020); *see Mitchell*, 2020 WL 4815961, at *2-*3 & n.6; *Protocol Cases*, 955 F.3d at 112; *see also Roane*, 140 S. Ct. at 353 (statement of Alito, J.). Instead, those courts have held that the "manner" of "implementation" of a death sentence under § 3596(a) "addresses, at most, state laws that set forth procedures for giving practical effect to a sentence of death," such as "choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements." *Mitchell*, 2020 WL 4815961, at *2. Pre-execution procedures, including state statutes governing "notice of an execution date," "fall outside the scope of 18 U.S.C. § 3596(a) because they are not pertinent to effectuating death." *Id.* at *3 n.6; *see Peterson*, 965 F.3d at 554 (holding that § 3596(a) addresses "how the sentence is carried out," not procedures that govern other aspects of the execution process such as the number and identity of witnesses). Even Judge Tatel, who would have held in favor of the inmates on some aspects of their FDPA claim in the D.C. Circuit litigation, agreed that § 3596(a) requires the federal government to follow only "those procedures that effectuate the death, including choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements." *Protocol Cases*, 955 F.3d at 151 (Tatel, J., dissenting).  There is no reason for this Court to depart from that sound judicial consensus.

Not only would Vialva's contrary approach be a poor fit with the statutory text and widespread precedent, it would threaten to undermine the basic purpose of the FDPA by making

16

it "impossible to carry out executions of prisoners sentenced in some States." *Roane*, 140 S. Ct. at 353 (statement of Alito, J.). Adherence to Texas's warrant requirement, for example, would require BOP to obtain "a warrant under the seal of" a Texas state "court for the execution of the sentence of death," Tex. Code Crim. P. art. 43.15(a), but it is unclear how Texas courts would have authority to issue such a warrant given that the state judicial system plays no role in a federal prosecution for a federal crime. Requiring federal authorities to comply with such procedural requirements could also, in some states, enable local obstruction of federal sentences. It is implausible that Congress meant to impose such obstacles, including potentially insurmountable obstacles, on the implementation of federal death sentences. Indeed, Vialva does not identify any federal execution that has been constrained in the way he suggests, including the three federal executions that occurred in July 2020 after the Supreme Court denied a petition for certiorari and stay application from inmates pressing an FDPA claim that is even less sweeping than the one Vialva asserts here. *See Bourgeois v. Barr*, 2020 WL 3492763 (S. Ct. June 29, 2020).

Accordingly, the fact that BOP's procedures do not precisely track Texas's law governing the pre-execution procedures for setting an execution date, issuing an execution warrant, and serving those documents on counsel does not mean that BOP has failed to "implement[]" Vialva's sentence "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). Vialva therefore is not entitled to injunctive relief.

## V.     The Balance of Harms Weighs Against Entry of an Injunction.

Finally, the balance of the equities weighs against issuing an injunction. In addition to Vialva's failure to establish success on the merits, he cannot demonstrate irreparable injury, that the balance of harms favors him, or that an injunction would comport with the public interest.

As explained, many of Vialva's complaints, even if meritorious, could be easily remedied by this Court without the need for an injunction. Vialva also has not identified any cognizable harm that would result from following BOP's procedures rather than Texas's. He does not dispute that the top-line manner of execution is the same under federal and state law. *See Barr v. Lee*, --- S. Ct. ---, 2020 WL 3964985, at \*1 (July 14, 2020) (explaining that federal execution protocol involves lethal injection using a single dose of pentobarbital); *Wood*, 836 F.3d at 536 (same in Texas). And he has already received most of the pre-execution procedures he says he wants: the government selected an execution date well in advance and served the equivalent of an execution warrant on Vialva and his counsel, and he identifies no reason why having a Texas court (or this Court) do those things would have made a difference.

The government also has an overwhelming interest in the timely enforcement of criminal sentences imposed by unanimous federal juries after fair trials that have been upheld through extensive appellate and post-conviction proceedings in federal courts. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019). Once post-conviction proceedings "have run their course," as they have here, "finality acquires an added moral dimension." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). Consequently, delay "inflict[s] a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the State and the victims of crime alike." *Id.* (quoting *Herrera v. Collins*, 506 U.S. 390, 421 (1993) (O'Connor, J., concurring)). Unduly delaying executions can also frustrate the death penalty by undermining its retributive and deterrent functions. *See Bucklew*, 139 S. Ct. at 1134; *id.* at 1144 (Breyer, J., dissenting).

The Government's interest in implementing Vialva's sentence is magnified by the "heinous" nature of his crimes. ECF No. 449 at 18. Vialva was the ringleader of the brutal murders of Todd and Stacie Bagley. After kidnapping them, robbing them, and driving around with them

locked in their own trunk for several hours as they pleaded for their lives, Vialva shot them both, killing Todd and then burning Stacie alive. His death sentence has been upheld throughout his many years of direct and post-conviction review. The balance of equities therefore tips strongly in the government's favor.

## CONCLUSION

For these reasons, the Court should deny Vialva's motion to enjoin.

Respectfully submitted,

JOHN F. BASH
United States Attorney

/s/ Mark Stelmach

By:   MARK STELMACH
Assistant United States Attorney
903 San Jacinto, Suite 334
Austin, TX  78701
(512) 916-5858

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of August, 2020, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System which will transmit notification of such filing to the following CM/ECF participant:

Susan N. Otto
Federal Public Defender

/s/ Mark Stelmach
By:   MARK STELMACH
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

UNITED STATES OF AMERICA,            §
                                     §        CAPITAL CASE
v.                                   §        NO. W-99-CR-00070(1)
                                     §        Execution Date: Sept. 24, 2020
CHRISTOPHER ANDRE VIALVA.            §

## ORDER

The Motion of Defendant Christopher Andre Vialva, requesting this Court enter an

order enjoining the Federal Bureau of Prisons and United States Marshals Service from

conducting his execution, is DENIED.

It is so ordered this _____ day of August, 2020.

_____
HONORABLE ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE